## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| ST. MARY CATHOLIC PARISH IN LITTLETON; ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD; LISA SHELEY; DANIEL SHELEY; and THE ARCHDIOCESE OF DENVER, <br><br> *Plaintiffs*, <br><br> v. <br><br> LISA ROY, in her official capacity as Executive Director of the Colorado Department of Early Childhood; and DAWN ODEAN, in her official capacity as Director of Colorado's Universal Preschool Program, <br><br> *Defendants*. | Case No. 1:23-cv-2079 <br><br> **FIRST AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## NATURE OF THE ACTION

1. St. Mary Catholic Parish in Littleton ("St. Mary's"), St. Bernadette Catholic Parish in Lakewood ("St. Bernadette's"), and the Archdiocese of Denver faithfully serve the educational mission of the Catholic Church by operating preschool programs to assist parents in the religious and educational upbringing of their children.

2. Parents who send their children to these preschools come from diverse backgrounds and varied economic circumstances, but all share the desire to have their children educated in a vibrant Catholic community.

3. These parents include Plaintiffs Daniel and Lisa Sheley, who currently have a four-year-old at St. Mary's preschool.

4. When Colorado announced it was creating a program to fund "universal" preschool education for prekindergarteners, St. Mary's preschool planned to participate.

5. To that end, St. Mary's preschool director reached out to the State seeking information about the program, contacted the preschool's local coordinating organization, and set up an online profile for the preschool.

6. Other Archdiocesan preschools, including St. Bernadette's, took similar steps.

7. Upon learning more about Colorado's UPK program, however, Plaintiffs discovered that the newly created Department of Early Childhood ("Department") had imposed requirements on participation in the UPK program that would categorically exclude all Archdiocese of Denver Catholic preschools because of the Catholic Church's sincere and long-held religious beliefs.

8. Specifically, the Department is purporting to require all preschool providers to accept any applicant without regard to a student or family's religion, sexual orientation, or gender identity, and to prohibit schools from "discriminat[ing] against any person" on the same bases.

9. These requirements directly conflict with St. Mary's, St. Bernadette's, and the Archdiocese's religious beliefs and their religious obligations as entities that carry out the Catholic Church's mission of Catholic education in northern Colorado.

10. In accordance with their Catholic beliefs, St. Mary's, St. Bernadette's, and the Archdiocese give priority to Catholic families seeking to ensure their children receive a Catholic education, thus prioritizing in admission not only Catholic families from their own parish congregation, but also Catholic families active in other local parishes and Catholic families who recently moved to the Denver area.

11. Following this religious belief would violate the Department's ban on religious "discrimination," though Plaintiffs do not believe adhering to these beliefs constitutes discrimination.

12. St. Mary's and St. Bernadette's—in accordance with the Archdiocese's guidance—also must ensure that those who teach in and administer their preschool programs uphold Catholic moral teachings in both word and deed.

13. In order to accomplish this goal, St. Mary's and St. Bernadette's each require their preschool staff to sign Archdiocese-approved employment contracts on an annual basis affirming their willingness to abide by and uphold Catholic teachings on (among other issues): life, marriage, and human sexuality.

14. Abiding by Catholic teaching on these issues would violate the Department's ban on sexual-orientation and gender-identity "discrimination," though Plaintiffs do not believe adhering to these beliefs constitutes discrimination.

15. As Catholic parishes seeking to foster vibrant Catholic communities, St. Mary's and St. Bernadette's also require parents who send children to their preschool to understand and accept "the community's worldview and convictions" regarding Catholic moral issues like life, marriage, and human sexuality.

16. This is in accordance with the Archdiocese's teaching that Catholic schools must take into consideration whether a family's actions and beliefs could create "intractable conflicts" for Catholic schools' ability to form children in, live out, and consistently witness to what they believe is true based on the Catholic faith.

17. Indeed, the Archdiocese instructs all Catholic schools, including St. Mary's and St. Bernadette's, to consider whether a family or child seeking placement in their schools has identified as LGBTQ, is in a same-sex relationship, or has adopted a gender identity different from his or her biological sex.

18. Yet taking sexual orientation and gender identity into account in this way would violate the Department's ban on sexual-orientation and gender-identity "discrimination."

19. For all the above reasons, neither St. Mary's, St. Bernadette's, nor any other preschool within the Archdiocese of Denver is able to sign the Department's mandatory UPK Program Service Agreement.

20. The Archdiocese's preschools were part of a coalition of religious preschool providers that asked the State to recognize religious exemptions and alerted the Department to the problems its implementation of the UPK program had created for religious schools.

21. The Department, however, made clear it would not grant Plaintiffs a religious accommodation that would allow them to participate in the UPK program.

22. For Plaintiffs Daniel and Lisa Sheley, this means that by choosing to send their children to St. Mary's preschool, they are losing out on 15 hours per week of state-funded preschool services that they could receive at a secular private preschool.

23. The Archdiocese's 36 preschools provide high quality, Catholic educational environments for over 1,500 preschoolers each year.

24. Many families who send their children to Archdiocesan schools are of limited means. Twenty percent of the families who send their children to Archdiocesan schools qualify for Colorado's free and reduced-price school meals program.

25. By creating a program that provides "universal" funding for preschool programs, Colorado has cornered the market for preschool services.

26. Any providers who do not participate in the UPK program will be severely disadvantaged since they will be forced to charge significantly higher prices than the participating programs—both secular and religious—which aren't religiously barred from participating in the UPK program.

27. This is especially true when it comes to serving the twenty percent of families who send their kids to Archdiocesan schools and who receive free or reduced-price lunches.

28. At St. Mary's, for example, several families with children who would be enrolling as four-year-olds for preschool either pulled out of the preschool or did not enroll because of the UPK program's offer of free preschool services at other non-Catholic providers.

29. At St. Bernadette's, where 85% of children are on free or reduced lunch plans based on family income, the school's inability to participate in the UPK program has made affording preschool a challenge for current parents and, on information and belief, has deterred prospective parents from applying.

30. Colorado did not have to create a universal preschool funding program, but in doing so it cannot implement that program in a way that excludes certain religious groups and providers based on their sincerely held religious beliefs.

## THE PARTIES

31. Plaintiff St. Mary Catholic Parish in Littleton ("St. Mary's") is a Colorado corporation sole. St. Mary Catholic Preschool is a ministry of St. Mary's.

32. Plaintiff St. Bernadette Catholic Parish in Lakewood ("St. Bernadette's") is a Colorado corporation sole. Wellspring Catholic Academy of St. Bernadette is a ministry of St. Bernadette's.

33. Plaintiffs Daniel and Lisa Sheley are parishioners at St. Mary Catholic Parish in Littleton and send their four-year-old to St. Mary's preschool. Plaintiffs also have a two-year-old and (almost) one-year-old who will attend St. Mary's preschool.

34. Plaintiff The Archdiocese of Denver is a Colorado corporation sole. The Archbishop of Denver is the person vested with title pursuant to Colo. Rev. Stat. § 7-52-

101. The Archbishop of Denver is responsible under Catholic canon law for the oversight and ultimate control over all Catholic parishes within the Archdiocese, including those parishes' preschool ministries.

35. Defendant Dr. Lisa Roy is the Executive Director of the Colorado Department of Early Childhood. Defendant Roy is authorized to implement and promulgate rules to execute Title 26.5 of Colorado's Revised Statutes, including the UPK program. Colo. Rev. Stat. § 26.5-1-105. She is sued in her official capacity only.

36. Defendant Dawn Odean is the Department's Universal Preschool Program Director and responsible for implementing and coordinating the UPK program. She is sued in her official capacity only.

37. Defendants Roy and Odean administer Colorado's UPK program.

## JURISDICTION AND VENUE

38. This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

39. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

40. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

41. This Court can award costs and attorneys' fees under 42 U.S.C. § 1988(b).

42. Venue lies in this district under 28 U.S.C. § 1391(b)(1) because all Defendants reside in the District of Colorado.

43. Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the District of Colorado.

## FACTUAL ALLEGATIONS

***St. Mary Catholic Parish***

44. Plaintiff St. Mary Catholic Parish in Littleton is a Colorado corporation sole in the Roman Catholic Archdiocese of Denver and subject to the authority of the Archbishop of Denver. St. Mary's was founded in 1951 in Littleton, Colorado and is dedicated to the Blessed Virgin Mary. St. Mary's has operated a preschool program as a ministry of the Parish since 2006.

45. St. Mary's operates one of the largest Catholic schools in the Archdiocese of Denver, serving approximately 470 students.

46. Twenty five percent of the families who attend St. Mary's preschool receive discounts or scholarships.

47. St. Mary's preschool is also an inclusive preschool, meaning that it is able to provide preschool services to a limited number of students with disabilities, including students with Down syndrome or autism.

48. The UPK program—by not allowing St. Mary's to individually interview families before enrollment—prevents St. Mary's from assessing the needs of individual families who seek to send their children with disabilities to St. Mary's preschool and determine on a case-by-case basis whether the school has the resources available to meet those needs.

49. This uncertainty has made it harder for St. Mary's to provide services to children with disabilities.

50. St. Mary's preschool is an integral component of St. Mary's religious education ministry. Eighty percent of children who attend St. Mary's preschool continue on to kindergarten at St. Mary's.

51. For many families, choosing a preschool is not about choosing where one child will attend school: five families at St. Mary's have two students in preschool currently and forty-one families have other children also enrolled at St. Mary's school.

52. Twenty percent of families who have children in St. Mary's preschool have four or more children. Without universal preschool funding, many of these families will be unable to send their younger children to St. Mary's preschool.

53. For the 2022-23 school year, St. Mary's preschool enrolled 64 four-year-old children; this year, they have only 52.

54. Numerous families have inquired about St. Mary's participation in the UPK program and told St. Mary's that they are not enrolling their child at the preschool because the school is not participating in the UPK program.

55. Upon information and belief, there are numerous other families who have made the same decision but have not informed St. Mary's.

56. By losing out on universal preschool funding, St. Mary's is unable to complete with schools that participate in the program because they lack the financial resources to attract and retain teachers for their program.

57. St. Mary's preschool curriculum follows the standards and objectives set by both the Archdiocese of Denver and Colorado Department of Education, and uses the "Catechesis of the Good Shepherd curriculum to guide our teaching of the Catholic faith," which is "steeped in the Holy Scripture together with tradition."[1]

58. "Focused on Students and Centered in Christ," St. Mary's "strives to produce engaged Catholics, lifelong learners, responsible community members and effective

---

[1] *Academic Excellence Preschool*, St. Mary Catholic School, https://perma.cc/3PDJ-EXU5.

communicators."[2] Its mission is to "educate the heart, mind, body, and soul of the student and to develop the potential in each, giving glory to God."[3]

59. At St. Mary's, students develop "a *sacramental vision* to perceive God in all" and a "*moral imagination* to see themselves as the saints, heroes and geniuses they are called to be."[4]

60. St. Mary's preschool gives priority to applicants in the following order: (1) siblings of current students, (2) parishioners of St. Mary's, (3) members of other Catholic parishes within the Archdiocese of Denver, (4) Catholics transferring into the Denver metro area whose children attend or previously attended Catholic schools within the last calendar year, and (5) Catholics unaffiliated with a parish or non-Catholics.

61. St. Mary's requires all administrators, teachers, and staff to agree to a Statement of Community Beliefs when signing annual contracts for at-will employment. *See* Ex. A. The Statement explains that "it is important for all members of our community to . . . be committed to our community's worldview and beliefs." *Id.* at 1.

62. The Statement further explains that all "Catholic School employees must be men and women who are 'outstanding in correct doctrine and integrity of life,' and who desire to grow in their love for Jesus Christ and his Church, joyfully giving witness to the truth of the Gospel." Ex. A at 6.

63. Even non-Catholic employees "must understand [that] the moral and ethical standards are for all employees and must respect our Catholic worldview, giving a joyful model of good character and maturity, and carrying out their duties in support

---

[2]  *Welcome*, St. Mary Catholic School, https://perma.cc/B4MR-SJXU.

[3]  *Why St. Mary?*, St. Mary Catholic School, https://perma.cc/S8HZ-WGLZ.

[4]  *Welcome*, St Mary Catholic School.

of the school's Catholic mission. They 'have the obligation to recognize and respect the Catholic character of the school from the moment of their employment.'" *Id*.

64. For teachers in particular, the Statement further explains that they must create and protect, among other things, "[a]n environment that addresses issues of race, gender, poverty, and inequality in a manner that is consistent with Church teaching and avoids the influence of secular, critical philosophies and theories that contradict Church teaching." *Id*. at 4.

65. All teachers must also be committed to the Church's worldview regarding "Catholic teachings on sexual identity, marriage, family, and parenting," as well as "the sanctity of life from the moment of conception to natural death, and the givenness of our sexuality, in all its aspects as male and female created in God's image and likeness[.]" *Id*. at 3.

66. Those teachers must therefore "must refrain from public promotion or approval of any conduct or lifestyle that would discredit, disgrace, or bring scandal to the Parish, the School, and the Church in the Archdiocese of Denver, or be considered in contradiction with Catholic doctrine or morals." *Id*. at 4.

67. St. Mary's and St. Bernadette's are subject to the authority of the Archdiocese of Denver. Their policies and activities must therefore follow the Archdiocese's teachings on all matters of faith.

68. The Archdiocese of Denver has promulgated "Guidance for Issues Concerning the Human Person and Sexual Identity" ("Guidance"). Ex. B. In this document, the Archdiocese has explained that "Catholic schools in particular need to implement policies that are consonant with Christian anthropology's view of the person. Schools should avoid validating or affirming the premises of gender ideology, even indirectly, by silence or inaction." *Id*. at 4.

69. This means Catholic schools are not to "recognize or facilitate a 'gender transition,' or grant any accommodation that recognizes or suggests a change in sexual identity." *Id.* at 2. Children "should never be granted access to the restroom or changing facilities of the opposite sex." *Id.* It is "impermissible" for students to wear the opposite sex's uniform or insist on the use of a preferred pronoun. *Id.*

70. The Archdiocese's guidance also states that while "children born to cohabiting couples must always be treated with respect," "Catholic schools cannot recognize cohabitation as equivalent to marriage." *Id.*

71. The Archdiocese has also explained that enrolling children whose parents or legal guardians are in a same-sex relationship "is likely to lead to intractable conflicts" because a "*Catholic school cannot treat a same-sex couple as a family equivalent to the natural family without compromising its mission and Catholic identity*[.]" *Id.* at 15.

72. Similarly, because Catholic schools cannot affirm LGBTQ identities and relationships, the Archdiocese advises Catholic schools to have all teachers sign employment agreements annually "acknowledging the expectation that they will uphold Catholic moral teachings in word and deed." *See id.* at 16.

73. Both St. Mary's and St. Bernadette's require their employees to sign these agreements annually.

74. One way St. Mary's preschool ensures families share its vision is by having in-person meetings with all prospective families before enrolling them in its preschool program. This is necessary to ensure that the school and the family are a good match, and that families understand St. Mary's Catholic beliefs and expectations.

*St. Bernadette Catholic Parish*

75. Plaintiff St. Bernadette Catholic Parish in Lakewood is a Colorado corporation sole in the Roman Catholic Archdiocese of Denver and subject to the authority of the Archbishop of Denver.

76. St. Bernadette's was founded in 1947 in Lakewood, Colorado and is dedicated to St. Bernadette of Soubirous. St. Bernadette's first opened a parish school in 1953.

77. Today's St. Bernadette's parish school is called Wellspring Catholic Academy ("Wellspring").

78. Wellspring offers a Catholic, Colorado Shines 4-Start rated preschool program beginning at age 3.

79. Wellspring's mission is to offer "our students, families, and community a Catholic education that Invites all to Dig Deep, to uncover our precious gifts within a loving encounter with God, the 'source and author of life' (Acts 3:15)."

80. Wellspring teachers and staff "strive to form young people who go forth from us to share Christ with the world because they know Him and are becoming like Him." Ex. G at 7.

81. Wellspring's Archdiocesan-approved curriculum integrates faith into all aspects of the educational environment, providing students with the foundation in faith that helps them grow into faithful Catholics.

82. In 2023, families that attended Wellspring received over $250,000 in scholarships.

83. Eighty-five percent of children attending Wellspring's preschool receive free or reduced-price lunches, three families are under the poverty line, and half of the students are ESL (English as a Second Language) learners.

84. Were Wellspring's preschool to have a waiting list, it would prioritize applicants in the following order: (1) siblings of current students, (2) parishioners of St. Bernadette, (3) members of other Catholic parishes within the Archdiocese of Denver, (4) Catholics transferring into the Denver metro area whose children attend or previously attended Catholic schools within the last calendar year, and (5) Catholics unaffiliated with a parish or non-Catholics.

85. Wellspring "accepts students who meet age and ability requirements, and who are shown through their family's application to be a good fit for [the] school – academically, socially, behaviorally, and spiritually. If accepted, in order to be fully admitted to Wellspring, the parent/guardian and students must agree to the school's philosophy and agree to abide by the educational policies and regulations of the school and Archdiocese." Ex. G at 11.

86. As a Catholic Parish and school within the Archdiocese of Denver, St. Bernadette's and Wellspring are subject to the religious guidance of the Archdiocese.

87. Wellspring requires all administrators, teachers, and staff to agree to the Archdiocese's Statement of Community Beliefs when signing annual contracts for at-will employment. *See* Ex. A.

88. Wellspring also requires all parents to confirm their agreement with the Archdiocese's Code of Conduct, which the school incorporates into its handbook. Ex. G at 57.

### *Daniel and Lisa Sheley*

89. Daniel and Lisa Sheley have six children, ages 14, 11, 8, 4, 2, and almost 1 year old.

90. The Sheleys have sent all of their school-age children to St. Mary's Catholic school because they believe the school provides excellent intellectual, moral, and spiritual formation for our children. They also believe that they are commanded by their Catholic faith to educate their children in the Catholic faith.

91. The Sheleys' four-year-old is currently in preschool. If St. Mary's preschool participated in Colorado's Universal Preschool Program, Daniel and Lisa would receive 15 hours per week of free preschool education for their four-year-old, saving (as calculated by the State) $5,926.69 over the course of the 2022-23 school year. Because St. Mary's is ineligible for the Program, they Sheleys are not receiving that benefit and have to pay the full cost out of pocket.

92. The Sheleys plan to send their two-year-old and (almost) one-year-old to St. Mary's preschool. If St. Mary's preschool participated in Colorado's Universal Preschool Program, they would receive 15 hours per week of free preschool education for each of these children when they are enrolled in prekindergarten. Because St. Mary's is ineligible for the Program, they will not receive that benefit and instead will have to pay the full cost out of pocket.

93. Saving roughly $6,000 per child for their three youngest children would go a long way to help Daniel and Lisa support their family.

### *The Archdiocese of Denver*

94. The first Catholic church in Denver was founded in 1860 by Bishop Joseph Machebeuf and would later become St. Mary's Cathedral.

95. Today, the Archdiocese of Denver is the spiritual home to roughly 610,000 Catholics across 149 parishes, stations, and mission parishes in northern Colorado.

96. The Archdiocese is led by Archbishop Samuel Aquila.

97. All Catholic parishes and Catholic schools located in the Archdiocese's territory are under the care and direction of the Archdiocese.

98. All Catholic schools which provide a religious education must follow Archdiocesan guidance and policies, especially on all matters of faith and morals.

99. The Archdiocese oversees, guides, and supports 36 preschools serving roughly 1,500 preschoolers.

100. The Archdiocese, in part through its Office of Catholic Schools, speaks for and advances the interests of all of the Archdiocese of Denver's Catholic schools and preschools.

101. One of the primary purposes of the Archdiocese's Office of Catholic Schools is to provide guidance and support to Catholic schools throughout the Archdiocese.

102. When Colorado rolled out its UPK program, the Archdiocese reviewed and assessed whether Archdiocesan preschools could participate in the program consistent with their religious beliefs and obligations. Ultimately, the Archdiocese determined that the UPK program's "quality standards" provision failed to provide the necessary religious exemptions for Catholic schools to ensure they could both participate in the UPK program and act in accord with their sincere religious beliefs.

103. Accordingly, the Archdiocese instructed all of its Catholic parishes and Catholic preschools not to sign the UPK program Agreement as written. Ex. H.

104. All Catholic preschools that provide a religious education within the Archdiocese of Denver are therefore precluded from participating in the UPK program on account of their shared religious beliefs, and in particular their shared inability to sign the Agreement due to the lack of a religious exemption from its non-discrimination provisions.

### *Colorado's New Universal Preschool Program*

105. Enacted in 2022, the Colorado Universal Preschool Program Act (the "Act"), Colo. Rev. Stat. §§ 26.5-4-201 *et seq.*, establishes a system of state funding for preschool services.

106. The Act's stated purpose is to "provide adequate funding for both a high-quality universal preschool program and additional preschool programming for children in low-income families." *Id.* § 26.5-4-202(3)(b).

107. In passing the Act, the legislature explained that "Colorado voters in rural, urban, and suburban communities . . . demonstrated their strong commitment to expand[] access to quality preschool for children regardless of their economic circumstances," *id.* § 26.5-4-202(1)(a)(V), and that universal preschool "increases the ultimate social and economic benefits of high-quality preschool programming for the state as a whole," *id.* § 26.5-4-202(1)(a)(VI).

108. The Act requires the Department to operate Colorado's UPK program. *Id.* § 26.5-4-204(1).

109. The UPK program's primary purpose is "[t]o provide children in Colorado access to voluntary, high-quality, universal preschool services free of charge in the school year before a child enrolls in kindergarten." *Id.* § 26.5-4-204(1)(a).

110. Accordingly, the Department "shall annually establish the per-child rates for universal preschool services," and shall distribute funds to preschool providers "based on the actual numbers and types of eligible children enrolled" in each participating preschool. *Id.* § 26.5-4-208(1)(a), (3)(a). These funds can be used "only to pay the costs of providing preschool services directly to eligible children enrolled by the preschool provider." *Id.* § 26.5-4-208(5).

111. Funding under the UPK program is therefore allocated "based on parent choice."[5]

112. Children eligible to participate in the UPK program can receive 15 hours per week of publicly funded preschool services for the 2023-24 school year. *See* 8 Colo. Code Regs. § 1404-1:4.104(C).

113. The Act also directs the Department to use "local coordinating organizations" to recruit "as broad a range [of UPK program providers] as possible." Colo. Rev. Stat. § 26.5-4-204(2).

114. Preschools seeking to participate in the UPK program must be licensed to provide preschool services in Colorado, must meet quality standards established by the Department, and must sign a Program Service Agreement ("Agreement").

115. A true and accurate copy of the UPK Colorado Program Service Agreement and its Terms & Conditions are attached as Exhibit C.

116. When a provider preschool submits a signed Agreement, its name then appears online in the Department's "Family Search and Application" portal, allowing families to apply to use UPK program funds at that preschool.

117. For the 2023-24 school year, St. Mary's preschool would receive $5,926.69 per child attending half-days (15 hours per week) and $10,544.48 per child attending full days (30 hours per week). Ex. D at 21.

118. For the 2023-24 school year, St. Bernadette's preschool would receive $5,890.53 per child attending half-days (15 hours per week) and $10,513.26 per child attending full days (30 hours per week). Ex. D at 22.

---

[5]  H.B. 22-1295, 74th Gen. Assemb., Reg Sess., Bill Summary (Colo. 2023), https://perma.cc/X6NV-WVS4.

119. Any child in the year before they are eligible for kindergarten is eligible for 15 hours of free preschool education; children who meet additional eligibility criteria—including due to parental income, foster care/kin care placement, dual language needs, or who have an Individual Education Program can receive additional hours of free preschool education.

120. The first UPK program payment to preschool providers for the 2023-24 school year was on August 1, 2023, for students enrolled by July 9, 2023. The Department will continue to make monthly payments to participating providers based on the number of eligible students enrolled in the provider's preschool on the 15th of the prior month.[6]

### The UPK program's exclusionary provisions

121. In implementing the UPK program, the Department has imposed two provisions that exclude St. Mary's, St. Bernadette's, and all Archdiocesan preschools from participating in the UPK program.

122. This, in turn, prevents families like the Sheleys from receiving the State's generally available benefit of 15 hours per week of free preschool education for their children.

123. The Act also requires the Department to promulgate UPK program guidelines that "include . . . [a] requirement that each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family[.]" Colo. Rev. Stat. § 26.5-4-205(2)(b).

---

[6] *Universal Preschool Provider Information*, Colorado Department of Early Childhood, https://perma.cc/X3X6-KDB6.

124. The Department has not yet promulgated this requirement (the "Enrollment Mandate") by rule, but it has included it in its Agreement as a requirement preschool providers must adhere to immediately, and in advance of the promulgation of a rule. *See* Ex. C at 2.

125. The Department retains discretion to waive the Enrollment Mandate, which is part of the Act's quality standards: "If necessary to ensure the availability of a mixed delivery system within a community," the Department may "allow a preschool provider that does not meet the quality standards to participate" in UPK while that provider works toward satisfying the standards. *Id.* § 26.5-4-205(1)(b)(II).

126. In addition to the Enrollment Mandate, the Department has added a second nondiscrimination requirement (the "Catch-all Provision") to the terms and conditions of the Agreement participating preschool providers must sign.

127. The Catch-all Provision prohibits preschool providers from engaging in "discriminat[ion] against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." Ex. C at 23.

128. Regardless of these two exclusionary provisions, the Department in its discretion allows UPK program preschools to selectively admit or exclude applicants in at least seven different circumstances.

129. First, faith-based providers "may require families to be a part of [their] congregation." Ex. D at 37.

130. Second, "a co-op" may "require family participation as part of [their] programming." Ex. D at 37.

131. Third, preschools that are "immersive or dual-language provider[s]" may require applicants "to be screened." Ex. D at 37.

132. Fourth, school-district providers may require families to reside in the same "school district or boundary." Ex. D at 37.

133. Fifth, "a Head Start grantee and families" may need "to meet additional factors to enroll" with certain providers. Ex. D at 37.

134. Sixth, providers may prioritize their employees' children in placement decisions. Ex. D at 37.

135. Seventh, the Department takes into account siblings already enrolled with a provider when making matches.[7]

136. Regarding the first exception, the Department has explained that faith-based preschool providers may "reserve all or a portion of their seats for their *members*, and decline a match from a family that is not *part of the congregation*." Ex. F (emphasis added).

137. The Enrollment Mandate and Catch-all Provision, however, continue to bar preschool providers from declining a match because of a family's *religion*.

### Colorado's UPK program excludes St. Mary's, St. Bernadette's, and all Archdiocesan preschools on the basis of their religious beliefs.

138. According to Catholic teaching, "[t]he duty and right of educating belongs in a special way to the Church, to which has been divinely entrusted the mission of assisting persons so that they are able to reach the fullness of the Christian life." Code of Canon Law c.794 § 2.

---

[7]  *Universal Preschool Provider Information*, Colorado Department of Early Childhood, https://perma.cc/X3X6-KDB6 ("As families apply, we will consider if they currently have a sibling also enrolled with a certain provider. We will take this into account in our matching to keep families and siblings together where possible.").

139. Accordingly, the Church imposes a general obligation on Catholic "[p]arents . . . to entrust their children to those schools which provide a Catholic education." *Id.* c.798. They can refrain from doing so only "[i]f they are unable." *Id.*

140. To permit Catholic parents to discharge this obligation, it follows that Catholic schools prioritize Catholic families in allocating their limited spots. Indeed, as with the obligation for parents, there is a corresponding "duty" for "[p]astors"—they must "arrang[e] everything so that all the faithful can have a Catholic education." *Id.* c.794 § 2.

141. That is, as communities of faith and religious ministries designed to help pass on the faith to the next generation, Plaintiffs' sincere religious beliefs require them to prioritize in preschool admissions not just parishioners, but affiliated Catholic applicants and Catholic families who participate fully in the life of the Church.[8]

142. This sincere religious belief that Catholic schools must prioritize providing an opportunity for Catholic families to send their children to Catholic schools means Plaintiffs cannot sign the UPK Provider Agreement as written because it forbids giving preference on the basis of religious belief.

143. Likewise, as a faith community and religious ministry of the Catholic Church, Plaintiffs require their teachers, administrators, and staff to agree to uphold and abide by the moral law of the Catholic Church in word and deed in order to ensure that those who pass on the "faith to the next generation" do so faithfully. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063 (2020); *see also* Code of Canon Law c.803 § 2 ("teachers are to be outstanding in correct doctrine and integrity of life").

---

[8] *How to Apply*, St. Mary Catholic School, https://perma.cc/GV5S-SE42.

144. This sincere religious belief means that Plaintiffs cannot employ teachers, staff, and administrators who refuse to uphold the Catholic Church's beliefs regarding marriage and the family, including its belief that marriage is limited to one man and one woman for life.

145. This sincere religious belief also means Plaintiffs cannot sign the UPK Provider Agreement as written because of its prohibition on discrimination based on sexual orientation and gender identity in the Catch-all Provision.

146. The Enrollment Mandate and Catch-all Provision also prohibit St. Mary's and St. Bernadette's preschools from individually screening prospective families before enrolling them in their preschool programs, instead requiring the schools to accept whoever chooses to enroll.

147. Further, Archdiocesan preschools, including St. Mary's and St. Bernadette's preschools, cannot enroll children who assert a gender identity at odds with their biological sex.

148. Further, in certain circumstances, Archdiocesan preschools, including St. Mary's and St. Bernadette's preschools, may be obligated not to enroll a student whose parents identify as gay or lesbian or who present themselves as part of a same-sex couple, in accordance with the Archdiocese's teaching that enrolling such students "is likely to lead to intractable conflicts." Ex. B at 15.

149. This sincere religious belief means neither St. Mary's, St. Bernadette's, nor any Archdiocesan religious preschool can sign the UPK Provider Agreement as written, due to its prohibition on discrimination on the basis of sexual orientation and gender identity.

150. But for the Enrollment Mandate and the Catch-all Provision, Plaintiffs are fully qualified to participate in the UPK program.

151. Plaintiffs therefore are categorically excluded from participating in the UPK program based solely on their religious beliefs and exercise.

152. By excluding Plaintiffs from participation in the UPK program, Defendants have imposed harm by denying Plaintiffs' schools equal access to funding and restricting their ability to serve Colorado families.

153. Absent prompt judicial relief, more harm will be done to the schools and the families that hope to enroll their children there.

154. Each month that Plaintiffs' preschools are excluded from participation, they will lose out on access to generally available government funding for their preschool programs.

155. For Plaintiffs Daniel and Lisa Sheley, each month that St. Mary's does not participate in the UPK Program, they are required to pay the full cost of preschool services at St. Mary's.

156. The Department has also already refused to grant Plaintiffs an exemption from its exclusionary requirements.

157. On February 17, 2023, a statewide coalition of religious preschool providers including the Archdiocese sent a letter to the State, requesting that the Department grant faith-based preschool providers exemptions from the Enrollment Mandate. Ex. E (The Catch-all Provision had not yet been announced by the Department.)

158. The coalition explained that "many private providers have chosen not to participate in UPK at this time" for fear of "compromising their sincerely held . . . beliefs." Ex. E at 1.

159. Defendant Dr. Lisa Roy replied to the coalition's letter on February 28, 2023.

160. On behalf of the Department, she declined to grant any exemptions. Letter to Colorado Private School Coalition Re: Recent Communication (Feb. 28, 2023), Ex. F.

161. Roy claimed that the Act does not authorize the Department to grant exemptions from its quality standards, declining to address or acknowledge the coalition letter's reference to First Amendment principles potentially requiring such exemptions regardless of state law.

162. St. Mary's preschool director has informed her local coordinating organization—the Arapahoe County Early Childhood Council—that St. Mary's preschool would like to participate in the UPK program but cannot sign the Agreement. The Council told St. Mary's preschool director that the State requires her to sign the Agreement to participate.

163. If the Department's Enrollment Mandate and Catch-all Provision are enjoined, St. Mary's preschool will seek to participate in the UPK program as soon as it is able.

164. Because of the UPK program's requirements that exclude Archdiocesan preschools, Wellspring has not yet sought to participate in the UPK program. If the Department's Enrollment Mandate and Catch-all Provision are enjoined, however, Wellspring's preschool will seek to participate in the UPK program as soon as it is able.

165. Because of the UPK program's requirements that exclude Archdiocesan preschools, other Archdiocesan religious preschools have not yet sought to participate in the UPK program. If the Department's Enrollment Mandate and Catch-all Provision are enjoined, however, Archdiocesan religious preschools will seek to participate in the UPK program as soon as they are able.

## CLAIMS FOR RELIEF

### Count I
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I:
### Free Exercise Clause—Categorical Exclusion from Otherwise Available Government Benefits

166. All preceding paragraphs are incorporated by reference.

167. The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

168. The Free Exercise Clause applies to states and their subdivisions and municipalities through the Fourteenth Amendment to the U.S. Constitution.

169. Under the Free Exercise Clause, imposing "special disabilities on the basis of religious views or religious status" triggers strict scrutiny. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460-461 (2017).

170. Thus, a system that precludes religious entities and families from obtaining generally available state benefits solely because of their religious character or beliefs is unconstitutional unless the government can satisfy strict scrutiny. *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022).

171. Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese engage in religious exercise by providing education from a distinctively Catholic religious perspective, for the spiritual formation of their students and in service to their families.

172. To fulfill this mission, Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese must be free to hire teachers according to their religious beliefs and practices and admit families and students on the basis of their adherence to the Catholic Church's religious beliefs—including by assessing a family's willingness to support

and abide by the Catholic Church's beliefs regarding marriage, life, the family, human sexuality, and gender.

173. Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese's religious beliefs and religious mandate as Catholic ministries means their preschools must also be able to direct the education of children according to Catholic religious beliefs and practices, which includes the ability to organize their schools in line with their beliefs on human sexuality and gender.

174. Plaintiffs Daniel and Lisa Sheley seek, in accordance with their Catholic beliefs, and in accordance with their obligation as Catholic parents, to provide their children with a Catholic education in preschool.

175. Colorado offers a benefit to licensed preschool providers: "a dedicated source of funding for statewide, voluntary, universal preschool programming." Colo. Rev. Stat. § 26.5-4-202(1)(a)(V).

176. To participate, however, Plaintiffs must agree to the Enrollment Mandate and the Catch-all Provision. Individually and collectively, these provisions amount to a "religious gerrymander[]" and have the effect of completely excluding St. Mary's, St. Bernadette's, the Sheleys, and all the Archdiocese's religious preschools from the UPK program because of their sincere religious beliefs. *Carson*, 142 S. Ct. at 2000.

177. The Enrollment Mandate and Catch-all Provision would make it unlawful for Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese to prioritize providing educational opportunities to families and children who share the Catholic faith, even if those families are not part of specific preschools' respective congregations.

178. The Enrollment Mandate and Catch-all Provision would also make it unlawful for Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese to require all families who send their children to their preschools to abide by the Catholic Church's teachings on marriage, human sexuality, and gender.

179. The Catch-all Provision further prohibits Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese's religious preschools from hiring teachers who support and uphold those preschool's religious mission and from structuring their preschool according to their religious beliefs.

180. The Catch-all Provision and the Enrollment Mandate both require Plaintiffs to choose between their religious exercise and receiving an otherwise generally available benefit. Plaintiffs are thus "disqualified from this generally available benefit 'solely because of their religious character'" and beliefs. *Carson*, 142 S. Ct. at 1997.

181. "By condition[ing] the availability of benefits in that manner," Colorado's UPK program "effectively penalizes the free exercise of religion." *Id.* (internal quotations omitted).

182. The Department's categorical exclusion of Plaintiffs from the UPK program furthers no compelling governmental interest.

183. Excluding Plaintiffs from the UPK program is not the least restrictive means of furthering Colorado's interests.

184. Plaintiffs have suffered and will suffer harm absent relief.

### Count II
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I:
### Free Exercise Clause—Ministerial Exception

185. All preceding paragraphs are incorporated by reference.

186. "The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as

those of faith and doctrine.'" *Our Lady*, 140 S. Ct. at 2055 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

187. An institution's right to religious autonomy "ensures that the authority to select and control who will minister to the faithful . . . is the church's alone." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194-95 (2012).

188. "Applying this principle," the Supreme Court has repeatedly held that "the First Amendment bar[s] a court from entertaining an employment discrimination claim" regarding a teacher or other ministerial employee responsible for transmitting the faith to the next generation. *Our Lady,* 140 S. Ct. at 2055 (citing *Hosanna-Tabor,* 565 U.S. 171).

189. Preschool teachers and administrators at Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese's preschools play a crucial role in educating the children in their care in the faith and in passing on the faith to the next generation. As such, all preschool teachers and administrators qualify as ministers under the ministerial exception.

190. The Catch-all Provision interferes with Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese's selection of preschool teachers and administrators by prohibiting them from selecting employees based on the employee's religious beliefs or willingness to abide by the Catholic Church's beliefs regarding marriage, human sexuality, and gender.

191. Defendants' actions have therefore interfered with Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese's religious hiring policies for their ministerial employees.

192. Consequently, the Catch-all Provision, as applied to school employees who have the "responsibility of educating and forming students in the faith, . . . threatens the school's independence in a way that the First Amendment does not allow." *Our Lady*, 140 S. Ct. at 2069.

193. Plaintiffs have suffered and will suffer harm absent relief.

**Count III**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause—Church Autonomy**

194. All preceding paragraphs are incorporated by reference.

195. The First Amendment protects the right of a religious institution to make "personnel decision[s] based on religious doctrine" even when those decisions do not involve a ministerial employee. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002).

196. Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese require all preschool employees to abide by standards of religious conduct.

197. Enforcing the Catch-all Provision to bar or modify such standards of religious conduct will interfere with Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese's right to frame policies and doctrine, govern their own internal affairs, and maintain a school environment faithful to their religious beliefs. This violates the First Amendment. *See Our Lady*, 140 S. Ct. at 2060 (2020).

198. Plaintiffs have suffered and will suffer harm absent relief.

**Count IV**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause—Not Generally Applicable:**
**Discretionary Exemptions**

199. All preceding paragraphs are incorporated by reference.

200. Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese's sincerely held religious beliefs inform how they engage in all aspects of their religious ministries— including the operation of their preschools.

201. Plaintiffs exercise their sincerely held religious beliefs through the operation of their preschools, by educating children in the Catholic faith, and by hiring teachers and staff who support and uphold their beliefs.

202. Application of the Enrollment Mandate and Catch-all Provisions substantially burden Plaintiffs' religious exercise.

203. Laws or regulations "burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

204. State action is no longer of general applicability "if it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1871 (2021).

205. The Department has the authority to grant exemptions from the Enrollment Mandate and the Catch-all Provision.

206. The Department has authority to "allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II).

207. By enforcing the Enrollment Mandate and Catch-all Provisions against religious schools while retaining discretion to grant exemptions for other reasons, the Department's actions are not neutral and generally applicable.

208. The Department's categorical exclusion of Plaintiffs' preschools furthers no compelling governmental interest.

209. Excluding Plaintiffs' preschools from the UPK program is not the least restrictive means of furthering Colorado's interests.

210. Plaintiffs have and will continue to suffer harm absent relief.

**Count V**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause—Not Neutral or Generally Applicable:**
**Categorical Exemptions**

211. All preceding paragraphs are incorporated by reference.

212. Laws or regulations "burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542 (1993).

213. Government regulation burdening religious exercise fails to be neutral or generally applicable when its "categorizations" treat comparable activities differently. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020).

214. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

215. The Enrollment Mandate aims to ensure equal access to preschool providers for all Coloradans, regardless of "religious affiliation, sexual orientation, gender identity . . . income level, or disability." Colo. Rev. Stat. § 26.5-4-205(2)(b).

216. This interest in equal access is undermined by the Department's creation of seven categories of exemptions from its nondiscrimination requirements.

217. These exemptions together compromise the state's interest in ensuring equal access to preschool services by allowing *some* providers to privilege *some* children—if those providers accomplish interests favored by the Department.

218. At least two exemptions directly contravene the Enrollment Mandate by allowing providers to discriminate based on protected categories.

219. The exemption for Head Start grantees allows those providers to prefer children based on their family's income level.

220. The exemption for faith-based providers allows some faith-based providers to prefer their own congregants, thus permitting those providers to prefer applicants on the basis of religion.

221. But the Department offers no exemption to faith-based providers without attached congregations, or to faith-based providers who seek to maintain the religious character of their schools in other ways.

222. Therefore, the Department treats comparable activities differently.

223. Since the Department is willing to compromise its interest in equal access for many reasons, the Enrollment Mandate is not neutral or generally applicable, and its application to Plaintiffs requires strict scrutiny.

224. The Department's categorical exclusion of Plaintiffs furthers no compelling governmental interest.

225. Excluding Plaintiffs from the UPK program is not the least restrictive means of furthering Colorado's interests.

226. Plaintiffs have suffered and will continue to suffer harm absent relief.

### Count VI
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I:
### Free Speech—Compelled Speech and Expressive Association

227. All preceding paragraphs are incorporated by reference.

228. Using government power to force a group that is formed for expressive purposes to include a message not its own "violates the fundamental rule of protection

under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

229. The Free Speech Clause prohibits the government from compelling people to speak messages against their will.

230. The Free Speech Clause also prohibits the government from forcing a group formed for expressive purposes to accept members who oppose those purposes. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 650, 659 (2000); *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023).

231. Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese's preschools were formed for the expressive purpose of teaching the Catholic faith to the next generation. They are expressive associations within the meaning of *Hurley* and *Dale*.

232. The Archbishop's Guidance makes clear that Catholic schools cannot engage in conduct that will "implicitly affirm[]" beliefs contrary to those of the Catholic Church. For example, if a Catholic school allows a student who asserts an identity at odds with his or her biological sex to wear a uniform of the opposite sex, "the school would be implicitly affirming the student's erroneous identity, and effectively encouraging the student to continue down a path that is harmful and unhealthy." Ex. B at 11-12.

233. In order to avoid endorsing conduct contrary to Catholic teaching, the Archdiocese also instructs Catholic schools to "communicate clearly what the Church teaches about marriage and same-sex relationships." Ex. B at 15. This is not possible if a Catholic school is required to affirm beliefs about marriage and the family that contradict those of the Church.

234. Together and separately, the Enrollment Mandate and Catch-all Provisions would require Plaintiffs St. Mary's, St. Bernadette's, and the Archdiocese to admit families and hire faculty who are opposed to their religious vision.

235. Admitting families and hiring faculty who oppose the Church's view on Catholic moral teachings sends a misleading and erroneous message to parishioners, all Catholics, and the general public that the Church approves of the conduct of those it employs and admits into its programs.

236. Coercing Plaintiffs into altering their religious expression serves no compelling governmental interest.

237. Colorado's Enrollment Mandate and Catch-all Provision are not narrowly tailored to accomplish the government's alleged interests.

238. Plaintiffs have suffered and will continue to suffer harm absent relief.

**Count VII**
**42 U.S.C. § 1983**
**Violation of U.S. Constitution Amend. I:**
**Denominational Favoritism**

239. All preceding paragraphs are incorporated by reference.

240. The First Amendment forbids the government from engaging in "denominational preferences," which favor the religious beliefs and practices of one religious denomination over another. *Larson v. Valente*, 456 U.S. 228, 245 (1982).

241. The Catholic Church believes that all Catholics are "members of the people of God" who are in a "bond of close communion" and thus "called to share . . . goods in common." *Lumen Gentium*, ¶ 13 (1964).

242. Accordingly, Plaintiffs' preschools prioritize placement in their schools based not only on affiliation with a particular parish or congregation, but also based on membership in the Catholic Church.

34

243. By permitting religious preschool providers to reserve some or all of their spots for families who are members of the congregation sponsoring the preschool but not to allow preschools to reserve or prioritize spots for members of their shared faith who are not members of their sponsoring congregation, the Department prefers certain religious denominations over others based on their theological beliefs about the composition of their church and their beliefs about the role of a religious school in providing education to those who share their beliefs.

244. Defendants do not have a compelling interest in preferring some religious denominations over others.

245. Defendants' exclusion of certain religious denominations based on their religious structure and beliefs is not the least restrictive means to accomplish any government interest.

246. Plaintiffs have suffered and will continue to suffer harm absent relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.  Declare that the religious affiliation, sexual-orientation, and gender-identity nondiscrimination requirements as set out in the Universal Preschool (UPK) Colorado Program Service Agreement violate the First Amendment to the United States Constitution as applied to Plaintiffs' religious exercise;

b.  Declare that the religious affiliation, sexual orientation, and gender identity nondiscrimination requirements of Colo. Rev. Stat. § 26.5-4-205(2)(b) violate the First Amendment to the United States Constitution as applied to Plaintiffs' religious exercise;

c.  Issue preliminary and permanent injunctive relief prohibiting Defendants from denying Plaintiffs participation in Colorado's UPK program based on Plaintiffs' religious beliefs, character, and exercise, including Plaintiffs' religious exercise of:

(i)   prioritizing Catholic families in admission;

(ii)  requiring preschool teachers, staff, and administrators to abide by and uphold Catholic teachings on life, marriage, gender, and human sexuality;

(iii) considering for purposes of admission or retention whether a family or child seeking placement in their schools has identified as LGBTQ, is in a same-sex relationship, or has adopted a gender identity different from his or her biological sex; and

(iv)  declining to grant students and staff access to the restroom or changing facilities of the opposite sex, to permit them to wear the opposite sex's uniform, or to insist on the use of a preferred pronoun.

d.  Award nominal damages in the amount of $1.00 against Defendants.

e.  Award Plaintiffs reasonable attorney's fees and costs.

f.  Award all such other relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: September 13, 2023   Respectfully submitted,

              /s/ Eric C. Rassbach
              Eric C. Rassbach
              Mark L. Rienzi
              Joseph C. Davis
              Nicholas R. Reaves
              The Becket Fund for Religious Liberty
               1919 Pennsylvania Ave. N.W.,
              Suite 400
              Washington, D.C. 20006
              (202) 955-0095
              erassbach@becketlaw.org