**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

ST. MARY CATHOLIC PARISH IN
LITTLETON; ST. BERNADETTE
CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY; LISA SHELEY; and
THE ARCHDIOCESE OF DENVER,

    *Plaintiffs*,

    v.

LISA ROY, in her official capacity as Executive
Director of the Colorado Department of Early
Childhood; and DAWN ODEAN, in her official
capacity as Director of Colorado's Universal
Preschool Program,

    *Defendants*.

Case No. 1:23-cv-2079-JLK

**PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND
MEMORANDUM IN
SUPPORT**

1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................3

MOTION..........................................................................................................................8

MEMORANDUM IN SUPPORT.........................................................................................9

FACTUAL BACKGROUND ..............................................................................................10

    A.  Catholic education in the Archdiocese .............................................................10

    B.  UPK Colorado.................................................................................................11

    C.  UPK Colorado excludes families at Archdiocesan preschools..........................12

LEGAL STANDARD........................................................................................................13

ARGUMENT ...................................................................................................................13

I.  Plaintiffs are likely to succeed on the merits of their claims. ..................................13

    A.  The State's exclusionary rules violate the Free Exercise Clause.......................13

        1.  The State excludes Plaintiffs because of their religious
            character and exercise. ...............................................................................14

        2.  The exclusionary rules are not neutral and generally applicable................16

        3.  The exclusionary rules fail strict scrutiny..................................................20

    B.  The State's exclusionary rules violate First Amendment
        church autonomy protections. ........................................................................22

        1.  The exclusionary rules violate the ministerial exception............................22

        2.  The exclusionary rules violate the broader church autonomy doctrine. ......24

    C.  The State's exclusionary rules violate expressive association...........................24

    D.  The State's exclusionary rules violate the First Amendment by
        impermissibly discriminating among religions..................................................26

II.  Plaintiffs easily satisfy the remaining preliminary-injunction factors.....................28

CONCLUSION.................................................................................................................29

CERTIFICATE OF SERVICE ...........................................................................................31

INDEX OF EXHIBITS......................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
143 S. Ct. 2298 (2023) .................................................................20, 25

*Ashaheed v. Currington*,
7 F.4th 1236 (10th Cir. 2021) ..............................................................19

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ...................................................... 26-27

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) ............................................................18

*Blackhawk v. Pennsylvania*,
381 F.3d 202 (3d Cir. 2004)........................................................... 17-18

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000).................................................................25, 26

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002) ........................................................22, 24

*Butler v. St. Stanislaus Kostka Catholic Acad.*,
609 F. Supp. 3d 184 (E.D.N.Y. 2022) ..............................................23, 24

*Carson v. Makin*,
142 S. Ct. 1987 (2022)...........................................................14, 15, 16

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)...................................................................19, 20

*Citizens United v. Gessler*,
773 F.3d 200 (10th Cir. 2014) .......................................................28, 29

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ...............................................................26

*Colorado Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) ................................................19, 26, 27

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987)...........................................................................24

*Denver Homeless Out Loud v. Denver*,
32 F.4th 1259 (10th Cir. 2022) ............................................................29

*Employment Div. v. Smith*,
   494 U.S. 872 (1990) ................................................................................................19

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246 (2020) ...............................................................................14, 15, 16

*Everson v. Board of Educ.*,
   330 U.S. 1 (1947) ......................................................................................................14

*Fratello v. Archdiocese of N.Y.*,
   863 F.3d 190 (2d Cir. 2017) ....................................................................................23

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021) ....................................................................................... *passim*

*Garrick v. Moody Bible Inst.*,
   412 F. Supp. 3d 859 (N.D. Ill. 2019) ....................................................................24

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
   546 U.S. 418 (2006) ................................................................................................20

*Heideman v. S. Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003) .............................................................................28

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) .......................................................................13, 28

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*,
   565 U.S. 171 (2012) .......................................................................................22, 23, 25

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*,
   515 U.S. 557 (1995) ................................................................................................20

*Kedroff v. St. Nicholas Cathedral*,
   344 U.S. 94 (1952) ..................................................................................................22

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) ...............................................................................16, 19, 20, 21

*Kikumura v. Hurley*,
   242 F.3d 950 (10th Cir. 2001) ...............................................................................28

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   570 U.S. 595 (2013) ................................................................................................15

*Larson v. Valente*,
   456 U.S. 228 (1982) ...........................................................................................26, 27

*Lutheran Soc. Serv. of Minn. v. United States*,
   758 F.2d 1283 (8th Cir. 1985) ...............................................................................27

*Newland v. Sebelius*,
   881 F. Supp. 2d 1287 (D. Colo. 2012) ...................................................20, 21, 29

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................................29

*NLRB v. Catholic Bishop of Chi.*,
   440 U.S. 490 (1979) ......................................................................................... 25-26

*Orr v. Christian Bros. High Sch., Inc.*,
   2021 WL 5493416 (9th Cir. Nov. 23, 2021) .......................................................23

*Our Lady of Guadalupe Sch. v. Morissey-Berru*,
   140 S. Ct. 2049 (2020) ...................................................................................22, 23

*Pac. Frontier v. Pleasant Grove City*,
   414 F.3d 1221 (10th Cir. 2005) ...........................................................................29

*Petruska v. Gannon Univ.*,
   462 F.3d 294 (3rd Cir. 2006) ..............................................................................23

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) ....................................................................................16, 28

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .............................................................................................15

*Sherbert v. Verner*,
   374 U.S. 398 (1963) .............................................................................................15

*Shrum v. City of Coweta*,
   449 F.3d 1132 (10th Cir. 2006) ...........................................................................15

*Singh v. Carter*,
   168 F.Supp.3d 216 (D.D.C. 2016) ......................................................................28

*Skrzypczak v. Roman Catholic Diocese of Tulsa*,
   611 F.3d 1238 (10th Cir. 2010) ...........................................................................22

*Slattery v. Hochul*,
   61 F.4th 278 (2d Cir. 2023) ...........................................................................25, 26

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
   41 F.4th 931 (7th Cir. 2022) ..........................................................................22, 23

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ........................................................................................16

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981) ...................................................................................... 14-15

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) .....................................................................................14, 15

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000) .........................................................................................22

*Verlo v. Martinez*,
    820 F.3d 1113 (10th Cir. 2016) .........................................................................13

*Watson v. Jones*,
    80 U.S. 679 (1872) ...........................................................................................27

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) .........................................................................................20

*Zorach v. Clauson*,
    343 U.S. 306 (1952) ..................................................................................... 15-16

**Statutes**

Colo. Rev. Stat. § 26.5-4-201 ...................................................................................8, 11

Colo. Rev. Stat. § 26.5-4-202 ........................................................................................11

Colo. Rev. Stat. § 26.5-4-204 ...................................................................................11, 21

Colo. Rev. Stat. § 26.5-4-205 ................................................................................. *passim*

Colo. Rev. Stat. § 26.5-4-208 ........................................................................................11

**Other Authorities**

Anchor Center for Blind Children, *Getting Started* ...................................................17

Colorado Department of Early Childhood, *Browse participating UPK Colorado
    providers* ...................................................................................................12

Colorado Department of Early Childhood, *Child Care Resource and Referral
    Agencies* ...................................................................................................21

Colorado Department of Early Childhood, *Submit an application for UPK
    Colorado for the 2023-2024 school year* ...............................................29

Colorado Department of Early Childhood, *Universal Preschool Colorado*...................................29

Gabrielle Franklin, *Polis: Catholic schools that want universal pre-K must not discriminate*, KDVR.com (Aug. 17, 2023)............................................................................16

RespiteCare, *F.A.Q.* ......................................................................................................................17

**MOTION**

Plaintiffs seek preliminary injunctive relief under Federal Rule of Civil Procedure 65(a). For the reasons stated below, and as supported by the attached exhibits, the Court should preliminarily enjoin Defendants from denying Plaintiffs participation in Universal Preschool Colorado, Colo. Rev. Stat. §§ 26.5-4-201, *et seq.,* based on their religious beliefs, character, and exercise, including:

(i)     prioritizing Catholic families in admission;

(ii)    requiring employees to abide by and uphold Catholic teachings, including on life, marriage, gender, and human sexuality;

(iii)   considering for purposes of admission or retention whether a family or child seeking placement abides by and upholds Catholic teachings; and

(iv)    operating their schools in accordance with Catholic teachings.

Plaintiffs' counsel conferred with Defendants' counsel on September 11, 2023, regarding this motion. Defendants oppose the motion. The parties, however, agreed to a briefing schedule for this motion. Per this agreement, Defendants' response brief would be due on October 16, 2023, with Plaintiffs' reply due on October 30, 2023.

## MEMORANDUM IN SUPPORT

Defendants are excluding Plaintiffs from the State's Universal Preschool program (also called "UPK Colorado") because they practice the Catholic faith. While such need-not-apply exclusions were once commonplace in American society, our Nation no longer countenances them. A long line of caselaw stretching from *Everson v. Board of Education* in 1947 to *Carson v. Makin* in 2022 forbids governments from denying otherwise-eligible religious people a public benefit based on their religious exercise.

That alone is enough to decide this motion, but Defendants' actions also trigger scrutiny under the First Amendment in at least seven other ways: by using categorical exemptions (*Tandon*), using individualized exemptions (*Fulton*), targeting religious schools (*Lukumi*), triggering the ministerial exception (*Hosanna-Tabor*), intruding on church autonomy (*Our Lady of Guadalupe*), violating expressive association (*303 Creative*), and discriminating among religious groups (*Larson*).

As for Defendants' strict-scrutiny affirmative defense (which applies to only some claims), they have no compelling reason to discriminate against Catholics in this way. And because they allow multiple exceptions to their exclusionary rules, they cannot pass strict scrutiny. The other elements of the preliminary-injunction standard are also easily satisfied under *Diocese of Brooklyn* and *Nken*.

The effects of excluding Catholic parents and schools are profound. Plaintiffs Daniel and Lisa Sheley stand to lose around $6,000 worth of preschool education per year because the State excludes St. Mary's from its universal preschool funding program. System-wide, the State's funding of all secular preschools pushes parents—particularly those of limited means—toward secular alternatives, acting as a tax on religious exercise. Only an injunction from this Court can ensure that the State's Universal Preschool program is in fact universal.

## FACTUAL BACKGROUND

### A. Catholic education in the Archdiocese

Plaintiffs St. Mary's and St. Bernadette's operate Catholic preschools to assist parents in providing a high-quality religious education to their children. St. Mary's "aim is to form our pre-schoolers into 'saints, heroes, and geniuses.'" Ex. 14 ¶ 14. Plaintiffs Daniel and Lisa Sheley are St. Mary's parishioners who currently have a four-year-old in preschool at St. Mary's. Ex. 18 ¶ 6. Because the Sheleys chose to send their preschooler to a Catholic school, they are losing out on roughly $600 per month in UPK Colorado benefits. *Id.* ¶¶ 6-7. St. Bernadette's preschool offers "a Catholic education that invites all to Dig Deep, to uncover our precious gifts within a loving encounter with God, the 'source and author of life' (Acts 3:15)." Ex. 16 ¶ 5. Eighty-six percent of children attending St. Bernadette's preschool receive free or reduced-price lunches. Sixty-four percent are English-as-a-Second-Language learners. *Id.* ¶ 9.

The Archdiocese of Denver's Office of Catholic Schools oversees thirty-six parish and Arch-diocesan preschools, including St. Mary's and St. Bernadette's. Ex. 1 ¶¶ 7-8. These schools are subject to the Archdiocese's guidance on matters of faith and morals. *Id.* This includes using Arch-diocese-approved teacher and staff contracts, implementing an Archdiocese-approved curriculum, and operating according to Archdiocesan policies. *Id.*

Educating and forming students in the Catholic faith is the central mission of these schools. Ex. 1 ¶ 23. "Because Jesus asked the Church to form disciple-students, the school is the natural place for discipleship, in learning the Christian faith and forming habits of the Christian life." Ex. 9 at 8. The Catholic school is therefore a "place of evangelization and catechesis, existing to equip students to go forth proclaiming the marvelous works of God." *Id.* at 9. Catholic preschools in particular provide "preparation for further formal instruction," Ex. 1 ¶¶ 20-21, planting the seeds of discipleship by creating a faith-filled and Christ-centered community. Ex. 14 ¶¶ 8-15.

But Archdiocesan preschools can only do this if those who lead the community are properly formed in the Catholic faith and those who make up the community are open and receptive to the truths and teaching of the faith. Accordingly, the Archdiocese requires that those who teach and

pass on the Catholic faith, including all preschool teachers, strive to uphold its tenets in both word and deed and meet the requirements of provisional catechetical certification. Ex. 1 ¶¶ 24-26. This is crucial because, as St. Mary's Preschool Director put it, "we can't teach what we don't practice in our own lives." Ex. 14 ¶ 17.

Parents and families also play a crucial role in creating a community of faith and discipleship. As the Archdiocese's "Catholic School Community Beliefs and Commitments" statement explains, "[b]y enrolling your child in our school, you are joining our Catholic educational mission[.]" Ex. 3 at 8. Accordingly, "all Catholic school families must understand and display a positive and supportive attitude toward the Catholic Church, her teachings, her work, and the mission of the Catholic school." *Id.* at 8. Without this common understanding, Catholic schools could not fulfill their role of supporting parents as the primary educators of their children and forming faith-fostering communities of disciples. *See* Ex. 9. This understanding of what is required to form a faith-filled community also informs the Archdiocese's religious belief that its schools should prioritize admitting Catholic families active in Archdiocesan parishes and should carefully consider whether admitting students or families who—in word or deed—oppose Catholic teachings will create intractable conflicts for the school. Ex. 1 ¶ 27.

### B.  UPK Colorado

In 2022, Colorado established a system of state funding for "universal" preschool to be administered by the newly created Department of Early Childhood. Colo. Rev. Stat. §§ 26.5-4-201, *et seq.* The program aims to make some "preschool services" free for all Colorado children, "regardless of their economic circumstances." *Id.* §§ 26.5-4-202(1)(a)(V), 26.5-4-204(1)(a).

For the 2022-23 school year, the Department will reimburse participating preschool providers for 15 hours of preschool per child they enroll. This funding may be used "only to pay the costs of providing preschool services directly to eligible children enrolled by the preschool provider." *Id.* § 26.5-4-208(5). Preschools seeking to participate in UPK Colorado must sign a Program Services Agreement. Ex. 15. Once signed, participating providers appear in the Department's Family

Search and Application portal, allowing families to apply to use UPK program funds at their preschool.[1]

The Agreement, however, includes two "nondiscrimination" provisions—one covering student enrollment and the other a provider's general operations. First, the Enrollment Mandate requires "each preschool provider [to] provide eligible children an equal opportunity to enroll and receive preschool services regardless of [the] … religious affiliation, sexual orientation, [or] gender identity" of "the child or the child's family." Ex. 15 at 2; *see also* Colo. Rev. Stat. § 26.5-4-205(2)(b). Second, the Catch-all Provision forbids "discriminat[ion] against any person on the basis of … religion, … sexual orientation, [or] gender identity." Ex. 15 at 27.

Despite these nondiscrimination requirements, UPK Colorado allows participating preschools numerous opportunities to reject a family that seeks to enroll in their program. For example, UPK Colorado's official Provider Guide lists seven "exception criteria" that providers can use to screen applications. Dkt. 1-4 at 38. These criteria allow, among other things, faith-based providers to serve only families who are part of their congregation, co-op programs to "require family participation," dual language providers to "screen" program participants, "Head Start grantee" programs to require families to "meet additional factors to enroll." *Id.*; *see also* Ex. 13 ("faith-based providers can … decline a match from a family that is not part of the congregation").

### C.  UPK Colorado excludes families at Archdiocesan preschools

When UPK Colorado was announced, St. Mary's and St. Bernadette's hoped to participate and started taking affirmative steps to do so. Ex. 14 ¶¶ 33-37; Ex. 16 ¶ 26. As details about the program emerged, however, the schools and the Archdiocese learned that they would be excluded because of their religious exercise. Ex. 1 ¶¶ 30-33. The Enrollment Mandate and Catch-all Provision prevent Archdiocesan preschools from reserving spots for Catholic families from other Archdiocesan parishes. The same provisions also forbid Archdiocesan schools from taking into consideration

---

[1]   Colorado Department of Early Childhood, *Browse participating UPK Colorado providers*, https://perma.cc/U4BD-K4FF.

whether a child or family is open to and supportive of the Catholic Church's teachings—including its teachings on human sexuality—or whether personal circumstances or actions would create intractable conflicts with what is being taught in the schools. *See, e.g.,* Ex. 16 ¶¶ 22-24; Ex. 14 ¶¶ 25-31. Finally, the Catch-all Provision forbids Archdiocesan preschools from requiring that those who teach the faith agree to live out those teachings in both word and deed.

When a coalition of religious preschool providers that included the Archdiocese requested a religious accommodation from the State so that they could participate in UPK Colorado, they were told that no religious accommodation would be provided. Ex. 1 ¶ 34. This has directly harmed both the families who send their children to Catholic preschools and the schools themselves. For families like the Sheleys, the State's exclusion of Catholic providers costs them roughly $600 per month for their four-year-old. Ex. 18 ¶¶ 6-7. And Archdiocesan preschools like St. Mary's and St. Bernadette's have experienced a significant decrease in enrollment for their programs. Ex. 14 ¶¶ 38-48; Ex. 16 ¶¶ 28-33.

## LEGAL STANDARD

A party moving for a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm; (3) the balance of harms favors an injunction; and (4) the injunction will be in the public interest. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). "In the First Amendment context, 'the likelihood of success on the merits will often be the determinative factor' because of the seminal importance of the issues at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016).

## ARGUMENT

**I.  Plaintiffs are likely to succeed on the merits of their claims.**

**A.  The State's exclusionary rules violate the Free Exercise Clause.**

UPK Colorado's exclusion of Archdiocesan preschools and families triggers strict scrutiny under the Free Exercise Clause—and fails that stringent test. As explained below, strict scrutiny is required under the Free Exercise Clause for at least four reasons: ***first***, because the exclusion is

based solely on Catholic preschools' religious character and exercise; *second*, because while Plaintiffs' religious exercise is prohibited, the State recognizes categorical exemptions permitting other preschool providers to "discriminate," including on grounds otherwise barred by the Enrollment Mandate and Catch-all Provision; *third*, because the State has reserved the authority to carve out individualized exemptions to these requirements in other circumstances; and *fourth*, because the State's implementation of UPK Colorado has targeted Plaintiffs' religious exercise.

**1.   The State excludes Plaintiffs because of their religious character and exercise.**

The First Amendment "prohibit[s]" denying otherwise-eligible religious individuals and organizations a public benefit "based on [their] religious exercise." *Carson v. Makin*, 142 S. Ct. 1987, 2000 (2022). The State here has done exactly that; its actions thus trigger "the strictest scrutiny." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017).

*Carson* is on-point. There, Maine offered tuition assistance for families to attend private schools. But schools were excluded if they "promote[d] a particular faith and present[ed] academic material through the lens of that faith." 142 S. Ct. at 2001. This exclusion violated the Free Exercise Clause. The Court explained: a state cannot "exclude some members of the community from an otherwise generally available public benefit because of their religious exercise," "status," or "character." *Id.* at 1996, 1998, 2001.

So too here. Colorado offers a generally available public benefit—"universal" preschool funding. But it excludes Archdiocesan preschools based solely on their religious exercise—prioritizing Catholic families and seeking to ensure their staff, students, and families respect and support Catholic teachings. "Conditioning the availability of benefits in that manner ... effectively penalizes the free exercise of religion." *Id.* at 1997 (cleaned up). "When otherwise eligible recipients are disqualified from a public benefit solely because of their religious character, we must apply strict scrutiny." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2260 (2020) (cleaned up).

*Carson* has deep roots—the Court has long held that states cannot exclude people "from receiving the benefits of public welfare legislation" because of their religion. *Everson v. Board of Educ.*, 330 U.S. 1, 16 (1947). Free-exercise protections thus apply "[w]here the state conditions

receipt of an important benefit upon conduct proscribed by a religious faith." *Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)).

Moreover, while *Trinity Lutheran* and *Espinoza* analyzed the challenged exclusion as based on "'religious status and not religious use,'" *Carson* rejected "such a distinction." 142 S. Ct. at 2001. The Court emphasized that Maine was denying benefits "based on a recipient's *religious exercise*," not status. *Id.* at 2000 (emphasis added). After all, the Free Exercise Clause protects just that—*exercise*. It therefore doesn't matter whether the State describes UPK Colorado as "closed to [Catholics] (status) or closed to people who," like Plaintiffs here, "do [Catholic] things"—"[i]t is free exercise either way." *Trinity Lutheran*, 582 U.S. at 469 (Gorsuch, J., concurring); *see also, e.g.*, *Shrum v. City of Coweta*, 449 F.3d 1132, 1144 (10th Cir. 2006) ("As its language suggests, the animating ideal of the constitutional provision is to protect the 'free exercise of religion' from unwarranted governmental inhibition whatever its source.").

The reason for the *Carson* rule is that benefit exclusions put a governmental "thumb on the scale" with respect to religion, *Espinoza*, 140 S. Ct. at 2278 (Gorsuch, J., concurring), incentivizing religious organizations to abandon or alter their religious exercise to "compete with secular" entities, *Trinity Lutheran*, 582 U.S. at 463; *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (coercing people to give up constitutional rights itself violates the Constitution). This increase in the relative cost of exercising religion requires compelling justification. *See Carson*, 142 S. Ct. at 1998 ("The State pays tuition for certain students at private schools—so long as the schools are not religious. That is discrimination against religion.").

It's difficult to imagine a case more clearly implicating that rationale than this one. Indeed, here, the State has effectively imposed a special religion tax on preschool services, making it *free* for families to send their children to most private preschools, while families sending their children to Catholic preschools pay full freight. *Cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 859 (1995) ("A tax exemption in many cases is economically and functionally indistinguishable from a direct monetary subsidy."). Under the First Amendment, religion must "flourish"

or wither "according to the zeal of its adherents and the appeal of its dogma," *Zorach v. Clauson*, 343 U.S. 306, 313 (1952)—not according to governmental carrots and sticks.

In short, Colorado didn't have to subsidize private preschools. But having done so, "it cannot disqualify some private schools solely because they are religious," *Espinoza*, 140 S. Ct. at 2261— or because they act that way, *Carson*, 142 S. Ct. at 2000-01. The State's exclusion therefore triggers strict scrutiny.

**2. The exclusionary rules are not neutral and generally applicable.**

The UPK rules also violate the Free Exercise Clause in other ways. If government "burden[s]" religious exercise under a policy that is "not neutral nor generally applicable," that "trigger[s] strict scrutiny." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022). Colorado has burdened Plaintiffs' religious exercise, *supra* I.A.1, and its policy is neither neutral nor generally applicable.

***Categorical exemptions.*** A policy fails general applicability "if it prohibits religious conduct" while allowing other "conduct that undermines the government's asserted interests in a similar way." *Kennedy*, 142 S. Ct. at 2422 (cleaned up); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest[.]" *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

In purporting to justify its application of the Enrollment Mandate and Catch-all Provision, the State asserts an interest in ensuring equal access to preschool, regardless of "religious affiliation, sexual orientation, gender identity, ... income level, or disability." Colo. Rev. Stat. § 26.5-4-205(2)(b). As the Governor has bluntly put it: "[S]erve everybody if you want to take public funds."[2]

---

[2]    Gabrielle Franklin, *Polis: Catholic schools that want universal pre-K must not discriminate*, KDVR.com (Aug. 17, 2023), https://perma.cc/WGZ5-SWBR.

But under the plain terms of Defendants' rules, not all preschools must "serve everybody" to participate. To the contrary, the State offers categorical exemptions allowing providers to discriminate based on these protected categories. As the State explains: "Providers will be able to request exceptions to matched applicants based on predefined criteria." Dkt. 1-4 at 38.

For example, the State allows providers to screen applicants based on income, explaining that "families may need to meet additional factors to enroll" with "Head Start grantee[s]," which serve only families whose incomes are at or below federal poverty guidelines. Dkt. 1-4 at 38. Similarly, although the statute says preschools must provide an "equal opportunity to enroll ... regardless of ... religious affiliation," the State has created an exception to that requirement, allowing faith-based providers to "require families to be a part of [their] congregation." Dkt. 1-4 at 38; *see* Ex. 13. Further, the State allows providers to screen applicants based on disability—the provider guide says that preschools can make their local coordinator aware that their school "support[s] children with Individualized Education Plans (IEP)," Dkt. 1-4 at 38; and in practice, multiple UPK Colorado participants in fact identify themselves as being open only to children with disabilities.[3] So for some providers, the State is willing to compromise its supposed interest in equal access. Not so when it comes to Plaintiffs' religious exercise. The Enrollment Mandate and Catch-all Provision are therefore not generally applicable, and their application to Plaintiffs requires strict scrutiny.

***Individualized exemptions.*** Government action also fails general applicability "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (cleaned up). That is because "such a regime creates the opportunity for" even "a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against

---

[3]   *See* Anchor Center for Blind Children, *Getting Started*, https://perma.cc/282U-GCKC; Res-piteCare, *F.A.Q.*, https://perma.cc/8CR2-WFV4 ("Children who qualify for services at Respite Care have developmental disabilities ... . ").

religiously motivated conduct." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (Alito, J.).

The State has created just such a mechanism for individualized exemptions here. Under Tenth Circuit precedent, a "'system of individualized exemptions' need not be a written policy"; rather, the plaintiff can show that it exists merely by pointing to "discretionary decisions" on the ground. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004). Here, however, the State has a written policy authorizing individualized exemptions—making this an easy case.

Specifically, the UPK Colorado statute reserves authority for Defendants to "allow a preschool provider that does not meet the quality standards"—which include the nondiscrimination provisions at issue here—"to participate in the preschool program for a limited time while working toward compliance." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II); *see also Fulton*, 141 S. Ct. at 1878 (written policy authorizing individualized exemptions triggered strict scrutiny); *Axson-Flynn*, 356 F.3d at 1299 ("greater discretion in the hands of governmental actors makes the action taken pursuant thereto more, not less, constitutionally suspect"). The State thus has broad discretion to excuse preschools who, for any reason, do not comply with the Enrollment and Catch-all Provision for an indeterminate amount of time—yet it declined to grant an accommodation to preschools who cannot comply because of their religious convictions. *Supra* pp. 12-13.

Moreover, this provision aside, Defendants have *actually exercised* discretionary authority to carve out exemptions from the nondiscrimination provisions at issue here. The statute provides that "[a]t a minimum, the quality standards" must require "that each preschool provider provide eligible children an equal opportunity to enroll ... regardless of ... income level," "disability," or "religious affiliation." Colo. Rev. Stat. §§ 26.5-4-205(2), (2)(b). But again, in the Provider Guide, the Department has created multiple exceptions to this rule, permitting Head Start grantees to discriminate based on income; providers to screen based on disability; and faith-based providers to prefer members of their "congregation." *Supra* p. 12. So Defendants apparently view themselves

as having authority to carve out exceptions—authority they have declined to use to protect religious exercise like Plaintiffs'.

*Fulton* thus requires strict scrutiny. Having retained discretion to grant exemptions from the Enrollment Mandate and Catch-all Provisions, the State "may not refuse to extend that system to cases of religious hardship without a compelling reason." *Fulton*, 141 S. Ct. at 1871.

**Targeting.** A government policy is not neutral if it is "specifically directed at ... religious practice." *Employment Div. v. Smith*, 494 U.S. 872, 878 (1990). A policy can fail this test either if it "discriminate[s] on its face," or if a religious exercise is otherwise its "object." *Kennedy*, 142 S. Ct. at 2422 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). This does not require the policy to be "motivated by overt religious hostility or prejudice." *Ashaheed v. Currington*, 7 F.4th 1236, 1244 (10th Cir. 2021). Rather, to be neutral, a law's burden on religious exercise must be an "incidental effect" rather than its deliberate consequence. *Smith,* 494 U.S. at 878.

Here, as explained above, the Archdiocese was part of a coalition of religious preschool providers that asked the State to recognize religious exemptions and alerted it to the problems its implementation of UPK Colorado had created for religious schools. Ex. 1; Ex. 12 But the State rejected this request, making clear it would not grant Plaintiffs a religious accommodation allowing them to participate. Ex. 13. Thus, the consequence of the government's actions was far from "incidental."

The exclusionary policy also lacks facial neutrality. The State expressly refers to independent churches, allowing them to discriminate in favor of members of the congregation sponsoring the preschool. Dkt. 1-4 at 38; *see Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008) ("a law is facially discriminatory 'if it refers to a religious practice without a secular meaning discernible from the language or context'" (quoting *Lukumi*)). But the State offers no exemption to religious providers without attached congregations, or to providers who seek to maintain the religious character of their schools in other ways. The law's facial distinction allowing certain

types of religious discrimination and not others fails to satisfy the requirement of neutrality towards religion.

### 3. The exclusionary rules fail strict scrutiny.

To successfully invoke a strict-scrutiny affirmative defense, Defendants must prove that their exclusions "serve a compelling interest and are narrowly tailored to that end." *Kennedy*, 142 S. Ct. at 2426. Here, the State cannot satisfy either element of this test.

First, the State's interests are not compelling. The State claims an interest in ensuring equal access to preschool providers for all Coloradans, regardless of "religious affiliation, sexual orientation, gender identity ... income level, or disability." Colo. Rev. Stat. § 26.5-4-205(2)(b). But the State itself does not treat this interest as compelling, as it allows other preschools to discriminate on the basis of religion, income, and disability. *Supra* I.A.2. As this Court explained in a previous religious-freedom case: "A law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012) (Kane, J.) (quoting *Lukumi*, 508 U.S. at 547), *aff'd*, 542 F. App'x 706 (10th Cir. 2013).

In any event, the question isn't whether the State's interests are "compelling ... generally, but whether it has such an interest in denying an exception to" the religious claimant. *Fulton*, 141 S. Ct. at 1881. Applying this analysis, the Supreme Court has repeatedly found antidiscrimination norms to give way to First Amendment rights. *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2321 (2023); *Fulton*, 141 S. Ct. at 1877; *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 578-79 (1995).

Put differently, strict scrutiny requires courts to "look[] beyond broadly formulated interests" and instead "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006). In *Wisconsin v. Yoder*, for example, the Court did not analyze the government's interest in compulsory public education generally, but instead the government's interest in making the specific Amish plaintiffs attend one more year of public school. 406 U.S. 205, 214-15 (1972); *see Fulton*,

141 S. Ct. at 1882 ("The City offers no compelling reason why it has a particular interest in deny-ing an exception to CSS while making them available to others."); *see also Newland*, 881 F. Supp. 2d at 1297 (this Court applying similar analysis under Religious Freedom Restoration Act).

Here, then, the State must assert a compelling interest in excluding *these specific Plaintiffs* from UPK Colorado in order to increase access to preschool. But any such assertion would fail for the same reasons as in *Fulton*. There, the government excluded a Catholic foster-care agency that would not certify same-sex couples to be foster parents, citing the goal of "[m]aximizing the num-ber of foster families." 141 S. Ct. at 1881. But the Supreme Court rejected this theory 9-0, explain-ing that the government had "fail[ed] to show that" accommodating the agency would jeopardize that goal since "[i]f anything, including [the agency] seems likely to increase, not reduce, the num-ber of available foster parents." *Id.* at 1881-82.

The same reasoning applies here. Excluding these Plaintiffs won't help anyone access non-Catholic preschool. Indeed, the State's policy doesn't just fail to increase access—it *decreases* access by keeping Catholic families like the Sheleys from participating. It also undermines the State's own directive to recruit "as broad a range [of providers] as possible." Colo. Rev. Stat. § 26.5-4-204(2). The exclusion therefore defies, rather than serves, the interests allegedly justify-ing it.

All this aside, excluding Plaintiffs is also not a "narrowly tailored" means—an independent basis for failing strict scrutiny. *Kennedy*, 142 S. Ct. at 2422. The State has in place systems—including Child Care Resource and Referral agencies—to help families find and "match" with appropriate providers.[4] And the State already allows some providers "to request exceptions to matched applicants" based on specified criteria. Dkt. 1-4 at 38. Using a similar process here would be a far less restrictive method of increasing preschool access and choices for families in Colorado

---

[4]   Colorado Department of Early Childhood, *Child Care Resource and Referral Agencies*, https://perma.cc/EB62-KJ7K.

than the blunt instrument of categorically excluding certain religious providers. And under strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, [it] must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).

### B. The State's exclusionary rules violate First Amendment church autonomy protections.

The church autonomy doctrine protects the "fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655-56 (10th Cir. 2002); *see Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116-17 (1952). The State's UPK conditions violate this doctrine twice over—first, by purporting to limit the Archdiocese's preschools' right to freely hire and fire ministers; second, by purporting to bar them from making religion-based personnel decisions even for non-ministers.

### 1. The exclusionary rules violate the ministerial exception.

One "component of [church] autonomy" is the "ministerial exception," which protects religious institutions' "authority to select, supervise, and if necessary, remove" employees "who play certain key roles." *Our Lady of Guadalupe Sch. v. Morissey-Berru*, 140 S. Ct. 2049, 2060-61 (2020). This rule "bar[s] the government from interfering with" a religious group's selection of ministers, or its "decision ... to fire one." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181, 185 (2012); *see also Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010).

As the Supreme Court has recognized, "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady*, 140 S. Ct. at 2064. Accordingly, religious-school employees who are "expected to help ... carry out" these responsibilities are covered by the exception. *Id.* at 2066. This includes teachers "responsible for providing instruction in ... religion," *id.*, as well as administrators charged with "guiding the religious mission of the school," *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 940 (7th Cir. 2022) (Administrative

Council member); *see also, e.g.*, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017) (principal); *Orr v. Christian Bros. High Sch., Inc.*, No. 21-15109, 2021 WL 5493416 (9th Cir. Nov. 23, 2021) (principal).

Here, the State's conditions on UPK funding violate the ministerial exception. The Catch-all Provision purports to leverage UPK funds to bar religious schools from "discriminat[ing] against any person," including employees, on various bases, including "religion," "sexual orientation," and "gender identity." Ex. 15 at 27. But under the ministerial exception, religious schools are free to select on any basis employees who are "entrusted ... with the responsibility of educating their students in the faith," *Our Lady*, 140 S. Ct. at 2066—including on bases barred by this Provision, *Hosanna-Tabor*, 565 U.S. at 194-95; *see also Starkey*, 41 F.4th at 938 (ministerial exception foreclosed claims of Catholic school employee nonrenewed for same-sex relationship); *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 188-89 (E.D.N.Y. 2022) (same).

The Archdiocese's preschool teachers and administrators are ministers. The teachers are expected to (and do) teach formal religious curriculum; "start their classes in prayer with their students"; "integrate Biblical stories and religious themes into their lessons and play"; and "witness to the faith in their own li[ves]," Ex. 14 ¶¶ 15-16. And the administrators "lead [the] religious organization" as a whole, *Our Lady*, 140 S. Ct. at 2063, including by exercising "supervisory authority over" the religious functions of the teachers, *Orr*, 2021 WL 5493416, at *1; *Petruska v. Gannon Univ.*, 462 F.3d 294, 307 n.10 (3rd Cir. 2006); *see also* Ex. 1 ¶ 27; Ex. 3 at 1-2.

Under the ministerial exception, then, "any attempt by government to dictate or even to influence" the Archdiocese's preschools' selection of such employees violates the First Amendment. *Our Lady*, 140 S. Ct. at 2060. The State has made just such an attempt—in the Catch-all Provision. This violates the ministerial exception.

### 2.    The exclusionary rules violate the broader church autonomy doctrine.

Ministerial exception aside, the Catch-all Provision would still violate church autonomy. Even for non-ministerial employees, "the broader church autonomy doctrine" protects religious organizations' freedom to make "personnel decision[s] based on religious doctrine." *Bryce*, 289 F.3d at 658 n.2, 660.

*Bryce* demonstrates the point. There, a church employee sued after church officials allegedly made discriminatory statements about homosexuality and her same-sex union. *Id.* at 651-53. But the Tenth Circuit held the suit was barred by the "broader church autonomy doctrine"—regardless of whether the employee was covered by the ministerial exception. *Id.* at 658 n.2. That was so because the employee challenged a "personnel decision based on religious doctrine"—namely, the church's "doctrine and policy" on same-sex relationships. *Id.* at 658-60; *see also*, *e.g.*, *Butler*, 609 F. Supp. 3d at 198-204 (even if plaintiff wasn't a minister, suit barred by church autonomy); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871-73 (N.D. Ill. 2019) (same).

Here, the Archdiocese's preschools require all staff to be "faithful men and women" and to "refrain from public promotion or approval of any conduct or lifestyle that would ... be considered in contradiction with Catholic doctrine or morals," including on marriage and sexuality. Ex. 3 at 2. Yet the State is purporting to bar providers from "discriminat[ing] against" employees based on "religion," "sexual orientation," and "gender identity." Ex. 15 at 27. "Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is ... a means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). By purporting to outlaw the Archdiocese's exercise of this core autonomy right, the Catch-all Provision violates the First Amendment.

### C.    The State's exclusionary rules violate expressive association.

The State's UPK conditions also violate the First Amendment's protection for expressive association. The Enrollment Mandate and Catch-all Provision purport to forbid Archdiocesan pre-

schools from considering "religious affiliation, sexual orientation," and "gender identity" in admission and hiring—meaning they couldn't prioritize Catholics in admission or decline to hire staff or admit families who reject the Church's teachings. Colo. Rev. Stat. § 26.5-4-205(2)(b); *see* Ex. 15 at 27. But "the First Amendment protects acts of expressive association." *303 Creative*, 143 S. Ct. at 2312. That includes the decision "not to associate" with others if the forced association would "affect[] in a significant way the group's ability to advocate" its "viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

In *Dale*, the Court held the Boy Scouts were entitled to exclude a scoutmaster who was "an avowed homosexual and gay rights activist," despite state law prohibiting sexual-orientation discrimination. *Id.* at 643-45. The Court explained that freedom to associate "presupposes a freedom not to associate," and requiring the Scouts to retain the plaintiff would impermissibly "force [them] to send a message" that they "accept[] homosexual conduct as a legitimate form of behavior." *Id.* at 648, 653.

Likewise, in *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), a pro-life pregnancy center challenged a state law prohibiting employment discrimination based on "reproductive health decision[s]," claiming the law violated expressive association by "preventing [the center] from disassociating itself from employees who, among other things, seek abortions." *Id.* at 283. Applying *Dale*, the Second Circuit ruled for the pregnancy center. "The right to expressive association," the court held, "allows [the center] to determine that its message will be … conveyed only by employees who sincerely share its views"; accordingly, "strict scrutiny applies." *Id.* at 288-89.

An expressive-association claim involves two questions: whether the claimant "engage[s] in some form of expression"; and whether the forced association would "significantly affect [its] ability to advocate" for its viewpoints. *Dale*, 530 U.S. at 648, 650. If so, "the First Amendment prohibits" it, absent satisfaction of strict scrutiny. *Id.* at 648, 659.

Here, the Archdiocese and its preschools are plainly expressive. Indeed, "[r]eligious groups" like these "are the archetype of" expressive associations. *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring). As the Supreme Court has recognized, the "*raison d'être* of parochial schools is

the propagation of a religious faith." *NLRB v. Catholic Bishop of Chi.,* 440 U.S. 490, 503 (1979). So too here. Ex. 3 at 1 ("[T]he mission of the Catholic school is to bring the young men and women in our care to encounter Jesus Christ and the truths of our Catholic faith.").

The question, then, is whether requiring the Archdiocese's preschools to hire staff and admit families who reject the Church's teachings would "significantly affect [the preschools'] ability to" convey their message. *Dale,* 530 U.S. at 641. Undoubtedly. "It would be difficult for [a religious group] to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct." *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 863 (7th Cir. 2006).

Indeed, courts must "give deference to an association's view of what would impair its expression." *Dale,* 530 U.S. at 653. Here, the Archdiocese's policies unambiguously explain the impairment. As the Archdiocese's Community Beliefs document explains, hiring teachers and administrators who reject the Church's "teachings on sexual identity" and "marriage" would undermine its ability to "transmit[]" those teachings, since students "listen[] more willingly to witnesses than to teachers." Ex. 3 at 4, 5. And as the Archdiocese's sexuality guidance explains, admitting students from a same-sex household could "cause confusion about the nature of marriage," suggesting (inconsistent with Catholic teaching) that same-sex guardians are "*no* different from ... a mother and a father." Ex. 6 at 15.

In short, "by foreclosing [preschools'] ability to reject employees" and families "whose actions suggest that they believe the opposite of the message [the Archdiocese] is trying to convey," the State's UPK conditions "severely burden[]" the "right of expressive association." *Slattery,* 61 F.4th at 288-90. It therefore must satisfy strict scrutiny, which it fails. *Supra* I.A.3.

**D.    The State's exclusionary rules violate the First Amendment by impermissibly discriminating among religions.**

Laws that favor one religion over another are subject to strict scrutiny. *Larson v. Valente,* 456 U.S. 228, 246-47 (1982); *CCU,* 534 F.3d at 1259-60; *Awad v. Ziriax,* 670 F.3d 1111, 1127 (10th

Cir. 2012). In *Larson*, for example, the Supreme Court held that a law imposing additional registration and reporting requirements on religious groups that received "more than fifty per cent of their funds from nonmembers, discriminates against such organizations in violation of the … First Amendment." *Larson*, 456 U.S. at 230. As the Court explained, the rule triggered strict scrutiny because it "focuses precisely and solely upon religious organizations" and "effectively distinguishes between 'well-established churches' ... and 'churches which are new and lacking in a constituency.'" *Id*. at 246 n.23. Similarly, in *CCU*, the Tenth Circuit held that a Colorado law which gave scholarship funding to sectarian—but not *pervasively* sectarian—universities violated denominational neutrality. *CCU*, 534 F.3d at 1259-60. As the Court explained, "[t]he sole function and purpose of the challenged provisions ... is to exclude some but not all religious institutions on the basis of the stated criteria." *Id*. at 1258.

Likewise, the State's decision to permit preschools to discriminate in favor of members of the congregation sponsoring the preschool, but not other members of the preschool's same faith, prefers some religious organizations and denominations over others. Dkt. 10-4 at 38. Specifically, the law discriminates among religious polities by favoring churches that are independent or congregational over churches that are hierarchical in structure. *See generally Watson v. Jones*, 80 U.S. 679, 722-728 (1872) (describing difference). A similar issue prompted Congress to amend the Revenue Act of 1950. As the Eighth Circuit explained, to address the concern that "the term 'church' included hierarchical churches (such as the Catholic Church), but not congregational churches in which each local congregation is autonomous (such as with the Baptist)," Congress added language "to give equal federal tax treatment to both hierarchical and congregational churches." *Lutheran Soc. Serv. of Minn. v. United States*, 758 F.2d 1283, 1288 (8th Cir. 1985).

Here, the State's exemption on its face favors independent churches, allowing them to discriminate in favor of those who are affiliated with their church and local governing body. By contrast, the Catholic Church operates 148 parishes, stations, and mission parishes, but only 36 preschools. Ex. 1 ¶ 29. This means that Colorado's congregation-only rule would force the Archdiocese to treat those Catholics who are members of 112 of their parishes, stations, and mission parishes the

same as non-Catholics or Catholics not part of the Archdiocese. Colorado's congregation-only rule favors some religious denominations over others and is therefore subject to strict scrutiny, which it fails. *Supra* I.A.3.

## II.   Plaintiffs easily satisfy the remaining preliminary-injunction factors.

Having shown a likelihood of success on the merits, the remaining factors—irreparable harm, balance of the equities, and public interest—all favor an injunction. As the Tenth Circuit has explained, "in First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby*, 723 F.3d at 1145; *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014) ("Having determined that Citizens United's First Amendment argument is valid, the remaining preliminary-injunction factors present little difficulty."). Plaintiffs' strong showing of a First Amendment violation confirms an injunction should issue.

*Irreparable harm.* "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Diocese of Brooklyn*, 141 S. Ct. at 67; *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (same). Once a likelihood of success on the merits of a First Amendment claim is shown, "no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (cleaned up). This already irreparable injury is further compounded where, as here, the State has singled out certain religious schools and families for exclusionary treatment. "[B]eing subjected to discrimination is by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016).

In addition, Plaintiffs suffer tangible harms each day they are excluded from UPK. Plaintiff Parents are denied UPK funding that they can never recover, simply because they chose to send their children to Catholic preschools. Ex. 18 ¶¶ 6-7. And Plaintiff schools—like all preschools in the Archdiocese—are harmed by the decrease in enrollment and loss of staff caused by their exclusion from UPK. Ex. 14 ¶¶ 38-47; Ex. 16 ¶¶ 28-33. This harm is also both immediate and ongoing. UPK Colorado is currently matching interested families *every week*, on a rolling basis. As the

Defendants' website explains, "Universal Preschool Colorado is not a first-come, first-served program. Applications are currently being accepted."[5] Accordingly, families who apply now "will be notified of their proposed matches every Friday and [they] will have until the following Thursday to accept or decline [their] match."[6] This means that families like the Sheleys would be eligible for participation in the UPK program *immediately* if the State's unlawful exclusion of religious providers were enjoined.

*Balance of the equities and public interest.* When injunctive relief is sought against the government, the third and fourth preliminary-injunction factors "merge." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). This factor favors Plaintiffs because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Gessler*, 773 F.3d at 218. And especially "when a law is likely unconstitutional, the [government's interests] … do not outweigh a plaintiff's interest in having its constitutional rights protected." *Id.* (cleaned up); *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) (similar); *Newland*, 881 F. Supp. 2d at 1295 ("These interests are countered, and indeed outweighed, by the public interest in the free exercise of religion."). Absent an injunction, Plaintiffs will continue being deprived of their First Amendment rights. By contrast, the State has no legitimate interest in enforcing its unconstitutional exclusion. Thus, protecting Plaintiffs' constitutional rights far outweighs any government interest in enforcing an unconstitutional law.

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction.

---

[5]   Colorado Department of Early Childhood, *Universal Preschool Colorado*, https://perma.cc/23L8-F4AM.

[6]   Colorado Department of Early Childhood, *Submit an application for UPK Colorado for the 2023-2024 school year*, https://perma.cc/NG47-BDQE.

Dated: September 13, 2023

Respectfully submitted,

/s/ Eric C. Rassbach
Eric C. Rassbach
Mark L. Rienzi
Joseph C. Davis
Nicholas R. Reaves
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
erassbach@becketlaw.org

**CERTIFICATE OF SERVICE**

I hereby certify that I have served the foregoing document on all parties via CM/ECF and as required by the relevant federal and local rules.

Dated: September 13, 2023                         /s/ Eric C. Rassbach
                                                                    Eric C. Rassbach

**INDEX OF EXHIBITS**

| | |
|---|---|
| Ex. 1 | Declaration of Elias Moo, dated August 31, 2023 |
| Ex. 2 | Att. A to Decl. of Moo, Policies |
| Ex. 3 | Att. B to Decl. of Moo, Statement of Community Beliefs |
| Ex. 4 | Att. C to Decl. of Moo, Mission and Charter |
| Ex. 5 | Att. D to Decl. of Moo, Archdiocese of Denver Code of Conduct |
| Ex. 6 | Att. E to Decl. of Moo, Archdiocese – LGBTQ Guidance Document |
| Ex. 7 | Att. F to Decl. of Moo, Parish School FT Teacher Formator Terms & Conditions |
| Ex. 8 | Att. G to Decl. of Moo, Splendor of the Human Person |
| Ex. 9 | Att. H to Decl. of Moo, School of the Lord's Service |
| Ex. 10 | Att. I to Decl. of Moo, Archdiocese of Denver Curriculum Guidance – Preschool |
| Ex. 11 | Att. J to Decl. of Moo, Archdiocesan Guidance on UPK Program |
| Ex. 12 | Att. K to Decl. of Moo, Coalition Letter |
| Ex. 13 | Att. L to Decl. of Moo, Letter to CO School Coalition |
| Ex. 14 | Declaration of Tracy Seul, dated August 24, 2023 |
| Ex. 15 | Att. A to Decl. of Seul, Universal Preschool Provider Agreement and Exhibits |
| Ex. 16 | Declaration of Avery Coats, dated August 28, 2023 |
| Ex. 17 | Att. A to Decl. of Coats, Wellspring Handbook |
| Ex. 18 | Declaration of Daniel Sheley, dated August 29, 2023 |