**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-02079-JLK

ST. MARY CATHOLIC PARISH IN LITTLETON; ST. BERNADETTE CATHOLIC PARISH
IN LAKEWOOD; LISA SHELEY; DANIEL SHELEY; and THE ARCHDIOCESE OF
DENVER,

      Plaintiffs,

v.

LISA ROY, in her official capacity as Executive Director of the Colorado Department of Early
Childhood; and DAWN ODEAN, in her official capacity as Director of Colorado's Universal
Preschool Program,

      Defendants.

---

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

---

      Plaintiffs seek court-sanctioned permission to accept taxpayer funds for their preschools
while also discriminating against LGBTQ families and children. The law does not require the
alarming relief that Plaintiffs request. It goes without saying that states have it within their power
to protect LGBTQ persons from the devastating effects of government-backed discrimination.

      Plaintiffs might be seeking to move First Amendment law in a different direction by
bringing this test case. That is their right, and it is no secret that the U.S. Supreme Court has
recently shifted the landscape underlying many First Amendment doctrines. But this case is a
particularly poor vehicle for that purpose. Plaintiffs have identified no actual family or child to
whom they have denied enrollment on account of their LGBTQ status. And the Colorado
Department of Early Childhood (the "Department") and multiple other agencies have received no
complaint that Plaintiffs have discriminated against LGBTQ persons. The absence of such facts
renders this Court unable to review these important constitutional questions on a record

sufficiently developed to sharpen the presentation of the issues. It also confirms that Plaintiffs

lack standing and their claims are not ripe for adjudication. The Court should therefore dismiss

this case for lack of subject matter jurisdiction.

Certificate of Conferral under D.C.Colo.LCivR 7.1: the undersigned conferred with

Plaintiffs' counsel regarding the relief requested by this motion. Plaintiffs oppose this motion.

## BACKGROUND

### I.    Colorado's history and investment in preschool.

Since 1988, Colorado has steadily increased its investment in high-quality preschool

programming. In 1988, Colorado established the Colorado Preschool Program, which focused on

serving Colorado's most needly families. Ex. 1, Odean Declaration ¶ 3. Nevertheless, in 2019-

2020, the Colorado Preschool Program was able to serve only approximately 25 percent of

Colorado's four-year-old children. *Id.* In the 2020 general election, Colorado voters

overwhelmingly approved proposition EE, establishing a dedicated source of funding for

statewide, voluntary, universal preschool (the "UPK program"). Colo. Rev. Stat. § 26.5-4-

202(1)(a)(V). The Colorado General Assembly declared the intent of the UPK program is to

continue to address income barriers to preschool access and further the benefits of high-quality

preschool throughout the state. Colo. Rev. Stat. § 26.5-4-202(1)(b). To implement the UPK

program, House Bill 21-1304 created the Department of Early Childhood. Colo. Rev. Stat. § 26-

6.2-302(6) (2021). All the prior responsibilities of the Department of Human Services for

administering early childhood programs and services, including the UPK program, were

transferred to the new Department on July 1, 2022. Colo. Rev. Stat. § 26.5-1-106(1)(a)(I)(A).

The new UPK program is universal and available to all children and families in the year prior to kindergarten. The Department is charged with providing early childhood opportunities for all children in Colorado and prioritizing the equitable delivery of resources. Colo. Rev. Stat. § 26.5-1-102(1)(a), (f).

Colorado law requires the Department to develop and establish in rule the Quality Assurance Standards that each preschool provider must meet to receive program funding. Colo. Rev. Stat. § 26.5-4-205(1)(a). These standards must reflect national and community-informed best practices, and the Department must work with families, educators, and program administrators to review and revise them as necessary. *Id.*

By statute, the Quality Assurance Standards must also include a requirement that each participating preschool provide eligible children with an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family. Colo. Rev. Stat. § 26.5-4-205(2)(b). To implement this provision, participating preschool providers must enter into a Program Service Agreement (the "Agreement") with the Department in which they contractually agree to provide eligible children an equal opportunity to enroll, provide preschool services, and not discriminate on the basis of the protected classes identified in section 26.5-4-205(2)(b). Ex. 1, Odean Declaration ¶ 12; Doc. 30-3 at 3 ("Quality Assurance" header).

The Department has not yet promulgated its Quality Assurance Standards rules for preschool providers. Once the Quality Standards are adopted, they will not become effective until the 2024-2025 school year. Ex. 1, Odean Declaration ¶ 14. The prior rules adopted by the

3

Department of Human Services continue in effect and apply until the Department promulgates the Quality Assurance Standards in rule. Colo. Rev. Stat. § 26.5-1-106(1)(c). All rules promulgated by the Department must increase equity in access to programs and services. Colo. Rev. Stat. § 26.5-1-105(1)(a)(III).

Separate from the Quality Assurance Standards, the Department's Agreement also contains a general antidiscrimination provision in paragraph 18(B), which Plaintiffs call the "Catch-all" provision. Doc. 30-3 at 23; Doc. 30 at 19, ¶¶ 126-27. Plaintiffs allege paragraph 18(B) prohibits them from declining to hire teachers, staff, and administrators who refuse to uphold the Catholic Church's views regarding marriage and the family. Doc. 30 at 22, ¶ 144. The Department, for its part, interprets and applies this provision to permit religious organizations to hire co-religionists in accordance with federal law, and to make employment decisions about their ministerial employees in accordance with federal law. Ex. 1, Odean Declaration ¶ 16.

## II.    The Department's commitment to inclusion of faith-based providers.

The Department identified and recruited preschool providers throughout the state before beginning to enroll children for the 2023-2024 school year. Ex. 1, Odean Declaration ¶¶ 5-6. In doing so, it established a "mixed delivery" system that enables parents to select preschool providers for their children from as broad a range as possible within their communities. Colo. Rev. Stat. § 26.5-4-204(2). Under this mixed delivery system, the UPK program's eligible preschool providers include licensed child care centers operated by public, private, and parochial schools. Colo. Rev. Stat. §§ 26.5-4-203(14); 26.5-5-303(3).

To ensure that the UPK program was inclusive of faith-based providers, the Department convened a faith-based work group consisting of religious providers that met on an

approximately bi-weekly basis from December 20, 2022 through June 13, 2023. Ex. 1, Odean Declaration ¶ 7. A representative of St. Mary Catholic School, one of the plaintiffs here, participated regularly in the work group and frequently conveyed what she asserted were the views of the Denver Archdiocese. *Id.* One product of this bi-weekly dialogue with faith-based providers is the ability of faith-based providers to give a preference to members of their own congregation by reserving all or a portion of their preschool seats for their congregation members. *Id.* ¶ 8. Through its ongoing rulemaking process, the Department is currently evaluating how to define "congregation." *Id.*

One of the Plaintiffs here, the Denver Archdiocese, requested that the state grant it an exemption from section 26.5-4-205(2)(b)'s antidiscrimination provision, stating that complying with the antidiscrimination requirement may compromise the Archdiocese's sincerely held beliefs. Doc. 31-1 at 23, ¶¶ 157-58. Defendant Roy responded that the Department does not have authority to create an exemption from the statute's antidiscrimination provision. Doc. 30-6 at 2; *see* Colo. Rev. Stat. §§ 24-4-103(8)(a); 26.5-4-205(2)(b). Dr. Roy also explained, however, that faith-based providers participating in the UPK program may give preference to members of their congregation by reserving all or a portion of their preschool seats for their members. *See* Doc. 30-6 at 3.

### III.    Family choice governs the child's preschool placement.

Once providers were in place, the Department began the process of matching families to those providers. This process starts with the family choosing up to five providers and ranking them from one to five in preference. The Department will match children with only one of the family's choices. If none of the family's choices are available, the family can select additional

providers for their child. A child is placed with a provider only when their family agrees to accept the match. As of September 2023, over 38,000 children are participating in the UPK program and have been matched with 1,905 preschool providers; they started receiving preschool services in the fall of 2023. Ex. 1, Odean Declaration ¶ 9. Of the children matched to providers, 94% of families received one of their top 2 choices and 82% of families received their top choice. *Id.* Forty faith-based providers are participating in the UPK program, and 904 children have been matched to those faith-based providers. *Id.* ¶ 10.

### IV.   The Plaintiff schools have not been subjects of complaints for discrimination as child care licensees or preschool providers.

Apart from the requirements applicable to UPK program providers, child care providers (including preschools) are subject to separate child care licensing requirements that long predate the UPK program. *See* 12 C.C.R. 2509-8.[1] Applicable government agencies often receive complaints regarding licensed child care providers from concerned parents, guardians, community members, and family members. The complaints run the gamut, from allegations of child abuse or neglect to child care staff not having proper certifications or qualifications. Ex. 1, Odean Declaration ¶ 20.

Both of the Plaintiff schools here, Wellspring Catholic Academy of St. Bernadette Catholic School and St. Mary Catholic Preschool, hold child care facility licenses. St. Bernadette has been licensed since 2007; St. Mary has been licensed since 2006. Neither has been the subject of a complaint from a LGBTQ family or other person for LGBTQ-based discrimination

---

[1] This rule is scheduled to be renumbered in the near future when regulatory oversight moves from the Department of Human Services to the Department of Early Childhood.

as a child care licensee. *Id.* ¶¶ 22-24. In fact, 35 schools that are affiliated with the Denver Archdiocese hold child care licenses; none has been the subject of a complaint for LGBTQ-based discrimination as a licensee. *Id.* ¶ 21.

Furthermore, St. Mary Catholic Preschool and nine other Denver Archdiocese preschools participate in the Colorado Child Care Assistance Program ("CCCAP"). Ex. 2, Burne Declaration ¶ 13. CCCAP helps families that are homeless, working, searching for work, or in school, find low-income child care assistance. *Id*. ¶ 3. CCCAP is administered at the county level with state oversight by the Department. *Id.* ¶ 4. Like the UPK program, participating providers in CCCAP must sign an agreement that prohibits discrimination based on a person's sex, sexual orientation, and other protected characteristics. St. Mary signed this agreement as recently as August 23, 2023. *Id.* ¶ 16. The counties in which the participating Denver Archdiocese preschools are located have not received any complaints regarding alleged acts of LGBTQ-based discrimination by any of the ten participating Denver Archdiocese preschools. *Id*. ¶ 18.

Last, St. Bernadette and nine other Denver Archdiocese preschools are preschool providers through the Denver Preschool Program. Ex. 5, Holguin Declaration ¶ 7. For the last 17 years, the Denver Preschool Program has offered tuition credits to Denver families with preschool-aged children. *Id.* ¶ 3. Like the UPK program and CCCAP, participating providers in the Denver Preschool Program must sign an agreement that prohibits discrimination based on a person's sexual orientation and gender identity, among other characteristics. *Id.* ¶ 5. St. Bernadette signed this agreement as recently as June 2022. *Id.* ¶ 9 & Ex. 7. The Denver Preschool Program has also never received a complaint that any of its participating Catholic

preschools discriminated against a LGBTQ family or student due to their protected LGBTQ status. *Id.* ¶ 10.

## LEGAL STANDARD

A challenge to subject matter jurisdiction can be raised at any stage, and the party invoking jurisdiction bears the burden of proof. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citation omitted). If a party makes a factual attack to subject matter jurisdiction, as here, the court need not presume the truthfulness of the allegations. *See Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). Rather, the court has wide discretion to consider affidavits and other documents. *Id.*

## ARGUMENT

### I.   Plaintiffs lack Article III standing to challenge Colorado's UPK program.

No live case or controversy exists here because Plaintiffs lack standing. To have standing under Article III, a plaintiff must show (1) an injury in fact that is "concrete and particularized," not "conjectural or hypothetical," (2) that the injury is fairly traceable to the challenged action of the defendant, and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted).

Plaintiffs lack standing here because their claimed injury, if any, is self-inflicted and not traceable to Defendants. Moreover, Plaintiffs identify no actual family or student they have excluded from their schools, rendering their claimed injury conjectural and hypothetical. Last, Plaintiffs face no credible threat that Defendants will prevent them from making faith-based

employment decisions as they desire. Defendants interpret and apply the Agreement in conformity with federal employment law.

### A.    Plaintiffs' alleged harm is self-inflicted and thus insufficient to create standing.

Plaintiffs cannot establish standing because their alleged injury is self-inflicted and not fairly traceable to Defendants. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). A plaintiff cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* Nor can a plaintiff premise their standing based on "costs they incurred in response to a speculative threat," even if the alleged threat rises to the level of a "nonparanoid fear." *Id.* Such injuries are caused by the plaintiff's voluntary choices and not fairly traceable to the defendant. *See id.*; *accord Pennsylvania v. New Jersey,* 426 U.S. 660, 664 (1976) ("No [party] can be heard to complain about damage inflicted by its own hand.").

Here, the Archdiocese of Denver instructed its preschools, including the two Plaintiff schools, to refrain from participating in the UPK program. Doc. 30-8. Specifically, the Archdiocese emailed their preschools on January 14, 2023, stating that "our Catholic preschools are eligible" to "receive the funding to provide the preschool program service to families" and it "appears to be a great benefit for families[.]" *Id.* at 1. But despite acknowledging their eligibility and the benefit to families, the Archdiocese "directed" its parishes and preschool programs to "not enter into any agreements with the state for UPK." *Id.* at 2. The two Plaintiff schools heeded the Archdiocese's directions and chose to refrain from participating in Colorado's UPK program. Ex. 1, Odean Declaration ¶ 18.

This is self-inflicted harm. Defendants welcome preschool providers of all types to participate in the UPK program—religious, secular, or otherwise. *Id.* ¶ 6. Indeed, Colorado currently has 40 religious schools participating in the UPK program. *Id.* ¶ 10. Plaintiffs here had the same opportunity as any other provider to sign up to participate in the program. Plaintiffs' voluntary choice to forego participation "break[s] the causal chain" between Defendants and Plaintiffs' claimed injury. *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 888 (10th Cir. 2021) (citing *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (Ginsburg, J.)).

Plaintiffs also base their standing on two parents who wish to receive UPK program funding to send their children to preschool at St. Mary. Doc. 31-1 at 14 ¶¶ 90-93. Without the funding offered by the UPK program, Plaintiffs argue, the parents "instead will have to pay the full cost out of pocket." *Id.* ¶ 92. But just as the Plaintiff schools' voluntary choice to forgo UPK participation breaks the causal chain for their own injury, so too does it break the causal chain for the parents' alleged injury. The causation element of standing requires that the alleged injury is "fairly . . . trace[able] to the challenged action *of the defendant*" and not the result of some independent action by a third party. *Lujan*, 504 U.S. at 560 (emphasis added) (quotations omitted). Plaintiffs fail to make that showing here.

### B. Plaintiffs' speculation about potential future events that have not occurred, and may never occur, does not generate standing.

Even if Plaintiffs' harm is not self-inflicted, Plaintiffs still fail to establish the required injury in fact. To have Article III standing, the plaintiff's injury in fact cannot be conjectural or hypothetical but rather must be "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560; *accord Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). A plaintiff does not

satisfy Article III's requirement that their injury be "certainly impending" when their theory "relies on a highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410.

Plaintiffs allege that a LGBTQ family's beliefs and actions, or a four-year old's adoption of a gender identity different from their biological sex, could create "'intractable conflicts' for Catholic schools' ability to form children in, live out, and consistently witness to what they believe is true based on the Catholic faith." Doc. 31-1 at 3, ¶ 16. But Plaintiffs have not alleged any instance in which they actually denied a family or child enrollment into their preschool due to a child's gender identity or a LGBTQ family's beliefs or actions. For Plaintiffs to have standing, a very lengthy and speculative chain of circumstances would have to occur: (1) an LGBTQ family enrolls their eligible child in the UPK program; (2) the family considers one of the Plaintiff schools as a potential match in the program; (3) the family learns about Plaintiffs' policies discriminating against LGBTQ families; (4) the family requests an exemption from Plaintiffs' policies; (5) the Plaintiff school refuses to provide equal access to preschool to that child; (6) a complaint is filed with the Department regarding the Plaintiff school's actions; (7) the Department investigates the complaint; (8) the Department finds a violation; (9) the Plaintiff school refuses to remedy the violation(s); and (10) the Department files a breach of contract claim against the Plaintiff school. None of these events has occurred, and may never occur.

The speculative possibility that Plaintiffs may "'some day'" face the prospect of a LGBTQ family requesting enrollment in one of the Plaintiff schools, without more, is insufficient to create Article III standing. *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 553 (10th Cir. 2016) (quoting *Lujan*, 504 U.S. at 564) (finding no standing where challengers alleged they might "some day" "experience difficulties" exercising their constitutional rights).

Strictly adhering to Article III's standing prerequisites and awaiting a controversy that "actually exists[s]," *Spokeo*, 578 U.S. at 340, also assures the "concrete adverseness" that "sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]" *Baker v. Carr*, 369 U.S. 186, 204 (1962). Here, Plaintiffs' amended complaint alleges no facts involving an actual family who requested but was denied enrollment into Plaintiffs' schools due to their LGBTQ status or other protected characteristics. With no actual facts to go on, the Department—and the Court—are unable to determine the specific circumstances of the family's situation, the reasons for the provider's denial, what specific services were not provided, and whether the provider violated Colorado's Quality Assurance Standards.

Nor have Plaintiffs alleged a sufficiently imminent threat of enforcement as required to establish standing for a pre-enforcement challenge under the First Amendment. *See Susan B. Anthony List v. Driehaus ("SBA List")*, 573 U.S. 149, 159 (2014). To have standing for a pre-enforcement challenge, the plaintiff must demonstrate an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the challenged statute, and that there exists "a credible threat of prosecution thereunder." *Colo. Outfitters Ass'n,* 823 F.3d at 545 (quoting *SBA List*, 573 U.S. at 159). Courts evaluate three factors when determining whether an alleged threat is credible: (1) whether the plaintiff showed "past enforcement against the same conduct"; (2) whether authority to initiate charges is "not limited to a prosecutor or an agency" and, instead, "any person" could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement. *SBA List*, 573 U.S. at 164-65.

Applied here, these factors show that Plaintiffs' alleged fear is not credible.[2] The Department has not disciplined any religious UPK program participant in the past, only the Department can bring a breach-of-contract action to enforce the Agreement, and as explained below, the Department disavows enforcement of the Agreement's paragraph 18(B) against Plaintiffs' employment decisions involving their co-religionists or ministerial employees that are consistent with federal law.[3] Ex. 1, Odean Declaration ¶ 16. These facts show that Plaintiffs' claimed fear is "imaginary or speculative," *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 299 (1979) (quotations omitted), and not "objectively justified." *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007) (quotations omitted).

The absence of any credible threat of future enforcement is also established by facts that Plaintiffs fail to mention in their amended complaint. Both Plaintiff schools have long been

---

[2] Plaintiffs' intent to discriminate against LGBTQ families and students while accepting state funds is also not a constitutionally protected interest—a point Defendants will fully develop if this case proceeds to the merits.

[3] While the Department does not disavow its authority to enforce the Quality Assurance Standards should the need arise, such a disavowal is "not necessary to defeat standing." *Ward v. Utah*, 321 F.3d 1263, 1268 (10th Cir. 2003); *accord Mink v. Suthers*, 482 F.3d 1244, 1255 (10th Cir. 2007) ("It is not necessary for defendants [ ] to refute and eliminate all possible risk that the statute might be enforced to demonstrate a lack of a case or controversy."). Disavowals by government regulators become important "'only in cases in which, without a disavowal, the plaintiff seeking to enjoin enforcement would have a reasonable basis for concern that he might be prosecuted.'" *Winsness v. Yocum*, 433 F.3d 727, 733 (10th Cir. 2006) (quoting *Lawson v. Hill*, 368 F.3d 955, 959 (7th Cir. 2004)); *see also Kegler v. U.S. Dep't of Justice*, 436 F. Supp. 2d 1204, 1212-18 (D. Wyo. 2006) (surveying federal case law and concluding that a prosecutor's disavowal is not necessary to show lack of standing, "lest the courthouse doors swing open for all disgruntled citizens lacking such assurances."). A mere expectation that a statute on the books will be enforced is not enough. *See Mink*, 482 F.3d at 1253. At bottom, in the absence of allegations indicating that Plaintiffs are a "special priority" for government regulators in enforcing the Quality Assurance Standards, *Kegler*, 436 F. Supp. 2d at 1218 (quotations omitted), Plaintiffs face no credible threat of enforcement.

13

licensed as child care facilities in Colorado. St. Bernadette has been licensed since 2007; St. Mary has been licensed since 2006. Ex. 1, Odean Declaration ¶¶ 22-23. Thirty-three other schools affiliated with the Denver Archdiocese also hold child care licenses. *Id.* ¶ 21. As licensees, they are subject to regulatory oversight. *See* 12 C.C.R. 2509-8. The state often receives complaints regarding licensed child care facilities on a range of topics. Ex. 1, Odean Declaration ¶ 20. The earliest complaint against a Denver Archdiocese school dates to 1992 and involves alleged harsh treatment of a child. But as relevant here, the complaint histories of the 35 licensees affiliated with the Denver Archdiocese reveal no complaints from LGBTQ families or others for discrimination related to a child's or family's protected LGBTQ status. *Id.* ¶ 21. This includes St. Bernadette and St. Mary. The absence of such complaints over such a lengthy period as licensed child care providers (16 years for St. Bernadette and 17 years for St. Mary) confirms that Plaintiffs face no credible threat.

Similarly, St. Mary and nine other Denver Archdiocese preschools participate in CCCAP. Ex. 2, Burne Declaration ¶ 13. To participate, these schools contractually agree to not discriminate based on a person's sex, sexual orientation, and other protected characteristics. *Id.* ¶¶ 9-11. St. Mary signed this agreement as recently as August 23, 2023—one week *after* filing this lawsuit. *Id.* ¶ 16. Like the UPK program, the counties that administer CCCAP have received no complaint alleging that St. Mary or any other Denver Archdiocese school has discriminated against a LGBTQ family or child. *Id.* ¶ 18.

The same is true for yet a *third* government program. St. Bernadette and nine other Denver Archdiocese preschools participate in the Denver Preschool Program. Ex. 5, Holguin Declaration ¶ 7. To participate in the Denver program, these schools contractually agree to an

antidiscrimination provision that is even stronger than that required by the UPK program.[4] *Id.*

¶¶ 4-5. St. Bernadette signed this agreement as recently as June 2022. *Id.* ¶ 9 & Ex. 7. And like

the UPK program and CCCAP, the Denver Preschool Program has received no complaint over

its 17-year history suggesting that any of these ten participating Catholic preschools has engaged

in LGBTQ-based discrimination. *Id.* ¶ 10.

The absence of any complaints against Catholic preschools, including the two Plaintiff

schools, across multiple government programs is telling. It shows that Plaintiffs face no credible

threat of enforcement. It remains possible, even likely, that the outcome Plaintiffs so fear may

never come to pass. Plaintiffs thus lack standing to bring their claims.

  **C.** **The Department applies paragraph 18(B) of the Agreement consistently with federal law, thus protecting Plaintiffs' right to prefer their co-religionists and to make employment decisions involving their ministerial employees in accordance with federal law.**

Plaintiffs' amended complaint also fails to establish an actual injury resulting from the

Agreement's paragraph 18(B) that, among other things, prohibits employment discrimination.

Doc. 31-1 at 19, ¶ 127. Plaintiffs allege that they cannot employ individuals "who refuse to

uphold the Catholic Church's beliefs regarding marriage and the family" and this "means that

Plaintiffs cannot sign the UPK Provider Agreement . . . because of its prohibition on

discrimination based on sexual orientation and gender identity" in paragraph 18(B). Doc. 31-1 at

22, ¶¶ 144-45.

---

[4] It is unclear why St. Mary and St. Bernadette found the antidiscrimination provisions for other government programs acceptable but refused to sign the UPK program's substantially similar provision.

Plaintiffs lack standing to challenge paragraph 18(B) for two reasons. *First*, the Department interprets and applies paragraph 18(B) to permit religious organizations to hire co-religionists in accordance with federal law and to make employment decisions involving its ministerial employees as protected by federal law. Ex. 1, Odean Declaration ¶ 16. The Department disavows any intention of interfering with Plaintiffs' faith-based hiring decisions that are protected by federal law. The Department has not caused concrete and particularized injury to Plaintiffs, nor is any such injury imminent. The Department has no history of enforcement against identical conduct, only the Department can bring a breach-of-contract action to enforce the Agreement, and the Department has disavowed enforcement against a religious provider's hiring of co-religionists in accordance with federal law and against a religious provider's employment decisions involving its ministerial employees as protected by federal law.[5] *Id.* ¶¶ 16-17.

*Second*, Plaintiffs' employment-related claims as to paragraph 18(B) are conjectural rather than "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. Again, a lengthy and speculative chain of events would have to occur before Plaintiffs would have standing: (1) an individual applies for a UPK program position with Plaintiffs or is already an employee in Plaintiffs' preschools; (2) Plaintiffs believe the individual is not living life as a co-religionist because they "refuse to uphold the Catholic Church's beliefs regarding marriage

---

[5] The Court and the Department will of course need facts to determine whether a provider's employment decisions regarding its co-religionist employees and ministerial employees are protected by federal law—yet another reason this case is not yet justiciable. For example, determining whether an employee qualifies as a ministerial employee, and thus whether the ministerial exception applies, requires facts absent here. *See generally Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. __ (2020).

and the family," Doc. 31-1 at 22, ¶ 144; (3) Plaintiffs decline to hire or fire the individual; (4) the individual files a complaint with the Department; (5) the Department investigates the complaint; (6) the Department finds a contractual violation; (7) Plaintiffs refuse to remedy the violation; and (8) the Department files a breach of contract claim against Plaintiffs.[6] None of these events have occurred and they may never occur.

Plaintiffs therefore lack standing for their claims premised on the Agreement's paragraph 18(B).

## II.     Plaintiffs' claims are not ripe for adjudication.

Even if Plaintiffs have standing, the Court should still dismiss the amended complaint because Plaintiffs' claims are not yet ripe. The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc*., 509 U.S. 43, 57 n.18 (1993). A "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300 (1998). The ripeness test requires courts to consider: (1) the fitness of the issue for judicial resolution; and (2) the hardship to the parties of withholding judicial consideration. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967); *United States v. Doe*, 58 F.4th 1148, 1154 (10th Cir. 2023). Because Plaintiffs'

---

[6] These hypotheticals do not encompass every possible chain of events or circumstances that may ever lead to an injury.

claims rest entirely on speculation about future events that have not occurred and may never

occur, their claims are not ripe for adjudication.[7]

A.   **Plaintiffs' unripe claims rely on incidents that may never occur, rendering them unfit for judicial resolution.**

In determining whether an issue is fit for judicial resolution, courts consider whether the

issue is "purely legal" and whether "the agency action [is] final." *Sierra Club v. Yeutter*, 911

F.2d 1405, 1415 (10th Cir. 1990). Both show Plaintiffs' claims are unripe.

*First*, Plaintiffs' claims are unfit for judicial decision at this time because they are not

purely legal but rather depend heavily on facts that have not occurred. Whether St. Bernadette or

St. Mary are ever confronted with the prospect of having to enroll a transgender child or LGBTQ

family "may not occur as anticipated, or indeed may not occur at all." *Texas,* 523 U.S. at 300.

Indeed, the complete absence of complaints against the Plaintiff schools—or *any* Denver

Archdiocese-affiliated school for that matter—for LGBTQ-based discrimination over a 15-year-

plus period shows that the events Plaintiffs fear might never occur. Moreover, a school's reasons

for declining to enroll a student may be multi-pronged, with some grounded in permissible

reasons (e.g., no slots available) and some in impermissible reasons (e.g., LGBTQ-based

discrimination). Only a fact-based inquiry that fully develops the record will allow the

Department, and the Court, to know for sure. *See Pub. Affairs Assocs. v. Rickover*, 369 U.S. 111,

---

[7] Article III ripeness defects are evaluated under Rule 12(b)(1), while prudential ripeness is evaluated under Rule 12(b)(6). *See North Mill Street, LLC v. City of Aspen*, 6 F.4th 1216, 1230 (10th Cir. 2021). Defendants assert Plaintiffs' claims are unripe under both. "Even when an appeal satisfies Article III's 'case or controversy' requirement, [the court] may still decline to review it under the prudential ripeness doctrine." *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019).

112-13 (1962) (declining to adjudicate a dispute of "serious public concern" absent "an adequate and full-bodied record").

Plaintiffs' employment-related claims are similarly dependent on facts that have not yet occurred and may never occur. The Department has not taken or threatened enforcement action based on Plaintiffs' employment policies governing the hiring of co-religionists and ministerial employees. And again, it may never do so, given the chain of speculative events that would first have to occur. Indeed, the Department has disavowed enforcement of paragraph 18(B) of the Agreement for employment decisions made pursuant to federal law. For these reasons, this dispute is unfit for judicial decision.

*Second*, the Department's agency action is not final in two important ways. For one, the Department has never initiated an investigation into either St. Bernadette or St. Mary because neither is participating in the UPK program and, in any event, no LGBTQ family has lodged a complaint. Unless and until such an investigation occurs, the Department's agency action is not yet final, rendering the issue unripe for judicial review. For another, the Department is currently at the early stages of its rulemaking process to establish the Quality Assurance Standards required by the Colorado General Assembly. *See* Colo. Rev. Stat. § 26.5-4-205(1)(a); Ex. 1, Odean Declaration ¶ 13. As part of the rulemaking process, the Department is evaluating how broadly or narrowly to define "congregation" for purposes of the UPK program. Ex. 1, Odean Declaration ¶ 15. This definition is key because faith-based providers can reserve all or a portion of their preschool seats for members of their congregation. Doc. 30-6 at 3; Doc. 31-1 at 19, ¶ 129. Depending on the results of the rulemaking and the definition of congregation, certain of Plaintiffs' claims may be rendered moot or, at minimum, require that Plaintiffs amend their

complaint to adjust their claims. As such, Plaintiffs' unripe claims are not fit for judicial resolution at this early stage.

      **B.**      **Plaintiffs will experience no hardship if the Court withholds judicial review pending an actual controversy.**

On the second ripeness factor, withholding judicial review until Plaintiffs' claims ripen into an actual dispute will not result in hardship. Hardship occurs when the plaintiff incurs an "immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance[.]" *Abbott Laboratories*, 387 U.S. at 153. Here, Plaintiffs are experiencing no change in the conduct of their own affairs, let alone an "immediate and significant" change that results in penalties for noncompliance. *Id.* Plaintiffs voluntarily chose to forego state funds offered through the UPK program and declined to seek court intervention before making that choice. Plaintiffs are subject to no penalties for continuing their current operations. Plaintiffs' situation thus remains the same as it was before the UPK program was promulgated. *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1093 (10th Cir. 2018) ("By declining to address the remedy of a violation which may never occur, we simply maintain the status quo.").

Accordingly, Plaintiffs' claims are not ripe for adjudication.

## CONCLUSION

This Court should dismiss the amended complaint for lack of subject matter jurisdiction because Plaintiffs lack standing and, even if they have standing, their claims are not ripe for adjudication.

Dated: October 6, 2023          PHILIP J. WEISER
                                Attorney General


                                s/ *Grant T. Sullivan*
                                _____
                                *Virginia R. Carreno,* Second Assistant Attorney General
                                *Grant T. Sullivan*, Assistant Solicitor General
                                *Ryan Lorch*, Senior Assistant Attorney General
                                *Nicole Rust*, Assistant Attorney General
                                1300 Broadway, Denver, CO 80203
                                Telephone: (720) 508-6349
                                Email: virginia.carreno@coag.gov; grant.sullivan@coag.gov;
                                ryan.lorch@coag.gov; niki.rust@coag.gov
                                *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2023, I electronically filed the foregoing **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

Eric C. Rassbach
Joseph C. Davis
Nicholas R. Reaves
Mark L. Rienzi
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Suite 400
Washington, D.C. 20006
erassbach@becketlaw.org; jdavis@becketlaw.org; nreaves@becketlaw.org;
mrienzi@becketlaw.org

*Attorneys for Plaintiffs*

                                s/ Bonnie Smith
                                _____
                                *Bonnie Smith*

<u>Exhibit List to Defendant's Motion to Dismiss Plaintiffs' Amended Complaint</u>

Ex. 1: Declaration of Dawn Odean dated October 6, 2023.

Ex. 2: Declaration of Jesse Burne dated October 5, 2023.

Ex. 3: Attachment 1 to Declaration of Jesse Burne, Colorado Child Care Assistance Program ("CCCAP") Fiscal Agreement valid January 1, 2023 through December 31, 2025.

Ex. 4: Attachment 2 to Declaration of Jesse Burne, signed CCCAP Fiscal Agreement by St. Mary Catholic Preschool in Littleton, Colorado, signed August 23, 2023.

Ex. 5: Declaration of Elsa Holguin dated October 3, 2023.

Ex. 6: Attachment 1 to Declaration of Elsa Holguin, Denver Preschool Program ("DPP") 2022-2023 Provider Agreement.

Ex. 7: Attachment 2 to Declaration of Elsa Holguin, signed DPP Provider Agreement for 2022-2023 by St. Bernadette Catholic Preschool in Lakewood aka "Wellspring Catholic Academy of St. Bernadette," signed June 1, 2022.