**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

ST. MARY CATHOLIC PARISH IN
LITTLETON; ST. BERNADETTE
CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY; LISA SHELEY; and
THE ARCHDIOCESE OF DENVER,

*Plaintiffs*,

    v.

LISA ROY, in her official capacity as Executive
Director of the Colorado Department of Early
Childhood; and DAWN ODEAN, in her official
capacity as Director of Colorado's Universal
Preschool Program,

*Defendants*.

Case No. 1:23-cv-2079-JLK


**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION
TO DISMISS PLAINTIFFS'
AMENDED COMPLAINT
(ECF NO. 38)**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................3

INTRODUCTION ...............................................................................................................7

FACTUAL BACKGROUND ...............................................................................................8

    A.  Catholic education in the Archdiocese of Denver ...............................................8

    B.  The Department of Early Childhood's Universal Preschool Program.............................11

    C.  The Department's exclusion of Catholic preschool providers...........................................13

LEGAL STANDARD..........................................................................................................14

ARGUMENT ......................................................................................................................15

I.  Plaintiffs have easily shown Article III standing. ..................................................15

    A.  Defendants both misunderstand and ignore Plaintiffs' injury. .........................15

        1.  Defendants have excluded Plaintiffs from UPK Colorado
            because of their religious character and exercise.....................................15

        2.  This is not a pre-enforcement challenge. .................................................21

    B.  Defendants' actions have injured Plaintiffs and an injunction from
        this Court would remedy that injury. ...............................................................25

II.  Plaintiffs' claims are ripe..........................................................................................26

CONCLUSION....................................................................................................................30

CERTIFICATE OF SERVICE ............................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)............................................................................................21

*Albertson v. Subversive Activities Control Bd.*,
  382 U.S. 70 (1965)............................................................................................28

*Am. Petroleum Inst. v. EPA*,
  906 F.2d 729 (D.C. Cir. 1990)...........................................................................29

*Amawi v. Paxton*,
  956 F.3d 816 (5th Cir. 2020)..............................................................................18

*Amawi v. Pflugerville Indep. Sch. Dist.*,
  373 F. Supp. 3d 717 (W.D. Tex. 2019)...............................................................18

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012).............................................................26, 27, 29

*Bd. of Educ. of Ottawa Twp. High Sch. Dist. 140 v. Spellings*,
  517 F.3d 922 (7th Cir. 2008)..............................................................................17

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020).........................................................................................8

*Brown v. Buhman*,
  822 F.3d 1151 (10th Cir. 2016)..........................................................................24

*Buchwald v. Univ. of N.M. Sch. of Med.*,
  159 F.3d 487 (10th Cir. 1998)......................................................................17, 25

*Carney v. Adams*,
  141 S. Ct. 493 (2020).........................................................................................19

*Carson v. Makin*,
  142 S. Ct. 1987 (2022)..........................................................................15, 16, 17

*Carson v. Makin*,
  979 F.3d 21 (1st Cir. 2020)....................................................................16, 17, 25

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................................20

*Colorado v. U.S. Dep't of Just.*,
455 F. Supp. 3d 1034 (D. Colo. 2020) ...........................................................................18

*Colorado v. U.S. Env't Protection Agency*,
989 F.3d 874 (10th Cir. 2021) .......................................................................................20

*Consumer Data Indus. Ass'n v. King*,
678 F.3d 898 (10th Cir. 2012) .......................................................................................25

*Espinoza v. Mont. Dep't of Rev.*,
140 S. Ct. 2246 (2020) ...................................................................................................16

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) .....................................................................................20

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ...................................................................................................17

*Hassan v. Colorado*,
870 F. Supp. 2d 1192 (D. Colo. 2012) ...........................................................................27

*Hill v. Warsewa*,
947 F.3d 1305 (10th Cir. 2020) .....................................................................................26

*Initiative & Referendum Inst. v. Walker*,
450 F.3d 1082 (10th Cir. 2006) ...............................................................................14, 21

*Jordahl v. Brnovich*,
336 F. Supp. 3d 1016 (D. Ariz. 2018) ...........................................................................18

*Jordahl v. Brnovich*,
789 F. App'x 589 (9th Cir. 2020) ...................................................................................18

*Koontz v. St. John's River Water Mgmt. Dist.*,
570 U.S. 595 (2013) ........................................................................................................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
527 U.S. 118 (2014) ........................................................................................................27

*Morgan v. McCotter*,
365 F.3d 882 (10th Cir. 2004) .......................................................................................27

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville,*
    508 U.S. 656 (1993)............................................................................................16, 25

*New Hampshire Right to Life Pol. Action Comm. v. Gardner,*
    99 F.3d 8 (1st Cir. 1996)...........................................................................................24

*New Mexicans for Bill Richardson v. Gonzales,*
    64 F.3d 1495 (10th Cir. 1995) ..............................................................................26-27

*North Mill St., LLC v. City of Aspen,*
    6 F.4th 1216 (10th Cir. 2021) ....................................................................................26

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020)...............................................................................................23

*Peck v. McCann,*
    43 F.4th 1116 (10th Cir. 2022) ..................................................................................15

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976)....................................................................................................20

*Powder River Basin Res. Council v. Babbitt,*
    54 F.3d 1477 (10th Cir. 1995) ...............................................................................28-29

*Rocky Mountain Gun Owners v. Polis,*
    No. 23-cv-1077, 2023 WL 5017253 (D. Colo. Aug. 7, 2023)..............................24

*Texas Brine Co. & Occidental Chem. Corp.,*
    879 F.3d 1224 (10th Cir. 2018) ..................................................................................26

*Thomas v. Rev. Bd.,*
    450 U.S. 707 (1981)....................................................................................................19

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017)....................................................................................................16

*Turner v. Fouche,*
    396 U.S. 346 (1970).....................................................................................................21

*Tyler v. Hennepin County,*
    598 U.S. 631 (2023).....................................................................................................17

*United States v. Sup. Ct. of N.M.,*
    839 F.3d 888 (10th Cir. 2016) .............................................................................19, 26

5

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988)..................................................................................24

*Ward v. Utah*,
321 F.3d 1263 (10th Cir. 2003) ...............................................................15

**Statutes**

Colo. Rev. Stat. § 26.5-4-201 .......................................................................11

Colo. Rev. Stat. § 26.5-4-202 .......................................................................11

Colo. Rev. Stat. § 26.5-4-204 .......................................................................11

Colo. Rev. Stat. § 26.5-4-205 .......................................................................11

Colo. Rev. Stat. § 26.5-4-208 .......................................................................11

**Other Authorities**

Catechism of the Catholic Church .................................................................8

*Testimony of Dawn Odean Before the Colorado Legislature Joint Budget
Committee,* 74th Gen. Assemb., First Reg. Sess.......................................12

13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal
Practice & Procedure* § 3531.5 (3d ed. 2023)..........................................20

## INTRODUCTION

*Chutzpah* has been defined as "that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan." Leo Rosten, The Joys of Yiddish 93 (1968). Defendants' motion to dismiss is an extended exercise in *chutzpah* and victim blaming. Defendants are the ones who have harmed Plaintiffs and violated the Constitution. They cannot now complain that Plaintiffs have asserted their rights and haled Defendants into federal court to answer for their misdeeds.

To hear Defendants tell the tale, they are the victims of a "test case" brought by parochial schools and parents who are looking to change First Amendment law. According to Defendants, Plaintiffs alone are responsible for their inability to participate in the State's new universal pre-school program—even as Defendants in the same breath claim they are "alarm[ed]" by Plaintiffs' request that they be permitted to do so.

But it is Plaintiffs who are being victimized by Defendants, not the other way around. It was the State who decided to pursue its goal of increasing preschool access by the counterintuitive means of excluding all Catholic preschools from a "universal" preschool funding program. It was the State who denied an accommodation when the Archdiocese of Denver sought one. And it is the State who could make this lawsuit go away, simply by waiving the specific conditions of the agreements that are causing the First Amendment conflict and by allowing religious families and schools to follow their faith. The injuries resulting from Defendants' actions couldn't be more concrete and immediate: the parochial school Plaintiffs are losing students every month they are barred from UPK Colorado, and Catholic families across Colorado (including the parent Plaintiffs) are losing money, simply because they observe their faith by sending their kids to Catholic school.

Defendants' Article III arguments derive from a fundamental confusion over what kind of civil rights lawsuit this is. Defendants assert that this is a pre-enforcement challenge. But this case is about whether Defendants can insist *today* that Plaintiffs agree to unconstitutional conditions in a

contract in order to participate in UPK Colorado. If Plaintiffs don't sign, they will not get the benefits. So far, Plaintiffs have been shut out of the program for the entire first semester of the school year. That fact eliminates all of Defendants' standing and ripeness arguments. To put it in terms of classic civil rights litigation, Defendants aren't just thinking about excluding Plaintiffs from equal access to educational benefits that ought to belong to every child in Colorado—they are standing in the schoolhouse door.

Defendants explain their refusal to accommodate by saying they are "protect[ing]" families from Plaintiffs' religious exercise. But while Plaintiffs, too, oppose "unjust discrimination," Catechism of the Catholic Church ¶ 2358, they have a right to seek to convey their beliefs to the next generation, including through forming communities composed of those receptive to their beliefs. Allowing them to do so while also participating in UPK Colorado doesn't exclude a single preschool or family whose beliefs are more amenable to the State. Meanwhile, it respects the "promise of the free exercise of religion" that "lies at the heart of our pluralistic society." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1753-54 (2020).

The Court should deny Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 38).

## FACTUAL BACKGROUND

### A.    Catholic education in the Archdiocese of Denver

Plaintiffs St. Mary's and St. Bernadette's operate Catholic preschools to assist parents in providing a high-quality, Catholic education to their children. St. Mary's "aim is to form our preschoolers into 'saints, heroes, and geniuses.'" ECF No. 32-14 ¶ 14. St. Bernadette's offers "a Catholic education that invites all to Dig Deep, to uncover our precious gifts within a loving encounter with God, the 'source and author of life' (*Acts* 3:15)." ECF No. 32-16 ¶ 5. Both preschools also strive to make quality Catholic education affordable, helping to serve the many families of limited

means who desire a Catholic education for their children. At St. Bernadette's, for example, 86 percent of preschool students receive free or reduced-price lunches. *Id.* ¶ 9.

Plaintiffs Daniel and Lisa Sheley are parishioners at St. Mary's who have a four-year-old currently enrolled in St. Mary's preschool. ECF No. 32-18 ¶ 6. The Archdiocese of Denver's Office of Catholic Schools oversees 36 parish and Archdiocesan preschools, including St. Mary's and St. Bernadette's. ECF No. 32-1 ¶¶ 7-8. These schools are subject to the Archdiocese's direction on matters of faith and morals. *Id.*

Educating and forming students in the Catholic faith is the central mission of these schools. ECF No. 32-1 ¶ 23. "Because Jesus asked the Church to form disciple-students, the school is the natural place for discipleship, in learning the Christian faith and forming habits of the Christian life." ECF No. 32-9 at 8. The Catholic school is therefore a "place of evangelization and catechesis, existing to equip students to go forth proclaiming the marvelous works of God." *Id.* at 9. Catholic preschools in particular provide "preparation for further formal instruction," ECF No. 32-1 ¶¶ 20-21, planting the seeds of discipleship by creating a faith-filled and Christ-centered community. ECF No. 32-14 ¶¶ 8-15.

Archdiocesan preschools can only fulfill this purpose if those who lead them are properly formed in the Catholic faith. Accordingly, the Archdiocese requires that those who teach and pass on the Catholic faith to the next generation—including preschool teachers—strive to uphold its tenets in both word and deed, and to meet the requirements of provisional catechetical certification. ECF No. 32-1 ¶¶ 24-26.

Parents and families also play a crucial role in creating a community of faith and discipleship. As the Archdiocese tells parents, "[b]y enrolling your child in our school, you are joining our Catholic educational mission[.]" ECF No. 32-3 at 7. Accordingly, "all Catholic school families must understand and display a positive and supportive attitude toward the Catholic Church, her

teachings, her work, and the mission of the Catholic school." *Id.* at 8. Without this common understanding, Catholic schools could not fulfill their role of supporting parents as the primary educators of their children and forming faith-fostering communities of disciples. ECF No. 32-9 at 8-9. This understanding of what is required to form a faith-filled community informs the Archdiocese's religious belief that its schools should prioritize admitting Catholic families active in Archdiocesan parishes and carefully consider whether admitting students or families who—in word or deed—oppose Catholic teachings will create "intractable conflicts." ECF No. 32-6 at 15; *see also* ECF No. 32-1 ¶ 27.

The Archdiocese insists on an openness to the Catholic faith because when what is being taught in school conflicts with the education and example in the home, this can undermine the mission of Catholic schools and can negatively impact the education provided to other students and families who enroll in the school. *Id.* This has meant that at times Plaintiffs have had to make the difficult decision not to enroll a family in their schools because doing so would "cause conflict and confusion within the school and within their family." ECF No. 32-16 ¶ 26. Ultimately, though, most families who seek out Catholic schools do so *because* they want their child to receive an education that both challenges them intellectually and nourishes them spiritually. And, as Defendants readily admit, despite the fact that the Archdiocese has insisted on adherence to these religious beliefs and taught the truths of the Catholic faiths across its 36 preschools for decades, it has carried out its unique mission without generating complaints from those who don't share these beliefs. ECF No. 38 at 15.

The Archdiocese takes seriously this obligation to help form faithful school communities. The Archdiocese's consistent position has been that those who teach in its schools and participate in its faith communities must be open to and supportive of the Catholic Church's teachings. The Archdiocese provided further guidance on how this manifests itself with regard to issues concerning the "human person and sexual identity" in 2018, issuing a 19-page document explaining the

Catholic Church's beliefs and providing guidance for Catholic schools facing these issues. ECF No. 32-6. The Archdiocese's Office of Catholic Schools helps to implement these beliefs by, among other things, requiring Archdiocesan schools to use its "Statements of Community Belief" when entering into employment contracts, ECF No. 32-1 ¶ 8; providing draft contracts for school staff (including preschool teachers), *id.* ¶ 12; providing courses of study and curriculum guides for mandatory use in Archdiocesan schools, *id.* ¶ 17; and providing ongoing tools and guidance to Archdiocesan schools as they carry out their religious mission, *id.* ¶¶ 13-14.

**B.    The Department of Early Childhood's Universal Preschool Program**

In 2022, Colorado established a system of state funding for "universal" preschool to be administered by the newly created Department of Early Childhood. Colo. Rev. Stat. §§ 26.5-4-201, *et seq.* The new program aims to make some "preschool services" free for all Colorado children, "regardless of their economic circumstances." *Id.* §§ 26.5-4-202(1)(a)(V), 26.5-4-204(1)(a).

For the 2023-24 school year, the Department will reimburse participating preschool providers for 15 hours of preschool per child. This funding may be used "only to pay the costs of providing preschool services directly to eligible children enrolled by the preschool provider." *Id.* § 26.5-4-208(5). Preschools seeking to participate in UPK Colorado must sign a Program Service Agreement. ECF No. 32-15. The Agreement includes two "nondiscrimination" provisions—one covering student enrollment and the other a provider's general operations. First, the Enrollment Mandate requires "each preschool provider [to] provide eligible children an equal opportunity to enroll and receive preschool services regardless of [the] … religious affiliation, sexual orientation, [or] gender identity" of "the child or the child's family." ECF No. 32-15 at 2; ECF No. 38 at 3; *see also* Colo. Rev. Stat. § 26.5-4-205(2)(b). Second, the Catch-all Provision forbids "discriminat[ion] against any person on the basis of … religion, … sexual orientation, [or] gender identity." ECF No. 32-15 at 27; ECF No. 38 at 4.

Despite these requirements, UPK Colorado allows participating preschools numerous opportunities to reject a family that seeks to enroll. For example, UPK Colorado's official Provider Guide lists seven "exception criteria" that providers can use to screen applications. ECF No. 1-4 at 38. These criteria allow, among other things, faith-based providers to serve only families who are part of their "congregation," co-op programs to "require family participation," dual language providers to "screen" program participants, "Head Start grantee" programs to require families to "meet additional factors to enroll." *Id.*; *see also* ECF No. 32-13 at 3 ("faith-based providers can … decline a match from a family that is not part of the congregation"); ECF No. 38 at 5 (confirming "that faith-based providers … may give preference to members of their congregation by reserving all or a portion of their preschool seats for their members."). Currently, only 2 percent of UPK providers are faith-based. *See* ECF No. 38-1 at 3.

UPK Colorado dramatically changed how preschool providers enroll families. Previously, preschools would enroll families in their program after a family applied and was accepted into the school. Now, families enroll directly in UPK Colorado and are then "matched" by an algorithm with a preschool provider. [1] *See also* ECF No. 38-1 ¶ 9. As the Director of UPK Colorado testified last month, this new program "represents more than a policy shift, it is an ongoing cultural shift for Colorado families and preschool providers alike."[2] UPK Colorado, for the first time, has limited the ability of preschools to screen applicants before enrollment. Once a family is "matched" with a preschool provider, "the school then reviews that placement and either accepts the match or uses a department exception process if there is some legitimate reason they are unable to accept the placement."[3] And, as explained above, the Department-sanctioned exceptions *do not* include

---

[1]   *Testimony of Dawn Odean Before the Colorado Legislature Joint Budget Committee,* 74th Gen. Assemb., First Reg. Sess. at 10:59 a.m. (Co. 2023), https://bit.ly/3FmLahg.

[2]   *Id.*

[3]   *Id.*

(and Defendants explicitly rejected) a religious accommodation that would protect Plaintiffs' religious exercise.

### C.    The Department's exclusion of Catholic preschool providers

When UPK Colorado was created in April 2022, St. Mary's and St. Bernadette's hoped to participate and started taking affirmative steps to do so. ECF No. 32-14 ¶¶ 33-37; ECF No. 32-16 ¶ 27. As details about the program emerged, however, the schools and the Archdiocese learned that they would be excluded because of their religious exercise. ECF No. 32-1 ¶¶ 30-33. The Enrollment Mandate and Catch-all Provision—both included in the mandatory Program Service Agreement for 2023-24—prevent Archdiocesan preschools from reserving spots for Catholic families from other Archdiocesan parishes. ECF No. 32-15. They also forbid Archdiocesan schools from taking into consideration whether a child or family is open to and supportive of the Catholic Church's teachings—including its teachings on human sexuality—or whether personal circumstances or actions would create intractable conflicts with what is being taught in the schools. *See, e.g.,* ECF No. 32-16 ¶¶ 22-24; ECF No. 32-14 ¶¶ 25-31. Finally, the Catch-all Provision forbids Archdiocesan preschools from requiring that those who teach the faith agree to live out those teachings in both word and deed, and from implementing policies consistent with these beliefs in their operation. *E.g.*, ECF No. 32-6 at 10-12.

When a coalition of religious preschools, including the Archdiocese, approached Defendants in February 2023 to request a religious accommodation so that they could participate in UPK Colorado, they were swiftly told no religious accommodation would be provided. ECF No. 32-1 ¶ 34; ECF No. 32-13; ECF No. 38 at 5 (acknowledging that "Defendant Roy responded that the Department does not have authority to create an exemption from the statute's antidiscrimination provision."). As a result, the Archdiocese was obligated by its religious beliefs to direct its schools not to participate in UPK Colorado, explaining that "in our review of the UPK statutes … we have found significant concerns with" the UPK Colorado nondiscrimination requirements, which

"clearly run counter to Church teachings and guidance we have provided to Catholic schools in the Archdiocese of Denver with respect to issues of sexual and gender identity." ECF No. 32-11 at 1-2. Accordingly, "due to the significant risk involved and until such a time as religious exemptions can be guaranteed by UPK, parishes and their preschool programs are directed to not enter into any agreements with the state for UPK." *Id.* at 2.

Defendants' denial of a religious accommodation has harmed both the families who send their children to Catholic preschools and the schools themselves. For hundreds of families just like the Sheleys, the State's denial of an accommodation costs them roughly $600 per month. ECF No. 32-18 ¶¶ 6-7. And Archdiocesan preschools like St. Mary's and St. Bernadette's have experienced a significant decrease in enrollment and other harms as a result of their exclusion. *See* ECF No. 32-14 ¶¶ 38-48; ECF No. 32-16 ¶¶ 28-33. At St. Mary's, four-year-old enrollment decreased from 64 to 52 in one year, an almost 20 percent decline. ECF No. 32-14 ¶ 38. The inability to participate in UPK Colorado has also made it more difficult for St. Mary to retain staff and ensure continuity of care. *Id.* ¶¶ 42-46. At St. Bernadette's, four-year-old enrollment dropped from 11 to 6, an almost 50 percent decline. ECF No. 32-16 ¶ 15. But for Defendants' discriminatory exclusion of Catholic preschools, St. Mary's and St. Bernadette's preschools would immediately seek to participate in UPK Colorado. *Id.* ¶ 35; ECF No. 32-14 ¶ 50.

## LEGAL STANDARD

"When evaluating a plaintiff's standing at [the motion to dismiss] stage, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. We also must construe the statements made in the affidavits in the light most favorable to the petitioner." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (citations and quotation marks omitted) (en banc). Further, "[f]or purposes of standing, we must assume the Plaintiffs' claim has legal validity." *Id*. at 1093.

## ARGUMENT

**I.  Plaintiffs have easily shown Article III standing.**

A Plaintiff may "establish Article III standing by showing (1) an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent,' (2) that the injury is 'fairly … trace[able] to the challenged action of the defendant,' and (3) that the injury is likely to be 'redressed by a favorable decision' of the court." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022). "[T]he First Amendment context creates unique interests that lead us to apply the standing requirements somewhat more leniently." *Id.*; *see also Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) ("Because of the significance of First Amendment rights, the Supreme Court 'has enunciated other concerns that justify a lessening of prudential limitations on standing.'").

**A.  Defendants both misunderstand and ignore Plaintiffs' injury.**

Plaintiffs are suffering an ongoing injury: by operation of the Enrollment Mandate and Catch-All Provision, Plaintiffs are forced to choose between following their religious beliefs and participating in UPK Colorado. This is an unconstitutional choice. And it is—as the Supreme Court, the Tenth Circuit, and this Court have all recognized—a concrete injury-in-fact under Article III. Defendants, rather than engage with this argument, try to recharacterize Plaintiffs' case as a pre-enforcement challenge. But, as explained below, this is not a pre-enforcement case. Moreover, even under Defendants' (incorrect) standing theory, Defendants' arguments fail. Plaintiffs have standing.

**1.  Defendants have excluded Plaintiffs from UPK Colorado because of their religious character and exercise.**

Plaintiffs' injury is simple: They are "exclude[d] … from an otherwise generally available public benefit because of their religious exercise." *Carson v. Makin*, 142 S. Ct. 1987, 1998 (2022). As a condition of participating in UPK Colorado, preschool providers must *sign a document* requiring them to agree to provide "an equal opportunity to enroll … regardless of" a child or family's "religious affiliation, sexual orientation [or] gender identity," and not "discriminat[e] against

any person" on these bases. Compl. ¶¶ 123-27; ECF No. 30-3 at 3, 28-29. But the Archdiocese's preschools operate in accordance with their Catholic religious beliefs—so they are forbidden by their faith from agreeing to these requirements. Compl. ¶¶ 138-49; ECF No. 30-1; ECF No. 30-8; ECF No. 30-12. And although the Archdiocese reached out to Defendants, explained the conflict, and asked for an exemption, ECF No. 32-12, Defendants denied that request, ECF No. 32-13.

Because of Defendants' conditions, then, Plaintiffs are barred from participating in UPK Colorado—even as thousands of other Colorado preschools who *don't* share their beliefs *do* participate. ECF No. 38-01 ¶ 9. "When," as here, "the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," "[t]he 'injury in fact' … is the denial of equal treatment resulting from the imposition of the barrier." *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

That is a cognizable injury-in-fact. *Id.* Indeed, it is exactly the injury at issue in each of the trilogy of recent Supreme Court decisions addressing religion-based exclusions from government benefit programs. *Carson*, 142 S. Ct. 1987; *Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017). In each of these cases, the relevant injury was "not the denial of a grant"; it was the denial of a religious school's "right to participate in a government benefit program without having to disavow its religious character." *Trinity Lutheran*, 582 U.S. at 463; *see also Carson v. Makin*, 979 F.3d 21, 30-31 (1st Cir. 2020) ("the plaintiffs' injury in fact inheres in their having lost the 'opportunity' to find religious … education for their children that would qualify for public funding"), *reversed on merits grounds*, 142 S. Ct. 1987. That is precisely the injury Plaintiffs are suffering here: the only way they can participate in UPK Colorado is if they disavow their religious exercise of, *inter alia*, preferring Catholic families in enrollment and considering an applicant's openness to the Church's teachings on marriage and sexuality when making enrollment and employment decisions. *Cf.*

*Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 493 (10th Cir. 1998) ("the injury is the imposition of the barrier itself").

And the circumstances particular to this case make the injury only more concrete. Plaintiffs' preschool directors have testified that they are currently losing enrollment and staff "due to th[e] increased funding" for UPK-participating schools. ECF No. 32-14 ¶¶ 38-42; ECF No. 32-16 ¶¶ 29-33. And Plaintiffs the Sheleys are currently losing around $600 per month because their child's preschool cannot participate. ECF No. 32-18 ¶ 6. "This is a classic pocketbook injury sufficient to give [Plaintiffs] standing." *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023).

In fact, standing here is even clearer than in *Carson*. The plaintiffs there, like the Sheleys, sought to send their children to religious schools that were disqualified because of their religious exercise from participating in a government benefit program. 142 S. Ct. at 1994-95. Yet in *Carson*, unlike here, there was "uncertainty about [the schools'] willingness to participate" even if the challenged condition were struck down. *Compare Carson*, 979 F.3d at 30, *with* ECF No. 32-14, 32-16 (explaining that but for the Enrollment Mandate and Catch-All Provisions, St. Mary and St. Bernadette would seek to participate in UPK Colorado). Nonetheless, the First Circuit in *Carson* found standing, *Carson*, 979 F.3d at 29-32, and at the Supreme Court not a single Justice questioned it. Given *Carson*, this is an *a fortiori* case.

Nor are these cases alone. Rather, "[t]he Supreme Court has addressed many disputes about the validity of conditions attached to" funding "without a single Justice suggesting that the Court was issuing advisory opinions." *Bd. of Educ. of Ottawa Twp. High Sch. Dist. 140 v. Spellings*, 517 F.3d 922, 924 (7th Cir. 2008). In *Fulton v. City of Philadelphia*, for example, the Supreme Court held that Philadelphia's "refusal … to contract with" a Catholic foster-care agency "unless it agrees to certify same-sex couples as foster parents" violated the First Amendment. 141 S. Ct. 1868, 1882 (2021). That is indistinguishable from the injury Plaintiffs are suing over here—the State's "refusal"

to allow Catholic preschools to participate in UPK "unless [they] agree[] to" provide equal access to non-Catholics and families who reject Church teaching on marriage and sexuality. *Id.*

And lower courts around the country have entertained challenges to allegedly unlawful conditions on funding arising in a posture indistinguishable from this case. *See, e.g.*, *Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717, 737-38 (W.D. Tex. 2019) (plaintiffs had standing where "they lost the opportunity to contract with" government agencies "because they refused to sign anti-boycott certifications"); *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1032 (D. Ariz. 2018) ("[T]he Firm was injured when it was asked to promise to refrain from engaging in a broad swath of boycotting activities, at least some of which is protected under the First Amendment, in exchange for receiving a government contract.").[4] Indeed, in *Colorado v. United States Department of Justice*, Colorado itself sued over allegedly unlawful "immigration-related conditions and certifications" attached to federal funding; this Court addressed its claim on the merits and ruled for the State. 455 F. Supp. 3d 1034, 1043-44 (D. Colo. 2020) (Kane, J.).

The State's counter to this argument turns entirely on the claim that Plaintiffs' injury is "self-inflicted." ECF No. 38 at 8-10. According to the State, it was Plaintiffs' "voluntary choice[]" not to participate—a claim it attempts to substantiate by pointing to the Archdiocese's communication to its schools "instruct[ing] its preschools" not to sign the UPK Colorado provider agreements. *Id.*

But if this injury is "self-inflicted," then so were the injuries in (for example) *Carson*, *Fulton*, and *City of Jacksonville*—not to mention the State's own injury in *Colorado v. DOJ*. Unsurprisingly, then, the State's argument is irreconcilable with both the facts and the law.

---

[4] Both these decisions were vacated on appeal after the government—rather than challenging standing or defending itself on the merits—exempted the plaintiffs from the challenged condition. *Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020); *Jordahl v. Brnovich*, 789 F. App'x 589 (9th Cir. 2020).

Factually, the argument is based on a selective, misleading quotation of the Archdiocese's communication to its schools. The Archdiocese did not arbitrarily direct its preschools not to participate despite their being "eligible." ECF No. 38 at 9. Rather, it told them that because "elements of" UPK Colorado's "non-discrimination requirements … clearly run counter to Church teaching," they could not participate without coming into "non-compliance for upholding Church teaching in our employment and admission practices," risking "penalties," and "cooperat[ing] with an ideology and agenda contrary to our beliefs on the human person." ECF No. 32-11 at 2. In other words, the nonparticipation here isn't due to an Archdiocesan fit of whimsy; it's the result of the State "condition[ing] receipt of an important benefit upon conduct proscribed by [the Archdiocese's] faith," *Thomas v. Review Board*, 450 U.S. 707, 717-18 (1981)—exactly what this lawsuit is all about. *See also Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.").

Legally, a plaintiff does not have to agree to an allegedly unconstitutional condition to challenge it. Rather, as the Tenth Circuit has explained, "it is an injury in itself to avoid lawful conduct"—like participation in UPK—"to avoid the application of an allegedly unlawful Rule"—like the challenged conditions here. *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 902-03 (10th Cir. 2016). Of course, the plaintiff must show that he is "'able and ready' to apply" for the benefit absent the challenged condition. *Carney v. Adams*, 141 S. Ct. 493, 499-500 (2020). But that Plaintiffs have met that requirement is both undisputed and indisputable in this case. *See* ECF No. 32-14 ¶ 50 ("If St. Mary's preschool were not prevented from participating in the UPK program because of our sincere religious beliefs, we would seek to participate in the program immediately."); ECF No. 32-16 ¶ 35 (same for St. Bernadette's). Indeed, both St. Mary's and St. Bernadette's have attained four-star ratings (the second highest) from the State's Colorado Shines ratings system, are

licensed by the State, and have already participated in other government programs (like those cited by the State itself, the Denver Preschool Program and the Colorado Child Care Assistance Program) that do not impose the same unlawful conditions, *see infra* Part I.A.2.

Tellingly, none of the State's "self-inflicted harm" cases, ECF No. 38 at 9-10, have anything to do with an unconstitutional-conditions challenge like this one. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-18 (2013) (claimed fear of future surveillance); *Colorado v. U.S. Env'l Protection Agency*, 989 F.3d 874, 888 (10th Cir. 2021) (self-inflicted harm where state tied state law to federal law *before* challenged change to federal law, then attempted to rely on link to demonstrate standing); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (states' claimed injuries arose from "decisions by their respective state legislatures," which "[n]othing prevent[ed]" them from changing). Indeed, the Tenth Circuit has already distinguished the State's lead case, *Clapper*, as "concern[ing] 'the actions of the political branches in the fields of intelligence gathering and foreign affairs,' where the Court engages in an especially rigorous standing inquiry"—unlike a case (like this one) "concerning … fundamental" constitutional rights. *Fish v. Schwab*, 957 F.3d 1105, 1120 (10th Cir. 2020) (cleaned up); *see also* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.5 (3d ed. 2023) ("So long as the defendants have engaged in conduct that may have contributed to causing the injury, it would be better to recognize standing[.]").

More to the point, the Tenth Circuit has "rejected the notion that the source of an injury is a litigant's decision not to comply with an allegedly unlawful state regime, rather than the regime itself." *Fish*, 957 F.3d at 1120 (cleaned up). Indeed, "[w]ere this notion to apply," "a court could never enjoin enforcement of an unlawful statute if the plaintiffs could have complied with the statute but elected not to; this hypothetical scenario borders on the absurd." *Id.* Yet that "absurd" result is exactly the one the State asks this Court to reach here. The "allegedly unlawful regime"

consists of the nondiscrimination provisions on which the State has conditioned participation in UPK Colorado; Plaintiffs do not have to "comply with" that regime before they can sue over it. *Id.*

In short, the upshot of the State's position is that the Archdiocese's preschools should—in bad faith—agree to conditions on UPK Colorado funding that they have no intention of complying with, and then hope the State never comes after them in an enforcement action. Yet the First Amendment does not require citizens to "express th[eir] beliefs only at the price of evident hypocrisy." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219-20 (2013). And it is difficult to see how encouraging parties to seek benefits on false pretenses serves the values of Article III—or even of the rule of law. *See Turner v. Fouche*, 396 U.S. 346, 361 n.23 (1970) ("the appellant Heath's allegation that he is not a freeholder," and thus ineligible for the benefit at issue, "is uncontested, and Georgia can hardly urge that her county officials may be depended on to ignore a provision of state law"). Plaintiffs have alleged an injury-in-fact.

### 2.  This is not a pre-enforcement challenge.

Rather than address the actual injury Plaintiffs alleged, Defendants offer a red herring, claiming that Plaintiffs brought a pre-enforcement challenge and must therefore show a credible threat that they will be punished for violating the relevant nondiscrimination provisions. But this is not a pre-enforcement case. In a pre-enforcement challenge, a plaintiff sues *before* she suffers an injury, alleging a future government action will cause her harm. Here, by contrast, Plaintiffs alleged they are *already* injured by their exclusion from UPK Colorado, because they cannot agree to the provisions (as the State requires them to do) in the first place. In other words, the law has already put Plaintiffs to the unconstitutional choice of either upholding their religious beliefs or receiving a government benefit. *Cf. Walker*, 450 F.3d at 1090 (contrasting the pre-enforcement challenge in *Laird v. Tatum* with the two-third requirement already injuring the plaintiffs in *Walker*). That is an

Article III injury, *supra* Part.I.A.1, and it is the only one the Court needs to address to resolve the standing issue here.[5]

Because Defendants focus on the wrong theory of standing, they also focus on the wrong facts—most of which aren't even relevant to the claims brought in this case. But even taking Defendants' factual arguments at face value, they fail. Defendants claim there is no credible threat of enforcement because Plaintiffs "have not alleged … they actually denied a family or child enrollment into their preschool" in violation of the Agreement. ECF No. 38 at 11. While Plaintiffs don't believe this is even *relevant* to standing for the reasons articulated in Part I.A.1, the record shows Plaintiffs have had to do exactly that. *E.g.*, ECF No. 32-16 ¶ 26 (noting that St. Bernadette has had to deny families enrollment on account of disagreements regarding the Archdiocese's religious beliefs).

Defendants also suggest there is no credible threat of enforcement because Plaintiffs have participated in other government programs with non-discrimination provisions. ECF No. 38 at 14-15. But Defendants ignore characteristics of these other programs that make them entirely compatible with Catholic teaching where Colorado UPK is not. Defendants claim that "[t]o participate in [the Denver Preschool Program], these schools contractually agree to an antidiscrimination provision that is even stronger than that required by the UPK program." *Id.* The DPP agreement, however, specifically protects the constitutional rights of faith-based preschool providers. ECF No. 38-7 at 16 ("Nothing in this Agreement shall be construed to … affect the independence of Providers, including any rights protected by the Colorado and U.S. Constitutions and applicable law."). Similarly, the non-discrimination provision for CCCAP covers only "referrals," but Arapahoe County (with whom St. Mary's entered into the CCCAP fiscal agreement) does not make referrals; instead,

---

[5]   Plaintiffs' pre-enforcement challenge arguments are largely recycled from their arguments in *Darren Patterson Christian Academy v. Roy*, where the plaintiff did sign the UPK Colorado Program Service Agreement and brought a pre-enforcement challenge against the enforcement of the Agreement against them.

it directs families to "online child care searches" and other third parties to help them locate providers.[6] Moreover, St. Mary's accepts a child's CCCAP funds only *after* evaluating and admitting that child into their program—another critical difference from UPK Colorado. *See* ECF No. 38-1 ¶ 9 (describing the UPK Colorado "matching" process).

Defendants next purport to "disavow" portions of the Catch-All Provision. But the Department claims to disavow the Catch-All Provision *only* as to "hiring of co-religionists"[7] and "a religious provider's employment decisions involving its ministerial employees as protected by federal law." ECF No. 38 at 16. This does not come close to resolving Plaintiffs' challenge to the Catch-All Provision, as that provision covers *all aspects* of a provider's operations—not merely hiring teachers and select staff. ECF No. 30 ¶¶ 142-148. At a minimum, the Catch-All Provision would still cover the same enrollment decisions as the Enrollment Mandate (which Defendants *refuse* to disclaim), and it would cover the day-to-day operations of Plaintiffs' preschools. *See* ECF No. 32-6 at 10-12 (outlining operational policies for Archdiocesan schools). "Disavowing" the ability to violate federal law is like Defendants "disavowing" ownership of the Brooklyn Bridge.

Equally problematic is Defendants' footnote five, which takes back Defendants' purported disavowal. ECF No. 38 at 16 n.5. Defendants explain that, despite the so-called disavowal, the Department will "of course," still need "facts to determine whether a provider's employment decisions regarding its co-religionist employees and ministerial employees are protected by federal law." *Id.* In other words, Defendants would *still investigate* Plaintiffs if they made hiring or firing decisions in line with their sincere religious beliefs to determine whether the Department believes Plaintiffs' actions are protected by federal law. That hardly disavows anything—Defendants already must comply with federal law.

---

[6]   Arapahoe County, *Child Care Assistance*, https://perma.cc/3QVM-KLKQ.
[7]   The Supreme Court has expressly rejected a "co-religionist" requirement in ministerial exception cases. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2068-69 (2020).

Even Defendants' pre-enforcement standing theory fails on its own (flawed) terms. Defendants contend Plaintiffs lack standing because they have not "alleged a sufficiently imminent threat of enforcement." ECF No. 38 at 12. But Defendants ignore precedent confirming that challenges to recently enacted statutes presumptively satisfy the "credible threat of enforcement" requirement because courts assume the government will enforce its newly enacted laws. *E.g., Rocky Mountain Gun Owners v. Polis*, No. 23-cv-1077, 2023 WL 5017253, at *7 (D. Colo. Aug. 7, 2023) ("Here, the statute is new, there is no evidence of an assurance that the statute will not be enforced, and there is no indication that the statute is moribund based on a change in controlling law. For the purpose of a preliminary injunction, the Individual Plaintiffs have made a clear showing of a credible threat of prosecution." (internal citation omitted)); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 14-15 (1st Cir. 1996) (analyzing four Supreme Court decisions addressing this issue).

Here, Plaintiffs challenge a recently enacted provision of Colorado law and a recently created government program. And besides failing to meaningfully disavow the Catch-all Provision, Defendants have explicitly *refused* to disavow enforcement of the Enrollment Mandate. ECF No. 38 at 13 n.3. Plaintiffs' religious beliefs and conduct are also well known to the State, including to the Governor, who expressed his disapproval of Plaintiffs' position in this case. ECF No. 32 at 16-17. There is thus no question Plaintiffs face a credible threat of enforcement should they violate their religious beliefs and, in bad faith, sign the Agreement. *E.g., Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016) ("A credible threat is one that is … not 'imaginary or wholly speculative.'" (citation omitted)).

Adopting the State's contrary theory would also insulate exclusionary government programs from legal challenge across Colorado. Here, Defendants claim Plaintiffs lack standing because

24

they have not signed the Agreement. But in the parallel *Darren Patterson* case, Defendants claim that by signing the Agreement, the plaintiff there cannot challenge UPK Colorado's requirements. *See* Motion to Dismiss, *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-1557 (D. Colo. Aug. 7, 2023), ECF No. 28. The State instead seems to think a plaintiff must wait for the government to bring an enforcement action before it can even think about suing. That is not the law. *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 907 (10th Cir. 2012) ("[P]laintiff … 'should not be required to await and undergo [enforcement] as the sole means of seeking relief.'") (citation omitted).

### B.  Defendants' actions have injured Plaintiffs and an injunction from this Court would remedy that injury.

With a proper understanding of the injury-in-fact, the other two elements of standing are straightforward. The State's actions cause the injury, since, but for the challenged conditions, Plaintiffs would seek to participate in UPK Colorado. ECF No. 32-14 ¶ 50; ECF No. 32-16 ¶ 35; *see also Carson*, 979 F.3d at 30-31; *City of Jacksonville*, 508 U.S. at 666 n.5. That is, Plaintiffs' current "lost opportunity" to participate "is fairly traceable to the" UPK Colorado conditions currently preventing them from doing so. *Carson*, 979 F.3d at 31.

Likewise, this Court can easily redress that injury—with an injunction allowing Plaintiffs to participate without regard to the challenged conditions. *See* ECF No. 30 at 35-36; ECF No. 32 at 8; *see also City of Jacksonville*, 508 U.S. at 666 n.5. As in *Carson*, "invalidation of [the challenged conditions] would restore the plaintiffs' now non-existent *opportunity* to" participate in UPK. 979 F.3d at 31; *see also, e.g.*, *Buchwald*, 159 F.3d at 493 (plaintiff denied admission for discriminatory reason "has standing to seek a prospective injunction ordering her admission to the school").

The State offers no argument on redressability. And its only argument on causation is to reiterate its "self-inflicted injury" argument, which fails for the reasons stated above. *Supra* Part I.A.1. Plaintiffs have standing.

## II.   Plaintiffs' claims are ripe.

Defendants attempt to hedge their bets, also invoking ripeness. ECF No. 38 at 17-20. Their ripeness arguments, however, suffer from the same fundamental flaw as their standing arguments: a misconception of Plaintiffs' injury. As explained above, this case is not about a hypothetical future action by the Department to "enforce" the provisions of the Agreement and the related Quality Standards. Instead, Plaintiffs have been and are currently being injured by their exclusion from UPK Colorado because they cannot sign the Program Service Agreement. *Supra* Part I.A.1. Their claims are therefore ripe for adjudication.

Ripeness "derives from both constitutional and prudential concerns" and its purpose "is to prevent the premature adjudication of abstract claims." *Texas Brine Co. & Occidental Chem. Corp.*, 879 F.3d 1224, 1229 (10th Cir. 2018). Here, however, constitutional ripeness rises or falls with standing: "if a threatened injury is sufficiently imminent to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (cleaned up); *Supreme Ct. of N.M.*, 839 F.3d at 903. Because Plaintiffs are currently being injured, their claims are constitutionally ripe.

As for prudential ripeness, courts engage in this inquiry by balancing "the fitness of the issues raised for judicial review," with "the hardship to the parties from withholding review." *Awad*, 670 F.3d at 1124 (ellipses omitted).[8] "[I]n determining the fitness of the issue for review, this Court considers whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Texas Brine*, 879 F.3d at 1229 (cleaned up). To assess hardship from withholding judicial review, courts ask "whether the challenged action creates a 'direct and immediate' dilemma for the parties." *New Mexicans for Bill Richardson v. Gonzales*,

---

[8]   As Defendants noted, prudential ripeness is decided under Rule 12(b)(6). ECF No. 38 at 18 n.7; *see North Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1230 (10th Cir. 2021). As such, it is judged by "accept[ing] as true the well-pleaded factual allegations in the complaint" and assuming the validity of Plaintiffs' claims. *Hill v. Warsewa*, 947 F.3d 1305, 1308 (10th Cir. 2020).

64 F.3d 1495, 1499 (10th Cir. 1995) (citation omitted); *Awad*, 670 F.3d at 1125. Here, both factors cut in favor of this Court discharging its "virtually unflagging" "'obligation' to hear and decide" this justiciable case. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 527 U.S. 118, 126 (2014) (citation omitted).

*Fitness.* This case is fit for judicial review. The issues involved are far from abstract or hypothetical. UPK Colorado is currently operating, and nearly 2,000 providers are currently receiving funding from the program. ECF No. 38-1 ¶ 9. For Plaintiffs to do likewise, Defendants admit that Plaintiffs must sign the Program Service Agreement and operate according to its conditions— indeed, they denied Plaintiffs' request for a religious accommodation and even claimed they *could not* grant an accommodation under state law. *See* ECF No. 38 at 3; ECF No. 30-3 at 3, 5, 28-29. But Plaintiffs cannot sign a binding legal agreement committing them to operate in this manner because doing so would violate their religious beliefs. Compl. ¶¶ 138-49. The dispute between the parties is thus properly teed up for resolution.

Legal questions also predominate in this dispute. Whether Plaintiffs' ongoing exclusion from UPK Colorado is constitutionally permitted is a question of law. *See Hassan v. Colorado*, 870 F. Supp. 2d 1192, 1198 (D. Colo. 2012) (potential candidate's challenge required no further factual development because it turned on the legal issue of the validity of the condition being challenged), *aff'd*, 495 F. App'x 947 (10th Cir.). The central facts—the conditions imposed on participation, and the conflict between those conditions and Plaintiffs' religious exercise—are undisputed. And any ancillary factual questions raised by Defendants can be (and are being) resolved through expeditious discovery. *Cf. Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004) ("the ripeness inquiry asks whether the challenged harm has been sufficiently realized *at the time of trial*" (emphasis added)).

In response, Defendants say this controversy is not fit for review because "[w]hether St. Bernadette or St. Mary are ever confronted with the prospect of having to enroll a transgender child

27

or LGBTQ family 'may not occur.'" ECF No. 38 at 18. But again, Plaintiffs are not challenging future enforcement against *violations* of the provider agreement; they are challenging the agreement's *imposition of unconstitutional conditions* itself. In other words, the event on which Plaintiffs' claim rests—the State's conditioning Plaintiffs' UPK Colorado participation on their agreement to provide equal access to families who reject Church teaching—has already "occur[red]." The question in this case is whether that condition is lawful.

Regardless, although it is unnecessary, even Defendants' scenario, too, has occurred—Plaintiffs have consistently abided by their religious beliefs in making enrollment and employment decisions, including by having to turn away families who disagree with the very teachings at issue here. *See* ECF No. 32-16 ¶ 26. That Defendants believe this religious exercise has never generated a complaint only underscores the needlessness of their unlawful insistence that Plaintiffs waive it as a condition of participating. *See* ECF No. 38-01 ¶ 24.

Next, Defendants note they are "at the early stages of" a "rulemaking process" related to the Quality Assurance Standards, which they say also undercuts fitness. ECF No. 38 at 19. But Defendants do not even hint that a future rule could give Plaintiffs all the relief they are seeking here. Far from it, they characterize that relief as "alarming," *id.* at 1, emphasize that the Enrollment Mandate is required "[b]y statute," *id.* at 3, and cannot help but pepper their allegedly jurisdictional motion to dismiss with asides disputing Plaintiffs' claims on the merits, *id.* at 1, 13 n.2.

More importantly, nothing about the hypothetical future rule alters the fact that Plaintiffs are *now* excluded. Plaintiffs want to participate in UPK Colorado today—and to do so they "are obliged to register and to submit … forms in accordance with presently existing [requirements]." *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 77 (1965). Thus, "the mere contingency that [Defendants] might revise the [requirements] at some future time does not render premature [Plaintiffs'] challenge to the existing requirements." *Id.*; *see also, e.g., Powder River Basin*

*Res. Council v. Babbitt*, 54 F.3d 1477, 1484 (10th Cir. 1995) ("Even though defendant began proceedings to change the statute, those proceedings did not lessen the force of the statute, and there was no guarantee that defendant would actually alter the provision."); *Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 739-40 (D.C. Cir. 1990) ("If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely.").

**Hardship.** The second ripeness factor, hardship to the parties from withholding review, also weighs heavily in favor of proceeding. Defendants suggest the Court could withhold review pending an effort by Defendants to enforce the challenged conditions in the context of a particular enrollment or employment decision. ECF No. 38 at 18-19. But this situation could only arise if Plaintiffs agree to the conditions in the first place—which they cannot do. Thus, to accept Defendants' suggestion would not be to withhold, but to deny, review—shutting Plaintiffs out of UPK Colorado in perpetuity.

Moreover, Plaintiffs are suffering ongoing—and increasing—harms right now. Every month, families like the Sheleys lose out on roughly $600 because of the religious exercise of sending their four-year-old to a Catholic preschool. ECF No. 32-18 ¶¶ 6-7. And Archdiocesan preschools, including St. Mary's and St. Bernadette's, struggle to maintain staff continuity and fend off decreasing enrollment. ECF No. 32-14 ¶¶ 38-48; ECF No. 32-16 ¶¶ 28-33. There is no doubt that Plaintiffs' exclusion from UPK Colorado "creates a direct and immediate dilemma," *Awad*, 670 F.3d at 1125 (citation omitted): Plaintiffs can either uphold their religious beliefs or sign the UPK Colorado Program Service Agreement, agreeing to abide by requirements inconsistent with those beliefs. ECF No. 32-14 ¶¶ 38-42; ECF No. 32-16 ¶¶ 29-33. This is not a hypothetical or future harm. As Defendants concede, children have been (and are being) matched with preschools and the State is disbursing funds—all conditioned on accepting the terms of the Program Service Agreement. ECF No. 38-1 ¶ 9; *see also* Motion to Dismiss at 6-7, 17, *Darren Patterson Christian Acad.*, No. 1:23-cv-1557, ECF No. 28. This case is ripe for this Court's review.

\*     \*     \*

Plaintiffs' goal is not "to move First Amendment law in a different direction." ECF No. 38 at 1. Their goal is to participate in a generally available public benefit without signing away their First Amendment rights. If Defendants are willing to permit that result absent an adverse ruling from this Court, Plaintiffs remain open to settlement or to a consent judgment. But Defendants have proven unwilling—so Plaintiffs are suffering *current* harm from a program that is *now* up and running. This is a justiciable controversy, and the Court should adjudicate it.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

Dated: October 20, 2023                    Respectfully submitted,


                                           /s/ Eric C. Rassbach
                                           Eric C. Rassbach
                                           Mark L. Rienzi
                                           Joseph C. Davis
                                           Nicholas R. Reaves
                                           Amanda G. Dixon*
                                           The Becket Fund for Religious Liberty
                                           1919 Pennsylvania Ave, N.W.
                                           Suite 400
                                           Washington, D.C. 20006
                                           (202) 955-0095
                                           erassbach@becketlaw.org

                                           * Not admitted to the D.C. Bar; admitted only
                                           in North Carolina. Practice limited to cases
                                           in federal court. Supervised by licensed D.C.
                                           Bar members.

**CERTIFICATE OF SERVICE**

I hereby certify that I have served the foregoing document on all parties via CM/ECF and as required by the relevant federal and local rules.

Dated: October 20, 2023                    /s/ Eric C. Rassbach
                                           Eric C. Rassbach