## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| ST. MARY CATHOLIC PARISH IN LITTLETON; ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD; DANIEL SHELEY; LISA SHELEY; and THE ARCHDIOCESE OF DENVER, | Case No. 1:23-cv-2079-JLK |
| *Plaintiffs*, | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION; AND MEMORANDUM IN SUPPORT** |
| v. | |
| LISA ROY, in her official capacity as Executive Director of the Colorado Department of Early Childhood; and DAWN ODEAN, in her official capacity as Director of Colorado's Universal Preschool Program, | |
| *Defendants*. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................3

MOTION...........................................................................................................................8

MEMORANDUM IN SUPPORT.......................................................................................9

STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................................11

A.  Catholic Education in the Archdiocese of Denver....................................................11

B.  UPK Colorado............................................................................................................16

C.  UPK Colorado and Plaintiffs ....................................................................................22

LEGAL STANDARD......................................................................................................26

ARGUMENT ...................................................................................................................27

I.   Plaintiffs have shown actual success on the merits. ..................................................27

    A.  The Department's exclusionary policies violate the Free Exercise Clause. .....................27

        1.   The Department excludes Plaintiffs because of their religious character and exercise, triggering strict scrutiny. .........................................................27

        2.   The Department's exclusionary policies are not neutral and generally applicable, and therefore independently trigger strict scrutiny...................................30

        3.   The exclusionary policies fail strict scrutiny. ...........................................37

    B.  The Department's exclusionary policies violate First Amendment church autonomy protections.........................................................................................41

        1.   The exclusionary policies violate the ministerial exception. ......................................41

        2.   The exclusionary policies violate the broader church autonomy doctrine. ................................................................................................43

    C.  The Department's exclusionary policies violate expressive association. ..........................44

    D.  The Department's exclusionary policies violate the First Amendment by impermissibly discriminating among religions................................................46

II.  Plaintiffs easily satisfy the remaining injunctive-relief factors. ...............................47

CONCLUSION.................................................................................................................50

CERTIFICATE OF SERVICE ........................................................................................52

INDEX OF EXHIBITS.....................................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
6 F.4th 1160 (10th Cir. 2021) ...............................................................34

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)...............................................................37, 44

*Ashaheed v. Currington*,
7 F.4th 1236 (10th Cir. 2021) ...............................................................36

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ...............................................................46, 48

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) ...............................................................33, 34, 36

*Blackhawk v. Pennsylvania*,
381 F.3d 202 (3d Cir. 2004)...............................................................33

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)...............................................................44, 45

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)...............................................................37, 40

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002) ...............................................................41, 43, 44

*Butler v. St. Stanislaus Kostka Catholic Acad.*,
609 F. Supp. 3d 184 (E.D.N.Y. 2022) ...............................................................42, 43

*Carson v. Makin*,
596 U.S. 767 (2022)...............................................................27, 28, 29, 30

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ...............................................................45

*Cillo v. City of Greenwood Vill.*,
739 F.3d 451 (10th Cir. 2013) ...............................................................26

*Citizens United v. Gessler*,
773 F.3d 200 (10th Cir. 2014) ...............................................................48, 49

*Colorado Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) ...............................................................37-38, 39, 46

3

*Corp. of Presiding Bishop v. Amos*,
    483 U.S. 327 (1987).............................................................................43

*Darren Patterson Christian Acad. v. Roy*,
    No. 23-cv-01557, 2023 WL 7270874 (D. Colo. Oct. 20, 2023)..................... *passim*

*Denver Homeless Out Loud v. Denver*,
    32 F.4th 1259 (10th Cir. 2022) ...............................................................49

*Employment Div. v. Smith*,
    494 U.S. 872 (1990)..............................................................................36

*Espinoza v. Montana Dep't of Revenue*,
    140 S. Ct. 2246 (2020)...................................................................28, 29, 30

*Everson v. Bd. of Educ.*,
    330 U.S. 1 (1947).................................................................................28

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
    82 F.4th 664 (9th Cir. 2023) ...................................................................34

*Fratello v. Archdiocese of N.Y.*,
    863 F.3d 190 (2d Cir. 2017).....................................................................42

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021)....................................................................... *passim*

*Garrick v. Moody Bible Inst.*,
    412 F. Supp. 3d 859 (N.D. Ill. 2019) ........................................................43

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
    546 U.S. 418 (2006)..............................................................................39

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) ...............................................................48

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) ........................................................... 47-48

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012)......................................................................41, 42, 45

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
    515 U.S. 557 (1995)..............................................................................37

*Kedroff v. St. Nicholas Cathedral*,
    344 U.S. 94 (1952)...............................................................................41

4

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022)................................................................. 30-31, 36, 37, 40

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013).................................................................................29

*Larson v. Valente*,
    456 U.S. 228 (1982)............................................................................46, 47

*Newland v. Sebelius*,
    881 F. Supp. 2d 1287 (D. Colo. 2012)............................................38, 49

*NLRB v. Catholic Bishop of Chi.*,
    440 U.S. 490 (1979)................................................................................45

*Orr v. Christian Bros. High Sch., Inc.*,
    No. 21-15109, 2021 WL 5493416 (9th Cir. Nov. 23, 2021) ....................42

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020)................................................................ 41, 42-43

*Pac. Frontier v. Pleasant Grove City*,
    414 F.3d 1221 (10th Cir. 2005) ..............................................................49

*Peck v. McCann*,
    43 F.4th 1116 (10th Cir. 2022) ...............................................................40

*Petruska v. Gannon Univ.*,
    462 F.3d 294 (3rd Cir. 2006) ..................................................................42

*Pryor v. Sch. Dist. No. 1*,
    No. 1:22-cv-2886, 2022 WL 18145414 (D. Colo. Dec. 23, 2022) ..........28

*Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs of Boulder Cnty.*,
    612 F. Supp. 2d 1157 (D. Colo. 2009)....................................................26

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020)..........................................................................31, 48

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)................................................................................29

*SEC v. GenAudio Inc.*,
    32 F.4th 902 (10th Cir. 2022) .................................................................26

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*,
    426 U.S. 696 (1976)................................................................................47

*Shrum v. City of Coweta*,
  449 F.3d 1132 (10th Cir. 2006) ...................................................................29

*Singh v. Carter*,
  168 F. Supp. 3d 216 (D.D.C. 2016) ..............................................................48

*Skrzypczak v. Roman Catholic Diocese of Tulsa*,
  611 F.3d 1238 (10th Cir. 2010) ...................................................................41

*Slattery v. Hochul*,
  61 F.4th 278 (2d Cir. 2023) ............................................................. 44-45, 46

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
  41 F.4th 931 (7th Cir. 2022) ..................................................................41, 42

*Sw. Stainless, LP v. Sappington*,
  582 F.3d 1176 (10th Cir. 2009) ...................................................................26

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021) ................................................................................31

*Thomas v. Review Bd.*,
  450 U.S. 707 (1981) ....................................................................................28

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ...............................................................................27, 29

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ....................................................................................40

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*,
  22 F.4th 892 (10th Cir. 2022) ................................................................26, 48

*Watson v. Jones*,
  80 U.S. 679 (1872) ......................................................................................47

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) .......................................................................47

*Zorach v. Clauson*,
  343 U.S. 306 (1952) ....................................................................................30

**Statutes**

Colo. Rev. Stat. § 26.5-4-201 ...........................................................................8, 16

Colo. Rev. Stat. § 26.5-4-202 .........................................................................16, 17

Colo. Rev. Stat. § 26.5-4-204 .....................................................................16, 37, 38

Colo. Rev. Stat. § 26.5-4-205 ............................................................................... *passim*

Colo. Rev. Stat. § 26.5-4-208 ............................................................................... 16-17

**Other Authorities**

1983 Code of Canon Law .....................................................................................12, 13

Catechism of the Catholic Church .......................................................................12, 13

Pope Francis, Apostolic Exhortation *Amoris Laetitia* (2016).......................................13

*Testimony of Dawn Odean Before the Colorado Legislature Joint Budget Committee,* 74th Gen. Assemb., First Reg. Sess. (Co. Sept. 20, 2023) ...................................19

Vatican Congregation for Catholic Education, *"Male and Female He Created Them": Towards a Path of Dialogue on the Question of Gender Theory in Education* (2019) ...................................................................................................13

## MOTION

Plaintiffs respectfully move this Court for (1) entry of summary judgment in Plaintiffs' favor pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 and (2) a permanent injunction barring Defendants' unconstitutional conduct. In the alternative, Plaintiffs move for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). For the reasons stated below, and as supported by the attached exhibits, the Court should enjoin Defendants from conditioning Plaintiffs' participation in the Colorado Universal Preschool Program Act, Colo. Rev. Stat. §§ 26.5-4-201, *et seq.*, on Plaintiffs' agreeing to violate their religious beliefs, character, and exercise, including:

(i)     prioritizing Catholic families in admission;

(ii)    requiring employees to abide by and uphold Catholic teachings, including on life, marriage, gender, and human sexuality;

(iii)   considering for purposes of admission or retention whether a family or child seeking placement abides by and upholds Catholic teachings; and

(iv)    operating their schools in accordance with Catholic teachings.

Plaintiffs' counsel conferred with Defendants' counsel on November 17, 2023, regarding this motion. Defendants oppose the motion.

## MEMORANDUM IN SUPPORT

Defendants have excluded Plaintiffs from Colorado's universal preschool program (also called "UPK Colorado") because Plaintiffs follow the teachings of their Catholic faith. If Plaintiffs were willing to change or violate their religious beliefs, there is no question they'd be able to participate in this government funding program immediately. But, because Plaintiffs cannot violate their sincere and long-held beliefs, they are stuck on the outside looking in—while both secular private preschools and faith-based preschools with different religious beliefs participate. To make matters worse, another court in this District has already held that UPK Colorado's conditions likely violate the First Amendment and ordered Colorado to allow a religious school with beliefs similar to Plaintiffs to participate while that litigation continues. Defendants have not appealed that decision. Nevertheless, Defendants continue to fight to exclude Plaintiffs. While such religion-based, "need-not-apply" exclusions were once commonplace, our Nation no longer countenances them. A long line of caselaw stretching from *Everson v. Board of Education* in 1947 to *Carson v. Makin* in 2022 forbids governments from denying otherwise-eligible religious people a public benefit based on their religious exercise.

*Carson* alone is enough to decide this motion, but Defendants' actions trigger scrutiny under the First Amendment in at least seven other ways. First, Defendants have created whole categories of exceptions from UPK Colorado's nondiscrimination requirements, allowing some preschools to account for (among other things) disability, income, and membership in a religious congregation when determining whether to accept a match from the Colorado Department of Early Childhood. Granting these exceptions while denying Plaintiffs a similar exception triggers strict scrutiny under *Tandon*. Second, Defendants have acknowledged that there are two separate mechanisms by which the Department can grant individualized exceptions: a statutory process and a wholly discretionary *de facto* exception process. While the mere existence of these mechanisms for individualized exceptions triggers strict scrutiny under *Fulton*, the record shows Defendants have used (and continue to use) the individualized exception process—further confirming the need for strict scrutiny.

Third, the Department's rejection of Plaintiffs' exception request—while simultaneously allowing over 1,000 other preschools to take advantage of at least one categorical exception—shows that this burden on Plaintiffs' religious exercise is far from incidental; it is a direct and intentional result of Defendants' actions in violation of *Lukumi*. Fourth and fifth, UPK Colorado's Program Service Agreement purports to regulate the hiring and firing of all employees, triggering both the ministerial exception (*Hosanna-Tabor*) and intruding on church autonomy (*Our Lady of Guadalupe*). Fourth and fifth, UPK Colorado's Program Service Agreement purports to regulate the hiring and firing of all employees, both triggering the ministerial exception (*Hosanna-Tabor*) and intruding on church autonomy (*Our Lady of Guadalupe*). Sixth, UPK Colorado's nondiscrimination requirements, by requiring Plaintiffs to allow staff and students to actively undermine their expressive religious message, violate Plaintiffs' right to control the content of their religious expression under *303 Creative*. And finally, Defendants' use of the congregation exception to favor some religious beliefs over others discriminates among religions in violation of *Larson*.

As for Defendants' strict-scrutiny affirmative defense (which doesn't even apply to the ministerial exception and church autonomy claims), Defendants have no compelling reason to discriminate against Plaintiffs in this way. For one thing, Defendants have carved out multiple exceptions to their nondiscrimination policies, undermining their interests in undifferentiated access to all programs for all families. Defendants also admit that not one of the Archdiocese's affiliated preschools has a history of complaints regarding its adherence to Catholic beliefs regarding human sexuality, further undermining any alleged interest in denying Plaintiffs an exception. Finally, the Department has numerous less restrictive alternatives available to advance its alleged interests. The Department therefore cannot hope to satisfy strict scrutiny. The other elements of the injunctive-relief standard are also easily satisfied under *Diocese of Brooklyn* and *Nken*.

The effects of excluding Catholic parents and schools are profound. Plaintiffs Daniel and Lisa Sheley stand to lose around $6,000 worth of preschool education per year because the Department excludes St. Mary's from UPK Colorado. At Wellspring Catholic Academy, where a majority of families are low income, exclusion from UPK Colorado means that these families must sacrifice

even more for their children to receive the Catholic education they are religiously obliged to give. System-wide, the Department's funding of all secular preschools also pushes parents—particularly those of limited means—toward secular alternatives, acting as a tax on religious exercise. Only an injunction from this Court can ensure that the State's universal preschool program is in fact universal.[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Catholic education in the Archdiocese of Denver

1. The Archdiocese of Denver's Office of Catholic Schools oversees thirty-six parish and Archdiocesan preschools, including St. Mary Catholic Preschool and Wellspring Catholic Academy at St. Bernadette. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶¶ 4-8.

2. Educating and forming students in the Catholic faith is the central mission of these schools. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶ 23.

3. Plaintiffs St. Mary's and St. Bernadette's operate Catholic preschools to assist parents in providing a high-quality religious education to their children. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶ 4; Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-14 ¶ 3; Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶¶ 3, 10.

4. St. Mary's "aim is to form our preschoolers into 'saints, heroes, and geniuses.'" Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-14 ¶ 14.

5. St. Bernadette's preschool, Wellspring Catholic Academy, has as its mission "to offer our students, families, and community a Catholic education that invites all to Dig Deep, to uncover our precious gifts within a loving encounter with God, the 'source and author of life' (*Acts* 3:15)."

---

[1] A little over two months ago, Plaintiffs filed a motion for a preliminary injunction, which remains pending. ECF No. 32 (filed Sept. 13, 2023). With the benefit of subsequent discovery, the record is now, Plaintiffs submit, sufficiently developed for the Court to render summary judgment; Plaintiffs therefore now move for summary judgment and request that the Court issue a permanent injunction. In the event, however, that the Court determines more discovery is needed before considering summary judgment, Plaintiffs respectfully renew (in the alternative) their motion for a preliminary injunction. *See* Fed. R. Civ. P. 65(a).

Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶ 5; Attachment A to Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-17.

6. Both St. Mary's and Wellspring's preschools have attained four-star ratings (the second highest) from the State's Colorado Shines rating system. *See* Ex. 8 at 2, 6.

7. Plaintiffs Daniel and Lisa Sheley are St. Mary's parishioners who currently have a four-year-old in preschool at St. Mary's. Declaration of Daniel Sheley (filed Sept. 13, 2023), ECF No. 32-18 ¶ 6.

8. The Catholic Church imposes a general obligation on Catholic "[p]arents ... to entrust their children to those schools which provide a Catholic education." 1983 Code of Canon Law c. 798. They may refrain from doing so only "[i]f they are unable[.]" *Id.*

9. The Sheleys believe they are "commanded by [their] faith to provide [their] children with a Catholic education." Declaration of Daniel Sheley (filed Sept. 13, 2023), ECF No. 32-18 ¶ 5.

10. Accordingly, they send their preschooler to a Catholic preschool. Because they have chosen a Catholic preschool rather than a secular one, they are losing out on roughly $600 per month in UPK Colorado benefits. Declaration of Daniel Sheley (filed Sept. 13, 2023), ECF No. 32-18 ¶ 6.

11. The thirty-six preschools of the Archdiocese of Denver, including St. Mary's and Wellspring, are subject to the Archdiocese's doctrinal guidance on matters of faith and morals. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶¶ 7-8, 16-17.

12. The Archdiocese's Office of Catholic Schools helps to implement Catholic beliefs by, among other things, offering guidance on matters of faith and morals. This includes providing Archdiocesan schools with the Archdiocese's "Statements of Community Belief" to use when entering into employment contracts, *see* Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶¶ 7-8, 16-17; providing draft contracts for school staff (including preschool teachers), *id.* ¶ 12; providing courses of study and curriculum guides for mandatory use in Archdiocesan schools, *id.* ¶ 17; and providing ongoing tools and guidance to Archdiocesan schools as they carry out their religious mission, *id.* ¶¶ 13-14.

13. The Catholic Church teaches that the Church "has been sent out by Christ on a mission to the whole of the human race," and that "[a]ll" are "called to belong to the new People of God." Catechism of the Catholic Church ¶ 831.

14. The Catholic Church opposes "unjust discrimination" of all types. *Id.* ¶ 2358.

15. The Catholic Church teaches that sexual acts outside of a marriage between one man and one woman are morally wrong and do not serve the good of the person or society, *id.* ¶¶ 1601, 2390; as well as that biological sex is a gift from God that cannot be "separated" from "gender" and should be "accep[ted] and respect[ed] as it was created," Pope Francis, Apostolic Exhortation *Amoris Laetitia*, ¶ 56 (2016).

16. The Catholic Church maintains that conveying these teachings is especially important in schools, which are "the principal assistance to parents in" forming Catholic children. 1983 Code of Canon Law c. 796 § 1; *accord, e.g.*, Vatican Congregation for Catholic Education, *"Male and Female He Created Them": Towards a Path of Dialogue on the Question of Gender Theory in Education* (2019); Attachment B to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-3 at 7-8.

17. In accordance with the Church's teachings, the Archdiocese has provided extensive guidance on issues concerning the "human person and sexual identity," issuing an eighteen-page document explaining the Church's beliefs and providing guidance for Catholic schools. *See* Attachment E to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-6.

18. The Archdiocese defines "parishioners" at Catholic parishes to include "Catholic individuals residing within the geographic boundaries of a parish or who have registered with the parish, typically by submitting basic demographic information to the parish's office." Ex. 7 at 10 (Interrogatory No. 10).

19. The Archdiocese operates 148 parishes, stations, or mission parishes but has only 36 preschools. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶ 29.

20. St. Mary's, Wellspring, and the Archdiocese believe that "[b]ecause Jesus asked the Church to form disciple-students, the school is the natural place for discipleship, in learning the

Christian faith and forming habits of the Christian life." Attachment H to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-9 at 8. The Catholic school is therefore a "place of evangelization and catechesis, existing to equip students to go forth proclaiming the marvelous works of God." *Id.* at 9. Catholic preschools in particular provide "preparation for further formal instruction," planting the seeds of discipleship by creating a faith-filled and Christ-centered community. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶¶ 20-21.

21. St. Mary's, Wellspring, and the Archdiocese believe that Archdiocesan preschools can fulfill this mission only if those who lead the community are properly formed in the Catholic faith and only if those who make up the community are open and receptive to the teaching of the faith. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶¶ 24-26; Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-14 ¶ 17.

22. Accordingly, the Archdiocese requires that those who teach and pass on the Catholic faith, including all preschool teachers, strive to uphold Catholicism's tenets in both word and deed and meet the requirements of provisional catechetical certification. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶¶ 24-26; Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-14 ¶ 17.

23. St. Mary's, Wellspring, and the Archdiocese believe that Archdiocesan preschools must prioritize admitting Catholic families active in Archdiocesan parishes, including those in parishes other than the parish sponsoring a particular preschool. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶ 28.

24. Plaintiffs believe that parents and families are partners in fulfilling the Catholic educational mission. Attachment B to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-3 at 7.

25. Accordingly, "all Catholic school families must understand and display a positive and supportive attitude toward the Catholic Church, her teachings, her work, and the mission of the Catholic school." Attachment B to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-3 at 8.

26. St. Mary's, Wellspring, and the Archdiocese believe that without this common understanding, Catholic schools could not fulfill their role of supporting parents as the primary educators of

their children and of forming faith-fostering communities of disciples. Attachment H to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-9 at 9-10, 29-30; *see also* Attachment E to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-6 at 4 (encouraging "partnership with parents").

27. Therefore, St. Mary's, Wellspring, and the Archdiocese believe that Archdiocesan preschools must carefully consider whether admitting students or families who oppose Catholic teachings in word or deed will create intractable conflicts that hinder the school's mission. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶ 27.

28. The Archdiocese insists that families demonstrate an openness to the Catholic faith because, when what is being taught in the classroom conflicts with the education and example in the home, the conflict can undermine the Catholic schools' mission. Attachment E to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-6 at 15; *see also* Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶ 27.

29. The Archdiocese believes that enrolling students and families who, in word or deed, oppose or contradict the teaching of the Catholic faith negatively impacts the education provided to other students and families who enroll in Catholic schools seeking a Catholic education. Attachment E to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-6 at 9-17; *see also* Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶¶ 22-26.

30. Accordingly, at times Archdiocesan schools and preschools have had to make the difficult decision to encourage families to seek alternative options rather than enroll in their schools because admitting a particular family would "cause conflict and confusion within the school and within their family." Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶ 26.

31. These beliefs are articulated in the Archdiocese's document entitled "The Splendor of the Human Person: A Catholic Vision of the Person and Sexuality," which the Archdiocese promulgated in 2021. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶ 13; *see generally* Attachment G to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-8.

32. The Archdiocese has also issued guidance to its Catholic schools on how to implement these beliefs regarding gender, sexuality, and the human person. *See* Attachment E to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-6.

33. In accordance with this guidance, Archdiocesan schools use terminology consistent with Catholic teachings, Attachment E to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-6 at 2; use pronouns that correspond with biological sex, *id.* at 10; enforce dress code expectations corresponding to biological sex, *id.* at 11; and make changing and bathroom facilities available only in correspondence with biological sex, *id.* at 12.

34. The Archdiocese also believes that "[s]ituations involving individuals should be addressed with pastoral care that is rooted in love and concern for the person; pastoral care recognizes God's call to every baptized person to share in his eternal life and to follow the moral law as the way to happiness. 'A person's discomfort with his or her sex, or the desire to be identified as the other sex, is a complicated reality that needs to be addressed with sensitivity and truth. Each person deserves to be heard and treated with respect; it is our responsibility to respond to their concerns with compassion, mercy and honesty' (USCCB, 2017)." Attachment E to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-6 at 3.

35. "Neither of the Plaintiff schools has any history of a complaint from an LGBTQ family or other person for LGBTQ-based discrimination." Declaration of Dawn Odean (filed Oct. 6, 2023), ECF No. 38-1 ¶ 24.

36. And none of the other licensed Catholic preschools affiliated with the Archdiocese "has any history of a complaint from an LGBTQ family or other person alleging LGBTQ-based discrimination." Declaration of Dawn Odean (filed Oct. 6, 2023), ECF No. 38-1 ¶ 21.

**B. UPK Colorado**

37. In 2022, Colorado established a system of state funding for "universal" preschool to be administered by the newly created Department of Early Childhood. Colo. Rev. Stat. §§ 26.5-4-201, *et seq.* ("the statute"). This new program aims to make some "preschool services" free for all

Colorado children, "regardless of their economic circumstances." *Id.* §§ 26.5-4-202(1)(a)(V), 26.5-4-204(1)(a).

38. For the 2022-23 school year, the Department is reimbursing participating preschool providers for 15 hours of preschool per eligible child they enroll. This funding may be used "only to pay the costs of providing preschool services directly to eligible children enrolled by the preschool provider." *Id.* § 26.5-4-208(5).

39. The Department agrees that UPK Colorado "provides a significant benefit for the families that do participate" in the program. Ex. 4 at 123:7-10.

40. The statute dictates that UPK Colorado use a mixed-delivery system. Colo. Rev. Stat. § 26.5-4-202(1)(a)(VI) ("Creating a statewide mixed delivery system of preschool providers to make preschool programming universally available to children throughout Colorado compounds the benefits for children who are in low-income families and increases the ultimate social and economic benefits of high-quality preschool programming for the state as a whole."); Ex. 4 at 19:8-25, 37:14-39:25 (confirming that faith-based providers are part of the mixed delivery system).

41. The Department considers mixed delivery important "to ensure that families have choice and can find the just-right provider that fits for their family." Ex. 4 at 38:6-11.

42. The statute directs the Department to develop "quality standards" with which preschool providers must comply. Colo. Rev. Stat. § 26.5-4-205(1)(a). It also directs the Department to include certain requirements in these quality standards. *Id.* § 26.5-4-205(2).

43. Among these requirements is the Equal Opportunity Mandate (or "Mandate"), which requires that "each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2)(b).

44. Plaintiffs previously referred to this provision as the Enrollment Mandate but, as Defendants emphasized in discovery, the Mandate extends to a preschool's operations, not just enrollment.

Ex. 4 at 51:15-20; Colo. Rev. Stat. § 26.5-4-205(2)(b) (requiring "equal opportunity to enroll and *receive preschool services*") (emphasis added).

45. By statute, the Department has the authority to grant exceptions from the quality standards Colo. Rev. Stat. § 26.5-4-205(1)(b)(II) ("If necessary to ensure the availability of a mixed delivery system within a community, the department may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards; except that each preschool provider must meet all quality standards relating to health and safety as a condition of participating in the preschool program").

46. Preschools seeking to participate in UPK Colorado must sign a Program Service Agreement. Ex. 3 at 2 (Request for Admission No. 1) (admitting "that in order to participate in the UPK Program, preschool providers must sign" Agreement); Ex. 4 at 24:25-25:3, 25:22-26:1, 46:16-22; Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 (copy of Agreement).

47. Once they sign the Program Service Agreement, participating providers appear in the Department's Family Search and Application portal, allowing families to apply to use UPK program funds at their preschool. Ex. 4 at 24:14-24; Ex. 9.

48. On the UPK Colorado portal, when a user is browsing preschool providers, the Department displays language reflecting when a provider has opted into one of the Department's exception criteria. Ex. 10.

49. The Program Service Agreement, like the statute, includes the Equal Opportunity Mandate, requiring "each preschool provider [to] provide eligible children an equal opportunity to enroll and receive preschool services regardless of [the] … religious affiliation, sexual orientation, [or] gender identity" of "the child or the child's family." Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 at 2; Ex. 4 at 51:1-18; *see also* Colo. Rev. Stat. § 26.5-4-205(2)(b).

50. The Equal Opportunity Mandate requires participating preschool providers to both "enroll" eligible children and provide "preschool services" regardless of the listed characteristics in the

Mandate. Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 at 2; Ex. 4 at 51:1-18.

51. In addition, Paragraph 18(B) of the Program Service Agreement forbids "discriminat[ion] against any person on the basis of … religion, … sexual orientation, [or] gender identity." Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 ¶ 18(B).

52. Paragraph 18(B) covers enrollment, hiring, and operational decisions made by preschool providers. Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 ¶ 18(B); Ex. 4 at 66:1-67:13, 69:12-15.

53. If a prospective UPK Colorado provider cannot agree to the terms of the Program Services Agreement, it cannot participate in UPK Colorado. Ex. 4 at 71:11-72:2; Ex. 5 at 22:5-19.

54. UPK Colorado changed how preschools enroll families in their programs. Previously, preschools had the ability to interview and accept applicants into their program. *Testimony of Dawn Odean Before the Colorado Legislature Joint Budget Committee,* 74th Gen. Assemb., First Reg. Sess., at 10:59:27-10:59:35 AM, 11:00:50-11:01:03 AM (Co. Sept. 20, 2023), https://bit.ly/3FmLahg (UPK Colorado "represents more than a policy shift, it's an ongoing cultural shift for Colorado families and preschool providers alike.").

55. Now, most families enroll directly in UPK Colorado and then are matched with a preschool provider by the Department. Ex. 4 at 18:2-25, 22:4-19; *Testimony of Dawn Odean Before the Colorado Legislature Joint Budget Committee,* 74th Gen. Assemb., First Reg. Sess., at 10:59:27-10:59:35 AM, 11:00:50-11:01:03 AM (Co. Sept. 20, 2023), https://bit.ly/3FmLahg.

56. If a preschool participating in UPK Colorado is matched by the Department with an eligible child, it may decline to enroll that child only if the preschool qualifies for a Department-approved exception from the Equal Opportunity Mandate. Ex. 4 at 23:13-23, 24:1-6, 29:23-30:8, 32:25-33:5.

57. In addition to matching, the Department also allows families to enroll directly in a preschool by showing up at a preschool participating in UPK Colorado and asking for a UPK Colorado application. Ex. 4 at 27:17-25, 29:23-31:5.

58. UPK Colorado's official Provider Guide lists the "exception criteria" preschools can use to either preference or deny proposed matches. Ex. 15 at 37.

59. These exception criteria allow, among other things, faith-based providers to give preference to families who are part of their congregation, co-op programs to "require family participation," dual language providers to "screen[ ]" program participants, and "Head Start grantee" programs to require families to "meet additional factors to enroll." *Id.*; *see also* Attachment L to Declaration of Moo (filed Sept. 13, 2023), ECF No. 32-13 at 2 ("faith-based providers can … decline a match from a family that is not part of the congregation").

60. The Department allows preschools to self-select whether they are "faith-based," and the Department does not verify the provider's selection. Ex. 2 at 6 (Interrogatory No. 5) ("[T]he Department does not currently have 'criteria' to determine whether providers are faith-based providers. Providers are given an opportunity as part of the UPK provider registration process to indicate that they are a faith-based provider. If a provider indicates that they are a faith-based provider, the Defendants accept that provider designated themselves as 'faith-based' in good faith.").

61. The Department also allows preschools to preference or exclude applicants on the basis of disability. Ex. 4 at 99:1-25 ("My location only serves children with specific disabilities" …. "Are there any UPK providers that have that preference? A: We—we do.").

62. For example, Anchor Center for Blind Children, a UPK preschool provider, only serves children with vision impairments. *See* Ex. 6 at 32; Ex. 11 at 2 ("Your child must have a suspected or diagnosed vision impairment or dual sensory loss of vision and hearing.").

63. The Department's proposed rulemaking incorporates the exception criteria. Ex. 12 at 6.

64. The Department has permitted at least 1,091 preschools to take advantage of an exception criterion. Ex. 2 at 6 (Interrogatory No. 7); *see generally* Ex. 6 at 1-53.

65. Separate and apart from the exception criteria, providers can also ask the Department for individualized exceptions from the Equal Opportunity Mandate. Ex. 4 at 91:15-21, 96:24-97:10, 98:10-24; Ex. 6 at 57 (describing the individualized exception request process), 82-87 (individualized exception spreadsheet).

66. This is done by submitting a request via an online form created by the Department. Ex. 6 at 54-55 (form to request individualized exception); Ex. 6 at 64-65 (describing exception request process).

67. The Department has granted at least one such exception to allow a preschool to give preference to the children of students at a high school associated with it. Ex. 4 at 90:4-17; Ex. 6 at 82-83 (listing other approved individualized exceptions).

68. The Department's proposed regulations state that it is permissible to: "Withhold[ ] ... placements or availability of seats by an enrolling preschool provider of a student(s) with an Individualized Education Program (IEP) to ensure conformity with obligations incurred pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. section 1400 (2004), or the Exceptional Children's Education Act, Article 20 of Title 22, C.R.S." Ex. 12 at 6.

69. The Department continues to consider case-by-case exceptions from the Equal Opportunity Mandate. Ex. 4 at 91:15-21.

70. Both the exception criteria and the individualized exception process were created by the Department in response to requests from preschool providers. Ex. 4 at 35:12-20, 79:17-25; 97:2-20.

71. The Department's proposed regulations state that "[i]n utilizing these programmatic preferences, eligible preschool providers must still comply with rule section 4.109(B) [the Equal Opportunity Mandate]." Ex. 12 at 6; Ex. 4 at 107:25-108:6 ("But also the rule doesn't allow us to go against what's in the law, and so that's why we have the 4.109(B). So, yes, to the extent that we can be inclusive of a specific congregation that also falls in alignment of the law that's set forth for us.").

72. The Department has also stated that it cannot—via rulemaking or discretionary exception—contradict the language in Colo. Rev. Stat. § 26.5-4-205(2)(b) (that is, the Equal Opportunity Mandate). Attachment L to Declaration of Moo (filed Sept. 13, 2023), ECF No. 32-13 at 1 ("I do not have the authority to create an exception that excludes faith-based providers from the [Equal

Opportunity Mandate]."); Ex. 4 at 121:10-122:3; Ex. 5 at 16:11-19; *id.* at 23:14-15 ("I cannot provide an exemption against what the law says.").

73. For the 2023-2024 school year, the Department has matched, and continues to match, families and preschools in rounds. Ex. 4 at 35:12-20.

74. The Department continues to match families on a weekly basis. Ex. 4 at 33:14-19, 35:12-20; Ex. 13 ("The matching process is now happening weekly. Families will be notified of their proposed matches every Friday and you will have until the following Thursday to accept or decline your match.").

75. The Department retains discretion to perform additional matching cycles at any time. Ex. 4 at 35:25-36:15.

76. Preschools can enroll in UPK Colorado and start accepting matches at any time. Ex. 4 at 33:14-25.

77. Preschools that enroll in UPK Colorado in the middle of a school year can start receiving UPK funding for their current class of four-year-old students once they complete the UPK enrollment process. Ex. 4 at 33:14-25; 36:24-37:4.

78. The Department allows eligible children who are not yet enrolled in a preschool to enroll at any time throughout the school year. Ex. 4 at 27:15-22.

79. The Department also made program adjustments to allow for preschools to admit "walk-in[s]," also known as "direct enrollment[s]." Ex. 4 at 33:6-13. These families can approach a preschool directly instead of going through the matching process. *Id.*

**C. UPK Colorado and Plaintiffs**

80. When UPK Colorado was announced, St. Mary's and Wellspring had initially hoped that the provisions of UPK Colorado would allow them to participate, and therefore started taking affirmative steps to do so. Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-14 ¶¶ 33-37; Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶ 27; *see also* Declaration of Elias Moo (filed Sept. 13, 2023), ECF 32-1 ¶ 30.

81.  However, as details about the program solidified, the Archdiocese determined that its pre-schools could not in good conscience sign the Program Service Agreement or operate their pre-schools consistent with the requirements of the Agreement. Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-1 ¶ 32; Attachment J to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-11 at 1-2.

82. The Archdiocese communicated this guidance to all thirty-six Archdiocesan preschools. Attachment J to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-11 at 1.

83. None of these thirty-six preschools participate in UPK Colorado. Supplemental Declara-tion of Elias Moo (filed Nov. 1, 2023), ECF 49-2 ¶ 8; Ex. 6 at 1-53 (Archdiocesan preschools not listed).

84. The Equal Opportunity Mandate forbids "discrimination" on the basis of religion. Attach-ment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 at 2; Colo. Rev. Stat. § 26.5-4-205(2)(b).

85. Paragraph 18(B) of the Program Service Agreement also forbids "discriminat[ion]" on the basis of religion. Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 at 27.

86. The Equal Opportunity Mandate and Paragraph 18(B) therefore prevent Archdiocesan pre-schools from preferencing Catholic families who are not members of their congregation. Attach-ment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 at 2, 27; Colo. Rev. Stat. § 26.5-4-205(2)(b); Ex. 5 at 22:5-20.

87. The Department's "expectation would be that providers should not decline to enroll a stu-dent because of any of those identities, race, religious affiliation, gender identity, sexual orienta-tion." Ex. 4 at 61:3-25.

88. The Equal Opportunity Mandate forbids discrimination on the basis of sexual orientation or gender identity. Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 at 2; Colo. Rev. Stat. § 26.5-4-205(2)(b).

89. Paragraph 18(B) of the Program Service Agreement also forbids "discriminat[ion]" on the basis of sexual orientation or gender identity. Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 at 27.

90. The Equal Opportunity Mandate and Paragraph 18(B) prohibit Archdiocesan schools from taking into consideration whether a child or family is open to and supportive of the Catholic Church's teachings—including its teachings on human sexuality—or whether personal circumstances or actions would create intractable conflicts with what is being taught in the schools. Ex. 4 at 107:25-108:11; *see, e.g.*, Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶¶ 22-24; Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-14 ¶¶ 25-31.

91. Paragraph 18(B) forbids Archdiocesan preschools from requiring that those who teach the faith agree to live out those teachings in both word and deed. Attachment A to Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-15 at 27; Ex. 4 at 65:13-66:5; Ex. 5 at 31:16-32:15.

92. This at times requires Archdiocesan preschools to consider the sexual orientation and gender identity of both prospective and currently enrolled families and their children. Attachment E to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-6 at 9-17 (describing Archdiocesan school policies).

93. The Department cannot and will not grant an exception that allows the Archdiocese's preschools to operate in line with their beliefs about gender, sexuality, and the human person. Ex. 4 at 107:25-108:11 ("But also the rule doesn't allow us to go against what's in the law, and so that's why we have the 4.109(B). So, yes, to the extent that we can be inclusive of a specific congregation that also falls in alignment of the law that's set forth for us. Q. Okay. So no matter what, it can't be defined in a way that would run into the law about equal opportunity regardless of sexual orientation? A. That's my understanding.").

94. A coalition of religious preschool providers that included the Archdiocese requested a religious accommodation from the State so that they could participate in UPK Colorado. Attachment K to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-12 at 2.

95. The head of the Department, Lisa Roy, responded that no religious accommodation would be provided and stated that the Department did not have the authority to provide such an accommodation. Attachment L to Declaration of Elias Moo (filed Sept. 13, 2023), ECF No. 32-13 at 1-2; Ex. 5 at 23:10-15.

96. The Department maintains that it does not have the power to grant Plaintiffs a religious exception from the statutory nondiscrimination requirement, through rulemaking or otherwise. Ex. 5 at 16:6-19.

97. Therefore, Archdiocesan preschools cannot participate in UPK Colorado while continuing to operate in a way that is faithful to and consistent with their religious beliefs about gender, sexuality, and the human person. Ex. 5 at 27:8-29:8, 30:17-31:11.

98. For the Sheleys and families like them, the Department's exclusion of Catholic providers costs them roughly $600 per month for their four-year-old. Declaration of Daniel Sheley (filed Sept. 13, 2023), ECF No. 32-18 ¶¶ 6-7.

99. At St. Bernadette's, four-year-old enrollment dropped from 11 to 6, an almost 50 percent decline in one year. Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶ 15; Ex. 7 at 11 (Interrogatory No. 11).

100.   Loss of UPK Colorado funding is particularly harmful for low-income families at Wellspring, some of whom will lose out on the opportunity to provide a quality, Catholic preschool education to their children without UPK Colorado funding. Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶ 34.

101.   At St. Mary's, four-year-old enrollment has also decreased. Ex. 7 at 11 (Interrogatory No. 11).

102.   Archdiocesan preschools like St. Mary's and Wellspring have also lost out on provider bonuses, which provide direct financial assistance to preschools that participate in UPK Colorado. Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-14 ¶ 44.

103.   The inability to participate in UPK Colorado has also made it more difficult for St. Mary to retain staff and ensure continuity of care. *Id.* ¶¶ 42-46.

25

104.    St. Mary's and St. Bernadette's preschools would immediately seek to participate in UPK Colorado if granted an accommodation that would allow them to do so consistent with their faith. Declaration of Avery Coats (filed Sept. 13, 2023), ECF No. 32-16 ¶ 35; Declaration of Tracy Seul (filed Sept. 13, 2023), ECF No. 32-14 ¶ 50.

## LEGAL STANDARD

"Summary judgment must be granted if 'there is no genuine dispute as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *SEC v. GenAudio Inc.*, 32 F.4th 902, 920 (10th Cir. 2022). To defeat summary judgment, "the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. … The nonmovant's evidence, including testimony, must be based on more than mere speculation, conjecture, or sur-mise." *Id*. (cleaned up). "A fact is material if, under the governing law, it could [affect] the outcome of the lawsuit. A factual dispute is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted).

A party is entitled to a permanent injunction when it proves: (1) "actual success on the merits;" (2) "irreparable harm unless the injunction is issued;" (3) that "the threatened injury outweighs the harm that the injunction may cause the opposing party;" and that (4) "the injunction, if issued, will not adversely affect the public interest." *Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, 612 F. Supp. 2d 1157, 1160 (D. Colo. 2009), *aff'd*, 613 F.3d 1229 (10th Cir. 2010); *see also, e.g.*, *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (listing the same requirements). The requirements for obtaining a preliminary injunction "are remarkably similar." *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 908 (10th Cir.) (internal quotation marks omitted), *cert. denied*, 143 S. Ct. 273 (2022). "In-deed, the same four elements apply to both types of injunctive relief, and the only measurable difference between the two is that … a preliminary injunction requires showing a *substantial like-lihood of success* on the merits" rather than actual success on the merits. *Id.* (cleaned up) (emphasis in original).

## ARGUMENT

### I.  Plaintiffs have shown actual success on the merits.

####    A.  The Department's exclusionary policies violate the Free Exercise Clause.

UPK Colorado's *de facto* exclusion of Catholic preschools triggers strict scrutiny under the Free Exercise Clause, and fails that stringent test. As explained below, strict scrutiny is required for multiple reasons: ***first***, because the exclusion is based solely on Catholic preschools' religious character and exercise; ***second***, because while Plaintiffs' religious exercise is prohibited, the Department recognizes categorical exceptions permitting other preschool providers to "discriminate," including on grounds otherwise barred by the Department's nondiscrimination requirements; ***third***, because the Department has reserved the authority to carve out individualized exceptions from these requirements in other circumstances; and ***fourth***, because the Department's implementation of UPK Colorado has targeted Plaintiffs' religious exercise.

####       1.  The Department excludes Plaintiffs because of their religious character and exercise, triggering strict scrutiny.

The First Amendment "prohibit[s]" denying otherwise-eligible religious individuals and organizations a public benefit "based on [their] religious exercise." *Carson v. Makin*, 596 U.S. 767, 785 (2022). The Department here has done exactly that; its actions thus trigger "the strictest scrutiny." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017).

*Carson* is on point. There, Maine offered tuition assistance for families to attend private schools, but not if they "promote[d] a particular faith and present[ed] academic material through the lens of that faith." 596 U.S. at 787. This exclusion violated the Free Exercise Clause. The Court explained: a state cannot "exclude some members of the community from an otherwise generally available public benefit because of their religious exercise," "status," or "character." *Id.* at 779, 781, 786-88.

So too here. Colorado offers a generally available public benefit—"universal" preschool funding. SUMF ¶ 37. But it effectively excludes Archdiocesan preschools based solely on their religious exercise—that is, requiring those who teach and participate in their schools to be open to

and supportive of the Catholic Church's teachings, and operating their schools according to those teachings. *Id.* ¶¶ 20-29, 80-92. "Conditioning the availability of benefits in that manner ... effectively penalizes the free exercise of religion." *Carson*, 596 U.S. at 780 (cleaned up). And "when otherwise eligible recipients are disqualified from a public benefit solely because of their religious character, we must apply strict scrutiny." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2260 (2020) (cleaned up).

*Carson* has deep roots. The Supreme Court has long held that states cannot exclude persons "from receiving the benefits of public welfare legislation" because of their religion. *Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947); *see also, e.g.*, *Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981) (the First Amendment forbids "the state" from "condition[ing] receipt of an important benefit upon conduct proscribed by a religious faith"). This Court, too, has observed that "[t]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests ... [,] even though the person has no right to the valuable governmental benefit and even though the government may deny him the benefit for any number of reasons." *Pryor v. Sch. Dist. No. 1*, No. 1:22-cv-2886, 2022 WL 18145414, at *1 (D. Colo. Dec. 23, 2022) (Kane, J.) (quoting *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996)).

Moreover, it does not matter that Colorado here excludes preschools on the basis of religious *exercise* (those who do Catholic things need not apply) rather than religious *nomenclature* ("Catholics" need not apply). SUMF ¶¶ 43, 49-53, 84-92, 97. In *Carson*, the Court clarified that while *Trinity Lutheran* and *Espinoza* happened to confront exclusions that were based on "'religious status and not religious use,'" "such a distinction" is immaterial. 596 U.S. at 786. In *Carson*, Maine insisted that it was denying participation not because of the schools' religious status, but because of their religious conduct (in *Carson*, educating "through the lens of [their] faith"). *Id.* at 775, 787-89. But the Court held that even if the denial were indeed "based on a recipient's *religious exercise*," not status, it wouldn't matter; the First Amendment "prohibit[s] ... denying the benefit" on that basis, too. *Id.* at 785 (emphasis added).

After all, the Free Exercise Clause protects just that—*exercise*. "As its language suggests, the animating ideal of the constitutional provision is to protect the 'free exercise of religion' from unwarranted governmental inhibition whatever its source." *Shrum v. City of Coweta*, 449 F.3d 1132, 1144 (10th Cir. 2006). So in *Carson*, "[r]egardless of how the benefit and restriction [were] described," Maine's program violated the First Amendment precisely because it "operate[d] to identify and exclude otherwise eligible schools on the basis of their religious exercise." 596 U.S. at 789. The same is true here. Whether the State describes UPK Colorado as "closed to [Catholics] (status) or closed to people who," like Plaintiffs here, "do [Catholic] things" (exercise)—it is violating the Constitution "either way." *Trinity Lutheran*, 582 U.S. at 469 (Gorsuch, J., concurring); *see* SUMF ¶¶ 43, 49-53, 84-92, 97.

*Carson*'s rule is essential because benefit exclusions put a governmental "thumb on the scale" against religion, *Espinoza*, 140 S. Ct. at 2278 (Gorsuch, J., concurring), incentivizing religious organizations to abandon or alter their religious exercise to "compete with secular" counterparts, *Trinity Lutheran*, 582 U.S. at 463; *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (it is unconstitutional to coerce people to give up constitutional rights). This increase in the relative cost of exercising religion requires a compelling justification. *See Carson*, 596 U.S. at 781 ("The State pays tuition for certain students at private schools—so long as the schools are not religious. That is discrimination against religion.").

It is difficult to imagine a case that more clearly implicates that rationale than this one. After all, here, the State has effectively imposed a special tax on religious preschools, whereby families who send their children to Catholic preschools must pay full freight, even as other families who send their children to nearly 2,000 Colorado preschools do so free of charge. SUMF ¶¶ 37-38, 98, 100; *see also* SUMF ¶ 39 (State's 30(b)(6) witness agreeing that UPK is a "significant benefit"); Ex. 6 at 1-53 (listing all UPK Colorado providers); *cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 859 (1995) ("A tax exemption in many cases is economically and functionally indistinguishable from a direct monetary subsidy."). That exclusion puts Catholic families—in-

cluding the Sheleys—to an agonizing choice: either follow your faith and pay full price or contradict your beliefs and let the State foot the bill. SUMF ¶¶ 37-38, 84-92, 98. This conflict is especially agonizing for the multitude of low-income and English-as-a-Second-Language families at St. Bernadette's, *see* ECF No. 32-16 ¶ 9, for whom access to universal preschool funds would be a crucial benefit. Under the First Amendment, religion must "flourish" or wither only "according to the zeal of its adherents and the appeal of its dogma"—not according to governmental carrots and sticks. *Zorach v. Clauson*, 343 U.S. 306, 313 (1952).

It is therefore no surprise that Judge Domenico already ruled in the parallel *Darren Patterson* litigation that many of the same UPK Colorado conditions at issue here likely violated the Free Exercise Clause as elucidated by the *Carson*, *Espinoza*, and *Trinity Lutheran* trilogy. *See Darren Patterson Christian Acad. v. Roy*, No. 23-cv-01557, 2023 WL 7270874, at *15 (D. Colo. Oct. 20, 2023). In *Darren Patterson*, as here, the plaintiff school sought to "hire only coreligionists, and to continue internal policies related to gender distinctions rooted in religious beliefs." *Id.*; *see* SUMF ¶¶ 17, 22, 31-34. But, as here, "[t]hese policies violate[d] the Department's non-discrimination standards for participating preschools." *Darren Patterson Christian Acad.*, 2023 WL 7270874, at *15; *see* SUMF ¶¶ 81, 84-92. The State's policies therefore "force[d]" the plaintiff school "into the unconstitutional choice of abandoning religiously motivated practices or foregoing otherwise available public funding." *Darren Patterson Christian Acad.*, 2023 WL 7270874, at *15. "The First Amendment forbids imposing such a choice," *id.*—in *Darren Patterson* as here.

In short, Colorado didn't have to subsidize private preschools. But having done so, "it cannot disqualify some private schools solely because they are religious"—or because they act that way. *Espinoza*, 140 S. Ct. at 2261; *see also Carson*, 596 U.S. at 784-88. The State's exclusion therefore triggers strict scrutiny.

### 2. The Department's exclusionary policies are not neutral and generally applicable, and therefore independently trigger strict scrutiny.

UPK Colorado's nondiscrimination requirements trigger strict scrutiny in other ways too. When the state "burden[s]" religious exercise under a policy that is "neither neutral nor generally

applicable," that "trigger[s] strict scrutiny." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). Colorado has burdened Plaintiffs' religious exercise, *supra* I.A.1, and its policy is neither neutral nor generally applicable.

***Categorical exceptions.*** A policy fails general applicability "if it prohibits religious conduct" while allowing other "conduct that undermines the government's asserted interests in a similar way." *Kennedy*, 142 S. Ct. at 2422 (cleaned up); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest[.]" *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Here, the Department asserts an interest in "provid[ing] equal and unfiltered and unbiased access to all preschool families." ECF No. 56 at 9; *see also* Colo. Rev. Stat. § 26.5-4-205(2)(b) (requiring an "equal opportunity to enroll and receive preschool services regardless of … religious affiliation, sexual orientation, gender identity, ... income level, or disability"). As the Governor has bluntly put it: "[S]erve everybody if you want to take public funds." Ex. 14 at 1.

It turns out, however, that not all preschools must "serve everybody" to participate. As the Department's Provider Guide explains, preschools can reject the Department's placement of an otherwise-eligible child in their program based on certain categorical exceptions: "Providers will be able to request exceptions to matched applicants based on predefined criteria." ECF No. 1-4 at 38; *see also* SUMF ¶¶ 45, 56, 58-64. And as the Department confirmed, it has (and continues to) exercise this authority to create and grant categorical exceptions. SUMF ¶ 64; Ex. 2 at 6; Ex. 4 at 80:4-11.

While these categorical exceptions were initially mentioned only in the Provider Guide (which is incorporated by reference into the Program Service Agreement), they are now also listed in the Department's proposed regulations. *See* Ex. 12 at 6 (listing nine categories of permissible "programmatic preferences during the matching process"). These categorical exceptions are not mandated by the UPK statute but instead are discretionary and were created by the Department in

response to feedback from preschools, many of which told the Department that a particular exception or set of exceptions from the Equal Opportunity Mandate would be "helpful." Ex. 4 at 79:19-25 ("We had heard from our local coordinating organizations and directly from providers that these would be helpful in ensuring inclusion in a particular community or of a particular provider type."); *see also* SUMF ¶ 45.

The categorical exception process is also widely used in practice: the Department has already permitted 1,091 preschools participating in UPK Colorado to take advantage of at least one of these categorical exceptions (with some schools taking advantage of several different categorical exceptions). Ex. 2 at 6; SUMF ¶ 64; Ex. 6 at 1-53. It is no surprise, then, that the categories of permitted exceptions are many and broad. The Department allows, among other things, "Cooperative preschool providers" to "requir[e] participation in the cooperative"; "Faith-based providers" to "grant[] preference to members of their congregation"; "Head Start programs" to require families to meet income thresholds; and *all* providers to "[w]ithhold[] … placements" for "student(s) with an Individualized Education Program (IEP)." SUMF ¶ 59; Ex. 12 at 6; Ex. 15 at 37. The categorical exceptions also permit preschools to employ a preference for "an eligible child of one of their employees," "an eligible child in order to keep siblings similarly located," and "an eligible child in order to ensure continuity-of-care for that child." Ex. 12 at 6.

Several of these categorical exceptions directly violate the Equal Opportunity Mandate's non-discrimination provision, which requires all preschools to provide "an equal opportunity to enroll and receive preschool services regardless of … religious affiliation, … income level, or disability, as such characteristics and circumstances apply to the child or the child's family." SUMF ¶ 43. For example, the Department allows Head Start programs to screen applicants based on income, explaining that "families may need to meet additional factors to enroll" with "Head Start grantee[s]," which serve only families whose incomes are at or below federal poverty guidelines. Ex. 15 at 37; Ex. 4 at 89:3-11 ("[A] family could exceed the income qualifications and, thus, not be able to enroll with the grantee? ... Yeah[.]"). Similarly, the State allows providers to categorically screen applicants based on disability: depending on the preschool's preferences, it can either

make its local coordinator aware that it "*support*[*s*] children with Individualized Education Plans (IEP)," Ex. 15 at 37 (emphasis added), or, conversely, it can "[*w*]*ithhold*[] … *placements*" if it does *not* serve children with disabilities, Ex. 12 at 6 (emphasis added). And in practice, multiple preschools self-identify as being open exclusively to children with disabilities. Ex. 4 at 99:4-24 ("We have school district-based providers that have specific programs for specific needs[.]"); Ex. 11 at 2 ("Your child must have a suspected or diagnosed vision impairment or dual sensory loss of vision and hearing."). The Department has also created an exception to that "religious affiliation" nondiscrimination requirement, allowing faith-based providers to "require families to be a part of [their] congregation." Ex. 15 at 37; *see* ECF No. 32-13; SUMF ¶ 59.[2] So while for some providers the Department is perfectly willing to compromise its asserted interest in equal access, for others, such as Plaintiffs, it is not. The Mandate and Paragraph 18(B) are therefore not generally applicable, and their application to Plaintiffs requires strict scrutiny.

**Individualized exceptions.** Government action is also not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (cleaned up). That is because "such a regime creates the opportunity for" even "a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (Alito, J.). In *Fulton*, for example, Philadelphia's foster-care contracts included broad nondiscrimination provisions which excluded Catholic Social Services because of its beliefs. *Fulton*, 141

---

[2]   The Department has claimed that, in utilizing these categorical exceptions, preschools must still comply with the Equal Opportunity Mandate. Ex. 4 at 106:14-17. But—especially with regard to disability, religion, and income—the permitted categorical exceptions *directly contradict* the Equal Opportunity Mandate's nondiscrimination requirement. Accordingly, the Department appears willing to grant exceptions to the Mandate's nondiscrimination requirements when convenient, but falls back on strict compliance when confronted with a request for an exception it does not want to grant. Such *ad hoc* behavior further confirms strict scrutiny is warranted. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004) ("[G]reater discretion in the hands of governmental actors makes the action taken pursuant thereto more, not less, constitutionally suspect.").

S. Ct. at 1878. At the same time, Philadelphia retained "discretion" to grant exceptions from these nondiscrimination requirements—while also making clear "that the [City] 'ha[d] no intention of granting an exception' to CSS." *Id*. As the Supreme Court held, this discretion to recognize case-by-case exceptions—even if in practice no such "exceptions ha[d ever] been given"—made the contract's nondiscrimination requirements not generally applicable and therefore subject to strict scrutiny. *Id.* at 1878-79.

This individualized exception rule is "bedrock" First Amendment law. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc); *see Fulton*, 141 S. Ct. at 1877 (citing *Smith*, *Sherbert*, *Lukumi*, and others for this rule). The Tenth Circuit, for its part, has articulated this rule on numerous occasions. *E.g.*, *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1184 (10th Cir. 2021) ("A law is also not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." (internal quotation marks omitted)), *rev'd on other grounds*, 600 U.S. 570 (2023); *Axson-Flynn*, 356 F.3d at 1297 ("[I]n circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason."). This Circuit has also confirmed that a "'system of individualized exemptions' need not be a written policy"; rather, a plaintiff can show that such a system exists merely by pointing to "discretionary decisions" on the ground. *Id.* at 1299.

The Department here has two mechanisms to grant individualized exceptions. First, the UPK Colorado statute gives the Department explicit authority to "allow a preschool provider that does not meet the quality standards"—which include the nondiscrimination provisions at issue here— "to participate in the preschool program for a limited time while working toward compliance." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). The Department thus has broad statutory discretion to excuse, for an indeterminate period of time, any preschool which does not for any reason comply with the Mandate and Paragraph 18(B). SUMF ¶ 45. Of course, the Department here declined to grant an exception to preschools that cannot comply because of their religious convictions. SUMF ¶¶ 93-96. "The fact that the state recognizes conditions could exist in which it would exempt a

preschool from the quality standards, but does not consider Plaintiff's religious convictions suffi-ciently compelling to do so here, triggers strict scrutiny." *Darren Patterson*, 2023 WL 7270874, at \*16; *see Fulton*, 141 S. Ct. at 1878 (written policy authorizing individualized exceptions trig-gered strict scrutiny).

Setting aside the statutory exception process, the Department has also created a second *de facto* individualized exception process which has no statutory basis, but which it has used to grant ex-ceptions from the Mandate to numerous other preschools while still denying Plaintiffs an exception. SUMF ¶¶ 65-67, 93-96. Specifically, the Department created and continues to use an online form by which a preschool can request an individualized exception from the Mandate's requirement that preschools enroll all students without distinction. Ex. 4 at 92:15-22 ("This is where -- this is where a provider could ask for a specific preference."); *see also* SUMF ¶ 66. As the Department's witness explained, if a preschool needs an exception from UPK Colorado's requirements, the Department will direct that preschool to an online form. Ex. 4 at 92:18-93:16. The form then asks the preschool to describe the "Exception Requested," and provides two examples of exceptions the Department might deem permissible: "My location only serves teen moms enrolled at a neighboring high school; My location only serves children with specific disabilities." Ex. 4 at 172. After the request is submitted, the Department determines on a case-by-case basis whether to grant the request. Ex. 4 at 97:6-10 ("[W]e would bring that to program leadership to make a recommendation based on what we heard and the need."); Ex. 6 at 57, 64-65.

The Department has received over 100 exception requests thus far and has granted over a dozen exceptions. Ex. 6 at 82-87 (showing list of individual exceptions requested). For example, the Department created a one-off exception from the Mandate to allow a "particular provider to be able to prioritize their students' children." Ex. 4 at 90:8-12. The Department also allowed a pre-school to accept only "fully Vaccinated Children," another to accept only "children who have parents who work for [two specific employers]," and yet another to "give priority to families who live in the Blue Lake subdivision." Ex. 6 at 82-83. The Department also approved a request to "declin[e] these families for school enrollment policies that we have in place." *Id.* at 83. And the

Department even granted exception requests that directly violated the Mandate—including by al-lowing providers to take into account a child's disability. *Compare* Ex. 4 at 99:1-4 ("'My location only serves children with specific disabilities'[.] Are there any UPK providers that have that pref-erence? A: We -- we do."); *with* Colo. Rev. Stat. § 26.5-4-205(2)(b) (requiring equal access to enroll regardless of "disability"). The Department has confirmed it will continue to consider re-quests on a case-by-case basis. Ex. 4 at 98:18-24.

By having not one, but two *Fulton*-style individualized exception processes, the Department has unmistakably subjected its discriminatory decision to deny Plaintiffs an accommodation to strict scrutiny. *See Axson-Flynn*, 356 F.3d at 1298. Indeed, compared with *Fulton*—where the City, unlike Defendants here, had "never" actually exercised its discretion to "grant[]" an exception, 141 S. Ct. at 1879—this is an *a fortiori* case. Having retained discretion to grant countless other exceptions from the Mandate and Paragraph 18(B), the State "may not refuse to extend that system to cases of religious hardship without a compelling reason." *Id.* at 1871.

**Targeting.** A government policy is not neutral if it is "specifically directed at ... religious prac-tice." *Employment Div. v. Smith*, 494 U.S. 872, 878 (1990). In other words, a policy is neutral only if its burden on religious exercise is a purely "incidental effect." *Id.* at 878. A policy fails this test when it "discriminate[s]" against religion "on its face" or when a religious exercise is otherwise its "object." *Kennedy*, 142 S. Ct. at 2422 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). Such a policy need not be "motivated by overt religious hos-tility or prejudice" to qualify as targeted. *Ashaheed v. Currington*, 7 F.4th 1236, 1244 (10th Cir. 2021).

Here, as explained above, the Archdiocese was part of a coalition of religious preschool pro-viders that asked the Department to recognize religious exceptions and alerted it to the problems that UPK Colorado had created for religious schools. ECF No. 32-1 ¶ 34; ECF No. 32-12; SUMF ¶ 94. But the State rejected this request, making clear it would not grant Plaintiffs a religious ex-ception that would allow them to participate. ECF No. 32-13; SUMF ¶ 95. At the same time, how-

ever, the Department granted over 1,000 other exceptions from the Mandate—including for religious providers with different religious beliefs. SUMF ¶¶ 59, 64; Ex. 2 at 4-6 (Interrogatory Nos. 4-5). Thus, the consequence of the government's actions was far from "incidental." Instead, it reflected hostility to Plaintiffs' sincere religious beliefs. *See* Ex. 5 at 22:10-20, 29:19-31:11 ("thank goodness" "[t]he law is there to protect" against situations in which a religious provider maintains bathrooms based on biological use or declines to use preferred pronouns; "We cannot legally allow any participant to knowingly discriminate against children.").

### 3. The exclusionary policies fail strict scrutiny.

With strict scrutiny triggered, the exclusion of Plaintiffs' preschools survives only if Defendants prove it "serve[s] a compelling interest and [is] narrowly tailored to that end." *Kennedy*, 142 S. Ct. at 2426. "That is a demanding standard." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). And in applying it, the Supreme Court has repeatedly ruled in favor of First Amendment claimants in cases like this one. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023) (website designer couldn't be forced to design for same-sex weddings); *Fulton*, 141 S. Ct. at 1877 (Catholic foster-care agency couldn't be forced to certify same-sex couples); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 578-79 (1995) (parade couldn't be forced to include LGBT pride group). The State fares no better here.

The "interest" served by UPK Colorado comes straight from the statute: increasing "access" for Colorado children to "high-quality, universal preschool services." Colo. Rev. Stat. § 26.5-4-204(1)(a). And in pursuing that interest, the Legislature directed Defendants to recruit "as broad a range [of providers] as possible." *Id.* § 26.5-4-204(2); *see also* Ex. 4 at 80:7-11 (Defendants' 30(b)(6) witness: "the program really prioritized inclusion of mixed delivery and ensuring that as many providers could participate as possible").

Yet this "purpose is not served by excluding" Plaintiffs' preschools. *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1269 (10th Cir. 2008) (*CCU*). In *CCU*, Colorado attempted to exclude a religious university from a public scholarship program, claiming the State had "a compelling interest in keeping taxpayers from supporting students who choose religious education." *Id.* at

1268. But the Tenth Circuit rejected this argument, explaining that "the State's *actual* interest in enacting the statute was to award scholarships to deserving students as universally as federal law permits"—which cut in favor of including CCU. *Id.* at 1269. So too here—the Legislature enacted a "universal" preschool program, and "universal" includes Plaintiffs' high-quality preschools. *See* SUMF ¶¶ 6, 37.

*Fulton* makes the same point. There, the city, invoking the goal of "[m]aximizing the number of foster families," elected to stop referring children to a Catholic foster-care agency because the agency would not certify same-sex couples as foster parents due to its religious beliefs. 141 S. Ct. at 1881-82. The Supreme Court unanimously rejected the City's decision, explaining that "[i]f anything, including [the agency] seems likely to increase, not reduce, the number of available foster parents." *Id.* at 1882. The same is true here: excluding Catholic preschools from state funding does nothing to increase "access" to preschool; in fact, excluding them, if anything, is more likely to *decrease* the "access" to which the State aspires, particularly for families conscience-bound to use Catholic schools (like the Sheleys). Colo. Rev. Stat. § 26.5-4-204(1)(a); *see* SUMF ¶¶ 99, 101.

Recognizing the issue, the Department pivots, asserting instead that its real interest is in requiring preschool providers to "provide equal and unfiltered and unbiased access to all preschool families." ECF No. 56 at 9; *see also* Ex. 14 at 1 ("serve everybody if you want to take public funds"). But the problem is that, for the myriad reasons discussed above, Defendants in fact require no such thing. Again, over a thousand UPK providers—fifty seven percent of them—have claimed one of Defendants' categorical exceptions from this requirement. SUMF ¶ 64; Ex. 6 at 1-53 (listing all UPK Colorado providers). And the State permits providers to request still other exceptions of any kind on an individualized basis; and the UPK statute by its terms allows Defendants to suspend applicability of the Mandate in their case-by-case discretion, Colo. Rev. Stat. § 26.5-4-205(1)(b)(II); *see supra* pp. 34-37. As this Court has explained: "[A] law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012)

(Kane, J.) (quoting *Lukumi*, 508 U.S. at 547), *aff'd*, 542 F. App'x 706 (10th Cir. 2013); *accord*, *e.g.*, *CCU*, 534 F.3d at 1268. That blackletter principle forecloses any effort by Defendants to carry their burden on strict scrutiny here.

Worse still, Defendants permit preschools to "filter" applicants based on the very criteria that the Equal Opportunity Mandate supposedly deems out of bounds. *Cf.* ECF No. 56 at 9. Again, Head Start grantees can impose income qualifications; faith-based schools are permitted to serve only those families who are part of their congregations; and schools may "only serve[] children with specific disabilities," *supra* pp. 34-37—even though the statute requires equal access regard-less of "income level," "religious affiliation," and "disability," Colo. Rev. Stat. § 26.5-4-205(2)(b). This proliferation of "exceptions ... undermines [any] contention that [the Department's] non-discrimination policies can brook no departures." *Fulton*, 141 S. Ct. at 1882.

Moreover, since this litigation began, the State has decided to brook even more departures, telling this Court it "does not plan to immediately appeal" the *Darren Patterson* injunction, ECF No. 53 at 2 n.1—even though that injunction permits a preschool to participate in UPK Colorado while maintaining some of the same policies on marriage and sexuality as Plaintiffs in this case maintain. SUMF ¶¶ 15, 17, 31-33. That is, if the Department is fine with the *Darren Patterson* school's participation even while the school requires prospective families to agree to its religious "code of conduct," "mandat[es] sex-separated bathrooms and dress codes," "forbids using pro-nouns that do not correspond to a student's or employee's biological sex," and requires employees to abstain "from sexual activity outside of the context of a marriage between a man and a woman," *Darren Patterson*, 2023 WL 7270874, at *3, 10, then it's difficult to see why the Department here has a "compelling" interest in stopping the Archdiocese from doing the same. SUMF ¶¶ 15, 17, 31-33.

Even worse for the Department, strict scrutiny requires courts to "look[] beyond broadly for-mulated interests" and instead "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006). So even if the State had shown it had "a compelling interest in enforcing its

nondiscrimination policies generally"—which it hasn't—it would still have to show it "has such an interest in denying an exception to" Plaintiffs. *Fulton*, 141 S. Ct. at 1881.

The State cannot make this showing; indeed, it has spent much of this litigation undermining it. As the Department has explained, the Archdiocese's preschools "have long been licensed as child care facilities in Colorado," yet the Department has never received a complaint against these schools for LGBTQ discrimination. ECF No. 38 at 13-14; *see* SUMF ¶¶ 35-36. Likewise, the State emphasizes that Plaintiffs haven't recently had to deny "a family and/or student enrollment into their schools due to sexuality ... or religious belief." ECF No. 53 at 2-3. In other words, according to the Department itself, the harms it seeks to avoid by excluding Plaintiffs' preschools have not occurred in the past and are "speculative" as to the future. ECF No. 38 at 11. This point is not, as the Department believes, relevant to Plaintiffs' standing, since (no matter how often the conflict arises) the Department is undisputedly requiring Plaintiffs to forswear their religious exercise in order to participate in the program. But it is highly relevant—indeed dispositive—on strict scrutiny, which requires the Department to "specifically identify an 'actual problem' in need of solving," *Brown*, 564 U.S. at 799, and for which "speculation is insufficient," *Fulton*, 141 S. Ct. at 1882; *see also, e.g.*, *Peck v. McCann*, 43 F.4th 1116, 1136 (10th Cir. 2022) ("[S]peculation ... is not enough to meet Defendants' burden under strict scrutiny.").

Finally, excluding Plaintiffs is also not a "narrowly tailored" means of advancing the Department's alleged interests. *Kennedy*, 142 S. Ct. at 2422. This requirement means that "[i]f a less restrictive alternative would serve the Government's purpose, [it] must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000). And it is an independent basis for failing strict scrutiny. *Kennedy*, 142 S. Ct. at 2422. Here, if Defendants are concerned about giving the mistaken impression that Plaintiffs' "discrimination" is "government-backed," ECF No. 38 at 1, they can explain in public-facing materials the already-obvious point that the beliefs of private preschool providers aren't attributable to the Department. Or if Defendants want to further guard against the already-speculative possibility of unexpected enrollment denials, they could alert parents by displaying language in the UPK portal, such as: "This is a faith-based provider and may

require families to be supportive of its faith"—exactly paralleling what Defendants already do for the existing exceptions. *See, e.g.*, Ex. 10. Either is more tailored than a blanket exclusion of all Archdiocesan preschools.

## B. The Department's exclusionary policies violate First Amendment church autonomy protections.

The church autonomy doctrine protects the "fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002); *see Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116-17 (1952). The State's UPK conditions violate this doctrine twice over—first, by purporting to limit the Archdiocese's preschools' right to freely hire and fire ministers; and second, by purporting to bar them from making religion-based personnel decisions even for non-ministers.

### 1. The exclusionary policies violate the ministerial exception.

One "component of [church] autonomy" is the "ministerial exception," which protects religious institutions' "authority to select, supervise, and if necessary, remove" employees "who play certain key roles." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060-61 (2020). This rule "bar[s] the government from interfering with" a religious group's selection of ministers, or its "decision ... to fire one." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181, 185 (2012); *see also Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010).

As the Supreme Court has recognized, "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady*, 140 S. Ct. at 2064. Accordingly, religious-school employees who are "expected to help ... carry out" these responsibilities are covered by the exception. *Id.* at 2066. This includes teachers "responsible for providing instruction in ... religion," *id.*, as well as administrators charged with "guiding the religious mission of the school," *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 940 (7th Cir. 2022) (administrative

council member); *see also, e.g.*, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017) (principal); *Orr v. Christian Bros. High Sch., Inc.*, No. 21-15109, 2021 WL 5493416 (9th Cir. Nov. 23, 2021) (principal).

Here, the State's conditions on UPK funding violate the ministerial exception. Paragraph 18(B) purports to use UPK funding as a hook to bar religious schools from "discriminat[ing] against any person" (a term that necessarily includes employees) on various bases, including "religion," "sexual orientation," and "gender identity." ECF No. 32-15 at 27; SUMF ¶ 51. But under the ministerial exception, religious schools are free to select on any basis employees who are "entrusted ... with the responsibility of educating their students in the faith," *Our Lady*, 140 S. Ct. at 2066—including on bases barred by this Provision, *Hosanna-Tabor*, 565 U.S. at 194-95; *see also Starkey*, 41 F.4th at 938 (ministerial exception foreclosed claims of Catholic school employee not renewed because of a same-sex relationship); *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 188-89 (E.D.N.Y. 2022) (same).

The Archdiocese's preschool teachers and administrators are ministers. The Archdiocese expects teachers to (and they do) teach formal religious curriculum; "start their classes in prayer with their students"; "integrate Biblical stories and religious themes into their lessons and play"; and "be witnesses to the faith in their own li[ves]," ECF No. 32-14 ¶¶ 15-16. And the administrators "lead[ the] religious organization" as a whole, *Our Lady*, 140 S. Ct. at 2063, including by exercising "supervisory authority over" the religious functions of the teachers, *Orr*, 2021 WL 5493416, at *1; *Petruska v. Gannon Univ.*, 462 F.3d 294, 307 n.10 (3rd Cir. 2006); *see also* ECF No. 32-1 ¶ 27; ECF No. 32-3 at 1-2.

Under the ministerial exception, "any attempt by government to dictate or even to influence" the Archdiocese's preschools' selection of such employees violates the First Amendment. *Our*

*Lady*, 140 S. Ct. at 2060. The State has made just such an attempt. This violates the ministerial exception. *See Darren Patterson*, 2023 WL 7270874, at *15 (finding the same).[3]

### 2. The exclusionary policies violate the broader church autonomy doctrine.

Ministerial exception aside, Paragraph 18(B) also violates "the broader church autonomy doctrine" that protects religious organizations' freedom to make "personnel decision[s] based on religious doctrine," including personnel decisions involving *non*-ministerial employees. *Bryce*, 289 F.3d at 658 n.2, 660. That is because "[d]etermining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is" a fundamental "means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). This right to pursue the employer's religious mission in making personnel decisions applies to Plaintiffs here.

*Bryce* demonstrates the point. There, a church employee sued after church officials allegedly made discriminatory statements about homosexuality and her same-sex union. 289 F.3d at 651-53. But the Tenth Circuit held the suit was barred by the "broader church autonomy doctrine," regardless of whether the employee was covered by the ministerial exception. *Id.* at 658 n.2. That was so because the employee challenged a "personnel decision based on religious doctrine"—namely, the church's "doctrine and policy" on same-sex relationships. *Id.* at 658-60; *see also, e.g.*, *Butler*, 609 F. Supp. 3d at 198-204 (even if plaintiff wasn't a minister, suit barred by church autonomy); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871-73 (N.D. Ill. 2019) (same).

Here, the Archdiocese's preschools require all staff to be "faithful men and women" and to "refrain from public promotion or approval of any conduct or lifestyle that would ... be considered in contradiction with Catholic doctrine or morals," including on marriage and sexuality. ECF

---

[3]   After Plaintiffs' amended complaint was filed, Defendants attempted to "disavow[]" enforcement of specific aspects of Paragraph 18(B). ECF No. 38-1 ¶ 16. But, as Plaintiffs already explained, ECF No. 42 at 23, and as Judge Domenico held when Defendants made the same move in *Darren Patterson*, 2023 WL 7270874, at *9-11, Defendants' disavowal is both far too little and too late.

No. 32-3 at 2. Yet the State is purporting to bar providers from "discriminat[ing] against" employees based on "religion," "sexual orientation," and "gender identity." ECF No. 32-15 at 27; SUMF ¶ 51. By purporting to restrict the Archdiocese from making "personnel decision[s] based on religious doctrine," *Bryce*, 289 F.3d at 660, Paragraph 18(B) violates the First Amendment.

### C. The Department's exclusionary policies violate expressive association.

The Department's Equal Opportunity Mandate and Paragraph 18(B) also violate the First Amendment's protection for expressive association. Both provisions purport to forbid Archdiocesan preschools from considering religion, sexual orientation, and gender identity in admission, hiring, and operations—meaning that if they accept the funds, they cannot prioritize Catholics in admission, decline to hire staff or admit families who reject the Church's teachings, or operate their preschools consistent with their sincere religious beliefs. Colo. Rev. Stat. § 26.5-4-205(2)(b) (requiring equal opportunity "to enroll and receive preschool services"); *see* ECF No. 32-15 at 27; SUMF ¶¶ 43, 51, 84-92. But "the First Amendment protects acts of expressive association." *303 Creative*, 600 U.S. at 586. That includes the decision "not to associate" with others if the forced association would "affect[] in a significant way the group's ability to advocate" its "viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

In *Dale*, the Court held that the Boy Scouts were entitled to exclude a scoutmaster who was "an avowed homosexual and gay rights activist," despite state law prohibiting sexual-orientation discrimination. *Id*. at 643-45. The Court explained that freedom to associate "presupposes a freedom not to associate," and that requiring the Scouts to retain the plaintiff would impermissibly "force [them] to send a message" that they "accept[] homosexual conduct as a legitimate form of behavior." *Id*. at 648, 653.

Likewise, in *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), a pro-life pregnancy center challenged a state law that prohibited employment discrimination based on "reproductive health decision[s]," claiming that the law violated expressive association by "preventing [the center] from disassociating itself from employees who, among other things, seek abortions." *Id.* at 283. Applying *Dale*, the Second Circuit ruled for the pregnancy center. "The right to expressive association,"

the court held, "allows [the center] to determine that its message will be … conveyed only by employees who sincerely share its views"; accordingly, "strict scrutiny applies." *Id.* at 288-89.

An expressive-association claim involves two questions: whether the claimant "engage[s] in some form of expression"; and whether the forced association would "significantly affect [its] ability to advocate" for its viewpoints. *Dale*, 530 U.S. at 648, 650. If the answer to both questions is yes, then, unless the demanding strict-scrutiny standard is met, "the First Amendment prohibits" the forced association. *Id.* at 648, 659.

Here, the Archdiocese and its preschools engage in expression. Indeed, "[r]eligious groups" like these "are the archetype of" expressive associations. *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring). As the Supreme Court has recognized, the "*raison d'être* of parochial schools is the propagation of a religious faith." *NLRB v. Catholic Bishop of Chi.,* 440 U.S. 490, 503 (1979). So too here. ECF No. 32-3 at 1 ("[T]he mission of the Catholic school is to bring the young men and women in our care to encounter Jesus Christ and the truths of our Catholic faith ….").

The question, then, is whether requiring the Archdiocese's preschools to retain staff and enroll families who reject the Church's teachings would "significantly affect [the preschools'] ability to" convey their message. *Dale*, 530 U.S. at 640. Undoubtedly. "It would be difficult for [a religious group] to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006).

Indeed, courts must "give deference to an association's view of what would impair its expression." *Dale*, 530 U.S. at 653. Here, the Archdiocese's policies unambiguously explain the impairment. As the Archdiocese's Statement of Community Beliefs explains, hiring teachers and administrators who reject the Church's "teachings on sexual identity" and "marriage" would subvert its ability to "transmit[]" those teachings, since students "listen[] more willingly to witnesses than to teachers." ECF No. 32-3 at 4, 5. And as the Archdiocese's sexuality guidance explains, admitting

students from a same-sex household could "cause confusion about the nature of marriage," suggesting (contrary to Catholic teaching) that same-sex guardians are "*no* different from ... a mother and a father." ECF No. 32-6 at 15.

In short, "by foreclosing [preschools'] ability to reject employees" and families "whose actions suggest that they believe the opposite of the message [the Archdiocese] is trying to convey," the Mandate and Paragraph 18(B) "severely burden" the "right of expressive association." *Slattery*, 61 F.4th at 288-90; *Darren Patterson*, 2023 WL 7270874, at *15 (same). The State therefore must satisfy strict scrutiny, which it fails for all the reasons explained above. *Supra* I.A.3.

### D. The Department's exclusionary policies violate the First Amendment by impermissibly discriminating among religions.

Laws that favor one religion over another are subject to strict scrutiny. *See Larson v. Valente*, 456 U.S. 228, 246-47 (1982); *CCU*, 534 F.3d at 1259-60; *Awad v. Ziriax*, 670 F.3d 1111, 1127 (10th Cir. 2012). In *Larson*, for example, the Supreme Court held that a law imposing additional registration and reporting requirements on religious groups receiving most "of their funds from nonmembers" discriminated among denominations "in violation of the … First Amendment." *Larson*, 456 U.S. at 230. The rule triggered strict scrutiny because it "focuse[d] precisely and solely upon religious organizations" and "effectively distinguishe[d] between 'well-established churches' ... and 'churches which are new and lacking in a constituency.'" *Id*. at 246 n.23. Similarly, in *CCU*, the Tenth Circuit held that a Colorado law giving scholarship funding to sectarian— but not *pervasively* sectarian—universities violated denominational neutrality. 534 F.3d at 1259-60. As the court explained, "[t]he sole function and purpose of the challenged provisions" was "to exclude some but not all religious institutions on the basis of the stated criteria." *Id*. at 1258.

The Department's congregation exception here likewise "focuses precisely and solely upon religious organizations." *Larson*, 456 U.S. at 246 n.23; *see* SUMF ¶ 59. And it likewise "function[s]" to impermissibly discriminate among them. *CCU*, 534 F.3d at 1258. According to the Department, the exception "accommodates" religious organizations' "interest" in requiring adherence to religious-conduct standards by enrolling families, since it allows faith-based preschools to extend an

enrollment preference to their "congregations." ECF No. 47 at 4, 7, 17. While this may work for some religious groups, it does not work for faith communities like the Catholic Church: The Archdiocese invites all baptized Catholics to register as a parishioner with the local parish, SUMF ¶ 18; but—because of their specifically educational function—imposes additional obligations on those seeking to enroll at Catholic schools, SUMF ¶ 16.[4]

The Department has therefore "effectively" extended a "denominational preference," *Larson*, 456 U.S. at 246 & n.23, favoring certain faiths over others based solely on their "religious law and polity." *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 709 (1976). Such actions are "suspect" and trigger "strict scrutiny," *Larson*, 456 U.S. at 246, which the Department fails, *supra* I.A.3; *see also Watson v. Jones*, 80 U.S. 679, 733 (1872) (how a religious organization ensures "the conformity of [its] members of the church to the standard of morals required of them" is a matter "strictly and purely ecclesiastical").

In short: the State's conditions on UPK funding trigger what has correctly been called "the strictest form of judicial scrutiny known to American law." *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014). That standard is nowhere near met here.

\* \* \*

As the foregoing shows, Plaintiffs are entitled to summary judgment on all of their claims. With respect to remedy, Plaintiffs have demonstrated a likelihood of success on the merits, the first preliminary injunction factor. But Plaintiffs have also demonstrated actual success on the merits as well, the first permanent injunction factor.

## II.   Plaintiffs easily satisfy the remaining injunctive-relief factors.

The remaining injunctive-relief factors—irreparable harm, balance of the equities, and public interest—all favor an injunction. As the Tenth Circuit has explained, "in First Amendment cases,

---

[4]   And of course, no matter how broadly the congregation exemption applies, the Department has confirmed that (at least for Plaintiffs) it will never trump the Equal Opportunity Mandate's requirement of equal access regardless of sexual orientation and gender identity. SUMF ¶¶ 94-97. So the Department's suggestion that the congregation exemption solves Plaintiffs' problem is meritless in any event.

the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013); *see Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014) ("Having determined that Citizens United's First Amendment argument is valid, the remaining preliminary-injunction factors present little difficulty."); *cf. Ute Indian Tribe*, 22 F.4th at 908 (calling the tests for preliminary and permanent injunctive relief "remarkably similar"). Because Plaintiffs have made a strong showing of a First Amendment violation, a permanent injunction should issue.

**Irreparable harm.** "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Diocese of Brooklyn*, 141 S. Ct. at 67; *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (same). Once success on the merits of a First Amendment claim is shown, "no further showing of irreparable injury is necessary." *Awad*, 670 F.3d at 1131. This already irreparable injury is further compounded where, as here, the Department has singled out certain religious schools and families for exclusionary treatment. "[B]eing subjected to discrimination is by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016).

In addition, Plaintiffs suffer tangible harms each day they are excluded from UPK. The Sheleys are denied UPK funding that they can never recover, simply because they choose to send their children to Catholic preschools. ECF No. 32-18 ¶¶ 6-7; SUMF ¶ 98. And Plaintiff schools—like all preschools in the Archdiocese—are harmed by the decrease in enrollment and loss of staff caused by their exclusion from UPK. ECF No. 32-14 ¶¶ 38-47; ECF No. 32-16 ¶¶ 28-33; SUMF ¶¶ 99, 101. This harm is also both immediate and ongoing. UPK Colorado is currently matching interested families *every week*, on a rolling basis. As the Defendants' website explains, "Universal Preschool Colorado is not a first-come, first-served program. Applications are currently being accepted." Ex. 16 at 2. Accordingly, families who apply now "will be notified of their proposed matches every Friday and [they] will have until the following Thursday to accept or decline [their] match." Ex. 13 at 2.

What the website states, the Department's Rule 30(b)(6) witness confirmed. Schools can still, the witness stated, sign up to participate in UPK Colorado today and, if they have eligible four-year-old students in their classes already, they can start receiving funds immediately. Ex. 4 at 34:17-37:5 (confirming that "if a new provider were to join UPK right now, … those 4-year-olds [could] directly enroll with the provider and start participating in UPK[.]"). The witness also stated that preschool matching and enrollment is still ongoing and that the ability to continue or restart matching remains within the Department's discretion. *Id.* This means that Plaintiffs' preschools and families like the Sheleys would be eligible for participation in the UPK program immediately if the State's unlawful exclusion of religious providers were enjoined.

**Balance of the equities and public interest.** When injunctive relief is sought against the government, the third and fourth injunction factors "merge." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). This factor favors Plaintiffs because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Gessler*, 773 F.3d at 218; *see also Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").

And especially when a law is unconstitutional, "the [government's] interests … do not outweigh a plaintiff's interest in having its constitutional rights protected." *Gessler*, 773 F.3d at 218; *Pac. Frontier*, 414 F.3d at 1237 (similar); *Newland*, 881 F. Supp. 2d at 1295 ("These interests are countered, and indeed outweighed, by the public interest in the free exercise of religion."). Absent an injunction, Plaintiffs will continue being deprived of their First Amendment rights. By contrast, the State has no legitimate interest in enforcing its unconstitutional exclusion. Thus, protecting Plaintiffs' constitutional rights far outweighs any government interest in enforcing an unconstitutional law.

**CONCLUSION**

The Court should grant Plaintiffs' motion for summary judgment and issue a permanent injunction. In the alternative, the Court should grant Plaintiffs a preliminary injunction.

Dated: November 21, 2023

Respectfully submitted,

/s/ Eric C. Rassbach
Eric C. Rassbach
Mark L. Rienzi
Joseph C. Davis
Nicholas R. Reaves
Amanda Dixon*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, D.C. 20006
(202) 955-0095
erassbach@becketlaw.org

* Not admitted to the D.C. Bar; admitted only in North Carolina. Supervised by licensed D.C. Bar members.

**CERTIFICATE OF SERVICE**

I hereby certify that I have served the foregoing document on all parties via CM/ECF and as required by the relevant federal and local rules.

Dated: November 21, 2023                    /s/ Eric C. Rassbach
                                            Eric C. Rassbach

## INDEX OF EXHIBITS

| Ex. 1 | Declaration of Nicholas Reaves, dated November 21, 2023 |
|---|---|
| Ex. 2 | Defendants' Answers to Plaintiffs' First Set of Interrogatories |
| Ex. 3 | Defendants' Answers to Plaintiffs' Requests for Admission |
| Ex. 4 | Deposition transcript of Dawn Odean, dated November 8, 2023 |
| Ex. 5 | Deposition transcript of Lisa Roy, dated November 8, 2023 |
| Ex. 6 | Documents produced in discovery by Defendants |
| Ex. 7 | Plaintiffs' Supplemental Answers to Defendants' First Set of Interrogatories |
| Ex. 8 | Colorado Shines rating pages |
| Ex. 9 | Colorado Department of Early Childhood's webpage titled "Browse participating UPK Colorado providers" |
| Ex. 10 | UPK Colorado Exception Criteria Disclaimers |
| Ex. 11 | Anchor Center – "Refer a Child" |
| Ex. 12 | Proposed Universal Preschool Program Rules and Regulations |
| Ex. 13 | Colorado Department of Early Childhood's webpage entitled "Submit an application for UPK Colorado for the 2023-2024 school year" |
| Ex. 14 | Polis: Catholic schools that want universal pre-K must not discriminate |
| Ex. 15 | UPK Colorado Provider Guide |
| Ex. 16 | Colorado Department of Early Childhood's webpage entitled "Universal Preschool Colorado" |