# Exhibit 4

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2

        ST. MARY CATHOLIC PARISH IN
3       LITTLETON; ST. BERNADETTE
        CATHOLIC PARISH IN LAKEWOOD;
4       DANIEL SHELEY; LISA SHELEY; and
        THE ARCHDIOCESE OF DENVER,
5
                  Plaintiffs,
6
        vs.                            Case No.
7                                      1:23-cv-2079-JLK
        LISA ROY, in her official capacity
8       as Executive Director of the
        Colorado Department of Early Childhood;
9       and DAWN ODEAN, in her official
        capacity as Director of Colorado's
10      Universal Preschool Program,
11              Defendants.
        _____
12

          REMOTE 30(B)(6) DEPOSITION OF COLORADO DEPARTMENT OF
13                EARLY CHILDHOOD BY DAWN ODEAN
                      November 8, 2023
14      _____
15
16
17
18
19
20
21
22
23
24
25

Page 2

```
 1      APPEARANCES:
 2      ON BEHALF OF THE PLAINTIFFS:
                JOSEPH C. DAVIS, ESQ.
 3              NICHOLAS R. REAVES, ESQ.
                AMANDA G. DIXON, ESQ.
 4              The Becket Fund for Religious Liberty
                1919 Pennsylvania Avenue, N.W., Suite 400
 5              Washington, D.C.  20006
                Phone:  202-955-0095
 6              Email:  jdavis@becketlaw.org
                Email:  nreaves@becketlaw.org
 7              Email:  adixon@becketlaw.org
 8      ON BEHALF OF THE DEFENDANTS:
                VIRGINIA R. CARRENO, ESQ.
 9              J. GREG WHITEHAIR, ESQ.
                Colorado Attorney General's Office
10              1300 Broadway
                Denver, Colorado  80203
11              Phone:  720-508-6000
                Email:  virginia.carreno@coag.gov
12
13      ALSO PRESENT:  Alexa Pastor, Veritext Concierge
                        Tim Derocher
14                      Lisa Roy, Ed.D.
                        Bonnie Smith
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1              PURSUANT TO WRITTEN NOTICE and the

2    appropriate rules of civil procedure, the remote 30(b)(6)

3    deposition of Colorado Department of Early Childhood by

4    DAWN ODEAN, called for examination by the Plaintiffs, was

5    taken remotely commencing at 9:07 a.m. on

6    November 8, 2023, before Laurel S. Tubbs, a Registered

7    Professional Reporter, Registered Merit Reporter,

8    Certified Realtime Reporter, and Notary Public in and for

9    the State of Colorado.

10                            INDEX

11    EXAMINATION:                                        PAGE

12    By Mr. Davis                                          4

13    EXHIBITS:                                           PAGE

14    Exhibit 1   Notice of Rule 30(b)(6) Deposition       8

15    Exhibit 2   Universal Preschool (UPK) Colorado       45
                  Program Service Agreement
16

      Exhibit 3   Declaration of Dawn Odean               72
17

      Exhibit 4   UPK Colorado Provider Guide             77
18

      Exhibit 5   Approved Exception Criteria List        92
19

      Exhibit 6   Universal Preschool Rules and          104
20                Regulations 8 CCR 1404-1

21    Exhibit 7   Interfaith Advisory Attendees          110

22    Exhibit 8   Email String                           111

23    Exhibit 9   Email String                           117

24

25

Page 4

1              P R O C E E D I N G S

2              THE REPORTER:  Are all counsel in

3      agreement that I will swear the witness in remotely?

4              MR. DAVIS:  Yes.

5              MS. CARRENO:  Yes.

6                      DAWN ODEAN,

7      having been first duly sworn or affirmed, was examined and

8      testified as follows:

9                      EXAMINATION

10     BY MR. DAVIS:

11             Q.   Great.  Well, good morning, Ms. Odean.  My

12     name is Joe Davis.  I'm one of the lawyers for the

13     plaintiffs in this case.  It's really good to meet you,

14     and I'm grateful for your time this morning.

15             A.   Thank of you.  Nice to meet you also.

16             Q.   I just want to go over a couple of ground

17     rules, and -- even if you've done this before, but, you

18     know, I've got to get us -- got to get them out there.

19                  One of them is that it's really important,

20     for purposes of the transcript, that -- you know, when

21     asking questions, that your answers are verbal answers.

22     So like "yes" or "no" rather than "uh-huh" or "huh-uh."

23                  Does that sound okay?

24             A.   Yes.

25             Q.   Another one is that it's also important

1    that we not talk over each other.  So, you know, I'll try

2    to let you completely finish your answers before I tee up

3    another question, and it would be great if you could do

4    the same for me, let me finish my question before you

5    start your answer.

6                    Does that work?

7          A.    Yes.

8          Q.    Great.

9                    And have you ever been deposed before?

10         A.    No.

11         Q.    Okay.  Well, just a couple of preliminary

12    questions about, you know, what we're doing here today.

13                    So first off, you understood you just took

14    an oath, right?

15         A.    I do.

16         Q.    Okay.  And so you understand that what you

17    say today, it can be introduced in court later and it will

18    become part of the public record?

19         A.    Yes, I understand.

20         Q.    Okay.  And is there anything that would

21    prevent you from giving your full attention this morning

22    or from giving complete and clear answers?

23         A.    No.

24         Q.    Okay.  Did you review any documents before

25    today's deposition?

Page 6

```
 1              A.   I did.  I reviewed my -- my statement and
 2      other documents that we submitted, including providers
 3      participating in the program.
 4              Q.   Okay.
 5              MR. DAVIS:  And, Virginia, can you just
 6      confirm that the documents that -- that she just
 7      mentioned have been produced to the plaintiffs?
 8              MS. CARRENO:  They have, yes.
 9              Q.   (By Mr. Davis)  And then other than --
10      other than, you know, your counsel -- your attorneys, did
11      you talk with anyone in preparation for this deposition?
12              A.   No.
13              Q.   Okay.  Do you have any email or messaging
14      programs open on your computer right now?
15              A.   I do.  I can close those.
16              Q.   Yeah, if you could just confirm for the
17      record that those are closed and are logged off of.
18              A.   It's closed.
19              Q.   Great.  And then if we can just confirm for
20      the record who else is in the room with you.
21              MS. CARRENO:  And so I'm Virginia Carreno,
22      counsel, and Dr. Roy, the executive director of CDEC, is
23      in the room.  Tim Derocher from Department of Early
24      Childhood.  Niki Rust, who's one of the attorneys on the
25      cases.  Bonnie Smith, who's our paralegal.  Michelle
```

Page 7

1    Lonhausen [phonetic] with the AG's office, and Greg

2    Whitehair with the AG's office as well.

3                    MR. DAVIS:  Great.  Thanks, Virginia.

4            Q.   (By Mr. Davis)  And, Ms. Odean, just -- you

5    know, you understand, like, the deposition is a

6    conversation between me and you, and so during the

7    deposition it's important that you only communicate with,

8    of course, your counsel, but also me and the court

9    reporter.

10                   Does that -- does that work?

11           A.   Yes.

12           Q.   Great.  So, you know, at any point in the

13   deposition, feel free to, you know, chime in if you need

14   to take a break, and I'll try to wrap up my current

15   line of questioning.  I think in any event, you know,

16   we'll need to take a break every hour or so.  I don't know

17   how many hours we're talking about here.  Hopefully not

18   too many, but we'll take a break every hour or so.

19                   Does that work?

20           A.   Yes.

21           Q.   All right.  Great.

22                   And then when we're in the breaks, just --

23   you know, do you understand that it's improper for you to

24   be discussing with your attorneys the content of the

25   deposition?

Page 8

1              A.    Yes.

2              Q.    Okay.  All right.

3                    And you understand that you're appearing

4      today as a witness on behalf of the Department of Early

5      Childhood, right?

6              A.    Yes.

7              Q.    Okay.  Great.

8                    And did you receive the list of topics that

9      we sent over for today's deposition?

10             A.    I did, yes.

11             Q.    Okay.  Great.

12                   I'm going to go and mark that as our first

13     exhibit, and that will give us a chance to make sure

14     Exhibit Share is working as well.

15                   Just give me one moment.

16                   (Exhibit 1 was marked.)

17             A.    Okay.

18             Q.    All right.  You should have it.

19                   Do you have the exhibit, Ms. Odean?

20             A.    I do.

21             Q.    Okay.  Great.

22                   And just to confirm, I think you're

23     testifying today on some of these topics.  Topics 1

24     through 4, 6, and 8 through 11; is that right?

25             A.    Yes.

Page 9

1          Q.   Okay.  Are you prepared to discuss those

2    topics this morning?

3          A.   I am.

4          Q.   Great.

5               Okay.  Ms. Odean, what's -- what is your --

6    just for the record, what's your current position at the

7    Department of Early Childhood?

8          A.   I'm the director of the universal

9    preschool program.

10         Q.   Okay.  And how long have you been the

11   director of UPK?

12         A.   I started August 15th, 2022.

13         Q.   All right.  Okay.

14              Was there a director of UPK before you or

15   are you the inaugural director of UPK?

16         A.   I am the inaugural director.

17         Q.   Great.

18              And what are the -- what was the scope of

19   the role?  What does it mean to be the director of UPK?

20         A.   Sure.  So the intention of the role is to

21   operationalize universal preschool for the state of

22   Colorado as set forth for us in law.

23         Q.   Okay.  What was -- what was your role

24   before you became the director of UPK?

25         A.   I was the executive director of early

```
                                              Page 10
 1      learning for Jefferson County Public Schools.
 2                Q.    Okay.  Had you had any previous employment
 3      with the State of Colorado?
 4                A.    I hadn't.
 5                Q.    Okay.  What about with any other local
 6      government besides Jefferson County?
 7                A.    No.
 8                Q.    And then before that, had you -- had your
 9      career been in education, or what did you do before --
10      before the Jefferson County role?
11                A.    I worked in communications in the private
12      sector.
13                Q.    Okay.  All right.
14                      What kind of -- what was the -- what was
15      the firm?
16                A.    I worked for an insurance company in their
17      marketing communications department --
18                Q.    Okay?
19                A.    -- before I became a teacher.
20                Q.    Okay.  So it was communications, teacher,
21      and then into administration in Jefferson County?
22                A.    Yes.
23                Q.    What made you want to switch careers to
24      education?
25                A.    I had my first child and thought, I don't
```

1    want to keep working, and I want to do something

2    different than what I'm doing now, so I went back to

3    school.

4              Q.   How -- how were you selected as director of

5    UPK?

6              A.   I went through the state application

7    portal to apply and then went through a series of

8    interviews.

9              Q.   Was -- was Dr. Roy the decision-maker?

10   Who -- who hired you?

11             A.   Yes.  Dr. Roy.

12             Q.   Okay.  Is Dr. Roy still your supervisor?

13             A.   She is.

14             Q.   Okay.  Did anybody else at the state have

15   any input as to who was brought on as director of UPK?

16             A.   I -- I'm not sure because I wasn't a part

17   of the final decision-making committee, but there were

18   several people on the interviews that I participated in.

19             Q.   Is it your understanding that the committee

20   was exclusively Department of Early Childhood folks, or

21   were there people from different agencies in the state?

22             A.   I'm not -- I don't -- I'm not aware.

23             Q.   Like the governor's office, for example?

24             A.   I'm trying to remember.  I don't think

25   there was anyone from the governor's office.  I believe

1    in the earlier interviews there were some external

2    stakeholders that participated, but not from the

3    governor's office.

4            Q.   External stakeholders like outside the

5    government altogether or --

6            A.   Yeah.

7            Q.   Okay.  What kind of -- what kind of -- what

8    kind of stakeholders?

9            A.   I recall one who had been involved in the

10   early childhood community in the bill writing from the

11   Denver Preschool Program.

12           Q.   Okay.  Anybody else that you recall?

13           A.   I can't remember all of the interviewers,

14   but that one in particular I remember.

15           Q.   Okay.  But -- you know, just to be clear,

16   not all of the interviewers -- was there any other one

17   that you remember?

18           A.   No one else.  Mary Alice Cohen, but she

19   was from the department.

20           Q.   Okay.

21           A.   Oh, Katy Anthes, who was the commissioner

22   of the Department of Education, was on the initial

23   interview, and then -- I'm not going to remember her

24   name, but the head of the Colorado Department of Human

25   Services.

1          Q.    Okay.

2                THE REPORTER:  Can I get the name again,

3     please?  Can I get the name -- the first name you

4     mentioned, ma'am?

5                THE DEPONENT:  Katy Anthes.

6                THE REPORTER:  First name again?

7                THE DEPONENT:  Katy.

8                THE REPORTER:  Thank you.

9          Q.    (By Mr. Davis)  Great.  Thank you for that.

10               So you said a moment ago your current

11    supervisor is Dr. Roy, right?

12         A.    That is correct.

13         Q.    And what is her role?

14         A.    She's the executive director of the

15    department.

16         Q.    Okay.  Who does she report to?

17         A.    She reports to the governor.

18         Q.    Okay.  Is Dr. Roy the ultimate

19    decision-maker for the department?

20         A.    She is.

21         Q.    Okay.  And you said Dr. Roy reports to the

22    governor -- to the governor's office.  Did the governor

23    appoint Dr. Roy?

24         A.    I wasn't on board at that time.  That

25    was -- that was prior to me being hired, so I'm not aware

Page 14

1    of that process.

2              Q.    Okay.  Does she report -- does the

3    department report to the governor on a regular basis?

4              A.    I'm not sure of her reporting structure,

5    but we give updates on where we are in the program.

6              Q.    Okay.  Is that like a regularly scheduled

7    meeting or how does that work?

8              A.    It depends.  We usually do a memo update,

9    and then meet if we need to discuss --

10             THE REPORTER:  Can we go off --

11             Q.    (By Mr. Davis)  How often is the --

12             THE REPORTER:  I'm sorry.  Could we go off

13   the record for a moment?

14             (Discussion off the record.)

15             Q.    (By Mr. Davis)  Ms. Odean, I think the

16   question was does the department have a regularly

17   scheduled meeting with the governor's office to provide

18   updates?

19             A.    We don't -- we do -- we typically give

20   updates biweekly, and then often we -- with -- in

21   alignment with that update, but it's not regular, if you

22   will.

23             Q.    Okay.  So it's an approximately biweekly

24   written update?

25             A.    Correct.

Page 15

1                    Q.    That's often followed by a meeting, but not

2        always?

3                    A.    Correct.

4                    Q.    Okay.  Is that -- is that the department in

5        general giving an update, or is that specifically your

6        division, the UPK division?

7                    A.    That's specific to the universal preschool

8        program.

9                    Q.    Okay.  Has the governor's office -- does

10       the governor's office ever initiate the updates to UPK to

11       check up on things?

12                   A.    Some -- yeah, sometimes.

13                   Q.    Okay.  Like what's an example of that?

14                   A.    An example might be a legislative question

15       from a representative to our department to give broader

16       understanding of the program.  Yeah.

17                   Q.    Okay.  Has the governor been in touch about

18       any of the sort of concerns that have been raised about

19       the way the UPK roll out has?

20                   MS. CARRENO:  And objection to the extent

21       that this calls for information that would fall within

22       the elected official privilege.

23                   I understand that one of the topics is

24       generally the structure and functioning of the

25       department, so obviously some of these questions -- but

1    to the extent that you're asking for information that

2    falls into delivery of process or elected official

3    privilege, I'm just going to instruct her not to answer.

4              MR. DAVIS:  Okay.

5         Q.   (By Mr. Davis)  Ms. Odean, the -- the

6    question wasn't getting at the content of what the

7    governor's office has expressed to you, if any.

8              The question was to the extent rollout --

9    concerns have been raised about the rollout of the UPK

10   program, has the governor been in contact with UPK about

11   those concerns?

12        A.   We certainly have given updates on

13   challenges throughout the start-up of the program.

14        Q.   Okay.  What about the concerns raised in

15   this lawsuit?

16             MS. CARRENO:  And again, objection to the

17   extent that this calls for anything that's privileged,

18   whether that's attorney-client or elected official.

19        Q.   (By Mr. Davis)  You can answer, Ms. Odean.

20        A.   I haven't had any specific conversations

21   about this lawsuit with the governor.

22        Q.   What about -- not this lawsuit, but the

23   Archdiocese preschool's participation in the UPK program?

24        A.   I haven't had any conversations with the

25   governor about this -- these participants, with the

1    governor.

2              Q.    What about with the governor's office, more

3    generally?

4              A.    Not that I can recall.

5              Q.    Okay.  Ms. Odean, can you just lay out for

6    me, like, sort of the basic structure of the UPK program?

7              A.    Sure.  So our team is set up with me as

8    the director.  I have two managers, one of our local

9    coordinating organizations, and she has five regional

10   specialists.

11             There are 32 local coordinating

12   organizations around the state that help support and

13   navigate universal preschool with families and providers

14   locally.  So that unit is in -- working with our local

15   coordinating organizations every day.

16             My other manager is an operational manager

17   who works with now three universal preschool program

18   specialists, and they support our work with our IT team

19   and our vendors that we contract with to operationalize

20   the universal preschool program.

21             Q.    Okay.  So that's how the program is

22   operationalized, but what is the universal preschool

23   program?  What does it do?

24             A.    Sure.  So the universal preschool is to

25   give at least 10 hours of preschool to every eligible

Page 18

1    4-year-old in Colorado the year before kindergarten.

2             Q.    Okay.  And how does it do that?  Does it --

3    funds go to the schools or do funds go to the families

4    directly?

5             A.    Sure.  So we have an application system

6    where providers register in that system to participate,

7    and families can go on and seek and find the just-right

8    provider.

9                   Then when they apply, they can choose one

10   to five providers and rank them.  And then they go

11   through a matching process to go with one of those five

12   providers to enroll -- as part of the enrollment.  Then

13   the providers can accept that enrollment and the family

14   can start in the program.

15                  CDEC funds the provider.  If it's a

16   part-time program, then it's an hour rate; if it's a

17   half-day program, it's a 15-hour rate.  So all children

18   are eligible for 15 hours a week, or a half day.  And

19   then we have our process with qualifying providers to

20   identify children who might qualify for additional hours

21   or a full day, which is a minimum of 30 hours a week.

22                  And so we go through a process to

23   determine that qualification and verification of funds

24   and award -- that payment goes monthly to the provider to

25   provide the services.

1           Q.    Okay.   And why is it important to make

2     preschool available in the way that UPK does?

3           A.    Yeah.   So it's shown over time in Colorado

4     with the previous program in a targeted way to have

5     positive child outcomes.   And so this expansion to a

6     universal model allows more children to have access to

7     early learning and care.

8                 There's so many incredible gains that can

9     be made in -- at the preschool age, certainly around

10    whole child development, cognitive, speech/language,

11    gross motor, fine motor, social, emotional.   Being in a

12    high-quality setting is an exceptional way to get to high

13    child outcomes over a long-term trajectory.   So we're

14    really excited about this for Colorado and for Colorado's

15    children.

16                But I will also say it's really critical

17    to ensure that families can thrive in Colorado and that

18    they're able to have choice in finding the just-right

19    provider, and really being able to have that savings they

20    might not have anticipated that they might need.

21                We have families that have been

22    participating in childcare previous to preschool, and we

23    have families who haven't.   So it's an opportunity to --

24    certainly put those children and families to have

25    positive outcomes.

```
 1              Q.   Okay.  And "universal" means you're trying
 2     to reach all children.  Is that the idea?
 3              A.   Yeah, that's the idea, that the
 4     opportunity is there for all children who reside in
 5     Colorado in the year before kindergarten.
 6              Q.   And -- so that's helpful.  Thank you.
 7              You talked about a couple of things there I
 8     want to sort to pull out one by one, if we could.  So
 9     families are trying to choose the just-right provider, how
10     do families -- how do they learn information about the
11     different UPK providers?
12              A.   Sure.  So our local coordinating
13     organizations are very important in supporting navigation
14     locally.  They are engaged with providers regularly, as
15     well as families, to help support connections and
16     navigation.
17              In our application system, providers who
18     are registered can create a profile to show who they are,
19     and what they offer, and what they provide and celebrate
20     who they are so families can search those and look for
21     what they're looking for.
22              They can search geographically, for
23     example.  They can look at the walking distance from
24     their home or a route between home and work.  Geography
25     is often one of the choice indicators, as you might
```

Page 21

```
 1      imagine.
 2                   But the system also doesn't replace that,
 3      you know, going to one contact.  We certainly recognize
 4      that providers have different events to attract families
 5      and connect with families.  And we know that families
 6      might go on tours, for example, or call directly to
 7      providers to have a more intimate conversation, if you
 8      will.
 9              Q.   Sure.
10                   So you say, like, part of what the
11      providers are trying to do is celebrate who they are, put
12      out -- put out their -- through the portal, you know,
13      information about their program.  What do you mean by
14      that?  Like is that educational philosophies, curriculum,
15      that kind of thing?  Besides geography, what are the --
16      what are the kinds of things that --
17              A.   Yeah, it could be.  If you look at the
18      site, it's very customizable by the provider to -- to
19      talk about the programs that they offer, the ages that
20      they offer, for example.
21                   While they're participating in universal
22      preschool, they might offer infant and toddler care,
23      which a family might be looking at if they have other
24      children.  Program year, length of year, rates for
25      additional hours, different opportunities they might
```

Page 22

1   provide.  The whole range of kind of enrichment

2   programming they might provide.

3                    Q.   Great.  Okay.

4                    So a family has done their research,

5   selected the providers that they're interested in.  And

6   you said next they rank them 1 to 5 in the application

7   system.

8                    A.   That's correct.

9                    Q.   Okay.  And then -- so what happens next?

10  There's a matching process.  How does the matching process

11  work?

12                   A.   Right.  So the way that the matching

13  process is set up is that there's a weight applied for

14  families who are continuity of care, have a sibling, have

15  a particular license location or an employee's child.

16                   And then it goes into what's called the

17  deferred acceptance algorithm, which is a standard --

18  industry standard for matching, like a lottery, to the

19  providers that they have chosen.

20                   Q.   And so -- well, first off, you said

21  continuity of care.  That means the child is already at

22  that school?

23                   A.   Correct.

24                   Q.   Okay.  How much of a weight is given for

25  continuity of care?

1         A.   It's -- all three of those are equally

2    weighted -- equally weighted.  So there's not a rank

3    order of weights.  You can get a weight for continuity of

4    care, sibling, or, you know, an employee's child.

5         Q.   Okay.  And if only one of those three is

6    applicable, does it get the same weight -- like does it

7    get a bigger weight in that --

8         A.   No.

9         Q.   Okay.

10         A.   They're all the same weight, and you can

11    only get one.

12         Q.   Okay.  Okay.

13              And then -- so the algorithm runs and it

14    comes back on the family's side with a, here's your

15    match -- here's the school that has matched you?

16         A.   It actually goes to the provider first.

17         Q.   Okay.

18         A.   And that's where we have preferences built

19    in for providers.

20         Q.   Okay.  So the provider gets the match, and

21    then the provider can either accept or reject the match?

22         A.   Correct.  If they are a good match or an

23    approved preference.

24         Q.   If they are an approved preference?

25         A.   Yeah.

1          Q.    Okay.  If they are an approved preference,

2     they accept the match, right?

3          A.    Right.

4          Q.    Okay.  They're required to accept the

5     match?

6          A.    They are.

7          Q.    Okay.  And we'll talk about the

8     preferences, of course --

9          A.    Okay.

10          Q.    -- in a bit.

11          A.    Okay.

12          Q.    So how does a provider start participating

13     in UPK in the first place?

14          A.    So the main requirement for a provider to

15     participate is that they're licensed, and then they

16     register in our system.

17          Q.    And registering in the system, what does

18     that entail?

19          A.    So they get -- log in into our application

20     system, and they register.  That's where we have our

21     provider agreement, which they would sign if they choose

22     to participate.  That's where they create their profile.

23     And that's where they get access to the enrollment

24     processes.

25          Q.    Okay.  And so to -- to become registered,

1    they're required to sign the provider agreement; is that

2    right?

3              A.   Correct.

4              Q.   Okay.  So all the current UPK providers

5    that are currently participating in the program, they

6    did -- they signed the agreement?

7              A.   They -- I don't know for 100 percent, but

8    close.

9              Q.   Okay.  How would they be in the -- in the

10   system and able to participate if they hadn't signed the

11   provider agreement?

12             A.   Sure.  So in year one, we had to start up

13   the system at a -- in a pretty compressed timeline, and

14   the agreement didn't go into affect until July 1.  So we

15   had providers registering with us who were considering to

16   participate, leading up to the agreement -- the agreement

17   going into effect.

18                  So it was November of last year when

19   providers were going in and registering and creating

20   profiles.  So ahead of the contract year.

21             Q.   I see.  Okay.

22                  So -- but the agreement that's in effect

23   now, if a provider wants to participate, they're required

24   to sign the agreement?

25             A.   Yeah.  And we still have providers signing

Page 26

1   on, yeah.

2           Q.   Okay.  Is -- are you trying to sort of go

3   back and get folks to sign that had gotten into the system

4   before the agreement went into effect?

5           A.   I'd have to look at our records to see

6   where we're at on that.  We certainly did leading up to

7   the contract starting.  I don't have -- I don't have that

8   off the top of my head, but --

9           Q.   Sure.  No, yeah.  The question was, you

10  know, was there an effort to go back and have providers

11  that were already there sign --

12          A.   Absolutely.  Yeah.

13          Q.   -- the agreement?  Okay.

14          And I really appreciate your answer.  Just

15  a reminder about us talking over each other a little bit

16  there?

17          So -- okay.  Great.  So that was really

18  helpful.  We just talked a lot about sort of the way the

19  matching process works, which I take it is -- is one way

20  the families get into the system.  But UPK is also

21  allowing walk-ins or direct enrollment right now; is that

22  right?

23          A.   That's correct.  We opened up walk-in or

24  direct enrollment as the program year began.

25          So most programs started in August.  And

1    so many families hadn't heard of universal preschool and

2    the application system and were going directly to the

3    provider to enroll.  We wanted to facilitate that process

4    in a way that allowed for the child to participate as

5    soon as possible.  A higher volume of applications were

6    earlier, and certainly have children who still, you know,

7    move or were coming in and want them to be able to access

8    the classroom as soon as possible.

9              Q.   And is there a term you prefer between

10    walk-ins and direct enrollment or are they

11    interchangeable?

12              A.   We -- we typically call it direct

13    placement.

14              Q.   Okay.  All right.

15              Can you -- so how does the direct placement

16    process work?

17              A.   So if the family shows up at a school to

18    enroll, that provider can let their local coordinating

19    organization know that they are enrolling.  The family

20    still has to complete the application, and then the LCO

21    directly places the child at that location rather than

22    going through a match.

23              Q.   Okay.  Can a provider decline a family or

24    decline to accept the family through the direct enrollment

25    method?

1                    MS. CARRENO:  And, Joe, can you just tell

2       me what topic the direct enrollment questions are related

3       to in terms of the 30(b)(6) notice?

4                    MR. DAVIS:  Sure.  This goes to the

5       structure of UPK.  So if there's two other ways of

6       participating in UPK and one of them is the matching

7       process and one is through the direct enrollment process,

8       I think that would pretty clearly fall into that topic.

9                    MS. CARRENO:  Yeah, and I -- I have number

10      9 as talking more about the matching process for kind of

11      how -- or how the universal preschool program is working.

12      I think this is going beyond just the structure and

13      operations of Universal Preschool Colorado.

14                    I just want to remind you that Dawn is

15      going to be testifying in her personal capacity tomorrow.

16      So to the extent that we veer too far away from the

17      topics that were noticed, I would just ask that you

18      reserve those questions for her personal deposition.

19                    MR. DAVIS:  Sure.  I mean, to be clear,

20      are you taking the position that one of the two methods

21      of enrollment is not part of the operations of UPK?

22                    MS. CARRENO:  I'm sorry.  Can you say that

23      again?

24                    MR. DAVIS:  So our topics include the

25      operations of universal preschool.  And my questions

1    right now are going to how does a family participate in

2    universal preschool, and I guess I view that as pretty

3    clearly falling into that topic.

4                    I just had a couple more questions about

5    direct enrollment, you know, if -- I'm curious, is your

6    position that direct enrollment is outside of the scope

7    of the operations of UPK?

8                    MS. CARRENO:  I think the limit is outside

9    the scope because you did specifically mention the

10   matching process.  But like I said, I will allow a little

11   leeway since you've explained that you are connecting

12   this to topic number one.  So no objection at this point

13   as long as there's just a few more questions.

14                   MR. DAVIS:  Okay.  Thank you, Virginia.

15                   I just want to say, I think this also

16   falls -- just for the record, topic number 9 says the

17   process and procedures by which families can seek to

18   participate in UPK Colorado, and the process by which

19   families are matched with preschools.  So, you know, I'd

20   say the part before the "and" there would encompass

21   direct enrollment.  So just -- just saying that for the

22   record.

23                   Q.   (By Mr. Davis)  Ms. Odean, I think the

24   question on the table was if a family is attempting to

25   directly enroll in a particular preschool, can a preschool

Page 30

1    decline to accept that enrollment?

2             A.    If they have an open seat available,

3    they -- we -- they can't decline them.  They certainly

4    have to apply, though, through the application process.

5             So we can't process them on the department

6    side unless they have actually applied.  And so the

7    provider might ask them to apply and then go through the

8    process.

9             Q.    Okay.  But the family -- but the provider

10   might ask them not to apply, and then they wouldn't be

11   able to enroll through the UPK process?

12            A.    I haven't had that particular situation

13   elevated to me.  So I would want to -- I wouldn't want to

14   speculate.  I would want to understand what happened

15   further.  But we haven't had that elevated to our state

16   team.

17            Q.    Okay.  But it -- but it could happen,

18   right, and then it would never be -- it would never be

19   sort of reported through the UPK system?

20            MS. CARRENO:  And objection to the extent

21   that this calls for speculation.

22            Q.    (By Mr. Davis)  You can answer.

23            A.    Well, I would imagine a family would call

24   us if they thought a participating provider didn't --

25   didn't accept them with questions, either through our

Page 31

```
 1     local coordinating organization or directly to our state
 2     team.
 3               Q.   Okay.
 4               A.   If they had done that, we certainly would
 5     reach out and find out more.
 6               Q.   Okay.  Why could a provider not decline to
 7     enroll or, you know, encourage a family not to apply and
 8     approach a provider through the direct enrollment process?
 9               A.   If the program is full, they don't have
10     seats, they wouldn't -- we don't require providers to be
11     all in.
12               So, for example, some providers have
13     multiage classrooms, so all their seats aren't all
14     universal preschool seats.  They may have made
15     adjustments to those program seats over time.  So they
16     might have initially -- initially we ask, hey, can you,
17     you know, give it a go with us, go all in on your seats.
18     We've had some providers who haven't filled seats, and so
19     they have asked to change those over to 3-year-old seats
20     for example, and so they weren't available for an
21     eligible UPKer, if you will.
22               And then we do have that preference
23     category where providers have specific preferences that
24     they could make to decline.
25               Q.   Right.
```

1          Yeah, and so I'm just -- you know, you said

2     that if a provider has a seat, they would have to accept

3     the family that approached them for direct enrollment

4     if --

5          A.   Yeah.

6          Q.   Why --

7          A.   You might have -- I apologize.

8          Q.   My question was why?  Is that because of

9     the provider agreement?  Why is that?

10         A.   Well, what -- what we would find -- what

11    we would try to find out, if that was a scenario, is why.

12    So why is there a seat listed as a universal preschool

13    seat when we're not requiring you to be all in and you're

14    not accepting a family.

15              It might be a mistake on the program seats

16    where they filled a 3-year-old, for example.  And it --

17    it's also allowable with their preferences.

18              And so if there's a preference that's

19    determined, for example, a Head Start program where

20    they're trying to meet a certain income level because

21    that's their federal mandate, then that would be

22    allowable.

23              So again, it's hard to speculate not

24    knowing the exact scenario or situation.

25         Q.   Okay.  So the same preferences that would

Page 33

```
1    allow a provider to decline to enroll a family through the

2    matching process would also allow a provider to decline to

3    enroll a family through the walk-in or direct enrollment

4    process?

5            A.   Correct.

6            Q.   Okay.  And the walk-in or direct enrollment

7    policy, that's currently in place, right?

8            A.   Actually, that started after the school

9    year started.

10           Q.   Okay.  But families right now can -- can

11   still utilize that procedure right now and become enrolled

12   in UPK?

13           A.   Yes.

14           Q.   Okay.  And you said earlier that providers

15   are still coming in and starting to participate right now.

16   So to be clear, a UPK provider -- or a preschool provider

17   can register with UPK right now and still participate in

18   the program?

19           A.   Correct.

20           Q.   Okay.  Is there any cutoff to when UPK

21   providers can come in?

22           A.   We don't have a cutoff date.  And we had

23   contemplated that because it is a lot of change, but in

24   this first year, we really wanted to be as inclusive as

25   possible for providers to participate.
```

Page 34

1              And because there was a lot of unknown

2     early on, there were many providers who were interested

3     in seeing how it played out to determine if they wanted

4     to participate or not.  So we've had rolling

5     registration, if you will, for providers.

6              We also have newer providers who are going

7     through the licensing process and had to have their

8     license finalized before they could enroll children.  But

9     we certainly had families and providers who were excited

10    about that.

11             For example, an employer-based provider

12    who got preschool opportunity for their employees.  And

13    so we wanted to be able to honor that -- especially in

14    this first year, be thoughtful about that inclusion in

15    this delivery.

16             Q.   Okay.  Great.

17             And is matching still going on as well?

18    Like if families choose to utilize the online portal, they

19    can still be matched to providers?

20             A.   We're in our last matching round, and then

21    we'll transition to only direct placement.  Families can

22    still enter through the application and be connected to

23    their provider through their LCO or they can -- they can

24    go through their provider and connect to their LCO.

25             Q.   Okay.

1          A.   But the number of applications has

2     significantly diminished since the start of the program

3     year.

4          Q.   Okay.  When is the last matching round set

5     to conclude?

6          A.   I'd have to look at the date for you.

7          Q.   That's fine.

8          A.   Do you want me to get back to you on that?

9          Q.   Well, yeah, why don't we -- you can get

10    back to me after -- after a break.

11         A.   Okay.

12         Q.   Does matching -- how often does matching

13    occur?  Is it on a weekly basis, a daily basis?

14         A.   It's been -- started out January 17th, in

15    the eight-week cycle for the first round.  Then in the

16    second round, we went to a four-week cycle, and then as

17    we've progressed to getting closer to the program year,

18    it was a one-week cycle.

19         Q.   So matching occurs every -- once a week?

20         A.   It has been occurring once a week.

21         Q.   Okay.

22         A.   I'd have to get back to you on the date we

23    transitioned on that.

24         Q.   Okay.

25              Is -- who decides whether to have another

Page 36

1    round of matching?

2              A.   The program team, based on what we're

3    hearing from -- what we're seeing as the number of

4    applications coming in and the amount of time it takes.

5              So the one-week matching rounds went

6    pretty quick, but as we moved further into the program

7    year, a direct placement is quicker to get that child in

8    the program.  So it's just been a transition leading up

9    to that, and then through the first few months.

10             Q.   I see.  Okay.

11             And -- but if -- if a -- like if this round

12   ended and then a significant number of new applications

13   came in, you could decide to have another round of

14   matching?

15             A.   We could, yeah.

16             So really what we're trying -- what we're

17   trying to accomplish is the least amount of

18   administrative burden for families and for providers.

19   And so when there's a higher volume of applications, it's

20   quicker to get families connected and enrolled.  When

21   there's a lower number, typically providers can manage

22   that and work with getting the child in the program.

23             Q.   Okay.  Okay.

24             So, you know, not to belabor it, but if a

25   new provider were to join UPK right now, already had

Page 37

1    4-years-olds in the program, could those 4-year-olds

2    directly enroll with the provider and start participating

3    in UPK?

4            A.   They could.  They would still have to fill

5    out the state application to be able to get connected.

6            Q.   Okay.

7                 MR. DAVIS:  I know there's a lot of

8    administrative stuff before we actually got started.  Why

9    don't we go off the record for our first 10-minute or so

10   break.  Does that work for you?

11                THE DEPONENT:  Yes.

12                MR. DAVIS:  Laurel, we'll go off.

13                (Recess from 9:52 a.m. to 10:03 a.m.)

14           Q.   (By Mr. Davis)  Great.  So, Ms. Odean,

15   is -- is one of the goals of UPK to achieve a mixed

16   delivery system of preschool?

17           A.   Yes.

18           Q.   Okay.  Can you say a little bit about what

19   that means?

20           A.   Yes.  So it is in the law that this isn't

21   school-district-managed only, for example, as our

22   previous state-funded preschool was.  And so what that

23   means is that any licensed provider for this age group is

24   able to participate.  It could be in-home family

25   childcare, it could be small center, large center, Head

Page 38

```
 1    Start, or school district managed.
 2              Q.   Okay.  Are religious providers or
 3    faith-based providers also part of the -- one of the
 4    components of the mixed delivery system?
 5              A.   Yes.
 6              Q.   And why is it good -- why do you want to
 7    have a mixed delivery system?
 8              A.   Well, it is in the law, specifically
 9    unique to Colorado, to ensure that families have choice
10    and can find the just-right provider that fits for their
11    family.
12              Q.   And for some families -- oh, please go
13    ahead.
14              A.   No.  Go ahead.
15              Q.   For some families, the just-right provider
16    might be a faith-based provider; is that right?
17              A.   Yes.
18              Q.   And why do you want the just-right
19    provider?  Why do you -- why is that helpful for your
20    goals?
21              A.   It's in the law, which is important for us
22    to follow.  But also we really want to provide a variety
23    of opportunities for families and children to engage
24    based on their needs and their hopes for their child and
25    what's available in their particular community.
```

```
 1              Q.    Okay.

 2                    Who designed the UPK program?  Was it --

 3       was it you, or -- you know, the matching process, the

 4       different components that we've been discussing so far?

 5              A.    Sure.  So I would say House Bill 22-1295

 6       had a pretty solid design foundationally set for us to

 7       start from.

 8              Q.    And the -- that's the -- that's the bill

 9       that created the universal preschool program; is that

10       right?

11              A.    Correct.

12              Q.    Okay.  As you were -- so as you were

13       working with the bill and starting to implement the actual

14       program, did you think about the way other similar

15       programs work?

16                    Like, you mentioned the Denver Preschool

17       Program earlier.  Did -- did that factor in at all?

18              A.    Sure.  So there was a transition director

19       who started up -- and I'm not going to remember that bill

20       number, but that allowed for the start up of the program

21       and the department prior to the start.

22                    So a transition director was hired, who

23       worked with, for example, the state OIT team to start to

24       build the system and components of the program prior to

25       the start of the department on July 1.
```

Page 40

```
 1              Q.   Okay.  And -- but the Denver Preschool

 2    Program is a little bit -- well, is different in the sense

 3    that it doesn't have a matching process; is that right?

 4              MS. CARRENO:  And objection to the extent

 5    you're asking her to speak about the Denver Preschool

 6    Program.  She's speaking on behalf of the department and

 7    the universal preschool program.

 8              So you can answer to the extent that you

 9    can.

10              A.   Yeah, I -- I don't know the details of

11    their enrollment process, but I know that there were

12    specific things called out that were intentional in the

13    law for one application -- a unified application; for

14    example, that families wouldn't have to fill out every

15    single provider's different application.

16              So there were certain components that were

17    set forth for us, for universal preschool, that might be

18    different than what the other instance of childcare award

19    might look like.

20              Q.   (By Mr. Davis)  Okay.  Those components,

21    like the matching process followed by providers generally

22    being required to accept their matches, did you

23    anticipate, as you implemented the program, that that

24    would be an issue for some providers that might want to

25    control their admissions a little bit more than that?
```

Page 41

1          A.   We heard, from some providers, concern for

2     not having done it before.  This represents a lot of

3     change for many providers who -- well, change for

4     providers who participated in previous state providers,

5     and then change for providers who hadn't.

6               So we certainly anticipated that we'd be

7     having a lot of engagement around how it would work and

8     how we would work together.

9          Q.   What kind of providers raised those

10    concerns or at least concerns about the change?

11         A.   I don't know that it was any one provider

12    type in mixed delivery.  We certainly had worked really

13    closely with our local coordinating organizations to

14    share out and communicate as directly as possible -- as

15    often as possible as we defined the program or

16    operationalized it along the way.

17         Q.   Did any of those concerns get factored in

18    when the department was coming up with its exemption

19    criteria or preference criteria that we were discussing

20    earlier?

21         A.   Sure.  Yeah.  So the weights and the

22    preferences were certainly challenges that were elevated

23    early on.  How are we going to meet our federal mandate,

24    for example, if the state mandate is different?

25               And so, again, really -- really worked

Page 42

1    with our evolving team to listen and be responsive with a

2    priority on inclusion and mixed delivery.

3              Q.   Okay.  Did the -- did the department have

4    any goals or projections about the number of providers it

5    was hoping to have participate in UPK?

6              A.   We didn't have specific goals set on the

7    number of providers.  We knew there were, from the state

8    demographer's office, 63,000 eligible children, and we

9    set goals and projections based on the number of children

10   and then really worked with our local coordinating

11   organizations to ensure we had enough seats available for

12   the children to attend.

13             Q.   Okay.  What -- what were the -- what were

14   the goals as far as number of children goes?

15             A.   Sure.  So we were shooting for 50 percent

16   uptake in year one and projected that would be likely

17   based on uptake in other states when they went to a more

18   universal program.

19             Q.   Have you met that goal?

20             A.   We have.

21             Q.   What other states have a universal pre-K

22   type program?

23             A.   Louisiana, Virginia.  I don't know all of

24   them.

25             Q.   Did you pay any attention to sort of the

1    design of those programs as you were implementing UPK?

2              A.   A little bit initially, but really our

3    program focus was on what we needed to do in Colorado

4    because it was so uniquely different.

5              Q.   In what way?

6              A.   Mixed delivery, for one.  Unified

7    application.  Specifics around -- well I don't -- I

8    can't -- I don't have a cross-check to other programs,

9    but those are some of the kind of top things that

10   prioritized for Colorado.

11             Q.   Yeah.  No, not looking for a full -- sort

12   of full cross-check.  Just what comes to mind.

13             A.   Yes.

14             Q.   Was there specifics around something that

15   you were going to say or --

16             A.   No.  I was just thinking through the bill

17   in my head, but it is 500 pages, so...

18             Q.   I've noticed.

19             When you say one of the ways Colorado is

20   different is mixed delivery, does that mean that some of

21   the other states are school district based?

22             A.   Yes.

23             Q.   Okay.  And then you said -- I think my

24   question was did you pay any attention to the way those

25   programs were set up, and you answered "a little bit at

Page 44

1      the beginning."

2                    What does that mean?  You had -- you met

3      with other people in the states or you pulled in, you

4      know, information online and compared it with what your

5      plans were?

6                    MS. CARRENO:  And objection to the form of

7      that question.

8                    But if you understood it, you can answer

9      it.

10              A.    Yeah.  So I think as I came into a new

11     job, I definitely was looking online to see what other

12     people had done, what was out there, and thinking about

13     what our charge was in Colorado.

14                   But as I said, starting up, it was a

15     compressed timeline and rapid growth.  And we prioritized

16     in the program what we were charged with in Colorado as

17     well as what we were hearing from families and providers

18     to inform the rollout of the program.

19              Q.    (By Mr. Davis)  Okay.  Thank you.

20                   And then I think you testified earlier

21     there was no set goal for how many providers you were

22     hoping to get.  It was more focused on how many children

23     you were hoping to have sign up.  But what about -- I

24     mean, were there any goals as to what would constitute

25     successfully having a mixed delivery system?  For example,

Page 45

```
 1    if you didn't have any home-based providers, you know,

 2    would that have been a failure?

 3              A.   We didn't have specific goals around each

 4    provider type, but we saw very early on all provider

 5    types participating based on how they're licensed; so

 6    that in-home family childcare, small center, large

 7    center, and school-based provider.  So we were excited

 8    about that.

 9              Q.   Great.  Okay.  I appreciate that.

10              I'm going to pivot a little bit here and

11    introduce our next exhibit.  We were discussing the

12    provider agreement earlier, so I just want to get that in

13    front of us.

14              All right.  You should have it.

15              (Exhibit 2 was marked.)

16              Q.   Do you have the provider agreement with

17    you?

18              A.   It's loading.

19              Q.   Okay.

20              A.   It says "Generating file preview.  May

21    take a while."

22              Q.   Interesting.  Have you tried to hit refresh

23    in your marked exhibit folder?

24              A.   There it is.

25              Q.   Great.  And it looks like I neglected to
```

Page 46

```
 1     put an exhibit stamp on this document, so that's -- my
 2     apologies for that.  But I'll just note for the record
 3     that we have Exhibit 2 here as the document that's
 4     Bates labeled, at the bottom of the page, PL_29 through
 5     PL_67.
 6                     Is that what you have in front of you,
 7     Ms. Odean?
 8             A.   Yes.
 9             Q.   Great.  I'll see if we can go back and put
10     a stamp on that, but I think that will take care of it for
11     now.
12                     Okay.  Great.  So, Ms. Odean, do you
13     recognize this document?
14             A.   Yes.
15             Q.   Okay.  It -- what is this document?
16             A.   This is the universal preschool program
17     agreement.
18             Q.   Okay.  Great.
19                     And this is the agreement we were
20     discussing before that providers need to sign in order to
21     register with -- with UPK, right?
22             A.   Yes.
23             Q.   Okay.  Who's supposed to actually sign the
24     agreement on the provider's side?  Is there a particular
25     person that's supposed to sign it?
```

Page 47

```
 1              A.   The authorized representative of the
 2      provider.
 3              Q.   Okay.  So often like the director of the
 4      preschool?
 5              A.   Correct.
 6              Q.   Okay.  Is -- and who signs it on the -- on
 7      the department side?
 8              A.   I do.
 9              Q.   Okay.  And both the -- both the provider
10      and the department are bound by this agreement; is that
11      right?
12              A.   Yes.
13              Q.   Okay.  Who prepared this agreement?
14              A.   This agreement was crafted by the
15      transition director and the Colorado Department of Human
16      Services contract team.
17                   THE REPORTER:  I'm sorry -- I'm sorry.  I
18      didn't hear the last word, ma'am.
19                   THE DEPONENT:  Colorado Department of
20      Human Services contract team.
21                   THE REPORTER:  Thank you.
22              Q.   (By Mr. Davis)  Okay.  So when you became
23      the director, the -- the agreement already existed, or did
24      they draft it while you were at UPK?
25              A.   It -- it was in process.
```

Page 48

1          Q.    Okay.  Did you have any input as to how the

2     agreement came together?

3          A.    I reviewed the agreement.  At that time

4     there were two of us operationalizing the program, so we

5     were dividing the work up.  So central transition

6     director had led this work and was coordinating with the

7     contract team.  She followed through on that.

8          Q.    Okay.  So the transition director and the

9     Department of Human Services prepared the agreement, but

10    then the department ultimately approved it, and that's how

11    it came to be the agreement that providers were to sign?

12         A.    Yes.

13         Q.    Okay.  Do you -- was there a -- like a

14    template that they were working from when they were

15    preparing this, like -- or did the providers -- well, let

16    me just leave it there.

17              Was there some template that they were

18    working from in preparing this?

19              MS. CARRENO:  And just objection.  This is

20    in some of our objections to discovery as well as some of

21    these questions are asking for answers prior to when the

22    department existed.  And so Ms. Odean and really no one

23    within TDC can speak to decisions that were made by an

24    entity that didn't exist at the time.

25              So they can't -- she can't answer

Page 49

1    specifically about what the transition team did because

2    there was not the Department of Early Childhood.  She can

3    only speak about decisions that were made after July 1st

4    of 2022.

5              Q.   (By Mr. Davis)  And, Ms. Odean, I'm asking

6    you to testify from your current awareness as the director

7    of UPK.

8              Was this agreement based on anything else

9    that already existed?

10             MS. CARRENO:  And you can answer if you

11   can.

12             A.   The only -- the only portion I know is

13   that the fiscal agreement was -- my understanding was the

14   fiscal agreement was standard for the Colorado Department

15   of Human Services contract team.

16             Q.   (By Mr. Davis)  Okay.  And I'm sorry, the

17   fiscal agreement, is that a portion of the contract or are

18   you saying the whole contract?

19             A.   At least a portion of the contract.  I

20   don't know specifics.  It was my understanding that they

21   had a standard fiscal agreement.

22             Q.   I see.  Okay.

23             So fiscal agreement is a term that you're

24   aware of on the Human Services side, not the UPK side?

25             A.   Correct.

Page 50

 1              Q.    Okay.  Got it.  Okay.  Great.

 2                    So I want to -- and actually, one more

 3      question about that.  When you were approving this

 4      agreement -- or deciding whether to approve this

 5      agreement, were any changes made because of input from you

 6      or from the other UPK leadership team?

 7              A.    Not that I'm aware of.

 8              Q.    Okay.  So the agreement, as presented to

 9      you, was approved, and then it became the program services

10      agreement for 2023?

11              A.    Yes.

12              Q.    Okay.  I want to look specifically at a

13      couple of provisions here.

14                    First, do you see the section that's

15      quality assurance, and it's on page PL 30?

16              A.    Yes.

17              Q.    All right.  And this says, "The provider

18      agrees to adhere to a number of quality standards," and

19      then -- or "agrees to adhere to the quality standards

20      identified in the law," and then it lists a number of

21      them.

22                    Is that right?

23              A.    Yes.

24              Q.    Okay.  And then one of those standards

25      is -- it looks like it's the fourth bullet point down,

Page 51

1    "The requirement that each preschool provider provide

2    eligible children an equal opportunity to enroll and

3    receive preschool services regardless of race, ethnicity,

4    religious affiliation, sexual orientation, gender

5    identity, lack of housing, income level, or disability, as

6    such characteristics and circumstances apply to the child

7    or the child's family."

8              Do you see that?

9         A.   Yes.

10        Q.   Okay.  So to participate in UPK, providers

11   have to agree to provide equal access to students and

12   their families regardless of any of these listed

13   identities in that provision; is that right?

14        A.   Yes.

15        Q.   Okay.  And this provision, it's

16   specifically about enrollment, right?  Equal access to

17   enrollment based on these identities?

18        A.   To enroll and receive preschool services.

19        Q.   To enroll and receive preschool services.

20   Okay.

21              But that's not, in and of itself, about

22   employment, like who gets employed at the preschool, is

23   it?

24        A.   It isn't.

25        Q.   Okay.  Why was this provision included in

1    the prov- -- in the -- in the agreement?

2              A.    It's in the law.

3              Q.    It's in the legislator's UPK bill?

4              A.    Yes.

5              Q.    Okay.  So you're saying the department

6    didn't have any discretion as to whether or not to make

7    this one of the quality assurance standards?

8              A.    Correct.

9              Q.    Okay.  So I'd like to talk a little bit

10   about what the -- what it actually means.

11             So, you know, let's say a preschool

12   provider declines to enroll a child because the student is

13   African-American.  Would that violate the provision?

14             MS. CARRENO:  And objection to the extent

15   it calls for speculation.

16             MR. DAVIS:  Yeah.

17             Q.    (By Mr. Davis)  You can answer, Ms. Odean.

18             A.    Sure.  So without knowing the whole

19   situation, we certainly would, you know, confer with our

20   department leadership and our attorneys if needed --

21             Q.    Yeah.

22             A.    -- once that's been elevated to us.

23             Q.    Sure.  But if the scenario is a provider

24   refuses to enroll the student because the student is

25   African-American, that is not providing equal opportunity

Page 53

1    to enroll based on race, is it?

2              A.    Again, it's hard to speculate without

3    knowing the actual situation, but we certainly would be

4    charged with addressing that --

5              Q.    Okay.

6              A.    -- and finding out.

7              Q.    And finding out what?

8              A.    What occurred.

9              Q.    Okay.  And to be clear, I'm sort of telling

10   you what occurred, right?  I'm asking for you to tell me

11   your understanding of what the provision means in that

12   situation.

13             And so I'm telling you that what occurred

14   is the provider declined to enroll a student that had

15   sought enrollment at that provider, and the provider

16   declined to enroll the student because of the student's

17   race.

18             Would that violate this provision?

19             MS. CARRENO:  Objection.  Asked and

20   answered.

21             Q.    (By Mr. Davis)  You can answer, Ms. Odean.

22             A.    I -- I can't speculate because I would

23   have to find out more about the actual situation, but we

24   certainly would be charged with --

25             Q.    Okay.  So maybe a --

```
                                                    Page 54
 1                    THE REPORTER:  I'm sorry.  I'm sorry.  I'm
 2      sorry.  "...be charged with..."  I didn't hear that.
 3                    THE DEPONENT:  Following what's set forth
 4      for us in the law.
 5                    MR. REAVES:  Upholding the law.
 6             Q.   (By Mr. Davis)  Okay.  So maybe a provider
 7      could decline to enroll a student because the student is
 8      African-American?
 9                    MS. CARRENO:  Objection.  It misstates her
10      testimony.
11                    MR. DAVIS:  Well, she said she needs to
12      know more, so, you know --
13             Q.   (By Mr. Davis)  You don't have to answer
14      that question.  I'll rephrase it, Ms. Odean.
15                    But I'm telling you that -- if a provider
16      declines to enroll a student because the student is
17      African-American, is that in violation of this provision
18      or not?  And I believe your testimony a moment ago was
19      you'd have to know more.
20                    And my question is, does that suggest that
21      sometimes a provider could decline to enroll a student
22      because the student is African-American?
23             A.   I'm -- I'm just trying to say that we
24      would be consulting with our leadership and our attorney
25      to determine the actual situation, which typically might
```

Page 55

```
 1    be more than that.  So we would want to find out to
 2    determine if that was the case, and then determine what
 3    the proper action might be.
 4              Q.    Okay.  And if what you determined was the
 5    provider declined to enroll the student because the
 6    student is African-American, would that violate this
 7    provision?
 8              MS. CARRENO:  Objection.  Asked and
 9    answered.
10              Q.    (By Mr. Davis)  You can answer, Ms. Odean.
11              A.    Again, I would consult with our attorney
12    to determine that.
13              Q.    Okay.  So if you determined --
14              A.    It wouldn't be my sole decision.
15              Q.    I'm asking for your understanding of what
16    this provision means as the representative of the
17    Department of Early Childhood.  And you testified that you
18    would have to determine what happened.
19              And I'm telling you that what happened is
20    the provider -- if you determined that what happened is
21    the provider declined to enroll a student because the
22    student is African-American, would that be a violation of
23    the provision?
24              And I believe you testified just now that
25    you'd have to consult with your attorney about something
```

Page 56

1    else, and I'm not clear on what that something else would

2    be.

3              A.   Yeah, I guess I'm not clear on what you're

4    asking.  So you're giving a scenario that's pretty

5    pinpointed, and what I'm saying is we would absolutely,

6    because of the law, investigate to understand what

7    occurred and -- and then take action based on that.

8              We don't have a determined process for

9    what the outcome of that would be or what the action

10   would be, but we would certainly address it and make that

11   decision based on the actual situation as it might have

12   occurred.

13             Q.   Okay.  And I'm not asking about what you

14   would -- what you would do.  I'm really trying to get at

15   what this contract means that you have providers sign,

16   right?  And you testified earlier that providers are bound

17   by it, the department is bound by it.  And so I think it

18   needs to mean something.

19             My question for you is just you've

20   consulted with your lawyers, and what you've determined is

21   this student was declined admission at the preschool

22   because of his race.  Does that violate this provision?

23             MS. CARRENO:  And objection.  She said

24   that she can't answer that scenario without actual facts

25   before her and the department several times now.

1          Q.   (By Mr. Davis)  You can answer, Ms. Odean.

2          A.   The department would need to understand

3    the total scope of the scenario to ensure that any

4    instance in the provider agreement was met or not met.

5          Q.   Yeah.  So there -- there's some further

6    determination that you can -- some -- strike that.

7               Are there any further facts that you can

8    discover in consultation with your attorneys when a

9    provider has declined admission because of the student's

10   race that would make that permissible under this

11   provision?

12              MS. CARRENO:  Objection.  Speculation, but

13   you can answer.

14         A.   Yeah, I think -- I think that's what's

15   difficult is the -- understanding the total scenario that

16   didn't occur that we're making up.

17              So I don't want to speculate without

18   knowing the full picture.  Certainly presuming that the

19   agreement is there for a reason that will uphold the

20   agreement, but would want to go through with integrity of

21   process to determine if there was an actual violation or

22   not.

23         Q.   (By Mr. Davis)  Okay.  A provider who signs

24   this agreement is then bound by it, right?  We discussed

25   that earlier.

Page 58

1          A.    Yes.

2          Q.    Okay.  Would you agree that the provider

3     needs to know what they can and cannot do in order to

4     comply with this agreement?

5          A.    Yes.

6          Q.    Okay.  So if a provider came up to you and

7     asked you the same question I'm asking you now, may I

8     decline to enroll students because of their race under

9     this agreement, what would your answer be?

10               MS. CARRENO:  Objection.  Speculation.

11               You can answer it.

12          A.    They would not be able to.

13          Q.    (By Mr. Davis)  The answer is no, they

14     would not be able to decline to enroll a student because

15     the student is African-American?

16               THE REPORTER:  I'm sorry.  I didn't hear

17     the answer.

18               THE DEPONENT:  Yes.  Correct.

19          Q.    (By Mr. Davis)  Okay.  If a provider, along

20     the same lines, came up to you and asked you, Director

21     Odean, am I allowed to deny admission to a student because

22     the student is transgender, what would your answer be?

23               MS. CARRENO:  Objection.  Speculation.

24          Q.    (By Mr. Davis)  You can answer.

25          A.    I would say what's in the agreement.  And

Page 59

1    again, it's voluntary to participate, and it's in the

2    agreement.  So we would follow the agreement.  But not

3    knowing a specific situation, I wouldn't want to

4    speculate.

5              Q.   (By Mr. Davis)  Okay.  And earlier you

6    said -- your answer to -- can I deny admission to a

7    student because they're African-American, your answer was

8    no, and that's because the agreement says providers must

9    provide equal access -- or sorry, an equal opportunity to

10   enroll regardless of race; is that right?

11             A.   It's -- it's true of everything in the

12   agreement.  So if a provider had a question at any point

13   of the agreement, I would say, we have the agreement, and

14   it is voluntary to participate.  So we are all operating

15   and following the agreement.  If there is a specific

16   instance, then after the agreement is signed when it's in

17   process, we would refer back to that agreement and we

18   would look into any specifics before we go any further.

19             Q.   Okay.  The agreement also says, just like

20   with race, that providers must provide an equal

21   opportunity to enroll regardless of gender identity,

22   right?

23             THE REPORTER:  I'm sorry.  I didn't hear

24   the answer.

25             THE DEPONENT:  Yes.

Page 60

```
 1              Q.   (By Mr. Davis)  Okay.  So -- so if the
 2    answer is no, you're not allowed to decline to enroll
 3    students because of their race, the answer is also no,
 4    you're not allowed to decline to enroll students because
 5    they're transgender; is that right?
 6              MS. CARRENO:  Objection.  You're
 7    mischaracterizing her testimony.
 8              But you can answer if you can.
 9         A.   Yeah, again, I think it speaks to any part
10    of the agreement that we have in place.
11              So maximum allowable educator-to-child
12    ratios.  If a provider came to me and said we're going to
13    go above that, then I would say, that's not part of our
14    provider agreement for universal preschool, and you
15    should consider if you want to participate.
16              If we're in program and someone has
17    already signed an agreement, then we would go through a
18    process to determine that -- the specifics around that
19    particular point in the agreement to determine next
20    steps.
21              Q.   (By Mr. Davis)  Okay.  So you enforce each
22    provision of the agreement equally as they're written in
23    the agreement?
24         A.   We follow the agreement, and we expect
25    providers to.  We haven't had any specific events that
```

1    have called into question, since the program was started,

2    the provider agreement not being followed.

3            Q.   Okay.  So you expect providers to provide

4    equal opportunity regardless of race, gender identity,

5    religious affiliation, and sexual orientation?

6            A.   Yes.

7            Q.   And you wouldn't expect providers to

8    decline admission to a student because of one of those

9    identities, right?

10           A.   Can you say that again?

11           Q.   Yeah.  Your expectation would be that

12   providers should not decline to enroll a student because

13   of any of those identities, race, religious affiliation,

14   gender identity, sexual orientation?

15           MR. DAVIS:  Did you get that, Laurel, the

16   response?

17           THE REPORTER:  No, I did not.

18           THE DEPONENT:  Correct.

19           Q.   (By Mr. Davis)  And that's true -- those

20   identities -- strike that.

21           It's -- it's race, sexual orientation,

22   religious affiliation, gender identity not just of the

23   child, but of the child's family.

24           Is that what the agreement says?

25           A.   Yes.

Page 62

1          Q.   Okay.  So a school also couldn't decline --

2     you wouldn't expect a school to decline to enroll a

3     student because of the family member's sexual orientation

4     is that right?

5               MS. CARRENO:  Objection -- objection.

6     Calls for speculation.

7               You can answer if you can.

8          A.   I wouldn't expect a provider to go against

9     the agreement.

10         Q.   (By Mr. Davis)  Okay.  And it would -- it

11    would be going against the agreement to decline to enroll

12    a student because his or her parents or guardians are in a

13    same-sex marriage?

14         A.   It's a requirement in the provider

15    agreement.  But again, I wouldn't speculate a specific

16    scenario without the details.

17         Q.   Okay.  And if a provider couldn't agree to

18    that requirement in the provider agreement, they shouldn't

19    sign the agreement, right?

20              MS. CARRENO:  Calls for speculation.

21         Q.   (By Mr. Davis)  You can answer.

22              MS. CARRENO:  You can answer if you can.

23         A.   Yeah, again, hard to know without the

24    specific facts, but the provider agreement is -- is set

25    forth to follow.

Page 63

```
 1                    Q.    (By Mr. Davis)   Okay.   Let's go down a
 2      little further in the provider agreement to page PL55.
 3                          Just let me know when you've gotten there.
 4                    A.    I'm there.
 5                    Q.    Great.   And do you see provision 18(b),
 6      which is entitled Discrimination?
 7                    A.    Yes.
 8                    Q.    Great.   And that provision says, "The
 9      provider shall not discriminate against any person on the
10      basis of gender, race, ethnicity, religion, national
11      origin, age, sexual orientation, gender identity,
12      citizenship status, education, disability, socioeconomic
13      status, or any other identity."
14                          Do you see that?
15                    A.    Yes.
16                    Q.    Okay.   So "any person there," a provider
17      shall not discriminate against any person, that's not
18      limited to students, is it?
19                    A.    That says "any person."
20                    Q.    Right.   So "any person" would also include
21      like a provider's employees?
22                    A.    Provider's employees are covered under the
23      contract allowance provision federally.
24                    Q.    I'm sorry, what is the contract allowance
25      provision?
```

Page 64

 1            A.   I'm trying to find it.

 2                 The only thing required of employees for

 3       our providers is through our licensing, expectations of

 4       their credentialing.  So this is not specific to

 5       employees.

 6            Q.   Right.  I -- so it's not specific to

 7       employees, but I think you testified that "any person"

 8       includes employees, right; an employee is a person?

 9            A.   It says family -- children and their

10       families specific to our preschool program.

11                 MR. DAVIS:  I'm sorry.  Could you --

12       Laurel, did you get that?  Could you read it back if you

13       did?

14                 (The last question was read.)

15            Q.   (By Mr. Davis)  Okay.  So you think -- so,

16       Ms. Odean, you're saying that "provider shall not

17       discriminate against any person," "any person" there

18       exclusively means student or the student's family?

19            A.   Yes, that's my understanding.

20            Q.   Did you ever locate that other provision

21       that you said was the one that applied to employees?

22            A.   No, I didn't.  I need to consult with

23       Virginia on that.

24            Q.   Ms. Odean, I'm asking for your

25       understanding as the witness here, not for -- not for your

Page 65

 1      counsel's understanding.

 2              A.   Okay.  So I'm just trying to remember the

 3      correct name so I don't misspeak.  But there's a federal

 4      allowance for a religious employer to hire co-religious

 5      state employees, which we also follow.

 6                   So when you're asking me questions about

 7      if this applies to employees, I'm trying to refer to

 8      that, but I can't find it in front of me, and I don't

 9      want to state it incorrectly.

10              Q.   Okay.  Sure.  I think we're -- I think

11      we're closer on the same page now.

12              A.   Okay.

13              Q.   So I want to -- I want to bracket off

14      religious employers a little bit and just talk about what

15      this provision 18(B) means like for a person -- a

16      preschool provider who signs the provider agreement, what

17      are they agreeing to here in provision 18(B)?

18                   And it says discriminate -- the provider

19      shall not discriminate against any person on a number of

20      these bases.

21                   For a nonreligious provider, is that

22      provider agreeing not to discriminate against their

23      employees on any of these bases by signing this agreement?

24              A.   I'm reading all of (B) to make sure.

25              Q.   Sure.  Take your time.

Page 66

1        A.   It's my understanding that the provider

2   can't discriminate against any person unless there's

3   another specific allowance that's also written.

4        Q.   You said "can't," right?

5        A.   Correct.

6        Q.   Okay.  So a provider can't discriminate

7   against its employees on any of these bases unless there's

8   another specific allowance?

9        A.   Well, the allowance -- federal allowance

10   trumps state law, which stands as our program agreement.

11        Q.   Of course, right.  So -- but if there's no

12   federal allowance, I'm just asking you -- I think this is

13   what you testified.  I'm just asking you to confirm.  A

14   provider -- if there's no federal allowance, a provider

15   cannot discriminate against its employees on any of these

16   bases set out in provision 18(B)?

17        A.   I think we're starting to get into that

18   speculate scenario again as well.  And so certainly would

19   want to understand the full concern if one was

20   elevated -- if there's a claim and the facts of that

21   claim to be able to determine that occurred or didn't

22   occur and what steps would be taken.

23        Q.   I'm just asking, Ms. Odean, what the

24   provision requires.  Like, a provider needs to understand

25   what they're agreeing to when they sign this agreement so

Page 67

1     that they can then abide by it.

2                A.   Yeah.

3                Q.   I think we agreed earlier that the

4     department wants the provision -- you know, wants the

5     whole provision to be -- to be abided by.  So is --

6                A.   Certainly -- I can't speak on behalf of

7     the provider -- I can't speak on behalf of the provider

8     and how they're interpreting this, but -- but it is an

9     agreement saying not to discriminate on this basis.

10               Q.   Right.  Including against employees as well

11    as students?

12               A.   Again, I would say yes, unless there's

13    another federal mandate that gives an allowance.

14               Q.   Okay.  Thank you.

15               So why did the -- why is this provision in

16    the provider agreement?

17               A.   I was not a drafter of the provider

18    agreement.

19               Q.   Okay.  But you approved the provider

20    agreement, right?

21               A.   It was approved.

22               Q.   By the department?

23               A.   Yes.

24               Q.   And you're testifying on behalf of the

25    department?

1            A.    Yes.

2            Q.    Okay.  So why did the department approve

3     this provision?

4            A.    We approved the agreement in its entirety

5     to ensure that we were following through on our charge of

6     implementing universal preschool with providers.

7            Q.    Okay.

8            A.    So that they had assurances and we had

9     assurances.

10           Q.    Great.

11                 When we were discussing the provision a

12     moment ago about equal opportunity to enroll, I asked you

13     why the department included that provision, and you said,

14     well, it's in the bill.  The law required us to include

15     that provision, right.

16                 Did the Colorado legislature require you

17     specifically to include this provision, 18(B)?

18           A.    I don't know the answer to that.

19           Q.    Okay.  But it's not your current

20     understanding that the reason it's there is because the

21     bill required it to be there, right?

22           A.    I don't know either way.  I do know that

23     children and family is in the law.

24           Q.    Okay.

25                 We got hung up a little bit there maybe on

1    employees, but I do -- I want to focus on children and

2    families, which I think you agree would also be covered by

3    provision 18(B).  I just want to be clear about what that

4    means.

5              So the provider can't discriminate against

6    any person on any of these bases, and I think we discussed

7    earlier that, you know, it doesn't say "in enrollment."

8    It's just in general, can't discriminate against anybody

9    on these bases; is that right?

10             MS. CARRENO:  Objection.  Form.

11             You can answer it if you understood.

12        A.   Yeah, I don't -- I don't know that.  When

13   I look at the total of (B), I certainly am approaching it

14   from the program, which is enrollment and being able to

15   participate in the services of the program.

16        Q.   (By Mr. Davis)  Okay.  So, like, if a UPK

17   provider, you know, made certain benefits during the day

18   available based on, like, race or sex, like, only boys

19   could have recess time, you know, girls had to stay

20   inside, would that be discriminating against any person on

21   the basis of their sex or gender identity?

22             MS. CARRENO:  Objection.  Form and

23   speculation.

24        Q.   (By Mr. Davis)  You can answer.

25        A.   I certainly would -- we certainly would

Page 70

```
 1    look into it further to find out the facts.
 2           Q.   Okay.  You're not really sure, though, if
 3    it's in the provision or not?
 4           A.   I'm not an attorney, but I certainly know
 5    that it would be our charge in the program to look into
 6    the facts.
 7           Q.   You'd need to look into that -- it at least
 8    might.  You'd need to look into it further.  Is that
 9    right?
10           A.   Yes.
11           Q.   Okay.  What about if a provider, you know,
12    similarly declined an accommodation for a transgender
13    student, so refused to allow the student to use, like, the
14    facilities of the sex that the student identifies with.
15    Would that present a problem under this provision?
16                MS. CARRENO:  Objection.  Asked and
17    answered.  Speculation.
18                You can answer.
19           A.   I'd say the same.  It certainly would be
20    incumbent upon the program to look into it and find out
21    the facts.
22           Q.   (By Mr. Davis)  Okay.  What would you need
23    to know to determine finally whether that was a violation
24    or not?
25                MS. CARRENO:  Objection.  Speculation.
```

Page 71

1           Q.    (By Mr. Davis)  You can answer.

2           A.    Yeah, it's -- it's hard to speculate on a

3     made-up scenario without specific facts.  Again, it would

4     be a process to determine what occurred and what steps

5     would be taken that would be inclusive of our leadership,

6     of our department, as well as our attorney general.

7           Q.    Okay.  When a provider signs this

8     agreement, you know, they're also signing it before they

9     have any specific facts like these, right?

10          A.    I can't speak on a provider's behalf.

11          Q.    Okay.  I mean, a provider has a policy,

12    say, of -- of declining accommodations to transgender

13    students along the lines that I just set out, and that

14    provider needs to know am I allowed to continue doing that

15    if I sign this agreement.  What's your answer to that

16    provider?

17                MS. CARRENO:  Objection.  Form.

18    Speculation.

19                You can answer.

20          A.    If a provider is not currently

21    participating and is asking these questions, I would say,

22    this is our agreement that we're agreeing to, you're

23    agreeing to, and if you don't feel like you can meet any

24    one of these assurances -- that this a voluntary program.

25    And again, that's different than -- as I stated earlier,

Page 72

1    than once we're in program and if there's a specific

2    claim that is made.

3              Q.   (By Mr. Davis)  Okay.  I'm going to tee up

4    another exhibit here, if you'll just give me a moment,

5    Ms. Odean.

6              Okay.  All right.  If you refresh, I think

7    you should have Exhibit 3.

8              Do you have it?

9         A.   It's loading.

10        Q.   Okay.

11        A.   I have it.

12        Q.   Great.

13             (Exhibit 3 was marked.)

14        Q.   Do you recognize this document?

15        A.   Yes.

16        Q.   Okay.  This is a declaration that you filed

17   previously in this litigation, right?

18        A.   Yes.

19        Q.   Okay.  If I could just have you scroll down

20   to -- it looks like it's page 5, paragraph 16.

21             Are you there?

22        A.   Yes.

23        Q.   Okay.  Great.  I just want to pull this up

24   and see if it sort of refreshed your recollection earlier,

25   when you were testifying about a federal allowance.

Page 73

```
 1                    Is this what you were referring to?
 2           A.    Yes.
 3           Q.    Okay.  And it says here, "The department
 4    disavows enforcement of contractual provision 18(B) -- so
 5    I think that was the one we just were discussing with
 6    respect to employees -- "against religious providers who
 7    hire co-religious in accordance with federal law and
 8    against religious providers' employment decisions
 9    involving their ministerial employees, as protected by
10    federal law."
11                    Do you see that?
12           A.    Yes.
13           Q.    Okay.  Ms. Odean, do you know -- strike
14    that.
15                    Does the department believe that all of a
16    religious school's -- or a religious preschool's teachers
17    are ministerial employees?
18                    MS. CARRENO:  Objection.  Call for a legal
19    conclusion.
20                    You can answer.
21           Q.    (By Mr. Davis)  You can answer.
22           A.    I'm not an attorney.  My understanding of
23    16 is that religious organizations can hire based on
24    their beliefs, and that isn't something the department
25    would review specifically or determine.
```

1          Q.   Okay.  I do want to look at the -- it does

2     look like there's two different parts of this.  I want to

3     get to the second half of it first.

4                So it says, "the department" --

5                THE REPORTER:  I'm sorry.  When you read,

6     can you slow down just a little bit, please?

7                MR. DAVIS:  Sure.  Sorry.

8          Q.   (By Mr. Davis)  It says, "The department

9     disavows enforcement of contractual provision 18(B)" --

10    skipping to the second half -- "against religious

11    providers' employment decisions involving their

12    ministerial employees."

13               Do you see that?

14         A.   Yes.

15         Q.   Do you know what a provider's ministerial

16    employees are?

17         A.   I -- I don't know specifically how they

18    might define who their employees are.

19         Q.   Okay.  But this is your declaration, and

20    you're saying the department disavows enforcement against

21    a religious provider with respect to its ministerial

22    employees, and I'm just asking you what did you mean by

23    that?  Who are the provider's ministerial employees?

24               MS. CARRENO:  And objection.  Calls for a

25    legal conclusion.

1              You can answer.

2         Q.   (By Mr. Davis)  You can answer.

3         A.   Yeah, from the program side, not being an

4    attorney or a religious organization, I would say the

5    program won't be investigating who providers are hiring

6    outside of the credentials that are expected for a

7    licensed preschool provider.

8         Q.   Okay.  So you don't know who a -- you don't

9    know who a provider's ministerial employees might or might

10   not be because you're not a lawyer?

11        A.   I'm not a religious organization hiring

12   employees either.

13        Q.   I'm sorry.  I'm sorry.  What was that?

14        A.   I'm also not a religious organization

15   hiring employees either.  So I'm not sure -- maybe I

16   don't understand the question.  Can you rephrase it?

17        Q.   All right.  Yeah, let me rephrase it.

18             In this paragraph of your declaration,

19   you're saying the department disavows enforcement, will

20   not enforce contractual provision 18(B), with respect to a

21   religious provider's hiring of its ministerial employees,

22   and I'm just asking you, what does that mean?

23             You know, when -- your understanding, when

24   you agreed to this declaration, what did you understand a

25   religious provider's "ministerial employees" mean?

Page 76

```
 1                A.   That means that the program wouldn't be
 2    reviewing who or how they hired their employees for their
 3    program.
 4                Q.   With ministerial employees?
 5                A.   The expectations around the licensed,
 6    credentialed preschool providers.
 7                Q.   Okay.  Specifically their ministerial
 8    employees, right?
 9                MS. CARRENO:  Objection.  Mischaracterizes
10    her testimony.
11                Q.   (By Mr. Davis)  You can answer.
12                A.   Could you ask it again?
13                Q.   Sure.  I'm just trying to get at -- well,
14    let me strike that.
15                Ms. Odean, are you -- when you're
16    testifying about how the department is going to enforce
17    contractual provision 18(B) against religious providers,
18    are you intending to say anything beyond what this
19    declaration paragraph 16 says, or are you intending to say
20    that that's the department's position here in paragraph
21    16?
22                MS. CARRENO:  Objection to form.
23                You can answer.
24                Q.   (By Mr. Davis)  You can answer.
25                A.   I'm saying for our providers in program,
```

1    the expectations are that they have -- that they meet the

2    expectations that are required by licensing, but that we

3    wouldn't tell a particular provider that the decisions

4    had to be made in a certain way.  In this specific

5    instance, a religious organization.

6              Q.   I'm sorry.  Was that the end of your

7    answer?

8              A.   I'd have to have Laurel read it back.

9              Q.   Okay.  We can -- I just thought that was

10   the middle of an answer, so -- okay.  Thank you.

11             MR. DAVIS:  I think we can -- I think we

12   can leave off here for -- maybe for another 10-minute

13   break.

14             (Discussion off the record.)

15             (Recess from 11:05 a.m. to 11:17 a.m.)

16             Q.   (By Mr. Davis)  Great.  I'm going to go

17   ahead and mark our next exhibit.  And just let me know

18   when you've got it.

19             Did you try hitting refresh?

20             A.   I did.  It's loading.

21             Q.   Okay.

22             Still not there?

23             A.   Still loading.

24             (Exhibit 4 was marked.)

25             MS. CARRENO:  We're just trying to load

Page 78

1     the document.

2              A.    I have it.

3              Q.    (By Mr. Davis)  Okay.  Great.  Do you

4     recognize this document?

5              A.    Yes.

6              Q.    What is it?

7              A.    This is a technical guide to show the

8     process for providers when they're navigating the system.

9              Q.    Okay.  And it's just titled The Provider

10    Guide, right?

11             A.    Yes.

12             Q.    Okay.  I'll use that term as I'm asking the

13    questions.

14                   Who put it together?

15             A.    The Office of -- the Office of the

16    Information Technology team put together this guide.

17             Q.    Did they come up with the content as well?

18             A.    With -- with program input.

19             Q.    With program in -- what does "program

20    input" mean?

21             A.    So they developed the guide, and program

22    reviewed -- our transition director reviewed and adjusted

23    content where needed.

24             Q.    Okay.  And then -- and then approved it so

25    this became the allotted provider guide, right?

Page 79

1           A.    Yes.

2           Q.    Okay.  Can you scroll down to page PO105,

3     please.

4           A.    Yes.

5           Q.    Okay.  So is this a -- this was setting out

6     those preferences that we were discussing earlier that

7     would allow a provider to decline a match; is that right?

8           A.    Yes.

9           Q.    Okay.  And I think we discussed earlier in

10    general, providers are supposed to accept the matches that

11    they're given, but if one of these preferences applies,

12    the provider might be able to decline the match; is that

13    right?

14                THE REPORTER:  I'm sorry.  I didn't hear

15    the answer.

16                THE DEPONENT:  Yes.

17          Q.    (By Mr. Davis)  Okay.  Why did the

18    department decide to include these preferences?

19          A.    We had heard from our local coordinating

20    organizations and directly from providers that these

21    would be helpful in ensuring inclusion in a particular

22    community or of a particular provider type.

23          Q.    So you're responding to feedback you got

24    from providers?

25          A.    Yes.

```
                                                    Page 80

  1              Q.   Could you have declined to respond to that

  2    feedback and not included these preferences?

  3              A.   Yes.

  4              Q.   So, I mean, the bill -- the UPK bill for

  5    the legislature doesn't tell you -- doesn't lay out these

  6    preferences one way or the other, right?

  7              A.   At this early stage, the program really

  8    prioritized inclusion of mixed delivery and ensuring that

  9    as many providers could participate as possible.  And we

 10    believed that this allowed for the options with mixed

 11    delivery.

 12              Q.   Okay.  Great.

 13              I want to walk through some of them just a

 14    little bit and try to get a better sense of what they

 15    mean.  Let me start with the co-op one.  It says you can

 16    check the box -- the provider could check the box saying

 17    I'm a co-op and will require family participation as part

 18    of my programming.

 19              Do you see that?

 20              A.   Yes.

 21              Q.   What kind of family participation can

 22    co-ops require?

 23              A.   That depends on the co-op, but it's a

 24    specific model that many providers utilize to ensure a

 25    certain level of family participation at their particular
```

Page 81

1       location.

2                   Q.   Got it.

3                        And if a family says that they are unable

4       to participate, the co-op can decline that match?

5                   A.   Yes.

6                   Q.   Okay.  What is the co-op model?  What

7       exactly is that?

8                   A.   The co-op model is where families

9       volunteer a certain amount of their time at that

10      particular program.

11                  Q.   So families whose children are part of that

12      preschool are actually helping to run the preschool as

13      well?

14                  A.   They're -- they may be helping with

15      particular programming.  So it's a licensed location with

16      credentialed, licensed educators, as well as the families

17      participating in volunteering in different -- in

18      different ways.

19                  Q.   Okay.  So if a family tells the provider

20      they're unable to participate, the provider can then

21      decline that match, right?

22                  A.   Yes.

23                  Q.   Can the provider ask families to share its

24      educational philosophy in order to enroll at the co-op?

25                       MS. CARRENO:  Objection.  Speculation.

Page 82

1              You can answer.

2         A.   This is intended specifically for the

3    volunteering contract that a co-op might have for their

4    families.

5         Q.   (By Mr. Davis)  I'm sorry.  Could you

6    repeat that?

7         A.   This is -- the one we're discussing is

8    where a co-op can decline if the family chooses not to

9    participate in the volunteering aspect of the program.

10        Q.   The co-op can define the participation that

11   they're looking for, and then if the family says they

12   can't supply that type of participation, the co-op can

13   decline the match?

14        A.   Yes.

15        Q.   Okay.  So the co-op could say, you know,

16   we're a Montessori co-op.  Families need to be -- family

17   participation needs to -- needs to track the Montessori

18   educational model, and if families can't agree to that,

19   they could decline the match?

20             MS. CARRENO:  Objection.  Form.

21             You can answer.

22        A.   No, that's -- that usually isn't tied to

23   this model specifically.

24        Q.   (By Mr. Davis)  Okay.  So what did you mean

25   by that?

Page 83

```
 1              A.   What we heard from providers was that
 2       families are required to volunteer for a specific amount
 3       of time, and if they're unable to do that, they're unable
 4       to participate in the co-op program.
 5              Q.   Okay.
 6                   We'll look at the next one.  "I am a
 7       immersive or dual language provider, and children may need
 8       to be screened to participate in my program."
 9                   Do you see that?
10              A.   Yes.
11              Q.   What kind of screening can immersive or
12       dual language providers engage in?
13              A.   It depends on the expectations of their
14       dual program.  So we have a particular provider who has a
15       federal expectation of providing a specific dual language
16       program that has specific participation required.
17              Q.   Specific participation from who?
18              A.   From the provider, the educator, and the
19       child.
20              Q.   I'm sorry, could you just explain what you
21       mean by that?  So the child has some participation -- some
22       federal participation requirements and the --
23              A.   To participate in the program, their level
24       of language might have to be at a specific yield.  But
25       you have to talk to that provider specifically on what
```

Page 84

1   they're held accountable for.

2           Q.   I see.

3           A.   What we have heard was there were federal

4   mandates to serve children who may have a native language

5   other than English and expectations of the program that

6   are aligned to that.

7           Q.   I see.  So what you heard was some dual

8   language providers or immersive providers might require

9   children to be at a certain level in the other language in

10  order to enroll at that preschool?

11          A.   Yes.

12          Q.   Okay.  And this preference criteria is

13  designed to provide that to the providers?

14          A.   Yes.

15          Q.   Okay.  The next one, "I am a school

16  district provider and will require families to live in my

17  school district or boundary."

18               Do you see that?

19          A.   Yes.

20          Q.   Why did the department include that

21  preference?

22          A.   Because school districts, that -- that

23  they may only be able to serve children who live within

24  their boundaries based on their capacity or their board

25  policy.

1          Q.   So not all of them might -- not all of them
2     might have that policy, but some school districts might
3     have that policy?
4               MS. CARRENO:   And just -- objection.   Can
5     you let her finish answering the question?   I don't think
6     she was finished.
7               Q.   (By Mr. Davis)   Go ahead.
8               A.   Yeah.   I was saying that school districts
9     have set for them specific boundaries, and many of them
10    have board policy on prioritization of students within
11    those boundaries, funding tied to children within those
12    boundaries.   Some may have the capacity to serve children
13    outside their boundaries as well, and some may not.
14               And so this was elevated as a concern for
15    an open match of a child that might come from -- might
16    reside in a different school district boundary.
17               Q.   (By Mr. Davis)   Do you know how a school
18    district might require a family to show that they live
19    within the boundaries?
20               A.   There's 178 different school districts, so
21    I can't speak to how they all verify -- verify that.
22               Q.   Yeah.   Do you know how any of them might
23    verify that?
24               A.   I can't speak on their behalf.
25               Q.   Okay.   Did Jefferson County prioritize

Page 86

1    students that were within that school district?

2            A.   Yes.

3            Q.   How did Jefferson County require families

4    to show they lived in the school district?

5            A.   I wasn't a part of that department, but my

6    understanding was that families first attest to it, and

7    then they could be verified in a variety of different

8    ways with different documentation.

9            Q.   Okay.  Are there some families that can

10   participate in UPK and that don't have permanent

11   addresses, like they're unhoused?

12           A.   Yes.

13           Q.   Okay.  If those families couldn't show that

14   they lived within a particular school district, could that

15   school district decline to enroll them under this

16   preference?

17           MS. CARRENO:  Objection.  Speculation.

18           Q.   (By Mr. Davis)  Please answer.

19           A.   Again, I would say that, you know, each

20   district might have a different process or, you know,

21   further inquiry around where they are and how they serve.

22           Q.   Okay.  And the -- but the department would

23   be okay with that if that was the way the school

24   district's policy was set up?

25           MS. CARRENO:  Objection.  Speculation.

1    Mischaracterized her testimony.

2                    You can answer.

3            A.    Yeah, it certainly isn't intended to not

4    serve unhomed families or children.  We certainly haven't

5    heard that as a concern that has been elevated.

6                    This particular preference was for school

7    districts who are at their capacity and other children

8    were choicing in from other -- who had residential

9    addresses in other school district boundaries.

10           Q.    (By Mr. Davis)  Okay.  Is -- is your

11   testimony that you're not sure if that would fall within

12   this preference or not, a school district declining to

13   enroll an unhoused family because the unhoused family did

14   not reside within the district?

15           A.    Just to be really clear, when we wrote

16   these, we were presuming positive intentions of all of

17   our providers to be inclusive, to the provider types and

18   the unique expectations that they might have from other

19   state agencies or federally.

20                   I'm pretty sure school districts can't

21   federally decline a homeless family, but I'm not a lawyer

22   or a school district at this point in time, and so I'm

23   not going to speak to that.

24                   But I will say that the intention was to

25   ensure that where they have had to prioritize children

Page 88

1   and not just take choice children from other districts,

2   if they don't have the capacity to serve more children,

3   that they -- we weren't requiring them, as a new program,

4   to do so.

5           Q.   Okay.  Looking at the next preference.

6   "I'm a Head Start grantee, and families may need to meet

7   additional factors to enroll with me."

8           Do you see that?

9           A.   I do.

10          Q.   Okay.  What is a Head Start grantee?

11          A.   A Head Start grantee receives federal

12  funds to provide Head Start services, including

13  preschool.

14          Q.   Okay.  And what kind of additional factors

15  does the department understand to fall within this

16  preference?

17          A.   So Head Start has -- and again, I don't

18  know the federal mandate as well as a Head Start grantee

19  would, but they receive funds directly from the federal

20  government to provide services for children at specific

21  income levels, for example, as a priority.

22          I know another part of that is children

23  with individualized education program.  Some Head Start

24  grantees may provide services earlier than preschool age,

25  and some may only provide preschool age.  But they

Page 89

 1      provide comprehensive services for families who may need

 2      those within their programming.

 3              Q.   Okay.  So the additional factors could

 4      include income qualifications?

 5              A.   Yes.

 6              Q.   Okay.  So like a family could exceed the

 7      income qualifications and, thus, not be able to enroll

 8      with the grantee?

 9              MS. CARRENO:  Objection.  Calls for

10      speculation of Head Start -- Head Start grantees.

11              A.   Yeah, and I would say that we heard from

12      Head Start providers who were participating that they

13      wouldn't be able to take just anyone who applied because

14      their federal mandate is to serve specific families and

15      their children.  And we presumed that they're following

16      their federal mandate and their charge, and that the

17      State, in a new program, isn't getting in between that.

18              Q.   (By Mr. Davis)  Okay.  Your

19      understanding -- that's all I'm asking you to testify to,

20      Ms. Odean -- is that these additional factors that are

21      mentioned in this preference could include income

22      qualifications?

23              A.   Yes.

24              Q.   Okay.

25              Is there any other basis on which a

Page 90

1    provider could decline a match besides these preferences

2    that we've been discussing?  Strike that.  Let me clarify

3    the question.

4              Besides -- is there any other basis on

5    which a provider could client a match other than these

6    preferences that are listed here on PL105?  And I say that

7    because we didn't discuss some of these.

8         A.   We had one other instance where we had a

9    provider who was a charter school who served high school

10   students with children as a priority.  So we added that

11   in later for that particular provider to be able to

12   prioritize their students' children.

13        Q.   Where did you add that in?

14        A.   We added that for that provider, that

15   specific provider.  So we didn't -- this particular guide

16   was written at a specific point in time, and the program

17   has continued to refine since this guide was written.

18        Q.   Okay.  So that provider came to the

19   department and said, We need to be able to include only

20   those children, and the department said, Okay, and you can

21   participate in UPK?

22        A.   They asked if they could prioritize them,

23   but that they might have seats for children outside their

24   program as well.

25        Q.   Okay.  And who could they prioritize,

Page 91

1    children of students?

2                A.   Students' children.

3                Q.   Their students' children.  Okay.

4                Okay.  Have there been any other

5    preferences the department has added besides that one?

6                A.   Not that I'm aware of, no.

7                Q.   Okay.  If another provider came to you and

8    said they were in a similar situation as the one that

9    wanted to prioritize the children of its students, would

10   UPK also accommodate that?

11               MS. CARRENO:  Objection.  Speculation.

12               You can answer.

13               A.   Yeah, I think it would be hard to say.

14   Depending on what the ask was.

15               Q.   (By Mr. Davis)  Okay.  But these

16   preferences, these are the ones that the department --

17   these preferences on page PL105, these are the ones the

18   department had arrived at at this point in time, but there

19   could be further preferences if the need for them was

20   raised by a provider?

21               A.   Potentially, yes.

22               Q.   I'm going to mark another document here.

23               And I may want you to keep Exhibit 4 on

24   your screen, if you would, just in another tab.  Is that

25   possible?

Page 92

```
 1              A.   I'll try.

 2                   MS. CARRENO:  Sorry.  Can you say that

 3      again?  Exhibit 4?

 4                   MR. DAVIS:  Yeah, the provider guide that

 5      we were just talking about.

 6                   You might want to keep that up, if you

 7      could.

 8                   MS. CARRENO:  Okay.

 9                   (Exhibit 5 was marked.)

10              Q.   (By Mr. Davis)  All right.  I'm showing you

11      Exhibit 5.

12                   Let me know when you've got it.

13              A.   I have it.

14              Q.   Great.

15                   Do you recognize this document?

16              A.   Yes.

17              Q.   What is it?

18              A.   This is where -- this is where a provider

19      could ask for a specific preference.

20              Q.   Okay.  It's a form that was up on the UPK

21      website that allowed providers to ask for a particular

22      preference?

23              A.   I can't remember where it was posted.

24      It -- it's the form we used when there was a request.

25              Q.   Okay.  Got it.
```

1            A.    Yeah.

2            Q.    So maybe a potential provider would reach

3      out and say, We'd like to request a preference, and you'd

4      send this form back to them?

5            A.    Yes.

6            Q.    Okay.

7                  Do you know how many providers were sent

8      this form?

9            A.    I don't.

10           Q.    Okay.

11           A.    I could find out.

12           Q.    Is this form still active?  Like, if a

13     provider came to you now and said, We'd like to

14     participate in UPK, but we may need a preference, would

15     you send them this form?

16           A.    Yes.

17           Q.    Okay.  Is this the -- is this the form that

18     the school that we were just discussing used to request a

19     preference for children that went to the school --

20     sorry -- children of students at the school?

21           A.    Yeah, I don't -- I don't recall off the

22     top of my head.  These are processed through the local

23     coordinating organization and then to our state team, so

24     I'd have to look back and see if they completed this or

25     not.

Page 94

1          Q.   Okay.  Do you know how many different

2     preferences have been requested using this form?

3          A.   I don't.

4          Q.   Do you have a ballpark?  Like a lot, a few,

5     one or two?

6          A.   Yeah, I don't -- it was more early on,

7     before enrollment.  So ballpark, I would say not very

8     many, and more in the earlier part of the year of

9     enrollment, but we can confirm that.

10          Q.   Okay.

11               MR. DAVIS:  These documents haven't been

12     provided to us, have they, Virginia?

13               MS. CARRENO:  Are you talking about this

14     specific form?  I don't know what documents you're

15     referring to.

16               MR. DAVIS:  Yeah.  Forms that were filled

17     out by providers or would-be providers that filled out

18     this form requesting a preference.

19               MS. CARRENO:  I don't recall those coming

20     up in our production.

21               MR. DAVIS:  Okay.

22          Q.   (By Mr. Davis)  I just want to scroll down

23     to the bottom where it says "Exception Requested."

24     Actually, strike that.

25               Let me just -- more generally, Ms. Odean,

Page 95

1    what would the -- how would the department -- how did the

2    department process exception requests using this -- using

3    this form?

4         A.   So this went through the local

5    coordinating organization.  So we were hearing from our

6    local coordinating organizations who were in regular

7    contact with providers, especially prior to the launch of

8    the application, where providers were determining if they

9    were going to sign on, questions they had, concerns they

10   might have had, trends that we could be responsive to to

11   really truly be inclusive of mixed delivery.

12             And so we put the form in place to kind of

13   get an idea of that.  And it's also where we were hearing

14   about the weights.  So from kind of all provider types,

15   we were hearing a need for some kind of exception

16   preference around continuity of care.

17             We know that research shows that yields

18   high quality.  And we certainly didn't want families to

19   have to have children at multiple locations if they

20   didn't have to.  We wanted them to be able to stay at a

21   location that they'd been served in.

22             And then really trying to be thoughtful

23   about workforce and challenges around workforce as well.

24             So those were elevated to us from

25   providers directly, and also from our LCOs, as well as

Page 96

1    some of these other expectations that a particular

2    provider might have that, again, we really wanted to be,

3    you know, inclusive and not create a program that didn't

4    allow for that robust mixed delivery opportunity for

5    providers, but really for families to find that

6    just-right provider.

7              Q.   Yeah, thank you.  I'm more just asking how

8    the department processes like an individual one of these

9    forms.  A provider says, Here's the exception I'd like to

10   request, and the department gets it.  Who would -- who

11   would decide whether to accommodate that preference or

12   not?

13             MS. CARRENO:  Objection to form on this

14   question to the extent that the department isn't the ones

15   that gets these forms.

16             But you can answer if you can -- if you

17   understood the question.

18             A.   Could you say that question again, please?

19             Q.   (By Mr. Davis)  Sure.

20             So when the department receives a form like

21   this -- you testified earlier a provider could say, Here's

22   a preference that I need, and UPK would -- or the

23   department would send them this form to fill out.

24             When the department receives that form, who

25   decides whether that's a preference that can be

1    accommodated or not?

2              A.   So initially we were really looking at if

3    it was a trend, if it was something that was going to

4    diminish providers or any specific provider type from

5    participating.

6              So these would be -- these would be

7    elevated to program from our local coordinating

8    organization or to us directly from providers, and we

9    would bring that to program leadership to make a

10   recommendation based on what we heard and the need.

11             Q.   Okay.  And what would you consider the

12   program leadership schedule -- at the program leadership's

13   level, what would you consider as to whether or not to

14   accommodate a particular preference?

15             A.   Yeah, so I think we were really looking at

16   is there a federal mandate, as we certainly couldn't get

17   in between that as a state agency.  Certainly looking at

18   being inclusive of mixed delivery and not diminishing a

19   specific charge of a program.  And then also, of course,

20   making sure that was in alignment with the law.

21             Q.   Okay.  I want to look down at the bottom of

22   the form.  Page 2, it says "Exception Requested."

23             Do you see that?

24             A.   Mm-hmm.

25             Q.   And it looks like it has a space for -- for

1     that to be filled out.  But I just want to look at the --

2     in the parentheses, it looks like there's some examples

3     listed.  So first one --

4                    THE REPORTER:  I'm sorry.  I'm sorry, sir,

5     but when you read, you just need to slow down for me.

6     Could you repeat, please?

7                    MR. DAVIS:  Sorry.  Sure.

8               Q.   (By Mr. Davis)  I'm looking at the material

9     in the parentheses, and it looks like there's a couple of

10    examples given.  So, for example, "My location only serves

11    teen moms enrolled in a neighboring high school."  And "my

12    location only serves children with specific disabilities."

13                    Is there any UPK provider that only serves

14    teen moms enrolled in a neighboring high school?

15              A.   I don't know that for sure.  We have

16    almost 2000 participating providers, so I'd have to look

17    back to see.

18              Q.   Okay.  Is that a preference that the

19    department could grant?

20              A.   Potentially.  Again, I wouldn't speculate.

21    I'd need to know more about the program.  And we

22    certainly want to be inclusive of all providers, but want

23    families to have assurances to find -- to be able to find

24    the just-right program.

25              Q.   Okay.  And then what about that second one,

Page 99

1    "My location only serves children with specific

2    disabilities"?  Are there any UPK providers that have that

3    preference?

4         A.   We -- we do.  We have school

5    district-based providers that have specific programs for

6    specific needs that are aligned to their federal mandate.

7         Q.   Okay.  So some UPK providers only serve

8    children with specific disabilities?

9         A.   At a specific -- in a specific classroom,

10   it might be -- that school district providers serve all

11   children, but they might have a specific location that's

12   resourced for a special classroom.

13        Q.   Sorry, I just want to make sure I

14   understand that.  There's like a separate licensed UPK

15   provider that's accepting matches, has children enrolled,

16   that serves only children with particular disabilities?

17             MS. CARRENO:  Objection.  Form.

18             You can answer.

19        A.   The school district may have multiple

20   licensed locations.  One of those locations or a

21   particular classroom within that location may be

22   resourced to serve specific student needs based on their

23   federal mandate.

24        Q.   (By Mr. Davis)  Okay.

25             Are you aware of a particular provider

Page 100

1    that's participating in UPK that's called the Anchor

2    Center For Blind Children?

3              A.    Not specifically.

4              Q.    Okay.  If the Anchor Center For Blind

5    Children exclusively served children who are blind, would

6    that be consistent with the UPK provider agreement?

7                    MS. CARRENO:  Objection.  Speculation.

8                    You can answer.

9              A.    Yeah, again, I would look into it further

10   just for assurances.  And it wouldn't be a director-only

11   decision, but, rather, a decision with our leadership

12   and -- to ensure that we're within the law.  Certainly

13   would look into it.

14             Q.    (By Mr. Davis)  Okay.  If we could turn

15   back in the tab to Exhibit 4 and scroll down to PL105.

16                   Let me know when you're there.

17             A.    I'm there.

18             Q.    Great.

19                   And I want to talk about one of the

20   preferences we skipped over earlier, which is the first

21   one, "I am a faith-based provider and may require families

22   to be a part of my congregation."

23                   Do you see that?

24             A.    Yes.

25             Q.    Why did the department include this

Page 101

1    preference in the provider guide?

2              A.    Again, we had heard from some providers

3    that that would assure that they could be included in

4    universal preschool.

5              Q.    Which providers?

6              A.    I'd have to look back.  It was -- we were

7    hearing from our local coordinating organizations, and

8    their transition director had a faith-based working group

9    to have conversations with and kind of give information

10   out about universal preschool and find out what needs

11   might be.

12              So this was intended to be -- provide an

13   opportunity to be inclusive of faith-based providers

14   being able to participate with those assurances that were

15   requested.

16              Q.    Okay.  Was this a request of the

17   faith-based working group?

18              A.    I believe it was part of the conversation.

19   I wasn't in attendance for those.  Again, the transition

20   director led those.  I did participate in an initial

21   meeting when we were giving an overview of the program

22   and some initial questions were asked.

23              Q.    Okay.  Was -- was this requested in that

24   meeting?

25              A.    I don't -- I don't recall that

Page 102

1    specifically.  Some of the questions were around if you

2    had to be all in or not, what the program types were,

3    what the rate would be, questions about if we were going

4    to say everyone had to use the same curriculum, that kind

5    of thing.

6              Q.   Okay.  Who ultimately decided yes, we will

7    have this preference as part of our program?

8              A.   Yeah, our program team and leadership

9    within the department.

10             Q.   Are you on that team?

11             A.   Yes.

12             Q.   Why did you make that decision?

13             A.   Again, I think really just trying to be

14   inclusive of mixed delivery and being thoughtful about

15   how we could give some assurances for folks to

16   participate.

17             Q.   Okay.  Was this language -- "I may require

18   families to be a part of my congregation."

19             Where did that language come from?  Was

20   there a model you were looking at?  Was that proposed to

21   you?

22             A.   Yeah, I don't -- I don't recall where it

23   came from specifically.  Again, we were moving in a

24   pretty compressed timeline and really working hard to be

25   responsive to be inclusive for the launch of the

Page 103

1    application and give providers those assurances that they

2    could, you know, meet their charge and still participate.

3              Q.   Okay.  What do you mean by -- what do you

4    mean by "assurances"?

5              A.   Just so they knew that if they were

6    prioritizing members of their congregation, that they

7    could still participate in UPK and not just get matched

8    with a bunch of families that may not have been a part of

9    that congregation or that particular community that they

10   had established.

11             Q.   Okay.  What is the department's

12   understanding of -- of what a congregation is?

13             A.   Yeah, I think at that time, when it was

14   written and we were creating it, really trying to be

15   thoughtful about that inclusive community and not getting

16   in between that.

17             We had -- I guess, you know, that's really

18   similar to the co-op model too, is that understanding of

19   that particular community has that established program

20   and that faith-based providers may have that as well.

21             Certainly would also have access to

22   continuity of care where families had participated with

23   that particular provider and could continue on, and that

24   as new families came in, that they had -- that they had

25   this preference so that they could ensure to keep that

Page 104

1    model that they provide in place.

2                    And so again, really just trying to be

3    inclusive of providers being able to participate in -- in

4    the model that they operated under.

5                    Q.   Yeah.  And -- that's helpful.

6                    I'm just trying to understand, you know,

7    this preference gives the assurance that faith-based

8    providers may require families to be a part of my

9    congregation.  What is the department's understanding of

10   what it means to be part of the faith-based provider's

11   congregation?

12                   A.   Yeah, certainly recognize that there's

13   been a lot of conversation about that since it was

14   written.  At the time, it was really just trying to be

15   thoughtful of that inclusive community and not

16   necessarily one particular definition.

17                   And that -- I mean, that -- that would

18   be -- you know, as we move forward -- and you've probably

19   seen in our draft rule that consideration of further

20   definition.

21                   Q.   Okay.  You know, why don't we mark the

22   draft rule so we can chat about it.

23                   (Exhibit 6 was marked.)

24                   Q.   All right.  You should have the next

25   exhibit.

Page 105

1          Let me know when you have it.

2          A.   I have it.

3          Q.   Great.

4          Does this look like the draft regulations

5    that you were just mentioning?  You can take your time to

6    scroll through it.

7          A.   Yes.

8          Q.   Okay.  Great.

9          And on page 2, at the top, that's the

10   definition of "congregation" that's currently being

11   proposed?

12         A.   Yes.

13         Q.   Okay.  And then page 6, that's the

14   regulation that -- so next to the number one, that's the

15   regulation that is embodying that congregation preference

16   that we were just discussing from the provider guide?

17         A.   Yes.

18         Q.   Okay.  I want to talk about -- I want to

19   talk about -- sort of look at subsection B here.

20         So 4.110, and then subsection (b), says,

21   "In utilizing these programatic preferences, eligible

22   preschool providers must still comply with rule section

23   4.109(B)."

24         Do you see that?

25         A.   Yes.

Page 106

1          Q.   Okay.  If we can just scroll down to

2     4.109(B) and make sure we're on the same page -- excuse

3     me, up to page 4.  I'm sorry.  Page 5.

4               Do you see 4.109(B)?

5          A.   Yes.

6          Q.   All right.  And that says, "Eligible

7     preschool providers must ensure that children receive an

8     opportunity to enroll and receive universal preschool

9     services regardless of religious affiliation, sexual

10     orientation, gender identity, as such characteristics and

11     circumstances apply to the child or the child's family."

12               Is that part of what it says?

13          A.   Yes.

14          Q.   Okay.  So the congregation preference, the

15     providers that utilize the congregation preference are

16     still subject to that requirement, right?

17          A.   Yes.

18          Q.   Okay.  Let's look at the definition of

19     "congregation" on page 2.

20               So congregation -- a congregation means "A

21     religious-based convocation of individuals in a particular

22     geographic area who share a common set of beliefs and who

23     collectively engage in conduct with a nexus to that set of

24     beliefs."

25               Do you see that?

Page 107

1          A.    Yes.

2          Q.    So could a congregation be -- you know, for

3    example -- you know, I guess could a congregation, in that

4    definition, be Catholics within the Archdiocese of Denver?

5                MS. CARRENO:   Just objection to the extent

6    that these rules are not promulgated yet and not

7    effective.

8                But you can answer.

9          A.    I understand that in this draft

10   definition, that "congregation" could be within the

11   geographic area of the Denver Archdiocese.

12         Q.    (By Mr. Davis)  Okay.  So can -- so not

13   just the people that go to a particular parish, but all

14   the Catholics within the Archdiocese of Denver?

15         A.    It -- that would be my understanding.

16         Q.    Okay.  Could it be everybody within the

17   Denver area who believes that marriage is reserved between

18   a man and a woman and who lives consistently -- in

19   consistency with that belief?

20               MS. CARRENO:   Objection.  Speculation.

21               You can answer.

22         Q.    (By Mr. Davis)  In the same way that you

23   answered my first question, Ms. Odean, I'm just asking you

24   to answer that question.

25         A.    And it certainly could be part of that

Page 108

1     definition by my understanding.  But also the rule

2     doesn't allow us to go against what's in the law, and so

3     that's why we have the 4.109(B).  So, yes, to the extent

4     that we can be inclusive of a specific congregation that

5     also falls in alignment of the law that's set forth for

6     us.

7              Q.   Okay.  So no matter what, it can't be

8     defined in a way that would run into the law about equal

9     opportunity regardless of sexual orientation?

10             A.   That's my understanding.

11             Q.   Okay.

12             MR. DAVIS:  I don't have a ton left.  I

13    don't know if you-all would want to take another break or

14    maybe just power through.

15             How are you feeling, Ms. Odean?

16             MS. CARRENO:  So again, I'm just

17    clarifying, when you say you don't have a lot left,

18    that's with the expectation that Dr. Roy will be your

19    next witness if you have questions left for the topics

20    noticed for Dr. Roy?

21             MR. DAVIS:  Correct, I don't have a lot

22    left for Ms. Odean, but I do have questions for Dr. Roy.

23    And I'm just asking, do you want to take another

24    10-minute break now, or do you want to see how far we can

25    get?

Page 109

1            MS. CARRENO:  I'm okay powering through if

2    you're okay.

3            THE DEPONENT:  Yes, I'm okay.

4            MR. DAVIS:  Okay.  Great.

5        Q.   (By Mr. Davis)  You mentioned the

6    interfaith working group a bit ago.  Can you just say

7    what -- what is or was the interfaith working group?

8        A.   It was established by the transition

9    director to reach out to faith-based providers to hear

10   from them, what they were thinking about participating in

11   the universal preschool program, to give an overview of

12   the program and answer any questions that they might

13   have.  And I understand that she met on a regular basis

14   with them over a period of time to have those

15   conversations.

16       Q.   I'm sorry, who is -- who's "she"?

17       A.   The transition director.

18       Q.   Oh, okay.

19            Do we have her name on the record yet?

20   What is her name?

21       A.   Her name is Michael Cooke.

22       Q.   Okay.  Did the interfaith working group, to

23   your knowledge, produce any written work product, any

24   written recommendations?

25       A.   Not that I'm aware of.

Page 110

1          Q.    Okay.  Did the -- let me just mark an

2     exhibit really quickly, actually.

3                (Exhibit 7 was marked.)

4          Q.    Let me know when you've got it up.

5          A.    I have it up.

6          Q.    Great.

7                Do you recognize this document?

8          A.    I do.

9          Q.    What is it?

10         A.    I believe it's who was invited to the

11     interfaith working group by Michael Cooke.

12         Q.    Okay.  Great.

13               And then at the bottom, is that sort of the

14     schedule of when they met?

15         A.    I believe so.

16         Q.    Okay.

17         A.    That's my understanding, yes.

18         Q.    Okay.  Did the department have a

19     representative in all of these meetings?

20         A.    No.

21         Q.    Sometimes it was just the members -- just

22     the faith-based providers themselves?

23         A.    Oh, I don't know if they met outside of

24     their time with Michael Cooke as the transition director.

25         Q.    I'm sorry --

Page 111

```
 1              A.   I wasn't in attendance at these.

 2              Q.   Okay.

 3                   I'm going to quickly mark Exhibit 8.

 4                   (Exhibit 8 was marked.)

 5              Q.   Let me know when you've got it.

 6              A.   I have it.

 7              Q.   Great.

 8                   Do you recognize this document?

 9              A.   I'm looking through.

10              Q.   Sure.  Take your time.

11              A.   If you're asking me if I remember this

12      specific email, I don't, but I can read it and recall

13      that there was some inquiry.

14              Q.   Sure.  We've all gotten a lot of emails

15      so -- between now and February, so --

16                   Yeah, just reading it and refreshing your

17      recollection, do you know who Melissa Mares is?

18              A.   I do.

19              Q.   Okay.

20              A.   She was the Colorado Children's Campaign

21      as the director of Early Childhood Initiatives.

22              Q.   What is the Colorado Children's Campaign?

23              A.   It's my understanding that they're an

24      organization that supports initiatives for early

25      childhood throughout the state, and they were active
```

```
                                                    Page 112
 1      participants in connecting the new department with the

 2      community.

 3                   Q.    Okay.   They were -- were they in favor of

 4      the UPK initiative?

 5                   MS. CARRENO:   Objection.   Speculation.

 6                   You can answer.

 7                   Q.    (By Mr. Davis)   You can answer.

 8                   A.    Yeah, I believe that they were.

 9                   Q.    Okay.   And just looking at the email, she

10      says that "Dawn Alexander and I connected today."

11                   Do you know who Dawn Alexander is?

12                   A.    Yes.

13                   Q.    Who's that?

14                   A.    She has a group -- I'm trying to remember

15      the acronym, ECEA, Early -- I don't -- I'm not -- I can't

16      tell you what it stands for.   But she provides services

17      for a variety of providers around the state.

18                   Q.    Okay.   And then the email says -- this is

19      Melissa.   She says she encouraged Dawn to counter

20      misinformation as it comes up, and I believe she's saying

21      as it comes up in the interfaith UPK working group.

22                   Is that how you understood that email?

23                   MS. CARRENO:   Objection.   Speculation.

24                   A.    Yeah --

25                   Q.    (By Mr. Davis)   I'm just asking you to read
```

Page 113

1    the email, Ms. Odean?

2           A.    Yeah, I can read it.  I'm not going to --

3    I'm not going to speculate what Melissa was trying to

4    communicate or not in an email.

5                 But I do know that she has often connected

6    providers with different members of our team for

7    clarification on a concern they may have elevated

8    directly to her or a question.

9           Q.    Okay.  You were a recipient of this email,

10   right?

11          A.    I was cc'd.

12          Q.    Okay.  And did you have any discussions

13   with Michael about what misinformation might be coming up

14   in the interfaith working group?

15          A.    Not that I recall.

16          Q.    Okay.  I guess asked more generally, what

17   changes did the department make to the UPK implementation

18   based on feedback from the interfaith working group?

19          A.    Yeah, I don't -- I don't know if I could

20   pinpoint a specific.  I do know that we heard very early

21   a lot of questions about it because faith-based providers

22   did not participate in the previous state funding of

23   preschool in Colorado.  And so -- unless they had a

24   specific contractor instance, but it wasn't typical.

25                 And so I think there were a lot of

Page 114

1    questions, and really this group was to kind of have a

2    dialog and be able to answer questions if the department

3    could.

4              We had other -- we had other groups like

5    this like in-home family childcare, for example, who

6    hadn't participated in the previous program who had a lot

7    of questions about what does this look like for us, what

8    does that mean for us.

9              Nothing -- not that specific change was

10   needed or specific action was needed to be taken, but

11   really more to share information and be -- and to listen

12   and to understand if there might be an opportunity or a

13   consideration.

14             I do know that the preference that was

15   given was based on input from providers, but I don't know

16   that it was specifically from this working group or other

17   providers, but it was certainly elevated to our

18   department team for consideration.

19        Q.   Okay.  Great.

20             Were there any other working groups, like a

21   co-op working group or an in-home provider working group?

22        A.   Not -- not as shown in I guess Exhibit 7,

23   where you have the list and the specific calendar

24   invites.  It really was, hey, we have a group of folks

25   who would like to meet with you; have a conversation.

Page 115

1    There might be follow-up.  But nothing -- nothing, you

2    know, regularly scheduled over time.

3                    But we certainly have heard from a variety

4    of providers since we launched and continue to reach out

5    directly to those providers based on their unique needs.

6    And I think we found, through some of those

7    conversations, that even if they're -- the in-home family

8    childcare is a particular provider licensed, needs and

9    expectations might vary from provider to provider, and so

10   a lot of times just a one-on-one conversation about

11   questions that a specific provider might have end up, you

12   know, with a couple multiple conversations with a

13   specific provider, but not necessarily a formalized

14   group, if you will.

15             Q.    Great.

16                    Out of the -- you said the congregation

17   preference, you know, originated at least in part with

18   discussions with the interfaith working group.  Did they

19   propose that preference in writing or is this something

20   that Michael maybe took away from a meeting?

21             A.    Yeah, I don't -- I don't know that I said

22   it was from this group specifically, although it could

23   have been.  It's when we were reviewing the preferences

24   that it -- you know, we had heard from LCOs or other

25   providers or, you know, Michael -- you'd have to ask --

Page 116

1    Michael may specifically have heard from this working

2    group that that consideration would be appreciated, to be

3    able to participate and not -- not have a full match of

4    any one or -- around the state who might go to a

5    particular provider.

6           Q.   Did Michael present that proposed

7    preference to the program's team?

8           A.   I recall it -- I don't remember having a

9    specific presentation.  It really was more kind of back

10   to that guide where we had made considerations about what

11   we heard, that it was kind of collectively put into

12   writing.  But it wasn't necessarily one person said, I'm

13   advocating for this or someone else is advocating for

14   that.

15              It was just a recognition that we had

16   heard these concerns, and if there was something

17   programatically or in the system that we could do to

18   support that, you know, continuity of care, sibling, an

19   employees's child, as well as the preferences we

20   reviewed, it would be helpful to ensure inclusion in

21   mixed delivery and support families and, you know, making

22   that -- that choice, as well as have some assurances

23   around ease in the process or fluidity in the process, if

24   you will.

25          Q.   Okay.  All right.  Thank you for that.

Page 117

```
 1              I'm going to mark -- well, let me just ask
 2      you this.  When did the department first become aware
 3      specifically of the Archdiocese of Denver's need for a
 4      religious exemption for the nondiscrimination requirements
 5      in the UPK?
 6                   MS. CARRENO:  Objection.  Form.
 7                   You can answer.
 8              A.   Can you ask it again, please.
 9              Q.   (By Mr. Davis)  Sure.  When did the
10      department first become aware of the Archdiocese of
11      Denver's request for a religious exemption from the
12      nondiscrimination of the UPK program?
13              A.   Yeah, in the first meeting -- the first
14      interfaith advisory I sat in on with Michael, I believe
15      the question was -- there was a question posed around
16      that, but not -- nothing outside of -- not necessarily in
17      consideration of the preference, but the law that was in
18      place.
19                   And so I believe that it was, you know,
20      the start of the conversation that continued.
21              Q.   Okay.
22                   I'm going to mark another exhibit here.
23                   All right.  Let me know when you've got
24      Exhibit 9.
25                   (Exhibit 9 was marked.)
```

Page 118

1          A.    I have it.

2          Q.    Great.

3                Do you recognize this email?

4          A.    Yes.

5          Q.    It looks like it's from Stacy Petty to you

6     and Michael Cooke; is that right?

7          A.    Yes.

8          Q.    Who is Stacy Petty?

9          A.    She is the director at one of our local

10    coordinating organizations.

11         Q.    Okay.  And it looks like it's forwarding an

12    email from the director of a Catholic preschool,

13    St. Stephen; is that right?

14         A.    That's what it looks like.

15         Q.    Okay.

16         A.    Yes.

17         Q.    And if you scroll down to the page,

18    Defendant 24 -- DEF24, it looks like the preschool

19    director is saying that this Catholic preschool is unable

20    to participate in UPK?

21         A.    It looks like they're choosing not to

22    participate.

23         Q.    It says "unable to participate," right?

24         A.    It does say that.

25         Q.    Why do you think that is equivalent to

Page 119

1    choosing not to participate?

2              A.   Well, just because it's a voluntary

3    program.  So it looks like their legal team told them

4    they were unable to participate.

5              Q.   Okay.  And it says -- she says they're not

6    able to participate, and the reason is the

7    nondiscrimination language in the UPK provider agreement?

8                   MS. CARRENO:  Objection.  Calls for

9    speculation.  I don't see where it says that in this

10   email.

11                  MR. DAVIS:  If you scroll up to the first

12   page.  But the question was for the witness.

13             A.   She said that in the email.

14             Q.   (By Mr. Davis)  Okay.  So you were aware of

15   the Archdiocese's specific need for an exemption by

16   January 13, 2023?  It looks like that's the date of this

17   email.

18                  MS. CARRENO:  Objection.  Form.

19             Q.   (By Mr. Davis)  You can answer.

20             A.   I would say at this point in time we

21   understood that there was -- there were providers who

22   would choose not to participate.  We had other, you know,

23   providers who were choosing not to participate at this

24   time as well.

25                  So this was -- this was an email we

Page 120

```
 1      received that said that they weren't participating
 2      because of that.
 3                    Q.   Did you respond to this email?
 4                    A.   I don't believe so.
 5                    Q.   Did you discuss it with anybody?
 6                    A.   We certainly had conversations, because at
 7      this time we had preference built in about whether that
 8      would allow for faith-based providers to participate.
 9      But we also knew that preference in that program decision
10      for that preference didn't make -- what was in the law
11      around discrimination, and we certainly recognized that
12      providers were deciding whether they were going to
13      participate or not at this time.
14                    Q.   So you had a discussion with --
15                    A.   I'm -- I'm sure Michael and I had a
16      conversation, but I don't recall a specific conversation
17      about this specific provider.
18                    Q.   What about the Archdiocese and its
19      preschools more generally?
20                    A.   I'm trying to -- it might have been --
21      yeah, I don't recall.  I don't recall a specific
22      conversation about that or how it might have been tied to
23      the next conversation in the working group.
24                    Q.   Were you aware that the Archdiocese had a
25      number of preschools within the state?
```

Page 121

1          A.   I -- I wasn't specifically tuned in at

2     that time about how many providers -- how the Archdiocese

3     was set up, no.  Not at that time.

4          Q.   Okay.  But eventually you learned that,

5     right?  It wasn't just one, it was --

6          A.   Yeah, I certainly have learned more, in a

7     lot of ways, in this -- in this last year about providers

8     and the services they provide and where they're located

9     and how they operate.  Absolutely.

10          Q.   Did it give you any concern, from a mixed

11     delivery system perspective, that none of the Archdiocese

12     and schools were going to be able to participate because

13     of the nondiscrimination requirements?

14              MS. CARRENO:  Objection.  Form.

15          Q.   (By Mr. Davis)  You can answer.

16          A.   Yeah.  I think, you know, as -- I also, as

17     the director of the program, can't change the law.  So

18     certainly understood if the law didn't meet their

19     expectations, and, you know, really, you know, understood

20     coming into this role that we would learn a lot about

21     providers and we would have to grapple with some hard

22     things around mixed delivery because it hadn't been done.

23              There's certainly unique instances, and

24     certainly hoped that we could, you know, have a dialog

25     and figure out ways to be as inclusive as possible, but

Page 122

1     again, don't have the ability as the director of the

2     program to go outside what's around that

3     nondiscrimination clause.

4              Q.   (By Mr. Davis)  Okay.  And if there's some

5     families within Colorado that feel a strong religious need

6     to send their children to an Archdiocese preschool, they

7     just can't participate in UPK, and that's all right?

8              MS. CARRENO:  Objection.  Speculation.

9              A.   Universal preschool is voluntary for

10    families as well.  And so we know that it's not

11    everything to everyone.  Some folks are choosing not to

12    participate.  Some folks choose not to have their

13    children attend preschool.

14              And so we certainly recognize that there

15    would be choices that were made by families that were the

16    family's choices to make.  We wanted to provide as much

17    inclusion and mixed delivery as we could based within the

18    parameters we had.  We certainly wanted to, you know,

19    utilize the funds in the way they're intended for anyone

20    eligible in the year before.

21              So, you know, we certainly didn't want to

22    have specific exclusions, but, again, we're not -- we're

23    not changing the law.  We're following the law and

24    working within that as a parameter.

25              Q.   (By Mr. Davis)  And if the Archdiocese's

Page 123

1    preschools can't comply with the requirements within the

2    law, they can't participate in UPK, right?

3                    MS. CARRENO:  Objection.  Speculation.

4                    You can answer.

5             A.    It's voluntary.  So it -- there is choice

6    there as well.

7             Q.    (By Mr. Davis)  Okay.  Would you agree that

8    UPK -- it provides a significant benefit for the families

9    that do participate, right?

10            A.    I do believe that, yes.

11                   MR. DAVIS:  Why don't we take just one

12   more break.  I think I'm probably done, but I might have

13   a couple more.  Can I just circle up and -- maybe we'll

14   go off for 10 minutes and then try to come back on at

15   12:41.  Does that work?

16                   MS. CARRENO:  Yeah, so are we taking a

17   lunch break?  I think everybody would like to take a

18   lunch break.

19                   MR. DAVIS:  Yeah.  I think it would be

20   best if we could maybe finish with Ms. Odean's portion

21   briefly -- and again, there may not be any more

22   questions.  But if we can finish with that and then take

23   a longer break before Dr. Roy's portion.  Would that

24   work?

25                   MS. CARRENO:  Sure.

Page 124

```
 1              MR. DAVIS:  Great.  So we'll be back on at
 2    12:42.
 3              (Recess from 12:32 p.m. to 12:42 p.m.)
 4         Q.   (By Mr. Davis)  So, Ms. Odean, I just want
 5    to circle back on a couple of things.
 6              Earlier on you said that it was important
 7    that UPK have high-quality providers, you know,
 8    participating and offering preschool services.  What
 9    exactly is it -- what do you have in mind by "high-quality
10    provider"?
11         A.   Sure.  So we have had, previous to
12    universal preschool, a lot of work in the state of
13    Colorado around quality in early education.  So certainly
14    want to build upon that.
15              And then as you probably know from the
16    law, there are expectations around specifically the
17    universal preschool program as it relates to quality.
18    That's inclusive of Colorado academic standards that have
19    been set forth for this age group as well as licensing
20    expectations, and in consideration of Colorado Shine's or
21    other programmatic quality work that providers have done.
22              And so the draft that we reviewed is our
23    initial phase of the quality standards that are required
24    in the law for us to establish.
25              So this draft will -- kind of establishes
```

Page 125

1    a base, if you will.  And then in the law it's also a

2    requirement it has to consider how we're supporting the

3    workforce and what resources that we can vet and provide

4    to educators to ensure a quality classroom environment.

5              Q.    Okay.  Thank you.

6                    And then we had a discussion about the

7    federal allowances for religious providers' hiring

8    decisions.

9                    Do you remember that?

10             A.    Yes.

11             Q.    Are those federal -- those federal

12   allowances aren't written into the provider agreement, are

13   they?

14             A.    Not that I'm aware.

15             Q.    Why not?

16             A.    Again, I didn't draft the initial

17   agreement.  Certainly are considering revisions for our

18   second-year agreement.  But, yeah, I don't -- I can't

19   speak to why that was excluded, although certainly

20   recognize that it was elevated after.

21             Q.    Okay.  So how would the department

22   determine if one of those federal allowances applied?

23                    MS. CARRENO:  Objection.  Calls for

24   privileged information.

25                    MR. DAVIS:  What is privileged?

Page 126

 1                    MS. CARRENO:  It calls for attorney-client

 2       information.

 3                    She can answer it.

 4                    MR. DAVIS:  I'm asking how --

 5            A.    Could you ask again, please.

 6            Q.    (By Mr. Davis)  Sure.  How will the

 7       department determine whether one of the federal hiring

 8       allowances applied in a particular situation?

 9            A.    Yeah.  So I think you're asking me to

10       speculate again.  But what I would say is I'm not an

11       attorney.  So if there was a claim made, it certainly

12       would elevate that to our leadership and to our attorney

13       general.

14            Q.    Okay.  And it's something the legal team

15       would have to think about investigating?

16            A.    I certainly would seek their counsel in

17       the process or path forward.

18                    MR. DAVIS:  Okay.  I think that's --

19       that's what I've got.  Thank you for your time.

20                    (Discussion off the record.)

21                    THE REPORTER:  What kind of transcript

22       would you like to receive; electronic, electronic with

23       exhibits?

24                    MR. DAVIS:  Yeah.  Electronic with

25       exhibits.

Page 127

1                    THE REPORTER:  And, Ms. Carreno?

2                    MS. CARRENO:  Is there a manuscript?

3                    MR. WHITEHAIR:  A mini.

4                    MS. CARRENO:  A mini -- I'm sorry.  What?

5                    MR. WHITEHAIR:  Do you have a minu-script

6      or is it just a plain --

7                    THE REPORTER:  We can do both.  We can do

8      four-to-a-page.

9                    MS. CARRENO:  So we would like both.

10                   THE REPORTER:  And exhibits?

11                   MS. CARRENO:  Electronic, please.

12                   THE REPORTER:  And do you want to handle

13     read and sign?

14                   MS. CARRENO:  I'm sorry.  Say that again?

15                   THE REPORTER:  Do you want to handle read

16     and sign?

17                   MS. CARRENO:  Yes.

18                   THE REPORTER:  Okay.  I'm off the record.

19     Thank you.

20                        *   *   *   *   *   *   *

21                   WHEREUPON, the foregoing deposition was

22     concluded at the hour of 12:47 p.m.  Total time on the

23     record was 3 hours and 7 minutes.

24

25

Page 128

1          I, DAWN ODEAN, the deponent in the above

2     deposition, do hereby acknowledge that I have read the

3     foregoing transcript of my testimony and state under oath

4     that it, together with any attached Amendment to

5     Deposition pages, constitutes my sworn testimony.

6

7     _____ I have made changes to my deposition

8     _____ I have NOT made any changes to my deposition

9

10

       _____

11                    DAWN ODEAN

12

13     Subscribed and sworn to before me this _____

14     day of _____, 20_____.

15

16     My commission expires: _____

17

18                          _____

                            Notary Public

19

20                          _____

                            Address

21

22

23

24

25

Page 129

1                    REPORTER'S CERTIFICATE

2

3

4            I, Laurel S. Tubbs, a Registered

5    Professional Reporter and Notary Public within the State

6    of Colorado, do hereby certify that previous to the

7    commencement of the examination, the deponent was duly

8    sworn by me to testify to the truth.

9            I further certify that this deposition was

10   taken in shorthand by me at the time and place herein set

11   forth and thereafter reduced to a typewritten form; that

12   the foregoing constitutes a true and correct transcript.

13           I further certify that I am not related

14   to, employed by, nor of counsel for any of the parties or

15   attorneys herein, nor otherwise interested in the result

16   of the within action.

17           My commission expires October 26, 2027.

18

19   _____
     LAUREL S. TUBBS

20   Registered Professional Reporter
     Registered Merit Reporter

21   Certified Realtime Reporter
     and Notary Public

22

23

24

25

Page 130

1    1  Virginia Carreno, Esquire

2    2  virginia.carreno@coag.gov

3    3                     November 13, 2023

4    4  RE:    St. Mary Catholic Parish In Littletown Et Al v. Roy, Lisa
     Et Al

5    5      11/8/2023, Dawn Odean (#6293872)

6    6       The above-referenced transcript is available for

7    7  review.

8    8       Within the applicable timeframe, the witness should

9    9  read the testimony to verify its accuracy. If there are

10   10  any changes, the witness should note those with the

11   11  reason, on the attached Errata Sheet.

12   12       The witness should sign the Acknowledgment of

13   13  Deponent and Errata and return to the deposing attorney.

14   14  Copies should be sent to all counsel, and to Veritext at

15   15  cs-midatlantic@veritext.com

16   16

17   17   Return completed errata within 30 days from

18   18  receipt of testimony.

19   19    If the witness fails to do so within the time

20   20  allotted, the transcript may be used as if signed.

21   21

22   22                   Yours,

23   23                   Veritext Legal Solutions

24   24

25   25

**[1 - abide]**

## 1

**1** 3:14 8:16,23 22:6 25:14 39:25 130:1
**10** 17:25 37:9 77:12 108:24 123:14 130:10
**100** 25:7
**104** 3:19
**10:03** 37:13
**11** 8:24 130:11
**11/8/2023** 130:5
**110** 3:21
**111** 3:22
**117** 3:23
**11:05** 77:15
**11:17** 77:15
**12** 130:12
**12:32** 124:3
**12:41** 123:15
**12:42** 124:2,3
**12:47** 127:22
**13** 119:16 130:3,13
**1300** 2:10
**14** 130:14
**1404-1** 3:20
**15** 18:17,18 130:15
**15th** 9:12
**16** 72:20 73:23 76:19,21 130:16

**17** 130:17
**178** 85:20
**17th** 35:14
**18** 63:5 65:15 65:17 66:16 68:17 69:3 73:4 74:9 75:20 76:17 130:18
**19** 130:19
**1919** 2:4
**1:23** 1:7
**1st** 49:3

## 2

**2** 3:15 45:15 46:3 97:22 105:9 106:19 130:2
**20** 128:14 130:20
**2000** 98:16
**20006** 2:5
**202-955-0095** 2:5
**2022** 9:12 49:4
**2023** 1:13 3:6 50:10 119:16 130:3
**2027** 129:17
**2079** 1:7
**21** 130:21
**22** 130:22
**22-1295** 39:5
**22402** 129:18

**23** 130:23
**24** 118:18 130:24
**25** 130:25
**26** 129:17
**29** 46:4

## 3

**3** 3:16 31:19 32:16 72:7,13 127:23 130:3
**30** 1:12 3:2,14 18:21 28:3 50:15 130:17
**32** 17:11

## 4

**4** 3:12,17 8:24 18:1 37:1,1 77:24 91:23 92:3 100:15 106:3 130:4
**4.109** 105:23 106:2,4 108:3
**4.110** 105:20
**400** 2:4
**45** 3:15

## 5

**5** 3:18 22:6 72:20 92:9,11 106:3 130:5
**50** 42:15
**500** 43:17

## 6

**6** 1:12 3:2,14 3:19 8:24 28:3 104:23 105:13 130:6
**6293872** 130:5
**63,000** 42:8
**67** 46:5

## 7

**7** 3:21 110:3 114:22 127:23 130:7
**72** 3:16
**720-508-6000** 2:11
**77** 3:17

## 8

**8** 1:13 3:6,14 3:20,22 8:24 111:3,4 130:8
**80203** 2:10

## 9

**9** 3:23 28:10 29:16 117:24 117:25 130:9
**92** 3:18
**9:07** 3:5
**9:52** 37:13

## a

**a.m.** 3:5 37:13 37:13 77:15,15
**abide** 67:1

**abided**  67:5
**ability**  122:1
**able**  19:18,19
    25:10 27:7
    30:11 34:13
    37:5,24 58:12
    58:14 66:21
    69:14 79:12
    84:23 89:7,13
    90:11,19 95:20
    98:23 101:14
    104:3 114:2
    116:3 119:6
    121:12
**above**  60:13
    128:1 130:6
**absolutely**
    26:12 56:5
    121:9
**academic**
    124:18
**accept**  18:13
    23:21 24:2,4
    27:24 30:1,25
    32:2 40:22
    79:10
**acceptance**
    22:17
**accepting**
    32:14 99:15
**access**  19:6
    24:23 27:7
    51:11,16 59:9
    103:21

**accommodate**
    91:10 96:11
    97:14
**accommodated**
    97:1
**accommodati...**
    70:12
**accommodati...**
    71:12
**accomplish**
    36:17
**accordance**
    73:7
**accountable**
    84:1
**accuracy**  130:9
**achieve**  37:15
**acknowledge**
    128:2
**acknowledg...**
    130:12
**acronym**
    112:15
**action**  55:3
    56:7,9 114:10
    129:16
**active**  93:12
    111:25
**actual**  39:13
    53:3,23 54:25
    56:11,24 57:21
**actually**  23:16
    30:6 33:8 37:8
    46:23 50:2
    52:10 81:12

94:24 110:2
**add**  90:13
**added**  90:10,14
    91:5
**additional**
    18:20 21:25
    88:7,14 89:3
    89:20
**address**  56:10
    128:20
**addresses**
    86:11 87:9
**addressing**
    53:4
**adhere**  50:18
    50:19
**adixon**  2:7
**adjusted**  78:22
**adjustments**
    31:15
**administration**
    10:21
**administrative**
    36:18 37:8
**admission**
    56:21 57:9
    58:21 59:6
    61:8
**admissions**
    40:25
**advisory**  3:21
    117:14
**advocating**
    116:13,13

**affect**  25:14
**affiliation**  51:4
    61:5,13,22
    106:9
**affirmed**  4:7
**african**  52:13
    52:25 54:8,17
    54:22 55:6,22
    58:15 59:7
**ag's**  7:1,2
**age**  19:9 37:23
    63:11 88:24,25
    124:19
**agencies**  11:21
    87:19
**agency**  97:17
**ages**  21:19
**ago**  13:10
    54:18 68:12
    109:6
**agree**  51:11
    58:2 62:17
    69:2 82:18
    123:7
**agreed**  67:3
    75:24
**agreeing**  65:17
    65:22 66:25
    71:22,23
**agreement**  3:15
    4:3 24:21 25:1
    25:6,11,14,16
    25:16,22,24
    26:4,13 32:9
    45:12,16 46:17

[agreement - applies]                                                         Page 3

46:19,24 47:10
47:13,14,23
48:2,3,9,11
49:8,13,14,17
49:21,23 50:4
50:5,8,10 52:1
57:4,19,20,24
58:4,9,25 59:2
59:2,8,12,13,13
59:15,16,17,19
60:10,14,17,19
60:22,23,24
61:2,24 62:9
62:11,15,18,19
62:24 63:2
65:16,23 66:10
66:25 67:9,16
67:18,20 68:4
71:8,15,22
100:6 119:7
125:12,17,18
**agrees**  50:18,19
**ahead**  25:20
38:13,14 77:17
85:7
**al**  130:4,4
**alexa**  2:13
**alexander**
112:10,11
**algorithm**
22:17 23:13
**alice**  12:18
**aligned**  84:6
99:6

**alignment**
14:21 97:20
108:5
**allotted**  78:25
130:20
**allow**  29:10
33:1,2 70:13
79:7 96:4
108:2 120:8
**allowable**
32:17,22 60:11
**allowance**
63:23,24 65:4
66:3,8,9,9,12
66:14 67:13
72:25
**allowances**
125:7,12,22
126:8
**allowed**  27:4
39:20 58:21
60:2,4 71:14
80:10 92:21
**allowing**  26:21
**allows**  19:6
**altogether**  12:5
**amanda**  2:3
**amendment**
128:4
**american**  52:13
52:25 54:8,17
54:22 55:6,22
58:15 59:7
**amount**  36:4,17
81:9 83:2

**anchor**  100:1,4
**answer**  5:5
16:3,19 26:14
30:22 40:8
44:8 48:25
49:10 52:17
53:21 54:13
55:10 56:24
57:1,13 58:9
58:11,13,17,22
58:24 59:6,7
59:24 60:2,3,8
62:7,21,22
68:18 69:11,24
70:18 71:1,15
71:19 73:20,21
75:1,2 76:11
76:23,24 77:7
77:10 79:15
82:1,21 86:18
87:2 91:12
96:16 99:18
100:8 107:8,21
107:24 109:12
112:6,7 114:2
117:7 119:19
121:15 123:4
126:3
**answered**
43:25 53:20
55:9 70:17
107:23
**answering**  85:5
**answers**  4:21
4:21 5:2,22

48:21
**anthes**  12:21
13:5
**anticipate**
40:23
**anticipated**
19:20 41:6
**anybody**  11:14
12:12 69:8
120:5
**apologies**  46:2
**apologize**  32:7
**appearances**
2:1
**appearing**  8:3
**applicable**  23:6
130:8
**application**
11:6 18:5
20:17 22:6
24:19 27:2,20
30:4 34:22
37:5 40:13,13
40:15 43:7
95:8 103:1
**applications**
27:5 35:1 36:4
36:12,19
**applied**  22:13
30:6 64:21
89:13 125:22
126:8
**applies**  65:7
79:11

**apply** 11:7 18:9
  30:4,7,10 31:7
  51:6 106:11
**appoint** 13:23
**appreciate**
  26:14 45:9
**appreciated**
  116:2
**approach** 31:8
**approached**
  32:3
**approaching**
  69:13
**appropriate**
  3:2
**approve** 50:4
  68:2
**approved** 3:18
  23:23,24 24:1
  48:10 50:9
  67:19,21 68:4
  78:24
**approving** 50:3
**approximately**
  14:23
**archdiocese** 1:4
  16:23 107:4,11
  107:14 117:3
  117:10 120:18
  120:24 121:2
  121:11 122:6
**archdiocese's**
  119:15 122:25
**area** 106:22
  107:11,17

**arrived** 91:18
**asked** 31:19
  53:19 55:8
  58:7,20 68:12
  70:16 90:22
  101:22 113:16
**asking** 4:21
  16:1 40:5
  48:21 49:5
  53:10 55:15
  56:4,13 58:7
  64:24 65:6
  66:12,13,23
  71:21 74:22
  75:22 78:12
  89:19 96:7
  107:23 108:23
  111:11 112:25
  126:4,9
**aspect** 82:9
**assurance**
  50:15 52:7
  104:7
**assurances**
  68:8,9 71:24
  98:23 100:10
  101:14 102:15
  103:1,4 116:22
**assure** 101:3
**attached** 128:4
  130:11
**attempting**
  29:24
**attend** 42:12
  122:13

**attendance**
  101:19 111:1
**attendees** 3:21
**attention** 5:21
  42:25 43:24
**attest** 86:6
**attorney** 2:9
  16:18 54:24
  55:11,25 70:4
  71:6 73:22
  75:4 126:1,11
  126:12 130:13
**attorneys** 6:10
  6:24 7:24
  52:20 57:8
  129:15
**attract** 21:4
**august** 9:12
  26:25
**authorized**
  47:1
**available** 19:2
  30:2 31:20
  38:25 42:11
  69:18 130:6
**avenue** 2:4
**award** 18:24
  40:18
**aware** 11:22
  13:25 49:24
  50:7 91:6
  99:25 109:25
  117:2,10
  119:14 120:24
  125:14

**awareness** 49:6

**b**

**b** 1:12 3:2,14
  28:3 63:5
  65:15,17,24
  66:16 68:17
  69:3,13 73:4
  74:9 75:20
  76:17 105:19
  105:20,23
  106:2,4 108:3
**back** 11:2
  23:14 26:3,10
  35:8,10,22
  46:9 59:17
  64:12 77:8
  93:4,24 98:17
  100:15 101:6
  116:9 123:14
  124:1,5
**ballpark** 94:4,7
**base** 125:1
**based** 34:11
  36:2 38:3,16
  38:24 42:9,17
  43:21 45:1,5,7
  49:8 51:17
  53:1 56:7,11
  69:18 73:23
  84:24 97:10
  99:5,22 100:21
  101:8,13,17
  103:20 104:7
  104:10 106:21
  109:9 110:22

**[based - carreno]**

113:18,21
114:15 115:5
120:8 122:17
**bases** 65:20,23
66:7,16 69:6,9
**basic** 17:6
**basis** 14:3
35:13,13 63:10
67:9 69:21
89:25 90:4
109:13
**bates** 46:4
**becket** 2:4
**becketlaw.org**
2:6,6,7
**began** 26:24
**beginning** 44:1
**behalf** 2:2,8 8:4
40:6 67:6,7,24
71:10 85:24
**belabor** 36:24
**belief** 107:19
**beliefs** 73:24
106:22,24
**believe** 11:25
54:18 55:24
73:15 101:18
110:10,15
112:8,20
117:14,19
120:4 123:10
**believed** 80:10
**believes** 107:17
**benefit** 123:8

**benefits** 69:17
**bernadette** 1:3
**best** 123:20
**better** 80:14
**beyond** 28:12
76:18
**bigger** 23:7
**bill** 12:10 39:5
39:8,13,19
43:16 52:3
68:14,21 80:4
80:4
**bit** 24:10 26:15
37:18 40:2,25
43:2,25 45:10
52:9 65:14
68:25 74:6
80:14 109:6
**biweekly** 14:20
14:23
**blind** 100:2,4,5
**board** 13:24
84:24 85:10
**bonnie** 2:14
6:25
**bottom** 46:4
94:23 97:21
110:13
**bound** 47:10
56:16,17 57:24
**boundaries**
84:24 85:9,11
85:12,13,19
87:9

**boundary**
84:17 85:16
**box** 80:16,16
**boys** 69:18
**bracket** 65:13
**break** 7:14,16
7:18 35:10
37:10 77:13
108:13,24
123:12,17,18
123:23
**breaks** 7:22
**briefly** 123:21
**bring** 97:9
**broader** 15:15
**broadway** 2:10
**brought** 11:15
**build** 39:24
124:14
**built** 23:18
120:7
**bullet** 50:25
**bunch** 103:8
**burden** 36:18

**c**

**c** 2:2 4:1
**calendar**
114:23
**call** 21:6 27:12
30:23 73:18
**called** 3:4 22:16
40:12 61:1
100:1
**calls** 15:21
16:17 30:21

52:15 62:6,20
74:24 89:9
119:8 125:23
126:1
**campaign**
111:20,22
**capacity** 1:7,9
28:15 84:24
85:12 87:7
88:2
**care** 19:7 21:22
22:14,21,25
23:4 46:10
95:16 103:22
116:18
**career** 10:9
**careers** 10:23
**carreno** 2:8 4:5
6:8,21,21
15:20 16:16
28:1,9,22 29:8
30:20 40:4
44:6 48:19
49:10 52:14
53:19 54:9
55:8 56:23
57:12 58:10,23
60:6 62:5,20
62:22 69:10,22
70:16,25 71:17
73:18 74:24
76:9,22 77:25
81:25 82:20
85:4 86:17,25
89:9 91:11

92:2,8 94:13
94:19 96:13
99:17 100:7
107:5,20
108:16 109:1
112:5,23 117:6
119:8,18
121:14 122:8
123:3,16,25
125:23 126:1
127:1,2,4,9,11
127:14,17
130:1
**case**   1:6 4:13
55:2
**cases**   6:25
**category**   31:23
**catholic**   1:2,3
118:12,19
130:4
**catholics**   107:4
107:14
**cc'd**   113:11
**ccr**   3:20
**cdec**   6:22 18:15
**celebrate**   20:19
21:11
**center**   37:25,25
45:6,7 100:2,4
**central**   48:5
**certain**   32:20
40:16 69:17
77:4 80:25
81:9 84:9

**certainly**   16:12
19:9,24 21:3
26:6 27:6 30:3
31:4 34:9 41:6
41:12,22 52:19
53:3,24 56:10
57:18 66:18
67:6 69:13,25
69:25 70:4,19
87:3,4 95:18
97:16,17 98:22
100:12 103:21
104:12 107:25
114:17 115:3
120:6,11 121:6
121:18,23,24
122:14,18,21
124:13 125:17
125:19 126:11
126:16
**certificate**
129:1
**certified**   3:8
129:21
**certify**   129:6,9
129:13
**challenges**
16:13 41:22
95:23
**chance**   8:13
**change**   31:19
33:23 41:3,3,5
41:10 114:9
121:17

**changes**   50:5
113:17 128:7,8
130:10
**changing**
122:23
**characteristics**
51:6 106:10
**charge**   44:13
68:5 70:5
89:16 97:19
103:2
**charged**   44:16
53:4,24 54:2
**charter**   90:9
**chat**   104:22
**check**   15:11
43:8,12 80:16
80:16
**child**   10:25
19:5,10,13
22:15,21 23:4
27:4,21 36:7
36:22 38:24
51:6 52:12
60:11 61:23
83:19,21 85:15
106:11 116:19
**child's**   51:7
61:23 106:11
**childcare**   19:22
37:25 40:18
45:6 114:5
115:8
**childhood**   1:8
1:13 3:3 6:24

8:5 9:7 11:20
12:10 49:2
55:17 111:21
111:25
**children**   18:17
18:20 19:6,15
19:24 20:2,4
21:24 27:6
34:8 38:23
42:8,9,12,14
44:22 51:2
64:9 68:23
69:1 81:11
83:7 84:4,9,23
85:11,12 87:4
87:7,25 88:1,2
88:20,22 89:15
90:10,12,20,23
91:1,2,3,9
93:19,20 95:19
98:12 99:1,8
99:11,15,16
100:2,5,5
106:7 122:6,13
**children's**
111:20,22
**chime**   7:13
**choice**   19:18
20:25 38:9
88:1 116:22
123:5
**choices**   122:15
122:16
**choicing**   87:8

[choose - congregation]                                                          Page 7

| | | | |
|---|---|---|---|
| **choose**  18:9 | **clearly**  28:8 | **comes**  23:14 | **completely**  5:2 |
| 20:9 24:21 | 29:3 | 43:12 112:20 | **comply**  58:4 |
| 34:18 119:22 | **client**  16:18 | 112:21 | 105:22 123:1 |
| 122:12 | 90:5 126:1 | **coming**  27:7 | **components** |
| **chooses**  82:8 | **close**  6:15 25:8 | 33:15 36:4 | 38:4 39:4,24 |
| **choosing** | **closed**  6:17,18 | 41:18 94:19 | 40:16,20 |
| 118:21 119:1 | **closely**  41:13 | 113:13 121:20 | **comprehensive** |
| 119:23 122:11 | **closer**  35:17 | **commencem...** | 89:1 |
| **chosen**  22:19 | 65:11 | 129:7 | **compressed** |
| **circle**  123:13 | **coag.gov**  2:11 | **commencing** | 25:13 44:15 |
| 124:5 | 130:2 | 3:5 | 102:24 |
| **circumstances** | **cognitive**  19:10 | **commission** | **computer**  6:14 |
| 51:6 106:11 | **cohen**  12:18 | 128:16 129:17 | **concern**  41:1 |
| **citizenship** | **collectively** | **commissioner** | 66:19 85:14 |
| 63:12 | 106:23 116:11 | 12:21 | 87:5 113:7 |
| **civil**  3:2 | **colorado**  1:1,8 | **committee** | 121:10 |
| **claim**  66:20,21 | 1:12 2:9,10 3:3 | 11:17,19 | **concerns**  15:18 |
| 72:2 126:11 | 3:9,15,17 9:22 | **common** | 16:9,11,14 |
| **clarification** | 10:3 12:24 | 106:22 | 41:10,10,17 |
| 113:7 | 18:1 19:3,14 | **communicate** | 95:9 116:16 |
| **clarify**  90:2 | 19:17 20:5 | 7:7 41:14 | **concierge**  2:13 |
| **clarifying** | 28:13 29:18 | 113:4 | **conclude**  35:5 |
| 108:17 | 38:9 43:3,10 | **communicati...** | **concluded** |
| **classroom**  27:8 | 43:19 44:13,16 | 10:11,17,20 | 127:22 |
| 99:9,12,21 | 47:15,19 49:14 | **community** | **conclusion** |
| 125:4 | 68:16 111:20 | 12:10 38:25 | 73:19 74:25 |
| **classrooms** | 111:22 113:23 | 79:22 103:9,15 | **conduct**  106:23 |
| 31:13 | 122:5 124:13 | 103:19 104:15 | **confer**  52:19 |
| **clause**  122:3 | 124:18,20 | 112:2 | **confirm**  6:6,16 |
| **clear**  5:22 | 129:6 | **company**  10:16 | 6:19 8:22 |
| 12:15 28:19 | **colorado's**  1:9 | **compared**  44:4 | 66:13 94:9 |
| 33:16 53:9 | 19:14 | **complete**  5:22 | **congregation** |
| 56:1,3 69:3 | **come**  33:21 | 27:20 | 100:22 102:18 |
| 87:15 | 78:17 85:15 | **completed** | 103:6,9,12 |
| | 102:19 123:14 | 93:24 130:17 | 104:9,11 |

105:10,15
106:14,15,19
106:20,20
107:2,3,10
108:4 115:16
**connect** 21:5
34:24
**connected**
34:22 36:20
37:5 112:10
113:5
**connecting**
29:11 112:1
**connections**
20:15
**consider** 60:15
97:11,13 125:2
**consideration**
104:19 114:13
114:18 116:2
117:17 124:20
**considerations**
116:10
**considering**
25:15 125:17
**consistency**
107:19
**consistent**
100:6
**consistently**
107:18
**constitute**
44:24
**constitutes**
128:5 129:12

**consult** 55:11
55:25 64:22
**consultation**
57:8
**consulted**
56:20
**consulting**
54:24
**contact** 16:10
21:3 95:7
**contemplated**
33:23
**content** 7:24
16:6 78:17,23
**continue** 71:14
103:23 115:4
**continued**
90:17 117:20
**continuity**
22:14,21,25
23:3 95:16
103:22 116:18
**contract** 17:19
25:20 26:7
47:16,20 48:7
49:15,17,18,19
56:15 63:23,24
82:3
**contractor**
113:24
**contractual**
73:4 74:9
75:20 76:17
**control** 40:25

**conversation**
7:6 21:7
101:18 104:13
114:25 115:10
117:20 120:16
120:16,22,23
**conversations**
16:20,24 101:9
109:15 115:7
115:12 120:6
**convocation**
106:21
**cooke** 109:21
110:11,24
118:6
**coordinating**
17:9,11,15
20:12 27:18
31:1 41:13
42:10 48:6
79:19 93:23
95:5,6 97:7
101:7 118:10
**copies** 130:14
**correct** 13:12
14:25 15:3
22:8,23 23:22
25:3 26:23
33:5,19 39:11
47:5 49:25
52:8 58:18
61:18 65:3
66:5 108:21
129:12

**counsel** 4:2
6:10,22 7:8
126:16 129:14
130:14
**counsel's** 65:1
**counter** 112:19
**county** 10:1,6
10:10,21 85:25
86:3
**couple** 4:16
5:11 20:7 29:4
50:13 98:9
115:12 123:13
124:5
**course** 7:8 24:8
66:11 97:19
**court** 1:1 5:17
7:8
**covered** 63:22
69:2
**crafted** 47:14
**create** 20:18
24:22 96:3
**created** 39:9
**creating** 25:19
103:14
**credentialed**
76:6 81:16
**credentialing**
64:4
**credentials**
75:6
**criteria** 3:18
41:19,19 84:12

**critical** 19:16
**cross** 43:8,12
**cs** 130:15
**curious** 29:5
**current** 7:14
9:6 13:10 25:4
49:6 68:19
**currently** 25:5
33:7 71:20
105:10
**curriculum**
21:14 102:4
**customizable**
21:18
**cutoff** 33:20,22
**cv** 1:7
**cycle** 35:15,16
35:18

**d**

**d** 4:1
**d.c.** 2:5
**daily** 35:13
**daniel** 1:4
**date** 33:22 35:6
35:22 119:16
**davis** 2:2 3:12
4:4,10,12 6:5,9
7:3,4 13:9
14:11,15 16:4
16:5,19 28:4
28:19,24 29:14
29:23 30:22
37:7,12,14
40:20 44:19
47:22 49:5,16

52:16,17 53:21
54:6,11,13
55:10 57:1,23
58:13,19,24
59:5 60:1,21
61:15,19 62:10
62:21 63:1
64:11,15 69:16
69:24 70:22
71:1 72:3
73:21 74:7,8
75:2 76:11,24
77:11,16 78:3
79:17 82:5,24
85:7,17 86:18
87:10 89:18
91:15 92:4,10
94:11,16,21,22
96:19 98:7,8
99:24 100:14
107:12,22
108:12,21
109:4,5 112:7
112:25 117:9
119:11,14,19
121:15 122:4
122:25 123:7
123:11,19
124:1,4 125:25
126:4,6,18,24
**dawn** 1:9,13
3:4,16 4:6
28:14 112:10
112:11,19
128:1,11 130:5

**day** 17:15
18:17,18,21
69:17 128:14
**days** 130:17
**decide** 36:13
79:18 96:11
**decided** 102:6
**decides** 35:25
96:25
**deciding** 50:4
120:12
**decision** 11:9
11:17 13:19
55:14 56:11
100:11,11
102:12 120:9
**decisions** 48:23
49:3 73:8
74:11 77:3
125:8
**declaration**
3:16 72:16
74:19 75:18,24
76:19
**decline** 27:23
27:24 30:1,3
31:6,24 33:1,2
54:7,21 58:8
58:14 60:2,4
61:8,12 62:1,2
62:11 79:7,12
81:4,21 82:8
82:13,19 86:15
87:21 90:1

**declined** 53:14
53:16 55:5,21
56:21 57:9
70:12 80:1
**declines** 52:12
54:16
**declining** 71:12
87:12
**def24** 118:18
**defendant**
118:18
**defendants**
1:11 2:8
**deferred** 22:17
**define** 74:18
82:10
**defined** 41:15
108:8
**definitely** 44:11
**definition**
104:16,20
105:10 106:18
107:4,10 108:1
**delivery** 16:2
34:15 37:16
38:4,7 41:12
42:2 43:6,20
44:25 80:8,11
95:11 96:4
97:18 102:14
116:21 121:11
121:22 122:17
**demographer's**
42:8

**denver**   1:4 2:10
   12:11 39:16
   40:1,5 107:4
   107:11,14,17
**denver's**   117:3
   117:11
**deny**   58:21
   59:6
**department**   1:8
   1:12 3:3 6:23
   8:4 9:7 10:17
   11:20 12:19,22
   12:24 13:15,19
   14:3,16 15:4
   15:15,25 30:5
   39:21,25 40:6
   41:18 42:3
   47:7,10,15,19
   48:9,10,22
   49:2,14 52:5
   52:20 55:17
   56:17,25 57:2
   67:4,22,25
   68:2,13 71:6
   73:3,15,24
   74:4,8,20
   75:19 76:16
   79:18 84:20
   86:5,22 88:15
   90:19,20 91:5
   91:16,18 95:1
   95:2 96:8,10
   96:14,20,23,24
   98:19 100:25
   102:9 110:18

112:1 113:17
   114:2,18 117:2
   117:10 125:21
   126:7
**department's**
   76:20 103:11
   104:9
**depending**
   91:14
**depends**   14:8
   80:23 83:13
**deponent**   13:5
   13:7 37:11
   47:19 54:3
   58:18 59:25
   61:18 79:16
   109:3 128:1
   129:7 130:13
**deposed**   5:9
**deposing**
   130:13
**deposition**   1:12
   3:3,14 5:25
   6:11 7:5,7,13
   7:25 8:9 28:18
   127:21 128:2,5
   128:7,8 129:9
**derocher**   2:13
   6:23
**design**   39:6
   43:1
**designed**   39:2
   84:13
**details**   40:10
   62:16

**determination**
   57:6
**determine**
   18:23 34:3
   54:25 55:2,2
   55:12,18 57:21
   60:18,19 66:21
   70:23 71:4
   73:25 125:22
   126:7
**determined**
   32:19 55:4,13
   55:20 56:8,20
**determining**
   95:8
**developed**
   78:21
**development**
   19:10
**dialog**   114:2
   121:24
**different**   11:2
   11:21 20:11
   21:4,25 39:4
   40:2,15,18
   41:24 43:4,20
   71:25 74:2
   81:17,18 85:16
   85:20 86:7,8
   86:20 94:1
   113:6
**difficult**   57:15
**diminish**   97:4
**diminished**
   35:2

**diminishing**
   97:18
**direct**   26:21,24
   27:10,12,15,24
   28:2,7 29:5,6
   29:21 31:8
   32:3 33:3,6
   34:21 36:7
**directly**   18:4
   21:6 27:2,21
   29:25 31:1
   37:2 41:14
   79:20 88:19
   95:25 97:8
   113:8 115:5
**director**   1:8,9
   6:22 9:8,11,14
   9:15,16,19,24
   9:25 11:4,15
   13:14 17:8
   39:18,22 47:3
   47:15,23 48:6
   48:8 49:6
   58:20 78:22
   100:10 101:8
   101:20 109:9
   109:17 110:24
   111:21 118:9
   118:12,19
   121:17 122:1
**disabilities**
   98:12 99:2,8
   99:16
**disability**   51:5
   63:12

**disavows** 73:4
74:9,20 75:19
**discover** 57:8
**discovery**
48:20
**discretion** 52:6
**discriminate**
63:9,17 64:17
65:18,19,22
66:2,6,15 67:9
69:5,8
**discriminating**
69:20
**discrimination**
63:6 120:11
**discuss** 9:1
14:9 90:7
120:5
**discussed** 57:24
69:6 79:9
**discussing** 7:24
39:4 41:19
45:11 46:20
68:11 73:5
79:6 82:7 90:2
93:18 105:16
**discussion**
14:14 77:14
120:14 125:6
126:20
**discussions**
113:12 115:18
**distance** 20:23
**district** 1:1,1
37:21 38:1

43:21 84:16,17
85:16,18 86:1
86:4,14,15,20
87:9,12,14,22
99:5,10,19
**district's** 86:24
**districts** 84:22
85:2,8,20 87:7
87:20 88:1
**dividing** 48:5
**division** 15:6,6
**dixon** 2:3
**document** 46:1
46:3,13,15
72:14 78:1,4
91:22 92:15
110:7 111:8
**documentation**
86:8
**documents**
5:24 6:2,6
94:11,14
**doing** 5:12 11:2
71:14
**dr** 6:22 11:9,11
11:12 13:11,18
13:21,23
108:18,20,22
123:23
**draft** 47:24
104:19,22
105:4 107:9
124:22,25
125:16

**drafter** 67:17
**dual** 83:7,12,14
83:15 84:7
**duly** 4:7 129:7

**e**

**e** 4:1,1
**earlier** 12:1
27:6 33:14
39:17 41:20
44:20 45:12
56:16 57:25
59:5 67:3 69:7
71:25 72:24
79:6,9 88:24
94:8 96:21
100:20 124:6
**early** 1:8,13 3:3
6:23 8:4 9:7,25
11:20 12:10
19:7 34:2
41:23 45:4
49:2 55:17
80:7 94:6
111:21,24
112:15 113:20
124:13
**ease** 116:23
**ecea** 112:15
**ed.d.** 2:14
**education** 10:9
10:24 12:22
63:12 88:23
124:13
**educational**
21:14 81:24

82:18
**educator** 60:11
83:18
**educators**
81:16 125:4
**effect** 25:17,22
26:4
**effective** 107:7
**effort** 26:10
**eight** 35:15
**either** 23:21
30:25 68:22
75:12,15
**elected** 15:22
16:2,18
**electronic**
126:22,22,24
127:11
**elevate** 126:12
**elevated** 30:13
30:15 41:22
52:22 66:20
85:14 87:5
95:24 97:7
113:7 114:17
125:20
**eligible** 17:25
18:18 31:21
42:8 51:2
105:21 106:6
122:20
**email** 2:6,6,7
2:11 3:22,23
6:13 111:12
112:9,18,22

**[email - example]**                                                                    Page 12

113:1,4,9
118:3,12
119:10,13,17
119:25 120:3
**emails** 111:14
**embodying**
105:15
**emotional**
19:11
**employed**
51:22 129:14
**employee** 64:8
**employee's**
22:15 23:4
**employees**
34:12 63:21,22
64:2,5,7,8,21
65:5,7,23 66:7
66:15 67:10
69:1 73:6,9,17
74:12,16,18,22
74:23 75:9,12
75:15,21,25
76:2,4,8
**employees's**
116:19
**employer** 34:11
65:4
**employers**
65:14
**employment**
10:2 51:22
73:8 74:11
**encompass**
29:20

**encourage** 31:7
**encouraged**
112:19
**ended** 36:12
**enforce** 60:21
75:20 76:16
**enforcement**
73:4 74:9,20
75:19
**engage** 38:23
83:12 106:23
**engaged** 20:14
**engagement**
41:7
**english** 84:5
**enrichment**
22:1
**enroll** 18:12
27:3,18 29:25
30:11 31:7
33:1,3 34:8
37:2 51:2,18
51:19 52:12,24
53:1,14,16
54:7,16,21
55:5,21 58:8
58:14 59:10,21
60:2,4 61:12
62:2,11 68:12
81:24 84:10
86:15 87:13
88:7 89:7
106:8
**enrolled** 33:11
36:20 98:11,14

99:15
**enrolling** 27:19
**enrollment**
18:12,13 24:23
26:21,24 27:10
27:24 28:2,7
28:21 29:5,6
29:21 30:1
31:8 32:3 33:3
33:6 40:11
51:16,17 53:15
69:7,14 94:7,9
**ensure** 19:17
38:9 42:11
57:3 68:5
80:24 87:25
100:12 103:25
106:7 116:20
125:4
**ensuring** 79:21
80:8
**entail** 24:18
**enter** 34:22
**entirety** 68:4
**entitled** 63:6
**entity** 48:24
**environment**
125:4
**equal** 51:2,11
51:16 52:25
59:9,9,20 61:4
68:12 108:8
**equally** 23:1,2
60:22

**equivalent**
118:25
**errata** 130:11
130:13,17
**especially**
34:13 95:7
**esq** 2:2,3,3,8,9
**esquire** 130:1
**establish**
124:24
**established**
103:10,19
109:8
**establishes**
124:25
**et** 130:4,4
**ethnicity** 51:3
63:10
**event** 7:15
**events** 21:4
60:25
**eventually**
121:4
**everybody**
107:16 123:17
**evolving** 42:1
**exact** 32:24
**exactly** 81:7
124:9
**examination**
3:4,11 4:9
129:7
**examined** 4:7
**example** 11:23
15:13,14 20:23

**[example - family]**                                    Page 13

21:6,20 31:12
31:20 32:16,19
34:11 37:21
39:23 40:14
41:24 44:25
88:21 98:10
107:3 114:5
**examples** 98:2
98:10
**exceed** 89:6
**exception** 3:18
94:23 95:2,15
96:9 97:22
**exceptional**
19:12
**excited** 19:14
34:9 45:7
**excluded**
125:19
**exclusions**
122:22
**exclusively**
11:20 64:18
100:5
**excuse** 106:2
**executive** 1:8
6:22 9:25
13:14
**exemption**
41:18 117:4,11
119:15
**exhibit** 3:14,15
3:16,17,18,19
3:21,22,23
8:13,14,16,19

45:11,15,23
46:1,3 72:4,7
72:13 77:17,24
91:23 92:3,9
92:11 100:15
104:23,25
110:2,3 111:3
111:4 114:22
117:22,24,25
**exhibits** 3:13
126:23,25
127:10
**exist** 48:24
**existed** 47:23
48:22 49:9
**expansion** 19:5
**expect** 60:24
61:3,7 62:2,8
**expectation**
61:11 83:15
108:18
**expectations**
64:3 76:5 77:1
77:2 83:13
84:5 87:18
96:1 115:9
121:19 124:16
124:20
**expected** 75:6
**expires** 128:16
129:17
**explain** 83:20
**explained**
29:11

**expressed** 16:7
**extent** 15:20
16:1,8,17
28:16 30:20
40:4,8 52:14
96:14 107:5
108:3
**external** 12:1,4

**f**

**facilitate** 27:3
**facilities** 70:14
**factor** 39:17
**factored** 41:17
**factors** 88:7,14
89:3,20
**facts** 56:24
57:7 62:24
66:20 70:1,6
70:21 71:3,9
**fails** 130:19
**failure** 45:2
**faith** 38:3,16
100:21 101:8
101:13,17
103:20 104:7
104:10 109:9
110:22 113:21
120:8
**fall** 15:21 28:8
87:11 88:15
**falling** 29:3
**falls** 16:2 29:16
108:5
**families** 17:13
18:3,7 19:17

19:21,23,24
20:9,10,15,20
21:4,5,5 22:14
26:20 27:1
29:17,19 33:10
34:9,18,21
36:18,20 38:9
38:12,15,23
40:14 44:17
51:12 64:10
69:2 81:8,11
81:16,23 82:4
82:16,18 83:2
84:16 86:3,6,9
86:13 87:4
88:6 89:1,14
95:18 96:5
98:23 100:21
102:18 103:8
103:22,24
104:8 116:21
122:5,10,15
123:8
**family** 18:13
21:23 22:4
27:17,19,23,24
29:1,24 30:9
30:23 31:7
32:3,14 33:1,3
37:24 38:11
45:6 51:7
61:23 62:3
64:9,18 68:23
80:17,21,25
81:3,19 82:8

82:11,16 85:18
87:13,13,21
89:6 106:11
114:5 115:7
**family's** 23:14
122:16
**far** 28:16 39:4
42:14 108:24
**favor** 112:3
**february**
111:15
**federal** 32:21
41:23 65:3
66:9,12,14
67:13 72:25
73:7,10 83:15
83:22 84:3
88:11,18,19
89:14,16 97:16
99:6,23 125:7
125:11,11,22
126:7
**federally** 63:23
87:19,21
**feedback** 79:23
80:2 113:18
**feel** 7:13 71:23
122:5
**feeling** 108:15
**figure** 121:25
**file** 45:20
**filed** 72:16
**fill** 37:4 40:14
96:23

**filled** 31:18
32:16 94:16,17
98:1
**final** 11:17
**finalized** 34:8
**finally** 70:23
**find** 18:7 31:5
32:10,11 38:10
53:23 55:1
64:1 65:8 70:1
70:20 93:11
96:5 98:23,23
101:10
**finding** 19:18
53:6,7
**fine** 19:11 35:7
**finish** 5:2,4
85:5 123:20,22
**finished** 85:6
**firm** 10:15
**first** 4:7 5:13
8:12 10:25
13:3,6 22:20
23:16 24:13
33:24 34:14
35:15 36:9
37:9 50:14
74:3 86:6 98:3
100:20 107:23
117:2,10,13,13
119:11
**fiscal** 49:13,14
49:17,21,23
**fits** 38:10

**five** 17:9 18:10
18:11
**fluidity** 116:23
**focus** 43:3 69:1
**focused** 44:22
**folder** 45:23
**folks** 11:20
26:3 102:15
114:24 122:11
122:12
**follow** 38:22
59:2 60:24
62:25 65:5
115:1
**followed** 15:1
40:21 48:7
61:2
**following** 54:3
59:15 68:5
89:15 122:23
**follows** 4:8
**foregoing**
127:21 128:3
129:12
**form** 44:6
69:10,22 71:17
76:22 82:20
92:20,24 93:4
93:8,12,15,17
94:2,14,18
95:3,12 96:13
96:20,23,24
97:22 99:17
117:6 119:18
121:14 129:11

**formalized**
115:13
**forms** 94:16
96:9,15
**forth** 9:22
40:17 54:3
62:25 108:5
124:19 129:11
**forward** 104:18
126:17
**forwarding**
118:11
**found** 115:6
**foundationally**
39:6
**four** 35:16
127:8
**fourth** 50:25
**free** 7:13
**front** 45:13
46:6 65:8
**full** 5:21 18:21
31:9 43:11,12
57:18 66:19
116:3
**functioning**
15:24
**fund** 2:4
**funded** 37:22
**funding** 85:11
113:22
**funds** 18:3,3,15
18:23 88:12,19
122:19

**further** 30:15 36:6 57:5,7 59:18 63:2 70:1,8 86:21 91:19 100:9 104:19 129:9 129:13

**g**

**g** 2:3 4:1
**gains** 19:8
**gender** 51:4 59:21 61:4,14 61:22 63:10,11 69:21 106:10
**general** 15:5 69:8 71:6 79:10 126:13
**general's** 2:9
**generally** 15:24 17:3 40:21 94:25 113:16 120:19
**generating** 45:20
**geographic** 106:22 107:11
**geographically** 20:22
**geography** 20:24 21:15
**getting** 16:6 35:17 36:22 89:17 103:15
**girls** 69:19

**give** 8:13,15 14:5,19 15:15 17:25 31:17 72:4 101:9 102:15 103:1 109:11 121:10
**given** 16:12 22:24 79:11 98:10 114:15
**gives** 67:13 104:7
**giving** 5:21,22 15:5 56:4 101:21
**go** 4:16 8:12 14:10,12 18:3 18:3,7,10,11,22 21:6 25:14 26:2,10 30:7 31:17,17 34:24 37:9,12 38:12 38:14 46:9 57:20 59:18 60:13,17 62:8 63:1 77:16 85:7 107:13 108:2 116:4 122:2 123:14
**goal** 42:19 44:21
**goals** 37:15 38:20 42:4,6,9 42:14 44:24 45:3

**goes** 18:24 22:16 23:16 28:4 42:14
**going** 8:12 12:23 16:3 21:3 25:17,19 27:2,22 28:12 28:15 29:1 34:6,17 39:19 41:23 43:15 45:10 60:12 62:11 72:3 76:16 77:16 87:23 91:22 95:9 97:3 102:3 111:3 113:2,3 117:1 117:22 120:12 121:12
**good** 4:11,13 23:22 38:6
**gotten** 26:3 63:3 111:14
**government** 10:6 12:5 88:20
**governor** 13:17 13:22,22 14:3 15:17 16:10,21 16:25 17:1
**governor's** 11:23,25 12:3 13:22 14:17 15:9,10 16:7 17:2

**grant** 98:19
**grantee** 88:6,10 88:11,18 89:8
**grantees** 88:24 89:10
**grapple** 121:21
**grateful** 4:14
**great** 4:11 5:3,8 6:19 7:3,12,21 8:7,11,21 9:4 9:17 13:9 22:3 26:17 34:16 37:14 45:9,25 46:9,12,18 50:1 63:5,8 68:10 72:12,23 77:16 78:3 80:12 92:14 100:18 105:3,8 109:4 110:6,12 111:7 114:19 115:15 118:2 124:1
**greg** 2:9 7:1
**gross** 19:11
**ground** 4:16
**group** 37:23 101:8,17 109:6 109:7,22 110:11 112:14 112:21 113:14 113:18 114:1 114:16,21,21 114:24 115:14 115:18,22

116:2 120:23
124:19
**groups**  114:4
114:20
**growth**  44:15
**guardians**
62:12
**guess**  29:2 56:3
103:17 107:3
113:16 114:22
**guide**  3:17 78:7
78:10,16,21,25
90:15,17 92:4
101:1 105:16
116:10

**h**

**half**  18:17,18
74:3,10
**handle**  127:12
127:15
**happen**  30:17
**happened**
30:14 55:18,19
55:20
**happens**  22:9
**hard**  32:23
53:2 62:23
71:2 91:13
102:24 121:21
**head**  12:24
26:8 32:19
37:25 43:17
88:6,10,11,12
88:17,18,23
89:10,10,12

93:22
**hear**  47:18 54:2
58:16 59:23
79:14 109:9
**heard**  27:1 41:1
79:19 83:1
84:3,7 87:5
89:11 97:10
101:2 113:20
115:3,24 116:1
116:11,16
**hearing**  36:3
44:17 95:5,13
95:15 101:7
**held**  84:1
**help**  17:12
20:15
**helpful**  20:6
26:18 38:19
79:21 104:5
116:20
**helping**  81:12
81:14
**hey**  31:16
114:24
**high**  19:12,12
90:9 95:18
98:11,14 124:7
124:9
**higher**  27:5
36:19
**hire**  65:4 73:7
73:23
**hired**  11:10
13:25 39:22

76:2
**hiring**  75:5,11
75:15,21 125:7
126:7
**hit**  45:22
**hitting**  77:19
**hmm**  97:24
**home**  20:24,24
37:24 45:1,6
114:5,21 115:7
**homeless**  87:21
**honor**  34:13
**hoped**  121:24
**hopefully**  7:17
**hopes**  38:24
**hoping**  42:5
44:22,23
**hour**  7:16,18
18:16,17
127:22
**hours**  7:17
17:25 18:18,20
18:21 21:25
127:23
**house**  39:5
**housing**  51:5
**huh**  4:22,22
**human**  12:24
47:15,20 48:9
49:15,24
**hung**  68:25

**i**

**idea**  20:2,3
95:13

**identified**
50:20
**identifies**  70:14
**identify**  18:20
**identities**  51:13
51:17 61:9,13
61:20
**identity**  51:5
59:21 61:4,14
61:22 63:11,13
69:21 106:10
**imagine**  21:1
30:23
**immersive**  83:7
83:11 84:8
**implement**
39:13
**implementati...**
113:17
**implemented**
40:23
**implementing**
43:1 68:6
**important**  4:19
4:25 7:7 19:1
20:13 38:21
124:6
**improper**  7:23
**inaugural**  9:15
9:16
**include**  28:24
63:20 68:14,17
79:18 84:20
89:4,21 90:19
100:25

included   51:25
68:13 80:2
101:3
includes   64:8
including   6:2
67:10 88:12
inclusion   34:14
42:2 79:21
80:8 116:20
122:17
inclusive   33:24
71:5 87:17
95:11 96:3
97:18 98:22
101:13 102:14
102:25 103:15
104:3,15 108:4
121:25 124:18
income   32:20
51:5 88:21
89:4,7,21
incorrectly
65:9
incredible   19:8
incumbent
70:20
index   3:10
indicators
20:25
individual   96:8
individualized
88:23
individuals
106:21

industry   22:18
infant   21:22
inform   44:18
information
15:21 16:1
20:10 21:13
44:4 78:16
101:9 114:11
125:24 126:2
initial   12:22
101:20,22
124:23 125:16
initially   31:16
31:16 43:2
97:2
initiate   15:10
initiative   112:4
initiatives
111:21,24
input   11:15
48:1 50:5
78:18,20
114:15
inquiry   86:21
111:13
ins   26:21 27:10
inside   69:20
instance   40:18
57:4 59:16
77:5 90:8
113:24
instances
121:23
instruct   16:3

insurance
10:16
integrity   57:20
intended   82:2
87:3 101:12
122:19
intending
76:18,19
intention   9:20
87:24
intentional
40:12
intentions
87:16
interchangea...
27:11
interested   22:5
34:2 129:15
interesting
45:22
interfaith   3:21
109:6,7,22
110:11 112:21
113:14,18
115:18 117:14
interpreting
67:8
interview   12:23
interviewers
12:13,16
interviews   11:8
11:18 12:1
intimate   21:7
introduce
45:11

introduced
5:17
investigate
56:6
investigating
75:5 126:15
invited   110:10
invites   114:24
involved   12:9
involving   73:9
74:11
issue   40:24

**j**

j   2:9
january   35:14
119:16
jdavis   2:6
jefferson   10:1,6
10:10,21 85:25
86:3
jlk   1:7
job   44:11
joe   4:12 28:1
join   36:25
joseph   2:2
july   25:14
39:25 49:3

**k**

k   42:21
katy   12:21 13:5
13:7
keep   11:1 91:23
92:6 103:25

**[kind - length]**

**kind**  10:14 12:7
  12:7,8 21:15
  22:1 28:10
  41:9 43:9
  80:21 83:11
  88:14 95:12,14
  95:15 101:9
  102:4 114:1
  116:9,11
  124:25 126:21
**kindergarten**
  18:1 20:5
**kinds**  21:16
**knew**  42:7
  103:5 120:9
**know**  4:18,20
  5:1,12 6:10 7:5
  7:12,13,15,16
  7:23 12:15
  21:3,5,12 23:4
  25:7 26:10
  27:6,19 29:5
  29:19 31:7,17
  32:1 36:24
  37:7 39:3
  40:10,11 41:11
  42:23 44:4
  45:1 49:12,20
  52:11,19 54:12
  54:12,19 58:3
  62:23 63:3
  67:4 68:18,22
  68:22 69:7,12
  69:17,19 70:4
  70:11,23 71:8

  71:14 73:13
  74:15,17 75:8
  75:9,23 77:17
  82:15 85:17,22
  86:19,20 88:18
  88:22 92:12
  93:7 94:1,14
  95:17 96:3
  98:15,21
  100:16 103:2
  103:17 104:6
  104:18,21
  105:1 107:2,3
  108:13 110:4
  110:23 111:5
  111:17 112:11
  113:5,19,20
  114:14,15
  115:2,12,17,21
  115:24,25
  116:18,21
  117:19,23
  119:22 121:16
  121:19,19,24
  122:10,18,21
  124:7,15
**knowing**  32:24
  52:18 53:3
  57:18 59:3
**knowledge**
  109:23

**l**

**labeled**  46:4
**lack**  51:5

**lakewood**  1:3
**language**  19:10
  83:7,12,15,24
  84:4,8,9
  102:17,19
  119:7
**large**  37:25
  45:6
**launch**  95:7
  102:25
**launched**  115:4
**laurel**  3:6 37:12
  61:15 64:12
  77:8 129:4,19
**law**  9:22 37:20
  38:8,21 40:13
  50:20 52:2
  54:4,5 56:6
  66:10 68:14,23
  73:7,10 97:20
  100:12 108:2,5
  108:8 117:17
  120:10 121:17
  121:18 122:23
  122:23 123:2
  124:16,24
  125:1
**lawsuit**  16:15
  16:21,22
**lawyer**  75:10
  87:21
**lawyers**  4:12
  56:20
**lay**  17:5 80:5

**lco**  27:20 34:23
  34:24
**lcos**  95:25
  115:24
**leadership**  50:6
  52:20 54:24
  71:5 97:9,12
  100:11 102:8
  126:12
**leadership's**
  97:12
**leading**  25:16
  26:6 36:8
**learn**  20:10
  121:20
**learned**  121:4,6
**learning**  10:1
  19:7
**leave**  48:16
  77:12
**led**  48:6 101:20
**leeway**  29:11
**left**  108:12,17
  108:19,22
**legal**  73:18
  74:25 119:3
  126:14 130:23
**legislative**
  15:14
**legislator's**
  52:3
**legislature**
  68:16 80:5
**length**  21:24

**[level - manager]**

**level**  32:20 51:5
  80:25 83:23
  84:9 97:13
**levels**  88:21
**liberty**  2:4
**license**  22:15
  34:8
**licensed**  24:15
  37:23 45:5
  75:7 76:5
  81:15,16 99:14
  99:20 115:8
**licensing**  34:7
  64:3 77:2
  124:19
**likely**  42:16
**limit**  29:8
**limited**  63:18
**line**  7:15
**lines**  58:20
  71:13
**lisa**  1:4,7 2:14
  130:4
**list**  3:18 8:8
  114:23
**listed**  32:12
  51:12 90:6
  98:3
**listen**  42:1
  114:11
**lists**  50:20
**litigation**  72:17
**little**  26:15
  29:10 37:18
  40:2,25 43:2

43:25 45:10
  52:9 63:2
  65:14 68:25
  74:6 80:14
**littleton**  1:3
**littletown**
  130:4
**live**  84:16,23
  85:18
**lived**  86:4,14
**lives**  107:18
**load**  77:25
**loading**  45:18
  72:9 77:20,23
**local**  10:5 17:8
  17:11,14 20:12
  27:18 31:1
  41:13 42:10
  79:19 93:22
  95:4,6 97:7
  101:7 118:9
**locally**  17:14
  20:14
**locate**  64:20
**located**  121:8
**location**  22:15
  27:21 81:1,15
  95:21 98:10,12
  99:1,11,21
**locations**  95:19
  99:20,20
**log**  24:19
**logged**  6:17
**long**  9:10 19:13
  29:13

**longer**  123:23
**lonhausen**  7:1
**look**  20:20,23
  21:17 26:5
  35:6 40:19
  50:12 59:18
  69:13 70:1,5,7
  70:8,20 74:1,2
  83:6 93:24
  97:21 98:1,16
  100:9,13 101:6
  105:4,19
  106:18 114:7
**looking**  20:21
  21:23 43:11
  44:11 82:11
  88:5 97:2,15
  97:17 98:8
  102:20 111:9
  112:9
**looks**  45:25
  50:25 72:20
  97:25 98:2,9
  118:5,11,14,18
  118:21 119:3
  119:16
**lot**  26:18 33:23
  34:1 37:7 41:2
  41:7 94:4
  104:13 108:17
  108:21 111:14
  113:21,25
  114:6 115:10
  121:7,20
  124:12

**lottery**  22:18
**louisiana**  42:23
**lower**  36:21
**lunch**  123:17
  123:18

**m**

**ma'am**  13:4
  47:18
**made**  10:23
  19:9 31:14
  48:23 49:3
  50:5 69:17
  71:3 72:2 77:4
  116:10 122:15
  126:11 128:7,8
**main**  24:14
**make**  8:13 19:1
  31:24 52:6
  56:10 57:10
  65:24 97:9
  99:13 102:12
  106:2 113:17
  120:10 122:16
**maker**  11:9
  13:19
**making**  11:17
  57:16 97:20
  116:21
**man**  107:18
**manage**  36:21
**managed**  37:21
  38:1
**manager**  17:16
  17:16

**managers** 17:8
**mandate** 32:21
   41:23,24 67:13
   88:18 89:14,16
   97:16 99:6,23
**mandates** 84:4
**manuscript**
   127:2
**mares** 111:17
**mark** 8:12
   77:17 91:22
   104:21 110:1
   111:3 117:1,22
**marked** 8:16
   45:15,23 72:13
   77:24 92:9
   104:23 110:3
   111:4 117:25
**marketing**
   10:17
**marriage** 62:13
   107:17
**mary** 1:2 12:18
   130:4
**match** 23:15,20
   23:21,22 24:2
   24:5 27:22
   79:7,12 81:4
   81:21 82:13,19
   85:15 90:1,5
   116:3
**matched** 23:15
   29:19 34:19
   103:7

**matches** 40:22
   79:10 99:15
**matching** 18:11
   22:10,10,12,18
   26:19 28:6,10
   29:10 33:2
   34:17,20 35:4
   35:12,12,19
   36:1,5,14 39:3
   40:3,21
**material** 98:8
**matter** 108:7
**maximum**
   60:11
**mean** 9:19
   21:13 28:19
   43:20 44:2,24
   56:18 71:11
   74:22 75:22,25
   78:20 80:4,15
   82:24 83:21
   103:3,4 104:17
   114:8
**means** 20:1
   22:21 37:19,23
   52:10 53:11
   55:16 56:15
   64:18 65:15
   69:4 76:1
   104:10 106:20
**meet** 4:13,15
   14:9 32:20
   41:23 71:23
   77:1 88:6
   103:2 114:25

121:18
**meeting** 14:7
   14:17 15:1
   101:21,24
   115:20 117:13
**meetings**
   110:19
**melissa** 111:17
   112:19 113:3
**member's** 62:3
**members** 103:6
   110:21 113:6
**memo** 14:8
**mention** 29:9
**mentioned** 6:7
   13:4 39:16
   89:21 109:5
**mentioning**
   105:5
**merit** 3:7
   129:20
**messaging** 6:13
**met** 42:19 44:2
   57:4,4 109:13
   110:14,23
**method** 27:25
**methods** 28:20
**michael** 109:21
   110:11,24
   113:13 115:20
   115:25 116:1,6
   117:14 118:6
   120:15
**michelle** 6:25

**midatlantic**
   130:15
**middle** 77:10
**mind** 43:12
   124:9
**mini** 127:3,4
**minimum**
   18:21
**ministerial**
   73:9,17 74:12
   74:15,21,23
   75:9,21,25
   76:4,7
**minu** 127:5
**minute** 37:9
   77:12 108:24
**minutes** 123:14
   127:23
**mischaracteri...**
   87:1
**mischaracteri...**
   76:9
**mischaracteri...**
   60:7
**misinformation**
   112:20 113:13
**misspeak** 65:3
**misstates** 54:9
**mistake** 32:15
**mixed** 37:15
   38:4,7 41:12
   42:2 43:6,20
   44:25 80:8,10
   95:11 96:4
   97:18 102:14

**[mixed - occurred]**

Page 21

116:21 121:10
121:22 122:17
**mm** 97:24
**model** 19:6
80:24 81:6,8
82:18,23
102:20 103:18
104:1,4
**moment** 8:15
13:10 14:13
54:18 68:12
72:4
**moms** 98:11,14
**montessori**
82:16,17
**monthly** 18:24
**months** 36:9
**morning** 4:11
4:14 5:21 9:2
**motor** 19:11,11
**move** 27:7
104:18
**moved** 36:6
**moving** 102:23
**multiage** 31:13
**multiple** 95:19
99:19 115:12

**n**

**n** 4:1
**n.w.** 2:4
**name** 4:12
12:24 13:2,3,3
13:6 65:3
109:19,20,21

**national** 63:10
**native** 84:4
**navigate** 17:13
**navigating** 78:8
**navigation**
20:13,16
**necessarily**
104:16 115:13
116:12 117:16
**need** 7:13,16
14:9 19:20
46:20 57:2
64:22 70:7,8
70:22 82:16
83:7 88:6 89:1
90:19 91:19
93:14 95:15
96:22 97:10
98:5,21 117:3
119:15 122:5
**needed** 43:3
52:20 78:23
114:10,10
**needs** 38:24
54:11 56:18
58:3 66:24
71:14 82:17,17
99:6,22 101:10
115:5,8
**neglected** 45:25
**neighboring**
98:11,14
**never** 30:18,18
**new** 36:12,25
44:10 88:3

89:17 103:24
112:1
**newer** 34:6
**nexus** 106:23
**nice** 4:15
**nicholas** 2:3
**niki** 6:24
**nondiscrimin...**
117:4,12 119:7
121:13 122:3
**nonreligious**
65:21
**notary** 3:8
128:18 129:5
129:21
**note** 46:2
130:10
**notice** 3:1,14
28:3
**noticed** 28:17
43:18 108:20
**november** 1:13
3:6 25:18
130:3
**nreaves** 2:6
**number** 28:9
29:12,16 35:1
36:3,12,21
39:20 42:4,7,9
42:14 50:18,20
65:19 105:14
120:25

**o**

**o** 4:1
**oath** 5:14 128:3
**objection** 15:20
16:16 29:12
30:20 40:4
44:6 48:19
52:14 53:19
54:9 55:8
56:23 57:12
58:10,23 60:6
62:5,5 69:10
69:22 70:16,25
71:17 73:18
74:24 76:9,22
81:25 82:20
85:4 86:17,25
89:9 91:11
96:13 99:17
100:7 107:5,20
112:5,23 117:6
119:8,18
121:14 122:8
123:3 125:23
**objections**
48:20
**obviously**
15:25
**occur** 35:13
57:16 66:22
**occurred** 53:8
53:10,13 56:7
56:12 66:21
71:4

**occurring**
    35:20
**occurs** 35:19
**october** 129:17
**odean** 1:9,13
    3:4,16 4:6,11
    7:4 8:19 9:5
    14:15 16:5,19
    17:5 29:23
    37:14 46:7,12
    48:22 49:5
    52:17 53:21
    54:14 55:10
    57:1 58:21
    64:16,24 66:23
    72:5 73:13
    76:15 89:20
    94:25 107:23
    108:15,22
    113:1 124:4
    128:1,11 130:5
**odean's** 123:20
**offer** 20:19
    21:19,20,22
**offering** 124:8
**office** 2:9 7:1,2
    11:23,25 12:3
    13:22 14:17
    15:9,10 16:7
    17:2 42:8
    78:15,15
**official** 1:7,9
    15:22 16:2,18
**oh** 12:21 38:12
    109:18 110:23

**oit** 39:23
**okay** 4:23 5:11
    5:16,20,24 6:4
    6:13 8:2,7,11
    8:17,21 9:1,5
    9:10,13,23
    10:2,5,13,18,20
    11:12,14 12:7
    12:12,15,20
    13:1,16,18,21
    14:2,6,23 15:4
    15:9,13,17
    16:4,14 17:5
    17:21 18:2
    19:1 20:1 22:3
    22:9,24 23:5,9
    23:12,12,17,20
    24:1,4,7,9,11
    24:25 25:4,9
    25:21 26:2,13
    26:17 27:14,23
    29:14 30:9,17
    31:3,6 32:25
    33:6,10,14,20
    34:16,25 35:4
    35:11,21,24
    36:10,23,23
    37:6,18 38:2
    39:1,12 40:1
    40:20 42:3,13
    43:23 44:19
    45:9,19 46:12
    46:15,18,23
    47:3,6,9,13,22
    48:1,8,13

49:16,22 50:1
50:1,8,12,24
51:10,15,20,25
52:5,9 53:5,9
53:25 54:6
55:4,13 56:13
57:23 58:2,6
58:19 59:5,19
60:1,21 61:3
62:1,10,17
63:1,16 64:15
65:2,10,12
66:6 67:14,19
68:2,7,19,24
69:16 70:2,11
70:22 71:7,11
72:3,6,10,16,19
72:23 73:3,13
74:1,19 75:8
76:7 77:9,10
77:21 78:3,9
78:12,24 79:2
79:5,9,17
80:12 81:6,19
82:15,24 83:5
84:12,15 85:25
86:9,13,22,23
87:10 88:5,10
88:14 89:3,6
89:18,24 90:18
90:20,25 91:3
91:4,7,15 92:8
92:20,25 93:6
93:10,17 94:1
94:10,21 97:11

97:21 98:18,25
99:7,24 100:4
100:14 101:16
101:23 102:6
102:17 103:3
103:11 104:21
105:8,13,18
106:1,14,18
107:12,16
108:7,11 109:1
109:2,3,4,18,22
110:1,12,16,18
111:2,19 112:3
112:9,18 113:9
113:12,16
114:19 116:25
117:21 118:11
118:15 119:5
119:14 121:4
122:4 123:7
125:5,21
126:14,18
127:18
**old** 18:1 31:19
    32:16
**olds** 37:1,1
**once** 35:19,20
    52:22 72:1
**ones** 91:16,17
    96:14
**online** 34:18
    44:4,11
**op** 80:15,17,23
    81:4,6,8,24
    82:3,8,10,12,15

82:16 83:4
103:18 114:21
**open**   6:14 30:2
85:15
**opened**   26:23
**operate**   121:9
**operated**   104:4
**operating**
59:14
**operational**
17:16
**operationalize**
9:21 17:19
**operationalized**
17:22 41:16
**operationaliz...**
48:4
**operations**
28:13,21,25
29:7
**opportunities**
21:25 38:23
**opportunity**
19:23 20:4
34:12 51:2
52:25 59:9,21
61:4 68:12
96:4 101:13
106:8 108:9
114:12
**ops**   80:22
**options**   80:10
**order**   23:3
46:20 58:3
81:24 84:10

**organization**
27:19 31:1
75:4,11,14
77:5 93:23
95:5 97:8
111:24
**organizations**
17:9,12,15
20:13 41:13
42:11 73:23
79:20 95:6
101:7 118:10
**orientation**
51:4 61:5,14
61:21 62:3
63:11 106:10
108:9
**origin**   63:11
**originated**
115:17
**outcome**   56:9
**outcomes**   19:5
19:13,25
**outside**   12:4
29:6,8 75:6
85:13 90:23
110:23 117:16
122:2
**overview**
101:21 109:11

**p**

**p**   4:1
**p.m.**   124:3,3
127:22

**page**   3:11,13
46:4 50:15
63:2 65:11
72:20 79:2
91:17 97:22
105:9,13 106:2
106:3,3,19
118:17 119:12
127:8
**pages**   43:17
128:5
**paragraph**
72:20 75:18
76:19,20
**paralegal**   6:25
**parameter**
122:24
**parameters**
122:18
**parentheses**
98:2,9
**parents**   62:12
**parish**   1:2,3
107:13 130:4
**part**   5:18 11:16
18:12,16 21:10
28:21 29:20
38:3 60:9,13
80:17 81:11
86:5 88:22
94:8 100:22
101:18 102:7
102:18 103:8
104:8,10
106:12 107:25

115:17
**participants**
16:25 112:1
**participate**
18:6 24:15,22
25:10,16,23
27:4 29:1,18
33:15,17,25
34:4 37:24
42:5 51:10
59:1,14 60:15
69:15 80:9
81:4,20 82:9
83:4,8,23
86:10 90:21
93:14 101:14
101:20 102:16
103:2,7 104:3
113:22 116:3
118:20,22,23
119:1,4,6,22,23
120:8,13
121:12 122:7
122:12 123:2,9
**participated**
11:18 12:2
41:4 103:22
114:6
**participating**
6:3 19:22
21:21 24:12
25:5 28:6
30:24 37:2
45:5 71:21
81:17 89:12

97:5 98:16
100:1 109:10
120:1 124:8
**participation**
16:23 80:17,21
80:25 82:10,12
82:17 83:16,17
83:21,22
**particular**
12:14 22:15
29:25 30:12
38:25 46:24
60:19 77:3
79:21,22 80:25
81:10,15 83:14
86:14 87:6
90:11,15 92:21
96:1 97:14
99:16,21,25
103:9,19,23
104:16 106:21
107:13 115:8
116:5 126:8
**parties** 129:14
**parts** 74:2
**pastor** 2:13
**path** 126:17
**pay** 42:25
43:24
**payment** 18:24
**pennsylvania**
2:4
**people** 11:18,21
44:3,12 107:13

**percent** 25:7
42:15
**period** 109:14
**permanent**
86:10
**permissible**
57:10
**person** 46:25
63:9,16,17,19
63:20 64:7,8
64:17,17 65:15
65:19 66:2
69:6,20 116:12
**personal** 28:15
28:18
**perspective**
121:11
**petty** 118:5,8
**phase** 124:23
**philosophies**
21:14
**philosophy**
81:24
**phone** 2:5,11
**phonetic** 7:1
**picture** 57:18
**pinpoint**
113:20
**pinpointed**
56:5
**pivot** 45:10
**pl** 46:4,5 50:15
**pl105** 90:6
91:17 100:15

**pl55** 63:2
**place** 24:13
33:7 60:10
95:12 104:1
117:18 129:10
**placement**
27:13,15 34:21
36:7
**places** 27:21
**plain** 127:6
**plaintiffs** 1:5
2:2 3:4 4:13
6:7
**plans** 44:5
**played** 34:3
**please** 13:3
38:12 74:6
79:3 86:18
96:18 98:6
117:8 126:5
127:11
**po105** 79:2
**point** 7:12
29:12 50:25
59:12 60:19
87:22 90:16
91:18 119:20
**policy** 33:7
71:11 84:25
85:2,3,10
86:24
**portal** 11:7
21:12 34:18
**portion** 49:12
49:17,19

123:20,23
**posed** 117:15
**position** 9:6
28:20 29:6
76:20
**positive** 19:5
19:25 87:16
**possible** 27:5,8
33:25 41:14,15
80:9 91:25
121:25
**posted** 92:23
**potential** 93:2
**potentially**
91:21 98:20
**power** 108:14
**powering** 109:1
**pre** 42:21
**prefer** 27:9
**preference**
23:23,24 24:1
31:22 32:18
41:19 84:12,21
86:16 87:6,12
88:5,16 89:21
92:19,22 93:3
93:14,19 94:18
95:16 96:11,22
96:25 97:14
98:18 99:3
101:1 102:7
103:25 104:7
105:15 106:14
106:15 114:14
115:17,19

116:7 117:17
120:7,9,10
**preferences**
23:18 24:8
31:23 32:17,25
41:22 79:6,11
79:18 80:2,6
90:1,6 91:5,16
91:17,19 94:2
100:20 105:21
115:23 116:19
**preliminary**
5:11
**preparation**
6:11
**prepared** 9:1
47:13 48:9
**preparing**
48:15,18
**preschool** 1:10
3:15,19 9:9,21
12:11 15:7
17:13,17,20,22
17:24,25 19:2
19:9,22 21:22
27:1 28:11,13
28:25 29:2,25
29:25 31:14
32:12 33:16
34:12 37:16,22
39:9,16 40:1,5
40:7,17 46:16
47:4 51:1,3,18
51:19,22 52:11
56:21 60:14

64:10 65:16
68:6 75:7 76:6
81:12,12 84:10
88:13,24,25
101:4,10
105:22 106:7,8
109:11 113:23
118:12,18,19
122:6,9,13
124:8,12,17
**preschool's**
16:23 73:16
**preschools**
29:19 120:19
120:25 123:1
**present** 2:13
70:15 116:6
**presentation**
116:9
**presented** 50:8
**presumed**
89:15
**presuming**
57:18 87:16
**pretty** 25:13
28:8 29:2 36:6
39:6 56:4
87:20 102:24
**prevent** 5:21
**preview** 45:20
**previous** 10:2
19:4,22 37:22
41:4 113:22
114:6 124:11
129:6

**previously**
72:17
**prior** 13:25
39:21,24 48:21
95:7
**prioritization**
85:10
**prioritize** 85:25
87:25 90:12,22
90:25 91:9
**prioritized**
43:10 44:15
80:8
**prioritizing**
103:6
**priority** 42:2
88:21 90:10
**private** 10:11
**privilege** 15:22
16:3
**privileged**
16:17 125:24
125:25
**probably**
104:18 123:12
124:15
**problem** 70:15
**procedure** 3:2
33:11
**procedures**
29:17
**process** 14:1
16:2 18:11,19
18:22 22:10,10
22:13 26:19

27:3,16 28:7,7
28:10 29:10,17
29:18 30:4,5,8
30:11 31:8
33:2,4 34:7
39:3 40:3,11
40:21 47:25
56:8 57:21
59:17 60:18
71:4 78:8
86:20 95:2
116:23,23
126:17
**processed**
93:22
**processes** 24:24
96:8
**produce** 109:23
**produced** 6:7
**product** 109:23
**production**
94:20
**professional**
3:7 129:5,20
**profile** 20:18
24:22
**profiles** 25:20
**program** 1:10
3:15 6:3 9:9
12:11 14:5
15:8,16 16:10
16:13,23 17:6
17:17,20,21,23
18:14,16,17
19:4 21:13,24

**[program - providers]** Page 26

25:5 26:24
28:11 31:9,15
32:15,19 33:18
35:2,17 36:2,6
36:8,22 37:1
39:2,9,14,17,20
39:24 40:2,6,7
40:23 41:15
42:18,22 43:3
44:16,18 46:16
48:4 50:9
60:16 61:1
64:10 66:10
69:14,15 70:5
70:20 71:24
72:1 75:3,5
76:1,3,25
78:18,19,19,21
80:7 81:10
82:9 83:4,8,14
83:16,23 84:5
88:3,23 89:17
90:16,24 96:3
97:7,9,12,12,19
98:21,24
101:21 102:2,7
102:8 103:19
109:11,12
114:6 117:12
119:3 120:9
121:17 122:2
124:17

**program's**
116:7

**programatic**
105:21
**programatica...**
116:17
**programmatic**
124:21
**programming**
22:2 80:18
81:15 89:2
**programs**  6:14
21:19 26:25
39:15 43:1,8
43:25 99:5
**progressed**
35:17
**projected**
42:16
**projections**
42:4,9
**promulgated**
107:6
**proper**  55:3
**propose**  115:19
**proposed**
102:20 105:11
116:6
**protected**  73:9
**prov**  52:1
**provide**  14:17
18:25 20:19
22:1,2 38:22
51:1,11 59:9
59:20 61:3
84:13 88:12,20
88:24,25 89:1

101:12 104:1
121:8 122:16
125:3
**provided**  94:12
**provider**  3:17
18:8,15,24
19:19 20:9
21:18 23:16,20
23:21 24:12,14
24:21 25:1,11
25:23 27:3,18
27:23 30:7,9
30:24 31:6,8
32:2,9 33:1,2
33:16,16 34:11
34:23,24 36:25
37:2,23 38:10
38:15,16,19
41:11 45:4,4,7
45:12,16 47:2
47:9 50:17
51:1 52:12,23
53:14,15,15
54:6,15,21
55:5,20,21
57:4,9,23 58:2
58:6,19 59:12
60:12,14 61:2
62:8,14,17,18
62:24 63:2,9
63:16 64:16
65:16,16,18,21
65:22 66:1,6
66:14,14,24
67:7,7,16,17,19

69:5,17 70:11
71:7,11,14,16
71:20 74:21
75:7 77:3 78:9
78:25 79:7,12
79:22 80:16
81:19,20,23
83:7,14,18,25
84:16 87:17
90:1,5,9,11,14
90:15,18 91:7
91:20 92:4,18
93:2,13 95:14
96:2,6,9,21
97:4 98:13
99:15,25 100:6
100:21 101:1
103:23 105:16
114:21 115:8,9
115:9,11,13
116:5 119:7
120:17 124:10
125:12

**provider's**
40:15 46:24
63:21,22 71:10
74:15,23 75:9
75:21,25
104:10

**providers**  6:2
17:13 18:6,10
18:12,13,19
20:11,14,17
21:4,7,11 22:5
22:19 23:19

25:4,15,19,25
26:10 31:10,12
31:18,23 33:14
33:21,25 34:2
34:5,6,9,19
36:18,21 38:2
38:3 40:21,24
41:1,3,4,4,5,9
42:4,7 44:17
44:21 45:1
46:20 48:11,15
51:10 56:15,16
59:8,20 60:25
61:3,7,12 64:3
68:6 73:6,8
74:11 75:5
76:6,17,25
78:8 79:10,20
79:24 80:9,24
83:1,12 84:8,8
84:13 87:17
89:12 92:21
93:7 94:17,17
95:7,8,25 96:5
97:4,8 98:16
98:22 99:2,5,7
99:10 101:2,5
101:13 103:1
103:20 104:3,8
105:22 106:7
106:15 109:9
110:22 112:17
113:6,21
114:15,17
115:4,5,25

119:21,23
120:8,12 121:2
121:7,21 124:7
124:21 125:7
**provides**
112:16 123:8
**providing**
52:25 83:15
**provision**   51:13
51:15,25 52:13
53:11,18 54:17
55:7,16,23
56:22 57:11
60:22 63:5,8
63:23,25 64:20
65:15,17 66:16
66:24 67:4,5
67:15 68:3,11
68:13,15,17
69:3 70:3,15
73:4 74:9
75:20 76:17
**provisions**
50:13
**public**   3:8 5:18
10:1 128:18
129:5,21
**pull**   20:8 72:23
**pulled**   44:3
**purposes**   4:20
**pursuant**   3:1
**put**   19:24 21:11
21:12 46:1,9
78:14,16 95:12
116:11

**q**

**qualification**
18:23
**qualifications**
89:4,7,22
**qualify**   18:20
**qualifying**
18:19
**quality**   19:12
50:15,18,19
52:7 95:18
124:7,9,13,17
124:21,23
125:4
**question**   5:3,4
14:16 15:14
16:6,8 26:9
29:24 32:8
43:24 44:7
50:3 54:14,20
56:19 58:7
59:12 61:1
64:14 75:16
85:5 90:3
96:14,17,18
107:23,24
113:8 117:15
117:15 119:12
**questioning**
7:15
**questions**   4:21
5:12 15:25
28:2,18,25
29:4,13 30:25
48:21 65:6

71:21 78:13
95:9 101:22
102:1,3 108:19
108:22 109:12
113:21 114:1,2
114:7 115:11
123:22
**quick**   36:6
**quicker**   36:7,20
**quickly**   110:2
111:3

**r**

**r**   2:3,8 4:1
**race**   51:3 53:1
53:17 56:22
57:10 58:8
59:10,20 60:3
61:4,13,21
63:10 69:18
**raised**   15:18
16:9,14 41:9
91:20
**range**   22:1
**rank**   18:10
22:6 23:2
**rapid**   44:15
**rate**   18:16,17
102:3
**rates**   21:24
**rather**   4:22
27:21 100:11
**ratios**   60:12
**reach**   20:2 31:5
93:2 109:9
115:4

**read**  64:12,14
  74:5 77:8 98:5
  111:12 112:25
  113:2 127:13
  127:15 128:2
  130:9
**reading**  65:24
  111:16
**really**  4:13,19
  19:14,16,19
  26:14,17 33:24
  36:16 38:22
  41:12,25,25
  42:10 43:2
  48:22 56:14
  70:2 80:7
  87:15 95:11,22
  96:2,5 97:2,15
  102:13,24
  103:14,17
  104:2,14 110:2
  114:1,11,24
  116:9 121:19
**realtime**  3:8
  129:21
**reason**  57:19
  68:20 119:6
  130:11
**reaves**  2:3 54:5
**recall**  12:9,12
  17:4 93:21
  94:19 101:25
  102:22 111:12
  113:15 116:8
  120:16,21,21

**receipt**  130:18
**receive**  8:8 51:3
  51:18,19 88:19
  106:7,8 126:22
**received**  120:1
**receives**  88:11
  96:20,24
**recess**  37:13
  69:19 77:15
  124:3
**recipient**  113:9
**recognition**
  116:15
**recognize**  21:3
  46:13 72:14
  78:4 92:15
  104:12 110:7
  111:8 118:3
  122:14 125:20
**recognized**
  120:11
**recollection**
  72:24 111:17
**recommendat...**
  97:10
**recommendat...**
  109:24
**record**  5:18
  6:17,20 9:6
  14:13,14 29:16
  29:22 37:9
  46:2 77:14
  109:19 126:20
  127:18,23

**records**  26:5
**reduced**  129:11
**refer**  59:17
  65:7
**referenced**
  130:6
**referring**  73:1
  94:15
**refine**  90:17
**refresh**  45:22
  72:6 77:19
**refreshed**
  72:24
**refreshing**
  111:16
**refused**  70:13
**refuses**  52:24
**regardless**  51:3
  51:12 59:10,21
  61:4 106:9
  108:9
**regional**  17:9
**register**  18:6
  24:16,20 33:17
  46:21
**registered**  3:6,7
  20:18 24:25
  129:4,20,20
**registering**
  24:17 25:15,19
**registration**
  34:5
**regular**  14:3,21
  95:6 109:13

**regularly**  14:6
  14:16 20:14
  115:2
**regulation**
  105:14,15
**regulations**
  3:20 105:4
**reject**  23:21
**related**  28:2
  129:13
**relates**  124:17
**religion**  63:10
**religious**  2:4
  38:2 51:4 61:5
  61:13,22 65:4
  65:4,14 73:6,7
  73:8,16,16,23
  74:10,21 75:4
  75:11,14,21,25
  76:17 77:5
  106:9,21 117:4
  117:11 122:5
  125:7
**remember**
  11:24 12:13,14
  12:17,23 39:19
  65:2 92:23
  111:11 112:14
  116:8 125:9
**remind**  28:14
**reminder**  26:15
**remote**  1:12 3:2
**remotely**  3:5
  4:3

[repeat - rounds]

repeat  82:6
98:6
rephrase  54:14
75:16,17
replace  21:2
report  13:16
14:2,3
reported  30:19
reporter  3:7,7
3:8 4:2 7:9
13:2,6,8 14:10
14:12 47:17,21
54:1 58:16
59:23 61:17
74:5 79:14
98:4 126:21
127:1,7,10,12
127:15,18
129:5,20,20,21
reporter's
129:1
reporting  14:4
reports  13:17
13:21
representative
15:15 47:1
55:16 110:19
represents  41:2
request  92:24
93:3,18 96:10
101:16 117:11
requested  94:2
94:23 97:22
101:15,23

requesting
94:18
requests  95:2
require  31:10
68:16 80:17,22
84:8,16 85:18
86:3 100:21
102:17 104:8
required  24:4
25:1,23 40:22
64:2 68:14,21
77:2 83:2,16
124:23
requirement
24:14 51:1
62:14,18
106:16 125:2
requirements
83:22 117:4
121:13 123:1
requires  66:24
requiring
32:13 88:3
research  22:4
95:17
reserve  28:18
reserved
107:17
reside  20:4
85:16 87:14
residential  87:8
resourced
99:12,22
resources
125:3

respect  73:6
74:21 75:20
respond  80:1
120:3
responding
79:23
response  61:16
responsive  42:1
95:10 102:25
result  129:15
return  130:13
130:17
review  5:24
73:25 130:7
reviewed  6:1
48:3 78:22,22
116:20 124:22
reviewing  76:2
115:23
revisions
125:17
right  5:14 6:14
7:21 8:2,5,18
8:24 9:13
10:13 13:11
18:7 19:18
20:9 22:12
24:2,3 25:2
26:21,22 27:14
29:1 30:18
31:25 33:7,10
33:11,15,17
36:25 38:10,15
38:16,18 39:10
40:3 45:14

46:21 47:11
50:17,22 51:13
51:16 53:10
56:16 57:24
59:10,22 60:5
61:9 62:4,19
63:20 64:6,8
66:4,11 67:10
67:20 68:15,21
69:9 70:9 71:9
72:6,17 75:17
76:8 78:10,25
79:7,13 80:6
81:21 92:10
96:6 98:24
104:24 106:6
106:16 113:10
116:25 117:23
118:6,13,23
121:5 122:7
123:2,9
robust  96:4
role  9:19,20,23
10:10 13:13
121:20
roll  15:19
rolling  34:4
rollout  16:8,9
44:18
room  6:20,23
round  34:20
35:4,15,16
36:1,11,13
rounds  36:5

route   20:24
roy   1:7 2:14
   6:22 11:9,11
   11:12 13:11,18
   13:21,23
   108:18,20,22
   130:4
roy's   123:23
rule   3:14
   104:19,22
   105:22 108:1
rules   3:2,19
   4:17 107:6
run   81:12
   108:8
runs   23:13
rust   6:24

**s**

s   3:6 4:1 129:4
   129:19
sat   117:14
savings   19:19
saw   45:4
saying   29:21
   49:18 52:5
   56:5 64:16
   67:9 74:20
   75:19 76:25
   80:16 85:8
   112:20 118:19
says   29:16
   45:20 50:17
   59:8,19 61:24
   63:8,19 64:9
   65:18 73:3

74:4,8 76:19
80:15 81:3
82:11 94:23
96:9 97:22
105:20 106:6
106:12 112:10
112:18,19
118:23 119:5,5
119:9
scenario   32:11
32:24 52:23
56:4,24 57:3
57:15 62:16
66:18 71:3
schedule   97:12
110:14
scheduled   14:6
14:17 115:2
school   11:3
22:22 23:15
27:17 33:8
37:21 38:1
43:21 45:7
62:1,2 84:15
84:17,22 85:2
85:8,16,17,20
86:1,4,14,15,23
87:6,9,12,20,22
90:9,9 93:18
93:19,20 98:11
98:14 99:4,10
99:19
school's   73:16
schools   10:1
18:3 121:12

scope   9:18 29:6
29:9 57:3
screen   91:24
screened   83:8
screening
83:11
script   127:5
scroll   72:19
79:2 94:22
100:15 105:6
106:1 118:17
119:11
search   20:20,22
seat   30:2 32:2
32:12,13
seats   31:10,13
31:14,15,17,18
31:19 32:15
42:11 90:23
second   35:16
74:3,10 98:25
125:18
section   50:14
105:22
sector   10:12
see   25:21 26:5
36:10 44:11
46:9 49:22
50:14 51:8
63:5,14 72:24
73:11 74:13
80:19 83:9
84:2,7,18 88:8
93:24 97:23
98:17 100:23

105:24 106:4
106:25 108:24
119:9
seeing   34:3
36:3
seek   18:7 29:17
126:16
seen   104:19
selected   11:4
22:5
send   93:4,15
96:23 122:6
sense   40:2
80:14
sent   8:9 93:7
130:14
separate   99:14
series   11:7
serve   84:4,23
85:12 86:21
87:4 88:2
89:14 99:7,10
99:22
served   90:9
95:21 100:5
serves   98:10,12
98:13 99:1,16
service   3:15
services   12:25
18:25 47:16,20
48:9 49:15,24
50:9 51:3,18
51:19 69:15
88:12,20,24
89:1 106:9

112:16 121:8
124:8
**set** 9:22 17:7
22:13 35:4
39:6 40:17
42:6,9 43:25
44:21 54:3
62:24 66:16
71:13 85:9
86:24 106:22
106:23 108:5
121:3 124:19
129:10
**setting** 19:12
79:5
**several** 11:18
56:25
**sex** 62:13 69:18
69:21 70:14
**sexual** 51:4
61:5,14,21
62:3 63:11
106:9 108:9
**share** 8:14
41:14 81:23
106:22 114:11
**sheet** 130:11
**sheley** 1:4,4
**shine's** 124:20
**shooting** 42:15
**shorthand**
129:10
**show** 20:18
78:7 85:18
86:4,13

**showing** 92:10
**shown** 19:3
114:22
**shows** 27:17
95:17
**sibling** 22:14
23:4 116:18
**side** 23:14 30:6
46:24 47:7
49:24,24 75:3
**sign** 24:21 25:1
25:24 26:3,11
44:23 46:20,23
46:25 48:11
56:15 62:19
66:25 71:15
95:9 127:13,16
130:12
**signature**
129:18
**signed** 25:6,10
59:16 60:17
130:20
**significant**
36:12 123:8
**significantly**
35:2
**signing** 25:25
65:23 71:8
**signs** 47:6
57:23 65:16
71:7
**similar** 39:14
91:8 103:18

**similarly** 70:12
**single** 40:15
**sir** 98:4
**site** 21:18
**situation** 30:12
32:24 52:19
53:3,12,23
54:25 56:11
59:3 91:8
126:8
**skipped** 100:20
**skipping** 74:10
**slow** 74:6 98:5
**small** 37:25
45:6
**smith** 2:14 6:25
**social** 19:11
**socioeconomic**
63:12
**sole** 55:14
**solid** 39:6
**solutions**
130:23
**soon** 27:5,8
**sorry** 14:12
28:22 47:17,17
49:16 54:1,1,2
58:16 59:9,23
63:24 64:11
74:5,7 75:13
75:13 77:6
79:14 82:5
83:20 92:2
93:20 98:4,4,7
99:13 106:3

**109:16** 110:25
127:4,14
**sort** 15:18 17:6
20:8 26:2,18
30:19 42:25
43:11 53:9
72:24 105:19
110:13
**sought** 53:15
**sound** 4:23
**space** 97:25
**speak** 40:5
48:23 49:3
67:6,7 71:10
85:21,24 87:23
125:19
**speaking** 40:6
**speaks** 60:9
**special** 99:12
**specialists**
17:10,18
**specific** 15:7
16:20 31:23
40:12 42:6
45:3 59:3,15
60:25 62:15,24
64:4,6,10 66:3
66:8 71:3,9
72:1 77:4
80:24 83:2,15
83:16,17,24
85:9 88:20
89:14 90:15,16
92:19 94:14
97:4,19 98:12

99:1,5,6,8,9,9
99:11,22 108:4
111:12 113:20
113:24 114:9
114:10,23
115:11,13
116:9 119:15
120:16,17,21
122:22
**specifically**
15:5 29:9 38:8
49:1 50:12
51:16 68:17
73:25 74:17
76:7 82:2,23
83:25 100:3
102:1,23
114:16 115:22
116:1 117:3
121:1 124:16
**specifics** 43:7
43:14 49:20
59:18 60:18
**speculate** 30:14
32:23 53:2,22
57:17 59:4
62:15 66:18
71:2 98:20
113:3 126:10
**speculation**
30:21 52:15
57:12 58:10,23
62:6,20 69:23
70:17,25 71:18
81:25 86:17,25

89:10 91:11
100:7 107:20
112:5,23 119:9
122:8 123:3
**speech** 19:10
**st** 1:2,3 118:13
130:4
**stacy** 118:5,8
**stage** 80:7
**stakeholders**
12:2,4,8
**stamp** 46:1,10
**standard** 22:17
22:18 49:14,21
**standards**
50:18,19,24
52:7 124:18,23
**stands** 66:10
112:16
**start** 5:5 16:13
18:14 24:12
25:12 32:19
35:2 37:2 38:1
39:7,20,21,23
39:25 80:15
88:6,10,11,12
88:17,18,23
89:10,10,12
117:20
**started** 9:12
26:25 33:8,9
35:14 37:8
39:19 61:1
**starting** 26:7
33:15 39:13

44:14 66:17
**state** 3:9 9:21
10:3 11:6,14
11:21 17:12
30:15 31:1
37:5,22 39:23
41:4,24 42:7
65:5,9 66:10
87:19 89:17
93:23 97:17
111:25 112:17
113:22 116:4
120:25 124:12
128:3 129:5
**stated** 71:25
**statement** 6:1
**states** 1:1 42:17
42:21 43:21
44:3
**status** 63:12,13
**stay** 69:19
95:20
**stephen** 118:13
**steps** 60:20
66:22 71:4
**strike** 57:6
61:20 73:13
76:14 90:2
94:24
**string** 3:22,23
**strong** 122:5
**structure** 14:4
15:24 17:6
28:5,12

**student** 52:12
52:24,24 53:14
53:16 54:7,7
54:16,16,21,22
55:5,6,21,22
56:21 58:14,15
58:21,22 59:7
61:8,12 62:3
62:12 64:18
70:13,13,14
99:22
**student's** 53:16
57:9 64:18
**students** 51:11
58:8 60:3,4
63:18 67:11
71:13 85:10
86:1 90:10,12
91:1,2,3,9
93:20
**stuff** 37:8
**subject** 106:16
**submitted** 6:2
**subscribed**
128:13
**subsection**
105:19,20
**successfully**
44:25
**suggest** 54:20
**suite** 2:4
**supervisor**
11:12 13:11
**supply** 82:12

**[support - think]**                                           Page 33

| | | | |
|---|---|---|---|
| **support**  17:12<br>  17:18 20:15<br>  116:18,21<br>**supporting**<br>  20:13 125:2<br>**supports**<br>  111:24<br>**supposed**  46:23<br>  46:25 79:10<br>**sure**  8:13 9:20<br>  11:16 14:4<br>  17:7,24 18:5<br>  20:12 21:9<br>  25:12 26:9<br>  28:4,19 39:5<br>  39:18 41:21<br>  42:15 52:18,23<br>  65:10,24,25<br>  70:2 74:7<br>  75:15 76:13<br>  87:11,20 96:19<br>  97:20 98:7,15<br>  99:13 106:2<br>  111:10,14<br>  117:9 120:15<br>  123:25 124:11<br>  126:6<br>**swear**  4:3<br>**switch**  10:23<br>**sworn**  4:7<br>  128:5,13 129:8<br>**system**  18:5,6<br>  20:17 21:2<br>  22:7 24:16,17<br>  24:20 25:10,13 | 26:3,20 27:2<br>30:19 37:16<br>38:4,7 39:24<br>44:25 78:8<br>116:17 121:11<br><br>**t**<br><br>**tab**  91:24<br>  100:15<br>**table**  29:24<br>**take**  7:14,16,18<br>  26:19 45:21<br>  46:10 56:7<br>  65:25 88:1<br>  89:13 105:5<br>  108:13,23<br>  111:10 123:11<br>  123:17,22<br>**taken**  3:5 66:22<br>  71:5 114:10<br>  129:10<br>**takes**  36:4<br>**talk**  5:1 6:11<br>  21:19 24:7<br>  52:9 65:14<br>  83:25 100:19<br>  105:18,19<br>**talked**  20:7<br>  26:18<br>**talking**  7:17<br>  26:15 28:10<br>  92:5 94:13<br>**targeted**  19:4<br>**tdc**  48:23<br>**teacher**  10:19<br>  10:20 | **teachers**  73:16<br>**team**  17:7,18<br>  30:16 31:2<br>  36:2 39:23<br>  42:1 47:16,20<br>  48:7 49:1,15<br>  50:6 78:16<br>  93:23 102:8,10<br>  113:6 114:18<br>  116:7 119:3<br>  126:14<br>**technical**  78:7<br>**technology**<br>  78:16<br>**tee**  5:2 72:3<br>**teen**  98:11,14<br>**tell**  28:1 53:10<br>  77:3 80:5<br>  112:16<br>**telling**  53:9,13<br>  54:15 55:19<br>**tells**  81:19<br>**template**  48:14<br>  48:17<br>**term**  19:13<br>  27:9 49:23<br>  78:12<br>**terms**  28:3<br>**testified**  4:8<br>  44:20 55:17,24<br>  56:16 64:7<br>  66:13 96:21<br>**testify**  49:6<br>  89:19 129:8 | **testifying**  8:23<br>  28:15 67:24<br>  72:25 76:16<br>**testimony**<br>  54:10,18 60:7<br>  76:10 87:1,11<br>  128:3,5 130:9<br>  130:18<br>**thank**  4:15 13:8<br>  13:9 20:6<br>  29:14 44:19<br>  47:21 67:14<br>  77:10 96:7<br>  116:25 125:5<br>  126:19 127:19<br>**thanks**  7:3<br>**thing**  21:15<br>  64:2 102:5<br>**things**  15:11<br>  20:7 21:16<br>  40:12 43:9<br>  121:22 124:5<br>**think**  7:15 8:22<br>  11:24 14:15<br>  28:8,12 29:8<br>  29:15,23 39:14<br>  43:23 44:10,20<br>  46:10 56:17<br>  57:14,14 60:9<br>  64:7,15 65:10<br>  65:10 66:12,17<br>  67:3 69:2,6<br>  72:6 73:5<br>  77:11,11 79:9<br>  85:5 91:13 |

97:15 102:13
103:13 113:25
115:6 118:25
121:16 123:12
123:17,19
126:9,15,18
**thinking**   43:16
44:12 109:10
**thought**   10:25
30:24 77:9
**thoughtful**
34:14 95:22
102:14 103:15
104:15
**three**   17:17
23:1,5
**thrive**   19:17
**tied**   82:22
85:11 120:22
**tim**   2:13 6:23
**time**   4:14 13:24
18:16 19:3
31:15 36:4
48:3,24 65:25
69:19 81:9
83:3 87:22
90:16 91:18
103:13 104:14
105:5 109:14
110:24 111:10
115:2 119:20
119:24 120:7
120:13 121:2,3
126:19 127:22
129:10 130:19

**timeframe**
130:8
**timeline**   25:13
44:15 102:24
**times**   56:25
115:10
**titled**   78:9
**today**   5:12,17
8:4,23 112:10
**today's**   5:25
8:9
**toddler**   21:22
**together**   41:8
48:2 78:14,16
128:4
**told**   119:3
**tomorrow**
28:15
**ton**   108:12
**took**   5:13
115:20
**top**   26:8 43:9
93:22 105:9
**topic**   28:2,8
29:3,12,16
**topics**   8:8,23,23
9:2 15:23
28:17,24
108:19
**total**   57:3,15
69:13 127:22
**touch**   15:17
**tours**   21:6
**track**   82:17

**trajectory**
19:13
**transcript**   4:20
126:21 128:3
129:12 130:6
130:20
**transgender**
58:22 60:5
70:12 71:12
**transition**
34:21 36:8
39:18,22 47:15
48:5,8 49:1
78:22 101:8,19
109:8,17
110:24
**transitioned**
35:23
**trend**   97:3
**trends**   95:10
**tried**   45:22
**true**   59:11
61:19 129:12
**truly**   95:11
**trumps**   66:10
**truth**   129:8
**try**   5:1 7:14
32:11 77:19
80:14 92:1
123:14
**trying**   11:24
20:1,9 21:11
26:2 32:20
36:16,17 54:23
56:14 64:1

65:2,7 76:13
77:25 95:22
102:13 103:14
104:2,6,14
112:14 113:3
120:20
**tubbs**   3:6 129:4
129:19
**tuned**   121:1
**turn**   100:14
**two**   17:8 28:5
28:20 48:4
74:2 94:5
**type**   41:12
42:22 45:4
79:22 82:12
97:4
**types**   45:5
87:17 95:14
102:2
**typewritten**
129:11
**typical**   113:24
**typically**   14:19
27:12 36:21
54:25

**u**

**uh**   4:22,22
**ultimate**   13:18
**ultimately**
48:10 102:6
**unable**   81:3,20
83:3,3 118:19
118:23 119:4

**under**  57:10
 58:8 63:22
 70:15 86:15
 104:4 128:3
**understand**
 5:16,19 7:5,23
 8:3 15:23
 30:14 56:6
 57:2 66:19,24
 75:16,24 88:15
 99:14 104:6
 107:9 109:13
 114:12
**understanding**
 11:19 15:16
 49:13,20 53:11
 55:15 57:15
 64:19,25 65:1
 66:1 68:20
 73:22 75:23
 86:6 89:19
 103:12,18
 104:9 107:15
 108:1,10
 110:17 111:23
**understood**
 5:13 44:8
 69:11 96:17
 112:22 119:21
 121:18,19
**unhomed**  87:4
**unhoused**
 86:11 87:13,13
**unified**  40:13
 43:6

**unique**  38:9
 87:18 115:5
 121:23
**uniquely**  43:4
**unit**  17:14
**united**  1:1
**universal**  1:10
 3:15,19 9:8,21
 15:7 17:13,17
 17:20,22,24
 19:6 20:1
 21:21 27:1
 28:11,13,25
 29:2 31:14
 32:12 39:9
 40:7,17 42:18
 42:21 46:16
 60:14 68:6
 101:4,10 106:8
 109:11 122:9
 124:12,17
**unknown**  34:1
**update**  14:8,21
 14:24 15:5
**updates**  14:5
 14:18,20 15:10
 16:12
**uphold**  57:19
**upholding**  54:5
**upk**  3:15,17
 9:11,14,15,19
 9:24 11:5,15
 15:6,10,19
 16:9,10,23
 17:6 19:2

 20:11 24:13
 25:4 26:20
 28:5,6,21 29:7
 29:18 30:11,19
 33:12,16,17,20
 36:25 37:3,15
 39:2 42:5 43:1
 46:21 47:24
 49:7,24 50:6
 51:10 52:3
 69:16 80:4
 86:10 90:21
 91:10 92:20
 93:14 96:22
 98:13 99:2,7
 99:14 100:1,6
 103:7 112:4,21
 113:17 117:5
 117:12 118:20
 119:7 122:7
 123:2,8 124:7
**upker**  31:21
**uptake**  42:16
 42:17
**use**  70:13 78:12
 102:4
**used**  92:24
 93:18 130:20
**using**  94:2 95:2
 95:2
**usually**  14:8
 82:22
**utilize**  33:11
 34:18 80:24
 106:15 122:19

**utilizing**  105:21

**v**

**v**  130:4
**variety**  38:22
 86:7 112:17
 115:3
**vary**  115:9
**veer**  28:16
**vendors**  17:19
**verbal**  4:21
**verification**
 18:23
**verified**  86:7
**verify**  85:21,21
 85:23 130:9
**veritext**  2:13
 130:14,23
**veritext.com**
 130:15
**vet**  125:3
**view**  29:2
**violate**  52:13
 53:18 55:6
 56:22
**violation**  54:17
 55:22 57:21
 70:23
**virginia**  2:8 6:5
 6:21 7:3 29:14
 42:23 64:23
 94:12 130:1
**virginia.carre...**
 2:11 130:2
**volume**  27:5
 36:19

**voluntary**  59:1
59:14 71:24
119:2 122:9
123:5
**volunteer**  81:9
83:2
**volunteering**
81:17 82:3,9
**vs**  1:6

**w**

**walk**  26:21,23
27:10 33:3,6
80:13
**walking**  20:23
**want**  4:16
10:23 11:1,1
20:8 27:7
28:14 29:15
30:13,13,14
35:8 38:6,18
38:22 40:24
45:12 50:2,12
55:1 57:17,20
59:3 60:15
65:9,13,13
66:19 69:1,3
72:23 74:1,2
80:13 91:23
92:6 94:22
95:18 97:21
98:1,22,22
99:13 100:19
105:18,18
108:13,23,24
122:21 124:4

124:14 127:12
127:15
**wanted**  27:3
33:24 34:3,13
91:9 95:20
96:2 122:16,18
**wants**  25:23
67:4,4
**washington**  2:5
**way**  15:19 19:2
19:4,12 22:12
26:18,19 27:4
39:14 41:16
43:5,24 68:22
77:4 80:6
86:23 107:22
108:8 122:19
**ways**  28:5
43:19 81:18
86:8 121:7,25
**we've**  31:18
34:4 35:17
39:4 90:2
111:14
**website**  92:21
**week**  18:18,21
35:15,16,18,19
35:20 36:5
**weekly**  35:13
**weight**  22:13
22:24 23:3,6,7
23:10
**weighted**  23:2
23:2

**weights**  23:3
41:21 95:14
**went**  11:2,6,7
26:4 35:16
36:5 42:17
93:19 95:4
**whitehair**  2:9
7:2 127:3,5
**witness**  4:3 8:4
64:25 108:19
119:12 130:8
130:10,12,19
**woman**  107:18
**word**  47:18
**work**  5:6 7:10
7:19 14:7
17:18 20:24
22:11 27:16
36:22 37:10
39:15 41:7,8
48:5,6 109:23
123:15,24
124:12,21
**worked**  10:11
10:16 39:23
41:12,25 42:10
**workforce**
95:23,23 125:3
**working**  8:14
11:1 17:14
28:11 39:13
48:14,18 101:8
101:17 102:24
109:6,7,22
110:11 112:21

113:14,18
114:16,20,21
114:21 115:18
116:1 120:23
122:24
**works**  17:17
26:19
**wrap**  7:14
**writing**  12:10
115:19 116:12
**written**  3:1
14:24 60:22
66:3 90:16,17
103:14 104:14
109:23,24
125:12
**wrote**  87:15

**y**

**yeah**  6:16 12:6
15:12,16 19:3
20:3 21:17
23:25 25:25
26:1,9,12 28:9
32:1,5 35:9
36:15 40:10
41:21 43:11
44:10 52:16,21
56:3 57:5,14
60:9 61:11
62:23 67:2
69:12 71:2
75:3,17 85:8
85:22 87:3
89:11 91:13
92:4 93:1,21

**[yeah - yields]**                                    Page 37

94:6,16 96:7
97:15 100:9
102:8,22
103:13 104:5
104:12 111:16
112:8,24 113:2
113:19 115:21
117:13 120:21
121:6,16
123:16,19
125:18 126:9
126:24
**year**   18:1,1
20:5 21:24,24
25:12,18,20
26:24 31:19
32:16 33:9,24
34:14 35:3,17
36:7 37:1
42:16 94:8
121:7 122:20
125:18
**years**   37:1
**yield**   83:24
**yields**   95:17

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Approved Exception Criteria List

We recognize that certain programs and providers may require additional information from families to participate in their programs. These include providers like faith-based, co-op, or immersive language programs.

Please complete the following application. If you have any questions, please contact your Local Coordinating Organization (LCO). You can find your LCO here.

Switch account

Not shared

* Indicates required question

Contact Name *

Your answer

Email address *

Your answer

Phone number *

Your answer

Provider Location Name *

Your answer

**Exhibit
0005**



License Number *

Your answer

Which Local Coordinating Organization (LCO) are you affiliated with? You can find *
your LCO here.

Choose ▾

**Exception Requested** (i.e. My location only serves teen moms enrolled at a *
neighboring high school; My location only serves children with specific
disabilities.) **Please provide any relevant information about the Program.**

Your answer

**Submit**                                                                    Clear form

Never submit passwords through Google Forms.

This form was created inside of State.co.us Executive Branch. Report Abuse

Google Forms