Exhibit 5

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2       _____
3
        ST. MARY CATHOLIC PARISH IN
4       LITTLETON; ST. BERNADETTE
        CATHOLIC PARISH IN LAKEWOOD;
5       DANIEL SHELEY; LISA SHELEY; and
        THE ARCHDIOCESE OF DENVER,
6
               Plaintiffs,              Case No.
7                                       1:23-cv-2079-JLK
8       vs.
9       LISA ROY, in her official capacity
        as Executive Director of the
10      Colorado Department of Early Childhood;
        and DAWN ODEAN, in her official
11      capacity as Director of Colorado's
        Universal Preschool Program,
12
               Defendants.
13      _____
14       REMOTE 30(B)(6) DEPOSITION OF COLORADO DEPARTMENT OF
                  EARLY CHILDHOOD BY LISA ROY, ED.D.
15                       November 8, 2023
        _____
16
17
18
19
20
21
22
23
24
25

```
                                              Page 2
 1      APPEARANCES:
 2      ON BEHALF OF THE PLAINTIFFS:
                   JOSEPH C. DAVIS, ESQ.
 3                 NICHOLAS R. REAVES, ESQ.
                   AMANDA G. DIXON, ESQ.
 4                 The Becket Fund for Religious Liberty
                   1919 Pennsylvania Avenue, N.W., Suite 400
 5                 Washington, D.C.  20006
                   Phone:  202-955-0095
 6                 Email:  jdavis@becketlaw.org
                   Email:  nreaves@becketlaw.org
 7                 Email:  adixon@becketlaw.org
 8      ON BEHALF OF THE DEFENDANTS:
                   VIRGINIA R. CARRENO, ESQ.
 9                 NICOLE SIOBHAN RUST, ESQ.
                   T. GREG WHITEHAIR, ESQ.
10                 Colorado Attorney General's Office
                   1300 Broadway
11                 Denver, Colorado  80203
                   Phone:  720-508-6000
12                 Email:  virginia.carreno@coag.gov
13
        ALSO PRESENT: Alexa Pastor, Vertiext Concierge
14                   Tim Derocher
                     Dawn Odean
15                   Bonnie Smith
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                    PURSUANT TO WRITTEN NOTICE and the

2       appropriate rules of civil procedure, the remote 30(b)(6)

3       deposition of Colorado Department of Early Childhood by

4       LISA ROY, ED.D., called for examination by the

5       Plaintiffs, was taken remotely, commencing at 1:32 p.m.

6       on November 8, 2023, before Laurel S. Tubbs, a Registered

7       Professional Reporter, Registered Merit Reporter,

8       Certified Realtime Reporter and Notary Public in and for

9       the State of Colorado.

10                              INDEX

11       EXAMINATION:                                  PAGE

12       By Mr. Davis                                    4

13       EXHIBITS:                                     PAGE

14       Exhibit 10   Email                             9

15       Exhibit 11   Letter Dated February 17, 2023    14

16       Exhibit 12   Letter Dated February 28, 2023    22

17       Exhibit 13   Email                             24

18       Exhibit 14   Email Chain                       34

19

20

21

22

23

24

25

```
                                                  Page 4
 1                    P R O C E E D I N G S
 2                THE REPORTER:  Do all counsel agree to the
 3       deponent being sworn remotely?
 4                MR. DAVIS:  Yes.
 5                MS. CARRENO:  Yes.
 6                    LISA ROY, ED.D.,
 7       having been first duly sworn or affirmed, was examined and
 8       testified as follows:
 9                         EXAMINATION
10       BY MR. DAVIS:
11                Q.   Good afternoon, Dr. Roy.
12                A.   Good afternoon.  How are you?
13                Q.   I'm well.  Thank you very much.
14                My name is Joe Davis.  I'm one of the
15       lawyers for the plaintiffs in this case.  And I'm really
16       grateful for your time with us this afternoon.
17                A.   Thank you.
18                Q.   I -- I know you were in the room for the
19       first piece of this 30(b)(6) deposition.  So maybe a
20       little bit of repetition, but I'll try to go faster
21       through the preliminaries this time.  But I just want to,
22       you know, go over some ground rules.
23                The first is, it's really important to give
24       verbal answers, so "yes" or "no," rather than "uh-huh" or
25       "huh-uh" or nodding or shaking your head, for purposes of
```

Page 5

1     the transcript.

2                   Another one is that it's very important

3     that we not talk over each other.  And I was doing that a

4     bit the last time around, and I'll try to do better this

5     time.

6                   So does this make sense?

7          A.   Yes, it does.

8          Q.   Great.

9                   So a couple of preliminary questions,

10    Dr. Roy.  You understand that you're under oath today?

11                   THE REPORTER:  Verbal answer.

12                   THE DEPONENT:  Yes.

13         Q.   (By Mr. Davis)  And you understand that

14    what you say here can be introduced in court and will

15    become part of the public record?

16         A.   Yes.

17         Q.   Is there anything that will present --

18    prevent you from giving your full attention or giving full

19    and clear answers?

20         A.   No.

21         Q.   Did you review any documents in preparation

22    for this deposition?

23         A.   Yes.

24         Q.   What documents were those?

25         A.   They were documents that we submitted.

Page 6

1          Q.    Submitted to us in the discovery process?

2          A.    Yes.  That is correct.

3          Q.    Okay.  Other than your counsel, did you

4     speak with anybody else preparing for this deposition?

5          A.    No, I did not.

6                MR. DAVIS:  Okay.  And can we just

7     establish for the record who else is in the room,

8     Virginia?  Would you mind running through that?

9                MS. CARRENO:  Sure.  Virginia Carreno.

10    Also have Tim Derocher from the Department of Early

11    Child; Dawn Odean from the Department of Early Childhood;

12    Niki Rust, who's an attorney with the A.G.'s office;

13    Michelle Lonhausen [phonetic], who's an attorney with the

14    A.G.'s office; and then our paralegal, Bonnie Smith.

15                Greg Whitehair, another attorney with our

16    office.  He is not in the room right now, but I

17    anticipate that he may rejoin us at some point today.  So

18    just to give you a heads-up that he will probably be here

19    as well.

20                MR. DAVIS:  Great.

21          Q.    (By Mr. Davis)  And, Dr. Roy, you

22    understand during the deposition, it's only appropriate

23    for you to communicate with your counsel, with the court

24    reporter, and with me?

25          A.    Yes, I do understand that.

Page 7

1              Q.   Okay.  Great.

2                   And, you know, depending how long we go,

3    we'll certainly take some breaks.  But I just want -- do

4    you understand that during the breaks it's inappropriate

5    for you to discuss the content of the deposition with your

6    attorney?

7              A.   Yes, I understand.

8              Q.   Okay.  And then finally, you know, this is

9    the second half of a deposition in which you're

10   representing the Department of Early Childhood.  And

11   you're prepared to speak on the two remaining topics on

12   that list of topics; is that right?

13             A.   Yes, I am, to the best of my ability.

14             Q.   Great.  Okay.

15                  So just to get it on the record, Dr. Roy,

16   what's your -- what's your position?

17             A.   I am the executive director.

18             Q.   Of the Department of Early Childhood?

19             A.   Yes, the Colorado Department of Early

20   Childhood.

21             Q.   And how long have you been the executive

22   director?

23             A.   I have been the executive director

24   officially since July 1st of 2022, when the department

25   started.

Page 8

1          Q.   Okay.  You were the first executive
2    director, right?
3          A.   I am the first and only, yes.
4          Q.   Were you appointed by the governor to that
5    position?
6          A.   Yes, I was.
7          Q.   Was there a confirmation process?
8          A.   Yes, there was.
9          Q.   Who had to confirm you?
10         A.   It was members of the legislature that
11   confirmed me.
12         Q.   Okay.  What position did you hold before
13   becoming director of the Department of Early Childhood?
14         A.   I was the director of improvement and
15   development for the Buffett Early Childhood Institute at
16   the University of Nebraska.
17         Q.   Okay.  But you've had previous experience
18   with education in Colorado as well, right?
19         A.   Yes, before that position, I did, yes.
20         Q.   Okay.  What was that role?
21         A.   I was the executive director for the
22   Department of Early Childhood for Denver Public Schools.
23         Q.   Okay.  And as executive director, what's a
24   general statement of what that role entails?
25         A.   I am responsible for the operations,

Page 9

1    programs for the Department of Early Childhood.

2              Q.   Okay.  And you oversee the UPK division?

3              A.   Yes, that's one of many programs that's

4    housed within the department.

5              Q.   Okay.  What are the other divisions that

6    are sort of the same level as the UPK division within the

7    department?

8              A.   We have workforce, our licensing, quality

9    initiatives, then we have family and community supports,

10   which include many different programs as well.

11             Q.   Okay.

12             Dr. Roy, when did you first become aware

13   that the Archdiocese of Denver's preschools were

14   requesting an exemption from the UPK program's

15   nondiscrimination requirements?

16             A.   I don't remember the exact date, but I do

17   remember receiving a letter expressing concerns and

18   requesting an exemption, I believe.

19             Q.   Okay.  I'm just going to mark an exhibit

20   really quickly.

21             (Exhibit 10 was marked.)

22             Q.   All right.  Just let me know when you --

23   when you've got Exhibit 10.

24             A.   Okay.

25             Would it come up with Veritext.

1          Q.   Yes.  It should be -- are you in the

2     Exhibit Share platform?

3          A.   I am.  Let me go back.  I might have done

4     the split already.

5          Q.   If you -- if you're in the marked exhibits

6     folder, I think if you hit "refresh," the new -- new thing

7     should populate.

8               (Discussion off the record.)

9          A.   Okay.  Yes.

10         Q.   (By Mr. Davis)  Great.  Take a moment to

11    review this -- this document and let me know when you're

12    done.

13         A.   Okay.

14         Q.   Do you recognize this email exchange?

15         A.   I do know that it was brought up, yes.

16         Q.   Okay.  It looks like the original email

17    there at the bottom was from you, and it's asking about a

18    meeting that was proposed?

19         A.   Mm-hmm.

20         Q.   Is that a "yes"?

21         A.   Yes.

22         Q.   And then there's a response from Michael

23    Cooke.

24              Can you just remind us who Michael Cooke

25    is?

Page 11

1          A.    Michael Cooke was the transition director

2     before I started, and continued on, yes, in June.

3     Mm-hmm.

4          Q.    Okay.  Okay.  Great.

5                So your original email asked if there was

6     an agenda for the meeting, and it looks like Michael

7     responded, "It is about the Archdiocese requesting an

8     exemption to the equity statement on religious grounds."

9                Do you see that?

10         A.    Yes, I do.

11         Q.    Okay.  Did you attend this meeting?

12         A.    No, I did not.

13         Q.    Okay.  Why not?

14         A.    I actually believe I had another meeting.

15    That's why I was asking what was the agenda.

16         Q.    Okay.  Did you ever circle back and discuss

17    this issue with Michael?

18         A.    I do not remember exactly when I did

19    circle back, if it was this day or another day, but, yes,

20    I did have a conversation with Michael about the pilot,

21    and who the letter came from, the numerous religious

22    providers.  We had a conversation.

23         Q.    Okay.  What is your understanding of what

24    the equity statement is?

25         A.    Well, my understanding of the equity

1    statement was it was around what the statute said around

2    practicing nondiscrimination.

3                Q.   Okay.  The provision requiring equal access

4    regardless of a list of identities?

5                A.   Yes.

6                Q.   Okay.  What is the pilot?

7                A.   Happy to tell you.  The pilot is -- we

8    hired a consultant because some of -- from this group,

9    religious-based providers, there was a concern around our

10   rate and our ability to ensure that families could

11   participate because our rate was smaller than what some

12   of our religious-based providers charged.

13               Q.   Which provider raised that concern?

14               A.   There was several, some religious-based

15   and some not.  But some of our Jewish preschools brought

16   this to our attention.

17               Q.   Okay.  Did the pilot -- did the pilot

18   happen?  Was there a pilot program?

19               A.   No, there was not a pilot program.  We put

20   together resources to help providers, but, no, there

21   ended up not being a pilot.

22               Q.   Why not?

23               A.   Mainly because the providers did not agree

24   with the options that were given them.

25               Q.   What -- I'm sorry, what do you mean?  Which

1    options?

2              A.   So the options were -- from a business

3    perspective, as you can imagine, there's a bottom line.

4    So in looking at what our rules were for the tuition, a

5    provider could decide that they could take a certain

6    number of children and still meet the bottom line.

7              And so some providers did decide to do

8    that.  It wasn't considered a pilot.  They just said,

9    okay, we can take a certain number of students.  Others

10   just said they just didn't feel that they could

11   participate at this point in time.

12             My understanding is that since that --

13   this time, they have joined in with the preschool

14   program.

15             Q.   Okay.  Would the pilot program still have

16   been subject to what we're calling just now the equity

17   statement?

18             A.   The pilot program and any program that we

19   work with is responsible for ensuring that they do not

20   discriminate against children.  That is correct.

21             Q.   Children or their families, right?

22             A.   Could you say that again?  I'm sorry.

23             Q.   I just said children or their -- or their

24   families, right?

25             A.   Children specifically.

Page 14

1          Q.   Okay.  I'm going to mark another exhibit.

2               All right.  Let me know when you've got

3     Exhibit 11.

4               (Exhibit 11 was marked.)

5          A.   Okay.  I see my name.

6          Q.   Great.  Great.

7               Do you recognize this document?

8          A.   I do recognize this document.

9          Q.   Okay.  Is this the letter requesting an

10    exemption from a number of schools that you mentioned a

11    moment ago?

12         A.   Yes.  It's not just schools.  It's ACE

13    scholarships.  But, yes.

14         Q.   Sure, yes.  Thank you for that.

15              Do you know when the department became

16    aware of this letter?

17         A.   February 17th, it looks like.

18         Q.   Okay.  It looks like that was a couple of

19    days after that last exchange with Michael Cooke; is that

20    right?

21         A.   That is correct.

22         Q.   Okay.  And so you did -- after receiving

23    this letter, that's when you said you and Michael Cooke

24    did circle up and have a conversation about it?

25         A.   Yes, we did.

Page 15

1          Q.   Okay.  This letter was addressed to the

2     governor.  How did you first become aware of it?

3          A.   I became aware of it because the

4     governor's office shared it with me.

5          Q.   Why did the governor's office share it with

6     you?

7               MS. CARRENO:  Objection.  Speculation.

8               You can answer.

9          Q.   (By Mr. Davis)  You can answer.

10               THE REPORTER:  I'm sorry.  I didn't hear

11     the answer.

12               THE DEPONENT:  I run the Colorado

13     Department of Early Childhood.

14          Q.   (By Mr. Davis)  Okay.  And when you

15     were -- who made the decision as to -- as to how to handle

16     this letter, how to process it?

17          A.   Well, I will say I immediately contacted

18     my Attorney General and worked with Michael Cooke to

19     figure out what was the best response legally to this

20     letter.

21          Q.   Okay.  Was one of the possible responses

22     granting the requested accommodation?

23               MS. CARRENO:  And objection, this calls

24     for attorney-client privileged discussions.

25               If you can answer the question without

```
                                                    Page 16
 1      talking about the legal advice.

 2              A.    Could you repeat the question?

 3              Q.    (By Mr. Davis)   Sure.   And to be clear,

 4      none of my questions are designed to ask you to tell me

 5      what an attorney -- what you and an attorney discussed.

 6                    You said that you began considering how to

 7      respond to this letter along with members of your legal

 8      team.   I'm not asking you to tell me what the legal team

 9      recommended or didn't recommend or informed you or didn't

10      inform you.

11                    Did you view as one of the possible

12      responses to this letter as being -- granting the

13      accommodation that the coalition members requested?

14              A.    I cannot grant an accommodation to a

15      nondiscrimination statute statement that's in statute.

16              Q.    Okay.   So that was never on the table, from

17      your perspective?

18              A.    That was not on the table from my

19      perspective.

20              Q.    Okay.   Did you understand that the various

21      schools that were members of this coalition, if you didn't

22      grant the -- if you didn't grant the accommodation, they

23      would not be able to participate in UPK?

24                    MS. CARRENO:   Objection.   Form.

25                    You can answer.
```

Page 17

1              Q.    (By Mr. Davis)  You can answer.

2              A.    I did not see it that way.  I have many

3         reasons for that, if you care to hear about them.

4              Q.    Please.

5              A.    First of all, I worked for Catholic

6         Charities myself for many years, understood the Catholic

7         Charities who's a part of the Archdiocese had received

8         federal, state, and local funding with the same type of

9         nondiscriminatory language attached to it.

10                   I worked in Denver, obviously was one of

11        the architects of the Denver Preschool Program.  And we

12        went above -- I feel like we went above and beyond with

13        Michael Cooke -- again, I wasn't in those meetings, but

14        meeting on a weekly and then almost a monthly basis with

15        our faith-based providers to figure out how we could best

16        coordinate and collaborate.  And then came up with a

17        preference for our faith-based providers and ensuring

18        that they could serve members of their congregation.

19                   So when you asked the question, I did not

20        see that as being a problem.

21             Q.    Okay.  With the -- in the letter it looks

22        like the coalition members say that it is a problem,

23        right?  They say, "We believe that certain requirements

24        under UPK will severely restrict the ability of

25        faith-based providers to participate without compromising

Page 18

1      their sincerely held religious beliefs."

2                      And is it your view that's just not

3      correct, based on your experience?

4              A.    Based on my experience, faith-based

5      providers have always had the opportunity to participate

6      in preschool, including my own son, who's now 37, who

7      went to a faith-based preschool, which held a head start

8      program.

9              Q.    Okay.  You said -- did you say that you

10     worked for Catholic Charities or worked with Catholic

11     Charities?  I just didn't hear.

12             A.    I worked for Catholic Charities.

13             Q.    Okay.  In what capacity?

14             A.    I was their Operation JumpStart director.

15             Q.    Okay.

16                   I'm going to introduce our next exhibit.

17             A.    And I also worked with Catholic Charities.

18             Q.    What capacity was that?

19             A.    When I worked with the city and county --

20                   THE REPORTER:  I'm sorry.  Ma'am, my end

21     on the computer froze.  Can you restate the -- your

22     answer?

23                   THE DEPONENT:  Of course.

24                   I worked with Catholic Charities in many

25     capacities, but one was when I worked for the City and

1    County of Denver's Head Start program, Bright Kids Head

2    Start, Catholic Charities was one of our delegate

3    programs.  We were the grantee for the federal funding.

4            Q.   (By Mr. Davis)  Before we move on to the

5    next exhibit, you said there that faith-based providers

6    have always been able to participate in preschool, right?

7            A.   Yes, they have, including with Denver

8    Public Schools.  That is correct.

9            Q.   But the question here, right, is not

10   whether they can have a preschool, but whether they can

11   participate in the UPK program?

12               MS. CARRENO:  Objection.  Form.

13               You can answer.

14           A.   Yes, they can participate.  And the

15   Catholic -- fortunately, Catholic Charities is

16   participating as part of the Archdiocese.

17           Q.   (By Mr. Davis)  Right.  They can

18   participate as long as they're willing to sign the equity

19   statement, right?

20           A.   The equity statement that all of the

21   Catholic providers have signed for decades, yes, that's

22   correct.

23           Q.   Okay.  And if they're not willing to sign

24   the equity statement, they shouldn't participate, right?

25               MS. CARRENO:  Objection.  Form.

1          You can answer.

2          A.   Again, this is a voluntary program, but

3     our commitment to the diverse delivery system, we have

4     made every accommodation besides breaking the law.

5          Q.   (By Mr. Davis)  Right.  But you wouldn't

6     want them to participate if they're not willing to abide

7     by the equity statement, correct?

8               MS. CARRENO:  Objection.  Form.

9               You can answer.

10         A.   I don't understand the question, honestly.

11         Q.   (By Mr. Davis)  Okay.

12         A.   Can you rephrase it in another way?

13         Q.   Yeah.  My question is, if they're not

14    willing to abide -- to sign or to abide by the equity

15    statement, they shouldn't participate in UPK Colorado,

16    right?

17              MS. CARRENO:  Object -- same objection.

18              But you can answer it.

19         A.   Again, my confusion is that they have.

20    They get CCAP.  They -- some of them get Head Start.

21    They've got the Denver Preschool Program.  That's why

22    it's hard for me to answer your question.

23              I'm not trying to be dense.  They have.

24    So I don't understand why this is more problematic than

25    any of the other many opportunities that they've had over

Page 21

1    decades, and I've been a participant in that this whole

2    time.

3             Q.   (By Mr. Davis)  I understand your

4    experience, your references to CCAP and the Denver

5    Preschool Program.  But I really do want to put those

6    aside for a moment, because this is -- this is a

7    coalition, right, not Catholic Charities, not the

8    Archdiocese, and -- themselves.  And they're saying we

9    cannot abide by the equity statement.  We cannot sign the

10   equity statement.

11            And all I'm asking you is, if they're

12   telling you that, we cannot abide by it and we cannot sign

13   it, your view is that they should not participate in UPK

14   Colorado, correct?

15            A.   So the reason I still have a hard time

16   answering that question is because they have signed the

17   same statement for other funding sources.  So should

18   they?  Shouldn't they?

19            I am saying if you signed it, you signed

20   it.  What -- why -- why am I being, in a sense, asked to

21   give my opinion when I have worked all my career to

22   ensure that they've had access and will continue to.

23   They've signed these statements before.

24            Q.   Do you know that every single provider on

25   this coalition letter has signed any of the statements

Page 22

1    that you're alleging that they have signed?

2           A.   I would have to check, but if they have

3    received CCAP, then, yes -- anyone that's received CCAP,

4    then, yes, they have signed it before.

5           Q.   Okay.  And I really am -- I'm just asking

6    you to set aside CCAP and set aside the Denver Preschool

7    Program, right?  We have a provider who's never

8    participated in these programs before but wants to

9    participate in UPK.

10              Can that provider participate if they're

11   unwilling to abide or to sign -- abide by or sign the

12   equity statement?

13          A.   So if there's a provider that feels that

14   they are willing to discriminate against young children,

15   then -- and they don't want to participate, they do not

16   have to.

17          Q.   They do want to participate.  Can they?

18          A.   So if they -- if they cannot abide by the

19   law, then, no.  We cannot legally allow any participant

20   to knowingly discriminate against children.

21          Q.   Okay.

22              All right.  Let me know when you've got

23   Exhibit 12.

24              (Exhibit 12 was marked.)

25          A.   I have it.  Thank you.

1          Q.   Great.

2               And do you recognize this document?

3          A.   Yes, I do.

4          Q.   Okay.  Is this your response to the

5     coalition letter that we were discussing?

6          A.   Yes, it is.

7          Q.   Okay.  Who drafted this document?

8          A.   I will tell you that I worked with Michael

9     Cooke to draft this document.

10         Q.   Okay.  And in response to the

11    coalition's -- the coalition letter's request for an

12    exemption, the answer is no, you cannot provide an

13    exemption, right?

14         A.   Correct.  I cannot provide an exemption

15    against what the law says.

16         Q.   Okay.  Is there anybody else you consulted

17    with besides Michael Cooke and besides your attorneys?

18         A.   No.  There's no one else I consulted with

19    besides Michael Cooke and the attorneys on this.

20         Q.   Okay.

21              All right.  Besides the coalition letter,

22    has the department received any other requests for

23    religious exemptions from the UPK program's requirements?

24         A.   As a result of appearing for this, I was

25    made aware of some emails that I had received that I read

Page 24

1      through, but didn't remember.  So the answer is yes to

2      your question.

3                    Q.    Okay.  Who are those emails from?

4                    A.    The Lutheran church, I believe, another

5      Catholic entity.  Those are the two that I remember in

6      preparation.

7                    Q.    Okay.  And then also one from a school

8      called Darren Patterson Christian Academy, right?

9                    A.    Yes.  Thank you.  And Darren Patterson.

10     Sorry that you had to remind me.

11                   Q.    Sure.

12                   A.    And the one Catholic entity was included

13     in this letter that I responded to.

14                   Q.    Okay.  Great.

15                         All right.  Thank you for that.  I'm going

16     to mark another exhibit here.

17                         (Exhibit 13 was marked.)

18                   Q.    All right.  Just let me know when you've

19     got Exhibit 13.

20                   A.    Okay.

21                   Q.    I'm sorry.  Do you have it?

22                   A.    Yes, I do.

23                   Q.    Okay.  Great.

24                         It might have been a been a while since you

25     looked at this, so feel free to take a moment to review

Page 25

1    this if needed, but I just wanted to ask you a bit about

2    the letter at the bottom on page DF 21.

3                  Do you need a moment or can I go ahead?

4             A.   No, you can go ahead.

5             Q.   Great.

6                  So this is -- this is the exemption request

7    from Darren Patterson Christian Academy that we just

8    mentioned, right?

9             A.   Mm-hmm.

10                 MS. CARRENO:  Objection to form.

11                 You can answer.

12            A.   I sent this letter to Mr. Drexler.

13            Q.   (By Mr. Davis)  And I'm looking at the --

14   I'm looking at the one at the bottom on page 21?

15            A.   Oh, at the bottom.  Okay.  Sorry.  I was

16   reading the one above.

17                 Okay.  Sorry.  I did not --

18            Q.   No problem.

19            A.   Okay.  So Mr. Drexler was head of school.

20                 All right.  I'm ready now.

21            Q.   Okay.  Great.

22                 And just to clarify, you understand this to

23   be a request for religious exemption from the UPK

24   program's equity requirements from Darren Patterson?

25                 MS. CARRENO:  Objection to form -- and

Page 26

1      objection to form.

2                    You can answer.

3            A.    I understood it to be an exemption from

4      practicing nondiscrimination against children.

5            Q.    (By Mr. Davis)  Okay.  And it looks like

6      there's actually two different problems, according to the

7      Darren Patterson school, that are raised here in these two

8      paragraphs, first and second.

9                    So I think first, it says that Darren

10     Patterson has policies about bathroom and pronoun usage

11     that are based on biological sex.  And it says that it's

12     concerned that that violates the equity statement that we

13     were discussing.

14                    Is that your understanding of what Darren

15     Patterson is saying?

16           A.    Mr. Davis, that is what he is saying.

17           Q.    Right.

18                    And it looks like there's another -- a

19     second paragraph where Mr. Drexler says that Darren

20     Patterson has employment policies based on its religious

21     beliefs, and, again, Mr. Drexler saying he's worried that

22     that violates the nondiscrimination provision in the

23     provider agreement.

24                    Is that right?

25                    MS. CARRENO:  Objection.  Form.

1          You can answer it.

2          A.   That is what Mr. Drexler is -- and the --

3     Darren Patterson are stating, I believe.

4          Q.   (By Mr. Davis)  All right.  Okay.

5          And then on page 20, at the top, is -- is

6     your email response to Mr. Drexler, correct?

7          A.   That is correct.

8          Q.   And your answer again is that the

9     department doesn't have authority to create an exemption

10    to the equity requirement, right?

11         A.   That is correct.

12         Q.   Okay.  So did you agree that the concerns

13    about pronoun usage, bathroom usage, that that is

14    discrimination against children under the equity

15    statement?

16              MS. CARRENO:  Objection.  Form.

17    Foundation.  Speculation.

18              You can answer.

19              THE DEPONENT:  Thank you.

20         A.   Again, if you read my email, what I am

21    doing is encouraging the Darren Patterson preschool

22    program to participate.  And I pointed out that they can

23    give preference to their members, that they can reserve

24    all or a portion of their seats for their members, and

25    they can decline a match from a family that is not part

Page 28

1    of their congregation, and that no provider can

2    discriminate against children or families in violation of

3    the state statute.

4                    You're asking me specifically about

5    bathrooms, and there wasn't a situation where that was

6    the case.  I've given, in this situation and in every

7    situation, every opportunity for a faith-based provider

8    to fill their seats with families who prescribe to the

9    same faith.

10                   Q.   (By Mr. Davis)  Thank you for that, and I

11   appreciate it.

12                   And I want to be clear, I'm really not

13   asking you to speculate because this is about the past and

14   about an email that you received and answered.  All right?

15                   And my question is:  Darren Patterson's

16   email says, we have these policies about bathrooms and

17   pronouns, and we're concerned that that's a problem under

18   the equity statement.

19                   And your response is, I don't have

20   authority to give you an exemption from the equity

21   statement, right?

22                   A.   So my comment was I don't have the

23   authority to tell them that they cannot discriminate.

24                   So equity is a different -- I know that

25   that was the term that was used by Michael Cooke, but

Page 29

1    that's not what I would describe this is.  It is actually

2    nondiscrimination as part of the law.

3                Q.   Okay.  Great.  No, that's helpful.

4                So I'll just restate it.  They're concerned

5    that these policies are discrimination under the law, and

6    your response is, I don't have authority to give you an

7    ability to discriminate; is that right?

8                A.   That is correct.

9                Q.   Okay.  And -- because you agreed that their

10   policies, are, in fact, discrimination under the law,

11   right?

12               MS. CARRENO:  Objection.  Misstates the

13   letter and her testimony.

14               Q.   (By Mr. Davis)  It was a question.

15               A.   Well, I -- I agree with my attorney.  I

16   believe that what you just stated and how you stated it

17   does not show the intent of my cooperation with

18   faith-based providers.

19               Q.   And to be clear, I'm not asking about your

20   cooperation with faith-based providers, right?  I'm just

21   asking, a provider comes to you, like in this email, and

22   it says a transgender child is not allowed to use the

23   bathroom that they identify with.  They're not -- we're

24   not going to use the pronouns that they're requesting.

25               Is that discriminating against children?

Page 30

1              MS. CARRENO:  Objection.  Objection.

2    Speculation.  You can answer.

3              A.   Mr. Davis, I am not early childhood -- can

4    relatively say an expert, and I'd look at things from a

5    child development lens, and I can tell you that if a

6    child was in the situation, it would prove best to have a

7    conversation with the family and decide what's best for

8    the child based on the environment that the child was

9    exposed to.  We don't want any child to be harmed by

10   being in a situation where they would be discriminated

11   against.

12              And so that is the answer.  The law is

13   there to protect, and thank goodness it does.  But it

14   behooves anyone who claims that they care about children

15   and their development to try to figure out what's best

16   for that child.

17              Q.   (By Mr. Davis)  Right.

18              And the child would be discriminated

19   against if the school would have used the pronouns or

20   provide access to the bathrooms?

21              MS. CARRENO:  Objection.  Speculation.

22              A.   I, again, would say that I don't determine

23   by law if that is discrimination.  I know, again, what

24   harm to children looks like, and I know that refusing a

25   child for any of the reasons that we've stated would be

Page 31

1    breaking the law.

2              Q.   (By Mr. Davis)  Gender identity, for

3    example?

4              MS. CARRENO:  Objection.  Speculation.

5              You can answer.

6         A.   So if a child, at age 4, does not

7    understand their gender and a provider made a decision to

8    not accept that child based on a child's natural

9    curiosity, their natural formation of identity, again,

10   the law says that that would be discriminatory to not

11   accept the child based on where that child is at age 4.

12             Q.   (By Mr. Davis)  Okay.

13             Before we get to the second part of what

14   the Darren Patterson email says, again, on page 21.

15        A.   Okay.

16             Q.   And this is where they say, "We have

17   employment policies based on our religious beliefs, and

18   we're concerned about the nondiscrimination requirements."

19             Do you see that?

20        A.   Yes, I do.

21             Q.   Okay.  Are you aware that the department

22   has now reported to disavow enforcement of any employment

23   nondiscrimination requirements against religious schools

24   in some circumstances?

25             A.   I was aware of that, and I don't see the

Page 32

1    reason why I didn't address it in my email.

2              I have -- as you heard me consistently

3    talk about children, we are -- and I believe I heard

4    Ms. Odean mention that we were looking at our policies.

5    We're also looking at the agreement, and understand where

6    our department is responsible for administration of the

7    program.

8              So "disavowing" is not quite the term I

9    would use.  I would use that we are, just like everything

10   we've been doing, looking at our policies and figuring

11   out what coincides with federal law, our state laws, and

12   what we have purview over and do not have purview over.

13        Q.   Okay.  So you wouldn't use the word

14   "disavow," right?

15        A.   I would not use the word "disavow" at all.

16        Q.   Okay.  Because it is discrimination to fire

17   a teacher because they are in a same-sex marriage?

18             MS. CARRENO:  Objection.  Calls for

19   speculation.  Also, this is outside the scope of the

20   topics that Dr. Roy has been noticed to testify about.

21             MR. DAVIS:  No, it isn't.  Dr. Roy has

22   been asked to testify about religious exception requests,

23   and my question has to do with, you know, if there was

24   this disavowal, why wasn't it mentioned in this response?

25   And that's what we're talking about at the moment.

1          A.    So, Mr. Davis, as Ms. Odean pointed out,

2     our religious-based providers do have certain, I would

3     say, preferences for how they do hiring based on federal

4     law.

5               I cannot speak to what the Catholic church

6     does when someone is in a same-sex marriage or if they're

7     gay or if they're a pedophile or any of those things.

8     It's not something that's part of my purview as far as

9     what they do to their staff or -- or ministers or

10    priests, I don't have anything to do with that.

11         Q.   (By Mr. Davis)  Why did you bring up

12    pedophile?

13         A.    I'm saying in the sense that anything

14    having to do with why someone is fired is not something

15    that we would have purview over.

16         Q.    Okay.  Why didn't you say that in your

17    response to Darren Patterson?

18         A.    And I wasn't saying that in the response

19    to Darren Patterson.  My apologies if you took it that

20    way.

21               What I was saying was that as far as

22    any -- any church, we do not have purview over who they

23    hire to run their programs and why they fire -- why they

24    might fire someone.  You said you would fire someone who

25    was in a same-sex marriage, right?  And so I was like,

Page 34

1    that is not something we have purview over.

2              Q.   My question was, if that's true, why didn't

3    you say that in response to Darren Patterson?  If they

4    come to you and say, we're worried about our employment

5    policies -- and then your response doesn't mention it at

6    all.  And it sounds like, you know, you could have said,

7    we don't have purview over that.  But you didn't, did you?

8              MS. CARRENO:  Objection.  Form.

9              You can answer.

10             A.   Yes, you're right.  I mean, I think I was

11   more focused, as I have been this whole time, with

12   children.  So it was an oversight.

13             Q.   (By Mr. Davis)  Okay.  I'm trying to mark

14   another exhibit here.

15             All right.  Let me know when you've got

16   Exhibit 14.

17             (Exhibit 14 was marked.)

18             A.   Okay.

19             Q.   Has it showed up?

20             A.   Yes, sir.  I'm just reading it.

21             Q.   Oh, sure.  Take your time.

22             A.   Okay.

23             Q.   And I know you just got a chance to

24   review -- to review it, but do you recognize it?

25             A.   I do recognize it, but only because it was

Page 35

1   shared with me recently.

2           Q.   Okay.  This is the request from the

3   Lutheran schools I think you mentioned earlier in this

4   deposition?

5           A.   Mm-hmm.  Mm-hmm.

6           Q.   Okay.  And the email reflects that the

7   Lutheran schools were likely intending to or going to have

8   to opt out because of the matching process.

9               Is that what it says?

10          A.   That is what it says.

11          Q.   Okay.  And then -- and then you learned

12  about that somehow.  It's not really reflected on this

13  email chain.

14              How did you find out about this email?

15          A.   I did not find this out until my attorney

16  shared it with me.

17          Q.   Okay.  So you never saw this email at all

18  until preparing for this deposition?

19          A.   I don't remember seeing this email before.

20              I don't see my name on it, except for it

21  says -- well, January 19th.  I just -- I do not remember

22  seeing this email, so...

23          Q.   Okay.

24              MR. DAVIS:  I guess I'm just trying to

25  understand what's been redacted.  Is that an email from

Page 36

1    Dr. Roy, Virginia, or what is that at the top?

2                    MS. CARRENO:  I'd have to -- I'd have to

3    look at the privilege log.  Can you just give us a

4    minute?

5                    MR. DAVIS:  Sure.

6                    (Discussion off the record.)

7                    (Recess from 2:20 p.m. to 2:26 p.m.)

8                    MR. DAVIS:  Okay.  Virginia, you were

9    going to report back.

10                   MS. CARRENO:  Yeah, thanks, Joe.  And

11   thank you for giving us a minute.  As you know, we didn't

12   have a lot of time to put the production and the

13   privilege log together, so it took me a minute to refresh

14   my recollection.

15                   This was a communication that was

16   forwarded to Dr. Roy, a discussion that led to work

17   product and conversations with legal counsel on a

18   response.

19                   MR. DAVIS:  Okay.  So this is Dr. Roy's

20   response that's been redacted at the top?

21                   MS. CARRENO:  No.  It was thoughts that

22   were forwarded to Dr. Roy, not Dr. Roy's response.

23                   MR. DAVIS:  Okay.  Thank you.

24              Q.   (By Mr. Davis)  Okay.  The email that's

25   forwarded here about the Lutheran schools maybe having to

Page 37

1     opt out, do you see where it says, "I assume that the

2     enrollment process would be like the Denver Preschool

3     Program where parents make the choice instead of a

4     computer program"?

5               A.   Yes.

6               Q.   What do you think that's -- what does that

7     mean?

8               A.   Mr. Davis, I think it means a couple of

9     things, but mainly --

10              MS. CARRENO:   Just -- objection.

11    Speculation for this one.

12              But you can continue to answer.

13              A.   Our matching process is different from

14    what Denver Preschool Program does.   However, the intent

15    of having a mixed delivery system and ensuring that

16    children have continuity of care are the same.

17              Q.   (By Mr. Davis)  Okay.   Does Denver

18    Preschool Program have a matching process or --

19              A.   No, they -- that is the point.   They do

20    not have a matching process.   We do.   But because we do,

21    we had the preferences so that we could provide

22    continuity of care for students.

23              Q.   And when you learned that the Lutheran

24    schools and maybe the Catholic schools that are mentioned

25    in this email might have to opt out based on the

Page 38

1     requirements in the provider agreement, did that give you

2     any concerns for purposes of trying to come up with a

3     mixed delivery system?

4                    MS. CARRENO:  Objection.  Form.

5                    You can answer.

6          A.   I would say, again, my hope is to develop

7     relationships with all of our providers.  We have all

8     types of concerns expressed, more than you can imagine,

9     just because it is so different, including from --

10    from even our district providers.

11                   So when I learned of this, yes, I had

12    concern, but mainly, it's because, as I mentioned all

13    along, I am used to working with all types of providers,

14    including our faith-based, including Catholic, and Jewish

15    providers.

16                   And so we are fortunate, though, that our

17    Lutheran providers, to my understanding, did decide to

18    join the universal preschool program.

19                   MR. DAVIS:  I think that's all my

20    questions.

21                   MS. CARRENO:  Great.  Thank you.

22                   (Discussion off the record.)

23                   THE REPORTER:  Mr. Davis, your order for

24    transcript, is it the same as prior?

25                   MR. DAVIS:  Yes.

Page 39

1                    THE REPORTER:  And, Ms. Carreno?

2                    MS. CARRENO:  Yeah, same as prior.

3                    THE REPORTER:  And do you want to handle

4       read and sign?

5                    MS. CARRENO:  Yes.

6                          *   *   *   *   *   *   *

7                    WHEREUPON, the foregoing deposition was

8       concluded at the hour of 2:30 p.m.  Total time on the

9       record 52 minutes.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

1              I, LISA ROY, Ed.D., the deponent in the

2      above deposition, do hereby acknowledge that I have read

3      the foregoing transcript of my testimony and state under

4      oath that it, together with any attached Amendment to

5      Deposition pages, constitutes my sworn testimony.

6

7      _____ I have made changes to my deposition

8      _____ I have NOT made any changes to my deposition

9

10

                     _____

11                        LISA ROY, Ed.D.

12

13     Subscribed and sworn to before me this _____

14     day of _____, 20_____.

15

16     My commission expires: _____

17

18                              _____

                               Notary Public

19

20                              _____

                               Address

21

22

23

24

25

Page 41

1                    REPORTER'S CERTIFICATE

2

3

4               I, Laurel S. Tubbs, a Registered

5     Professional Reporter and Notary Public within the State

6     of Colorado, do hereby certify that previous to the

7     commencement of the examination, the deponent was duly

8     sworn by me to testify to the truth.

9               I further certify that this deposition was

10    taken in shorthand by me at the time and place herein set

11    forth and thereafter reduced to a typewritten form; that

12    the foregoing constitutes a true and correct transcript.

13              I further certify that I am not related

14    to, employed by, nor of counsel for any of the parties or

15    attorneys herein, nor otherwise interested in the result

16    of the within action.

17              My commission expires October 26, 2027.

18

19    _____

      LAUREL S. TUBBS

20    Registered Professional Reporter

      Registered Merit Reporter

21    Certified Realtime Reporter

      and Notary Public

22

23

24

25

Page 42

1    1   Virginia Carreno, Esquire

       virginia.carreno@coag.gov

2    2

3    3              November 13, 2023

4    4   RE:    St. Mary Catholic Parish In Littletown Et Al v. Roy, Lisa

Et Al

5    5      11/8/2023, Lisa  Roy (#6293872)

6    6      The above-referenced transcript is available for

7    7   review.

8    8      Within the applicable timeframe, the witness should

9    9   read the testimony to verify its accuracy. If there are

10   10   any changes, the witness should note those with the

11   11   reason, on the attached Errata Sheet.

12   12      The witness should sign the Acknowledgment of

13   13   Deponent and Errata and return to the deposing attorney.

14   14   Copies should be sent to all counsel, and to Veritext at

15   15   cs-midatlantic@veritext.com

16   16

17   17    Return completed errata within 30 days from

18   18   receipt of testimony.

19   19    If the witness fails to do so within the time

20   20   allotted, the transcript may be used as if signed.

21   21

22   22           Yours,

23   23          Veritext Legal Solutions

24   24

25   25

**[1 - amendment]**                                                      Page 1

**1**

**1**  42:1
**10**  3:14 9:21,23
   42:10
**11**  3:15 14:3,4
   42:11
**11/8/2023**  42:5
**12**  3:16 22:23
   22:24 42:12
**13**  3:17 24:17
   24:19 42:3,13
**1300**  2:10
**14**  3:15,18
   34:16,17 42:14
**15**  42:15
**16**  42:16
**17**  3:15 42:17
**17th**  14:17
**18**  42:18
**19**  42:19
**1919**  2:4
**19th**  35:21
**1:23**  1:7
**1:32**  3:5
**1st**  7:24

**2**

**2**  42:2
**20**  27:5 40:14
   42:20
**20006**  2:5
**202-955-0095**
   2:5
**2022**  7:24
**2023**  1:15 3:6
   3:15,16 42:3

**2027**  41:17
**2079**  1:7
**21**  25:2,14
   31:14 42:21
**22**  3:16 42:22
**22402**  41:18
**23**  42:23
**24**  3:17 42:24
**25**  42:25
**26**  41:17
**28**  3:16
**2:20**  36:7
**2:26**  36:7
**2:30**  39:8

**3**

**3**  42:3
**30**  1:14 3:2
   4:19 42:17
**34**  3:18
**37**  18:6

**4**

**4**  3:12 31:6,11
   42:4
**400**  2:4

**5**

**5**  42:5
**52**  39:9

**6**

**6**  1:14 3:2 4:19
   42:6
**6293872**  42:5

**7**

**7**  42:7
**720-508-6000**
   2:11

**8**

**8**  1:15 3:6 42:8
**80203**  2:11

**9**

**9**  3:14 42:9

**a**

**a.g.'s**  6:12,14
**abide**  20:6,14
   20:14 21:9,12
   22:11,11,18
**ability**  7:13
   12:10 17:24
   29:7
**able**  16:23 19:6
**above**  17:12,12
   25:16 40:2
   42:6
**academy**  24:8
   25:7
**accept**  31:8,11
**access**  12:3
   21:22 30:20
**accommodati...**
   15:22 16:13,14
   16:22 20:4
**accuracy**  42:9
**ace**  14:12
**acknowledge**
   40:2

**acknowledg...**
   42:12
**action**  41:16
**actually**  11:14
   26:6 29:1
**address**  32:1
   40:20
**addressed**  15:1
**adixon**  2:7
**administration**
   32:6
**advice**  16:1
**affirmed**  4:7
**afternoon**  4:11
   4:12,16
**age**  31:6,11
**agenda**  11:6,15
**ago**  14:11
**agree**  4:2 12:23
   27:12 29:15
**agreed**  29:9
**agreement**
   26:23 32:5
   38:1
**ahead**  25:3,4
**al**  42:4,4
**alexa**  2:13
**alleging**  22:1
**allotted**  42:20
**allow**  22:19
**allowed**  29:22
**amanda**  2:3
**amendment**
   40:4

answer   5:11
15:8,9,11,25
16:25 17:1
18:22 19:13
20:1,9,18,22
23:12 24:1
25:11 26:2
27:1,8,18 30:2
30:12 31:5
34:9 37:12
38:5
answered
28:14
answering
21:16
answers   4:24
5:19
anticipate   6:17
anybody   6:4
23:16
apologies   33:19
appearances
2:1
appearing
23:24
applicable   42:8
appointed   8:4
appreciate
28:11
appropriate
3:2 6:22
archdiocese   1:5
9:13 11:7 17:7
19:16 21:8

architects
17:11
aside   21:6 22:6
22:6
asked   11:5
17:19 21:20
32:22
asking   10:17
11:15 16:8
21:11 22:5
28:4,13 29:19
29:21
assume   37:1
attached   17:9
40:4 42:11
attend   11:11
attention   5:18
12:16
attorney   2:10
6:12,13,15 7:6
15:18,24 16:5
16:5 29:15
35:15 42:13
attorneys   23:17
23:19 41:15
authority   27:9
28:20,23 29:6
available   42:6
avenue   2:4
aware   9:12
14:16 15:2,3
23:25 31:21,25

**b**

b   1:14 3:2 4:19
back   10:3
11:16,19 36:9
based   12:9,12
12:14 17:15,17
17:25 18:3,4,4
18:7 19:5
26:11,20 28:7
29:18,20 30:8
31:8,11,17
33:2,3 37:25
38:14
basis   17:14
bathroom
26:10 27:13
29:23
bathrooms
28:5,16 30:20
becket   2:4
becketlaw.org
2:6,6,7
becoming   8:13
began   16:6
behalf   2:2,8
behooves   30:14
beliefs   18:1
26:21 31:17
believe   9:18
11:14 17:23
24:4 27:3
29:16 32:3
bernadette   1:4
best   7:13 15:19
17:15 30:6,7

30:15
better   5:4
beyond   17:12
biological
26:11
bit   4:20 5:4
25:1
bonnie   2:15
6:14
bottom   10:17
13:3,6 25:2,14
25:15
breaking   20:4
31:1
breaks   7:3,4
bright   19:1
bring   33:11
broadway   2:10
brought   10:15
12:15
buffett   8:15
business   13:2

**c**

c   2:2 4:1
called   3:4 24:8
calling   13:16
calls   15:23
32:18
capacities
18:25
capacity   1:9,11
18:13,18
care   17:3 30:14
37:16,22

career  21:21
carreno  2:8 4:5
   6:9,9 15:7,23
   16:24 19:12,25
   20:8,17 25:10
   25:25 26:25
   27:16 29:12
   30:1,21 31:4
   32:18 34:8
   36:2,10,21
   37:10 38:4,21
   39:1,2,5 42:1
case  1:6 4:15
   28:6
catholic  1:3,4
   17:5,6 18:10
   18:10,12,17,24
   19:2,15,15,21
   21:7 24:5,12
   33:5 37:24
   38:14 42:4
ccap  20:20 21:4
   22:3,3,6
certain  13:5,9
   17:23 33:2
certainly  7:3
certificate  41:1
certified  3:8
   41:21
certify  41:6,9
   41:13
chain  3:18
   35:13
chance  34:23

changes  40:7,8
   42:10
charged  12:12
charities  17:6,7
   18:10,11,12,17
   18:24 19:2,15
   21:7
check  22:2
child  6:11
   29:22 30:5,6,8
   30:8,9,16,18,25
   31:6,8,11,11
child's  31:8
childhood  1:10
   1:14 3:3 6:11
   7:10,18,20
   8:13,15,22 9:1
   15:13 30:3
children  13:6
   13:20,21,23,25
   22:14,20 26:4
   27:14 28:2
   29:25 30:14,24
   32:3 34:12
   37:16
choice  37:3
christian  24:8
   25:7
church  24:4
   33:5,22
circle  11:16,19
   14:24
circumstances
   31:24

city  18:19,25
civil  3:2
claims  30:14
clarify  25:22
clear  5:19 16:3
   28:12 29:19
client  15:24
coag.gov  2:12
   42:1
coalition  16:13
   16:21 17:22
   21:7,25 23:5
   23:11,21
coalition's
   23:11
coincides  32:11
collaborate
   17:16
colorado  1:1,10
   1:14 2:10,11
   3:3,9 7:19 8:18
   15:12 20:15
   21:14 41:6
colorado's  1:11
come  9:25 34:4
   38:2
comes  29:21
commencem...
   41:7
commencing
   3:5
comment  28:22
commission
   40:16 41:17

commitment
   20:3
communicate
   6:23
communication
   36:15
community  9:9
completed
   42:17
compromising
   17:25
computer
   18:21 37:4
concern  12:9
   12:13 38:12
concerned
   26:12 28:17
   29:4 31:18
concerns  9:17
   27:12 38:2,8
concierge  2:13
concluded  39:8
confirm  8:9
confirmation
   8:7
confirmed  8:11
confusion
   20:19
congregation
   17:18 28:1
considered
   13:8
considering
   16:6

consistently
32:2
constitutes
40:5 41:12
consultant   12:8
consulted
23:16,18
contacted
15:17
content   7:5
continue   21:22
37:12
continued   11:2
continuity
37:16,22
conversation
11:20,22 14:24
30:7
conversations
36:17
cooke   10:23,24
11:1 14:19,23
15:18 17:13
23:9,17,19
28:25
cooperation
29:17,20
coordinate
17:16
copies   42:14
correct   6:2
13:20 14:21
18:3 19:8,22
20:7 21:14
23:14 27:6,7

27:11 29:8
41:12
counsel   4:2 6:3
6:23 36:17
41:14 42:14
county   18:19
19:1
couple   5:9
14:18 37:8
course   18:23
court   1:1 5:14
6:23
create   27:9
cs   42:15
curiosity   31:9
cv   1:7

d

d   4:1
d.c.   2:5
daniel   1:5
darren   24:8,9
25:7,24 26:7,9
26:14,19 27:3
27:21 28:15
31:14 33:17,19
34:3
date   9:16
dated   3:15,16
davis   2:2 3:12
4:4,10,14 5:13
6:6,20,21
10:10 15:9,14
16:3 17:1 19:4
19:17 20:5,11
21:3 25:13

26:5,16 27:4
28:10 29:14
30:3,17 31:2
31:12 32:21
33:1,11 34:13
35:24 36:5,8
36:19,23,24
37:8,17 38:19
38:23,25
dawn   1:10 2:14
6:11
day   11:19,19
40:14
days   14:19
42:17
decades   19:21
21:1
decide   13:5,7
30:7 38:17
decision   15:15
31:7
decline   27:25
defendants
1:12 2:8
delegate   19:2
delivery   20:3
37:15 38:3
dense   20:23
denver   1:5 2:11
8:22 17:10,11
19:7 20:21
21:4 22:6 37:2
37:14,17
denver's   9:13
19:1

department
1:10,14 3:3
6:10,11 7:10
7:18,19,24
8:13,22 9:1,4,7
14:15 15:13
23:22 27:9
31:21 32:6
depending   7:2
deponent   4:3
5:12 15:12
18:23 27:19
40:1 41:7
42:13
deposing   42:13
deposition   1:14
3:3 4:19 5:22
6:4,22 7:5,9
35:4,18 39:7
40:2,5,7,8 41:9
derocher   2:14
6:10
describe   29:1
designed   16:4
determine
30:22
develop   38:6
development
8:15 30:5,15
df   25:2
different   9:10
26:6 28:24
37:13 38:9
director   1:9,11
7:17,22,23 8:2

[director - exhibit]

8:13,14,21,23
11:1 18:14
**disavow**  31:22
32:14,15
**disavowal**
32:24
**disavowing**
32:8
**discovery**  6:1
**discriminate**
13:20 22:14,20
28:2,23 29:7
**discriminated**
30:10,18
**discriminating**
29:25
**discrimination**
27:14 29:5,10
30:23 32:16
**discriminatory**
31:10
**discuss**  7:5
11:16
**discussed**  16:5
**discussing**  23:5
26:13
**discussion**  10:8
36:6,16 38:22
**discussions**
15:24
**district**  1:1,1
38:10
**diverse**  20:3
**division**  9:2,6

**divisions**  9:5
**dixon**  2:3
**document**
10:11 14:7,8
23:2,7,9
**documents**
5:21,24,25
**doing**  5:3 27:21
32:10
**dr**  4:11 5:10
6:21 7:15 9:12
32:20,21 36:1
36:16,19,22,22
**draft**  23:9
**drafted**  23:7
**drexler**  25:12
25:19 26:19,21
27:2,6
**duly**  4:7 41:7

**e**

**e**  4:1,1
**earlier**  35:3
**early**  1:10,14
3:3 6:10,11
7:10,18,19
8:13,15,22 9:1
15:13 30:3
**ed.d.**  1:14 3:4
4:6 40:1,11
**education**  8:18
**email**  2:6,6,7
2:12 3:14,17
3:18 10:14,16
11:5 27:6,20
28:14,16 29:21

31:14 32:1
35:6,13,14,17
35:19,22,25
36:24 37:25
**emails**  23:25
24:3
**employed**
41:14
**employment**
26:20 31:17,22
34:4
**encouraging**
27:21
**ended**  12:21
**enforcement**
31:22
**enrollment**
37:2
**ensure**  12:10
21:22
**ensuring**  13:19
17:17 37:15
**entails**  8:24
**entity**  24:5,12
**environment**
30:8
**equal**  12:3
**equity**  11:8,24
11:25 13:16
19:18,20,24
20:7,14 21:9
21:10 22:12
25:24 26:12
27:10,14 28:18
28:20,24

**errata**  42:11,13
42:17
**esq**  2:2,3,3,8,9
2:9
**esquire**  42:1
**establish**  6:7
**et**  42:4,4
**exact**  9:16
**exactly**  11:18
**examination**
3:4,11 4:9 41:7
**examined**  4:7
**example**  31:3
**except**  35:20
**exception**
32:22
**exchange**  10:14
14:19
**executive**  1:9
7:17,21,23 8:1
8:21,23
**exemption**  9:14
9:18 11:8
14:10 23:12,13
23:14 25:6,23
26:3 27:9
28:20
**exemptions**
23:23
**exhibit**  3:14,15
3:16,17,18
9:19,21,23
10:2 14:1,3,4
18:16 19:5
22:23,24 24:16

[exhibit - help]

Page 6

24:17,19 34:14
34:16,17
**exhibits**  3:13
10:5
**experience**  8:17
18:3,4 21:4
**expert**  30:4
**expires**  40:16
41:17
**exposed**  30:9
**expressed**  38:8
**expressing**  9:17

**f**

**fact**  29:10
**fails**  42:19
**faith**  17:15,17
17:25 18:4,7
19:5 28:7,9
29:18,20 38:14
**families**  12:10
13:21,24 28:2
28:8
**family**  9:9
27:25 30:7
**far**  33:8,21
**faster**  4:20
**february**  3:15
3:16 14:17
**federal**  17:8
19:3 32:11
33:3
**feel**  13:10 17:12
24:25
**feels**  22:13

**figure**  15:19
17:15 30:15
**figuring**  32:10
**fill**  28:8
**finally**  7:8
**find**  35:14,15
**fire**  32:16 33:23
33:24,24
**fired**  33:14
**first**  4:7,19,23
8:1,3 9:12 15:2
17:5 26:8,9
**focused**  34:11
**folder**  10:6
**follows**  4:8
**foregoing**  39:7
40:3 41:12
**form**  16:24
19:12,25 20:8
25:10,25 26:1
26:25 27:16
34:8 38:4
41:11
**formation**  31:9
**forth**  41:11
**fortunate**  38:16
**fortunately**
19:15
**forwarded**
36:16,22,25
**foundation**
27:17
**free**  24:25
**froze**  18:21

**full**  5:18,18
**fund**  2:4
**funding**  17:8
19:3 21:17
**further**  41:9,13

**g**

**g**  2:3 4:1
**gay**  33:7
**gender**  31:2,7
**general**  8:24
15:18
**general's**  2:10
**give**  4:23 6:18
21:21 27:23
28:20 29:6
36:3 38:1
**given**  12:24
28:6
**giving**  5:18,18
36:11
**go**  4:20,22 7:2
10:3 25:3,4
**going**  9:19 14:1
18:16 24:15
29:24 35:7
36:9
**good**  4:11,12
**goodness**  30:13
**governor**  8:4
15:2
**governor's**
15:4,5
**grant**  16:14,22
16:22

**grantee**  19:3
**granting**  15:22
16:12
**grateful**  4:16
**great**  5:8 6:20
7:1,14 10:10
11:4 14:6,6
23:1 24:14,23
25:5,21 29:3
38:21
**greg**  2:9 6:15
**ground**  4:22
**grounds**  11:8
**group**  12:8
**guess**  35:24

**h**

**half**  7:9
**handle**  15:15
39:3
**happen**  12:18
**happy**  12:7
**hard**  20:22
21:15
**harm**  30:24
**harmed**  30:9
**head**  4:25 18:7
19:1,1 20:20
25:19
**heads**  6:18
**hear**  15:10 17:3
18:11
**heard**  32:2,3
**held**  18:1,7
**help**  12:20

helpful 29:3
hire 33:23
hired 12:8
hiring 33:3
hit 10:6
hmm 10:19
  11:3 25:9 35:5
  35:5
hold 8:12
honestly 20:10
hope 38:6
hour 39:8
housed 9:4
huh 4:24,25

**i**

identify 29:23
identities 12:4
identity 31:2,9
imagine 13:3
  38:8
immediately
  15:17
important 4:23
  5:2
improvement
  8:14
inappropriate
  7:4
include 9:10
included 24:12
including 18:6
  19:7 38:9,14
  38:14
index 3:10

inform 16:10
informed 16:9
initiatives 9:9
institute 8:15
intending 35:7
intent 29:17
  37:14
interested
  41:15
introduce
  18:16
introduced
  5:14
issue 11:17

**j**

january 35:21
jdavis 2:6
jewish 12:15
  38:14
jlk 1:7
joe 4:14 36:10
join 38:18
joined 13:13
joseph 2:2
july 7:24
jumpstart
  18:14
june 11:2

**k**

kids 19:1
know 4:18,22
  7:2,8 9:22
  10:11,15 14:2
  14:15 21:24

22:22 24:18
28:24 30:23,24
32:23 34:6,15
34:23 36:11
knowingly
  22:20

**l**

lakewood 1:4
language 17:9
laurel 3:6 41:4
  41:19
law 20:4 22:19
  23:15 29:2,5
  29:10 30:12,23
  31:1,10 32:11
  33:4
laws 32:11
lawyers 4:15
learned 35:11
  37:23 38:11
led 36:16
legal 16:1,7,8
  36:17 42:23
legally 15:19
  22:19
legislature 8:10
lens 30:5
letter 3:15,16
  9:17 11:21
  14:9,16,23
  15:1,16,20
  16:7,12 17:21
  21:25 23:5,21
  24:13 25:2,12
  29:13

letter's 23:11
level 9:6
liberty 2:4
licensing 9:8
likely 35:7
line 13:3,6
lisa 1:5,9,14 3:4
  4:6 40:1,11
  42:4,5
list 7:12 12:4
little 4:20
littleton 1:4
littletown 42:4
local 17:8
log 36:3,13
long 7:2,21
  19:18
lonhausen 6:13
look 30:4 36:3
looked 24:25
looking 13:4
  25:13,14 32:4
  32:5,10
looks 10:16
  11:6 14:17,18
  17:21 26:5,18
  30:24
lot 36:12
lutheran 24:4
  35:3,7 36:25
  37:23 38:17

**m**

ma'am 18:20
made 15:15
  20:4 23:25

31:7 40:7,8
**make**  5:6 37:3
**mark**  9:19 14:1
24:16 34:13
**marked**  9:21
10:5 14:4
22:24 24:17
34:17
**marriage**  32:17
33:6,25
**mary**  1:3 42:4
**match**  27:25
**matching**  35:8
37:13,18,20
**mean**  12:25
34:10 37:7
**means**  37:8
**meet**  13:6
**meeting**  10:18
11:6,11,14
17:14
**meetings**  17:13
**members**  8:10
16:7,13,21
17:18,22 27:23
27:24
**mention**  32:4
34:5
**mentioned**
14:10 25:8
32:24 35:3
37:24 38:12
**merit**  3:7 41:20
**michael**  10:22
10:24 11:1,6

11:17,20 14:19
14:23 15:18
17:13 23:8,17
23:19 28:25
**michelle**  6:13
**midatlantic**
42:15
**mind**  6:8
**ministers**  33:9
**minute**  36:4,11
36:13
**minutes**  39:9
**misstates**  29:12
**mixed**  37:15
38:3
**mm**  10:19 11:3
25:9 35:5,5
**moment**  10:10
14:11 21:6
24:25 25:3
32:25
**monthly**  17:14
**move**  19:4

| **n** |
| --- |

**n**  4:1
**n.w.**  2:4
**name**  4:14 14:5
35:20
**natural**  31:8,9
**nebraska**  8:16
**need**  25:3
**needed**  25:1
**never**  16:16
22:7 35:17

**new**  10:6,6
**nicholas**  2:3
**nicole**  2:9
**niki**  6:12
**nodding**  4:25
**nondiscrimin...**
9:15 12:2
16:15 26:4,22
29:2 31:18,23
**nondiscrimin...**
17:9
**notary**  3:8
40:18 41:5,21
**note**  42:10
**notice**  3:1
**noticed**  32:20
**november**  1:15
3:6 42:3
**nreaves**  2:6
**number**  13:6,9
14:10
**numerous**
11:21

| **o** |
| --- |

**o**  4:1
**oath**  5:10 40:4
**object**  20:17
**objection**  15:7
15:23 16:24
19:12,25 20:8
20:17 25:10,25
26:1,25 27:16
29:12 30:1,1
30:21 31:4
32:18 34:8

37:10 38:4
**obviously**
17:10
**october**  41:17
**odean**  1:10
2:14 6:11 32:4
33:1
**office**  2:10 6:12
6:14,16 15:4,5
**official**  1:9,10
**officially**  7:24
**oh**  25:15 34:21
**okay**  6:3,6 7:1
7:8,14 8:1,12
8:17,20,23 9:2
9:5,11,19,24
10:9,13,16
11:4,4,11,13,16
11:23 12:3,6
12:17 13:9,15
14:1,5,9,18,22
15:1,14,21
16:16,20 17:21
18:9,13,15
19:23 20:11
22:5,21 23:4,7
23:10,16,20
24:3,7,14,20,23
25:15,17,19,21
26:5 27:4,12
29:3,9 31:12
31:15,21 32:13
32:16 33:16
34:13,18,22
35:2,6,11,17,23

**[okay - problem]**                                                                 Page 9

36:8,19,23,24
37:17
**operation**
18:14
**operations** 8:25
**opinion** 21:21
**opportunities**
20:25
**opportunity**
18:5 28:7
**opt** 35:8 37:1
37:25
**options** 12:24
13:1,2
**order** 38:23
**original** 10:16
11:5
**outside** 32:19
**oversee** 9:2
**oversight** 34:12
**own** 18:6

**p**

**p** 4:1
**p.m.** 3:5 36:7,7
39:8
**page** 3:11,13
25:2,14 27:5
31:14
**pages** 40:5
**paragraph**
26:19
**paragraphs**
26:8
**paralegal** 6:14

**parents** 37:3
**parish** 1:3,4
42:4
**part** 5:15 17:7
19:16 27:25
29:2 31:13
33:8
**participant**
21:1 22:19
**participate**
12:11 13:11
16:23 17:25
18:5 19:6,11
19:14,18,24
20:6,15 21:13
22:9,10,15,17
27:22
**participated**
22:8
**participating**
19:16
**parties** 41:14
**past** 28:13
**pastor** 2:13
**patterson** 24:8
24:9 25:7,24
26:7,10,15,20
27:3,21 31:14
33:17,19 34:3
**patterson's**
28:15
**pedophile** 33:7
33:12
**pennsylvania**
2:4

**perspective**
13:3 16:17,19
**phone** 2:5,11
**phonetic** 6:13
**piece** 4:19
**pilot** 11:20 12:6
12:7,17,17,18
12:19,21 13:8
13:15,18
**place** 41:10
**plaintiffs** 1:6
2:2 3:5 4:15
**platform** 10:2
**please** 17:4
**point** 6:17
13:11 37:19
**pointed** 27:22
33:1
**policies** 26:10
26:20 28:16
29:5,10 31:17
32:4,10 34:5
**populate** 10:7
**portion** 27:24
**position** 7:16
8:5,12,19
**possible** 15:21
16:11
**practicing** 12:2
26:4
**preference**
17:17 27:23
**preferences**
33:3 37:21

**preliminaries**
4:21
**preliminary**
5:9
**preparation**
5:21 24:6
**prepared** 7:11
**preparing** 6:4
35:18
**preschool** 1:11
13:13 17:11
18:6,7 19:6,10
20:21 21:5
22:6 27:21
37:2,14,18
38:18
**preschools** 9:13
12:15
**prescribe** 28:8
**present** 2:13
5:17
**prevent** 5:18
**previous** 8:17
41:6
**priests** 33:10
**prior** 38:24
39:2
**privilege** 36:3
36:13
**privileged**
15:24
**probably** 6:18
**problem** 17:20
17:22 25:18
28:17

**problematic**
20:24
**problems** 26:6
**procedure** 3:2
**process** 6:1 8:7
15:16 35:8
37:2,13,18,20
**product** 36:17
**production**
36:12
**professional**
3:7 41:5,20
**program** 1:11
12:18,19 13:14
13:15,18,18
17:11 18:8
19:1,11 20:2
20:21 21:5
22:7 27:22
32:7 37:3,4,14
37:18 38:18
**program's** 9:14
23:23 25:24
**programs** 9:1,3
9:10 19:3 22:8
33:23
**pronoun** 26:10
27:13
**pronouns**
28:17 29:24
30:19
**proposed** 10:18
**protect** 30:13
**prove** 30:6

**provide** 23:12
23:14 30:20
37:21
**provider** 12:13
13:5 21:24
22:7,10,13
26:23 28:1,7
29:21 31:7
38:1
**providers**
11:22 12:9,12
12:20,23 13:7
17:15,17,25
18:5 19:5,21
29:18,20 33:2
38:7,10,13,15
38:17
**provision** 12:3
26:22
**public** 3:8 5:15
8:22 19:8
40:18 41:5,21
**purposes** 4:25
38:2
**pursuant** 3:1
**purview** 32:12
32:12 33:8,15
33:22 34:1,7
**put** 12:19 21:5
36:12

**q**

**quality** 9:8
**question** 15:25
16:2 17:19
19:9 20:10,13

20:22 21:16
24:2 28:15
29:14 32:23
34:2
**questions** 5:9
16:4 38:20
**quickly** 9:20
**quite** 32:8

**r**

**r** 2:3,8 4:1
**raised** 12:13
26:7
**rate** 12:10,11
**rather** 4:24
**read** 23:25
27:20 39:4
40:2 42:9
**reading** 25:16
34:20
**ready** 25:20
**really** 4:15,23
9:20 21:5 22:5
28:12 35:12
**realtime** 3:8
41:21
**reason** 21:15
32:1 42:11
**reasons** 17:3
30:25
**reaves** 2:3
**receipt** 42:18
**received** 17:7
22:3,3 23:22
23:25 28:14

**receiving** 9:17
14:22
**recently** 35:1
**recess** 36:7
**recognize**
10:14 14:7,8
23:2 34:24,25
**recollection**
36:14
**recommend**
16:9
**recommended**
16:9
**record** 5:15 6:7
7:15 10:8 36:6
38:22 39:9
**redacted** 35:25
36:20
**reduced** 41:11
**referenced** 42:6
**references** 21:4
**reflected** 35:12
**reflects** 35:6
**refresh** 10:6
36:13
**refusing** 30:24
**regardless** 12:4
**registered** 3:6,7
41:4,20,20
**rejoin** 6:17
**related** 41:13
**relationships**
38:7
**relatively** 30:4

| religious 2:4 | requesting 9:14 | return 42:13,17 | s |
|---|---|---|---|
| 11:8,21 12:9 | 9:18 11:7 14:9 | review 5:21 | |
| 12:12,14 18:1 | 29:24 | 10:11 24:25 | s 3:6 4:1 41:4 |
| 23:23 25:23 | requests 23:22 | 34:24,24 42:7 | 41:19 |
| 26:20 31:17,23 | 32:22 | right 6:16 7:12 | saw 35:17 |
| 32:22 33:2 | requirement | 8:2,18 9:22 | saying 21:8,19 |
| remaining 7:11 | 27:10 | 13:21,24 14:2 | 26:15,16,21 |
| remember 9:16 | requirements | 14:20 17:23 | 33:13,18,21 |
| 9:17 11:18 | 9:15 17:23 | 19:6,9,17,19,24 | says 23:15 26:9 |
| 24:1,5 35:19 | 23:23 25:24 | 20:5,16 21:7 | 26:11,19 28:16 |
| 35:21 | 31:18,23 38:1 | 22:7,22 23:13 | 29:22 31:10,14 |
| remind 10:24 | requiring 12:3 | 23:21 24:8,15 | 35:9,10,21 |
| 24:10 | reserve 27:23 | 24:18 25:8,20 | 37:1 |
| remote 1:14 3:2 | resources | 26:17,24 27:4 | scholarships |
| remotely 3:5 | 12:20 | 27:10 28:14,21 | 14:13 |
| 4:3 | respond 16:7 | 29:7,11,20 | school 24:7 |
| repeat 16:2 | responded 11:7 | 30:17 32:14 | 25:19 26:7 |
| repetition 4:20 | 24:13 | 33:25 34:10,15 | 30:19 |
| rephrase 20:12 | response 10:22 | role 8:20,24 | schools 8:22 |
| report 36:9 | 15:19 23:4,10 | room 4:18 6:7 | 14:10,12 16:21 |
| reported 31:22 | 27:6 28:19 | 6:16 | 19:8 31:23 |
| reporter 3:7,7 | 29:6 32:24 | roy 1:9,14 3:4 | 35:3,7 36:25 |
| 3:8 4:2 5:11 | 33:17,18 34:3 | 4:6,11 5:10 | 37:24,24 |
| 6:24 15:10 | 34:5 36:18,20 | 6:21 7:15 9:12 | scope 32:19 |
| 18:20 38:23 | 36:22 | 32:20,21 36:1 | seats 27:24 |
| 39:1,3 41:5,20 | responses | 36:16,22 40:1 | 28:8 |
| 41:20,21 | 15:21 16:12 | 40:11 42:4,5 | second 7:9 26:8 |
| reporter's 41:1 | responsible | roy's 36:19,22 | 26:19 31:13 |
| representing | 8:25 13:19 | rules 3:2 4:22 | see 11:9 14:5 |
| 7:10 | 32:6 | 13:4 | 17:2,20 31:19 |
| request 23:11 | restate 18:21 | run 15:12 | 31:25 35:20 |
| 25:6,23 35:2 | 29:4 | 33:23 | 37:1 |
| requested | restrict 17:24 | running 6:8 | seeing 35:19,22 |
| 15:22 16:13 | result 23:24 | rust 2:9 6:12 | sense 5:6 21:20 |
| | 41:15 | | 33:13 |

| | | | |
|---|---|---|---|
| **sent** 25:12 42:14 | **smith** 2:15 6:14 | 20:7,15 21:9 | **talking** 16:1 |
| **serve** 17:18 | **solutions** 42:23 | 21:10,17 22:12 | 32:25 |
| **set** 22:6,6 41:10 | **son** 18:6 | 26:12 27:15 | **teacher** 32:17 |
| **several** 12:14 | **sorry** 12:25 | 28:18,21 | **team** 16:8,8 |
| **severely** 17:24 | 13:22 15:10 | **statements** | **tell** 12:7 16:4,8 |
| **sex** 26:11 32:17 | 18:20 24:10,21 | 21:23,25 | 23:8 28:23 |
| 33:6,25 | 25:15,17 | **states** 1:1 | 30:5 |
| **shaking** 4:25 | **sort** 9:6 | **stating** 27:3 | **telling** 21:12 |
| **share** 10:2 15:5 | **sounds** 34:6 | **statute** 12:1 | **term** 28:25 |
| **shared** 15:4 | **sources** 21:17 | 16:15,15 28:3 | 32:8 |
| 35:1,16 | **speak** 6:4 7:11 | **students** 13:9 | **testified** 4:8 |
| **sheet** 42:11 | 33:5 | 37:22 | **testify** 32:20,22 |
| **sheley** 1:5,5 | **specifically** | **subject** 13:16 | 41:8 |
| **shorthand** | 13:25 28:4 | **submitted** 5:25 | **testimony** |
| 41:10 | **speculate** 28:13 | 6:1 | 29:13 40:3,5 |
| **show** 29:17 | **speculation** | **subscribed** | 42:9,18 |
| **showed** 34:19 | 15:7 27:17 | 40:13 | **thank** 4:13,17 |
| **sign** 19:18,23 | 30:2,21 31:4 | **suite** 2:4 | 14:14 22:25 |
| 20:14 21:9,12 | 32:19 37:11 | **supports** 9:9 | 24:9,15 27:19 |
| 22:11,11 39:4 | **split** 10:4 | **sure** 6:9 14:14 | 28:10 30:13 |
| 42:12 | **st** 1:3,4 42:4 | 16:3 24:11 | 36:11,23 38:21 |
| **signature** 41:18 | **staff** 33:9 | 34:21 36:5 | **thanks** 36:10 |
| **signed** 19:21 | **start** 18:7 19:1 | **sworn** 4:3,7 | **thing** 10:6 |
| 21:16,19,19,23 | 19:2 20:20 | 40:5,13 41:8 | **things** 30:4 |
| 21:25 22:1,4 | **started** 7:25 | **system** 20:3 | 33:7 37:9 |
| 42:20 | 11:2 | 37:15 38:3 | **think** 10:6 26:9 |
| **sincerely** 18:1 | **state** 3:9 17:8 | | 34:10 35:3 |
| **single** 21:24 | 28:3 32:11 | **t** | 37:6,8 38:19 |
| **siobhan** 2:9 | 40:3 41:5 | | **thoughts** 36:21 |
| **sir** 34:20 | **stated** 29:16,16 | **t** 2:9 | **tim** 2:14 6:10 |
| **situation** 28:5,6 | 30:25 | **table** 16:16,18 | **time** 4:16,21 |
| 28:7 30:6,10 | **statement** 8:24 | **take** 7:3 10:10 | 5:4,5 13:11,13 |
| **smaller** 12:11 | 11:8,24 12:1 | 13:5,9 24:25 | 21:2,15 34:11 |
| | 13:17 16:15 | 34:21 | 34:21 36:12 |
| | 19:19,20,24 | **taken** 3:5 41:10 | 39:8 41:10 |
| | | **talk** 5:3 32:3 | |

**[time - young]**                                                        Page 13

| | u | v | |
|---|---|---|---|
| 42:19 | **uh** 4:24,25 | **v** 42:4 | **weekly** 17:14 |
| **timeframe** 42:8 | **under** 5:10 | **various** 16:20 | **went** 17:12,12 |
| **today** 5:10 6:17 | 17:24 27:14 | **verbal** 4:24 | 18:7 |
| **together** 12:20 | 28:17 29:5,10 | 5:11 | **whitehair** 2:9 |
| 36:13 40:4 | 40:3 | **verify** 42:9 | 6:15 |
| **took** 33:19 | **understand** | **veritext** 9:25 | **willing** 19:18 |
| 36:13 | 5:10,13 6:22 | 42:14,23 | 19:23 20:6,14 |
| **top** 27:5 36:1 | 6:25 7:4,7 | **veritext.com** | 22:14 |
| 36:20 | 16:20 20:10,24 | 42:15 | **witness** 42:8,10 |
| **topics** 7:11,12 | 21:3 25:22 | **vertiext** 2:13 | 42:12,19 |
| 32:20 | 31:7 32:5 | **view** 16:11 18:2 | **word** 32:13,15 |
| **total** 39:8 | 35:25 | 21:13 | **work** 13:19 |
| **transcript** 5:1 | **understanding** | **violates** 26:12 | 36:16 |
| 38:24 40:3 | 11:23,25 13:12 | 26:22 | **worked** 15:18 |
| 41:12 42:6,20 | 26:14 38:17 | **violation** 28:2 | 17:5,10 18:10 |
| **transgender** | **understood** | **virginia** 2:8 6:8 | 18:10,12,17,19 |
| 29:22 | 17:6 26:3 | 6:9 36:1,8 42:1 | 18:24,25 21:21 |
| **transition** 11:1 | **united** 1:1 | **virginia.carre...** | 23:8 |
| **true** 34:2 41:12 | **universal** 1:11 | 2:12 42:1 | **workforce** 9:8 |
| **truth** 41:8 | 38:18 | **voluntary** 20:2 | **working** 38:13 |
| **try** 4:20 5:4 | **university** 8:16 | **vs** 1:8 | **worried** 26:21 |
| 30:15 | **unwilling** 22:11 | | 34:4 |
| **trying** 20:23 | **upk** 9:2,6,14 | **w** | **written** 3:1 |
| 34:13 35:24 | 16:23 17:24 | **want** 4:21 7:3 | |
| 38:2 | 19:11 20:15 | 20:6 21:5 | **y** |
| **tubbs** 3:6 41:4 | 21:13 22:9 | 22:15,17 28:12 | **yeah** 20:13 |
| 41:19 | 23:23 25:23 | 30:9 39:3 | 36:10 39:2 |
| **tuition** 13:4 | **usage** 26:10 | **wanted** 25:1 | **years** 17:6 |
| **two** 7:11 24:5 | 27:13,13 | **wants** 22:8 | **young** 22:14 |
| 26:6,7 | **use** 29:22,24 | **washington** 2:5 | |
| **type** 17:8 | 32:9,9,13,15 | **way** 17:2 20:12 | |
| **types** 38:8,13 | **used** 28:25 | 33:20 | |
| **typewritten** | 30:19 38:13 | **we've** 30:25 | |
| 41:11 | 42:20 | 32:10 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.