## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02079-JLK

ST. MARY CATHOLIC PARISH IN LITTLETON; ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD; LISA SHELEY; DANIEL SHELEY; and THE ARCHDIOCESE OF DENVER

      Plaintiffs,

v.

LISA ROY, in her official capacity as Executive Director of the Colorado Department of Early Childhood; and DAWN ODEAN, in her official capacity as Director of Colorado's Universal Preschool Program,

      Defendants.

---

**DEFENDANTS' RULE 56(d) MOTION TO DENY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT TO ALLOW DEFENDANTS TO CONDUCT NECESSARY DISCOVERY AND DEFENDANTS' RESPONSE TO PLAINTIFFS' ALTERNATIVE MOTION FOR A PRELIMINARY INJUNCTION, WITH TRIAL BRIEF**

---

Plaintiffs, in their effort to receive taxpayer funds while discriminating against LGBTQ+ children and families, have moved for summary judgment less than four months after filing this case. In doing so, Plaintiffs essentially ask for a permission slip from this Court, in the form of an advisory opinion, to discriminate against four-year-olds and their families in their preschools.

Despite working diligently to comply with the compressed timeline in this matter, Defendants have been unable to obtain full discovery concerning the UPK participation of preschools affiliated with Plaintiff Archdiocese of Denver. Given more time, Defendants would have obtained additional discovery regarding the two Plaintiff preschools and prepared more robust expert reports. To that end, Defendants request additional time under Fed. R. Civ. P. 56(d) to obtain discovery regarding the Archdiocese, should the Archdiocese remain in the case.

It remains Defendants' position that no Plaintiff in this case has standing to pursue it. That said, should this Court not dismiss this case entirely, areas of material fact remain that preclude summary judgment under Fed. R. Civ. P. 56(a).

## PROCEDURAL BACKGROUND

Plaintiffs, St. Mary Catholic Parish in Littleton ("St. Mary"), St. Bernadette Catholic Parish in Lakewood ("St. Bernadette") (collectively, "Plaintiff Preschools"), and the Archdiocese of Denver ("Archdiocese"), filed their Complaint in this case on August 16, 2023. Plaintiffs allege that Defendants violated their First Amendment rights because the Universal Preschool Program's ("UPK Program") nondiscrimination statute and provider agreement do not allow Plaintiffs to deny children, families, employees, and prospective employees access to preschool enrollment and employment opportunities based on religion, gender identity, and sexual orientation. On September 13, 2023, Plaintiffs filed a Motion for a Preliminary Injunction.  On September 14, 2023, Plaintiffs filed an Amended Complaint adding two individuals, Lisa and Daniel Sheley, as Plaintiffs.

On October 6, 2023, Defendants filed a Motion to Dismiss, arguing that Plaintiffs' claims are not ripe and that Plaintiffs lack standing. That Motion to Dismiss is fully briefed, including Supplemental filings ordered by this Court, and remains pending. Defendants filed a Motion to Stay Discovery on October 10, 2023, which this Court denied on October 30, 2023. Defendants have worked diligently to obtain discovery, including reviewing nearly 4,000 pages of documents produced by Plaintiffs, taking four depositions of representatives from the Archdiocese and the two Plaintiff Preschools as well as Plaintiff Lisa Sheley, locating two expert witnesses on the real-world impact of LGBTQ+ discrimination on vulnerable families, and

preparing expert disclosures regarding the same. Defendants are currently preparing for the trial to be held before this Court on January 2-4, 2024.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Parker v. United Airlines, Inc.*, 49 F.4th 1331, 1337 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1087 (2023). "A fact is 'material' if it 'might affect the outcome of the suit under governing law.'" *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1046 (D. Colo. 2020) (Kane, J.) (quoting *Anderson*, 477 U.S. at 248). Furthermore, "summary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" *Convertino v. U.S. Dep't of Just.*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting *Anderson*, 477 U.S. at 257). A party in the Tenth Circuit seeking additional discovery under Rule 56(d) must submit a declaration specifying "(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment." *Adams v. C3 Pipeline Constr. Inc.*, 30 F.4th 943, 968 (10th Cir. 2021) (quotations omitted).

## ARGUMENT FOR WHY DEFENDANTS' RULE 56(d) MOTION SHOULD BE GRANTED

Even if this Court finds that dismissal is inappropriate, a ruling for summary judgment would be inappropriate for two reasons: 1) summary judgment is premature; 2) and there remain genuine issues of material fact.

To give some brief background, the UPK Program was approved by Colorado voters in 2020 to expand the reach of preschool programming for the state's four-year-olds. When enacting legislation to implement the will of the voters, Colorado's General Assembly explained the UPK Program's objective to continue to address income barriers to preschool access and further the benefits of high-quality preschool throughout the state. Colo. Rev. Stat. § 26.5-4-202(1)(b). The Program established a "mixed delivery" system that enables parents to select preschool providers — including faith-based providers — from as broad a range as possible. Colo. Rev. Stat. § 26.5-4-204(2). A full description of the background of the UPK Program is contained in Defendants' Motion to Dismiss (Doc. 38 at 2-5); Defendants request that this Court take judicial notice of that filing and its statements and arguments.

## I.      Summary judgment is premature

Defendants attach to this motion a declaration from counsel of record, as required by Rule 56(d), detailing facts that Defendants intend to elicit during further discovery that will have a direct bearing on Plaintiffs' motion for summary judgment. See attached Ex. 1 (Carreno Decl.). This declaration satisfies the Tenth Circuit's standard for granting a Rule 56(d) motion, as articulated below.

### A.      The declaration identifies probable facts not currently available

The Carreno declaration identifies the critically important facts not currently available to Defendants. As explained in detail in Defendants' Supplemental Brief to their Motion to Dismiss (Doc. 72), Defendants have been unsuccessful in obtaining discovery regarding the populations, policies, and enrollment of the Unnamed Preschools, despite good faith attempts at the same. Tellingly, the Archdiocese is uncertain whether all 34 Unnamed Preschools even desire to

4

participate in the UPK Program. See Ex. 2 (Moo Tr. at 137:19-138:21, 141:18-19) ("I can tell you of one that, at least at the outset said, you know, they weren't necessarily interested."). Should the Archdiocese remain in this case as a plaintiff, Defendants seek additional discovery regarding the 34 Unnamed Preschools. Defendants also lack information about the six Catholic Charities preschools ("Catholic Charities Preschools") that are participating in the UPK Program. Doc. 47-1 at ¶ 4. Moreover, Defendants have secured two experts who are prepared to testify at the trial scheduled for January 2-4, 2024. However, the experts' ability to prepare a full analysis is hampered by the lack of time to prepare a full report.[1]

### B. The declaration explains why these facts cannot be presented currently and what steps have been taken to obtain these facts

Defendants have not been able to obtain discovery, apart from school handbooks, regarding the 34 Unnamed Preschools. The Archdiocese claims that it cannot produce information because it has no legal control over the Unnamed Preschools (Doc. 62 at 4) even as it simultaneously claims that the schools are bound to follow Archdiocese "directions" and "guidance" and that it can thus speak for the schools. *Id*. at 5. As discussed more fully in Defendants' Supplemental Brief in Support of the Motion to Dismiss (Doc. 72), each preschool

---

[1] Plaintiffs in their portion of the Joint Status Report filed on November 27, 2023, again bring up *Darren Patterson Christian Academy v. Roy,* No. 1:23-cv-01557-DDD-STV (D. Colo.) as a reason why expert testimony is not needed. Plaintiffs claim that the state's decision not to appeal the preliminary injunction ruling in *Darren Patterson* proves there is no state interest. However, this analysis simplifies a complicated matter. The state and Defendants are under no obligation to reveal legal strategy as to why or why not an appeal was filed in any case. Further, the *Darren Patterson* case is not analogous to this one. As stated previously, that case has completely different facts, the preschool was already participating in the UPK Program before the lawsuit, that preschool was already receiving UPK funds before the preliminary injunction was ordered, and the school could not identify one child or family that it had harmed by discrimination. Therefore, the decision regarding whether to appeal the preliminary injunction in *Darren Patterson* does not bear on whether an expert is needed in this case.

is a distinct legal entity, and decisions regarding "the complexities of issues pertaining to []

gender identity [and] sexual identity" are made by the parish pastor at the school level. Doc. 72

at 4 (quoting Moo Tr. at 194:22-195:2).  The attached declaration details the types of discovery

Defendants plan to seek from the Unnamed Preschools should the Archdiocese remain in this

case.

### C. The declaration describes how additional time will enable the Defendants to obtain those facts and rebut the motion for summary judgment

 If the Archdiocese is not dismissed for lack of standing, additional time will allow

Defendants to seek discovery into the Unnamed Preschools and the Catholic Charities Preschools

that participate in the UPK Program—schools to which the Archdiocese claims to give binding

direction and guidance related to the issues at the heart of this litigation and to whom,

presumably, this Court's ultimate decision would then apply.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Deposition testimony confirms that many of Plaintiffs' alleged "undisputed material

facts" are either not "material" or not "undisputed."[2] Further, many of these "undisputed material

facts" are statements of opinions, religious beliefs, or legal contentions rather than assertions of

fact that Defendants can admit or deny. Given their extensive number and the multiple issues

regarding those statements, and for ease of reading, Defendants have attached a chart as its

Response to the Statement of Undisputed Material Facts as Ex. 3, which consists of a chart

listing each proposed fact alongside Defendants' response.

---

[2] Among other things, in their proposed Undisputed Facts, Plaintiffs consistently wrongly conflate an "exemption" from the antidiscrimination requirement with "an exception" from the default matching process (what the Department calls a "preference"). As this Response later explains in detail, Plaintiffs' description is wrong both as to fact and to law.

**ARGUMENT FOR WHY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED**

**II.     Plaintiffs Have Not Met Their Burden to Show They Have Standing or That This Case is Ripe for Judicial Review**

Defendants maintain that none of the Plaintiffs have standing and that this case is not ripe for judicial review. Those arguments were fully briefed and remain pending for this Court's determination. Docs. 38; 42; 47. Defendants further addressed specifically why the Archdiocese lacks standing in their Supplemental Brief in Support of Their Motion to Dismiss (Doc. 72). Defendants also maintain that because the Department has not concluded its rulemaking on the UPK Program's Quality Standards or finalized its amendments to the UPK Provider Agreement for the 2023-2024 school year, many, if not all, claims in this case will soon become moot.

**A.     The Plaintiffs Have Not Met Their Burden to Show That the Program's Antidiscrimination Requirements Violate the First Amendment**

Plaintiffs make unprecedented and baseless claims that they have a First Amendment right to discriminate against four-year-olds and their families in publicly funded preschools. The First Amendment provides no such right.

**1.     The Program's Statutory Antidiscrimination Requirement Does Not Violate the Free Exercise Clause**

The UPK Program welcomes all providers, public and private, faith-based and secular. Because its antidiscrimination requirement applies to all providers, and is both neutral and generally applicable, it receives only rational-basis scrutiny under the Free Exercise Clause. The Program's antidiscrimination requirement easily satisfies this review by ensuring that all four-

year-olds and their families do not face discriminatory barriers to preschool and instead can receive its many benefits.

       **a.**    **The UPK Program Does Not Exclude Religious Providers, But Is Instead Open to Providers Both Religious and Secular**

As the Supreme Court has recognized, the Free Exercise Clause does not require Colorado to open its Universal Preschool Program to private preschool providers. *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) ("A State need not subsidize private education."). Even so, Colorado has chosen to do just that, welcoming both faith-based and secular private preschools to participate in its Program along with public schools. The Program requires all providers that receive state funding—regardless of whether they are public or private, secular or faith-based—to provide "an equal opportunity to enroll and receive preschool services" regardless of protected class status. Yet Plaintiff Preschools want to receive state funding without complying with the same requirements that apply to <u>all</u> other participating preschools.

Tellingly, nowhere in their motion do Plaintiffs make any mention of *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990), even though *Smith* controls the Free Exercise Clause analysis in this case. Under *Smith*, government actions that are neutral and generally applicable are subject only to rational basis scrutiny. *Id.* at 879-80.

Plaintiffs instead cite extensively to *Carson v. Makin*, 596 U.S. 767 (2022), *Espinoza*, and *Trinity Lutheran Church v. Comer*, 582 U.S. 449 (2017). But those decisions have no bearing on this case. Each of those cases involved a Free Exercise Clause challenge to a state program that <u>facially excluded</u> otherwise-eligible religious institutions from certain public funding programs solely because those institutions were religious. In stark contrast, Colorado's

program is expressly broad, and <u>includes</u> religious preschools. Colo. Rev. Stat. § 26.5-4-202(1)(b); Colo. Rev. Stat. § 26.5-4-204(2).

A brief examination of each of Plaintiffs' heavily relied-upon cases highlights their inapplicability. In *Carson*, the Court considered a Maine law that supported families in areas without public high schools by providing publicly funded tuition assistance to attend other public or private schools so long as those schools were "nonsectarian" (where "sectarian" schools were defined as those "associated with a particular faith or belief system" and that "promote[] the faith or belief system with which it is associated and/or present[] the material taught through the lens of this faith"). 596 U.S. at 775. Because Maine's program "specifically carved out private religious schools from those eligible to receive" state funds, it was subject to strict scrutiny. *Id.* at 780.

The Court considered the same problem in *Trinity Lutheran*. There, a state program offered public funding to nonprofit organizations to buy and install rubber surfaces for their playgrounds—but expressly excluded any applicants "owned or controlled by a church, sect, or other religious entity." 582 U.S. at 455. The Court identified the Free Exercise violation as "expressly discriminat[ing] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 462. Because the program excluded a church that operated a preschool and daycare center "simply because of what it is—a church," it triggered strict scrutiny. *Id.* at 464.

The Court applied this same principle yet again in *Espinoza,* where it considered a Montana law that barred any school "controlled in whole or in part by any church, sect, or denomination" from the benefits otherwise available to private schools under a state program

providing tax credits to donors who financed scholarships for students' private school tuition. 140 S. Ct. at 2252. There too, the Court applied strict scrutiny because the state "bars religious schools from public benefits solely because of the religious character of the schools." *Id.* at 2255.[3]

In each of these cases, the programs triggered strict scrutiny because they "specifically carved out private religious schools from those eligible to receive such funds." *Carson,* 596 U.S. at 780. In each, the Court found that the carve-out failed strict scrutiny, and thus required that otherwise-eligible religious schools be free to participate in the public funding program on the same terms as everyone else. Here, in contrast, the UPK Program does not carve out religious schools for exclusion, and here Plaintiff Preschools seek to participate in the Program not on the same terms as everyone else, but instead on their own terms.

Colorado's UPK Program does not exclude otherwise-eligible providers because they are religious; indeed, many faith-based providers currently participate in the Program. Declaration of Dawn Odean (Doc 38-1 ¶ 10) (explaining that 40 faith-based providers are currently participating in the UPK Program and 904 children have been matched to those providers). What all participating preschools must do—regardless of their religious or secular nature—is provide children "an equal opportunity to enroll and receive preschool services" regardless of protected

---

[3] Nor does *Everson v. Bd. Of Educ. Of Ewing*, 330 U.S. 1 (1947), also cited by Plaintiffs, apply to this case. There the Court rejected an Establishment Clause challenge to New Jersey law that provided public funding for students' transportation to schools both public and private, including religious schools, noting that a state "cannot exclude" individuals "because of their faith, or lack of it, from receiving the benefits of public welfare legislation." *Id.* at 3, 16. Again, Colorado's program includes all preschools, including religious providers.

class status. Whether a preschool seeks to deny equal opportunity for secular or religious reasons does not matter; all participating preschools are prevented from doing so.

Plaintiffs also mischaracterize the Court's discussion of the term "religious use" in *Carson*. *See* Doc. 61 at 28-29. In *Carson,* the Court held that expressly excluding an otherwise-eligible religious institution from a public funding program triggered strict scrutiny regardless of whether the carve-out was based simply on the entity's religious identity or instead on the entity's use of the funding for religious instruction or other religious purposes. 596 U.S. at 786-88. More specifically, in *Carson* the state of Maine sought to distinguish the express exclusions of religious entities that triggered strict scrutiny in *Trinity Lutheran* and *Espinoza* as based solely on the entities' religious identity, without more. In contrast, Maine argued that its public funding program expressly carved out religious schools to instead prevent the use of state funds for religious uses like religious instruction, and that the Free Exercise Clause posed no bar to the state's choice. The Court rejected this distinction, stating that the government's decision to carve out otherwise-eligible religious schools from participation to prevent their use of public monies for religious instruction also triggered strict scrutiny. *Id* at 787-88.

Here, Colorado's UPK Program does not exclude religious preschools <u>for any reason</u>.  To the contrary, unlike the program at issue in *Carson,* Colorado's Program includes preschools that offer religious instruction. In fact, 40 faith-based providers are currently participating in the UPK Program and 904 children have been matched to those faith-based providers. Declaration of Dawn Odean (Doc 38-1 ¶ 10). The Program's antidiscrimination provision instead prohibits discriminatory conduct by requiring all publicly funded preschools—public or private, secular or faith-based—to provide "an equal opportunity to enroll and receive preschool services"

regardless of protected class status. For this reason, *Smith*—rather than the *Carson-Espinoza-Trinity Lutheran* trilogy—provides the appropriate Free Exercise Clause analysis. *Smith,* 494 U.S. at 879-80 (holding that government actions that are neutral and generally applicable are subject only to rational basis scrutiny).

> ### 2. The Program's Antidiscrimination Requirement is Neutral and Generally Applicable to all Providers That Receive State UPK funding, Regardless of Those Providers' Religious or Secular Status

Plaintiffs seek to receive the state's funding without complying with the same rules that apply to all other participating preschools.  In other words, Plaintiffs seek to receive public funding while at the same time receiving an exemption from the Program's neutral and generally applicable antidiscrimination provision. This the Free Exercise Clause does not require.

> #### a. The Program's Antidiscrimination Requirement is Neutral

A governmental action is not neutral for Free Exercise Clause purposes if it "prohibits conduct because it is undertaken for religious reasons" —in other words, where "the object or purpose of a law is the suppression of religion or religious conduct." *Church of the Lukumi Babalu v. City of Hialeah*, 508 U.S. 520, 532-33 (1993).  Evidence of such impermissible purpose may be found in the text of the law, the legislative history, or the background circumstances that gave rise to the law. *Id.* at 533-34, 540-41. That a law may have an adverse impact on religious conduct, however, does not mean that the law impermissibly targets that conduct. *Id.* at 535.

Nothing in the UPK Program's statutory text, its legislative history, or the reasons for its enactment indicate that Colorado sought to target or suppress religious conduct when it required all participating preschool providers not to discriminate against children and families. *See*

*Harmon v. City of Norman*, 61 F.4th 779, 794 (10th Cir. 2023) (holding that a law was neutral because nothing in the record indicated that its enactment or enforcement sought to infringe religious practice). The Program's antidiscrimination requirement is facially neutral and prohibits discrimination regardless of its motivation—secular, religious, or otherwise. Moreover, the Program's legislative history and background circumstances indicate no governmental hostility to religion. Indeed, when a coalition of faith-based providers, including the Archdiocese, requested participation in the UPK Program, Defendant Dr. Roy responded that "faith-based providers can, and are encouraged to, participate in the UPK program. To that end, we created an interfaith working group, which meets weekly, to problem solve issues as they arise from within the faith-based community and facilitate participation." Doc. 32-13 at 2.

The Supreme Court's decision in *Lukumi* makes clear that a government action is not neutral when the government regulates "because of" religion, not "in spite of" religion. *Lukumi, 508 U.S.* at 540-41; *see also Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649-50 (10th Cir. 2006) ("A law is neutral so long as its object is something other than the infringement or restriction of religious practices."). Here the UPK Program prohibits discrimination not because of religion (and regardless of a provider's reasons for discriminating), but instead because of the harms caused by discriminatory conduct.[4]

> b.   **The Program's Antidiscrimination Requirement is Generally Applicable**

---

[4] The Plaintiffs cite the Tenth Circuit's decision in *Ashaheed v. Currington,* 7 F.4th 1236 (10th Cir. 2021) for support, but *Ashaheed* has no application here, as it involved a Free Exercise Clause challenge alleging that a detention officer refused to provide an existing religious exemption to a Muslim prisoner based on anti-Muslim animus. Here there is no such religious exemption, nor any refusal (animus-based or otherwise) to apply such an exemption.

A governmental action is not generally applicable for Free Exercise Clause purposes when it provides a mechanism for individualized exemptions from its equirements or when it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). Colorado's Program does not exempt any provider, secular or faith-based, from its antidiscrimination requirements, nor does it permit secular conduct that undermines its antidiscrimination interests.

### c.     The UPK Program Has No "Categorical Exceptions" From Its Antidiscrimination Requirement

In claiming that the Program's antidiscrimination requirement is not generally applicable, Plaintiffs conflate the antidiscrimination requirement with the Program's matching preferences, which they mischaracterize as "categorical exceptions" from its antidiscrimination requirements. *See* MSJ (Doc. 61 at 31-33). In addition to mischaracterizing the preferences as "categorical exceptions," Plaintiffs also inaccurately describe the preferences and how they work. The preferences are departures from the Program's default *matching process*—not from the Program's antidiscrimination requirement. The matching preferences permit a participating provider to save some or all of its preschool seats for families or community members to ensure continuity of care, to ensure programming coverage, or to comply with other federal or state requirements. The matching preferences are also consistent with the statute's directive that all rules promulgated by the Department must increase equity in access to programs and services. Colo. Rev. Stat. § 26.5-1-105(1)(a)(III).

Plaintiffs don't claim that the Program's matching process burdens their religious exercise; they claim instead that the Program's antidiscrimination provision burdens their religious exercise. But the preferences do not permit providers to engage in discrimination that violates the Program's antidiscrimination provision. The Department expects all participating providers—regardless of any preferences they may employ—to comply with the Program's antidiscrimination requirement, will investigate any complaint that a provider has violated that requirement, and will take enforcement action against a provider found to have violated that requirement. See Draft Rules (Doc. 61-12 at 6), 4.110.B, attached as Ex. 4.

Contrast the facts in *Fulton,* where the program at issue created the possibility of exceptions specifically from the contested antidiscrimination provision. There, the contractual provision that prohibited providers from discriminating based on sexual orientation or other protected class status included, in the same sentence, the possibility of "an exception granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." *Id.* at 1878.

Colorado's UPK Program recognizes nine general preferences that permit a participating provider to save some or all of its preschool seats for families or community members to ensure continuity of care, to ensure programming coverage, or to comply with other federal or state requirements. Four of these preferences permit providers to reserve seats for children continuing in the same program to ensure continuity of care for that child; for the siblings of a child already in the school to keep siblings similarly located; for the children of its employees; and (with respect to public school providers) for children within that district's boundaries. Proposed Rules (Doc. 61-12 at 6).

A fifth preference permits faith-based providers–not just those attached to a house of worship—to reserve seats for children from their congregations. *Id.* This congregation preference was developed in response to requests from faith-based providers to permit faith-based providers, like other providers, to hold seats for members of their communities. Plaintiffs mischaracterize this preference as an exemption from the nondiscrimination requirement. MSJ (Doc. 61 at 33). In actuality, the congregation preference—along with several other preferences like the "cooperative" preference for families that agree to volunteer time to support the provider's programming and the provider preferences for the siblings of current students or the children of its employees—instead privileges applicants with various ongoing relationships with specific provider communities.

A sixth preference permits "cooperative" preschool providers that rely on families' volunteer time to support their programming to reserve seats for families who agree to donate such time. Proposed Rules (Doc. 61-12 at 6). Seventh, preschools that provide dual-language or language immersion programming may reserve seats for children with proficiencies in certain languages. *Id*.

Eighth, Head Start[5] providers may reserve seats "for families that qualify for Head Start in accordance with Head Start's federal mandate." *Id.* Plaintiffs wrongly describe this preference as an exemption from the Program's antidiscrimination requirement. MSJ (Doc. 61 at 32). That

---

[5] Colorado's UPK statute defines a "Head Start agency" to mean the local public or private nonprofit agency designated by the federal Department of Health and Human Services to operate a Head Start program under the provisions of Title V of the federal "Economic Opportunity Act of 1964," as amended. Colo. Rev. Stat. § 26.5-2-102(3).

the UPK statute's definition of "preschool provider"[6] itself expressly requires the inclusion of

Head Start providers demonstrates that Head Start providers do not violate that statute's

antidiscrimination provision by prioritizing families, including[7] low-income families, who

qualify for the Head Start program. Colo. Rev. Stat. § 26.5-4-203(14). In other words, the

preferences do not permit providers to engage in discrimination that violates the Program's

antidiscrimination provision—and the Department does not interpret that provision to prohibit

providers from prioritizing low-income families. Nor would it make any sense to interpret it in

that way when the Program's key objectives, as expressly identified in statute, include expanding

low-income families' access to preschool. Colo. Rev. Stat. § 26.5-4-202; § 26.5-4-204(1)(b).

Ninth, providers may reserve[8] seats for children with disabilities to ensure compliance

with state and federal law like the Individuals with Disabilities Education Act. Proposed Rules

(Doc. 61-12 at 6).  Here too, the UPK statute itself requires and prioritizes the inclusion of such

providers.[9] Proposed Rules (72-8) at 6; Colo. Rev. Stat. §§ 26.5-4-202(4), 26.5-4-206(1). Indeed,

---

[6] Colorado's UPK statute defines a "preschool provider" to mean any of the following entities that are licensed pursuant to [the child care licensing act]: (a) A family child care home, as defined in section 26.5-5-303;(b) A child care center, as defined in section 26.5-5-303; (c) A school district licensed to operate as a public preschool provider; (d) A charter school licensed to operate as a public preschool provider; or (e) *A head start program*. Colo. Rev. Stat. § 26.5-4203(14) (emphasis added).

[7] Head Start programs may enroll some children from families whose incomes are higher if they meet other requirements such as experiencing homelessness, have children in foster care, or are receiving public assistance. *See* https://www.hhs.gov/answers/programs-for-families-and-children/how-can-i-get-my-child-into-head-start/index.html.

[8] Plaintiffs mischaracterize this preference in the MSJ (Doc. 61 at 33) as allowing providers to refuse to serve children with disabilities, rather than saving seats for those children to ensure compliance with state and federal law.

[9] In enacting Colorado's UPK statute, the general assembly recognized "the requirement of the federal "Individuals with Disabilities Education Act," 20 U.S.C. sec. 1400 et seq., as amended, to provide educational services to every three- or four-year-old child with a disability, in

the statute specifically identifies the Program's key objectives to include serving preschool aged children with disabilities. *Id. See also* Colo. Rev. Stat. § 26.5-4-204(1)(c); (4)(a)(II)-(IV). The statutory antidiscrimination provision thus does not prohibit providers from prioritizing children with disabilities, and the preference available to such providers is not an exemption from the antidiscrimination requirement.

Plaintiffs concede that the preferences originated from the Department's engagement with, and incorporation of feedback from, Local Coordinating Organizations ("LCO") and community providers. MSJ (Doc. 61 at 21 ¶ 70). The legislature was clear that the Department must work with other state and local agencies, public and private early childhood providers, Head Start agencies, nonprofit organizations, and parents and families to prioritize the equitable delivery of resources and supports for early childhood. Colo. Rev. Stat. Ann. § 26.5-1-102(1)(f). To this end, the preferences seek to ensure inclusion of diverse communities and fulfill the legislative intent of a "mixed-delivery[10]" system. See Ex. 5 Odean Tr. at 79:17-80:11. The

---

accordance with the child's individualized education program, and declared "that, for purposes of section 17 of article IX of the state constitution, meeting the obligation of serving all three- and four-year-old children with disabilities through the Colorado universal preschool program is an important element of expanding the availability of preschool programs and may therefore receive funding from the state education fund created in section 17(4) of article IX of the state constitution." Colo. Rev. Stat. § 26.5-4-202(4). The statute also requires the Department to "ensure all children with disabilities are served equitably in the Colorado universal preschool program, ensure access to classrooms that meet the individual needs of children with disabilities based on their individualized education programs, and ensure that preschool providers operate in accordance with federal and state law concerning education for preschool-age children with disabilities." Colo. Rev. Stat. § 26.5-4-206(1).

[10] Colorado's UPK statute specifically recognized that "creating a statewide mixed delivery system of preschool providers to make preschool programming universally available to children throughout Colorado compounds the benefits for children who are in low-income families and increases the ultimate social and economic benefits of high-quality preschool programming for the state as a whole." It thus declared "that it is in the best interests of the state and consistent

preferences thus implement the statute's overall commitment to providing early childhood opportunities for all children in Colorado, and ensuring that parent and community input is prioritized in the continuing design and implementation of programs and policies affecting children and families. Colo. Rev. Stat. §§ 26.5-1-102(1)(a), (f); 26.5-4-204(2).

Because the Department only became operational on July 1, 2022, and had to immediately begin implementing the UPK Program for the 2023-2024 school year, it did not have time to promulgate these preferences in rule[11] before providers and families began signing up for the inaugural year of the Program. The Department thus included language in its UPK Provider Guide and a process within the UPK Provider portal that allowed providers to begin utilizing these preferences in year one. UPK Provider Guide (Doc. 30-4 at 38). The Department is currently in the process of promulgating the UPK Quality Standards rules for adoption in early 2024. The proposed draft of these rules, which is open for public and stakeholder feedback, incorporates the same preferences available to providers for the 2023-2024 school year. Proposed Rules (Doc 72-8 at 6).

Again, none of these preferences permits a provider to discriminate in violation of the Program's antidiscrimination requirement, and thus none of these preferences is an exemption from that requirement. *See Church v. Polis*, No. 20-1391, 2022 WL 200661 *9 (10th Cir. Jan. 24,

---

with the will of the voters of Colorado to establish the Colorado universal preschool program to provide high-quality, voluntary preschool programming through a mixed delivery system for children throughout the state in the year preceding kindergarten enrollment and to provide for additional preschool services for children who are in low-income families or who meet identified qualifying factors." Colo. Rev. Stat. 26.5-4-202(1)(a)(VI) and (1)(b).

[11] The prior rules adopted by the Department of Human Services continue in effect until the Department promulgates the new Quality Standards in rules adopted by the executive director. Colo. Rev. Stat. § 26.5-1-106(1)(c).

2022) (unpublished), *cert. denied sub nom. Cmty. Baptist Church v. Polis*, 142 S. Ct. 2753 (2022) (finding that a law was neutral and generally applicable because "the so-called" exemptions did not "actually operate" as exemptions) (citations omitted)).

The Tenth Circuit has interpreted *Smith*'s general applicability analysis to mean that a law is generally applicable when it "remains exemptionless." *Grace United Methodist Church,* 451 F.3d at 650. More specifically, the Tenth Circuit found that a zoning ordinance was generally applicable when there was "no evidence that the Board ever interpreted the exempt categories to include certain daycare operations and not others, or that the ordinance was enacted based on religious animus. . . . The First Amendment simply does not entitle the Church to special treatment so that it may operate a daycare exactly where it pleases while no one else can do the same." *Id.* at 655. Here too, the Department has never permitted exemptions from the Program's antidiscrimination requirements, and the Free Exercise Clause does not entitle Plaintiffs to special treatment so that they can discriminate when other providers cannot.

> **d.    The Program Has No "Individualized Exceptions" From Its Antidiscrimination Requirement**

Plaintiffs also mischaracterize the Program as permitting "individualized exceptions" from its antidiscrimination requirement. *See* MSJ (Doc. 61 at 33-36). The Program permits no such exceptions.

The Plaintiffs start by claiming that the statutory provision that permits the Department to "allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards" creates the possibility for individualized exceptions that exclude faith-based providers. MSJ (Doc. 61 at 34). But this is wrong for two reasons. First, the Department does not

interpret this provision to permit exceptions from the antidiscrimination provision because the same statutory provision goes on to state that "except that each preschool provider must meet all quality standards relating to health and safety as a condition of participating in the preschool program." Colo. Rev. Stat. § 26.5-4-205 (1)(b)(II). The Department understands the antidiscrimination requirement as "relating to health and safety" because it ensures, among other things, that children have access to a safe educational environment free from harmful discrimination. For this reason, any provider receiving a temporary waiver would not be exempted from the antidiscrimination requirement nor from any other health and safety requirement. Second, even if this provision were interpreted as permitting an exception from the antidiscrimination provision, the statute makes clear that a temporary waiver of the quality standards would be available only when "necessary to *ensure the availability of a mixed delivery system* within a community" and any such temporary exemption  would be available to all providers, including Plaintiffs, so long as they—as required by the statute—were "working toward compliance." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II) (emphasis added).

The Plaintiffs then mischaracterize the Program's consideration of providers' individualized requests for matching preferences as individualized exemptions from its antidiscrimination requirement (MSJ (Doc. 61at 35)—even though, as explained above, the preferences are departures from the matching process and not from the antidiscrimination requirement. In addition to the nine generalized preferences discussed above, the Department invited requests for individualized preferences as it continued to seek feedback and learn from the provider community during the Program's early stages. Doc. 61-6. Again, preferences are departures from the default *matching* process—not from the antidiscrimination provision—and

they do not permit a provider to discriminate in violation of the Program's antidiscrimination requirements. To the contrary, permitting providers to prioritize "fully vaccinated" children, children whose parents work for specific employers, or children living in certain areas (to name the individualized preferences cited by the Plaintiffs, Doc. 61 at 35) does not permit them to discriminate in violation of the Program's antidiscrimination requirement. Once again, this process is consistent with the statute's objective to ensure that parent and community input are prioritized in the delivery of early childhood programs and services.  Colo. Rev. Stat. § 26.5-1-102(1)(d).

Nor does the Program's antidiscrimination requirement permit "secular conduct that undermines the government's asserted interests in a similar way." *See Fulton,* 141 S. Ct. at 1877. The Program prohibits discrimination in violation of the statute regardless of its motivation, religious or secular.

### 3. The Program's Antidiscrimination Requirement Easily Satisfies Rational Basis Scrutiny

The government's interest in ensuring that four-year-olds and their families do not face discriminatory barriers to preschool is legitimate, indeed compelling. *See id.* at 1882 (describing the government's interest in the equal treatment of participants in publicly funded services as "weighty" and recognizing that gay persons and gay couples cannot be treated "as inferior in dignity and worth") (quoting *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n,* 138 S. Ct. 1719, 1727 (2018)); *Bob Jones Univ. v. United States,* 461 U.S. 574, 604 (1983) (noting the government's "fundamental, overriding interest" in preventing discrimination in education). Discrimination means that some children and families have fewer options available to them because of who they are. *See Roberts v. United States Jaycees*, 468 U.S. 609, 625 (1984)

(describing how discrimination "both deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic, and cultural life").

Children who experience discrimination, especially in school contexts, suffer a range of harms. Early childhood is a crucial time for children to engage in the world and develop a sense of self, identity, and relationships with others.  See Ex. 6, Masten, A.S. & and Cicchetti, D., *Developmental cascades,* Development and Psychopathology, 22, 491-495 (2010); Shonkoff, J. P., Garner, A.S. et. al., See Ex. 7, *The lifelong effects of early childhood adversity and toxic stress,* Pediatrics, 129, 232-246 (2012).

Adverse experiences—such as discrimination—during these early childhood years and in a school context—can lead to profound negative effects for children's development, mental and physical health, and sense of safety in the world. *Id.* Unfortunately, the likelihood of a transgender or gender diverse child being exposed to adversity—including discrimination—due to their identity is much higher than for cisgender children.  Gender-diverse and transgender children face higher rates of bullying at school than their cisgender classmates, and in turn face higher rates of suicide. See Ex. 8, Thoma Brain C., Rezeppa T.L., Choukas-Bradley S., et al., *Disparities in Childhood Abuse Between Transgender and Cisgender Adolescents,* Pediatrics 148(2): e2020016907 2021; See Ex. 9, Thoma, Brian C., Rachel H. Salk, Sophia Choukas-Bradley, Tina R. Goldstein, Michele D. Levine, Michael P. Marshal, *Suicidality Disparities Between Transgender and Cisgender Adolescents,* Pediatrics, 144 (5): e20191183. 10.1542/peds.2019-1183 (Nov. 2019).

When home and school both offer accepting environments for a child, they foster positive academic and emotional outcomes for that child's development; in contrast, children experience

harm when they are accepted in one environment (for example, at home) but not in another (like school). See Ex. 10, Joyce, A.N., *High-Conflict Divorce: A form of Child Neglect,* Family Court Review, 54:642-656. (2016); See Ex. 11, Cox, Diane D., *Evidence-Based Interventions using Home-School Collaboration*, School Psychology Quarterly 20.4, 473-97, (2005), ProQuest. Web. 8 Dec. 2023; See Ex. 12, Sutherland, Kevin S.; Wu, Eleanor G.; Washington-Nortey, Melissa; McKnight, Kimberly W.; McLeod, Bryce D.; Conroy, Maureen A. et al., *Caregiver and Teacher Perspectives on Home–School Partnerships Within a Tier 2 Intervention,* Journal of Emotional and Behavioral Disorders 31.3, 219–232, (2023).

Additionally, stigmatizing a child's parents in school environments not only makes that child feel less safe, but it can negatively impact their educational experience as the child is unable to observe a positive relationship between parents and teachers, nor to feel supported across the spheres of influence in their lives.  See Ex. 13, Goldberg, A. E., & Smith, J.Z., *Predictors of school engagement among lesbian, gay, and heterosexual adoptive parents of kindergarteners,* Journal of School Psychology, 52, 463-478, (2014b). Adverse experiences in the school environment only add to the barriers faced by families with same-sex parents or a transgender parent, undermining the family's feeling of community safety and consequently, the family's openness about their family make-up in school environments.  See Ex. 14, Goldberg, A. E., *Lesbian, gay, and heterosexual adoptive parents' experiences in preschool environmen*ts, Early Childhood Research Quarterly, 29, 669-681 (2014).  Families with same-sex or transgender parents often live in poverty and/or rural environments, thus making access to affordable, safe education even more difficult.  *Id*.  *See also* Ex. 15 Goldberg, A. E., & Smith, J.

Z., *Preschool selection considerations and experiences of school mistreatment among lesbian, gay, and heterosexual adoptive parents,* Early Childhood Research Quarterly, 29, 64-75 (2014a).

By requiring participating preschools to provide "an equal opportunity to enroll and receive preschool services" regardless of protected class status, the antidiscrimination provision is rationally related—and, indeed, narrowly tailored—to achieving the government's compelling interest in ensuring that four-year-olds do not face discriminatory barriers to preschool and its benefits by prohibiting providers from engaging in discriminatory conduct that poses these harms.

### 4.    The Plaintiffs' Position Has No Limiting Principle

If accepted, the Plaintiffs' claim to a Free Exercise Clause right to discriminate against children and their families would strip state and local governments of the ability to enforce antidiscrimination requirements against any publicly funded service provider that argues that those requirements conflict with its religious beliefs. Think, as two of many examples, of the Denver Preschool Program and Colorado Child Care Assistance Program that require publicly funded preschool and childcare providers not to discriminate on a number of bases.

Moreover, if accepted, Plaintiffs' claim to a Free Exercise Clause right to discriminate could not be limited to religious entities' objections to antidiscrimination requirements that protect gay or transgender service recipients. For instance, the exemption that Plaintiffs seek would also be available to providers that, because of their religious beliefs, refuse to serve girls or students of certain national origins or races.

Nor could the Plaintiffs' claim to a Free Exercise Clause right to discriminate be limited to antidiscrimination requirements that apply to publicly funded preschool and childcare

providers. If adopted, the Plaintiffs' position would strip state and local governments of the ability to require *any* publicly funded service providers—from health care providers to soup kitchens to rehabilitation service providers—to refrain from engaging in discrimination.

### B. The Program's Contractual Antidiscrimination Provision Does Not Violate Church Autonomy Protections

The Plaintiffs claim that the Program's contractual provision that prohibits participants from engaging in unlawful employment discrimination unconstitutionally interferes with their decisions regarding their ministerial and non-ministerial employees. But the Program's contractual provision does no such thing, as it incorporates the ministerial exception and co-religionist provision in accordance with federal law. Odean Dec. (38-1 ¶16).

### 1. The Program interprets and will enforce its contractual antidiscrimination provision consistent with the ministerial exception in accordance with federal law

The UPK Program's contractual antidiscrimination provision tracks federal law by recognizing the ministerial exception that insulates religious organizations' employment decisions about their ministerial employees from judicial review. *See* Doc. 38-1 ¶ 16; Odean Tr. at 73:22-25. Whether a particular employee qualifies as a "ministerial employee" for purposes of this exception, of course, depends on the facts. *Tucker v. Faith Bible Chapel Int'l,* 36 F. 4th 1021, 1027 (10th Cir. 2022) ("[T]he "ministerial exception" does not preclude discrimination claims brought by a religious employer's non-ministerial employees."); *see also Our Lady of Guadalupe School v. Morrissey-Berru,* 140 S. Ct. 2049, 2064, 2067 (2020) (explaining that "what matters" when determining whether an employee is a ministerial employee "is what an employee does," and observing that courts should "take all relevant circumstances into account .

. . to determine whether each particular position implicate[s] the fundamental purpose of the exception").

As noted earlier, the Department, consistent with the ministerial exception, will not enforce the antidiscrimination provision with respect to Plaintiffs' employment decisions regarding employees found to be ministerial employees. Odean Declaration (38-1 at ¶ 16) ("The Department interprets and applies [the UPK Provider] Agreement . . . to permit religious organizations to hire co-religionists in accordance with federal law and to protect religious organizations' employment decisions about their ministerial employees in accordance with federal law. The Department disavows enforcement of [the UPK Provider Agreement] against religious providers who hire co-religionists in accordance with federal law, and against religious providers' employment decisions involving their ministerial employees as protected by federal law.").

**2.**      **The Program interprets and will enforce its contractual antidiscrimination provision consistent with the co-religionist exception in accordance with federal law**

The co-religionist exception in federal employment law permits religious organizations to prefer their own co-religionists when making employment decisions about non-ministerial employees. This, for example, permits Plaintiff Preschools and the Unnamed Preschools to prefer Catholic applicants for non-ministerial jobs.

But the co-religionist exception does not permit religious organizations to discriminate against its non-ministerial employees based on sex, race, or any other basis prohibited by federal law. *Our Lady of Guadalupe School,* 140 S. Ct. at 2060 (explaining that the church autonomy principle protects religious institutions' control over ministerial employees but "does not mean that religious institutions enjoy a general immunity from secular laws"). Whether a religious

organization refuses to hire, or fires, a non-ministerial worker because of sex—or instead because of religion—is a question of fact to be determined on a case-by-case basis, facts that are not present here.

*Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), is consistent with these principles, notwithstanding Plaintiffs' claims to the contrary. *See* MSJ (Doc. 61 at 43). Because *Bryce* involved an employee's challenge not to her termination by a church, but instead to the church's speech about her in church meetings and letters, the court recognized that there was no need to determine whether she was a ministerial or non-ministerial employee. *Id.* at 658 n.2 (making clear that because the challenger's claims were "based solely on communications that are protected by the First Amendment under the broader church autonomy doctrine," there was no reason to determine whether she was a ministerial or non-ministerial employee).

The Plaintiff Preschools assert that all preschool employees are ministerial employees. See Ex. 16, Coats Tr. at 28:22-23; See Ex. 17 Seul Tr. at 24:12-13. As noted above, the Department, consistent with the ministerial exception, will not enforce the antidiscrimination provision with respect to Defendants' employment decisions regarding those found to be ministerial employees. Defendants currently lack information about the staffing of the Unnamed Preschools and whether the preschools employ any non-ministerial employees such as janitors.

> **C.      Neither the Statutory Antidiscrimination Provision Nor the Contractual Antidiscrimination Provision Violate Expressive Association Rights**

Plaintiffs claim that the Program's antidiscrimination provisions violate their expressive association rights by prohibiting them from discriminating based on religion, sexual orientation,

and gender identity in "admission, hiring, and operations." MSJ (Doc. 61 at 44). But neither the

Supreme Court, nor the Tenth Circuit, has ever recognized an expressive association right that

permits employers or schools to engage in otherwise illegal discrimination.

### 1.    Plaintiffs' Position Has No Basis in Precedent

To the contrary, on multiple occasions the Supreme Court has rejected expressive

association challenges to the application of antidiscrimination requirements in employment and

education settings. For example, the Court held that requiring a law firm to treat its female and

male attorneys equally did not interfere with the firm's expressive association and thus did not

violate the First Amendment. *Hishon v. King & Spalding,* 467 U.S. 69, 78 (1984). The Court

similarly held that requiring a private school to admit Black students did not unconstitutionally

interfere with the school's ability to control the expressive content of its curriculum. *Runyon v.*

*McCrary,* 427 U.S. 160, 175-76 (1976). In the same vein, the Court held that a law requiring law

schools to provide military recruiters with access to their campuses equal to that provided by

other recruiters did not violate the schools' freedom of expressive association. *Rumsfeld v.*

*Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47, 68 (2006). As all these cases

make clear, antidiscrimination laws do not violate the First Amendment when they require

employers or schools to provide equal opportunity regardless of protected class status.

Nor does *Boy Scouts of America v. Dale* provide any support for Plaintiffs' position, as it

applied only to a nonprofit organization's right to control its membership and not to an

employer's or school's hiring, firing, or admissions decisions. 530 U.S. 640, 644 (2000) (holding

that the Boy Scouts had a right to exclude Scoutmasters and other members based on sexual

orientation). Indeed, the Boy Scouts acknowledged at that time that they would have to comply

with any employment discrimination law that prohibited terminating employees based on sexual orientation. *Id. a*t 672 (Stevens, J., dissenting) (quoting from the Boy Scouts' statements of policies and procedures).  Neither does *303 Creative v. Elenis* provide any support for Plaintiffs' position, as that decision did not address hiring, firing, or admissions decisions and instead involved the potential enforcement of public accommodations law against a website designer who offered design services for sale to the public. 600 U.S. 570, 578-79 (2023).

Plaintiffs also rely on a Second Circuit decision, *Slattery v. Hochul*, 61 F. 4th 278 (2d Cir. 2023), that is neither binding nor persuasive. There the Second Circuit found that an employer had stated a plausible claim that a state antidiscrimination law burdened its expressive association rights and remanded to the lower court to apply heightened scrutiny. *Id.* at 283. But in so doing, the Second Circuit failed to mention, much less make any effort to distinguish, the Supreme Court precedent, discussed above, that has repeatedly rejected expressive association challenges to the application of antidiscrimination law in employment and school settings.

### 2.      The Plaintiffs' Position Has No Limiting Principle

Plaintiffs' claim to a First Amendment expressive association right to discriminate has no limiting principle and would thus dramatically undermine the protections of antidiscrimination law. Because expressive association claims do not and cannot turn on the religious or secular motivations of the association, the Plaintiffs' claim, if accepted, would extend to any objections—secular as well as religious—to hiring or admitting workers or students based on protected class status, and any employer or school could invoke such a right to exclude applicants regardless of its secular or religious status. Employers, for example, could refuse to hire female workers if they believed for any reason that women should not work outside the

home, and a school could refuse to admit Black students if it believed for any reason that people of color are inferior. Think, for example, of the law firm in *Hishon* that sought to exclude women partners for secular reasons. 467 U.S. at 78.

### 3.    The Program Does Not Discriminate Among Religions

Plaintiffs wrongly claim that the Program's congregation preference discriminates among religions. Not true. Any faith-based provider, whether attached to a house of worship or not, can indicate in the matching system that it prefers matches from families "with a common set of beliefs" who "engage in conduct with a direct nexus to that shared common set of beliefs." Ex. 4 at 1-2. That preference is available to faith-based providers of any denomination or religion.

*Larson v. Valente,* 456 U.S. 228 (1982), provides no support for Plaintiffs' claim. The Court in *Larson* found that a state violated the Establishment Clause by expressly imposing certain registration and reporting requirements only upon certain religious organizations and not others—that is, on only religious organizations that, like the Unification Church, solicited more than fifty percent of their funds from nonmembers. *Id.* at 230, 246. Colorado's UPK Program, in contrast, draws no such lines between denominations or religions.  For the same reasons, *Colorado Christian University v. Weaver,* 534 F.3d 1245 (10th Cir. 2008), is also inapposite. There the Tenth Circuit considered a program that permitted sectarian universities to participate in a state-funded scholarship program so long as they were not "pervasively" sectarian, and the state then applied this criterion to include a Roman Catholic university and a Methodist institution, among others, but to exclude an evangelical Protestant university and a Buddhist university. *Id. a*t 1258. The Tenth Circuit held that the state's program expressly discriminated among religions without constitutional justification through criteria that required

unconstitutionally intrusive scrutiny of religious belief and practice. *Id. a*t 1250. Unlike the programs at issue in *Larson* and *Colorado Christian University* that expressly treated different religions and denominations differently, Colorado's congregation preference, and the Program overall, is available to all religions and denominations.

## III.    The Plaintiffs' Motion For A Preliminary Injunction Should Be Denied

The Plaintiffs in their Amended Complaint request a permanent injunction.  To obtain a permanent injunction, the party seeking it must prove "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quoting *Fisher v. Okla. Health Care Auth.,* 335 F.3d 1175, 1180 (10th Cir. 2003)). These factors are "remarkably similar to the standard for a preliminary injunction." *Id*. Plaintiffs have failed to meet their burden to show any of these factors.

### A.    Success on the merits

As discussed above, Plaintiffs have not met their burden to show that they have standing to pursue this case and that this case is ripe. In particular, the Archdiocese does not have standing because it does not operate a preschool and has no legal control over the 36 preschools affiliated with it. *See* Doc. 72. The Plaintiff Preschools lack standing because they have not shown that they have an injury that is concrete and particularized, and actual or imminent, not conjectural or hypothetical. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).

Neither Plaintiff Preschool reports having a transgender preschooler four-year-old or one with same-sex parents apply to its preschool program. See Doc. 72-4 at 5-6 (No instances since January 1, 2018, in which St. Mary or St. Bernadette denied an applicant's request to enroll in

preschool because of the applicant or a family member's sexuality, sexual identity, sexual orientation, gender identity, religious beliefs or the sexuality, sexual identity, sexual orientation, gender identity, or religious beliefs; No instances since January 1, 2018, in which St. Mary or St. Bernadette have denied an enrolled preschool student or family member's request for an accommodation regarding the student's pronouns, use of bathroom facilities, or school uniform.) Nor has either Plaintiff Preschool in the last five years taken adverse action against an employee or prospective employee based on sexuality, sexual identity, sexual orientation, gender identity, or religious beliefs. *Id*.

The Sheleys also lack standing because they have not shown that they are actually incurring a financial hardship. They receive tuition discounts because Mrs. Sheley is employed by St. Mary and because the Sheleys have multiple children at the school. *See* Ex. Sheley Tr. at 21:15-20; 26:17-21.

Nor are any of the Plaintiffs' claims ripe as discussed above and in Defendants' Motion to Dismiss (Doc. 38) and Supplemental Brief to the Motion to Dismiss (Doc. 72). The Archdiocese's and the Plaintiff Preschools' alleged injuries depend on a chain of events that is speculative and may never occur at all. These speculative claims are not fit for judicial decision, as they involve "uncertain or contingent future events." *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (citing 13A Wright, Miller & Cooper, *Federal Practice & Procedure*, § 3532 at 112).

Even if the Plaintiffs' claims were to proceed to the merits, their First Amendment claims are without merit, for the reasons articulated above, and for this reason too they are unable to show their likelihood of success.

**B.      Irreparable injury**

In addition to not being able to meet their burden to show standing, none of the Plaintiffs have shown that they have any injury, much less an irreparable injury.

Plaintiffs' requested injunction would allow Plaintiff Preschools[12] to do four things: (1) prioritize Catholic students in admission; (2) allow the schools to require preschool teachers, staff, and administrators to "to abide by and uphold Catholic teachings on life, marriage, gender, and human sexuality;" (3) allow the schools to consider for enrollment and retention purposes "whether a family or child seeking placement in their schools has identified as LGBTQ, is in a same-sex relationship, or has adopted a gender identity different from his or her biological sex;" and (4) allow schools to bar students from bathrooms or changing rooms that do not correspond to their gender assigned at birth, bar them from wearing uniforms that do not correspond to their gender assigned at birth, and allow schools to refuse to use students' requested pronouns. Doc. 31-1 at 36. Plaintiffs fail to show that injunctive relief is necessary to allow the Plaintiff Preschools to do the first two things on their list, and the second two would give the Plaintiff Preschools an exemption from the statute's protection of some of Colorado's most vulnerable: very young LGBTQ+ children and those who come from families with at least one LGBTQ+ parent.

Regarding the first request for relief, Plaintiff Preschools (and the Unnamed Preschools) may already participate in the UPK Program and at the same time prefer members of their own congregation. The draft rules' proposed definition of "congregation" is consistent with the

---

[12] This Court limited the hearing scheduled for January 2-4, 2024, to the Plaintiff Preschools and the Sheleys in light of the pending motion to dismiss the Archdiocese. Thus, if this Court grants Plaintiffs any relief, such relief should only apply to the two Plaintiff Preschools.

Plaintiffs' stated desire to prioritize "parishioners" for admission. Plaintiffs' Supplemental Discovery Responses (Doc. 72-4 at 10) Interrogatory Response #10.

Regarding the second request, the Department disavows enforcement of the UPK contract's Provision 18(B) against Plaintiff Preschools' employment decisions involving their co-religionists or ministerial employees that are consistent with federal law. Doc. 38-1 ¶ 16; Odean Tr. at 73:22-25. Representatives from Plaintiff Preschools testified that all the preschool employees are teachers and aides that are ministerial employees. Coats Tr. at 28:22-23; Seul Tr. at 24:12-13.  If all of their employees are indeed found to be ministerial employees, the Department agrees that federal law—and thus the contractual antidiscrimination provision— permits Plaintiffs' discretion in making employment decisions involving those employees. *See Our Lady of Guadalupe Sch. v. Morrissey-Beru*, 140 S. Ct. 2049, 2066 (2020) (concluding teachers at religious school were ministerial employees).

The third and fourth requests for injunctive relief would allow Plaintiff Preschools to accept public funding while at the same time discriminating against students based on protected class status in those publicly-funded services. As discussed in detail above, Plaintiffs have not met their burden to show that the statutory antidiscrimination provision violates the First Amendment. See Section II.A. above.  Moreover, Plaintiff Preschools have signed contracts for CCCAP (Ex. 19) and the DPP (Ex. 20) containing similar nondiscrimination provisions and have participated in those programs with Archdiocese approval and without "hardship." Moo Tr. at 160:13-16, *see also id.* at 164:21-165:1, 93:1-5; 94:4-5; *see also* Coats Tr. at 108:10-12. Ultimately, Plaintiffs have not shown any injury that requires injunctive relief.

### C.    Balance of harms

Because Plaintiffs can show no injury, much less an irreparable injury, the potential harm to LGBTQ+ children and those with LGBTQ+ parents outweighs Plaintiffs' threatened injury. *See Magluta v. U.S. Fed. Bureau of Prisons*, No. 11-CV-02381-RM-KLM, 2013 WL 4781596, at *4 (D. Colo. Sept. 6, 2013) (holding that where plaintiff "will suffer no injury if an injunction is not entered," the balance of harm factor weighs in defendants' favor and denying preliminary injunction).

Preschool-aged children and their families face significant harm if Plaintiff Preschools are allowed an exemption from the Antidiscrimination Provision. Children in schools that equate same-sex attraction with mental illness are negatively impacted in that those messages can create a sense of confusion and distress, in that they love someone whose fundamental identity is being equated with illness and deviance. Wilkinson L., & Pearson, J., *School culture and the well being of same-sex attracted youth,* Gender & Society, 23, 542-68 (2009); Daly, S., MacNeela, P., & Sarma, K., *When parents separate and one parent 'comes out' as lesbian, gay, or bisexual: Sons and daughters engage with the tension that occurs when their family unit changes*, PLoS One, 10(12) (2015); Jenkins, J. A., *Boundary ambiguity in gay stepfamilies: Perspectives of gay biological fathers and their same-sex partners,* Journal of Divorce and Remarriage, 54, 329–348 (2013).   Policies that create conflict between a child's home and school experience and frustrate the ability for the child to be recognized with a consistent identity at home and at school can create conflict and confusion for a child. Sutherland, Kevin S.; Wu, Eleanor G.; Washington-Nortey, Melissa; McKnight, Kimberly W.; McLeod, Bryce D.; Conroy, Maureen A. et al.,

*Caregiver and Teacher Perspectives on Home–School Partnerships Within a Tier 2 Intervention,*
Journal of Emotional and Behavioral Disorders, 31.3: 219–232 (2023).

### D.     Public interest

"[A] court should be particularly cautious when contemplating relief that implicates
public interests." *Salazar v. Buono*, 559 U.S. 700, 714 (2010). Here, Colorado voters
overwhelmingly voted to establish voluntary, **universal** preschool. Colo. Rev. Stat. § 26.5-4-
202(1)(a)(V). And the Colorado legislature declared what it believes to be the public interest in
addressing income barriers and increasing access to high-quality preschool for **all** children in
Colorado through the **equitable** delivery of resources.  Colo. Rev. Stat. §§ 26.5-4-202; 26.5-1-
102(1)(a), (f). In doing so, it mandated that the Department require that preschool providers
provide all eligible children with an equal opportunity to enroll and receive preschool services
regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of
housing, income level, or disability. Colo. Rev. Stat. § 26.5-4-205(2)(b).

The legislature and voters are in a better position than Plaintiffs or this Court to
determine the public interest. *Fish v. Kobach,* 840 F.3d 710, 755 (10th Cir. 2016) ("our
democratically elected representatives are in a better position than this Court to determine the
public interest"); *accord Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020) ("giving effect
to the will of the people by enforcing the laws they and their representatives enact serves the
public interest"). The public's interest in ensuring equitable access to preschool for all Colorado
children weighs heavily in Defendants' favor. Colorado has an important, even compelling
interest in protecting children from discrimination in education. *See Bob Jones Univ.,* 461 U.S. at
604. In addition, the state's interest encompasses preventing the potential harm to children

addressed by Dr. Goldberg and Dr. Tishelman as discussed above.

For all of these reasons, Plaintiffs' request for a permanent injunction should be denied.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Summary Judgment, along with its request for a permanent injunction. The request for summary judgment is premature; there are many issues of disputed fact remaining in this case; and the Plaintiffs have failed to carry their burden of proving that they are entitled to a permanent injunction.

## TRIAL BRIEF

Defendants' trial brief is attached to this submission as Appendix A.

Dated: December 18, 2023

PHILIP J. WEISER
Attorney General

s/ *Janna K. Fischer*

*Virginia R. Carreno,* Second Assistant Attorney General
*Nicole Rust*, Assistant Attorney General
*J. Gregory Whitehair*, Assistant Attorney General
*Janna K. Fischer*, Senior Assistant Attorney General
1300 Broadway, Denver, CO 80203
Telephone: (720) 508-6349
Email: virginia.carreno@coag.gov; niki.rust@coag.gov; greg.whitehair@coag.gov; janna.fischer@coag.gov
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that on December 18, 2023, I electronically filed the forgoing **DEFENDANTS' RULE 56(D) MOTION TO DENY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT TO ALLOW DEFENDANTS TO CONDUCT NECESSARY DISCOVERY AND DEFENDANTS' RESPONSE TO PLAINTIFFS' ALTERNATIVE MOTION FOR A PRELIMINARY INJUNCTION, WITH TRIAL BRIEF** with the Clerk of Court using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

Eric C. Rassbach
Joseph C. Davis
Nicholas R. Reaves
Mark L. Rienzi
Amanda Dixon
Jordan T. Varberg
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Suite 400
Washington, D.C. 20006
erassbach@becketlaw.org; jdavis@becketlaw.org; nreaves@becketlaw.org;
mrienzi@becketlaw.org; adixon@becketlaw.org; jvarberg@becketlaw.org

*Attorneys for Plaintiffs*

         *s/* Bonnie Smith
         *Bonnie Smith*

**Exhibit List To Defendants' Rule 56(d) Motion To Deny Plaintiffs' Motion For Summary Judgment To Allow Defendants To Conduct Necessary Discovery And Defendants' Response To Plaintiffs' Alternative Motion For A Preliminary Injunction, With Trial Brief**

**Ex. 1:** Declaration of Virginia Carreno (with exhibits A-D attached)

**Ex. 2:** Moo Transcript, November, 27, 2023, unsigned.

**Ex. 3:** Defendants' Response to the Statement of Undisputed Material Facts

**Ex. 4:** Draft Rules (Doc. 61-12)

**Ex. 5:** Odean Transcript.

**Ex. 6:** Masten, A.S. & and Cicchetti, D., *Developmental cascades,* Development and Psychopathology, 22, 491-495 (2010).

**Ex. 7:** Shonkoff, J. P., Garner, A.S. et. al., *The lifelong effects of early childhood adversity and toxic stress,* Pediatrics, 129, 232-246 (2012).

**Ex. 8:** Thoma Brain C., Rezeppa T.L., Choukas-Bradley S., et al., *Disparities in Childhood Abuse Between Transgender and Cisgender Adolescents,* Pediatrics 148(2): e2020016907 (2021).

**Ex. 9:** Thoma, Brian C., Rachel H. Salk, Sophia Choukas-Bradley, Tina R. Goldstein, Michele D. Levine, Michael P. Marshal, *Suicidality Disparities Between Transgender and Cisgender Adolescents,* Pediatrics, 144 (5): e20191183. 10.1542/peds.2019-1183 (Nov. 2019).

**Ex. 10:** Joyce, A.N., *High-Conflict Divorce: A form of Child Neglect,* Family Court Review, 54:642-656. (2016).

**Ex. 11:** Cox, Diane D., *Evidence-Based Interventions using Home-School Collaboration,* School Psychology Quarterly 20.4, 473-97, (2005), ProQuest. Web. 8 Dec. 2023.

**Ex. 12:** Sutherland, Kevin S.; Wu, Eleanor G.; Washington-Nortey, Melissa; McKnight, Kimberly W.; McLeod, Bryce D.; Conroy, Maureen A. et al., *Caregiver and Teacher Perspectives on Home–School Partnerships Within a Tier 2 Intervention,* Journal of Emotional and Behavioral Disorders 31.3, 219–232, (2023).

**Ex. 13:** Goldberg, A. E., & Smith, J.Z., *Predictors of school engagement among lesbian, gay, and heterosexual adoptive parents of kindergarteners,* Journal of School Psychology, 52, 463-478, (2014b).

**Ex. 14:** Goldberg, A. E., *Lesbian, gay, and heterosexual adoptive parents' experiences in preschool environmen*ts, Early Childhood Research Quarterly, 29, 669-681 (2014).

**Ex. 15:** Goldberg, A. E., & Smith, J. Z., *Preschool selection considerations and experiences of school mistreatment among lesbian, gay, and heterosexual adoptive parents,* Early Childhood Research Quarterly, 29, 64-75 (2014a).

**Ex. 16:** Avery Coats Deposition Transcript, November 28, 2023, unsigned.

**Ex. 17:** Tracy Seul Deposition Transcript, December 1, 2023, unsigned.

**Ex. 18:** Lisa Sheley Deposition Transcript, December 1, 2023, unsigned.

**Ex. 19:** Colorado Child Care Assistance Program ("CCCAP") Contract.

**Ex. 20:** Denver Preschool Program ("DPP") Contract.

**Ex. 21:** Wilkinson L., & Pearson, J., *School culture and the well being of same-sex attracted youth,* Gender & Society, 23, 542-68 (2009).

**Ex. 22:** Daly, S., MacNeela, P., & Sarma, K., *When parents separate and one parent 'comes out' as lesbian, gay, or bisexual: Sons and daughters engage with the tension that occurs when their family unit changes*, PLoS One, 10(12) (2015).

**Ex. 23:** Jenkins, J. A., *Boundary ambiguity in gay stepfamilies: Perspectives of gay biological fathers and their same-sex partners,* Journal of Divorce and Remarriage, 54, 329–348 (2013).

**Ex. 24:** Tishelman, A., Nic Rider, G., *Assessment of Gender Diverse Children, Incorporating the Standard of Care 8th Edition*, Child Adolesc Psychiatric Clin N Am, https://doi.org/10.1016/j.chc.2023.05.008 (2023).

**Appendix A**: Trial Brief