Elias Moo  30(b)(6)
November 27, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:23-cv-2079-JLK

_____

RULE 30(b)(6) DEPOSITION OF:
Superintendent of Catholic Schools
at Denver Archdiocese
ELIAS MOO
November 27, 2023
Via RemoteDepo

_____

ST. MARY CATHOLIC PARISH IN LITTLETON;
ST BERNADETTE CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY; LISA SHELEY; and
THE ARCHDIOCESE OF DENVER,

Plaintiffs,

v.

LISA ROY, in her official capacity as Executive
Director of the Colorado Department of Early
Childhood; and DAWN ODEAN, in her official
capacity as Director of Colorado's Universal
Preschool Program,

Defendants.

_____

        PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of Superintendent of Catholic Schools at
Denver Archdiocese, ELIAS MOO, was taken on behalf of
the Defendants in Denver County, Colorado, by remote
means, on November 27, 2023, at 8:09 a.m., before
Lisa B. Kelly, Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public within
Colorado, appearing remotely from Larimer County,
Colorado.

Elias Moo   30(b)(6)
November 27, 2023

Page 2

```
 1              REMOTE APPEARANCES
 2   For the Plaintiffs:
 3           JOSEPH C. DAVIS, ESQ.
             NICHOLAS R. REAVES, ESQ.
 4           AMAMDA DIXON, ESQ.
             The Becket Fund for Religious Liberty
 5           1919 Pennsylvania Avenue, N.W., Suite 400
             Washington, D.C. 20006
 6           jdavis@becketlaw.org
             nreaves@becketlaw.org
 7           adixon@becketlaw.org
 8   For the Defendants:
 9           VIRGINIA R. CARRENO, ESQ.
             NICOLE RUST, ESQ.
10           J. GREGORY WHITEHAIR, ESQ.
             JANNA FISCHER, ESQ.
11           Colorado Attorney General's Office
             1300 Broadway
12           Denver, Colorado 80202
             virginia.carreno@coag.gov
13           niki.rust@coag.gov
             greg.whitehair@coag.gov
14           Jamma.fischer@coag.gov
15   Also Present:
             Bonnie Miller
16           Jennifer Reynard
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   Exhibit 9     Universal Preschool (UPK)        143
                   Colorado Program Service
 2                 Agreement
 3   Exhibit 10    Letter to St. Mary Preschool     156
                   from Jefferson County Division
 4                 of Human Services, 8/28/23,
 5   Exhibit 11    2022-2023 DPP Provider           165
                   Renewal Questions/Information
 6
     Exhibit 12    Guidance for Issues Concerning   171
 7                 the Human Person and Sexual
                   Identity
 8
     (Exhibits provided electronically to the reporter.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   EXAMINATION OF ELIAS MOO:                    PAGE
     November 27, 2023
 3
     By Ms. Carreno                                  6
 4
     By Mr. Davis                                  231
 5
 6                                              INITIAL
     DEPOSITION EXHIBITS:                      REFERENCE
 7
     Exhibit 1     Notice of Rule 30(b)(6)         15
 8                 Deposition
 9   Exhibit 2     1000 Series Organization and    64
                   Administration, Canonical
10                 Overview, Effective: August 2002
11   Exhibit 3     Archdiocese of Denver Office of  85
                   Catholic Schools Statement on
12                 Universal Pre-K (UPK)
                   Barriers/Impacts
13
     Exhibit 4     Letter to Governor Polis, 2/17/23  98
14
     Exhibit 5     Update on Guidance for          105
15                 Participation in UPK
16   Exhibit 6     Email string ending with an     124
                   email to Brandorff and Neuman
17                 from Dudzic, 1/14/23, Subject:
                   Fwd: NOTICE: Direction for
18                 Parishes and Schools on
                   "Universal (UPK) Pre-School
19                 Colorado"
20   Exhibit 7     Email to Rogers from Vessely,   128
                   5/11/23, Subject: UPK/Polis
21                 meeting
22   Exhibit 8     Email string ending with an     133
                   email to Moo from Nesbitt,
23                 5/15/23, Subject: Re:
                   Invitation to Private Meeting
24                 for Pastors-School Leaders:
                   Update on Universal Preschool
25                 Program
```

Page 5

```
 1           WHEREUPON, the following proceedings were
 2   taken pursuant to the Federal Rules of Civil
 3   Procedure.
 4           *      *      *      *      *      *
 5           THE REPORTER:  All counsel participating
 6   in this deposition acknowledge that I am not
 7   physically present in a deposition room with the
 8   deponent and that I will be reporting this deposition
 9   and providing an oath remotely.
10           You further agree that, in lieu of an
11   oath administered in person, the witness declares his
12   testimony in this matter is given under penalty of
13   perjury.
14           All parties and counsel consent to this
15   arrangement and waive any objections to this manner of
16   reporting and manner of providing the oath.
17           Counsel, please indicate your agreement
18   by stating your name and your agreement on the record,
19   and then I will swear in the witness.
20           MS. CARRENO:  Virginia Carreno, attorney
21   for Defendants Roy and Odean.
22           MR. DAVIS:  Joseph Davis, attorney for
23   the Plaintiffs.  We agree.
24
25
```

Elias Moo  30(b)(6)
November 27, 2023

Page 6

```
 1                    ELIAS MOO,
 2   having verbally declared under penalty of perjury that
 3   his testimony in this case will be the truth, the
 4   whole truth, and nothing but the truth, testified as
 5   follows:
 6               (Deponent's reply to oath:  I do.)
 7        THE REPORTER:  Thank you.
 8        Ms. Carreno.
 9        MS. CARRENO:  Thank you, Lisa.
10        Good morning, everyone.
11               EXAMINATION
12   BY MS. CARRENO:
13        Q.   Good morning, Mr. Moo.
14        A.   Good morning.
15        Q.   Can you hear me okay?
16        A.   Yeah.  It's a little bit of an echo, but
17   it's coming in okay.
18        Q.   Okay.  Let me know if you have any
19   problems where you can't hear me and we can try to
20   adjust the sound before it gets distracting.
21        A.   Sounds good.  Thank you.
22        THE REPORTER:  Can I jump in real quick,
23   Virginia?  Are you aways away from the microphone?  Is
24   there any way to pull it closer to you or is it as
25   close as it can be?
```

Page 7

```
 1        MS. CARRENO:  I think I've just pulled it
 2   a little bit closer, but it's right next to me.
 3        THE REPORTER:  That's better.  Thank you.
 4        MS. CARRENO:  Oh, okay.
 5        Q.   (BY MS. CARRENO)  So my name is Virginia
 6   Carreno, Mr. Moo, and I'm an attorney with the
 7   Attorney General's Office in Colorado.  I represent
 8   the defendants, Dr. Roy and Dawn Odean, from the
 9   Colorado Department of Early Childhood, and I'm going
10   to be asking you some questions for your deposition
11   today.
12        I know that Ms. Kelly had already asked
13   you this question, but can I ask you on the record to
14   identify anyone that's in the room with you today?
15        A.   Just Mr. Joe Davis is here with me.
16        Q.   Okay.  And where are you?
17        A.   We are at a conference room, 119, at the
18   John Paul II Center for the New Evangelization.
19        Q.   And where is that located?
20        A.   1300 South Steele Street.
21        Q.   In Denver, Colorado?
22        A.   Yes.
23        Q.   Okay.  Mr. Moo, do you have any chat or
24   any other communications open?
25        A.   No, not currently.
```

Page 8

```
 1        Q.   And do you have any electronic devices
 2   with you today?
 3        A.   Yeah.  My cell phone is sitting next to
 4   me.
 5        Q.   Okay.  I just want to remind you that you
 6   can't communicate through any chats or through text
 7   messaging or with anyone else while your deposition is
 8   happening today about the contents of the deposition.
 9        A.   Yes.  Understood.
10        Q.   Okay.  Great.  Did you bring any
11   documents with you to the deposition today?
12        A.   No.  Just myself here.
13        Q.   Okay.  Do you have any documents open on
14   your computer?
15        A.   No.
16        Q.   And just the same reminder that I ask
17   that you not use any documents, unless you
18   specifically ask to use those documents, and then we
19   will make those part of the record today.
20        Does that sound accurate or fair?
21        A.   Yes.  Understood.
22        Q.   Okay.
23        MS. CARRENO:  And, Mr. Davis, for the
24   record, can you please identify any attorneys that are
25   either with you or present on the Zoom call today or
```

Page 9

```
 1   anyone else from your office?
 2        MR. DAVIS:  Sure.  Nick Reaves and Amanda
 3   Dixon from my office, also counsel for the Plaintiffs,
 4   are just appearing remotely.
 5        MS. CARRENO:  Great.
 6        Q.   (BY MS. CARRENO)  All right.  Mr. Moo, I
 7   want to get some basic information from you.  Can you
 8   spell your full name, please?
 9        A.   Yeah.  My first name is Elias, E-l-i-a-s.
10   My middle name is Josue, J-o-s-u-e.  And my last name
11   is Moo, M-o-o.
12        Q.   Any previous names?
13        A.   I'm sorry.  Can you repeat that again?
14        Q.   Do you have any previous names or other
15   names that you're known by?
16        A.   No.
17        Q.   What is your address?
18        A.   My address?
19        Q.   Yes.
20        A.   It's 14220 East Arkansas Drive.  That's
21   Aurora, Colorado 80012.
22        Q.   What is your telephone number?
23        A.   It's 720-345-4700.
24        Q.   And do you own your home?
25        A.   Yes.
```

Elias Moo  30(b)(6)
November 27, 2023

Page 10

1    Q.   How long have you lived there?
2    A.   Since 2017.  So going on six years,
3  approximately.
4    Q.   Have you ever been deposed before?
5    A.   No.
6    Q.   I'm going to go through some questions
7  with you, and I just want to lay down some basic
8  ground rules about how the deposition is going to work
9  today.
10        So, first and foremost, I need all of
11  your answers to be verbal.  Things like shaking your
12  head or nodding won't be picked up.  Even though we
13  can see each other on video, we are not recording the
14  deposition today.
15        So I need for your answers to be verbal
16  so that we will have them on the transcript of this
17  deposition after we finish today.
18        Does that sound okay?
19    A.   Yes.  Understood.
20    Q.   And I also, just, again, since we're over
21  video and we're trying to get a clear record, just
22  want to make sure that we take turns talking today.
23        So if you wait a second, sometimes it
24  might sound like I'm finished with my question, but I
25  might keep talking.  I just want to make sure that we

Page 11

1  don't talk over each other.  Does that sound fair?
2    A.   Yes.  Absolutely.
3    Q.   If you need a break, please say so.  The
4  only thing I ask is that if you need to take a break,
5  that you answer the pending question before asking to
6  take a break.
7        I'm going to build in some breaks today
8  as we go.  We'll definitely have a lunch break and
9  maybe short breaks every hour or so, depending on how
10  quickly the deposition is going.  But please, let us
11  know if you need to take breaks.  Does that sound
12  good?
13    A.   Yes.  Yeah.  Thank you.
14    Q.   Just want to remind you, you are under
15  oath.  Ms. Kelly just asked you to take an oath to
16  tell the truth.  And do you understand that this is
17  the same oath you would take if you were sworn in at a
18  trial?
19    A.   Yes.
20    Q.   And do you agree that you will tell the
21  whole truth to the best of your ability today?
22    A.   Yes.  Absolutely.
23    Q.   If you learn -- and I'm here to learn
24  everything about you -- I'm sorry -- everything about
25  the events that you know related to this lawsuit and

Page 12

1  the facts surrounding this lawsuit.  So I'm looking
2  for full and complete answers to my questions.
3        So if you give an answer and you realize
4  that something that you said was incorrect, can we
5  agree that you will let me know and we'll correct that
6  on the record?
7    A.   Yeah.  I'm sorry.  Can you repeat that
8  last part?  Correct what on the record?
9    Q.   If you realize that some answer that you
10  gave is incorrect or that you misspoke, will you let
11  me know?
12    A.   Yes.
13    Q.   You'll have an opportunity after the
14  deposition today to review the transcript.  Like I
15  said, the court reporter is writing down everything
16  that we're saying, and you'll have an opportunity to
17  correct an answer if something is incorrect.
18        If it happens, though, I would -- I may
19  ask that we come back and have an opportunity to
20  discuss that on the record.
21        Does that sound fair as well?
22    A.   Yes.
23    Q.   It's also important if I ask a question
24  that you don't understand, that you let me know so
25  that we make sure that you understand the question

Page 13

1  that you're being asked.  Is that fair?
2    A.   Yes.
3    Q.   And, Mr. Moo, are you on any medications
4  today that would affect your ability to testify?
5    A.   No.  I mentioned to Mr. Davis, I have
6  been fighting a head cold so I took some decongestant
7  early this morning, but that's about it.  I don't
8  think that's going to impair my ability to be able to
9  answer your questions here.
10    Q.   Okay.  Well, thank you for letting me
11  know that.  And the next question was, are you sick at
12  all today?  It sounds like maybe you've got a bit of a
13  head cold.
14    A.   Yes.
15    Q.   And do you think -- it sounds like the
16  answer is no, but I just want to be clear.  Do you
17  think that your head cold will affect your ability to
18  testify today?
19    A.   No.
20    Q.   Is there any reason why you cannot give
21  accurate and complete testimony here today?
22    A.   No.
23    Q.   Did you understand everything I said so
24  far?
25    A.   Yes, ma'am.

Elias Moo  30(b)(6)
November 27, 2023

Page 14

1    Q.   And before we get started, do you have
2  any questions for me about anything that I just said?
3    A.   No.  Not at this time.
4    Q.   Okay.  What did you do to prepare for
5  your deposition today?
6         MR. DAVIS:  I'm going to object to the
7  extent that the question gets at attorney-client
8  privileged information, but you can answer otherwise,
9  please.
10   A.   Yeah.  Just I reviewed the various
11 documents that have been submitted already for the
12 record.
13   Q.   (BY MS. CARRENO)  And did you meet with
14 anybody?  Without disclosing any privileged
15 information, did you meet with anybody about the
16 deposition today?
17   A.   Just the -- just my counsel.
18   Q.   And how many times did you meet with your
19 counsel about this depositions?
20   A.   It was one, one conversation specific to
21 this deposition.
22   Q.   And how long was that meeting or that
23 conversation?
24        MR. DAVIS:  I'll object as to relevance,
25 but you can answer, Elias.

Page 15

1    A.   Yeah.  We had a Zoom call for about
2  90 minutes, I want to say, approximately.  Just to
3  clarify, Mr. Davis and I did have a brief phone call a
4  couple days ago just to connect on logistics for this
5  here.  But, yeah, the first call was a 90-minute Zoom
6  call.
7    Q.   (BY MS. CARRENO)  Thank you.  Have you
8  ever testified under oath before?
9    A.   I have not, no.
10   Q.   And I think you said you've never been
11 deposed before; is that correct?
12   A.   Correct.  Yes.
13   Q.   Have you ever been involved with a
14 lawsuit or any type of litigation in the past?
15   A.   Can I clarify?  In a professional
16 setting?  Personal setting?  Any?
17   Q.   Let's start with a professional setting.
18   A.   Professional setting, no.  Personal, my
19 wife and I were in a suit against a contractor that
20 did some work in our house back in 2021, I want to
21 say.
22   Q.   Okay.  Great.  Thank you.
23        And I want to mark the deposition notice
24 as Exhibit 1.
25        MS. CARRENO:  And, Bonnie, can you share

Page 16

1  Exhibit 1, please?
2    Q.   (BY MS. CARRENO)  Mr. Moo, do you
3  recognize this document?
4    A.   Yes.
5         MS. CARRENO:  And, Bonnie, if you can
6  scroll down to the topics.
7    Q.   (BY MS. CARRENO)  And, Mr. Moo, what do
8  you recognize this document to be?
9    A.   I recognize this document to be the
10 scheduled topics to be discussed today during this
11 deposition.
12   Q.   And did you review those topics?
13   A.   I did, yes.
14   Q.   And are you here on behalf of the
15 Archdiocese of Denver for this deposition right now?
16   A.   I am, yes.
17   Q.   And you understand that you are not
18 testifying at this minute in your individual capacity,
19 but in your capacity as a representative for the
20 Archdiocese of Denver; is that correct?
21   A.   Yes.  That's correct.
22   Q.   And after reviewing these deposition
23 topics or this schedule of topics, are you able to
24 testify about these topics in the notice?
25   A.   I am, yes.

Page 17

1    Q.   Are you the best person -- or strike
2  that.
3         Are you the person with the most
4  knowledge concerning the topics in the deposition
5  notice?
6    A.   Yes, I am.
7    Q.   Is there anyone else on any of the topics
8  that would be better able to speak to any of the
9  topics?
10   A.   Possibly, when it comes to questions
11 around the relationship between the Archdiocese and
12 Catholic Charities, the chief operating officer, who I
13 report to directly here at the Archdiocese, would be
14 better positioned to be able to speak on, like,
15 corporate structure as it pertains to the Archdiocese
16 and Catholic Charities specifically.
17        But I'm familiar and well-versed enough
18 in that to be able to speak to it, but I would concede
19 his expertise and level of expertise with respect to
20 that topic.
21   Q.   Thank you.
22        MR. DAVIS:  I'm just going to object on
23 the record to relevance.  I mean, the witness is
24 prepared to testify within the confines of
25 Rule 30(b)(6) on the topics that you've identified,

Elias Moo  30(b)(6)
November 27, 2023

Page 18

1  Virginia.
2      Q.   (BY MS. CARRENO)  And what is the name of
3  the person that you referenced?
4      A.   Mr. Keith Parsons.
5      Q.   And what did you say his title is?
6      A.   He's the chief operating officer at the
7  Archdiocese of Denver.
8      Q.   And do you have full authority to speak
9  on behalf of the Archdiocese with respect to the
10 deposition topics today?
11     A.   I do, yes.
12     Q.   Are you aware that answers you give to my
13 questions will be binding on the Archdiocese?
14     A.   Yes.
15     Q.   And, again, with that in mind, you're
16 fully prepared to speak to each of the topics in the
17 deposition notice?
18     A.   Yes.  I'm fully prepared.
19     Q.   Mr. Moo, what is your date of birth?
20     A.   It is April 22nd, 1985.
21     Q.   Where did you go to high school?
22     A.   I went to high school at Santa Clara High
23 School in Oxnard, California.
24     Q.   And where did you go to college?
25     A.   I went to the University of Notre Dame in

Page 19

1  South Bend, Indiana.
2      Q.   Did you get -- excuse me.  Strike that.
3           Did you obtain a degree from your
4  college?
5      A.   Yes.  I received a bachelor's degree and
6  then, a few years later, two master's degrees, also
7  from the University of Notre Dame.
8      Q.   What was your bachelor's degree in?
9      A.   It was a double major in sociology and
10 theology.
11     Q.   And what were your master's degrees in?
12     A.   My first master's was a master's in
13 education, with a focus on elementary education.  My
14 second master's was a master's in educational
15 leadership.
16     Q.   Do you have any certificates,
17 professional certificates?
18     A.   Probably.  Again, I can't think of any
19 right now that come to mind.
20     Q.   Okay.  That's fine.  What about any
21 professional licenses?
22     A.   I don't currently hold any professional
23 licenses.
24     Q.   Are you married?
25     A.   I am, yes.

Page 20

1      Q.   And what is your spouse's name?
2      A.   Her name is Claudia.
3      Q.   Same last name?
4      A.   Yes.
5      Q.   Are you -- have you ever been divorced?
6      A.   No.
7      Q.   Do you have any children?
8      A.   Yes.
9      Q.   What are the names and ages of your
10 children?
11          MR. DAVIS:  Objection to relevance.
12          Do we need the names of the children on
13 the public record, Virginia?
14     Q.   (BY MS. CARRENO)  Can we get ages of the
15 children, the number of children and the ages?  I
16 don't need their names.
17          MR. DAVIS:  You can answer.
18     A.   I have five boys.  Their ages are 10, 8,
19 6, 4, and 2.
20     Q.   (BY MS. CARRENO)  Any other dependents
21 besides your children?
22     A.   No.
23     Q.   I want to talk a little bit about your
24 employment.  So where are you currently employed?
25     A.   Currently employed by the Archdiocese of

Page 21

1  Denver.
2      Q.   What is your current job title?
3      A.   My title is superintendent of Catholic
4  Schools.
5      Q.   How long have you had that title?
6      A.   Five years and -- gosh -- ten months.
7      Q.   When did you start working for the
8  Archdiocese of Denver?
9      A.   In February of 2018, on a part-time
10 basis, and full-time starting July 2018.
11     Q.   And who do you report to in your position
12 with the Archdiocese of Denver?
13     A.   I report to -- well, first and foremost,
14 the Archbishop of Denver, Archbishop Samuel Aquila.
15 He has delegated some supervisory duties over me to
16 his chief operating officer, Mr. Keith Parsons.
17          And I also report to the vicar-general
18 for the Archdiocese, Father Randy Dollins.
19     Q.   What is your job description as
20 superintendent of Catholic Schools?
21     A.   As the delegate of the archbishop to the
22 Archdiocese of Denver Catholic Schools, my job is to
23 carry out his episcopal duties to teach, govern, and
24 sanctify, as laid out in Canon Law as his duties and
25 responsibilities, to carry that out on his behalf to

Elias Moo  30(b)(6)
November 27, 2023

Page 22

1  the Catholic schools and within the geographic
2  boundaries of the Archdiocese of Denver.
3       So primarily that's through providing
4  direction, supervision, alongside parish pastors who
5  oversee parish schools with their principals, and do
6  development of policy and strategy for schools.
7       Q.  When you say "direction," who do you
8  direct?
9       A.  I direct the -- well, first, the Office
10 of Catholic Schools, which is the group here at the
11 Archdiocese that I directly supervise and manager, and
12 then also the school principals, who I co-supervise
13 with parish pastors at our parish schools.
14      Q.  And when you say "supervision," is that
15 the same -- do you mean the same as direction, or do
16 you supervise the different individuals that you just
17 described?
18      A.  We use supervision in -- yeah, directing
19 would fall under supervising, but supervising would
20 also encompass evaluating the performance of our
21 principals and of our schools, ultimately.
22      Q.  And who do you directly supervise?
23      A.  As I noted, I directly supervise the
24 members of the Office of Catholic Schools team here at
25 the Archdiocese.  It's a total of five individuals.

Page 23

1       And then I also directly supervise the
2  four school leaders of the four Archdiocesan schools
3  that we directly oversee, two high schools and two
4  K-to-8 schools.
5       And then I also directly supervise seven
6  school principals, again alongside their school
7  pastors.  The other school principals are supervised
8  by the other superintendents in the Office of Catholic
9  Schools.  Those superintendents I directly supervise.
10      Q.  How many other superintendents are there
11 that you supervise?
12      A.  There's three others.
13      Q.  What are the seven schools that you
14 directly supervise?
15      A.  Again, that's testing my memory here.
16 All Souls Catholic School, Annunciation Catholic
17 School, Frassati Catholic Academy, Blessed Miguel Pro
18 Catholic Academy, Bishop Machebeuf High School, Our
19 Lady of Fatima, and St. John the Baptist Catholic
20 School.
21      Q.  Who supervises St. Mary's, St. Mary's of
22 Littleton?  I believe there are two St. Mary's.
23      A.  Yeah.  If I recall correctly, that would
24 be our assistant superintendent, Abriana Chilelli.
25      Q.  And who supervises Wellspring Academy of

Page 24

1  St. Bernadette?
2       A.  If I'm recalling correctly, it would be
3  her as well.
4       Q.  Can you repeat her name for me again?
5       A.  Yes.  It's Abriana.
6       Q.  Can you spell that?
7       A.  Yes.  A-b-r-i-a-n-a.
8       Q.  And what is her last name?
9       A.  Her last name is Chilelli,
10 C-h-i-l-l-e-l-i (sic).
11      Q.  Thank you.  And when you say that you and
12 the other three superintendents supervise Catholic
13 schools, does that include high schools and middle
14 schools as well, or what does that mean?
15      A.  Yes.  It includes the two Archdiocesan
16 high schools that we have.  We don't have any
17 stand-alone middle schools.  Outside of our two
18 Archdiocesan high schools, all other schools that we
19 have are either Pre-K through 8th grade schools or
20 stand-alone preschool programs.
21      Q.  Are there any -- are there any
22 stand-alone preschool programs?
23      A.  There are, yes.
24      Q.  What are those stand-alone preschool
25 programs that are within the Archdiocese Catholic

Page 25

1  schools?
2       A.  Yeah.  The -- there's three or four of
3  them.  St. Joan of Arc Preschool; Holy Name Preschool;
4  St. Michael Preschool; Most Precious Blood Preschool.
5  Those are the four that I'm recalling right now are
6  the stand-alones.
7       So, in other words, they operate
8  separately, whether because they don't have a K-to-8
9  program or just have a separation between their
10 programs in terms of leadership structure.
11      Q.  And what about the rest of the
12 preschools?  If they're not stand-alone, how do they
13 operate in conjunction with the rest of the school?
14      A.  Yeah.  They're just -- they're one of the
15 tracks that are available for families in the parish
16 school program, so they'll go from preschool through
17 8th grade.
18      Q.  Do those schools that are not stand-alone
19 have their own policies?
20      A.  I'm sorry.  Can you repeat that question
21 again?
22      Q.  Sure.  So the schools that are not
23 stand-alone preschools, but operating in conjunction
24 with the rest of the school, do they share things like
25 policies and handbooks with the rest of the school or

Elias Moo  30(b)(6)
November 27, 2023

Page 26

1   do they have their own?
2       A.   Yes.  So those preschool programs are
3   part of -- the K to 8 or a Preschool-to-8 program all
4   have the same policies, operate by the same policies
5   and systems.
6       Q.   What would you say that your role is
7   within the Archdiocese, beyond what you've already
8   described?
9           MR. DAVIS:  Objection.  Asked and
10  answered.
11          But you can answer, if you can.
12      A.   I suppose the other thing I would add is
13  one of my primary areas of responsibility, on behalf
14  of the Archbishop of Denver, is to supervise and
15  direct, especially when it pertains to the matters of
16  faith and morals in doctrine.
17          And so my interaction with schools also
18  centers around the way that our schools carry out the
19  Catholic mission and charter for schools, for our
20  schools here.
21      Q.   (BY MS. CARRENO)  Have you had any other
22  jobs within the Archdiocese, other than superintendent
23  of Catholic Schools?
24      A.   Have I had any other jobs?  Is that what
25  you asked?

Page 27

1       Q.   Have you had any other positions or
2   titles within the Archdiocese?
3       A.   Yes.  Prior to becoming superintendent, I
4   was a principal at St. Rose of Lima Catholic Academy
5   in Denver.
6       Q.   How long were you in that position?
7       A.   Four years as principal there.
8       Q.   And prior to being a principal at
9   St. Rose, what was your job before that?
10      A.   I was an assistant principal for two
11  years, also at St. Rose of Lima.
12      Q.   And what about before being assistant
13  principal?
14      A.   I was a teacher, classroom teacher.  And
15  all I've known professionally, up to my job at the
16  Archdiocese, was at St. Rose of Lima at Denver.
17      Q.   How many years did you work at St. Rose?
18      A.   Starting in 2007 to 2014.  I'm sorry.
19  2018.  Excuse me.
20      Q.   According to some of the pleadings and
21  some of the information exchanged in this case, it
22  sounds like you're moving to Oregon.  Is that correct?
23      A.   Yes, that's correct.
24      Q.   When are you moving to Oregon?
25      A.   We are beginning to relocate on

Page 28

1   December 5th.
2       Q.   And what are you going to be doing in
3   Oregon?
4       A.   I will be director for Catholic education
5   at the Archdiocese of Portland.
6       Q.   Do you know who will be taking over your
7   current role yet?
8       A.   I do not know.
9       Q.   Do you have any idea when that decision
10  will be made?  Or where is that -- where is that
11  process, if you know?
12      A.   Yeah.  It's in the -- it's in process.
13  What I know is they're hoping to have a new
14  superintendent named by the middle of December, if not
15  by the first of the new calendar year.  That's a rough
16  timeline.
17      Q.   Will you be in the Denver area December
18  19th, 20th, and 21st?
19      A.   Yes.  I've made arrangements to be
20  present on those dates.
21      Q.   Okay.  So I just want to back up a little
22  bit.  I know we started jumping into talking about
23  your position as superintendent of Catholic schools,
24  but I'm hoping that you can give me a little bit more
25  information about the Catholic Archdiocese of Denver

Page 29

1   in general.
2           What is the Catholic Archdiocese of
3   Denver?
4       A.   If you could clarify if you mean in terms
5   of geographic area.  What precisely were you looking
6   for here with respect to what makes up the
7   Archdiocese?
8       Q.   So is the Catholic Archdiocese a
9   corporation?  Is it a nonprofit?  What is it?
10      A.   Yeah.
11          MR. DAVIS:  Objection to the extent it
12  calls for a legal analysis.
13          But you can answer otherwise.
14      A.   Yeah.  The Archdiocese of Denver is a
15  corporation.  I wouldn't be able to tell you what kind
16  of a corporation at this point.  But it's run by the
17  Archbishop of Denver, who is the corporate sole of the
18  Archdiocese of Denver.
19      Q.   (BY MS. CARRENO)  What is the mission or
20  purpose of the Archdiocese of Denver?
21      A.   The Archdiocese of Denver exists so that
22  in Jesus Christ all might be rescued and have abundant
23  life for the glory of the Father.
24      Q.   And what is the geographic region of the
25  Archdiocese of Denver?

Elias Moo  30(b)(6)
November 27, 2023

Page 30

```
1       A.   Yeah.  To the best of my understanding,
2  the Archdiocese of Denver extends from the state
3  border with Wyoming, down to County Line Road.  Goes
4  east to the state border with Kansas, northeast to the
5  state border with Nebraska, and then goes west to the
6  western border.  But then there's a cutoff at some
7  point around -- just north of Grand Junction.
8            Again, that's a really kind of rough
9  boundary line for you there, but hopefully that gives
10 a sense of the geographic span there.
11      Q.   Who is the head of the Archdiocese of
12 Denver?
13      A.   The Archbishop of Denver.
14      Q.   And you said that is the Reverend Aquila?
15      A.   Yes.  Most Reverend Samuel Aquila, yeah.
16      Q.   How did the Most Reverend Aquila get that
17 position?
18      A.   He was appointed as such by the Holy
19 Father.  At the time that was Pope Benedict the XVI.
20      Q.   Who does the archbishop report to, if
21 anyone?
22      A.   That's a good question.  Probably the
23 pope.  That would be the primary person that he
24 reports to.
25      Q.   And what is the archbishop's role?
```

Page 31

```
1       A.   According to Canon Law, he has a
2  threefold role, and that's to teach, govern, and
3  sanctify over the church that he has been given
4  authority of.
5       Q.   Does the Archdiocese have employees?
6       A.   Yes.
7       Q.   How many employees are employed by the
8  Archdiocese?
9       A.   Again, I don't know that I could give you
10 a firm number, but ballpark, it's probably around 125
11 to 130 employees, give or take.  But that's -- yeah,
12 that's not a concise number.  I'm sorry.
13      Q.   Okay.  And what type of employees make up
14 the Archdiocese generally?
15           MR. DAVIS:  Objection to the form.  It
16 seems vague.
17           But if you understand the question, you
18 can answer.
19      A.   Yeah.  And maybe you can help me out in
20 terms of -- yeah.  Could you -- or could you rephrase
21 the question?  What do you mean, what type of
22 employees?
23      Q.   (BY MS. CARRENO)  Yeah.  So are the
24 employees -- well, let me back up.
25           So where is the Archdiocese of Denver
```

Page 32

```
1  located?
2       A.   1300 South Steele Street in Denver.
3       Q.   And do the employees work at that
4  location or do they work in various locations?
5       A.   Yeah.  They're -- for the most part, the
6  employees are based out of 1300 South Steele Street.
7       Q.   And are these employees office employees?
8  Or I'm just trying to get a general idea of the makeup
9  of the different types of employees that work for the
10 Archdiocese.
11      A.   Yes.  Generally, they're office
12 employees.  I think some of the employees will travel
13 across the various different parish communities within
14 the Archdiocese of Denver territory to provide
15 services and support for pastors and their teams.
16           But for the most part, I would say the
17 great majority of our office employees office here at
18 the headquarters.
19      Q.   And who hires and fires those employees?
20      A.   Yeah.  There's -- obviously, there's the
21 chief operating office who oversees the Archdiocese of
22 Denver Pastoral Center Management Corporation and then
23 there are heads of departments.
24           There's various departments.  So the
25 Office of Catholic Schools is one of the departments,
```

Page 33

```
1  for example.  And so the authority over those
2  departments is delegated to the heads of the various
3  departments.  Those heads report to the chief
4  operating officer.
5           So, yeah.  So there's some lines of
6  authority, a chain of command that's built in that
7  way.
8       Q.   Does the Archdiocese require that all
9  Archdiocese employees be Catholic?
10      A.   No.  I do not believe that that's a
11 requirement.
12      Q.   Under what circumstances, if any, does
13 the Archdiocese require employees to be Catholic?
14      A.   Under what circumstances, you asked?
15      Q.   Yes.  Under what circumstances, if any,
16 does the Archdiocese require its employees to be
17 Catholics?
18      A.   Yeah.  I think if there is -- if there's
19 a requirement, it probably comes with roles or
20 positions that have to do with the defense of
21 doctrine, of faith.
22           So anything that would require an
23 employee to have not just a full understanding of
24 church teaching, but also be able to model and witness
25 to the Catholic faith as part of their job
```

Page 34

1  responsibilities would certainly, I think, be --
2  result in some sort of a requirement for an employee
3  or prospective employee to be Catholic.
4      Q.   Would you say that most employees are
5  Catholic?
6      A.   Yes.
7      Q.   If employees aren't necessarily required
8  to be Catholic, are they required to be Christian or
9  to identify as religious more generally?
10     A.   No.  I've not seen that as a requirement.
11  If there is -- if there's a bottom line, it's that any
12  employee is going to abide by the teachings of the
13  Catholic Church and not do anything in their
14  professional or even their public and private life,
15  outside of their professional work and life, that
16  would be a cause of scandal or would be a promotion of
17  something that goes or is contrary to church teaching.
18     Q.   And so can you give me some examples of
19  what types of roles would have to do with, I think you
20  said, the defense of doctrine?
21     A.   Yeah.  So, for example, if you're going
22  to work in the tribunal here at the Archdiocese of
23  Denver, the tribunal is the canonical legal arm of the
24  Archdiocese.
25          And so I would imagine that -- again, not

Page 35

1  directly overseeing that department, but knowing what
2  they do, I would imagine that for someone to be
3  employed in the tribunal, they would have to have not
4  just a full understanding of Canon Law, but also be a
5  Catholic that's living in communion with the church,
6  precisely because the tribunal handles matters and
7  disputes that deal with being able to -- or the extent
8  to which people or situations are following church
9  law.
10     Q.   And for those positions where being
11  Catholic or having an understanding of Canon Law would
12  be required, how does the Archdiocese verify that?
13          MR. DAVIS:  Objection.  Calls for
14  speculation.
15          But you can answer, if you know.
16     A.   Yeah.  I would not -- I wouldn't be able
17  to tell you.  Again, not being directly involved with
18  the hiring of employees for the tribunal, I don't know
19  what process they follow.
20     Q.   (BY MS. CARRENO)  Are you involved in the
21  hiring and firing of any employees?
22     A.   Yes.  The employees of the Office of
23  Catholics Schools and --
24     Q.   Sorry.  Go ahead.
25     A.   -- and also supporting pastors in the

Page 36

1  hiring and firing of school principals.
2      Q.   And are any of the employees that you
3  hire and fire required to be Catholic?
4      A.   No.
5      Q.   So none of those employees are required
6  to be Catholic?
7      A.   Of the ones that I am directly involved
8  with, no.
9      Q.   Okay.
10     A.   I'm sorry.  Can I clarify that?  I
11  misspoke.
12     Q.   Sure.
13     A.   So, yeah.  So the associate
14  superintendents and the principals are required to be
15  Catholic.  There are other employees in the Office of
16  Catholic Schools that are not required to be Catholic.
17          But specifically for the superintendents
18  and the principals, there is a requirement to be
19  Catholic.
20     Q.   Okay.  And so for those employees that
21  are required to be Catholic, how do you verify that?
22     A.   Yeah.  The job description has, as one of
23  the requirements for eligibility for employment, that
24  they must be a Catholic in good standing.
25          Typically, we ask for a letter of

Page 37

1  reference from, for example, a pastor at the parish
2  where they attend to be able to attest to their
3  involvement or another letter of reference and
4  recommendation.
5          So we ask them to furnish something that
6  would be able to show that they are Catholics in good
7  standing with the church.
8      Q.   What does that mean, to be a member in
9  good standing?
10     A.   That they're living out the precepts of
11  the Catholic Church according to the church's
12  teachings.  So, for example, going to Mass on Sundays,
13  attending Mass during Holy Feasts and Days of
14  Obligation, living a sacramental life.
15          But we also -- a Catholic in good
16  standing would also be someone who is actively living
17  as a disciple in Jesus Christ in their work and in the
18  world.
19     Q.   What does that mean, being a disciple of
20  Jesus Christ?
21     A.   Someone who lives out the Gospel of Jesus
22  Christ, so Jesus' teachings.  And so someone that
23  gives witness to that, someone that, again, is
24  actively practicing their faith and by that, right,
25  according to the Catholic Church's teachings and

Elias Moo   30(b)(6)
November 27, 2023

Page 38

1  precepts.
2         And also someone that is able to
3  articulate, as a part of their witness, and give
4  testimony to their relationship with Jesus as
5  manifested through prayer life or through their world
6  view.
7         Q.   And so it sounds like there are some
8  circumstances where the Archdiocese might hire
9  individuals -- well, let me strike that.  Let me just
10  ask a question.
11         Are there any circumstances where the
12  Archdiocese will hire individuals who disagree with
13  the Archdiocese view about sexual orientation or
14  gender identity?
15         MR. DAVIS:  Objection to the extent it
16  calls for speculation.
17         But you can answer, if you know.
18         A.   Yeah.  Intentionally, probably not.
19  Could a candidate present themselves and apply for a
20  position and withhold that they disagree with the
21  church's teaching on sexual -- on sexuality?  Yeah,
22  that's possible.  But, yeah.  Yeah.  That's the best I
23  could offer on that, though.
24         Q.   (BY MS. CARRENO)  And that would be the
25  same for individuals that aren't required to be in

Page 39

1  good standing or Catholics in the way that you just
2  described?
3         MR. DAVIS:  Same objection.
4         But you can answer, if you know.
5         A.   Yes.  Yeah.  I suppose it could be the
6  same.  Again, the application and interview process
7  only goes so far.  And so there could be -- again,
8  there could be situations or scenarios where an
9  employee would withhold their lack of belief or their
10  opposition to church teachings on certain topics.
11         Q.   (BY MS. CARRENO)  So you described some
12  of the positions, I think associate supervisors and
13  principals, where employees would be required to be
14  Catholic.
15         Can you give any examples where employees
16  wouldn't be required to be Catholic?
17         A.   Yeah.  School teachers are not required
18  to be Catholic.  Some of the other ancillary roles in
19  a school setting.  Cafeteria managers, custodians,
20  maintenance, teacher aides, I think those would all be
21  examples of roles where there isn't necessarily a
22  requirement to be Catholic.
23         Q.   If they're not required to be Catholic,
24  would there be any expectations about their agreement
25  with the Catholic Church generally?

Page 40

1         A.   Yes.  Yeah.  For all those employees,
2  there's an expectation that they would not carry
3  themselves, promote, or conduct themselves in school,
4  out of the school setting, in their public and private
5  life, in a manner that is contrary to the church's
6  teaching.
7         All employees are asked to sign
8  agreements that state that they understand that, and
9  prime of which is our Statement of Catholic Community
10  Beliefs and Commitments that all employees are asked
11  to sign as part of their work agreements.
12         Q.   And that would be true for I think you
13  mentioned maintenance workers.  That would be true for
14  employees that are not maintenance workers as well?
15         A.   Yes.
16         Q.   Has the Archdiocese ever hired an
17  employee who expressed disagreement with its views
18  about sexual orientation and/or gender identity during
19  the interview process?
20         A.   I can't think of a situation like that.
21  So at least in my experience with hiring of employees,
22  I have not come across that, no.
23         Q.   Would that be something that would be
24  permissible?
25         MR. DAVIS:  Objection to the extent it

Page 41

1  calls for speculation.
2         But you can answer, if you know.
3         A.   Would it be permissible to -- I'm
4  sorry -- to hire someone that would not -- or that has
5  disagreements with church teaching?
6         Q.   (BY MS. CARRENO)  Yes.
7         A.   Yeah.  Again, I can only speak for myself
8  in my role and capacity as superintendent of Catholic
9  Schools, but I believe that this is reflective of the
10  position that the Archdiocese has and that would be
11  the following:  That if a prospective employee
12  presents themselves in a manner that demonstrates that
13  they are not willing to abide by or to support the
14  church's teaching, then, yes, they would not be
15  eligible for hire.
16         Again, even -- they don't have to be
17  Catholic -- even if they don't have to be Catholic --
18  excuse me -- there is still an expectation that they
19  would abide by the church's teaching and not promote
20  anything contrary to the church's teaching.
21         So if an employee at the outset is,
22  whether verbally or otherwise, demonstrating that
23  they're not willing to abide by or carry themselves in
24  a manner that is consistent with church teaching, then
25  yes, they would not be eligible for employment.

Elias Moo  30(b)(6)
November 27, 2023

Page 42

1     Q.   And that would be for all employees?
2     A.   Yes.  Yep.  Yep.  For all employees, I
3  would say.  Again, I think it's -- this is something
4  we have delineated in our work agreements and the
5  documents that we have all employees sign.
6     Q.   I believe in the amended complaint that
7  was filed in this case, it says that the Archdiocese
8  is made up of 148 parishes; is that accurate?
9     A.   Yes.
10    Q.   And 36 schools?
11    A.   Yes.
12    Q.   And in the complaint, it says that there
13 was 148 parishes and 38 schools under the care and
14 direction of the Archdiocese.  What does that mean?
15         MR. DAVIS:  Objection.  I think that
16 misstates the complaint.
17         Did you say 38 schools, Virginia?
18         MS. CARRENO:  I'm sorry.  I misspoke.
19    Q.   (BY MS. CARRENO)  So 148 parishes and 36
20 schools.  What does it mean that there was 148
21 parishes and 36 schools under the care and direction
22 of the Archdiocese?
23    A.   Yeah.  So those parishes are given a
24 pastor, and that pastor is the corporate sole of those
25 parishes.  Canonically, according to church law, that

Page 43

1  pastor is appointed by the Archbishop of Denver to
2  exercise the archbishop's authority and duty, again,
3  to teach, govern, and sanctify over that particular
4  parish community.
5          And so the archbishop ultimately is the
6  one directing, and he exercises that direction through
7  his priests, through the pastors specifically, who he
8  appoints to oversee those parish communities.
9          So while the parishes themselves exist as
10 individual corporate soles, the pastors, nonetheless,
11 report to the archbishop.  And the archbishop is
12 directing and instructing his pastors, and then
13 through his pastors, to the faithful of the parishes.
14    Q.   And did you say the archbishop appoints
15 those pastors?
16    A.   Yes.
17    Q.   And if I'm not using the right
18 terminology, I apologize, but who would fire those
19 pastors?
20    A.   Yeah.  It would be a removal of the
21 pastor, and that would also fall to the archbishop,
22 ultimately.
23    Q.   Who has decision-making authority for the
24 Archdiocese?
25         MR. DAVIS:  Objection to the form.

Page 44

1          But you can answer, if you understand.
2     A.   Yeah.  If you can clarify.  Who has
3  decision-making authority over the -- over what
4  specifically?
5     Q.   (BY MS. CARRENO)  Who has decision-making
6  authority for the Archdiocese over the preschools?
7     A.   The -- so the first line would be the
8  pastors.  So the preschool programs operate as
9  ministries of parishes.  And so the pastor would be
10 the authority that has the ability to, again, run and
11 operate his program as he sees necessary and best fit.
12 He cooperates and hires a preschool director or a
13 school principal, right, to administer the day-to-day.
14         But at the end of the day, the authority
15 lies with the pastor of the parish where the preschool
16 program is located.
17    Q.   Okay.  And you had described a geographic
18 area that sounds really large for the Archdiocese of
19 Denver, but mentioned that there's only 36 preschools.
20         Does every -- does that encompass all of
21 the Catholic preschools within the geographic area
22 that falls in the Archdiocese of Denver?
23    A.   Yes.  That's right.
24    Q.   Is every Catholic Church in that
25 geographic area required to be a member of the Denver

Page 45

1  Archdiocese?
2     A.   Yeah.  I guess I wouldn't say it's a
3  requirement as much as that's just how -- that's how
4  it's set up canonically.  So yes.
5          So in short, every parish is -- that
6  holds the Catholic name is under the jurisdiction of
7  the Archbishop of Denver and the Archdiocese of
8  Denver.
9     Q.   Okay.  How does the church become or
10 parish become a member of the Archdiocese?
11    A.   So, yeah.  I guess I wouldn't look at it
12 in terms of membership in perhaps the way you're
13 suggesting.
14         Churches are erected by the archbishop,
15 ultimately.  So it's not like there's a community of
16 faith that all of a sudden says, We want to be
17 Catholic and can we be admitted?  There doesn't exist
18 a mechanism, to the best of my understanding, such as
19 that.
20         But if there is a well-known need for a
21 parish community to be erected, then the archbishop
22 would establish it as such through decree, through a
23 canonical decree, which then allows a church, a
24 Catholic Church to begin with -- alongside the
25 appointment of a pastor, as well, to be able to

Page 46

1  oversee it.
2      Q.   Thank you.  What do you consider an
3  Archdiocesan school?
4          MR. DAVIS:  Objection.  Misstates -- or
5  assumes facts not in evidence.
6          But you can answer, if you can, Elias.
7          MS. CARRENO:  And I can clarify.
8      Q.   (BY MS. CARRENO)  So when I say an
9  "Archdiocesan school," I'm referring to the
10  Archdiocese of Denver's Archdiocesan school.
11     A.   Yeah.  So for policy, a school is
12  considered an Archdiocesan school or a school of the
13  Archdiocese of Denver, again, if it is a school that
14  is running out of a legitimately established parish
15  or is a legitimately established school as decreed as
16  such by the Archbishop of Denver.
17          So we have, in our school portfolio in
18  the Archdiocese of Denver, really kind of two buckets,
19  if you will.  We have parish schools, so schools that
20  serve as ministries of parishes.
21          And then we have regional schools that
22  have been erected not attached to a parish, but
23  erected by the archbishop to be able to serve the
24  faithful as Catholic schools.  So those are the two
25  consorts that we have, but all of them would be

Page 47

1  considered Archdiocese of Denver schools, ultimately.
2      Q.   So the 36 preschools that you identified,
3  are those parish schools or are those regional
4  schools?
5      A.   There's only two that are regional
6  schools of that group.  The rest are parish schools.
7      Q.   Which ones are regional schools?
8      A.   That would be Frassati Catholic Academy
9  and Blessed Miguel Pro Catholic Academy.
10          And to be clear, those are K-to-8
11  schools -- Pre-K-to-8 schools -- excuse me -- that
12  have a preschool program there.
13     Q.   And then the other 34 are parish schools?
14  Did I say that correctly?
15     A.   That's correct.
16     Q.   So do -- are all 34 preschools associated
17  with a specific parish?
18     A.   Yes.
19     Q.   What about St. Mary's Academy in Cherry
20  Hills?  Is that school a member of the Archdiocese?
21     A.   Not -- they are not considered an
22  Archdiocese of Denver school.  They are an independent
23  Catholic school and they have been given permission to
24  use the Catholic name by the decree of the archbishop
25  many years ago.  I don't know exactly when.  But they

Page 48

1  are not -- they are not part of the Archdiocese of
2  Denver Catholic schools.
3      Q.   And so you said you consider them an
4  independent Catholic school?
5      A.   Correct.
6      Q.   And that is different than the parish
7  schools and the regional schools?
8      A.   Correct.
9      Q.   What is an independent Catholic school
10  then?
11     A.   Yeah.  It's a school that is governed
12  completely by whether a religious order or a board
13  of -- a lay board of trustees, where the
14  Archdiocese -- they don't -- they're not required to
15  abide by or comply with the rules and regulations of
16  the Archdiocese of Denver that we have for schools,
17  except for, again, those areas of faith and morals
18  that are proper to the church and to the Archdiocese
19  oversight even over those independent schools.
20     Q.   And so does the Archdiocese have
21  oversight over those independent schools?
22     A.   Yeah.  Not -- again, not in terms of
23  day-to-day operations of the school or even in terms
24  of the strategic decision-making of the school
25  finances.  None of that is where the Archdiocese has

Page 49

1  any oversight.
2          But church law has set up the bishop to
3  have oversight over any -- any entity that holds the
4  Catholic name officially and that oversight, again, is
5  in areas in matters of faith and morals doctrine.
6      Q.   Is St. Mary's one of those 30 -- I'm
7  sorry -- St. Mary's of -- St. Mary's Academy in Cherry
8  Hills, is that one of the 36 preschools that
9  Plaintiffs have identified as an Archdiocese
10  preschool?
11     A.   No, it's not.
12     Q.   Are there any other independent Catholic
13  schools in the Archdiocese of Denver's geographic
14  region?
15     A.   And to clarify, with preschool programs
16  or just in general?
17     Q.   Just preschool programs.
18     A.   There is -- I believe there is one other.
19  Escuela de Guadalupe is another independent Catholic
20  school that I believe has a preschool program.  I
21  can't say that with 100 percent confidence, but I
22  believe that to be the case.
23     Q.   And were either of these schools given
24  any instructions or directions about the Universal
25  Preschool Program --

Elias Moo   30(b)(6)
November 27, 2023

Page 50

1    A.   No.
2         Q.   -- by the Archdiocese of Denver?
3         A.   No.  Not -- no, not directly.  They could
4    have received communication from us, as they are part
5    of the email list, if you will, that we have, but we
6    never directly reached out to them to instruct them or
7    direct them in the same manner that we did the 36.
8         MS. CARRENO:  I think now might be a good
9    time for a ten-minute break.  Does that work for
10   everyone?
11        MR. DAVIS:  It's good with us.
12        THE REPORTER:  Off the record.
13        (Recess from 9:20 a.m. to 9:31 a.m.)
14        THE REPORTER:  Back on the record.
15        MS. CARRENO:  Thank you, Lisa.
16        Q.   (BY MS. CARRENO)  Welcome back, Mr. Moo.
17   Can you still hear me okay?
18        A.   Yes, I can.  Thank you.
19        Q.   And I just want to confirm.  Am I
20   pronouncing your last name correct?
21        A.   Moo is the proper pronunciation.  Yep.
22        Q.   Apologies.  As I said it, I just
23   remembered that maybe you said it differently when you
24   introduced yourself.  So apologies, Mr. Moo.  I have
25   probably been mispronouncing your name all morning.

Page 51

1    A.   No worries.  I get it all the time.
2         Q.   We talked a lot about the Archdiocese
3    generally, but I believe that you said your position
4    is within the Office of Catholic Schools; is that
5    correct?
6         A.   Yes.  That's correct.
7         Q.   What is the Office of Catholic Schools?
8         A.   Yeah.  The Office of Catholic Schools is
9    the department that, on behalf of the archbishop,
10   oversees the -- and supervises the Catholic schools of
11   the Archdiocese of Denver.
12        Q.   What does that mean, that the Office
13   oversees and supervises the Catholic schools within
14   the Archdiocese?
15        A.   Consistent with our policy, again, that
16   falls, kind of, in a few buckets.  One, it's a policy
17   guidance, policy determination for schools, the
18   evaluation of school principals, alongside school
19   pastors, curriculum, and also and especially most
20   importantly, I would say matters of faith and morals.
21        So ensuring that schools are adhering to
22   the church's teaching in all aspects of the school
23   program.
24        Q.   How does that oversight and that
25   supervision work?  Are you physically present at the

Page 52

1    schools or can you tell me a little bit more about
2    that?
3         A.   Sure.  Yes.  We -- yeah.  We do conduct
4    visits of the schools, "we" being myself and the three
5    assistant associate superintendents that we have.
6         We also have -- just to offer a
7    correction of something I said a little bit earlier,
8    we also have a regional director that functions as an
9    associate superintendent.  I don't think I mentioned
10   that role earlier.
11        But they -- again, they carry out the
12   duties of an associate superintendent, but we have
13   them in a regional capacity overseeing schools in the
14   north.
15        But all five of us, that would be, visit
16   schools.  We are in communication with school pastors.
17   We engage in a twice-a-year evaluation of the school
18   principal and the school program, alongside school
19   pastors.
20        And then there's -- yeah.  Then there's
21   informal communication happening with them throughout
22   the course of the academic year, as well as informal
23   visits that are taking place as well.
24        Q.   In one of the declarations that you
25   filled out for this litigation, you had said that the

Page 53

1    Office of Catholic Schools requires Archdiocese
2    schools to use a statement of community belief when
3    entering into employment contracts.
4         Can you tell me what you meant by
5    requiring?  How does the Office require Archdiocesan
6    schools to do this?
7         A.   Yeah.  So, again, policy is one aspect of
8    our work.  And one of the elements of the policy that
9    we direct with and on is employment agreements.
10        So all our Archdiocese of Denver Catholic
11   schools are using standardized work agreements,
12   teacher contracts, we call them, for teaching
13   positions; at-will agreements for non-teaching
14   positions.
15        And those agreements all contain that
16   Statement of Catholic Community Beliefs and
17   Commitments.  So our policies are decreed by the
18   Archbishop of Denver and, thus, they become, kind of,
19   in the church world, they become particular law, is
20   how it would be described.  So binding, if decreed as
21   such by the archbishop, binding over all parishes and
22   in this instance, schools as well.
23        Q.   How does the Office require the schools
24   to do those things, though?
25        MR. DAVIS:  Objection.  Asked and

Elias Moo   30(b)(6)
November 27, 2023

1  answered.
2          But you can answer, if you can.
3      Q.   Can I clarify?  Are you asking how do
4  we -- how do we ensure that they're completing the
5  templates out and the forms?  Is that what you're
6  getting at?
7      Q.   (BY MS. CARRENO)  Yes.  Yes.  I believe
8  you said what they are required to do, but I'm asking
9  how you require they actually do that.
10     A.   Yeah.  Yeah.  We're not -- we don't
11 actually see them physically doing it.  We distribute
12 the documents.  We conduct audits every so often
13 during official visits and that's one way, you know,
14 to guarantee or ensure that certain things are
15 happening, such as, you know, the Statement of
16 Catholic Community Beliefs being distributed and
17 signed by employees.
18          But we're not asking for copies to be
19 sent to us.  But we expect our professionals to be
20 professional and, in particular, our leaders to
21 exercise their leadership and comply with the
22 directive.  So we leave it to them to ensure that that
23 happens.
24     Q.   What would happen if, during one of the
25 audits, you realized that one of the schools was not

1  taking the actions that are required?  Would there be
2  any sanctions or any recourse that would happen?
3          MR. DAVIS:  Objection to the extent it
4  calls for speculation.
5          But you can answer, if you can.
6      A.   Yeah.  If there was a situation like
7  that, yeah, we would go through a process of
8  identifying what failed, why didn't it happen, having
9  conversations with the leadership, the principal first
10 or the preschool director, and then ultimately the
11 pastor as well.
12          But we would engage and ensure we could
13 exhaust kind of typical means at the local level,
14 before we get into anything like disciplinary, for
15 example.
16     Q.   (BY MS. CARRENO)  And would the Office
17 have authority to take disciplinary action?
18     A.   With respect to the parish schools, we
19 would -- we would have to be in lockstep with the
20 pastor of that school.
21          So we could not, for example,
22 unilaterally come in and terminate a principal at a
23 parish school.  The pastor would have to be onboard
24 and be willing to sign off.
25          So we would -- again, this is why the

1  communication with the pastor would be really
2  important for us to ensure we're on the same page.
3          But in the case of parish schools, we
4  are -- no.  We just can't come in and say -- or
5  terminate an employee, for example, in a leadership
6  role without their support and cooperation.
7      Q.   But, ultimately, the archbishop has
8  authority over the pastor; is that correct?
9      A.   Yes.
10     Q.   And I think you mentioned that you
11 supervised the principals, alongside of the pastor;
12 isn't that correct?
13     A.   That's correct.  Yes.
14     Q.   You had talked about, when we were
15 talking about the Archdiocese generally, some of the
16 employees that you would be responsible for hiring and
17 firing.
18          Is the Office of Catholic Schools
19 involved in hiring or firing decisions within the
20 preschool?
21     A.   No.  Not within a preschool program.
22 Again, our primary line of authority is through school
23 leadership roles.
24          And so let me -- let me take a step back
25 and clarify here.  So I might go, again, to the two

1  structural situations that we have in the Archdiocese
2  of Denver Catholic schools.
3          So, again, we have four regional schools,
4  then we have the other parish schools, right?
5  Starting with the four regional schools, that is --
6  for example, if we run into a situation or scenario
7  where the leadership or teachers there are not
8  complying with policies or -- or have carried
9  themselves out or done something that violates policy
10 that would result in, let's say, termination, we do
11 have authority there to come in and to tell the
12 principal, in those four regional schools, to move
13 forward with termination of employment.
14          In the parish schools, it does not work
15 that way.  So in the parish schools, the -- again, we
16 lead through -- alongside pastors and then,
17 ultimately, through the school leadership.  And so it
18 falls to the pastor of that parish, and the school
19 leader of that parish school, oversight for their
20 preschool program.
21          So we would not be involved in any
22 matters pertaining to that preschool program at that
23 point, again, unless it surfaces through a pastor and
24 they want to -- they want to consult with us.  But
25 we're not directly involved in how they go about their

Elias Moo   30(b)(6)
November 27, 2023

Page 58

1  day-to-day operations at their preschool programs in a
2  parish school context.
3      **Q.   But you would be -- when I say "you," I**
4  **mean Office of Catholic Schools -- would be involved**
5  **in those types of decisions for, I believe you said**
6  **the four regional schools; is that correct?**
7      A.   That's correct.  Yes.
8      **Q.   If the Archdiocese learned that one of**
9  **the parish schools hired a same-sex individual for a**
10 **teaching position within that parish school, would the**
11 **Office of Catholic Schools make any recommendations or**
12 **take any actions?**
13         MR. DAVIS:  Objection.  Calls for
14 speculation.
15         Also, Virginia, do any of your topics in
16 the 30(b)(6) notice get at employment?  I'm not sure I
17 saw that.
18         MS. CARRENO:  Yeah.  I'm still just
19 trying to figure out the structure, role, and
20 authority of the Catholic Archdiocese of Denver and
21 the different relationships between the parishes and
22 schools and the preschools, which is Topic Number 1.
23         MR. DAVIS:  Okay.
24     A.   Yeah.  So just to restate the question,
25 then, to my understanding, if we caught wind or found

Page 59

1  out that there was an employee who -- or a same-sex
2  attracted person working in our schools, if we would
3  intervene, if we would do something there?  Was that
4  the question?
5      **Q.   (BY MS. CARRENO)  Yes.**
6      A.   Yeah.  If it was brought to our
7  attention, yeah.  We would -- we would discuss it with
8  the pastor, but we would want to figure out exactly
9  what was involved.
10         So to be really clear, just because
11 someone is same-sex attracted does not mean that
12 they're in violation of church teaching.  The church
13 teaching itself, I think, is clear that while same-sex
14 attraction is intrinsically disordered, the attraction
15 itself is not sinful.  It's the carrying out of a
16 lifestyle that is considered in opposition.
17         So, again, just the mere existence of
18 someone who has a same-sex attraction would not be a
19 problem at all.  But, yeah, if something were to
20 surface and be brought to our attention that -- and it
21 could be not just about a same-sex attracted person,
22 it could be a heterosexual person, but they're living
23 in a manner that's contrary to church teaching, then,
24 yeah, we would reach out to the pastor and engage them
25 in a conversation around the extent to which, you

Page 60

1  know, it's been verified that this is the case.
2          If someone is persisting, have they been,
3  you know, advised that they're living in a manner
4  contrary to church teaching?  Are they intending to
5  persist in that lifestyle?  And if so, then, yeah,
6  then there might be some irreconcilable differences
7  that could lead to departing of ways or termination of
8  employment.
9          Again, it would come down to what a
10 particular situation might be about.  But to be clear,
11 just because someone is same-sex attracted, again,
12 does not necessarily mean that they're in violation of
13 church teaching or doing something that goes against
14 their work agreements or their contracts.
15     **Q.   Yes.  And thank you for that**
16 **clarification.  In the example that you just gave,**
17 **where the church determined that it was more than a**
18 **same-sex attraction and actually someone living out a**
19 **lifestyle that was inconsistent with the church**
20 **beliefs, and that employee was a teacher in one of the**
21 **four regional schools, what, if any, action would the**
22 **Office of Catholic Schools take?**
23         MR. DAVIS:  Objection.  Calls for
24 speculation.
25     A.   Yeah.  We would, you know, first and

Page 61

1  foremost, follow due process and investigate and
2  identify, again, what is happening.  They're, you
3  know, reports, or they're allegations until proven
4  that it's true.  And then there is follow-up with the
5  employee and conversation with the employee before
6  disciplinary action.
7          So, again, I think there would be a
8  process that would be put in place, first and
9  foremost, to identify the extent to which an employee
10 might be in violation of their contract, their work
11 agreement, Statement of Catholic Community Beliefs and
12 Commitments, the church's code of conduct as well,
13 before any decision is ultimately made.
14     **Q.   (BY MS. CARRENO)  Would the Office have**
15 **hiring and firing abilities or oversight in that**
16 **example?**
17         MR. DAVIS:  Objection.  Calls for
18 speculation.
19     A.   For the four regional schools?
20     **Q.   (BY MS. CARRENO)  Yes.**
21     A.   Yes.  Yes, we would.
22     **Q.   And can you remind me what the four**
23 **regional schools are?**
24     A.   Yeah.  It's Bishop Machebeuf High School,
25 Holy Family High School, Frassati Catholic Academy,

Elias Moo  30(b)(6)
November 27, 2023

Page 62

1  and Blessed Miguel Pro Catholic Academy.
2      Q.    And none of those four regional schools
3  are plaintiffs in this lawsuit?
4      A.    Yeah, that's correct.  None of the four
5  are.
6      Q.    How many employees are within the Office
7  of Catholic Schools?
8      A.    We have -- let me do a quick tally.
9          Including me, there's 11.
10     Q.    Does the Office of Catholic Schools
11  review the internal policies and practices of all
12  36 preschools?
13     A.    Yeah.  So the Office of Catholic Schools
14  Administrator Manual is what directs the Catholic
15  preschool through 8th grade and high school programs
16  in the Archdiocese of Denver.
17          That Administrator's Manual then also
18  directs what policies the schools put in their own
19  kind of manuals and procedures and handbooks and so
20  forth.
21          So the expectation is that they would
22  take the policies from the Administrator's Manual and
23  put it into their handbooks, make citations,
24  et cetera.  They're able to add policies that they see
25  necessary for their local situation.  And then they

Page 63

1  send a copy of their handbooks to us for
2  recordkeeping.
3          So we don't go to the extent of telling
4  them, you know, this is missing, that's missing, or
5  inspecting every handbook in a detailed fashion.  But,
6  again, per policy, the expectation is that the
7  Archdiocese of Denver Schools Administrator's Manual
8  would be adhered by and incorporated into their local
9  handbooks and policy manuals.
10     Q.    And I think you said before that for the
11  preschools that are associated with kindergarten and
12  higher education, they're not stand-alone preschools,
13  they would typically have one handbook that would
14  apply to both the preschool and the rest of the
15  school?
16     A.    Yes, that's correct.  There might be some
17  nuance that they build in locally that are
18  preschool-specific procedures.  Generally that happens
19  because preschools are more regulated than K-to-8
20  programs, so adult-to-student ratio, things like that,
21  for example.  But, yes, largely speaking, they're
22  incorporated.
23     Q.    And when you reference the
24  Administrator's Manual, is that the same as the
25  1000-Series?

Page 64

1      A.    Yes, that's correct.  The 1000-Series is
2  part of the Administrator's Manual.
3      Q.    Okay.  If I could direct your attention
4  to what's going to be marked as Exhibit 2.
5          MS. CARRENO:  Bonnie, if you could share
6  your screen.
7      Q.    (BY MS. CARRENO)  Mr. Moo, are you able
8  to see this document?
9      A.    Yes, I can see it.
10     Q.    And do you recognize this document?
11     A.    I do.  Yes.
12     Q.    What do you recognize it to be?
13     A.    This is the first policy in our policy
14  manual, the canonical overview, that lays out the
15  archbishop's authority and rights over Catholic
16  schools in the territory.
17     Q.    And are you able to read the document or
18  do you need it to be a little bit larger?
19          MR. DAVIS:  Virginia, before you ask him
20  to authenticate, is there any way we can just scroll
21  through it, top to bottom, so that the witness is able
22  to see the whole document?
23          MS. CARRENO:  Sure.
24          MR. DAVIS:  Thank you.
25          MS. CARRENO:  You're welcome.

Page 65

1      Q.    (BY MS. CARRENO)  And, Mr. Moo, does that
2  document still look like what you had previously said
3  you recognized it to be?
4      A.    Yes.  Yeah.  And I see the other policies
5  that are in here as well, so thank you for that.
6      Q.    Great.
7          MS. CARRENO:  And, Bonnie, can you go
8  back up to the first page, please?
9      Q.    (BY MS. CARRENO)  And, Mr. Moo, is this
10  large enough for you to read or do you need us to make
11  it a little bit larger?
12     A.    Yeah.  I can read it.  Yeah.  Thank you.
13     Q.    So in the second paragraph on this page,
14  it says that "The archbishop has the right to watch
15  over and inspect the Catholic schools within the
16  territory of the Archdiocese, even those established
17  or directed by members of religious institutes."
18          What is the distinction, "even those
19  established or directed by members of religious
20  institutes"?  Can you tell me what that means?
21     A.    Yes.  So here it's referring to
22  institutes for consecrated life or religious life.
23  That would be, for example, the Jesuits, the Sisters
24  of Loretto, the Lasallian Brothers.
25          So these are what are referred to or

Elias Moo   30(b)(6)
November 27, 2023

Page 66

1  known in the church as religious orders.  They have a
2  rule of life and are primarily overseen by a superior
3  of that religious order.
4            And so when, for example, priests are
5  ordained at the Archdiocese, they make vows and one of
6  the vows is obedience to the bishop.
7            Religious orders make vows and they make
8  vows of obedience to their religious order and their
9  local order superior.
10           So there are religious orders that -- of
11 men or women that have a particular, what we call in
12 the church, charism in education, and that charism
13 leads them to run schools, operate schools.
14           So that's what this is referring to here,
15 those religious orders -- or those schools that are
16 run and overseen by religious orders.
17      Q.   Great.  Thank you.  And so in that
18 description of the Catholic schools within the
19 territory of the Archdiocese, even those established
20 or directed by members of religious institutions,
21 would that include all 36 Archdiocesan preschools?
22      A.   Yes.  Yep.  That includes all of those.
23      Q.   And then the other types of religious
24 institutes, do any -- are there any of those, that we
25 haven't already talked about, that have preschools

Page 67

1  that would be covered by this document?
2            MR. DAVIS:  Objection to the form.
3            You can answer, if you understand the
4  question.
5       A.   So we spoke about St. Mary's Academy in
6  Cherry Hills.  That was originally founded by the
7  Sisters of Loretto, which is a religious institute, a
8  religious order.
9            They're no longer in direct oversight, is
10 my understanding of the school, but are, nonetheless,
11 affiliated with that order.  So that would be -- that
12 would be one that would also, I think, be included
13 within this.
14      Q.   (BY MS. CARRENO)  And the next sentence
15 says, "He," the archbishop, "has also the right to
16 issue directives concerning the general regulations of
17 Catholic schools.  These directives apply as to
18 schools conducted by members of a religious institute,
19 although they retain their autonomy in the internal
20 management of their schools."
21           So this would also apply to all
22 36 preschools?
23      A.   Yes.
24      Q.   And then the other types schools or
25 orders that you described as well?

Page 68

1       A.   Yes.
2       Q.   Okay.
3            MS. CARRENO:  Bonnie, you can stop
4  sharing the screen now.
5       Q.   (BY MS. CARRENO)  What happens if a
6  preschool refuses to follow a directive or other
7  instruction?
8            MR. DAVIS:  Objection.  Calls for
9  speculation.
10      A.   And here, to clarify, are you asking
11 about the parish preschools or the regional
12 preschools?
13      Q.   (BY MS. CARRENO)  Let's talk about both.
14 So if you could first answer the parish preschools.
15      A.   Yeah.  Again, I think it would -- it
16 would come down to what exactly is taking place.  But
17 it would first lead to conversations with the school
18 pastor to determine the extent to which the pastor is
19 aware of what's happening, of where the noncompliance
20 might be, and what his perspective would be on any
21 noncompliance with directives or instructions.
22           And then -- yeah.  And then hopefully
23 that risk is resolved through the pastor ultimately
24 exercising his authority to correct what needs to be
25 corrected.

Page 69

1       Q.   And then what about the other types of
2  schools?  Is that the regional schools?
3       A.   For the regional --
4       Q.   What are they?
5       A.   Sorry.  Yeah.  For the regional schools,
6  it would be -- it would be a little bit more direct.
7  We work with the school leaders there to look into the
8  situation and then would ask the leadership to ensure
9  that everything is in compliance and move to make sure
10 that everything was in compliance.
11      Q.   Great.  I want to move on and talk about a
12 little bit about the Archdiocese of Denver's
13 relationship or affiliation with Catholic Charities.
14           So would you be able to tell me, what is
15 the relationship or affiliation with Catholic
16 Charities and the Archdiocese?
17      A.   Yeah.  Catholic Charities is the
18 organization under the Archdiocese of Denver that
19 carries out the corporal works of mercy.  The corporal
20 works of mercy; feeding the hungry, giving drink to
21 the thirsty, clothing the naked, feeding, sheltering
22 the homeless.
23           Those are some of the primary functions
24 that -- or work -- excuse me -- that Catholic
25 Charities carries out on behalf of the church here in

Page 70

1  the Archdiocese of Denver through shelters and food
2  ministries, but also carries out pro life activities
3  on behalf of the Archdiocese and also provides kind of
4  emergency pregnancy support for women, especially
5  single mothers or women who are victims of abuse as
6  well.
7          So, ultimately, Catholic Charities is the
8  entity that carries out a lot of the social work and
9  social ministry that the Archdiocese has.
10  **Q.   And, Mr. Moo, I just want to make sure I**
11  **understood.  Did you say pro life activities?  Or what**
12  **was the --**
13         A.   Yes.  Pro life.  Pro life activities,
14  yes.
15  **Q.   Okay.  And so you said that Catholic**
16  **Charities is under the Archdiocese of Denver?**
17         A.   Yes.
18  **Q.   Does Catholic Charities receive any**
19  **funding or assistance from the Archdiocese of Denver?**
20         A.   Yes.  So Catholic Charities does receive
21  an allocation -- I couldn't tell you how much -- but
22  it does receive an allocation from the Annual
23  Archbishop's Catholic Appeal.
24         So the appeal is one of the large
25  fundraisers that the Archdiocese has to be able to

Page 71

1  provide the various different services.  And so the
2  charity work of Catholic Charities is one of the
3  aspects of the annual appeal.
4  **Q.   And does the Archdiocese exercise any**
5  **control over Catholic Charities?**
6         A.   I'm sorry.  Exercise any --
7  **Q.   Control.**
8         A.   Control.  Well, Catholic Charities has a
9  CEO.  Ultimately, it is a Catholic entity,
10  ecclesiastical entity.  Catholic Charities is
11  considered an ecclesiastical entity of the Archdiocese
12  of Denver, so ultimately subject to the authority of
13  the archbishop.
14         But, again, I think there are -- there's
15  particular layers in the chain of command here.  So
16  there's a CEO that oversees Catholic Charities.  That
17  CEO is responsible to or reports to a board.
18         There are -- the archbishop, I believe,
19  and the chief operating officer sit on that board.
20  And so the board supervises, oversees the CEO, who's
21  tasked then with the administration of Catholic
22  Charities.
23         But ultimately, again, in terms of
24  matters of faith and morals, the archbishop is
25  responsible for Catholic Charities as an

Page 72

1  ecclesiastical entity.
2  **Q.   And can you tell me what an**
3  **ecclesiastical entity is?**
4         A.   Yeah.  I think it's just a fancy way to
5  say church entity.  So, yeah.  An organization that
6  exists to provide a service in the church.
7  **Q.   Okay.  That's a little easier for me to**
8  **pronounce so thank you.**
9  **And, again, apologies if I'm**
10  **mispronouncing any of the terms.  I'm not doing it on**
11  **purpose.  So please correct me if I pronounce anything**
12  **incorrectly.**
13         A.   Yeah.  Thank you.
14  **Q.   Does the Archdiocese have any hiring or**
15  **firing authority over Catholic Charities?**
16         A.   Yeah.  You know, I don't know.  I don't
17  know that I could tell you specifically the lines.
18  Now, again, the primary way that the Archdiocese
19  exercises its authority over Catholic Charities is
20  through the board and the board's structure.  And then
21  everything else, again, that falls to the ministries
22  of Catholic Charities, ultimately, is at the direction
23  of the CEO of Catholic Charities.
24  **Q.   And who appoints the CEO or how is the**
25  **CEO hired?**

Page 73

1         A.   Yeah.  The CEO is appointed by the -- is
2  elected by the board, hired by the board of Catholic
3  Charities, ultimately.
4  **Q.   And how do members get appointed to the**
5  **board?**
6         A.   Yeah.  That's a process I'm not familiar
7  with.  I couldn't -- yeah.  I'm sorry.  I can't speak
8  to that.
9  **Q.   Okay.  And I think that you said the**
10  **person who might be better able to speak to that is**
11  **the CEO, Father Dollins; is that correct?**
12         A.   No.  That would be the COO, the chief
13  operating officer, Keith Parsons.
14  **Q.   Okay.  Great.**
15         MR. DAVIS:  Virginia, is this question
16  about Catholic Charities or is it about the
17  relationship between the Archdiocese and Catholic
18  Charities?
19         MS. CARRENO:  I think it's both.
20         MR. DAVIS:  Okay.
21  **Q.   (BY MS. CARRENO)  Okay.  In your**
22  **supplemental declaration that you completed in**
23  **October, you had said that Catholic Charities are a**
24  **part of -- preschool programs are a part of**
25  **Catholic Charities' ministry.  What did you mean by**

Elias Moo 30(b)(6)
November 27, 2023

Page 74

1  ministry?
2       A.    Just to clarify, you're speaking of the
3  Head Start programs?
4       Q.    Yes.
5       A.    Yeah.  So the Head Start programs, those
6  are government preschool programs that Catholic
7  Charities extends to the community primarily to
8  provide a service, social service to the community.
9             So that, again, is I think what we would
10 say is a ministry that they provide, like they provide
11 through homeless shelters or through food lines, for
12 example.  So ministries to the poor, work on behalf of
13 the church to the poor.
14            So, yeah.  So that ultimately is, I
15 think, what I was getting at with that.
16      Q.    And I believe, when you were testifying
17 earlier about the Catholic schools, you described
18 those as having educational ministries; is that
19 correct?
20      A.    Yes.
21      Q.    Okay.  When you were describing Catholic
22 Charities, you talked about the faith and morals for
23 Catholic Charities.  Are those the same faith and
24 morals as the Archdiocese of Denver?
25            MR. DAVIS:  Objection to the form.

Page 75

1             You can answer, if you understand the
2  question.
3       A.    If I could clarify.  So, yeah.  I guess
4  I'm having -- I'm a bit confused.  So faith and
5  morals -- so you're asking my understanding of the --
6  or how I'm using the term "faith and morals" and if
7  that applies in a similar way to Catholic Charities?
8       Q.    (BY MS. CARRENO)  Yeah.  So when you were
9  explaining what Catholic Charities was, you talked
10 about faith and morals.  And when you were talking
11 about the preschools, you also used the term "faith
12 and morals."
13            So I just want to understand whether
14 you're using the term to mean the same thing or you're
15 using those differently?
16      A.    Oh, okay.  Yes.  Thank you for that.
17 Yeah.  No.  Absolutely.  There's no difference.
18      Q.    I assume that you're aware that
19 Archdiocese -- sorry.  Strike that.
20            I assume that you're aware that Catholic
21 Charities preschools are participating in Universal
22 Preschool?
23      A.    Yes.
24      Q.    Did the Archdiocese have any
25 conversations with Catholic Charities about them

Page 76

1  participating?
2       A.    No.  And the Head Start programs are not
3  something that we were involved with.  Again, they
4  fall out of the realm of the authority of jurisdiction
5  of the Archdiocese of Denver Catholic schools and the
6  Office of Catholic Schools.
7       Q.    And can you repeat that?  They fall out
8  of the authority of the Office of Catholic Schools and
9  what else?
10      A.    Yeah.  They fall out of the authority of
11 the Office of Catholic Schools, the Archdiocese of
12 Denver Catholic schools.
13      Q.    Do you know or are you aware of whether
14 the Archdiocese itself had conversations with Catholic
15 Charities about participating in Universal Preschool?
16      A.    Yeah.  No.  I'm not aware of a
17 conversation and, yeah, wouldn't even be able to
18 speculate on whether one took place or not.  I was not
19 involved in any conversations with them.
20      Q.    Do any of the 36 Catholic preschools
21 serve low-income families or families experiencing
22 homelessness?
23      A.    I can definitely say that some of our
24 schools serve low-income families.  The extent to
25 which they serve homeless families, I wouldn't be able

Page 77

1  to ascertain for you.
2             But knowing some of the communities that
3  we have, I wouldn't be surprised if there were
4  families that were homeless that also had their
5  children in our schools.
6       Q.    So why would the Catholic Charities Head
7  Start schools or Head Start programs be different than
8  the Catholic schools preschools?
9             MR. DAVIS:  Objection to the form.
10            You can answer the question, if you
11 understand it.
12      A.    Well, I guess I would offer this:  The
13 Head Start programs are not meant to be
14 religious-based programs.  To the best of my
15 understanding, there is -- there is no integration of
16 catechesis or theology in the curriculum and they're
17 primarily meant to be childcare, early ed centers for
18 the poor.
19            And so while there is an educating
20 component, it is devoid of what really we desire and
21 we expect to see in our Archdiocese of Denver Catholic
22 schools, which is the program that flows from the
23 heart of the church.
24            That is directly and intentionally
25 offering moments of catechesis and theology

Elias Moo  30(b)(6)
November 27, 2023

Page 78

1  instruction, but also that every subject in the school
2  is imbued with a Catholic world view and Catholic
3  religious instruction.
4        So even math and history and reading, all
5  of that is strong in making connections to the
6  teaching in a Catholic world view, which, again, to
7  the best of my knowledge, is not taking place in any
8  of those Head Start programs.
9        So, yeah.  So I would consider them to be
10  varied and even, perhaps at a fundamental level, very
11  distinct forms of education.
12        Q.   (BY MS. CARRENO)  So would you say that
13  faith and morals does not apply to the Head Start
14  programs?
15        A.   Yeah.  I don't know if -- I don't know if
16  I would go to that length.  Because here's the thing.
17  You know, the church -- the church commands us --
18  well, Jesus and the Gospel commands us to go and to
19  serve the poor, to cloth the -- to provide these
20  corporal works of mercy.  Excuse me.
21        And that's primarily how Catholic
22  Charities views their Head Start programs, as a
23  corporal work of mercy and as a work on behalf of the
24  church for the poor.  And that very much flows from
25  our faith and from our morals.  But -- so it's -- so

Page 79

1  it's a work that's coming from a point of faith,
2  ultimately.
3        So, again, I guess I wouldn't go to the
4  extent of saying that faith and morals don't apply,
5  but the way that the work itself is carried out is
6  fundamentally different.
7        And so faith and morals aren't taught --
8  perhaps that might be the distinction -- in a Head
9  Start program -- or would be taught in a Head Start
10  program like they're taught in one of our Archdiocese
11  of Denver Catholic school programs.
12        Q.   And you said that the archbishop held
13  ultimate direction over Catholic Charities; correct?
14        A.   Yes.
15        Q.   Aren't the Catholic Charities preschools
16  located on properties owned by Catholic parishes?
17        A.   Yes.  I believe there are some.
18        Q.   And do the Catholic Charities preschools
19  provide children or families with information about
20  any of the Archdiocese parishes or the Catholic faith
21  generally?
22        MR. DAVIS:  Objection to form.
23        You can answer, if you understand.
24        A.   If I could clarify.  So do Catholic
25  Charities -- does Catholic Charities provide that

Page 80

1  information to families in the Head Start programs?
2  Is that the question?
3        Q.   (BY MS. CARRENO)  Yeah.  That's the
4  question.
5        A.   Yeah.  Yeah.  I don't know that.  I
6  wouldn't be able to tell you if that was happening or
7  not.
8        What I can tell you is that Catholic
9  Charities offers its services without, you know, a
10  litmus test for faith, right, or without an
11  expectation to want to convert people.
12        So, yeah.  That's all I can offer to that
13  point.
14        Q.   Okay.  And I think you may have already
15  answered this already, but just want to make sure I
16  get this.  Let me just start over and strike what I
17  said.
18        Does the Office of Catholic Schools
19  within the Archdiocese have any direction or oversight
20  over the curriculums that are used in Catholic
21  Charities preschools?
22        A.   No.  Yeah.  We do not have any
23  involvement with that.
24        Q.   Are the Head Start employees required to
25  be Catholic?

Page 81

1        A.   I do not believe they are, no.
2        Q.   So none of the -- or well, strike that.
3        Are any of the Catholic Charities
4  employees required to be Catholic?
5        A.   No.  No.  To the best of my knowledge,
6  no.
7        Q.   Are any of the Catholic Charities
8  employees expected to not display public or private
9  behaviors that would be inconsistent with the beliefs
10  of the Catholic Church?
11        A.   Yeah.  To the best of my knowledge, I
12  believe that that is the expectation for employees.
13        Q.   Are the Catholic Charities' employees
14  required to sign the same employment contracts as the
15  parish preschools?
16        A.   I do not believe so.  I haven't -- to be
17  clear, I haven't seen what the work agreement or
18  employment contract for Charities' employees looks
19  like, but I do not believe that they're using the same
20  one.
21        Q.   Okay.  In your October declaration, you
22  said, "This charitable ministry of the Archdiocese,
23  like Archdiocese soup kitchens and homeless shelters,
24  does not condition its care for the poor and needy on
25  adherence to Catholic beliefs or an agreement to

Elias Moo   30(b)(6)
November 27, 2023

Page 82

1  support and uphold Catholic teachings.  Instead, these
2  Head Start and early Head Start programs are open to
3  all families in need, regardless of personal
4  circumstances and seek to help by providing childcare
5  services while parents work to get back on their
6  feet."
7          Do you agree with that statement still?
8     A.   Yes, I do.
9     Q.   Does this mean that Catholic schools
10 would refuse to serve the children of needy families
11 if their families disagreed with Catholic beliefs?
12         MR. DAVIS:  Objection to the form.
13         You can answer, if you understand.
14    A.   No.  But, again, I think we would -- we
15 would have a situation where -- so one of the
16 foundations for the work of a Catholic school in the
17 Archdiocese of Denver is, again, to provide an
18 education that supports what the church calls the
19 primary educator of a child, and that being the
20 parents.
21         And in partnership with parents, to be
22 able to provide an education and a formation that
23 leads them to know and love Jesus Christ and then to
24 discover the vocation that they have been created for.
25         THE DEPONENT:  Sorry.  I just got an

Page 83

1  alert.  My battery is dying.
2          MS. CARRENO:  That's okay.  Do you want
3  to take a minute to plug your computer in?
4          THE DEPONENT:  I'm sorry?
5          MS. CARRENO:  Did you need to take a
6  minute to plug your computer in?
7          THE DEPONENT:  No.  It's back.  It got
8  loose.  The connection was loose.  So apologies for
9  that.
10    A.   Yeah.  So the work of the Catholic
11 Schools is in support of and in partnership with
12 primary educators, with parents, in their, what the
13 catechism of the Catholic Church says is their duty
14 and right to help their children to grow to know,
15 love, and serve Christ and discover their vocation and
16 mission in this world for the sake of the next.
17         So if families come in good faith to a
18 Catholic school, to one of the 36 Catholic preschool
19 programs -- and understand the expectations that the
20 school would have of them and their family, which
21 includes also that they would provide an environment
22 that will be supportive of the aims of the school,
23 then, yeah, they will be admitted.
24         If a family comes forward and says, Well,
25 we don't agree with the church on X, Y, and Z items,

Page 84

1  but -- and insists that they're not going to instruct
2  their children in a way that's supportive of the
3  church's teaching, then we might, frankly, come into a
4  situation where there would be an irreconcilable
5  difference that would not allow the church's vision
6  for an education to happen, because the family would
7  not be able to enter into a right partnership with the
8  school and give the child a well-founded -- or to be
9  able to have the complimentary of the school and the
10 home environment such that the aims that the church
11 has for education are met.
12         And so, like, it's not a simple yes-or-no
13 answer, unfortunately, because it requires schools to,
14 what we would call discern or, you know, reflect on
15 the extent to which a family's situation might be open
16 to the benefit of a Catholic education.
17         But is there a hard and fast rule?  For
18 example, if there's a family that says, you know, I
19 don't agree on this, that they can't be admitted?  No,
20 there's not.
21         And oftentimes we have found that
22 families who sometimes do come with reticence, maybe
23 they don't disclose it at first, or they say, Well,
24 we're not sure of the church's teaching, but we're not
25 going to undermine the church's teaching, ultimately,

Page 85

1  and actually discovering it and the value and the
2  truth of it.
3          And so those are situations that we have
4  had.  But yeah.  But, again, it wouldn't be an
5  immediate disqualifier.  It would have to be
6  something, again, discerned or reflected on by local
7  school leadership.
8     Q.   (BY MS. CARRENO)  Great.  Thank you for
9  that.
10         MS. CARRENO:  I think now might be
11 another good time to take a ten-minute break.  Does
12 that work for everyone?
13         MR. DAVIS:  Sure.
14         THE REPORTER:  Great.  Off the record.
15         (Recess from 10:30 a.m. to 10:41 a.m.)
16         THE REPORTER:  Back on the record.
17         MS. CARRENO:  Thank you.
18    Q.   (BY MS. CARRENO)  And, Mr. Moo, I wanted
19 to direct you to the screen.
20         MS. CARRENO:  Bonnie, and if you could
21 share the document that says "Archdiocese of Denver
22 Office of Catholic Schools."
23         THE REPORTER:  Will this be Exhibit 3?
24         MS. CARRENO:  This will be Exhibit 3.
25    Q.   (BY MS. CARRENO)  And, Mr. Moo, are you

Page 86

1  able to see this document?
2       A.   Yes.
3       Q.   And do you recognize this document?
4       A.   Yes.
5       Q.   What is it?
6       A.   Yeah.  This document was created as a
7  statement on where our position was with Universal
8  Preschool and the concerns and barriers that we saw --
9  the concerns we had, barriers we saw, to participating
10  in Universal Preschool.
11      Q.   And when you say "we," what do you mean
12  by "we"?
13      A.   We would be the Archdiocese of Denver.
14      Q.   Who wrote this document?
15      A.   I wrote this document, along with some
16  members of our team here at the Archdiocese.
17      Q.   Who were the other members of the team?
18      A.   Yeah.  So this document was primarily
19  written to provide a statement to the Temple Hoyne
20  Buell Foundation, if I'm recalling correctly.
21           The mission advancement grants writing
22  team here at the Archdiocese collaborated with me on
23  this.  They were applying for a grant through the
24  Temple Hoyne Buell Foundation to support a collective
25  of our preschools in the Archdiocese and were looking

Page 87

1  for a statement on where we stood with UPK.
2       Q.   And what is that grant that you're
3  referring to?
4       A.   It's a grant for preschool operations, to
5  help fund preschool operations.
6       Q.   And is the Temple Hoyne Buell -- I don't
7  know if I'm saying that correctly -- is that who the
8  grantor is for that grant?
9       A.   Yes.  Yeah.  That's correct.  Yeah.  The
10  Temple Hoyne Buell, yep.
11      Q.   What is the Temple Hoyne Buell?
12      A.   My understanding is it's a private
13  foundation.
14      Q.   Okay.  And when was this written?
15      A.   Gosh.  I don't recall the exact time
16  frame.  Oh, this must have been -- yeah.  It was -- I
17  want to say, ballpark, February, March.  I'm having a
18  really hard time recalling the exact time that we
19  wrote this.
20      Q.   Why was this document needed to apply for
21  that grant?
22      A.   Yeah.  My understanding from the grant's
23  team was that Temple Hoyne Buell was asking for --
24  asking the extent to which we intended to or were
25  going to be participating -- some of our schools would

Page 88

1  be participating in UPK.  And this is, ultimately,
2  what they submitted in response to that.
3       Q.   And did the Archdiocese receive the
4  Temple Hoyne Buell grant?
5       A.   Well, so the Archdiocese grant's team
6  applied on behalf of a group of preschools.  And my
7  understanding is that some of those preschools were
8  awarded a grant.  I don't have that list in front of
9  me.  But there were some that did receive it, yes.
10      Q.   Do you know which preschools received the
11  grant?
12      A.   There's one I can recall off the top of
13  my head, Annunciation Catholic School.  But, yeah,
14  without having the list in front of me, I wouldn't be
15  able to tell you, unfortunately.
16      Q.   Okay.  Thanks, Mr. Moo.
17           This document says that "Our Catholic
18  preschools are eligible to become state-approved local
19  coordinating organizations, LCOs, that can receive the
20  funding to provide the preschool program service to
21  families."
22           Would you say that that's accurate or
23  what did you mean by that statement?
24      A.   Yeah.  At the time -- at the time, I
25  believe that was our understanding.  At this point, my

Page 89

1  understanding is that we wouldn't necessarily be able
2  to be LCOs.  So I think there was maybe a
3  misunderstanding in the terminology at the time.
4           So, yeah.  So I would say I think there's
5  a different or a refined understanding of what an LCO
6  is.
7       Q.   And you said you can't recall when this
8  document was created?
9       A.   No, again, not the exact time.  I can't
10  recall.
11      Q.   Do you know when you learned that that
12  understanding, about the preschools being local
13  coordinating organizations or LCOs -- strike that.
14           Do you know when you learned that
15  understanding, that the preschools could be LCOs, was
16  incorrect?
17      A.   Yeah.  That was around May, late May, I
18  believe.
19      Q.   So this was written before May?
20      A.   Yes.
21      Q.   And that's 2023?
22      A.   2023, correct.
23      Q.   The document also says, in that first
24  bullet, that "There are no religious exemptions in the
25  UPK agreement and it excludes classes operated

Elias Moo   30(b)(6)
November 27, 2023

Page 90

1   primarily for religious instruction."
2          What did you mean by it excludes classes
3   operated primarily for religious instruction?
4          A.   If I'm recalling correctly, that's
5   language that we pulled directly from the agreement
6   itself, I believe.  And so are you asking what my --
7   what I would understand to be classes primarily
8   operated -- or operated primarily for religious
9   instruction?
10         Q.   No.  I'm asking what -- that bullet that
11   says that a barrier is that UPK excludes classes
12   operated primarily for religious instruction, I'm
13   asking what you meant by that, what the barrier was.
14         A.   Yeah.  So at that point, I think our
15   understanding was that it would be difficult for us to
16   sign the agreement, again, knowing that the
17   majority -- most of what is taught in our schools has
18   connection to religious instruction.
19              So at that point it would be a barrier,
20   certainly, to be able to sign an agreement if our
21   operations -- somehow we were going to have to
22   compartmentalize our notion of religious formation as
23   present and prevailing all things in the school, and
24   in the sense that the agreement was pigeonholing, if
25   you will, religious instruction to one period and

Page 91

1   block of the day.
2          Q.   So you said at that time that was your
3   understanding.  Has your understanding changed?
4          A.   No.  I don't think so.  The agreement
5   hasn't changed so I suppose I would carry the same
6   understanding.
7          Q.   Okay.  And if that language doesn't come
8   from the agreement itself, would that change the
9   concern or the barrier?
10              MR. DAVIS:  Object to the form.
11              But if you understand the question, you
12   can answer it.
13         A.   Yeah.  If I could clarify.  Are you
14   saying if the -- if this language was not in the
15   agreement, would we have a different take?
16         Q.   (BY MS. CARRENO)  Yes.
17         A.   On this particular point, possibly, yeah.
18   Yeah.  I think so.
19         Q.   So is it your understanding that the UPK
20   program excludes classes operated primarily for
21   religious instruction?
22              MR. DAVIS:  Objection to the extent it
23   calls for a legal conclusion.
24              But you can answer otherwise.
25         A.   Yeah.  It's my understanding -- I mean, I

Page 92

1   think it was also, at the time of the writing of this,
2   that somehow we would be -- we would not receive the
3   funding available if -- or hours, I guess, that would
4   be eligible for funding -- let me restate that.
5              Hours eligible for funding would be
6   lessened or would be less if we provided religious
7   instruction.  Yeah.  So I guess the best way I have to
8   convey what my understanding is, is an example.
9              So if we have -- if we have a four-hour
10   day, and one hour of that is noted as religious
11   instruction, right, that we would only be eligible to
12   receive -- our families would only be eligible to
13   receive funding for three hours, right.  So that would
14   be a penalty of sorts for the fact that we had
15   religious instruction.  I think that would be the --
16   what the understanding is there.
17              Again, I think the difficulty for us on
18   this point is that for our school programs, four hours
19   of program, I mean, is four hours of, yeah, you know,
20   academic education instruction, if you will, but
21   interwoven with that is a sense of the faith and
22   connection with the Catholic world view, which we
23   would view it -- would make us view it as religious
24   inherently.
25         Q.   (BY MS. CARRENO)  Do -- strike that.

Page 93

1              So you're aware that some of the
2   Archdiocese preschools are participating in the
3   Colorado Childcare Assistance Program; is that
4   correct?
5          A.   Yes.
6          Q.   And you're also aware that some of the
7   Archdiocese preschools are participating in the Denver
8   Preschool Program; is that correct?
9          A.   Yes.
10         Q.   Aren't there similar requirements about
11   those programs not paying for religious instruction?
12         A.   Yeah.  I believe there are, yes.
13         Q.   And so why would a similar requirement in
14   the Universal Preschool Program create a barrier
15   concern that those other programs did not?
16         A.   Yeah.  There is -- this was the stated
17   barrier.  I think if the other programs also in
18   practice -- so I guess I'll say this:
19              In practice, if the schools that are
20   participating with CCAP or DPP, the Denver Preschool
21   Program, felt that there was something that was
22   limiting their ability to be able to carry out with
23   fidelity the program and the curriculum that was
24   prescribed by the Archdiocese, then, yeah, it would
25   lead, I think, to naturally a rethinking of the extent

Elias Moo  30(b)(6)
November 27, 2023

Page 94

1  to which they might be able to participate there.
2            At this point in practice, there hasn't
3  been that concern and -- but that's my understanding.
4  It hasn't been viewed as a barrier in the way that
5  it's been executed upon by those programs.
6            But with UPK, given the fact that this,
7  coupled with some of the other regulations in the
8  agreement were concerning, we made an interpretation
9  of what the intention was, and that's what we ran with
10 in terms of our understanding here.
11     Q.   In the second bullet, in about the middle
12 of the document it says, "There are questions about
13 the programmatic control of preschool programs."
14            What were the questions about
15 programmatic control?
16     A.   Yeah.  I think here it's referring to, in
17 particular, the way that UPK has been set up, where
18 families apply directly through UPK seeking
19 enrollment, and then families are assigned to
20 particular schools without that school being able to
21 vet families and engage them directly in admissions or
22 the admissions processes.
23            So that type of programmatic control, if
24 you will, was and is problematic for us as our
25 schools, in order to be able to, again, discern kind

Page 95

1  of the suitability and the fit of a family with the
2  aims of the school, would not be able to do so in the
3  way that the program itself, the system itself was
4  structured and laid out mechanically.
5      Q.   So is it your understanding that schools
6  are not able to meet with families before those
7  families are enrolled under the UPK program?
8      A.   I'm sorry.  Can you repeat that last
9  part?
10     Q.   Under the UPK program?
11     A.   Yes.  As far as UPK is concerned, my
12 understanding is that, yes.
13     Q.   And if schools were able to meet with
14 these families in advance of enrollment, would that
15 alleviate some of your concerns that you discussed in
16 this document?
17     A.   Possibly, if also the school had the
18 ability to reject admission if it did come across
19 something that made the school and family situation
20 incompatible.
21     Q.   Okay.  In this letter, a little bit
22 further down the page, I think it's the fourth bullet,
23 under "The Impacts of These Barriers Include the
24 Following:"  And that second bullet under that section
25 says, "Accommodating part-time toddlers would harm the

Page 96

1  full-time preschool programs."  What did you mean by
2  this?
3      A.   Yeah.  I believe that the inclusion of
4  this was to note that perhaps programs had to be open
5  to part-time students as well, and some of our
6  full-time programs were not in position to open
7  part-time options.
8            And so I think this is -- yeah.  This is
9  referring to something that -- an understanding in the
10 agreement related to the admission of part-time
11 toddlers to be able to receive the UPK funding for
12 that family.
13     Q.   And if schools did have the ability to
14 designate part-time and full-time spots that was
15 consistent with how the school operates, would that
16 alleviate some of your concerns that you identified in
17 this document?
18     A.   Yeah.  On that particular point, yes.
19     Q.   Looking further down the document, the
20 final bullet says that "Catholic preschool programs in
21 the Denver area will likely lose Denver Preschool
22 Program funds."
23            Why did you have the concern that UPK
24 would impact Denver Preschool Program funds?
25     A.   Yeah.  At the time of this writing, we

Page 97

1  had an incorrect understanding of the extent to which
2  Denver Preschool Program was going to be impacted by
3  UPK.
4            Our initial understanding was actually
5  that it was going to be absorbed by UPK.  And I think
6  we were -- actually, we were interpreting what would
7  have been announced about CCAP, I believe, as also
8  applying to the Denver Preschool Program.
9            And then later -- so, again, also in the
10 month of May, we -- it was clarified for us that, in
11 fact, DPP was not going away and that it would be
12 providing back-end funding after UPK was -- UPK
13 funding was provided.
14            So that -- the statement here is,
15 admittedly, not accurate.  And as I noted, it was
16 something that was clarified to us after the time of
17 the writing of this.
18     Q.   And then -- so the very last paragraph
19 where it says, "Without necessary rule changes as
20 noted above, schools may not be able to participate in
21 DPP after this year."
22            Was that -- is that statement no longer
23 accurate as well, with the new understanding you just
24 described?
25     A.   Yeah.  That's correct.  For the time

Elias Moo  30(b)(6)
November 27, 2023

Page 98

1 being, schools are continuing to participate.
2      Q.   Okay.  Now, I want to share another
3 document with you, which will be marked as Exhibit 4.
4           MS. CARRENO:  Right, Bonnie?
5           And this will be marked as Exhibit 4.
6 And it's the February 17, 2023 letter to Governor
7 Polis.
8           Bonnie, can you scroll all the way to the
9 bottom?
10     Q.   (BY MS. CARRENO)  And, Mr. Moo, are you
11 able to see this document?
12     A.   Yes.  I can see it.
13     Q.   Do you recognize this?
14     A.   I do.
15     Q.   What do you recognize this to be?
16     A.   This is a letter written to appeal to
17 Governor Polis on the coalition of both private and
18 independent religious schools and organizations that
19 support private education, who together were asking
20 the Governor to assist us in getting some exemptions
21 to some of the regulations in the UPK program and UPK
22 program agreement.
23     Q.   Was this coalition one that existed prior
24 to writing this letter or was the coalition formed to
25 write this letter?

Page 99

1      A.   Yeah.  There is -- there is a group, an
2 organization called the Colorado Association of
3 Private Schools, that the majority of the signees of
4 these are on.
5           And so this -- so there was a coalition
6 of sorts.  But with the concerns that we all shared on
7 UPK, it expanded to also include some other
8 organizations noted on here.
9      Q.   And the Archdiocese seal is at the top of
10 this letter, with the seals of some other
11 organizations; is that correct?
12     A.   Yes.  That's correct.
13     Q.   And your signature or your name is signed
14 at the bottom of the letter; is that also correct?
15     A.   Yep.  That's correct.
16     Q.   Who drafted this letter?
17     A.   Yeah.  This was drafted by a member of
18 the CAPS, the Colorado Association of Private Schools
19 team.  And, yeah, it was drafted by him and then
20 shared with the signees on here for review.
21     Q.   And who is the representative of CAPS
22 that drafted this?
23     A.   His name is Ross, R-o-s-s, Izard,
24 I-z-a-r-d.
25     Q.   Is Mr. Izard an attorney?

Page 100

1      A.   No.  I don't believe so.
2      Q.   What is Mr. Izard's title, if you know?
3      A.   I don't know.  I know he does -- he's
4 contracted as a consultant and a lobbyist for the
5 Colorado Association of Private Schools.
6      Q.   And you said that the signees also were
7 able to have some input on the letter.  So that would
8 have included yourself?
9      A.   Yes.
10     Q.   Did you-all meet to draft this or how was
11 it drafted?
12     A.   No.  No meeting.  It was all via email
13 communication.
14     Q.   And I know the letter is dated
15 February 17th, but when did you -- when did you-all
16 start drafting this document?
17     A.   Yeah.  To the best of my recollection, I
18 think this was late January when all this began.
19     Q.   And how did this come about?
20     A.   I'm sorry.  Can you repeat that question?
21     Q.   Yeah.  You said you think it was late
22 January when this began, but how did all of this
23 begin?
24     A.   My understanding is that it came out of a
25 meeting that was held by the board of the Colorado

Page 101

1 Association of Private schools.  The idea for this
2 ultimately kind of flowed from the CAPS, for short,
3 group.  And then Mr. Izard got to work on this in
4 light of the idea generating at a CAPS meeting.
5      Q.   And you said that you had the ability to
6 give input on this letter.  Did you make any changes
7 or did you make any edits to the letter?
8      A.   No.  I don't recall making or suggesting
9 any revisions or changes.
10     Q.   So does that mean that you, on behalf of
11 the Archdiocese, agreed with the contents of the
12 letter?
13     A.   Yes.
14     Q.   The fourth paragraph of the letter, the
15 last sentence says, "And because the program is
16 closely intertwined with the Denver Preschool Program,
17 some providers are also having to re-evaluate their
18 long-standing participation in that program."
19          Do you understand what that sentence
20 meant?
21     A.   Yeah.  I think it's similar to the point
22 I made on Exhibit 3, that there was an understanding
23 of those of us in Denver, and primarily I think driven
24 by us, that there might be -- that some of the
25 concerns we had with UPK came from our understanding

Page 102

1  of, at the time, DPP being absorbed by UPK.

2        So Mr. Izard would have been privy to

3  some of the conversation that happened at the CAPS

4  board meeting where that perspective was shared and

5  brought there.  So I think that's where that comes

6  from, ultimately.

7      Q.  Has this group gotten together since

8  sending the letter?

9      A.  All the signees together, no.  But the

10  members of the Colorado Association of Private Schools

11  meet monthly.

12      Q.  And are you aware of whether any of the

13  groups that signed on to this letter ended up

14  participating in UPK?

15      A.  I don't know if you can scroll down to

16  the bottom.  I am pretty sure none of them have.

17        Yeah.  So the only ones that are schools

18  here -- or represent schools would be the Hillel

19  Academy, Association of Christian Schools

20  International, Rocky Mountain District Lutheran

21  Church.  Yeah.  And the Archdiocese, obviously.

22        I don't know.  Yeah.  I couldn't -- I

23  don't think there's any of these.  But to the best of

24  my knowledge, all have remained committed to not

25  participating yet.

Page 103

1      Q.  Okay.  The letter, at the very bottom of

2  the first page, also references what looks like a cut

3  and paste of the statute.  It says, "The governing

4  statute mandates that those quality standards include

5  a requirement," and then the statute is cut and

6  pasted.  Would you agree with that?

7      A.  Yes.

8      Q.  This letter does not mention this letter

9  of nondiscrimination clause in the UPK agreement;

10  would you agree?

11        MR. DAVIS:  Objection to the form.

12        If you understand the question, you can

13  answer it.

14      A.  Yeah.  I'm sorry.  Can you repeat the

15  question?

16      Q.  (BY MS. CARRENO)  Yeah.  So this letter

17  specifically mentions the statutory requirement that's

18  in the contract, but it does not list the other

19  requirement in the contract that's at issue in this

20  lawsuit; is that correct?

21        MR. DAVIS:  Objection.  Assumes facts not

22  in evidence.  Lack of foundation.

23      A.  Yeah.  Are there other things in the

24  agreement that didn't make it into this letter?

25  That's correct.  Yeah.

Page 104

1      Q.  (BY MS. CARRENO)  Okay.  So are you aware

2  that the plaintiffs in this lawsuit are challenging

3  this statutory requirement that's here and also

4  another broader nondiscrimination requirement that

5  appears in the Universal Preschool Provider contract?

6      A.  Yes.

7      Q.  And so my question is, why is the second

8  provision being challenged in this lawsuit not a part

9  of this February 17th letter?

10      A.  Yeah.  I don't know.  This, ultimately,

11  was the way that this was drafted and then the

12  consensus document, right, from the various parties

13  here.  So I wouldn't be able to tell you why the

14  other -- those other pieces didn't make the cut, if

15  you will.

16      Q.  And you didn't suggest adding that other

17  concern to this letter when you weighed in on possible

18  edits?

19      A.  No.  I mean, I think that's -- I think

20  what's noted in here felt like it captured, for the

21  most part, our concerns and our position.

22      Q.  And you had reviewed the provider

23  agreement by the time that this letter was sent; is

24  that correct?

25      A.  Yeah.  We had -- we had seen the provider

Page 105

1  agreement, yes.

2      Q.  I want to share another document, which

3  is going to be Exhibit 5.

4        And, Mr. Moo, if I can just back up.  You

5  had said that the other concern is not noted in that

6  letter.  What did you mean by the other concern?

7      A.  Well, that nondiscrimination language

8  that you were referencing.

9      Q.  Okay.  Thank you.  And that's the

10  nondiscrimination language in the provider contract --

11      A.  Correct.

12      Q.  -- with the broader nondiscrimination

13  provision?

14      A.  Yes.  Right.

15      Q.  Thank you, Mr. Moo, for letting me

16  clarify.

17        And, Mr. Moo, are you able to see the

18  document that Bonnie is sharing right now, that's been

19  marked as Exhibit 5?

20      A.  Yes.  I can see it.

21        MS. CARRENO:  And, Bonnie, if you can

22  scroll through.

23      Q.  (BY MS. CARRENO)  Mr. Moo, do you

24  recognize this document?

25      A.  I do.  Yes.

Elias Moo   30(b)(6)
November 27, 2023

1    Q.   What is this?

2    A.   It's the slide deck that was used at a

3  meeting that we hosted for our pastors and school

4  leaders of the preschool programs.

5    Q.   And what pastors and what school leaders?

6    A.   Oh, yeah.  I don't have the official

7  attendance or roster in front of me, but we invited

8  all the pastors and school leaders, preschool

9  directors of all Archdiocese of Denver Catholic

10  preschools.  I don't recall how many were in person,

11  but we had -- we had a number with us here in person

12  and we also had a few join us via Zoom as well.

13    Q.   And who wrote this?  Who prepared this

14  document?

15    A.   I prepared this.

16    Q.   Did anyone assist you with preparing

17  this?

18    A.   No.  It was shared with counsel, but I

19  don't recall them making any changes.

20    Q.   And so --

21    MR. DAVIS:  We're not going to divulge

22  attorney-client information.

23    Q.   (BY MS. CARRENO)  And so the intended

24  audience and recipient of this document was pastors

25  and school leaders of preschools; is that correct?

1    A.   That's correct.

2    Q.   Anyone else?

3    A.   Just them and members of the Office of

4  Catholic Schools team.

5    Q.   And you said this was for a meeting?

6    A.   Yes.

7    Q.   What was the purpose of the meeting?

8    A.   Yeah.  It was to provide them an update

9  on where we stood following the January directive to

10  not participate in UPK, to provide them an update on

11  where we stood with potential participation in UPK in

12  the future.

13    Q.   And this is dated May 25th of 2023.  Is

14  that when the meeting was held?

15    A.   Yes.  That's correct.

16    Q.   I want to direct your attention to the

17  third page of this document.  And the second bullet

18  point says that the target is -- "one of the targets

19  is to discuss a path towards securing participation

20  and the implications of engaging in this manner."

21    Does that participation refer to UPK or

22  what does that refer to?

23    A.   It does refer to UPK, yes.

24    Q.   And what did you mean by securing or

25  discussing a path for securing participation?

1    A.   Yeah.  There was still a hope that our

2  preschool programs would be willing to participate in

3  UPK for the sake of families that were looking for a

4  Catholic preschool education.

5    And so the intent of the work that we

6  have done and continue to do, on behalf of our

7  preschool programs, is to identify ways for securing

8  access to -- or participating in UPK without

9  compromising on our religious beliefs.

10    Q.   And this was after the coalition's

11  response for religious exemption was denied; is that

12  correct?

13    A.   Yes.  This was after that.

14    Q.   And the Archdiocese believed that there

15  might still be, I think you said a hope that the

16  Archdiocese could still participate; is that correct?

17    A.   Yep.  The hope was and continues to be

18  participation for those that want it, yes.

19    Q.   And then if I could direct your attention

20  to page 7.  And in the second bullet of the Current

21  Reality references, "The Denver Preschool Program:

22  Nine schools currently participating in DPP receiving

23  a total of $587,699.  Support ranging from 14K to

24  126K."

25    Why was the Denver Preschool Program

1  listed under the Current Reality for this group?

2    A.   Yeah.  This is -- this is still coming

3  from that point of misunderstanding on the extent to

4  which DPP was being impacted by UPK or absorbed by

5  UPK.  In fact, it was actually right after this

6  meeting that we were -- that this was clarified for

7  us.

8    One of our preschool directors brought to

9  our attention that we might have a misunderstanding,

10  and we looked into it further, and that's where we

11  received clarification.

12    But up to this point and up to the date

13  of this presentation, we still had this understanding

14  of the Denver Preschool Program.

15    Q.   And so, again, the misunderstanding was

16  that the Denver Preschool Program was being rolled

17  into the Universal Preschool Program?

18    A.   Correct.  Yes.

19    Q.   And so that was why the Archdiocese was

20  concerned that it might no longer be able to

21  participate in the Denver Preschool Program at the

22  time?

23    A.   Correct.

24    Q.   This third bullet also says that the

25  current reality at the end of May was that preschool

Elias Moo   30(b)(6)
November 27, 2023

1  numbers are holding steady despite the current
2  do-not-participate directive.  What does that mean?
3      A.   Yeah.  We polled our preschools to
4  identify to what extent they had seen enrollment hits
5  because of UPK launching and Catholic preschool
6  programs not participating yet.
7          And so at the time, there did not seem to
8  be a major hit on enrollment, so that's what this is
9  referring to here.
10     Q.   Did that change at some point?
11     A.   Yeah.  I think it depends on the school.
12 I would say at this point, largely, numbers are
13 probably still holding steady.  But, yeah.  Have we
14 seen a significant change one way or another?
15 Probably not.
16     Q.   I'm sorry.  Can you say that last
17 sentence again?
18     A.   Yeah.  Have we seen a significant shift
19 one way or another on enrollment numbers to a large
20 increase or a large decrease?  No.  Probably not.
21     Q.   In that same bullet it says, "Impact on
22 low- to middle-income families," with a -- "Impact on
23 low- to middle-income families," with a question mark.
24 What does that mean?
25     A.   One of the real concerns we have had and

1  continue to have is to what extent our low- to
2  middle-income families are going to be able to afford
3  preschool education in a Catholic school, if they so
4  wish to provide their children a Catholic preschool
5  education.
6          We know that these are usually the ones
7  that are, with many sacrifices, sending their children
8  to our Catholic schools.  And our hope was that by
9  participating in UPK, our Catholic preschools would be
10 able to serve many more low- to middle-income families
11 who, you know, anecdotally, schools have heard, are
12 not able to send their children to Catholic preschool
13 because of the cost impediment there.
14     Q.   And you said "anecdotally" for that.
15 What do you mean by that?
16     A.   Yeah.  Reports from preschool leaders,
17 school leaders, yeah.  Just what they have -- what
18 they have shared with us with respect to some of the
19 challenges that they're experiencing.
20     Q.   Does the Archdiocese have anything to
21 support those concerns, other than anecdotes?
22     A.   No.  Nothing in terms of, you know -- we
23 have one letter that we received from a family, in
24 light of the suit that we filed, noting that they were
25 grateful for what we were doing because they're not

1  able to afford a Catholic preschool education and
2  would like to be able to send their child.
3          But have we surveyed or collected data to
4  a larger extent than a one-off comment sent to us?
5  No.
6          MS. CARRENO:  And, Mr. Davis, do you know
7  if that letter was exchanged in discovery, that email?
8          MR. DAVIS:  I'm not sure.  We'll
9  coordinate with that at our next break and get back to
10 you.
11         MS. CARRENO:  Great.  Thank you.
12     Q.   (BY MS. CARRENO)  On the next page, or
13 page 8 of that document, the first bullet says that
14 "The Archdiocese does not desire schools to become
15 overly dependent on state/federal money, but also
16 holds with the church that," and then there's a quote.
17         What did you mean by the Archdiocese does
18 not desire schools to become overly dependent on state
19 or federal money?
20     A.   You know, one of the things that we are
21 constantly asking our school leaders to do is to
22 ensure that they have a really well-balanced income
23 portfolio.
24         Unfortunately, we don't receive public
25 funding, in the way that public schools do, to run our

1  school operations.  And so by and large, it's a
2  tuition-based operating model.
3          And given that we have made, over the
4  last six to seven years, an effort to welcome families
5  that don't necessarily have the means, especially more
6  low- to middle-income, schools have had to figure out
7  how to generate additional income, fundraising or
8  other sources, right, so just state, federal grants,
9  or funding opportunities.
10         But at the same time, as we've told them,
11 right, I mean -- I guess we would say colloquially,
12 all your eggs in one basket, you know, could result in
13 a real hardship in the future if that basket goes away
14 or something happens where drawing from that source is
15 not going to be a possibility.
16         So that's what's fundamentally, I think,
17 being conveyed here, as I shared with them during this
18 meeting.  You know, if, without compromising, we can
19 receive support, without compromising on our beliefs
20 and our religious freedom, we can receive a benefit
21 from state or federal sources, great.  But that can't
22 be the only source, ultimately.  And so that's what
23 that is referring to here.
24     Q.   So has the Archdiocese had to make
25 determinations not to participate in other state or

Elias Moo  30(b)(6)
November 27, 2023

Page 114

1  federal programs in an effort to not become overly
2  dependent?
3       A.   Excuse me.  I'm choking for a second.
4       Q.   Take your time.
5       A.   I'm sorry.  Can you repeat your question?
6       Q.   Sure.  So has the Archdiocese made other
7  determinations not to participate in other state or
8  federal programs due to the desire not to become
9  overly dependent on government money?
10      A.   No.  Not that I can think of.  I think we
11 have been -- to be clear, I think we have been closely
12 monitoring different opportunities that come up to
13 ensure that if there is, again, not going to be a risk
14 of compromising our religious beliefs, is probably the
15 primary concern, and then secondly, yeah, you know,
16 the extent to which there might be a dependency.
17           But have there been decisions made solely
18 on that basis?  No.  None that I can think of.
19      Q.   In the next bullet on the same page, it
20 says, "The State continues to push a platform and
21 approach with little to no interest to providing just
22 exemptions with respect to our sincerely held
23 religious beliefs, which we share with various faith
24 groups in our state."
25           What do you mean by various faith groups

Page 115

1  in our state?
2       A.   Yeah.  So this, I think, is making
3  reference to the coalition that wrote the letter in
4  February, so the representatives of the Jewish
5  community and the Lutheran community, in particular,
6  who were signees to that letter.
7       Q.   And do you know -- I know that you
8  answered in terms of individuals and persons that
9  specifically signed the letter.  But are you aware of
10 whether any Jewish or Lutheran providers are
11 participating in UPK?
12      A.   No.  No.  I'm not aware of that.
13      Q.   The next page, the second bullet, it says
14 that "The bishops in the Colorado Catholic Conference
15 are ready to support ensuring protections for our
16 sincerely held religious beliefs."
17           What did you mean by that?
18      A.   Yeah.  Again, I think here it's the same.
19 So the three bishops in the state of Colorado all
20 exercise authority over their local churches.  And
21 they conveyed that they were ready to continue to
22 pursue whatever avenues were necessary to be able to,
23 one, ensure that our religious beliefs aren't
24 compromised, and the hope here with UPK was to be able
25 to continue to appeal and ask for exemptions as would

Page 116

1  allow us to be able to operate according to our
2  religious beliefs.
3       Q.   So you mentioned the three bishops.  I
4  assume one of those is Archdiocese of Denver.  Who are
5  the other two bishops?
6       A.   There is -- there's a bishop of Colorado
7  Springs and the Diocese of Pueblo.  Diocese of Colorado
8  Springs and the Diocese of Pueblo.
9       Q.   Are there any other diocese or bishops
10 associated with the Catholic Church in Colorado?
11      A.   No.  There is no other diocese.  There is
12 an assistant bishop, what we refer to in the Catholic
13 Church as an auxiliary bishop, here in the Archdiocese
14 of Denver.  So one other bishop, but only three
15 diocese.
16      Q.   So what does it mean that the bishops are
17 supporting ensuring protections for our sincerely held
18 religious beliefs?  What kind of support are the
19 bishops providing?
20      A.   Yeah.  Again, I think lending -- lending
21 their names, lending their teams to, you know, whether
22 it's writing letters, right, appealing to state
23 officials, supporting pastors.  That's what the
24 support really entails, ultimately.
25           And then trusting their teams to continue

Page 117

1  to identify the course of action, in this case, right,
2  to be able to identify next steps, to continue to see
3  if UPK participation was possible while still holding
4  on to religious beliefs.
5       Q.   What is the Colorado Catholic Conference?
6       A.   What is the Colorado Catholic Conference.
7       Q.   Yes.
8       A.   Yeah.  The Colorado Catholic Conference
9  is the -- is the body that represents the bishops of
10 the three diocese in the state of Colorado.  So they
11 primarily do that through being a voice for the
12 bishops -- the united voice of the bishops on a
13 variety of different issues, moral issues, political
14 issues.
15      Q.   And -- strike that.
16           Next page, it says, "For parishes
17 interested in pursuing the pathway."  What pathway are
18 you referring to?
19      A.   Yeah.  So here we told our pastors and
20 our school leaders, preschool directors, that we felt
21 the next step was for them to go online, register
22 their program online with UPK, and then, ultimately,
23 return the service agreements unsigned, with a letter
24 that we provided to them requesting exemption and
25 asking them to be exempted, ultimately, from the

Elias Moo   30(b)(6)
November 27, 2023

Page 118

1  problematic regulations that we saw in the agreement.
2       So that was the -- that was the pathway
3  that we said we -- if a preschool program wanted to
4  pursue, that they could pursue as a way to continue to
5  engage further and see if that would open up, for
6  individual schools, access to UPK, with some
7  exemptions granted in writing to them.
8       MS. CARRENO:  And, Mr. Davis, do we have
9  a copy of the provided letter referenced in Number 2?
10      MR. DAVIS:  A copy of the letter that we
11 have that was actually sent?  I can get you the Bates
12 label for it.
13      MS. CARRENO:  Okay.  Great.
14      Q.  (BY MS. CARRENO)  Did any of the parishes
15 or any of the schools take either or both of those
16 steps, Mr. Moo?
17      A.  Yes.  Yes.  We know of one parish that
18 took both of those steps.  I believe there is one
19 other that went to the step of signing up online, but
20 they did not send a letter in.  Yeah.
21      MR. DAVIS:  So, Virginia, the one that I
22 was referring to is at PL3244.
23      MS. CARRENO:  Thank you.
24      Q.  (BY MS. CARRENO)  Which parish took both
25 those steps?

Page 119

1       A.  That was St. Michael the Archangel.
2       Q.  And which ones signed up online?
3       A.  If I'm recalling correctly, I believe it
4  was St. Mary in Littleton.
5       Q.  And did both of those parishes return the
6  agreement with the provider letter or just one?
7       A.  Return the agreement with the letter we
8  gave them?
9       Q.  Yeah.  Did both of them do that?
10      A.  No.  I believe it was only St. Michael
11 the Archangel.
12      Q.  One second.  In plaintiff's amended
13 complaint, it says that the Archdiocese instructed all
14 its Catholic parishes and preschools not to sign the
15 UPK program agreement as written.
16      What did you mean by instructed?
17      A.  Yeah.  We told our preschool programs not
18 to sign the agreement.
19      Q.  And what would happen if any of them
20 signed the agreement?
21      MR. DAVIS:  Objection.  Calls for
22 speculation.
23      A.  Yeah.  If we found out, then that would
24 lead to a conversation with the pastor to ensure that
25 they understood the directive and identify what

Page 120

1  happened.
2       Q.  (BY MS. CARRENO)  And who made this
3  direction or instruction?
4       A.  Well, this one on May 26th came from me.
5       Q.  Let me back up for a second.
6       So you said that if the Archdiocese found
7  out that any of the preschools signed the agreement,
8  that you would have a conversation and look into that
9  more.  What action would the Archdiocese take?
10      MR. DAVIS:  Objection.  Calls for
11 speculation.
12      A.  Yeah.  I mean, I think it would -- it
13 would depend.  Ultimately, you know, I think this gets
14 to the realities of our structure.  And so it could --
15 yeah, it could result in a number of different
16 actions, if you will.
17      If this was a regional school that we had
18 direct jurisdiction over and we found out that a
19 school leader had done that against the directive,
20 then we would have a noncompliance issue and that
21 would be dealt with according to our policies and
22 procedures with potentially some disciplinary action
23 involved for the people who were ultimately
24 responsible for the non-compliance.
25      In the parish setting, again, I think it

Page 121

1  would come down to a conversation with the pastor to
2  find out where the noncompliance came from, and then
3  taking action according to where it falls in the chain
4  of command there.
5       Q.  (BY MS. CARRENO)  Would one possible
6  action for those four regional schools be removal from
7  the Archdiocese?
8       A.  Removal of the school?
9       Q.  Yes.
10      A.  No.  Yeah.  No.  That wouldn't be a --
11 no.  Yeah.  I think we would be talking about
12 termination of employment of the responsible party,
13 ultimately, before -- yeah.
14      Q.  Has an Archdiocese preschool ever been
15 asked to serve a 4-year-old who was asserting a gender
16 identity at odds with their biological sex, that
17 you're aware of?
18      A.  Let me restate for my understanding.  Has
19 an Archdiocese preschool been asked to enroll, you
20 said --
21      Q.  A 4-year-old who is asserting a gender
22 identity at odds with their biological sex.
23      A.  Not that I can recall.  No.  No.  I can't
24 recall a situation of a 4-year-old demonstrating
25 gender confusion being asked to enroll in the Catholic

Page 122

```
 1  school.
 2       Q.   Why would gender identity or sexual
 3  orientation of a child's parents be an impediment to
 4  an Archdiocese preschool participating in the
 5  Universal Preschool Program?
 6            MR. DAVIS:  Objection to the form.
 7       You can answer, if you understand.
 8            MS. CARRENO:  I would please ask that
 9  when you object to form, you just object to form and
10  not direct him that he shouldn't understand the
11  question.
12            MR. DAVIS:  I'm sorry.  What was that,
13  Virginia?
14            MS. CARRENO:  I said, I would just ask
15  that when you object to form, that you just leave the
16  objection to form and let him know that he can answer,
17  but not suggest to him in any way that the question is
18  confusing or that he shouldn't understand it.
19            MR. DAVIS:  Okay.
20       A.   So just for my clarity, then, the
21  question is why -- if a parent is -- could you just
22  restate the question for me?
23       Q.   (BY MS. CARRENO)  Sure.  Why would the
24  gender identity or sexual orientation of a
25  4-year-old's parents be an impediment for that child
```

Page 123

```
 1  participating in an Archdiocese preschool?
 2       A.   Gotcha.  Okay.  Well, again, I think it
 3  would come down to not a question of perhaps identity
 4  or orientation and more lifestyle.
 5            So what is the lifestyle that a parent is
 6  carrying out?  The lifestyle is very much important
 7  because, again, as I noted earlier, the Catholic
 8  Church can, from our perspective, only accomplish its
 9  mission to educate and to inform children if it's
10  doing so in partnership, right partnership with
11  parents, with a family.
12            Foundational to that partnership is that
13  there's a well-founded hope that the family will
14  support the aims of a Catholic education and a
15  Catholic formation.
16            And if there is something in the family's
17  lifestyle or situation that becomes an impediment to
18  or creates an inconsistency with the church's teaching
19  or with providing that well-founded hope of supporting
20  the aims and the teachings of the church, then we have
21  a potential situation where the family can't properly
22  fulfill its end of the partnership with the school, in
23  which case, then, again, we might have irreconcilable
24  differences that would then lead a school to discern
25  that a family situation may not be the right fit for
```

Page 124

```
 1  the school or the school for the family, ultimately.
 2            So, again, I don't know that this is a
 3  question, at least in my view, in our view here at the
 4  Archdiocese, about identity and orientation as much as
 5  it is about lifestyle and conduct.
 6            And so the moment that a lifestyle or a
 7  conduct that is contrary to the church teaching
 8  becomes public to the school or the school is made
 9  known that there's something that is in conflict, then
10  that's where there's a potential difficulty, but even
11  then, there's more to be done and discerned and
12  reflected on a case-by-case basis.
13       Q.   I want to direct your attention to
14  Exhibit 6.  This is, I believe, an email dated
15  January 14th of 2023, from The Very Reverend Dollins
16  or Father Dollins.
17            And, Mr. Moo, have you seen this document
18  before?
19       A.   Can you scroll to the bottom there?
20            Yeah.  Thank you.  And, yes, I have seen
21  this.
22       Q.   What is this document?
23       A.   Yeah.  This is the notice that Father
24  Dollins sent out to all priests in the Archdiocese of
25  Denver, giving the first Archdiocesan directive on
```

Page 125

```
 1  UPK.
 2       Q.   And is it Father Dollins or is it
 3  Reverend Dollins?  I just want to make sure I say his
 4  name correctly.
 5       A.   Yeah.  The typical here in our speak is
 6  Father.  Very Reverend or Reverend is a more formal
 7  title, but Father is fine.
 8       Q.   So who is Father Dollins?
 9       A.   Father Dollins is the vicar-general of
10  the Archdiocese of Denver.
11       Q.   And who drafted this email or this
12  document?
13       A.   He and I worked on this together.
14       Q.   Did anyone else weigh in or approve this
15  email?
16       A.   No.  No one outside of the two of us.
17  But it got shared with counsel and leave it at that.
18       Q.   On the second page of this document, on
19  the second paragraph -- or the first full paragraph,
20  the last sentence says, "Most notably, though,
21  participation at this time would be to cooperate with
22  an ideology and agenda contrary to our beliefs on the
23  human person which would ultimately compromise the
24  integrity of our Catholic schools' mission."
25            Whose agenda were you referring to or
```

Page 126

1  were you and Father Dollins referring to?
2       A.  Yeah.  I think -- specifically the agenda
3  here?  You're asking about the word "agenda"?
4       Q.  Yeah.  Whose agenda?
5       A.  Yeah.  I mean, I think this can be
6  interpreted in two ways and our thinking was twofold;
7  one, it felt like the State's agenda to want to
8  continue to impose a particular ideology on the nature
9  and identity of the human person that was incongruous
10  with our own, and to do so through these
11  nondiscrimination agreements around gender identity
12  and sexual orientation.
13            And then more broadly, probably an agenda
14  that's prevalent in mainstream culture also that -- on
15  the issues of sexual and gender identity and
16  expression that are incongruous with church teaching
17  as well.
18       Q.  And did you think that -- or did the
19  Archdiocese think that that agenda was trying to be
20  imposed specifically on the Catholic Church?
21       A.  I don't think I would say that.  It
22  seemed that the agenda was attempting -- there was an
23  attempt to impose the agenda overall, and the Catholic
24  Church, as a participant in society and culture,
25  certainly also then experiencing the imposition.

Page 127

1            But was it specifically against the
2  Catholic Church or intended to be imposed specifically
3  against the Catholic Church?  I don't know that I
4  could say that or would say that.
5       Q.  And what was the specific ideology that
6  was being imposed that was inconsistent with the
7  Catholic Church's beliefs?
8       A.  Yeah.  The notion that gender is fluid;
9  that there are more identities beyond the sexual
10  identity that we each receive at the moment of birth;
11  the notion that sexual expression and orientation is
12  also not only fluid, but has the same legitimacy and
13  kind of the same standing as an -- I'm sorry.  Step
14  back -- that sexual -- that same-sex marriages, for
15  example, or same-sex couples would have the same
16  standing as heterosexual couples in marriages.
17            Yeah.  Those would be some of the aspects
18  of the ideology I think that we would be referring to
19  here.
20       Q.  And so if I understood your prior
21  testimony, the agenda isn't the issue so much as
22  specific conduct; is that correct?
23       A.  Yes.
24       Q.  The letter also says -- the third -- or
25  the second full paragraph down, there's a sentence

Page 128

1  that's bulleted, and it says, "Therefore, due to the
2  significant risk involved and until such time as
3  religious exemptions can be guaranteed by UPK,
4  parishes and their preschool programs are directed to
5  not enter into any agreements with the State for UPK."
6            Do you see that sentence?
7       A.  Yes.
8       Q.  What does it mean, that the parishes are
9  directed not to enter into any agreements?
10       A.  That the pastors, the ultimate
11  responsible, that are being told that they're to ensure
12  that their preschool programs are not signing any
13  agreements with the State for UPK.
14       Q.  I want to show you another document, an
15  email dated May 11 of 2023.  And I believe this is
16  going to be marked as Exhibit 7.  Yes, this will be
17  marked as Exhibit 7.
18            Mr. Moo, do you recognize this document?
19  Let me know if you need a minute to review it.
20       A.  Yeah.  If I can have just one minute.
21            Okay.  Yes, I do recognize this.
22       Q.  And what is this document?
23       A.  I'm sorry.  What was your question?
24       Q.  What is this document?
25       A.  This is an email from Brittany Vessely,

Page 129

1  who is the executive director of the Colorado Catholic
2  Conference, to Trey Rogers, just laying out next steps
3  with respect to what emerged at the bishops -- the
4  Colorado Catholic Conference bishops meeting that was
5  had not too long before this email was sent.
6       Q.  And you're cc'd on this email?
7       A.  I am.  Yes.
8       Q.  And the second paragraph refers to you by
9  saying, "I can go through Governor Polis' scheduler,
10  but I hoped you may have a more direct line to engage
11  him on.  I cc'd Dietrich, Scott and Elias, too."
12            Who is Brittany Vessely?
13       A.  Brittany is the executive director of the
14  Colorado Catholic Conference.
15       Q.  And you talked a little bit about the
16  Colorado Catholic Conference a few minutes ago, but
17  what is the Archdiocese's relationship with the
18  Colorado Catholic Conference?
19       A.  In terms of the corporate relationship,
20  structural relationship, or --
21       Q.  Does the Archdiocese have a relationship
22  with the Colorado Catholic Conference?
23       A.  Yeah.  Yeah.  Again, the Catholic
24  Conference is the primary arm that unites and links
25  the three bishops in the state together.  So when the

Page 130

1 Colorado Catholic Conference speaks, it does so on
2 behalf of the three bishops. It won't speak on
3 anything that the three bishops aren't united.
4        So the Archdiocese of Denver has a really
5 good strong working relationship with the Colorado
6 Catholic Conference, but the Colorado Catholic
7 Conference itself is a distinct entity from the
8 Archdiocese of Denver.
9        Q.  So does the Colorado Catholic Conference
10 have any authority over the Archdiocese?
11        A.  No, no direct authority over the
12 Archdiocese.
13        Q.  Does the Colorado Catholic Conference
14 ever speak on behalf of the Archdiocese when its, I
15 guess, positions are consistent with the other two
16 bishops?
17        A.  Yes.
18        Q.  And you had mentioned the bishops board
19 meeting that's mentioned in this email. Were you at
20 the bishops board meeting?
21        A.  I was at the one that this is referring
22 to, yes.
23        Q.  Did you say you were not?
24        A.  I was, yes.
25        Q.  You were. Okay. When was that meeting?

Page 131

1        A.  Oh, I would have to look through a
2 calendar. I can't recall the exact date. But it
3 was -- it was not too long before this email, so
4 sometime in May, early May.
5        Q.  And it says it was decided at that
6 meeting to proceed with UPK, despite the lack of
7 religious exemptions. What does that mean, that it
8 was decided to proceed with UPK?
9        A.  Yeah. The decision that was made here
10 was what was shared with pastors and school leaders on
11 May 26, 2023, at that meeting that we had with them.
12 So the information we shared, that you asked me about
13 from that slide deck, really came out of this meeting
14 here.
15        Q.  So the Archdiocese was part of the
16 decision to proceed with UPK?
17        MR. DAVIS: Objection. Misstates
18 testimony.
19        A.  So the Archdiocese --
20        Q.  (BY MS. CARRENO)  I'm just going to
21 rephrase. I'm going to rephrase my question.
22        It says it was decided to proceed with
23 UPK. Who made that decision?
24        A.  Well, for the Archdiocese of Denver,
25 ultimately it was the Archbishop of Denver who gave

Page 132

1 the go ahead to proceed with or pursue -- open up the
2 opportunity for schools to pursue the pathway that was
3 shared with them on May 26th.
4        Q.  And what about the Colorado Catholic
5 Conference?
6        A.  What about them? Did they have -- are
7 you asking if they had a say?
8        Q.  I'm just asking -- it says it was decided
9 to proceed with UPK. And you talked about the
10 Archdiocese decision and the document that we went
11 over a few minutes ago.
12        Who else was involved in the decision to
13 move forward with the UPK, in terms of the Colorado
14 Catholic Conference, besides the Archdiocese?
15        MR. DAVIS: Objection. Misstates
16 testimony.
17        A.  Yeah. So what I can -- what I can give
18 you is that -- and say is that the bishops got
19 together to speak about a variety of different topics,
20 as is par for the course for their board meetings.
21 One of them was UPK.
22        And there was a desire from the bishops
23 to have a united front on how to proceed. At the
24 time, the bishops felt that UPK was important enough
25 to continue to prioritize work in securing access to

Page 133

1 UPK without infringing on our religious beliefs or
2 compromising our religious beliefs. And that was --
3 that was the decision, if you will, that was made.
4        From there, then the Archbishop of
5 Denver, with me and his leadership team, ultimately
6 took that and decided to then direct -- or rather open
7 the opportunity for our schools, as was relayed to
8 them on May 26th.
9        So ultimately the decision for the
10 Archdiocese of Denver came down to Archbishop Aquila,
11 myself, and the leadership team with the Archdiocese
12 of Denver.
13        Q.  (BY MS. CARRENO)  Who is -- this email is
14 from Brittany Vessely to Trey Rogers. Who is Trey
15 Rogers?
16        A.  Trey Rogers is a contact that she has. I
17 don't -- I'm not too familiar with him. I've heard
18 and seen the name before. A contact, though, that he
19 has -- that she has -- excuse me -- that seemingly I
20 think had some connections with the governor's team as
21 well.
22        Q.  I want to show you one more document,
23 which is another email from -- this one is from
24 May 15th. And this one is going to be marked as
25 Exhibit 8.

Page 134

1    And, Mr. Moo, please review this and let
2  me know if you recognize this, after you've had a
3  chance to review.
4       MS. CARRENO:  And, Bonnie, if you can
5  scroll down.  I am focusing on the email from Mr. Moo
6  to Barbara and some others.
7       THE DEPONENT:  Was there another part at
8  the bottom to this?
9       Okay.  Yeah.  Thank you.  I do recognize
10  this.  Yes.
11       Q.   (BY MS. CARRENO)  And what is this email?
12       A.   This was my email inviting pastors and
13  school leaders to the meeting that we hosted here on
14  Friday, May 26th, where we talked about the -- we were
15  going to update them and talk about the possible
16  pathway to continue to pursue access to UPK.
17       Q.   And that was the email that we just
18  looked at the PowerPoint slides for?
19       A.   Yes.  That's correct.
20       Q.   Sorry.  I think I misspoke.  That was the
21  meeting on May 26th that we looked at the PowerPoint
22  slides for?
23       A.   Yes.  Yes.  Correct.
24       Q.   In the first paragraph of that email, the
25  last sentence says, "We wanted to ensure we could

Page 135

1  provide this form as quickly as possible to assist you
2  in your discernment and decision-making."
3       And when you say "your discernment and
4  decision-making," who are you referring to?
5       A.   Here referring to pastors and their
6  school leaders.
7       Q.   And the pastors of all 36 preschools or
8  something else?
9       A.   No.  Yeah.  Of the preschool -- of the
10  parishes of the preschools.
11       Q.   And so when you said "to assist in your
12  discernment and decision-making," what did you mean by
13  this?
14       A.   Yeah.  I think it was to, if you will,
15  tease that there was a potential opportunity for them
16  to discern and make a decision on, ultimately.
17       Again, prior to this, the only directive
18  was the one from January from Father Dollins, and we
19  had heard that there was a registration window opening
20  up in early June.
21       And so we wanted to provide this
22  opportunity for pastors and school leaders to come
23  together to hear what potential pathway there might be
24  to continue to pursue access to UPK, without
25  compromising our religious beliefs.

Page 136

1       And so that's what we wanted to put in
2  front of them and what was -- what I was -- excuse
3  me -- what I was alluding to, ultimately, by noting to
4  them that we wanted to assist them in their
5  discernment and decision-making.
6       Q.   And so you just said, at that point there
7  was still the hope that the Archdiocese would be able
8  to -- the Archdiocese preschools would be able to
9  participate in UPK; is that correct?
10       A.   Yes.  Yes.  That's correct.  Yes.
11       Q.   And I think we covered this when we were
12  talking about the slides, but it sounds like the only
13  two preschools that decided to participate were the
14  two that you referenced a little bit ago that
15  registered and/or returned the form and the letter?
16       MR. DAVIS:  Objection.  Misstates
17  testimony.
18       Q.   (BY MS. CARRENO)  And, Mr. Moo --
19       A.   Yes.
20       Q.   Was that a yes?
21       A.   What was the -- I'm sorry.  I didn't get
22  the --
23       THE REPORTER:  Yeah.  The question cut
24  out, Virginia.  I didn't get that either.
25       Q.   (BY MS. CARRENO)  So the question was --

Page 137

1  actually, I'm just going to ask a new question.
2       Did any of the preschools express a
3  desire to participate in the UPK program at that time?
4       A.   At the time of the meeting or following
5  the meeting?
6       Q.   Yes.
7       A.   You know, I don't recall.  At that point,
8  it would have been just verbal conversations at that
9  point.  I don't recall anyone at that meeting saying,
10  We're in.  We want to do this this way.  No.  I don't
11  recall that.
12       I think it was after that we heard -- we
13  heard from some schools.  They had more questions
14  around what this entailed ultimately, but we didn't
15  hear any affirmative declarations at that point, at
16  the time of the meeting.
17       Q.   Did any school express any interest to
18  participate in UPK after that meeting?
19       A.   Yeah.  I think -- I think after the
20  schools -- so, generally speaking -- I'll say this:
21  Our schools have -- we've had a lot -- a number of
22  schools that have been interested in participating in
23  UPK.
24       I don't think that interest ever went
25  away.  I think, in large part, our schools, you know,

Page 138

1  were trusting in our ability to be able to direct them
2  in the right way, and that right way being that they
3  weren't going to lock themselves into a situation that
4  would compel them or place them in a situation of
5  noncompliance for carrying out their work and their
6  operations according to the church's belief.
7        So the ones that we've interacted with, I
8  think, have always expressed interest in being part of
9  the UPK, even after that January directive that went
10  out, you know.  There was always -- even though that
11  directive said, Do not participate, I think there was
12  still, just through conversations I had with schools,
13  a desire to get to a point where that wouldn't be the
14  case.
15        So yes.  So I don't know if May 26th is a
16  delineating line -- or dividing line, I should say,
17  between interest or not.  Because it's been there to
18  some extent.  Maybe it was there and expressed a bit
19  more after.  I wouldn't be able to tell you, you know,
20  in what volume because that I can't recall at this
21  point.
22        But what I can tell you is there's always
23  been a general interest in wanting to participate
24  because of the benefit this would bring to families,
25  ultimately.

Page 139

1      Q.  When did the Archdiocese make the
2  decision to initiate this lawsuit?
3        MR. DAVIS:  Objection to the extent it
4  calls for attorney-client privileged communication.
5        You can answer otherwise.
6      A.  Yeah.  So the reality is, I think our
7  deepest desire was always to work with the typical
8  right channels and communicate with State officials to try
9  to appeal to receive rule changes or exemptions that
10  would give us the sufficient comfort to participate.
11        At the time of the May 26th meeting, that
12  was still the case.  But I think even then we had come
13  in with a sense that if this last effort -- in some
14  ways this felt like a last effort -- to have schools
15  sign up, register online, not sign the agreement but
16  turn in this letter requesting exemptions and
17  requesting of the recipients of the letter, State
18  officials, to provide in writing a support for that,
19  that, you know, our hope was maybe this could be the
20  way, the individual communities, right, reaching out
21  and appealing.
22        But I think that there was the sense,
23  though, for the officials here in the Archdiocese that
24  if this didn't work out, then we would have to pursue
25  and look at all options, including legal action.

Page 140

1      So was a hard decision made on May 26th
2  or on May -- whenever we met with the bishops board
3  or -- no.  I think there was always just this
4  generalized sense that it could result in this if the
5  appeals and the attempts of appeals to the right
6  officials to receive relief and get exemptions would
7  come.  But if not, then, yeah, then we would pursue
8  action.
9        So I think it was, you know, early after
10  this meeting on the 26th, and then waiting to see how
11  many schools sent letters that, ultimately, then a
12  decision to take additional action came.
13      Q.  (BY MS. CARRENO)  Did some of the schools
14  determine that they didn't want to participate in the
15  UPK program, regardless of an exemption or rule change
16  or any other assurances?  They just didn't want to
17  participate?
18      A.  Yeah.  Certainly.  I can tell you of one
19  that, at least at the outset said, you know, they
20  weren't necessarily interested.  And -- but the great
21  majority, I think -- well, to be clear, many others
22  didn't say a thing, which, again, is okay.
23        We didn't, you know, necessarily ask them
24  specifically one way or another to give us a hard,
25  hard commitment.  But, yeah.  We had, I think, at

Page 141

1  least to the best of my recollection right now, one
2  that did say this wasn't something that they were
3  interested in, from what I can recall.
4      Q.  Which school wasn't interested?
5      A.  Yeah.  Again, you're testing my memory
6  here.  Yeah.  I don't want to be inaccurate here.  I
7  can tell you there was one.  The name is not coming to
8  me right now.  And without having documents in front
9  of me, I'm hard-pressed to tell you what school that
10  is.
11      Q.  And did they say why they weren't
12  interested?
13      A.  No, not particularly.  It was just a
14  pretty simple like, no, not interested.  Yeah.  No.
15      Q.  So if you didn't hear from all
16  36 schools, is it fair to say that others may also
17  just not have been interested in participating in UPK?
18        MR. DAVIS:  Objection.  Calls for
19  speculation.
20      A.  Yeah.  I don't know.  Could there have
21  been some that say, We're just not interested at all?
22  Yes.  Were there others that were just waiting to see
23  what happens?  That's probably, in my view at least,
24  where the majority were at.  But, yeah.  I couldn't
25  quantify or even begin to quantify that one for you.

Elias Moo  30(b)(6)
November 27, 2023

Page 142

1    Q.   (BY MS. CARRENO)  And you said at that
2  time this was kind of like a last attempt to
3  participate, was to sign up but not sign the contract
4  and try to register; is that correct?
5    A.   Yeah.  Yeah.  I think at that point, this
6  was -- in our minds, was certainly one last push at
7  trying to gain access through this means.
8    Q.   But only 2 out of the 36 schools actually
9  moved forward with that suggested last attempt to
10  participate; is that correct?
11    A.   Yes.  Yep.
12    MS. CARRENO:  I think this is a good time
13  for us to take our lunch break.
14    MR. DAVIS:  Okay.
15    MS. CARRENO:  I would suggest that we
16  come back at 1:00, just in the interest of not
17  having -- not having a lot of time to finish these
18  depositions, with our discovery cutoff coming up on
19  December 1st.  So I want to try to power through as
20  much as possible.
21    Does that work for everyone?
22    MR. DAVIS:  Sure.
23    THE REPORTER:  Off the record.
24    (Recess from 12:27 p.m. to 1:09 p.m.)
25    THE REPORTER:  Back on the record.

Page 143

1    Q.   (BY MS. CARRENO)  Welcome back, Mr. Moo.
2  Can you still hear me okay?
3    A.   Yes.  Yeah.  I can hear you.  Thank you.
4    Q.   I want to show another exhibit, which is
5  going to be marked as Exhibit 9, and it is a copy of
6  the UPK provider agreement.
7    MS. CARRENO:  And, Bonnie, if you can
8  scroll through UPK.  Thank you.  And I would just
9  represent that this is Document 30-3 that is part of
10  the records in this case.
11    Q.   (BY MS. CARRENO)  Do you need to see more
12  of this document, Mr. Moo?
13    A.   Yeah.  If you can keep scrolling down, I
14  would be grateful.  Thank you.
15    Q.   And, Mr. Moo, are you familiar with this
16  document?
17    A.   I am, yes.
18    Q.   Can you recognize this to be the UPK
19  provider agreement?
20    A.   Yes.
21    Q.   Have you reviewed this document before
22  today?
23    A.   Yes, I have.
24    Q.   According to the complaint in this case,
25  there are two provisions in this provider agreement

Page 144

1  that the Archdiocese believes are inconsistent with
2  its sincerely held religious beliefs.  And I want to
3  direct your attention to the first one on page 3.
4    MS. CARRENO:  I think that it might be
5  page 3 of the PDF.  Yeah.  Page 3 of the PDF -- or no.
6  Sorry.  Yeah.  That's it.
7    Q.   (BY MS. CARRENO)  So under the Quality
8  Assurances provision, it says, in the first bullet,
9  "Provider agrees to adhere to the quality standards
10  identified in Section 26.5-4.205."  And then further
11  on in that paragraph it says, "at a minimum of quality
12  standards must include," and then the fourth bullet
13  down, "a requirement that each preschool provider
14  provide eligible children an equal opportunity to
15  enroll and receive preschool services regardless of
16  race, ethnicity, religious affiliation, sexual
17  orientation, gender identity, lack of housing, income
18  level, or disability as such characteristics and
19  circumstances apply to the child or the child's
20  family."
21    Do you see that, Mr. Moo?
22    A.   I do.  Yes.
23    Q.   What about this provision does the
24  Archdiocese believe is inconsistent with its sincerely
25  held religious beliefs or what about this provision is

Page 145

1  problematic?
2    A.   Well, specifically the terms "sexual
3  orientation" and "gender identity" are cause for
4  concern for us.  You know, I noted earlier that, you
5  know, for us, when it comes to following through on
6  our policies and policy guidance with respect to
7  issues of gender identity and sexual identity, sexual
8  orientation, it's the conduct, the behavior itself
9  that is really where the problem lies.
10    But, you know, our understanding of these
11  terms is such that it imposes on us that students
12  would be fully accepted for embracing a gender that is
13  contrary to their biological sex or living out in a
14  manner that operates just full-scale acceptance of an
15  alternative sexual orientation or lifestyle, if you
16  will, which are things that we can't -- we can't
17  promote nor -- nor accept.
18    And here, I would differentiate between,
19  you know, just the experience of gender confusion or
20  dysphoria.  That, in and of itself, is not the issue.
21    But if gender identity means that a
22  student has transitioned and the school has to accept
23  the transition as such and refer to them by different
24  pronouns or allow the use of the opposite sex
25  restroom, for example, that's just -- that's a place

Elias Moo   30(b)(6)
November 27, 2023

Page 146

1  that we can't.
2      So if that's what families are desiring
3  their children to receive in our schools, it's going
4  to be irreconcilable with our policy guidance and our
5  position on this.  So that's where we have the largest
6  problems and concerns, ultimately.
7      **Q.   And you mentioned students transitioning.**
8  **What do you mean by that?**
9      A.   Yeah.  My understanding of the term is,
10  you know, a person, male or female, who has begun to
11  carry themselves, through their dress, through
12  pronouns use, in a way that conveys that they are of a
13  different gender.
14      So a male, biological male, who has now
15  transitioned to being female, so dresses in typical
16  girl clothing or is requesting to go by, you know,
17  she/her pronouns, or requesting use of the girls
18  bathroom because the other is biological male.  So
19  that -- those would be examples of transition having
20  taken place.
21      **Q.   And I asked the question earlier whether**
22  **you know of any 4-year-olds in preschools, at the**
23  **Archdiocese preschools, who have transitioned.**
24      A.   Right.  Yeah.  No, I don't.
25      **Q.   And you also mentioned sexual**

Page 147

1  orientation, concerns about sexual orientation of the
2  **students.  Can you tell me what the concerns were**
3  **around that?**
4      A.   Yeah.  If a student is very openly -- and
5  parents supporting students as well in their openness,
6  declaring -- the student declaring that they are, you
7  know, attracted to someone of the same sex or they're
8  bisexual or what have you, that would be problematic.
9      Again, I think the moment that the
10  behavior starts to become something that directly
11  contradicts church teaching and also the moment that a
12  family starts requesting acceptance of such as a -- as
13  something, you know, normal, if you will, to be
14  celebrated and, perhaps even to be supported by the
15  school, yeah, that's the bottom line.  The school
16  can't at that point.
17      So it's -- again, it's less about the
18  existence of a same-sex attraction, let's say, and
19  more about the extent to which a child and the family,
20  ultimately -- because I don't know that we could hold
21  a child separate from their family, at least in our
22  view -- but in which the family, the parents, are
23  asking the school to accept and support a particular
24  world view, but also lifestyle that is not going to be
25  permissible or acceptable according to church

Page 148

1  teaching, but also just according to policies.
2      So that's the -- that's the concern there
3  with the term "sexual orientation."
4      **Q.   And so you're saying the sexual**
5  **orientation of both students and parents; is that**
6  **correct?**
7      A.   Well, yeah.  I was referring specifically
8  to students.  But previously, yes, I think I've spoken
9  to the sexual orientation of parents as well.  Well,
10  let me be clear; more specifically, the lifestyle, an
11  alternative lifestyle, a lifestyle that's carried out
12  that would be incongruous with church teaching.
13      **Q.   And so concerns around sexual orientation**
14  **and gender identity are related to both the students**
15  **and the families of those students; is that correct?**
16      A.   Correct.
17      **Q.   Do you understand -- when the language**
18  **talks about "eligible children," do you understand**
19  **that to mean preschool students or other students**
20  **within the Archdiocese schools as a whole?**
21      A.   In this case, I would understand it as
22  preschool specifically.  That's referring to preschool
23  specifically.
24      **Q.   And do you understand preschool students**
25  **that would qualify for UPK would typically be**

Page 149

1  4-year-olds?
2      A.   Sorry.  You cut off there a little bit.
3  Do I understand that preschool students --
4      **Q.   Do you understand preschool students that**
5  **would be part of the Universal Preschool Program would**
6  **typically be 4-year-olds?**
7      A.   Yes.
8      **Q.   Any other classes that are in that bullet**
9  **or that requirement that are problematic for the**
10  **Archdiocese or that are inconsistent with the**
11  **Archdiocese being able to sign the UPK agreement?**
12      A.   Yeah.  No.  Based on the other -- the
13  other classes here, I would even say that all the
14  other classes, outside of sexual orientation and
15  gender identity, are ones that we have in our own
16  nondiscrimination statement for our Catholic schools
17  in the Archdiocese of Denver.
18      **Q.   So is it fair to say that the Archdiocese**
19  **doesn't have any issues with agreeing not to**
20  **discriminate on the basis of race?**
21      A.   Right.  That's correct.
22      **Q.   And no issues with agreeing not to**
23  **discriminate on the basis of disability?**
24      A.   Correct.
25      MS. CARRENO:  I want to go to the second

Elias Moo   30(b)(6)
November 27, 2023

Page 150

1  provision that is at issue in this lawsuit, which is
2  on page 23 of, I believe, the PDF. I think it's
3  page 10 of the document itself.
4          Yeah. Just go to page 23 of the PDF.
5          Q.  (BY MS. CARRENO) And, Mr. Moo, are you
6  able to see the provision that is under capital B,
7  that says "Discrimination"?
8          A.  Yes. I can see it.
9          Q.  And it says here, "Provider shall not
10  discriminate against any person on the basis of
11  gender, race, ethnicity, religion, national origin,
12  age, sexual orientation, gender identity, citizenship
13  status, education, disability, socioeconomic status,
14  or any other identity."
15          What about this provision is problematic
16  for the Archdiocese's participation in the UPK
17  program?
18          A.  Similarly to the previous section, the
19  term "sexual orientation" "gender identity," our
20  understanding of what that conveys, and also the vague
21  use of any other identity as well, is just problematic
22  for us for the reasons I've noted.
23          Q.  We talked about why the prior provision
24  in the statute was problematic for students and their
25  families in terms of enrollment.

Page 151

1          Are there any other concerns related to
2  this provision that weren't discussed in the prior
3  provision?
4          A.  Yeah. I think the implications of this
5  for employment decisions and the extent to which we
6  are able to continue to make hiring or firing
7  decisions based on our religious beliefs and upholding
8  our code of conduct, upholding our Statement of
9  Catholic Community Beliefs, which would hold a very
10  different understanding of the nature of the human
11  person and sexuality, ultimately, than what's conveyed
12  through the use of these two terms.
13          Q.  In terms of specific or designated
14  preschool staff, are there preschool staff that are
15  not affiliated with kindergarten and higher education
16  within the Archdiocese schools?
17          MR. DAVIS: Virginia, which of the
18  30(b)(6) topics does this line of questioning fall
19  under?
20          MS. CARRENO: Yeah. So I think this goes
21  to Topic Number 5, which is the Archdiocese review and
22  assessment of whether the Archdiocese could
23  participate in the UPK program consistent with their
24  religious beliefs and obligations.
25          I'm trying to figure out what

Page 152

1  specifically about these two provisions is
2  problematic. So he said that employees, this would be
3  problematic for employees. So I'm just trying to
4  understand why that would be.
5          MR. DAVIS: Okay. I think we can let
6  that question go forward but, you know, there's not a
7  lot of notice given in the topics that he's going to
8  have to discuss employment issues that much. But you
9  can proceed with the question.
10          THE DEPONENT: Sorry. Could you restate
11  the question again?
12          Q.  (BY MS. CARRENO) So the question is
13  whether preschools have staff that are just designated
14  for the preschool.
15          A.  Yeah. I think, by and large, most
16  preschool staff are just preschool staff. So I
17  don't -- I can't tell you of a situation where that's
18  not the case.
19          And there could be some shared duties
20  with kindergarten, let's say, but I think you're going
21  to have specialized and specific preschool teachers
22  and then specific kinder teachers, first grade
23  teachers, et cetera, et cetera.
24          So, yeah. I don't -- if that's what
25  you're asking, yeah, I don't know of any programs that

Page 153

1  don't have preschool staff that also is doing
2  something more than just preschool.
3          Q.  Great. And we can ask Ms. Coats and
4  Ms. Seul more specific questions about the individual
5  schools as well. But what is your -- is your
6  understanding that those preschool employees or that
7  preschool employees, in general, are ministerial
8  employees?
9          MR. DAVIS: Objection. Calls for a legal
10  conclusion.
11          A.  Yes. Any employee of a Catholic school
12  is considered a minister of the church. They are all
13  asked to sign a code of conduct which specifically
14  states that they're considered ministers of the
15  church.
16          Q.  (BY MS. CARRENO) And so when we spoke
17  earlier about certain employees -- actually, strike
18  that.
19          So would those ministers of the church be
20  required to be Catholic?
21          A.  No. Not necessarily.
22          Q.  Would those ministers of the church be
23  required to abide by a certain code of conduct?
24          A.  Yes.
25          Q.  And is that similar to what you described

Elias Moo   30(b)(6)
November 27, 2023

Page 154

1   earlier for Archdiocese employees?
2       A.   Yes.  Yeah.  And I would direct you to
3   two documents that capture that.  It's -- first is the
4   Archdiocese of Denver code of conduct, and then the
5   second would be the Statement of Catholic Community
6   Beliefs and Commitments.
7            That's a part of the workers agreement.
8   The workers agreement itself also has language that
9   denotes this as well.
10      Q.   And those employees that you noted
11  before, I think you noted maintenance staff and some
12  other workers that wouldn't need to be Catholic, would
13  those workers be considered ministerial employees of
14  the Archdiocese?
15           MR. DAVIS:  Objection.  Calls for a legal
16  conclusion.
17      A.   Yes.  Again, they all sign the code of
18  conduct as well.  So anyone who signs the code of
19  conduct is considered a minister of the church.  And
20  our policies here in the Archdiocese of Denver have
21  anyone working in the Catholic parish or school
22  setting as a minister of the church, ultimately.
23      Q.   (BY MS. CARRENO)  If this provision
24  weren't in the contract, so this entire subsection B
25  under discrimination, would the Archdiocese have any

Page 155

1   concerns about the Archdiocese's ability to
2   participate in the UPK program and these employment
3   decisions?
4            MR. DAVIS:  Objection.  Calls for
5   speculation.
6       A.   If this provision wasn't here, then,
7   yeah, I think it would have certainly lessened our
8   concern.  If this and the previous one -- or if any
9   mention of providers shall not -- or we would be --
10  there would be a regulation stating that we would
11  somehow be discriminating by not accepting the State's
12  understanding of sexual orientation and gender
13  identity that was not in the agreement, yeah, I think
14  we would feel comfortable, more comfortable.
15      Q.   (BY MS. CARRENO)  Is your understanding
16  that this provision is the only provision that would
17  infringe upon the Archdiocese's ability to make
18  employment decisions consistent with its sincerely
19  held religious beliefs?
20           MR. DAVIS:  Objection.  Calls for a legal
21  conclusion.
22      A.   Yeah.  This and the previous one.  And
23  really, any language, I think, that kind of speaks to
24  this would be where our concerns are at, ultimately.
25      Q.   (BY MS. CARRENO)  So let me -- let's just

Page 156

1   go back up to the previous language.  And so, again,
2   it's the fourth bullet there.  It says, "Requirements
3   of each preschool provider provides eligible children
4   an equal opportunity to enroll and receive services."
5            Is it your opinion that this would
6   infringe on the Archdiocese's ability to make
7   employment decisions?
8            MR. DAVIS:  Objection.  Calls for a legal
9   conclusion.
10      A.   This particular one here doesn't, I
11  think, speak to employment decisions.  I understand
12  that this is specific to children here and the
13  enrollment of children.
14      Q.   (BY MS. CARRENO)  And if we can go back
15  down to -- so my question was, if this provision was
16  taken out of the UPK provider agreement in its
17  entirety, would the Archdiocese have any concerns
18  about entering into the UPK provider agreement in
19  terms of just making employment decisions?
20           MR. DAVIS:  Objection.  Calls for
21  speculation.  Calls for a legal conclusion.
22      A.   Yeah.  Just on employment issues, again,
23  I think we would -- we would be less concerned.  Yeah.
24      Q.   (BY MS. CARRENO)  Okay.  I want to mark
25  Exhibit Number 10, which is going to be the CCAP or

Page 157

1   the Colorado Childcare Assistance Program fiscal
2   agreement.
3            And, Mr. Moo, before we talk about this
4   document, are you familiar with the Colorado Childcare
5   Assistance Program or CCAP?
6       A.   I am a little bit.  I can't say I'm
7   well-versed or fully understand the ins and outs, but
8   I am familiar and have a sense of the particular --
9   the mechanism, the funding mechanism, and also who
10  might be eligible for receipts of CCAP.
11      Q.   And Topic Number 7 of the 30(b)(6)
12  deposition notice for the Archdiocese is the
13  Archdiocese's determinations about and instructions to
14  its Catholic preschools regarding participation in the
15  Colorado Childcare Assistance Program, CCAP, the
16  Denver Preschool Program, DPP, or any other government
17  assistance programs requiring an agreement with any
18  nondiscrimination.
19           Are you able to speak to that topic on
20  behalf of the Archdiocese?
21      A.   On the topic of -- I'm sorry.  Can you
22  repeat that?
23      Q.   On Topic Number 7 in the --
24           MS. CARRENO:  Let's just pull it up on
25  the screen, Bonnie.  Can you go back to Exhibit

Elias Moo   30(b)(6)
November 27, 2023

Page 158

1  Number 1?  Excuse me.
2      Q.   (BY MS. CARRENO)  And it will probably be
3  easier for you to make that decision if you read it
4  rather than listen to me.  Topic Number 7.
5          And so just let me know when you're
6  finished, Mr. Moo.
7      A.   Okay.  Yes.  And I can speak to this.
8      Q.   Okay.  Great.  And so what is your
9  understanding of the Colorado Childcare Assistance
10  Program or CCAP?
11     A.   In terms of how it operates or what part
12  of it?
13     Q.   The question was, what is it?
14     A.   Yeah.  My understanding is it's funding
15  support that's given to families in particular
16  situations to cover the cost of childcare.
17     Q.   And are you aware that ten Archdiocese
18  preschools are participating in CCAP?
19     A.   Yeah.  I knew there was preschool
20  programs that had been participating with CCAP, but I
21  couldn't tell you or verify if ten is the right
22  number.  But if that's been verified, then I'll take
23  your word for it there.
24     Q.   Would you agree that one of the
25  preschools from the Archdiocese that's participating

Page 159

1  is St. Mary, who is a plaintiff in this lawsuit?
2      A.   Yes.  I believe that to be the case.
3      Q.   Have you --
4          MS. CARRENO:  And if we can pull this up
5  again.
6          Bonnie, can you just scroll through the
7  fiscal agreement so that Mr. Moo can see fully what
8  he's looking at here?
9      Q.   (BY MS. CARRENO)  And, Mr. Moo, have you
10  ever seen this document or this fiscal agreement prior
11  to today?
12     A.   No, I have not.
13     Q.   Is the fiscal agreement something that
14  the Office of Catholic Schools would typically weigh
15  in on or review?
16     A.   Not generally, no.
17     Q.   Are you aware that paragraph number 12 of
18  this agreement contained a nondiscrimination
19  provision?  Or are you aware that there's a
20  nondiscrimination provision that's part of the CCAP
21  contract?
22     A.   Not the exact nondiscrimination
23  provision, but looking at it now, yeah, I see what's
24  here.  I would expect that CCAP and a like program to
25  have a nondiscrimination provision.

Page 160

1      Q.   So is this nondiscrimination provision
2  problematic for Archdiocese preschools participation
3  in the CCAP program?
4          MR. DAVIS:  Objection.  Calls for a legal
5  conclusion.
6      A.   Yeah.  You know, possibly, depending on
7  the -- again, the sexual orientation, what is being
8  specifically conveyed and stated in there.
9      Q.   (BY MS. CARRENO)  Why hasn't the
10  Archdiocese weighed in on the CCAP nondiscrimination
11  provision, but has weighed in on the UPK program
12  nondiscrimination requirements?
13     A.   Yeah.  Frankly, we haven't had to.  And
14  what makes us weigh in on situations is when we have a
15  hardship that's being placed or has been placed on a
16  school.
17         So had a school experienced, let's say,
18  the local county coming in and saying, Hey, you're not
19  complying with this nondiscrimination provision for
20  reasons of sexual orientation, that would have come to
21  us, and then we would have had to weigh in at that
22  point.
23         And so, again, you know, we're not
24  necessarily looking into every single one of these
25  provisions, but when issues arise and things come to

Page 161

1  our level, we do weigh in and look to see the extent
2  to which it's something that a school can, in good
3  confidence, agree to and abide by.
4          You know, up to this point, my
5  understanding is there have been no concerns, at least
6  in practice, that have surfaced or challenges or
7  difficulties that have surfaced that would have
8  required us to weigh in at this point.
9          And this is, I think -- work with CCAP
10  goes back some time, even before my time here, and I
11  don't think there's -- I don't recall even this being
12  a concern prior to my time.
13         So -- but why UPK?  Well, you know,
14  frankly, we were asked to weigh in very early.  And
15  part of that was with the way that this -- that UPK
16  was set up.
17         And really, I think what, in some ways,
18  triggered our weighing in was how the system itself
19  was set up, and the fact that families had to, again,
20  register through UPK.  They were assigned to schools.
21  Schools were not able to reject applications based on,
22  you know, religious beliefs, even in the way that the
23  system itself was set up.
24         And so what happened there was an
25  imposition, without the school being able to follow

Elias Moo   30(b)(6)
November 27, 2023

Page 162

1  its admissions process and procedures.  They would
2  have vet families and so forth.  So, yeah.  That
3  ultimately is what triggered, I think, our engagement,
4  understanding the system, understanding the provisions
5  and the agreements as a part of that.
6          But the CCAP is distinct.  My
7  understanding is it's very different.  Families are
8  applying through their local counties.  They are able
9  to receive the support.  They're going through the
10  admissions process at their schools, parallel or
11  separate from that.  So even just the way it functions
12  is all distinct.
13          And, again, in practice, we haven't -- to
14  the best of my memory, there have been no issues
15  raised to me with respect to concerns from local
16  schools that would trigger our weighing in or our
17  intervention on something like this.
18      Q.   And paragraph 12 says that the
19  provider -- sorry.
20          MS. CARRENO:  Please scroll up a little
21  bit.  I need the heading.
22      Q.   (BY MS. CARRENO)  "The provider agrees
23  to," and then if we go down to paragraph 12, "The
24  provider agrees to accept referrals for childcare
25  without discrimination with regard to race, color,

Page 163

1  national origin, age, sex, religion, marital status,
2  sexual orientation, or physical, intellectual, or
3  mental health disability."
4          So wouldn't you agree that by signing
5  this contract, the Archdiocese preschools would have
6  to agree to accept these referrals without considering
7  sexual orientation or sex?
8          MR. DAVIS:  Objection.  Calls for
9  speculation.  Calls for legal conclusion.
10      A.   Yeah.  I suppose it would come down to
11  what's the -- what would be the CCAP's understanding
12  of those terms.  But, yeah.  Largely here, would I say
13  that they're agreeing to not discriminate on the basis
14  of sex?  Sure.  We would say that that's not
15  inconsistent with our position, that we ask persons
16  not to discriminate on the basis of sex.
17          We -- with respect to sexual orientation,
18  you know, I think I've noted previously that the topic
19  really isn't orientation.  The question comes down to
20  lifestyle.  So, you know, a school could well read
21  that in that manner as well.
22          But -- so, yes.  So are they agreeing to
23  these terms by signing?  I would agree that they're
24  agreeing to those terms.
25      Q.   (BY MS. CARRENO)  And the UPK

Page 164

1  nondiscrimination requirement is also prohibiting
2  discrimination based on sexual orientation, is your
3  understanding?
4      A.   Yes.
5      Q.   You mentioned that there's never been a
6  hardship with any of the preschools, that you know of,
7  agreeing to this nondiscrimination provision.
8          What did you mean by there's never been a
9  hardship?
10      A.   Yeah.  Again, I think it would -- that,
11  to me, would be that CCAP would pull funding or remove
12  funding because the school has been found to be
13  noncompliant with their procedures or that the school
14  has been asked by CCAP to correct the situation due to
15  a complaint that's been received by them suggesting
16  that the school has been discriminatory.
17          Those would be, I guess, examples of what
18  a potential hardship would be.  I haven't heard of any
19  of those.  There's probably others.  But those are the
20  two that come to mind.
21      Q.   And so as far as you know, none of the
22  Archdiocese preschools that participate in CCAP have
23  ever had a hardship from having to agree with
24  paragraph number 12 in the CCAP fiscal agreement?
25      A.   As far as I know, they haven't had any

Page 165

1  conflicts on that yet.
2      Q.   Okay.  I want to direct your attention to
3  what we're marking as Exhibit Number 11.  And this is
4  a copy of the Denver Preschool Program contract.
5          And, Mr. Moo, are you familiar -- I know
6  we've talked about it a little bit earlier today, but
7  are you familiar with the Denver Preschool Program or
8  DPP?
9      A.   I am familiar with DPP, yes.
10      Q.   And do you know whether any Denver
11  Archdiocese preschools are participating in DPP?
12      A.   Yes.  I know of a number.  Exactly how
13  many, I can't recall.  But I know there are a number
14  of Denver -- or Catholic schools in Denver that
15  participate with DPP.
16      Q.   And Wellspring Catholic Academy of
17  St. Bernadette, are you aware that they're
18  participating in DPP?
19      A.   Yes.
20      Q.   And are you aware that the DPP contract
21  also has a nondiscrimination requirement or provision?
22      A.   Yes.
23          MS. CARRENO:  And, Bonnie, if you can go
24  to page 26, paragraph 3.
25      Q.   (BY MS. CARRENO)  And, Mr. Moo, the DPP

Elias Moo   30(b)(6)
November 27, 2023

Page 166

```
 1  contract language says, "Provider shall not
 2  discriminate against any person on the basis of race,
 3  color, religion, national origin, gender, age, except
 4  as to the age of children qualifying for tuition
 5  credits, military status, sexual orientation, gender
 6  variance, marital status, or physical or mental
 7  health" -- sorry -- "physical or mental disability,
 8  except as such disability may materially and adversely
 9  impact proper administration of the preschool
10  program."
11              Were you aware that this was one of the
12  requirements for an Archdiocese preschool to
13  participate in the Universal Preschool Program?
14      A.   In the Universal Preschool Program?
15      Q.   Apologies.  Were you aware that this
16  nondiscrimination provision was a requirement for an
17  Archdiocese preschool to participate in the Denver
18  Preschool Program?
19      A.   Yes.
20      Q.   And does the Archdiocese have any
21  concerns about this provision interfering with an
22  Archdiocese preschool's sincerely held religious
23  beliefs?
24      A.   Yeah.  In a similar way to CCAP, first
25  the structure of the program is different to the UPK,
```

Page 167

```
 1  in terms of how families enroll, and that has lessened
 2  the concern.
 3              But then the second is also -- and I
 4  can't recall which number it is, but I believe there
 5  is a provision in the DPP agreement that notes
 6  protections for religious programs and the honoring of
 7  the religious nature of the program.
 8              Yeah.  I wish I could point you to the
 9  exact location of that.
10      Q.   Yeah.  And I think we can help.
11          MS. CARRENO:  Bonnie, if you can go to
12  page 15 of the DPP contract, there should be something
13  in there that says, "Nothing in this agreement shall
14  be construed."
15          THE DEPONENT:  There it is.  Number 8.
16  Oh, no.  No.  That's not it.  Sorry.
17      Q.   (BY MS. CARRENO)  I think it's here at
18  the bottom of the first paragraph.  Is this what
19  you're referring to, "Nothing in this agreement shall
20  be construed to affect the provider's right to engage
21  in privately funded, inherently religious activity or
22  affect the independence of providers, including any
23  rights protected by the Colorado and U.S.
24  Constitutions and applicable law."
25      A.   Correct.  Yep.  Yep.  So that -- yeah.
```

Page 168

```
 1  This provision here has given us a measure of comfort
 2  in allowing schools to participate in DPP.
 3      Q.   If this provision were part of the UPK
 4  provider agreement, would the Archdiocese direct
 5  preschools that they could sign the agreement if they
 6  chose to?
 7          MR. DAVIS:  Objection.  Calls for
 8  speculation.
 9      A.   If this provision was in the UPK
10  agreement?  Is that what you said?
11      Q.   (BY MS. CARRENO)  Yes.  That's the
12  question.
13      A.   I think we might actually wish to seek
14  some additional clarifying language to go with it, but
15  language like this would be welcome.
16      Q.   And has the Archdiocese sought additional
17  guidance regarding this language and the Archdiocese
18  participation in DPP?
19          MR. DAVIS:  Objection to form.
20      A.   Have we sought additional guidance on
21  this language?  Is that what you --
22      Q.   (BY MS. CARRENO)  Yes.  So you just said,
23  before you could sign the UPK contract, you would have
24  to seek some additional guidance about this language
25  to determine whether this would alleviate the
```

Page 169

```
 1  Archdiocese concerns.
 2              My question was, has the Archdiocese
 3  sought guidance about this language in terms of its
 4  participation in DPP?
 5          MR. DAVIS:  Objection to the extent it
 6  calls for attorney-client privileged communications.
 7      A.   Yeah.  We have sought guidance.  I'll
 8  leave it at that.
 9      Q.   (BY MS. CARRENO)  And without disclosing
10  any privileged information, ultimately the Archdiocese
11  did not have concerns about Wellspring Academy
12  entering into this agreement with the current
13  language?
14      A.   Not at the current juncture, no.
15      Q.   And would you agree that -- actually,
16  strike that.  I'm going to move on.
17              Are there --
18          MS. CARRENO:  We can stop sharing,
19  Bonnie.
20      Q.   (BY MS. CARRENO)  Are there any other
21  grants or agreements that Archdiocese preschools have
22  entered into that contain nondiscrimination
23  requirements?
24      A.   Any other agreements?  Yeah.  There might
25  be.  There's none that I can call to mind right now to
```

Elias Moo   30(b)(6)
November 27, 2023

Page 170

1  specifically tell you which ones, but --
2            MR. DAVIS:  Virginia, is that a question,
3  like, for all time?  I think we discussed sort of a
4  five-year limitation on our ability to testify to
5  these issues.
6            MS. CARRENO:  Yeah.  I'm happy to -- I'm
7  happy to narrow that to within the last five years.
8       Q.   (BY MS. CARRENO)  Are you aware of any
9  government assistance programs that Archdiocese
10 preschools have entered into that have required
11 nondiscrimination agreements?
12      A.   Yeah.  Preschool programs specifically,
13 yeah.  I can't -- I can't call to mind any that I'm
14 familiar with at this point.  Yeah.  Possible, sure.
15 But yeah.  I don't know specifically.
16           MS. CARRENO:  Okay.  Oh, you're not
17 sharing.
18      Q.   (BY MS. CARRENO)  I'm going to move on to
19 a new topic.
20           Does the Archdiocese provide its
21 preschools with any guidance about enrolling or
22 disenrolling students or families that have identified
23 as -- I'm going to use the term "LGBTQ," but let me
24 know if you need me to define that.
25           So let me start the question over.

Page 171

1            Does the Archdiocese provide its
2  preschools with any guidance about enrolling or
3  disenrolling students and/or families that have
4  identified as LGBTQ, in a same-sex relationship, or
5  adopted a gender identity different from his or her
6  biological sex?
7       A.   Yes.  We have released to our school
8  programs the Guidance on Issues on Human Nature and
9  Sexual Identity.  That's an approximately 17-page
10 document, in question-answer format, that provides
11 some guiding principles based on church teaching from
12 which to discern or assess individual situations.
13           This was -- this document is a compliment
14 to a teaching document released by the Archdiocese
15 titled Splendor of the Human Person, which also lays
16 out the church's teaching on these issues.
17           MS. CARRENO:  And, Bonnie, if you could
18 share Exhibit Number 12, please.
19      Q.   (BY MS. CARRENO)  And this document is
20 approximately 17 pages.  Is this the document that you
21 were referring to just now?
22      A.   Yes.  That would be the one.
23      Q.   And when you say "We prepared this
24 document as a compliment," who's we?
25      A.   This would be from the Office of Catholic

Page 172

1  Schools.
2       Q.   And who wrote this document?
3       A.   I put this together, along with one of
4  our associate superintendents, who is no longer
5  employed by the Archdiocese, but was with us at the
6  time.  And we drew, in large part, as noted here,
7  substantial portions of this document from a document
8  that was written by or coauthored by the three women
9  noted in the first paragraph there.
10      Q.   And who is the person that's no longer
11 with the Archdiocese?
12      A.   His name is Dr. Jared Staudt, J-a-r-e-d
13 S-t-a-u-d-t.
14      Q.   And I believe you said that you asked --
15 when I say "you," again, I mean the Archdiocese.  The
16 Archdiocese, the Office of Catholic Schools, asks all
17 parishes and schools to abide by the guidance in this
18 document; is that correct?
19      A.   Yes.
20      Q.   I want to go to page 4 of this document.
21 And there should be a number 1.
22           And so in paragraph number 1, about
23 halfway through, it says, "The school and Diocesan
24 policies should explicitly state that they are written
25 to conform to the teachings of the Catholic Church in

Page 173

1  all respects."
2            Where do the teachings of the Catholic
3  Church come from?
4       A.   Well, they come from, in its most concise
5  and comprehensive form, the catechism of the Catholic
6  Church.  They also come from the teaching magisterium
7  of the Catholic Church, so that would include the
8  teachings of the popes, from the current one down
9  through the different popes over the years.  And
10 that's considered the ordinary magisterium.
11           Through tradition as well, sacred
12 traditions as being captured first and foremost by
13 sacred scripture, by the Gospels, by the New
14 Testament, the Bible.
15           And then also through how they have been
16 implemented, if you will, or taught by local bishops
17 as well.
18      Q.   I want to look forward to page 5 of this
19 document and direct your attention to the second to
20 the last paragraph that starts with, "Catholic schools
21 and religious education programs should present basic
22 Christian anthropology to all children in
23 age-appropriate ways throughout the course of a
24 child's education," and then it goes on.
25           But I wanted to clarify, what do you mean

Page 174

1 by "in age-appropriate ways"?
2        A.   Yeah.  So at each stage of development,
3 we recognize that a child's capacities and also their
4 innocence -- their capacities are to be acknowledged,
5 their innocence is meant to be protected.
6              And so what is appropriate for high
7 schoolers may not be for middle schoolers.  Or what's
8 appropriate for middle schoolers may not be
9 appropriate for primary grade students or our youngest
10 schoolers.
11             So the task of education is always to be
12 responsive to the child and the particular stage of
13 development.  And so with respect to Christian
14 anthropology to all children, we wouldn't expect to
15 get into the -- a nuanced discussion with
16 kindergartners, for example, on the nature of the
17 human person and the genus and the complimentary nexus
18 that's present, what we call in the church, theology
19 of the body, for example, which is an aspect of the
20 curriculum that we have in all our Catholic schools.
21             That's probably more appropriate for
22 middle school, late middle school, early high school.
23             But for kindergartners, we will present,
24 you know, that God created male and female in his
25 image and likeness.  And a male body has male body

Page 175

1 parts and a female body has female body parts.  And
2 there is a mission and a vocation that's been written
3 into the very DNA and fabric of our human nature.
4             Those are concepts that can be presented
5 and taught even to the youngest students, but
6 obviously more nuanced.  And then the more deeper
7 discussion, both on theological and anthropological
8 and also biological terms, would happen more
9 appropriately at higher grade levels.
10        Q.   You mentioned kindergartners.  What about
11 preschoolers?
12        A.   Yeah, similar to preschoolers.  You know,
13 preschoolers are able to hear the stories of creation,
14 the creation of man and woman.  In fact, I believe
15 that's one aspect of the curriculum that is asked for
16 preschoolers.
17             Preschoolers are able to, you know,
18 identify differences between boys and girls.  And
19 they're able to also understand, you know, the nature
20 of the family, the mom and a dad, right?
21             So those are -- those are aspects of
22 teaching that can be provided to students even in the
23 preschool.
24        Q.   And I want to draw your attention to
25 page 6.  And where it says in the paragraph,

Page 176

1 "practically speaking," a few sentences in, it talks
2 about in grades K through 12.  And then the next
3 paragraph it talks about middle school and it
4 references 7th and 8th grade.  And in that same
5 paragraph, it goes on to talk about high school, which
6 is 9th through 12th grade.
7             Would you agree that preschool is not
8 mentioned in this document?
9        A.   Yes.  Preschool is not mentioned in
10 there.
11        Q.   So is it fair to say that this only
12 applies to K through 12?
13             MR. DAVIS:  Objection to form.  Vague of
14 what "this" is.
15             MS. CARRENO:  So I can rephrase the
16 question.
17        Q.   (BY MS. CARRENO)  When I say "this," I'm
18 referring to this document entitled Guidance for
19 Issues Concerning the Human Person and Sexual
20 Identity.
21        A.   No.  Yeah.  No.  I would disagree that
22 this doesn't apply to preschools.  The examples that
23 are being given here are, as it denotes, practically
24 speaking, ways that Catholic schools could provide
25 presentations to parents on the subject.  But it

Page 177

1 doesn't preclude that this document wouldn't apply to
2 preschool programs as well.
3             The authors failure to note preschool
4 parents in here I don't think has any significance, in
5 my view at least, to the applicability or impact on
6 the applicability on preschools.
7        Q.   So why is preschool the only grade that
8 isn't contained in the examples in this document?
9             MR. DAVIS:  Objection.  Asked and
10 answered.
11        A.   Yeah.  This -- as I noted, this section
12 borrows, I believe, from the -- borrows heavily from
13 the document that was written by the three co-authors.
14 Yeah.
15             I can't speak to their decisions,
16 ultimately, on how they wrote this.  But from our
17 perspective, yeah, there was -- there was no intention
18 on our part to leave out preschools.
19             Yeah.  I don't.  You would have to ask
20 the authors why they chose not to include preschools
21 specifically in their examples.
22        Q.   (BY MS. CARRENO)  So when you say "the
23 authors," you've referring to the three women that you
24 identified as Theresa Farnan, Susan Selner-Wright, and
25 Mary Rice Hasson?  Those are the authors?

Page 178

1    A.   Yes.  Correct.

2    Q.   And they did not include preschool in the

3  "Catholic Schools and Gender Ideology:  General

4  Principles and Recommendations."  Is that your

5  testimony?

6         MR. DAVIS:  Objection.  Misstates

7  testimony.

8    A.   No.  They didn't include preschool in the

9  examples that you're highlighting here, is what I was

10  getting at.

11    Q.   (BY MS. CARRENO)  So I'm trying to

12  understand, did you write the Guidance for Issues

13  Concerning the Human Person and Sexual Identity, or

14  did the three authors that -- the three doctors that I

15  just described?

16    A.   Yeah.  As I noted, I put the document

17  together, pulling from the document that the three

18  authors wrote.  So this is my compilation of excerpts

19  that were drawn from their document, ultimately.  It's

20  not my original piece, so -- to be clear.

21    Q.   Is there anything in this document that

22  is not an excerpt from those three doctors?

23    A.   Yeah.  If you can scroll up.  So all the

24  question and answers that you see here, this comes

25  directly from their document.  Yeah.

Page 179

1         The terminology pieces here, this might

2  be.  Very genuinely, I don't recall.  We put this

3  together in 2018, 2019, so it's been sometime, and I

4  can't genuinely recall where we, perhaps, edited or

5  took some license on our end, as we were compiling

6  this, to add some things.

7         But it would most likely be on this page

8  here.  Everything else below, though, for the most

9  part, is coming directly from the sources cited.

10    Q.   And the question and answers, are those

11  something that you and Mr. Staudt wrote, or are those

12  from question-and-answers ones that you pulled from

13  the other document?

14    A.   Yeah.  No.  All pulled from the other

15  document.  They did a marvelous job at encapsulating

16  all aspects of what we wanted to provide guidance on.

17         So I don't -- yeah.  I don't recall us

18  adding any additional questions or answers to this.

19    Q.   And then the recommendations, are those

20  also recommendations that were pulled from that

21  document?

22    A.   Yes.

23    Q.   And I want to move on to page 9.  And in

24  paragraph C, it talks about atypical expressions of

25  masculinity and femininity.  And the recommendation

Page 180

1  below is that "Educators should be familiar with

2  variances in child development, the uneven arrival and

3  progression of pubertal development and the broad

4  range of personal interests, style" -- excuse me --

5  "and preferences among boys and girls.  Schools should

6  allow for individual differences, within the limits of

7  the school's chosen dress code or other relevant

8  policies, while upholding standards that recognize

9  sexual difference."

10         How do you interpret atypical expression

11  of masculinity or femininity?

12    A.   Yeah.  You know, I would offer the

13  example of a young lady who perhaps prefers to play

14  with boys versus girls; maybe then dislikes wearing

15  dresses and prefers to wear pants; prefers to play

16  sports instead of the games that girls may be playing,

17  you know, on strict binary male/female cultural lines,

18  right?  So that could be, you know, an atypical

19  expression.

20         Or similarly, you know, a boy who,

21  perhaps, isn't engaged in athletics like the rest of

22  the boys do in a class or takes interests that might

23  be categorized as being more feminine.

24         Yeah.  All those could be considered

25  atypical expressions.  That would be my understanding,

Page 181

1  at least, of that.

2    Q.   And these types of atypical expressions,

3  using the term from the document, would not be

4  inherently prohibitive of a child's participation in

5  an Archdiocese preschool program; is that correct?

6    A.   That's correct.

7    Q.   And why would these not be problematic

8  for the Archdiocese religious beliefs?

9    A.   Well, nowhere there is there a

10  declaration by the child or -- again, assuming that

11  there isn't any declaration by a child or by a parent

12  that because of these atypical expressions, they are

13  now of a different gender or they now need to be

14  accepted as being of a different gender.

15         That's really the problematic aspect of

16  things, is when this notion of gender fluidity starts

17  to come in versus, again, what -- you know, what I

18  think the authors are getting to here, which we would

19  agree with in the Archdiocese, is that in the

20  development -- in child development, there are

21  manifestations of behaviors or interests and likes

22  that could cross the gender lines, if you will,

23  between male and female.

24         And -- but I think where we would

25  separate that from gender confusion is, you know, the

Elias Moo   30(b)(6)
November 27, 2023

Page 182

1  moment that a child starts to say, Well, I am a
2  girl -- if they're a biological boy and say, I'm a
3  girl now because -- or if they're a biological girl
4  and they say, I'm a boy now, and then parents start to
5  say, Yes, this is who they are and so, please, call
6  them by this name, refer to them by these pronouns,
7  let them use the opposite sex restroom, et cetera,
8  et cetera, that's the ideology, that's the problematic
9  piece that the Archdiocese of Denver would have
10  significant issues with.
11          But these atypical and developmentally
12  appropriate expressions that we're discussing here
13  aren't problematic insofar as, again, it doesn't begin
14  to get blurred, ultimately, and we allow nature to run
15  its course without it being blurred by a gender
16  ideology.
17      Q.   And is part of -- strike that.
18          Is the Archdiocese concerned about these
19  types of issues arising with 4-year-olds?
20      A.   Well, which types of issues?
21      Q.   The ones that you just described, where
22  they would cross over from -- let me use the right
23  terminology -- where they would cross over from
24  atypical expressions of masculinity or femininity into
25  areas which would be inconsistent with the Archdiocese

Page 183

1  religious beliefs.
2      A.   Yeah.  Unfortunately, we're seeing a rise
3  in these cases and issues and even at the youngest age
4  groups.  Again, I don't know that we have yet, at the
5  preschool level, had to work through a situation like
6  this yet, at least here in the Archdiocese of Denver.
7          But, yeah.  Is there a concern?  I think
8  there is a concern, given where the culture and where
9  society have trended towards on this.
10      Q.   And you said that this is not something
11  at the preschool level that the Archdiocese has
12  encountered yet?
13      A.   Yeah.  To the best of my knowledge at
14  this point, that's correct.
15      Q.   In terms of the dress code for
16  Archdiocese preschools, are boys and girls typically
17  both permitted to wear pants?
18      A.   Typically, yes.  There will probably be
19  some preschools that might be a little bit more strict
20  on the rules and will actually only allow boys to wear
21  pants and ask that girls wear skirts or dresses.
22      Q.   Are you familiar with Wellspring's dress
23  code?
24      A.   No.  No.  I can't say that I am.
25      Q.   Okay.  We can ask these questions to

Page 184

1  Wellspring.
2          But assuming that the dress code
3  permitted both girls and boys to wear things like
4  pants or shorts, that wouldn't be a problem for the
5  Archdiocese?
6      A.   No.
7      Q.   And, again, atypical expressions of
8  masculinity or femininity wouldn't be an obstacle to
9  enrollment of students or their families for the
10  Archdiocese; is that accurate?
11      A.   Yes.  That's accurate.
12      Q.   I want to go to page 11 of the same
13  document.  And this paragraph that starts with, "When
14  a student experiences distress or conflict over his or
15  her sexual identity," about halfway through that
16  paragraph it says, "The school has discretion to make
17  accommodations, e.g., private access to a private
18  bathroom, in order to address concerns about any
19  student's safety or privacy, while taking steps to
20  ensure that those accommodations are not perceived by
21  other students as an endorsement of the student's
22  asserted identity or of gender ideology's core idea;
23  that a person's authentic identity might differ from
24  biological sex."
25          Do preschools have the ability to offer

Page 185

1  these types of accommodations which are described on
2  page 11?
3      A.   Just to clarify, do they -- for example,
4  are they able to?  Do they have the facilities to do
5  that?  Is that where you're getting at?
6      Q.   If you want to take a second and read the
7  paragraph, I'm just asking whether this paragraph
8  means that preschools have discretion to make certain
9  accommodations around things like bathroom usage.
10      A.   Oh, okay.  Yeah.
11          Yeah.  You know, again, I think this is
12  where taking individual student's situations on a
13  case-by-case basis, it's certainly within their
14  discretion.
15          You know, I think I would read this in
16  the context of the first -- the opening of this
17  paragraph, which is, if we have a student experiencing
18  distress, that distress is a very real thing,
19  especially if there's a diagnosis of gender dysphoria.
20          The dysphoria does cause significant
21  distress and anxiety.  So as with any students that we
22  have who experiences stress and distress or anxiety,
23  gosh, our hope would be that our schools would be
24  responsive and loving towards that child in the moment
25  and allow them the necessary discretion to make

Page 186

1   whatever accommodations are needed to minimize the
2   distress and the anxiety that they're experiencing in
3   a particular moment.
4          But ultimately, here, right, I think if
5   that accommodation is being made, I would also hope
6   that the school is working on other aspects with the
7   family.
8          This would -- this kind of a situation,
9   where the school would accommodate, would also have to
10  come with families being supportive of the school and
11  the church's teaching and the school's position,
12  ultimately, for this to work; otherwise, I think it
13  could fall in what the authors are cautioning here,
14  which is that there could be an endorsement of an
15  asserted identity if the parents and the school are
16  not in lockstep on this, ultimately.
17      Q.   Moving ahead to page 13 of this document.
18  At the very bottom of that page, it says, "We would be
19  remiss if we did not note that the religious liberty
20  claim is strongest when the Catholic school ensures
21  that all of its policies and practices are consistent
22  with the teachings of the Catholic Church and openly
23  conveys its intention to remain faithful to the
24  teachings of the magisterium."
25          What does this paragraph mean?

Page 187

1       A.   Yeah.  I mean, I think this is getting at
2   possible allegations of discrimination against the
3   school, ultimately, and that our schools would not
4   have the -- would be in the strongest position to be
5   able to defend itself against a claim of
6   discrimination if everything that we do in the school
7   is rooted in the teachings of the church and remaining
8   in fidelity to the teaching magisterium of the church.
9          So, again, I think this is -- that is
10  ultimately what's being conveyed from this paragraph.
11      Q.   And you had mentioned the magisterium
12  earlier.  What is the magisterium?
13      A.   Yeah.  So the magisterium is the teaching
14  authority.  It's another phrase for the teaching
15  authority of the church, as carried out and exercised
16  by the pope, in communion with all the bishops as
17  well.
18      Q.   And how do you -- how does the
19  Archdiocese determine what's carried out by the pope
20  and the bishops?
21          MR. DAVIS:  Objection to form.
22      A.   How do we -- how do we determine what's
23  carried out by the pope and the bishops?
24      Q.   (BY MS. CARRENO)  Yeah.  So you said the
25  teaching authority of the church, as carried out by

Page 188

1   the pope and the bishops.
2          And so I'm trying to figure out if that's
3   documentation that the Archdiocese receives.  Are
4   those statements?  Or how does the Archdiocese become
5   familiar with what's carried out by the pope and the
6   bishops?
7       A.   Yeah.  Okay.  Yeah.  There is different
8   degrees of strength of teaching, if you will.  So
9   we'll put it in those terms.
10         So depending on what the -- so primarily
11  it's through documents.  And those documents of the
12  highest degree are going to be encyclical documents.
13         So these are direct statements written by
14  the pope himself that are released to the universal
15  church.  There's apostolic letters.  There are
16  apostolic exhortations, which are another degree below
17  that.
18         There is other documents, teaching
19  documents, that come out from the various departments
20  in the Vatican, and those have teaching authority,
21  too, and so are sent out to various diocese across
22  the -- across the globe.
23         And then more ordinary or common teaching
24  forms would be, yeah, statements or a teaching that
25  the pope gave, for example, at an audience, or

Page 189

1   statements that he -- speeches that he makes at a
2   particular function where he is speaking as the Holy
3   Father, as the pope.
4          Or even bishops who, locally, right --
5   Archdiocese Aquila just recently released an apostolic
6   letter, a pastoral letter on the subject of marijuana,
7   which is, again, a teaching instrument that he has
8   implemented for the faithful in this Archdiocese.
9          So yeah.  Just to give you an example,
10  there's various forms and degrees and levels of
11  teaching and teaching authority and weight that
12  ultimately comes with the various roles, from the pope
13  down to his Curia departments at the Vatican, down to
14  the local bishops overseeing diocese in their
15  respective regions and corners of the world.
16      Q.   So does that guidance or those positions,
17  do they change and evolve over time at all?
18          MR. DAVIS:  I'm going to object as to
19  relevance.  The archbishop is the authoritative
20  interpreter of Catholic doctrine within the
21  Archdiocese of Denver, so I'm not really sure what
22  this line of questioning is getting at.
23      Q.   (BY MS. CARRENO)  And, Mr. Moo, you can
24  answer the question.
25      A.   Yeah.  Your question is, does this

Page 190

1  doctrine develop?
2       Q.   Does it evolve or change over time?
3            You gave me an example of a position on
4  marijuana.  Is that something that may change or
5  evolve over time?
6       A.   Yeah.  So the church -- the church is
7  actually pretty clear in their teaching.  And the
8  catechism in the Catholic Church, if you will, becomes
9  the center point and compendium of what is true and
10  good and needs to be adhered to and abided by and
11  believed by believers and by faithful Catholics.  And
12  so in some way, that serves as the foundation,
13  ultimately, for anything else.
14            There are subjects or matters of
15  prudential judgment, but ultimately -- one of the
16  principles that's present in the church, ultimately,
17  is that all these must be looked at in a hermeneutic
18  of continuity, we would say.  And that's that, you
19  know, from pope to pope even, teaching is built, and
20  the moment that a teaching begins to undermine or
21  contradict something that has been a longstanding
22  foundation or belief and is not respectful of
23  tradition, that's not -- that is actually something
24  that can't be accepted.
25            So I suppose it develops insofar as it

Page 191

1  allows us to be able to gain a better -- a more
2  coherent understanding of how the truths of the faith
3  apply to circumstances and realities of the current
4  time.
5            But it would actually be a violation of
6  the faith to make a 180-degree reversal on something
7  that the church has long taught.  And if it seems to
8  come as an evolution or development out of -- yeah,
9  maybe out of nowhere, that's not consistent or inline
10  with church teaching and the church's long-standing
11  tradition.
12            So, yeah.  I suppose that's what I would
13  offer there.  Development and evolution are terms,
14  though, that don't really capture, I think, again, the
15  sense of continuity that the church is constantly
16  striving for and reaching for.  And you see this sense
17  of continuity.
18            We would understand a teaching within the
19  context of other teachings in continuation and
20  consistent with other teachings that have come before.
21  So what the Holy Father Pope Frances teaches is
22  building on what Benedict taught and what John Paul II
23  taught and John Paul I and Paul VI, et cetera,
24  et cetera.
25            And so they would be -- I would -- I

Page 192

1  can't speak for the Holy Father, but I think you could
2  see in his own writings and his teaching a reference
3  document that speaks to this continuity.
4            But they don't have an authority to go
5  back and all of a sudden make a change and decide to
6  make a change or develop something because it
7  doesn't -- it doesn't necessarily gel with what's
8  happening in the present moment.  So yeah.  So I
9  suppose I would offer that there.
10       Q.   Okay.  And I just have a couple more
11  questions and then we'll take a break.  I know we've
12  been going for kind of a long stretch here.
13            We had asked some interrogatory
14  questions, that you had signed off on, about any
15  instances in the last five years in which any of the
16  Plaintiff preschools denied a preschool applicant's
17  request or their family's request or denied some type
18  of an accommodation regarding gender identity, sexual
19  orientation or things like pronouns or bathroom
20  facilities.
21            And the answer was that none of the
22  Plaintiffs were aware of any of these instances
23  happening in Plaintiff preschools over the last five
24  years; is that correct?
25       A.   Yes.  That's correct.

Page 193

1       Q.   On page 16 of the same document that
2  we've been looking at, the first full paragraph on
3  that page says, "Accordingly, the school should be
4  attentive to situations that might cause confusion
5  about the nature of marriage.  In these situations,
6  the school should seek guidance from the diocese which
7  can assist them in assessing the possibility of
8  enrollment."
9            Is this referring to things like same-sex
10  couples or the examples regarding asserting different
11  gender identity that you had given before?
12       MR. DAVIS:  Virginia, I think if you
13  scroll down the paragraph, it will tell you what it's
14  referring to.
15       Q.   (BY MS. CARRENO)  And, Mr. Moo, are you
16  able to answer that question?
17       A.   Yes.  It's referring to same-sex couples.
18       Q.   I'm sorry.  I think I mispronounced your
19  name now, Mr. Moo.  Apologies.
20            And so according to this guidance, if
21  that was the situation that came up at one of the
22  Archdiocese preschools, the guidance is that that
23  preschool should reach out to the Archdiocese for
24  further discussion; is that correct?
25       A.   Yes.

Elias Moo  30(b)(6)
November 27, 2023

Page 194

1    Q.   And to the best of your knowledge,
2  neither of the Plaintiff preschools has reached out to
3  you regarding that situation in the last five years?
4    A.   For their preschool programs, no.
5         MS. CARRENO:  Okay.  And I think now is a
6  great time to take a break.  Do you want to come back
7  at 3:00?
8         MR. DAVIS:  Yes.  Sure.
9         THE DEPONENT:  Yes.
10         THE REPORTER:  Off the record.
11         (Recess from 2:42 p.m. to 3:01 p.m.)
12         THE REPORTER:  Back on the record.
13    Q.   (BY MS. CARRENO)  And, Mr. Moo, I just
14  want to back up a little.  You said a bunch of times,
15  when we were talking about the guidance on -- guidance
16  for issues concerning the human person and sexual
17  identity, that the Archdiocese schools and the
18  Archdiocese would make decisions on a case-by-case
19  basis.
20         Can you tell me a little bit more about
21  what you mean by that?
22    A.   Yeah.  We have found that it would,
23  actually, in one sense be really difficult and in
24  another not, just to be able to have one policy that's
25  black and white and addresses the complexities of

Page 195

1  issues pertaining to, again, gender identity, sexual
2  identity.
3         So we have a very clear foundation of
4  church teaching, is what we believe.  The guidance
5  itself provides a sense of what that foundation --
6  what the implications of that foundation and the
7  church's teaching would be.
8         And that's the starting point for them
9  looking at each situation and determining what is
10  there.  How can the school work with the situation?
11  Where can it not?  And then working with pastors and
12  school leaders who, ultimately, can discern the right
13  course of action.
14         Yeah.  So I think when we refer to case
15  by case, that's precisely it.  That when an issue
16  arises in this realm, that we want to treat the
17  situation not necessarily as a problem to be solved
18  but really as a family or child situation to be worked
19  with, and then for it to be determined the extent to
20  which the school can move forward with the situation.
21    Q.   And the example that -- one of the
22  examples that we talked about was a child that might
23  be in distress over usage of the restroom.  And you
24  had said that, you know, the school would need to --
25  potentially the Archdiocese would need to look into

Page 196

1  that further.
2         How would the Archdiocese or the
3  preschool look into that type of situation further?
4    A.   Yeah.  The process would be -- again, it
5  would be a process.  And it primarily -- so to be
6  clear, the Archdiocese would not be driving this
7  process.
8         We would expect the school, the local
9  school leadership, to really drive it, and that being
10  the school principal, principal/director, the pastor,
11  all involved and all understanding and ascertaining
12  what's presenting.
13         What do the parents think about it?  What
14  are their thoughts?  What are their requests?  What
15  type of support is this child receiving?  Is this a
16  diagnoses of dysphoria?  Have they been receiving
17  mental health support?
18         So trying to really kind of understand
19  all the different aspects of the situation, right?
20  But that's not -- that's happening through dialogue.
21  That's happening through dialogue, again, at the local
22  level with the leadership of the school.
23         So our Archdiocesan officials are not the
24  ones coming out and engaging in the investigation or,
25  you know, talking to the kids or talking to the

Page 197

1  families.
2         Really, the onus is placed on the local
3  school leadership, and our role is to work with school
4  leadership, accompany them and discern with them, as
5  they ascertain the facts of a particular situation,
6  ultimately.
7    Q.   And you said that the Archdiocese
8  wouldn't conduct an investigation.  But does that mean
9  that the school might conduct an investigation?
10    A.   Yeah.  Sure, they would.  And, here
11  again, I would say the hope would be that they're
12  not -- you know, that this is more a result from the
13  fruits of dialogue with the parents of the child.
14         So that's what I would qualify here as an
15  investigation, is to look into it and get all the
16  facts of the situation, but, yeah, through dialogue,
17  more than anything else.
18    Q.   And you had mentioned also that
19  Archdiocese preschools typically need to have a
20  meeting with the family before they can enroll a
21  child; is that correct?
22    A.   Yeah.  It's a typical practice.  We don't
23  mandate that practice in policy.  We ask schools to
24  ascertain that families can meet the minimum
25  requirements of their program.

Elias Moo   30(b)(6)
November 27, 2023

Page 198

1        And so they do that a variety of ways.
2    They could do that through the application process
3    itself.  They can do that through interviews, which I
4    believe there to be some schools that do ask families
5    to interview before admission.
6        So -- but, yeah.  We don't -- we don't
7    necessarily mandate an interview, so to speak.
8    **Q.   And if, during the application process or**
9    **the interview process, the school determined that**
10   **there might be some type of conflict with either the**
11   **potential student or their family that would interfere**
12   **with the Archdiocese or the preschool's sincerely held**
13   **religious beliefs, how should the preschool further**
14   **look into that?**
15       MR. DAVIS:  Objection.  Calls for
16   speculation.
17       A.   Yeah.  Again, I think it would be -- so
18   if something comes up in conversation or that process,
19   right, the hope would be that the school would look
20   further into it with the parents themselves.
21       And, you know, one of the -- one of the
22   methods that we recommend, again, it's not mandated,
23   but that we would recommend to our schools is to be
24   pretty upfront and very clear with what the school
25   believes, what the school expects of families, what

Page 199

1    the school is going to uphold and abide by, what the
2    school invites the family into, ultimately, as part of
3    being in the Catholic school and part of the Catholic
4    community at that school.  And that through that
5    clarity, that families would be able to identify,
6    ultimately, if this -- that school is the right fit
7    for them.
8        So sometimes that means that school
9    leadership has to be very clear and say, You know, it
10   sounds like there might be something incongruous with
11   our world view and our teaching here and this may not
12   be a good fit.
13       Other times it could be, you know, Hey,
14   we heard this.  Bottom line, to be part of the
15   community, this is what we would expect and it's up to
16   you to determine if you can enter into this with us,
17   knowing that that's the expectation.
18       So, yes.  So, again, I think it -- you
19   know, I wouldn't say there's an immediate desire for
20   them to kick people out or to be able to, say, close
21   the door on them right away just because they happen
22   to say, Well, I don't agree with this particular thing
23   in the church teaching.
24       It's really going to come down to,
25   ultimately, to what extent is a family willing to,

Page 200

1    again, at the very least, not undermine the church's
2    teaching, but then be open to supporting what the
3    school is going to be providing the child, ultimately.
4        And if they're willing and they're making
5    a good faith effort to be open, then -- yeah, then
6    schools would be open to them.
7        But if it becomes clear that they're
8    going to persist in a particular way or be
9    adversarial, then, yeah, I guess the expectation would
10   be at that point that the school would say, you know,
11   This isn't a good fit for you.
12   **Q.   (BY MS. CARRENO)  Are there situations**
13   **where the family decides that the school is not a good**
14   **fit for the family?**
15       A.   Yeah.  I mean, I've heard from principals
16   that there certainly have been situations like that.
17   **Q.   And are there situations where it's**
18   **mutual that both the family and the school decide that**
19   **it's not a good fit?**
20       A.   Yeah.  No.  I can't really think of any
21   specific ones on that point.  But, yeah.  I think it's
22   happened.
23   **Q.   Are there reasons, other than the reasons**
24   **that we've already discussed in terms of gender**
25   **identity and sexual orientation, where the school**

Page 201

1    **would determine that a family might not be a good fit**
2    **for that school?**
3        A.   Yes.  So we do have a policy that gives
4    schools discretion to make that determination if the
5    parents' behavior ultimately is undermining the
6    mission and aims of the school program.
7        So that could be for any variety of
8    behavior, including, you know, aggressive and
9    adversarial behavior towards school leadership or
10   towards a classroom teacher.  It could be for
11   undermining school policy and, you know, all matters
12   of policy, right?
13       So, yeah.  So there's -- there's plenty
14   of spaces outside of this particular realm of gender
15   identity and sexual identity matters where a school
16   could make that determination, ultimately, if the
17   parental behavior was incompatible with the school's
18   beliefs and values and policies.
19   **Q.   I want to switch gears and talk a little**
20   **bit about enrollment numbers and trends at Archdiocese**
21   **preschools.**
22       **Does the Archdiocese keep track of the**
23   **enrollment numbers of Archdiocese preschools or any of**
24   **the Archdiocese preschools?**
25       A.   Yeah.  So we, going back to about 2018,

Elias Moo   30(b)(6)
November 27, 2023

Page 202

1  started to track that.  Prior to that, it was really
2  sporadic and not consistent, but in kind of a
3  self-recording fashion.  So we ask schools to submit
4  their numbers, preschool enrollment numbers to us.
5         We, in the early -- in 2018, 2019 -- so
6  take a step back.  Every October, as is typical for
7  most schools, public and private, there's official
8  student counts and you have to complete spreadsheets
9  that they submit to us.
10        Generally speaking, right, that has been
11 really focused on kindergarten through 8th grade.  We
12 started to add a preschool category.  Some schools
13 provided that early on; others did not.
14        But I could tell you, at least the last
15 two to three years, to the best of my recollection, we
16 have pretty -- we have pretty solid numbers coming
17 from all our preschool programs.
18     Q.    And so that's something that the
19 Archdiocese tracks, at least since 2018, 2019?  Is
20 that what you said?
21     A.    Yeah.  Since about that time, if I'm
22 recalling correctly, yes.
23        MS. CARRENO:  And, Mr. Davis, do you know
24 if, when discovery responses were provided, that
25 was -- if -- I don't believe we were provided

Page 203

1  enrollment numbers for all 36 schools from the
2  Archdiocese, but it sounds like that's something that
3  they would have.
4         MR. DAVIS:  My recollection was that the
5  interrogatory only asked about the two Plaintiff
6  preschools, but we can -- we can discuss that further.
7         MS. CARRENO:  Okay.  And I can't remember
8  so that's something that we'll come back to.  And so
9  your recollection is it was just -- what was provided
10 was just for the two Plaintiff preschools?
11        MR. DAVIS:  Yeah.  That's my
12 recollection.  I think this is in the context of the
13 interrogatories and interrogatory responses.
14        MS. CARRENO:  Okay.
15     Q.    (BY MS. CARRENO)  And so I think that you
16 said, Mr. Moo, that the preschools fill something out
17 and report those numbers back to the Archdiocese.
18        Did I understand that correctly?
19     A.    Yes.  That's correct.
20     Q.    And then are those kept in a spreadsheet
21 or how are those numbers kept?
22     A.    Yeah, in a spreadsheet.
23     Q.    And so -- and that's for just the
24 36 Archdiocese preschools or does that include other
25 schools as well?

Page 204

1     A.    Yeah.  No.  This is our general
2  demographic report for all schools.  But, yeah, there
3  is a preschool component or section, if you will.
4     Q.    Okay.  And so we had talked about some of
5  the different types of Catholic schools and the
6  distinction of schools like -- I keep forgetting --
7  the other St. Mary's.
8         Does the spreadsheet contain information
9  for those schools as well or just the 36 preschools
10 within Archdiocese?
11     A.    Yeah.  I do believe that we also receive
12 demographic information from those independent
13 schools.  So the National Catholic Education
14 Association is a national organization that collects
15 this type of enrollment data to report out on every
16 year.
17        And we're -- the Archdiocese of Denver
18 Office of Catholic Schools is the central hub for that
19 data to report to the National Catholic Education
20 Association or the NCEA, in short.
21        So those independent schools, I believe,
22 if I'm recalling the data correctly, do report their
23 general enrollment numbers to us so that we can report
24 to the NCEA.
25        I don't know -- I don't have the

Page 205

1  spreadsheets in front of me, so I couldn't tell you in
2  what manner they're disaggregated, but I do know we
3  have -- I do think we have some enrollment numbers
4  even for those independent Catholic schools.
5     Q.    And that's the National Catholic
6  Education Association or NCEA?
7     A.    Yes.  That's correct.
8     Q.    The Archdiocese and the plaintiffs stated
9  in the pleadings that the Archdiocese serves over
10 1,500 preschoolers.
11        Do you know how many preschoolers were
12 enrolled in Catholic preschools this year?
13     A.    How many preschoolers were enrolled in --
14     Q.    Catholic preschools this year.
15     A.    Catholic preschools this year.  Yeah.  I
16 don't have the number in front of me.  It's -- it's
17 not too far off from the 1,500 figure that you've
18 received, but we just wrapped up the official count
19 for this year.  But, yeah.  I just don't have that
20 number off of memory.
21     Q.    Okay.  And would that number be on the
22 spreadsheets that you referenced?
23     A.    Yes.
24     Q.    And numbers going back to either 2018 or
25 2019?

Elias Moo   30(b)(6)
November 27, 2023

Page 206

1    A.   Yep.  Yep.  So we would have the numbers
2  from the -- any year we've collected preschool
3  information.
4    Q.   And that 1,500 number, would you say that
5  that's been pretty consistent since 2018 or 2019?
6    A.   You know, we actually -- we actually saw
7  an increase right after COVID.  Preschool and
8  kindergarten actually saw the largest increase in
9  enrollment, unfortunately, due to the fact that many
10  public preschool programs were closed for an extended
11  period of time, and the Catholic preschools chose to
12  remain open in the fall of 2020.
13        So we saw a good bump that year, from my
14  recollection, of the numbers; but otherwise, since
15  then, it's -- it's held pretty steady.
16    Q.   And then did you say that after that
17  increase, when the public schools opened back up, then
18  there was, unfortunately, a decrease?  Did I hear that
19  correctly?
20    A.   No.  No.  No.  To the best of my
21  recollection, it remained steady.  I don't think we
22  saw any significant decrease or increase.  Just
23  remained steady.
24    Q.   Okay.  And that was in just preschools or
25  in Catholic schools generally?

Page 207

1    A.   Yeah.  In Catholic schools generally,
2  yeah.
3    Q.   Any other causes, that you can think of,
4  or issues that may have contributed to enrollment
5  decreases in Catholic preschool numbers in recent
6  years?
7        MR. DAVIS:  Objection to the extent it
8  calls for speculation.
9    A.   No.  I mean, nothing of significance,
10  like a pandemic, for example.  You know, general
11  enrollment trends are always impacted by local --
12  local circumstances and situations and there could
13  well be some trends at individual schools based off of
14  maybe some instability in leadership or turmoil in the
15  community.
16        But, you know, that's par for the course.
17  And yeah.  But in terms of a general circumstance that
18  has led to a significant across-the-system trend, no,
19  nothing else that I can think of right now.
20    Q.   (BY MS. CARRENO)  And you broke up a
21  little bit.  What were the two examples of local
22  trends that you mentioned?
23    A.   Yeah.  Leadership instability.  So
24  sometimes we've seen at schools that when there's
25  leadership transitions or challenges, that that can

Page 208

1  result in enrollment decline or, you know, turmoil in
2  the community.  And, you know, that could be defined a
3  number of ways.
4        But, yeah.  Those are one-offs that can
5  happen from time to time in the school world.
6    Q.   Do you -- are you aware of whether
7  St. Mary's or Wellspring has struggled with decreased
8  enrollment in the last five years?
9        MR. DAVIS:  Objection.  Calls for
10  speculation.
11    A.   Yeah.  Not -- not at St. Mary's in
12  Littleton.  Wellspring is actually a reboot program
13  from a previous school that was shut down in 2018, the
14  spring of 2018, and remained closed for a year.
15        So it remained closed for the '18/'19
16  school year and then reopened in the fall of 2019 as
17  Wellspring Catholic Academy.  So you would have seen,
18  at that point, some fluctuation just by virtue of the
19  fact that a school program was closed or paused
20  temporarily and then reopened a year later.
21        But, yeah.  But otherwise, in the history
22  of that school, that would be the one thing to point
23  out.
24    Q.   (BY MS. CARRENO)  Do you know if any of
25  the Archdiocese preschools have raised their tuition

Page 209

1  in the last year?
2        MR. DAVIS:  Objection to the extent this
3  is outside the scope of the 30(b)(6) notice.
4    A.   The what?  I'm sorry.  What did you say
5  before tuition?  It cut off there.
6    Q.   (BY MS. CARRENO)  Yes.  Do you know if
7  any of the Archdiocese preschools have raised their
8  tuition for this school year?
9        MR. DAVIS:  Virginia, to the extent
10  this -- I mean, I don't see this in the 30(b)(6).
11  You're free to ask Elias, in his, you know, individual
12  capacity in that deposition.
13        MS. CARRENO:  Yeah.  And just to be
14  clear, I believe this goes to Topic 14.  I'm just
15  exploring whether -- the enrollment trends and
16  enrollment at different Archdiocese schools and
17  whether there may be some correlation between tuition
18  and those numbers.
19        MR. DAVIS:  I don't think the witness is
20  prepared to speak about tuition on the behalf of the
21  Archdiocese as a whole.  If he wants to answer in his
22  individual capacity for the deposition, I think that's
23  fine.
24        MS. CARRENO:  Can we go off the record
25  for one minute?

Elias Moo   30(b)(6)
November 27, 2023

Page 210

1    THE REPORTER:  Is that fine, Joe?
2    Are you okay with going off the record?
3    MR. DAVIS:  Yes.
4    THE REPORTER:  Off the record.
5    (Discussion off the record.)
6    THE REPORTER:  Back on the record.
7    MS. CARRENO:  So we disagree --
8    obviously, it sounds like we disagree on whether this
9    is within the scope of the 30(b)(6) or not.  But to
10   the extent that Mr. Moo can answer the question in his
11   personal capacity, we would ask that he do it as part
12   of this deposition.
13       Q.    (BY MS. CARRENO)  Mr. Moo, you can go
14   ahead --
15       MR. WHITEHAIR:  Hold on.  Joe's not on.
16       MS. CARRENO:  Joe, were you saying
17   something?
18       THE REPORTER:  Joe, you're muted.
19       MR. DAVIS:  No.  I wasn't saying
20   anything.
21       Q.    (BY MS. CARRENO)  Okay.  Mr. Moo, do you
22   need me to repeat the question?
23       A.    Yes, please.
24       Q.    Okay.  Have any of the Archdiocese
25   preschools raised their tuition for this school year?

Page 211

1        A.    Raised their tuition for the school year.
2    Yes, I believe they have.  I don't have the
3    information, the data in front of me to be able to
4    tell you how many.  But generally speaking, schools
5    are raising their tuition to, you know, at the very
6    least cover the rising rates of inflation.
7        So you're going to see a gradual
8    increase, at the very least, every year, as expenses
9    go up every year, naturally.
10       Q.    In your declaration, you have said -- in
11   your August declaration you said, "When Archdiocese
12   preschools have a wait list, they prioritize Catholic
13   families active at parishes within the Archdiocese
14   over non-Catholic families."
15       What did you mean by that?
16       A.    Yeah.  You know, it's one of the criteria
17   that can be put in place when the school is in the
18   fortunate situation of having a wait list, and that
19   being that, you know, as soon as the class is full,
20   then those families on the wait list would be given
21   priority according to, you know, a certain set of
22   criteria.
23       And one set of criteria that schools can
24   employ is that affiliation, Catholic affiliation,
25   where that's -- as parishioners at the parish that has

Page 212

1    the school or affiliation with another parish, let's
2    say.  And then there might be nonaffiliated people who
3    say they're Catholic but aren't necessarily involved
4    or active in the parish.  And then there's others who
5    are not Catholic that, you know, again, might fall at
6    a lower level of priority, ultimately.
7        So, additionally, too, you know, if they
8    have siblings at the school, that could be another
9    layer of the criteria that bumps them up on the wait
10   list.  So just for the purpose of filtering the
11   families on the wait list and being able to give
12   priority if spots were to open up.
13       Q.    How often -- you said if schools are
14   fortunate enough to have a wait list.  How often do
15   Archdiocese schools have a wait list?
16       A.    Yeah.  Not very often, unfortunately.  It
17   would be a great problem to have.  But by and large, I
18   think we see we have a lot of empty seats still in our
19   schools, particularly our preschool programs.
20       Q.    So does that mean that the Archdiocese
21   does not prioritize enrolling Catholic families active
22   at parishes within the Archdiocese over non-Catholic
23   families when there's not a wait list?
24       A.    Yeah.  That's correct.  I mean, I think
25   all families are given an equal shot, if you will, at

Page 213

1    enrollments if there's not that wait list, yeah,
2    especially if there's empty seats to be filled,
3    usually on a first-come first-serve basis.
4        Q.    When you are talking about Catholic
5    families active at parishes within the Archdiocese,
6    can you tell me what that means?
7        A.    Yeah.  That can mean a couple things;
8    one, that they are registered contributing members of
9    a Catholic parish community.  So that could mean that
10   they have physically completed their registration
11   form, where they sign up as parishioners at that
12   parish.
13       Oftentimes that means that they're
14   tithing on a regular basis, so there's a record of
15   donations and tithing that's coming to that parish.
16       And sometimes it could mean that it's
17   families that live in the geographic boundaries of
18   that particular church or parish as well.  So those
19   are -- those are the ways that we would use the term
20   "parishioner" here.
21       Q.    So if the term "parishioner" -- I just
22   want to go to the definition that you provided.
23       A parishioner is considered Catholic
24   individuals residing in the geographic boundaries of
25   the parish or who are registered with the parish,

Elias Moo  30(b)(6)
November 27, 2023

Page 214

1  typically by submitting basic demographic information
2  to the parish's office.
3       A.   Right.
4       Q.   So it could be either of those situations
5  that a family or a person would be considered a
6  parishioner?
7       A.   Yes, largely speaking.  Generally
8  speaking, yes.  I think if we're -- if we're talking
9  about, you know, criteria for verifying the extent to
10  which someone is active, it would be a bit different.
11  But the term "parishioner," yes, would be qualified as
12  such.
13       Q.   According to the documents submitted by
14  Plaintiffs in this case, the Archdiocese is a
15  spiritual home to roughly 610,000 Catholics, across
16  149 parishes, stations, and mission parishes in
17  Northern Colorado.  Is that accurate?
18       A.   Yes.
19       Q.   And those 610,000 Catholics, where does
20  the Archdiocese -- how does the Archdiocese obtain
21  that information?
22       A.   Yeah.  So there is -- there is a couple
23  of ways that that's gathered.  One would be there's an
24  annual parish count.  So similar to schools, there's a
25  day in October that all parishes are asked to count

Page 215

1  the number of people that are present at the
2  celebration of the Holy Mass on a given weekend.  And
3  that data is collected by the Archdiocesan leadership.
4       Since this data is also used here -- and
5  I believe that's probably what has accounted for the
6  610,000, ultimately.  Because the term "Catholic"
7  really doesn't necessarily imply attendance at Mass as
8  much as it implies there's affiliation, ultimately.
9       So I think the census data is ultimately
10  what's used and refined by the geographic -- or
11  defined -- excuse me -- by the geographic boundaries
12  of the Archdiocese itself.
13       So, yeah.  Those are the two means I know
14  of data collection that exists to verify the number of
15  Catholics, but then also participation.
16       Q.   And so all 610,000 of those Catholics, as
17  I understand, are not necessarily associated with a
18  parish or a church; is that correct?
19       A.   Yeah.  I don't know that we could say
20  that.  My understanding is those 610,000 are people
21  who affiliate as Catholic.
22       Q.   And in determining who affiliates as
23  Catholic is how you just described, the census data
24  and the other data that's reviewed?
25       A.   Yep.

Page 216

1       Q.   The 610,000 Catholics across 149
2  parishes, stations, and mission parishes.  What is a
3  parish?
4       A.   A parish is a geographic area that is
5  overseen by a pastor.  Oftentimes, it has a church
6  structure that serves as the church of that parish.
7  Or, you know, the term "parish" sometimes has become
8  synonymous with church or vice versa.
9       But technically speaking, according to
10  how church law defines parish, it would be this
11  geographic area that is placed under the spiritual
12  care of a parish pastor who's appointed by the
13  archbishop.
14       Q.   What is a station?
15       A.   My understanding of a station is it's a
16  location where Mass, the Holy Mass, can be offered and
17  celebrated but is not a permanent community of faith.
18       Q.   And what is a mission parish, as opposed
19  to just a parish?
20       A.   Yeah.  So mission is typically a part of
21  a parish and may offer limited -- a limited number of
22  Holy Masses or other sacramental opportunities, but is
23  not the primary place of worship for that geographic
24  area.
25       So, yeah.  There's a number of locations

Page 217

1  like that, where there could be these mission
2  locations.  They're usually chapels or perhaps other
3  churches that just didn't have the faithful -- or the
4  number of faithful to be able to carry out regular
5  service and so forth and so it got relegated down to a
6  mission status.
7       It's a categorization that exists in
8  church law for a particular situation.
9       Q.   So based on the definition of a
10  parishioner, that we just went over, individuals just
11  have to be Catholic and live within the geographic
12  boundary of a parish to be considered a parishioner?
13       A.   Yes.
14       Q.   Do you know if those members, the 610,000
15  Catholics within the Archdiocese territory, have gone
16  up or gone down in the last five years?
17       A.   Yeah.  That, I don't know.
18       Q.   Do you have any idea if there have been
19  any fluctuations in those numbers?
20       A.   Any idea of what?  I'm sorry.
21       Q.   Any fluctuations in those numbers.
22       A.   No.  No.  I can't say even that I know if
23  there's been fluctuations.  My general impression is
24  that it's been steady.
25       Q.   Does the Archdiocese keep track of those

Elias Moo   30(b)(6)
November 27, 2023

Page 218

1  numbers?

2       A.   Of the numbers of the faithful, Catholic
3  faithful?

4       Q.   **The Catholic parishioners within the**
5  **Archdiocese boundaries.**

6       A.   Oh, the parishioners.  Yeah.  So every
7  parish keeps track of its parishioner base.  And I
8  believe, if I'm recalling correctly, the
9  vicar-general, Father Dollins, who I mentioned in that
10  annual report that's submitted, is the one who keeps
11  track of, again, the count of people coming to Holy
12  Mass and also the number of registered parishioners at
13  that parish.

14       Q.   **That was the National Catholic Education**
15  **Association or was that something else that you**
16  **mentioned?**

17       A.   No.  Yeah.  The National Catholic
18  Education Association is only tracking national
19  school -- Catholic school enrollment numbers, yeah,
20  not parishioner information.

21       Q.   **Got it.  And can you clarify what you had**
22  **mentioned, where that information might be available**
23  **or where that information might be tracked?**

24       A.   On parishioners?

25       Q.   **Yes.**

Page 219

1       A.   Yeah.  So, again, there is a day in
2  October that the Archdiocese asks all parishes to do a
3  count, submit a count of the number of people that
4  came to Mass in that given -- in that given weekend.
5  So that becomes the official count, Mass count, it's
6  called, for the year.

7            And with that, I believe is also
8  submitted the number of registered parishioners.  It's
9  not a spreadsheet I have access to.  That's kept in
10  another department with the vicar-general.  Excuse me.

11       Q.   **The vicar-general, that's Father Dollins?**

12       A.   Yes.  Correct.

13       Q.   **And do you know whether the number of**
14  **Catholic parishioners has gone up or gone down or**
15  **generally stayed the same in the last five years?**

16       A.   Yeah.  My impression is that it's
17  generally stayed the same.  As you know, as I was
18  describing with schools earlier, fluctuations at
19  individual parishes based on local circumstances and
20  realities.  But, yeah, I wouldn't be able to speak to
21  exact trends at this point.

22       Q.   **Does the Archdiocese use the term**
23  **"congregation"?**

24       A.   Not as an official category.  Maybe at an
25  informal discussion or when referring to the members,

Page 220

1  the parishioners or the members of a parish.  But
2  congregation isn't typically a term -- I don't know to
3  what extent it might appear even in official
4  documents, but it's not a typical term.

5       Q.   **Okay.  So it sounds like a parish is a**
6  **more common term within the Catholic Archdiocese than**
7  **congregation?**

8       A.   Yes.  Yeah.  I would say so.

9       Q.   **Are any -- does the Archdiocese allow --**
10  **let's strike that.**

11            **How does someone join a parish?**

12       A.   Yeah.  So, again, the simplest way is
13  they start showing up on Sundays.  They start to
14  attend Mass, attend parish events.  To be officially
15  registered, they'll go to -- they'll complete an
16  online form or go to the parish office and sign up
17  with some demographic information on their family.
18  They'll start receiving the sacraments at that parish.

19            So that's generally how folks become
20  parishioners.  It's largely through their attendance,
21  but also through the registration process and also
22  through tithing at that location.

23       Q.   **Are same-sex couples allowed to join**
24  **Archdiocese parishes?**

25       A.   You know, I have not seen a rule that

Page 221

1  does not permit them to join.  I think the question
2  becomes to what extent are they able to participate in
3  a life of the parish, but that's a matter that pastors
4  are going to ultimately have to discern.

5       Q.   **What about transgender individuals?  Are**
6  **they -- is there any restrictions on transgender**
7  **individuals joining Archdiocese parishes?**

8       A.   Yes.  Similarly, I don't think there
9  exists a rule that says that a transgender individual
10  cannot be part of a parish community.  The question is
11  really going to come down to, to what extent can they
12  participate in the life of the parish community?

13            I might, add, too, the distinction for
14  both of these situations that the Holy Mass is open to
15  anyone that wants to be there and participate at the
16  Mass.

17            That's the prime place where we believe
18  that we encounter Jesus Christ and come to adore and
19  worship him.  And that's a place of refuge for all
20  sinners and all people.  And so a same-sex couple and
21  a transgender person can -- yeah, can come to Mass.

22            So no one is going to be barred from
23  coming and participating in the holy sacrifice of the
24  Mass, ultimately.  But I think, you know, with respect
25  to then, from there, activity in the life of the

Elias Moo   30(b)(6)
November 27, 2023

Page 222

1 parish, involvement with ministries, that sort of
2 thing, that's probably where there's going to be some
3 discernment made by the pastor ultimately.
4 　　　Q.　And you had mentioned that one of the
5 ways that an individual might join a parish is they
6 would start receiving the sacraments.
7 　　　　　Is that something that a same-sex couple
8 or a member of a same-sex couple would be able to
9 participate in or receive?
10 　　　A.　Yeah.　That, I think, is ultimately going
11 to need to be determined by a pastor discerning with
12 that same-sex couple, let's say.
13 　　　　　So the sacrament of marriage is not going
14 to be possible for them to receive.　The church is
15 pretty clear on the fact that marriage cannot exist in
16 sacramental form between two people of the same-sex.
17 　　　　　The sacrament of baptism is going to be
18 also one that is going to come down to a discernment
19 on what the Vatican has instructed on multiple
20 occasions, which is that there has to be well-founded
21 hope that the child will be raised in the faith.
22 　　　　　And at least locally here, the directive
23 that pastors have received from Archbishop Aquila is
24 that this is a matter to be discerned very seriously
25 and with their use of prudence, ultimately.

Page 223

1 　　　　　You know, some of the other sacraments,
2 the sacrament of reconciliation is available to all
3 who are seeking contrition -- who have contrition and
4 are seeking forgiveness for their sins.
5 　　　　　So, yeah.　That wouldn't be withheld from
6 someone who's in a same-sex relationship.　But, you
7 know, for the graces of the sacrament to be made
8 available to that person, they would have to also
9 resolve to not persist in the sin, ultimately, that
10 they're confessing.
11 　　　　　So those are some examples.　But, again,
12 you know, I can speak generally here with respect to
13 what might be possible based on church teaching, but
14 by and large, these are situations that are going to
15 need to be discerned and discussed with a local pastor
16 and his parishioner, even if that member of the
17 community happens to be a person or, let's say, a
18 couple that's a same-sex couple or a person who's in a
19 same-sex relationship.
20 　　　Q.　And you mentioned that for baptisms, it
21 comes down to -- or maybe one of the factors comes
22 down to what the Vatican has instructed on baptism.
23 　　　　　Did I get that correct?
24 　　　A.　Yes.
25 　　　　　MR. DAVIS:　Objection as to relevance.

Page 224

1 This case is not about baptism or sacrament of
2 marriage or confession or any other sacraments.
3 　　　Q.　(BY MS. CARRENO)　You can answer,
4 Mr. Moo.
5 　　　A.　Yes.　I had said yes.
6 　　　Q.　Are you aware that the Vatican made an
7 announcement, on November 8th of 2023, that
8 transgender people can be godparents at baptisms and
9 be baptized themselves?
10 　　　A.　Yes.
11 　　　Q.　And would that have an impact on
12 decisions that the Archdiocese make?
13 　　　A.　No.　And, frankly, because there -- there
14 hasn't been a change in church teaching on the matter.
15 　　　Q.　So would you agree that transgender
16 people are able to be godparents at baptisms?
17 　　　　　MR. DAVIS:　He just --
18 　　　A.　I'm sorry.　Can you restate your
19 question?
20 　　　Q.　(BY MS. CARRENO)　Yes.　The question was,
21 would you agree that transgender individuals can be
22 godparents at baptisms in the Catholic Archdiocese,
23 Denver Archdiocese?
24 　　　　　MR. DAVIS:　Objection as to relevance.
25 　　　A.　My understanding of the response is that

Page 225

1 the Dicastery for the Doctrine of the Faith, that was
2 submitted by a priest from Brazil, which you're
3 referring to here, is that it could be possible if --
4 and I think there's a large if here -- again, this is
5 where, as I mentioned earlier, some of the media
6 headlines have -- and, well, probably can't expect, I
7 think, media headlines to fully kind of understand the
8 continuity of theology here on this matter ultimately.
9 　　　　　But the responses to the questions that
10 were submitted on this topic refer back to the
11 conditions for a transgender person, let's say, to be
12 a godparent would also be the ones that would be
13 imposed on any person.
14 　　　　　And that's -- but they also say very
15 clearly that caution must be taken to ensure that
16 scandal is not -- that this isn't a cause for scandal
17 or confusion in the community.
18 　　　　　So I think my sense is that what the
19 Vatican here is doing is really saying that, yeah,
20 there could be a circumstance where, let's say,
21 there's a person who's undergone surgery and because
22 of that right, a biological male now appears to be
23 female; thus, maybe characterized as transgender, but
24 has repented of a lifestyle that's incongruent with
25 the church's understanding of the nature of the human

Page 226

1 person and is actively trying to live their life in
2 conformity with church teaching, which is one of the
3 requirements for being a godparent, that they would be
4 able to accompany parents in the instruction of the
5 faith and in giving witness to the truths of the
6 faith. But if that person, right, happens to be
7 pursuing being -- in living in a manner consistent
8 with the church's teaching, that it could be
9 permissible for a pastor to allow them to be
10 godparents.
11        So, if anything, I think it's -- it's
12 providing clarity on a particular way to approach it,
13 but not creating a universal -- a new universal norm,
14 especially if the Dicastery for Doctrine of Faith is
15 intentionally saying that pastors must be -- must be
16 cautious and must ensure that allowing a transgender
17 person to be a godparent is not going to cause scandal
18 and confusion to the faithful.
19        **Q.   (BY MS. CARRENO)  And so similar to what**
20 **you talked about before, in evaluating whether or not**
21 **a family with a transgender individual could enroll a**
22 **child at one of the Archdiocese preschools, would this**
23 **type of determination also be a case-by-case**
24 **determination that the Archdiocese would need to make?**
25        MR. DAVIS:  Objection.  Misstates

Page 227

1 testimony.
2        A.   That determination of what exactly?
3        **Q.   (BY MS. CARRENO)  Whether or not a**
4 **transgender individual could be a godparent.  Would**
5 **that be a case-by-case determination?**
6        A.   Yeah.  Possibly.  The archbishop has not
7 yet weighed in on -- because, ultimately, you know,
8 the bottom line is, the archbishop, as Canon Law lays
9 it out, is the Father and the authority of his local
10 church.
11        So, you know, again, what the Vatican
12 here has provided is not a universal norm or a law
13 that now has to be implemented in every diocese.  But
14 the chief shepherd or the chief authority, in this
15 case here the Archbishop of Denver, would certainly,
16 day-to-day, have the final say and need to weigh in,
17 and he hasn't weighed in on that yet.
18        So would it be permissible on a
19 case-by-case basis?  Maybe.  But that would be
20 something that the archbishop, at the end of the day,
21 is going to have to weigh in on and have a say on.
22        **Q.   I want to back up.  I realized, when we**
23 **were talking about the spreadsheets that track**
24 **enrollment of Archdiocese preschool enrollment and**
25 **general Catholic school enrollment, I wanted to ask**

Page 228

1 **whether or not the Archdiocese tracks enrollment at**
2 **any of the Catholic Charities Head Start preschools.**
3        A.   Yeah.  We do not.  So the Office of
4 Catholic Schools does not.  I don't know if Catholic
5 Charities does.  They might.  But the Archdiocese of
6 Denver does not.
7        MS. CARRENO:  Okay.  I think now is
8 another time to take a maybe five-minute break and I
9 may be done with my questions.  But once we come back
10 on the record, I'll let you know if I have a few more
11 questions, but we may be finished.
12        MR. DAVIS:  Okay.
13        THE REPORTER:  Off the record.
14        (Recess from 4:01 p.m. to 4:08 p.m.)
15        THE REPORTER:  Back on the record.
16        MS. CARRENO:  And I believe those are all
17 of the questions that I have for Mr. Moo.  I did want
18 to follow up on a few items that were referenced in
19 the deposition and just request that we receive copies
20 of those.
21        The Buell Hoyne Foundation grant
22 information, I believe that that would have been
23 responsive to Interrogatories 7 and 8.  So any
24 information regarding those grants or applications for
25 those grants, we would ask that those be provided.

Page 229

1        MR. DAVIS:  Sorry.  The what grant
2 information?  I didn't hear what grant you said.
3        MS. CARRENO:  It was the Buell Hoyne
4 Foundation grant that Mr. Moo had mentioned at the
5 beginning of his testimony.
6        MR. DAVIS:  Oh.  So that's a private
7 foundation, Virginia.  The question was about
8 government grants, so I don't think it's responsive.
9        MS. CARRENO:  It says, "Identify all
10 federal, state, or local grants, funding
11 reimbursements or awards you or any preschool
12 identified in Interrogatory Number 2, since
13 January 1st of 2018, related to education programs or
14 operations of any school, preschool, or otherwise
15 under the control or direction of the Archdiocese of
16 Denver."
17        MR. DAVIS:  Right.  And my point is just
18 that this is not a federal, state, or local grant.
19 It's a private philanthropic foundation.
20        MS. CARRENO:  From the way you described
21 it, I was under the impression that it was a local --
22 it's a local Denver-funded grant.
23        MR. DAVIS:  Feel free to ask the witness.
24 You know, I shouldn't testify as to -- my
25 understanding is that's a private foundation, but he's

Elias Moo   30(b)(6)
November 27, 2023

Page 230

1  under oath so . . .
2      Q.   (BY MS. CARRENO)  Okay.  Mr. Moo, what is
3  the Buell Hoyne, to your knowledge?
4      A.   Yeah.  The Temple Hoyle Buell Foundation
5  is, my understanding, a private foundation.
6      Q.   Is there any affiliation with the City of
7  Denver?
8      A.   None that I'm aware of.  Again, that
9  doesn't preclude that there could be.  Just I'm not
10 aware of an affiliation with the City of Denver.
11     Q.   Okay.  And I would just ask if, after
12 this deposition, Mr. Moo learns that -- if Mr. Moo
13 learns otherwise, that Plaintiffs supplement their
14 interrogatory requests -- or their interrogatory
15 responses in the production.
16          MR. DAVIS:  Understood.
17          MS. CARRENO:  And then there was also a
18 reference to a template of a letter that schools that
19 wanted to participate in the UPK program would submit
20 with their registration, knowing that they wouldn't
21 sign the UPK provider agreement.
22          We would also ask that any templates of
23 that letter, that was provided to the schools, be
24 disclosed.
25          MR. DAVIS:  Okay.  I think we provided

Page 231

1  you an as-sent version, which may be the only one --
2  the one that we've seen, but we'll look for that.
3  Yeah.  Thanks.
4          MS. CARRENO:  And then also, if there's
5  a -- for the May 26th meeting, there was an indication
6  that the parties were asked to register for that
7  meeting.  So any registration lists of that meeting,
8  we would ask that that be provided as well.
9          MR. DAVIS:  We can look for that.
10         MS. CARRENO:  I think that covered
11 everything.  So other than that, I think we can just
12 go off of the record and talk housekeeping for
13 tomorrow.
14         MR. DAVIS:  Actually, I do have a couple
15 questions for Mr. Moo on redirect.
16         MS. CARRENO:  Sure.
17                 EXAMINATION
18 BY MR. DAVIS:
19     Q.   All right.  Mr. Moo, just a few questions
20 for you.  First, if a student or a family identifies
21 as LGBTQ, do they get admitted to an Archdiocesan
22 preschool on the same terms as everybody else, or is
23 the school supposed to find out more information about
24 their situation and its congruence with church
25 teaching?

Page 232

1      A.   The school is supposed to find out more
2  information.
3      Q.   And sometimes, after considering it
4  further, the school might decline enrollment; right?
5      A.   Correct.
6      Q.   So the Archdiocesan preschools, they do
7  not provide an equal opportunity to enroll regardless
8  of sexual orientation or gender identity; is that
9  right?
10     A.   On that basis, that's correct.
11     Q.   Okay.  And in making these enrollment
12 decisions, they're expected to follow the Archdiocese,
13 as we discussed earlier, in the Guidance for Issues
14 Concerning the Human Person and Sexual Identity
15 document?
16         MS. CARRENO:  Objection to form.
17     A.   Correct.
18     Q.   (BY MR. DAVIS)  Okay.  Mr. Moo, you
19 testified earlier about the CCAP program.  Do you
20 recall that testimony?
21     A.   Yes.
22     Q.   Okay.  And some Archdiocesan schools
23 participate?
24     A.   Yes.
25     Q.   Okay.  Does CCAP have a matching process

Page 233

1  like UPK does?
2      A.   I do not believe that they do.  No.
3      Q.   Okay.  So Archdiocesan schools that
4  participate in CCAP, can they still, in practice,
5  require families, even families that might go on to be
6  eligible to participate in CCAP, they can require
7  those families to go through the ordinary enrollment
8  process?
9      A.   Yes.
10         MS. CARRENO:  Objection to form.
11     Q.   (BY MR. DAVIS)  Okay.  So in practice, is
12 it your understanding that by participating in CCAP,
13 Archdiocese preschools haven't been required to accept
14 all referrals regardless of sexual orientation?
15     A.   In practice, sure.  Yes.
16         THE REPORTER:  Did you have an objection
17 to that one, Virginia?
18         MS. CARRENO:  Yeah.  Just objection to
19 form.
20     Q.   (BY MR. DAVIS)  Mr. Moo, you testified
21 earlier that at one point, the Archdiocese understood
22 UPK to exclude classes operated primarily for
23 religious instruction.  Do you remember that?
24     A.   Yes.
25     Q.   Okay.  But if it turned out that the

Elias Moo  30(b)(6)
November 27, 2023

Page 234

1  provider agreement didn't actually include that
2  exclusion, then the exclusion would no longer be a
3  reason for a preschool not to sign the agreement,
4  would it?
5          MS. CARRENO:  Objection.  Form.
6      A.  No, it wouldn't.  Yeah.
7      Q.  (BY MR. DAVIS)  Okay.  And even if there
8  were such an exclusion, would the Archdiocese
9  preschools still be free to participate in UPK to the
10  extent that they can get reimbursement for classes not
11  operated primarily for religious instruction?
12     A.  Yeah.  Can you repeat that again?
13     Q.  Sure.  If there were no -- excuse me.
14         If there were an exclusion for classes
15  operating primarily for religious instruction, would
16  the Archdiocese preschools still be free to
17  participate in UPK to the extent that they have
18  classes that are not operated primarily for religious
19  instruction?
20     A.  Yeah.  That there would still be some
21  eligibility for participation there.
22     Q.  Yeah.  Like they do with CCAP and DPP?
23     A.  Correct.
24     Q.  You also testified earlier that when
25  there's a wait list, Archdiocesan preschools typically

Page 235

1  prioritize Catholic applicants; is that right?
2      A.  Yes.
3      Q.  And Catholic -- that's a religious
4  affiliation, Catholic?
5      A.  Yes.
6      Q.  So in addition to the parts of the UPK
7  nondiscrimination provisions that cover sexual
8  orientation and gender identity, is it also an issue
9  for the Archdiocese that UPK says, You have to provide
10  equal opportunity regardless of religious affiliation?
11         MS. CARRENO:  Objection.  Form.
12  Mischaracterizes testimony.
13     A.  Yes.  I guess in that sense, it would be.
14     Q.  (BY MR. DAVIS)  When there's a wait list;
15  right?
16     A.  When there's a wait list.
17     Q.  We also discussed, I think, what was
18  referred to in the deposition as a possible pathway to
19  participate that was outlined in a May 26th meeting.
20     A.  Yes.
21     Q.  Okay.  And at least one school actually
22  sent a letter to UPK along the lines discussing that
23  meeting; right?
24     A.  Right.
25     Q.  Did that school hear back from UPK?

Page 236

1      A.  No.
2      Q.  Okay.  And then at some point, the UPK
3  program actually got up and running; right?
4      A.  Yes.
5      Q.  Was that an impetus for the Archdiocese
6  to press this lawsuit?
7      A.  Yeah.  I think schools were -- and we
8  sensed schools were starting to really feel the crunch
9  of not being able to participate in the new academic
10  term, fall '23 starting up.
11         So yes.  I think that that certainly
12  factored into our decision, ultimately.
13         MR. DAVIS:  No further questions for me.
14         THE REPORTER:  Any more for you,
15  Virginia?
16         MS. CARRENO:  No.  No further questions.
17         THE REPORTER:  Perfect.  Before we go off
18  the record today, would you like an electronic
19  transcript, Virginia, with scanned exhibits?  Etran?
20         MS. CARRENO:  Yes.
21         THE REPORTER:  Perfect.
22         And then, Joe, did you need a copy of the
23  transcript, electronic with scanned exhibits?
24         MR. DAVIS:  Yes, please.
25         THE REPORTER:  Would you handle signature

Page 237

1  with the witness for me?
2          MR. DAVIS:  I will.  Yeah.  We'll reserve
3  signature.
4          THE REPORTER:  Perfect.  With that, we
5  can go off the record.  Thank you.
6          MS. CARRENO:  And, Ms. Kelly, would you
7  provide electronic with miniscript as well?
8          THE REPORTER:  You bet.  You mean
9  four-to-a-page, electronic and four-to-a-page?
10         MS. CARRENO:  Yes.
11         THE REPORTER:  Okay.  Off the record.
12         WHEREUPON, the within proceedings were
13  concluded at the approximate hour of 4:19 p.m. on the
14  27th day of November, 2023.
15         *     *     *     *     *
16
17
18
19
20
21
22
23
24
25

## Page 238

1      I, ELIAS MOO, do hereby certify that I have

2  read the above and foregoing deposition and that the

3  same is a true and accurate transcription of my

4  testimony, except for attached amendments, if any.

5      Amendments attached  (  ) Yes   (  ) No

6

7                  _____
                        ELIAS MOO

8

9

10     The signature above of ELIAS MOO was

11  subscribed and sworn to before me in the county of

12  _____, state of _____,

13  this _____ day of _____, 2023.

14

15

16                  _____
                        Notary Public
                        My Commission expires:

17

18

19

20

21

22

23

24

25  ELIAS MOO 11/27/23 (lbk)

## Page 239

1          REPORTER'S CERTIFICATE
2  STATE OF COLORADO  )
                      ) ss.
3  COUNTY OF LARIMER  )
4      I, LISA B. KELLY, Registered Realtime
   Reporter, Registered Professional Reporter and Notary
5  Public ID 20194029689, State of Colorado, do hereby
   certify that previous to the commencement of the
6  examination, the said ELIAS MOO verbally declared his
   testimony in this matter is under penalty of perjury;
7  that the said deposition was taken in machine
   shorthand by me at the time and place aforesaid and
8  was thereafter reduced to typewritten form; that the
   foregoing is a true transcript of the questions asked,
9  testimony given, and proceedings had.
10     I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
11  herein, nor otherwise interested in the outcome of
   this litigation.
12
       IN WITNESS WHEREOF, I have affixed my
13  signature this 7th day of December, 2023.
14     My commission expires August 6, 2027.
15
16              _Lisa B Kelly_
17                  Lisa B. Kelly
18
19  __x__  Reading and Signing was requested.
20  _____  Reading and Signing was waived.
21  _____  Reading and Signing is not required.
22
23
24
25

## Page 240

1  Errata Sheet

2

3  NAME OF CASE: ST. MARY CATHOLIC PARISH IN LITTLETON vs LISA ROY

4  DATE OF DEPOSITION: 11/27/2023

5  NAME OF WITNESS: Elias Moo

6  Reason Codes:

7      1. To clarify the record.

8      2. To conform to the facts.

9      3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                  _____