Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2

3     ST. MARY CATHOLIC PARISH IN
      LITTLETON; ST. BERNADETTE
      CATHOLIC PARISH IN LAKEWOOD;
4     DANIEL SHELEY; LISA SHELEY; and
      THE ARCHDIOCESE OF DENVER,
5

6          Plaintiffs,

7     vs.                              Case No.
                                       1:23-cv-2079-JLK
8     LISA ROY, in her official capacity
      as Executive Director of the
      Colorado Department of Early Childhood;
9     and DAWN ODEAN, in her official
      capacity as Director of Colorado's
10    Universal Preschool Program,

11         Defendants.

12    _____

13    REMOTE 30(B)(6) DEPOSITION OF COLORADO DEPARTMENT OF
                  EARLY CHILDHOOD BY DAWN ODEAN
                       November 8, 2023
14    _____

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT
5

Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
       JOSEPH C. DAVIS, ESQ.
3      NICHOLAS R. REAVES, ESQ.
       AMANDA G. DIXON, ESQ.
4      The Becket Fund for Religious Liberty
       1919 Pennsylvania Avenue, N.W., Suite 400
5      Washington, D.C.  20006
       Phone:  202-955-0095
6      Email: jdavis@becketlaw.org
       Email: nreaves@becketlaw.org
7      Email: adixon@becketlaw.org
8  ON BEHALF OF THE DEFENDANTS:
       VIRGINIA R. CARRENO, ESQ.
9      J. GREG WHITEHAIR, ESQ.
       Colorado Attorney General's Office
10     1300 Broadway
       Denver, Colorado  80203
11     Phone:  720-508-6000
       Email: virginia.carreno@coag.gov
12
13  ALSO PRESENT:  Alexa Pastor, Veritext Concierge
       Tim Derocher
14     Lisa Roy, Ed.D.
       Bonnie Smith
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        PURSUANT TO WRITTEN NOTICE and the
2  appropriate rules of civil procedure, the remote 30(b)(6)
3  deposition of Colorado Department of Early Childhood by
4  DAWN ODEAN, called for examination by the Plaintiffs, was
5  taken remotely commencing at 9:07 a.m. on
6  November 8, 2023, before Laurel S. Tubbs, a Registered
7  Professional Reporter, Registered Merit Reporter,
8  Certified Realtime Reporter, and Notary Public in and for
9  the State of Colorado.
10              INDEX
11  EXAMINATION:                        PAGE
12  By Mr. Davis                          4
13  EXHIBITS:                           PAGE
14  Exhibit 1  Notice of Rule 30(b)(6) Deposition       8
15  Exhibit 2  Universal Preschool (UPK) Colorado      45
            Program Service Agreement
16
     Exhibit 3  Declaration of Dawn Odean             72
17
     Exhibit 4  UPK Colorado Provider Guide           77
18
     Exhibit 5  Approved Exception Criteria List      92
19
     Exhibit 6  Universal Preschool Rules and        104
20            Regulations 8 CCR 1404-1
21  Exhibit 7  Interfaith Advisory Attendees         110
22  Exhibit 8  Email String          111
23  Exhibit 9  Email String          117
24
25

Page 4

1           P R O C E E D I N G S
2        THE REPORTER:  Are all counsel in
3  agreement that I will swear the witness in remotely?
4        MR. DAVIS:  Yes.
5        MS. CARRENO:  Yes.
6           DAWN ODEAN,
7  having been first duly sworn or affirmed, was examined and
8  testified as follows:
9           EXAMINATION
10 BY MR. DAVIS:
11     Q.  Great.  Well, good morning, Ms. Odean.  My
12 name is Joe Davis.  I'm one of the lawyers for the
13 plaintiffs in this case.  It's really good to meet you,
14 and I'm grateful for your time this morning.
15     A.  Thank of you.  Nice to meet you also.
16     Q.  I just want to go over a couple of ground
17 rules, and -- even if you've done this before, but, you
18 know, I've got to get us -- got to get them out there.
19        One of them is that it's really important,
20 for purposes of the transcript, that -- you know, when
21 asking questions, that your answers are verbal answers.
22 So like "yes" or "no" rather than "uh-huh" or "huh-uh."
23        Does that sound okay?
24     A.  Yes.
25     Q.  Another one is that it's also important

Page 5

1  that we not talk over each other.  So, you know, I'll try
2  to let you completely finish your answers before I tee up
3  another question, and it would be great if you could do
4  the same for me, let me finish my question before you
5  start your answer.
6        Does that work?
7     A.  Yes.
8     Q.  Great.
9        And have you ever been deposed before?
10    A.  No.
11    Q.  Okay.  Well, just a couple of preliminary
12 questions about, you know, what we're doing here today.
13       So first off, you understood you just took
14 an oath, right?
15    A.  I do.
16    Q.  Okay.  And so you understand that what you
17 say today, it can be introduced in court later and it will
18 become part of the public record?
19    A.  Yes, I understand.
20    Q.  Okay.  And is there anything that would
21 prevent you from giving your full attention this morning
22 or from giving complete and clear answers?
23    A.  No.
24    Q.  Okay.  Did you review any documents before
25 today's deposition?

2 (Pages 2 - 5)

1     A.  I did.  I reviewed my -- my statement and
2  other documents that we submitted, including providers
3  participating in the program.
4     Q.  Okay.
5        MR. DAVIS:  And, Virginia, can you just
6  confirm that the documents that -- that she just
7  mentioned have been produced to the plaintiffs?
8        MS. CARRENO:  They have, yes.
9     Q.  (By Mr. Davis)  And then other than --
10  other than, you know, your counsel -- your attorneys, did
11  you talk with anyone in preparation for this deposition?
12     A.  No.
13     Q.  Okay.  Do you have any email or messaging
14  programs open on your computer right now?
15     A.  I do.  I can close those.
16     Q.  Yeah, if you could just confirm for the
17  record that those are closed and are logged off of.
18     A.  It's closed.
19     Q.  Great.  And then if we can just confirm for
20  the record who else is in the room with you.
21        MS. CARRENO:  And so I'm Virginia Carreno,
22  counsel, and Dr. Roy, the executive director of CDEC, is
23  in the room.  Tim Derocher from Department of Early
24  Childhood.  Niki Rust, who's one of the attorneys on the
25  cases.  Bonnie Smith, who's our paralegal.  Michelle

1  Lonhausen [phonetic] with the AG's office, and Greg
2  Whitehair with the AG's office as well.
3        MR. DAVIS:  Great.  Thanks, Virginia.
4     Q.  (By Mr. Davis)  And, Ms. Odean, just -- you
5  know, you understand, like, the deposition is a
6  conversation between me and you, and so during the
7  deposition it's important that you only communicate with,
8  of course, your counsel, but also me and the court
9  reporter.
10        Does that -- does that work?
11     A.  Yes.
12     Q.  Great.  So, you know, at any point in the
13  deposition, feel free to, you know, chime in if you need
14  to take a break, and I'll try to wrap up my current
15  line of questioning.  I think in any event, you know,
16  we'll need to take a break every hour or so.  I don't know
17  how many hours we're talking about here.  Hopefully not
18  too many, but we'll take a break every hour or so.
19        Does that work?
20     A.  Yes.
21     Q.  All right.  Great.
22        And then when we're in the breaks, just --
23  you know, do you understand that it's improper for you to
24  be discussing with your attorneys the content of the
25  deposition?

1     A.  Yes.
2     Q.  Okay.  All right.
3        And you understand that you're appearing
4  today as a witness on behalf of the Department of Early
5  Childhood, right?
6     A.  Yes.
7     Q.  Okay.  Great.
8        And did you receive the list of topics that
9  we sent over for today's deposition?
10     A.  I did, yes.
11     Q.  Okay.  Great.
12        I'm going to go and mark that as our first
13  exhibit, and that will give us a chance to make sure
14  Exhibit Share is working as well.
15        Just give me one moment.
16        (Exhibit 1 was marked.)
17     A.  Okay.
18     Q.  All right.  You should have it.
19        Do you have the exhibit, Ms. Odean?
20     A.  I do.
21     Q.  Okay.  Great.
22        And just to confirm, I think you're
23  testifying today on some of these topics.  Topics 1
24  through 4, 6, and 8 through 11; is that right?
25     A.  Yes.

1     Q.  Okay.  Are you prepared to discuss those
2  topics this morning?
3     A.  I am.
4     Q.  Great.
5        Okay.  Ms. Odean, what's -- what is your --
6  just for the record, what's your current position at the
7  Department of Early Childhood?
8     A.  I'm the director of the universal
9  preschool program.
10     Q.  Okay.  And how long have you been the
11  director of UPK?
12     A.  I started August 15th, 2022.
13     Q.  All right.  Okay.
14        Was there a director of UPK before you or
15  are you the inaugural director of UPK?
16     A.  I am the inaugural director.
17     Q.  Great.
18        And what are the -- what was the scope of
19  the role?  What does it mean to be the director of UPK?
20     A.  Sure.  So the intention of the role is to
21  operationalize universal preschool for the state of
22  Colorado as set forth for us in law.
23     Q.  Okay.  What was -- what was your role
24  before you became the director of UPK?
25     A.  I was the executive director of early

Page 10

1 learning for Jefferson County Public Schools.
2      Q.  Okay.  Had you had any previous employment
3 with the State of Colorado?
4      A.  I hadn't.
5      Q.  Okay.  What about with any other local
6 government besides Jefferson County?
7      A.  No.
8      Q.  And then before that, had you -- had your
9 career been in education, or what did you do before --
10 before the Jefferson County role?
11      A.  I worked in communications in the private
12 sector.
13      Q.  Okay.  All right.
14           What kind of -- what was the -- what was
15 the firm?
16      A.  I worked for an insurance company in their
17 marketing communications department --
18      Q.  Okay?
19      A.  -- before I became a teacher.
20      Q.  Okay.  So it was communications, teacher,
21 and then into administration in Jefferson County?
22      A.  Yes.
23      Q.  What made you want to switch careers to
24 education?
25      A.  I had my first child and thought, I don't

Page 11

1 want to keep working, and I want to do something
2 different than what I'm doing now, so I went back to
3 school.
4      Q.  How -- how were you selected as director of
5 UPK?
6      A.  I went through the state application
7 portal to apply and then went through a series of
8 interviews.
9      Q.  Was -- was Dr. Roy the decision-maker?
10 Who -- who hired you?
11      A.  Yes.  Dr. Roy.
12      Q.  Okay.  Is Dr. Roy still your supervisor?
13      A.  She is.
14      Q.  Okay.  Did anybody else at the state have
15 any input as to who was brought on as director of UPK?
16      A.  I -- I'm not sure because I wasn't part
17 of the final decision-making committee, but there were
18 several people on the interviews that I participated in.
19      Q.  Is it your understanding that the committee
20 was exclusively Department of Early Childhood folks, or
21 were there people from different agencies in the state?
22      A.  I'm not -- I don't -- I'm not aware.
23      Q.  Like the governor's office, for example?
24      A.  I'm trying to remember.  I don't think
25 there was anyone from the governor's office.  I believe

Page 12

1 in the earlier interviews there were some external
2 stakeholders that participated, but not from the
3 governor's office.
4      Q.  External stakeholders like outside the
5 government altogether or --
6      A.  Yeah.
7      Q.  Okay.  What kind of -- what kind of -- what
8 kind of stakeholders?
9      A.  I recall one who had been involved in the
10 early childhood community in the bill writing from the
11 Denver Preschool Program.
12      Q.  Okay.  Anybody else that you recall?
13      A.  I can't remember all of the interviewers,
14 but that one in particular I remember.
15      Q.  Okay.  But -- you know, just to be clear,
16 not all of the interviewers -- was there any other one
17 that you remember?
18      A.  No one else.  Mary Alice Cohen, but she
19 was from the department.
20      Q.  Okay.
21      A.  Oh, Katy Anthes, who was the commissioner
22 of the Department of Education, was on the initial
23 interview, and then -- I'm not going to remember her
24 name, but the head of the Colorado Department of Human
25 Services.

Page 13

1      Q.  Okay.
2           THE REPORTER:  Can I get the name again,
3 please?  Can I get the name -- the first name you
4 mentioned, ma'am?
5           THE DEPONENT:  Katy Anthes.
6           THE REPORTER:  First name again?
7           THE DEPONENT:  Katy.
8           THE REPORTER:  Thank you.
9      Q.  (By Mr. Davis)  Great.  Thank you for that.
10           So you said a moment ago your current
11 supervisor is Dr. Roy, right?
12      A.  That is correct.
13      Q.  And what is her role?
14      A.  She's the executive director of the
15 department.
16      Q.  Okay.  Who does she report to?
17      A.  She reports to the governor.
18      Q.  Okay.  Is Dr. Roy the ultimate
19 decision-maker for the department?
20      A.  She is.
21      Q.  Okay.  And you said Dr. Roy reports to the
22 governor -- to the governor's office.  Did the governor
23 appoint Dr. Roy?
24      A.  I wasn't on board at that time.  That
25 was -- that was prior to me being hired, so I'm not aware

4 (Pages 10 - 13)

Page 14

1  of that process.
2      Q.  Okay.  Does she report -- does the
3  department report to the governor on a regular basis?
4      A.  I'm not sure of her reporting structure,
5  but we give updates on where we are in the program.
6      Q.  Okay.  Is that like a regularly scheduled
7  meeting or how does that work?
8      A.  It depends.  We usually do a memo update,
9  and then meet if we need to discuss --
10     THE REPORTER:  Can we go off --
11     Q.  (By Mr. Davis)  How often is the --
12     THE REPORTER:  I'm sorry.  Could we go off
13 the record for a moment?
14     (Discussion off the record.)
15     Q.  (By Mr. Davis)  Ms. Odean, I think the
16 question was does the department have a regularly
17 scheduled meeting with the governor's office to provide
18 updates?
19     A.  We don't -- we do -- we typically give
20 updates biweekly, and then often we -- with -- in
21 alignment with that update, but it's not regular, if you
22 will.
23     Q.  Okay.  So it's an approximately biweekly
24 written update?
25     A.  Correct.

Page 15

1      Q.  That's often followed by a meeting, but not
2  always?
3      A.  Correct.
4      Q.  Okay.  Is that -- is that the department in
5  general giving an update, or is that specifically your
6  division, the UPK division?
7      A.  That's specific to the universal preschool
8  program.
9      Q.  Okay.  Has the governor's office -- does
10 the governor's office ever initiate the updates to UPK to
11 check up on things?
12     A.  Some -- yeah, sometimes.
13     Q.  Okay.  Like what's an example of that?
14     A.  An example might be a legislative question
15 from a representative to our department to give broader
16 understanding of the program.  Yeah.
17     Q.  Okay.  Has the governor been in touch about
18 any of the sort of concerns that have been raised about
19 the way the UPK roll out has?
20     MS. CARRENO:  And objection to the extent
21 that this calls for information that would fall within
22 the elected official privilege.
23     I understand that one of the topics is
24 generally the structure and functioning of the
25 department, so obviously some of these questions -- but

Page 16

1  to the extent that you're asking for information that
2  falls into delivery of process or elected official
3  privilege, I'm just going to instruct her not to answer.
4      MR. DAVIS:  Okay.
5      Q.  (By Mr. Davis)  Ms. Odean, the -- the
6  question wasn't getting at the content of what the
7  governor's office has expressed to you, if any.
8      The question was to the extent rollout --
9  concerns have been raised about the rollout of the UPK
10 program, has the governor been in contact with UPK about
11 those concerns?
12     A.  We certainly have given updates on
13 challenges throughout the start-up of the program.
14     Q.  Okay.  What about the concerns raised in
15 this lawsuit?
16     MS. CARRENO:  And again, objection to the
17 extent that this calls for anything that's privileged,
18 whether that's attorney-client or elected official.
19     Q.  (By Mr. Davis)  You can answer, Ms. Odean.
20     A.  I haven't had any specific conversations
21 about this lawsuit with the governor.
22     Q.  What about -- not this lawsuit, but the
23 Archdiocese preschool's participation in the UPK program?
24     A.  I haven't had any conversations with the
25 governor about this -- these participants, with the

Page 17

1  governor.
2      Q.  What about with the governor's office, more
3  generally?
4      A.  Not that I can recall.
5      Q.  Okay.  Ms. Odean, can you just lay out for
6  me, like, sort of the basic structure of the UPK program?
7      A.  Sure.  So our team is set up with me as
8  the director.  I have two managers, one of our local
9  coordinating organizations, and she has five regional
10 specialists.
11     There are 32 local coordinating
12 organizations around the state that help support and
13 navigate universal preschool with families and providers
14 locally.  So that unit is in -- working with our local
15 coordinating organizations every day.
16     My other manager is an operational manager
17 who works with now three universal preschool program
18 specialists, and they support our work with our IT team
19 and our vendors that we contract with to operationalize
20 the universal preschool program.
21     Q.  Okay.  So that's how the program is
22 operationalized, but what is the universal preschool
23 program?  What does it do?
24     A.  Sure.  So the universal preschool is to
25 give at least 10 hours of preschool to every eligible

5 (Pages 14 - 17)

1 4-year-old in Colorado the year before kindergarten.
2     Q.  Okay.  And how does it do that?  Does it --
3 funds go to the schools or do funds go to the families
4 directly?
5     A.  Sure.  So we have an application system
6 where providers register in that system to participate,
7 and families can go on and seek and find the just-right
8 provider.
9     Then when they apply, they can choose one
10 to five providers and rank them.  And then they go
11 through a matching process to go with one of those five
12 providers to enroll -- as part of the enrollment.  Then
13 the providers can accept that enrollment and the family
14 can start in the program.
15     CDEC funds the provider.  If it's a
16 part-time program, then it's an hour rate; if it's a
17 half-day program, it's a 15-hour rate.  So all children
18 are eligible for 15 hours a week, or a half day.  And
19 then we have our process with qualifying providers to
20 identify children who might qualify for additional hours
21 or a full day, which is a minimum of 30 hours a week.
22     And so we go through a process to
23 determine that qualification and verification of funds
24 and award -- that payment goes monthly to the provider to
25 provide the services.

1     Q.  Okay.  And why is it important to make
2 preschool available in the way that UPK does?
3     A.  Yeah.  So it's shown over time in Colorado
4 with the previous program in a targeted way to have
5 positive child outcomes.  And so this expansion to a
6 universal model allows more children to have access to
7 early learning and care.
8     There's so many incredible gains that can
9 be made in -- at the preschool age, certainly around
10 whole child development, cognitive, speech/language,
11 gross motor, fine motor, social, emotional.  Being in a
12 high-quality setting is an exceptional way to get to high
13 child outcomes over a long-term trajectory.  So we're
14 really excited about this for Colorado and for Colorado's
15 children.
16     But I will also say it's really critical
17 to ensure that families can thrive in Colorado and that
18 they're able to have choice in finding the just-right
19 provider, and really being able to have that savings they
20 might not have anticipated that they might need.
21     We have families that have been
22 participating in childcare previous to preschool, and we
23 have families who haven't.  So it's an opportunity to --
24 certainly put those children and families to have
25 positive outcomes.

1     Q.  Okay.  And "universal" means you're trying
2 to reach all children.  Is that the idea?
3     A.  Yeah, that's the idea, that the
4 opportunity is there for all children who reside in
5 Colorado in the year before kindergarten.
6     Q.  And -- so that's helpful.  Thank you.
7     You talked about a couple of things there I
8 want to sort to pull out one by one, if we could.  So
9 families are trying to choose the just-right provider, how
10 do families -- how do they learn information about the
11 different UPK providers?
12     A.  Sure.  So our local coordinating
13 organizations are very important in supporting navigation
14 locally.  They are engaged with providers regularly, as
15 well as families, to help support connections and
16 navigation.
17     In our application system, providers who
18 are registered can create a profile to show who they are,
19 and what they offer, and what they provide and celebrate
20 who they are so families can search those and look for
21 what they're looking for.
22     They can search geographically, for
23 example.  They can look at the walking distance from
24 their home or a route between home and work.  Geography
25 is often one of the choice indicators, as you might

1 imagine.
2     But the system also doesn't replace that,
3 you know, going to one contact.  We certainly recognize
4 that providers have different events to attract families
5 and connect with families.  And we know that families
6 might go on tours, for example, or call directly to
7 providers to have a more intimate conversation, if you
8 will.
9     Q.  Sure.
10     So you say, like, part of what the
11 providers are trying to do is celebrate who they are, put
12 out -- put out their -- through the portal, you know,
13 information about their program.  What do you mean by
14 that?  Like is that educational philosophies, curriculum,
15 that kind of thing?  Besides geography, what are the --
16 what are the kinds of things that --
17     A.  Yeah, it could be.  If you look at the
18 site, it's very customizable by the provider to -- to
19 talk about the programs that they offer, the ages that
20 they offer, for example.
21     While they're participating in universal
22 preschool, they might offer infant and toddler care,
23 which a family might be looking at if they have other
24 children.  Program year, length of year, rates for
25 additional hours, different opportunities they might

Page 22

1    provide.  The whole range of kind of enrichment
2    programming they might provide.
3         Q.  Great.  Okay.
4            So a family has done their research,
5    selected the providers that they're interested in.  And
6    you said next they rank them 1 to 5 in the application
7    system.
8         A.  That's correct.
9         Q.  Okay.  And then -- so what happens next?
10   There's a matching process.  How does the matching process
11   work?
12        A.  Right.  So the way that the matching
13   process is set up is that there's a weight applied for
14   families who are continuity of care, have a sibling, have
15   a particular license location or an employee's child.
16            And then it goes into what's called the
17   deferred acceptance algorithm, which is a standard --
18   industry standard for matching, like a lottery, to the
19   providers that they have chosen.
20        Q.  And so -- well, first off, you said
21   continuity of care.  That means the child is already at
22   that school?
23        A.  Correct.
24        Q.  Okay.  How much of a weight is given for
25   continuity of care?

Page 23

1         A.  It's -- all three of those are equally
2    weighted -- equally weighted.  So there's not a rank
3    order of weights.  You can get a weight for continuity of
4    care, sibling, or, you know, an employee's child.
5         Q.  Okay.  And if only one of those three is
6    applicable, does it get the same weight -- like does it
7    get a bigger weight in that --
8         A.  No.
9         Q.  Okay.
10        A.  They're all the same weight, and you can
11   only get one.
12        Q.  Okay.  Okay.
13            And then -- so the algorithm runs and it
14   comes back on the family's side with a, here's your
15   match -- here's the school that has matched you?
16        A.  It actually goes to the provider first.
17        Q.  Okay.
18        A.  And that's where we have preferences built
19   in for providers.
20        Q.  Okay.  So the provider gets the match, and
21   then the provider can either accept or reject the match?
22        A.  Correct.  If they are a good match or an
23   approved preference.
24        Q.  If they are an approved preference?
25        A.  Yeah.

Page 24

1         Q.  Okay.  If they are an approved preference,
2    they accept the match, right?
3         A.  Right.
4         Q.  Okay.  They're required to accept the
5    match?
6         A.  They are.
7         Q.  Okay.  And we'll talk about the
8    preferences, of course --
9         A.  Okay.
10        Q.  -- in a bit.
11        A.  Okay.
12        Q.  So how does a provider start participating
13   in UPK in the first place?
14        A.  So the main requirement for a provider to
15   participate is that they're licensed, and then they
16   register in our system.
17        Q.  And registering in the system, what does
18   that entail?
19        A.  So they get -- log in into our application
20   system, and they register.  That's where we have our
21   provider agreement, which they would sign if they choose
22   to participate.  That's where they create their profile.
23   And that's where they get access to the enrollment
24   processes.
25        Q.  Okay.  And so to -- to become registered,

Page 25

1    they're required to sign the provider agreement; is that
2    right?
3         A.  Correct.
4         Q.  Okay.  So all the current UPK providers
5    that are currently participating in the program, they
6    did -- they signed the agreement?
7         A.  They -- I don't know for 100 percent, but
8    close.
9         Q.  Okay.  How would they be in the -- in the
10   system and able to participate if they hadn't signed the
11   provider agreement?
12        A.  Sure.  So in year one, we had to start up
13   the system at a -- in a pretty compressed timeline, and
14   the agreement didn't go into affect until July 1.  So we
15   had providers registering with us who were considering to
16   participate, leading up to the agreement -- the agreement
17   going into effect.
18            So it was November of last year when
19   providers were going in and registering and creating
20   profiles.  So ahead of the contract year.
21        Q.  I see.  Okay.
22            So -- but the agreement that's in effect
23   now, if a provider wants to participate, they're required
24   to sign the agreement?
25        A.  Yeah.  And we still have providers signing

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1   on, yeah.
2       Q.  Okay.  Is -- are you trying to sort of go
3   back and get folks to sign that had gotten into the system
4   before the agreement went into effect?
5       A.  I'd have to look at our records to see
6   where we're at on that.  We certainly did leading up to
7   the contract starting.  I don't have -- I don't have that
8   off the top of my head, but --
9       Q.  Sure.  No, yeah.  The question was, you
10  know, was there an effort to go back and have providers
11  that were already there sign --
12      A.  Absolutely.  Yeah.
13      Q.  -- the agreement?  Okay.
14          And I really appreciate your answer.  Just
15  a reminder about us talking over each other a little bit
16  there?
17          So -- okay.  Great.  So that was really
18  helpful.  We just talked a lot about sort of the way the
19  matching process works, which I take it is -- is one way
20  the families get into the system.  But UPK is also
21  allowing walk-ins or direct enrollment right now; is that
22  right?
23      A.  That's correct.  We opened up walk-in or
24  direct enrollment as the program year began.
25          So most programs started in August.  And

1   so many families hadn't heard of universal preschool and
2   the application system and were going directly to the
3   provider to enroll.  We wanted to facilitate that process
4   in a way that allowed for the child to participate as
5   soon as possible.  A higher volume of applications were
6   earlier, and certainly have children who still, you know,
7   move or were coming in and want them to be able to access
8   the classroom as soon as possible.
9       Q.  And is there a term you prefer between
10  walk-ins and direct enrollment or are they
11  interchangeable?
12      A.  We -- we typically call it direct
13  placement.
14      Q.  Okay.  All right.
15          Can you -- so how does the direct placement
16  process work?
17      A.  So if the family shows up at a school to
18  enroll, that provider can let their local coordinating
19  organization know that they are enrolling.  The family
20  still has to complete the application, and then the LCO
21  directly places the child at that location rather than
22  going through a match.
23      Q.  Okay.  Can a provider decline a family or
24  decline to accept the family through the direct enrollment
25  method?

1           MS. CARRENO:  And, Joe, can you just tell
2   me what topic the direct enrollment questions are related
3   to in terms of the 30(b)(6) notice?
4           MR. DAVIS:  Sure.  This goes to the
5   structure of UPK.  So if there's two other ways of
6   participating in UPK and one of them is the matching
7   process and one is through the direct enrollment process,
8   I think that would pretty clearly fall into that topic.
9           MS. CARRENO:  Yeah, and I -- I have number
10  9 as talking more about the matching process for kind of
11  how -- or how the universal preschool program is working.
12  I think this is going beyond just the structure and
13  operations of Universal Preschool Colorado.
14          I just want to remind you that Dawn is
15  going to be testifying in her personal capacity tomorrow.
16  So to the extent that we veer too far away from the
17  topics that were noticed, I would just ask that you
18  reserve those questions for her personal deposition.
19          MR. DAVIS:  Sure.  I mean, to be clear,
20  are you taking the position that one of the two methods
21  of enrollment is not part of the operations of UPK?
22          MS. CARRENO:  I'm sorry.  Can you say that
23  again?
24          MR. DAVIS:  So our topics include the
25  operations of universal preschool.  And my questions

1   right now are going to how does a family participate in
2   universal preschool, and I guess I view that as pretty
3   clearly falling into that topic.
4           I just had a couple more questions about
5   direct enrollment, you know, if -- I'm curious, is your
6   position that direct enrollment is outside of the scope
7   of the operations of UPK?
8           MS. CARRENO:  I think the limit is outside
9   the scope because you did specifically mention the
10  matching process.  But like I said, I will allow a little
11  leeway since you've explained that you are connecting
12  this to topic number one.  So no objection at this point
13  as long as there's just a few more questions.
14          MR. DAVIS:  Okay.  Thank you, Virginia.
15          I just want to say, I think this also
16  falls -- just for the record, topic number 9 says the
17  process and procedures by which families can seek to
18  participate in UPK Colorado, and the process by which
19  families are matched with preschools.  So, you know, I'd
20  say the part before the "and" there would encompass
21  direct enrollment.  So just -- just saying that for the
22  record.
23      Q.  (By Mr. Davis)  Ms. Odean, I think the
24  question on the table was if a family is attempting to
25  directly enroll in a particular preschool, can a preschool

1  decline to accept that enrollment?

2      A.  If they have an open seat available,

3  they -- we -- they can't decline them.  They certainly

4  have to apply, though, through the application process.

5      So we can't process them on the department

6  side unless they have actually applied.  And so the

7  provider might ask them to apply and then go through the

8  process.

9      Q.  Okay.  But the family -- but the provider

10  might ask them not to apply, and then they wouldn't be

11  able to enroll through the UPK process?

12      A.  I haven't had that particular situation

13  elevated to me.  So I would want to -- I wouldn't want to

14  speculate.  I would want to understand what happened

15  further.  But we haven't had that elevated to our state

16  team.

17      Q.  Okay.  But it -- but it could happen,

18  right, and then it would never be -- it would never be

19  sort of reported through the UPK system?

20      MS. CARRENO:  And objection to the extent

21  that this calls for speculation.

22      Q.  (By Mr. Davis)  You can answer.

23      A.  Well, I would imagine a family would call

24  us if they thought a participating provider didn't --

25  didn't accept them with questions, either through our

1  local coordinating organization or directly to our state

2  team.

3      Q.  Okay.

4      A.  If they had done that, we certainly would

5  reach out and find out more.

6      Q.  Okay.  Why could a provider not decline to

7  enroll or, you know, encourage a family not to apply and

8  approach a provider through the direct enrollment process?

9      A.  If the program is full, they don't have

10  seats, they wouldn't -- we don't require providers to be

11  all in.

12      So, for example, some providers have

13  multiage classrooms, so all their seats aren't all

14  universal preschool seats.  They may have made

15  adjustments to those program seats over time.  So they

16  might have initially -- initially we ask, hey, can you,

17  you know, give it a go with us, go all in on your seats.

18  We've had some providers who haven't filled seats, and so

19  they have asked to change those over to 3-year-old seats

20  for example, and so they weren't available for an

21  eligible UPKer, if you will.

22      And then we do have that preference

23  category where providers have specific preferences that

24  they could make to decline.

25      Q.  Right.

1      Yeah, and so I'm just -- you know, you said

2  that if a provider has a seat, they would have to accept

3  the family that approached them for direct enrollment

4  if --

5      A.  Yeah.

6      Q.  Why --

7      A.  You might have -- I apologize.

8      Q.  My question was why?  Is that because of

9  the provider agreement?  Why is that?

10      A.  Well, what -- what we would find -- what

11  we would try to find out, if that was a scenario, is why.

12  So why is there a seat listed as a universal preschool

13  seat when we're not requiring you to be all in and you're

14  not accepting a family.

15      It might be a mistake on the program seats

16  where they filled a 3-year-old, for example.  And it --

17  it's also allowable with their preferences.

18      And so if there's a preference that's

19  determined, for example, a Head Start program where

20  they're trying to meet a certain income level because

21  that's their federal mandate, then that would be

22  allowable.

23      So again, it's hard to speculate not

24  knowing the exact scenario or situation.

25      Q.  Okay.  So the same preferences that would

1  allow a provider to decline to enroll a family through the

2  matching process would also allow a provider to decline to

3  enroll a family through the walk-in or direct enrollment

4  process?

5      A.  Correct.

6      Q.  Okay.  And the walk-in or direct enrollment

7  policy, that's currently in place, right?

8      A.  Actually, that started after the school

9  year started.

10      Q.  Okay.  But families right now can -- can

11  still utilize that procedure right now and become enrolled

12  in UPK?

13      A.  Yes.

14      Q.  Okay.  And you said earlier that providers

15  are still coming in and starting to participate right now.

16  So to be clear, a UPK provider -- or a preschool provider

17  can register with UPK right now and still participate in

18  the program?

19      A.  Correct.

20      Q.  Okay.  Is there any cutoff to when UPK

21  providers can come in?

22      A.  We don't have a cutoff date.  And we had

23  contemplated that because it is a lot of change, but in

24  this first year, we really wanted to be as inclusive as

25  possible for providers to participate.

1 And because there was a lot of unknown
2 early on, there were many providers who were interested
3 in seeing how it played out to determine if they wanted
4 to participate or not. So we've had rolling
5 registration, if you will, for providers.
6 We also have newer providers who are going
7 through the licensing process and had to have their
8 license finalized before they could enroll children. But
9 we certainly had families and providers who were excited
10 about that.
11 For example, an employer-based provider
12 who got preschool opportunity for their employees. And
13 so we wanted to be able to honor that -- especially in
14 this first year, be thoughtful about that inclusion in
15 this delivery.
16 Q. Okay. Great.
17 And is matching still going on as well?
18 Like if families choose to utilize the online portal, they
19 can still be matched to providers?
20 A. We're in our last matching round, and then
21 we'll transition to only direct placement. Families can
22 still enter through the application and be connected to
23 their provider through their LCO or they can -- they can
24 go through their provider and connect to their LCO.
25 Q. Okay.

1 A. But the number of applications has
2 significantly diminished since the start of the program
3 year.
4 Q. Okay. When is the last matching round set
5 to conclude?
6 A. I'd have to look at the date for you.
7 Q. That's fine.
8 A. Do you want me to get back to you on that?
9 Q. Well, yeah, why don't we -- you can get
10 back to me after -- after a break.
11 A. Okay.
12 Q. Does matching -- how often does matching
13 occur? Is it on a weekly basis, a daily basis?
14 A. It's been -- started out January 17th, in
15 the eight-week cycle for the first round. Then in the
16 second round, we went to a four-week cycle, and then as
17 we've progressed to getting closer to the program year,
18 it was a one-week cycle.
19 Q. So matching occurs every -- once a week?
20 A. It has been occurring once a week.
21 Q. Okay.
22 A. I'd have to get back to you on the date we
23 transitioned on that.
24 Q. Okay.
25 Is -- who decides whether to have another

1 round of matching?
2 A. The program team, based on what we're
3 hearing from -- what we're seeing as the number of
4 applications coming in and the amount of time it takes.
5 So the one-week matching rounds went
6 pretty quick, but as we moved further into the program
7 year, a direct placement is quicker to get that child in
8 the program. So it's just been a transition leading up
9 to that, and then through the first few months.
10 Q. I see. Okay.
11 And -- but if -- if a -- like if this round
12 ended and then a significant number of new applications
13 came in, you could decide to have another round of
14 matching?
15 A. We could, yeah.
16 So really what we're trying -- what we're
17 trying to accomplish is the least amount of
18 administrative burden for families and for providers.
19 And so when there's a higher volume of applications, it's
20 quicker to get families connected and enrolled. When
21 there's a lower number, typically providers can manage
22 that and work with getting the child in the program.
23 Q. Okay. Okay.
24 So, you know, not to belabor it, but if a
25 new provider were to join UPK right now, already had

1 4-years-olds in the program, could those 4-year-olds
2 directly enroll with the provider and start participating
3 in UPK?
4 A. They could. They would still have to fill
5 out the state application to be able to get connected.
6 Q. Okay.
7 MR. DAVIS: I know there's a lot of
8 administrative stuff before we actually got started. Why
9 don't we go off the record for our first 10-minute or so
10 break. Does that work for you?
11 THE DEPONENT: Yes.
12 MR. DAVIS: Laurel, we'll go off.
13 (Recess from 9:52 a.m. to 10:03 a.m.)
14 Q. (By Mr. Davis) Great. So, Ms. Odean,
15 is -- one of the goals of UPK to achieve a mixed
16 delivery system of preschool?
17 A. Yes.
18 Q. Okay. Can you say a little bit about what
19 that means?
20 A. Yes. So it is in the law that this isn't
21 school-district-managed only, for example, as our
22 previous state-funded preschool was. And so what that
23 means is that any licensed provider for this age group is
24 able to participate. It could be in-home family
25 childcare, it could be small center, large center, Head

1  Start, or school district managed.
2      Q.  Okay.  Are religious providers or
3  faith-based providers also part of the -- one of the
4  components of the mixed delivery system?
5      A.  Yes.
6      Q.  And why is it good -- why do you want to
7  have a mixed delivery system?
8      A.  Well, it is in the law, specifically
9  unique to Colorado, to ensure that families have choice
10  and can find the just-right provider that fits for their
11  family.
12      Q.  And for some families -- oh, please go
13  ahead.
14      A.  No.  Go ahead.
15      Q.  For some families, the just-right provider
16  might be a faith-based provider; is that right?
17      A.  Yes.
18      Q.  And why do you want the just-right
19  provider?  Why do you -- why is that helpful for your
20  goals?
21      A.  It's in the law, which is important for us
22  to follow.  But also we really want to provide a variety
23  of opportunities for families and children to engage
24  based on their needs and their hopes for their child and
25  what's available in their particular community.

1      Q.  Okay.
2          Who designed the UPK program?  Was it --
3  was it you, or -- you know, the matching process, the
4  different components that we've been discussing so far?
5      A.  Sure.  So I would say House Bill 22-1295
6  had a pretty solid design foundationally set for us to
7  start from.
8      Q.  And the -- that's the -- that's the bill
9  that created the universal preschool program; is that
10  right?
11      A.  Correct.
12      Q.  Okay.  As you were -- so as you were
13  working with the bill and starting to implement the actual
14  program, did you think about the way other similar
15  programs work?
16          Like, you mentioned the Denver Preschool
17  Program earlier.  Did -- did that factor in at all?
18      A.  Sure.  So there was a transition director
19  who started up -- and I'm not going to remember that bill
20  number, but that allowed for the start up of the program
21  and the department prior to the start.
22          So a transition director was hired, who
23  worked with, for example, the state OIT team to start to
24  build the system and components of the program prior to
25  the start of the department on July 1.

1      Q.  Okay.  And -- but the Denver Preschool
2  Program is a little bit -- well, is different in the sense
3  that it doesn't have a matching process; is that right?
4          MS. CARRENO:  And objection to the extent
5  you're asking her to speak about the Denver Preschool
6  Program.  She's speaking on behalf of the department and
7  the universal preschool program.
8          So you can answer to the extent that you
9  can.
10      A.  Yeah, I -- I don't know the details of
11  their enrollment process, but I know that there were
12  specific things called out that were intentional in the
13  law for one application -- a unified application; for
14  example, that families wouldn't have to fill out every
15  single provider's different application.
16          So there were certain components that were
17  set forth for us, for universal preschool, that might be
18  different than what the other instance of childcare award
19  might look like.
20      Q.  (By Mr. Davis)  Okay.  Those components,
21  like the matching process followed by providers generally
22  being required to accept their matches, did you
23  anticipate, as you implemented the program, that that
24  would be an issue for some providers that might want to
25  control their admissions a little bit more than that?

1      A.  We heard, from some providers, concern for
2  not having done it before.  This represents a lot of
3  change for many providers who -- well, change for
4  providers who participated in previous state providers,
5  and then change for providers who hadn't.
6          So we certainly anticipated that we'd be
7  having a lot of engagement around how it would work and
8  how we would work together.
9      Q.  What kind of providers raised those
10  concerns or at least concerns about the change?
11      A.  I don't know that it was any one provider
12  type in mixed delivery.  We certainly had worked really
13  closely with our local coordinating organizations to
14  share out and communicate as directly as possible -- as
15  often as possible as we defined the program or
16  operationalized it along the way.
17      Q.  Did any of those concerns get factored in
18  when the department was coming up with its exemption
19  criteria or preference criteria that we were discussing
20  earlier?
21      A.  Sure.  Yeah.  So the weights and the
22  preferences were certainly challenges that were elevated
23  early on.  How are we going to meet our federal mandate,
24  for example, if the state mandate is different?
25          And so, again, really -- really worked

1   with our evolving team to listen and be responsive with a
2   priority on inclusion and mixed delivery.
3        Q.   Okay.  Did the -- did the department have
4   any goals or projections about the number of providers it
5   was hoping to have participate in UPK?
6        A.   We didn't have specific goals set on the
7   number of providers.  We knew there were, from the state
8   demographer's office, 63,000 eligible children, and we
9   set goals and projections based on the number of children
10  and then really worked with our local coordinating
11  organizations to ensure we had enough seats available for
12  the children to attend.
13       Q.   Okay.  What -- what were the -- what were
14  the goals as far as number of children goes?
15       A.   Sure.  So we were shooting for 50 percent
16  uptake in year one and projected that would be likely
17  based on uptake in other states when they went to a more
18  universal program.
19       Q.   Have you met that goal?
20       A.   We have.
21       Q.   What other states have a universal pre-K
22  type program?
23       A.   Louisiana, Virginia.  I don't know all of
24  them.
25       Q.   Did you pay any attention to sort of the

1   design of those programs as you were implementing UPK?
2        A.   A little bit initially, but really our
3   program focus was on what we needed to do in Colorado
4   because it was so uniquely different.
5        Q.   In what way?
6        A.   Mixed delivery, for one.  Unified
7   application.  Specifics around -- well I don't -- I
8   can't -- I don't have a cross-check to other programs,
9   but those are some of the kind of top things that
10  prioritized for Colorado.
11       Q.   Yeah.  No, not looking for a full -- sort
12  of full cross-check.  Just what comes to mind.
13       A.   Yes.
14       Q.   Was there specifics around something that
15  you were going to say or --
16       A.   No.  I was just thinking through the bill
17  in my head, but it is 500 pages, so...
18       Q.   I've noticed.
19       When you say one of the ways Colorado is
20  different is mixed delivery, does that mean that some of
21  the other states are school district based?
22       A.   Yes.
23       Q.   Okay.  And then you said -- I think my
24  question was did you pay any attention to the way those
25  programs were set up, and you answered "a little bit at

1   the beginning."
2        What does that mean?  You had -- you met
3   with other people in the states or you pulled in, you
4   know, information online and compared it with what your
5   plans were?
6        MS. CARRENO:  And objection to the form of
7   that question.
8        But if you understood it, you can answer
9   it.
10       A.   Yeah.  So I think as I came into a new
11  job, I definitely was looking online to see what other
12  people had done, what was out there, and thinking about
13  what our charge was in Colorado.
14       But as I said, starting up, it was a
15  compressed timeline and rapid growth.  And we prioritized
16  in the program what we were charged with in Colorado as
17  well as what we were hearing from families and providers
18  to inform the rollout of the program.
19       Q.   (By Mr. Davis)  Okay.  Thank you.
20       And then I think you testified earlier
21  there was no set goal for how many providers you were
22  hoping to get.  It was more focused on how many children
23  you were hoping to have sign up.  But what about -- I
24  mean, were there any goals as to what would constitute
25  successfully having a mixed delivery system?  For example,

1   if you didn't have any home-based providers, you know,
2   would that have been a failure?
3        A.   We didn't have specific goals around each
4   provider type, but we saw very early on all provider
5   types participating based on how they're licensed; so
6   that in-home family childcare, small center, large
7   center, and school-based provider.  So we were excited
8   about that.
9        Q.   Great.  Okay.  I appreciate that.
10       I'm going to pivot a little bit here and
11  introduce our next exhibit.  We were discussing the
12  provider agreement earlier, so I just want to get that in
13  front of us.
14       All right.  You should have it.
15       (Exhibit 2 was marked.)
16       Q.   Do you have the provider agreement with
17  you?
18       A.   It's loading.
19       Q.   Okay.
20       A.   It says "Generating file preview.  May
21  take a while."
22       Q.   Interesting.  Have you tried to hit refresh
23  in your marked exhibit folder?
24       A.   There it is.
25       Q.   Great.  And it looks like I neglected to

Page 46

1  put an exhibit stamp on this document, so that's -- my
2  apologies for that. But I'll just note for the record
3  that we have Exhibit 2 here as the document that's
4  Bates labeled, at the bottom of the page, PL_29 through
5  PL_67.
6          Is that what you have in front of you,
7  Ms. Odean?
8      A. Yes.
9      Q. Great. I'll see if we can go back and put
10 a stamp on that, but I think that that will take care of it for
11 now.
12         Okay. Great. So, Ms. Odean, do you
13 recognize this document?
14     A. Yes.
15     Q. Okay. It -- what is this document?
16     A. This is the universal preschool program
17 agreement.
18     Q. Okay. Great.
19         And this is the agreement we were
20 discussing before that providers need to sign in order to
21 register with -- with UPK, right?
22     A. Yes.
23     Q. Okay. Who's supposed to actually sign the
24 agreement on the provider's side? Is there a particular
25 person that's supposed to sign it?

Page 47

1      A. The authorized representative of the
2  provider.
3      Q. Okay. So often like the director of the
4  preschool?
5      A. Correct.
6      Q. Okay. Is -- and who signs it on the -- on
7  the department side?
8      A. I do.
9      Q. Okay. And both the -- both the provider
10 and the department are bound by this agreement; is that
11 right?
12     A. Yes.
13     Q. Okay. Who prepared this agreement?
14     A. This agreement was crafted by the
15 transition director and the Colorado Department of Human
16 Services contract team.
17         THE REPORTER: I'm sorry -- I'm sorry. I
18 didn't hear the last word, ma'am.
19         THE DEPONENT: Colorado Department of
20 Human Services contract team.
21         THE REPORTER: Thank you.
22     Q. (By Mr. Davis) Okay. So when you became
23 the director, the -- the agreement already existed, or did
24 they draft it while you were at UPK?
25     A. It -- it was in process.

Page 48

1      Q. Okay. Did you have any input as to how the
2  agreement came together?
3      A. I reviewed the agreement. At that time
4  there were two of us operationalizing the program, so we
5  were dividing the work up. So central transition
6  director had led this work and was coordinating with the
7  contract team. She followed through on that.
8      Q. Okay. So the transition director and the
9  Department of Human Services prepared the agreement, but
10 then the department ultimately approved it, and that's how
11 it came to be the agreement that providers were to sign?
12     A. Yes.
13     Q. Okay. Do you -- was there a -- like a
14 template that they were working from when they were
15 preparing this, like -- or did the providers -- well, let
16 me just leave it there.
17         Was there some template that they were
18 working from in preparing this?
19         MS. CARRENO: And just objection. This is
20 in some of our objections to discovery as well as some of
21 these questions are asking for answers prior to when the
22 department existed. And so Ms. Odean and really no one
23 within TDC can speak to decisions that were made by an
24 entity that didn't exist at the time.
25         So they can't -- she can't answer

Page 49

1  specifically about what the transition team did because
2  there was not the Department of Early Childhood. She can
3  only speak about decisions that were made after July 1st
4  of 2022.
5      Q. (By Mr. Davis) And, Ms. Odean, I'm asking
6  you to testify from your current awareness as the director
7  of UPK.
8          Was this agreement based on anything else
9  that already existed?
10         MS. CARRENO: And you can answer if you
11 can.
12     A. The only -- the only portion I know is
13 that the fiscal agreement was -- my understanding was the
14 fiscal agreement was standard for the Colorado Department
15 of Human Services contract team.
16     Q. (By Mr. Davis) Okay. And I'm sorry, the
17 fiscal agreement, is that a portion of the contract or are
18 you saying the whole contract?
19     A. At least a portion of the contract. I
20 don't know specifics. It was my understanding that they
21 had a standard fiscal agreement.
22     Q. I see. Okay.
23         So fiscal agreement is a term that you're
24 aware of on the Human Services side, not the UPK side?
25     A. Correct.

13 (Pages 46 - 49)

Page 50

1    Q.  Okay.  Got it.  Okay.  Great.
2        So I want to -- and actually, one more
3    question about that.  When you were approving this
4    agreement -- or deciding whether to approve this
5    agreement, were any changes made because of input from you
6    or from the other UPK leadership team?
7    A.  Not that I'm aware of.
8    Q.  Okay.  So the agreement, as presented to
9    you, was approved, and then it became the program services
10   agreement for 2023?
11   A.  Yes.
12   Q.  Okay.  I want to look specifically at a
13   couple of provisions here.
14       First, do you see the section that's
15   quality assurance, and it's on page PL 30?
16   A.  Yes.
17   Q.  All right.  And this says, "The provider
18   agrees to adhere to a number of quality standards," and
19   then -- or "agrees to adhere to the quality standards
20   identified in the law," and then it lists a number of
21   them.
22       Is that right?
23   A.  Yes.
24   Q.  Okay.  And then one of those standards
25   is -- it looks like it's the fourth bullet point down,

Page 51

1    "The requirement that each preschool provider provide
2    eligible children an equal opportunity to enroll and
3    receive preschool services regardless of race, ethnicity,
4    religious affiliation, sexual orientation, gender
5    identity, lack of housing, income level, or disability, as
6    such characteristics and circumstances apply to the child
7    or the child's family."
8        Do you see that?
9    A.  Yes.
10   Q.  Okay.  So to participate in UPK, providers
11   have to agree to provide equal access to students and
12   their families regardless of any of these listed
13   identities in that provision; is that right?
14   A.  Yes.
15   Q.  Okay.  And this provision, it's
16   specifically about enrollment, right?  Equal access to
17   enrollment based on these identities?
18   A.  To enroll and receive preschool services.
19   Q.  To enroll and receive preschool services.
20   Okay.
21       But that's not, in and of itself, about
22   employment, like who gets employed at the preschool, is
23   it?
24   A.  It isn't.
25   Q.  Okay.  Why was this provision included in

Page 52

1    the prov- -- in the -- in the agreement?
2    A.  It's in the law.
3    Q.  It's in the legislator's UPK bill?
4    A.  Yes.
5    Q.  Okay.  So you're saying the department
6    didn't have any discretion as to whether or not to make
7    this one of the quality assurance standards?
8    A.  Correct.
9    Q.  Okay.  So I'd like to talk a little bit
10   about what the -- what it actually means.
11       So, you know, let's say a preschool
12   provider declines to enroll a child because the student is
13   African-American.  Would that violate the provision?
14       MS. CARRENO:  And objection to the extent
15   it calls for speculation.
16       MR. DAVIS:  Yeah.
17   Q.  (By Mr. Davis)  You can answer, Ms. Odean.
18   A.  Sure.  So without knowing the whole
19   situation, we certainly would, you know, confer with our
20   department leadership and our attorneys if needed --
21   Q.  Yeah.
22   A.  -- once that's been elevated to us.
23   Q.  Sure.  But if the scenario is a provider
24   refuses to enroll the student because the student is
25   African-American, that is not providing equal opportunity

Page 53

1    to enroll based on race, is it?
2    A.  Again, it's hard to speculate without
3    knowing the actual situation, but we certainly would be
4    charged with addressing that --
5    Q.  Okay.
6    A.  -- and finding out.
7    Q.  And finding out what?
8    A.  What occurred.
9    Q.  Okay.  And to be clear, I'm sort of telling
10   you what occurred, right?  I'm asking for you to tell me
11   your understanding of what the provision means in that
12   situation.
13       And so I'm telling you that what occurred
14   is the provider declined to enroll a student that had
15   sought enrollment at that provider, and the provider
16   declined to enroll the student because of the student's
17   race.
18       Would that violate this provision?
19       MS. CARRENO:  Objection.  Asked and
20   answered.
21   Q.  (By Mr. Davis)  You can answer, Ms. Odean.
22   A.  I -- I can't speculate because I would
23   have to find out more about the actual situation, but we
24   certainly would be charged with --
25   Q.  Okay.  So maybe a --

14 (Pages 50 - 53)

Page 54

1    THE REPORTER: I'm sorry. I'm sorry. I'm
2  sorry. "...be charged with..." I didn't hear that.
3    THE DEPONENT: Following what's set forth
4  for us in the law.
5    MR. REAVES: Upholding the law.
6    Q.  (By Mr. Davis) Okay. So maybe a provider
7  could decline to enroll a student because the student is
8  African-American?
9    MS. CARRENO: Objection. It misstates her
10  testimony.
11    MR. DAVIS: Well, she said she needs to
12  know more, so, you know --
13    Q.  (By Mr. Davis) You don't have to answer
14  that question. I'll rephrase it, Ms. Odean.
15    But I'm telling you that -- if a provider
16  declines to enroll a student because the student is
17  African-American, is that in violation of this provision
18  or not? And I believe your testimony a moment ago was
19  you'd have to know more.
20    And my question is, does that suggest that
21  sometimes a provider could decline to enroll a student
22  because the student is African-American?
23    A.  I'm -- I'm just trying to say that we
24  would be consulting with our leadership and our attorney
25  to determine the actual situation, which typically might

Page 55

1  be more than that. So we would want to find out to
2  determine if that was the case, and then determine what
3  the proper action might be.
4    Q.  Okay. And if what you determined was the
5  provider declined to enroll the student because the
6  student is African-American, would that violate this
7  provision?
8    MS. CARRENO: Objection. Asked and
9  answered.
10    Q.  (By Mr. Davis) You can answer, Ms. Odean.
11    A.  Again, I would consult with our attorney
12  to determine that.
13    Q.  Okay. So if you determined --
14    A.  It wouldn't be my sole decision.
15    Q.  I'm asking for your understanding of what
16  this provision means as the representative of the
17  Department of Early Childhood. And you testified that you
18  would have to determine what happened.
19    And I'm telling you that what happened is
20  the provider -- if you determined that what happened is
21  the provider declined to enroll a student because the
22  student is African-American, would that be a violation of
23  the provision?
24    And I believe you testified just now that
25  you'd have to consult with your attorney about something

Page 56

1  else, and I'm not clear on what that something else would
2  be.
3    A.  Yeah, I guess I'm not clear on what you're
4  asking. So you're giving a scenario that's pretty
5  pinpointed, and what I'm saying is we would absolutely,
6  because of the law, investigate to understand what
7  occurred and -- and then take action based on that.
8    We don't have a determined process for
9  what the outcome of that would be or what the action
10  would be, but we would certainly address it and make that
11  decision based on the actual situation as it might have
12  occurred.
13    Q.  Okay. And I'm not asking about what you
14  would -- what you would do. I'm really trying to get at
15  what this contract means that you have providers sign,
16  right? And you testified earlier that providers are bound
17  by it, the department is bound by it. And so I think it
18  needs to mean something.
19    My question for you is just you've
20  consulted with your lawyers, and what you've determined is
21  this student was declined admission at the preschool
22  because of his race. Does that violate this provision?
23    MS. CARRENO: And objection. She said
24  that she can't answer that scenario without actual facts
25  before her and the department several times now.

Page 57

1    Q.  (By Mr. Davis) You can answer, Ms. Odean.
2    A.  The department would need to understand
3  the total scope of the scenario to ensure that any
4  instance in the provider agreement was met or not met.
5    Q.  Yeah. So there -- there's some further
6  determination that you can -- some -- strike that.
7    Are there any further facts that you can
8  discover in consultation with your attorneys when a
9  provider has declined admission because of the student's
10  race that would make that permissible under this
11  provision?
12    MS. CARRENO: Objection. Speculation, but
13  you can answer.
14    A.  Yeah, I think -- I think that's what's
15  difficult is the -- understanding the total scenario that
16  didn't occur that we're making up.
17    So I don't want to speculate without
18  knowing the full picture. Certainly presuming that the
19  agreement is there for a reason that will uphold the
20  agreement, but would want to go through with integrity of
21  process to determine if there was an actual violation or
22  not.
23    Q.  (By Mr. Davis) Okay. A provider who signs
24  this agreement is then bound by it, right? We discussed
25  that earlier.

15 (Pages 54 - 57)

1     A. Yes.
2     Q. Okay. Would you agree that the provider
3  needs to know what they can and cannot do in order to
4  comply with this agreement?
5     A. Yes.
6     Q. Okay. So if a provider came up to you and
7  asked you the same question I'm asking you now, may I
8  decline to enroll students because of their race under
9  this agreement, what would your answer be?
10    MS. CARRENO: Objection. Speculation.
11  You can answer it.
12    A. They would not be able to.
13    Q. (By Mr. Davis) The answer is no, they
14  would not be able to decline to enroll a student because
15  the student is African-American?
16    THE REPORTER: I'm sorry. I didn't hear
17  the answer.
18    THE DEPONENT: Yes. Correct.
19    Q. (By Mr. Davis) Okay. If a provider, along
20  the same lines, came up to you and asked you, Director
21  Odean, am I allowed to deny admission to a student because
22  the student is transgender, what would your answer be?
23    MS. CARRENO: Objection. Speculation.
24    Q. (By Mr. Davis) You can answer.
25    A. I would say what's in the agreement. And

1  again, it's voluntary to participate, and it's in the
2  agreement. So we would follow the agreement. But not
3  knowing a specific situation, I wouldn't want to
4  speculate.
5     Q. (By Mr. Davis) Okay. And earlier you
6  said -- your answer to -- can I deny admission to a
7  student because they're African-American, your answer was
8  no, and that's because the agreement says providers must
9  provide equal access -- or sorry, an equal opportunity to
10  enroll regardless of race; is that right?
11    A. It's -- it's true of everything in the
12  agreement. So if a provider had a question at any point
13  of the agreement, I would say, we have the agreement, and
14  it is voluntary to participate. So we are all operating
15  and following the agreement. If there is a specific
16  instance, then after the agreement is signed when it's in
17  process, we would refer back to that agreement and we
18  would look into any specifics before we go any further.
19    Q. Okay. The agreement also says, just like
20  with race, that providers must provide an equal
21  opportunity to enroll regardless of gender identity,
22  right?
23    THE REPORTER: I'm sorry. I didn't hear
24  the answer.
25    THE DEPONENT: Yes.

1     Q. (By Mr. Davis) Okay. So -- so if the
2  answer is no, you're not allowed to decline to enroll
3  students because of their race, the answer is also no,
4  you're not allowed to decline to enroll students because
5  they're transgender; is that right?
6     MS. CARRENO: Objection. You're
7  mischaracterizing her testimony.
8     But you can answer if you can.
9     A. Yeah, again, I think it speaks to any part
10  of the agreement that we have in place.
11    So maximum allowable educator-to-child
12  ratios. If a provider came to me and said we're going to
13  go above that, then I would say, that's not part of our
14  provider agreement for universal preschool, and you
15  should consider if you want to participate.
16    If we're in program and someone has
17  already signed an agreement, then we would go through a
18  process to determine that -- the specifics around that
19  particular point in the agreement to determine next
20  steps.
21    Q. (By Mr. Davis) Okay. So you enforce each
22  provision of the agreement equally as they're written in
23  the agreement?
24    A. We follow the agreement, and we expect
25  providers to. We haven't had any specific events that

1  have called into question, since the program was started,
2  the provider agreement not being followed.
3     Q. Okay. So you expect providers to provide
4  equal opportunity regardless of race, gender identity,
5  religious affiliation, and sexual orientation?
6     A. Yes.
7     Q. And you wouldn't expect providers to
8  decline admission to a student because of one of those
9  identities, right?
10    A. Can you say that again?
11    Q. Yeah. Your expectation would be that
12  providers should not decline to enroll a student because
13  of any of those identities, race, religious affiliation,
14  gender identity, sexual orientation?
15    MR. DAVIS: Did you get that, Laurel, the
16  response?
17    THE REPORTER: No, I did not.
18    THE DEPONENT: Correct.
19    Q. (By Mr. Davis) And that's true -- those
20  identities -- strike that.
21    It's -- it's race, sexual orientation,
22  religious affiliation, gender identity not just of the
23  child, but of the child's family.
24    Is that what the agreement says?
25    A. Yes.

1      Q.   Okay.  So a school also couldn't decline --
2  you wouldn't expect a school to decline to enroll a
3  student because of the family member's sexual orientation
4  is that right?
5      MS. CARRENO:  Objection -- objection.
6  Calls for speculation.
7      You can answer if you can.
8      A.   I wouldn't expect a provider to go against
9  the agreement.
10     Q.   (By Mr. Davis)  Okay.  And it would -- it
11 would be going against the agreement to decline to enroll
12 a student because his or her parents or guardians are in a
13 same-sex marriage?
14     A.   It's a requirement in the provider
15 agreement.  But again, I wouldn't speculate a specific
16 scenario without the details.
17     Q.   Okay.  And if a provider couldn't agree to
18 that requirement in the provider agreement, they shouldn't
19 sign the agreement, right?
20     MS. CARRENO:  Calls for speculation.
21     Q.   (By Mr. Davis)  You can answer.
22     MS. CARRENO:  You can answer if you can.
23     A.   Yeah, again, hard to know without the
24 specific facts, but the provider agreement is -- is set
25 forth to follow.

1      Q.   (By Mr. Davis)  Okay.  Let's go down a
2  little further in the provider agreement to page PL55.
3      Just let me know when you've gotten there.
4      A.   I'm there.
5      Q.   Great.  And do you see provision 18(b),
6  which is entitled Discrimination?
7      A.   Yes.
8      Q.   Great.  And that provision says, "The
9  provider shall not discriminate against any person on the
10 basis of gender, race, ethnicity, religion, national
11 origin, age, sexual orientation, gender identity,
12 citizenship status, education, disability, socioeconomic
13 status, or any other identity."
14     Do you see that?
15     A.   Yes.
16     Q.   Okay.  So "any person there," a provider
17 shall not discriminate against any person, that's not
18 limited to students, is it?
19     A.   That says "any person."
20     Q.   Right.  So "any person" would also include
21 like a child's employees?
22     A.   Provider's employees are covered under the
23 contract allowance provision federally.
24     Q.   I'm sorry, what is the contract allowance
25 provision?

1      A.   I'm trying to find it.
2      The only thing required of employees for
3  our providers is through our licensing, expectations of
4  their credentialing.  So this is not specific to
5  employees.
6      Q.   Right.  I -- so it's not specific to
7  employees, but I think you testified that "any person"
8  includes employees, right; an employee is a person?
9      A.   It says family -- children and their
10 families specific to our preschool program.
11     MR. DAVIS:  I'm sorry.  Could you --
12 Laurel, did you get that?  Could you read it back if you
13 did?
14     (The last question was read.)
15     Q.   (By Mr. Davis)  Okay.  So you think -- so,
16 Ms. Odean, you're saying that "provider shall not
17 discriminate against any person," "any person" there
18 exclusively means student or the student's family?
19     A.   Yes, that's my understanding.
20     Q.   Did you ever locate that other provision
21 that you said was the one that applied to employees?
22     A.   No, I didn't.  I need to consult with
23 Virginia on that.
24     Q.   Ms. Odean, I'm asking for your
25 understanding as the witness here, not for -- not for your

1  counsel's understanding.
2      A.   Okay.  So I'm just trying to remember the
3  correct name so I don't misspeak.  But there's a federal
4  allowance for a religious employer to hire co-religious
5  state employees, which we also follow.
6      So when you're asking me questions about
7  if this applies to employees, I'm trying to refer to
8  that, but I can't find it in front of me, and I don't
9  want to state it incorrectly.
10     Q.   Okay.  Sure.  I think we're -- I think
11 we're closer on the same page now.
12     A.   Okay.
13     Q.   So I want to -- I want to bracket off
14 religious employers a little bit and just talk about what
15 this provision 18(B) means like for a person -- a
16 preschool provider who signs the provider agreement, what
17 are they agreeing to here in provision 18(B)?
18     And it says discriminate -- the provider
19 shall not discriminate against any person on a number of
20 these bases.
21     For a nonreligious provider, is that
22 provider agreeing not to discriminate against their
23 employees on any of these bases by signing this agreement?
24     A.   I'm reading all of (B) to make sure.
25     Q.   Sure.  Take your time.

17 (Pages 62 - 65)

1     A.  It's my understanding that the provider
2  can't discriminate against any person unless there's
3  another specific allowance that's also written.
4     Q.  You said "can't," right?
5     A.  Correct.
6     Q.  Okay.  So a provider can't discriminate
7  against its employees on any of these bases unless there's
8  another specific allowance?
9     A.  Well, the allowance -- federal allowance
10  trumps state law, which stands as our program agreement.
11     Q.  Of course, right.  So -- but if there's no
12  federal allowance, I'm just asking you -- I think this is
13  what you testified.  I'm just asking you to confirm.  A
14  provider -- if there's no federal allowance, a provider
15  cannot discriminate against its employees on any of these
16  bases set out in provision 18(B)?
17     A.  I think we're starting to get into that
18  speculate scenario again as well.  And so certainly would
19  want to understand the full concern if one was
20  elevated -- if there's a claim and the facts of that
21  claim to be able to determine that occurred or didn't
22  occur and what steps would be taken.
23     Q.  I'm just asking, Ms. Odean, what the
24  provision requires.  Like, a provider needs to understand
25  what they're agreeing to when they sign this agreement so

1  that they can then abide by it.
2     A.  Yeah.
3     Q.  I think we agreed earlier that the
4  department wants the provision -- you know, wants the
5  whole provision to be -- to be abided by.  So is --
6     A.  Certainly -- I can't speak on behalf of
7  the provider -- I can't speak on behalf of the provider
8  and how they're interpreting this, but -- but it is an
9  agreement saying not to discriminate on this basis.
10     Q.  Right.  Including against employees as well
11  as students?
12     A.  Again, I would say yes, unless there's
13  another federal mandate that gives an allowance.
14     Q.  Okay.  Thank you.
15        So why did the -- why is this provision in
16  the provider agreement?
17     A.  I was not a drafter of the provider
18  agreement.
19     Q.  Okay.  But you approved the provider
20  agreement, right?
21     A.  It was approved.
22     Q.  By the department?
23     A.  Yes.
24     Q.  And you're testifying on behalf of the
25  department?

1     A.  Yes.
2     Q.  Okay.  So why did the department approve
3  this provision?
4     A.  We approved the agreement in its entirety
5  to ensure that we were following through on our charge of
6  implementing universal preschool with providers.
7     Q.  Okay.
8     A.  So that they had assurances and we had
9  assurances.
10     Q.  Great.
11        When we were discussing the provision a
12  moment ago about equal opportunity to enroll, I asked you
13  why the department included that provision, and you said,
14  well, it's in the bill.  The law required us to include
15  that provision, right.
16        Did the Colorado legislature require you
17  specifically to include this provision, 18(B)?
18     A.  I don't know the answer to that.
19     Q.  Okay.  But it's not your current
20  understanding that the reason it's there is because the
21  bill required it to be there, right?
22     A.  I don't know either way.  I do know that
23  children and family is in the law.
24     Q.  Okay.
25        We got hung up a little bit there maybe on

1  employees, but I do -- I want to focus on children and
2  families, which I think you agree would also be covered by
3  provision 18(B).  I just want to be clear about what that
4  means.
5        So the provider can't discriminate against
6  any person on any of these bases, and I think we discussed
7  earlier that, you know, it doesn't say "in enrollment."
8  It's just in general, can't discriminate against anybody
9  on these bases; is that right?
10     MS. CARRENO:  Objection.  Form.
11        You can answer it if you understood.
12     A.  Yeah, I don't -- I don't know that.  When
13  I look at the total of (B), I certainly am approaching it
14  from the program, which is enrollment and being able to
15  participate in the services of the program.
16     Q.  (By Mr. Davis)  Okay.  So, like, if a UPK
17  provider, you know, made certain benefits during the day
18  available based on, like, race or sex, like, only boys
19  could have recess time, you know, girls had to stay
20  inside, would that be discriminating against any person on
21  the basis of their sex or gender identity?
22     MS. CARRENO:  Objection.  Form and
23  speculation.
24     Q.  (By Mr. Davis)  You can answer.
25     A.  I certainly would -- we certainly would

Page 70

1  look into it further to find out the facts.
2      Q.  Okay.  You're not really sure, though, if
3  it's in the provision or not?
4      A.  I'm not an attorney, but I certainly know
5  that it would be our charge in the program to look into
6  the facts.
7      Q.  You'd need to look into that -- it at least
8  might.  You'd need to look into it further.  Is that
9  right?
10     A.  Yes.
11     Q.  Okay.  What about if a provider, you know,
12  similarly declined an accommodation for a transgender
13  student, so refused to allow the student to use, like, the
14  facilities of the sex that the student identifies with.
15  Would that present a problem under this provision?
16         MS. CARRENO:  Objection.  Asked and
17  answered.  Speculation.
18         You can answer.
19     A.  I'd say the same.  It certainly would be
20  incumbent upon the program to look into it and find out
21  the facts.
22     Q.  (By Mr. Davis)  Okay.  What would you need
23  to know to determine finally whether that was a violation
24  or not?
25         MS. CARRENO:  Objection.  Speculation.

Page 71

1      Q.  (By Mr. Davis)  You can answer.
2      A.  Yeah, it's -- it's hard to speculate on a
3  made-up scenario without specific facts.  Again, it would
4  be a process to determine what occurred and what steps
5  would be taken that would be inclusive of our leadership,
6  of our department, as well as our attorney general.
7      Q.  Okay.  When a provider signs this
8  agreement, you know, they're also signing it before they
9  have any specific facts like these, right?
10     A.  I can't speak on a provider's behalf.
11     Q.  Okay.  I mean, a provider has a policy,
12  say, of -- of declining accommodations to transgender
13  students along the lines that I just set out, and that
14  provider needs to know am I allowed to continue doing that
15  if I sign this agreement.  What's your answer to that
16  provider?
17         MS. CARRENO:  Objection.  Form.
18  Speculation.
19         You can answer.
20     A.  If a provider is not currently
21  participating and is asking these questions, I would say,
22  this is our agreement that we're agreeing to, you're
23  agreeing to, and if you don't feel like you can meet any
24  one of these assurances -- that this a voluntary program.
25  And again, that's different than -- as I stated earlier,

Page 72

1  than once we're in program and if there's a specific
2  claim that is made.
3      Q.  (By Mr. Davis)  Okay.  I'm going to tee up
4  another exhibit here, if you'll just give me a moment,
5  Ms. Odean.
6         Okay.  All right.  If you refresh, I think
7  you should have Exhibit 3.
8         Do you have it?
9      A.  It's loading.
10     Q.  Okay.
11     A.  I have it.
12     Q.  Great.
13         (Exhibit 3 was marked.)
14     Q.  Do you recognize this document?
15     A.  Yes.
16     Q.  Okay.  This is a declaration that you filed
17  previously in this litigation, right?
18     A.  Yes.
19     Q.  Okay.  If I could just have you scroll down
20  to -- it looks like it's page 5, paragraph 16.
21         Are you there?
22     A.  Yes.
23     Q.  Okay.  Great.  I just want to pull this up
24  and see if it sort of refreshed your recollection earlier,
25  when you were testifying about a federal allowance.

Page 73

1         Is this what you were referring to?
2      A.  Yes.
3      Q.  Okay.  And it says here, "The department
4  disavows enforcement of contractual provision 18(B) -- so
5  I think that was the one we just were discussing with
6  respect to employees -- "against religious providers who
7  hire co-religious in accordance with federal law and
8  against religious providers' employment decisions
9  involving their ministerial employees, as protected by
10  federal law."
11         Do you see that?
12     A.  Yes.
13     Q.  Okay.  Ms. Odean, do you know -- strike
14  that.
15         Does the department believe that all of a
16  religious school's -- or a religious preschool's teachers
17  are ministerial employees?
18         MS. CARRENO:  Objection.  Call for a legal
19  conclusion.
20         You can answer.
21     Q.  (By Mr. Davis)  You can answer.
22     A.  I'm not an attorney.  My understanding of
23  16 is that religious organizations can hire based on
24  their beliefs, and that isn't something the department
25  would review specifically or determine.

19 (Pages 70 - 73)

Page 74

1    Q.  Okay.  I do want to look at the -- it does
2   look like there's two different parts of this.  I want to
3   get to the second half of it first.
4       So it says, "the department" --
5       THE REPORTER:  I'm sorry.  When you read,
6   can you slow down just a little bit, please?
7       MR. DAVIS:  Sure.  Sorry.
8    Q.  (By Mr. Davis)  It says, "The department
9   disavows enforcement of contractual provision 18(B)" --
10  skipping to the second half -- "against religious
11  providers' employment decisions involving their
12  ministerial employees."
13      Do you see that?
14   A.  Yes.
15   Q.  Do you know what a provider's ministerial
16  employees are?
17   A.  I -- I don't know specifically how they
18  might define who their employees are.
19   Q.  Okay.  But this is your declaration, and
20  you're saying the department disavows enforcement against
21  a religious provider with respect to its ministerial
22  employees, and I'm just asking you what did you mean by
23  that?  Who are the provider's ministerial employees?
24      MS. CARRENO:  And objection.  Calls for a
25  legal conclusion.

Page 75

1       You can answer.
2    Q.  (By Mr. Davis)  You can answer.
3    A.  Yeah, from the program side, not being an
4   attorney or a religious organization, I would say the
5   program won't be investigating who providers are hiring
6   outside of the credentials that are expected for a
7   licensed preschool provider.
8    Q.  Okay.  So you don't know who a -- you don't
9   know who a provider's ministerial employees might or might
10  not be because you're not a lawyer?
11   A.  I'm not a religious organization hiring
12  employees either.
13   Q.  I'm sorry.  I'm sorry.  What was that?
14   A.  I'm also not a religious organization
15  hiring employees either.  So I'm not sure -- maybe I
16  don't understand the question.  Can you rephrase it?
17   Q.  All right.  Yeah, let me rephrase it.
18      In this paragraph of your declaration,
19  you're saying the department disavows enforcement, will
20  not enforce contractual provision 18(B), with respect to a
21  religious provider's hiring of its ministerial employees,
22  and I'm just asking you, what does that mean?
23      You know, when -- your understanding, when
24  you agreed to this declaration, what did you understand a
25  religious provider's "ministerial employees" mean?

Page 76

1    A.  That means that the program wouldn't be
2   reviewing who or how they hired their employees for their
3   program.
4    Q.  With ministerial employees?
5    A.  The expectations around the licensed,
6   credentialed preschool providers.
7    Q.  Okay.  Specifically their ministerial
8   employees, right?
9       MS. CARRENO:  Objection.  Mischaracterizes
10  her testimony.
11   Q.  (By Mr. Davis)  You can answer.
12   A.  Could you ask it again?
13   Q.  Sure.  I'm just trying to get at -- well,
14  let me strike that.
15      Ms. Odean, are you -- when you're
16  testifying about how the department is going to enforce
17  contractual provision 18(B) against religious providers,
18  are you intending to say anything beyond what this
19  declaration paragraph 16 says, or are you intending to say
20  that that's the department's position here in paragraph
21  16?
22      MS. CARRENO:  Objection to form.
23      You can answer.
24   Q.  (By Mr. Davis)  You can answer.
25   A.  I'm saying for our providers in program,

Page 77

1   the expectations are that they have -- that they meet the
2   expectations that are required by licensing, but that we
3   wouldn't tell a particular provider that the decisions
4   had to be made in a certain way.  In this specific
5   instance, a religious organization.
6    Q.  I'm sorry.  Was that the end of your
7   answer?
8    A.  I'd have to have Laurel read it back.
9    Q.  Okay.  We can -- I just thought that was
10  the middle of an answer, so -- okay.  Thank you.
11      MR. DAVIS:  I think we can -- I think we
12  can leave off here for -- maybe for another 10-minute
13  break.
14      (Discussion off the record.)
15      (Recess from 11:05 a.m. to 11:17 a.m.)
16   Q.  (By Mr. Davis)  Great.  I'm going to go
17  ahead and mark our next exhibit.  And just let me know
18  when you've got it.
19      Did you try hitting refresh?
20   A.  I did.  It's loading.
21   Q.  Okay.
22      Still not there?
23   A.  Still loading.
24      (Exhibit 4 was marked.)
25      MS. CARRENO:  We're just trying to load

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 the document.

2     A.  I have it.

3     Q.  (By Mr. Davis)  Okay.  Great.  Do you

4 recognize this document?

5     A.  Yes.

6     Q.  What is it?

7     A.  This is a technical guide to show the

8 process for providers when they're navigating the system.

9     Q.  Okay.  And it's just titled The Provider

10 Guide, right?

11     A.  Yes.

12     Q.  Okay.  I'll use that term as I'm asking the

13 questions.

14     Who put it together?

15     A.  The Office of -- the Office of the

16 Information Technology team put together this guide.

17     Q.  Did they come up with the content as well?

18     A.  With -- with program input.

19     Q.  With program in -- what does "program

20 input" mean?

21     A.  So they developed the guide, and program

22 reviewed -- our transition director reviewed and adjusted

23 content where needed.

24     Q.  Okay.  And then -- and then approved it so

25 this became the allotted provider guide, right?

1     A.  Yes.

2     Q.  Okay.  Can you scroll down to page PO105,

3 please.

4     A.  Yes.

5     Q.  Okay.  So is this a -- this was setting out

6 those preferences that we were discussing earlier that

7 would allow a provider to decline a match; is that right?

8     A.  Yes.

9     Q.  Okay.  And I think we discussed earlier in

10 general, providers are supposed to accept the matches that

11 they're given, but if one of these preferences applies,

12 the provider might be able to decline the match; is that

13 right?

14     THE REPORTER:  I'm sorry.  I didn't hear

15 the answer.

16     THE DEPONENT:  Yes.

17     Q.  (By Mr. Davis)  Okay.  Why did the

18 department decide to include these preferences?

19     A.  We had heard from our local coordinating

20 organizations and directly from providers that these

21 would be helpful in ensuring inclusion in a particular

22 community or of a particular provider type.

23     Q.  So you're responding to feedback you got

24 from providers?

25     A.  Yes.

1     Q.  Could you have declined to respond to that

2 feedback and not included these preferences?

3     A.  Yes.

4     Q.  So, I mean, the bill -- the UPK bill for

5 the legislature doesn't tell you -- doesn't lay out these

6 preferences one way or the other, right?

7     A.  At this early stage, the program really

8 prioritized inclusion of mixed delivery and ensuring that

9 as many providers could participate as possible.  And we

10 believed that this allowed for the options with mixed

11 delivery.

12     Q.  Okay.  Great.

13     I want to walk through some of them just a

14 little bit and try to get a better sense of what they

15 mean.  Let me start with the co-op one.  It says you can

16 check the box -- the provider could check the box saying

17 I'm a co-op and will require family participation as part

18 of my programming.

19     Do you see that?

20     A.  Yes.

21     Q.  What kind of family participation can

22 co-ops require?

23     A.  That depends on the co-op, but it's a

24 specific model that many providers utilize to ensure a

25 certain level of family participation at their particular

1 location.

2     Q.  Got it.

3     And if a family says that they are unable

4 to participate, the co-op can decline that match?

5     A.  Yes.

6     Q.  Okay.  What is the co-op model?  What

7 exactly is that?

8     A.  The co-op model is where families

9 volunteer a certain amount of their time at that

10 particular program.

11     Q.  So families whose children are part of that

12 preschool are actually helping to run the preschool as

13 well?

14     A.  They're -- they may be helping with

15 particular programming.  So it's a licensed location with

16 credentialed, licensed educators, as well as the families

17 participating in volunteering in different -- in

18 different ways.

19     Q.  Okay.  So if a family tells the provider

20 they're unable to participate, the provider can then

21 decline that match, right?

22     A.  Yes.

23     Q.  Can the provider ask families to share its

24 educational philosophy in order to enroll at the co-op?

25     MS. CARRENO:  Objection.  Speculation.

1      You can answer.
2      A.   This is intended specifically for the
3  volunteering contract that a co-op might have for their
4  families.
5      Q.   (By Mr. Davis) I'm sorry.  Could you
6  repeat that?
7      A.   This is -- the one we're discussing is
8  where a co-op can decline if the family chooses not to
9  participate in the volunteering aspect of the program.
10      Q.   The co-op can define the participation that
11  they're looking for, and then if the family says they
12  can't supply that type of participation, the co-op can
13  decline the match?
14      A.   Yes.
15      Q.   Okay.  So the co-op could say, you know,
16  we're a Montessori co-op.  Families need to be -- family
17  participation needs to -- needs to track the Montessori
18  educational model, and if families can't agree to that,
19  they could decline the match?
20      MS. CARRENO:  Objection.  Form.
21      You can answer.
22      A.   No, that's -- that usually isn't tied to
23  this model specifically.
24      Q.   (By Mr. Davis) Okay.  So what did you mean
25  by that?

1      A.   What we heard from providers was that
2  families are required to volunteer for a specific amount
3  of time, and if they're unable to do that, they're unable
4  to participate in the co-op program.
5      Q.   Okay.
6      We'll look at the next one.  "I am a
7  immersive or dual language provider, and children need
8  to be screened to participate in my program."
9      Do you see that?
10      A.   Yes.
11      Q.   What kind of screening can immersive or
12  dual language providers engage in?
13      A.   It depends on the expectations of their
14  dual program.  So we have a particular provider who has a
15  federal expectation of providing a specific dual language
16  program that has specific participation required.
17      Q.   Specific participation from who?
18      A.   From the provider, the educator, and the
19  child.
20      Q.   I'm sorry, could you just explain what you
21  mean by that?  So the child has some participation -- some
22  federal participation requirements and the --
23      A.   To participate in the program, their level
24  of language might have to be at a specific yield.  But
25  you have to talk to that provider specifically on what

1  they're held accountable for.
2      Q.   I see.
3      A.   What we have heard was there were federal
4  mandates to serve children who may have a native language
5  other than English and expectations of the program that
6  are aligned to that.
7      Q.   I see.  So what you heard was some dual
8  language providers or immersive providers might require
9  children to be at a certain level in the other language in
10  order to enroll at that preschool?
11      A.   Yes.
12      Q.   Okay.  And this preference criteria is
13  designed to provide that to the providers?
14      A.   Yes.
15      Q.   Okay.  The next one, "I am a school
16  district provider and will require families to live in my
17  school district or boundary."
18      Do you see that?
19      A.   Yes.
20      Q.   Why did the department include that
21  preference?
22      A.   Because school districts, that -- that
23  they may only be able to serve children who live within
24  their boundaries based on their capacity or their board
25  policy.

1      Q.   So not all of them might -- not all of them
2  might have that policy, but some school districts might
3  have that policy?
4      MS. CARRENO:  And just -- objection.  Can
5  you let her finish answering the question?  I don't think
6  she was finished.
7      Q.   (By Mr. Davis) Go ahead.
8      A.   Yeah.  I was saying that school districts
9  have set for them specific boundaries, and many of them
10  have board policy on prioritization of students within
11  those boundaries, funding tied to children within those
12  boundaries.  Some may have the capacity to serve children
13  outside their boundaries as well, and some may not.
14      And so this was elevated as a concern for
15  an open match of a child that might come from -- might
16  reside in a different school district boundary.
17      Q.   (By Mr. Davis) Do you know how a school
18  district might require a family to show that they live
19  within the boundaries?
20      A.   There's 178 different school districts, so
21  I can't speak to how they all verify -- verify that.
22      Q.   Yeah.  Do you know how any of them might
23  verify that?
24      A.   I can't speak on their behalf.
25      Q.   Okay.  Did Jefferson County prioritize

1 students that were within that school district?
2     A.  Yes.
3     Q.  How did Jefferson County require families
4 to show they lived in the school district?
5     A.  I wasn't a part of that department, but my
6 understanding was that families first attest to it, and
7 then they could be verified in a variety of different
8 ways with different documentation.
9     Q.  Okay.  Are there some families that can
10 participate in UPK and that don't have permanent
11 addresses, like they're unhoused?
12     A.  Yes.
13     Q.  Okay.  If those families couldn't show that
14 they lived within a particular school district, could that
15 school district decline to enroll them under this
16 preference?
17     MS. CARRENO:  Objection.  Speculation.
18     Q.  (By Mr. Davis)  Please answer.
19     A.  Again, I would say that, you know, each
20 district might have a different process or, you know,
21 further inquiry around where they are and how they serve.
22     Q.  Okay.  And the -- but the department would
23 be okay with that if that was the way the school
24 district's policy was set up?
25     MS. CARRENO:  Objection.  Speculation.

1 Mischaracterized her testimony.
2     You can answer.
3     A.  Yeah, it certainly isn't intended to not
4 serve unhomed families or children.  We certainly haven't
5 heard that as a concern that has been elevated.
6     This particular preference was for school
7 districts who are at their capacity and other children
8 were choicing in from other -- who had residential
9 addresses in other school district boundaries.
10     Q.  (By Mr. Davis)  Okay.  Is -- is your
11 testimony that you're not sure if that would fall within
12 this preference or not, a school district declining to
13 enroll an unhoused family because the unhoused family did
14 not reside within the district?
15     A.  Just to be really clear, when we wrote
16 these, we were presuming positive intentions of all of
17 our providers to be inclusive, to the provider types and
18 the unique expectations that they might have from other
19 state agencies or federally.
20     I'm pretty sure school districts can't
21 federally decline a homeless family, but I'm not a lawyer
22 or a school district at this point in time, and so I'm
23 not going to speak to that.
24     But I will say that the intention was to
25 ensure that where they have had to prioritize children

1 and not just take choice children from other districts,
2 if they don't have the capacity to serve more children,
3 that they -- we weren't requiring them, as a new program,
4 to do so.
5     Q.  Okay.  Looking at the next preference.
6 "I'm a Head Start grantee, and families may need to meet
7 additional factors to enroll with me."
8     Do you see that?
9     A.  I do.
10     Q.  Okay.  What is a Head Start grantee?
11     A.  A Head Start grantee receives federal
12 funds to provide Head Start services, including
13 preschool.
14     Q.  Okay.  And what kind of additional factors
15 does the department understand to fall within this
16 preference?
17     A.  So Head Start has -- and again, I don't
18 know the federal mandate as well as a Head Start grantee
19 would, but they receive funds directly from the federal
20 government to provide services for children at specific
21 income levels, for example, as a priority.
22     I know another part of that is children
23 with individualized education program.  Some Head Start
24 grantees may provide services earlier than preschool age,
25 and some may only provide preschool age.  But they

1 provide comprehensive services for families who may need
2 those within their programming.
3     Q.  Okay.  So the additional factors could
4 include income qualifications?
5     A.  Yes.
6     Q.  Okay.  So like a family could exceed the
7 income qualifications and, thus, not be able to enroll
8 with the grantee?
9     MS. CARRENO:  Objection.  Calls for
10 speculation of Head Start -- Head Start grantees.
11     A.  Yeah, and I would say that we heard from
12 Head Start providers who were participating that they
13 wouldn't be able to take just anyone who applied because
14 their federal mandate is to serve specific families and
15 their children.  And we presumed that they're following
16 their federal mandate and their charge, and that the
17 State, in a new program, isn't getting in between that.
18     Q.  (By Mr. Davis)  Okay.  Your
19 understanding -- that's all I'm asking you to testify to,
20 Ms. Odean -- is that these additional factors that are
21 mentioned in this preference could include income
22 qualifications?
23     A.  Yes.
24     Q.  Okay.
25     Is there any other basis on which a

23 (Pages 86 - 89)

1  provider could decline a match besides these preferences
2  that we've been discussing? Strike that. Let me clarify
3  the question.
4          Besides -- is there any other basis on
5  which a provider could client a match other than these
6  preferences that are listed here on PL105? And I say that
7  because we didn't discuss some of these.
8      A.  We had one other instance where we had a
9  provider who was a charter school who served high school
10  students with children as a priority. So we added that
11  in later for that particular provider to be able to
12  prioritize their students' children.
13      Q.  Where did you add that in?
14      A.  We added that for that provider, that
15  specific provider. So we didn't -- this particular guide
16  was written at a specific point in time, and the program
17  has continued to refine since this guide was written.
18      Q.  Okay. So that provider came to the
19  department and said, We need to be able to include only
20  those children, and the department said, Okay, and you can
21  participate in UPK?
22      A.  They asked if they could prioritize them,
23  but that they might have seats for children outside their
24  program as well.
25      Q.  Okay. And who could they prioritize,

1  children of students?
2      A.  Students' children.
3      Q.  Their students' children. Okay.
4          Okay. Have there been any other
5  preferences the department has added besides that one?
6      A.  Not that I'm aware of, no.
7      Q.  Okay. If another provider came to you and
8  said they were in a similar situation as the one that
9  wanted to prioritize the children of its students, would
10  UPK also accommodate that?
11      MS. CARRENO: Objection. Speculation.
12          You can answer.
13      A.  Yeah, I think it would be hard to say.
14  Depending on what the ask was.
15      Q.  (By Mr. Davis) Okay. But these
16  preferences, these are the ones that the department --
17  these preferences on page PL105, these are the ones the
18  department had arrived at at this point in time, but there
19  could be further preferences if the need for them was
20  raised by a provider?
21      A.  Potentially, yes.
22      Q.  I'm going to mark another document here.
23          And I may want you to keep Exhibit 4 on
24  your screen, if you would, just in another tab. Is that
25  possible?

1      A.  I'll try.
2      MS. CARRENO: Sorry. Can you say that
3  again? Exhibit 4?
4      MR. DAVIS: Yeah, the provider guide that
5  we were just talking about.
6          You might want to keep that up, if you
7  could.
8      MS. CARRENO: Okay.
9          (Exhibit 5 was marked.)
10      Q.  (By Mr. Davis) All right. I'm showing you
11  Exhibit 5.
12          Let me know when you've got it.
13      A.  I have it.
14      Q.  Great.
15          Do you recognize this document?
16      A.  Yes.
17      Q.  What is it?
18      A.  This is where -- this is where a provider
19  could ask for a specific preference.
20      Q.  Okay. It's a form that was up on the UPK
21  website that allowed providers to ask for a particular
22  preference?
23      A.  I can't remember where it was posted.
24  It -- it's the form we used when there was a request.
25      Q.  Okay. Got it.

1      A.  Yeah.
2      Q.  So maybe a potential provider would reach
3  out and say, We'd like to request a preference, and you'd
4  send this form back to them?
5      A.  Yes.
6      Q.  Okay.
7          Do you know how many providers were sent
8  this form?
9      A.  I don't.
10      Q.  Okay.
11      A.  I could find out.
12      Q.  Is this form still active? Like, if a
13  provider came to you now and said, We'd like to
14  participate in UPK, but we may need a preference, would
15  you send them this form?
16      A.  Yes.
17      Q.  Okay. Is the -- is this the form that
18  the school that we were just discussing used to request a
19  preference for children that went to the school --
20  sorry -- children of students at the school?
21      A.  Yeah, I don't -- I don't recall off the
22  top of my head. These are processed through the local
23  coordinating organization and then to our state team, so
24  I'd have to look back and see if they completed this or
25  not.

1    Q.  Okay.  Do you know how many different
2  preferences have been requested using this form?
3    A.  I don't.
4    Q.  Do you have a ballpark?  Like a lot, a few,
5  one or two?
6    A.  Yeah, I don't -- it was more early on,
7  before enrollment.  So ballpark, I would say not very
8  many, and more in the earlier part of the year of
9  enrollment, but we can confirm that.
10    Q.  Okay.
11    MR. DAVIS:  These documents haven't been
12  provided to us, have they, Virginia?
13    MS. CARRENO:  Are you talking about this
14  specific form?  I don't know what documents you're
15  referring to.
16    MR. DAVIS:  Yeah.  Forms that were filled
17  out by providers or would-be providers that filled out
18  this form requesting a preference.
19    MS. CARRENO:  I don't recall those coming
20  up in our production.
21    MR. DAVIS:  Okay.
22    Q.  (By Mr. Davis)  I just want to scroll down
23  to the bottom where it says "Exception Requested."
24  Actually, strike that.
25    Let me just -- more generally, Ms. Odean,

1  what would the -- how would the department -- how did the
2  department process exception requests using this -- using
3  this form?
4    A.  So this went through the local
5  coordinating organization.  So we were hearing from our
6  local coordinating organizations who were in regular
7  contact with providers, especially prior to the launch of
8  the application, where providers were determining if they
9  were going to sign on, questions they had, concerns they
10  might have had, trends that we could be responsive to to
11  really truly be inclusive of mixed delivery.
12    And so we put the form in place to kind of
13  get an idea of that.  And it's also where we were hearing
14  about the weights.  So from kind of all provider types,
15  we were hearing a need for some kind of exception
16  preference around continuity of care.
17    We know that research shows that yields
18  high quality.  And we certainly didn't want families to
19  have to have children at multiple locations if they
20  didn't have to.  We wanted them to be able to stay at a
21  location that they'd been served in.
22    And then really trying to be thoughtful
23  about workforce and challenges around workforce as well.
24    So those were elevated to us from
25  providers directly, and also from our LCOs, as well as

1  some of these other expectations that a particular
2  provider might have that, again, we really wanted to be,
3  you know, inclusive and not create a program that didn't
4  allow for that robust mixed delivery opportunity for
5  providers, but really for families to find that
6  just-right provider.
7    Q.  Yeah, thank you.  I'm more just asking how
8  the department processes like an individual one of these
9  forms.  A provider says, Here's the exception I'd like to
10  request, and the department gets it.  Who would -- who
11  would decide whether to accommodate that preference or
12  not?
13    MS. CARRENO:  Objection to form on this
14  question to the extent that the department isn't the ones
15  that gets these forms.
16    But you can answer if you can -- if you
17  understood the question.
18    A.  Could you say that question again, please?
19    Q.  (By Mr. Davis)  Sure.
20    So when the department receives a form like
21  this -- you testified earlier a provider could say, Here's
22  a preference that I need, and UPK would -- or the
23  department would send them this form to fill out.
24    When the department receives that form, who
25  decides whether that's a preference that can be

1  accommodated or not?
2    A.  So initially we were really looking at if
3  it was a trend, if it was something that was going to
4  diminish providers or any specific provider type from
5  participating.
6    So these would be -- these would be
7  elevated to program from our local coordinating
8  organization or to us directly from providers, and we
9  would bring that to program leadership to make a
10  recommendation based on what we heard and the need.
11    Q.  Okay.  And what would you consider the
12  program leadership schedule -- at the program leadership's
13  level, what would you consider as to whether or not to
14  accommodate a particular preference?
15    A.  Yeah, so I think we were really looking at
16  is there a federal mandate, as we certainly couldn't get
17  in between that as a state agency.  Certainly looking at
18  being inclusive of mixed delivery and not diminishing a
19  specific charge of a program.  And then also, of course,
20  making sure that was in alignment with the law.
21    Q.  Okay.  I want to look down at the bottom of
22  the form.  Page 2, it says "Exception Requested."
23    Do you see that?
24    A.  Mm-hmm.
25    Q.  And it looks like it has a space for -- for

Page 98

1  that to be filled out. But I just want to look at the --
2  in the parentheses, it looks like there's some examples
3  listed. So first one --
4        THE REPORTER: I'm sorry. I'm sorry, sir,
5  but when you read, you just need to slow down for me.
6  Could you repeat, please?
7        MR. DAVIS: Sorry. Sure.
8        Q. (By Mr. Davis) I'm looking at the material
9  in the parentheses, and it looks like there's a couple of
10  examples given. So, for example, "My location only serves
11  teen moms enrolled in a neighboring high school." And "my
12  location only serves children with specific disabilities."
13        Is there any UPK provider that only serves
14  teen moms enrolled in a neighboring high school?
15        A. I don't know that for sure. We have
16  almost 2000 participating providers, so I'd have to look
17  back to see.
18        Q. Okay. Is that a preference that the
19  department could grant?
20        A. Potentially. Again, I wouldn't speculate.
21  I'd need to know more about the program. And we
22  certainly want to be inclusive of all providers, but want
23  families to have assurances to find -- to be able to find
24  the just-right program.
25        Q. Okay. And then what about that second one,

Page 99

1  "My location only serves children with specific
2  disabilities"? Are there any UPK providers that have that
3  preference?
4        A. We -- we do. We have school
5  district-based providers that have specific programs for
6  specific needs that are aligned to their federal mandate.
7        Q. Okay. So some UPK providers only serve
8  children with specific disabilities?
9        A. At a specific -- in a specific classroom,
10  it might be -- that school district providers serve all
11  children, but they might have a specific location that's
12  resourced for a special classroom.
13        Q. Sorry, I just want to make sure I
14  understand that. There's like a separate licensed UPK
15  provider that's accepting matches, has children enrolled,
16  that serves only children with particular disabilities?
17        MS. CARRENO: Objection. Form.
18        You can answer.
19        A. The school district may have multiple
20  licensed locations. One of those locations or a
21  particular classroom within that location may be
22  resourced to serve specific student needs based on their
23  federal mandate.
24        Q. (By Mr. Davis) Okay.
25        Are you aware of a particular provider

Page 100

1  that's participating in UPK that's called the Anchor
2  Center For Blind Children?
3        A. Not specifically.
4        Q. Okay. If the Anchor Center For Blind
5  Children exclusively served children who are blind, would
6  that be consistent with the UPK provider agreement?
7        MS. CARRENO: Objection. Speculation.
8        You can answer.
9        A. Yeah, again, I would look into it further
10  just for assurances. And it wouldn't be a director-only
11  decision, but, rather, a decision with our leadership
12  and -- to ensure that we're within the law. Certainly
13  would look into it.
14        Q. (By Mr. Davis) Okay. If we could turn
15  back in the tab to Exhibit 4 and scroll down to PL105.
16        Let me know when you're there.
17        A. I'm there.
18        Q. Great.
19        And I want to talk about one of the
20  preferences we skipped over earlier, which is the first
21  one, "I am a faith-based provider and may require families
22  to be a part of my congregation."
23        Do you see that?
24        A. Yes.
25        Q. Why did the department include this

Page 101

1  preference in the provider guide?
2        A. Again, we had heard from some providers
3  that that would assure that they could be included in
4  universal preschool.
5        Q. Which providers?
6        A. I'd have to look back. It was -- we were
7  hearing from our local coordinating organizations, and
8  their transition director had a faith-based working group
9  to have conversations with and kind of give information
10  out about universal preschool and find out what needs
11  might be.
12        So this was intended to be -- provide an
13  opportunity to be inclusive of faith-based providers
14  being able to participate with those assurances that were
15  requested.
16        Q. Okay. Was this a request of the
17  faith-based working group?
18        A. I believe it was part of the conversation.
19  I wasn't in attendance for those. Again, the transition
20  director led those. I did participate in an initial
21  meeting when we were giving an overview of the program
22  and some initial questions were asked.
23        Q. Okay. Was -- was this requested in that
24  meeting?
25        A. I don't -- I don't recall that

26 (Pages 98 - 101)

1  specifically.  Some of the questions were around if you
2  had to be all in or not, what the program types were,
3  what the rate would be, questions about if we were going
4  to say everyone had to use the same curriculum, that kind
5  of thing.
6      Q.  Okay.  Who ultimately decided yes, we will
7  have this preference as part of our program?
8      A.  Yeah, our program team and leadership
9  within the department.
10     Q.  Are you on that team?
11     A.  Yes.
12     Q.  Why did you make that decision?
13     A.  Again, I think really just trying to be
14 inclusive of mixed delivery and being thoughtful about
15 how we could give some assurances for folks to
16 participate.
17     Q.  Okay.  Was this language -- "I may require
18 families to be a part of my congregation."
19         Where did that language come from?  Was
20 there a model you were looking at?  Was that proposed to
21 you?
22     A.  Yeah, I don't -- I don't recall where it
23 came from specifically.  Again, we were moving in a
24 pretty compressed timeline and really working hard to be
25 responsive to be inclusive for the launch of the

1  application and give providers those assurances that they
2  could, you know, meet their charge and still participate.
3      Q.  Okay.  What do you mean by -- what do you
4  mean by "assurances"?
5      A.  Just so they knew that if they were
6  prioritizing members of their congregation, that they
7  could still participate in UPK and not just get matched
8  with a bunch of families that may not have been a part of
9  that congregation or that particular community that they
10 had established.
11     Q.  Okay.  What is the department's
12 understanding of -- of what a congregation is?
13     A.  Yeah, I think at that time, when it was
14 written and we were creating it, really trying to be
15 thoughtful about that inclusive community and not getting
16 in between that.
17         We had -- I guess, you know, that's really
18 similar to the co-op model too, is that understanding of
19 that particular community has that established program
20 and that faith-based providers may have that as well.
21         Certainly would also have access to
22 continuity of care where families had participated with
23 that particular provider and could continue on, and that
24 as new families came in, that they had -- that they had
25 this preference so that they could ensure to keep that

1  model that they provide in place.
2          And so again, really just trying to be
3  inclusive of providers being able to participate in -- in
4  the model that they operated under.
5      Q.  Yeah.  And -- that's helpful.
6          I'm just trying to understand, you know,
7  this preference gives the assurance that faith-based
8  providers may require families to be a part of my
9  congregation.  What is the department's understanding of
10 what it means to be part of the faith-based provider's
11 congregation?
12     A.  Yeah, certainly recognize that there's
13 been a lot of conversation about that since it was
14 written.  At the time, it was really just trying to be
15 thoughtful of that inclusive community and not
16 necessarily one particular definition.
17         And that -- I mean, that -- that would
18 be -- you know, as we move forward -- and you've probably
19 seen in our draft rule that consideration of further
20 definition.
21     Q.  Okay.  You know, why don't we mark the
22 draft rule so we can chat about it.
23         (Exhibit 6 was marked.)
24     Q.  All right.  You should have the next
25 exhibit.

1          Let me know when you have it.
2      A.  I have it.
3      Q.  Great.
4          Does this look like the draft regulations
5  that you were just mentioning?  You can take your time to
6  scroll through it.
7      A.  Yes.
8      Q.  Okay.  Great.
9          And on page 2, at the top, that's the
10 definition of "congregation" that's currently being
11 proposed?
12     A.  Yes.
13     Q.  Okay.  And then page 6, that's the
14 regulation that -- so next to the number one, that's the
15 regulation that is embodying that congregation preference
16 that we were just discussing from the provider guide?
17     A.  Yes.
18     Q.  Okay.  I want to talk about -- I want to
19 talk about -- sort of look at subsection B here.
20         So 4.110, and then subsection (b), says,
21 "In utilizing these programatic preferences, eligible
22 preschool providers must still comply with rule section
23 4.109(B)."
24         Do you see that?
25     A.  Yes.

27 (Pages 102 - 105)

1    Q.   Okay.  If we can just scroll down to
2  4.109(B) and make sure we're on the same page -- excuse
3  me, up to page 4.  I'm sorry.  Page 5.
4        Do you see 4.109(B)?
5    A.   Yes.
6    Q.   All right.  And that says, "Eligible
7  preschool providers must ensure that children receive an
8  opportunity to enroll and receive universal preschool
9  services regardless of religious affiliation, sexual
10 orientation, gender identity, as such characteristics and
11 circumstances apply to the child or the child's family."
12       Is that part of what it says?
13   A.   Yes.
14   Q.   Okay.  So the congregation preference, the
15 providers that utilize the congregation preference are
16 still subject to that requirement, right?
17   A.   Yes.
18   Q.   Okay.  Let's look at the definition of
19 "congregation" on page 2.
20       So congregation -- a congregation means "A
21 religious-based convocation of individuals in a particular
22 geographic area who share a common set of beliefs and who
23 collectively engage in conduct with a nexus to that set of
24 beliefs."
25       Do you see that?

1    A.   Yes.
2    Q.   So could a congregation be -- you know, for
3  example -- you know, I guess could a congregation, in that
4  definition, be Catholics within the Archdiocese of Denver?
5        MS. CARRENO:  Just objection to the extent
6  that these rules are not promulgated yet and not
7  effective.
8        But you can answer.
9    A.   I understand that in this draft
10 definition, that "congregation" could be within the
11 geographic area of the Denver Archdiocese.
12   Q.   (By Mr. Davis)  Okay.  So can -- so not
13 just the people that go to a particular parish, but all
14 the Catholics within the Archdiocese of Denver?
15   A.   It -- that would be my understanding.
16   Q.   Okay.  Could it be everybody within the
17 Denver area who believes that marriage is reserved between
18 a man and a woman and who lives consistently -- in
19 consistency with that belief?
20       MS. CARRENO:  Objection.  Speculation.
21       You can answer.
22   Q.   (By Mr. Davis)  In the same way that you
23 answered my first question, Ms. Odean, I'm just asking you
24 to answer that question.
25   A.   And it certainly could be part of that

1  definition by my understanding.  But also the rule
2  doesn't allow us to go against what's in the law, and so
3  that's why we have the 4.109(B).  So, yes, to the extent
4  that we can be inclusive of a specific congregation that
5  also falls in alignment of the law that's set forth for
6  us.
7    Q.   Okay.  So no matter what, it can't be
8  defined in a way that would run into the law about equal
9  opportunity regardless of sexual orientation?
10   A.   That's my understanding.
11   Q.   Okay.
12       MR. DAVIS:  I don't have a ton left.  I
13 don't know if you-all would want to take another break or
14 maybe just power through.
15       How are you feeling, Ms. Odean?
16       MS. CARRENO:  So again, I'm just
17 clarifying, when you say you don't have a lot left,
18 that's with the expectation that Dr. Roy will be your
19 next witness if you have questions left for the topics
20 noticed for Dr. Roy?
21       MR. DAVIS:  Correct, I don't have a lot
22 left for Ms. Odean, but I do have questions for Dr. Roy.
23 And I'm just asking, do you want to take another
24 10-minute break now, or do you want to see how far we can
25 get?

1        MS. CARRENO:  I'm okay powering through if
2  you're okay.
3        THE DEPONENT:  Yes, I'm okay.
4        MR. DAVIS:  Okay.  Great.
5    Q.   (By Mr. Davis)  You mentioned the
6  interfaith working group a bit ago.  Can you just say
7  what -- what is or was the interfaith working group?
8    A.   It was established by the transition
9  director to reach out to faith-based providers to hear
10 from them, what they were thinking about participating in
11 the universal preschool program, to give an overview of
12 the program and answer any questions that they might
13 have.  And I understand that she met on a regular basis
14 with them over a period of time to have those
15 conversations.
16   Q.   I'm sorry, who is -- who's "she"?
17   A.   The transition director.
18   Q.   Oh, okay.
19       Do we have her name on the record yet?
20 What is her name?
21   A.   Her name is Michael Cooke.
22   Q.   Okay.  Did the interfaith working group, to
23 your knowledge, produce any written work product, any
24 written recommendations?
25   A.   Not that I'm aware of.

28 (Pages 106 - 109)

1    Q.   Okay.  Did the -- let me just mark an
2    exhibit really quickly, actually.
3           (Exhibit 7 was marked.)
4    Q.   Let me know when you've got it up.
5    A.   I have it up.
6    Q.   Great.
7           Do you recognize this document?
8    A.   I do.
9    Q.   What is it?
10   A.   I believe it's who was invited to the
11   interfaith working group by Michael Cooke.
12   Q.   Okay.  Great.
13          And then at the bottom, is that sort of the
14   schedule of when they met?
15   A.   I believe so.
16   Q.   Okay.
17   A.   That's my understanding, yes.
18   Q.   Okay.  Did the department have a
19   representative in all of these meetings?
20   A.   No.
21   Q.   Sometimes it was just the members -- just
22   the faith-based providers themselves?
23   A.   Oh, I don't know if they met outside of
24   their time with Michael Cooke as the transition director.
25   Q.   I'm sorry --

1    A.   I wasn't in attendance at these.
2    Q.   Okay.
3           I'm going to quickly mark Exhibit 8.
4           (Exhibit 8 was marked.)
5    Q.   Let me know when you've got it.
6    A.   I have it.
7    Q.   Great.
8           Do you recognize this document?
9    A.   I'm looking through.
10   Q.   Sure.  Take your time.
11   A.   If you're asking me if I remember this
12   specific email, I don't, but I can read it and recall
13   that there was some inquiry.
14   Q.   Sure.  We've all gotten a lot of emails
15   so -- between now and February, so --
16          Yeah, just reading it and refreshing your
17   recollection, do you know who Melissa Mares is?
18   A.   I do.
19   Q.   Okay.
20   A.   She was the Colorado Children's Campaign
21   as the director of Early Childhood Initiatives.
22   Q.   What is the Colorado Children's Campaign?
23   A.   It's my understanding that they're an
24   organization that supports initiatives for early
25   childhood throughout the state, and they were active

1    participants in connecting the new department with the
2    community.
3    Q.   Okay.  They were -- were they in favor of
4    the UPK initiative?
5           MS. CARRENO:  Objection.  Speculation.
6           You can answer.
7    Q.   (By Mr. Davis)  You can answer.
8    A.   Yeah, I believe that they were.
9    Q.   Okay.  And just looking at the email, she
10   says that "Dawn Alexander and I connected today."
11          Do you know who Dawn Alexander is?
12   A.   Yes.
13   Q.   Who's that?
14   A.   She has a group -- I'm trying to remember
15   the acronym, ECEA, Early -- I don't -- I'm not -- I can't
16   tell you what it stands for.  But she provides services
17   for a variety of providers around the state.
18   Q.   Okay.  And then the email says -- this is
19   Melissa.  She says she encouraged Dawn to counter
20   misinformation as it comes up, and I believe she's saying
21   as it comes up in the interfaith UPK working group.
22          Is that how you understood that?
23          MS. CARRENO:  Objection.  Speculation.
24   A.   Yeah --
25   Q.   (By Mr. Davis)  I'm just asking you to read

1    the email, Ms. Odean?
2    A.   Yeah, I can read it.  I'm not going to --
3    I'm not going to speculate what Melissa was trying to
4    communicate or not in an email.
5           But I do know that she has often connected
6    providers with different members of our team for
7    clarification on a concern they may have elevated
8    directly to her or a question.
9    Q.   Okay.  You were a recipient of this email,
10   right?
11   A.   I was cc'd.
12   Q.   Okay.  And did you have any discussions
13   with Michael about what misinformation might be coming up
14   in the interfaith working group?
15   A.   Not that I recall.
16   Q.   Okay.  I guess asked more generally, what
17   changes did the department make to the UPK implementation
18   based on feedback from the interfaith working group?
19   A.   Yeah, I don't -- I don't know if I could
20   pinpoint a specific.  I do know that we heard very early
21   a lot of questions about it because faith-based providers
22   did not participate in the previous state funding of
23   preschool in Colorado.  And so -- unless they had a
24   specific contractor instance, but it wasn't typical.
25          And so I think there were a lot of

Page 114

1 questions, and really this group was to kind of have a
2 dialog and be able to answer questions if the department
3 could.
4          We had other -- we had other groups like
5 this like in-home family childcare, for example, who
6 hadn't participated in the previous program who had a lot
7 of questions about what does this look like for us, what
8 does that mean for us.
9          Nothing -- not that specific change was
10 needed or specific action was needed to be taken, but
11 really more to share information and be -- and to listen
12 and to understand if there might be an opportunity or a
13 consideration.
14          I do know that the preference that was
15 given was based on input from providers, but I don't know
16 that it was specifically from this working group or other
17 providers, but it was certainly elevated to our
18 department team for consideration.
19     Q.  Okay.  Great.
20          Were there any other working groups, like a
21 co-op working group or an in-home provider working group?
22     A.  Not -- not as shown in I guess Exhibit 7,
23 where you have the list and the specific calendar
24 invites.  It really was, hey, we have a group of folks
25 who would like to meet with you; have a conversation.

Page 115

1 There might be follow-up.  But nothing -- nothing, you
2 know, regularly scheduled over time.
3          But we certainly have heard from a variety
4 of providers since we launched and continue to reach out
5 directly to those providers based on their unique needs.
6 And I think we found, through some of those
7 conversations, that even if they're -- the in-home family
8 childcare is a particular provider licensed, needs and
9 expectations might vary from provider to provider, and so
10 a lot of times just a one-on-one conversation about
11 questions that a specific provider might have end up, you
12 know, with a couple multiple conversations with a
13 specific provider, but not necessarily a formalized
14 group, if you will.
15     Q.  Great.
16          Out of the -- you said the congregation
17 preference, you know, originated at least in part with
18 discussions with the interfaith working group.  Did they
19 propose that preference in writing or is this something
20 that Michael maybe took away from a meeting?
21     A.  Yeah, I don't -- I don't know that I said
22 it was from this group specifically, although it could
23 have been.  It's when we were reviewing the preferences
24 that it -- you know, we had heard from LCOs or other
25 providers or, you know, Michael -- you'd have to ask --

Page 116

1 Michael may specifically have heard from this working
2 group that that consideration would be appreciated, to be
3 able to participate and not -- not have a full match of
4 any one or -- around the state who might go to a
5 particular provider.
6     Q.  Did Michael present that proposed
7 preference to the program's team?
8     A.  I recall it -- I don't remember having a
9 specific presentation.  It really was more kind of back
10 to that guide where we had made considerations about what
11 we heard, that it was kind of collectively put into
12 writing.  But it wasn't necessarily one person said, I'm
13 advocating for this or someone else is advocating for
14 that.
15          It was just a recognition that we had
16 heard these concerns, and if there was something
17 programatically or in the system that we could do to
18 support that, you know, continuity of care, sibling, an
19 employees's child, as well as the preferences we
20 reviewed, it would be helpful to ensure inclusion in
21 mixed delivery and support families and, you know, making
22 that -- that choice, as well as have some assurances
23 around ease in the process or fluidity in the process, if
24 you will.
25     Q.  Okay.  All right.  Thank you for that.

Page 117

1          I'm going to mark -- well, let me just ask
2 you this.  When did the department first become aware
3 specifically of the Archdiocese of Denver's need for a
4 religious exemption for the nondiscrimination requirements
5 in the UPK?
6          MS. CARRENO:  Objection.  Form.
7          You can answer.
8     A.  Can you ask it again, please.
9     Q.  (By Mr. Davis)  Sure.  When did the
10 department first become aware of the Archdiocese of
11 Denver's request for a religious exemption from the
12 nondiscrimination of the UPK program?
13     A.  Yeah, in the first meeting -- the first
14 interfaith advisory I sat in on with Michael, I believe
15 the question was -- there was a question posed around
16 that, but not -- nothing outside of -- not necessarily in
17 consideration of the preference, but the law that was in
18 place.
19          And so I believe that it was, you know,
20 the start of the conversation that continued.
21     Q.  Okay.
22          I'm going to mark another exhibit here.
23          All right.  Let me know when you've got
24 Exhibit 9.
25          (Exhibit 9 was marked.)

Page 118

1    A.  I have it.
2    Q.  Great.
3        Do you recognize this email?
4    A.  Yes.
5    Q.  It looks like it's from Stacy Petty to you
6  and Michael Cooke; is that right?
7    A.  Yes.
8    Q.  Who is Stacy Petty?
9    A.  She is the director at one of our local
10  coordinating organizations.
11   Q.  Okay.  And it looks like it's forwarding an
12  email from the director of a Catholic preschool,
13  St. Stephen; is that right?
14   A.  That's what it looks like.
15   Q.  Okay.
16   A.  Yes.
17   Q.  And if you scroll down to the page,
18  Defendant 24 -- DEF24, it looks like the preschool
19  director is saying that this Catholic preschool is unable
20  to participate in UPK?
21   A.  It looks like they're choosing not to
22  participate.
23   Q.  It says "unable to participate," right?
24   A.  It does say that.
25   Q.  Why do you think that is equivalent to

Page 119

1  choosing not to participate?
2    A.  Well, just because it's a voluntary
3  program.  So it looks like their legal team told them
4  they were unable to participate.
5    Q.  Okay.  And it says -- she says they're not
6  able to participate, and the reason is the
7  nondiscrimination language in the UPK provider agreement?
8        MS. CARRENO:  Objection.  Calls for
9  speculation.  I don't see where it says that in this
10  email.
11       MR. DAVIS:  If you scroll up to the first
12  page.  But the question was for the witness.
13   A.  She said that in the email.
14   Q.  (By Mr. Davis)  Okay.  So you were aware of
15  the Archdiocese's specific need for an exemption by
16  January 13, 2023?  It looks like that's the date of this
17  email.
18       MS. CARRENO:  Objection.  Form.
19   Q.  (By Mr. Davis)  You can answer.
20   A.  I would say at this point in time we
21  understood that there was -- there were providers who
22  would choose not to participate.  We had other, you know,
23  providers who were choosing not to participate at this
24  time as well.
25       So this was -- this was an email we

Page 120

1  received that said that they weren't participating
2  because of that.
3    Q.  Did you respond to this email?
4    A.  I don't believe so.
5    Q.  Did you discuss it with anybody?
6    A.  We certainly had conversations, because at
7  this time we had preference built in about whether that
8  would allow for faith-based providers to participate.
9  But we also knew that preference in that program decision
10  for that preference didn't make -- what was in the law
11  around discrimination, and we certainly recognized that
12  providers were deciding whether they were going to
13  participate or not at this time.
14   Q.  So you had a discussion with --
15   A.  I'm -- I'm sure Michael and I had a
16  conversation, but I don't recall a specific conversation
17  about this specific provider.
18   Q.  What about the Archdiocese and its
19  preschools more generally?
20   A.  I'm trying to -- it might have been --
21  yeah, I don't recall.  I don't recall a specific
22  conversation about that or how it might have been tied to
23  the next conversation in the working group.
24   Q.  Were you aware that the Archdiocese had a
25  number of preschools within the state?

Page 121

1    A.  I -- I wasn't specifically tuned in at
2  that time about how many providers -- how the Archdiocese
3  was set up, no.  Not at that time.
4    Q.  Okay.  But eventually you learned that,
5  right?  It wasn't just one, it was --
6    A.  Yeah, I certainly have learned more, in a
7  lot of ways, in this -- in this last year about providers
8  and the services they provide and where they're located
9  and how they operate.  Absolutely.
10   Q.  Did it give you any concern, from a mixed
11  delivery system perspective, that none of the Archdiocese
12  and schools were going to be able to participate because
13  of the nondiscrimination requirements?
14       MS. CARRENO:  Objection.  Form.
15   Q.  (By Mr. Davis)  You can answer.
16   A.  Yeah.  I think, you know, as -- I also, as
17  the director of the program, can't change the law.  So
18  certainly understood if the law didn't meet their
19  expectations, and, you know, really, you know, understood
20  coming into this role that we would learn a lot about
21  providers and we would have to grapple with some hard
22  things around mixed delivery because it hadn't been done.
23       There's certainly unique instances, and
24  certainly hoped that we could, you know, have a dialog
25  and figure out ways to be as inclusive as possible, but

31 (Pages 118 - 121)

1  again, don't have the ability as the director of the
2  program to go outside what's around that
3  nondiscrimination clause.
4      Q.   (By Mr. Davis)  Okay.  And if there's some
5  families within Colorado that feel a strong religious need
6  to send their children to an Archdiocese preschool, they
7  just can't participate in UPK, and that's all right?
8      MS. CARRENO:  Objection.  Speculation.
9      A.   Universal preschool is voluntary for
10  families as well.  And so we know that it's not
11  everything to everyone.  Some folks are choosing not to
12  participate.  Some folks choose not to have their
13  children attend preschool.
14      And so we certainly recognize that there
15  would be choices that were made by families that were the
16  family's choices to make.  We wanted to provide as much
17  inclusion and mixed delivery as we could based within the
18  parameters we had.  We certainly wanted to, you know,
19  utilize the funds in the way they're intended for anyone
20  eligible in the year before.
21      So, you know, we certainly didn't want to
22  have specific exclusions, but, again, we're not -- we're
23  not changing the law.  We're following the law and
24  working within that as a parameter.
25      Q.   (By Mr. Davis)  And if the Archdiocese's

1  preschools can't comply with the requirements within the
2  law, they can't participate in UPK, right?
3      MS. CARRENO:  Objection.  Speculation.
4  You can answer.
5      A.   It's voluntary.  So it -- there is choice
6  there as well.
7      Q.   (By Mr. Davis)  Okay.  Would you agree that
8  UPK -- it provides a significant benefit for the families
9  that do participate, right?
10      A.   I do believe that, yes.
11      MR. DAVIS:  Why don't we take just one
12  more break.  I think I'm probably done, but I might have
13  a couple more.  Can I just circle up and -- maybe we'll
14  go off for 10 minutes and then try to come back on at
15  12:41.  Does that work?
16      MS. CARRENO:  Yeah, so are we taking a
17  lunch break?  I think everybody would like to take a
18  lunch break.
19      MR. DAVIS:  Yeah.  I think it would be
20  best if we could maybe finish with Ms. Odean's portion
21  briefly -- and again, there may not be any more
22  questions.  But if we can finish with that and then take
23  a longer break before Dr. Roy's portion.  Would that
24  work?
25      MS. CARRENO:  Sure.

1      MR. DAVIS:  Great.  So we'll be back on at
2  12:42.
3      (Recess from 12:32 p.m. to 12:42 p.m.)
4      Q.   (By Mr. Davis)  So, Ms. Odean, I just want
5  to circle back on a couple of things.
6      Earlier on you said that it was important
7  that UPK have high-quality providers, you know,
8  participating and offering preschool services.  What
9  exactly is it -- what do you have in mind by "high-quality
10  provider"?
11      A.   Sure.  So we have had, previous to
12  universal preschool, a lot of work in the state of
13  Colorado around quality in early education.  So certainly
14  want to build upon that.
15      And then as you probably know from the
16  law, there are expectations around specifically the
17  universal preschool program as it relates to quality.
18  That's inclusive of Colorado academic standards that have
19  been set forth for this age group as well as licensing
20  expectations, and in consideration of Colorado Shine's or
21  other programmatic quality work that providers have done.
22      And so the draft that we reviewed is our
23  initial phase of the quality standards that are required
24  in the law for us to establish.
25      So this draft will -- kind of establishes

1  a base, if you will.  And then in the law it's also a
2  requirement it has to consider how we're supporting the
3  workforce and what resources that we can vet and provide
4  to educators to ensure a quality classroom environment.
5      Q.   Okay.  Thank you.
6      And then we had a discussion about the
7  federal allowances for religious providers' hiring
8  decisions.
9      Do you remember that?
10      A.   Yes.
11      Q.   Are those federal -- those federal
12  allowances aren't written into the provider agreement, are
13  they?
14      A.   Not that I'm aware.
15      Q.   Why not?
16      A.   Again, I didn't draft the initial
17  agreement.  Certainly are considering revisions for our
18  second-year agreement.  But, yeah, I don't -- I can't
19  speak to why that was excluded, although certainly
20  recognize that it was elevated after.
21      Q.   Okay.  So how would the department
22  determine if one of those federal allowances applied?
23      MS. CARRENO:  Objection.  Calls for
24  privileged information.
25      MR. DAVIS:  What is privileged?

32 (Pages 122 - 125)

Page 126

1          MS. CARRENO:  It calls for attorney-client
2    information.
3          She can answer it.
4          MR. DAVIS:  I'm asking how --
5          A.  Could you ask again, please.
6          Q.  (By Mr. Davis)  Sure.  How will the
7    department determine whether one of the federal hiring
8    allowances applied in a particular situation?
9          A.  Yeah.  So I think you're asking me to
10   speculate again.  But what I would say is I'm not an
11   attorney.  So if there was a claim made, it certainly
12   would elevate that to our leadership and to our attorney
13   general.
14         Q.  Okay.  And it's something the legal team
15   would have to think about investigating?
16         A.  I certainly would seek their counsel in
17   the process or path forward.
18         MR. DAVIS:  Okay.  I think that's --
19   that's what I've got.  Thank you for your time.
20         (Discussion off the record.)
21         THE REPORTER:  What kind of transcript
22   would you like to receive; electronic, electronic with
23   exhibits?
24         MR. DAVIS:  Yeah.  Electronic with
25   exhibits.

Page 127

1          THE REPORTER:  And, Ms. Carreno?
2          MS. CARRENO:  Is there a manuscript?
3          MR. WHITEHAIR:  A mini.
4          MS. CARRENO:  A mini -- I'm sorry.  What?
5          MR. WHITEHAIR:  Do you have a minu-script
6    or is it just a plain --
7          THE REPORTER:  We can do both.  We can do
8    four-to-a-page.
9          MS. CARRENO:  So we would like both.
10         THE REPORTER:  And exhibits?
11         MS. CARRENO:  Electronic, please.
12         THE REPORTER:  And do you want to handle
13   read and sign?
14         MS. CARRENO:  I'm sorry.  Say that again?
15         THE REPORTER:  Do you want to handle read
16   and sign?
17         MS. CARRENO:  Yes.
18         THE REPORTER:  Okay.  I'm off the record.
19   Thank you.
20         * * * * * * *
21         WHEREUPON, the foregoing deposition was
22   concluded at the hour of 12:47 p.m.  Total time on the
23   record was 3 hours and 7 minutes.
24
25

Page 128

1          I, DAWN ODEAN, the deponent in the above
2    deposition, do hereby acknowledge that I have read the
3    foregoing transcript of my testimony and state under oath
4    that it, together with any attached Amendment to
5    Deposition pages, constitutes my sworn testimony.
6
7    _____ I have made changes to my deposition
8    _____ I have NOT made any changes to my deposition
9
10
          _____
11             DAWN ODEAN
12
13   Subscribed and sworn to before me this _____
14   day of _____, 20_____.
15
16   My commission expires: _____
17
18
          _____
          Notary Public
19
20
          _____
          Address
21
22
23
24
25

Page 129

               REPORTER'S CERTIFICATE
1
2
3
4          I, Laurel S. Tubbs, a Registered
5    Professional Reporter and Notary Public within the State
6    of Colorado, do hereby certify that previous to the
7    commencement of the examination, the deponent was duly
8    sworn by me to testify to the truth.
9          I further certify that this deposition was
10   taken in shorthand by me at the time and place herein set
11   forth and thereafter reduced to a typewritten form; that
12   the foregoing constitutes a true and correct transcript.
13         I further certify that I am not related
14   to, employed by, nor of counsel for any of the parties or
15   attorneys herein, nor otherwise interested in the result
16   of the within action.
17         My commission expires October 26, 2027.
18
19   _____
20   LAUREL S. TUBBS
     Registered Professional Reporter
     Registered Merit Reporter
21   Certified Realtime Reporter
     and Notary Public
22
23
24
25

33 (Pages 126 - 129)

Page 130

1   1  Virginia Carreno, Esquire
2   2  virginia.carreno@coag.gov
3   3              November 13, 2023
4   4  RE:   St. Mary Catholic Parish In Littletown Et Al v. Roy, Lisa
       Et Al
5   5      11/8/2023, Dawn Odean (#6293872)
6   6      The above-referenced transcript is available for
7   7  review.
8   8      Within the applicable timeframe, the witness should
9   9  read the testimony to verify its accuracy. If there are
10  10  any changes, the witness should note those with the
11  11  reason, on the attached Errata Sheet.
12  12     The witness should sign the Acknowledgment of
13  13  Deponent and Errata and return to the deposing attorney.
14  14  Copies should be sent to all counsel, and to Veritext at
15  15  cs-midatlantic@veritext.com
16  16
17  17  Return completed errata within 30 days from
18  18  receipt of testimony.
19  19    If the witness fails to do so within the time
20  20  allotted, the transcript may be used as if signed.
21  21
22  22           Yours,
23  23           Veritext Legal Solutions
24  24
25  25

**[1 - abide]**

Page 1

## 1

**1**  3:14 8:16,23
22:6 25:14
39:25 130:1
**10**  17:25 37:9
77:12 108:24
123:14 130:10
**100**  25:7
**104**  3:19
**10:03**  37:13
**11**  8:24 130:11
**11/8/2023**
130:5
**110**  3:21
**111**  3:22
**117**  3:23
**11:05**  77:15
**11:17**  77:15
**12**  130:12
**12:32**  124:3
**12:41**  123:15
**12:42**  124:2,3
**12:47**  127:22
**13**  119:16
130:3,13
**1300**  2:10
**14**  130:14
**1404-1**  3:20
**15**  18:17,18
130:15
**15th**  9:12
**16**  72:20 73:23
76:19,21
130:16

**17**  130:17
**178**  85:20
**17th**  35:14
**18**  63:5 65:15
65:17 66:16
68:17 69:3
73:4 74:9
75:20 76:17
130:18
**19**  130:19
**1919**  2:4
**1:23**  1:7
**1st**  49:3

## 2

**2**  3:15 45:15
46:3 97:22
105:9 106:19
130:2
**20**  128:14
130:20
**2000**  98:16
**20006**  2:5
**202-955-0095**
2:5
**2022**  9:12 49:4
**2023**  1:13 3:6
50:10 119:16
130:3
**2027**  129:17
**2079**  1:7
**21**  130:21
**22**  130:22
**22-1295**  39:5
**22402**  129:18

**23**  130:23
**24**  118:18
130:24
**25**  130:25
**26**  129:17
**29**  46:4

## 3

**3**  3:16 31:19
32:16 72:7,13
127:23 130:3
**30**  1:12 3:2,14
18:21 28:3
50:15 130:17
**32**  17:11

## 4

**4**  3:12,17 8:24
18:1 37:1,1
77:24 91:23
92:3 100:15
106:3 130:4
**4.109**  105:23
106:2,4 108:3
**4.110**  105:20
**400**  2:4
**45**  3:15

## 5

**5**  3:18 22:6
72:20 92:9,11
106:3 130:5
**50**  42:15
**500**  43:17

## 6

**6**  1:12 3:2,14
3:19 8:24 28:3
104:23 105:13
130:6
**6293872**  130:5
**63,000**  42:8
**67**  46:5

## 7

**7**  3:21 110:3
114:22 127:23
130:7
**72**  3:16
**720-508-6000**
2:11
**77**  3:17

## 8

**8**  1:13 3:6,14
3:20,22 8:24
111:3,4 130:8
**80203**  2:10

## 9

**9**  3:23 28:10
29:16 117:24
117:25 130:9
**92**  3:18
**9:07**  3:5
**9:52**  37:13

## a

**a.m.**  3:5 37:13
37:13 77:15,15
**abide**  67:1

**abided** 67:5
**ability** 122:1
**able** 19:18,19
  25:10 27:7
  30:11 34:13
  37:5,24 58:12
  58:14 66:21
  69:14 79:12
  84:23 89:7,13
  90:11,19 95:20
  98:23 101:14
  104:3 114:2
  116:3 119:6
  121:12
**above** 60:13
  128:1 130:6
**absolutely**
  26:12 56:5
  121:9
**academic**
  124:18
**accept** 18:13
  23:21 24:2,4
  27:24 30:1,25
  32:2 40:22
  79:10
**acceptance**
  22:17
**accepting**
  32:14 99:15
**access** 19:6
  24:23 27:7
  51:11,16 59:9
  103:21

**accommodate**
  91:10 96:11
  97:14
**accommodated**
  97:1
**accommodati...**
  70:12
**accommodati...**
  71:12
**accomplish**
  36:17
**accordance**
  73:7
**accountable**
  84:1
**accuracy** 130:9
**achieve** 37:15
**acknowledge**
  128:2
**acknowledg...**
  130:12
**acronym**
  112:15
**action** 55:3
  56:7,9 114:10
  129:16
**active** 93:12
  111:25
**actual** 39:13
  53:3,23 54:25
  56:11,24 57:21
**actually** 23:16
  30:6 33:8 37:8
  46:23 50:2
  52:10 81:12

  94:24 110:2
**add** 90:13
**added** 90:10,14
  91:5
**additional**
  18:20 21:25
  88:7,14 89:3
  89:20
**address** 56:10
  128:20
**addresses**
  86:11 87:9
**addressing**
  53:4
**adhere** 50:18
  50:19
**adixon** 2:7
**adjusted** 78:22
**adjustments**
  31:15
**administration**
  10:21
**administrative**
  36:18 37:8
**admission**
  56:21 57:9
  58:21 59:6
  61:8
**admissions**
  40:25
**advisory** 3:21
  117:14
**advocating**
  116:13,13

**affect** 25:14
**affiliation** 51:4
  61:5,13,22
  106:9
**affirmed** 4:7
**african** 52:13
  52:25 54:8,17
  54:22 55:6,22
  58:15 59:7
**ag's** 7:1,2
**age** 19:9 37:23
  63:11 88:24,25
  124:19
**agencies** 11:21
  87:19
**agency** 97:17
**ages** 21:19
**ago** 13:10
  54:18 68:12
  109:6
**agree** 51:11
  58:2 62:17
  69:2 82:18
  123:7
**agreed** 67:3
  75:24
**agreeing** 65:17
  65:22 66:25
  71:22,23
**agreement** 3:15
  4:3 24:21 25:1
  25:6,11,14,16
  25:16,22,24
  26:4,13 32:9
  45:12,16 46:17

46:19,24 47:10
47:13,14,23
48:2,3,9,11
49:8,13,14,17
49:21,23 50:4
50:5,8,10 52:1
57:4,19,20,24
58:4,9,25 59:2
59:2,8,12,13,13
59:15,16,17,19
60:10,14,17,19
60:22,23,24
61:2,24 62:9
62:11,15,18,19
62:24 63:2
65:16,23 66:10
66:25 67:9,16
67:18,20 68:4
71:8,15,22
100:6 119:7
125:12,17,18
**agrees**  50:18,19
**ahead**  25:20
38:13,14 77:17
85:7
**al**  130:4,4
**alexa**  2:13
**alexander**
112:10,11
**algorithm**
22:17 23:13
**alice**  12:18
**aligned**  84:6
99:6

**alignment**
14:21 97:20
108:5
**allotted**  78:25
130:20
**allow**  29:10
33:1,2 70:13
79:7 96:4
108:2 120:8
**allowable**
32:17,22 60:11
**allowance**
63:23,24 65:4
66:3,8,9,9,12
66:14 67:13
72:25
**allowances**
125:7,12,22
126:8
**allowed**  27:4
39:20 58:21
60:2,4 71:14
80:10 92:21
**allowing**  26:21
**allows**  19:6
**altogether**  12:5
**amanda**  2:3
**amendment**
128:4
**american**  52:13
52:25 54:8,17
54:22 55:6,22
58:15 59:7
**amount**  36:4,17
81:9 83:2

**anchor**  100:1,4
**answer**  5:5
16:3,19 26:14
30:22 40:8
44:8 48:25
49:10 52:17
53:21 54:13
55:10 56:24
57:1,13 58:9
58:11,13,17,22
58:24 59:6,7
59:24 60:2,3,8
62:7,21,22
68:18 69:11,24
70:18 71:1,15
71:19 73:20,21
75:1,2 76:11
76:23,24 77:7
77:10 79:15
82:1,21 86:18
87:2 91:12
96:16 99:18
100:8 107:8,21
107:24 109:12
112:6,7 114:2
117:7 119:19
121:15 123:4
126:3
**answered**
43:25 53:20
55:9 70:17
107:23
**answering**  85:5
**answers**  4:21
4:21 5:2,22

48:21
**anthes**  12:21
13:5
**anticipate**
40:23
**anticipated**
19:20 41:6
**anybody**  11:14
12:12 69:8
120:5
**apologies**  46:2
**apologize**  32:7
**appearances**
2:1
**appearing**  8:3
**applicable**  23:6
130:8
**application**
11:6 18:5
20:17 22:6
24:19 27:2,20
30:4 34:22
37:5 40:13,13
40:15 43:7
95:8 103:1
**applications**
27:5 35:1 36:4
36:12,19
**applied**  22:13
30:6 64:21
89:13 125:22
126:8
**applies**  65:7
79:11

**[apply - based]**                                                        Page 4

**apply**  11:7 18:9
  30:4,7,10 31:7
  51:6 106:11
**appoint**  13:23
**appreciate**
  26:14 45:9
**appreciated**
  116:2
**approach**  31:8
**approached**
  32:3
**approaching**
  69:13
**appropriate**
  3:2
**approve**  50:4
  68:2
**approved**  3:18
  23:23,24 24:1
  48:10 50:9
  67:19,21 68:4
  78:24
**approving**  50:3
**approximately**
  14:23
**archdiocese**  1:4
  16:23 107:4,11
  107:14 117:3
  117:10 120:18
  120:24 121:2
  121:11 122:6
**archdiocese's**
  119:15 122:25
**area**  106:22
  107:11,17

**arrived**  91:18
**asked**  31:19
  53:19 55:8
  58:7,20 68:12
  70:16 90:22
  101:22 113:16
**asking**  4:21
  16:1 40:5
  48:21 49:5
  53:10 55:15
  56:4,13 58:7
  64:24 65:6
  66:12,13,23
  71:21 74:22
  75:22 78:12
  89:19 96:7
  107:23 108:23
  111:11 112:25
  126:4,9
**aspect**  82:9
**assurance**
  50:15 52:7
  104:7
**assurances**
  68:8,9 71:24
  98:23 100:10
  101:14 102:15
  103:1,4 116:22
**assure**  101:3
**attached**  128:4
  130:11
**attempting**
  29:24
**attend**  42:12
  122:13

**attendance**
  101:19 111:1
**attendees**  3:21
**attention**  5:21
  42:25 43:24
**attest**  86:6
**attorney**  2:9
  16:18 54:24
  55:11,25 70:4
  71:6 73:22
  75:4 126:1,11
  126:12 130:13
**attorneys**  6:10
  6:24 7:24
  52:20 57:8
  129:15
**attract**  21:4
**august**  9:12
  26:25
**authorized**
  47:1
**available**  19:2
  30:2 31:20
  38:25 42:11
  69:18 130:6
**avenue**  2:4
**award**  18:24
  40:18
**aware**  11:22
  13:25 49:24
  50:7 91:6
  99:25 109:25
  117:2,10
  119:14 120:24
  125:14

**awareness**  49:6

**b**

**b**  1:12 3:2,14
  28:3 63:5
  65:15,17,24
  66:16 68:17
  69:3,13 73:4
  74:9 75:20
  76:17 105:19
  105:20,23
  106:2,4 108:3
**back**  11:2
  23:14 26:3,10
  35:8,10,22
  46:9 59:17
  64:12 77:8
  93:4,24 98:17
  100:15 101:6
  116:9 123:14
  124:1,5
**ballpark**  94:4,7
**base**  125:1
**based**  34:11
  36:2 38:3,16
  38:24 42:9,17
  43:21 45:1,5,7
  49:8 51:17
  53:1 56:7,11
  69:18 73:23
  84:24 97:10
  99:5,22 100:21
  101:8,13,17
  103:20 104:7
  104:10 106:21
  109:9 110:22

113:18,21
114:15 115:5
120:8 122:17
**bases** 65:20,23
66:7,16 69:6,9
**basic** 17:6
**basis** 14:3
35:13,13 63:10
67:9 69:21
89:25 90:4
109:13
**bates** 46:4
**becket** 2:4
**becketlaw.org**
2:6,6,7
**began** 26:24
**beginning** 44:1
**behalf** 2:2,8 8:4
40:6 67:6,7,24
71:10 85:24
**belabor** 36:24
**belief** 107:19
**beliefs** 73:24
106:22,24
**believe** 11:25
54:18 55:24
73:15 101:18
110:10,15
112:8,20
117:14,19
120:4 123:10
**believed** 80:10
**believes** 107:17
**benefit** 123:8

**benefits** 69:17
**bernadette** 1:3
**best** 123:20
**better** 80:14
**beyond** 28:12
76:18
**bigger** 23:7
**bill** 12:10 39:5
39:8,13,19
43:16 52:3
68:14,21 80:4
80:4
**bit** 24:10 26:15
37:18 40:2,25
43:2,25 45:10
52:9 65:14
68:25 74:6
80:14 109:6
**biweekly** 14:20
14:23
**blind** 100:2,4,5
**board** 13:24
84:24 85:10
**bonnie** 2:14
6:25
**bottom** 46:4
94:23 97:21
110:13
**bound** 47:10
56:16,17 57:24
**boundaries**
84:24 85:9,11
85:12,13,19
87:9

**boundary**
84:17 85:16
**box** 80:16,16
**boys** 69:18
**bracket** 65:13
**break** 7:14,16
7:18 35:10
37:10 77:13
108:13,24
123:12,17,18
123:23
**breaks** 7:22
**briefly** 123:21
**bring** 97:9
**broader** 15:15
**broadway** 2:10
**brought** 11:15
**build** 39:24
124:14
**built** 23:18
120:7
**bullet** 50:25
**bunch** 103:8
**burden** 36:18

**c**

**c** 2:2 4:1
**calendar**
114:23
**call** 21:6 27:12
30:23 73:18
**called** 3:4 22:16
40:12 61:1
100:1
**calls** 15:21
16:17 30:21

52:15 62:6,20
74:24 89:9
119:8 125:23
126:1
**campaign**
111:20,22
**capacity** 1:7,9
28:15 84:24
85:12 87:7
88:2
**care** 19:7 21:22
22:14,21,25
23:4 46:10
95:16 103:22
116:18
**career** 10:9
**careers** 10:23
**carreno** 2:8 4:5
6:8,21,21
15:20 16:16
28:1,9,22 29:8
30:20 40:4
44:6 48:19
49:10 52:14
53:19 54:9
55:8 56:23
57:12 58:10,23
60:6 62:5,20
62:22 69:10,22
70:16,25 71:17
73:18 74:24
76:9,22 77:25
81:25 82:20
85:4 86:17,25
89:9 91:11

92:2,8 94:13
94:19 96:13
99:17 100:7
107:5,20
108:16 109:1
112:5,23 117:6
119:8,18
121:14 122:8
123:3,16,25
125:23 126:1
127:1,2,4,9,11
127:14,17
130:1

**case** 1:6 4:13
55:2

**cases** 6:25

**category** 31:23

**catholic** 1:2,3
118:12,19
130:4

**catholics** 107:4
107:14

**cc'd** 113:11

**ccr** 3:20

**cdec** 6:22 18:15

**celebrate** 20:19
21:11

**center** 37:25,25
45:6,7 100:2,4

**central** 48:5

**certain** 32:20
40:16 69:17
77:4 80:25
81:9 84:9

**certainly** 16:12
19:9,24 21:3
26:6 27:6 30:3
31:4 34:9 41:6
41:12,22 52:19
53:3,24 56:10
57:18 66:18
67:6 69:13,25
69:25 70:4,19
87:3,4 95:18
97:16,17 98:22
100:12 103:21
104:12 107:25
114:17 115:3
120:6,11 121:6
121:18,23,24
122:14,18,21
124:13 125:17
125:19 126:11
126:16

**certificate**
129:1

**certified** 3:8
129:21

**certify** 129:6,9
129:13

**challenges**
16:13 41:22
95:23

**chance** 8:13

**change** 31:19
33:23 41:3,3,5
41:10 114:9
121:17

**changes** 50:5
113:17 128:7,8
130:10

**changing**
122:23

**characteristics**
51:6 106:10

**charge** 44:13
68:5 70:5
89:16 97:19
103:2

**charged** 44:16
53:4,24 54:2

**charter** 90:9

**chat** 104:22

**check** 15:11
43:8,12 80:16
80:16

**child** 10:25
19:5,10,13
22:15,21 23:4
27:4,21 36:7
36:22 38:24
51:6 52:12
60:11 61:23
83:19,21 85:15
106:11 116:19

**child's** 51:7
61:23 106:11

**childcare** 19:22
37:25 40:18
45:6 114:5
115:8

**childhood** 1:8
1:13 3:3 6:24

8:5 9:7 11:20
12:10 49:2
55:17 111:21
111:25

**children** 18:17
18:20 19:6,15
19:24 20:2,4
21:24 27:6
34:8 38:23
42:8,9,12,14
44:22 51:2
64:9 68:23
69:1 81:11
83:7 84:4,9,23
85:11,12 87:4
87:7,25 88:1,2
88:20,22 89:15
90:10,12,20,23
91:1,2,3,9
93:19,20 95:19
98:12 99:1,8
99:11,15,16
100:2,5,5
106:7 122:6,13

**children's**
111:20,22

**chime** 7:13

**choice** 19:18
20:25 38:9
88:1 116:22
123:5

**choices** 122:15
122:16

**choicing** 87:8

**[choose - congregation]**

**choose** 18:9
20:9 24:21
34:18 119:22
122:12
**chooses** 82:8
**choosing**
118:21 119:1
119:23 122:11
**chosen** 22:19
**circle** 123:13
124:5
**circumstances**
51:6 106:11
**citizenship**
63:12
**civil** 3:2
**claim** 66:20,21
72:2 126:11
**clarification**
113:7
**clarify** 90:2
**clarifying**
108:17
**classroom** 27:8
99:9,12,21
125:4
**classrooms**
31:13
**clause** 122:3
**clear** 5:22
12:15 28:19
33:16 53:9
56:1,3 69:3
87:15

**clearly** 28:8
29:3
**client** 16:18
90:5 126:1
**close** 6:15 25:8
**closed** 6:17,18
**closely** 41:13
**closer** 35:17
65:11
**coag.gov** 2:11
130:2
**cognitive** 19:10
**cohen** 12:18
**collectively**
106:23 116:11
**colorado** 1:1,8
1:12 2:9,10 3:3
3:9,15,17 9:22
10:3 12:24
18:1 19:3,14
19:17 20:5
28:13 29:18
38:9 43:3,10
43:19 44:13,16
47:15,19 49:14
68:16 111:20
111:22 113:23
122:5 124:13
124:18,20
129:6
**colorado's** 1:9
19:14
**come** 33:21
78:17 85:15
102:19 123:14

**comes** 23:14
43:12 112:20
112:21
**coming** 27:7
33:15 36:4
41:18 94:19
113:13 121:20
**commencem...**
129:7
**commencing**
3:5
**commission**
128:16 129:17
**commissioner**
12:21
**committee**
11:17,19
**common**
106:22
**communicate**
7:7 41:14
113:4
**communicati...**
10:11,17,20
**community**
12:10 38:25
79:22 103:9,15
103:19 104:15
112:2
**company** 10:16
**compared** 44:4
**complete** 5:22
27:20
**completed**
93:24 130:17

**completely** 5:2
**comply** 58:4
105:22 123:1
**components**
38:4 39:4,24
40:16,20
**comprehensive**
89:1
**compressed**
25:13 44:15
102:24
**computer** 6:14
**concern** 41:1
66:19 85:14
87:5 113:7
121:10
**concerns** 15:18
16:9,11,14
41:10,10,17
95:9 116:16
**concierge** 2:13
**conclude** 35:5
**concluded**
127:22
**conclusion**
73:19 74:25
**conduct** 106:23
**confer** 52:19
**confirm** 6:6,16
6:19 8:22
66:13 94:9
**congregation**
100:22 102:18
103:6,9,12
104:9,11

105:10,15
106:14,15,19
106:20,20
107:2,3,10
108:4 115:16
**connect** 21:5
34:24
**connected**
34:22 36:20
37:5 112:10
113:5
**connecting**
29:11 112:1
**connections**
20:15
**consider** 60:15
97:11,13 125:2
**consideration**
104:19 114:13
114:18 116:2
117:17 124:20
**considerations**
116:10
**considering**
25:15 125:17
**consistency**
107:19
**consistent**
100:6
**consistently**
107:18
**constitute**
44:24
**constitutes**
128:5 129:12

**consult** 55:11
55:25 64:22
**consultation**
57:8
**consulted**
56:20
**consulting**
54:24
**contact** 16:10
21:3 95:7
**contemplated**
33:23
**content** 7:24
16:6 78:17,23
**continue** 71:14
103:23 115:4
**continued**
90:17 117:20
**continuity**
22:14,21,25
23:3 95:16
103:22 116:18
**contract** 17:19
25:20 26:7
47:16,20 48:7
49:15,17,18,19
56:15 63:23,24
82:3
**contractor**
113:24
**contractual**
73:4 74:9
75:20 76:17
**control** 40:25

**conversation**
7:6 21:7
101:18 104:13
114:25 115:10
117:20 120:16
120:16,22,23
**conversations**
16:20,24 101:9
109:15 115:7
115:12 120:6
**convocation**
106:21
**cooke** 109:21
110:11,24
118:6
**coordinating**
17:9,11,15
20:12 27:18
31:1 41:13
42:10 48:6
79:19 93:23
95:5,6 97:7
101:7 118:10
**copies** 130:14
**correct** 13:12
14:25 15:3
22:8,23 23:22
25:3 26:23
33:5,19 39:11
47:5 49:25
52:8 58:18
61:18 65:3
66:5 108:21
129:12

**counsel** 4:2
6:10,22 7:8
126:16 129:14
130:14
**counsel's** 65:1
**counter** 112:19
**county** 10:1,6
10:10,21 85:25
86:3
**couple** 4:16
5:11 20:7 29:4
50:13 98:9
115:12 123:13
124:5
**course** 7:8 24:8
66:11 97:19
**court** 1:1 5:17
7:8
**covered** 63:22
69:2
**crafted** 47:14
**create** 20:18
24:22 96:3
**created** 39:9
**creating** 25:19
103:14
**credentialed**
76:6 81:16
**credentialing**
64:4
**credentials**
75:6
**criteria** 3:18
41:19,19 84:12

critical 19:16
cross 43:8,12
cs 130:15
curious 29:5
current 7:14
9:6 13:10 25:4
49:6 68:19
currently 25:5
33:7 71:20
105:10
curriculum
21:14 102:4
customizable
21:18
cutoff 33:20,22
cv 1:7
cycle 35:15,16
35:18

**d**

d 4:1
d.c. 2:5
daily 35:13
daniel 1:4
date 33:22 35:6
35:22 119:16
davis 2:2 3:12
4:4,10,12 6:5,9
7:3,4 13:9
14:11,15 16:4
16:5,19 28:4
28:19,24 29:14
29:23 30:22
37:7,12,14
40:20 44:19
47:22 49:5,16

52:16,17 53:21
54:6,11,13
55:10 57:1,23
58:13,19,24
59:5 60:1,21
61:15,19 62:10
62:21 63:1
64:11,15 69:16
69:24 70:22
71:1 72:3
73:21 74:7,8
75:2 76:11,24
77:11,16 78:3
79:17 82:5,24
85:7,17 86:18
87:10 89:18
91:15 92:4,10
94:11,16,21,22
96:19 98:7,8
99:24 100:14
107:12,22
108:12,21
109:4,5 112:7
112:25 117:9
119:11,14,19
121:15 122:4
122:25 123:7
123:11,19
124:1,4 125:25
126:4,6,18,24
dawn 1:9,13
3:4,16 4:6
28:14 112:10
112:11,19
128:1,11 130:5

day 17:15
18:17,18,21
69:17 128:14
days 130:17
decide 36:13
79:18 96:11
decided 102:6
decides 35:25
96:25
deciding 50:4
120:12
decision 11:9
11:17 13:19
55:14 56:11
100:11,11
102:12 120:9
decisions 48:23
49:3 73:8
74:11 77:3
125:8
declaration
3:16 72:16
74:19 75:18,24
76:19
decline 27:23
27:24 30:1,3
31:6,24 33:1,2
54:7,21 58:8
58:14 60:2,4
61:8,12 62:1,2
62:11 79:7,12
81:4,21 82:8
82:13,19 86:15
87:21 90:1

declined 53:14
53:16 55:5,21
56:21 57:9
70:12 80:1
declines 52:12
54:16
declining 71:12
87:12
def24 118:18
defendant
118:18
defendants
1:11 2:8
deferred 22:17
define 74:18
82:10
defined 41:15
108:8
definitely 44:11
definition
104:16,20
105:10 106:18
107:4,10 108:1
delivery 16:2
34:15 37:16
38:4,7 41:12
42:2 43:6,20
44:25 80:8,11
95:11 96:4
97:18 102:14
116:21 121:11
121:22 122:17
demographer's
42:8

**denver** 1:4 2:10
　12:11 39:16
　40:1,5 107:4
　107:11,14,17
**denver's** 117:3
　117:11
**deny** 58:21
　59:6
**department** 1:8
　1:12 3:3 6:23
　8:4 9:7 10:17
　11:20 12:19,22
　12:24 13:15,19
　14:3,16 15:4
　15:15,25 30:5
　39:21,25 40:6
　41:18 42:3
　47:7,10,15,19
　48:9,10,22
　49:2,14 52:5
　52:20 55:17
　56:17,25 57:2
　67:4,22,25
　68:2,13 71:6
　73:3,15,24
　74:4,8,20
　75:19 76:16
　79:18 84:20
　86:5,22 88:15
　90:19,20 91:5
　91:16,18 95:1
　95:2 96:8,10
　96:14,20,23,24
　98:19 100:25
　102:9 110:18

112:1 113:17
114:2,18 117:2
117:10 125:21
126:7
**department's**
　76:20 103:11
　104:9
**depending**
　91:14
**depends** 14:8
　80:23 83:13
**deponent** 13:5
　13:7 37:11
　47:19 54:3
　58:18 59:25
　61:18 79:16
　109:3 128:1
　129:7 130:13
**deposed** 5:9
**deposing**
　130:13
**deposition** 1:12
　3:3,14 5:25
　6:11 7:5,7,13
　7:25 8:9 28:18
　127:21 128:2,5
　128:7,8 129:9
**derocher** 2:13
　6:23
**design** 39:6
　43:1
**designed** 39:2
　84:13
**details** 40:10
　62:16

**determination**
　57:6
**determine**
　18:23 34:3
　54:25 55:2,2
　55:12,18 57:21
　60:18,19 66:21
　70:23 71:4
　73:25 125:22
　126:7
**determined**
　32:19 55:4,13
　55:20 56:8,20
**determining**
　95:8
**developed**
　78:21
**development**
　19:10
**dialog** 114:2
　121:24
**different** 11:2
　11:21 20:11
　21:4,25 39:4
　40:2,15,18
　41:24 43:4,20
　71:25 74:2
　81:17,18 85:16
　85:20 86:7,8
　86:20 94:1
　113:6
**difficult** 57:15
**diminish** 97:4
**diminished**
　35:2

**diminishing**
　97:18
**direct** 26:21,24
　27:10,12,15,24
　28:2,7 29:5,6
　29:21 31:8
　32:3 33:3,6
　34:21 36:7
**directly** 18:4
　21:6 27:2,21
　29:25 31:1
　37:2 41:14
　79:20 88:19
　95:25 97:8
　113:8 115:5
**director** 1:8,9
　6:22 9:8,11,14
　9:15,16,19,24
　9:25 11:4,15
　13:14 17:8
　39:18,22 47:3
　47:15,23 48:6
　48:8 49:6
　58:20 78:22
　100:10 101:8
　101:20 109:9
　109:17 110:24
　111:21 118:9
　118:12,19
　121:17 122:1
**disabilities**
　98:12 99:2,8
　99:16
**disability** 51:5
　63:12

**disavows** 73:4
  74:9,20 75:19
**discover** 57:8
**discovery**
  48:20
**discretion** 52:6
**discriminate**
  63:9,17 64:17
  65:18,19,22
  66:2,6,15 67:9
  69:5,8
**discriminating**
  69:20
**discrimination**
  63:6 120:11
**discuss** 9:1
  14:9 90:7
  120:5
**discussed** 57:24
  69:6 79:9
**discussing** 7:24
  39:4 41:19
  45:11 46:20
  68:11 73:5
  79:6 82:7 90:2
  93:18 105:16
**discussion**
  14:14 77:14
  120:14 125:6
  126:20
**discussions**
  113:12 115:18
**distance** 20:23
**district** 1:1,1
  37:21 38:1

43:21 84:16,17
85:16,18 86:1
86:4,14,15,20
87:9,12,14,22
99:5,10,19
**district's** 86:24
**districts** 84:22
  85:2,8,20 87:7
  87:20 88:1
**dividing** 48:5
**division** 15:6,6
**dixon** 2:3
**document** 46:1
  46:3,13,15
  72:14 78:1,4
  91:22 92:15
  110:7 111:8
**documentation**
  86:8
**documents**
  5:24 6:2,6
  94:11,14
**doing** 5:12 11:2
  71:14
**dr** 6:22 11:9,11
  11:12 13:11,18
  13:21,23
  108:18,20,22
  123:23
**draft** 47:24
  104:19,22
  105:4 107:9
  124:22,25
  125:16

**drafter** 67:17
**dual** 83:7,12,14
  83:15 84:7
**duly** 4:7 129:7

## e

**e** 4:1,1
**earlier** 12:1
  27:6 33:14
  39:17 41:20
  44:20 45:12
  56:16 57:25
  59:5 67:3 69:7
  71:25 72:24
  79:6,9 88:24
  94:8 96:21
  100:20 124:6
**early** 1:8,13 3:3
  6:23 8:4 9:7,25
  11:20 12:10
  19:7 34:2
  41:23 45:4
  49:2 55:17
  80:7 94:6
  111:21,24
  112:15 113:20
  124:13
**ease** 116:23
**ecea** 112:15
**ed.d.** 2:14
**education** 10:9
  10:24 12:22
  63:12 88:23
  124:13
**educational**
  21:14 81:24

82:18
**educator** 60:11
  83:18
**educators**
  81:16 125:4
**effect** 25:17,22
  26:4
**effective** 107:7
**effort** 26:10
**eight** 35:15
**either** 23:21
  30:25 68:22
  75:12,15
**elected** 15:22
  16:2,18
**electronic**
  126:22,22,24
  127:11
**elevate** 126:12
**elevated** 30:13
  30:15 41:22
  52:22 66:20
  85:14 87:5
  95:24 97:7
  113:7 114:17
  125:20
**eligible** 17:25
  18:18 31:21
  42:8 51:2
  105:21 106:6
  122:20
**email** 2:6,6,7
  2:11 3:22,23
  6:13 111:12
  112:9,18,22

**[email - example]**                                                      Page 12

113:1,4,9
118:3,12
119:10,13,17
119:25 120:3
**emails** 111:14
**embodying**
105:15
**emotional**
19:11
**employed**
51:22 129:14
**employee** 64:8
**employee's**
22:15 23:4
**employees**
34:12 63:21,22
64:2,5,7,8,21
65:5,7,23 66:7
66:15 67:10
69:1 73:6,9,17
74:12,16,18,22
74:23 75:9,12
75:15,21,25
76:2,4,8
**employees's**
116:19
**employer** 34:11
65:4
**employers**
65:14
**employment**
10:2 51:22
73:8 74:11
**encompass**
29:20

**encourage** 31:7
**encouraged**
112:19
**ended** 36:12
**enforce** 60:21
75:20 76:16
**enforcement**
73:4 74:9,20
75:19
**engage** 38:23
83:12 106:23
**engaged** 20:14
**engagement**
41:7
**english** 84:5
**enrichment**
22:1
**enroll** 18:12
27:3,18 29:25
30:11 31:7
33:1,3 34:8
37:2 51:2,18
51:19 52:12,24
53:1,14,16
54:7,16,21
55:5,21 58:8
58:14 59:10,21
60:2,4 61:12
62:2,11 68:12
81:24 84:10
86:15 87:13
88:7 89:7
106:8
**enrolled** 33:11
36:20 98:11,14

99:15
**enrolling** 27:19
**enrollment**
18:12,13 24:23
26:21,24 27:10
27:24 28:2,7
28:21 29:5,6
29:21 30:1
31:8 32:3 33:3
33:6 40:11
51:16,17 53:15
69:7,14 94:7,9
**ensure** 19:17
38:9 42:11
57:3 68:5
80:24 87:25
100:12 103:25
106:7 116:20
125:4
**ensuring** 79:21
80:8
**entail** 24:18
**enter** 34:22
**entirety** 68:4
**entitled** 63:6
**entity** 48:24
**environment**
125:4
**equal** 51:2,11
51:16 52:25
59:9,9,20 61:4
68:12 108:8
**equally** 23:1,2
60:22

**equivalent**
118:25
**errata** 130:11
130:13,17
**especially**
34:13 95:7
**esq** 2:2,3,3,8,9
**esquire** 130:1
**establish**
124:24
**established**
103:10,19
109:8
**establishes**
124:25
**et** 130:4,4
**ethnicity** 51:3
63:10
**event** 7:15
**events** 21:4
60:25
**eventually**
121:4
**everybody**
107:16 123:17
**evolving** 42:1
**exact** 32:24
**exactly** 81:7
124:9
**examination**
3:4,11 4:9
129:7
**examined** 4:7
**example** 11:23
15:13,14 20:23

[example - family]                                        Page 13

21:6,20 31:12
31:20 32:16,19
34:11 37:21
39:23 40:14
41:24 44:25
88:21 98:10
107:3 114:5
**examples** 98:2
98:10
**exceed** 89:6
**exception** 3:18
94:23 95:2,15
96:9 97:22
**exceptional**
19:12
**excited** 19:14
34:9 45:7
**excluded**
125:19
**exclusions**
122:22
**exclusively**
11:20 64:18
100:5
**excuse** 106:2
**executive** 1:8
6:22 9:25
13:14
**exemption**
41:18 117:4,11
119:15
**exhibit** 3:14,15
3:16,17,18,19
3:21,22,23
8:13,14,16,19

45:11,15,23
46:1,3 72:4,7
72:13 77:17,24
91:23 92:3,9
92:11 100:15
104:23,25
110:2,3 111:3
111:4 114:22
117:22,24,25
**exhibits** 3:13
126:23,25
127:10
**exist** 48:24
**existed** 47:23
48:22 49:9
**expansion** 19:5
**expect** 60:24
61:3,7 62:2,8
**expectation**
61:11 83:15
108:18
**expectations**
64:3 76:5 77:1
77:2 83:13
84:5 87:18
96:1 115:9
121:19 124:16
124:20
**expected** 75:6
**expires** 128:16
129:17
**explain** 83:20
**explained**
29:11

**expressed** 16:7
**extent** 15:20
16:1,8,17
28:16 30:20
40:4,8 52:14
96:14 107:5
108:3
**external** 12:1,4

**f**

**facilitate** 27:3
**facilities** 70:14
**factor** 39:17
**factored** 41:17
**factors** 88:7,14
89:3,20
**facts** 56:24
57:7 62:24
66:20 70:1,6
70:21 71:3,9
**fails** 130:19
**failure** 45:2
**faith** 38:3,16
100:21 101:8
101:13,17
103:20 104:7
104:10 109:9
110:22 113:21
120:8
**fall** 15:21 28:8
87:11 88:15
**falling** 29:3
**falls** 16:2 29:16
108:5
**families** 17:13
18:3,7 19:17

19:21,23,24
20:9,10,15,20
21:4,5,5 22:14
26:20 27:1
29:17,19 33:10
34:9,18,21
36:18,20 38:9
38:12,15,23
40:14 44:17
51:12 64:10
69:2 81:8,11
81:16,23 82:4
82:16,18 83:2
84:16 86:3,6,9
86:13 87:4
88:6 89:1,14
95:18 96:5
98:23 100:21
102:18 103:8
103:22,24
104:8 116:21
122:5,10,15
123:8
**family** 18:13
21:23 22:4
27:17,19,23,24
29:1,24 30:9
30:23 31:7
32:3,14 33:1,3
37:24 38:11
45:6 51:7
61:23 62:3
64:9,18 68:23
80:17,21,25
81:3,19 82:8

82:11,16 85:18
87:13,13,21
89:6 106:11
114:5 115:7
**family's** 23:14
122:16
**far** 28:16 39:4
42:14 108:24
**favor** 112:3
**february**
111:15
**federal** 32:21
41:23 65:3
66:9,12,14
67:13 72:25
73:7,10 83:15
83:22 84:3
88:11,18,19
89:14,16 97:16
99:6,23 125:7
125:11,11,22
126:7
**federally** 63:23
87:19,21
**feedback** 79:23
80:2 113:18
**feel** 7:13 71:23
122:5
**feeling** 108:15
**figure** 121:25
**file** 45:20
**filed** 72:16
**fill** 37:4 40:14
96:23

**filled** 31:18
32:16 94:16,17
98:1
**final** 11:17
**finalized** 34:8
**finally** 70:23
**find** 18:7 31:5
32:10,11 38:10
53:23 55:1
64:1 65:8 70:1
70:20 93:11
96:5 98:23,23
101:10
**finding** 19:18
53:6,7
**fine** 19:11 35:7
**finish** 5:2,4
85:5 123:20,22
**finished** 85:6
**firm** 10:15
**first** 4:7 5:13
8:12 10:25
13:3,6 22:20
23:16 24:13
33:24 34:14
35:15 36:9
37:9 50:14
74:3 86:6 98:3
100:20 107:23
117:2,10,13,13
119:11
**fiscal** 49:13,14
49:17,21,23
**fits** 38:10

**five** 17:9 18:10
18:11
**fluidity** 116:23
**focus** 43:3 69:1
**focused** 44:22
**folder** 45:23
**folks** 11:20
26:3 102:15
114:24 122:11
122:12
**follow** 38:22
59:2 60:24
62:25 65:5
115:1
**followed** 15:1
40:21 48:7
61:2
**following** 54:3
59:15 68:5
89:15 122:23
**follows** 4:8
**foregoing**
127:21 128:3
129:12
**form** 44:6
69:10,22 71:17
76:22 82:20
92:20,24 93:4
93:8,12,15,17
94:2,14,18
95:3,12 96:13
96:20,23,24
97:22 99:17
117:6 119:18
121:14 129:11

**formalized**
115:13
**forms** 94:16
96:9,15
**forth** 9:22
40:17 54:3
62:25 108:5
124:19 129:11
**forward** 104:18
126:17
**forwarding**
118:11
**found** 115:6
**foundationally**
39:6
**four** 35:16
127:8
**fourth** 50:25
**free** 7:13
**front** 45:13
46:6 65:8
**full** 5:21 18:21
31:9 43:11,12
57:18 66:19
116:3
**functioning**
15:24
**fund** 2:4
**funded** 37:22
**funding** 85:11
113:22
**funds** 18:3,3,15
18:23 88:12,19
122:19

**further** 30:15
36:6 57:5,7
59:18 63:2
70:1,8 86:21
91:19 100:9
104:19 129:9
129:13

**g**

**g** 2:3 4:1
**gains** 19:8
**gender** 51:4
59:21 61:4,14
61:22 63:10,11
69:21 106:10
**general** 15:5
69:8 71:6
79:10 126:13
**general's** 2:9
**generally** 15:24
17:3 40:21
94:25 113:16
120:19
**generating**
45:20
**geographic**
106:22 107:11
**geographically**
20:22
**geography**
20:24 21:15
**getting** 16:6
35:17 36:22
89:17 103:15
**girls** 69:19

**give** 8:13,15
14:5,19 15:15
17:25 31:17
72:4 101:9
102:15 103:1
109:11 121:10
**given** 16:12
22:24 79:11
98:10 114:15
**gives** 67:13
104:7
**giving** 5:21,22
15:5 56:4
101:21
**go** 4:16 8:12
14:10,12 18:3
18:3,7,10,11,22
21:6 25:14
26:2,10 30:7
31:17,17 34:24
37:9,12 38:12
38:14 46:9
57:20 59:18
60:13,17 62:8
63:1 77:16
85:7 107:13
108:2 116:4
122:2 123:14
**goal** 42:19
44:21
**goals** 37:15
38:20 42:4,6,9
42:14 44:24
45:3

**goes** 18:24
22:16 23:16
28:4 42:14
**going** 8:12
12:23 16:3
21:3 25:17,19
27:2,22 28:12
28:15 29:1
34:6,17 39:19
41:23 43:15
45:10 60:12
62:11 72:3
76:16 77:16
87:23 91:22
95:9 97:3
102:3 111:3
113:2,3 117:1
117:22 120:12
121:12
**good** 4:11,13
23:22 38:6
**gotten** 26:3
63:3 111:14
**government**
10:6 12:5
88:20
**governor** 13:17
13:22,22 14:3
15:17 16:10,21
16:25 17:1
**governor's**
11:23,25 12:3
13:22 14:17
15:9,10 16:7
17:2

**grant** 98:19
**grantee** 88:6,10
88:11,18 89:8
**grantees** 88:24
89:10
**grapple** 121:21
**grateful** 4:14
**great** 4:11 5:3,8
6:19 7:3,12,21
8:7,11,21 9:4
9:17 13:9 22:3
26:17 34:16
37:14 45:9,25
46:9,12,18
50:1 63:5,8
68:10 72:12,23
77:16 78:3
80:12 92:14
100:18 105:3,8
109:4 110:6,12
111:7 114:19
115:15 118:2
124:1
**greg** 2:9 7:1
**gross** 19:11
**ground** 4:16
**group** 37:23
101:8,17 109:6
109:7,22
110:11 112:14
112:21 113:14
113:18 114:1
114:16,21,21
114:24 115:14
115:18,22

116:2 120:23
124:19
**groups**  114:4
114:20
**growth**  44:15
**guardians**
62:12
**guess**  29:2 56:3
103:17 107:3
113:16 114:22
**guide**  3:17 78:7
78:10,16,21,25
90:15,17 92:4
101:1 105:16
116:10

**h**

**half**  18:17,18
74:3,10
**handle**  127:12
127:15
**happen**  30:17
**happened**
30:14 55:18,19
55:20
**happens**  22:9
**hard**  32:23
53:2 62:23
71:2 91:13
102:24 121:21
**head**  12:24
26:8 32:19
37:25 43:17
88:6,10,11,12
88:17,18,23
89:10,10,12

93:22
**hear**  47:18 54:2
58:16 59:23
79:14 109:9
**heard**  27:1 41:1
79:19 83:1
84:3,7 87:5
89:11 97:10
101:2 113:20
115:3,24 116:1
116:11,16
**hearing**  36:3
44:17 95:5,13
95:15 101:7
**held**  84:1
**help**  17:12
20:15
**helpful**  20:6
26:18 38:19
79:21 104:5
116:20
**helping**  81:12
81:14
**hey**  31:16
114:24
**high**  19:12,12
90:9 95:18
98:11,14 124:7
124:9
**higher**  27:5
36:19
**hire**  65:4 73:7
73:23
**hired**  11:10
13:25 39:22

76:2
**hiring**  75:5,11
75:15,21 125:7
126:7
**hit**  45:22
**hitting**  77:19
**hmm**  97:24
**home**  20:24,24
37:24 45:1,6
114:5,21 115:7
**homeless**  87:21
**honor**  34:13
**hoped**  121:24
**hopefully**  7:17
**hopes**  38:24
**hoping**  42:5
44:22,23
**hour**  7:16,18
18:16,17
127:22
**hours**  7:17
17:25 18:18,20
18:21 21:25
127:23
**house**  39:5
**housing**  51:5
**huh**  4:22,22
**human**  12:24
47:15,20 48:9
49:15,24
**hung**  68:25

**i**

**idea**  20:2,3
95:13

**identified**
50:20
**identifies**  70:14
**identify**  18:20
**identities**  51:13
51:17 61:9,13
61:20
**identity**  51:5
59:21 61:4,14
61:22 63:11,13
69:21 106:10
**imagine**  21:1
30:23
**immersive**  83:7
83:11 84:8
**implement**
39:13
**implementati...**
113:17
**implemented**
40:23
**implementing**
43:1 68:6
**important**  4:19
4:25 7:7 19:1
20:13 38:21
124:6
**improper**  7:23
**inaugural**  9:15
9:16
**include**  28:24
63:20 68:14,17
79:18 84:20
89:4,21 90:19
100:25

included 51:25
68:13 80:2
101:3
includes 64:8
including 6:2
67:10 88:12
inclusion 34:14
42:2 79:21
80:8 116:20
122:17
inclusive 33:24
71:5 87:17
95:11 96:3
97:18 98:22
101:13 102:14
102:25 103:15
104:3,15 108:4
121:25 124:18
income 32:20
51:5 88:21
89:4,7,21
incorrectly
65:9
incredible 19:8
incumbent
70:20
index 3:10
indicators
20:25
individual 96:8
individualized
88:23
individuals
106:21

industry 22:18
infant 21:22
inform 44:18
information
15:21 16:1
20:10 21:13
44:4 78:16
101:9 114:11
125:24 126:2
initial 12:22
101:20,22
124:23 125:16
initially 31:16
31:16 43:2
97:2
initiate 15:10
initiative 112:4
initiatives
111:21,24
input 11:15
48:1 50:5
78:18,20
114:15
inquiry 86:21
111:13
ins 26:21 27:10
inside 69:20
instance 40:18
57:4 59:16
77:5 90:8
113:24
instances
121:23
instruct 16:3

insurance
10:16
integrity 57:20
intended 82:2
87:3 101:12
122:19
intending
76:18,19
intention 9:20
87:24
intentional
40:12
intentions
87:16
interchangea...
27:11
interested 22:5
34:2 129:15
interesting
45:22
interfaith 3:21
109:6,7,22
110:11 112:21
113:14,18
115:18 117:14
interpreting
67:8
interview 12:23
interviewers
12:13,16
interviews 11:8
11:18 12:1
intimate 21:7
introduce
45:11

introduced
5:17
investigate
56:6
investigating
75:5 126:15
invited 110:10
invites 114:24
involved 12:9
involving 73:9
74:11
issue 40:24

**j**

j 2:9
january 35:14
119:16
jdavis 2:6
jefferson 10:1,6
10:10,21 85:25
86:3
jlk 1:7
job 44:11
joe 4:12 28:1
join 36:25
joseph 2:2
july 25:14
39:25 49:3

**k**

k 42:21
katy 12:21 13:5
13:7
keep 11:1 91:23
92:6 103:25

**[kind - length]**                                                            Page 18

**kind**   10:14 12:7
  12:7,8 21:15
  22:1 28:10
  41:9 43:9
  80:21 83:11
  88:14 95:12,14
  95:15 101:9
  102:4 114:1
  116:9,11
  124:25 126:21
**kindergarten**
  18:1 20:5
**kinds**   21:16
**knew**   42:7
  103:5 120:9
**know**   4:18,20
  5:1,12 6:10 7:5
  7:12,13,15,16
  7:23 12:15
  21:3,5,12 23:4
  25:7 26:10
  27:6,19 29:5
  29:19 31:7,17
  32:1 36:24
  37:7 39:3
  40:10,11 41:11
  42:23 44:4
  45:1 49:12,20
  52:11,19 54:12
  54:12,19 58:3
  62:23 63:3
  67:4 68:18,22
  68:22 69:7,12
  69:17,19 70:4
  70:11,23 71:8

  71:14 73:13
  74:15,17 75:8
  75:9,23 77:17
  82:15 85:17,22
  86:19,20 88:18
  88:22 92:12
  93:7 94:1,14
  95:17 96:3
  98:15,21
  100:16 103:2
  103:17 104:6
  104:18,21
  105:1 107:2,3
  108:13 110:4
  110:23 111:5
  111:17 112:11
  113:5,19,20
  114:14,15
  115:2,12,17,21
  115:24,25
  116:18,21
  117:19,23
  119:22 121:16
  121:19,19,24
  122:10,18,21
  124:7,15
**knowing**   32:24
  52:18 53:3
  57:18 59:3
**knowledge**
  109:23

**l**

**labeled**   46:4
**lack**   51:5

**lakewood**   1:3
**language**   19:10
  83:7,12,15,24
  84:4,8,9
  102:17,19
  119:7
**large**   37:25
  45:6
**launch**   95:7
  102:25
**launched**   115:4
**laurel**   3:6 37:12
  61:15 64:12
  77:8 129:4,19
**law**   9:22 37:20
  38:8,21 40:13
  50:20 52:2
  54:4,5 56:6
  66:10 68:14,23
  73:7,10 97:20
  100:12 108:2,5
  108:8 117:17
  120:10 121:17
  121:18 122:23
  122:23 123:2
  124:16,24
  125:1
**lawsuit**   16:15
  16:21,22
**lawyer**   75:10
  87:21
**lawyers**   4:12
  56:20
**lay**   17:5 80:5

**lco**   27:20 34:23
  34:24
**lcos**   95:25
  115:24
**leadership**   50:6
  52:20 54:24
  71:5 97:9,12
  100:11 102:8
  126:12
**leadership's**
  97:12
**leading**   25:16
  26:6 36:8
**learn**   20:10
  121:20
**learned**   121:4,6
**learning**   10:1
  19:7
**leave**   48:16
  77:12
**led**   48:6 101:20
**leeway**   29:11
**left**   108:12,17
  108:19,22
**legal**   73:18
  74:25 119:3
  126:14 130:23
**legislative**
  15:14
**legislator's**
  52:3
**legislature**
  68:16 80:5
**length**   21:24

**level** 32:20 51:5
80:25 83:23
84:9 97:13
**levels** 88:21
**liberty** 2:4
**license** 22:15
34:8
**licensed** 24:15
37:23 45:5
75:7 76:5
81:15,16 99:14
99:20 115:8
**licensing** 34:7
64:3 77:2
124:19
**likely** 42:16
**limit** 29:8
**limited** 63:18
**line** 7:15
**lines** 58:20
71:13
**lisa** 1:4,7 2:14
130:4
**list** 3:18 8:8
114:23
**listed** 32:12
51:12 90:6
98:3
**listen** 42:1
114:11
**lists** 50:20
**litigation** 72:17
**little** 26:15
29:10 37:18
40:2,25 43:2

43:25 45:10
52:9 63:2
65:14 68:25
74:6 80:14
**littleton** 1:3
**littletown** 130:4
**live** 84:16,23
85:18
**lived** 86:4,14
**lives** 107:18
**load** 77:25
**loading** 45:18
72:9 77:20,23
**local** 10:5 17:8
17:11,14 20:12
27:18 31:1
41:13 42:10
79:19 93:22
95:4,6 97:7
101:7 118:9
**locally** 17:14
20:14
**locate** 64:20
**located** 121:8
**location** 22:15
27:21 81:1,15
95:21 98:10,12
99:1,11,21
**locations** 95:19
99:20,20
**log** 24:19
**logged** 6:17
**long** 9:10 19:13
29:13

**longer** 123:23
**lonhausen** 7:1
**look** 20:20,23
21:17 26:5
35:6 40:19
50:12 59:18
69:13 70:1,5,7
70:8,20 74:1,2
83:6 93:24
97:21 98:1,16
100:9,13 101:6
105:4,19
106:18 114:7
**looking** 20:21
21:23 43:11
44:11 82:11
88:5 97:2,15
97:17 98:8
102:20 111:9
112:9
**looks** 45:25
50:25 72:20
97:25 98:2,9
118:5,11,14,18
118:21 119:3
119:16
**lot** 26:18 33:23
34:1 37:7 41:2
41:7 94:4
104:13 108:17
108:21 111:14
113:21,25
114:6 115:10
121:7,20
124:12

**lottery** 22:18
**louisiana** 42:23
**lower** 36:21
**lunch** 123:17
123:18

**m**

**ma'am** 13:4
47:18
**made** 10:23
19:9 31:14
48:23 49:3
50:5 69:17
71:3 72:2 77:4
116:10 122:15
126:11 128:7,8
**main** 24:14
**make** 8:13 19:1
31:24 52:6
56:10 57:10
65:24 97:9
99:13 102:12
106:2 113:17
120:10 122:16
**maker** 11:9
13:19
**making** 11:17
57:16 97:20
116:21
**man** 107:18
**manage** 36:21
**managed** 37:21
38:1
**manager** 17:16
17:16

managers  17:8
mandate  32:21
    41:23,24 67:13
    88:18 89:14,16
    97:16 99:6,23
mandates  84:4
manuscript
    127:2
mares  111:17
mark  8:12
    77:17 91:22
    104:21 110:1
    111:3 117:1,22
marked  8:16
    45:15,23 72:13
    77:24 92:9
    104:23 110:3
    111:4 117:25
marketing
    10:17
marriage  62:13
    107:17
mary  1:2 12:18
    130:4
match  23:15,20
    23:21,22 24:2
    24:5 27:22
    79:7,12 81:4
    81:21 82:13,19
    85:15 90:1,5
    116:3
matched  23:15
    29:19 34:19
    103:7

matches  40:22
    79:10 99:15
matching  18:11
    22:10,10,12,18
    26:19 28:6,10
    29:10 33:2
    34:17,20 35:4
    35:12,12,19
    36:1,5,14 39:3
    40:3,21
material  98:8
matter  108:7
maximum
    60:11
mean  9:19
    21:13 28:19
    43:20 44:2,24
    56:18 71:11
    74:22 75:22,25
    78:20 80:4,15
    82:24 83:21
    103:3,4 104:17
    114:8
means  20:1
    22:21 37:19,23
    52:10 53:11
    55:16 56:15
    64:18 65:15
    69:4 76:1
    104:10 106:20
meet  4:13,15
    14:9 32:20
    41:23 71:23
    77:1 88:6
    103:2 114:25

121:18
meeting  14:7
    14:17 15:1
    101:21,24
    115:20 117:13
meetings
    110:19
melissa  111:17
    112:19 113:3
member's  62:3
members  103:6
    110:21 113:6
memo  14:8
mention  29:9
mentioned  6:7
    13:4 39:16
    89:21 109:5
mentioning
    105:5
merit  3:7
    129:20
messaging  6:13
met  42:19 44:2
    57:4,4 109:13
    110:14,23
method  27:25
methods  28:20
michael  109:21
    110:11,24
    113:13 115:20
    115:25 116:1,6
    117:14 118:6
    120:15
michelle  6:25

midatlantic
    130:15
middle  77:10
mind  43:12
    124:9
mini  127:3,4
minimum
    18:21
ministerial
    73:9,17 74:12
    74:15,21,23
    75:9,21,25
    76:4,7
minu  127:5
minute  37:9
    77:12 108:24
minutes  123:14
    127:23
mischaracteri...
    87:1
mischaracteri...
    76:9
mischaracteri...
    60:7
misinformation
    112:20 113:13
misspeak  65:3
misstates  54:9
mistake  32:15
mixed  37:15
    38:4,7 41:12
    42:2 43:6,20
    44:25 80:8,10
    95:11 96:4
    97:18 102:14

116:21 121:10
121:22 122:17
**mm** 97:24
**model** 19:6
80:24 81:6,8
82:18,23
102:20 103:18
104:1,4
**moment** 8:15
13:10 14:13
54:18 68:12
72:4
**moms** 98:11,14
**montessori**
82:16,17
**monthly** 18:24
**months** 36:9
**morning** 4:11
4:14 5:21 9:2
**motor** 19:11,11
**move** 27:7
104:18
**moved** 36:6
**moving** 102:23
**multiage** 31:13
**multiple** 95:19
99:19 115:12

**n**

**n** 4:1
**n.w.** 2:4
**name** 4:12
12:24 13:2,3,3
13:6 65:3
109:19,20,21

**national** 63:10
**native** 84:4
**navigate** 17:13
**navigating** 78:8
**navigation**
20:13,16
**necessarily**
104:16 115:13
116:12 117:16
**need** 7:13,16
14:9 19:20
46:20 57:2
64:22 70:7,8
70:22 82:16
83:7 88:6 89:1
90:19 91:19
93:14 95:15
96:22 97:10
98:5,21 117:3
119:15 122:5
**needed** 43:3
52:20 78:23
114:10,10
**needs** 38:24
54:11 56:18
58:3 66:24
71:14 82:17,17
99:6,22 101:10
115:5,8
**neglected** 45:25
**neighboring**
98:11,14
**never** 30:18,18
**new** 36:12,25
44:10 88:3

89:17 103:24
112:1
**newer** 34:6
**nexus** 106:23
**nice** 4:15
**nicholas** 2:3
**niki** 6:24
**nondiscrimin...**
117:4,12 119:7
121:13 122:3
**nonreligious**
65:21
**notary** 3:8
128:18 129:5
129:21
**note** 46:2
130:10
**notice** 3:1,14
28:3
**noticed** 28:17
43:18 108:20
**november** 1:13
3:6 25:18
130:3
**nreaves** 2:6
**number** 28:9
29:12,16 35:1
36:3,12,21
39:20 42:4,7,9
42:14 50:18,20
65:19 105:14
120:25

**o**

**o** 4:1
**oath** 5:14 128:3
**objection** 15:20
16:16 29:12
30:20 40:4
44:6 48:19
52:14 53:19
54:9 55:8
56:23 57:12
58:10,23 60:6
62:5,5 69:10
69:22 70:16,25
71:17 73:18
74:24 76:9,22
81:25 82:20
85:4 86:17,25
89:9 91:11
96:13 99:17
100:7 107:5,20
112:5,23 117:6
119:8,18
121:14 122:8
123:3 125:23
**objections**
48:20
**obviously**
15:25
**occur** 35:13
57:16 66:22
**occurred** 53:8
53:10,13 56:7
56:12 66:21
71:4

| | | | |
|---|---|---|---|
| **occurring** | **oit** 39:23 | 49:16,22 50:1 | 97:21 98:18,25 |
| 35:20 | **okay** 4:23 5:11 | 50:1,8,12,24 | 99:7,24 100:4 |
| **occurs** 35:19 | 5:16,20,24 6:4 | 51:10,15,20,25 | 100:14 101:16 |
| **october** 129:17 | 6:13 8:2,7,11 | 52:5,9 53:5,9 | 101:23 102:6 |
| **odean** 1:9,13 | 8:17,21 9:1,5 | 53:25 54:6 | 102:17 103:3 |
| 3:4,16 4:6,11 | 9:10,13,23 | 55:4,13 56:13 | 103:11 104:21 |
| 7:4 8:19 9:5 | 10:2,5,13,18,20 | 57:23 58:2,6 | 105:8,13,18 |
| 14:15 16:5,19 | 11:12,14 12:7 | 58:19 59:5,19 | 106:1,14,18 |
| 17:5 29:23 | 12:12,15,20 | 60:1,21 61:3 | 107:12,16 |
| 37:14 46:7,12 | 13:1,16,18,21 | 62:1,10,17 | 108:7,11 109:1 |
| 48:22 49:5 | 14:2,6,23 15:4 | 63:1,16 64:15 | 109:2,3,4,18,22 |
| 52:17 53:21 | 15:9,13,17 | 65:2,10,12 | 110:1,12,16,18 |
| 54:14 55:10 | 16:4,14 17:5 | 66:6 67:14,19 | 111:2,19 112:3 |
| 57:1 58:21 | 17:21 18:2 | 68:2,7,19,24 | 112:9,18 113:9 |
| 64:16,24 66:23 | 19:1 20:1 22:3 | 69:16 70:2,11 | 113:12,16 |
| 72:5 73:13 | 22:9,24 23:5,9 | 70:22 71:7,11 | 114:19 116:25 |
| 76:15 89:20 | 23:12,12,17,20 | 72:3,6,10,16,19 | 117:21 118:11 |
| 94:25 107:23 | 24:1,4,7,9,11 | 72:23 73:3,13 | 118:15 119:5 |
| 108:15,22 | 24:25 25:4,9 | 74:1,19 75:8 | 119:14 121:4 |
| 113:1 124:4 | 25:21 26:2,13 | 76:7 77:9,10 | 122:4 123:7 |
| 128:1,11 130:5 | 26:17 27:14,23 | 77:21 78:3,9 | 125:5,21 |
| **odean's** 123:20 | 29:14 30:9,17 | 78:12,24 79:2 | 126:14,18 |
| **offer** 20:19 | 31:3,6 32:25 | 79:5,9,17 | 127:18 |
| 21:19,20,22 | 33:6,10,14,20 | 80:12 81:6,19 | **old** 18:1 31:19 |
| **offering** 124:8 | 34:16,25 35:4 | 82:15,24 83:5 | 32:16 |
| **office** 2:9 7:1,2 | 35:11,21,24 | 84:12,15 85:25 | **olds** 37:1,1 |
| 11:23,25 12:3 | 36:10,23,23 | 86:9,13,22,23 | **once** 35:19,20 |
| 13:22 14:17 | 37:6,18 38:2 | 87:10 88:5,10 | 52:22 72:1 |
| 15:9,10 16:7 | 39:1,12 40:1 | 88:14 89:3,6 | **ones** 91:16,17 |
| 17:2 42:8 | 40:20 42:3,13 | 89:18,24 90:18 | 96:14 |
| 78:15,15 | 43:23 44:19 | 90:20,25 91:3 | **online** 34:18 |
| **official** 1:7,9 | 45:9,19 46:12 | 91:4,7,15 92:8 | 44:4,11 |
| 15:22 16:2,18 | 46:15,18,23 | 92:20,25 93:6 | **op** 80:15,17,23 |
| **oh** 12:21 38:12 | 47:3,6,9,13,22 | 93:10,17 94:1 | 81:4,6,8,24 |
| 109:18 110:23 | 48:1,8,13 | 94:10,21 97:11 | 82:3,8,10,12,15 |

82:16 83:4
103:18 114:21
**open**   6:14 30:2
85:15
**opened**   26:23
**operate**   121:9
**operated**   104:4
**operating**
59:14
**operational**
17:16
**operationalize**
9:21 17:19
**operationalized**
17:22 41:16
**operationaliz...**
48:4
**operations**
28:13,21,25
29:7
**opportunities**
21:25 38:23
**opportunity**
19:23 20:4
34:12 51:2
52:25 59:9,21
61:4 68:12
96:4 101:13
106:8 108:9
114:12
**ops**   80:22
**options**   80:10
**order**   23:3
46:20 58:3
81:24 84:10

**organization**
27:19 31:1
75:4,11,14
77:5 93:23
95:5 97:8
111:24
**organizations**
17:9,12,15
20:13 41:13
42:11 73:23
79:20 95:6
101:7 118:10
**orientation**
51:4 61:5,14
61:21 62:3
63:11 106:10
108:9
**origin**   63:11
**originated**
115:17
**outcome**   56:9
**outcomes**   19:5
19:13,25
**outside**   12:4
29:6,8 75:6
85:13 90:23
110:23 117:16
122:2
**overview**
101:21 109:11

**p**

**p**   4:1
**p.m.**   124:3,3
127:22

**page**   3:11,13
46:4 50:15
63:2 65:11
72:20 79:2
91:17 97:22
105:9,13 106:2
106:3,3,19
118:17 119:12
127:8
**pages**   43:17
128:5
**paragraph**
72:20 75:18
76:19,20
**paralegal**   6:25
**parameter**
122:24
**parameters**
122:18
**parentheses**
98:2,9
**parents**   62:12
**parish**   1:2,3
107:13 130:4
**part**   5:18 11:16
18:12,16 21:10
28:21 29:20
38:3 60:9,13
80:17 81:11
86:5 88:22
94:8 100:22
101:18 102:7
102:18 103:8
104:8,10
106:12 107:25

115:17
**participants**
16:25 112:1
**participate**
18:6 24:15,22
25:10,16,23
27:4 29:1,18
33:15,17,25
34:4 37:24
42:5 51:10
59:1,14 60:15
69:15 80:9
81:4,20 82:9
83:4,8,23
86:10 90:21
93:14 101:14
101:20 102:16
103:2,7 104:3
113:22 116:3
118:20,22,23
119:1,4,6,22,23
120:8,13
121:12 122:7
122:12 123:2,9
**participated**
11:18 12:2
41:4 103:22
114:6
**participating**
6:3 19:22
21:21 24:12
25:5 28:6
30:24 37:2
45:5 71:21
81:17 89:12

97:5 98:16
100:1 109:10
120:1 124:8
**participation**
16:23 80:17,21
80:25 82:10,12
82:17 83:16,17
83:21,22
**particular**
12:14 22:15
29:25 30:12
38:25 46:24
60:19 77:3
79:21,22 80:25
81:10,15 83:14
86:14 87:6
90:11,15 92:21
96:1 97:14
99:16,21,25
103:9,19,23
104:16 106:21
107:13 115:8
116:5 126:8
**parties** 129:14
**parts** 74:2
**pastor** 2:13
**path** 126:17
**pay** 42:25
43:24
**payment** 18:24
**pennsylvania**
2:4
**people** 11:18,21
44:3,12 107:13

**percent** 25:7
42:15
**period** 109:14
**permanent**
86:10
**permissible**
57:10
**person** 46:25
63:9,16,17,19
63:20 64:7,8
64:17,17 65:15
65:19 66:2
69:6,20 116:12
**personal** 28:15
28:18
**perspective**
121:11
**petty** 118:5,8
**phase** 124:23
**philosophies**
21:14
**philosophy**
81:24
**phone** 2:5,11
**phonetic** 7:1
**picture** 57:18
**pinpoint**
113:20
**pinpointed**
56:5
**pivot** 45:10
**pl** 46:4,5 50:15
**pl105** 90:6
91:17 100:15

**pl55** 63:2
**place** 24:13
33:7 60:10
95:12 104:1
117:18 129:10
**placement**
27:13,15 34:21
36:7
**places** 27:21
**plain** 127:6
**plaintiffs** 1:5
2:2 3:4 4:13
6:7
**plans** 44:5
**played** 34:3
**please** 13:3
38:12 74:6
79:3 86:18
96:18 98:6
117:8 126:5
127:11
**po105** 79:2
**point** 7:12
29:12 50:25
59:12 60:19
87:22 90:16
91:18 119:20
**policy** 33:7
71:11 84:25
85:2,3,10
86:24
**portal** 11:7
21:12 34:18
**portion** 49:12
49:17,19

123:20,23
**posed** 117:15
**position** 9:6
28:20 29:6
76:20
**positive** 19:5
19:25 87:16
**possible** 27:5,8
33:25 41:14,15
80:9 91:25
121:25
**posted** 92:23
**potential** 93:2
**potentially**
91:21 98:20
**power** 108:14
**powering** 109:1
**pre** 42:21
**prefer** 27:9
**preference**
23:23,24 24:1
31:22 32:18
41:19 84:12,21
86:16 87:6,12
88:5,16 89:21
92:19,22 93:3
93:14,19 94:18
95:16 96:11,22
96:25 97:14
98:18 99:3
101:1 102:7
103:25 104:7
105:15 106:14
106:15 114:14
115:17,19

116:7 117:17
120:7,9,10
**preferences**
23:18 24:8
31:23 32:17,25
41:22 79:6,11
79:18 80:2,6
90:1,6 91:5,16
91:17,19 94:2
100:20 105:21
115:23 116:19
**preliminary**
5:11
**preparation**
6:11
**prepared** 9:1
47:13 48:9
**preparing**
48:15,18
**preschool** 1:10
3:15,19 9:9,21
12:11 15:7
17:13,17,20,22
17:24,25 19:2
19:9,22 21:22
27:1 28:11,13
28:25 29:2,25
29:25 31:14
32:12 33:16
34:12 37:16,22
39:9,16 40:1,5
40:7,17 46:16
47:4 51:1,3,18
51:19,22 52:11
56:21 60:14

64:10 65:16
68:6 75:7 76:6
81:12,12 84:10
88:13,24,25
101:4,10
105:22 106:7,8
109:11 113:23
118:12,18,19
122:6,9,13
124:8,12,17
**preschool's**
16:23 73:16
**preschools**
29:19 120:19
120:25 123:1
**present** 2:13
70:15 116:6
**presentation**
116:9
**presented** 50:8
**presumed**
89:15
**presuming**
57:18 87:16
**pretty** 25:13
28:8 29:2 36:6
39:6 56:4
87:20 102:24
**prevent** 5:21
**preview** 45:20
**previous** 10:2
19:4,22 37:22
41:4 113:22
114:6 124:11
129:6

**previously**
72:17
**prior** 13:25
39:21,24 48:21
95:7
**prioritization**
85:10
**prioritize** 85:25
87:25 90:12,22
90:25 91:9
**prioritized**
43:10 44:15
80:8
**prioritizing**
103:6
**priority** 42:2
88:21 90:10
**private** 10:11
**privilege** 15:22
16:3
**privileged**
16:17 125:24
125:25
**probably**
104:18 123:12
124:15
**problem** 70:15
**procedure** 3:2
33:11
**procedures**
29:17
**process** 14:1
16:2 18:11,19
18:22 22:10,10
22:13 26:19

27:3,16 28:7,7
28:10 29:10,17
29:18 30:4,5,8
30:11 31:8
33:2,4 34:7
39:3 40:3,11
40:21 47:25
56:8 57:21
59:17 60:18
71:4 78:8
86:20 95:2
116:23,23
126:17
**processed**
93:22
**processes** 24:24
96:8
**produce** 109:23
**produced** 6:7
**product** 109:23
**production**
94:20
**professional**
3:7 129:5,20
**profile** 20:18
24:22
**profiles** 25:20
**program** 1:10
3:15 6:3 9:9
12:11 14:5
15:8,16 16:10
16:13,23 17:6
17:17,20,21,23
18:14,16,17
19:4 21:13,24

25:5 26:24
28:11 31:9,15
32:15,19 33:18
35:2,17 36:2,6
36:8,22 37:1
39:2,9,14,17,20
39:24 40:2,6,7
40:23 41:15
42:18,22 43:3
44:16,18 46:16
48:4 50:9
60:16 61:1
64:10 66:10
69:14,15 70:5
70:20 71:24
72:1 75:3,5
76:1,3,25
78:18,19,19,21
80:7 81:10
82:9 83:4,8,14
83:16,23 84:5
88:3,23 89:17
90:16,24 96:3
97:7,9,12,12,19
98:21,24
101:21 102:2,7
102:8 103:19
109:11,12
114:6 117:12
119:3 120:9
121:17 122:2
124:17
**program's**
  116:7

**programatic**
  105:21
**programatica...**
  116:17
**programmatic**
  124:21
**programming**
  22:2 80:18
  81:15 89:2
**programs**   6:14
  21:19 26:25
  39:15 43:1,8
  43:25 99:5
**progressed**
  35:17
**projected**
  42:16
**projections**
  42:4,9
**promulgated**
  107:6
**proper**   55:3
**propose**   115:19
**proposed**
  102:20 105:11
  116:6
**protected**   73:9
**prov**   52:1
**provide**   14:17
  18:25 20:19
  22:1,2 38:22
  51:1,11 59:9
  59:20 61:3
  84:13 88:12,20
  88:24,25 89:1

101:12 104:1
121:8 122:16
125:3
**provided**   94:12
**provider**   3:17
  18:8,15,24
  19:19 20:9
  21:18 23:16,20
  23:21 24:12,14
  24:21 25:1,11
  25:23 27:3,18
  27:23 30:7,9
  30:24 31:6,8
  32:2,9 33:1,2
  33:16,16 34:11
  34:23,24 36:25
  37:2,23 38:10
  38:15,16,19
  41:11 45:4,4,7
  45:12,16 47:2
  47:9 50:17
  51:1 52:12,23
  53:14,15,15
  54:6,15,21
  55:5,20,21
  57:4,9,23 58:2
  58:6,19 59:12
  60:12,14 61:2
  62:8,14,17,18
  62:24 63:2,9
  63:16 64:16
  65:16,16,18,21
  65:22 66:1,6
  66:14,14,24
  67:7,7,16,17,19

69:5,17 70:11
71:7,11,14,16
71:20 74:21
75:7 77:3 78:9
78:25 79:7,12
79:22 80:16
81:19,20,23
83:7,14,18,25
84:16 87:17
90:1,5,9,11,14
90:15,18 91:7
91:20 92:4,18
93:2,13 95:14
96:2,6,9,21
97:4 98:13
99:15,25 100:6
100:21 101:1
103:23 105:16
114:21 115:8,9
115:9,11,13
116:5 119:7
120:17 124:10
125:12
**provider's**
  40:15 46:24
  63:21,22 71:10
  74:15,23 75:9
  75:21,25
  104:10
**providers**   6:2
  17:13 18:6,10
  18:12,13,19
  20:11,14,17
  21:4,7,11 22:5
  22:19 23:19

| | | q | |
|---|---|---|---|
| 25:4,15,19,25 | 119:21,23 | | 71:21 78:13 |

**q**

25:4,15,19,25
26:10 31:10,12
31:18,23 33:14
33:21,25 34:2
34:5,6,9,19
36:18,21 38:2
38:3 40:21,24
41:1,3,4,4,5,9
42:4,7 44:17
44:21 45:1
46:20 48:11,15
51:10 56:15,16
59:8,20 60:25
61:3,7,12 64:3
68:6 73:6,8
74:11 75:5
76:6,17,25
78:8 79:10,20
79:24 80:9,24
83:1,12 84:8,8
84:13 87:17
89:12 92:21
93:7 94:17,17
95:7,8,25 96:5
97:4,8 98:16
98:22 99:2,5,7
99:10 101:2,5
101:13 103:1
103:20 104:3,8
105:22 106:7
106:15 109:9
110:22 112:17
113:6,21
114:15,17
115:4,5,25

119:21,23
120:8,12 121:2
121:7,21 124:7
124:21 125:7
**provides**
112:16 123:8
**providing**
52:25 83:15
**provision** 51:13
51:15,25 52:13
53:11,18 54:17
55:7,16,23
56:22 57:11
60:22 63:5,8
63:23,25 64:20
65:15,17 66:16
66:24 67:4,5
67:15 68:3,11
68:13,15,17
69:3 70:3,15
73:4 74:9
75:20 76:17
**provisions**
50:13
**public** 3:8 5:18
10:1 128:18
129:5,21
**pull** 20:8 72:23
**pulled** 44:3
**purposes** 4:20
**pursuant** 3:1
**put** 19:24 21:11
21:12 46:1,9
78:14,16 95:12
116:11

**q**

**qualification**
18:23
**qualifications**
89:4,7,22
**qualify** 18:20
**qualifying**
18:19
**quality** 19:12
50:15,18,19
52:7 95:18
124:7,9,13,17
124:21,23
125:4
**question** 5:3,4
14:16 15:14
16:6,8 26:9
29:24 32:8
43:24 44:7
50:3 54:14,20
56:19 58:7
59:12 61:1
64:14 75:16
85:5 90:3
96:14,17,18
107:23,24
113:8 117:15
117:15 119:12
**questioning**
7:15
**questions** 4:21
5:12 15:25
28:2,18,25
29:4,13 30:25
48:21 65:6

71:21 78:13
95:9 101:22
102:1,3 108:19
108:22 109:12
113:21 114:1,2
114:7 115:11
123:22
**quick** 36:6
**quicker** 36:7,20
**quickly** 110:2
111:3

**r**

**r** 2:3,8 4:1
**race** 51:3 53:1
53:17 56:22
57:10 58:8
59:10,20 60:3
61:4,13,21
63:10 69:18
**raised** 15:18
16:9,14 41:9
91:20
**range** 22:1
**rank** 18:10
22:6 23:2
**rapid** 44:15
**rate** 18:16,17
102:3
**rates** 21:24
**rather** 4:22
27:21 100:11
**ratios** 60:12
**reach** 20:2 31:5
93:2 109:9
115:4

**read**  64:12,14
  74:5 77:8 98:5
  111:12 112:25
  113:2 127:13
  127:15 128:2
  130:9
**reading**  65:24
  111:16
**really**  4:13,19
  19:14,16,19
  26:14,17 33:24
  36:16 38:22
  41:12,25,25
  42:10 43:2
  48:22 56:14
  70:2 80:7
  87:15 95:11,22
  96:2,5 97:2,15
  102:13,24
  103:14,17
  104:2,14 110:2
  114:1,11,24
  116:9 121:19
**realtime**  3:8
  129:21
**reason**  57:19
  68:20 119:6
  130:11
**reaves**  2:3 54:5
**recall**  12:9,12
  17:4 93:21
  94:19 101:25
  102:22 111:12
  113:15 116:8
  120:16,21,21

**receipt**  130:18
**receive**  8:8 51:3
  51:18,19 88:19
  106:7,8 126:22
**received**  120:1
**receives**  88:11
  96:20,24
**recess**  37:13
  69:19 77:15
  124:3
**recipient**  113:9
**recognition**
  116:15
**recognize**  21:3
  46:13 72:14
  78:4 92:15
  104:12 110:7
  111:8 118:3
  122:14 125:20
**recognized**
  120:11
**recollection**
  72:24 111:17
**recommendat...**
  97:10
**recommendat...**
  109:24
**record**  5:18
  6:17,20 9:6
  14:13,14 29:16
  29:22 37:9
  46:2 77:14
  109:19 126:20
  127:18,23

**records**  26:5
**reduced**  129:11
**refer**  59:17
  65:7
**referenced**
  130:6
**referring**  73:1
  94:15
**refine**  90:17
**refresh**  45:22
  72:6 77:19
**refreshed**
  72:24
**refreshing**
  111:16
**refused**  70:13
**refuses**  52:24
**regardless**  51:3
  51:12 59:10,21
  61:4 106:9
  108:9
**regional**  17:9
**register**  18:6
  24:16,20 33:17
  46:21
**registered**  3:6,7
  20:18 24:25
  129:4,20,20
**registering**
  24:17 25:15,19
**registration**
  34:5
**regular**  14:3,21
  95:6 109:13

**regularly**  14:6
  14:16 20:14
  115:2
**regulation**
  105:14,15
**regulations**
  3:20 105:4
**reject**  23:21
**related**  28:2
  129:13
**relates**  124:17
**religion**  63:10
**religious**  2:4
  38:2 51:4 61:5
  61:13,22 65:4
  65:4,14 73:6,7
  73:8,16,16,23
  74:10,21 75:4
  75:11,14,21,25
  76:17 77:5
  106:9,21 117:4
  117:11 122:5
  125:7
**remember**
  11:24 12:13,14
  12:17,23 39:19
  65:2 92:23
  111:11 112:14
  116:8 125:9
**remind**  28:14
**reminder**  26:15
**remote**  1:12 3:2
**remotely**  3:5
  4:3

repeat 82:6
98:6
rephrase 54:14
75:16,17
replace 21:2
report 13:16
14:2,3
reported 30:19
reporter 3:7,7
3:8 4:2 7:9
13:2,6,8 14:10
14:12 47:17,21
54:1 58:16
59:23 61:17
74:5 79:14
98:4 126:21
127:1,7,10,12
127:15,18
129:5,20,20,21
reporter's
129:1
reporting 14:4
reports 13:17
13:21
representative
15:15 47:1
55:16 110:19
represents 41:2
request 92:24
93:3,18 96:10
101:16 117:11
requested 94:2
94:23 97:22
101:15,23

requesting
94:18
requests 95:2
require 31:10
68:16 80:17,22
84:8,16 85:18
86:3 100:21
102:17 104:8
required 24:4
25:1,23 40:22
64:2 68:14,21
77:2 83:2,16
124:23
requirement
24:14 51:1
62:14,18
106:16 125:2
requirements
83:22 117:4
121:13 123:1
requires 66:24
requiring
32:13 88:3
research 22:4
95:17
reserve 28:18
reserved
107:17
reside 20:4
85:16 87:14
residential 87:8
resourced
99:12,22
resources
125:3

respect 73:6
74:21 75:20
respond 80:1
120:3
responding
79:23
response 61:16
responsive 42:1
95:10 102:25
result 129:15
return 130:13
130:17
review 5:24
73:25 130:7
reviewed 6:1
48:3 78:22,22
116:20 124:22
reviewing 76:2
115:23
revisions
125:17
right 5:14 6:14
7:21 8:2,5,18
8:24 9:13
10:13 13:11
18:7 19:18
20:9 22:12
24:2,3 25:2
26:21,22 27:14
29:1 30:18
31:25 33:7,10
33:11,15,17
36:25 38:10,15
38:16,18 39:10
40:3 45:14

46:21 47:11
50:17,22 51:13
51:16 53:10
56:16 57:24
59:10,22 60:5
61:9 62:4,19
63:20 64:6,8
66:4,11 67:10
67:20 68:15,21
69:9 70:9 71:9
72:6,17 75:17
76:8 78:10,25
79:7,13 80:6
81:21 92:10
96:6 98:24
104:24 106:6
106:16 113:10
116:25 117:23
118:6,13,23
121:5 122:7
123:2,9
robust 96:4
role 9:19,20,23
10:10 13:13
121:20
roll 15:19
rolling 34:4
rollout 16:8,9
44:18
room 6:20,23
round 34:20
35:4,15,16
36:1,11,13
rounds 36:5

route  20:24
roy  1:7 2:14
   6:22 11:9,11
   11:12 13:11,18
   13:21,23
   108:18,20,22
   130:4
roy's  123:23
rule  3:14
   104:19,22
   105:22 108:1
rules  3:2,19
   4:17 107:6
run  81:12
   108:8
runs  23:13
rust  6:24

**s**

s  3:6 4:1 129:4
   129:19
sat  117:14
savings  19:19
saw  45:4
saying  29:21
   49:18 52:5
   56:5 64:16
   67:9 74:20
   75:19 76:25
   80:16 85:8
   112:20 118:19
says  29:16
   45:20 50:17
   59:8,19 61:24
   63:8,19 64:9
   65:18 73:3

74:4,8 76:19
80:15 81:3
82:11 94:23
96:9 97:22
105:20 106:6
106:12 112:10
112:18,19
118:23 119:5,5
119:9
scenario  32:11
   32:24 52:23
   56:4,24 57:3
   57:15 62:16
   66:18 71:3
schedule  97:12
110:14
scheduled  14:6
   14:17 115:2
school  11:3
   22:22 23:15
   27:17 33:8
   37:21 38:1
   43:21 45:7
   62:1,2 84:15
   84:17,22 85:2
   85:8,16,17,20
   86:1,4,14,15,23
   87:6,9,12,20,22
   90:9,9 93:18
   93:19,20 98:11
   98:14 99:4,10
   99:19
school's  73:16
schools  10:1
   18:3 121:12

scope  9:18 29:6
   29:9 57:3
screen  91:24
screened  83:8
screening
   83:11
script  127:5
scroll  72:19
   79:2 94:22
   100:15 105:6
   106:1 118:17
   119:11
search  20:20,22
seat  30:2 32:2
   32:12,13
seats  31:10,13
   31:14,15,17,18
   31:19 32:15
   42:11 90:23
second  35:16
   74:3,10 98:25
   125:18
section  50:14
   105:22
sector  10:12
see  25:21 26:5
   36:10 44:11
   46:9 49:22
   50:14 51:8
   63:5,14 72:24
   73:11 74:13
   80:19 83:9
   84:2,7,18 88:8
   93:24 97:23
   98:17 100:23

105:24 106:4
106:25 108:24
119:9
seeing  34:3
   36:3
seek  18:7 29:17
   126:16
seen  104:19
selected  11:4
   22:5
send  93:4,15
   96:23 122:6
sense  40:2
   80:14
sent  8:9 93:7
   130:14
separate  99:14
series  11:7
serve  84:4,23
   85:12 86:21
   87:4 88:2
   89:14 99:7,10
   99:22
served  90:9
   95:21 100:5
serves  98:10,12
   98:13 99:1,16
service  3:15
services  12:25
   18:25 47:16,20
   48:9 49:15,24
   50:9 51:3,18
   51:19 69:15
   88:12,20,24
   89:1 106:9

112:16 121:8
124:8
**set** 9:22 17:7
22:13 35:4
39:6 40:17
42:6,9 43:25
44:21 54:3
62:24 66:16
71:13 85:9
86:24 106:22
106:23 108:5
121:3 124:19
129:10
**setting** 19:12
79:5
**several** 11:18
56:25
**sex** 62:13 69:18
69:21 70:14
**sexual** 51:4
61:5,14,21
62:3 63:11
106:9 108:9
**share** 8:14
41:14 81:23
106:22 114:11
**sheet** 130:11
**sheley** 1:4,4
**shine's** 124:20
**shooting** 42:15
**shorthand**
129:10
**show** 20:18
78:7 85:18
86:4,13

**showing** 92:10
**shown** 19:3
114:22
**shows** 27:17
95:17
**sibling** 22:14
23:4 116:18
**side** 23:14 30:6
46:24 47:7
49:24,24 75:3
**sign** 24:21 25:1
25:24 26:3,11
44:23 46:20,23
46:25 48:11
56:15 62:19
66:25 71:15
95:9 127:13,16
130:12
**signature**
129:18
**signed** 25:6,10
59:16 60:17
130:20
**significant**
36:12 123:8
**significantly**
35:2
**signing** 25:25
65:23 71:8
**signs** 47:6
57:23 65:16
71:7
**similar** 39:14
91:8 103:18

**similarly** 70:12
**single** 40:15
**sir** 98:4
**site** 21:18
**situation** 30:12
32:24 52:19
53:3,12,23
54:25 56:11
59:3 91:8
126:8
**skipped** 100:20
**skipping** 74:10
**slow** 74:6 98:5
**small** 37:25
45:6
**smith** 2:14 6:25
**social** 19:11
**socioeconomic**
63:12
**sole** 55:14
**solid** 39:6
**solutions**
130:23
**soon** 27:5,8
**sorry** 14:12
28:22 47:17,17
49:16 54:1,1,2
58:16 59:9,23
63:24 64:11
74:5,7 75:13
75:13 77:6
79:14 82:5
83:20 92:2
93:20 98:4,4,7
99:13 106:3

109:16 110:25
127:4,14
**sort** 15:18 17:6
20:8 26:2,18
30:19 42:25
43:11 53:9
72:24 105:19
110:13
**sought** 53:15
**sound** 4:23
**space** 97:25
**speak** 40:5
48:23 49:3
67:6,7 71:10
85:21,24 87:23
125:19
**speaking** 40:6
**speaks** 60:9
**special** 99:12
**specialists**
17:10,18
**specific** 15:7
16:20 31:23
40:12 42:6
45:3 59:3,15
60:25 62:15,24
64:4,6,10 66:3
66:8 71:3,9
72:1 77:4
80:24 83:2,15
83:16,17,24
85:9 88:20
89:14 90:15,16
92:19 94:14
97:4,19 98:12

99:1,5,6,8,9,9
99:11,22 108:4
111:12 113:20
113:24 114:9
114:10,23
115:11,13
116:9 119:15
120:16,17,21
122:22
**specifically**
15:5 29:9 38:8
49:1 50:12
51:16 68:17
73:25 74:17
76:7 82:2,23
83:25 100:3
102:1,23
114:16 115:22
116:1 117:3
121:1 124:16
**specifics** 43:7
43:14 49:20
59:18 60:18
**speculate** 30:14
32:23 53:2,22
57:17 59:4
62:15 66:18
71:2 98:20
113:3 126:10
**speculation**
30:21 52:15
57:12 58:10,23
62:6,20 69:23
70:17,25 71:18
81:25 86:17,25

89:10 91:11
100:7 107:20
112:5,23 119:9
122:8 123:3
**speech** 19:10
**st** 1:2,3 118:13
130:4
**stacy** 118:5,8
**stage** 80:7
**stakeholders**
12:2,4,8
**stamp** 46:1,10
**standard** 22:17
22:18 49:14,21
**standards**
50:18,19,24
52:7 124:18,23
**stands** 66:10
112:16
**start** 5:5 16:13
18:14 24:12
25:12 32:19
35:2 37:2 38:1
39:7,20,21,23
39:25 80:15
88:6,10,11,12
88:17,18,23
89:10,10,12
117:20
**started** 9:12
26:25 33:8,9
35:14 37:8
39:19 61:1
**starting** 26:7
33:15 39:13

44:14 66:17
**state** 3:9 9:21
10:3 11:6,14
11:21 17:12
30:15 31:1
37:5,22 39:23
41:4,24 42:7
65:5,9 66:10
87:19 89:17
93:23 97:17
111:25 112:17
113:22 116:4
120:25 124:12
128:3 129:5
**stated** 71:25
**statement** 6:1
**states** 1:1 42:17
42:21 43:21
44:3
**status** 63:12,13
**stay** 69:19
95:20
**stephen** 118:13
**steps** 60:20
66:22 71:4
**strike** 57:6
61:20 73:13
76:14 90:2
94:24
**string** 3:22,23
**strong** 122:5
**structure** 14:4
15:24 17:6
28:5,12

**student** 52:12
52:24,24 53:14
53:16 54:7,7
54:16,16,21,22
55:5,6,21,22
56:21 58:14,15
58:21,22 59:7
61:8,12 62:3
62:12 64:18
70:13,13,14
99:22
**student's** 53:16
57:9 64:18
**students** 51:11
58:8 60:3,4
63:18 67:11
71:13 85:10
86:1 90:10,12
91:1,2,3,9
93:20
**stuff** 37:8
**subject** 106:16
**submitted** 6:2
**subscribed**
128:13
**subsection**
105:19,20
**successfully**
44:25
**suggest** 54:20
**suite** 2:4
**supervisor**
11:12 13:11
**supply** 82:12

**support** 17:12
  17:18 20:15
  116:18,21
**supporting**
  20:13 125:2
**supports**
  111:24
**supposed** 46:23
  46:25 79:10
**sure** 8:13 9:20
  11:16 14:4
  17:7,24 18:5
  20:12 21:9
  25:12 26:9
  28:4,19 39:5
  39:18 41:21
  42:15 52:18,23
  65:10,24,25
  70:2 74:7
  75:15 76:13
  87:11,20 96:19
  97:20 98:7,15
  99:13 106:2
  111:10,14
  117:9 120:15
  123:25 124:11
  126:6
**swear** 4:3
**switch** 10:23
**sworn** 4:7
  128:5,13 129:8
**system** 18:5,6
  20:17 21:2
  22:7 24:16,17
  24:20 25:10,13

26:3,20 27:2
30:19 37:16
38:4,7 39:24
44:25 78:8
116:17 121:11

**t**

**tab** 91:24
  100:15
**table** 29:24
**take** 7:14,16,18
  26:19 45:21
  46:10 56:7
  65:25 88:1
  89:13 105:5
  108:13,23
  111:10 123:11
  123:17,22
**taken** 3:5 66:22
  71:5 114:10
  129:10
**takes** 36:4
**talk** 5:1 6:11
  21:19 24:7
  52:9 65:14
  83:25 100:19
  105:18,19
**talked** 20:7
  26:18
**talking** 7:17
  26:15 28:10
  92:5 94:13
**targeted** 19:4
**tdc** 48:23
**teacher** 10:19
  10:20

**teachers** 73:16
**team** 17:7,18
  30:16 31:2
  36:2 39:23
  42:1 47:16,20
  48:7 49:1,15
  50:6 78:16
  93:23 102:8,10
  113:6 114:18
  116:7 119:3
  126:14
**technical** 78:7
**technology**
  78:16
**tee** 5:2 72:3
**teen** 98:11,14
**tell** 28:1 53:10
  77:3 80:5
  112:16
**telling** 53:9,13
  54:15 55:19
**tells** 81:19
**template** 48:14
  48:17
**term** 19:13
  27:9 49:23
  78:12
**terms** 28:3
**testified** 4:8
  44:20 55:17,24
  56:16 64:7
  66:13 96:21
**testify** 49:6
  89:19 129:8

**testifying** 8:23
  28:15 67:24
  72:25 76:16
**testimony**
  54:10,18 60:7
  76:10 87:1,11
  128:3,5 130:9
  130:18
**thank** 4:15 13:8
  13:9 20:6
  29:14 44:19
  47:21 67:14
  77:10 96:7
  116:25 125:5
  126:19 127:19
**thanks** 7:3
**thing** 21:15
  64:2 102:5
**things** 15:11
  20:7 21:16
  40:12 43:9
  121:22 124:5
**think** 7:15 8:22
  11:24 14:15
  28:8,12 29:8
  29:15,23 39:14
  43:23 44:10,20
  46:10 56:17
  57:14,14 60:9
  64:7,15 65:10
  65:10 66:12,17
  67:3 69:2,6
  72:6 73:5
  77:11,11 79:9
  85:5 91:13

97:15 102:13
103:13 113:25
115:6 118:25
121:16 123:12
123:17,19
126:9,15,18
**thinking**  43:16
44:12 109:10
**thought**  10:25
30:24 77:9
**thoughtful**
34:14 95:22
102:14 103:15
104:15
**three**  17:17
23:1,5
**thrive**  19:17
**tied**  82:22
85:11 120:22
**tim**  2:13 6:23
**time**  4:14 13:24
18:16 19:3
31:15 36:4
48:3,24 65:25
69:19 81:9
83:3 87:22
90:16 91:18
103:13 104:14
105:5 109:14
110:24 111:10
115:2 119:20
119:24 120:7
120:13 121:2,3
126:19 127:22
129:10 130:19

**timeframe**
130:8
**timeline**  25:13
44:15 102:24
**times**  56:25
115:10
**titled**  78:9
**today**  5:12,17
8:4,23 112:10
**today's**  5:25
8:9
**toddler**  21:22
**together**  41:8
48:2 78:14,16
128:4
**told**  119:3
**tomorrow**
28:15
**ton**  108:12
**took**  5:13
115:20
**top**  26:8 43:9
93:22 105:9
**topic**  28:2,8
29:3,12,16
**topics**  8:8,23,23
9:2 15:23
28:17,24
108:19
**total**  57:3,15
69:13 127:22
**touch**  15:17
**tours**  21:6
**track**  82:17

**trajectory**
19:13
**transcript**  4:20
126:21 128:3
129:12 130:6
130:20
**transgender**
58:22 60:5
70:12 71:12
**transition**
34:21 36:8
39:18,22 47:15
48:5,8 49:1
78:22 101:8,19
109:8,17
110:24
**transitioned**
35:23
**trend**  97:3
**trends**  95:10
**tried**  45:22
**true**  59:11
61:19 129:12
**truly**  95:11
**trumps**  66:10
**truth**  129:8
**try**  5:1 7:14
32:11 77:19
80:14 92:1
123:14
**trying**  11:24
20:1,9 21:11
26:2 32:20
36:16,17 54:23
56:14 64:1

65:2,7 76:13
77:25 95:22
102:13 103:14
104:2,6,14
112:14 113:3
120:20
**tubbs**  3:6 129:4
129:19
**tuned**  121:1
**turn**  100:14
**two**  17:8 28:5
28:20 48:4
74:2 94:5
**type**  41:12
42:22 45:4
79:22 82:12
97:4
**types**  45:5
87:17 95:14
102:2
**typewritten**
129:11
**typical**  113:24
**typically**  14:19
27:12 36:21
54:25

**u**

**uh**  4:22,22
**ultimate**  13:18
**ultimately**
48:10 102:6
**unable**  81:3,20
83:3,3 118:19
118:23 119:4

**under** 57:10
58:8 63:22
70:15 86:15
104:4 128:3
**understand**
5:16,19 7:5,23
8:3 15:23
30:14 56:6
57:2 66:19,24
75:16,24 88:15
99:14 104:6
107:9 109:13
114:12
**understanding**
11:19 15:16
49:13,20 53:11
55:15 57:15
64:19,25 65:1
66:1 68:20
73:22 75:23
86:6 89:19
103:12,18
104:9 107:15
108:1,10
110:17 111:23
**understood**
5:13 44:8
69:11 96:17
112:22 119:21
121:18,19
**unhomed** 87:4
**unhoused**
86:11 87:13,13
**unified** 40:13
43:6

**unique** 38:9
87:18 115:5
121:23
**uniquely** 43:4
**unit** 17:14
**united** 1:1
**universal** 1:10
3:15,19 9:8,21
15:7 17:13,17
17:20,22,24
19:6 20:1
21:21 27:1
28:11,13,25
29:2 31:14
32:12 39:9
40:7,17 42:18
42:21 46:16
60:14 68:6
101:4,10 106:8
109:11 122:9
124:12,17
**unknown** 34:1
**update** 14:8,21
14:24 15:5
**updates** 14:5
14:18,20 15:10
16:12
**uphold** 57:19
**upholding** 54:5
**upk** 3:15,17
9:11,14,15,19
9:24 11:5,15
15:6,10,19
16:9,10,23
17:6 19:2

20:11 24:13
25:4 26:20
28:5,6,21 29:7
29:18 30:11,19
33:12,16,17,20
36:25 37:3,15
39:2 42:5 43:1
46:21 47:24
49:7,24 50:6
51:10 52:3
69:16 80:4
86:10 90:21
91:10 92:20
93:14 96:22
98:13 99:2,7
99:14 100:1,6
103:7 112:4,21
113:17 117:5
117:12 118:20
119:7 122:7
123:2,8 124:7
**upker** 31:21
**uptake** 42:16
42:17
**use** 70:13 78:12
102:4
**used** 92:24
93:18 130:20
**using** 94:2 95:2
95:2
**usually** 14:8
82:22
**utilize** 33:11
34:18 80:24
106:15 122:19

**utilizing** 105:21

**v**

**v** 130:4
**variety** 38:22
86:7 112:17
115:3
**vary** 115:9
**veer** 28:16
**vendors** 17:19
**verbal** 4:21
**verification**
18:23
**verified** 86:7
**verify** 85:21,21
85:23 130:9
**veritext** 2:13
130:14,23
**veritext.com**
130:15
**vet** 125:3
**view** 29:2
**violate** 52:13
53:18 55:6
56:22
**violation** 54:17
55:22 57:21
70:23
**virginia** 2:8 6:5
6:21 7:3 29:14
42:23 64:23
94:12 130:1
**virginia.carre...**
2:11 130:2
**volume** 27:5
36:19

[voluntary - yeah] Page 36

**voluntary** 59:1
59:14 71:24
119:2 122:9
123:5
**volunteer** 81:9
83:2
**volunteering**
81:17 82:3,9
**vs** 1:6

**w**

**walk** 26:21,23
27:10 33:3,6
80:13
**walking** 20:23
**want** 4:16
10:23 11:1,1
20:8 27:7
28:14 29:15
30:13,13,14
35:8 38:6,18
38:22 40:24
45:12 50:2,12
55:1 57:17,20
59:3 60:15
65:9,13,13
66:19 69:1,3
72:23 74:1,2
80:13 91:23
92:6 94:22
95:18 97:21
98:1,22,22
99:13 100:19
105:18,18
108:13,23,24
122:21 124:4

124:14 127:12
127:15
**wanted** 27:3
33:24 34:3,13
91:9 95:20
96:2 122:16,18
**wants** 25:23
67:4,4
**washington** 2:5
**way** 15:19 19:2
19:4,12 22:12
26:18,19 27:4
39:14 41:16
43:5,24 68:22
77:4 80:6
86:23 107:22
108:8 122:19
**ways** 28:5
43:19 81:18
86:8 121:7,25
**we've** 31:18
34:4 35:17
39:4 90:2
111:14
**website** 92:21
**week** 18:18,21
35:15,16,18,19
35:20 36:5
**weekly** 35:13
**weight** 22:13
22:24 23:3,6,7
23:10
**weighted** 23:2
23:2

**weights** 23:3
41:21 95:14
**went** 11:2,6,7
26:4 35:16
36:5 42:17
93:19 95:4
**whitehair** 2:9
7:2 127:3,5
**witness** 4:3 8:4
64:25 108:19
119:12 130:8
130:10,12,19
**woman** 107:18
**word** 47:18
**work** 5:6 7:10
7:19 14:7
17:18 20:24
22:11 27:16
36:22 37:10
39:15 41:7,8
48:5,6 109:23
123:15,24
124:12,21
**worked** 10:11
10:16 39:23
41:12,25 42:10
**workforce**
95:23,23 125:3
**working** 8:14
11:1 17:14
28:11 39:13
48:14,18 101:8
101:17 102:24
109:6,7,22
110:11 112:21

113:14,18
114:16,20,21
114:21 115:18
116:1 120:23
122:24
**works** 17:17
26:19
**wrap** 7:14
**writing** 12:10
115:19 116:12
**written** 3:1
14:24 60:22
66:3 90:16,17
103:14 104:14
109:23,24
125:12
**wrote** 87:15

**y**

**yeah** 6:16 12:6
15:12,16 19:3
20:3 21:17
23:25 25:25
26:1,9,12 28:9
32:1,5 35:9
36:15 40:10
41:21 43:11
44:10 52:16,21
56:3 57:5,14
60:9 61:11
62:23 67:2
69:12 71:2
75:3,17 85:8
85:22 87:3
89:11 91:13
92:4 93:1,21

94:6,16 96:7
97:15 100:9
102:8,22
103:13 104:5
104:12 111:16
112:8,24 113:2
113:19 115:21
117:13 120:21
121:6,16
123:16,19
125:18 126:9
126:24
**year** 18:1,1
20:5 21:24,24
25:12,18,20
26:24 31:19
32:16 33:9,24
34:14 35:3,17
36:7 37:1
42:16 94:8
121:7 122:20
125:18
**years** 37:1
**yield** 83:24
**yields** 95:17

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.