## STUDENT NOTES

# HIGH-CONFLICT DIVORCE: A FORM OF CHILD NEGLECT

*Alexa N. Joyce*

In high-conflict divorce cases, the emotional toll on the family unit is unquestionably destructive. While the physical and mental health of the children should be the primary focus, the emotional turmoil of a high-conflict divorce often moves the focus away from the children as parents struggle emotionally and financially. Although the best interests of the children are always in the judicial purview, the repeated, lengthy, and hostile litigation process often associated with high-conflict dissolution has lasting effects on the physical and mental health of children, similar to those associated with physical abuse and neglect. Child Protective Services (CPS) must step in and protect the emotional well-being of children during high-conflict divorce cases.

Key Points for the Family Law Community:
- High-conflict divorce is detrimental to the entire family unit and often causes emotional and psychological harm to the children.
- Children entrenched in their parents' high-conflict divorce experience emotional neglect.
- Emotional neglect is an under-recognized form of child neglect that warrants state intervention through Child Protective Services.
- Emotional neglect is underreported and often unrecognizable to the untrained eye.
- Child Protective Services must be responsible for investigating possible emotional neglect in high-conflict divorce cases and connecting families with appropriate therapeutic interventions.
- An attorney for the child must be appointed where Child Protective Services is forced to petition the court for compliance with therapeutic intervention or services.

***Keywords:*** *Child Abuse; Child Neglect; Child Protective Services; Divorce; Emotional Harm; Emotional Neglect; High Conflict; Mental Health; Parental Conflict; Social Work Perspective; and Therapeutic Intervention.*

## I. INTRODUCTION

Everyone in the courtroom was crying—everyone but the parents of the two young children. The case began as a typical divorce. After three years of expensive, lengthy, and draining litigation, the case was finally set for trial. What made this case unique, however, was the presence of the New Jersey Division of Child Protection and Permanency (DCPP)[1] and a law guardian[2] appointed to represent the two minor children. A DCPP case was opened when the parents began making baseless allegations of sexual abuse and child neglect. Although the allegations were unfounded, the case remained open because the father continued to make accusations of physical abuse and neglect against the mother on a biweekly basis. The caseworker was the only adult willing to supervise and facilitate visitation between the brothers. He understood how precious their visits were together and the importance of sibling bonding to the emotional and developmental health of the boys. Additionally, the court-appointed law guardian was not comfortable being removed from the case and leaving the two minor children with no voice or representation.

The mother in this case remained in the marital home with the younger child, Michael, age six.[3] The father, upon being "evicted" from the mother's rental home, decided to move to the farthest

Correspondence: ajoyce4@pride.hofstra.edu

FAMILY COURT REVIEW, Vol. 54 No. 4, October 2016 642–656
© 2016 Association of Family and Conciliation Courts



Case No. 1:23-cv-02079-JLK   Document 77-13   filed 12/18/23   USDC Colorado   pg 2 of 15

corner of New Jersey, almost three hours away. The father took the older son, Sean, age ten, with him to his new home.[4] The parents pitted the child in their custody against the noncustodial parent. On the first day of trial, Michael and Sean were both individually interviewed by the judge in chambers while the rest of the courtroom listened to their heartbreaking testimony. It was clear to everyone in the courtroom that the older child was brainwashed by his father to believe the most terrible and disgusting, albeit baseless, facts about his mother. On the other hand, the younger son was completely terrified and wary of his father. What the two brothers truly wanted was to be together.

During his interview, Michael began to cry numerous times. Through his tears, Michael raised his voice and began shouting: "No, my parents can't agree about anything. NOTHING. I don't get it. I don't get why. But I don't care. I just want to be with my brother. I don't care if we have to be with my mom or my dad. I don't care about seeing either of them, I just want to be with my brother." In that moment, it was clear why the DCPP case was never closed. The children needed protection, a voice, representation, and supervision of their emotional and physical health.

Upon observation of Michael and Sean, it was clear that they not only loved and cherished their sibling relationship, but they also enjoyed more trust and respect in their relationships with their caseworker and attorney than with their own parents. While their parents continued to bicker during the lunch break, the caseworker volunteered to take the children to lunch and to the park to facilitate visitation. The parents could not agree on anything regarding visitation for the children. The caseworker and law guardian were the only two adults willing to stand up for the children and to help them foster their sibling relationship. At the end of the second day of trial, the law guardian insisted on sibling visitation[5] during the pendency of the trial. Both attorneys for the parents immediately stood up to contest this request on behalf of their clients. It was clear the parents no longer had the ability to recognize the best interests of their children as the highest priority in this case. Their priority was winning and making sure that the other side suffered.

"High-conflict divorce" will be used throughout this Note to refer to cases associated with extreme lack of trust between parties, elevated levels of anger, and willingness to engage in repetitive litigation[6] as well as to parental relationships marked by fear, projection of blame, refusal to cooperate or communicate, allegations of abuse, and sabotage of parent–child relationships.[7] Only about one tenth of divorcing couples experience repeated litigation and proceed to trial before coming to a final stipulation.[8] This repeated litigation, overt hostility, anger, and tension carries over into the daily lives of children who are victimized by their parents' high-conflict divorce.[9]

The developmental, emotional, and physical health of children involved in these divorces are dramatically affected.[10] The inability of the parties to settle disputes creates high levels of anxiety and defensiveness within the family unit. Additionally, high-conflict divorce decreases parenting competence and reduces the prioritization of the best interests of the children.[11] For children involved in high-conflict divorce, coping strategies, adjustment, academic achievement, self-esteem, psychological distress, depression, delinquency, substance abuse, sexual precocity, and suicidal behaviors may color their future long after dissolution of their parents' marriage.[12] The unintended victims of high-conflict divorce must be adequately monitored.

Parents involved in high-conflict divorce are often not emotionally stable enough to ensure the best interests of the children are protected throughout the litigation process.[13] They often evaluate their decisions from a place of anger, jealousy, and self-centeredness. While some jurisdictions do provide mechanisms to protect the child in certain situations, including the appointment of a guardian ad litem[14] or an attorney for the child,[15] the rights and needs of children must be statutorily protected nationwide.[16] As previously mentioned, high-conflict divorces represent a relatively small percentage of all marital dissolutions in the United States.[17] However, in the last two decades, nearly two million children were caught in the crossfire of these contentious dissolutions.[18] As a matter of public policy, there is a need for a more regulated and consistent protection of these children.[19]

This Note proposes the implementation of a national, statutory two-pronged approach to the dissolution of marriage in high-conflict cases. The statutory provision will require: (1) referrals to CPS by the family or matrimonial court judge presiding over any case deemed to be high conflict and/or involved

Case No. 1:23-cv-02079-JLK   Document 77-13   filed 12/18/23   USDC Colorado   pg 3 of 15

in continuous litigation for more than eighteen months and (2) the appointment of an attorney for the child, upon a finding of emotional neglect and noncompliance with recommended CPS services.

In Part II, this Note will discuss the effects that high-conflict divorce has on children and parents, both during and after the dissolution process. Part III will discuss the effects of physical abuse and neglect on children as well as the traditional role of CPS. Thereafter, this section will describe the reluctance of CPS to provide services for emotionally neglected children and compare the effects of various types of abuse and neglect on children. Part III will discuss the need for the emotional neglect of children to be more thoroughly protected by CPS as it relates to high-conflict divorce. Part IV will discuss how CPS can ensure the emotional needs of children are addressed during high-conflict dissolution. This section will argue for a uniform national statute mandating CPS investigations and the appointment of an attorney for the child where there is a substantiated finding of emotional neglect. Part V will address the risks and benefits of creating a separate statute for the welfare of children involved in high-conflict divorce cases as it relates to children, families, and social policy. Part VI will reiterate the importance of protecting the emotional well-being of children involved in high-conflict dissolution cases through the implementation of a uniform statute.

## II. THE EFFECTS OF HIGH-CONFLICT DIVORCE ON CHILDREN AND FAMILIES

### A. WHAT IS A HIGH-CONFLICT DIVORCE?

High-conflict divorce is illustrated by a consistent desire to litigate, extreme hostility, and lack of trust between parties that may emanate from dysfunctional marital relationships, mental health disorders, criminal backgrounds, substance abuse, and/or allegations of domestic violence or child abuse.[20] Characteristics of high-conflict divorce include: repetitive disputes over parenting practices, physical threats, and actual violence.[21] Allegations of adultery or instances where one partner abandons the marriage while the other partner is still in love often lead to elevated levels of hostility, anger, and distrust.[22] The dynamics of the relationship, both pre- and postseparation as well as the personality traits and mental health concerns of the couple may thrust a family into a heated, hostile, and strongly contentious divorce.

Some commentators argue that the adversarial system of a matrimonial proceeding exacerbates conflict in contentious divorce proceedings.[23] While partners in a failing relationship are experiencing hostility, their attorneys who zealously represent their clients may only worsen the problem.[24] The desire of both sides to "win" the divorce can perpetuate conflict, litigation, and feelings of hostility.[25] Linda D. Elrod, a distinguished family law professor at Washburn University School of Law, argues that "the win/lose framework [of litigation] encourages parents to find fault with each other rather than to cooperate."[26] In an attempt to enhance their client's position, attorneys often make "extreme demands to increase the bargaining advantage [which] only escalate[s] conflict."[27] Repeated litigation drains both parties of financial and emotional resources.[28] This contributes to increased levels of stress and anxiety that often present as anger, aggression, and hatred.

### B. MAKING THE DECISION TO END A MARRIAGE CONSIDERING THE BEST INTERESTS OF THE CHILDREN

The interpersonal and interfamilial dysfunction that often leads to high-conflict divorce disturbs the entire familial unit.[29] These disruptions often lead to behavioral and emotional issues for children both during and after the dissolution.[30] Regardless of whether a divorce is considered high conflict, it is nonetheless a traumatic experience for children as family finances diminish, one or both parents leave the marital home, and parents become less likely to "meaningfully and constructively" attend to their children's needs.[31]

Commentators and social scientists have long debated whether or not it is more appropriate for parents to stay together for the sake of the children or to end the marriage.[32] While conservative viewpoints endorse the notion that divorce is always bad for children, social science research indicates that "children who are exposed to serious conflict in their parents' marriage are better off when conflict is reduced by divorce."[33] However, high-conflict marriages are often precursors to high-conflict divorces. The marital conflict generally carries over into the divorce and accentuates the effects of the dysfunctional parental relationship on the emotional well-being of the children.[34]

### C. THE EMOTIONAL EFFECTS OF HIGH-CONFLICT PARENTAL RELATIONSHIPS ON CHILDREN

While acknowledging that ending a high-conflict marriage is generally beneficial to children, social science further suggests that high levels of parental conflict during the marriage often carry into the dissolution process and continue to harm the emotional well-being of children.[35] Symptoms such as conduct disorders, antisocial behaviors, difficulty with peers and authority figures, depression, and academic problems are found more frequently in children from high-conflict marriages as opposed to children from low-conflict marriages.[36] In general, children of divorce are more aggressive and antisocial.[37] Children who experience high-conflict marriage and divorce are more prone to depression and other mental health issues as young adults.[38] The more frequent and continuous the parental conflict, the more likely it is to have a negative impact on the children.[39] Parental conflict that is centered on the children, such as custody, parenting time, visitation, or support, is most troublesome and causes children to "express more self-blame, shame, and fear of being drawn into the conflict."[40]

### D. HOW HIGH-CONFLICT DIVORCE AFFECTS CHILDREN SOCIALLY

Parents are the primary exemplars for children on how to handle conflict, compromise, and resolution. Children often mirror their parents' behavior, viewing them as role models, mentors, and teachers of life skills, coping mechanisms, and communication techniques.[41] Because parents involved in high-conflict marriages and divorce are commonly lacking in these skills, they frequently pass these deficiencies on to their children.[42] Because these skills are often inadequately modeled in families with high levels of parental conflict, children often struggle with social interaction.[43] They become overly angry, impulsive, or violent whenever they experience conflict.[44] Healthy modes of expression are generally absent in high-conflict relationships, which causes children to exhibit frequent and extreme anxiety based on their inability to communicate.[45]

Additionally, parents involved in high-conflict marriage and divorce are more likely to use drugs or alcohol.[46] Consequently, their children are more prone to alcohol, cigarette, and marijuana experimentation than children from intact, low-conflict families.[47] Children whose parents divorce are more likely to experience unwed pregnancies, earlier marriages, weaker marital relationships, increased incidences of divorce, and lower socioeconomic status.[48]

### E. THE EFFECTS OF HIGH-CONFLICT DIVORCE ON PARENT–CHILD RELATIONSHIPS

The presence of high conflict during marriage and throughout the dissolution process "undermines the quality of parenting" and parent–child relationships.[49] Conflicting spouses often undermine consistent parenting techniques. Fathers tend to shrink away from their role as disciplinarians or mentors whether it be willfully or by pressure from the mother.[50] This may decrease the quality of parent–child interactions and cause children to feel rejected.[51] The disruption of parenting and the use of contradicting parenting methods often lead to significant gaps in supervision.[52] Children in search of stability and recognition are therefore more likely to experiment with substance use as they migrate

17441617, 2016, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/fcre.12249 by Greg Whitehair , Wiley Online Library on [18/12/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case No. 1:23-cv-02079-JLK   Document 77-13   filed 12/18/23   USDC Colorado   pg 5 of 15

toward friends.[53] Additionally, due to lack of supervision, children of divorce often experience lower levels of academic achievement.[54]

Parents in high-conflict marriages are often depressed.[55] This has a negative impact on the children as they model their parents' behavior.[56] Social science suggests that adjustment of the custodial parent postdivorce is the "best predictor of child adjustment."[57] Continued conflict between parents and parental emotional distress make it difficult for the child to adjust to the divorce, particularly when the parent–child relationship is strained.[58] Children often exhibit less affection and contact and are less likely to care for their parents as they age.[59]

## F. HOW THE FINANCIAL CONSEQUENCES OF HIGH-CONFLICT DIVORCE AFFECT CHILDREN

Throughout the divorce process, a substantial amount of family resources are used for legal fees, child care, and reorganization of assets.[60] Often families must adjust to supporting two households instead of one.[61] The entire family suffers from a "substantial decline in standard of living," causing the children to experience a sense of financial insecurity.[62] As described by Joan B. Kelly, a psychologist dedicated to researching the impact of divorce on families, "it is estimated the economic problems of divorced households account for as much as half of the adjustment problems seen in [...] children."[63] The primary lingering financial effect for children from high-conflict divorce is less educational success and career options based on lack of adequate financial support.[64]

## III. STATE INTERVENTION IN CHILD ABUSE AND NEGLECT CASES

### A. THE EMOTIONAL EFFECTS OF PHYSICAL ABUSE AND NEGLECT ON CHILDREN

Physical child abuse and neglect are major public health issues.[65] Physically abused children often exhibit: poor ego development, anxiety, social detachment, aggression, and self-destructive behavior.[66] Abuse and neglect often damage child development and intensify antisocial behaviors.[67] Children often have intellectual deficits, underachieve academically, and have high rates of maladjustment.[68] The likelihood of physical abuse and neglect and the perpetuation of its harmful effects on children are often aggravated when parents are struggling with their own mental health or substance abuse issues or when the home environment is unstable.[69] Abused and neglected children typically do not have consistent or affectionate parental guidance, which causes lasting developmental, emotional, and social impediments.[70]

Physical abuse and neglect are easily identifiable by social workers, teachers, and lay people.[71] According to social work writer, Kieran O'Hagan, most agencies that deal with child abuse and neglect are "preoccupied with physical or sexual abuse to the exclusion of any other potential area of abuse."[72] Physical abuse and neglect is often easiest to prove because it is readily identifiable to the untrained eye.[73] Anyone can identify with ease a child who has bruises or who does not have appropriate clothing.[74] Therefore the primary focus of state intervention through its *parens patriae* power is the physical abuse and neglect of children.[75]

### B. THE DEVELOPMENT OF STATE INTERVENTION IN PHYSICAL ABUSE AND NEGLECT CASES

In the 1960s and 1970s, states began to recognize the need for specialized investigations of allegations of child abuse and neglect.[76] By 1974, the Child Abuse Protection and Treatment Act (CAPTA) facilitated the rapid creation of CPS agencies nationwide.[77] In accordance with mandatory reporting statutes, most CPS agencies created "highly publicized 'hot lines'" to allow the public to make anonymous reports of abuse.[78] It is arguable that the majority of reports made to CPS would not be made

without mandatory reporting laws and the development of media campaigns calling attention to the importance of protecting children from physical abuse and neglect.[79]

Generally, when an individual calls the hotline, they speak with a trained caseworker from CPS.[80] If the caseworker finds that a child may be at risk, an investigator from CPS will investigate the allegations, generally within twenty-four hours of the report being made.[81] Although the process for investigations and the implementation of services varies by state, all CPS agencies perform similar functions:[82] investigate families and determine the best way to remedy their situation.[83] Working from a social work perspective, CPS helps families decide if mental health or social service programs would be beneficial in remedying substantiated cases of abuse or neglect.[84] Often parents are willing to work with CPS to remedy abuse and neglect, and court intervention is not necessary.[85] Ordinarily, the goal for most CPS agencies is to work toward resolving concerns using therapeutic intervention.[86] However, family court intervention is necessary when CPS recommends placing a child outside of the home or when a family is not cooperative.[87] Criminal prosecution is less common and depends on the severity and type of abuse or neglect.[88]

### C. WHAT IS EMOTIONAL NEGLECT?

Emotional neglect is a form of neglect that lawyers, judges, and parents may not easily understand or acknowledge.[89] It is a common, yet underdocumented, form of neglect that is hard to identify, define, and prove.[90] Although emotional neglect often does not encompass any clear intent to cause harm to the child, it inevitably can cause physical, social, educational, and emotional impediments.[91] Emotional neglect is harmful to child development and its consequences often carry into adult life.[92] Emotional neglect has strong correlations with negative long-term psychological functioning, including "internalizing and externalizing behaviors, social impairment, low self-esteem, suicidal behavior, psychiatric diagnoses, and hospitalizations."[93]

Parental unavailability, unresponsiveness, and preoccupation with the parent's own personal mental health and substance use issues often lead to emotional neglect.[94] Where parents are unable to respond to the emotional needs of their children, children often feel responsible for filling the psychological voids created by their parents.[95] Continuous hostility, denigration, rejection, and/or exposure to traumatic life events often lead to emotional neglect.[96]

### D. EMOTIONAL EFFECTS OF HIGH-CONFLICT DIVORCE VERSUS PHYSICAL ABUSE AND NEGLECT

High-conflict divorce often involves the emotional neglect of children. Witnessing interparental conflict is one of the most stressful life events for children.[97] Emotional neglect results when parents are preoccupied with their own financial, social, and emotional concerns.[98] High-conflict divorce is generally a traumatic life experience for a child that unquestionably exposes them to various risk factors of emotional neglect.[99] During divorce, children experience and must cope with drastic shifts in their living and financial situations. Their parents are often unavailable to provide emotional support during these stressful times, because they are engrossed with their own anxieties and/or lack productive coping mechanisms.[100]

Children of high-conflict divorce experience emotional effects similar to those experienced by children who are victimized by physical abuse and/or neglect.[101] Children who witness high-conflict parental dissolution similarly exhibit depression, antisocial behaviors, conduct disorders, low academic achievement, and problems with authority.[102] High-conflict divorce is a form of emotional neglect, and children should be afforded the same state protection provided to physically abused and neglected children.

17441617, 2016, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/fcre.12249 by Greg Whitehair , Wiley Online Library on [18/12/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case No. 1:23-cv-02079-JLK   Document 77-13   filed 12/18/23   USDC Colorado   pg 7 of 15

### E. WHY CPS INTERVENTION FOR EMOTIONAL NEGLECT IS RARE, IF NOT NONEXISTENT

Even though CPS workers are under a legal, moral, and professional obligation to recognize and understand emotional and psychological abuse, agencies often require workers to identify evidence of physical abuse or neglect before they can open cases.[103] Emotional neglect cases are rarely opened by CPS and are even less likely to be brought to the attention of a family court judge.[104] In general, the emotional health of children is only examined in conjunction with physical abuse and neglect, or intervening to ensure the mental health of a child is protected as it pertains to the effects of physical abuse.[105]

Emotional neglect ought to warrant the same state intervention as physical abuse and neglect. The state has parens patriae power to protect children from abuse and neglect at the hands of parents, guardians, or primary caregivers.[106] Read plainly, this power should require the state to intervene to protect children from emotional harm unrelated to physical abuse or neglect.[107] Courts pay very little attention to the stand-alone emotional needs of children, because the term "emotional health" is less understood by people outside of the mental health field.[108]

Therefore, CPS caseworkers must be responsible for identifying the emotional neglect of children.[109] Children are often at risk for emotional neglect when parents are preoccupied with their own mental health, substance use, or financial difficulties.[110] Often, parents are unable to identify emotional or psychological concerns and/or are unaware of interventions that are available.[111] Emotional neglect must be reported to CPS by schools, doctors, and social services.[112] It is necessary for trained caseworkers, operating from a social work perspective, to investigate, identify, and provide services to remedy potential emotional neglect.[113]

## IV. MANDATORY STATE INTERVENTION IN HIGH-CONFLICT DIVORCE

### A. THE SOLUTION

Investigations by CPS should be statutorily mandated in high-conflict divorce cases. The number of divorce cases characterized as high conflict is relatively low.[114] As conflict and litigation continues, even after a judgment of divorce is entered, parents in high-conflict cases deplete financial resources and continue to expose children to trauma.[115] Although high-conflict divorce cases are a breeding ground for the emotional neglect of children, these cases are generally not pursued by CPS and are rarely brought to the attention of the family court.[116]

While it is undisputed that the states' parens patriae power is intended to protect children from abuse and neglect, there is currently no universal definition.[117] The Child Abuse Prevention and Treatment Act includes in its definition of abuse and neglect, "any recent act or failure to act on the part of a parent or caretaker which results in [...] serious [...] emotional harm."[118] State intervention for emotional neglect should be required in accordance with the parens patriae power.

In high-conflict divorce cases, parents are often unable to recognize the unintended infliction of emotional neglect on their children, as they are preoccupied with their own issues and repeated litigation.[119] Because some matrimonial judges and lawyers may be ill equipped to acknowledge the stand-alone effects of the emotional neglect of children, it is imperative that CPS intervene on behalf of the children to connect the family with appropriate therapeutic interventions.[120] A federal statute should be adopted mandating state CPS agencies to investigate the emotional well-being of children where parents have been involved in high-conflict litigation for more than eighteen months. Upon a finding of emotional neglect, CPS shall intervene to implement appropriate services or therapeutic intervention.

### B. HOW EMOTIONAL NEGLECT SHOULD BE UNIVERSALLY DEFINED

An emotionally neglected child is one whose parent, guardian, or primary caregiver either intentionally or unintentionally exposes the child to repeated traumatic situations, including but not

limited to extreme interparental conflict, emotional unavailability, or constant personal preoccupation.[121] In order to appropriately deem a child emotionally neglected, it is necessary for a mental health professional to evaluate the child.[122] Any child experiencing interparental conflict, including high-conflict divorce, for more than eighteen months is at risk for emotional neglect.[123] The presence of repeated, contentious, and lengthy litigation as well as intense levels of mistrust and hatred between parties is often unobservable to the untrained eye.[124] Therefore, after the eighteenth month of litigation, cases involving children should automatically be referred to CPS for a trained caseworker to investigate the need for services.

### C. THE PROCEDURE FOR SUGGESTED STATE INTERVENTION

Similar to screening protocols for traditional physical abuse and neglect cases, trained caseworkers shall be responsible for meeting with children to determine whether they are at a heightened risk for emotional neglect.[125] Although unrecognizable to the untrained eye, emotional neglect is relatively easy for trained mental health professionals to identify.[126] A caseworker will determine the presence and severity of a number of factors to decide whether intervention and referral to mental health services is necessary by meeting with the children, parents, and other interested parties. The caseworker will examine: parental preoccupation with personal stressors[127]; the presence of conduct disorders, antisocial behaviors, difficulty with peers/authority figures, depression, academic problems, or anxieties in children[128]; whether parental conflict is predominantly centered around child-rearing issues[129]; and the level of parent–child affection and contact.[130] Caseworkers will use their professional judgment to determine whether a CPS case should be opened to provide services on the basis of emotional neglect.[131]

If a case is opened, CPS will work with the family to create an intervention plan to protect the emotional well-being of the children. The caseworker will connect the family with appropriate therapeutic services.[132] It is not likely a criminal or civil case will be opened against parents, except under extreme circumstances or where parents refuse to comply with the plan for therapeutic intervention.[133] Typically, parents will be willing to comply as they may have simply been unaware that their children's emotional needs were not being met.[134] If parents are noncompliant, CPS may petition the judge presiding over the matrimonial matter to order compliance.[135] If the court becomes involved, an attorney for the child shall be appointed.[136]

A pilot program should be implemented in each state prior to the adoption of a statute. It is unquestionable that high-conflict divorce generally leads to the emotional neglect of children based on the very nature of elevated levels of familial conflict and stress. Children involved in high-conflict divorce, nationwide, who are the victims of emotional neglect, must be afforded the same protection of state intervention as are children in physical abuse and neglect cases who suffer comparable emotional hardships.[137]

## V. COSTS AND BENEFITS

### A. HOW THE SOLUTION WILL PROTECT CHILDREN FROM A SOCIAL WORK PERSPECTIVE

The vast majority of emotional neglect cases are currently being ignored.[138] Although domestic violence and substance use certainly may be present during high-conflict dissolution, families do not generally exhibit any overt characteristics of physical abuse or neglect.[139] Instead, continuous litigation and conflicting parenting practices color the family dynamic, leaving children without proper emotional guidance.[140] High-conflict divorce is one of the strongest predictors of poor outcomes for children.[141] Mandatory intervention by CPS is only suggested in high-conflict cases, a disproportionately small number of divorce cases nationwide.[142] Most children and families are able to endure dissolution of a marriage without any long-lasting emotional harm, however, children

17441617, 2016, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/fcre.12249 by Greg Whitehair , Wiley Online Library on [18/12/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case No. 1:23-cv-02079-JLK   Document 77-13   filed 12/18/23   USDC Colorado   pg 9 of 15

cannot survive divorce unharmed where there is "prolonged, chronic, hostility between parents."[143] In high-conflict situations, children are often left to "pay the price of their parents' stormy court battles."[144] It is nearly impossible for children involved in high-conflict divorce to escape from emotional harm.[145] CPS must be involved to ensure children receive adequate services, at least during the pendency of litigation.

Intervention would ensure parents are educated about and aware of the emotional harm they are inflicting on their children. While this may not expedite a faster resolution, parents may at least be made aware of the harm their contentious litigation is imposing on their children. CPS can work with a family to create an intervention plan to help them locate financial and therapeutic resources. Assuming the parents are receptive, no further action would be required either through the court or law enforcement absent a finding of physical abuse or neglect.

## B. DISTINGUISHING EMOTIONAL NEGLECT FROM ABUSE AND THE EFFECTS OF THE SOLUTION ON PARENTS

High-conflict divorce or emotional neglect must be distinguished from abuse. Under the recommended statute, parents will not be held criminally liable for emotional neglect. Currently, there appears to be a recurrent disconnect within CPS agencies, as workers attempt to protect children without labeling or blaming caregivers.[146] This has led to inadequate protection for children against emotional neglect.[147] The number of children who are emotionally neglected and would benefit from the support and protection of CPS is seriously underestimated.[148] State intervention is necessary, but must be structured so as to protect the family unit from unnecessary social or financial destruction. The term neglect connotes the presence of poverty or interfamilial issues as opposed to serious criminal behavior indicated by the term abuse.[149] The argument that CPS should intervene is based on the inability of laypersons to identify emotional harm, parental fixation with personal turmoil, and the need to protect children, not the criminal fault of the parents.[150]

Only where a family is noncompliant will court intervention be necessary. The judge presiding over the matrimonial matter should be responsible for implementing intervention plans upon noncompliance. Unless, upon investigation, the caseworker finds physical abuse and/or neglect, the standards, protocol, and consequences for a finding of emotional neglect in a high-conflict divorce case will be much less severe and only operate to call attention to issues and employ therapeutic intervention. Where CPS petitions the court for implementation of a service plan, an attorney for the child must be appointed to ensure the wishes of the child are reflected on the record.[151]

## C. WHAT ARE THE COSTS FOR CPS AND THE COURT SYSTEM?

Establishing a new statutorily recognized form of neglect for already overworked CPS caseworkers to investigate may seem unnecessary, expensive, counterproductive, and wasteful. But only about ten percent of divorcing couples are considered high conflict and intervention would only be mandatory after eighteen months of litigation.[152] A number of these cases may already be open with CPS as some high-conflict divorce cases are colored with domestic violence, substance abuse, and/or physical child abuse and neglect.[153] It is unfathomable to ignore the thousands of children who are currently disregarded by CPS simply because there is no substantiated claim of physical abuse or neglect. These children suffer through years of emotional neglect as their parents viciously fight to dissolve their marriage.[154]

It is estimated that a single divorce case costs the government $30,000.[155] The annual average cost of divorce for taxpayers is over $30 billion.[156] CPS involvement may entice parents to realize the detrimental effects of continued litigation and come to a resolution, saving not only the parties, but also the taxpayers and court system millions of dollars.[157] By addressing the emotional needs of the family, most importantly the children, CPS involvement may lessen the likelihood of juvenile

Case No. 1:23-cv-02079-JLK   Document 77-13   filed 12/18/23   USDC Colorado   pg 10 of 15

delinquency and societal issues faced by children of high-conflict divorce whose mental health needs are not adequately addressed.

## VI. CONCLUSION

Sean and Michael were afforded the opportunity to have a caseworker provide services throughout their parents' divorce process.[158] It was clear that the brothers were emotionally neglected by their parents. Their parents had entirely lost their ability to recognize the harm their divorce was causing the children. If there had been a statutory protocol requiring CPS to investigate and intervene in cases involving the emotional neglect of children in high-conflict cases, these brothers would have been provided the appropriate services without exposure to baseless, shameful, and harmful allegations of sexual and physical abuse in addition to their parents' long, drawn-out, and contentious divorce. Mandating CPS involvement in high-conflict divorce cases can safeguard the emotional health of children and families while ensuring that the appropriate services are accessible.

## NOTES

1. The New Jersey Division of Child Protection and Permanency is the Child Protective Services (CPS) unit of the New Jersey Department of Human Services.

2. A law guardian in New Jersey is appointed under N.J.S.A. 9:6-8.23 for any minor who is the subject of a child abuse or neglect proceeding. A law guardian is appointed to protect the minor's interests and help him express his wishes to the court. A law guardian is not a guardian ad litem. Law guardians are not intended to represent the best interests of the child. They are an attorney for the child, advocating for and expressing the child's desires to the court.

3. Michael is a fictional character created for the purposes of this Note. However, his story is based on similar cases and the general experiences of children victimized by parental high-conflict divorce.

4. Sean is a fictional character created for the purposes of this Note. However, his story is based on similar cases and the general experiences of children victimized by parental high-conflict divorce.

5. *See* L. v. G., 203 N.J. Super. 385 (1985). The court held that the relationship between siblings is an important and unique relationship. Children gain meaningful knowledge and experiences from fostering a relationship with their siblings. The court found the relationship between siblings to be irreplaceable. Furthermore, the court held that "siblings posses the natural, inherent and inalienable right to visit with each other," subject to the best interest of the children when they are not living with each other or placed in the same home.

6. *See* Linda D. Elrod, *Reforming the System to Protect Children in High Conflict Custody Cases*, 28 WM. MITCHELL L. REV. 2 (2001).

7. *See* Janet R. Johnston, *Building Multidisciplinary Professional Partnerships with the Court on Behalf of High-Conflict Divorcing Families and Their Children: Who Needs What Kind of Help*, 22 UNIV. ARK. LITTLE ROCK L. REV. 453 (2000).

8. *Id*.
9. *Id*.
10. *Id*.
11. *Id*.

12. Solly Dreman, *The Influence of Divorce on Children*, 32 J. DIVORCE & REMARRIAGE 41 (2000).

13. Janet R. Johnston, *High-Conflict Divorce*, 4 CHILD & DIVORCE 165 (1994).

14. *See* Morgan v. Getter, 441 S.W. 3d 94 (Ky. 2014) (The court held that "the duties of a guardian ad litem ('GAL') shall be to advocate for the child-client's best interest in the proceeding through which the GAL was appointed." The Family Court Rules of Procedure provide for the appointment of a GAL for the child in custody, shared parenting, visitation, and support proceedings. If the attorney's understanding of the child's best interests are in conflict with the child's wishes, the GAL shall inform the court of the conflict and indicate the child's wishes and reasoning. In the holding the court acknowledges the differences that exist across jurisdictions with regards to the appointment of a GAL or attorney for the child, and under which circumstances they are permitted.).

15. *See* Diane Somberg, *Defining the Role of Law Guardian in New York State by Statute, Standards and Case Law*, 19 TOURO L. REV. 530 (2014) ("In New York State, the Family Court Act ("FCA") states that minors involved in proceedings that originated in family court need to be represented by counsel." The article continues by listing the types of cases covered under the FCA including: child abuse or neglect cases, termination of parental rights applications, adoption applications, requests for an abortion where parents have not given consent to their pregnant daughter, civil commitment proceedings, child custody disputes, juvenile delinquency hearings, persons in needs of supervision (PINS) proceedings, and medical treatment issues. Accordingly, in New York a law guardian is an attorney for the child, which is different from a GAL. A law guardian in New

17441617, 2016, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/fcre.12249 by Greg Whitehair , Wiley Online Library on [18/12/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case No. 1:23-cv-02079-JLK   Document 77-13   filed 12/18/23   USDC Colorado   pg 11 of 15

York State is an advocate as well as a GAL with a statutory mandate to represent the child's wishes and best interests. In New York a law guardian is required to be assigned for any case involving abuse and neglect, termination of parental rights, juvenile delinquency, and PINS cases.).

16. *See* Ann M. Haralambie, The Child's Attorney: A Guide to Representing Children in Custody, Adoption, and Protection Cases (1993) (discussing the difference between the role of a GAL and an attorney for the child in the representation of children in parental conflict situations).

17. Jay Lebow & Kathleen Newcomb Rekart, *Integrative Family Therapy for High-Conflict Divorce with Disputes Over Child Custody and Visitation*, 46 Fam. Process 79, 79–91(2006).

18. *See* Johnston, *supra* note 7.

19. *Id*.

20. *See* Elrod, *supra* note 6.

21. *See* Johnston, *supra* note 13. The nature of disputes and the personalities of parties may contribute to the likelihood of a divorce being high conflict.

22. *Id*. Feelings stemming from sadness, disappointment, and an inability to let go or acknowledge the end of the relationship may lead to repetitive litigation as one or both parties attempt to hold on to the imploding relationship. Several explanations exist for why certain couples are more prone to high-conflict dissolution. For example, the history of the marital relationship and the nature of the separation can cause couples to create "negative, polarized views of each other," which furthers the contentiousness of the divorce process. This article describes the nature of some prior relationships as creating extreme distrust between parties. Accordingly, this causes some parents to fight zealously to protect the children from what they perceive as the negative aspects of the other partner.

23. *See* Elrod, *supra* note 6, at 6–10.

24. *Id*. at 7.

25. *Id*.

26. *Id*.

27. *Id*.

28. *See* Johnston, *supra* note 13, at 171.

29. Lebow & Rekart, *supra* note 17.

30. *See* Johnston, *supra* note 13.

31. Michael E. Lamb et al., *The Effects of Divorce and Custody Arrangements on Children's Behavior, Development, and Adjustment*, 35 Fam. & Conciliation Cts. Rev. 4 (1997). Parents are often unable to focus on the needs of the children because they are preoccupied by their own financial, emotional, and social stress.

32. Elizabeth S. Scott, *Divorce, Children's Welfare, and the Culture Wars,* 9 VA J. Soc. Pol'y & L. 95 (2001) The article discusses different views regarding how the emotional and physical welfare of a child is affected by high-conflict marriage and divorce. Within this article Scott references the longitudinal study of families by Paul Amato and Alan Booth. Although children are typically better off when their parents decide to end high-conflict marriages, the study suggests, "a surprisingly high percentage of marriages that end in divorce involve low or moderate levels of conflict." Accordingly, these marriages are "good enough" and have seriously negative impacts on the long-term well being of the children involved. A child is only better off when their parents divorce, if the marital relationship was marked by high-conflict.

33. *Id*. Children are generally better off when parents chose to end a high-conflict marriage.

34. Joan B. Kelly, *Children's Adjustment in Conflicted Marriage and Divorce: A Decade Review of Research*, 39 J. Am. Acad. Child & Adolescent Psychiatry 963 (2000).

35. Lebow & Rekart, *supra* note 17, at 79.

36. *See* Kelly, *supra* note 34, at 964.

37. *Id*. at 966. Girls and boys exhibit slight variations in the type and degree of problem behaviors. Boys are more likely to exhibit external behaviors such as "being suspended or expelled from school, getting in trouble with the police, or running away from home." *Id*.

38. *Id*.

39. *Id*. at 964. The article describes the different types of conflict and how it creates different emotional issues for children. For example, overt hostile conflict such as physical abuse or screaming causes externalizing behaviors in children. Covert conflict styles such as passive aggressive behaviors, unspoken tension, and resentment were linked to depression, anxiety, and other internalizing symptoms in children.

40. *Id*.

41. John H. Grych & Frank D. Fincham, *Marital Conflict and Children's Adjustment: A Cognitive-Contextual Framework*, 108 Psychol. Bull. 267 (1990).

42. *Id*.

43. *Id*. at 275.

44. *See* Kelly, *supra* note 34, at 965.

45. *Id*.

46. *Id*. at 967.

47. *Id*. (stating substance use can be attributed to less effective coping skills, impaired parental monitoring and flawed parenting skills).

48. *Id*.
49. *Id*. at 965.
50. *Id*.
51. *Id*.
52. *See* Johnston, *supra* note 13, at 172.
53. *See* Kelly, *supra* note 34, at 967. The article reiterates the importance of the paternal role in parenting that is often jeopardized during divorce. Studies show when fathers remain involved in the child's academic life the child is more likely to perform better academically and avoid disciplinary issues at school.
54. *Id*. Lower academic achievement can be attributed to financial resources and parental monitoring being jeopardized during and after dissolution.
55. *See* Lamb et al., *supra* note 31, at 394.
56. *See* Grych & Fincham, *supra* note 41.
57. *See* Johnston, *supra* note 13; *see also* Kelly, *supra* note 34 (describing how adequate family functioning is often impaired when depression and/or anxiety color a parental mindset).
58. *See* Johnston, *supra* note 13. The article reiterates parental distress and continued conflict between parents often creates more strain for the parent-child relationship. Typically the relationship is already strained due to the inevitable shift in family dynamic during any family rearrangement. Not only does this stress make it more difficult for a child to adjust to the divorce, but it may also lead to more severe behavioral, developmental, and emotional complications for the child.
59. Kelly, *supra* note 34, at 967.
60. *See* Lamb et al., *supra* note 31, at 395.
61. *Id*.
62. *See* Kelly, *supra* note 34.
63. *Id*.
64. *Id*.
65. Sandra J. Kaplan et al., *Child and Adolescent Abuse and Neglect Research: A Review of the Past 10 Years. Part I: Physical and Emotional Abuse and Neglect*, 38 THE J. OF THE AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 1214 (1999).
66. Jocelyn Brown et al., *Childhood Abuse and Neglect: Specificity of Effects on Adolescent and Young Adults*, 38 THE J. OF THE AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 1490 (1999).
67. Joan McCord, *A Forty Year Perspective on Effects of Child Abuse and Neglect*, 7 CHILD ABUSE & NEGLECT 265 (1983). The article describes the outcomes of a study of abused and neglected boys. The study found abuse and neglect caused antisocial behaviors leading to increased rates of juvenile delinquency within this group. Additionally, paternal alcoholism, crime, and aggression facilitate a strong likelihood of continuing physical abuse and neglect.
68. *See* Brown et al., *supra* note 66. The authors reiterate disruptive family systems and inadequate parenting often contribute to maladjustment for children of abuse and neglect. Physically abused and neglected children often have delays in health, cognitive development, emotional adjustment, and socialization. Adverse family environments and specific characteristics of parent-child relationships often explain the link between childhood abuse and depression.
69. *Id*. Parents who are suffering with mental illness may be unable to control the abuse if it is being performed by their spouse or another caregiver. Additionally, parents may be blind to the abuse if they are preoccupied with their own issues, leaving the children without any protection within the home. Alternatively, parents may be performing the abuse due to their mental health issues.
70. *See* McCord, *supra* note 67, at 268; *see also* Brown et al., *supra* note 66 (The article indicates childhood abuse makes an individual three to four times more likely to be abused or suicidal in the future. Adults who were abused as children typically are at an increased risk for distress, mental health disorders, depression, and suicidal ideations).
71. KIERAN O'HAGAN, IDENTIFYING EMOTIONAL AND PSYCHOLOGICAL ABUSE: A GUIDE FOR CHILDCARE PROFESSIONALS (2006).
72. *Id*. at 25.
73. Danya Glaser, *Emotional Abuse and Neglect (Psychological Maltreatment): A Conceptual Framework*, 26 CHILD ABUSE & NEGLECT 697 (2002).
74. *Id*.
75. Judith C. Areen, *Intervention Between Parent and Child: A Reappraisal of the State's Role in Child Neglect and Abuse Cases*, 63 GEO. L.J. 887 (1975). The parens patriae power allows the state to protect children from abuse and neglect at the hands of their parents or caretakers.
76. Douglas J. Besharov, *"Doing Something" About Child Abuse: The Need to Narrow the Grounds for State Intervention*, 8 HARV. J.L. & PUB. POL'Y 539 (1985). The author discusses the history of CPS. The article states Vincent DeFrancis of the American Humane Association and Dr. Vincent J. Fontana of the New York Foundling Hospital were strong advocates for the creation of a centralized agency to receive and investigate reports of abuse and neglect). CPS is responsible for receiving and investigating allegations of child abuse and neglect.
77. *Id*. at 548. The Child Abuse Protection and Treatment Act was passed when national recognition and mass media coverage of child fatalities resulting from unreported and uninvestigated abuse became widespread. Additionally, the federal government encouraged the creation of CPS agencies by allocating grant money for the creation of these programs.
78. *See* Besharov, *supra* note 76, at 548; *see also id*. at 542 (discussing reporting laws requiring "certain" professionals to report instances of suspected child abuse; by 1967 all states had laws requiring physicians to report all physical injuries inflicted on children caused by nonaccidental means); How and When to Report Child Abuse/Neglect, N.J. Dep't Child &

17441617, 2016, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/fcre.12249 by Greg Whitehair , Wiley Online Library on [18/12/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case No. 1:23-cv-02079-JLK   Document 77-13   filed 12/18/23   USDC Colorado   pg 13 of 15

Families, http://www.nj.gov/dcf/reporting/how/ (last visited Nov. 22, 2015) (describing the process for making reports of abuse and neglect to CPS). As indicated by Besharov, *supra* note 76, all states have anonymous hotlines for individuals to report child abuse and neglect. For example, in New Jersey the hotline is 1-877 NJ ABUSE. Any person that reasonably believes a child to be subject to abuse should call the hotline.

79. *See* Besharov, *supra* note 76, at 545.

80. *How and When to Report Child Abuse/Neglect*, *supra* note 78.

81. *Id*.

82. *See* Besharov, *supra* note 76, at 549.

83. *Id*.

84. *Id*. CPS generally helps a family obtain services including financial assistance, therapy, or parenting classes.

85. *See id*. The author discusses the possibility that parents or caregivers may not be compliant or cooperative with services. In such cases, court intervention is necessary to implement care plans/services. According to this article only about fifteen percent of substantiated cases result in civil court actions to enforce services. Similarly, less than five percent of cases result in criminal prosecution.

86. Andrea J. Sedlak et al., *Child Protection and Justice Systems Processing of Serious Child Abuse and Neglect Cases*, 30 CHILD ABUSE & NEGLECT 657 (2006). This article discusses the different roles of CPS and law enforcement in dealing with allegations of abuse and neglect. This article indicates it is up to the prosecutor to determine whether or not to prosecute a case for child abuse. Typically court involvement is limited to civil or family court intervention to require participation in the therapeutic interventions recommended by CPS. These interventions include recommendations to family or individual therapy.

87. *Id. at* 660. CPS will petition the court for the power to provide care and supervision of the child if they remain in the home in order to ensure compliance with therapeutic interventions and continual safety plans.

88. *Id*. at 660.

89. *See* Areen, *supra* note 75, at 927. Mental health and social science experts are well aware of the effects of emotional neglect on children.

90. *See* Glaser, *supra* note 73, at 697.

91. *Id*. at 699.

92. *Id*. at 698.

93. Kaplan et al., *supra* note 65.

94. *See* Glaser, *supra* note 73.

95. *Id*. at 705.

96. *Id*.

97. Patrick T. Davies & E. Mark Cummings, *Marital Conflict and Child Adjustment: An Emotional Security Hypothesis*, 116 PSYCHOL. BULL. 387 (1994).

98. *See* Areen, *supra* note 75. When parents are unable to provide adequate emotional support due to personal preoccupation, they continuously place their children in stressful situations.

99. *See* Lamb et al., *supra* note 31.

100. *Id*.

101. *See* Kelly, *supra* note 34, at 964 (describing the emotional effects of high conflict divorce on children); *see also* Kaplan et al., *supra* note 65 (discussing the lasting social, emotional, and educational effects of physical abuse and neglect on children).

102. Kelly, *supra* note 34, at 964. Children of divorce are also generally more at risk for depression as young adults similar to children who are physically abused and neglected; *see also* Brown et al., *supra* note 66 (describing the lasting effects of physical abuse and neglect on children); *see also* Kelly, *supra* note 34, at 964 (describing the effects of high conflict divorce on children).

103. *See* O'HAGAN, *supra* note 71, at 17. The author describes a case where a caseworker attempted to bring a case against a parent for emotional neglect. Supervisors at CPS requested the caseworker indicate what physical injuries the child sustained. The caseworker observed emotional neglect that was substantiated by the observations of other professionals, however, in order for a case to be opened a bruise on the child's body had to be used as evidence of physical abuse. This section of the chapter indicates caseworkers are enticed to only pursue physical abuse and neglect. The point of this story is to show CPS is unlikely to open a case for emotional neglect, because it is hard to prove, define, and identify. Therefore, emotional neglect often is unreported and unsubstantiated.

104. *See generally* Areen, *supra* note 75, at 927. In fact, some courts have specifically indicated emotional danger has no place in neglect proceedings.

105. *Id.; see also* Johnston, *supra* note 13, at 168 (stating although allegations of neglect or abuse are often made during high-conflict dissolution, they are often dismissed by CPS workers because they feel they are only "indicators of inter-parental spite, impossible to prove, or insufficiently serious to require state intervention").

106. *Id*. at 903.

107. *Id*. at 912.

108. *Id*. at 927–28.

109. *Id*. at 928.

110. *See* Glaser, *supra* note 73.

111. *Id*. at 698. The state must exercise its parens patriae power to intervene on behalf of the children in these cases.

112. *Id*. at 705. CPS must be responsible because courts, lawyers, and laypersons are often unable to identify emotional neglect.

113. *Id*.

114. Christine A. Coates et al., *Parenting Coordination for High-Conflict Families*, 41 FAM. CT. REV. 1 (2003). The number of high-conflict divorce cases is relatively low. The number of cases, which will be statutorily required to be referred for CPS investigation after eighteen months of litigation, will be an even smaller percentage. Coincidentally, the number of cases requiring further court intervention and the appointment of an attorney for the child will be even smaller. Therefore, it is argued the burden of protecting the children will not have grave repercussions on the functioning of the court or CPS.

115. *Id*. Additionally, parents continue to emphasize their destructive opinions of each other, which inflicts further emotional harm on the children.

116. *See* Areen, *supra* note 75.

117. *Id*. at 903; *see also* Kristen Shook Slack et al., *Understanding the Risks of Child Neglect: An Exploration of Poverty and Parenting Characteristics*, 9 CHILD MALTREATMENT 395 (2004).

118. *Id*.

119. *See* Glaser, *supra* note 73.

120. *See* Areen, *supra* note 75.

121. *See* Glaser, *supra* note 73; *see also* Lamb et al., *supra* note 31.

122. *See* Areen, *supra* note 75, at 933. This article discusses the importance of specifically defining emotional health in a model statute. This article proposes intervention be supported by evidence the child is suffering from a specific list of mental health disorders including anxiety, depression, withdrawal, aggression, or hostility. Additionally, the article argues for an exhaustive list of signs and symptoms to support a finding of emotional neglect.

123. *See* Johnston, *supra* note 13, at 171 (describing high-conflict divorce as marked by repetitive litigation perpetuated based on extreme levels of mistrust, anger, aggression, and hatred between parties); *see also* Areen, *supra* note 75. The emotional effects on children may not be recognizable to lawyers, judges, or parents.

124. *See generally* Areen, *supra* note 75.

125. *See How and When to Report Abuse/Neglect, supra* note 78.

126. Glaser, *supra* note 73, at 705. When family dynamic is a cause for concern, for example, in high-conflict martial relationships, there is a need for investigation to determine whether there is emotional neglect.

127. *See* Lamb et al., *supra* note 31. This article discusses the nature of divorce in general and arguing parents become less likely to gainfully or productively contribute to the emotional needs of their children based on their own inability to appropriately deal with the traumatic divorce experience. Additionally, these stressors are extenuated and more harmful to the children in high-conflict cases.

128. *See* Kelly, *supra* note 34, at 964 (describing the presence of the listed factors as more likely to be exhibited by children involved in high-conflict marriages and divorces as opposed to children from low-conflict marriages, and subsequent divorces).

129. *Id*. When intense parental conflict is centered around issues such as child care, support, parenting time, or the children's activities, generally, children are more likely to feel shameful, to blame, or fearful of the outcome of the conflict.

130. *Id*. at 967.

131. *See* N.J. DEP'T CHILD. & FAMILIES, *supra* note 80.

132. *See* Besharov, *supra* note 76; *see also* Sedlak et al., *supra* note 86. The role of CPS with regards to emotional neglect cases will be no different than a traditional physical abuse or neglect case. CPS will use therapeutic interventions and operate from a social work perspective.

133. *Id*.

134. *See* Glaser, *supra* note 73. Parents may not be aware because they are preoccupied with the divorce process.

135. Sedlak et al., *supra* note 86, at 660.

136. *See* Somberg, *supra* note 15, at 533 (explaining the right to counsel was extended to children with the passing of CAPTA; CPS agencies were only entitled to federal aid if state legislatures enacted laws ensuring a child involved with CPS proceedings would be granted a GAL).

137. Some states have already started implementing similar programs. However, this Note advocates for nationwide protection for children in high-conflict dissolution proceedings.

138. *See* O'HAGAN, *supra* note 71, at 25. The author discusses the failure of child welfare systems to address emotional neglect unless it is attached to physical abuse or neglect. Further arguing most supervisors in child welfare organizations require a finding of physical abuse or neglect to open cases and provide services to families.

139. *See* Johnston, *supra* note 13.

140. Areen, *supra* note 75, at 927.

141. Wilma J. Henry et al., *Parenting Coordination and Court Relitigation: A Case Study*, 47 FAM. CT. REV. 682 (2009).

142. Coates et al., *supra* note 114.

143. *See* Henry et al., *supra* note 142 (This article discusses the relationship between long, drawn out, court involvement and the serious emotional and behavioral effects it has on children and their relationship with "one or both of their parents." Reiterating the point that high-conflict divorce often poses "substantial emotional risk and psychological harm to the children who are victims of the resulting parental discord.").

17441617, 2016, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/fcre.12249 by Greg Whitehair , Wiley Online Library on [18/12/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

144. *Id.; see also* Glaser, *supra* note 73. As parents become more entrenched in the emotional, financial, and social stress of high-conflict divorce, especially when conflict continues for extended periods of time, they become less likely to sustain strong emotional or even physical ties to the children. Parents become less likely to acknowledge the toll the high-conflict divorce is taking on a child's emotional well-being.

145. Areen, *supra* note 75.

146. Glaser, *supra* note 73.

147. *Id*.

148. *Id*. at 699; *see also* Lebow & Rekart, *supra* note 17. Although the number of high-conflict divorces as compared to the total number of divorces in the United States is relatively low, almost two million children in the past two decades have been victimized by high-conflict parental dissolution.

149. *See* O'HAGAN, *supra* note 71, at 25.

150. *See* Areen, *supra* note 75. Trained caseworkers with a social work background can conduct an investigation to determine the possibility and/or existence of emotional neglect.

151. *See* HARALAMBIE, *supra* note 16. Appointment of an attorney for the child (AFC) is commonplace in physical abuse and neglect cases.

152. Henry et al., *supra* note 142; *see also* Johnston, *supra* note 7. Although proportionality small in number, these cases are not only detrimental to the emotional health of the entire family unit, but also consume a "disproportionate amount of the court's time and resources."

153. *See* Elrod, *supra* note 6.

154. *See* O'HAGAN, *supra* note 71; *see also* Glaser, *supra* note 76; *see also* Johnston, *supra* note 7.

155. *Id*. at 683. This amount takes into consideration the costs associated with acts of juvenile delinquency performed by children of divorce.

156. *Id.; see also* Johnston, *supra* note 7. The author discusses how this small group of divorcing couples uses a disproportionate amount of the court system's resources with grim legal outcomes. The longer a case is open, the more money the court system and taxpayers are forced to pay.

157. *Id*.

158. Sean and Michael are two fictional characters created for the purpose of this Note. Their story is based on similar cases observed in family court proceedings where there was high conflict and emotional neglect.

*Alexa would like to thank her family, friends, and employers for their continued support, patience, and inspiration.*

*Alexa Joyce received her bachelor's degree from Loyola University in Maryland in 2012 with a major in political science and a minor in sociology. She is currently a third-year law student at the Maurice A. Deane School of Law at Hofstra University. She is also pursuing a master's in social work at Monmouth University and expects to graduate with both degrees in May 2017. She is currently the Managing Editor of Notes and Comments for Family Court Review and a Child and Family Advocacy Fellow at Hofstra Law.*