Lisa Sheley
December 01, 2023

                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO

Case No. 1:23-cv-2079-JLK
_____

DEPOSITION OF: LISA SHELEY, December 1, 2023
                Via RemoteDepo
_____

ST. MARY CATHOLIC PARISH IN LITTLETON;
ST BERNADETTE CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY; LISA SHELEY; and
THE ARCHDIOCESE OF DENVER,

Plaintiffs,

v.

LISA ROY, in her official capacity as Executive
Director of the Colorado Department of Early
Childhood; and DAWN ODEAN, in her official
capacity as Director of Colorado's Universal
Preschool Program.

Defendants,

_____


        PURSUANT TO NOTICE, the deposition of
LISA SHELEY was taken on behalf of the Defendants in
Denver County, Colorado, by remote means, on
December 1, 2023, at 1:38 p.m., before Lisa B. Kelly,
Registered Professional Reporter, Certified Realtime
Reporter, and Notary Public within Colorado, appearing
remotely from Larimer County, Colorado.

**EXHIBIT**
**18**

Lisa Sheley
December 01, 2023

**Page 2**

```
 1              REMOTE APPEARANCES
 2  For the Plaintiffs:
 3          NICHOLAS R. REAVES, ESQ.
            JOSEPH C. DAVIS, ESQ.
 4          AMAMDA DIXON, ESQ.
            The Becket Fund for Religious Liberty
 5          1919 Pennsylvania Avenue, N.W., Suite 400
            Washington, D.C. 20006
 6          jdavis@becketlaw.org
            nreaves@becketlaw.org
 7          adixon@becketlaw.org
 8  For the Defendants:
 9          J. GREGORY WHITEHAIR, ESQ.
            VIRGINIA R. CARRENO, ESQ.
10          NICOLE RUST, ESQ.
            MICHELE MULHAUSEN, ESQ.
11          TANJA WHEELER, ESQ.
            Colorado Attorney General's Office
12          1300 Broadway
            Denver, Colorado 80203
13          greg.whitehead@coag.gov
            virginia.carreno@coag.gov
14          niki.rust@coag.gov
            michele.mulhausen@coag.gov
15          tanja.wheeler@coag.gov
16  Also Present:
            Bonnie Miller
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                I N D E X
 2  EXAMINATION OF LISA SHELEY:                 PAGE
    December 1, 2023
 3
    By Mr. Whitehair                           5, 71
 4
    By Mr. Reaves                                69
 5
 6                                            INITIAL
    DEPOSITION EXHIBITS:                     REFERENCE
 7
    Exhibit 23    Declaration of Daniel Sheley    29
 8
    Exhibit 24    C.R.S.A. 26.5-4-205, 5/15/23    50
 9
    (Exhibits provided electronically to the reporter.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              WHEREUPON, the following proceedings were
 2  taken pursuant to the Federal Rules of Civil
 3  Procedure.
 4          *       *       *       *       *
 5              THE REPORTER:  All counsel participating
 6  in this deposition acknowledge that I am not
 7  physically present in a deposition room with the
 8  deponent and that I will be reporting this deposition
 9  and providing an oath remotely.
10              You further agree that, in lieu of an
11  oath administered in person, the witness declares her
12  testimony in this matter is given under penalty of
13  perjury.
14              All parties and counsel consent to this
15  arrangement and waive any objections to this manner of
16  reporting and manner of providing the oath.
17              Counsel, please indicate your agreement
18  by stating your name and your agreement on the record,
19  and then I will swear in the witness.
20              MR. REAVES:  Nick Reaves.  I consent.
21              MR. WHITEHAIR:  Thank you, Mr. Reaves.
22              Greg Whitehair.  I agree.
23
24
25
```

**Page 5**

```
 1              LISA SHELEY,
 2  having verbally declared under penalty of perjury that
 3  her testimony in this case will be the truth, the
 4  whole truth, and nothing but the truth, testified as
 5  follows:
 6              (Deponent's reply to oath:  Yes.)
 7          THE REPORTER:  Thank you.
 8          Mr. Whitehair.
 9          MR. WHITEHAIR:  Thank you.
10              EXAMINATION
11  BY MR. WHITEHAIR:
12          Q.   Before we get started, would you tell us
13  how to pronounce your name?  I want to get it right
14  today, ma'am.
15          A.   It's Sheley.
16          Q.   Thank you, Ms. Sheley.  My name is Greg
17  Whitehair.  I'm one of the attorneys for the attorney
18  general's office that's working on the case on behalf
19  of the Defendants in the case that you and your
20  husband brought against the Colorado Department of
21  Early Childhood.
22              Today we're going to get to have a
23  deposition.  I'm going to ask a few questions about
24  what you know about that.  But just to make it clear,
25  I believe we've already established there's nobody
```

Lisa Sheley
December 01, 2023

1  else in the room with you right now other than
2  Mr. Reaves; is that correct?
3       A.   Correct.
4       Q.   Are you presently looking on your own
5  personal computer to be on this camera?
6       A.   Correct.
7       Q.   Do you have any files open, any chats,
8  any communication modules?
9       A.   No.
10      Q.   And is your cell phone put away in a
11 way --
12      A.   Yes.
13      Q.   -- that is not accessible?  Great.
14      You know, one of the challenges of the
15 Zoom game is to figure out how we're going to be both
16 easy access to all the materials but always make sure
17 that we're acting as if we're literally on a stand in
18 front of a judge.
19      And so you understand that this is the
20 equivalent of you testifying in court; right?
21      A.   Correct.
22      Q.   Great.  Would you give us your full name
23 and spell it for the record, please?
24      A.   My full name is Lisa Marie Sheley;
25 L-i-s-a M-a-r-i-e S-h-e-l-e-y.

1       Q.   Ms. Sheley, have you ever used any
2  different name than that?
3       A.   Yes.  My maiden name.
4       Q.   Would you share that with us?
5       A.   Cawthra, C-a-w-t-h-r-a.
6       Q.   Ma'am, have you ever been deposed before?
7       A.   No.
8       Q.   Have you ever testified under oath in any
9  action; for instance, a hearing or some kind of
10 proceeding?
11      A.   No.
12      Q.   Have you had the general outline of how a
13 deposition works explained to you?  I don't need
14 details of your attorney's advice, but rather do you
15 understand what our context is today?
16      A.   Yes.
17      Q.   My goal is to ask you questions under the
18 circumstances of not being in the same room, meaning
19 that it's harder for us to know when one of us is done
20 speaking and when the other one would like to start.
21      So if you'll work with me, I'll do my
22 best to complete my questions in a way that sounds
23 complete.  And then I will wait to hear your answer in
24 it's completeness.
25      The other thing I would like to invite

1  you to do is throughout, make sure that you're using
2  verbal communications.  You have already done so.  And
3  I think we're not going to have that problem.  But the
4  court reporter struggles to catch anything other than
5  the things that come across the audio.
6       So if you will use full yesses and nos,
7  as appropriate, rather than nods and uh-huhs, I think
8  we'll be in great shape.
9       A.   Yes, sir.
10      Q.   If you need a break at any time, please
11 say so.  We've been taking breaks at about an hour as
12 kind of a practice.  I don't know that we're even
13 going to go much more than an hour today.  We'll see
14 where things go.  But if you feel the need to take a
15 break, please interrupt me and say you would like one.
16      The only question -- the only request I
17 have of you is that we be sure that you answer the
18 question on the table before you head away.
19      A.   Okay.
20      Q.   If, for some reason, you need to talk to
21 your counsel, that's a good reason, and we'll let you
22 do that if you feel like you need to consult with
23 counsel.  You don't have to answer the question until
24 you receive that feedback and you feel like you have,
25 you know, the guidance and you can go forth;

1  all right?  So keep me posted if anything comes up.
2       You will have an opportunity to review
3  the transcript we're going to build today together.
4  You've got a 30-day window to look at it.
5       But if you today realize, in the course
6  of answering maybe a later question or after you come
7  back from a break, you realize, Oh, I misspoke,
8  there's something I would like to clarify, there's a
9  piece I didn't share, or there's something that's just
10 wrong, can I invite you to share that with me today if
11 it comes up for you today?
12      A.   Yes.
13      Q.   Thank you.  If you're not sure about a
14 question, you're not sure you understand it, ask me.
15 We'll get it clarified.  I may put it back to you with
16 some other clarifying questions about it, but let's
17 make sure that we're talking about the same thing all
18 day.
19      So that's open to you if you decide, I
20 don't really know what you're asking, Mr. Whitehair.
21 Let's talk about that some more.
22      I'm going to ask you a personal question
23 and I mean no personalness by it.  Is there any reason
24 why you can't give full and clearheaded testimony
25 today; for instance, being on medication, being in

Lisa Sheley
December 01, 2023

Page 10

1  some kind of a medical condition or other factor that
2  might make today's deposition not your clearheaded
3  testimony?
4       A.   No.
5       Q.   Thank you.  Did you review any documents
6  to prepare for today's testimony?
7       A.   Just the declaration that my husband
8  made.
9       Q.   You're aware that there's a deposition
10  notice.  I wouldn't expect you to necessarily see it,
11  but it essentially just says that we're going to talk
12  about this today.
13            Was there any other documentation that
14  you looked at or reviewed, either with your attorney
15  or outside of the time with your attorney?
16       A.   No.
17       Q.   What do you recall about your husband's
18  declaration?
19       A.   He just stated background and why we were
20  bringing our case against the State.
21       Q.   Thank you.  The lawyers have already
22  spoken about keeping your personal address private.
23            If you can -- I don't know that we came
24  up with a protocol exactly how we wanted to do it.
25  There was a decision that it would be sent under

Page 11

1  separate cover.
2            So if your lawyer will just send that
3  under separate cover, it doesn't need to be in the
4  deposition transcript, we'll have it available.  And
5  just so you know, we -- I always want to know where
6  everybody can be found, if something falls apart
7  later, everybody is gone, the lawyers have left,
8  there's a reason to get ahold of somebody, may need
9  you in a court hearing, so our goal is to be able to
10  find you.
11            We will always go through your attorney
12  on this case unless there's some crazy event that I
13  can't imagine.  So that's our intention for that, so
14  it's not just to try to pry into your personal life.
15       A.   Okay.
16       Q.   I am going to ask you a few things about
17  your personal life because the way in which you
18  operate at the school and in the context of this
19  parish and the context of possible UPK preschool,
20  you've sort of put yourself in evidence by saying you
21  would be willing to be in a lawsuit.
22            So I'm going to ask you some things about
23  your prior experience with lawsuits, whether you've
24  had any, any run-ins with the law, et cetera.
25            So let me just ask it straight.  Have you

Page 12

1  ever been a party to a lawsuit before now?
2       A.   No.
3       Q.   Does that include any civil action, a
4  little fight over, you know, some contract, anything
5  like that?
6       A.   No.
7       Q.   Do you know if your husband has ever been
8  a party to a lawsuit?
9       A.   Yes.
10       Q.   Is that in the capacity of his personal
11  capacity or his work capacity?
12       A.   Work capacity.
13       Q.   I'm just really focusing on what would be
14  true of the family and as the parents here.
15            Did you discuss with anyone your
16  anticipated testimony today?
17       A.   No.
18       Q.   Did you have -- did you talk with your
19  lawyers at all about -- I don't want to know what they
20  gave to you as advice, but did you spend any time
21  speaking with the lawyers about coming here today or
22  getting ready for this deposition?
23            MR. REAVES:  You can answer to the extent
24  it doesn't reveal attorney-client information.
25       A.   Yes.

Page 13

1       Q.   (BY MR. WHITEHAIR)  About how long did
2  you meet with counsel?
3       A.   One hour.
4       Q.   And do you mind telling me which counsel
5  or counsels it was?
6       A.   Nick and Joe and Amanda.
7       Q.   Were there any non-attorneys involved in
8  those conversations?
9       A.   No.
10       Q.   Had you met any of these attorneys before
11  this lawsuit?
12       A.   No.
13       Q.   How did you hear about this lawsuit?
14       A.   Through the Archdiocese.
15       Q.   Help me understand how the Archdiocese
16  communicated this with you.
17            MR. REAVES:  You can answer to the extent
18  it doesn't reveal attorney-client information.
19       A.   It was -- I believe it was kind of just
20  announced that the Archdiocese was considering legal
21  action.
22       Q.   (BY MR. WHITEHAIR)  Legal action to do
23  what?
24       A.   To sue the State over the right to
25  Universal Pre-K for our schools.

Lisa Sheley
December 01, 2023

Page 14

```
 1        Q.   Did you hear this in church?
 2        A.   I don't recall.
 3        Q.   We'll come back to that.
 4             Tell me a little bit about you.
 5             Where did you grow up, Ms. Sheley?
 6        A.   Lakewood, Colorado.
 7        Q.   Where did you go to high school?
 8        A.   Lakewood High School.
 9        Q.   Wow.  I went to Alameda, but we'll go
10   ahead and move forward, despite that difficulty.
11             When did you graduate from Lakewood?
12        A.   2004.
13        Q.   Did you pursue any other education after
14   Lakewood?
15        A.   Yes.
16        Q.   What did you do?
17        A.   I have a bachelor's from Benedictine
18   College.
19        Q.   And remind me where Benedictine is.
20        A.   Atchison, Kansas.
21        Q.   What degree did you achieve?
22        A.   I do not recall.
23        Q.   Do you remember what your major was?
24        A.   I majored in business administration and
25   physical education.
```

Page 15

```
 1        Q.   When did you graduate from Benedictine?
 2        A.   2008.
 3        Q.   What did you do after that?
 4        A.   I got a master's from the University of
 5   Colorado Denver in sports management.
 6        Q.   Well, I have to ask.  What sport were you
 7   in varsity in high school?
 8        A.   Soccer.
 9        Q.   I, too, played soccer.  I, too, recall
10   playing Lakewood.  I'm sure that we didn't play
11   within -- it was in a different century, by the way,
12   so -- but congratulations.  I think we could go on and
13   have a whole lot of conversation about the value of
14   soccer in people's lives.
15             Are you able to play ball now?
16        A.   Oh, no.
17        Q.   I got to play rec with my kids and some
18   other stuff after, so I played for a long time.
19             So then you got your master's from UCD.
20   When did you complete that degree, Ms. Sheley?
21        A.   2010.
22        Q.   What did you do next?  Was it more
23   schooling or was it work or something else?
24        A.   I began working.
25        Q.   Where did you go to work?
```

Page 16

```
 1        A.   I started at the State of Colorado in the
 2   division of oil and public safety.
 3        Q.   What did you call it?  Division of oil
 4   and public safety?
 5        A.   Was it oil and public safety?  I don't
 6   recall what it was.
 7        Q.   Okay.  Where was the -- where was your
 8   office located?  Maybe that will help.
 9        A.   Downtown, on 17th Street.
10        Q.   Okay.
11        A.   Maybe it was oil and gas.
12        Q.   Could it have been the Oil & Gas
13   Commission?  Do they have a staff?
14        A.   No.  It was like the gas station pump
15   things, certifying them.
16        Q.   Okay.
17        A.   Administrative work.
18        Q.   So was that, like, metes and measures or
19   something going on there?
20        A.   Something like that, yeah.
21        Q.   Thank you.  And what did you get to do
22   there for the State of Colorado?
23        A.   Just administrative work.  So answering
24   phones, filing paperwork, finding paperwork for
25   people, making copies.
```

Page 17

```
 1        Q.   How long did you have that position?
 2        A.   One year.
 3        Q.   What did you do after that?
 4        A.   I began working for Foothills Parks and
 5   Recreation District as their adult athletics
 6   assistant.
 7        Q.   How long did you have that post?
 8        A.   I think I was there for six years.
 9        Q.   Well, I'm not running my math ideally,
10   but how long ago did you finish that post?
11        A.   Oh, gosh.  I want to say it was around
12   2014, because I had worked there part-time for a time
13   before that.
14        Q.   Okay.  Thank you.  So then where did you
15   go after Foothills?
16        A.   I went to Highlands Ranch Community
17   Association, and I was a sports coordinator.
18        Q.   Is that a private organization?
19        A.   It's a homeowners association.
20        Q.   That's what I wondered.  And how long
21   were you at Highlands?
22        A.   I was there for nine years.
23        Q.   I'm sorry.  I didn't hear.
24        A.   Nine years.
25        Q.   And what did you do next, after that?
```

Lisa Sheley
December 01, 2023

Page 18

1    A.   I came to work for St. Mary's.
2    Q.   How did you end up working at St. Mary's?
3    A.   My kids go there, so I was drawn to be on
4  the campus and not driving to three different
5  locations constantly.
6    Q.   How long have you -- let me ask it.  When
7  did you start working for St. Mary's?
8    A.   In June of this year.
9    Q.   2023?
10   A.   Correct.
11   Q.   What is the office you hold?
12   A.   I am the school office administrator.
13   Q.   What are the duties of the school office
14  administrator?
15   A.   I answer the phone.  I greet parents,
16  vendors, different people that come into the office.
17  I handle enrollment and marketing of the school and
18  give school tours.
19   Q.   I want you to help me divide up, if it's
20  dividable, where the parish is and where the school is
21  and whether this is a combined parish and school
22  office that you're in.
23        So help me -- help me understand.  Where
24  are the admins on campus with respect to the church?
25   A.   On our campus, we are in the school

Page 19

1  building.  So I am in the school building with another
2  front office assistant and then the assistant
3  principal and the principal.
4    Q.   They're all close by where you are?
5    A.   Correct.
6    Q.   And are those offices all feeding out,
7  into the hallways of the school itself?
8    A.   The main office does, yes.
9    Q.   And I apologize.  I have not had a chance
10  to take a tour so you can help us have one, just a
11  little bit, here.
12        So about how many classrooms are there in
13  the school that your office is supporting, just
14  roughly?
15   A.   Yeah.  No.  I'm thinking really fast.
16  Roughly 23.
17   Q.   Is it all on one level or do you have a
18  two-story building?
19   A.   We have a two-story and then a separate
20  building for middle school.
21   Q.   Okay.  So I was under the impression it
22  was K through 8; is that correct?
23   A.   Correct.
24   Q.   And you're saying there's a middle school
25  that's separate?  Is that 6, 7, 8?

Page 20

1    A.   Our middle school is 6, 7, 8, yes.
2    Q.   And they're physically in a different
3  housed setting?
4    A.   Yes, but on the same campus.
5    Q.   Sure.  Is it easy walking distance?  Is
6  it, like, 100 yards kind of thing?
7    A.   Yes.
8    Q.   Thank you.  So then you got the
9  K through 4 is in the building you're describing; is
10  that correct?
11   A.   K through 5.
12   Q.   K-5.  Oh, gosh.  And I did okay in math
13  in school.  So that didn't work out.  Thank you.
14  K through 5.
15        And then the preschool, where is it
16  housed?  Let me say it differently.  The preschool,
17  where is it housed or how is it housed, either within
18  or separately from the K-through-5 space.
19   A.   It's down stairs of the K-through-5
20  space.
21   Q.   I assume there's an elevator down to
22  that?
23   A.   No.
24   Q.   Is it -- is it handicap accessible to get
25  to the basement?

Page 21

1    A.   Yes.
2    Q.   Do you come in from the outside?
3    A.   You can, yes.
4    Q.   Are there ramps sufficient to allow
5  access to the interior to the building?
6    A.   Yes.
7    Q.   Are you a full-time employee or a
8  part-time employee?
9    A.   Full-time.
10   Q.   All right.  Are you familiar with the
11  tuition program that St. Mary's School provides to its
12  full-time employees?
13   A.   I'm aware of my personal circumstance.  I
14  am not aware of others.
15   Q.   Sure.  That's fine.  So help me
16  understand what you understand about the tuition
17  program that you and your family are eligible for at
18  this time as a full-time employee.
19   A.   I am eligible for a 50 percent tuition
20  discount.
21   Q.   Is that at every level of the school?  I
22  mean, if you have a 4th grader, if you had an
23  8th grader?
24   A.   I don't know how it breaks down.
25   Q.   How did you know the 50 percent was only

Lisa Sheley
December 01, 2023

Page 22

1  for preschool or whether it was a wider application?
2      A.   It would be for all the students that I
3  have at the school.  So if I have preschool through
4  8th grade, it's 50 percent off the total.  I don't
5  know how it breaks down per child.
6      Q.   You mean how does the school allocate
7  between each of your kiddos?
8      A.   Correct.
9      Q.   And we're going to get into -- just get a
10 little bit more detail about your family in a second.
11          I understood, from some testimony that
12 happened earlier today, that there was also a
13 multi-child discount to regular non-employees.
14          Are those separate and apart?  You either
15 get an employee discount or you get a multi-child
16 discount, do you know?
17     A.   For my situation, it's not separate.
18     Q.   Okay.  So is there a multi-child discount
19 in addition?
20     A.   In my situation, I believe there is.
21     Q.   Do you know how it applies to you?  I
22 take it you have more than one child presently in the
23 school.
24     A.   Correct.
25     Q.   Let's get into that, and then I'll be

Page 23

1  able to do the math better in my head.
2          How many children do you have,
3  Ms. Sheley?
4      A.   I have six total children.
5      Q.   And without giving us their names -- no
6  reason they need to be identified for the record --
7  could you tell us their ages and their genders?
8      A.   14-year-old male; 11-year-old male;
9  8-year-old female; 4-year-old male; 2-year-old male;
10 and 1-year-old female.
11     Q.   First, congratulations.
12          Is the 14-year-old going to St. Mary's
13 School right now?
14     A.   No.  He's in high school.
15     Q.   Where is he attending high school?
16     A.   Mullen.
17     Q.   My nieces and nephews, several of them
18 went to Mullen.  They had a fabulous experience.  But
19 I think they're a little too old to match up with your
20 child, so I won't ask about whether you know the
21 names.
22          Are the 11 and 8-year-old presently
23 attending the St. Mary's School?
24     A.   Yes.
25     Q.   And I take it the 4-year-old is in the

Page 24

1  St. Mary's Preschool.
2      A.   Yes.
3      Q.   I remember myself asking a question
4  earlier, where are the parish offices, if they're
5  different from the offices you described for the
6  school.
7      A.   The parish office is across the parking
8  lot.
9      Q.   About how many admins do they have during
10 the day?  You said you had two in your shop.
11     A.   Just administrative, I think they only
12 have one for front desk.  I'm not sure how many they
13 have doing all the administrative work outside of
14 that.
15     Q.   Do you -- thank you.  I take it that's
16 where the pastor for your congregation spends his
17 time, at least administratively?
18     A.   As far as I'm aware.
19     Q.   Now, your principal is also a Father, a
20 priest; yes?
21     A.   Correct.
22     Q.   And is that his sole administrative
23 office there in your office?  Is that his only office
24 that he works out of?
25     A.   For the school, yes.  I'm not sure if he

Page 25

1  has another location.
2      Q.   Thank you.  Do you have a place -- strike
3  that.
4          I take it you have a conference room
5  somewhere nearby your office.
6      A.   Not really, no.
7      Q.   I was curious, when you had visitors
8  from, for instance, the Archdiocese, one of the
9  superintendents or one of the assistant
10 superintendents, is there a place that they're able to
11 come and visit with you?
12     A.   They typically would go to Father James'
13 office or to the pastoral center.
14     Q.   And the pastoral center, of course,
15 you're calling what I'm calling the main parish
16 administrative office?
17     A.   Correct.
18     Q.   Let's be specific about the grades of
19 your children.  Going back to the family.  The
20 14-year-old is a freshman?
21     A.   Correct.
22     Q.   The 11-year-old, what grade?
23     A.   6th.
24     Q.   The 8-year-old?
25     A.   3rd.

Page 26

1    Q.   4-year-old?  In preschool?
2    A.   Correct.
3    Q.   And the 2 and the 1, are they in the
4  school or are they getting separate care when you're
5  not home?
6    A.   The 2-year-old is in the preschool
7  part-time.
8    Q.   Again, not wishing to pry, but curious
9  about your 1-year-old.  Is she on campus or is there
10  some other childcare arrangement that you have there?
11    A.   She goes to an in-home daycare.
12    Q.   Thank you.  Is that in-home daycare
13  affiliated with any religion?
14    A.   Not that I'm aware of.
15    Q.   I see on my note I didn't check a box so
16  I'm going to go back on the issue of the discounts.
17         Is it your understanding that at present
18  you're paying less than 50 percent of tuition because
19  you have both a full-time employee discount and you
20  have a multi-child discount of some kind?
21    A.   I believe so.
22    Q.   Do you have any idea how much you're
23  paying for the 4-year-old who's in preschool, your son
24  there?
25    A.   Not off the top of my head.

Page 27

1    Q.   Do you know, of your own personal
2  knowledge, how much the State's Universal Preschool or
3  Prekindergarten Program is offering annually for
4  schools that are subscribed?
5    A.   I don't know the specific amount.
6    Q.   Do you remember reviewing a complaint
7  that you are named in in this case?
8    A.   No.
9    Q.   Did you ever see any documentation -- let
10  me strike that.
11         Were you aware that the lawsuit had been
12  filed before you and your husband joined it, that
13  there was a lawsuit already filed on this topic?
14    A.   Yes.
15    Q.   Were you aware that you were being added
16  to that?
17    A.   Yes.
18    Q.   Were you -- I don't want to get into
19  attorney-client privilege, but I do want to understand
20  what you saw.
21         Were you ever shown the document that was
22  filed on your behalf, you and your husband's behalf,
23  that recited what the -- what your complaint was
24  against the State and these two State employees?
25         THE DEPONENT:  Can I confer with counsel?

Page 28

1         MR. WHITEHAIR:  Sure.  Do you want to go
2  off the record?  We can take a two-minute stand down.
3         MR. REAVES:  Sure.  Sure.  Let's do that.
4         THE REPORTER:  Off the record.
5         (Discussion off the record.)
6         THE REPORTER:  Back on the record.
7         MR. WHITEHAIR:  So do you want me to have
8  the question read again?
9         THE DEPONENT:  Yes, please.
10         MR. WHITEHAIR:  Do you mind, Ms. Kelly?
11         (The last question was read back.)
12    A.   Yes, I was.
13    Q.   (BY MR. WHITEHAIR)  And did you agree
14  with the statements that were made on your behalf?
15    A.   Yes.
16    Q.   Did you agree to the statements that your
17  husband made on his declaration that was attached to
18  one of the other papers that was filed?
19    A.   Yes.
20    Q.   And you mentioned that you reviewed that
21  declaration before you -- I think we can bring it into
22  the record.  Let's have it just for completeness, give
23  you a chance to look at it, see if you recognize it,
24  double-check on its content, and we can move on.
25         MR. WHITEHAIR:  So give me one moment.

Page 29

1  And by me, I mean her.
2         Would you mark this?
3         Because this is a document of two pages.
4  It's actually four full pages.  It's been marked as
5  Exhibit 23.  Can we just scroll to the bottom of it?
6  Thank you.
7    Q.   (BY MR. WHITEHAIR)  Do you recognize this
8  document, Ms. Sheley?
9    A.   Yes.
10    Q.   What is it?
11    A.   It's our declaration.
12    Q.   Did you work with Mr. Sheley on it?
13    A.   Yes.
14    Q.   So you would have -- if I may, you would
15  have probably signed it, too, if you would have been
16  asked; is that right?
17    A.   Correct.
18    Q.   It's fairly recent, so it looks like the
19  children are essentially the same age.
20         MR. WHITEHAIR:  You can scroll down.
21    Q.   (BY MR. WHITEHAIR)  Now, is it your
22  understanding that the St. Mary Preschool would have
23  signed up for the 15-hour-a-week coverage?  I think
24  there is also a more extensive, maybe 30.
25         Do you know what the plan was for the

Lisa Sheley
December 01, 2023

Page 30

1   preschool if you had signed up?
2       A.   No, I do not.
3       Q.   But you did understand that there would
4   be 14 hours per week of free preschool education for
5   your present 4-year-old; right?
6       A.   Correct.
7       Q.   Have you ever investigated any other
8   preschool in your area for -- that would be accessible
9   to you or to your husband on the way to work, other
10  than this preschool?
11      A.   No.
12      Q.   Do you know what other available
13  preschools there might be if you were not choosing to
14  go to St. Mary's?
15      A.   I would have to do research.
16      Q.   Your 2-year-old, you said, is in a
17  part-time setting.  Is it called preschool?
18      A.   Yes.
19      Q.   I didn't know whether there was a more
20  different or specialized name if they were outside of
21  the Pre-K preschool setting.
22           Is that a separate class of just
23  similarly-aged children?
24      A.   Correct.
25      Q.   Are you able to go visit them during the

Page 31

1   day?
2       A.   I could.  I don't.
3       Q.   With regard to -- I'm just looking here
4   at paragraph 6 and 7.  There's a conversation that's
5   listed out here about how much money the State would
6   be reimbursing if you had one child, if you had
7   another child, and you had another child involved.
8           I think at the bottom, in paragraph 8,
9   you say you're saving roughly $6,000 when each of our
10  children is in pre-kindergarten.
11          Now, the number that's calculated in this
12  declaration, that's the full amount without employee
13  discount; is that right?
14      A.   To my knowledge.
15      Q.   And it doesn't attempt to make any
16  modifications based on the fact that you have multiple
17  children?
18      A.   Not that I'm aware of.
19      Q.   Just so we're clear, this money, as you
20  understand it, doesn't come to the families; right?
21  It goes to the preschool?
22      A.   I'm not sure.
23      Q.   It's not like you would get a voucher
24  for this money and you could decide where to take
25  them; right?

Page 32

1       A.   Okay.
2       Q.   But you don't know?
3       A.   I'm not aware.
4       Q.   Okay.  Are you aware of how much
5   full-time tuition is for your 4-year-old in preschool
6   right now?  Full-time -- I'm sorry.  Your 4-year-old
7   in preschool -- well, the full tuition, so for maybe
8   one of his colleagues, right, whose parents are not
9   working there, do you know what the annual preschool
10  amount is?
11      A.   I could ballpark, but I don't know
12  specifically.
13      Q.   Is the ballpark $8,000 a year?
14      A.   Yes.
15      Q.   And so your discount is $4,000 a year --
16      A.   Yes.
17      Q.   -- assuming just a 50 percent discount.
18  You might even have a more discount rate; is that
19  right?
20      A.   Yes.
21      Q.   And the school would then be making,
22  according to your declaration, nearly $6,000 a year
23  for your child; is that right?
24      A.   Yes.
25      Q.   So on yours, the school would actually be

Page 33

1   making money, over and above what you would normally
2   pay in preschool tuition; is that right?
3       A.   It would appear that way.
4       Q.   Let me ask you -- I forgot to ask and it
5   wasn't intended to be rude.  I would like to know the
6   name of your husband.  Again, we don't need to know
7   his address.
8       A.   Daniel.
9       Q.   And where did he grow up?
10      A.   Centennial.
11      Q.   How long have you folks been married?
12      A.   14 years.
13      Q.   What year were you married?
14      A.   2009.
15      Q.   When?
16      A.   August.
17      Q.   I can ask you because I know you know the
18  answer.  What is your anniversary?
19      A.   August 8th.
20      Q.   August 8th, 2009?
21      A.   Correct.
22      Q.   Were you married here in Denver?
23      A.   We were married at St. Mary's.
24      Q.   Were you both congregants at the time or
25  parishioners at the time you were married?

Lisa Sheley
December 01, 2023

Page 34

1    A.    No.
2    Q.    Were you parishioners in a different
3  church at the time you were married?
4    A.    No.
5    Q.    Just for context, again, simply wanting
6  to unpack what you shared already, I believe up above
7  in your declaration there was a reference to Catholic
8  education and what you and your husband -- in that
9  case your husband was saying you and he wanted for
10 your children.
11          Did you have any Catholic upbringing or
12 Catholic training?  You went to Lakewood High and
13 Benedictine.  I don't know.  Is Benedictine a Catholic
14 college?
15   A.    Yes.
16   Q.    Were your professors Catholic?
17   A.    Yes.
18   Q.    Lakewood High is not a Catholic college
19 or high school.  Did you have --
20   A.    Correct.
21   Q.    -- Catholic training before you went to
22 Benedictine College?
23   A.    No.
24   Q.    Were you raised Catholic?
25   A.    No.

Page 35

1    Q.    When did you, would you say convert?
2  What kind of word would you -- perhaps you were
3  confirmed?  What was your entry into the Catholic
4  faith?
5    A.    I went through RCIA in 2016.
6    Q.    When did your first -- when did your
7  children first start going to school at St. Mary?
8    A.    2019.
9    Q.    Was your husband a Catholic?
10   A.    Yes.
11   Q.    Cradle Catholic?
12   A.    Yes.
13   Q.    What was his home parish here in
14 Colorado?  You said he was in Centennial.
15   A.    He was at MPB, Most Precious Blood.
16   Q.    I know, but thank you for the record.
17          Whose idea was it to get married at
18 St. Mary's?
19   A.    His.
20   Q.    Why not at Most Precious Blood?
21   A.    He had stopped going after moving away
22 for college.
23   Q.    You got through my questions faster than
24 I planned.  I have -- I have a number more.  Don't
25 misunderstand me.  But I'm just trying to catch up

Page 36

1  with my own bad handwriting.
2          Ma'am, you mentioned going through the
3  RCIA in 2016.  Would you give us -- do you recall what
4  the acronym stands for?
5    A.    Rights of Christian Initiation of Adults.
6    Q.    It that a training program?  Is it a
7  doctrinal discussion about what it means to be a
8  Catholic?
9    A.    Yes.  It's for people that are interested
10 in joining the Catholic faith.
11   Q.    Had you been baptized into some faith
12 before you took that?
13   A.    Yes.
14   Q.    And what was that faith?
15   A.    Episcopalian.
16   Q.    So as I recall, you made the opposite
17 path.  I believe it's called receiving into the
18 church.  Were you received in the Catholic Church or
19 did you make a confirmation or was there some other --
20 do you recall what the phrase was when you went from
21 Episcopalian to Catholic?
22   A.    We went through confirmation again.
23   Q.    You had been confirmed in the Episcopal
24 church?
25   A.    Yes.

Page 37

1    Q.    And he had been confirmed in the Catholic
2  Church?
3    A.    Yes.
4    Q.    And then as committed to this new parish,
5  you chose to both be confirmed again?  Or he got to be
6  confirmed again, you became confirmed in Catholicism
7  for the first time?
8    A.    He didn't go through confirmation.  He
9  had already done it once.  I did it with becoming
10 Catholic.
11   Q.    And you joined the -- the children
12 started going to school in 2019.  You took the RCIA in
13 2016.  When did you formally join the St. Mary's
14 parish?
15   A.    In 2009.
16   Q.    What year was your oldest boy born in?
17   A.    2009.
18   Q.    And what is his birthday?
19   A.    February 3rd.
20   Q.    Did your children attend school before
21 they went to St. Mary's?
22   A.    Yes.
23   Q.    I had several of my kids homeschooled, so
24 it's not just obvious where somebody might have went.
25          Could you tell me where they went to or

Lisa Sheley
December 01, 2023

Page 38

1 where you were going to school?  Was it a public or
2 private school?
3     A.  Public.
4     Q.  And what was the public school that your
5 children attended before they all started -- the
6 oldest one started in 2019 at St. Mary?
7     A.  Highlands Elementary in Littleton Public
8 Schools.
9     Q.  Remind me where Highlands is.  My kids
10 went to Littleton High.  I can't remember where
11 Highlands Elementary is.
12     A.  Arapahoe and Clarkson area.
13     Q.  Okay.  I see soccer fields around there.
14 That's what I'm seeing.
15     And I guess your oldest boy would have
16 still been in elementary school when you decided to
17 move over to St. Mary?
18     A.  Correct.
19     Q.  Yeah.  Because he wouldn't have made
20 it -- just trying to figure out if he went to middle
21 school --
22     A.  Yes.  No.  He --
23     Q.  -- in public school.
24     A.  -- went to St. Mary's.  He was in 5th
25 grade.

Page 39

1     Q.  Thank you.  I'm going to ask a couple
2 more personal questions.  Because of the context of
3 the allegations in the complaint, issues around gender
4 identity, sexual orientation, and the teachings of the
5 church are all relevant to the complaint you brought
6 against the State.
7     So, again, meaning no disrespect, are you
8 related in any way to any brothers, sisters, family
9 members, including cousins, who identify --
10 self-identify as LGBTQ plus, something other than --
11 it's called cisgender or heterosexual.
12     A.  Yes.
13     Q.  And who is that?
14     A.  I have a cousin.
15     Q.  What state do they live in?  I don't know
16 that we need to find out any personal details.  Where?
17     A.  Oregon.
18     Q.  Male?  Female?
19     A.  Female.
20     Q.  Identifying as what?
21     A.  Female.
22     Q.  Is she in a lesbian relationship?
23     A.  Yes.
24     Q.  Is she Catholic?
25     A.  No.

Page 40

1     Q.  Do you know if she declared a faith?
2     A.  I do not know.
3     Q.  Have your children met her?
4     A.  I don't believe so.
5     Q.  Any other family members who identify
6 either sexual orientation, or by what we call gender
7 diverse, something different than their birth gender?
8     A.  No.
9     Q.  Have you read the materials that the
10 Archdiocese distributes on -- I want to get the name
11 right.  And just a logistical question.
12     Do you recall seeing any of the
13 attachments that were added to the complaint that was
14 amended that you and your husband signed on for?  Did
15 you see the packet that was attached to it?
16     A.  I believe there was an attachment.  I may
17 have looked through it, but I don't specifically
18 remember anything at this time.
19     Q.  There is, in that complaint, an exhibit
20 labeled -- I think it's labeled B in that amended
21 complaint.  Yeah.  Exhibit labeled B in the amended
22 complaint, and its title is Guidance for Issues
23 Concerning the Human Person and Sexual Identity.
24     Are you familiar with that document?
25     A.  No.

Page 41

1     Q.  Do you know whether that guidance is
2 distributed to the teachers that are teaching your
3 4-year-old right now?
4     A.  I'm unaware.
5     Q.  Do you know whether that guidance has
6 been given to teachers who are teaching your
7 11-year-old?
8     A.  I do not know.
9     Q.  Have you -- let me back up.
10     Does the parish or the school provide any
11 kind of classes for parents concerning really
12 anything, but I'm asking specifically about things
13 like the curriculum or church teachings or that kind
14 of information, so that parents can be kept up to
15 speed or interested parents can learn about things
16 that they might not have ready access to?  Are you
17 aware of any kind of classes like that?
18     A.  I don't know of a physical sit-down
19 class.  I'm sure there's literature provided.
20     Q.  Do you know whether there's any, what we
21 might call a parent lecture?  Maybe Father comes in
22 and has a sit-down and shares thoughts or answers,
23 questions on behalf of interested parents?
24     A.  I'm not aware.
25     Q.  Have you ever attended any lecture,

Lisa Sheley
December 01, 2023

Page 42

1   whether in school, in your parish, or anywhere in the
2   Archdiocese, on gender etiology or Christian
3   anthropology?
4        A.   Not that I'm aware.
5        Q.   Are you aware of the nondiscrimination
6   clause that's at issue in the complaint that you
7   filed?
8        A.   I'm aware there is a nondiscrimination
9   clause.
10       Q.   Do you know what part of that clause is
11  causing the harm alleged by you and your husband?
12       A.   No.
13            MR. WHITEHAIR:  We have been going just
14  about an hour.  I try to make it an automatic, just so
15  I don't lose track and try and force people into
16  places.
17            I don't think we're going to be a long
18  time after this.  The most we could go is 3:30, but
19  can we take a ten-minute break right now?
20            MR. REAVES:  Yeah.  We'll take a
21  ten-minute break.
22            MR. WHITEHAIR:  Thank you.
23            THE REPORTER:  Off the record.
24            (Recess from 2:34 p.m. to 2:44 p.m.)
25            THE REPORTER:  Back on the record.

Page 43

1            MR. WHITEHAIR:  Thank you.
2        Q.   (BY MR. WHITEHAIR)  Thank you,
3   Ms. Sheley, for returning.  Sometimes people try and
4   run.
5            What I would like to do is ask a little
6   bit about the nondiscrimination rule.  Let's back up.
7            Do you recall when the voters of Colorado
8   were invited to start the Universal Pre-Kindergarten
9   or the -- basically, the preschool program that was on
10  the ballot several years ago?
11       A.   Yes.
12       Q.   Were you familiar with that when you went
13  to vote that year?
14       A.   Yes.
15       Q.   Do you recall whether you voted for it or
16  against it?
17       A.   I voted against it.
18       Q.   When the Referendum II was up this year,
19  there would be an extension of taxes from I believe
20  cannabis sources to permanently fund Universal
21  Preschool.  Do you recall that ballot issue being in
22  the last election?
23       A.   Can you repeat?
24       Q.   There was a ballot measure to essentially
25  create a permanent funding mechanism for Universal

Page 44

1   Preschool, UPK, using, I believe it was an extraction
2   of taxes that would otherwise have been returned -- I
3   think they came from cannabis.
4            I'm curious if you remembered that was on
5   the ballot.  It was one of the two big Tabor-related
6   initiatives that were on the last ballot.
7        A.   Yes.
8        Q.   And do you recall how you voted, yes or
9   no, on extending permanent funding to UPK?
10       A.   I do not recall.
11       Q.   In response to the citizen's proposal to
12  have the Pre-K program, the state legislature put
13  together a statute which described in detail a whole
14  bunch of stuff that we're not going to get into.  I
15  wouldn't expect you to know it.  I don't even know it.
16            But there is one clause that is important
17  because it tends to be taken from the statute forward
18  through to the contracts that are involved in any
19  company or organization that wants to get UPK money,
20  okay?
21            So I'm going to, in a second, have my
22  very able assistant put up the language that's in the
23  statute.
24            But remember I was asking you just before
25  the break, I was going to ask what, of the

Page 45

1   antidiscrimination protocols that you recall, you were
2   against in regards to bringing this complaint against
3   the State.
4            Do you recall now what those restrictions
5   are or what the terms of the antidiscrimination were
6   that caused you to bring the lawsuit?
7        A.   I believe it was in regards to gender and
8   teachings that would be required.
9        Q.   Okay.  Are there anti -- are you familiar
10  with the antidiscrimination laws at the federal level,
11  for instance, civil rights laws concerning no
12  discrimination on the basis of race?
13       A.   Yes.
14       Q.   And a number of other -- a number of
15  other items have been added to that list; right?  That
16  it's -- at a federal level, it's illegal to
17  discriminate on certain bases in certain places, in
18  certain public places.  Are you familiar generally
19  with that law, that scheme?
20       A.   Yes.
21       Q.   So I'm going to -- I'm going to show you
22  the statutory protocol, the statutory list of
23  nondiscriminations.
24            Before I do, did you sign an employment
25  contract when you employed at St. Mary?

Lisa Sheley
December 01, 2023

Page 46

1    A.   Yes.
2         Q.   Did it provide guidance or expectation on
3    how you would live or how you would follow Catholic
4    teachings?
5         A.   Yes.
6         Q.   Did you have a chance to look through
7    that with care, what you were promising to do?
8         A.   I don't --
9         Q.   Did you look at your contract closely
10   before you signed it?
11        A.   Probably not.
12        Q.   Okay.  I appreciate your candor.
13             Do you know whether the school has
14   nondiscrimination practices of any kind, that there
15   are any kind of nondiscriminations that you, as the
16   school, promise to abide by?
17        A.   I don't know.
18        Q.   Would you imagine that you have rules
19   that prohibit you from having race-based
20   discrimination?
21             MR. REAVES:  Objection.  Calls for
22   speculation.
23        Q.   (BY MR. WHITEHAIR)  You can answer.
24        A.   Can you repeat?
25        Q.   Yeah.

Page 47

1             MR. WHITEHAIR:  Ms. Kelly, would you
2    repeat my question, please?
3             (The last question was read back.)
4         A.   Yes.
5         Q.   (BY MR. WHITEHAIR)  You would think it
6    would be a problem, wouldn't you, if they started to
7    have bathrooms for the black children separate from
8    the white children?
9         A.   Yes.
10        Q.   And that they would have bathrooms
11   separate for the Croatians than they would have for
12   the Italians?
13             MR. REAVES:  Objection.  Calls for
14   speculation.
15             You can answer.
16        A.   Yes.
17        Q.   (BY MR. WHITEHAIR)  Do you see value in
18   having those rules in place as your children are
19   coming up through the school?
20             MR. REAVES:  Objection.  Vague.
21        A.   And what specifics are you referring to?
22        Q.   (BY MR. WHITEHAIR)  Family value.  Is it
23   a family value that your children go to a school that
24   is committed to treating all people of all races
25   equally?

Page 48

1         A.   It is a value that we attend a Catholic
2    school and receive a Catholic education.
3         Q.   And if the Catholic education was to
4    discriminate on the basis of race, would you want to
5    practice that?
6         A.   I wouldn't -- I wouldn't know because I
7    haven't been faced with that so I can't answer
8    honestly either way.
9         Q.   So if I'm hearing you, you do understand
10   that the Catholic teaching in Catholic education
11   includes today that the Catholic Church and its
12   educational arms are not practicing discrimination on
13   the basis of race?
14             MR. REAVES:  Objection.  Misstates the
15   witness' testimony.
16        Q.   (BY MR. WHITEHAIR)  I'll ask it new.
17             Do you understand that the Archdiocese,
18   the Vatican, the superintendent of your school, the
19   principal, and the teachers all agree that they should
20   treat all races equally at St. Mary's in 2023?
21        A.   Yes.
22        Q.   Is that a value to your family, that that
23   rule is in place?
24             MR. REAVES:  Objection.  Vague.
25        A.   Yes.

Page 49

1         Q.   (BY MR. WHITEHAIR)  Is it a value to your
2    family that the school doesn't discriminate on the
3    basis of anyone?  They don't treat people who make
4    different amounts of money differently?
5         A.   It doesn't matter to us.
6         Q.   How about treating people with
7    disabilities as equal as possible?  Is that a value?
8         A.   Yes.
9         Q.   Do you have any family members who are
10   disabled?
11        A.   Yes.
12        Q.   And who is that?  You don't need a name,
13   but just tell me the circumstances.
14        A.   My mom recently became paralyzed, and I
15   have a cousin with I think some sort of chromosome or
16   something.
17        Q.   First of all, I'm so sorry about your
18   mom.  Is she here in town?
19        A.   Yes.
20        Q.   Well, all good wishes for that difficult
21   circumstance.
22             Your cousin with the chromosomal issues,
23   is that in the nature of Down syndrome or something
24   more related to gender identity, do you know?
25        A.   It's more on the Down syndrome level.

Lisa Sheley
December 01, 2023

1     Q.   Is that cousin here in town or here in
2  Colorado?
3     A.   No.
4     Q.   Do you know what kind of services are
5  available to that cousin?
6     A.   No.
7     Q.   Let me put up the requirement for the
8  state statute that's in the UPK contract.
9          And I'll represent to you, ma'am, that
10 this is taken from the public record.  And Counsel can
11 confirm this is the statute known as 26.5-4-205,
12 Quality Standards Evaluation Support.  It is the most
13 recent version effective in May.
14         And if we can scroll down, the state
15 legislature has set up a department, essentially, that
16 is doing this work, putting together the appropriate
17 protocols to bring schools into what we now are
18 calling the UPK.
19         If you'll continue, I believe there is
20 something known as the quality standards, and I will
21 read this, "At a minimum, quality standards must
22 include," and then I've had my assistant highlight the
23 language I'm interested in.  There's a statement, "a
24 requirement that each preschool provider" -- and this,
25 again, would be preschools that choose to join the

1  State program and take State monies -- "that each
2  preschool provider provide eligible children an equal
3  opportunity to enroll."  We'll stop there.
4          Are you aware that one of the criteria
5  requested of all the preschools to participate is that
6  they allow every child in Colorado who's eligible to
7  play to have a shot at perhaps going into their
8  school?
9          I'll ask you in a minute whether there
10 are some exceptions that were put in place or
11 preferences, but on the basis of the beginning of the
12 program, it was, Let's be sure that every child who's
13 eligible for 4-year-old or Pre-K enrollment has a shot
14 at getting enrolled somewhere in the state.  Were you
15 aware of that?
16         MR. REAVES:  Objection to the extent it
17 calls for a legal conclusion and misstates the record.
18    Q.   (BY MR. WHITEHAIR)  You can go ahead and
19 answer.  Were you aware --
20    A.   Yes.
21    Q.   -- of this effort?  And then it goes on,
22 not just the opportunity to enroll, but also to
23 receive preschool services.  And would it be fair to
24 say that preschool services probably means teaching?
25    A.   Yes.

1     Q.   And the first one is regardless of race.
2  Do you believe that that is a valuable request on the
3  part of the State, that in order to receive State
4  monies, that your school would provide preschool
5  services regardless of race?
6          MR. REAVES:  Objection.  Vague as to
7  valuable.
8     A.   Yes.
9     Q.   (BY MR. WHITEHAIR)  How about ethnicity?
10 Do you appreciate that State money will only be given
11 to schools that provide services that are neutral or
12 equal opportunity with regard to ethnicity?
13         MR. REAVES:  Same objection.
14    A.   Yes.
15    Q.   (BY MR. WHITEHAIR)  How about religious
16 affiliation?
17    A.   Yes.
18    Q.   What about sexual orientation?
19    A.   In what sense?
20    Q.   Providing preschool services, regardless
21 of anyone -- it goes on to say a child or the child's
22 family at the end there, anybody that either the child
23 or the child's family has a sexual orientation
24 different from the majority.
25         MR. REAVES:  Again, objection.  Vague and

1  calls for a legal conclusion.
2          You can answer.
3     A.   Okay.  Can you restate the question in a
4  different manner?
5     Q.   (BY MR. WHITEHAIR)  Well, you mentioned
6  earlier that you agree that it was, from your point of
7  view, legitimate and even appropriate -- I don't want
8  to rephrase.  You can say it a different way -- but
9  that you -- well, let me ask you.
10         Do you understand and agree that State
11 monies -- I'm going to focus on race for a moment --
12 that State monies provided to schools that want to
13 provide preschool services should not be used to
14 discriminate on the basis of race?
15    A.   Yes.
16    Q.   You shouldn't use the money to, for
17 instance, build a separate bathroom for the black
18 kids; yeah?
19    A.   Correct.
20    Q.   And on ethnicity, build a separate
21 drinking fountain for people from outside of this
22 country?
23    A.   Correct.
24    Q.   And with regard to religious affiliation,
25 that they wouldn't have a Jewish bathroom that was

Lisa Sheley
December 01, 2023

Page 54

1  separate from the Catholic bathroom?
2       A.  Correct.
3       Q.  So then my question is, should they have
4  that same evenhandedness when it comes to sexual
5  orientation?
6       A.  I don't think preschoolers should be
7  dealing with sexual orientation.
8       Q.  What about if their parents are a
9  minority sexual orientation?  And by minority, I mean
10  LGBTQ and other variations, so a child who has two
11  mothers.
12       MR. REAVES:  Objection.  Calls for
13  speculation.
14       Q.  (BY MR. WHITEHAIR)  I'm just asking
15  whether you believe that that same level of treatment
16  should be applied to people based on their sexual
17  orientation.
18       A.  No.
19       Q.  So that you would agree that it's
20  appropriate to use State monies to discriminate
21  against people who are gay?
22       MR. REAVES:  Objection.  Misstates the
23  testimony.
24       Q.  (BY MR. WHITEHAIR)  I'll be more
25  specific.

Page 55

1       To use the money to discriminate against
2  a gay couple who claimed to have a civil union or
3  marriage.
4       MR. REAVES:  Objection.  Misstates the
5  testimony.
6       Q.  (BY MR. WHITEHAIR)  You can answer.
7       A.  I don't believe that we would
8  discriminate against them in our practices.  I don't
9  think they would want to attend our school.
10       Q.  Have you had an occasion for any of your
11  children to meet anybody who has identified as gay or
12  a minority sexual orientation?  It could be a drag
13  queen.  It could be somebody who's expressing, either
14  for a part or, in fact, as an expression of their
15  gender identity -- I'm sorry -- their sexual
16  orientation.
17       A.  To meet as in to communicate directly
18  with that person or walk by them on the street?
19       Q.  Walk by or answer any questions.  If
20  you're at the mall and somebody walks by and it's a
21  gentleman, from all appearances, and yet dressed
22  completely in female clothes.
23       Or somebody who is acting out in a way,
24  for instance, holding hands with the same-sex person.
25  Has any of that ever come up with any of your

Page 56

1  children?
2       A.  Yes.
3       Q.  And what is the family position on how
4  you deal with or react to those folks?
5       A.  We treat them with respect and dignity
6  but our family follows the Catholic values and
7  teachings.
8       Q.  And what is the Catholic teaching around
9  sexual orientation?
10       A.  That marriage and sexual orientation is
11  meant between a man and a woman and your gender is the
12  one that you are assigned at birth.
13       Q.  Let's move on to gender identity.  Do you
14  know what that phrase means?
15       A.  Yes.
16       Q.  And what does it mean to you?
17       A.  To me, it means the gender that you think
18  you could be.
19       Q.  Well, let me unpack that a little bit.
20  Help me understand.  So are you -- is this also a
21  Catholic teaching, what gender identity is, or is
22  there a Catholic teaching that your family follows
23  with regard to gender identity?
24       A.  We follow that your gender relates to
25  what you were born with.

Page 57

1       Q.  Have you ever met anybody who was born
2  with multiple gender parts or physical manifestations,
3  sometimes called intersex, sometimes called miss -- or
4  terminology changes, but let's use intersex; somebody
5  who was born with more than one obvious portion of
6  sexual genitalia?
7       A.  Not that I'm aware of.
8       Q.  Are you aware a substantial portion of
9  the population, upwards of 2 percent of the population
10  in the United States, may have been born with some
11  degree of -- we'll call it unclarity, some degree of
12  either multiple or missing gender components?
13       A.  No.
14       Q.  So I take it that the family hasn't had
15  occasion to experience that or have a conversation
16  about how you see that in the order of your Catholic
17  faith?
18       A.  No.
19       Q.  Just to complete our little exercise, do
20  you believe that it's legitimate on the part of the
21  state legislature to expect that all schools receiving
22  State monies to run UPK programs would provide fair
23  treatment or equal neutral treatment to people who are
24  homeless or known as unhoused by some?
25       A.  Yes.

Lisa Sheley
December 01, 2023

Page 58

1     Q.   How about income level, poor versus rich?
2   Should that also be an equal opportunity experience
3   for everybody going to a preschool that's receiving
4   State funds?
5     A.   Yes.
6     Q.   And I think you mentioned earlier that
7   you support equal treatment, to the best possible
8   ability, for anybody with a disability.
9     A.   Yes.
10     Q.   And that's your family values?
11     A.   Yes.
12     Q.   And really your religious values; isn't
13   it?
14     A.   Correct.
15     Q.   And so just to put a fine point on it and
16   to complete the exercise, I understand and just want
17   to confirm, I think you've confirmed it, that in this
18   packet of topics, all of the items from your
19   standpoint, with the exception of sexual orientation
20   and gender identity, should be treated with equal
21   opportunity and best available fair treatment both to
22   the children, as well as to any child in the
23   preschool's family; is that fair?
24         MR. REAVES:  Objection to the extent it
25   misstates the witness's testimony.  Objection to the

Page 59

1   extent it calls for a legal conclusion.  You can
2   answer.
3     A.   Yes.
4     Q.   (BY MR. WHITEHAIR)  So let's look at
5   that.
6         MR. WHITEHAIR:  You can take that down.
7   Thank you.  And thank you for working with me on that.
8     Q.   (BY MR. WHITEHAIR)  Are you aware of any
9   situation in your present preschool -- you've got your
10   4-year-old attending; you've got your 2-year-old
11   full-time in the 2-year-old's program.  Are you aware
12   of any circumstances where any child is presently
13   expressing or appears to be in any way gender diverse,
14   we'll say, something different than their birth gender
15   or acting it or requesting treatment for it?
16     A.   No.
17     Q.   Are you aware of any LGBTQ couples,
18   same-sex parent couples who have children in the
19   preschool?
20     A.   No.
21     Q.   Are you aware of any same-sex couples who
22   have children anywhere in school?
23     A.   No.
24     Q.   Do you know whether any same-sex couple
25   has ever applied or requested an opportunity to

Page 60

1   participate at St. Mary's School?
2     A.   I don't know.
3     Q.   Are you aware of any children in the
4   school, not just the preschool but in the school
5   generally, who have at any point -- we'll use the
6   colloquial come out and declared that they were gay or
7   lesbian or some other variation of a minority sexual
8   orientation?
9     A.   I do not know.
10     Q.   Do you know what the treatment of such a
11   child, if it did happen -- if it was one of your
12   children or one of their classmates who found
13   themselves in that difficult moment and said, I
14   believe I'm attracted to my same gender, do you know
15   what the opportunity or treatment or teaching would
16   be?
17     A.   No, I do not.
18     Q.   Are you aware of whether your 4-year-old
19   is accompanied to the bathroom by an adult when he is
20   in preschool?
21     A.   They are escorted to the door.
22     Q.   And then they have to take care of
23   themselves?
24     A.   Yes.
25     Q.   Is the door closed?

Page 61

1     A.   Yes.
2     Q.   Do you know how your 2-year-old is
3   treated in that same circumstance?
4     A.   He is still in diapers.
5     Q.   So is somebody changing those diapers?
6     A.   Yes.
7     Q.   And is it a female changing those
8   diapers?
9     A.   Yes.
10     Q.   Is it sometimes a male?  Are there any
11   male teachers or aides in that class?
12     A.   No.
13     Q.   Is the bathroom identified as male or
14   female?
15     A.   Yes.
16     Q.   In the preschool class?
17     A.   I'm unaware.
18     Q.   You may be thinking -- there's, I think,
19   gendered bathrooms on the way toward the gymnasium; is
20   that right?
21     A.   Yes.
22     Q.   And the question is, in the preschool
23   classroom, do you know whether the bathroom is
24   identified in any way as male or female?
25     A.   I do not know.

Lisa Sheley
December 01, 2023

Page 62

1    Q.   And do you know whether there's a urinal
2  in any of the bathrooms at any of the preschool --
3    A.   I do not know.
4    Q.   Okay -- preschool and preschool rooms?
5         Have you ever taken any of your sons into
6  a woman's room in a public mall, for instance?
7    A.   Yes.
8    Q.   Help me understand your concerns if, for
9  instance, a child was brought into your son's
10 preschool and his parents were of the same gender.
11 What are your concerns about that happening?
12        So your 4-year-old is there.  We'll
13 assume the 4-year-old sees the parents.  It's not a
14 secret.  It's an open relationship.  What is it that
15 concerns you about that?
16   A.   It goes against our Catholic teaching.
17   Q.   And what would you expect the preschool
18 teacher to say about that topic to a 4-year-old?
19        MR. REAVES:  Objection.  Calls for
20 speculation.  Vague.
21   Q.   (BY MR. WHITEHAIR)  What would you, as a
22 parent, expect them to say to maintain compliance with
23 your Catholic upbringing and faith, your Catholic
24 faith?
25        MR. REAVES:  Same objection.  Go ahead.

Page 63

1    A.   I would expect that they would explain
2  our Catholic belief according to the catechism of the
3  Catholic Church and the Bible.
4    Q.   (BY MR. WHITEHAIR)  And what would you
5  hope they would say about that child's parents so that
6  your child understands the Catholic teaching?
7         MR. REAVES:  Again, objection.  Calls for
8  speculation about a hypothetical.
9         MR. WHITEHAIR:  I'm asking her to
10 speculate what she wants, not what somebody else
11 wants.
12   Q.   (BY MR. WHITEHAIR)  What do you want?
13 What do you want to have happen, Ms. Sheley?  A child
14 is confronted with the idea that his classmate's
15 parents are holding hands, of the same gender.  What
16 do you want your teacher to be teaching about that
17 family?
18        MR. REAVES:  Same objection.
19   A.   I would like my child to learn that
20 marriage and relationships are between a man and a
21 woman.
22   Q.   (BY MR. WHITEHAIR)  And what is the
23 lesson to be learned about people who don't follow
24 that?
25   A.   That they are not following our faith

Page 64

1  formation.
2    Q.   And what will become of them?
3    A.   That's not for us to decide.
4    Q.   Would he be allowed to sit by his friend,
5  after he got the lesson these people are not following
6  the doctrine of the Catholic faith?
7         MR. REAVES:  Objection.  Calls for
8  speculation.
9         MR. WHITEHAIR:  I'm asking her in her
10 life, what she would want.
11   A.   I would be fine if he wanted to make
12 friends.
13   Q.   (BY MR. WHITEHAIR)  But it would be
14 important that he be taught that his parents are not
15 following the faith?
16   A.   Correct.
17   Q.   What if one of your 4-year-old's
18 classmates wanted to try on an opposite sex outfit?
19 What do you want the teacher to see, say, and do when
20 that happens in the classroom?
21        MR. REAVES:  Objection.  Hypothetical.
22   A.   I would not want them to have a situation
23 where they're putting on different clothing at school.
24   Q.   (BY MR. WHITEHAIR)  What would you want
25 the teacher to see, say, and do?

Page 65

1         MR. REAVES:  Objection.  Hypothetical.
2    A.   I would not want them to be putting on
3  different clothing, in general.  They should just wear
4  the clothes that they wore there.
5    Q.   (BY MR. WHITEHAIR)  They're preschoolers.
6  They all have a change of clothes; right?
7    A.   Correct.
8    Q.   Can the change of clothes themselves be
9  run through in a day?
10   A.   You provide your own change of clothes
11 for your child.
12   Q.   And it turns out there's two blowouts.
13 And the next thing that's available is -- let's just
14 say it's unisex.  It's not clear if it's a boy or
15 girl.  Do you have any problem if that's what gets put
16 on until it gets you home?
17        MR. REAVES:  Objection.  Hypothetical.
18        But you can answer.
19   A.   I don't have a problem with that.
20   Q.   (BY MR. WHITEHAIR)  Okay.  I'm asking if
21 one of your children, for instance, let's say the
22 4-year-old, who just thought it would be interesting
23 to try on something else from the other side, right, a
24 girl's jumper.
25        What would you want the -- what would you

Lisa Sheley
December 01, 2023

Page 66

1   want the teacher to see, say, and do?
2        A.   I'm not sure.  I haven't been in that
3   situation.
4        Q.   Have you been in the preschool class for
5   your son?
6        A.   Yes.
7        Q.   I understand it's center staged or center
8   setting, something like that, that there's, like, an
9   open space in the center, is that right, with
10  stations --
11       A.   Yes.
12       Q.   I'm sorry.  I interrupted you.  With
13  stations on the outside?
14       A.   Yes.
15       Q.   And is one of the stations a make-believe
16  play station?
17       A.   It's possible.
18       Q.   You don't know?
19       A.   I don't know for certain.
20       Q.   Do you have any concerns, as a Catholic
21  parent wanting to ensure that your child is raised in
22  the Catholic faith, that they may experiment with
23  different things to put on?
24            MR. REAVES:  Objection.  Facts not in the
25  record.  Calls for speculation.

Page 67

1            You can answer.
2        A.   No.  I don't have any issues with that.
3        Q.   (BY MR. WHITEHAIR)  I've been asking you
4   questions about what you would like to have said or
5   what you would like the schoolteacher to say.
6            What is it that you're concerned that
7   your child might come away with if they're in a
8   classroom with a child whose parents are displaying or
9   conducting themselves in a gay marriage?
10           MR. REAVES:  Objection.  Misstates
11  testimony.
12       Q.   (BY MR. WHITEHAIR)  Go ahead.
13       A.   I don't think there's an issue that they
14  would come away with anything.
15       Q.   Is it your understanding that -- I'm
16  going to focus now -- come out of the classroom and
17  come into your coworker space -- that your coworkers
18  have also signed the contract that you signed; yes?
19       A.   Yes.
20       Q.   And that in that contract, one of the
21  expectations is to comply with and follow Catholic
22  teachings; yes?
23       A.   Yes.
24       Q.   And one of the Catholic teachings is not
25  to have any conduct or demonstrable behavior that is

Page 68

1   expressing attraction to a same-sex adult; is that
2   right?
3        A.   Correct.
4        Q.   And if there was hired at your work
5   someone who was expressing that and who wanted to join
6   you, what concerns do you have about working next to
7   somebody like that?
8            MR. REAVES:  Objection.  Hypothetical.
9        A.   I don't have concerns.  I don't know why
10  they would.
11       Q.   (BY MR. WHITEHAIR)  Have you, in the
12  previous jobs you've had, ever worked with anybody who
13  was gender diverse?
14       A.   No.
15       Q.   Have you worked with anybody who had a
16  minority sexual orientation?
17       A.   Not that I'm aware of.
18       Q.   So when you were at Foothills in the
19  sports department, did you work with any lesbians,
20  that you knew of?
21       A.   No.
22            MR. WHITEHAIR:  Give me a couple minutes.
23  Let's go off the record.
24            THE REPORTER:  Off the record.
25            (Recess from 3:19 p.m. to 3:20 p.m.)

Page 69

1            THE REPORTER:  Back on the record.
2            MR. WHITEHAIR:  Thank you for bringing us
3   back on the record.  Thank you for returning,
4   Ms. Sheley.
5            I believe Mr. Reaves has some questions
6   for you now.  I'm complete.
7            MR. REAVES:  Sorry.  Did we lose you for
8   a second?
9            MR. WHITEHAIR:  I said, I am complete.  I
10  believe Mr. Reaves may have some questions for you
11  now.
12            MR. REAVES:  Oh.  I'm sorry.  We must
13  have lost audio for a second.  Yeah.  I just have,
14  like, two or three quick questions.
15                    EXAMINATION
16  BY MR. REAVES:
17       Q.   One is going back to the discussion you
18  were having earlier with Greg.  We were talking about
19  tuition at St. Mary's.
20            When you're paying tuition, do you pay
21  one bill or do you pay a bill for each child
22  separately?
23       A.   One bill.
24       Q.   Do you recall generally, like, how much
25  you're paying each year for your kids at St. Mary's?

Lisa Sheley
December 01, 2023

Page 70

1    A.   It depends on the grade levels, but I
2  think this year was roughly 13,000.
3    Q.   And I guess within that, what are the
4  different deductions from the total bill that you see
5  on there?
6    A.   Yeah.  There's -- the youngest child is
7  the full price, and then the sibling discounts go up
8  from there.  So when you get to your fourth child,
9  that's a significant more discount, but they tend to
10  be older.  And then on the bill, there's deductions
11  for scholarships.
12    Q.   And do you remember or do you know, do
13  those scholarships apply to preschool or are they
14  primarily for the older kids?
15    A.   I believe they're only K through 8.
16    Q.   Other than the scholarships, is there any
17  other deductions that you receive?
18    A.   As an employee, I receive parish
19  assistance.
20    Q.   And do you know approximately how much
21  you receive for that?
22    A.   It was approximately a thousand dollars.
23    Q.   And then when we were talking earlier
24  about the nondiscrimination clause that Greg pulled up
25  on the screen, do you remember that?

Page 71

1    A.   Yes.
2    Q.   Listed on there was -- one of the
3  categories was religious affiliation.  And you had
4  said, you know, it's important not to discriminate on
5  the basis of religion.  Do you remember that?
6    A.   Yes.
7    Q.   You know, would you also say it's, you
8  know, fair and appropriate for a Catholic school like
9  St. Mary's to be able to prioritize Catholics when
10  they're admitting people to school?
11    A.   Yes.
12    MR. REAVES:  Yeah.  No further questions
13  here.
14    EXAMINATION
15  BY MR. WHITEHAIR:
16    Q.   Okay.  Just so I'm sure I understand, let
17  me talk about the tuition bill.  Are you saying that
18  your 2-year-old's tuition is the highest that you pay
19  or the 4-year-old's preschool tuition is the highest
20  bill you're paying?  You said the youngest.
21    A.   The 2-year-old is the youngest so his
22  would be the full price.
23    Q.   So full price for part-time 2-year-old.
24  Is that the most expensive tuition you then pay?
25  Everybody else is less than that?

Page 72

1    A.   No.  The most expensive is the 4-year-old
2  because he goes full-time.
3    Q.   Okay.  So then we take the 4-year-old,
4  and then each of your other two children now still in
5  school have a lesser number than that preschool
6  number?
7    A.   Yes.
8    Q.   Let me ask, on the nondiscrimination
9  clause question your counsel asked you, about whether
10  being able to prioritize Catholics was important in
11  what you were looking for in that exception for
12  nondiscrimination, in that light, are you aware that
13  there is what's called a congregation priority that
14  the school is allowed to exercise; they can interview
15  people and find out if they're in the congregation?
16    A.   Yes.
17    Q.   And based on your earlier description, do
18  you feel like the congregation is limited in any way
19  to, like, the parish, some other thing?
20    MR. REAVES:  Objection.  Calls for a
21  legal conclusion.  Objection to speculation.
22    A.   I didn't hear the part about the parish
23  anyway.
24    Q.   (BY MR. WHITEHAIR)  Yeah.  So
25  congregation is not necessarily defined as a parish.

Page 73

1  I can represent that to you, but maybe you know that,
2  that congregation is a term that's used in the
3  preference section of the contract to get State money.
4    A.   I'm not sure.
5    Q.   But you are aware that St. Mary's can
6  prioritize members of its parish for sure if they were
7  to take up the UPK money?
8    MR. REAVES:  Objection.  Sorry.
9  Objection.  Calls for a legal conclusion.
10    A.   Yes.
11    Q.   (BY MR. WHITEHAIR)  Are you aware of any
12  term that says Catholics are not allowed to
13  participate in the program?
14    A.   No.
15    Q.   And would this be true of LDS?  There's
16  not a specific prohibition against participation by
17  LDS or the Mormons?  Church of Jesus Christ of
18  Latter-Day Saints is the LDS reference.
19    So there's nothing in the statute that
20  would in any way discriminate or prohibit treatment or
21  participation by Mormons; right?
22    MR. REAVES:  Objection.  Calls for a
23  legal conclusion.  You can answer.
24    A.   No.
25    Q.   (BY MR. WHITEHAIR)  You certainly never

Lisa Sheley
December 01, 2023

Page 74

1  heard of such a thing, have you?
2      A.  No.
3      Q.  So one of the things that you brought as
4  a lawsuit is that you're suing the two state agency
5  reps on the basis that they have these preferences,
6  and one of the preferences, particular preference of
7  concern -- or one of the preferences of concern is the
8  congregation section.
9          So as the plaintiff in the lawsuit on the
10  congregation exception, what do you understand the
11  congregation to include?
12         MR. REAVES:  Greg, I'll let you ask one
13  or two more, but this is way beyond the scope of just
14  asking if they think they prioritize Catholics or not.
15  That was my only redirect on this point.
16         Now you're bringing in a new provision
17  that we didn't look at.  But I'll let her answer one
18  or two more, but this is beyond the scope.
19         MR. WHITEHEAD:  Well, let's see where
20  that goes.  I appreciate your making a record.
21      A.  I would say --
22      Q.  (BY MR. WHITEHAIR)  So what do you
23  understand -- you're a plaintiff.  It's your
24  complaint.  You signed it or at least allowed your
25  client -- your counsel to say that you cosigned it.

Page 75

1          What do you understand the congregation
2  preference to allow St. Mary's, if it chose to
3  participate, already in place to mean?
4          MR. REAVES:  Objection.  Calls for a
5  legal conclusion.
6      Q.  (BY MR. WHITEHAIR)  Let me say it again.
7  Let's just focus on this.
8          What do you understand the congregation
9  preference to mean that you're suing them on?
10      A.  The congregation would be the church, the
11  Catholic Church.
12         MR. WHITEHAIR:  I have no further
13  questions.
14         THE REPORTER:  Anything further, Nick?
15         MR. REAVES:  One second.
16         Nope.  We can go off the record.
17         THE REPORTER:  Before we go off the
18  record, Greg, would you like this transcribed, an
19  electronic transcript with miniscript and scanned
20  exhibits?
21         MR. WHITEHAIR:  I want all the cool
22  things Niki got.
23         THE REPORTER:  Perfect.  Rough draft for
24  you, then.
25         And then, Nick, did you want a copy of

Page 76

1  the transcript again?  Electronic with scanned
2  exhibits?
3          MR. REAVES:  Yes, please.
4          THE REPORTER:  And will you handle
5  signature with your client?
6          MR. REAVES:  Yes.
7          THE REPORTER:  Perfect.  And I'll wait to
8  hear from you if you need a rough draft.  We won't
9  provide that until I hear from you.
10         MR. REAVES:  Yeah.  We'll take the rough
11  on whatever the State is also ordering, but I don't
12  think we need it on any of the other ones.
13         THE REPORTER:  I'm sorry?
14         MR. REAVES:  We'll have what they're
15  having, is all I mean.
16         THE REPORTER:  Okay.  Off the record.
17         WHEREUPON, the within proceedings were
18  concluded at the approximate hour of 3:31 p.m. on the
19  1st day of December, 2023.
20         *      *      *      *      *

Page 77

1          I, LISA SHELEY, do hereby certify that I
2  have read the above and foregoing deposition and that
3  the same is a true and accurate transcription of my
4  testimony, except for attached amendments, if any.
5          Amendments attached  (  ) Yes   (  ) No

7                         LISA SHELEY

10        The signature above of LISA SHELEY was
11  subscribed and sworn to before me in the county of
12  _____, state of _____,
13  this _____ day of _____, 2023.

16                         Notary Public
                           My Commission expires:

25  LISA SHELEY 12/1/23 (lbk)

Lisa Sheley
December 01, 2023

Page 78

```
1              REPORTER'S CERTIFICATE
2  STATE OF COLORADO  )
                      ) ss.
3  COUNTY OF LARIMER  )
4         I, LISA B. KELLY, Registered Realtime
   Reporter, Registered Professional Reporter and Notary
5  Public ID 20194029689, State of Colorado, do hereby
   certify that previous to the commencement of the
6  examination, the said LISA SHELEY verbally declared
   her testimony in this matter is under penalty of
7  perjury; that the said deposition was taken in machine
   shorthand by me at the time and place aforesaid and
8  was thereafter reduced to typewritten form; that the
   foregoing is a true transcript of the questions asked,
9  testimony given, and proceedings had.
10        I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
11 herein, nor otherwise interested in the outcome of
   this litigation.
12
          IN WITNESS WHEREOF, I have affixed my
13 signature this 14th day of December, 2023.
14        My commission expires August 6, 2027.
15
16                _____
17                     Lisa B. Kelly
18
19 __x__  Reading and Signing was requested.
20 _____  Reading and Signing was waived.
21 _____  Reading and Signing is not required.
22
23
24
25
```

Page 79

```
1  Errata Sheet
2
3  NAME OF CASE: ST. MARY CATHOLIC PARISH IN LITTLETON vs LISA ROY
4  DATE OF DEPOSITION: 12/01/2023
5  NAME OF WITNESS: Lisa Sheley
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25                _____
```