ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/268135255

# Boundary Ambiguity in Gay Stepfamilies: Perspectives of Gay Biological Fathers and Their Same-Sex Partners

**Conference Paper** *in* Journal of Divorce & Remarriage · January 2014

DOI: 10.1080/10502556.2013.780501

CITATIONS
18

READS
786

**1 author:**

David Jenkins
The Ohio State University
**27** PUBLICATIONS   **509** CITATIONS

SEE PROFILE

All content following this page was uploaded by David Jenkins on 30 July 2015.

The user has requested enhancement of the downloaded file.

EXHIBIT
**23**

This article was downloaded by: [TCU Texas Christian University], [. David A. Jenkins]
On: 06 May 2013, At: 11:43
Publisher: Routledge
Informa Ltd Registered in England and Wales Registered Number: 1072954 Registered office: Mortimer House, 37-41 Mortimer Street, London W1T 3JH, UK



## Journal of Divorce & Remarriage

Publication details, including instructions for authors and subscription information:
http://www.tandfonline.com/loi/wjdr20

# Boundary Ambiguity in Gay Stepfamilies: Perspectives of Gay Biological Fathers and Their Same-Sex Partners

David A. Jenkins [a]

[a] Department of Social Work , Texas Christian University , Fort Worth , Texas , USA
Published online: 06 May 2013.

To cite this article: David A. Jenkins (2013): Boundary Ambiguity in Gay Stepfamilies: Perspectives of Gay Biological Fathers and Their Same-Sex Partners, Journal of Divorce & Remarriage, 54:4, 329-348

To link to this article:  http://dx.doi.org/10.1080/10502556.2013.780501

PLEASE SCROLL DOWN FOR ARTICLE

Full terms and conditions of use: http://www.tandfonline.com/page/terms-and-conditions

This article may be used for research, teaching, and private study purposes. Any substantial or systematic reproduction, redistribution, reselling, loan, sub-licensing, systematic supply, or distribution in any form to anyone is expressly forbidden.

The publisher does not give any warranty express or implied or make any representation that the contents will be complete or accurate or up to date. The accuracy of any instructions, formulae, and drug doses should be independently verified with primary sources. The publisher shall not be liable for any loss, actions, claims, proceedings, demand, or costs or damages whatsoever or howsoever caused arising directly or indirectly in connection with or arising out of the use of this material.

*Journal of Divorce & Remarriage*, 54:329–348, 2013
Copyright © Taylor & Francis Group, LLC
ISSN: 1050-2556 print/1540-4811 online
DOI: 10.1080/10502556.2013.780501



# Boundary Ambiguity in Gay Stepfamilies: Perspectives of Gay Biological Fathers and Their Same-Sex Partners

DAVID A. JENKINS

*Department of Social Work, Texas Christian University, Fort Worth, Texas, USA*

*Gay stepfamilies have their own unique stressors that impact the individual member's ability to form a family. Through in-depth interviews, gay biological fathers and their same-sex partners described their experiences in their stepfamilies. The conceptual framework of boundary ambiguity is used to frame the experiences of institutional and interpersonal stressors that influence these family members.*

*KEYWORDS    blended family, boundary ambiguity, gay, same-sex, stepfamily*

The creation of a stepfamily brings structural and psychological challenges to the members often not experienced in their previous family arrangement (Ganong & Coleman, 1987). A few of these challenges might include the reorganization of members into a new family unit, concerns about loyalty to previous family members, the relationship formed between children and the stepparent, and the struggles with who is included within the new family (Pryor, 2008; Stewart, 2007; Sweeney, 2010). Additionally, a common concern in a stepfamily is that the newly created reorganization of family members might upset the delicate balance of relationships between biological parents and their children (Moore, 2008; Visher & Visher, 1979).

One type of stepfamily that has not received a great deal of attention is the gay or lesbian stepfamily. In this family form, a gay parent brings a child into the new family from a previous relationship. Although some research has been done on gay and lesbian stepfamilies together (Baptiste, 1987a, 1987b;

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

The author would like to thank Berit Ingersoll-Dayton, PhD, for her extensive and thoughtful review of earlier versions of this article.

Address correspondence to David A. Jenkins, Department of Social Work, Texas Christian University, Fort Worth, TX 76129, USA. E-mail: d.jenkins@tcu.edu

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

Berger, 2000; Lynch, 2000, 2004a, 2004b; Robitaille & Saint-Jacques, 2009) and a modest amount of information is known specifically about lesbian stepfamilies (e.g., Erera & Fredriksen, 1999; Goldberg, 2009; Moore, 2008; Wright, 1998), little is known about stepfamilies headed by two gay men (e.g., Benson, Silverstein, & Auerbach, 2005; Crosbie-Burnett & Helmbrecht, 1993; Current-Juretschko & Bigner, 2005; van Eeden-Moorefield, Pasley, Crosbie-Burnett, & King, 2012).

There is a need to have greater understanding of the experiences in stepfamilies (e.g., Demo, Aquilino, & Fine, 2005), specifically of gay stepfamilies where the relationship is less than 5 years old. With this in mind, the purpose of this article is to examine the experiences of gay men in their newly formed stepfamilies from the perspective of the gay biological fathers and their same-sex partners.

## LITERATURE REVIEW

With the formation of a stepfamily, members often struggle to understand where they fit in the new family structure (Crosbie-Burnett & Giles-Sims, 1987; Giles-Sims & Crosbie-Burnett, 1989) as they outline responsibilities and obligations to one another (Brown & Manning, 2009). The addition of stepchildren to a family could add stressors for a newly coupled relationship (Hetherington & Kelly, 2002; White & Booth, 1985). It is not merely the presence of stepchildren, but it is the age of the children, residence of family members, and complexity of the structure of the stepfamily (one or both parents bringing children into the relationship) that impacts stepfamily relationship quality (Falke & Larson, 2007). Because stepfamily members often struggle with establishing these new family expectations and norms, Cherlin (1978) described stepfamilies as "incomplete institutions."

Given the struggles with roles and obligations in stepfamilies, it is no surprise that authors have linked stepfamilies with ambiguous family boundaries (Ahrons, 1979; Cherlin, 1978; Mahoney, 2006; Visher, Visher, & Pasley, 2003). Boss (2006) referred to boundary ambiguity as the effort of individuals to define who fits within the parameters of the family. Lacking clear guidelines for handling relationships, boundaries, and norms (Crosbie-Burnett & Pann, 2005), stepfamily members struggle with boundary ambiguity (Stewart, 2005). The presence of boundary ambiguity might result in family distress and dysfunction (Boss & Greenberg, 1984; Mu & Chang, 2010).

Whereas stepfamilies seem to have ambiguous boundaries, gay stepfamilies appear to have an even greater amount of difficulty in forming a clearly defined family unit for several reasons. First, the privileged status of heterosexual families over other family forms (Wright, 1998) might result in greater boundary ambiguity for gay families. Gay and lesbian families cope with laws and policies that regularly challenge their fitness as

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

parents (Latham, 2005; Parks, 1998), and stepfamilies have some of these same struggles. Second, they experience invisibility and marginalization in society (Berger, 1998, 2000; Turner, Scadden, & Harris, 1990). For example, although society grants traditions, formalities, and marital opportunities to heterosexual relationships, these same legal and social rituals are not completely available to gay couples (Benson et al., 2005). Third, they have great difficulty finding positive images of their families to share with their children (Lynch, 2004a, 2004b; Wright, 1998).

Given ambiguity is a key experience in stepfamilies (Mahoney, 2006; Visher et al., 2003), one could assume gay parents would experience similar concerns in their families. However, no research has verified this assumption. This article uses the framework of boundary ambiguity for understanding the experiences of gay male parents in their stepfamilies.

## CONCEPTUAL FRAMEWORK

The concept of boundary ambiguity has its origins in family stress theory and is a useful concept in studying family relationship changes across the life cycle (Boss, 1977, 1980). Boundary ambiguity focuses more on the psychological structure of the family than the physical structure (Boss, 2006) and is concerned with family members' perceptions of their current family situation (Boss, Greenberg, & Pearce-McCall, 1990; Roper & Jackson, 2007). Scholars have operationalized boundary ambiguity as any discrepancy among family members about who is included or in the family and who is excluded from or out of a family system (Brown & Manning, 2009; Pasley, 1987; Stewart, 2005).

A boundary ambiguity framework has been applied to many topics related to family stress and membership change (Berge & Holm, 2007; Carroll, Olson, & Buckmiller, 2007; McWey, Bolen, Lehan, & Bojczyk, 2009). Specific applications have been made to postdivorce or remarried families and stepfamilies (Pasley, 1987; Pearce-McCall, 1989; Stewart, 2005) and found that the uncertainty that exists about family membership generates conflict and stress that weakens family ties and leads to family dysfunction (Boss, 2004, 2007; Boss & Greenberg, 1984; Brown & Manning, 2009; Pasley & Ihinger-Tallman, 1989). The boundary ambiguity framework has not been applied to gay stepfamilies and has value for better understanding the events in the lives of these individuals.

Authors have proposed a typology of causes or situations that might lead to high boundary ambiguity (Carroll et al., 2007). The three main types of family changes and sources of boundary ambiguity include loss or separation, inclusion, and intrusion (Lee, 1995). Although these factors could be applied here, gay stepfamilies might have their own unique experiences with ambiguity. These experiences are explored in this article.

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

Researchers have called for greater understanding of the boundary ambiguity in stepfamilies (Carroll et al., 2007). However, until now, no research has considered boundary ambiguity in gay stepfamilies. Gay men in stepfamilies, experiencing both internal and external sources of stress, appear to experience conditions conducive to boundary ambiguity. Boundary ambiguity offers a helpful way to conceptualize what occurred among family members interviewed for this research.

## METHOD

### Design of the Study

I followed a phenomenological approach for this exploratory research. Scholars often use phenomenology research where little is known about a topic (Donalek, 2004; Giorgi & Giorgi, 2003) to offer greater understanding of the phenomenon (Gubrium & Holstein, 1993; Munhall, 2001; Radina, Hennon, & Gibbons, 2008). In this study, all participants were partners in a same-sex relationship. The interviews were conducted separately with both the gay biological father and the same-sex partner. To ensure coverage of the various aspects of gay stepfamilies, I designed and used a semistructured interview guide based on categories from the literature on stepfamilies and gay families (see Appendix for the interview guide). The semistructured interview format allowed the participants to elaborate about a broad range of information on their experience as a gay parent in a blended family. Minor modifications of the interview guide were made throughout the research project to ensure thoroughness of the interviews.

### Sampling and Recruitment of Participants

Two large metropolitan areas, one in the west and one in the southwest, served as sites for this project because of their large lesbian, gay, bisexual, and transgendered (LGBT) communities. One of these locations was available and familiar to the researcher. Participants were selected using purposive sampling and snowball techniques. These sampling techniques are often advisable considering the difficulty of locating subgroups within a sexual minority population (LaSala, 2002; Meezan & Martin, 2003).

The purposive sampling criteria were as follows: (a) the gay biological parent became a father during a previous heterosexual relationship, (b) the gay biological parent lived with a same-sex partner, (c) the partners formed the gay relationship within the last 5 years, (d) the gay biological parent was a noncustodial parent of the children, and (e) at least one child from the previous heterosexual relationship was under the age of 18 and considered a dependent when the same-sex relationship was formed. Recruitment strategies for participants included e-mail announcements to gay and gay parent

groups in the metropolitan areas, advertisements in the bulletins of large gay-affirming churches, individuals known by the author to be gay parents, and recommendations from research participants.

Eighteen individuals were interviewed for this project. Most of the participants were in their 40s, with ages ranging from 32 to 50. One participant identified as Hispanic and the remainder identified as Caucasian. The majority of the participants had completed some college, with several completing postgraduate work. The majority of the parents and stepparents claimed a Christian religious affiliation.

All of the biological fathers in this study ($n = 9$) had a previous heterosexual marriage and all of their children were from this earlier relationship. All of the fathers were considered to be the noncustodial parents of their children. All of the stepfathers ($n = 9$) had no previous heterosexual marriage and no children. One stepfather had recently donated sperm to a lesbian couple who conceived and were raising the child without his participation as a parent. Study participants had lived with their current partner at the start of this project between 1.5 and 5 years, with a mean of 3 years.

A total of 23 children resulted from the biological father's previous heterosexual marriages and their ages ranged from 2 to 21. Of the 23 children, 22 were dependent aged when the stepfamily was formed. One family had both a dependent child and a child who was older and living independently. All of the 22 dependent children continued some type of relationship with their biological father. Three of the dependent children (14%) refused to meet or have any type of relationship with their father's partner. Of the 22 dependent children, 10 (45%) lived a portion of their time in the home of their father and his same-sex partner. These 10 children had lived part-time in their father's home for the past 1 to 5 years. The majority of the fathers lived in the general area of their children and had visitation schedules that allowed them access to their children about every other weekend.

## Data Collection

Each participant was first contacted by phone or e-mail to set up the interview. During the first meeting, each participant was given a brief explanation of the purpose of the interview and consent forms were signed. Interviews were completed separately with the biological parent and the stepparent in either their home or an agreed on location. Initial and follow-up interviews lasted from 45 min to 2 hr with the vast majority of interviews lasting approximately 1.5 hr.

## Data Analysis

The researcher conducted and audio-recorded each interview, had them transcribed, and checked each transcript for accuracy. Memos were written

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

throughout the interview process that catalogued participants' description of their experiences. Following accepted research qualitative guidelines (Miles & Huberman, 1994; Wertz, 2005), the researcher immersed himself in the data by reading through the transcripts multiple times and formed initial impressions of the data. The data were carefully analyzed and related back to the whole (Wilding & Whiteford, 2005) until insights and meaning were gleaned (Kleiman, 2004). The researcher dwelled with the data until salient categories emerged.

## Enhancement of Rigor and Trustworthiness

I took multiple steps to strengthen the rigor and trustworthiness of the results. As suggested by numerous authors (Creswell, 2007; Lietz, Langer, & Furman, 2006; Padgett, Mathew, & Conte, 2004), the researcher began the project by bracketing and setting aside bias, subjectivity, and previous ways of thinking. As a gay father, I did not want to allow any of my experiences to impact the findings for this project. Coming out of my own experiences, I started this project after meeting a few other gay men who discussed their efforts of bringing their children and partner together into their new family.

I used peer debriefing with several different colleagues to discuss reactions to interviews and to help with the analysis of the data. Through the debriefing process, any discrepancies about coding and themes were resolved through consensus. I also integrated an audit trail, triangulation, and member checking in the project (Anastas, 2004; Padgett, 1998). Triangulation was established by interviewing both the father and stepfather of the stepfamily relationship and member checking involved making multiple contacts with participants to verify the findings fit with their experiences.

## RESULTS

The data analysis resulted in two main themes: (a) defining family, and (b) encountering obstructions. These themes and their subthemes are discussed next.

## Defining Family

The parents in this study were asked to describe who was in their family. Whereas some of them quickly and seemingly easily gave an answer, several of them paused and struggled to clarify their answers. This hesitation suggested that they might not have clearly defined the topic of family membership. Two distinct family membership patterns emerged from their discussion of family membership: (a) family that includes partner and children, and (b) two separate families.

Downloaded by [TCU Texas Christian University], [. David A. Jenkins]. at 11:43 06 May 2013

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

### FAMILY THAT INCLUDES PARTNER AND CHILDREN

Biological fathers and stepfathers generally reported that their family consists of their partner and children. The parents reported their family members experienced the difficulties of blending together, but they felt they were now a family. Overcoming any ambiguity of membership, the parents felt some success and pride in the families they had created. One father with three children and the longest relationship in the study stated his views of his family by adding:

> It's beyond my wildest dreams. I just wanted them to not be uncomfortable. We sit down for dinner and the kids say it's a family dinner. I tried not to force the relationship with [the stepfather] on them, but the kids seem to see it as equal to a traditional family relationship.

Other parents, although clear who was in their family, discussed more of a struggle to bring the various individuals together as a family. The fathers described their frustration and impatience with how the family did not easily come together as one unit. As one father with four children summed up his experience, "It's been a struggle. It is no more challenging than a male/female stepfamily . . . . It's just a relationship. It's not that it's gay or straight."

### TWO SEPARATE FAMILIES

Other biological fathers and stepfathers had difficulty defining who was really "in" or "not in" their family. These parents reported the biological father felt close to the children before his divorce. However, they acknowledged the children were not accepting of the idea that their father was gay and in a same-sex relationship. Furthermore, the children did not welcome the stepparent into the family. This lack of closeness and interaction results in the parents' reporting they actually had two separate families. One family configuration included only the biological father and his partner. The other configuration included only the biological father with his children.

One father who had really struggled to establish a relationship between his partner and his son described the phenomenon in this manner: "There are two totally separate relationships that I have: one with my partner and one with my child. I am not happy with my family . . . . I love my son, but I am frustrated." A father of two adolescent girls summed up his frustration by stating, "It is sort of like it is two families: one with the girls and one when we don't have them." One stepfather acknowledged his own definition of family by stating, "I would not include his kids. We don't have much time with his kids. There isn't much time together."

Downloaded by [TCU Texas Christian University], [. David A. Jenkins]. [. David A. Jenkins] at 11:43 06 May 2013

## Encountering Obstructions

The men in this study describe their lives as having obstacles that added to the difficulties they were experiencing in bringing together their blended families. Although these obstacles are described as obstacles by the research participants, they can also be seen as factors contributing to boundary ambiguity. Heterosexism, the belief that heterosexuality is the only natural, normal, or acceptable sexual orientation, is an overarching contributing factor to boundary ambiguity in these families. This factor, reported in all of these families, is common to all of the obstacles listed here. In addition to heterosexism, the major obstacles included legal hurdles, religious beliefs, and ex-spouse and child interference.

### LEGAL HURDLES

One obstacle for these families comes from legal institutions that imply that gay men are unfit to parent their children. Legal institutions frequently couch these messages in custody and visitation decisions that limit the time a partner could spend with the father when children were present. These legal decisions force the partner, or stepparent, to not stay overnight in the home when the children were there. The court bases these decisions on the definition of the term *nonrelative,* worded in the custody document to exclude anyone without a legal relationship to the children from staying overnight when kids were home.

Because of the inability of the gay parents to have a legal marriage recognized by their state and federal government, the partner would always remain a nonrelative in the eyes of the courts and legal system. This wording of the custody and visitation decision legally excludes the gay stepparent as a member of the family. One father, a former pastor whose children live in another area with their mother, summed up this difficulty by stating:

> It's me and the kids without my partner about one weekend a month . . . . We do get to spend time with my partner, but he has to leave in the evenings because of a clause in the divorce papers. It states that no nonrelatives may stay overnight when I have the kids.

A stepfather discussed his frustration about the legal decision when he stated, "I'm really frustrated at times. Why should I have to leave my home?" This lack of time and interaction adds to the stress and strain experienced in their family.

An additional hurdle created by the lack of legal recognition for such families is that the stepparent or coparent never officially receives a title similar to those found in heterosexual remarriages. For example, a divorced heterosexual mother could remarry and her male spouse instantly receives the officially sanctioned title "stepparent" to the children. For many in these

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

gay families, the stepparent never formally receives any title from those in their various communities. Furthermore, the parents and the children in these families might struggle with what to call the new stepparent. As one stepparent related, "There's not even a name for what I am in this family . . . . I'd like to be a stepfather, but that's difficult to explain." Another stepfather added, "I have a role with no title. No one knows what to call me." Without a title, the partner might be overlooked as a member of the family.

## Religious beliefs

A common difficulty the fathers and stepfathers discuss in bringing their family together is the impact of religious beliefs on their family relationships. Many of the biological fathers reported their relationship with their children became more ambiguous and strained after they disclosed their sexual orientation to the children. They reported the relationship became even worse after they had a partner. According to the fathers, the strain in their relationship with the children was partly a result of teachings in religious institutions the children were hearing that being gay was not natural and was sinful or bad.

Many of these same biological fathers had once worshipped with their children as part of a heterosexual family at these same religious institutions that sent the message that it was not possible to be a believer in their faith and be gay. Although these fathers no longer worshipped in these particular religious organizations after coming out, the children's other biological parent, the mother, often continued to worship at these same churches and taught the children these same beliefs. The children received a message vastly different from what the gay parent might want them to hear about being gay or living in a same-sex relationship.

One father shared a particularly painful message his child had learned through the church his family used to attend together. As this father acknowledged, "[Child's name] has even gone so far as to state 'I'm going to rejoice when I'm in heaven and you're in hell.' How can I have a relationship with my child with that going on?" This father went on to reveal that his children no longer stay with him, will not meet his partner, and do not like that he wears a ring from his partner. He can only see his children without his partner being present. The harmful messages from religious institutions add another aspect of stress and ambiguity to the context of these families.

## Ex-spouse and child interference

Parents reported strain on their stepfamilies that originates in the poor or nonexistent coparenting relationships the fathers have with the mother of the children. Study participants described how the biological mother attempts to disrupt or prevent interaction between the biological father and his children.

Case No. 1:23-cv-02079-JLK   Document 77-26   filed 12/18/23   USDC Colorado   pg 12 of 22

As one stepfather reported, "[Partner's son] is not part of our immediate family because he has chosen or was influenced by his mother to not participate in our family." He went on to describe that the mother encourages beliefs that a same-sex relationship is a bad influence for the child.

Some mothers also hinder any relationship between the children and the gay stepparent. As one stepfather reported, "In the beginning the kids didn't want me around. This was a result of how their mother portrayed [the children's father] as a sinner." This ill will of the mother fosters a strained relationship between the children and the gay parents.

Beyond the mother as an obstacle to unity in these gay stepfamilies, some parents reported that their children do not accept the gay parent's sexuality or partner relationship. As one father stated, "[My child] has never come inside this house. I have to meet [my child] at another location if I want to have a visit." Another father summed up this problem when he stated:

> I wish the girls were more willing to spend the night with us. They don't stay with us and we don't wake up in the same house . . . . They are probably not happy they have a gay dad. They like me and are OK but are not happy with who their dad is.

The parents described living in fear of having their child decide to no longer want to be a part of their life because of the father's sexuality. Fathers and stepfathers worry the kids will stop coming over if the parents demand respect or acceptance of their same-sex relationship. Therefore, some of the fathers altered their regular interaction with their child to keep a relationship. The fathers no longer believed they could be a parent in the same manner as had been done before coming out. A father of two children who had been highly respected in his conservative religious group stated, "I used to have a very close relationship with my kids. I was involved in all areas of their lives. Now, I worry about losing my relationship with them because I am gay." A parent with an adolescent child elaborated this point by stating:

> [My partner] and my son are both in my family. However, it's really nebulous that my son is in this family because he won't see me with my partner and when he does see me, I can't discuss any gay topics.

Some of the parents discussed their struggle with showing any type of appropriate level of affection for their partner in front of the children. Parents reported being concerned about negatively impacting the children or facing some sort of consequence from the ex-spouse or children if they showed affection in public. As one stepfather reported about his partner:

> He tries to show me affection when it's not obvious to the kids. When no one else is around, he'll hold my hand or kiss me. I know that happens

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

Downloaded by [TCU Texas Christian University], [. David A. Jenkins]. [. David A. Jenkins] at 11:43 06 May 2013

in gay relationships, but in my home, I wish that I would not have to be concerned with it.

Because the father and stepfather believed they cannot show any type of affection in front of others, they acted as if they were not a couple, but just friends. The lack of respect and acceptance of the same-sex relationship contributes to stress and ambiguity in the family relationships.

## DISCUSSION

The following discussion outlines how boundary ambiguity contributes to family difficulties and leads to disharmony in gay stepfamilies. Some of the aspects described by the parents, more common to all stepfamilies, are not elaborated here. The issues highlighted are more salient in gay stepfamilies and add to our understanding of boundary ambiguity. Based on this research, there are two types of factors contributing to boundary ambiguity in gay stepfamilies: institutional and interpersonal.

### Institutional Factors

Institutional factors include heterosexism, legal decisions, and beliefs and practices encouraged in religious institutions. These particular institutional factors set these families apart from other stepfamilies and leave them lacking in the cultural and legal supports of other family forms (Sweeney, 2010). These gay stepfamilies discussed experiencing heterosexism at a pervasive level. Although researchers report gays and lesbians exhibit parenting styles and outcomes similar to their heterosexual counterparts (Bigner, 2000, 2006; Patterson, 2006; Tasker, 2005), these men have struggled to overcome messages that a heterosexual relationship is the only natural or a healthy environment in which to raise a family. Laws, court decisions, and the values of many religious institutions regularly reinforce heterosexist beliefs and practices (Latham, 2005; Parks, 1998).

All families have stressors, but gay stepfamilies have stressors found in few types of families (Barker, Herdt, & deVries, 2006; Franklin, 2003; Lynch, 2004a). Although laws are changing in some areas, the inability of gay families to have legalized federal marriage is one aspect of unequal treatment of gays and lesbians by society (Jenkins, Walker, Cohen, & Curry, 2010; Johnston & Jenkins, 2004; Wolfson, 2009). Court decisions and visitation guidelines are based on a legal definition of family that does not regularly include same-sex partners. Therefore, courts treat gay biological fathers and their partners as a "friend" or "paramour" and have limits set on their interaction with the children. Because the gay couple is not allowed a federally recognized and legalized marriage, they will remain nonrelatives by some

Downloaded by [TCU Texas Christian University], [. David A. Jenkins], [. at 11:43 06 May 2013

definitions. In so doing, the legal system contributes to boundary ambiguity that could result in further stress for these families.

Most visitation restrictions placed on the gay parent and partner are based on decisions, beliefs, and practices that do not allow or affirm gay relationships as healthy or normal (Cahill, 2005). Because of these difficult visitation guidelines, members of gay stepfamilies might have to work much harder to reach a favorable parent–child and stepfather/coparent–child relationship. The resulting splitting of the residence of the gay couple when the children are present can cause additional strain on the family relationships and create tension and ambiguity in the household.

With this custody and visitation arrangement, the gay stepparent or coparent finds another place to stay and ways to occupy his time while the biological parent spends time with the children. This situation can also cause the coparent to be regularly absent and make it more difficult for that parent to form an attachment or bond with the children. This lack of time spent between the children and stepparent could cause additional strain on the couple relationship. For example, it might appear to the coparent that the children are the reason he has to leave his home and cannot stay with his partner. This perception might take the focus off a source of strain that appears to originate from the heterosexism inherent in the political, civil, and religious systems that fail to honor and support gay parents (LaSala, 2000; Latham, 2005; Mallon, 1998; Parks, 1998; Schwartz, 2012; van Eeden-Moorefield et al., 2012). Ultimately, the members of these gay stepfamilies have to work harder to overcome boundary ambiguity.

With the limited time allowed for contact between the gay parents and their children, the noncustodial fathers might struggle to move beyond the recreational or "Disneyland Dad" role discussed by Stewart (1999a, 1999b). In this particular role of parent, the father cannot be involved in the regular, more mundane, activities of the child and foster a more involved relationship (Kelly & Lamb, 2000). Research shows that overnight stays could foster a form of parenting that differs from daytime-only contact (Cashmore, Parkinson, & Taylor, 2008). As written in some of these parents' visitation guidelines, the stepparent might never have the opportunity to stay overnight with the entire family, thus contributing to the ambiguity in these families.

## Interpersonal Factors

Interpersonal factors include the relationship of the gay parent with his ex-spouse and children. Concerns about an ex-spouse are not a new topic in postdivorce parent–child relationships (e.g., see Falke & Larson, 2007). What is unique here is the support the ex-spouse receives from many segments of society for interfering with the relationship of the child and gay stepfamily. For example, peers and members of religious institutions might encourage an ex-spouse for limiting a child's contact with his or her gay parent and his same-sex partner due to the sexuality of the gay parent.

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

In this study, parents were well aware of and pained by the children's struggle with identifying as a part of a gay family. Beyond the common stepfamily struggles of "loyalty" to one household over another (Wallerstein & Kelly, 1980), the children in these gay stepfamilies encounter additional "loyalty" concerns resulting from the messages they have internalized. Here, children might have difficulty feeling loyal to a part of their family that their heterosexual parent, the church, and society do not support. Heterosexism has encouraged the child to feel embarrassed or ashamed that he or she is part of a gay family and this is something he or she would not feel proud to share with friends or a peer group (Ray & Gregory, 2001; Robitaille & Saint-Jacques, 2009).

As discussed earlier, custody and visitation decisions for gay fathers could limit the time spent between family members and set additional boundaries on the entire gay stepfamily spending time together as a unit. Gay fathers might accept reduced or restricted visitation arrangements with their children out of fear of possibly losing all contact with their children if they have to go to court (Johnston & Jenkins, 2004) or decide to push the child to accept the same sex-relationship. Some children will attempt to force the gay father to keep his relationship with his partner separate from their parent–child relationship or risk losing all contact between father and child. Here, the child will only see the father if the partner is not around or even discussed. If the father agrees to this conditional approval, he has to maintain some form of boundary between the child and stepfather. His agreement to restricted contact allows a continued, yet limited, connection to the children, but also adds to the boundary ambiguity in the stepfamily.

This decision by the father to keep a relationship with the child comes at the possible expense of respecting and valuing his relationship with his partner. The gay father might have to make a form of impossible choice as he wrestles with setting aside the needs of the partner and the partner relationship to keep some kind of connection to the children. As expected, this choice can cause a tremendous strain on the partner relationship and encourage boundary ambiguity in this family.

## LIMITATIONS OF THE STUDY

Although this research helped shed light on the experience of parents in gay stepfamilies, the design of the study has limitations that future research should address. A major obstacle of conducting research about minority populations is locating them. The researcher selected participants from two large metropolitan areas (both lacking civil unions and marriage for gay couples) and the sample lacked diversity in terms of race, education level, and religious affiliation. However, future work can investigate the different experiences of populations from these various groups and in locations that offer a more supportive environment for gay couples.

Case No. 1:23-cv-02079-JLK   Document 77-26   filed 12/18/23   USDC Colorado   pg 16 of 22

A second limitation of this study is the wide variation in stages of family development. That is, the children who lived with the gay partners ranged in age from 2 to 17. These age differences could be significant in how children respond to the coming out of their father and how the stepfamily integrates. Researchers should examine experiences of gay stepfamilies vis-à-vis family life stages.

A final limitation of this study is that the voice of the child is absent. Future work would benefit from hearing the perspectives of these other members of the gay stepfamily. As Bozett (1989) states, gay stepfamilies are diverse and worthy of further research and understanding.

## CONCLUSIONS

Gay stepfamilies encounter challenges that are uncommon in other family forms. This study examines how gay biological parents and their partners are in a fairly unique position as they seek to form a stepfamily. They face the multitude of concerns that come from being in a stepfamily and the heterosexism and additional burdens of unsupportive legal, societal, and religious institutions. These gay parents live with ties to a heterosexual past (children, relationship with ex-spouse) while engaged in the present with a same-sex stepfamily relationship. Balancing these responsibilities can be a difficult and stressful task.

Gay stepfamily members face multiple sources of boundary ambiguity as they attempt to function as one unit. Some gay families are able to overcome these obstacles and form a cohesive family unit with boundary clarity. Others struggle and end up creating two separate families to manage the boundary ambiguity in their family.

Gay stepfamilies experience two main types of factors that contribute to boundary ambiguity. The first is institutional ambiguity factors that include heterosexism, legal decisions, and beliefs and practices in religious institutions. The second is interpersonal ambiguity factors surrounding the relationship of the gay parents with the ex-spouse and children. The combination of these factors puts huge strains on gay stepfamilies. Even with these strains, gay stepfamilies have many strengths. Hopefully, future research will examine the factors that help gay stepfamilies to manage boundary ambiguity and to thrive.

## REFERENCES

Ahrons, C. R. (1979). The binuclear family: Two households, one family. *Alternative Lifestyles*, *2*, 499–515.

Downloaded by [TCU Texas Christian University], [. David A. Jenkins]. [. David A. Jenkins] at 11:43 06 May 2013

Case No. 1:23-cv-02079-JLK   Document 77-26   filed 12/18/23   USDC Colorado   pg 17 of 22

Anastas, J. (2004). Quality in qualitative evaluation: Issues and possible answers. *Research on Social Work Practice*, *14*(1), 57–65.

Baptiste, D. (1987a). The gay and lesbian stepparent family. In F. Bozett (Ed.), *Gay and lesbian parents* (pp. 112–137). New York, NY: Praeger.

Baptiste, D. (1987b). Psychotherapy with gay/lesbian couples and their children in "stepfamilies": A challenge for marriage and family therapists. *Journal of Homosexuality*, *14*, 223–238.

Barker, J. C., Herdt, G., & deVries, B. (2006). Social support in the lives of lesbians and gay men at midlife and later. *Sexuality Research & Social Policy*, *3*(2), 1–23.

Benson, A. L., Silverstein, L. B., & Auerbach, C. F. (2005). From the margins to the center: Gay fathers reconstruct the fathering role. *Journal of GLBT Family Studies*, *1*(3), 1–30.

Berge, J. M., & Holm, K. E. (2007). Boundary ambiguity in parents with chronically ill children: Integrating theory and research. *Family Relations*, *56*, 123–134.

Berger, R. (1998). The experience and issues of gay stepfamilies. *Journal of Divorce & Remarriage*, *29*(3–4), 93–102.

Berger, R. (2000). Gay stepfamilies: A triple-stigmatized group. *Families in Society: The Journal of Contemporary Human Services*, *81*, 504–516.

Bigner, J. (2000). Gay and lesbian families. In W. Nichols, M. Pace-Nichols, D. Becvar, & A. Napier (Eds.), *Handbook of family development and intervention* (pp. 279–298). New York, NY: Wiley.

Bigner, J. (2006). *Parent–child relations: An introduction to parenting* (7th ed.). Upper Saddle River, NJ: Prentice Hall.

Boss, P. (1977). A clarification of the concept of psychological father presence in families experiencing ambiguity of boundary. *Journal of Marriage and Family*, *39*, 141–151.

Boss, P. (1980). Normative family stress: Family boundary changes across the life span. *Family Relations*, *29*, 445–450.

Boss, P. (2004). Ambiguous loss research, theory, and practice: Reflections after 9/11. *Journal of Marriage and Family*, *66*, 551–566. doi:10.1111/j.0022-2445.2004.00037.x

Boss, P. (2006). *Loss, trauma, and resilience: Therapeutic work with ambiguous loss*. New York, NY: Norton.

Boss, P. (2007). Ambiguous loss theory: Challenges for scholars and practitioners. *Family Relations*, *56*, 105–111. doi:10.1111/j.1741-3729.2007.00444.x

Boss, P., & Greenberg, J. (1984). Family boundary ambiguity: A new variable in family stress theory. *Family Process*, *23*, 535–546. doi:10.1111/j.1545-5300.1984.00535.x

Boss, P., Greenberg, J., & Pearce-McCall, D. (1990). *Measurement of boundary ambiguity in families*. Station Bulletin (593–1990). Minneapolis, MN: University of Minnesota, Agricultural Experiment Station.

Bozett, F. (1989). Gay fathers. In F. Bozett (Ed.), *Gay and lesbian parents* (pp. 3–22). New York, NY: Praeger.

Brown, S. L., & Manning, W. D. (2009). Family boundary ambiguity and the measurement of family structure: The significance of cohabitation. *Demography*, *46*(1), 85–101. doi:10.1353/dem.0.0043

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

Case No. 1:23-cv-02079-JLK   Document 77-26   filed 12/18/23   USDC Colorado   pg 18 of 22

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

Cahill, S. (2005). The disproportionate impact of antigay family policies on Black and Latino same-sex couple households. *Journal of African American Studies*, *13*, 219–250. doi:10.1007/s12111-008-9060-7

Carroll, J. S., Olson, C. D., & Buckmiller, N. (2007). Family boundary ambiguity: A 30-year review of theory, research, and measurement. *Family Relations*, *56*, 210–230. doi:10.1111/j.1741-3729.2007.00453.x

Cashmore, J., Parkinson, P., & Taylor, A. (2008). Overnight stays and children's relationships with resident and nonresident parents after divorce. *Journal of Family Issues*, *29*, 707–733. doi:10.1177/0192513X07308042

Cherlin, A. J. (1978). Remarriage as an incomplete institution. *American Journal of Sociology*, *84*, 634–650.

Creswell, J. (2007). *Qualitative inquiry and research design: Choosing among five approaches* (2nd ed.). Thousand Oaks, CA: Sage.

Crosbie-Burnett, M., & Giles-Sims, J. (1987). Marital power in stepfather families. *Journal of Family Psychology*, *43*, 394–399.

Crosbie-Burnett, M., & Helmbrecht, L. (1993). A descriptive empirical study of gay male stepfamilies. *Family Relations*, *42*, 256–262.

Crosbie-Burnett, M., & Pann, K. M. (2005). Remarriage and recoupling: A stress perspective. In P. McKenry & S. Price (Eds.), *Families and change: Coping with stressful events and transitions* (3rd ed., pp. 253–284). Thousand Oaks, CA: Sage.

Current-Juretschko, L., & Bigner, J. (2005). An exploratory investigation of gay stepfathers' perceptions of their role. *Journal of GLBT Family Studies*, *1*(4), 1–20. doi: http://dx.doi.org/10.1300/J461v01n04_01

Demo, D., Aquilino, W., & Fine, M. (2005). Family composition and family transitions. In V. L. Bengtson, K. Allen, A. Acock, P. Dilworth-Anderson, & D. Klein (Eds.), *Sourcebook on family theory and research* (pp. 119–142). Thousand Oaks, CA: Sage.

Donalek, J. G. (2004). Phenomenology as a qualitative research method. *Urologic Nursing*, *24*, 516–517.

Erera, P. I., & Fredriksen, K. I. (1999). Lesbian stepfamilies: A unique family structure. *Families in Society: The Journal of Contemporary Human Services*, *80*, 263–270. doi:10.1606/1044-3894.680

Falke, S. I., & Larson, J. H. (2007). Premarital predictors of remarital quality: Implications for clinicians. *Contemporary Family Therapy*, *29*(1–2), 9–23 doi:10.1007/s10591-007-9024-4

Franklin, K. (2003). Practice opportunities with an emerging family form: The planned lesbian and gay family. *Journal of Forensic Psychology Practice*, *3*(3), 47–64. doi:10.1300/j158v03n03_03

Ganong, L., & Coleman, M. (1987). Effects of parental remarriage on children: An updated comparison of theories, methods, and findings from clinical and empirical research. In K. Pasley & M. Ihinger-Tallman (Eds.), *Remarriage and stepparenting: Current research and theory* (pp. 94–140). New York, NY: Guilford.

Giles-Sims, J., & Crosbie-Burnett, M. (1989). Adolescent power in stepfather families: A test of normative-resource theory. *Journal of Marriage and the Family*, *51*, 1065–1078.

Giorgi, A., & Giorgi, B. (2003). Phenomenology. In J. A. Smith (Ed.), *Qualitative psychology: A practical guide to research methods* (pp. 25–50). Thousand Oaks, CA: Sage.

Case No. 1:23-cv-02079-JLK   Document 77-26   filed 12/18/23   USDC Colorado   pg 19 of 22

Goldberg, A. (2009). Lesbian parents and their families: Complexity and intersectionality from a feminist perspective. In S. Lloyd, A. Few, & K. Allen (Eds.), *Handbook of feminist family studies* (pp. 108–120). Thousand Oaks, CA: Sage.

Gubrium, J. F., & Holstein, J. A. (1993). Phenomenology, ethnomethodology, and family discourse. In P. G. Boss, W. J. Doherty, R. LaRossa, W. R. Schumm, & S. K. Steinmetz (Eds.), *Sourcebook of family theories and methods: A contextual approach* (pp. 651–672). New York, NY: Plenum.

Hetherington, E. M., & Kelly, J. (2002). *For better or for worse: Divorce reconsidered*. New York, NY: Norton.

Jenkins, D., Walker, C., Cohen, H., & Curry, L. (2010). A lesbian older adult managing identity disclosure: A case study. *Journal of Gerontological Social Work*, *53*, 402–420. doi:10.1080/D1634372.2010.488280

Johnston, L., & Jenkins, D. (2004). Coming out in mid-adulthood: Building a new identity. *Journal of Gay and Lesbian Social Services*, *16*(2), 19–42. doi:10.1300/J041v16n02-02

Kelly, J. B., & Lamb, M. E. (2000). Using child development research to make appropriate custody and access decisions. *Family and Conciliation Courts Review*, *38*, 297–311. doi:10.1111/j.174-1617.2000tb00577.x

Kleiman, S. (2004). Phenomenology: To wonder and search for meanings. *Nurse Researcher*, *11*(4), 7–19.

LaSala, M. C. (2000). Gay male couples: The importance of coming out and being out to parents. *Journal of Homosexuality*, *39*, 47–71. doi:10.1300/J082v39n02_03

LaSala, M. C. (2002). Walls and bridges: How couples, gay men, and lesbians manage their intergenerational relationships. *Journal of Marital and Family Therapy*, *28*, 327–339. doi:10.1111/j1752-0606.2002.tb01190.x

Latham, H. (2005). Desperately clinging to the Cleavers: What family law courts are doing about homosexual parents, and what some are refusing to see. *Law & Psychology Review*, *29*, 223–242.

Lee, C. (1995*)*. Rethinking boundary ambiguity from an ecological perspective: Stress in Protestant clergy families. *Family Process*, *34*(1), 75–86. doi:10.1111/j1545-5300.1995.00075.x

Lietz, C. A., Langer, C. L., & Furman, R. (2006). Establishing trustworthiness in qualitative research in social work: Implications from a study regarding spirituality. *Qualitative Social Work*, *5*, 441–458. doi:10.1177/1473325006070288

Lynch, J. M. (2000). Considerations of family structure and gender composition: The lesbian and gay stepfamily. *Journal of Homosexuality*, *40*(2), 81–95. doi:10.1300/J082v40n02_06

Lynch, J. M. (2004a). Becoming a stepparent in gay/lesbian stepfamilies: Integrating identities. *Journal of Homosexuality*, *48*(2), 45–60. doi:10.1300/J08248n02_03

Lynch, J. M. (2004b). The identity transformation of biological parents in lesbian/gay stepfamilies. *Journal of Homosexuality*, *47*(2), 91–107. doi:10.1300/J082v47n02_06

Mahoney, M. M. (2006). Stepparents as third parties in relation to their stepchildren. *Family Law Quarterly*, *40*, 81–108.

Mallon, G. (1998). Social work practice with gay men and lesbians within families. In G. P. Mallon (Ed.), *Foundations of social work practice with lesbian and gay persons* (pp. 145–181). Binghamton, NY: Harrington Park Press.

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

McWey, L. M., Bolen, M., Lehan, T., & Bojczyk, K. E. (2009). I thought I was the adult in this house: Boundary ambiguity for parents involved in the foster care system. *Journal of Social Service Research*, *35*(1), 77–91. doi:10.1080/01488370802477493

Meezan, W., & Martin, J. (2003). Exploring current themes in research on gay, lesbian, bisexual and transgender populations. *Journal of Gay and Lesbian Social Services*, *15*(1–2), 14. doi:10.1300/J041v15n01_01

Miles, M. B., & Huberman, A. M. (1994). *Qualitative data analysis: An expanded sourcebook* (2nd ed.). Newbury Park, CA: Sage.

Moore, M. R. (2008). Gendered power relations among women: A study of household decision making in Black, lesbian stepfamilies. *American Sociological Review*, *73*, 335–356. doi:10.1177/000312240807300208

Mu, P.-F., & Chang, K.-P. (2010). The effectiveness of a programme of enhancing resiliency by reducing family boundary ambiguity among children with epilepsy. *Journal of Clinical Nursing*, *19*, 1443–1453. doi:10.1111/j.1365-2702.2009.03075.x

Munhall, P. L. (2001). Phenomenology: A method. In P. L. Munhall (Ed.), *Nursing research: A qualitative perspective* (3rd ed., pp. 123–183). Sudbury, MA: Jones & Bartlett.

Padgett, D. (1998). *Qualitative methods in social work research: Challenges and rewards*. Thousand Oaks, CA: Sage.

Padgett, D. K., Mathew, R., & Conte, S. (2004). Formation, care, and maintenance. In D. K. Padgett (Ed.), *The qualitative research experience* (pp. 229–239). Belmont, CA: Thomson/Brooks/Cole.

Parks, A. (1998). Lesbian parenthood: A review of the literature. *American Journal of Orthopsychiatry*, *68*, 376–389. doi:10.137/h0080347

Pasley, K. (1987). Family boundary ambiguity: Perceptions of adult stepfamily family members. In K. Pasley & M. Ihinger-Tallman (Eds.), *Remarriage and stepparenting: Current research and theory* (pp. 206–224). New York, NY: Guilford.

Pasley, K., & Ihinger-Tallman, M. (1989). Boundary ambiguity in remarriage: Does ambiguity differentiate degree of marital adjustment and integration? *Family Relations*, *38*, 46–52.

Patterson, C. J. (2006). Children of lesbian and gay parents. *Current Directions in Psychological Science*, *15*, 241–244. doi:10.1111/j.1467-8624.1992tb01679.x

Pearce-McCall, D. (1989). Daughters' and parents' perceptions of their postdivorce/remarried family systems: Family relationships, family boundaries, and the ritual of the daughters' weddings (Doctoral dissertation, University of Minnesota, 1988). *Dissertation Abstracts International*, *50(2-A)*, *552*.

Pryor, J. (Ed.). 2008. *The international handbook of stepfamilies: Policy and practice in legal, research, and clinical environments*. Hoboken, NJ: Wiley.

Radina, M. E., Hennon, C. B., & Gibbons, H. M. (2008). Divorce and mid- and later life families: A phenomenological analysis with implications for family life educators. *Journal of Divorce & Remarriage, 49*(1–2), 142–170. doi:10.1080/10502550801973146

Ray, V., & Gregory, R. (2001). School experiences of the children of lesbian and gay parents. *Family Matters*, *59*, 28–34.

Robitaille, C., & Saint-Jacques, M. C. (2009). Social stigma and the situation of young people in lesbian and gay stepfamilies. *Journal of Homosexuality*, *56*, 421–442. doi:10.1080/00918360902821429

Roper, S. O., & Jackson, J. B. (2007). The ambiguities of out-of-home care: Children with severe or proud disabilities. *Family Relations*, *56*, 147–161. doi:10.1111/j.1741-3729.2007.00448.x

Schwartz, L. B. (2012). Mixed-orientation marriages: Coming out, staying together. *Journal of GLBT Family Studies*, *8*(1), 121–136. doi:10.1080/1550428X.2012.641375

Stewart, S. D. (1999a). Disneyland dads, Disneyland moms? How nonresident parents spend time with absent children. *Journal of Family Issues*, *20*, 539–556. doi:10.1177/0192513X04273591

Stewart, S. D. (1999b). Nonresident mothers' and fathers' social contact with children. *Journal of Marriage and Family*, *61*, 894–907.

Stewart, S. D. (2005). Boundary ambiguity in stepfamilies. *Journal of Family Issues*, *26*, 1002–1029. doi:10.1177/0192513X04273591

Stewart, S. D. (2007). *Brave new stepfamilies: Diverse paths toward stepfamily living*. Thousand Oaks, CA: Sage.

Sweeney, M. M. (2010). Remarriage and stepfamilies: Strategic sites for family scholarship in the 21st century. *Journal of Marriage and Family*, *72*, 667–684. doi:10.1111/j.1741-3737.2010.00724.x

Tasker, F. (2005). Lesbian mothers, gay fathers, and their children: A review. *Journal of Developmental and Behavioral Pediatrics*, *26*, 224–240. doi:0196-206X/2603-0224

Turner, P. H., Scadden, L., & Harris, M. B. (1990). Parenting in gay and lesbian families. *Journal of Gay and Lesbian Psychotherapy*, *1*(3), 55–66. doi:10.1300/J236v01n03_04

van Eeden-Moorefield, B., Pasley, K., Crosbie-Burnett, M., & King, E. (2012). Explaining couple cohesion in different types of gay families. *Journal of Family Issues*, *33*(2), 182–201. doi:10.1177/0192513X11418180

Visher, E., & Visher, J. (1979). *Stepfamilies: A guide to working with stepparents and stepchildren*. New York, NY: Brunner/Mazel.

Visher, E., Visher, J., & Pasley, K. (2003). Remarriage families and stepparenting. In F. Walsh (Ed.), *Normal family processes: Growing diversity and complexity* (3rd ed., pp. 153–175). New York, NY: Guilford.

Wallerstein, J., & Kelly, J. (1980). *Surviving the break-up: How children and parents cope with divorce*. New York, NY: Basic Books.

Wertz, F. J. (2005). Phenomenological research methods for counseling psychology. *Journal of Counseling Psychology*, *52*, 167–177. doi:10.1037/0022-0167.52.2.167

White, L. K., & Booth, A. (1985). The quality and stability of remarriages: The role of stepchildren. *American Sociological Review*, *50*, 689–698.

Wilding, C., & Whiteford, G. (2005). Phenomenological research: An exploration of conceptual, theoretical, and practical issues. *OTJR: Occupation, Participation and Health*, *25*(3), 98–104.

Wolfson, E. (2009). Winning the freedom to marry: Helping others understand how ending exclusion from marriage helps families and hurts no one. *Journal of Gay and Lesbian Mental Health*, *13*, 194–203. doi:10.1080/19359700902929126

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

Downloaded by [TCU Texas Christian University], [. David A. Jenkins] at 11:43 06 May 2013

348 *D. A. Jenkins*

Wright, J. (1998). *Lesbian step families: An ethnography of love*. Binghamton, NY: Harrington Park Press.

## APPENDIX: INTERVIEW GUIDE

Gay Stepfamily Interview

1. Discuss your own coming out process.
2. Describe who is in your family.
3. Describe the different households that exist for the children. Have any of these family arrangements changed over time?
4. Discuss any unresolved issues from any prior marriage/coupling.
5. Describe the relationship with the birth mother. Discuss quality of relationship with her partner (if one exists).
6. Discuss any difficulties related to the child's movement between households (visitation). Discuss your view for kids and view for you.
7. Discuss any divided loyalties that might exist between the households.
8. Discuss how the stepparent is/is not included in the family (physically, psychologically, etc.).
9. Discuss any "siding" that the biological parent might do when disagreements occur between stepparent and child.
10. Discuss the quality of the relationship with the stepparent.
11. Discuss the quality of the biological (gay) parent–child relationship.
12. Discuss the satisfaction with the handling of money in the household.
13. Discuss the contentment level of the couple relationship.
14. Discuss family cohesion.
15. Discuss the overall contentment with family relationships.

View publication stats