IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02079-JLK

**ST. MARY CATHOLIC PARISH IN LITTLETON,** *et al.*,
    Plaintiffs,

v.

**ROY**, *et al.*,
    Defendants.

**DEFENDANTS' RESPONSE TO ALL PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT WITNESS TESTIMONY (DOC. 73)**

Defendants, Dr. Lisa Roy, Executive Director of the Colorado Department of Early Childhood ("CDEC" or "Department"), and Dawn Odean, director of the Department's Universal Preschool Program ("UPK Program") or ("Program"), through counsel, submit this response to *Plaintiffs' Motion to Exclude Defendants' Expert Witness Testimony* (Doc. 73) and state:

    I.   INTRODUCTION

Plaintiffs are taking the Department and its UPK Program to trial next week, asking this Court to determine whether the antidiscrimination provision found in the UPK statute's quality standards, and replicated in the UPK provider agreement, violates the First Amendment. As part of that attack, Plaintiffs question the level of the state's interest in imposing this antidiscrimination provision upon all providers, including those that are faith-based, along with how well tailored the antidiscrimination provision is for its purpose.

In response, Defendants assert – and will prove at trial – that the Department has substantial and even compelling interests, anchored in statute, in prohibiting discrimination by

publicly funded preschools against families and their children on the basis of sexual orientation and gender identity. With respect, the expert testimony at issue will, more likely than not, help the Court to more accurately discern the strength of the governmental interests at stake and how the antidiscrimination provision works to achieve those interests, and to determine material and relevant facts in dispute. Fed. R. Evid. 702; *see also Order on the Parties' Joint Status Report*, Doc. 65 at 8 ("I find the expert testimony described by Defendants is potentially relevant and helpful in determining the questions that must be resolved in this case.").

## II.  THE RETAINED EXPERTS SHOULD BE ALLOWED TO TESTIFY

### A.  Plaintiffs protest only the relevance of these reports, not their reliability.

Plaintiffs do not contest the professional qualifications of either of Defendants' retained experts, Dr. Abbie Goldberg or Dr. Amy Tishelman. Neither do they contest the sufficiency of the Doctors' disclosed facts or data, nor their principles or methods, nor the reliability of their application. Plaintiffs instead argue that (1) proffering evidence-based social science to show the value of UPK's antidiscrimination provision is a *post hoc* fabrication of statutory objectives, and (2) that these two experts address questions not before this Court. Plaintiffs are incorrect on both counts.

### B.  CDEC's statutory objectives emphasize children's and families' well-being and bar discrimination based upon sexual orientation and gender identity.

In seeking to exclude the retained experts as allegedly *post hoc* backfill, Plaintiffs cite to several inapposite cases. In *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) -- a case not involving a challenge to a statute and its objectives but instead to an individual personnel action—a high school coach was fired for conducting on-field prayer circles after public high school football games. In a footnote, the Supreme Court criticized "still another backup

2

argument" made by the school long after the events at issue, arguments relied upon by neither the District Court nor the Court of Appeals. *Id*. at 2432 n.8. Here, in contrast, the experts seek to offer testimony before the original trier of fact, testimony consistent with long-stated statutory objectives (see below).

And in *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1268 (10th Cir. 2008), a state scholarship program provided scholarships to Colorado students, including those at religiously affiliated universities, so long as they were not used at "pervasively sectarian" institutions; the statute's discrimination *among* religions was struck down. The Tenth Circuit criticized the state for having no legislative foundation for its asserted "compelling interest in keeping taxpayers from supporting students who choose religious education," noting the lack of evidence, legislative history, or state court interpretation to the contrary. *Id*. Here, however, the circumstances surrounding the enactment of the statute, including but not limited to the objectives expressly identified in the statute, make clear the state's commitment to a publicly funded preschool program free from harmful discrimination.

So too is *United States v. Virginia* entirely inapplicable. There the Court considered an equal protection challenge to the state of Virginia's exclusion of women from a public university – an exclusion that dated to 1839. 518 U.S. 515, 519-20 (1996). The Court held that the government's gender-based classifications fail equal protection scrutiny unless the government can establish an "exceedingly persuasive justification" for such gender-based discrimination – and that this "[j]ustification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*. at 532-33. For this reason, the Court

rejected the state's claim that by excluding women from the Virginia Military Institute, it sought to offer its citizens a diverse array of educational opportunities: as the Court noted, VMI's historic and constant plan to "affor[d] a unique educational benefit only to males" did not serve any genuine purpose to offer a diverse array of educational opportunities. *Id*. at 540. In this case, in stark contrast, the General Assembly has codified in statute a commitment to protect four-year-olds and their families from the harms of discrimination on the basis of sexual orientation and gender identity in preschools – and the Defendants' experts speak directly to those harms.

  Indeed, CDEC's foundational statute[1] articulates an array of statutory objectives consistent with and supporting the antidiscrimination provision, and the expert testimony at issue. *See also* Defendants' Trial Brief (Doc. 77-28). For instance, the General Assembly directs the use of practice- and evidence-based practices for family support and child development. Colo. Rev. Stat. § 26.5-1-102(1)(h)(II). It goes on to promote behavioral health and linguistically appropriate strategies to support child and parent outcomes and improve overall family well-being. *Id*. § -103(1)(a). And the General Assembly explicitly found that stressful experiences early in life have destructive impacts on the architecture of the brain, and observed that responsive, nurturing relationships between young children and their caregivers can lead to secure attachment. *Id*. § -113(1)(a). All of these objectives are compromised when vulnerable families are discriminated against. Indeed, to highlight its special import, the UPK statute enumerates the antidiscrimination provision as a quality standard "must." *Id*. at § 26.5-4-205(2)(b).

---

[1] CDEC oversees the UPK Program.

Defendants will show at trial that these governmental interests are legitimate, substantial, and even compelling in ensuring equal educational opportunities for Colorado families and their preschool-aged children. Moreover, the antidiscrimination provision is carefully tailored to achieve these interests.[2] As for prior testimony before the legislature, Defendants acknowledge that these particular experts with their particular resources were not called to testify by the General Assembly during passage of the CDEC statute; however, Plaintiffs cite to no case or precedent that would impose such a narrow restriction on a court seeking to understand and rule on the importance of the above-stated governmental interests *as they apply in the real world*.

    C. <u>The expert testimony of Drs. Goldberg and Tishelman illuminates and supports the statute's objective in prohibiting discrimination on the basis of sexual orientation and gender identity.</u>

The retained experts at issue are widely respected and have both clinical and multi-year field studies and experience at their fingertips on these important issues. As the Court will see by reviewing the reports attached to Plaintiffs' *Motion to Exclude,* Dr. Goldberg and Dr. Tishelman have extensive personal and expert knowledge on how discrimination against LGBTQ+ parents and/or their children leads to significant stress, trauma, and damaging long-term outcomes.

---

[2] Plaintiffs also cite to *Fulton* and *Gonzales* to suggest that the proper inquiry is the state's interest in refusing to allow the Archdiocese and its preschools to discriminate. Among other things, this argument wrongly presupposes that the UPK Program's antidiscrimination provision is not generally applicable or not neutral, thus triggering strict scrutiny. Defendants respectfully direct the Court to the discussion of *Fulton* in their recently filed response to motion for summary judgment, Doc. 77, at pp. 13-22 regarding the antidiscrimination provision's general applicability to all providers. Witnesses at trial will also provide facts relevant to this particular dispute. For purposes of the *Motion to Exclude*, it is enough to note that an important issue before the Court is the state's interest in preventing harm to all vulnerable children and families facing such proposed discrimination, which both experts are well positioned to describe.

Dr. Goldberg's expertise is in demographically tracking and counseling scores of LGBTQ+ parent dyads, and she is thus well versed in their disproportionate poverty and rural isolation, issues of particular salience in this state and to the state's objective in eliminating barriers to access to preschool. She will also share her experience that sheds light on the importance of maintaining physically and psychologically safe school environments in support of these vulnerable families, as well as on the "compromised psychosocial adjustment when [LGBTQ+ families] attend schools characterized by an anti-LGBTQ+ climate." Doc. 73-1, Ex. 1 to *Motion to Exclude*, at 8 (cited by Plaintiffs).

Dr. Tishelman provides an important complement, with her focus on clinical treatment and study of gender diverse children and the harms they experience when schools do not support them and their families' lived experience of stress and dysregulation and disorganized attachment that is so heavily influenced by the school-home relationship. As also pointed out by Plaintiffs, Dr. Tishelman will explain why "[i]t is imperative that policies [] not constrain a parent from using their best judgment in making decisions for the gender diverse child. It is *especially important* that policies not undermine a parent's best efforts to accept and support their child or to advocate for their child's well-being in any environment." Doc. 73-2, Ex. 2 to *Motion to Exclude*, at 12. These opinions go to the heart of the statutory framework, and the retained experts should be allowed to explain the harm to vulnerable families that the antidiscrimination provision seeks to prevent.

III. ENDORSEMENT OF THE NON-RETAINED EXPERTS WAS PRECAUTIONARY

As the Court noted in the *Continental Materials* case cited by Plaintiffs, Fed. R. Evid. 701 "does not permit a lay witness to express an opinion as to matters which are beyond the

realm of common experience and which require the special skill and knowledge of an expert witness." 2019 WL 13167106 at *1. The non-retained experts listed by Defendants are indeed primarily fact witnesses, but each possesses expertise through "knowledge, skill, experience, training, or education" related to their anticipated testimony. Fed. R. Evid. 702. The Court may be aware of a burgeoning litigation practice in the Colorado courts, on nearly identical state and federal rules, to move to block any testimony that hints of an opinion or a methodology, where a lay person on the street would not be in a position to render such an opinion. *See, e.g., Midtown Investments LP v Auto-Owners Insurance Company*, 2022 WL 17039225 (D. Colo. Nov. 17, 2022); *Venalonzo v. People*, 2017 CO 9, 388 P.3d 868 (2017). It is an abundance of caution that prompted the disclosures by Defendants' non-retained experts, to avoid any evidentiary quarrel should the Plaintiffs assert that the testimony exceeds lay bounds.

If Plaintiffs are saying that they do not intend to interpose such an objection for these witnesses, the Defendants' protective non-retained expert disclosures will prove unnecessary.

Dated: December 27, 2023      PHILIP J. WEISER
Attorney General

*s/ J. Gregory Whitehair*
*Virginia R. Carreno,* Second Assistant Attorney General
*Janna K. Fischer*, Senior Assistant Attorney General
*Nicole Rust*, Assistant Attorney General
*J. Gregory Whitehair*, Assistant Attorney General
1300 Broadway, 6th Floor, Denver, CO 80203
Telephone: (720) 508-6349
Email: virginia.carreno@coag.gov; niki.rust@coag.gov; greg.whitehair@coag.gov; janna.fischer@coag.cov
*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2023, I electronically filed the foregoing **DEFENDANTS' RESPONSE TO ALL PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT WITNESS TESTIMONY** with the Clerk of Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

Eric C. Rassbach
Joseph C. Davis
Nicholas R. Reaves
Mark L. Rienzi
Amanda Dixon
Jordan Varberg
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Suite 400
Washington, D.C. 20006
erassbach@becketlaw.org; jdavis@becketlaw.org; nreaves@becketlaw.org; mrienzi@becketlaw.org; adixon@becketlaw.org; jvarberg@becketlaw.org

*Attorneys for Plaintiffs*

                                                                    *s/* Bonnie Smith
                                                                    *Bonnie Smith*