**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02079-JLK

ST. MARY CATHOLIC PARISH IN LITTLETON;
ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY;
LISA SHELEY; and
THE ARCHDIOCESE OF DENVER,

   Plaintiffs,

v.

LISA ROY, in her official capacity as Executive Director
of the Colorado Department of Early Childhood; and
DAWN ODEAN, in her official capacity as Director
of Colorado's Universal Preschool Program,

   Defendants.

---

**AMENDED ORDER ON DEFENDANTS' MOTION TO DISMISS (ECF NO. 38),**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 61),**
**AND PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS'**
**EXPERT WITNESS TESTIMONY (ECF NO. 73)**

---

Kane, J.

   This case is set for a bench trial beginning January 2, 2024. This Order resolves three

pending motions in preparation for that trial: Defendants' Motion to Dismiss Plaintiffs'

Amended Complaint (ECF No. 38); Plaintiffs' Motion for Summary Judgment, or in the

Alternative, for a Preliminary Injunction (ECF No. 61); and Plaintiffs' Motion to Exclude

Defendants' Expert Witness Testimony (ECF No. 73).

   At issue in this case is whether the nondiscrimination requirements of the State of

Colorado's newly implemented Universal Preschool Program ("UPK Colorado") violate

Plaintiffs' rights guaranteed by the First Amendment to the U.S. Constitution. Presently, UPK

Colorado provides 15 hours of free preschool per week for each eligible child in the state. Odean Decl. ¶ 5, ECF No. 38-1. The Program is administered by the Colorado Department of Early Childhood (the "Department") and uses a "mixed-delivery system of preschool providers," that is "a combination of school- and community-based preschool providers . . . funded by a combination of public and private money." Colo. Rev. Stat. §§ 26.5-4-202(1); 26.5-4-203(12). Participating preschool providers are prohibited from discriminating on the basis of religious affiliation, sexual orientation, and gender identity, among other statuses. *See id.* § 26.5-4-205(2)(b).

The five Plaintiffs in this case can be divided into three categories: two Catholic parishes operating preschools that wish to enroll as UPK Colorado providers (the "Named Preschools"); the Archdiocese of Colorado, which "speaks for and advances the interests of all of [its] Catholic Schools and their preschool programs," Moo Decl. ¶ 15, ECF No. 32-1; and two parents who desire to benefit from UPK Colorado while their preschool-age child attends the Catholic school of their choice ("Parent Plaintiffs"). The Named Preschools and the Archdiocese bring five claims under the Free Exercise Clause, a free-speech claim based on compelled speech and expressive association, and a claim under the Establishment Clause for "denominational favoritism." Parent Plaintiffs assert a single Free-Exercise claim. The Amended Complaint names as Defendants Lisa Roy, the Executive Director of the Department, and Dawn Odean, the Director of UPK Colorado. Plaintiffs seek "preliminary and permanent injunctive relief prohibiting Defendants from denying [their] participation in Colorado's UPK program based on [their] religious beliefs, character, and exercise, including [their] religious exercise of:

    (i)       prioritizing Catholic families in admission;

    (ii)      requiring preschool teachers, staff, and administrators to abide by and uphold Catholic teachings on life, marriage, gender, and human sexuality;

(iii)   considering for purposes of admission or retention whether a family or child seeking placement in their schools has identified as LGBTQ, is in a same-sex relationship, or has adopted a gender identity different from his or her biological sex; and

(iv)   declining to grant students and staff access to the restroom or changing facilities of the opposite sex, to permit them to wear the opposite sex's uniform, or to insist on the use of a preferred pronoun."

Am. Compl. at 36, ECF No. 30.[1]

In their Motion to Dismiss, Defendants contend Plaintiffs lack standing to bring any of the claims asserted and that their claims are not ripe. Plaintiffs filed a Response to the Motion to Dismiss (ECF No. 42), Defendants submitted a Reply in Support of the Motion (ECF No. 47), and Plaintiffs were granted leave to file a Surreply (ECF No. 51). Plaintiffs also filed a Notice of Supplemental Authority (ECF No. 44), and Defendants responded to that Notice (ECF No. 53). Despite those many filings, the parties' arguments lacked specificity, so I ordered them to submit supplemental briefing on whether the Archdiocese in particular has standing to bring the claims it asserts. After reviewing the recent submissions, I conclude the Named Preschools and Parent Plaintiffs have standing to assert their claims and that those claims are ripe, but the Archdiocese does not have standing. Thus, I grant Defendants' Motion to Dismiss in part and deny it in part.

Before Defendants filed their Response to Plaintiffs' Motion for Summary Judgment, I indicated that I intended to conduct a bench trial since at least some material facts are in dispute and that I would rule as a matter of law in the final order, as appropriate. *See* Order on the Parties' Joint Status Report at 8, ECF No. 65. Defendants have now filed their Response to Plaintiffs' Motion (ECF No. 77), and Plaintiffs have submitted their Reply in Support of their

---

[1] The Amended Complaint also requests declaratory judgment and nominal damages of $1.00. *See* Am. Compl. at 35-36. Plaintiffs' Motion for Summary Judgment does not address either of these forms of relief, and so I do not elaborate on them here.

3

Motion (ECF No. 94). My assessment of Plaintiffs' Motion remains unchanged. Consequently, I deny it to the extent it seeks to avoid the upcoming bench trial.

Plaintiffs have also filed a Motion to Exclude the testimony of Defendants' retained experts and to prevent current and former State employees who will testify on behalf of Defendants (the "employee-witnesses") from being qualified as experts. I find the expert testimony proposed by Defendants is relevant and helpful for deciding the issues in this case. And, because this case will be tried to the Court, I see no reason to order at this time that Defendants' employee-witnesses may not be qualified as experts. I, therefore, deny Plaintiffs' Motion without prejudice.

I expound on each of these rulings below.

## I. RELEVANT FACTS AND ALLEGATIONS

In 2020, Colorado voters approved Proposition EE to create a dedicated source of funding for voluntary, universal preschool. The Colorado General Assembly passed House Bill 21-1304 to begin implementation of that program. H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021). That legislation created the Colorado Department of Early Childhood. Additional legislation enacted in 2022 officially created UPK Colorado and directed the Department to develop "quality standards that each preschool provider must meet to receive funding through [UPK Colorado]." H.B. 22-1295, 73rd Gen. Assemb. (Colo. 2021); Colo. Rev. Stat. § 26.5-4-205(1)(a). The quality standards established by the Department must include "[a] requirement that each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances

apply to the child or the child's family." *Id.* § 26.5-4-205(2)(b). Plaintiffs' claims in this case take issue with this provision, which I will call the "statutory nondiscrimination requirement." The quality standards developed by the Department must also "reflect national and community-informed best practices with regard to school readiness, academic and cognitive development, healthy environments, social-emotional learning, and child and family outcomes." *Id.* § 26.5-4-205(1)(a).[2] The implementing legislation authorizes the Department:

> if necessary to ensure the availability of a mixed delivery system within a community, . . . [to] allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards; except that each preschool provider must meet all quality standards relating to health and safety as a condition of participating in the preschool program.

*Id.* § 26.5-4-205(1)(b)(II).[3]

For a school to participate in UPK Colorado, it must sign the Program Service Agreement (the "Agreement"). In addition to the statutory nondiscrimination requirement, Plaintiffs' claims challenge two provisions of the Agreement: its incorporation of the statutory nondiscrimination requirement and a more expansive nondiscrimination provision found in Paragraph 18(B).

---

[2] The Department is in the process of rulemaking for the requisite quality standards. Odean Decl. ¶ 13; Odean Suppl. Decl. ¶¶ 8-13, ECF No. 47-1. Once the rules are promulgated, they will not take effect until the 2024-2025 school year. Odean Decl. ¶ 14.

[3] Defendants represent that the Department interprets the statutory nondiscrimination requirement as "'relating to health and safety' because it ensures, among other things, that children have access to a safe educational environment free from harmful discrimination." Resp. to Pls.' Mot. for Summ. J. at 21, ECF No. 77. Under that interpretation, the Department is not authorized to permit a temporary waiver of compliance with the statutory nondiscrimination requirement. Other than their representation to the Court, Defendants do not point to any evidence (i.e., materials from the Department, a declaration, or deposition transcript) that this is the interpretation of the Department. Plaintiffs cite deposition testimony from M. Michael Cooke, the Department's former Transition Director, claiming that she "said the opposite." Reply in Supp. of Pls.' Mot. for Summ. J. at 15, ECF No. 94. From the testimony provided, however, it does not appear she addressed that specific question at all. *See* Cooke Dep. 15:14-22, ECF No. 94-1 (being asked, "in your opinion, what makes a provider safe?" and responding regarding licensing requirements).

Agreement, ECF No. 32-15 at 3 ("Provider agrees to adhere to the quality standards identified in §26.5-4-205, C.R.S., [including] . . . [the r]equirement that each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family."); *id.*, ECF No. 32-15 at 28. Paragraph 18(B) reads: "Provider shall not . . . discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." *Id.* The Department interprets and applies this provision "to permit religious organizations to hire co-religionists in accordance with federal law and to protect religious organizations' employment decisions about their ministerial employees in accordance with federal law." Odean Decl. ¶ 16. I will refer to the statutory nondiscrimination requirement together with the two challenged provisions of the Agreement as the "UPK Colorado nondiscrimination requirements."

Generally, families apply for UPK Colorado, rank their preferred participating preschool providers, and then are matched with one of their ranked providers. Odean Dep. 18:5-14, ECF No. 61-4. Participating preschool providers may select from nine different preferences that are departures from the default matching process. As stated in the Departments' proposed rules, those options are:

1. Faith-based providers granting preference to members of their congregation;

2. Cooperative preschool providers requiring participation in the cooperative;

3. School districts maintaining enrollment consistent with their established boundaries;

4. Withholding of placements or availability of seats by an enrolling preschool

provider of a student(s) with an Individualized Education Program (IEP) to ensure conformity with obligations incurred pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. section 1400 (2004), or the Exceptional Children's Education Act, Article 20 of Title 22, C.R.S.;

5. Head Start programs' adhering to any applicable federal law requirements including eligibility requirements;

6. Participating preschool providers granting preference to an eligible child of one of their employees;

7. Participating preschool providers granting preference to an eligible child in order to ensure continuity-of-care for that child;

8. Participating preschool providers granting preference to an eligible child in order to keep siblings similarly located; and

9. Participating preschool providers granting preference to an eligible child who is multilingual in order to ensure the proper delivery of services to that child.

UPK Proposed Rules and Regulations, ECF No. 61-12 at 7; *see also* UPK Colorado Provider Guide, ECF No. 61-15 at 38. These departures from the standard matching process allow faith-based providers to give preference to families who are part of their congregation "by reserving all or a portion of their preschool seats for their congregation members" and to "decline a match from a family that is not part of their congregation." Odean Decl. ¶ 8.

In addition to these enumerated preferences, providers may request individualized departures from the default matching process. *See* Table of Requested Departures, ECF No. 61-6 at 83-88. The form permitting providers to make such a request includes as an example: "My location only serves children with specific disabilities." Odean Dep. 98:8-99:23; Ex. 5 to Odean Dep., ECF No. 61-4 at 172. Defendant Odean testified that UPK Colorado does have school-district-based providers that offer specific programs for individuals with disabilities, either at one location of multiple locations or in a particular classroom within a location. Odean Dep. 98:25-99:23. The Department has granted a number of other individualized requests, including for a

provider only accepting fully vaccinated children, a location that serves teen mothers and their children, and a preschool that must prioritize subdivision residents. Table of Requested Departures, ECF No. 61-6 at 83-84.

The Archdiocese of Denver's Office of Catholic Schools oversees 36 preschools, Moo Decl. ¶ 4, including the Named Preschools and other preschools within the Archdiocese (the "Unnamed Preschools"). The Named and Unnamed Preschools are subject to the Archdiocese's guidance on matters of faith and morals. *Id.* ¶¶ 5-6. The Archdiocese "speaks for and advances the interests of all of [its] Catholic Schools and their preschool programs." *Id.* ¶ 15. However, each parish or regional school within the Archdiocese "is a separately incorporated legal entity distinct from the Archdiocese," and "each preschool is subject to the direct control of the pastor of that specific parish." Moo Suppl. Decl. ¶¶ 4, 6, ECF No. 62-1; Joint Status Report II at 4, ECF No. 62.

The Named Preschools and the Archdiocese "believe that Archdiocesan preschools must carefully consider whether admitting students or families who oppose Catholic teachings in word or deed will create intractable conflicts that hinder the school's mission." Pls.' Mot. for Summ. J. at 15, ECF No. 61 (citing Moo Decl. ¶ 27); The Archdiocese's Guidance for Issues Concerning the Human Person and Sexual Identity, ECF No. 32-6 at 15-16. According to guidance from the Archdiocese, "[a] Catholic school cannot treat a same-sex couple as a family equivalent to the natural family without compromising its mission and Catholic identity and causing confusion about the nature of marriage for all students enrolled." *Id.*, ECF No. 32-6 at 16 (emphasis removed). Archdiocesan schools are instructed to use pronouns that correspond with biological sex, to enforce their dress code that corresponds with an individual's biological sex, and to make changing and bathroom facilities available only as they correspond with an individual's

biological sex. *See id.*, ECF No. 32-6 at 3, 11-13. The Archdiocese further "requires that those who teach and pass on the Catholic faith, including all preschool teachers, strive to uphold Catholicism's tenets in both word and deed and meet the requirements of provisional catechetical certification." Pls.' Mot. for Summ. J. at 14 (citing Moo Decl. ¶¶ 24-26; Seul Decl. ¶ 17, ECF No. 32-14).

If Archdiocesan preschools participated in UPK Colorado, Plaintiffs believe the statutory nondiscrimination requirement and Paragraph 18(B) of the Agreement would "prevent [them] from preferencing Catholic families who are not members of their congregation." *Id.* at 23. Plaintiffs also believe those provisions would "prohibit Archdiocesan preschools from taking into consideration whether a child or family is open to and supportive of the Catholic Church's teachings—including its teachings on human sexuality—or whether personal circumstances or actions would create intractable conflicts with what is being taught in the schools." *Id.* at 24. Additionally, Plaintiffs claim Paragraph 18(B) would "forbid[] Archdiocesan preschools from requiring that those who teach the faith agree to live out those teachings in both word and deed." *Id.*

For those reasons, the Archdiocese of Denver, as part of a coalition of other religious preschool providers, requested an exemption from the statutory nondiscrimination requirement. Feb. 17, 2023 Letter to Polis, ECF No. 32-12 at 2. The Department denied that request. Feb. 28, 2023 Roy Letter, ECF No. 32-13 at 1-2. The Department's position is that it does not have the authority to create an exemption from the statutory nondiscrimination requirement. *Id.*, ECF No. 32-13 at 1; Odean Dep. 122:1-122:3; Roy Dep. 16:11-19, 23:10-15, ECF No. 61-5.

The Archdiocese later "determined that its preschools could not in good conscience sign the Program Service Agreement or operate their preschools consistent with the requirements of

the Agreement." Pls.' Mot. for Summ. J. at 23 (citing Moo Decl. ¶ 32; Jan. 14, 2023 Dollins Email, ECF No. 32-11 at 2-3). The Archdiocese thus communicated to its preschools that they were not to enter into any agreement with the State for UPK Colorado. Jan. 14, 2023 Dollins Email ECF No. 32-11 at 2-3. The Named Preschools assert that they "would immediately seek to participate in UPK Colorado if granted an accommodation that would allow them to do so consistent with their faith." Pls.' Mot. for Summ. J. at 26 (citing Coats Decl. ¶ 35, ECF No. 32-16; Seul Decl. ¶ 50). If the Named Preschools were UPK Colorado providers, they would qualify for provider bonuses that give direct financial assistance to participating preschools. *See* Seul Decl. ¶ 43.

Families continue to be matched with participating UPK Colorado providers on a weekly basis. Odean Dep. 35:12-20; UPK Colorado Website Materials, ECF No. 61-13 at 2. Preschools can complete the UPK enrollment process at any time to begin being matched with students. Odean Dep. 33:14-34:24. Direct enrollment with some providers is now available as an option to families as well. *Id.* 33:6-13.

## II. DEFENDANTS' MOTION TO DISMISS

Defendants' Motion to Dismiss seeks dismissal of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that jurisdiction is not proper because Plaintiffs lack standing and their claims are not ripe. I agree with Plaintiffs that Defendants view this case through the wrong lens. Defendants advocate that Plaintiffs' circumstances are self-inflicted and that an attenuated series of events would need to occur for Plaintiffs to experience any injury. But Plaintiffs' alleged injury is not the potential for some future enforcement of the

State's nondiscrimination requirements against them.[4] Plaintiffs' claimed injury is their present perceived inability to participate in UPK Colorado based on the nondiscrimination conditions imposed by the State and the Department's denial of an exemption from those conditions.

## A. Legal Standards for Standing and Ripeness

The U.S. Constitution requires that federal courts exercise limited jurisdiction so as not to invade the province of other branches of government or the rights of the people. Federal courts may only operate with regard to an established case or controversy. For such a case or controversy to exist, a plaintiff must have standing to bring the claims asserted. This requirement is so integral that, should a plaintiff fail to establish standing, the presiding court must dismiss the case before it. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-561 (1992). Constitutional standing has three components: an injury in fact, a causal connection between a defendant's conduct and the injury, and the ability of the court to redress the injury should the plaintiff prevail. As to the former, the alleged injury "must affect the plaintiff in a personal and individual way," *id.* at 560 n.1, and be "actual or imminent, not conjectural or hypothetical," *id.* at 560 (citation and quotation marks omitted). Concerning causation, the injury must be attributable to a defendant's actions and not "the result of the independent action of some third party not before the court." *Id*. (citation and alteration omitted). Lastly, the relief that plaintiff seeks from the court must be capable of remedying the injury incurred. *Id.* at 561.

---

[4] Much of Defendants' Motion to Dismiss is spent analyzing Plaintiffs' standing under the pre-enforcement framework. Plaintiffs urge the Court not to apply that framework, and I agree that it does not fit this case. As a result, I accept Defendants' invitation and simply address the traditional standing questions raised. *See* Reply in Supp. of Mot. to Dismiss at 6, ECF No. 47.

A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). "The Art[icle] III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Id.* However, an organization may assert standing to bring suit on behalf of its members, known as "representational" or "associational" standing, when: (1) any one of its members would have standing to bring the claim on its own, (2) the interests it seeks to protect are germane to its purpose, and (3) "the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to the proper resolution of the cause." *Id.* at 511; *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

If any of the requirements for standing are absent, Federal Rule of Civil Procedure 12(b)(1) provides that a party may move to dismiss the suit for lack of subject matter jurisdiction. When a party makes a factual attack under Rule 12(b)(1), as Defendants do here, the party may go beyond the allegations in the complaint and present evidence in support of its challenge. *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001); *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1272 n.1 (10th Cir. 2012). The court has wide discretion to consider these materials. *Id.*; *Stuart*, 271 F.3d at 1225.

Ripeness relates to the injury-in-fact element of standing. Under the doctrine of ripeness, a "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). Ripeness is a temporal constraint "drawn both from Article III limitations on judicial power and from

prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). Defendants assert Plaintiffs' claims are unripe based on Article III limitations and for prudential reasons. Article III ripeness implicates subject matter jurisdiction and is therefore analyzed under Rule 12(b)(1). Prudential ripeness, on the other hand, is evaluated under Rule 12(b)(6), considering and accepting as true the well-pleaded allegations in the complaint. *See North Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1230 (10th Cir. 2021); *Hill v. Warsewa*, 947 F.3d 1305, 1308 (10th Cir. 2020).

For Article III ripeness, "[i]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *American C.L. Union v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999) (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996)). In contrast, "[i]njury to a party's interest for the purposes of constitutional standing does not automatically confer prudential standing." *Hill*, 947 F.3d at 1310 (internal quotation marks omitted). For prudential ripeness, courts "balance the fitness of the issue for judicial review with the hardship to the parties from withholding review." *United States v. Bennett*, 823 F.3d 1316, 1326 (10th Cir. 2016). In determining the fitness of the issue for review, courts focus on "whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Id.* (quoting *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1119 (10th Cir. 2008)). Then, to assess the hardship from withholding judicial review, courts consider "whether the parties face 'a direct and immediate dilemma.'" *Id.* (quoting *Stout*, 519 F.3d at 1118).

**B. Analysis**

    1.  The Parishes

I begin the analysis of Plaintiffs' standing with the Catholic Parishes that are named as Plaintiffs, St. Mary Catholic Parish in Littleton ("St. Mary's") and St. Bernadette Catholic Parish in Lakewood ("St. Bernadette's") (together, the "Parishes"). I find they satisfy all three components of standing: an injury in fact, causation, and redressability. *See Lujan*, 504 U.S. at 560-61. Defendants assert the Parishes have failed to demonstrate the first two. Defendants portray the Parishes' injury as hypothetical and self-inflicted.

The Parishes claim that, because of UPK Colorado's nondiscrimination requirements, their preschools are unable to participate in the Program without compromising their sincerely held religious beliefs. Thus, their alleged injury is their perceived inability to participate in and benefit from the Program. This is a sufficiently concrete injury.[5]

Defendants do not seem to genuinely question that the Parishes would receive some benefit from their preschools' participation in UPK Colorado. And nothing in the record indicates the preschools would be otherwise ineligible to participate. Instead, Defendants contend that the Parishes' alleged injury is conjectural or hypothetical and not concrete and particularized or actual or imminent. Defendants list out "a very lengthy and speculative chain of circumstances [that] would have to occur" for the Department to take an enforcement action against the Named Preschools, what Defendants assert is required for Plaintiffs to have standing. Mot. to Dismiss at 11, ECF No. 38. This argument is based on Defendants' flawed view of the

---

[5] Plaintiffs claim they are "forced to choose between following their religious beliefs and participating in UPK Colorado." Resp. to Mot. to Dismiss at 15, ECF No. 42. They call this an "unconstitutional choice." *Id.* That is a merits determination, but for the purposes of standing, the perceived inability to participate in UPK Colorado constitutes an injury in fact.

case. The injury to the Parishes is not some future potential for enforcement against them. It is a present perceived conflict with government policy that prevents them from receiving benefits. They have requested an exemption from that policy, and Defendants have acted to deny it. Defendants argue that the mere existence of the UPK Colorado nondiscrimination requirements cannot create standing. But the alleged injury is not the existence of an unconstitutional law, it is the loss of benefits tied to a government policy. As such, I am not persuaded by Defendants' citation to cases that do not involve government benefits.

Defendants further advocate that the Named Preschools should, in a sense, game the UPK Colorado system to avoid the feared conflicts concerning their religious beliefs. Specifically, Defendants suggest the Named Preschools could take advantage of the optional preferences by reserving all their preschool seats for Catholic parishioners and prioritizing siblings of current students. Defendants presume doing so would alleviate any injury experienced by the Parishes. Plaintiffs represent, however, that the Named Preschools regularly enroll students whose families are not parishioners and who do not have siblings at the school. Surreply to Mot. to Dismiss at 1-2, ECF No. 51. The available departures from the standard matching process do not eliminate the Parishes' alleged injury.

With respect to the causation component of standing, Defendants insist that the Parishes' injury is self-inflicted and manufactured. Defendants blame the Parishes' decision not to participate, rather than the challenged government policy, for the Named Preschools missing out on the benefits of UPK Colorado.

In support of their contention, Defendants submitted evidence that the Named Preschools have participated in other State programs that have required them to agree to nondiscrimination provisions. In the past, Wellspring Catholic Academy, the school operated by St. Bernadette's,

has been a provider for the Denver Preschool Program, which offers tuition credits to Denver families for preschool education. Holguín Decl. ¶¶ 3, 9, ECF No. 38-5. The contract for the Denver Preschool Program contains a nondiscrimination provision. *See* Denver Preschool Program Provider Agreement, ECF No. 38-7 at 26. However, as Plaintiffs stress, the contract also includes a provision protecting religious providers, which states: "Nothing in this Agreement shall be construed to affect the Provider's right to engage in privately funded, inherently religious activity or affect the independence of Providers, including any rights protected by the Colorado and U.S. Constitutions and applicable law." *Id.*, ECF No. 38-7 at 16. Plaintiffs have interpreted this language to exempt Archdiocesan preschools from the nondiscrimination requirement in the contract. *See* Pls.' Suppl. Resp. to Mot. to Dismiss at 11-12, ECF No. 75. Considering that reasoning, it is not inconsistent for the Parishes to find the UPK Colorado requirements conflict with their beliefs but those of the Denver Preschool Program do not.

St. Mary's preschool currently participates in the Colorado Child Care Assistance Program ("CCCAP"), which "helps families that are homeless, working, searching for work or in school find low-income child care assistance." Burne Decl. ¶¶ 3, 13, ECF No. 38-2. CCCAP requires providers to "[a]ccept referrals for child care without discrimination with regard to race, color, national origin, age, sex, religion, marital status, sexual orientation or physical, intellectual or mental health disability." CCCAP Fiscal Agreement, ECF No. 38-3 at 5. Plaintiffs note that, unlike the UPK Colorado provisions, the CCCAP requirement does not appear to cover students' families and does not reference gender identity. Plaintiffs assert that they believe sexual orientation is not relevant for preschool students. Pls.' Suppl. Resp. to Mot. to Dismiss at 12. Plaintiffs have also "understood [CCCAP] to permit them to follow their ordinary enrollment

process," in which they evaluate applicants before enrollment. *Id.*; Resp. to Mot. to Dismiss at 23. Here, too, it is not inconsistent for the Parishes to find injury from the UPK Colorado Agreement but not from the CCCAP provision.

Defendants' theory of standing encourages the Parishes to set aside their potential conflicts with the nondiscrimination requirements, participate in UPK Colorado, and assume that enforcement of the requirements for a specific act of discrimination will never occur. But the Named Preschools cannot be blamed for foregoing enrollment in a program they understand to conflict with their beliefs. Their loss of benefits and the Department's denial of an exemption are sufficient to establish standing.

Because I find the Parishes have alleged an injury that satisfies the requirements for standing, I conclude their claims are ripe for Article III purposes. *See Johnson*, 194 F.3d at 1155. Under the prudential ripeness analysis, I likewise find their claims should be adjudicated. The issues presented are fit for review, and the Parishes would likely experience hardship if consideration of their claims is withheld. Defendants argue that the Parishes' claims depend on facts that have not yet occurred. But government actions have been taken—a statute has been passed, the Agreement has been finalized, and the Archdiocese's request for an exemption has been denied. Even though the agency has yet to promulgate the rules mandated by the statute, the nondiscrimination requirements are in effect, and UPK Colorado is presently being administered. If the Department's rulemaking and the anticipated updates and amendments to the Agreement moot any aspect of the Parishes' claims, Defendants may file appropriate motions at that time. By withholding judicial review, the Parishes would either be unable to have their claims heard or the Named Preschools would be forced to sign the Agreement, which they have determined conflicts with their religious beliefs.

The Parishes have, therefore, established standing and their claims are ripe.

2. Parent Plaintiffs

The analysis for Parent Plaintiffs is similar. Parent Plaintiffs are parishioners of St. Mary's and their four-year-old attends preschool there. Sheley Decl. ¶ 6, ECF No. 32-18. They believe they are "commanded by [their] faith to provide [their] children with a Catholic education." *Id.* ¶ 5. Because their child attends preschool at St. Mary's, they are not currently receiving benefits through UPK Colorado. *Id.* ¶ 6. Consequently, their claimed injury is clear: a loss of benefits.[6]

Defendants argue, however, that their injury is caused not by the State but by the failure of St. Mary's preschool to enroll as a provider in UPK Colorado and the Archdiocese's decision to prohibit its preschools from participating in the Program. This argument fails for the same reasons explained above. The alleged injury is not self-inflicted; it is the result of government policy and action.

Perhaps Defendants could question whether granting an injunction in this case would remedy Parent Plaintiffs' injury since St. Mary's preschool would still need to enroll in UPK Colorado for Parent Plaintiffs to benefit. However, there is evidence in the record that St. Mary's would immediately seek to participate in UPK Colorado if it "were not prevented from participating . . . because of [its] sincere religious beliefs." Seul Decl. ¶ 50. Parent Plaintiffs have

---

[6] The amount of the benefit Parent Plaintiffs would receive is not clear from the evidence presented because they already receive a discount on tuition for one of the parents being a school employee. *See, e.g.*, Defs.' Suppl. Br. in Supp. of Mot. to Dismiss at 13; Reply in Supp. of Pls.' Mot. for Summ. J. at 9. Nevertheless, the present record supports that Parent Plaintiffs are not receiving at least some monetary benefit that they would if St. Mary's preschool were participating in UPK Colorado.

established the three requirements for standing.

The prudential ripeness analysis is the same for Parent Plaintiffs as for the Parishes. It is proper for this Court to exercise jurisdiction over those parties and their claims.

### 3. The Archdiocese

In contrast, the Archdiocese has failed to allege a sufficient injury to have standing in its own right and has not established it has standing as a representative of the Archdiocesan preschools.

The Amended Complaint does not allege any particularized injury to the Archdiocese. After I ordered supplemental briefing on the issue, Plaintiffs advanced the argument that the Archdiocese "has had to chill its own religious exercise (making Catholic education broadly accessible, including through its preschools' participation in UPK) in response to an objectively justified threat of real consequences imposed by the State (the requirement that its preschools abandon their religious exercise in order to participate)." Pls.' Suppl. Resp. to Mot. to Dismiss at 2, ECF No. 75. First, nothing is preventing the Archdiocese from providing the same support to Catholic education as it has in the past. And, second, the cases the Archdiocese cites in support of its "chilling" argument, such as *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006), do not involve the Free Exercise Clause and relate to pre-enforcement challenges.

Additionally, as the Archdiocese acknowledges, it promotes Catholic education through its legally independent preschools. *Id.* at 3; Joint Status Report II at 5. The Archdiocese itself does not seek to participate in UPK Colorado and would not be subject to the nondiscrimination

requirements.[7] The Archdiocese preschools may have empty seats because of UPK Colorado, and the schools may have lost out on provider bonuses offered through the Program. Moo Dep. 111:6-112:5, 212:14-19, ECF No. 75-1; Coats Dep. 77:3-10, ECF No. 75-2; Seul Dep. 108:24-109:9, ECF No. 75-3; Seul Decl. ¶¶ 38, 41; Coats Decl. ¶¶ 31-32. At most, however, the Archdiocese alleges a vicarious or indirect injury, and it has failed to substantiate that injury.

In any event, the Archdiocese has not shown that its purported individual injury would be redressed by any relief granted in this case, i.e., that there would be increased access to a Catholic education. *See* Pls.' Suppl. Resp. to Mot. to Dismiss at 3 (asserting that "[t]he Archdiocese seeks to engage in a specific religious exercise: providing . . . increased access to a Catholic education."). Plaintiffs make no allegations and there is no evidence in the record regarding the desire of the Unnamed Preschools to participate in UPK Colorado nor the impact participation would have on student enrollment or education. *See, e.g.*, Moo Dep. 111:20-112:5.

Again, after I ordered supplemental briefing on the issue, the Archdiocese asserted that it has representational or associational standing to sue on behalf of the Archdiocesan preschools. This cannot be. The Archdiocese has emphasized that its parishes are separate legal entities with distinct interests and injuries, and the Archdiocese has made clear that the participation of the Unnamed Preschools is necessary for the fair resolution of this case.

To demonstrate associational or representational standing, the Archdiocese must show:

---

[7] Citing *Aptive Environmental, LLC v. Town of Castle Rock*, 959 F.3d 961, 977 (10th Cir. 2020), Plaintiffs claim it does not "matter that it is the preschools, and not the Archdiocese, who would be signing the provider agreement and directly subject to Defendants' enforcement authority." Pls.' Suppl. Resp. to Mot. to Dismiss at 5. *Aptive* dealt with a free-speech, pre-enforcement claim. *Id.* at 974-75, 979. And it is further distinguishable because the business there showed it incurred a concrete, independent injury in the form of decreased sales. *Id.* at 975. Moreover, the case involved a business that hired "independent contractors" as salespeople, *id.* at 977, and there is no evidence here that the relationship between the Archdiocese and the preschools is equivalent.

"(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. The Archdiocese fails to carry its burden on the last requirement, so I do not address the others.

The individual participation of the Archdiocesan preschools is indispensable in this as-applied challenge brought primarily under the Free Exercise Clause. The Archdiocese seeks to procure an injunction applicable to its 36 schools' individual dealings with the Department. Yet, the Unnamed Preschools are separate legal entities over which the Archdiocese does not exercise legal or practical control. *See* Joint Status Report II at 5. "[E]ach preschool is subject to the direct control of the pastor of that specific parish." Moo Suppl. Decl. ¶ 6. There is no evidence in the record that the Archdiocese has the authority to represent each school's specific legal interests nor that each preschool desires to participate in UPK Colorado. *See* Moo Dep. 140:13-20, ECF No. 77-5 (testifying that at least one school determined it did not want to participate in UPK Colorado). Because this is an as-applied challenge, the individual facts of the injured parties are significant. Plaintiffs even argue that the UPK Colorado nondiscrimination requirements trigger strict scrutiny, requiring an analysis of "whether harms would result from granting the 'specific exemption[]' sought by the 'particular religious claimant[.]'" Reply in Supp. of Pls.' Mot. for Summ. J. at 16 (quoting *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021)). Under these circumstances, the individual participation of the Unnamed Preschools is necessary to adjudicate the claims asserted.

In addition, since the claims warrant consideration of the individual facts, discovery related to each injured party is relevant. The Archdiocese has argued, however, that it is not

required to produce the requisite discovery on behalf of the Unnamed Preschools, as it "do[es] not have legal 'control' over the documents of the 34 nonparty preschools." Joint Status Report II at 4. More directly, it has stated: "[T]he Archdiocese's religious authority and responsibilities under Catholic canon law do not change the fact that the Archdiocese and its preschools are otherwise distinct and separate legal entities—or that the Archdiocese does not exercise legal or practical control over the operations of each separately incorporated preschool." *Id.* at 5. When a third party's interests are asserted and the representative party refuses to cooperate with the production of relevant discovery related to that third party, the participation of the third party becomes necessary for the just resolution of the case.

Consequently, the Archdiocese has not established that it has standing to bring its claims in its own right or on behalf of any members. Defendants' Motion to Dismiss is, therefore, granted in part in that the Archdiocese is dismissed from this case. The Motion is denied with respect to the Parishes and Parent Plaintiffs.

### III. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs' Motion for Summary Judgment argues that Plaintiffs are entitled as a matter of law to the permanent injunctive relief requested in their Amended Complaint. Summary judgment is only appropriate if the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if a reasonable factfinder could return a verdict for the nonmoving parties. *See id.* In determining whether such genuine disputes of material fact exist, courts view the evidence in the light most favorable to the

non-moving parties and resolve all disputed facts in their favor. *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018).

Plaintiffs' Motion sets out 104 "Undisputed Material Facts." *See* Pls.' Mot. for Summ. J. at 11-26. I do not disagree with Plaintiffs' description of this dispute as "largely legal." *See* Joint Status Report II at 2. Still, the table Defendants submitted containing their response to each of Plaintiffs' "Undisputed Material Facts" confirms that the facts necessary to resolve this dispute are not all settled. *See, e.g.*, Resp. to Pls.' Undisputed Material Facts at 20, ECF No. 77-6 (disputing the difference between a matching "preference" and an "exception" to the nondiscrimination requirements); *id.* at 22 (disputing whether preschools may exclude applicants on the basis of disability); *id.* at 24 (disputing whether the Department permits exceptions to the statutory nondiscrimination requirement on a case-by-case basis).

The first, fourth, and fifth claims in the Amended Complaint are brought under the Free Exercise Clause of the First Amendment, a violation of which occurs "when [a state] excludes religious observers from otherwise available public benefits." *Carson v. Makin*, 596 U.S. 767, 778 (2022). The right of free exercise does not, however, "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Employment Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)). "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). In contrast, a law that is not neutral or generally applicable "must be justified by a compelling governmental interest and

must be narrowly tailored to advance that interest." *Id.* at 531-32.

Here, Plaintiffs contend UPK Colorado's nondiscrimination requirements are neither neutral nor generally applicable and thus are subject to strict scrutiny. Defendants, on the other hand, maintain that the requirements are both neutral and generally applicable and pass the associated rational basis test. In deciding the merits of Plaintiffs' first, fourth, and fifth claims, key questions, then, are whether UPK Colorado's nondiscrimination requirements are neutral and whether they are generally applicable.

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533. Plaintiffs contend the State's actions in denying its request for a religious exception to the nondiscrimination requirements "reflected hostility to Plaintiffs' sincere religious beliefs." Pls.' Mot. for Summ. J. at 36-37. Whether such an inference is warranted is a question of fact that is intensely disputed in this case. For example, as evidence of the State's alleged hostility toward Plaintiffs' religious beliefs, Plaintiffs highlight Defendant Roy's testimony that the Department cannot allow participants to knowingly discriminate against children. *Id.* at 37; Roy Dep. 22:10-20, 29:19-31:11 ("We don't want any child to be harmed by being in a situation where they would be discriminated against. . . . The law is there to protect, and thank goodness it does."). Defendants, in turn, emphasize their efforts to engage with religious providers through the creation of the interfaith working group "to problem solve issues as they arise from within the faith-based community and facilitate participation." Feb. 28, 2023 Roy Letter, ECF No. 32-13 at 2; Resp. to Pls.' Mot. for Summ. J. at 13. This evidence must be weighed and a determination must be made regarding the "object" of UPK Colorado's

nondiscrimination requirements.[8]

Likewise, determining whether the nondiscrimination requirements are generally applicable involves genuine disputes of material facts. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. 1868, 1877 (2021) (quoting *Smith*, 494 U.S. at 884). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* Defendants contend UPK Colorado "does not exempt any provider, secular or faith-based from its antidiscrimination requirements, nor does it permit secular conduct that undermines its antidiscrimination interests." Resp. to Pls.' Mot. for Summ. J. at 14, ECF No. 77. Plaintiffs argue aspects of the Program do just that, highlighting the statutory provision permitting a temporary waiver of some quality standards and the general and individualized provider preferences that permit departures from the standard matching process.

The statutory provision authorizing the Department to temporarily waive a UPK Colorado provider's compliance with some quality standards does not permit a waiver for those standards relating to health and safety. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). The statutory framework is not clear on which of the quality standards relate to health and safety. As noted above, Defendants represent that the Department interprets the statutory nondiscrimination requirement as relating to health and safety, meaning the Department cannot grant a temporary waiver for noncompliance with that requirement. *See* note 3, *supra*. The Department is charged

---

[8] Plaintiffs insist that *Carson v. Makin* "alone is enough to decide [their] motion." Pls.' Mot. for Summ. J. at 9. But *Carson* likewise requires a finding that the Named Preschools are "disqualified from th[e] generally available benefit 'solely because of their religious character,'" i.e., a finding of non-neutrality. 596 U.S. at 780 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)).

with promulgating the requisite regulations, and its interpretation of its authority to grant temporary waivers may control. Nonetheless, the evidence presented on this issue is not satisfactory—Defendants offer their representation to the Court without evidence, and Defendants cite less than persuasive testimony in response. *See id.* More factual development on this issue is necessary.[9]

Plaintiffs argue that the preferences providers may select as departures from the standard UPK Colorado matching process constitute exceptions to the nondiscrimination requirements such that the requirements are not generally applicable. Plaintiffs assert: "[E]specially with regard to disability, religion, and income—the permitted categorical exceptions directly contradict the [statutory] nondiscrimination requirement." Pls.' Mot. for Summ. J. at 33 n.2. While none of the optional preferences on their face exempt compliance with the nondiscrimination requirements, it is difficult to decipher from the evidence—as the parties have presented it—whether discrimination contrary to each aspect of the nondiscrimination requirements is permitted by the Department's implementation of the optional preferences. To illustrate, one of the optional preferences allows faith-based providers to reserve seats for children from their congregation. If that preference allows providers to discriminate on the basis of a particular status enumerated in the nondiscrimination requirements, that would support a finding that the associated nondiscrimination requirements are not generally applicable. Conversely, if the preference is based on some other attribute and not a status protected by the

---

[9] Additionally, Defendants argue that, even if the temporary-waiver provision applied to the nondiscrimination requirement, it would be available to all providers meeting the specifications. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(II) (permitting a waiver when "necessary to ensure the availability of a mixed delivery system within a community" if the provider is "working toward compliance"). Under those circumstances, the parties would need to address how the provision compares to the fully discretionary exception in *Fulton v. City of Philadelphia*, 141 S. Ct. at 1878-79.

nondiscrimination requirements and if any lesser opportunity for students to enroll does not undermine the asserted interests, a finding that the requirements are generally applicable may be appropriate. The factual issues surrounding the optional preferences and particular statuses must be resolved to determine whether the UPK Colorado nondiscrimination requirements are generally applicable. Plaintiffs argue that whether the preferences constitute exceptions to general applicability "in the relevant sense is a question of Free Exercise Clause law, not a fact dispute." Reply in Supp. of Pls.' Mot. for Summ. at 9. In this case, where the contours and impacts of the alleged exceptions are disputed, I disagree.

Plaintiffs further contend that, by allowing individual provider preferences, the Department has "even granted exception requests that directly violated the [statutory nondiscrimination requirement]—including by allowing providers to take into account a child's disability." Pls.' Mot. for Summ. J. at 35-36. Defendant Odean clarified that UPK Colorado includes school-district-based providers that have specific programs for individuals with disabilities, either at one location of multiple locations or in a particular classroom within a location. Odean Dep. 98:25-99:23. The statutory nondiscrimination requirement mandates that providers "provide eligible children an equal opportunity to enroll and receive preschool services regardless of . . . disability, as such characteristics and circumstances apply to the child or the child's family." Colo. Rev. Stat. § 26.5-4-205(2)(b). At the trial, the parties will need to address whether serving only individuals with specific disabilities or reserving spots for those individuals is equivalent to failing to provide children an equal opportunity to enroll and receive services regardless of their disability. I am doubtful that it is. I also am not certain that allowing discrimination based on certain statuses negates efforts to prevent it based on other statuses.

Because genuine disputes of material fact linger, I find a trial on the merits is warranted

and deny Plaintiffs' Motion for Summary Judgment. The second, third, sixth, and seventh claims asserted in the Amended Complaint may be more appropriate for judgment as a matter of law.[10] However, it does not seem that evidence specific to those claims alone will be presented at the trial, and so I find it prudent to hold the trial and then rule on all the claims asserted in a final order.[11]

## IV. PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT WITNESS TESTIMONY

Also pending is Plaintiffs' Motion to Exclude the testimony of Defendants' retained expert witnesses—Drs. Abbie Goldberg and Amy Tishelman—and to limit four current or former State employees—Dawn Odean, Jesse Burne, Elsa Holguín, and M. Michael Cooke—to testifying only as fact and lay witnesses.

### A. Retained Expert Witnesses

Defendants intend to present the testimony of their retained experts to "place sexual

---

[10] I question whether a stipulation resolving the second and third claims in the Amended Complaint might be appropriate based on Defendants' apparent submission to the Court that Paragraph 18(b) of the Agreement will be interpreted "to permit religious organizations to hire co-religionists in accordance with federal law and to protect religious organizations' employment decisions about their ministerial employees in accordance with federal law," and thus, as it relates to Plaintiffs' second and third claims, requires no more and no less from the Named Preschools as employers. Odean Decl. ¶ 16. Plaintiffs claim Defendants' "disavowal" of that provision is insufficient, *see* Pls.' Mot. for Summ. J. at 43 n.3; Resp. to Mot. to Dismiss at 23, and it may be for standing purposes and for the other claims asserted. But the Amended Complaint's second and third claims pertain only to the impact of the provision on the Named Preschools' ability to ensure that their employees abide by standards of religious conduct, specifically in relation to marriage, human sexuality, and gender. *See* Am. Compl. ¶¶ 189-92, 196-97.

[11] Plaintiffs request, in the alternative, that I issue a preliminary injunction. The imminent trial obviates the need for the preliminary injunction, and thus that alternative request is likewise denied.

orientation and gender identity protections in their proper context" and to "unpack[] the State's interest in preventing the pain and loss and long-term trauma suffered by families when schools (or governments) intrude into this sensitive space." Joint Status Report II at 10-11. The offered experts are highly qualified and have performed extensive research in the relevant areas. Dr. Goldberg is a clinical psychologist and psychology professor at Clark University in Massachusetts, where she is the Director of Women's and Gender Studies. Goldberg Report, ECF No. 73-1 at 2. One of her areas of expertise and research is LGBTQ+ parent families, and she is the author of over 150 peer-reviewed articles, 25 book chapters, and four books. *Id.*, ECF No. 73-1 at 3. Dr. Tishelman is a clinical and research psychologist and currently a Research Associate Professor at Boston College in Massachusetts. Tishelman Report, ECF No. 73-2 at 1. She has received funding from the National Institutes of Health for her research, which has focused on gender diverse and transgender youth. *Id.*, ECF No. 73-2 at 2. She has developed best practices for caring for and assessing gender diverse prepubescent children and has served as an expert witness approximately 40 times. *Id.*, ECF No. 73-2 at 2-4.

For good reason, Plaintiffs challenge neither the qualifications of these experts nor the reliability of their opinions. Instead, Plaintiffs contend their testimony is not relevant to the resolution of this case because "(1) *post hoc* justifications for a government action cannot, as a matter of law, supply the necessary compelling interest to satisfy the government's burden under strict scrutiny and (2) the proffered testimony fails to address the specific questions before this Court." Pls.' Mot. to Exclude at 1, ECF No. 73. Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

First, Plaintiffs argue that "there is no evidence that the Colorado Legislature or the

Department of Early Childhood reviewed and considered any of the studies or research relied on by either expert—or even that they considered the same topics—in making the decisions to exclude Plaintiffs [from UPK Colorado]." *Id.* at 3. But there is no requirement that, in evaluating the relevant governmental interest, courts may only review the evidence that was openly considered by the government when it took the challenged action. Here, as Defendants explain, "the circumstances surrounding the enactment of the statute, including but not limited to the objectives expressly identified in the statute, make clear the state's commitment to a publicly funded preschool program free from harmful discrimination." Resp. to Pls.' Mot. to Exclude at 3, ECF No. 83. The inclusion of the statutory nondiscrimination requirement and the focus on healthy environments and child and family outcomes demonstrate that the experts' research and opinions do not constitute impermissible, post hoc justifications. *See, e.g.*, Colo. Rev. Stat. § 26.5-4-205(1)(a) & (2)(b). The cases cited by Plaintiffs—*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), and *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008)—are distinguishable and do not support a contrary conclusion.

Second, Plaintiffs point to *Fulton v. City of Philadelphia* to support their argument that Defendants' expert testimony is irrelevant. Plaintiffs claim *Fulton* requires the Court to consider the State's specific interest in denying the Named Preschools an exception and not the overall objective of the State's nondiscrimination policies. So, according to Plaintiffs, "the question this Court must answer is whether the State has a compelling interest in denying [the Named Preschools] a religious accommodation which would allow these preschools to participate" in UPK Colorado. Pls.' Mot. to Exclude at 4. Plaintiffs maintain that neither of Defendants' experts offers opinions that would assist with answering that question. However, as Defendants note, Plaintiffs' argument presupposes that the nondiscrimination requirements are not generally

applicable and neutral. I have just found that factual disputes pertaining to these issues remain and thus the question cannot be resolved until trial. As a result, I find the proposed testimony of Drs. Goldberg and Tishelman to be relevant.

## B. Defendants' Employee-Witnesses

Plaintiffs also seek to prevent Defendants' employee-witnesses from being qualified as experts because doing so "would prejudice Plaintiffs by potentially allowing Defendants' fact witnesses to offer opinions beyond what is otherwise permitted by [Federal Rule of Evidence] 701." Pls.' Mot. to Exclude at 5. Plaintiffs do not identify any specific opinions these witnesses might offer that are beyond what is permitted by Rule 701. Additionally, because the trial is to the Court, the risk for prejudice is minimal.[12] I consequently deny this aspect of Plaintiffs' Motion. But Plaintiffs may object to particular opinions from Defendants' employee-witnesses during the trial, if appropriate.

## V. CONCLUSION

Accordingly, Defendants' Motion to Dismiss (ECF No. 38) is GRANTED IN PART in that the Archdiocese of Denver is DISMISSED as a party to this case. Plaintiffs' Motion for Summary Judgment is DENIED (ECF No. 61). Defendants' corresponding request pursuant to Federal Rule of Civil Procedure 56(d) is likewise DENIED. And Plaintiffs' Motion to Exclude Defendants' Expert Witness Testimony (ECF No. 73) is DENIED as indicated above.

---

[12] Defendants represent that their endorsement of their employee-witnesses as experts was out "an abundance of caution" in case Plaintiffs argued that the testimony exceeds lay bounds because it is beyond the scope of what a lay person on the street could testify to. Resp. to Pls.' Mot. to Exclude at 7. For this reason as well, the risk of any prejudice is minimal.

DATED this 30th day of December, 2023, nunc pro tunc.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE