## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| ST. MARY CATHOLIC PARISH IN LITTLETON; ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD; DANIEL SHELEY; LISA SHELEY; and THE ARCHDIOCESE OF DENVER, | Case No. 1:23-cv-2079-JLK |
| *Plaintiffs*, | |
| v. | **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| LISA ROY, in her official capacity as Executive Director of the Colorado Department of Early Childhood; and DAWN ODEAN, in her official capacity as Director of Colorado's Universal Preschool Program, | |
| *Defendants*. | |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................4

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ......................................8

FINDINGS OF FACT .......................................................................................................8

    A.  The Archdiocese of Denver ........................................................................8

    B.  Plaintiff preschools ....................................................................................9

    C.  Daniel and Lisa Sheley ............................................................................10

    D.  The Archdiocese's religious guidance and directives for Plaintiff preschools ................10

    E.  Plaintiff preschools' religiously mandated employment policies ......................................12

    F.  Plaintiff preschools' religiously mandated student enrollment policies ...........................14

    G.  UPK Colorado ..........................................................................................17

    H.  The Equal Opportunity Mandate ............................................................19

    I.  The Program Service Agreement and Paragraph 18(B) ...................................19

    J.  Statutory authority ..................................................................................20

    K.  Categorical exceptions .............................................................................20

    L.  Individualized exceptions ........................................................................23

    M.  UPK Colorado's ongoing enrollment ......................................................24

    N.  Plaintiffs' interest in UPK Colorado .......................................................24

    O.  Conflicts between the Mandate and Plaintiff preschools' beliefs ....................................25

    P.  Attempts to secure a religious accommodation ................................................26

    Q.  Participation in other government funding programs ......................................27

    R.  Effects of exclusion from UPK Colorado ................................................28

    S.  Alleged harm to LGBTQ families ...........................................................28

CONCLUSIONS OF LAW ...............................................................................................30

I.  Free Exercise Clause ............................................................................................. 31

   A.  Exclusion based on religious character and exercise (Count I) ......................... 31

   B.  Lack of neutrality and general applicability (Count IV & V) ........................... 35

      1.  General applicability—categorical exceptions ........................................... 35

      2.  General applicability—individualized exceptions ...................................... 43

      3.  Neutrality ................................................................................................ 46

   C.  Strict scrutiny ................................................................................................ 47

      1.  Compelling interest ................................................................................. 47

      2.  Narrow tailoring ...................................................................................... 55

   D.  Rational basis ................................................................................................ 58

II.  Church autonomy ................................................................................................. 58

   A.  Ministerial exception (Count II) ..................................................................... 59

   B.  Church autonomy (Count III) ......................................................................... 60

   C.  Defendants' intention to voluntarily cease enforcing Paragraph 18(B) in the future ........ 60

III. Expressive association (Count VI) ......................................................................... 62

IV. Denominational favoritism (Count VII) ................................................................. 63

V.  Relief .................................................................................................................... 65

   A.  Permanent injunction ..................................................................................... 65

      1.  Irreparable harm ...................................................................................... 66

      2.  Balance of the equities and public interest ............................................... 67

   B.  Declaratory judgment ..................................................................................... 68

   C.  Nominal damages ........................................................................................... 68

[PROPOSED] JUDGMENT AND ORDER ................................................................. 69

CERTIFICATE OF SERVICE ..................................................................................... 73

## INTRODUCTION

This is a case about whether two Catholic preschools can participate in Colorado's Universal Preschool Program without abandoning their sincere religious exercise. Throughout this litigation, Defendants have thrown every possible argument against the wall to keep Plaintiffs out of UPK Colorado—from pretending Plaintiffs "voluntarily" chose not to participate, to offering a host of utterly baseless arguments like claiming that Plaintiffs' religious beliefs are inconsistent, that those beliefs are harming four-year-olds, and that Plaintiffs seek an exception no other UPK provider has ever been granted.

The evidence at trial told a very different story. Plaintiff preschools—the parish preschools at St. Mary Catholic Parish and St. Bernadette Catholic Parish—persuasively demonstrated that they were excluded from UPK Colorado on account of their sincere religious exercise and that, but for this exclusion, they would immediately seek to participate in the program. And Lisa Sheley testi-fied that, but for Defendants' actions, she and her husband Dan would be eligible for at least 15 hours per week of free preschool for their four-year-old, saving them $4,700 annually.

In response, Defendants put on the Director of UPK Colorado who confirmed that preschools can participate in the program *even if* they limit their enrollment based on disability, religious affiliation, income level, race, sexual orientation, and gender identity (all of which are statuses covered by the Equal Opportunity Mandate). Defendants also put on experts who (i) confirmed that no preschool student or family has been or likely will be harmed by Plaintiffs' religious beliefs or exercise, (ii) were unable to point to a single study showing harm to preschoolers from a (hy-pothetical) preschool enrollment denial, and (iii) failed to come up with any evidence (or even a theory) supporting Defendants' claim that *excluding* two Catholic preschools from UPK Colorado somehow *increases* access to affirming preschools. Instead, the evidence at trial confirmed that the only people actually harmed are families like the Sheleys—families motivated by their faith to

send their kids to Catholic preschools and who are being denied a generally available government benefit as a result.

The most on-point line of Supreme Court precedent regarding denials of government funding on account of religious exercise starts with cases like *Sherbert* and *Thomas* and culminates in *Carson v. Makin*. And under *Carson*, if Colorado has excluded Plaintiff preschools and the Sheleys from a generally available government funding program on account of their religious exercise, strict scrutiny is triggered *regardless* of whether the program is otherwise deemed neutral and generally applicable (in fact, *Carson* notes that exclusion on these grounds is *itself* clear evidence of non-neutrality). Here, there is no dispute that Plaintiff preschools and the Sheleys are excluded from UPK Colorado on account of their religious exercise. Strict scrutiny is required.

But that is just the start of Defendants' constitutional violations. As this Court recognized in its summary judgment order, the "key question[]" to be addressed at trial was whether UPK Colorado's Equal Opportunity Mandate is both neutral and generally applicable. The evidence confirmed that it is not. Starting with general applicability, the testimony showed that preschool providers may deny families an "equal opportunity to enroll and receive preschool services" on account of "religious affiliation" (a Catholic preschool could exclude Lutheran families, and vice versa); "race" (UPK preschool could limit enrollment to "children of color from historically underserved areas"); "disability" (UPK preschool could serve only children with disabilities); "income level" (Head Start programs could limit enrollment based on "income level"); "sexual orientation" (UPK preschool could limit enrollment to "the LGBTQ community"); and "gender identity" (UPK preschool could limit enrollment to "gender-nonconforming students"). Providers therefore participate in UPK Colorado *today* without complying with the Mandate's plain terms for at least six other reasons—even while the Department denies Plaintiffs that same opportunity solely on account of their religious exercise. Defendants can't dispute these facts; they instead argue that there are good reasons to allow other providers to have these enrollment preferences,

and that they are consistent with the purpose behind the UPK statute. But that's exactly the point—when the government is making value-laden decisions regarding *which* reasons are the right reasons, strict scrutiny is triggered under *Tandon* and *Kennedy*.

There is more. In addition to categorical exceptions, the Department has at least two mechanisms for granting individualized exceptions: a statutory provision and a wholly discretionary individualized exception process. As for the statutory provision, Defendants' only response is to claim that the Equal Opportunity Mandate (primarily concerned with ensuring equality in the admissions process) is actually a "health and safety" requirement. But this interpretation flies in the face of common sense, contradicts the text of the Department's own contracts, and appears to have been invented during this litigation. And as for the wholly discretionary exceptions, even the two *examples* Defendants used on their exception request form violate the Mandate (allowing a provider to serve only "teen moms" or children with disabilities), confirming this process was intended to allow some UPK preschools to seek exceptions from the plain text of the Mandate—just not religious schools like Plaintiff preschools.

Defendants' exclusion of Plaintiff preschools is also not neutral. Defendants openly disparaged Plaintiffs' religious beliefs—even comparing them to 1970s segregation academies in the South. And—while "work[ing] really hard" to accommodate everyone else—Defendants appear to have singled out only schools with Plaintiffs' religious beliefs for exclusion, letting in over 2,000 other preschool providers.

Having triggered strict scrutiny in at least four separate ways, Defendants fail to meet its high standard. Defendants' alleged interests are hardly compelling when they (i) lack any evidence that their actions address an actual (non-speculative) harm, (ii) cannot connect their alleged interest to the decision to exclude Plaintiff preschools from UPK Colorado, and (iii) put on expert testimony undermining their own claims. Nor have Defendants demonstrated that they are pursuing their interests in a way that is narrowly tailored; instead, they have declined to pursue alternative ways

of advancing their interests with respect to Plaintiff preschools, even as they employ the very same alternatives for numerous other providers.

Beyond these Free Exercise Clause claims, Defendants' attempt to regulate Plaintiff preschools' employment decisions violates the principles of church autonomy, and both the Mandate and Paragraph 18(B) (Defendants' catch-all nondiscrimination provision) infringe on Plaintiff preschools' right of expressive association and favor some religious groups over others, violating denominational neutrality.

Because Plaintiff preschools and the Sheleys have shown success on the merits, this Court should enter final judgment in their favor. Specifically, this Court should grant an injunction allowing them to participate in UPK Colorado immediately, as well as declaratory relief and nominal damages.

### [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Trial to the bench was held from January 2, 2024, through January 4, 2024. Having heard the testimony of the witnesses and assessed their credibility, reviewed and considered the exhibits admitted into evidence, heard and considered the statements of counsel and reviewed the applicable law, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT[1]

#### A. The Archdiocese of Denver

1.   "The Archdiocese of Denver is the geographic reality" of "the Catholic Church in northern Colorado." It "operates under the pastoral leadership of Archbishop Sam[uel] Aquila." Tr. (Day 1, Chilelli) 35:17-36:2.[2]

2.   The Archdiocese's purpose "is to establish ministries across northern Colorado in order to communicate the message of the gospel, … and in that way, … lead the faithful and the non-faithful to the rescue of Jesus Christ." *Id.* at 36:5-10.

3.   Among the Archdiocese's ministries are preschools. In particular, the Archdiocese's Office of Catholic Schools oversees 36 parish and Archdiocesan preschools serving approximately 1,500 students, including the preschools of Plaintiffs St. Mary Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood. *Id.* at 36:13-37:13; Tr. (Day 1, Seul) 73:3-24; Tr. (Day 1, Coats) 105:1-12.

---

[1]   This Court already admitted all the stipulated trial exhibits and stated that, as to the others, the Court would reserve its ruling on the motion seeking their admission "until the findings of fact." Tr. (Day 1) 31:20-32:8; *see* ECF No. 79 (unified exhibit list). The Court also clarified that, given the reservation of the ruling on the motion, there was no need to offer each exhibit individually during trial. Tr. (Day 1) 41:23-24. Accordingly, Plaintiffs now respectfully re-urge their motion to admit the following 13 non-stipulated exhibits: Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 23, 33, 38, and 39. Plaintiffs' remaining non-stipulated exhibits—specifically, 1, 26, and 27—have already been admitted by the Court. *See* Tr. (Day 1) 40:20-22, 129:12-17; ECF No. 97 at 2-3.

[2]   Citations to "Tr." refer to the transcript of the January 2-4, 2024, bench trial. *See* ECF Nos. 103, 104, 106.

4.   Archdiocesan preschools exercise the delegated teaching authority of the Archbishop within the hierarchy of the Catholic Church. Tr. (Day 1, Chilelli) 37:10-38:3; Tr. (Day 1, Seul) 73:1-24. The mission of the Archdiocese's schools is to be "sanctuaries of education … [and to] support parents and empower families in their mission, which is to lead children to Jesus Christ in order that those children might have abundant life for the glory of the Father." Tr. (Day 1, Chilelli) 40:24-41:20; Ex. 3 at 1.

## B.  *Plaintiff preschools*

5.   Plaintiffs St. Mary's and St. Bernadette's operate Catholic preschools to assist parents in providing a high-quality religious education to their children. Tr. (Day 1, Seul) 74:2-5; Tr. (Day 1, Coats) 111:4-9; Ex. 14 at 3-4; Ex. 17 at 7.

6.   St. Mary's aim is to form its preschoolers into "saints, heroes, and geniuses." Tr. (Day 1, Seul) 86:6-9; Ex. 17 at 7 ¶ 1. As part of its preschool admissions process, St. Mary's asks interested families to complete an inquiry form and visit the preschool. After touring the preschool and meeting the preschool director, families interested in enrolling must complete a formal application and meet with the school's principal. If admitted, the family then must complete and sign an enrollment packet that includes the Archdiocese's Statement of Community Beliefs, the school handbook, and other forms. Tr. (Day 1, Seul) 76:25-79:20; *see also* Ex. 2; Ex. 17; Ex. 18.

7.   St. Bernadette's school, called Wellspring Catholic Academy, aims "to raise up disciples of Christ … through our motto of dig deep, … find more, and share greatly," and through "academics, faith, service, and adventure." Tr. (Day 1, Coats) 106:10-14; Ex. 14 at 6-8. To enroll a child at Wellspring, a family must similarly complete an application packet, set up a family tour, and (in most cases) schedule a shadow day for their child. The principal also meets with the family. Once a child is accepted, the parents review and sign the school handbook, which also incorporates the Archdiocesan Code of Conduct. Tr. (Day 1, Coats) 109:9-110:6, 111:2-112:12.

8.   Both St. Mary's and Wellspring's preschools are licensed in the State of Colorado and have attained four-star ratings (the second highest score) from the Colorado Shines rating system, which is operated by the Colorado Department of Early Childhood. Tr. (Day 1, Seul) 71:13-72:1; Tr. (Day 1, Coats) 104:17-23; Tr. (Day 3, Burne) 398:14-20.

### C.  Daniel and Lisa Sheley

9.   Plaintiffs Daniel and Lisa Sheley are parishioners of St. Mary's. They currently have a four-year-old enrolled at St. Mary's preschool. Tr. (Day 1, Sheley) 97:14-17, 98:2-10, 98:18-20, 99:4-6. The Sheleys also have a three-year-old at St. Mary's preschool and a one-year-old who they plan to send to St. Mary's once she is old enough. *Id.* at 99:10-14.

10. The Catholic Church teaches that "Catholic parents have a duty to provide a Catholic education for their children." Tr. (Day 1, Chilelli) 55:8-9.

11. The Sheleys believe that it is their "directive as Catholics" to provide their children with a Catholic education and that "as Catholics, [faith formation is] something that's very important." Tr. (Day 1, Sheley) 99:1-3, 100:5-7. This is why the Sheleys send their four-year-old to St. Mary's. *Id.* at 99:1-100:14. Because they have chosen a Catholic preschool rather than a secular one, the Sheleys are losing out on 15 hours of free preschool every week, which is costing them roughly $4,700 this school year. *Id.* at 100:14-101:9.

### D.  The Archdiocese's religious guidance and directives for Plaintiff preschools

12. Archdiocesan preschools, including St. Mary's and Wellspring, are bound to follow the Archdiocese's religious teachings and guidance, especially on matters of faith and morals. Tr. (Day 1, Chilelli) 38:4-20; Tr. (Day 1, Seul) 73:13-24; Tr. (Day 1, Coats) 105:9-12; Ex. 1 at 1.

13. As relevant to this case, the Catholic Church's teachings on marriage and sexuality flow from beliefs about "Christian anthropology." Tr. (Day 1, Coats) 119:13-19. In particular, the Archdiocese believes and teaches "that human beings were created by a loving creator, God, … that the human person is endowed, created, not only with a soul, but with a body, and that the body-soul

unity is the makeup of the human person," which "communicates" human beings' "identity." Tr. (Day 1, Chilelli) 47:13-48:2. Accordingly, "being a biological man or a woman is of great importance and reverence." *Id.* at 48:3-4. And because of this, "the church has a particular understanding of marriage as being between a man and a woman, given the biological realities of the body, and the way that the body is ordered towards unity with one another and the procreation of children." *Id.* at 47:13-48:12; *see* Tr. (Day 1, Coats) 127:8-11.

14. The Archdiocese also teaches that "the Church is obligated to equip the faithful with an understanding of God's creation of the world, the nature of the human person, the importance of human sexuality, and the grace and virtue needed to be truly alive and happy on our way to eternal life," Ex. 7 at 5, and that "Catholic schools in particular need to implement policies that are consonant with Christian anthropology's view of the person," Ex. 5 at 4.

15. In accordance with these teachings, the Archdiocese, through its Office of Catholic Schools, has provided extensive guidance to its schools, teachers, and families—most fully set out in an eighteen-page document titled *Guidance for Issues Concerning the Human Person and Sexual Identity*. Ex. 5. This document explains the Church's teachings regarding gender, sexuality, and personhood, and provides practical guidance on how Catholic schools should implement these teachings. *See* Tr. (Day 1, Chilelli) 48:20-54:23; Ex. 5; Ex. 7 at 5. Plaintiff preschools follow this guidance in operating their preschools. Tr. (Day 1, Seul) 80:6-15; Tr. (Day 1, Coats) 112:15-113:4.

16. As this guidance makes clear, "[s]ituations involving individuals should be addressed with pastoral care that is rooted in love and concern for the person; pastoral care recognizes God's call to every baptized person to share in his eternal life and to follow the moral law as the way to happiness. 'A person's discomfort with his or her sex, or the desire to be identified as the other sex, is a complicated reality that needs to be addressed with sensitivity and truth. Each person deserves to be heard and treated with respect; it is our responsibility to respond to their concerns with compassion, mercy and honesty.'" Ex. 5 at 3.

17. Also, in accordance with this guidance, Archdiocesan schools (including Plaintiff pre-schools) must use pronouns that correspond with biological sex, enforce dress code expectations corresponding to biological sex, and make changing and bathroom facilities available only in correspondence with biological sex. *See* Tr. (Day 1, Chilelli) 53:9-54:23; Tr. (Day 1, Seul) 80:6-15; Tr. (Day 1, Coats) 112:20-113:4, 120:1-6; Ex. 5 at 2, 9-12.

18. This guidance is just one example of how the Archdiocese's Office of Catholic Schools helps to advance its religious educational mission at Archdiocesan schools, including at St. Mary's and Wellspring. Tr. (Day 1, Chilelli) 38:18-39:8, 42:1-16. Others include:

- Providing Archdiocesan schools with an Administrators' Manual that gives guidance on their day-to-day operations in their role as Catholic schools within the Archdiocese. *See id.* at 39:9-40:6; Ex. 1.

- Requiring all Archdiocesan schools to have staff sign a "Statement of Community Belief" when entering into employment contracts. *See* Tr. (Day 1, Chilelli) 42:5-16, 43:21-45:14; Tr. (Day 1, Seul) 75:10-25; Tr. (Day 1, Coats) 105:18-25; Ex. 2.

- Requiring Archdiocesan schools to use Archdiocese-approved employment contracts for all staff (including preschool teachers). *See* Tr. (Day 1, Chilelli) 42:10-13, 45:18-25, 46:11-25; Tr. (Day 1, Coats) 105:18-25; Ex. 6.

- Providing courses of study and curriculum guides for mandatory use in Archdiocesan schools. Tr. (Day 1, Chilelli) 42:17-43:20; Tr. (Day 1, Coats) 119:15-19; Ex. 9.

- Adopting a code of conduct which all Archdiocesan employees and employees of Archdiocesan schools are required to sign. *See* Tr. (Day 1, Chilelli) 45:21-46:10; Tr. (Day 1, Coats) 105:18-106:8; Ex. 4.

- Providing ongoing tools and guidance to Archdiocesan schools as they carry out their religious mission. Tr. (Day 1, Chilelli) 48:20-54:23; Tr. (Day 1, Seul) 73:13-24, 93:19-22; Tr. (Day 1, Coats) 125:4-9; Ex. 5; Ex. 7 at 5.

### E.  *Plaintiff preschools' religiously mandated employment policies*

19. St. Mary's, Wellspring, and the Archdiocese believe that Catholic preschools can fulfill their religious mission only if those who lead their community are properly formed in the Catholic faith and only if those who make up the community are open and receptive to the teaching of the faith. Tr. (Day 1, Chilelli) 45:4-14; Tr. (Day 1, Seul) 74:6-76:15; Tr. (Day 1, Coats) 106:15-107:1, 107:21-23, 108:11-16.

20. Accordingly, the Archdiocese requires that those who teach and pass on the Catholic faith, including all preschool teachers, "live in such a way that would promote the church's teachings. We ask them to unabashedly defend the church's teachings, … and at the bare minimum to never live in a manner contrary to church teaching that would cause confusion about the reputation of the school and what it teaches." Tr. (Day 1, Chilelli) 45:9-14; *see, e.g.*, Ex. 6 at ¶ 5(c).

21. Teachers, faculty, and staff, including at Plaintiff preschools, must therefore agree to the Archdiocese's Statement of Community Beliefs (laying out the Archdiocese's vision for how educators and families can participate in the Catholic school community) and the Archdiocesan Code of Conduct when they sign their contracts. Tr. (Day 1, Chilelli) 45:15-25; Tr. (Day 1, Seul) 75:14-25; Tr. (Day 1, Coats) 105:22-25; Ex. 2; Ex. 4; Ex. 6 at 2, 4.

22. The Archdiocese also requires all teachers at its Catholic schools, including preschool teachers, to have a provisional catechetical certificate, certifying that they are thoroughly trained in catechesis, which is the teaching of the faith. Tr. (Day 1, Chilelli) 40:16-19.

23. St. Mary's further requires that its teachers be Catholic. Tr. (Day 1, Seul) 76:1-3. Wellspring, in turn, requires that all its teachers (even non-Catholics) uphold the values and beliefs of the Catholic Church. Tr. (Day 1, Coats) 107:21-23.

24. At St. Mary's and Wellspring, preschool teachers are responsible for incorporating faith throughout the curriculum and for modeling faithful behavior in their own actions. Tr. (Day 1, Seul) 74:17-75:9; Tr. (Day 1, Coats) 107:21-23, 119:4-12. To facilitate this, both St. Mary's and Wellspring offer opportunities for teachers to grow in their own faith. Tr. (Day 1, Seul) 76:16-22; Tr. (Day 1, Coats) 107:6-20, 108:1-7.

25. While non-teaching staff at both Plaintiff preschools are not required to be Catholic, they "need to be supportive of our beliefs, and … understand and [be] supportive of our teaching and theology." Tr. (Day 1, Seul) 76:10-15; *see* Tr. (Day 1, Coats) 108:11-16, 116:12-18.

*F.  Plaintiff preschools' religiously mandated student enrollment policies*

26. St. Mary's, Wellspring, and the Archdiocese believe that the mission of Catholic schools is to partner with parents to nurture the distinctly Catholic education of their children. Tr. (Day 1, Chilelli) 41:14-20, 51:13-14; Tr. (Day 1, Seul) 81:18-22, 82:13-83:18; Tr. (Day 1, Coats) 111:4-9; Ex. 2 at 7-8; Ex. 17 at 7 ¶ 2; Ex. 18 at 3874.

27. The Archdiocese's schools "can't fulfill [their] mission without that partnership" or without parents "understanding the mission of [the] schools and desiring it." Tr. (Day 1, Chilelli) 55:21-25. It is therefore important that parents "[d]esir[e] to teach [a Catholic worldview] within their family, to promote it, to defend it, and have their children formed in [it]." *Id.* at 55:21-25; *see also id.* at 55:1-25; Tr. (Day 1, Seul) 78:16-21, 82:15-18; Tr. (Day 1, Coats) 111:4-9. Accordingly, families who send their children to St. Mary's and Wellspring must support and uphold the teachings of the Church. Tr. (Day 1, Seul) 82:1-6; Tr. (Day 1, Coats) 112:17-19, 116:12-18.

28. Plaintiffs believe that when what is being taught in the classroom conflicts with the education and example in the home, this conflict can undermine a Catholic school's mission. Tr. (Day 1, Chilelli) 51:13-20; Tr. (Day 1, Seul) 78:22-79:10, 83:11-18; Tr. (Day 1, Coats) 114:2-13, 126:2-5.

29. Accordingly, the Archdiocese instructs its schools (including its preschools) to have parents sign the Statement of Community Beliefs at the time of enrollment "so that it's abundantly clear what the Catholic school will teach and what the Catholic school community believes." Tr. (Day 1, Chilelli) 44:18-23; Tr. (Day 1, Seul) 75:19-25, 79:13-24; Ex. 2 at 7-8; *see also* Tr. (Day 1, Coats) 111:12-112:12; Ex. 15; Ex. 16. The Statement makes clear that families are expected to "understand and display a positive and supportive attitude toward the Catholic Church, her teachings, her work, and the mission of the Catholic school," "to recognize, respect, and bear witness to the Catholic identity of the school," and to "refrain from public promotion or approval

of any conduct or lifestyle that would discredit, disgrace, or bring scandal to the School … or be considered a counter-witness to Catholic doctrine or morals." Ex. 2 at 8.

30. The Archdiocese defines a "parishioner" of a Catholic parish to include any baptized Catholic residing within the geographic boundaries of that parish. Tr. (Day 1, Chilelli) 67:9-15. Being a parishioner does not necessarily indicate alignment or agreement with the above requirements for enrollment at a Catholic school. *Id.* at 68:13-22.

31. Plaintiff preschools and the Archdiocese also believe that they must carefully consider whether enrolling students or families who oppose Catholic teachings in word or deed will create intractable conflicts that hinder the school's mission and disrupt family life. *See* Tr. (Day 1, Chilelli) 51:13-20, 52:3-53:2, 68:13-22; Tr. (Day 1, Seul) 78:22-79:10; Tr. (Day 1, Coats) 114:2-13, 125:4-9, 126:2-5; Ex. 5 at 6, 15.

32. Specifically, if a prospective student or family is presenting themselves as living in a sexual relationship inconsistent with how the Catholic Church understands human sexuality, the Archdiocese requires that its preschools discuss the Church's teachings on human sexuality with the family, assess whether these teachings "may cause confusion for the child," and then determine if it "would be difficult for the child to hear [these teachings] from the school, especially if that's not what they hear from their parents." Tr. (Day 1, Chilelli) 51:3-12. "[B]ecause the school's mission is to serve the parents in their education of their children, [the school] would never want to … cause conflict with what the parents are teaching in their home;" so enrollment would not be possible "given the confusion it would create for the child and the family." *Id.* at 40:18-51:22; *see also* Ex. 5 at 14-16.

33. Similarly, if a family seeks to enroll a child who asserts a gender identity at odds with the child's biological sex (something which hasn't happened at either Plaintiff preschool), the Archdiocese requires that its preschools explain to the parents that the school adheres to and teaches Catholic theology on the good of the body's biological reality and make clear that if the parents

are affirming or teaching a contrary belief or perspective, this will create conflict for the child. If this conflict exists, then "out of abundant respect for the family," the school cannot enroll that child. Tr. (Day 1, Chilelli) 52:3-53:2; *see also* Ex. 5 at 5-9.

34. Accordingly, Archdiocesan schools have at times had to make the difficult decision to help a family find alternative options rather than enrolling at a Catholic school when they determine that admitting that family would cause conflict and confusion within the school and the family. Tr. (Day 1, Coats) 114:2-13. Indeed, in 2023, a same-sex couple inquired about enrolling their fifth grader at Wellspring. *Id.* at 113:5-11, 114:2-13. The parents were interested in Wellspring because their fifth-grader's previous school had instituted unisex bathrooms, which left them "quite appalled" and "upset" because they "did not want their daughter exposed to this." *Id.* at 125:15-23. After meeting with the parents, Ms. Coats (the school's principal) consulted with Wellspring's pastor and the Archdiocese about the possibility of admitting the student. *Id.* at 125:7-9. They ultimately determined that admitting this student would "create an intrafamily conflict and cause confusion for the family" given the school's adherence to the Catholic Church's teachings on same-sex relationships. *Id.* at 114:2-13, 125:4-9, 126:2-5. Thus, Wellspring informed the parents that it could not admit their fifth-grade student; in response, the parents "were understanding" and "very kind." *Id.* at 125:24-126:12.

35. While this has happened with respect to a student seeking enrollment in fifth grade, to date neither of the Plaintiff preschools has knowingly received an inquiry from same-sex parents or from an LGBTQ child seeking to enroll. Tr. (Day 1, Seul) 80:16-81:2; Tr. (Day 1, Coats) 114:19-115:10, 126:13-19. And neither has enrolled an LGBTQ student. *Id.*

36. Moreover, as both sides agree, neither Plaintiff preschool has ever received a complaint from an LGBTQ family or other persons alleging LGBTQ-based discrimination. Tr. (Day 1, Seul) 81:3-5; Tr. (Day 1, Coats) 115:11-13; Tr. (Day 2, Odean) 264:1-265:9; *see also* Ex. 39 ¶ 24; Tr. (Day 3, Burne) 407:4-7; 446:22-447:10. Similarly, not one of the other 34 licensed preschools

affiliated with the Archdiocese has any history of such complaints. Tr. (Day 1, Chilelli) 69:7-11; Tr. (Day 2, Odean) 264:1-265:9; *see also* Ex. 39 ¶ 21.

37. Plaintiff preschools also have admissions priorities (which they employ when there is a waitlist) that stem from their religious obligation to help Catholic families provide their children with a Catholic education. Tr. (Day 1, Chilelli) 55:1-11; Tr. (Day 1, Seul) 81:6-22; Tr. (Day 1, Coats) 115:22-116:5. For Plaintiff preschools, this means they prioritize admissions in a particular order: First, siblings of current students, then parishioners of their own parish, then Catholic families active in other Archdiocesan parishes and those Catholic families who have recently moved into the area, and lastly, non-Catholic families. Tr. (Day 1, Chilelli) 55:1-11; Tr. (Day 1, Seul) 81:6-22; Tr. (Day 1, Coats) 115:22-116:5.

38. When space is available, however, Archdiocesan schools welcome non-Catholics who "desire[] the [C]hurch's assistance in fulfilling their duties as parents" as an act of evangelization. Tr. (Day 1, Chilelli) 68:1-12; *see also* Tr. (Day 1, Coats) 117:18-25. Both St. Mary and Wellspring enroll non-Catholic families in their preschools. Tr. (Day 1, Coats) 116:19-21; Tr. (Day 1, Seul) 81:23-82:12.

## G.  UPK Colorado

39. In 2022, the Colorado General Assembly enacted a law establishing a system of state funding for "universal" preschool. Colo. Rev. Stat. §§ 26.5-4-201, *et seq.* ("the UPK statute"). The program, which is administered by the newly created Department of Early Childhood, aims to make some "preschool services" free for all Colorado children "regardless of their economic circumstances." *Id.* §§ 26.5-4-202(1)(a)(V), 26.5-4-204(1)(a). The program is open to all licensed childcare providers, private and public. Tr. (Day 1, Cooke) 143:24-144:7; Ex. 71 at 3-4 (defining "Preschool provider"). As the Department's witnesses emphasized at trial, it is "important that all families ha[ve] equal access ... to preschool programs of their choosing," Tr. (Day 1, Cooke)

142:25-143:1, and "that families ha[ve] a choice and … find that just-right provider … that best m[eets] their family's needs," Tr. (Day 2, Odean) 185:19-22.

40. The UPK statute therefore dictates that UPK Colorado use a mixed-delivery system. *See* Colo. Rev. Stat. § 26.5-4-202(1)(a)(VI); Tr. (Day 2, Odean) 207:17-208:2. The goal of this system is "to recruit and engage providers … of all types, school districts, center-based, home-based, [and] faith-based," Tr. (Day 1, Cooke) 147:23-25, so that the UPK program will "be as inclusive as possible," Tr. (Day 2, Odean) 196:22.

41. UPK Colorado "provides a significant benefit for the families" that participate. Ex. 26 at 123:7-10; *see also* ECF No. 77-6 ¶ 39. For the 2023-24 school year, the Department reimburses UPK providers for 15 hours of preschool per eligible child they enroll. Tr. (Day 2, Odean) 190:8-9; Ex. 26 at 18:15-18. This funding may be used "only to pay the costs of providing preschool services directly to eligible children enrolled by the" provider. Colo. Rev. Stat. § 26.5-4-208(5).

42. "Faith-based providers have always been envisioned to be part of the mixed-delivery model." Tr. (Day 1, Cooke) 160:16-17. And the Department "wanted to … give families every opportunity to seek a provider of their choosing, and that includes faith-based providers." *Id.* at 160:19-22.

43. UPK Colorado changes how participating preschools enroll families in their programs. Previously, preschools had the ability to interview and determine whether to accept applicants into their programs, but now, a family ordinarily enrolls directly in UPK Colorado, at which point the Department matches their child with a preschool provider by algorithm. Ex. 26 at 18:2-25, 22:4-19. The preschool may decline to enroll that child only if the preschool qualifies for a Department-approved exception (discussed below). *Id.* at 23:13-23, 24:1-6, 29:23-30:8, 32:25-33:5, 79:9-16; *see also* Tr. (Day 1, Cooke) 156:24-157:6; Tr. (Day 2, Odean) 255:9-18. More recently, the Department has started allowing families to enroll by showing up at a preschool participating in UPK Colorado and asking for a UPK application. Ex. 26 at 27:17-22, 29:23-30:8, 33:6-13. Even then,

however, if the school "ha[s] an open seat available," absent a Department-approved exception, the school "can't decline them." *Id.* at 30:2-3; *see also id.* at 32:25-33:5.

## H. The Equal Opportunity Mandate

44. The UPK statute directs the Department to develop "quality standards" with which preschool providers must comply and establishes requirements that must be included in those standards. Colo. Rev. Stat. § 26.5-4-205(1)(a), (2). Among these is the Equal Opportunity Mandate (or "Mandate"), which requires that "each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2)(b); Tr. (Day 2, Odean) 246:9-13. The Mandate extends to a preschool's operations, not just enrollment. Ex. 26 at 51:15-18; Colo. Rev. Stat. § 26.5-4-205(2)(b) (requiring "equal opportunity to enroll and *receive preschool services*" (emphasis added)).

45. The word "discrimination" does not appear anywhere in the text of the Mandate; instead, it requires "that providers have to provide an *equal opportunity* to enroll … ." Tr. (Day 2, Odean) 254:1-7, 254:21-255:1 (emphasis added); *see* Colo. Rev. Stat. § 26.5-4-205(2)(b).

## I. The Program Service Agreement and Paragraph 18(B)

46. Preschools seeking to participate in UPK Colorado must sign a Program Service Agreement (or "Agreement"). ECF No. 77-6 ¶¶ 46, 53 (admitting this fact); Ex. 13 (copy of Agreement); Tr. (Day 1, Seul) 88:2-8; Tr. (Day 1, Cooke) 164:24-165:1; *see also* Ex. 26 at 71:11-72:2; Ex. 27 at 22:5-20. If a prospective provider cannot sign the Agreement, it cannot participate in UPK Colorado. *Id.* Once they sign the Agreement, participating providers appear in the Department's Family Search and Application portal, allowing families to apply to use UPK program funds at their preschool. *See* Ex. 19; Ex. 26 at 24:14-24.

47. The Agreement includes a word-for-word recitation of the Mandate. Ex. 13 at 2; *see* Colo. Rev. Stat. § 26.5-4-205(2)(b). In addition, Paragraph 18(B) of the Agreement forbids "discrimi-nat[ion] against any person on the basis of … religion, … sexual orientation, [or] gender identity," Ex. 13 at 27 ¶ 18(B), and thus covers enrollment, hiring, and operational decisions made by pre-school providers, Ex. 26 at 66:1-67:13, 69:12-15.

48. The Department has three main ways to grant providers exceptions from the matching re-quirements and quality standards: first, by temporarily permitting noncompliant providers to par-ticipate while working toward compliance; second, by recognizing discretionary categorical ex-ceptions; and third, by recognizing individualized exceptions. The first way, as explained below, comes directly from the UPK statute. The second and third ways, by contrast, were created by the Department in response to requests from preschool providers. *See* Tr. (Day 2, Odean) 216:22-217:9, 272:2-6; Ex. 26 at 35:12-20, 79:17-25; 97:2-20.

### J. Statutory authority

49. The Department has statutory authority to grant exceptions from the quality standards. Spe-cifically, if it is "necessary to ensure the availability of a mixed delivery system within a commu-nity, the [D]epartment may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). Still, "each preschool provider must meet all quality standards relating to health and safety." *Id.*; *see* Tr. (Day 2, Odean) 207:7-16.

### K. Categorical exceptions

50. In addition, the Department has exercised discretionary authority to create categories of exceptions. Indeed, UPK Colorado's official Provider Guide lists several "exception criteria" that the Department has adopted. These criteria permit qualified preschools to either prefer or deny proposed matches based on certain characteristics. Ex. 24 at 37; *see* Tr. (Day 1, Seul) 92:6-19; Tr. (Day 1, Cooke) 155:13-23, 156:22-157:2. The criteria allow, among other things, "faith-based

provider[s]" to prefer "families" who are "part of" their "congregation"; providers to "support children with Individualized Education Plans (IEP)"; dual-language providers to "screen[]" program participants; and "Head Start grantee" programs to require families to "meet additional factors to enroll." Ex. 24 at 37. Providers have "an opportunity to review" the families they are "matche[d]" with and "exercise a decline option if the match does not fit the preference that has been granted to the provider." Tr. (Day 1, Cooke) 156:25-157:2; *see also* Ex. 12 at 2 ("[F]aith-based providers can … decline a match from a family that is not part of the congregation.").

51. As for the congregation exception, providers who qualify may require that families be adherents to a specific faith and may reject matches of other faiths. Tr. (Day 2, Odean) 239:13-240:1. For example, the Department interprets this exception to permit a school to limit admission to "all Catholics" or "all Lutherans" "in a particular area" and thus to "reserve seats" accordingly. *Id.* The Department allows preschools to self-select whether they are "faith-based" and does not verify their selection. ECF No. 77-6 ¶ 60 (admitting this fact); *see* Tr. (Day 2, Odean) 275:23-276:6.

52. As for the Head Start exception, providers who qualify may require that families satisfy "income level qualifications." Tr. (Day 1, Cooke) 171:7-10; *see also* Tr. (Day 2, Odean) 237:17-238:5. And for the children-with-IEP exception, providers who qualify may reserve seats for children with disabilities. Tr. (Day 1, Cooke) 171:11-17; Tr. (Day 2, Odean) 219:4-17, 238:6-11.

53. The exception criteria listed in the Provider Guide are incorporated into the Department's current proposed rules. *See* Ex. 24 at 37; Ex. 71 at 7. The proposed rules also list three additional criteria, including a broad catch-all exception that would permit providers to "grant[] preference to an eligible child based on the child and/or family being a part of a specific community; having specific competencies or interests; having a specific relationship to the provider or to the provider's employees, students, or their families; receiving certain public assistance benefits; or participating in a specific activity." Ex. 71 at 7. In addition to this catch-all, the proposed rule allows providers

to employ enrollment preferences for "continuity-of-care for that child" and "in order to keep siblings similarly located." *Id*.

54. Director Odean testified that under the proposed rules' new catch-all exception, a preschool provider could limit enrollment to only "gender-nonconforming children," to "children of color from historically underserved areas," and to "child[ren] and/or famil[ies]" from the "LGBTQ community," and exclude all other applicants. Tr. (Day 2, Odean) 244:15-246:8.

55. These updates to the proposed rules were finalized on New Year's Day and provided to Plaintiffs' counsel and the Court partway through the first day of trial. Tr. (Day 2, Odean) 240:18-242:4. The updates also included a new provision (similar to language used in Denver Preschool Program contracts) stating that "[n]othing in these rules shall be construed to affect an eligible preschool provider's right to engage in privately funded, inherently religious activity or affect the independence of eligible preschool providers, including any rights protected by the Colorado and U.S. Constitutions and applicable law." Ex. 71 at 8. At trial, the Department claimed that this proviso is not intended to "give an exception to" the Mandate and therefore "doesn't change" whether Plaintiff preschools' "enrollment practices are allowed or not allowed under the UPK program." Tr. (Day 2, Odean) 268:12-269:3.

56. After trial, the Department promulgated another new version of the proposed rules, but this version does not materially alter any of the provisions relevant to this litigation. *Compare, e.g.*, Draft Rules at 7 (§ 4.109(A)(10)), Colorado Department of Early Childhood (Jan. 8, 2024), https://perma.cc/78FG-M3R6, *with* Ex. 71 at 7 (§ 4.109(A)(10)).

57. There are multiple ways families are made aware of whether providers qualify for one of these exception criteria. When a family browses preschool providers on the UPK Colorado portal, the website shows that a provider has opted into one of the criteria. *See* Ex. 20; Tr. (Day 2, Odean) 263:15-25. Ms. Cooke also testified that the portal can prompt families to answer questions to determine whether they meet those criteria. Tr. (Day 1, Cooke) 167:11-168:2.

58. The Department has permitted 1,091 preschools to use at least one exception criteria. Ex. 28 at 6 (Interrogatory No. 7); Ex. 30; Tr. (Day 2, Odean) 255:22-25. Indeed, Director Odean con-firmed that it would be "really hard" to have "both a universal and a mixed delivery preschool program if every provider had to accept every child matched to that provider." Tr. (Day 2, Odean) 214:7-10.

### L. Individualized exceptions

59. Apart from the categorical exceptions, providers may also ask the Department for individ-ualized exceptions if they need greater "flexibility … to meet their organizational requirements, or [have] other unique situations." Ex. 32; *see* Tr. (Day 2, Odean) 256:1-257:8; *see also* Ex. 26 at 91:15-21, 96:24-97:10, 98:10-24 (individualized-exception request process).

60. The Department has created an online form for providers to submit these requests. *See* Ex. 31 (form); Tr. (Day 2, Odean) 256:5-14; *see also* Ex. 33 at 64-65. This form includes, as examples of individualized exceptions, requests based on disability and sex: "i.e. My location only serves teen moms enrolled at a neighboring high school; My location only serves children with specific disabilities." Ex. 31 at 55; *see also* Ex. 26 at 98:8-24 (Department could "potentially" allow pro-vider to only serve teen moms but "I wouldn't speculate."); Tr. (Day 2, Odean) 256:15-25. The Department has also granted numerous individualized exceptions. Ex. 34 (listing individualized exception requests that were granted); Tr. (Day 1, Cooke) 173:21-174:8; Tr. (Day 2, Odean) 257:9-23. For example, the Department has granted at least two requests permitting providers to admit only "fully vaccinated" children. *See* Ex. 34 at 82-83; Tr. (Day 2, Odean) 257:16-19. The Depart-ment continues to consider individualized exceptions under this process. Ex. 26 at 91:15-21.

61. The Department's proposed rulemaking states that "[i]n utilizing these programmatic pref-erences, eligible preschool providers must still comply with" the Equal Opportunity Mandate. Ex. 71 at 8. And at trial, Director Odean repeatedly claimed that the Department cannot—via rulemak-ing or discretionary exception—permit a school to act contrary to the Equal Opportunity Mandate.

*See, e.g.*, Tr. (Day 2, Odean) 206:22-207:6, 210:5-9, 268:21-24; *see also* Ex. 27 at 23:14-15 (Dr. Roy: "I cannot provide an exemption against what the law says."). Nevertheless, she also stated that the Department viewed the enrollment preferences and exceptions described above (admittedly permitting providers to *deny* an "equal opportunity to enroll" based on various protected statuses) as consistent with and permitted by the UPK statute, including the Mandate. Tr. (Day 2, Odean) 270:12-17.

### M. UPK Colorado's ongoing enrollment

62. For the current 2023-2024 school year, the Department has matched, and continues to match, families with preschools. Ex. 26 at 33:14-19, 35:12-20; *see also* Ex. 22. And it retains discretion to perform additional matching cycles at any time. Ex. 26 at 35:25-36:15; *see also id.* at 27:15-22 (families can continue enrolling in UPK Colorado).

63. Preschools, in turn, can sign up for UPK Colorado and start accepting matches at any time. Tr. (Day 2, Odean) 237:2-4; Ex. 26 at 33:14-25. Preschools that enroll in UPK Colorado in the middle of a school year can start receiving UPK funding for their current class of four-year-old students once they complete the UPK enrollment process. Ex. 26 at 33:14-25, 36:24-37:4.

### N. Plaintiffs' interest in UPK Colorado

64. When UPK Colorado was announced, the Plaintiff preschools initially planned to participate and were eager to do so. Tr. (Day 1, Seul) 89:12-24; Tr. (Day 1, Coats) 120:7-22. Wellspring's principal was "extremely excited" because "the majority of our families are low-income," so "any assistance that we [could] get" would have been "hugely helpful" to those families. Tr. (Day 1, Coats) 120:16-22. St. Mary's preschool director, Ms. Seul, "attended all of the UPK meetings that [she] could that the State was putting on"; she also contacted the school's local coordinating organization "to find out more about how the process was going to work." Tr. (Day 1, Seul) 89:17-24.

65. These preschools were disappointed to learn, however, that they could not participate. Tr. (Day 1, Seul) 89:25-90:7; Tr. (Day 1, Coats) 120:20-22. As more details about the program requirements emerged, the Archdiocese determined that its preschools could not—consistent with Catholic beliefs—sign the Agreement or operate their preschools consistent with the UPK program's requirements. *See* Ex. 10; Tr. (Day 1, Chilelli) 56:7-58:23. The Archdiocese communicated this directive to all 36 of its preschools on January 14, 2023. *See* Ex. 10; Tr. (Day 1, Chilelli) 56:23-57:5. As a result, neither of the Plaintiff preschools participates in UPK Colorado. Tr. (Day 1, Seul) 89:25-90:13; Tr. (Day 1, Coats) 120:23-121:8.

### O. *Conflicts between the Mandate and Plaintiff preschools' beliefs*

66. The Equal Opportunity Mandate requires "provid[ing] eligible children an equal opportunity to enroll and receive preschool services regardless of," among other things, "religious affiliation." Ex. 13 at 2; *see* Colo. Rev. Stat. § 26.5-4-205(2)(b). Paragraph 18(B) of the Program Service Agreement, in turn, forbids "discriminat[ion]" on the basis of "religion." Ex. 13 at 27.

67. The Mandate and Paragraph 18(B) therefore on their face prevent Plaintiff preschools from preferring Catholic families in enrollment, even though the schools believe it is their religious obligation to provide that preference. *See* Ex. 13 at 2, 27; Colo. Rev. Stat. § 26.5-4-205(2)(b); Tr. (Day 1, Chilelli) 66:22-69:2; Tr. (Day 1, Seul) 81:9-17; Tr. (Day 1, Coats) 115:17-20; Tr. (Day 1, Cooke) 169:20-24.

68. The Mandate requires providing preschoolers an equal opportunity to enroll "regardless of … sexual orientation[ and] gender identity." Ex. 13 at 2; Colo. Rev. Stat. § 26.5-4-205(2)(b). Paragraph 18(B) prohibits "discriminat[ion]" on these same bases. Ex. 13 at 27.

69. The Mandate and Paragraph 18(B) therefore prohibit Plaintiff preschools from considering whether a child or family is open to and supportive of the Catholic Church's teachings—including its teachings on human sexuality—or instead whether personal circumstances or actions would create intractable conflicts with those teachings. *See* Tr. (Day 1, Chilelli) 49:6-54:23; Tr. (Day 1,

Seul) 78:16-79:10, 82:1-9, 83:11-18; Tr. (Day 1, Coats) 113:5-8, 114:1-13, 116:12-18, 125:24-126:10; Tr. (Day 1, Cooke) 169:23-24 ("If [a school's] statement of faith is contrary to the equity statement in law, then that would be problematic."); Ex. 26 at 107:25-108:10. This at times requires Plaintiff preschools to consider the asserted sexual orientation and gender identity of families and children seeking a Catholic education. *See* Ex. 5 at 5-16 (Archdiocesan guidance on sexuality); Tr. (Day 1, Seul) 80:6-15 (St. Mary's follows this guidance); Tr. (Day 1, Coats) 112:20-113:4 (same for Wellspring); *see also* Tr. (Day 1, Chilelli) 49:6-54:23; Tr. (Day 1, Seul) 82:1-9.

70. Paragraph 18(B) also purports to regulate not only Plaintiff preschools' enrollment and provision of preschool services, but also their employment practices and policies. Ex. 13 at 27 (forbidding "discriminat[ion] against any person on the basis of ... religion, ... sexual orientation, [and] gender identity"); *see also* Tr. (Day 1, Chilelli) 40:12-19, 45:4-47:9, 56:13-22; Tr. (Day 1, Seul) 74:6-76:9; Tr. (Day 1, Coats) 105:13-106:8, 106:15-108:7, 108:11-16.

### P. *Attempts to secure a religious accommodation*

71. Because of these concerns, a coalition of religious preschool providers, including the Archdiocese, sent a letter requesting a religious accommodation from the State so that their schools could participate in UPK Colorado. *See* Ex. 11; Tr. (Day 1, Chilelli) 59:1-8, 59:21-60:8. But Defendant Dr. Roy sent a response letter stating that the Department lacked the authority to provide such an accommodation and denying the request. *See* Ex. 12; Tr. (Day 1, Chilelli) 59:6-8, 60:9-13. Plaintiff preschools are therefore barred from participating in UPK Colorado in a way that is faithful to and consistent with their religious beliefs. Ex. 27 at 27:8-28:9, 30:17-31:11.

72. Following Dr. Roy's denial of an accommodation, the Archdiocese continued to pursue avenues for its preschools to participate consistent with their faith. For example, the Archdiocese advised its preschools that they could "sign up as providers" in the UPK Colorado online portal and "send back" the Program Service Agreement to the Department "unsigned" along "with a letter explaining why we weren't able to sign that user agreement." Tr. (Day 1, Chilelli) 59:9-20;

*see also* Tr. (Day 1, Seul) 96:11-12; Tr. (Day 1, Coats) 121:9-16. By taking this fully optional route, a preschool could ask the Department for permission to participate in UPK Colorado *without* signing the Agreement (and thus not agreeing to the Mandate or Paragraph 18(B)). Tr. (Day 1, Chilelli) 59:9-60:3. In the end, neither of the Plaintiff preschools pursued this option, which the Archdiocese later reassessed. Tr. (Day 1, Seul) 95:25-96:7; Tr. (Day 1, Coats) 121:12-16, 123:13-15. Indeed, Ms. Seul already "knew that the local coordinating organization wouldn't accept" St. Mary's as a UPK provider if it did not sign the Agreement. Tr. (Day 1, Seul) 96:2-7; *supra* ¶ 46 (Department admitting providers must sign Agreement to participate). And regardless, the only Archdiocesan preschool that attempted this option received no response from the Department. Tr. (Day 1, Chilelli) 59:25-60:3.

### Q. *Participation in other government funding programs*

73. Plaintiff preschools have participated in other government-funded tuition-assistance programs (such as the Denver Preschool Program, or DPP, and the Colorado Child Care Assistance Program, or CCCAP) when doing so does not conflict with their Catholic beliefs. Tr. (Day 1, Chilelli) 60:25-65:13 (explaining the Archdiocese's theological guidance that participation in these programs is consistent with Catholic teachings); Tr. (Day 1, Seul) 87:24-89:5 (St. Mary's follows the Archdiocese's guidance on participation in CCCAP); Tr. (Day 1, Coats) 117:1-20 (Wellspring follows the Archdiocese's guidance on participation in DPP). This Court has found that it is "not inconsistent for the Parishes to find the UPK Colorado requirements conflict with their beliefs but those of the Denver Preschool Program" and the "CCCAP provision" "do not." ECF No. 99 at 15-16.[3]

---

[3]   In addition, Catholic Charities, which is a "different ministr[y] within the Archdiocese of Denver," permits its Head Start programs to participate in UPK Colorado. Tr. (Day 1, Chilelli) 66:3-14. Unlike that Archdiocese's Catholic schools, these programs exist to provide "child care resources" to low-income parents "as they go back to work," not to provide a distinctly Catholic "educational ministry ordered towards the formation of the human person" for families specifically seeking a Catholic education for their children. *See id.* at 65:14-66:21.

***R.  Effects of exclusion from UPK Colorado***

74. Exclusion from UPK Colorado has come at a cost. Starting with the Sheleys, they have already lost out on 15 hours per week of free preschool, costing roughly $4,700 in tuition assistance for their four-year-old enrolled at St. Mary's preschool for this school year. Tr. (Day 1, Sheley) 100:25-101:3; *see also* Tr. (Day 1, Seul) 91:18-21. They also have a one-year-old whom they intend to send to preschool at St. Mary's, as well as a three-year-old already at St. Mary's; for both of these children, they will again lose out on UPK Colorado's tuition assistance. Tr. (Day 1, Sheley) 99:10-14.

75. As for Plaintiff preschools, they have been unable to provide any families with the fifteen hours of free preschool that the UPK program promises. Tr. (Day 1, Seul) 90:23-91:11, Tr. (Day 1, Coats) 121:17-22. This is particularly harmful for low-income families. Tr. (Day 1, Coats) 108:20-24, 120:16-22. It has also affected the schools' ability to recruit families and compete with preschools participating in UPK Colorado, which are able to offer 15 hours of completely free preschool. Tr. (Day 1, Seul) 90:23-91:11. Indeed, prospective families have contacted both St. Mary's and Wellspring to inquire whether they are participating in UPK Colorado, and the pre-schools have had to tell them that they cannot, after which some of the families have not applied. Tr. (Day 1, Seul) 91:22-92:5; Tr. (Day 1, Coats) 121:23-122:1, 122:10-12. Finally, the preschools have lost out on bonuses given to participating UPK providers. Tr. (Day 1, Seul) 91:12-17; Tr. (Day 1, Coats) 121:19-22.

76. If granted a religious accommodation, Plaintiff preschools would immediately seek to par-ticipate in UPK Colorado. Tr. (Day 1, Seul) 92:22-25; Tr. (Day 1, Coats) 122:13-16.

***S.  Alleged harm to LGBTQ families***

77.  None of the testimony or evidence presented at trial showed that LGBTQ students or fam-ilies have been or would likely be harmed by Plaintiff preschools' religious exercise.

78. None of the expert testimony or related evidence was probative of whether Plaintiff pre-schools' participation in UPK Colorado would increase or decrease the ability of LGBTQ families to access preschool services in Denver. Tr. (Day 3, Tishelman) 396:13-22 ("I don't know that I can answer that question"); Tr. (Day 2, Goldberg) 304:23-305:4 (unaware of relevant evidence).

79. Defendants' expert Dr. Amy Tishelman stated that the research she relied on (about transgender bullying, which she admitted was not an issue in this case) pertained to "older children" and that she merely "presumed" it was "relevant to younger children as well." Tr. (Day 2, Tishel-man) 368:18-20; *see also* Tr. (Day 3, Tishelman) 379:13-19 (not able to identify whether any examples were of preschool students), *id*. at 395:23-396:8 (agreeing her testimony regarding her clinical work with young children was "anecdotal" and "may not be truly representative of the experiences of families more broadly"), *id.* at 376:20-23, 378:4-8 (not aware of any research or studies on preschool LGBTQ bullying or impact of denying enrollment at Catholic school); *id.* at 381:6-18 (confirming no evidence of any LGBTQ-related complaints or "adverse childhood experiences" more generally at Plaintiff preschools).

80. The only preschool- or enrollment-specific testimony—none of which was included in Defendants' experts' reports—was admittedly "speculative[]" and was based on anecdotal observations. Tr. (Day 2, Tishelman) 358:3-14; *see generally* Ex. 45, 47.

81. Defendants' other expert, Dr. Abbie Goldberg, could not identify *any* research suggesting that allowing Plaintiff preschools to participate in UPK Colorado would make it harder for LGBTQ families to access preschool services. Tr. (Day 2, Goldberg) 300:18-23.

82. Even apart from Defendants' experts, there was no evidence presented at trial showing how Plaintiff preschools' participation in UPK Colorado would make it harder for LGBTQ families to access UPK Colorado's free preschool services.

## CONCLUSIONS OF LAW

83. Currently before this Court are seven claims brought by Plaintiffs St. Mary Catholic Parish in Littleton, St. Bernadette Catholic Parish in Lakewood, Lisa Sheley, and Daniel Sheley. Counts I, IV, and V are brought by all of these Plaintiffs under the Free Exercise Clause alleging that the Department's exclusion of Plaintiff preschools from UPK Colorado is an exclusion based on religious character and exercise (Count I) and is not neutral and generally applicable (Counts IV and V). Counts II and III, brought by the Plaintiff preschools, are for violations of the ministerial exception (Count II) and broader church autonomy doctrine (Count III). The Plaintiff preschools also brought expressive association (Count VI) and the denominational favoritism (Count VII) claims under the First Amendment. Each claim is addressed in turn below.

84. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202, and under 42 U.S.C. §§ 1983 and 1988.

85. Before trial, this Court found that Plaintiff preschools and the Sheleys have standing based on their loss of a generally available government benefit. ECF No. 99 at 14-19. The evidence at trial confirmed the facts on which this Court relied and further demonstrated that these plaintiffs have standing. *See* Tr. (Day 1, Chilelli) 66:22-69:2 (congregation exception does not resolve the conflict between Plaintiff preschools' religious beliefs and the UPK requirements); *id.* at 61:2-65:13 (Archdiocese does not understand DPP and CCCAP agreements to impose same religious conflicts and are willing to terminate participation if incorrect); Tr. (Day 1, Seul) 88:20-25 (same for St. Mary's); Tr. (Day 1, Coats) 117:12-20 (same for Wellspring); Ex. 26 at 33:14-19, 35:12-20 (UPK Colorado is operational today and providers can still join for the 2023-24 school year); Tr. (Day 1, Seul) 90:23-92:5, 92:22-25 (St. Mary's harmed by exclusion); Tr. (Day 1, Sheley) 100:14-101:9 (same for Sheleys); Tr. (Day 1, Coats) 121:17-122:16 (same for Wellspring); Tr. (Day 1, Seul) 92:22-25 (St. Mary's would immediately seek to participate in UPK Colorado if granted religious accommodation); Tr. (Day 1, Coats) 122:13-16 (same for Wellspring).

86. While Plaintiffs maintain that the Archdiocese of Denver has both organizational and as-sociational standing, they recognize that, having been dismissed from the case, the Archdiocese was not a party at trial. ECF No. 99 at 19-22; ECF No. 65 at 7. Plaintiffs therefore do not reassert standing or merits arguments regarding the Archdiocese here.

## I.   Free Exercise Clause

87. UPK Colorado's exclusion of Plaintiff preschools triggers strict scrutiny under the Free Exercise Clause and fails that stringent test. Strict scrutiny is required under the Free Exercise Clause for at least four reasons: ***first***, because the exclusion is based solely on Plaintiff preschools' religious character and exercise in violation of the rule in *Carson*; ***second***, because the Department recognizes categorical exceptions permitting other preschool providers to engage in similar con-duct for secular reasons, violating the rule in *Tandon* and *Kennedy*; ***third***, because the Department has reserved the authority to carve out, and has carved out, individualized exceptions from the Mandate in violation of the rule in *Fulton*; and ***fourth***, because the Department's implementation of UPK Colorado is not neutral, violating the rule in *Lukumi* and *Masterpiece*.

### A.   Exclusion based on religious character and exercise (Count I)

88. The rule coming out of the Supreme Court's cases dealing with religious funding exclu-sions is straightforward. As *Espinoza* explained: "disqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'" *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020). And as the Court then clarified in *Carson*, "denying the benefit based on a recipient's religious *exercise*" triggers the same strict scrutiny. *Carson v. Makin*, 596 U.S. 767, 785 (2022) (emphasis added).

89. Rather than follow *Carson*, Defendants urge this Court to rely on *Employment Division v. Smith*, a thirty-year-old case about a criminal prohibition on peyote use. ECF No. 77 at 8, 12 (citing 494 U.S. 872 (1990)). But the Supreme Court has already told courts how to assess rules excluding

religious schools from public benefits: apply the Court's benefits-exclusion cases—don't apply *Smith.* Indeed, *Carson* didn't even cite *Smith,* instead relying on other public-benefits cases like *Sherbert v. Verner* and *Thomas v. Review Board. See Carson,* 596 U.S. at 778.[4]

90. *Carson* thus reaffirmed a longstanding Free Exercise rule distinct from *Smith*'s framework: that exclusion from a public benefit on account of one's religious exercise "violates the Free Exercise Clause." *Id.* at 778; *see Sherbert v. Verner,* 374 U.S. 398, 404 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."); *Everson v. Board of Educ.,* 330 U.S. 1, 16 (1947) (same); *Thomas v. Review Bd.,* 450 U.S. 707, 716 (1981) (same).

91. This case fits squarely within that line of precedent. Colorado offers a generally available public benefit: "universal" preschool funding. Tr. (Day 2, Odean) 190:7-14. But it excludes Plaintiff preschools based solely on their religious character and exercise—that is, requiring those who attend their schools to be open to and supportive of the Catholic Church's teachings, and operating

---

[4]   This Court previously suggested that *Carson* requires a finding of "non-neutrality." *See* ECF No. 99 at 25 n.8. But denial of a government benefit on account of one's religious exercise *itself* is not neutral. *Carson,* 596 U.S. at 781 ("Justice Breyer stresses the importance of 'government neutrality' when it comes to religious matters, but there is nothing neutral about Maine's program.") (internal citation omitted). As Justice Souter explained in his concurrence in *Lukumi,* there are at least two types of neutrality: "what might be called formal neutrality, which as a free-exercise requirement would only bar laws with an object to discriminate against religion, [and] what might be called substantive neutrality, which, in addition to demanding a secular object, would generally require government to accommodate religious differences by exempting religious practices from formally neutral laws." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 561-62 (1993) (Souter, J., concurring); *see also* Douglas Laycock, *Formal, Substantive, and Disaggregated Neutrality Toward Religion,* 39 DePaul L. Rev. 993, 1001 (1990) ("[S]ubstantive neutrality … require[s] government to minimize the extent to which it either encourages or discourages religious belief or disbelief, practice or nonpractice, observance or nonobservance."). Here, by universally subsidizing preschool services but excluding Plaintiff preschools, the Department has discouraged religious exercise and thus has not acted with substantive neutrality.

their schools according to those teachings. *Supra* ¶ 26-29, 31-36, 68-69. "Conditioning the availability of benefits in that manner … effectively penalizes the free exercise of religion." *Carson*, 596 U.S. at 780 (cleaned up).

92. It does not matter that Colorado here excludes preschools based on their religious *exercise* (those who do Catholic things need not apply) rather than religious *status* ("Catholics" need not apply). *Carson* clarified that while *Trinity Lutheran* and *Espinoza* happened to confront exclusions based on "religious status and not religious use," "such a distinction" is immaterial. *Carson*, 596 U.S. at 786. In *Carson*, Maine insisted that it was denying participation not because of the schools' religious status, but because of their religious conduct. *Id.* at 775, 786-89. But the Court confirmed that even if the denial were "based on a recipient's *religious exercise*," not status, it wouldn't matter; the First Amendment "prohibit[s] … denying the benefit" on that basis, too. *Id.* at 785 (emphasis added).

93. Defendants similarly claim *Carson* is different because plaintiffs there were "*facially excluded* … solely because th[ey] were religious." ECF No. 77 at 8 (emphasis in original). But Maine made the same argument in *Carson*, insisting that its exclusion was not based on the schools' *religious identity* but instead on the *things they did*: "a school is excluded only if it promotes a particular faith and presents academic material through the lens of that faith." 596 U.S. at 775, 786-88. Even accepting Maine's characterization, the Court held it unconstitutional. *Id.* at 785, 789. What matters is *who* is excluded—not *how* the government phrases the exclusion.

94. *Carson*'s rule is essential because benefit exclusions put a governmental "thumb on the scale" against religion, *Espinoza*, 140 S. Ct. at 2278 (Gorsuch, J., concurring), incentivizing religious organizations to abandon or alter their religious exercise to "compete with secular" counterparts, *Trinity Lutheran*, 582 U.S. at 463. This increase in the relative cost of exercising religion requires a compelling justification. *See Carson*, 596 U.S. at 781.

95. Indeed, it is difficult to imagine a case that more clearly implicates that rationale than this one. The Department has effectively imposed a special tax on religious preschools, whereby families who send their children to Catholic preschools continue to pay full freight, while families who send their children to over 2,000 other Colorado preschools receive 15 hours of free instruction per week. Tr. (Day 2, Odean) 190:8-14; 236:21-23; *cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 859 (1995) (Thomas, J., concurring) ("A tax exemption in many cases is economically and functionally indistinguishable from a direct monetary subsidy."). This puts Catholic families—including Plaintiff parents—to an agonizing choice: either follow your faith and foot the bill or contradict your beliefs and let the State write the check. Tr. (Day 1, Sheley) 99:23-101:9. This conflict is especially agonizing for the many low-income and English-as-a-Second-Language families at Catholic preschools like Wellspring. *See* Tr. (Day 1, Coats) 108:21-109:8.

96. It is therefore no surprise that Judge Domenico already ruled in the parallel *Darren Patterson* litigation that many of the same UPK Colorado conditions at issue here likely violated the Free Exercise Clause under *Carson*. *See Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-01557, 2023 WL 7270874, at *15 (D. Colo. Oct. 20, 2023).

97. In short, Colorado didn't have to subsidize private preschools. But having done so, "it cannot disqualify some private schools solely because they are religious"—or because they engage in religious exercise. *Espinoza*, 140 S. Ct. at 2261; *see Carson*, 596 U.S. at 784-88; *see also Pryor v. Sch. Dist. No. 1*, No. 1:22-cv-2886, 2022 WL 18145414, at *1 (D. Colo. Dec. 23, 2022) (Kane, J.) ("The government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests … [,] even though the person has no right to the valuable governmental benefit[.]" (quoting *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996))); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (same). Defendants' actions therefore trigger strict scrutiny.

**B.   Lack of neutrality and general applicability (Count IV & V)**

98. *Carson* aside, Defendants' exclusion of Plaintiff preschools still triggers strict scrutiny. Under *Smith*, strict scrutiny applies when the government "burden[s] [the plaintiff's] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). Defendants fail both halves of this test.

**1.   General applicability—categorical exceptions**

99. Beginning with the second half, there are multiple ways of showing that a religion-burdening action is not generally applicable. For one, a law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). In other words, if the government recognizes "categorical exemption[s] for individuals with secular [reasons to act] but not for individuals with … religious [reasons]," its actions are not generally applicable. *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.); *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

100. "[W]hether … activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest." *Tandon*, 593 U.S. at 62. Here, Defendants have vacillated between interests—sometimes claiming their interest is in requiring participating providers to offer "unfiltered and unbiased access to all preschool families" via the matching process, ECF No. 57-1 at 2[5]; other times claiming it is a narrower interest specifically in preventing "discrimination that violates the Program's antidiscrimination provision," *i.e.*, the Equal Opportunity Mandate. ECF No. 77 at 15. Either way, they have permitted categorical exemptions undermining these interests.

---

[5]   *See also, e.g.*, Tr. (Day 1, Cooke) 146:14-20 ("ensures that every child would have an opportunity to attend a preschool of their choosing"); Ex. 23 (Gov. Polis: "I think our focus has always been: the kids first, of course no discrimination, serve everybody if you want … public funds[.]").

101.  On this point, the Ninth Circuit's recent en banc decision *Fellowship of Christian Ath-letes v. San Jose Unified School District*, 82 F.4th 664 (9th Cir. 2023), is instructive. There, a school district refused to recognize a Christian student group because the group required its leaders to agree with and abide by its belief that "sexual intimacy is designed only to be expressed within the confines of a marriage between one man and one woman." *Id.* at 671. In support, the school district invoked two different interests—first, an interest "in ensuring equal access for all students to all programs" (*i.e.*, an "All-Comers policy"); and second, a narrower interest "in prohibiting discrimination on protected enumerated bases, including sex, race, and ethnicity." *Id.* at 689. The Ninth Circuit held that neither was generally applicable. The school district allowed "groups to select their members based on 'good moral character'"—undermining the alleged "All-Comers policy." *Id.* at 689, 693. And as for the nondiscrimination interest, the district allowed some groups (like the "Senior Women Club" and the "South Asian Heritage Club") to maintain membership criteria implicating "otherwise protected grounds" (like "sex and ethnicity"), undermining its pur-ported interest in preventing exactly that type of discrimination. *Id.* at 688-89.

102.  Just so here. Consider first the "unfiltered … access" (or "serve everybody") interest: the Department has recognized *ten* different categorical "preferences" that permit preschool providers to decline to accept all matches. Ex. 71 at 6-7; *see also* Tr. (Day 3, Defendants' Closing) 478:1-8.[6] Some of those exceptions allow providers to, for example, prefer siblings of current students, children of employees, and "multilingual" children. Ex. 71 at 7. Others are of sweeping breadth—

---

[6]    Seven of these preferences appeared in the UPK Colorado Provider Guide, issued at the outset of the program. Ex. 24 at 37 (fourth preference later split into two preferences). Three additional preferences (for siblings, continuity of case, and a catch-all provision) were formalized in the De-partment's proposed UPK regulations issued on January 1. Ex. 71; *supra* ¶ 56. Director Odean also testified that the catch-all preference formalized and expanded on the exceptions already avail-able through the individualized exception request form, *see* Ex. 31; *see also infra* ¶¶ 56, 59-60, because the Department may not have "caught all of the preferences that would be helpful to honor a mixed delivery system." Tr. (Day 2, Odean) 228:19-229:20.

for example, allowing providers to require all students or families to be "part of a specific com-munity," have "specific competencies or interests," or "participat[e] in a specific activity." *Id.* And these preferences are not merely theoretical; at least 1,091 participating preschools—approxi-mately half the total—have taken advantage of at least one of them (with some providers claiming several). Ex. 28 at 6 (Interrogatory No. 7). That is the antithesis of a generally applicable policy—and is far more than needed to trigger strict scrutiny. *See Tandon*, 593 U.S. at 62 (treating "*any*" secular comparator better triggers strict scrutiny).

103.  Consider next Defendants' interest in enforcing the terms of the Mandate: Even focusing on that interest, Defendants' exclusion of Plaintiff preschools is not generally applicable. That is because several of the categorical preferences allow providers to exclude families based on char-acteristics also covered by the Mandate. For example, although the Mandate requires providers to offer an equal opportunity to enroll "regardless of race, … religious affiliation, sexual orientation, gender identity, … income level, or disability," Ex. 13 at 2, the categorical preferences allow:

- Head Start providers to screen applicants based on "income level," Tr. (Day 1, Cooke) 171:7-10; Tr. (Day 2, Odean) 237:14-238:5; Ex. 26 at 88:5-89:5;
- providers to serve only children with disabilities, Tr. (Day 2, Odean) 238:6-11; Ex. 26 at 98:25-99:23;
- faith-based providers to reserve seats for members of their "congregation," Tr. (Day 2, Odean) 238:12-14; Ex. 71 at 7;
- providers to (under the "specific community" preference) limit enrollment to "children of color from historically underserved areas," Tr. (Day 2, Odean) 245:25-246:3; and
- providers to (also under the "specific community" preference) limit enrollment to "gen-der-nonconforming children," and "the LGBTQ community," Tr. (Day 2, Odean) 244:22-25, 246:4-8.

By permitting providers to make exclusions based on a status protected by the Mandate, each of these "exclusionary … requirements pose an identical risk to the [Department's] stated interest" in enforcing the Mandate—"render[ing] its decision" to exclude Plaintiff preschools "subject to strict scrutiny." *Fellowship of Christian Athletes*, 82 F.4th at 689-90.

104. At summary judgment, this Court explained how to assess these preferences: "[i]f that preference allows providers to discriminate on the basis of a particular status enumerated in the nondiscrimination requirements, that would support a finding that the associated nondiscrimination requirements are not generally applicable." ECF No. 99 at 26.

105. After trial, there is no doubt that this is so. For one, the congregation preference allows providers to discriminate on the basis of "religious affiliation." Ex. 13 at 2. That is indicated by the plain language of the Department's definition of "congregation," which expressly hinges on religion—saying a "congregation" "means a *religious-based* convocation" (or "convocations") "of individuals in a particular geographic area *who share a common set of beliefs* and *who collectively engage in conduct with a direct nexus to that shared common set of beliefs*." Ex. 71 at 2 (emphasis added). And it was confirmed by Defendants' testimony at trial: Director Odean acknowledged that this preference would allow a Catholic provider to reserve seats for "Catholics," and allow a Lutheran provider to reserve seats for "Lutherans"—and indeed that a Catholic provider "wouldn't have to provide an opportunity to enroll to Lutherans." Tr. (Day 2, Odean) 239:3-240:17. It is impossible to understand this as anything other than a preference allowing faith-based providers to provide *un*equal opportunities to enroll based on a family's *religious affiliation* (*e.g.*, Catholic or Lutheran). *See also Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1297 (D. Colo. 2012) (Kane, J.) (exemption for some religious employers "undermined" effort to deny religious exemption to plaintiff).[7]

106. Moreover, and even though this is *not* legally required, Plaintiffs can also point to exceptions relating to the particular characteristics that prohibit *their* actions—*i.e.*, "sexual orientation"

---

[7] Indeed, while Defendants previously claimed that the congregation preference "[i]n actuality ... privileges applicants with various ongoing relationships with specific provider communities," ECF No. 77 at 16, the Department has admitted that providers can define the geographic range of a "congregation" as broadly as they choose (including the entire Archdiocese of Denver), undermining the claim that this is a preference based on anything other than religious affiliation. Tr. (Day 2, Odean) 227:15-18; Ex. 26 at 107:2-108:1.

and "gender identity." For one, another preschool sharing some of the same religiously motivated practices regarding sexuality and gender identity has participated in UPK Colorado from the outset. *See Darren Patterson*, 2023 WL 7270874, at *3 (Darren Patterson "mandat[es] sex-separated bathrooms and dress codes" and "forbids using pronouns that do not correspond to … biological sex"); *see also* Tr. (Day 2, Odean) 265:15-22. Defendants are well aware of this—yet the Department has never investigated that school and has instead declined to appeal a preliminary injunction permitting the school to participate in UPK Colorado while maintaining these policies.

107.  Further, at trial, Director Odean testified that under the "specific community" preference, a preschool could limit enrollment to gender-nonconforming children or members of the LGBTQ community, Tr. (Day 2, Odean) 244:22-25, 246:4-8, 270:12-17; Ex. 71 at 7. In other words, providers who *share* the Department's views on marriage and sexuality are free to condition access based on sexual orientation and gender identity, but providers (such as Plaintiff preschools) who *disagree* with the Department's views are excluded. That is not a generally applicable policy.

108.  Defendants' efforts to explain away these exceptions fail. First, Defendants claim that none of these enrollment "preferences" allow a provider to disregard the requirements of the Equal Opportunity Mandate. Tr. (Day 3, Defendants' closing) 477:19-25; ECF No. 77 at 14-15. But—regardless of how many times or how adamantly Defendants incant this position—the evidence at trial, summarized above, confirmed the opposite. If, as Defendants admit, Catholic preschools can *completely deny* Lutheran families enrollment in their schools, Tr. (Day 2, Odean) 239:8-240:1, there is no question that this "preference" is also an exception from the Mandate's equal-opportunity requirement, which requires the opposite: an equal opportunity to enroll *regardless of* "religious affiliation," *see* Colo. Rev. Stat. § 26.5-4-205(2)(b). And Defendants admitted that preschools can make enrollment decisions that turn on a wide variety of other protected characteristics. *See, e.g.*, Tr. (Day 2, Odean) 237:17-238:5 (income level), *id.* at 238:9-11 (disability), *id.* at 244:22-25 (gender-nonconforming children)*; see also supra* ¶¶ 50-58. The preferences are not just

part of the matching process—they allow UPK providers to make *enrollment* decisions that deviate from the Equal Opportunity Mandate.

109.  Second, Defendants claim their carve-outs from the Mandate for low-income and disability-focused providers are justified because children served by such providers were "called out" as a priority elsewhere in the statute, making these exceptions "supported by the statute's objectives," Tr. (Day 1, Defendants' Opening) 23:2-9, 24:3-23; *see, e.g.*, Tr. (Day 2, Odean) 219:15-23, 220:6-16, not "violation[s] of the" Mandate, ECF No. 77 at 16-17, 19.

110.  But even if this were right (it is not),[8] it wouldn't change the result. The income and disability exceptions are both at least facially inconsistent with the Mandate. And while Defendants are willing to interpret the Mandate flexibly to accommodate these providers, they insist on a rigid interpretation of that Mandate to exclude Plaintiff preschools. That selective flexibility is simply an extension of the lack of "evenhanded, across-the-board" treatment that Plaintiffs are challenging in the first place. *Kennedy*, 597 U.S. at 526-27.

111.  Indeed, even if the income and disability exceptions were, by statute, *explicitly* excluded from the Mandate (they aren't), the result would still be the same. The statute is, of course, itself subject to the First Amendment. *See, e.g.*, *Carson*, 596 U.S. at 778. And Defendants' ultimate

---

[8]  Nothing in the UPK statute itself carves out disability and income-level exceptions from the Mandate. Defendants note that the Legislature's "objectives … include[d] serving" low-income children and "children with disabilities," ECF No. 77 at 16-18 (citing statutory provisions), but that isn't the same thing as allowing providers to provide *unequal* enrollment opportunities based on these characteristics in violation of the Mandate. Likewise, even if the Legislature contemplated that Head Start and disability-focused providers would participate in the program, that doesn't change the plain language of the Mandate; and it is "the provisions of … legislative commands rather than the principal concerns of our legislators by which we are governed." *Bostock v. Clayton County* 140 S. Ct. 1731, 1749 (2020) (cleaned up); *see also*, *e.g.*, *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019) ("statements of purpose … by their nature cannot override a statute's operative language") (cleaned up). If anything, as Defendants' testimony in this case demonstrates, otherwise-eligible "preschool providers" are *subject to* the quality standards and cannot participate unless they agree to abide by them. *See* Colo. Rev. Stat. § 26.5-4-203(14) (defining "Preschool provider" to include licensed child care centers like Plaintiff preschools).

problem is that there is simply no neutral, compelling basis to distinguish between children and families whose need for a unique educational environment is driven by their (say) disability and those for whom it is driven by their faith. *See Fraternal Order of Police*, 170 F.3d at 365-66 (exception for disabled police officers to grow medically required beard rendered unconstitutional refusal to allow Muslim police officers to grow religiously required beard); *see also* Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 U. Chi. L. Rev. 1109, 1139-40 (1990) (explaining "analogy … between free exercise theory and the theory of handicap discrimination"; "the paradigmatic instance of" both "free exercise violations" and "handicap discrimination is treating people who are fundamentally different as if they were the same"). Indeed, in the workplace context, federal law has long reflected this analogy, requiring accommodations for both religion and disability and in exactly the same terms. *Compare* 42 U.S.C. § 2000e(j), 2000e-2(a)(1) (Title VII, requiring employers to "reasonably accommodate" religion absent "undue hardship") *with* 42 U.S.C. § 12112(a), (b)(5)(A) (Americans with Disabilities Act, requiring employers to make "reasonable accommodations" for disability absent "undue hardship").

112.  What is more—even putting income and disability aside—Defendants' argument here says nothing at all about the preferences they've affirmed based on race, religious affiliation, sexual orientation, and gender identity, which are not "called out" anywhere. *Supra* ¶¶ 50-51, 54.

113.  Defendants next claim that the preferences for providers aimed at low-income and disabled children—and presumably also for those aimed at gender-nonconforming children and children of color—are not "discrimination," because they benefit groups "who historically have been discriminated against." Tr. (Day 2, Odean) 197:17-23, 222:1-5; *see* Tr. (Day 1, Defendants' Opening) 24:12-23. But for one thing, the Mandate does not mention "discrimination," at all, much less forbidding it only against those groups "who historically have been discriminated against." Instead,

it requires an "equal opportunity to enroll" *any* eligible child "regardless" of the listed character-istics—period. Defendants cannot rewrite unambiguous state-law commands to gerrymander Plaintiffs out.

114.   Moreover, the *Fellowship of Christian Athletes* defendant made the same argument—to no avail. The school district there sought to "justify" its exceptions for groups like the Senior Women Club and the South Asian Heritage Club "by asserting that they benefit 'individuals who need specific support from the school system' and align with the District's 'equity policy.'" 82 F.4th at 688. But this didn't change the result. "While inclusiveness is a worthy pursuit," the court held, "the District's alleged good intentions do not change the fact that it is treating compa-rable secular activity more favorably than religious exercise." *Id.* at 687-88; *see also id.* at 693 (no exceptions "for 'benign' discriminatory membership rules."). So too here. By reinterpreting the Mandate's straightforward requirement of equal treatment as a flexible provision allow providers to engage in admittedly *un*equal treatment based on values the Department deems important to "ensure inclusion of diverse communities and fulfill the legislative intent of a 'mixed delivery' system," the Department's value-laden application of the Mandate is subject to strict scrutiny. ECF No. 77 at 18.[9]

115.   Contrary to Defendants' suggestions at trial, Tr. (Day 1, Defendants' Opening) 24:24-25:18, Plaintiffs are *not* challenging the Department's provision of any of these other preferences. What they seek is for Defendants' alleged inclusiveness to extend to them. Defendants have made a value judgment that it's more important for certain children to access UPK providers tailored to

---

[9]   Moreover, as many courts have acknowledged, Catholics *have* historically been discriminated against, including in Colorado. *See, e.g., Espinoza*, 140 S. Ct. at 2259 (many provisions denying aid to religious schools were "born of bigotry" and "arose at a time of pervasive hostility to the Catholic Church and to Catholics in general"); *see also id.* at 2268-74 & n.20 (Alito, J., concurring) (expanding on this history and citing Colorado provision).

meeting their needs than it is for Catholic children whose families feel obliged to provide a Catholic education to have that same benefit. *See id.* at 24:3-11 (populations served by preferred providers are ones "that especially benefit from access to preschool"). But when the government "devalues religious reasons … by judging them to be of lesser import than nonreligious reasons," its actions "must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 537-38, 546. That is this case.

### 2. General applicability—individualized exceptions

116.  Defendants' refusal to accommodate Plaintiff preschools also isn't generally applicable because Defendants have "a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877. In *Fulton*, the Supreme Court applied strict scrutiny to Philadelphia's effort to condition a Catholic foster-care agency's contract on the agency's agreeing to certify same-sex couples as foster parents. *Id.* at 1874, 1881-82. Although the city claimed the relevant nondiscrimination requirement applied to all agencies, the Court determined that the city in fact retained "discretion" to grant "individual exemptions." *Id.* at 1878-79. The city therefore could not refuse an exception to the Catholic agency "without compelling reason." *Id.* at 1878; *see also, e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004) (similarly requiring compelling interest).

117.  Here, it is undisputed that Defendants have discretion to make individualized exceptions from the requirement that providers accept the children that are matched with them. Indeed, Defendants have an online form allowing providers to "Request[ ]" individualized "Exception[s]." Ex. 31. The form offers specific examples of exceptions providers might request, like "My location only serves teen moms enrolled at a neighboring high school," and "My location only serves children with specific disabilities." *Id.* at 55. And the record shows the Department considers these requests on a case-by-case basis, and has granted several. *See* Ex. 34 at 82-83; *see also, e.g.*, Ex. 26 at 91:15-21, 92:10-93:16, 96:19-97:20 (describing process); Tr. (Day 2, Odean) 257:9-23.

118.  The Department asserts that exceptions under this process are not available if they would violate the Mandate. ECF No. 77 at 21-22. But this theory founders on the form itself—indeed, *both* the sample exception requests listed on the form ("teen moms," "children with specific disabilities") implicate characteristics off-limits for consideration under the Mandate ("sex," "disability"). Ex. 31 at 55. And the mere discretion to grant these exceptions (confirmed by Defendants' own form)—even if not exercised—triggers strict scrutiny. *Fulton*, 141 S. Ct. at 1879.

119.  In any event, even if Defendants' unsupported assertion were true, Defendants nonetheless have explicit *statutory* discretion to grant exceptions from the Mandate. Specifically, "the department may allow a preschool provider that does not meet the quality standards"—which include the Mandate—"to participate in the preschool program for a limited time while working toward compliance." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II); *see id.* § 26.5-4-205(2). Defendants claim they've never used this authority, but that is beside the point: "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1879 (cleaned up).

120.  Unable to deny this statutory discretion, Defendants now claim that the Mandate is a "health and safety" regulation that is itself excepted from their statutory authority to grant exceptions. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). But this theory has never appeared in any Department guidance document, Tr. (Day 2, Odean) 247:12-248:13; rather, Defendants' lawyers offered it for the first time in response to Plaintiffs' motion for summary judgment, *see* ECF No. 77 at 20-21 (filed Dec. 18, 2023). The UPK statute itself doesn't identify the Mandate as being related to "health and safety." And the Mandate is, according to Director Odean, the only one of the twelve quality standards listed in the UPK statute about which Defendants have made such a determination. Tr. (Day 2, Odean) 249:13-17; *see* Colo. Rev. Stat. § 26.5-4-205(2)(a)-(*l*).

121. The Court owes no deference to this made-for-litigation position—just as the Supreme Court in *Fulton* did not defer to the city's similarly self-serving effort to interpret its contract and state law to eliminate, rather conveniently, its discretion to grant exceptions. 141 S. Ct. at 1879-81; *see also Nieto v. Clark's Market, Inc.*, 488 P.3d 1140, 1149 (Colo. 2021) (declining to adopt *Chevron* deference under state law). And Defendants' theory fails on its merits: in ordinary usage, "health and safety" surely refers to regulations of the *conditions at the preschool* for students who are already there, rather than regulations that limit a school's discretion to decide who can become part of the school community.

122. That is presumably why, in the Agreement, the Department distinguished between the Mandate and "[q]uality standards relating to health and safety," listing them as two distinct types of "quality standards." Ex. 13 at 2. And that is also presumably why the page entitled "Health and Safety Requirements" on the Department's own website makes no mention of enrollment standards, instead discussing items pertinent only to *existing* community members, like building hazards, safety in transporting children, and the administration of medication and allergy-sensitive foods.[10] If anything, the Department's last-minute scramble toward this "health and safety" explanation is a tell: it underscores the lack of general applicability of its actions. Like the post-litigation policy adopted in *Fellowship of Christian Athletes*, it "appears to be the type of post hoc justification" for excluding Plaintiffs "that is incompatible with the protections of the First Amendment." 82 F.4th at 693.

123. Nor does it matter that the Department's statutory discretion is available only if an exception is "necessary to ensure the availability of a mixed-delivery system" and may be time-limited. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). The Department has never asserted that the mixed-delivery caveat forecloses an exception here. *See* Tr. (Day 1, Cooke) 160:16-17 ("Faith-

---

[10] *Health and Safety Requirements*, Colorado Department of Early Childhood, https://perma.cc/7HEY-EVAK.

based providers have always been envisioned to be part of the mixed-delivery model."); *Black-hawk v. Pennsylvania*, 381 F.3d 202, 205, 209-10 (3d Cir. 2004) (Alito, J.) (applying strict scrutiny even though government official had to determine that exception was "consistent with sound game or wildlife management activities or the intent of [the Game and Wildlife Code]").

124.  And even if waivers under the UPK statute are time-limited (though the time limits are unstated), the existence of even temporary exceptions triggers strict scrutiny and requires a "com-pelling reason." *Axson-Flynn*, 356 F.3d at 1297-99 (a one-day exception from requirement could trigger strict scrutiny of denial of permanent exception); *see also, e.g.*, *Singh v. Berger*, 56 F.4th 88, 99-100 (D.C. Cir. 2022); *Newland*, 881 F. Supp. 2d at 1291, 95 (Kane, J.) (government's in-terest in requiring religious plaintiff to cover contraceptives in health plan "undermined by the creation of exemptions for" "grandfathered" plans and a "temporary enforcement safe harbor" for others).

### 3.  Neutrality

125.  Defendants' exclusion of Plaintiff preschools is not only lacking in general applicability, but has also "transgressed th[e] neutrality standard" imposed by the Free Exercise Clause. *Fulton*, 141 S. Ct. at 1877. At minimum, neutrality means the government cannot proceed based "on hos-tility to a religion or religious viewpoint" or "act in a manner that passes judgment upon or pre-supposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 618-19 (2018); *see also Kennedy*, 597 U.S. at 525.

126.  Here, however, Defendants have compared Plaintiffs preschools to 1970s segregation academies in the South and characterized Plaintiffs' millennia-old religious beliefs as stigmatiza-tion and bullying. ECF No. 77 at 23-26, 29-31; Tr. (Day 2, Odean) 260:5-9, 261:21-262:12, 263:7-14. These statements are not only offensive and wrong, *see Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015) ("emphasiz[ing]" religious organizations must be "given proper protection as they seek to teach" their views on marriage); they are similar to the statements by a different Colorado

agency that the *Masterpiece* Court found to demonstrate "clear and impermissible hostility." 584 U.S. at 634-35 (comparison of beliefs "to defenses of slavery and the Holocaust"). And they are fully in keeping with the previously expressed views of Director Roy. *See* Ex. 27 at 22:10-20, 29:19-31:11 ("thank goodness" "[t]he law is there to protect" against religious providers' maintaining bathrooms based on biological use or declining to use preferred pronouns). Defendants' lack of neutrality again triggers strict scrutiny.

### C. Strict scrutiny

127.  With strict scrutiny triggered, Defendants have the burden to prove that excluding Plaintiff preschools "serve[s] a compelling interest and [is] narrowly tailored to that end." *Kennedy*, 597 U.S. at 532. "That is a demanding standard." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). And in applying it, the Supreme Court has repeatedly ruled in favor of First Amendment claimants in cases like this one. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023) (website designer couldn't be forced to design for same-sex weddings); *Fulton*, 141 S. Ct. at 1877 (Catholic foster-care agency couldn't be forced to certify same-sex couples); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 578-79 (1995) (parade couldn't be forced to include LGBT pride group). Defendants fare no better.

#### 1. Compelling interest

128.  Neither of Defendants' alleged interests are compelling.

129.  Defendants first asserted an interest in "equal and unfiltered and unbiased access to all preschool families." ECF No. 56 at 9; ECF No. 77 at 37 ("interest in ensuring equitable access to preschool for all Colorado children"); *see also* Ex. 23 at 1 ("serve everybody if you want to take public funds"). But the problem is that, for the myriad reasons discussed above, UPK Colorado requires no such thing. Over a thousand UPK providers have claimed one of Defendants' categorical exceptions from this "serve everybody" requirement. *Supra* ¶ 58. The Department also permits providers to request still other exceptions of any kind on an individualized basis. *Supra* ¶¶ 59-60.

And at trial, even more exceptions were added to the list. *Supra* ¶ 55 ("gender-nonconforming children"; "children of color from historically underserved areas"; "LGBTQ community").

130.  This proliferation of "exceptions … undermines [any] contention that [the Department's] non-discrimination policies can brook no departures." *Fulton*, 141 S. Ct. at 1882. "[A] law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Newland*, 881 F. Supp. 2d at 1298 (quoting *Lukumi*, 508 U.S. at 547), *aff'd*, 542 F. App'x 706 (10th Cir. 2013). That blackletter principle forecloses Defendants' effort to satisfy strict scrutiny here.

131.  Recognizing this weakness, Defendants pivot, claiming instead that their interest in excluding Plaintiffs is in "ensuring that four-year-olds and their families do not face discriminatory barriers to preschool," which Defendants define as "hav[ing] fewer options available … because of who they are." ECF No. 77 at 22; *see also* Tr. (Day 3, Defendants' Closing) 482:4-9. But this alleged interest fares no better.

132.  ***First***, excluding Plaintiff preschools doesn't even advance this alleged interest. There are approximately 2,000 UPK providers that have agreed to the Department's Mandate. Tr. (Day 2, Odean) 229:4-10. Allowing Plaintiff preschools to participate would not take away a *single one* of those options for LGBTQ families. *See id.* at 237:8-13 (new providers "participate alongside" current providers). To the contrary, it would *add* to the list of UPK providers—permitting Catholic families who feel obliged to send their kids to Catholic schools, like the Sheleys, to participate too. Tr. (Day 1, Sheley) 98:25-99:3, 100:3-7; *see Fulton*, 141 S. Ct. at 1881-82 ("Maximizing the number of foster families" is an "important goal[]," but "[i]f anything, including" a Catholic foster agency "seems likely to increase, not reduce, the number of available foster parents"). Put simply, if the goal is to prevent "children and families" from "hav[ing] fewer options available to them because of who they are," ECF No. 77 at 22-23, Defendants have "fail[ed] to show that granting [Plaintiff preschools] an exception will put th[at] goal[] at risk," *Fulton*, 141 S. Ct. at 1881-82. If

anything, including Plaintiff preschools will *increase* access for families, like the Sheleys, who have *no* UPK options right now "because of who they are." ECF No. 77 at 22.

133. **Second**, after-the-fact justifications cannot, as a matter of law, supply the compelling government interest necessary to make out a strict scrutiny affirmative defense. *Kennedy*, 597 U.S. at 543 n.8 ("Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" (alteration in original)); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1268 (10th Cir. 2008) (*CCU*) ("governmental interest found nowhere but in the defendants' litigating papers" is insufficient).

134. Defendants have failed to show that the Department considered, let alone relied upon, this alleged interest when it denied Plaintiffs an accommodation. Defendants have repeatedly confirmed that the reason they denied the accommodation was that (in their view) the UPK statute did not allow them to grant an exception from the Mandate. Tr. (Day 1, Cooke) 159:23-160:7, 173:18-20; Ex. 12 at 1 (only reason stated in letter). No other reason has been proffered. And although Defendants now seek to attribute this interest to the Legislature, the key statutory findings they cite relate to a *completely different* children's mental health program not at issue here. *See* ECF No. 83 at 4 (citing Colo. Rev. Stat. § 26.5-1-113(1)(a) (a statutory provisions regarding, as explained in subsection 3(a), how "the department shall contract with a Colorado-based nonprofit entity to provide children's mental health programs.")). Without any record evidence even suggesting that—at the time this decision was made—the Department determined that granting the accommodation would (somehow) impose discriminatory barriers on access to preschool, this interest is not compelling. *CCU*, 534 F.3d at 1268.

135. **Third**, Defendants lack a compelling interest in specifically denying *Plaintiff preschools* a religious exception. When determining whether an interest is compelling, courts must "look[] beyond broadly formulated interests" and instead "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espírita Beneficente*

*União do Vegetal*, 546 U.S. 418, 431 (2006); *see Ramirez v. Collier*, 595 U.S. 411, 427 (2022) (same); *Fulton*, 141 S. Ct. at 1881 (same). It is not enough for the Department to advance a general interest in removing discriminatory barriers to preschool; instead, Defendants must show they have a compelling "interest in denying an exception to" *Plaintiff preschools* specifically. *Fulton*, 141 S. Ct. at 1881.

136.   Defendants attempt to show they have a compelling interest by citing studies focused on alleged harms to LGBTQ-identifying families and children from "[a]dverse experiences … in a school context." ECF No. 77 at 23-25. But there is *no evidence* that anything like what Defendants cite has happened or would happen at either Plaintiff preschool. To the contrary, the record shows that Plaintiff preschools have not caused *any* of the harms that Defendants' UPK requirements are intended to prevent, and Defendants themselves agree that any future harm is purely "speculative." *See* ECF No. 38 at 11; *supra* ¶¶ 35-36.

137.   Both Plaintiff preschools are state licensed and have participated in government funding programs for years. *Supra* ¶¶ 8, 73. Even so, the Department has not received a *single* complaint regarding LGBTQ discrimination against either school. Tr. (Day 2, Odean) 264:1-265:14; Ex. 39 ¶¶ 20-24. Likewise, Defendants themselves emphasize that Plaintiff preschools haven't had to deny "a family and/or student enrollment into their schools due to sexuality … or religious belief." ECF No. 53 at 2-3; *see also* Tr. (Day 1, Seul) 80:16-81:5 (confirming same); Tr. (Day 1, Coats) 114:19-115:13 (same). In other words, according to the Department, the alleged harms it seeks to avoid by excluding Plaintiff preschools have not occurred in the past and are "*speculative*" as to the future. ECF No. 38 at 11 (Defendants' motion to dismiss) (emphasis added).

138.   In addition, the record shows that Plaintiff preschools already take steps that mitigate the only purported harms that Defendants have tried to offer—alleged harm caused to LGBTQ students and families from being in non-affirming school environments. Indeed, Plaintiff preschools employ thoughtful admissions processes that are designed ultimately to ensure that parents and

students understand and agree with the schools' Catholic beliefs and morals. *See* Tr. (Day 1, Seul) 76:25-83:18 (St. Mary); Tr. (Day 1, Coats) 109:9-20, 111:2-113:4, 116:6-18 (Wellspring); Ex. 5 (detailing admissions policies and procedures). As Plaintiffs have said from the start, they too want to avoid creating conflicts for families who might have beliefs or views on sexuality that diverge from what their schools teach. *E.g.*, ECF No. 30 ¶ 148. This is why Plaintiffs have the enrollment policies they do. *Cf.* Tr. (Day 1, Coats) 114:2-13 (declining to enroll fifth-grade child of same-sex parents to avoid "caus[ing] great conflict within their own family"); *see also* Tr. (Day 1) (Chilelli) 50:18-54:20. All of this only underscores the speculative nature of Defendants' alleged concerns.

139.  Without any evidence that accommodating Plaintiff preschools would decrease access (or impose "barriers") to preschool for LGBTQ students and families, Defendants lack a compelling interest in applying their policies specifically to Plaintiff preschools. This point is dispositive on strict scrutiny. Defendants are required to "specifically identify an 'actual problem' in need of solving," *Brown*, 564 U.S. at 799; mere "speculation is insufficient," *Fulton*, 141 S. Ct. at 1882; *see also, e.g.*, *Peck v. McCann*, 43 F.4th 1116, 1136 (10th Cir. 2022) ("[S]peculation … is not enough to meet Defendants' burden under strict scrutiny."); *O Centro*, 546 U.S. at 431 (requiring courts to assess "the asserted harm of granting specific exemptions to particular religious claimants."). All Defendants can do is speculate—confirming strict scrutiny is not satisfied.

140.  ***Fourth***, Defendants' own experts confirmed the Department lacks a compelling interest in excluding Plaintiff preschools from UPK Colorado.

141.  The testimony of Dr. Goldberg and Dr. Tishelman established conclusively that there is *no* research demonstrating that excluding preschools (much less Catholic preschools specifically) from UPK Colorado would advance the Department's alleged interests in removing discriminatory barriers to preschool. *E.g.*, Tr. (Day 2, Goldberg) 300:12-17 (no evidence regarding the effect of enrollment policies on LGBTQ families), 302:2-21 (no research on topics relevant to the legal questions at issue in this case), 305:1-4 (agreeing there is no "evidence showing that LGBTQ

families in Denver are unable to access cost-effective early childhood education through the UPK program"); Tr. (Day 3, Tishelman) 377:4-378:3, 378:6-8 (not "aware of studies specific to preschool on LGBTQ bullying").

142.  Moreover, neither Dr. Goldberg nor Dr. Tishelman provided any testimony that would support Defendants' burden of showing that excluding Plaintiff preschools *in particular* from UPK Colorado advances their alleged interests. *See* Tr. (Day 3, Tishelman) 396:22 ("I don't know that I can answer that question"); Tr. (Day 2, Goldberg) 304:13-305:7 (unaware of evidence regarding accessibility of early childhood education for LGBTQ families in UPK Colorado, much less evidence relating to Plaintiff preschools specifically). Nor could the experts point to any harm more generally caused by Plaintiff preschools that would justify excluding them from UPK Colorado. Dr. Goldberg offered no evidence that lesbian or gay families in Denver would be unable to access affirming preschools as a result of Plaintiffs' policies, *e.g.*, Tr. (Day 2, Goldberg) 302:2-21, and (to the contrary) her research showed that lesbian and gay families actively and successfully seek out affirming preschools, *id.* at 308:2-19. Dr. Tishelman also readily admitted there was no evidence Plaintiff preschools' policies had caused "adverse childhood experiences" for *any* child. Tr. (Day 3, Tishelman) 381:6-22, 383:15-17; *cf.* Tr. (Day 2, Tishelman) 358:3-14 (testimony about enrollment "speculative[ ]").

143.  Instead, both experts established that Defendants' alleged interests were not compelling—in fact, their testimony tended to show that Defendants' alleged interests are spurious as applied to Plaintiffs. The experts agreed that—rather than *lacking* access—same-sex couples living in urban areas (like Denver) already had access to affirming preschool environments. *See* Tr. (Day 2, Goldberg) 304:16-305:4, 308:2-19. Dr. Goldberg even acknowledged that the lesbian and gay families living in urban areas in her own research study *had not* reported experiencing discrimination in the preschool environment, contradicting Defendants' alleged concerns. *Id.* at 306:15-307:8; *see also id.* at 304:2-7 ("affirming environments … are more easily found in urban areas");

Ex. 57 at 12-13 (one respondent: "we live in LGBT nirvana when it comes to parenting"). *But see* Tr. (Day 1, Defendants' Opening) 19:17-20:8 (alleging statutory purpose to prevent harm to LGBTQ families).

144.   And, while Defendants have constrained parents' choice of UPK providers by excluding Plaintiff preschools, Dr. Tishelman's testimony rejected Defendants' paternalism. Dr. Tishelman explained that parents should "be allowed to decide what is best for their child in this realm we're talking about of gender diversity and transgendered children." Tr. (Day 2, Tishelman) 367:12-22. She further testified that "parents and school[s]" should be "on board together in a … coordinated approach," and that schools should "follow how a family treats their child at home." *Id.* at 351:2-352:4. Dr. Tishelman's testimony thus confirmed that it should ultimately be up to parents and schools to determine whether enrollment would be a good fit given a family's particular circumstances. *See* Ex. 47 at 12 ("It is imperative that policies do not constrain a parent from using their best judgment[.]"). Dr. Tishelman's testimony, therefore, does not support the Department's decision to deny families the option of sending their children to St. Mary and Wellspring.

145.   Defendants' experts further undermined the salience and impartiality of their own testimony when they acknowledged that what they found objectionable was actually the "message" sent by Plaintiffs' schools—and that they actually wanted religious schools to *change* that religious message to be more inclusive of LGBTQ individuals. *See* Tr. (Day 2, Goldberg) 311:4-19 (testifying that the "message" Catholic schools are sending is "harmful"); Tr. (Day 3, Tishelman) 382:13-383:22 (viewing her testimony as advancing "access to religious institutions for people … [who] identify as transgender or gender diverse"). As Colorado should know by now, dictating an organization's religious message is off the table. *See 303 Creative*, 600 U.S. at 586.

146.   This Court, however, need not opine on the merits of any expert testimony to resolve this case. Instead, it can look to the Supreme Court's analysis in *Fulton*—where the government put

on expert testimony strikingly similar to the expert testimony at trial here[11]—to resolve strict scrutiny. Just as in *Fulton*, Defendants here assert an interest in "equal treatment" and the removal of discriminatory barriers for LGBTQ families. *Compare Fulton*, 141 S. Ct. at 1882, *with* ECF No. 77 at 22 (quoting same language from *Fulton* to describe interest). And just as in *Fulton*, Plaintiffs here assert the right to maintain their religiously mandated policies while participating in a government funding program. *See Fulton*, 141 S. Ct. at 1874-75. Given the all-but-identical interests at stake, *Fulton*'s strict scrutiny analysis is dispositive. And there, the Court couldn't have been clearer: "The City offers no compelling reason why it has a particular interest in denying an exception to [Catholic Social Services] while making them available to others." *Fulton*, 141 S. Ct. at 1882.

147. **Fifth**, a government interest is not compelling "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015); *O Centro*, 546 U.S. at 433 (same). Here, during trial, Defendants abandoned their attempt to regulate the religious curriculum taught in faith-based preschools, changing a provision in their proposed regulations to give faith-based preschools greater "independence" to determine when and how they will provide religious education in the classroom. Tr. (Day 2, Odean) 232:23-234:17 ("Q. … Does the Department have any intention of interfering with the curriculum of faith-based providers? A. No."). *Compare* Ex. 21 at 7 (Section 4.111(C)) *with* Ex. 71 at 8 (Section 4.111(C)); Tr. (Day 2, Odean) 267:9-21 (provision newly amended).

---

[11]   The defendant city in *Fulton v. City of Philadelphia* called an expert "to testify to the harms that might occur if the Court granted injunctive relief," but that testimony was categorically disregarded by the district court, the Third Circuit, and the Supreme Court. *See Fulton*, 320 F. Supp. 3d 661, 703 (E.D. Pa. 2018) ("The Court, however, need not, and has not relied on Cervone's testimony in deciding the Injunction Motion."); *Fulton*, 922 F.3d 140, 151 n.6 (3d Cir. 2019) (Cervone's "testimony is not important to the issues on appeal."); *Fulton*, 141 S. Ct. 1868 (2021) (no mention of expert testimony).

148.  But—to the extent they could identify *any* harms—Defendants' experts seemed to think the greatest harms could result from students' receiving messages in the classroom inconsistent with their perceived sexuality identity. Tr. (Day 2, Tishelman) 296:15-23, 297:17-20, 313:21-22; Ex. 45 at 7-8 ("Such messages will negatively impact children"); *cf.* Tr. (Day 2, Tishleman) 364:17-25; *supra* ¶ 145. And they pointed to non-affirming curricula as one source of this harm. Tr. (Day 2, Goldberg) 296:18-23, 313:5-7, 316:11-14. Thus, *even assuming* Defendants' experts had shown evidence of harm (they didn't, as explained above), Defendants' *volte-face* on religious curricula would leave "appreciable damage" to a "supposedly vital interest unprohibited" by failing to address the supposedly harmful messages taught in the classroom. Defendants' asserted interest is, again, not compelling. *Reed*, 576 U.S. at 172.

### 2.  Narrow tailoring

149.  Defendants have not only failed to assert a compelling interest—they have not shown that their means of advancing these alleged interests are "narrowly tailored." *Kennedy*, 597 U.S. at 525. Strict scrutiny requires that "[i]f a less restrictive alternative would serve the Government's purpose, [it] must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000). Narrow tailoring also requires that there be a close "fit" between the "means" they have chosen and the "ends" they are seeking to accomplish (*i.e.*, their asserted government interests). *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1226 (10th Cir. 2021); *see also Awad v. Ziriax*, 670 F.3d 1111, 1130 (10th Cir. 2012). This an independent basis for failing strict scrutiny. *Kennedy*, 597 U.S. at 525. Defendants fail narrow tailoring in at least two ways.

150.  ***First***, Defendants have failed to use available alternatives less restrictive of religious exercise than total exclusion of Plaintiff preschools from UPK Colorado—an omission that is especially glaring when the record suggests that a narrower approach is both already being used for other providers and is likely to be effective.

151.  If Defendants' interest is in removing "discriminatory barriers to preschool," *supra* ¶ 131, then helping families quickly find accurate information about providers advances that interest. Tr. (Day 1, Defendants' Opening) 19:14-15 ("The goal was to provide options for families so they can select the school that was the just-right fit for their family[.]"). Indeed, the Department has already taken steps to facilitate easy access to finding and assessing UPK providers through its online portal. Ex. 20, 25; Tr. (Day 1, Cooke) 167:11-168:2. When a family goes to the UPK portal today to search for providers, they will see disclaimers like: "This is a Head Start grantee and families may need to meet additional factors to enroll"; "[T]he provider supports children with Individual-ized Education Program (IEP)"; "This is an immersive or dual language provider and children may need to be screened to participate in the program"; and "This provider may require families to be a part of their congregation." Ex. 20 at 1-5. What is more, the portal can ask families questions to determine whether that family meets a provider's enrollment requirements. For example, "a family will be asked [on the UPK portal] if they're employed by the provider. A family will be asked if they have a sibling with a provider. A family would be asked if they are currently enrolled with a provider[.]" Tr. (Day 1, Cooke) 167:11-168:2. This information could help determine if a family is eligible for the particular provider. *Id.*

152.  Thus, rather than exclude secular providers who cannot serve all families, the Department has taken steps to support these providers' ability to participate in the program *without* complying fully with the Mandate. The Department, however, has denied Plaintiffs this same option. And the Department has failed to demonstrate how allowing Plaintiff preschools to participate in the pro-gram while providing families with similar information upfront would not advance the Depart-ment's asserted interest in the same way.[12] *See* Tr. (Day 2, Odean) 263:23-25 (provider preferences

---

[12]   Similarly, if Defendants are concerned about giving the mistaken impression that Plaintiffs' "discrimination" is "government-backed," ECF No. 38 at 1, they can explain in public-facing ma-terials the already-obvious point that the beliefs of private preschool providers aren't attributable to the Department. That is what they already do with respect to Head Start-only preschools and

are displayed "[s]o that families understand and are making an informed choice about the provider that they've listed"); *McCullen v. Coakley*, 573 U.S. 464, 495 (2014) ("To meet the requirement of narrow tailoring, *the government must demonstrate* that alternative measures that burden substantially less speech would fail to achieve the government's interests[.]" (emphasis added)).

153.  ***Second***, Defendants fail narrow tailoring because the "means" they have chosen do not "fit" their asserted interest. As explained earlier, if Defendants' asserted interest is in removing discriminatory barriers to preschool (and therefore *increasing* access to preschool), they have failed to show that *excluding* two Catholic preschools from UPK Colorado advances that interest one iota. *Supra* ¶ 132. Adding two preschools will not prevent any current UPK provider from participating in the program; it would instead facilitate access for more families—including Catholic families like the Sheleys. By picking means that do not advance their asserted ends, Defendants "have not carried their burden to show why [denying a religious accommodation is] 'closely fitted' to a compelling interest." *Awad*, 670 F.3d at 1131.

154.  Rather than carrying their burden, Defendants have previously asserted that Plaintiffs' position has no "Limiting Principle," raising the specter of race discrimination and worrying that other programs (like the Denver Preschool Program) might have to have religious exemptions, too. ECF No. 77 at 25-26. *But see O Centro*, 546 U.S. at 435-36 (generalized "slippery-slope concerns" insufficient on strict scrutiny). But *Defendants* (not Plaintiffs) are the ones who apparently believe it is permissible for preschools to discriminate based on race. *Supra* ¶ 54. And their professed fear that a religious exception here could lead to a similar exception under DPP is ironic—DPP *already* has a religious exemption, which is why the Archdiocese permits its schools to participate. Tr. (Day 1, Chilelli) 62:12-16. Accommodating religious preschools in these other programs—some

---

IEP-only preschools – they attribute the restriction to the provider, not the State. *See, e.g.*, Ex. 20 at 1-5.

for decades—has not led any of these other programs down the fanciful slippery slope Defendants fear.

155.  In fact, it is Defendants' position that lacks a "Limiting Principle." UPK revolutionized the delivery of preschool in Colorado overnight, turning it from a system in which Catholic schools could compete equally with their secular counterparts to one in which they were massively disadvantaged by the State because of their religious exercise. If Defendants here are right, Colorado could do the same thing tomorrow to (in Defendants' words) "*any* publicly funded service providers—from health care providers to soup kitchens to rehabilitation service providers." ECF No. 77 at 26. That view cannot be reconciled with the First Amendment.

### D.  Rational basis

156.  For many of the same reasons Defendants' actions fail strict scrutiny, they also fail rational-basis review. Given the lack of any connection between Defendants' exclusion of Plaintiff preschools and their alleged interest in removing discriminatory barriers to access preschool (nothing in logic or evidence suggests *adding* UPK providers would *decrease* preschool access), Defendants' actions are not even rationally related to a legitimate government interest. *Romer v. Evans*, 517 U.S. 620, 632-33 (1996) (government's action must be "grounded in a sufficient factual context" for the court to determine that it "bear[s] a rational relationship to an independent and legitimate [governmental] end"); *Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1033 (10th Cir. 2007) (no rational basis where decision's "relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

## II.  Church autonomy

157.  Turning to church autonomy, the Department's attempt to regulate the employment decisions of UPK providers violates that doctrine twice over—by purporting first to limit Plaintiff preschools' right to freely hire and fire ministers; and second, to bar them from making religion-based personnel decisions for non-ministers.

158.  During trial, Defendants conceded that they have no "authority" to regulate the employment practices of St. Mary or Wellspring and said they will remove Paragraph 18(B)—the offending provision—from the Agreement starting next year. *See* Tr. (Day 2, Odean) 231:15-232:22, 265:23-266:20. Because Paragraph 18(B) intrudes on Plaintiffs' constitutional rights, and because Defendants have abandoned its defense (though it remains in the Agreement for the rest of *this* academic year), this Court should hold that Paragraph 18(B) violates Plaintiffs' First Amendment rights.

## A.  Ministerial exception (Count II)

159.  One "component of [church] autonomy" is the "ministerial exception," which protects religious institutions' "authority to select, supervise, and if necessary, remove" employees "who play certain key roles." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060-61 (2020). This rule "bar[s] the government from interfering with" a religious group's selection of ministers, or its "decision … to fire one." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181, 185 (2012); *see also Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010).

160.  As the Supreme Court has recognized, "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady*, 140 S. Ct. at 2064. Accordingly, religious-school employees who are "expected to help … carry out" these responsibilities are covered by the exception. *Id.* at 2066 (teachers); *see Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 940 (7th Cir. 2022) (administrative council member); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017) (principal).

161.  Here, there is no question that Plaintiff preschools' teachers qualify as ministers, Tr. (Day 1, Chilelli) 38:21-40:21, 42:23-44:14; *supra* ¶¶ 20-24, or that Paragraph 18(B)'s text purports to regulate the employment relationship between these teachers and Plaintiff preschools, Ex. 13 at 27

("Provider shall not: … discriminate against *any person* …" (emphasis added)). Paragraph 18(B)'s attempt to "dictate or even to influence" Plaintiffs' selection of ministerial employees violates the First Amendment. *Our Lady*, 140 S. Ct. at 2060; *see Darren Patterson*, 2023 WL 7270874, at *15 (finding the same).

## B. Church autonomy (Count III)

162.  In addition to running afoul of the ministerial exception, Paragraph 18(B) also violates "the broader church autonomy doctrine" that protects religious organizations' freedom to make "personnel decision[s] based on religious doctrine," including personnel decisions involving *non*-ministerial employees. *Bryce v. Episcopal Church of the Diocese of Colo.*, 289 F.3d 648, 658 n.2, 660 (10th Cir. 2002).

163.  Here, the Archdiocese's preschools require all staff to be "faithful men and women" and to "refrain from public promotion or approval of any conduct or lifestyle that would … be considered in contradiction with Catholic doctrine or morals," including on marriage and sexuality. Ex. 2 at 3; Ex. 6 at 1-2; Tr. (Day 1, Chilelli) 44:2-17, 46:9-25; *supra* ¶¶ 21, 25. Yet the Department purports to bar providers from "discriminat[ing] against" employees based on "religion," "sexual orientation," and "gender identity." Ex. 13 at 27. By preventing Plaintiff preschools from making "personnel decision[s] based on religious doctrine," *Bryce*, 289 F.3d at 660, Paragraph 18(B) violates the First Amendment.

## C. Defendants' intention to voluntarily cease enforcing Paragraph 18(B) in the future

164.  Rather than defend their intrusion into Plaintiffs' employment practices, Defendants flee, claiming this provision was a mistake, Tr. (Day 2, Odean) 231:25-232:2, that it won't be used next year, *id.* at 232:16-20, and that they have now "disavowed" enforcement, *id.* at 232:12-15.[13]

---

[13]   Defendants did not tell Plaintiffs or this Court that Paragraph 18(B) was a "mistake" until trial, despite multiple opportunities to do so. Presumably Defendants ought to have realized their mistake when it was first brought to their attention, not months (and two lawsuits) later.

165.  But the contract that Plaintiff preschools would be expected to sign to participate for the remainder of *this* year still contains Paragraph 18(B). *See* Ex. 13 at 27; *cf.* Tr. (Day 1, Chilelli) 58:18-23. And this hasty retreat is ineffective for several reasons.

166.  First, Defendants reserved the right to "of course" find any "facts" needed "to determine whether a provider's employment decisions … are protected by federal law." ECF No. 38 at 16 n.5. This makes no sense; if the Department lacks "authority" to enforce Paragraph 18(B) as to employment, it should be precluded from even *initiating an investigation* to determine those facts. Tr. (Day 2, Odean) 266:10-12.

167.  Second, with regard to Plaintiffs' church autonomy claim (Count III), Defendants say they're willing to permit Plaintiffs preschools to prefer "co-religionists," but contend this doesn't exempt them from employment claims based on "sex" discrimination. ECF No. 77 at 27-28. This is simply a rejection of the Tenth Circuit's decision in *Bryce*, which applied the "broader church autonomy doctrine" precisely to dismiss a claim of otherwise-prohibited "sex" discrimination. *Bryce*, 289 F.3d at 655-60 & n.2. Other than *Bryce*, Defendants' sole citation is to *Our Lady of Guadalupe*—but the Supreme Court there *rejected* the precise "co-religionist" understanding of church autonomy that Defendants urge here, explaining it "would create a host of problems" including "judicial entanglement in religious issues." 140 S. Ct. at 2068-69.

168.  Fourth, even if Defendants' 11th-hour decision to drop Paragraph 18(B) were effective, it cannot make Counts II and III moot, because "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Without the voluntary-cessation doctrine, a defendant "could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [it] left off" once the claim is dismissed, *United States v. Sanchez-Gomez*, 584 U.S. 381, 386 n.* (2018)—as Defendants likely will seek the freedom to do here.

169.  For these reasons, a live dispute remains between the parties as to Counts II and III. And because Defendants have abandoned their defense of Paragraph 18(B), this Court should follow their lead and enjoin enforcement of that provision against Plaintiff preschools.

## III.    Expressive association (Count VI)

170.  "[T]he First Amendment protects acts of expressive association." *303 Creative*, 600 U.S. at 586. That includes the decision "not to associate" with others if the forced association would "affect[] in a significant way the group's ability to advocate" its "viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). The Mandate and Paragraph 18(B) violate this First Amendment protection by forbidding Plaintiff preschools from considering religion, sexual orientation, and gender identity in admission, hiring, and operations. *See supra* ¶¶ 66-70.

171.  In *Dale*, the Court held that the Boy Scouts were entitled to exclude a scoutmaster who was "an avowed homosexual and gay rights activist," despite a state law prohibiting sexual-orientation discrimination. *Boy Scouts of Am.*, 530 U.S. at 643-45. The Court explained that freedom to associate "presupposes a freedom not to associate," and that requiring the Scouts to retain the plaintiff would impermissibly "force [them] to send a message" that they "accept[] homosexual conduct as a legitimate form of behavior." *Id*. at 648, 653. Likewise, in *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), a pro-life pregnancy center challenged a state law that prohibited employment discrimination based on "reproductive health decision[s]," claiming the law violated expressive association by "preventing [the center] from disassociating itself from employees who, among other things, seek abortions." *Id.* at 283. Applying *Dale*, the Second Circuit ruled for the center. "The right to expressive association allows [the center] to determine that its message will be … conveyed only by employees who sincerely share its views"; accordingly, "strict scrutiny applies." *Id.* at 288-89.

172.  Defendants do not dispute that Plaintiff preschools "engage in some form of expression," or that forced association would "significantly affect [their] ability to advocate" for their view-points. *Dale*, 530 U.S. at 648, 650. Nor do they dispute that, having shown this, the Department's actions must satisfy strict scrutiny. *Id*. at 648, 659. *See* ECF No. 77 at 28-30.

173.  Instead, Defendants imagine a brand new carve-out from expressive association claims, one that is (conveniently) limited to "employment and education settings" but that is found *no-where* in the caselaw. *See* ECF No. 77 at 29. This proposed "employment and education" exception to the First Amendment contradicts: recent Circuit-level precedent (*Slattery*); Judge Domenico's decision in *Darren Patterson*, 2023 WL 7270874, at *15; and *Dale* itself, where the nondiscrimi-nation law at issue *also* applied in the context of employment, 530 U.S. at 661-62. (Tellingly, Defendants cite the *Dale* dissent. ECF No. 77 at 30.)

174.  Defendants' own cases further confirm that this new exception is fictitious. *Hishon*, for example, didn't hold that employment claims are *per se* exempt from expressive-association de-fenses; it simply held that the defendant there (a large, for-profit law firm) hadn't shown the rele-vant association would in fact "inhibit[ ]" expression of its "ideas and beliefs." *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). Defendants' citation to *Runyon v. McCrary*, 427 U.S. 160, 175-76 (1976), repeats their offensive and incorrect conflation of Plaintiffs' millennia-old religious beliefs with invidious race discrimination. *Supra* ¶ 126. And the "critical" point in *Rumsfeld v. FAIR* was that the law there did not require schools to accept military recruiters as members of their community, like it would if—as here—it forced them to accept objectionable "[s]tudents and faculty." 547 U.S. 47, 69-70 (2006). If anything, *FAIR* supports *Plaintiffs*.

## IV. Denominational favoritism (Count VII)

175.  Laws that favor one religion over another are subject to strict scrutiny. *Larson v. Valente*, 456 U.S. 228, 246-47 (1982). "In other words, no State can pass laws which aid one religion or that prefer one religion over another." *CCU*, 534 F.3d at 1257 (cleaned up); *see also Awad*, 670

F.3d at 1127 ("Strict scrutiny is required when laws discriminate among religions."). In *Larson*, for example, the Supreme Court held that a law imposing additional registration and reporting requirements on religious groups receiving most "of their funds from nonmembers" discriminated among denominations "in violation of the … First Amendment." *Larson*, 456 U.S. at 230. The rule triggered strict scrutiny because it "focuse[d] precisely and solely upon religious organizations" and "effectively distinguishe[d] between 'well-established churches' … and 'churches which are new and lacking in a constituency.'" *Id.* at 246 n.23.

176.  Similarly, in *CCU*, the Tenth Circuit held that a Colorado law giving scholarship funding to sectarian—but not *pervasively* sectarian—universities violated denominational neutrality. 534 F.3d at 1259-60. The court explained, "[t]he sole function and purpose of the challenged provisions" was "to exclude some but not all religious institutions on the basis of the stated criteria." *Id.* at 1258.

177.  Defendants' policies likewise violate denominational neutrality. The congregation preference "focuses precisely and solely upon religious organizations." *Larson*, 456 U.S. at 246 n.23. And it "function[s]" to impermissibly discriminate among them. *CCU*, 534 F.3d at 1258. According to the Department, the exception "accommodates" religious preschools' "interest" in requiring adherence to religious-conduct standards by enrolling families. ECF No. 47 at 4, 7, 17. But providers are not allowed to require such adherence where it would be "contrary to the equity statement" (*i.e.*, the Equal Opportunity Mandate), Tr. (Day 1, Cooke) 169:20-24; *see also* Ex. 26 at 107:16-108:10, including its requirements with respect to sexual orientation and gender identity.

178.  The preference thus "effects the *selective* … imposition of burdens and advantages upon particular denominations," *Larson*, 456 U.S. at 253-54, depending on their views on marriage and sexuality. For example, as Ms. Cooke testified, under the congregation preference, a Jewish preschool "presumably" could include a kosher food requirement in its mandatory statement of faith. Tr. (Day 1, Cooke) 169:25-171:1. But this preference doesn't extend to the religious-conduct

standards at issue in this case. *See also* Br. of *Amici Curiae* the Jewish Coalition for Religious Liberty, *et al.*, Supporting Plaintiffs, ECF No. 71-1 at 15-17 (highlighting other examples of denominational discrimination in application of congregation exception). These schools are *not* permitted to form a community composed solely of those who believe in and live out their beliefs, because the Department has labeled certain beliefs invidious "discrimination." Such actions are "suspect" and trigger "strict scrutiny," *Larson*, 456 U.S. at 246, which the Department fails, *see supra* ¶¶ 127-155.[14]

## V.  Relief

179.  As relief for Defendants' denial of their First Amendment rights, Plaintiffs' amended complaint seeks a permanent injunction, a declaratory judgment, and nominal damages. ECF No. 30 at 35-36. They are entitled to all three.

### A.  Permanent injunction

180.  Plaintiffs are entitled to a permanent injunction permitting Plaintiff preschools to participate in UPK Colorado consistent with their religious exercise.

181.  A party is entitled to a permanent injunction when it proves: (1) "actual success on the merits"; (2) "irreparable harm unless the injunction is issued"; (3) that "the threatened injury outweighs the harm that the injunction may cause the opposing party"; and (4) "the injunction, if issued, will not adversely affect the public interest." *Rocky Mtn. Christian Church v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, 612 F. Supp. 2d 1157, 1160 (D. Colo. 2009), *aff'd*, 613 F.3d 1229

---

[14]   Defendants' answer, filed after the trial, suggests they may attempt to argue that Counts V and VII are moot based on their post-complaint promulgation of the "congregation" definition. ECF No. 107 at 28. But the evidence at trial showed that this new definition doesn't resolve Plaintiffs' claims because (among other things) Plaintiff preschools enroll non-Catholics (not just "parishioners," no matter how broadly defined), *supra* ¶ 38, and the Archdiocese requires Plaintiff preschools to ensure that families sign and agree to the Statement of Community Beliefs (which is not required of all parishioners), *supra* ¶¶ 29-31; *see also* Tr. (Day 1, Chilelli) 66:22-69:2. Instead, the updated "congregation" definition only *underscores* the First Amendment problems with Defendants' position, as explained above and at *supra* ¶¶ 67, 105, 177-178.

(10th Cir. 2010); *see also, e.g.*, *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (listing same requirements).

182.   These requirements are "'remarkably similar' to those for obtaining a preliminary injunction." *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 908 (10th Cir. 2022) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007)). "Indeed, the same four elements apply to both types of injunctive relief, and the only measurable difference between the two is that a permanent injunction requires showing *actual success* on the merits, whereas a preliminary injunction requires showing a *substantial likelihood of success* on the merits." *Id.* (cleaned up; emphasis in original).

183.   "In the First Amendment context," as here, "'success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)). In other words, "[h]aving determined that" the plaintiff's "First Amendment argument is valid, the remaining" injunctive-relief factors typically "present little difficulty." *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014). That is the case here.

### 1.  Irreparable harm

184.   First, Plaintiffs have suffered irreparable harm. Once success on the merits of a First Amendment claim is shown, "no further showing of irreparable injury is necessary." *Awad*, 670 F.3d at 1131. That is because—as the Supreme Court recently confirmed—"the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020); *see also, e.g.*, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (same). Here, Plaintiffs have, since the inception of UPK Colorado, lost their First Amendment right to participate in an otherwise-available government program without having to forswear their religious exercise. That is itself irreparable harm.

185.  The irreparable harm is further compounded here, in multiple respects. For one thing, "being subjected to discrimination" based on religion "is by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016). Here, Plaintiffs have been singled out because of their religious exercise—denied the ability to participate in a "universal" benefits program enjoyed by over 2,000 peer schools (and, in the case of the Sheleys, more than 40,000 of their fellow Coloradans). *See* Tr. (Day 2, Odean) 210:13-16, 236:21-23.

186.  Moreover, Plaintiffs are continuing to suffer tangible—though no less irreparable— harms each day they are excluded from UPK. The Sheleys are denied UPK funding they can never recover, simply because they choose to send their children to Catholic preschools. Tr. (Day 1, Sheley) 100:10-101:9. And the Plaintiff preschools miss out on the opportunity to enroll families looking for a UPK provider—and thus are unable to compete with other private preschools on equal terms. Tr. (Day 1, Seul) 90:23-92:5; Tr. (Day 1, Coats) 121:17-122:1. These harms are not just immediate but are ongoing: As Director Odean confirmed at trial, new providers are able to join UPK right now. Tr. (Day 2, Odean) 237:2-4.

## 2.  Balance of the equities and public interest

187.  When injunctive relief is sought against the government, the third and fourth injunction factors "merge." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

188.  Here, this merged factor favors Plaintiffs. In fact, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Gessler*, 773 F.3d at 218. Meanwhile, when a law has already been determined to be unconstitutional, "the [government's] interests" in enforcing it "do not outweigh a plaintiff's interest in having its constitutional rights protected." *Id.*; *see also, e.g.*, *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) (similar, collecting cases).

189.  That analysis applies all the more here, where, as explained above, Plaintiffs' participation in UPK Colorado would only *further* the statute's goals of offering Colorado families a diverse range of providers. Moreover, the harms suffered by Plaintiffs are (again) immediate and ongoing, while the harms alleged by Defendants as resulting from Plaintiffs' participation in the program are—according to Defendants themselves—"speculative." ECF No. 38 at 11-15; *see also Awad*, 670 F.3d at 1132 (injunction against "a measure that does not appear to address any immediate problem will generally not cause material harm").

190.  In short, when government action "affronts the federal Constitution—the Constitution which the people of the United States themselves ordained and established—the court merely reminds the people that they must govern themselves in accordance with the principles of their choosing." *Awad*, 670 F.3d at 1132. Plaintiffs are entitled to a permanent injunction.

## B. Declaratory judgment

191.  Plaintiffs are also entitled to a declaratory judgment that Defendants' exclusion of the Plaintiff preschools from UPK Colorado violates the First Amendment. "[U]pon the filing of an appropriate pleading," this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). And here, "a declaratory judgment that [Defendants' exclusion] is unconstitutional," along with "an injunction preventing its enforcement," "would likely redress [Plaintiffs'] injury." *Ward v. Utah*, 321 F.3d 1263, 1269-70 (10th Cir. 2003); *see also Carson v. Makin*, No. 1:18-cv-00327, 2023 WL 2814131, at *9 (D. Me. Apr. 6, 2023) (on remand from Supreme Court, holding that plaintiffs were entitled to declaratory relief and permanent injunction).

## C. Nominal damages

192.  Plaintiffs are also entitled to nominal damages in the amount of $1.00. "[A]n award of nominal damages is mandatory upon a finding of a constitutional violation." *Searles v. Van Bebber*,

251 F.3d 869, 879 (10th Cir. 2001); *see also, e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800 (2021).[15]

## [PROPOSED] JUDGMENT AND ORDER

The Court declares that exclusion of the preschools at Plaintiffs St. Mary Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood from Colorado's Universal Preschool Program on account of their sincere religious exercise, including: (i) prioritizing Catholic students and families in admissions decisions; (ii) requiring employees to adhere to and support the schools' religious beliefs, including on marriage and sexuality; (iii) considering for purposes of student admission or retention whether a family or child adheres to and supports the schools' religious beliefs, including on marriage and sexuality; and (iv) operating their schools in accordance with their religious beliefs, violates the First Amendment to the United States Constitution.

The Court immediately enjoins Defendants Lisa Roy and Dawn Odean from conditioning participation in the Colorado Universal Preschool Program, Colo. Rev. Stat. §§ 26.5-4-201, *et seq.*, by Plaintiffs St. Mary Catholic Parish in Littleton, St. Bernadette Catholic Parish in Lakewood, Daniel Sheley, and Lisa Sheley on their:

    i.    agreeing to provide, or providing, eligible children an equal opportunity to enroll and receive preschool services regardless of religious affiliation, sexual orientation, or gender identity;

    ii.    agreeing not to discriminate against any person on the basis of religion, sexual orientation, or gender identity; or

    iii.    otherwise agreeing to violate, or violating, their religious beliefs, character, and exercise, including:

---

[15] Plaintiffs' claim for nominal damages does not reach the $20 threshold to trigger the Seventh Amendment right to trial by jury and Plaintiffs' other claims all sound in equity; this Court can and should therefore resolve all of Plaintiffs' remaining claims at this time. *See Adams v. Cyprus Amax Mins. Co.*, 149 F.3d 1156, 1159 (10th Cir. 1998).

    a.   prioritizing Catholic students and families in admissions decisions;

    b.   requiring employees to adhere to and support the schools' religious beliefs, including on marriage and sexuality;

    c.   considering for purposes of student admission or retention whether a family or child adheres to and supports the schools' religious beliefs, including on marriage and sexuality; and

    d.   maintaining operational policies in accordance with their religious beliefs on marriage and sexuality, including with respect to dress codes, pronoun usage, and restroom usage.

The Court further orders that Defendants immediately permit Plaintiffs St. Mary Catholic Parish in Littleton, St. Bernadette Catholic Parish in Lakewood, Daniel Sheley, and Lisa Sheley to begin participating in UPK Colorado, including for the 2023-2024 school year, notwithstanding their sincere religious exercise described above.

The Court further orders Defendants to pay Plaintiffs $1.00 in nominal damages.

SO ORDERED this _____ day of _____, 2024.

_____
The Honorable John L. Kane
United States District Court Judge

Dated: January 26, 2024          Respectfully submitted,

/s/ Eric C. Rassbach
Eric C. Rassbach
Mark L. Rienzi
Joseph C. Davis
Nicholas R. Reaves
Jordan T. Varberg*
Amanda G. Dixon*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
 Suite 400
Washington, D.C. 20006
(202) 955-0095
erassbach@becketlaw.org

* Not admitted to the D.C. Bar; admitted only
in Illinois and North Carolina respectively.
Supervised by licensed D.C. Bar members.

**CERTIFICATE OF SERVICE**

I hereby certify that I have served the foregoing document on all parties via CM/ECF and as required by the relevant federal and local rules.

Dated: January 26, 2024                                  /s/ Eric C. Rassbach
                                                         Eric C. Rassbach