### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02079-JLK

**ST. MARY CATHOLIC PARISH IN LITTLETON,** *et al.*,
      Plaintiffs,

v.

**ROY**, *et al.*,
      Defendants.

---

### DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Defendants, Dr. Lisa Roy, Executive Director of the Colorado Department of Early Childhood ("CDEC" or "Department"), and Dawn Odean, Director of the Department's Universal Preschool Program ("UPK Program" or "Program"), through counsel, pursuant to this Court's Order, submit their proposed Findings of Fact and Conclusions of Law:

### I.    <u>INTRODUCTION</u>

The Colorado electorate voted overwhelmingly in 2020 to enact the UPK Program. The UPK Program is the latest in a long line of preschool programs investing in Colorado's youngest students and was born out of the hard work of early childhood advocates, the General Assembly, and stakeholders in early childhood education. A key piece of that investment is the UPK Program Act's requirement that children receive "an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability." Colo. Rev. Stat. § 26.5-4-205(2)(b).

This requirement derives from the General Assembly's determination that children's health and safety is best served when children and their families are supported and nurtured and

not exposed to stressful experiences that will affect their physical, emotional, cognitive, mental, and behavioral health for years to come. *See* Colo. Rev. Stat. §§ 26.5-1-113(1)(a); 26.5-1-109(1)(a). At trial from January 2-4, 2024, Defendants proved that the UPK Program's statutory nondiscrimination provision, as enacted and implemented, is neutral and generally applicable, and that this provision directly advances the State's substantial and even compelling interests, anchored in statute, in prohibiting discrimination by publicly-funded preschools against families and their children on the basis of sexual orientation and gender identity to protect their health, safety, and well-being. Defendants further proved that the UPK Program does not exclude—and indeed welcomes—public, private, religious, and secular, preschool providers without distinction – so long as they each agree to abide by the statutory and contractual UPK Program requirements, including the nondiscrimination provision.

## II.   <u>FINDINGS OF FACT</u>

<u>Trial Testimony Established That the Thoughtful Creation of UPK's Mixed-Delivery System Sought to Provide Public Funding for Quality Preschool Services That Protect the "Whole Child" Through Safe and Healthy Learning Environments Free From Discrimination</u>

1.      On January 2, 2024, M. Michael Cooke, the former early childhood transition director of the Colorado State Governor's Office, testified as to her involvement with the UPK Program and the historical context of how the Program came to be in the state.  *See generally* Cooke TR 1/2/2024 at 134-178.  Her testimony was credible.

2.      On January 3, 2024, Dawn Odean, the Director of Colorado's UPK Program testified as to the implementation of the Program. *See generally* Odean TR 1/3/2024 at 183-281. Her testimony was credible and some of her testimony rose to the level of persuasive expert opinion due to her deep programmatic knowledge.

2

3.      For decades, through the Colorado Preschool Program, Colorado delivered state-sponsored preschool services that were administered by public school districts and that prioritized low-income families and those at risk of entering kindergarten without being prepared to learn.  *Id.* at 139:17-21.

4.      The Colorado Preschool Program was serving about 18,000 four-year-olds in 2022. Odean TR at 211:5-6.

5.      "In 2020, Colorado voters approved Proposition EE to create a dedicated source of funding for voluntary, universal preschool." Amended Order on Defendants' Motion to Dismiss (ECF No. 38), Plaintiffs' Motion For Summary Judgment (ECF No. 61), and Plaintiffs' Motion to Exclude Defendants' Expert Witness Testimony (ECF No. 73), ECF No. 99 at 4 ("Kane Order Amended 1/3/2024"); Cooke TR at 135:13-14.

6.      The UPK Program is currently serving almost 40,000 children around the state which is about sixty percent of eligible four-year-olds. Cooke TR at 210:14-19.

7.      Prior to this, in 2006 voters in Denver County similarly recognized the importance of quality preschool programming when they voted to dedicate a portion of Denver sales taxes to supporting the Denver Preschool Program ("DPP"), a program run by Denver County.  Holguín TR 1/4/2024 at 421:8-13. That program also recognized that preschool was important and had benefits for young children. *Id.* at 423:22-25.

8.      Following the passage of Proposition EE, the Colorado General Assembly implemented the voter-approved UPK Program during the 2021 legislative session, with the enactment of House Bill 21-1304. *See* H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021); Kane Order (Amended 1/3/2024), ECF No. 99 at 4; Cooke TR at 136:20-21.

3

9.      House Bill 21-1304 also created the Colorado Department of Early Childhood ("CDEC"), thus removing the Division of Early Childhood Education from within the Colorado Department of Human Services.  Indeed, Colorado's commitment to preschool was so strong that the Early Childhood Leadership Commission ("ECLC" or "Commission")[1] recommended that Colorado use its last remaining constitutional department for the creation of CDEC. Kane Order (Amended 1/3/2024), ECF No. 99 at 4; Cooke TR at 136:20-137:1, 136:13-17.

10.     The implementing legislation was informed by public hearings before final passage and by stakeholder engagement through ECLC working groups including "monthly town halls that were open to all Coloradans: providers, parents, advocates, [and] anyone with an interest in the work around the establishment of the new department and Universal Preschool." *Id*. at 137:12-16.  *See also* Odean TR at 215:21-24, 216:16-19.

11.     After the implementing bill was passed, there continued "a very robust stakeholder process that was led by the Early Childhood Leadership Commission to talk about what that state department should look like.  And what followed that process was additional legislation to operationalize the department…." Cooke TR at 136:21-24.

12.     This public process ultimately resulted in House Bill 1295, legislation that identified its statutory objectives to include a mixed delivery system with both public and private providers, a nondiscrimination requirement, the prioritization of low-income children and children with disabilities, and a focus on family choice in which parents are enabled to choose

---

[1] The Commission was charged with leading the stakeholder process and creating recommendations for the UPK Program prior to CDEC becoming operational. Cooke TR at 137:9-18, 141:18-142:7; *see also* H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021) and Colo. Rev. Stat. § 26.5-1-303.

from a wide variety of quality preschool programming. House Bill 1295 thus reflected recommendations made by stakeholders through ECLC reports that were submitted to the legislature and ultimately incorporated into law. *Id.* at 141:18-143:3.

13.     The Early Childhood Act that emerged from these processes directs that the Department "shall work with other state and local agencies, public and private early childhood providers, head start agencies, nonprofit organizations, and parents and families … to [i]mprove outcomes for children and families through … [i]mplementation of evidence- and practice-based practices in education, family support, and child development …" as the UPK's statutory objectives. Colo. Rev. Stat. § 26.5-1-102(1)(h)(II).

14.     The Act further directs the Department to "[p]romote child physical, oral, and behavioral health and use multigenerational and culturally and linguistically appropriate strategies to support child and parent outcomes that improve overall family well-being[.]" Colo. Rev. Stat. § 26.5-1-109(1)(a).

15.     The Department sought providers that could offer a "safe, nurturing, inclusive, nondiscriminatory environment for children." Cooke TR 1/2/2024 at 147:23-148:2.

16.     Colorado's universal preschool program was designed to reach families all across the state and match them with providers. Odean TR at 184:14-19.

17.     The UPK program has 32 Local Coordinating Organizations[2] across the state that help families understand what their options are and connect them with providers. *Id.* at 186:3-9.

---

[2] "Local coordinating organization" means the entity selected by the Department pursuant to section 26.5-2-103 to implement a community plan for increasing access to, coordinating, and allocating funding for early childhood and family support programs and services within a specified community. Colo. Rev. Stat. § 26.5-1-103(4).

18.    The legislature made it clear from the beginning that this new iteration of preschool programming in Colorado should use public funding to increase access to high-quality preschool services across the state.  Cooke TR at 143:24-25.

19.    Access to preschool programming across the state is "important so that all of those children can have access to that high-quality environment and get to the learning outcomes that we know come from a high-quality program. But it also allows for families to have opportunity and options, all families." Odean TR at 190:10-14.

20.    The concept of "whole child" development seeks not only to promote a child's cognitive development, but also their physical, social, and emotional development. *Id.* at 194:13-17.

21.    The Early Childhood Act's express findings emphasized the importance of safe and healthy preschool learning environments, along with the importance of the "whole child" concept: "the General Assembly finds and declares that: (I) [n]eurobiological research confirms that stressful experiences early in life can have profound and destructive impacts on the architecture of the brain; and (II) [a]dditional scientific research has shown, however, that responsive, nurturing relationships between young children and their caregivers that lead to secure attachment serve as powerful, protective buffers to stressful experiences early in life...." Colo. Rev. Stat. § 26.5-1-113(1)(a).

22.    The Act's focus on "whole child" health and safety "is really an acknowledgement of how important whole child development is, cognitive development being one of those areas that are critical to a child's development.  And that's typically associated with academics or thinking. So, it might be early literacy, early communication, early numeracy

components of cognitive development. So, the statute is asking us through our quality standards to be thoughtful about ensuring that we're including that, as well as the whole child." Odean TR at 194:4-12.

23.    The public process and input also led the legislature to include a statutory directive that the UPK Program implement a novel mixed-delivery[3] approach for preschool which required the Program to include public, private, faith-based, and in-home programs. "The general assembly finds, therefore, that it is in the best interests of the state and consistent with the will of the voters of Colorado to establish [UPK] to provide high-quality, voluntary preschool programing through a mixed delivery system for children throughout the state in the year preceding kindergarten enrollment and to provide for additional preschool services for children who are in low-income families or who meet identified qualifying factors." Colo. Rev. Stat. § 26.5-4-202(1)(b); Cooke TR at 141:18-142:10.

24.    The UPK Act specifically calls for a mixed delivery requirement. Colo. Rev. Stat. §§ 26.5-4-202(1)(b); 26.5-4-203(12); 26.5-5-303(3).

25.    Mixed delivery was intended to widen families' access to safe and healthy, and thus high-quality, preschool services: "[T]he statute has told us to ensure that families have choice through this mixed-delivery model, and that families have confidence that those are safe

---

[3] "'Mixed delivery system' means a system for delivering preschool services through a combination of school- and community-based preschool providers, which include family child care homes, child care centers, and head start agencies, that are funded by a combination of public and private money." Colo. Rev. Stat. § 26.5-4-203(12).

and healthy environments, and that they're in place not only for supervision, but so that their child can grow and begin a positive journey for learning." Odean TR at 197:10-16.

26.     The Department's goal "was to recruit and engage providers, again, of all types, school districts, center-based, home-based, faith-based, that could provide a safe, nurturing, inclusive, nondiscriminatory environment for children." Cooke TR at 147:23-148:2.

27.     "[I]n the consideration of mixed delivery, the department has worked very intentionally about being inclusive of a variety of providers to ensure that they can participate [] with the aim that families have that choice." Odean TR at 214:18-21.

28.     To facilitate mixed delivery, the Department created a faith-based work group, recruited faith-based providers into the UPK Program, and developed a preference to the matching algorithm specific to faith-based providers and the communities they serve. Cooke TR at 151:20-152:5, 153:20-154:12. *See also* Odean TR at 225:13-17.

29.     Another reason the legislature required mixed delivery of the UPK Program is to build on the work of Colorado Preschool Program and broaden access for families, especially low-income families, children with disabilities, and children with other qualifying factors[4]. "[W]e're thinking about children with disabilities, children who are low-income and so forth on the risk factors to ensure that the work of the Colorado Preschool Program wasn't diminished through going to a universal model, but to continue to be thoughtful about ensuring those

---

[4]"Qualifying factor" means a child or family circumstance, as identified by department rule pursuant to section 26.5-4-204(4)(a)(II), that may negatively impact a child's cognitive, academic, social, physical, or behavioral health or development. Colo. Rev. Stat. § 26.5-4-203(15).

outcomes continue for children who haven't had the opportunity historically." Odean TR at 190:18-23.

30.     The UPK Act emphasizes the Program's commitment to eliminating barriers to preschool access faced by low-income families as well as those with other "qualifying factors" like disability status, Individualized Education Plan ("IEP") status, or dual language learners. Colo. Rev. Stat. §§ 26.5-4-204(1), (3), (4); 26.5-4-202(1)(b); Cooke TR at 142:11-143:3.

31.     "[T]he qualifying factors established in rule were what was called out in statute, which are low-income families, families with children with disabilities, or an individualized education program.  Dual language or multi-language families and their children, and we also added homelessness through rule.  That was from the stakeholder input and feedback, as well as foster or kinship care." Odean TR at 191:22–192:3. *See also* Colo. Rev. Stat. §§ 26.5-4-202(3) and (4); 26.5-4-204(3)(a)(III),(V), 4(a)(I) and (II); 26.5-4-203(15).

32.     The UPK Act also directed Department rulemaking on "quality standards": "[T]he Department [is directed to develop] 'quality standards that each preschool provider must meet to receive funding through [UPK Colorado].'" Colo. Rev. Stat. § 26.5-4-205(1)(a).  *See also* Kane Order (Amended 1/3/2024), ECF No. 99 at 4; Cooke TR at 143:15-21.

33.     While mixed delivery focuses on including as many provider options to families as possible, the UPK Act does not permit quality to be sacrificed for quantity such that providers must adhere to "quality standards" that include not only pre-existing child care licensing standards but also standards that implement the statutory directive to focus on "whole child" health, wellness, and safety.  Odean TR at 192:16-24; Colo. Rev. Stat. § 26.5-4-205(1) and (2).

34.     The quality standards must also "reflect national and community-informed best practices with regard to school readiness, academic and cognitive development, healthy environments, social-emotional learning, and child and family outcomes. *Id*. § 26.5-4-205(1)(a)." Kane Order (Amended 1/3/2024), ECF No. 99 at 4-5, *See also* Cooke TR at 143:24-144:7 (discussing importance of quality standards and their scope).

35.     "The quality standards must include '[a] requirement that each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family.' *Id*. § 26.5-4-205(2)(b)." Kane Order (Amended 1/3/2024), ECF No. 99 at 4 (denoted as the "statutory nondiscrimination requirement" by the Court), *See also* Cooke TR at 142:11-143:3, 146:6-11.

36.     "Quality standards" have developed over time due to research into early childhood development and the growth of a child's brain, attachments, sense of self, and trust developed at this time.  Quality standards of early childhood education include not only the minimum health and safety requirements from child care licensing statutes but also wellbeing of the "whole child", family ecology, and socio-emotional learning. Cooke TR at 147:23-148:2, 163:16-19, 164:22-23 ("general well-being of a child also factors into health"). Odean TR at 194:21-25, 198:25-199:3. "We know we have licensing child care regulations for health and safety, but this kind of goes beyond that in a way that ensures children in the classroom are in a space where they can learn and grow.  So, it's physical safety, yes, but also that they're in an

environment that's welcoming, that they feel a part of, and maximizes through best practices that development." *Id.* at 195:1-7.

37.     The nondiscrimination requirement in statute was included early in the legislative process of developing the UPK Program and was recommended by the ECLC in a report issued to the legislature that aided in crafting H.B. 1295. Cooke TR at 141:18-142:7, 142:13-143:3.

38.     The Department has interpreted the statute's nondiscrimination requirement to be among the health and safety standards required of all providers based on the legislative objectives to implement a program in line with national and community-informed best practices and whole child development. Odean TR at 199:18-25. "Part of a child feeling safe and being safe and healthy is also that their family feels safe and healthy and that they feel a part of their family.  And we certainly want them and their family to feel a part of the community and the learning environment that they're in." *Id*. at 198:14-18. "Q: And is the nondiscrimination language – is the nondiscrimination statute a health and safety requirement? A: It is." *Id.* at 210:10-12.

**Expert Testimony Established that the Nondiscrimination Requirement Supports Safe and Healthy Learning Environments and Positive Outcomes for Children and Families**

39.     Dr. Abbie Goldberg, a clinical psychologist and psychology professor at Clark University in Massachusetts, where she is the Director of Women's and Gender Studies, testified as an expert. Tr. Ex. 44 (Goldberg CV); Tr. Ex. 45 (Goldberg Report) at 2. Her testimony was credible.

40.     Dr. Goldberg testified in an area of her expertise and research: LGBTQ+ parent families.  She is the author of over 150 peer-reviewed articles, 25 book chapters, and four books on this subject area. Tr. Ex. 45 at 3.

41.     Dr. Goldberg is highly qualified and has performed extensive research into the area of her expertise. Kane Order (Amended 1/3/2024), ECF No. 99 at 28-29.

42.     Dr. Amy Tishelman, a clinical and research psychologist, and currently a Research Associate Professor at Boston College in Massachusetts, also testified as an expert. Her testimony was credible.  Tr. Ex. 46 (Tishelman CV); Tr. Ex. 47 (Tishelman Report).

43.     Dr. Tishelman has seen patients for years and was the director of clinical research in the gender multi-specialty services which serves youth and their families when there are variation in sex traits.  Tr. Ex. 46; Tr. Ex. 47.  Variations in sex characteristics or sex traits are congenital biological conditions whereby there's an atypicality in reproductive or sex anatomical or hormonal expressions.  Tishelman TR 1/3/2024 at 333:22-334:1.

44.     Dr. Tishelman has received funding from the National Institutes of Health for her research, which has focused on gender diverse and transgender youth. Tr. Ex. 46; Tr. Ex. 47. She has developed best practices for caring for and assessing gender diverse prepubescent children and has served as an expert witness approximately 40 times. Tr. Ex. 46; Tr. Ex. 47.

45.     Dr. Tishelman is qualified and has performed extensive research into the area of her expertise: gender diverse and transgender children, and sex trait variants. Tr. Ex. 46; Tr. Ex. 47.

46.     "For good reason, Plaintiffs challenge neither the qualifications of these experts nor the reliability of their opinions."  Kane Order (Amended 1/3/2024), ECF No. 99 at 29.

47.     The expert testimony was relevant to establishing the strength and validity of the General Assembly's statutory commitment to nondiscrimination as part of ensuring safe and healthy, and thus quality, publicly funded preschool experiences for Colorado's children and families.  The experts' research and opinions support the inclusion of the statutory nondiscrimination requirement and its focus on healthy environments and child and family outcomes, and the experts' "opinions do not constitute impermissible, post hoc justifications. *See, e.g.*, Colo. Rev. Stat. § 26.5-4-205(1)(a) & (2)(b)." Kane Order (Amended 1/3/2024), ECF No. 99 at 30.

**Testimony of Dr. Goldberg**

**LGBTQ+ Parents Experience Barriers to Access Preschool Services**

48.      While LGBTQ+ parents are found in all in environments, they are found in higher concentrations in rural areas and are "about twice as likely to live in poverty as compared to heterosexual and cisgender parents."  Goldberg TR 1/3/2024 at 287:1-9, 15-18.

49.     As a consequence, LGBTQ+ parents often have limited preschool options, and they struggle to find accessible and affordable preschool environments for their children. Goldberg TR at 287:22-25, 288:2-5, 289:18-290:4, 323:18-24, 324:1-24, 325:2, 3-17.  *See also* Tr. Ex. 57, Goldberg, A.E., *Lesbian, Gay, and Heterosexual Adoptive Parents' Experiences in Preschool Environment,* 29 Early Childhood Research Quarterly 669-681 (2014).

50.     In more socio-politically conservative environments, studies have shown that LGBTQ+ parents "tend to face more stigma in the school environment, sort of trickle-down effects from the community.  They also report great victimization of their children in schools....

Both parents and children are reporting often worse outcomes." Goldberg TR at 290:12-21, 304:2-7.

51.     School environments that are less affirming or supportive of LGBTQ+ parents and their children are often environments where the children of LGBTQ+ parents are more likely to be teased about sexual orientation or sexual identity of their parents or themselves and in turn, results in more mental health problems for the children as scientific literature has shown a strong correlation between victimization and self-esteem, depression, anxiety, and behavioral challenges. *Id.* at 291:7-9, 14-18, 20-22, 24-25.

52.     Dr. Goldberg's research has shown that about 25 percent of LGBTQ+ parents in metropolitan areas have faced significant challenges in school environments, both explicit and implicit marginalization, by teachers, the general school climate, and other parents. Consequently, Dr. Goldberg's study shows that when LGBTQ+ parents feel alienated by a school community or environment, they are less likely to engage in the school and a parent's non-participation in school can have a negative impact on a child's development. *Id.* at 292:4-12, 16-22, 293:1-4, 16-22, 327:1-17. *See* Tr. Ex. 55, Goldberg, A.E., & Smith, J.Z., *Preschool Selection Considerations and Experiences of School Mistreatment Among Lesbian, Gay, and Heterosexual Adoptive Parents,* 29 Early Childhood Research Quarterly 64-75 (2014); Tr. Ex. 56, Goldberg, A.E. & Smith, J.Z., *Predicting Parents' School Engagement Among Lesbian, Gay, and Heterosexual Adoptive Parents of Kindergartners,* 52 Journal of School Psychology 463-478 (2014) ("*Predictors*").

**LGBTQ+ Children Are Adversely Affected When Their Parents Experience Discrimination**

53.     Studies have shown that children are impacted by the environments they spend the most time in, such as school, and that "children receive messages from schools about whether their families and in turn they are valid and accepted." Goldberg TR at 296:5-7, 296:18-23, 297:1-4.

54.     Dr. Goldberg's research has also shown that "for youth who are raised by LGBT parents, the struggles that they face in life don't stem from their parent's sexual orientation or gender identity, but rather from the environment that may or may not stigmatize their parents. So, the pain that they might experience, the teasing they might experience is due to other people's perceptions of their family … the findings really were that the challenges that they faced in life stemmed from societal homophobia, not from their parents' sexual orientation." *Id.* at 299:2-8, 21-23.

55.     Similarly, "when a child feels … accepted and included at a school, they in turn have a better self-regard for themselves.  If a child alternatively is being implicitly or explicitly told that there is something wrong with them or their family, this can create negative self-views.... [I]f a child is getting messages that their identity or presentation is non-normative, not accepted, equated with negative qualities or attributes, they will internalize those qualities as applying to themselves." *Id.* at 297:9-13, 17-20; *see also* Tr. Ex. 56*, Predictors,* 52 Journal of School Psychology 463-478.

56.     "Putting the onus on parents to choose a new school when they may not even have that choice if their child is confronting bullying, harassment, a generally inhospitable environment, is inappropriate, because all things being equal, many parents don't have that

15

choice, and schools are supposed to provide safe environments for children." Goldberg TR at 328:14-19.

**Testimony of Dr. Tishelman**

57.    Dr. Tishelman is an expert in many areas, including the areas of gender diversity and development, and variations in sex characteristics in children.  A variation in sex characteristics or sex traits is a congenital biological condition whereby there is an atypicality in reproductive or sex anatomical or hormonal expressions.  "'Gender diverse' and 'transgender' may be different terms, but 'transgender' is an umbrella term to refer to somebody whose gender identity differs from what their gender identity was assumed to be at birth.  And 'gender diversity' is a broader term than that.  That can refer to diverse gender expressions that maybe aren't expected in [a] particular community, and not necessarily gender identity differences.'" Tishelman TR at 336:12-14, 23-25, 337:1-4; examples of sex trait variants, 348:24-349:12.

**Discrimination and Other Adverse Childhood Life Experiences Adversely Affect Children's Health**

58.    Dr. Tishelman explained that early childhood development is a time of rapid change for a child, in which relationships develop, trust in the adults around them is learned, attachments are formed, and is a time when a child starts to develop a sense of self and figure out their own identity is occurring. *Id.* at 338:10-21, 339:4-6, 9-15, 361:21-362:6.

59.    Early life adversities and adverse childhood experiences ("ACEs") have been scientifically proven to have significant effects on an individual's physical, emotional, and mental health, with a high potential for lifelong consequences.  Currently, this correlation is documented in "robust literature ... on early life adversities … and the relationship between those adversities and subsequent development for youth.  And so those kinds of early experiences have

16

been demonstrated to be extremely important in terms of development." *Id.* at 339:19-24.  *See also* Tr. Ex. 60, Masten, A.S. & Cicchetti, D., *Developmental cascades,* 22 Development and Psychopathology 491-495 (2010); Tr. Ex. 61, Shonkoff, J.P., Garner, A.S. *et al.*, *The lifelong effects of early toxic stress,*129 Pediatrics 232-246 (2012) ("Shonkoff").

60.     ACEs are "experiences that have the potential to cause trauma for a child, and they can be single incidents or chronic stress, chronic extreme stress."  Examples of ACEs include, extreme neglect, physical abuse, emotional abuse, emotional neglect, homelessness, significantly bullied in a school environment, and discrimination. Tishelman TR at 340:5-13, 16-18, 348:6-18.

61.     ACEs can cause physical harm to a child, such as irreversible injury or death, and have the potential to cause lifelong physical harm, such as a higher likelihood of diseases (heart disease and cancer), addiction, poor physical health for adults, brain development, and hormonal expression. *Id.* at 341:7-11, 342:5-8, 15-24, 343:2-11, 343:17-344:1.

62.     In terms of mental and emotional harm to a child, ACEs have been found to lead to a higher likelihood of anxiety, depression, suicidality, trauma, and toxic stress.  Toxic stress occurs when a child is in a chronic stress condition as opposed to a one-time trauma experience and studies have been done recently to understand the effects of this type of extreme stress on child development.  Transgender children are often affected by chronic stress because they face stressful situations on a daily basis in regard to the acceptance of their identity. *Id.* at 341:18-25, 342: 3-8, 10-24, 343:2-344:1, 344:16-23, 345:21-23, 368: 3-6.

63.     Toxic or chronic stress during early childhood development has been found to have significant impacts on the brain because the brain during the early childhood stage is in a

rapid developmental phase, with critical periods for learning and for neurological development. In her practice treating patients, Dr. Tishelman has personally observed the manifestations of this in children with "significant emotional dysregulation and mental health consequences, and ability to learn and acquire functional academic skills." *Id*. at 358:22-359:2, 359:12-15. *See also* Shonkoff, Tr. Ex. 61, 129 Pediatrics at 232-246.

64.     Dr. Tishelman provided examples from her own practice of when transgender and gender diverse children, including preschoolers, face ACEs and/or chronic stress.  Specifically, Dr. Tishelman stated she observed that many children have to be homeschooled or removed from a school environment because they do not feel safe in that school.  She also provided a specific example of a kindergartner who was experiencing suicidality while in a school environment and had to be transported by an ambulance to a hospital. Tishelman TR at 346:20-25, 347:3-11, 15-25.

65.     Transgender and gender diverse children face more adversity than their cisgender peers in the form of gender-related stressors, bullying, and higher rates of suicidality. Dr. Tishelman also cited research that bullying is correlated with higher rates of suicidality. She clarified that bullying can occur from peers and adults, and sometimes teasing, can rise to the level of bullying, in her professional opinion. *Id.* at 357:6-20, 368:13-20, 369:1-370:6, 385:1-16, 386: 4-5.  *See also* Tr. Ex. 64, Thoma, Brian C., *et al., Suicidality Disparities Between Transgender and Cisgender Adolescents,* Pediatrics 144 (5): e20191183 (November 2019); Tr. Ex. 63, Thoma, Brian C., *et al*., *Disparities in Childhood Abuse Between Transgender and Cisgender Adolescents,* Pediatrician 148(2): e2020016907 (2021).

66.     Generally, children who have social support in the form of supportive peers and school environments, have more positive mental health. Similarly, cooperation between schools and families is helpful to children. *See* Tr. Ex. 53, Cox, Diane D., *Evidence-Based Interventions Using Home-School Collaboration,* 20.4 School Psychology Quarterly 473-97 (2005) (*ProQuest*. Web. 8 Dec. 2023). On the other hand, studies have shown that conflict between the child's home and school environment causes harm to the child. Tishelman TR at 351:8-352:4, 395:11-15, 368:13-20.

67.     "Social transitioning" occurs when an individual "chooses to express themselves in one or more ways consistent with their gender identity that is known to them." This self-expression can take the form of clothing, haircuts, how they are addressed by others, and which bathroom they use.  Dr. Tishelman explained, "It's important for children to be free to express themselves in the way that's comfortable for them, as long as they're not destructive to others in every setting in which they wish to do so.... Because those are situations in which a child's understanding of themselves that is often shared with their family is not being recognized in the school setting, and that can be – can instill a sense that they are not themselves acceptable the way that they are, especially about something that they can't change." *Id.* at 365:10-366:13, 391:25-392:5.

68.     Dr. Tishelman gave an example of how it is hard for an individual to function when they feel unsafe in an environment. This example related to an individual who was severely bullied at school for not using the bathroom consistent with what his gender was assumed to be at birth. As a consequence, even 15 years later this individual still did not feel safe using public restrooms. *Id.* at 345:2-18.

19

69.     Because gender identity or a sex trait variance can be revealed at any time, Dr. Tishelman agreed that there could be an instance wherein a child could enroll at school in August as cisgender and later in the school year could be revealed as gender diverse, or could discover a sex trait variance.  A child could then face harm if forced to switch schools, if the school environment is not accepting of their gender identity (as new environments can be stressful for children) or learning that the community they felt connected to and a part of does not accept them.  *Id.* at 390:14-19, 390:22-391:12.

70.     Dr. Tishelman also testified to her professional experience of working with LGBTQ children and families who are deeply connected to a religious community, so much so that they want to attend or are attending a faith-based school.  In her experience, when an LGBTQ child or family loses that religious community, it can be a terrible loss because they often go to that community for solace and sustenance, and to be excluded from that community because of their LGBTQ status "could be a terrible loss of community and faith that's important to them."  "[I]f children are already at a school and start to identify as within a LGBTQ community and need to be excluded from a community that they...support and a community that means something to them, that can be a significant adversity and loss."  *Id.* at 382:15-383:10.

**The Department Developed Its Preference System to Preserve Providers' Ability to Save Seats for Their Community Members Consistent With the Statute's Directive For a Mixed-Delivery System**

71.     Before a family is matched with a provider, the family chooses up to five providers and ranks them from one to five. Declaration of Dawn Odean, Tr. Ex. 39 ¶ 9.

72.     The Department will only match children with one of the family's choices. If none of the family's choices are available, the family will have the opportunity to select additional providers for their child. *Id*.

73.     UPK Providers may meet with families and provide tours of their schools during the matching process.  Odean TR at 211:12-23.

74.     After a family selects their provider choices, a "computer algorithm matches families….to one of the family's choices." Cooke TR at 156:15-18.

75.     The Department recruited and engaged all types of providers including "school districts, center-based, home-based and faith-based, that could provide safe, nurturing, inclusive, nondiscriminatory environment[s] for children" with assistance from Local Coordinating Organizations ("LCOs"). Cooke TR at 147:23-148:2, 150:13-151:14.

76.     LCOs "know their communities better than the State does" and were "partners with the Department of Early Childhood in implementing the UPK [Program] at the local level. Cooke TR 149:15-18, 22-25.

77.     The Department also convened multiple working groups with different types of providers including school districts, Head Start providers, in-home family child care, corporate providers and faith-based providers. Odean TR at 215:5-13.

78.     As a result, there are roughly 1,900 UPK providers participating in the UPK Program. Odean Declaration, Tr. Ex. 39 ¶ 9.

79.     The Department learned through providers and LCOs that the computer algorithm used to match families with providers, which was based on a simple lottery matching system, "doesn't account for mixed delivery" in that it cannot account for certain factors such as

21

providers' ability to protect "continuity of care" for children and families and other complexities of Colorado's mixed delivery. Odean TR at 212:6-9, 16-20.

80.     "Continuity of care limits the transitions for a child… provide(s) positive outcomes for growth for the child and supportive environment for that community and the family." *Id.* at 213:10-14.

81.     The Department figured out a way to override the lottery matching algorithm by developing preferences that added weights within the algorithm to achieve the statutory objectives of mixed delivery and family choice. Odean TR at 275:19-21, 277:2-10, 13-14; Cooke TR at 154:9-12 ("so the preference really was designed to protect . . . the seats in a particular provider setting from the unintended consequences of our computer algorithm which managed matching").

82.     By permitting providers to hold seats for members of the community that they were serving, the preferences sought to ensure the continuity of care for a child, and to ensure the success of the mixed-delivery system.  Odean TR at 275:19-21.

**The Preferences Do Not Permit Providers to Discriminate in Violation of the Nondiscrimination Provision**

83.     The preferences "acknowledge certain relationships … that existed between the provider and the community the provider served or families the provider served" and "protect … the seats in a particular provider setting from the unintended consequences of [the] computer algorithm which managed matching." Cooke TR at 153:22-25, 154:9-12.

84.     "Eligible preschool providers may utilize the following programmatic preferences to the deferred acceptance algorithm component of the matching process:

1)      Faith-based providers granting preference to members of their congregation;

2)      Cooperative preschool providers requiring participation in the cooperative;

3)      School districts maintaining enrollment consistent with their established boundaries;

4)      Participating preschool providers reserving placements for a student(s) with an Individualized Education Program (IEP) to ensure conformity with obligations incurred pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. section 1400 (2004), or the Exceptional Children's Education Act, Article 20 of Title 22, C.R.S.;

5)      Head Start programs' adhering to any applicable federal law requirements including eligibility requirements;

6)      Participating preschool providers granting preference to an eligible child of one of their employees;

7)      Participating preschool providers granting preference to an eligible child in order to ensure continuity-of-care for that child;

8)      Participating preschool providers granting preference to an eligible child in order to keep siblings similarly located;

9)      Participating preschool providers granting preference to an eligible child who is multilingual in order to ensure the proper delivery of services to that child; and;

10)     Participating preschool providers granting preference to an eligible child based on the child and/or family being a part of a specific community; having specific competencies or interests; having a specific relationship to the provider or to the provider's employees, students, or their families; receiving certain public assistance benefits; or participating in a specific activity."

Tr. Ex. 71 at 7-8 (UPK Proposed Rules updated January 2, 2024). S*ee also* Tr. Ex. 21 at 6-7 (UPK Proposed Rules prior version); Tr. Ex. 24 at 37 (UPK Provider Guide).

85.     During the trial, CDEC released its latest draft of the programmatic rules for public comment, which were introduced into evidence without objection.  This updated draft included a proposed tenth preference for stakeholder review and comment. This tenth preference was also discussed during Ms. Odean's direct, cross and redirect. Odean TR at 229:3-20, 242:1–246:25.

86.     Exhibit 71 is a draft of proposed rules and the Department is "still in the input-receiving part of the rule process" such that the adopted rule language, including the definition of

"congregation" may differ from the January 2, 2024 draft version. Odean TR at 202:1-9, 274:14-21.

87.     "In utilizing these programmatic preferences, eligible preschool providers must still comply with [the nondiscrimination provision]." Tr. Ex. 71 at 8.

88.     The Department understands the statute to mean that providers who prioritize low-income families do not violate the statutory nondiscrimination provision because the statute expressly directs the prioritization of low-income families to address the longstanding barriers to preschool access experienced by those families. Odean TR at 221:14-18, 222:1-12; Colo. Rev. Stat. §§ 26.5-4-205(1) and 26.5-4-203(14)(e).

89.     The statute specifically identifies Head Start providers, which are "federally funded programs that prioritize comprehensive supports for young children and their families who are living in poverty, are low-income, or have children with disabilities" as providers to be included in the Program. Odean TR at 220:22-25; Colo. Rev. Stat. §§ 26.5-4-205(1) and 26.5-4-203(14)(e).

90.     Similarly, the Department understands the statute to mean that providers who prioritize children with disabilities do not violate the statutory nondiscrimination provision because the statute expressly directs the prioritization of children with disabilities because "historically, they haven't had equitable access or aligned care that meets their needs." Odean TR at 220:9-16; Colo. Rev. Stat. §§ 26.5-4-205(2); 26.5-4-204(1), (3)(a)(III), (4).

91.     Allowing school districts to utilize a preference for students with disabilities or Individualized Education Programs ("IEPs") "ensures that school districts and their contracted

partners can meet their federal mandate under ID[E]A. And that might include ratios in the classroom, [and] aligned resources and services….” Odean TR at 219:8-12.

92.     Neither school districts nor their contracted partners are permitted to violate the nondiscrimination provision. Odean TR at 220:2-5.

93.     The tenth preference also allows for departures from the default matching process in favor of specific communities, competencies, interests, relationships, public assistance benefits, or other specific activities. Tr. Ex. 71 at 7.

94.     The Department has granted individualized requests, including for a provider that only accepts fully vaccinated children and a preschool that prioritizes subdivision residents. Tr. Ex. 34 (Individualized Request Data).  These individual departures from the default matching process were given in favor of communities and “to be responsive [] to providers, [and] stakeholders.” Odean TR at 229:4-16.

95.     When considering a request under the tenth preference, the Department’s leadership team will meet to consider the request and potentially consult with counsel to determine whether that preference is aligned with the nondiscrimination provision. *Id*. at 277:2-10.

96.     Ms. Odean was asked to consider whether, for instance, a school could prioritize African-American families or LGBTQ families and said yes. *Id*. at 245:25-246:8. Ms. Odean later clarified that she had never before thought about the possibility of any such request, that she does not have sole authority to approve such a request, that instead the Department carefully reviews requests for preferences with the advice of legal counsel, and that it would not grant any request if the preference violated the nondiscrimination provision. *Id*. at 278:23-280:5.

97.     The Department has never received a request from a provider seeking to turn away white children. *Id.* at 278:23-279:2.

98.     The Department has never received a request form a provider seeking to turn away cisgender children. *Id.* at 279:3-7.

99.     The Department has never received a request to turn away straight children or families. *Id.* at 8-12.

100.    In addressing an existing example of a school that served the children of teen mothers, the Department would investigate that school turning away a teenage father's child based on the parent's gender. *Id*. at 280:22-281:5.

101.    No provider may discriminate in utilizing the tenth preference. ("That provision means that the preferences don't allow for discrimination as defined in our antidiscrimination provision.")  Odean TR at 230:23-24. ("Q: You were also asked about a school that only serves a community of teen moms. Would the department investigate the decision of a provider if it refused a teen dad access to that preschool solely on the basis of his gender? A: Would we investigate? Q: Yes. Would you investigate the decision to not serve a person solely on the basis of his gender? A: If a father of a child in that program was denied access, we would investigate." Odean TR at 280:22-281:5.)

102.    Faith-based providers may give preference to families who are part of their congregation "by reserving all or a portion of their preschool seats for their congregation members" and to "decline a match from a family that is not part of their congregation." Odean Declaration, Ex. 39 ¶ 8. *See also* Cooke TR at 156:13-157:6 (describing operation of faith-based congregation preference in the matching process during the first year of UPK).

103.    The Department does not interpret the congregation preference to permit a provider's religious-based discrimination, because the preference is about an "inclusive community, and being able to ensure that providers can continue to serve the families that they have served, and families can continue to participate." Odean TR at 276:7-22.

104.    If the Department learned that a provider was utilizing the congregation preference to discriminate, the Department would investigate and follow the expectations set forth in law. *Id.*

105.    The preferences were "targeted at the matching process" and do not give "any kind of exception to the agreement or to anything in rule or statute…." Cooke TR at 154:14-18. And no preference grants a provider an exemption from any of the quality standards. *Id*. at 177:3-8.

106.    The Department would deny use of the congregation preference to a provider who correlated the ability to save seats for its members as permission to discriminate. "Q: "So, is it possible for a church that has a statement of faith that providers must agree to to limit their enrollment to families who have agreed to that statement of faith?

A:  If that statement of faith is contrary to the equity statement in law, then that would be problematic." Cooke TR at 169:20-24.

107.    The preferences were never meant to be exceptions to the non-discrimination statute. Rather, they are intended to "be inclusive of providers in mixed delivery and the programs that they bring for families in that community, and continuity of care ..." and "to honor the unique program we have in Colorado and the expectations around mixed delivery." Odean TR at 275:19-21, 277:2-10.

108.    Preferences are departures from the matching algorithm, and do not provide exceptions from the nondiscrimination provision. *Id.* at 277:13-14.

109.    If the Department ever receives a complaint about a preference being used to discriminate against children and families regarding preschool enrollment and services, the Department will investigate. *Id.* at 276:16-19.

**The "Temporary Waiver" Is Not an Exemption from the Nondiscrimination Provision**

110.    "The implementing legislation authorizes the Department: if necessary to ensure the availability of a mixed delivery system within a community, . . . [to] allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards; except that each preschool provider must meet all quality standards relating to health and safety as a condition of participating in the preschool program.  § 26.5-4-205(1)(b)(II)." Kane Order (Amended 1/3/2/2024), ECF No. 99 at 5.

111.    The Department does not interpret the "temporary waiver" to permit exceptions from the nondiscrimination provision because it states that "except that each preschool provider must meet all quality standards relating to health and safety as a condition of participating in the preschool program." Colo. Rev. Stat. § 26.5-4-205 (1)(b)(II). "The waiver doesn't exempt a provider from what's in the law, so that wouldn't be a waiver associated with this process.  Q: And is the nondiscrimination language – is the nondiscrimination statute a health and safety requirement? A: It is." Odean TR at 210:8-12.

**Faith-Based Providers Are Participating in the UPK Program and were Intentionally Included and Welcomed into the Development and Implementation of the Program**

112.    The Department began meeting in December of 2022 on a bi-weekly basis with a faith-based working group made up of representatives from faith-based providers. Cooke TR at 151:23-152:20; Odean Declaration, Tr. Ex 39 ¶ 7.

113.    The faith-based working group included representatives from multiple faiths including Jewish, Lutheran, Presbyterian and nondenominational providers, as well as representatives from the Colorado Council of Churches and the Interfaith Task Force and those of various Christian denominations. Cooke TR at 152:8-20.  Tracy Seul from St. Mary was one of the "early and lasting members." *Id*. at 152:16.

114.    The Department created the congregation preference in direct response to feedback from faith-based providers who had expressed concern about members of a church family losing their seats because of the unintended consequences of the matching algorithm's operation. *Id*. at 154:21-155:5, 157:17-24.

115.    The Department "heard from faith-based providers considering to participate" and was "thoughtful about being inclusive of faith-based providers being able to [] be inclusive to their community, and be able to participate and their families to be able to have access."  Odean TR at 225:13-17.

116.    The congregation preference is open to all faiths. Cooke TR at 158:11-12.  That could include "their church family, their church community, their parish, whatever that might be, such that they could hold all or a portion of their seats" *Id.* at 154:25-155:2.

117.     Currently there are 40 faith-based providers participating in UPK.  Odean TR at 234:8, 11-13. 904 children have been matched to these providers.  *Id.* at 234:25; Odean Declaration, Tr. Ex. 39 ¶ 10.

118.     The Department does not monitor faith-based providers' curriculum.  *Id.* at 232:23-233:7.

**Plaintiffs Seek an Exemption, That Does Not Exist and Has Never Existed, From the Non-Discrimination Statute**

119.     The preferences are not exemptions: "[The preferences were] totally targeted at the matching process. It was not in any way giving a provider any kind of exception to the agreement or to anything in rule or statute, but rather to address circumstances with the particular provider by going to the matching process." Cooke TR at 154:14-18. And no preference grants a provider an exemption from any of the quality standards.  *Id*. at 169:5-8, 177:3-8

120.     Plaintiffs seek an exemption from the nondiscrimination statute that would permit them to discriminate on the basis of sexual orientation and gender identity. "The Archdiocese of Denver, as part of a coalition of other religious preschool providers, requested an exemption from the statutory nondiscrimination requirement." Kane Order (Amended 1/3/2024), ECF No. 99 at 9 (quoting Exhibit 11). *See also* Cooke TR at 158:20-159:2 (acknowledging receipt of letter). The Department denied the request for an exemption, explaining that it did not have authority under the statute to grant such an exemption. The Department stated in the letter that it does not have the authority to create an exemption from the statutory nondiscrimination requirement. Tr. Ex. 12, ECF No. 32-13 at 1-2 (Roy Email); Kane Order (Amended 1/3/2024), ECF No. 99 at 9.  *See also* Cooke TR at 159:18-160:7.

121.    In the same letter that denied the request for a special exemption, the Department

encouraged those requesting the exemption to participate in the faith-based working group and

the UPK Program. Roy Response Email, Tr. Ex. 12; Cooke TR at 160:10-13.

**The Plaintiff Preschools Participate in Other Grant Programs with Non-Discrimination Clauses in Their Contracts**

**Denver Preschool Program**

122.    On January 4, 2024, Elsa Holguín, the Chief Executive Officer of the Denver

Preschool Program, testified. *See generally* Holguín TR 1/4/2024 at 420-450. Her testimony was

credible and some of her testimony rose to the level of expert opinion due to her extensive

programmatic knowledge.

123.    Plaintiff St. Bernadette participates in the Denver Preschool Program. Coats TR at

117:7-9.

124.    The Denver Preschool Program or DPP, provides financial support for Denver 4-

year-olds and some 3-year-olds to attend preschool. Holguín TR at 421:10-13. All Denver four-

year-olds qualify for the program. *Id*. at 423:16-20.

125.    DPP requires providers to sign an agreement to participate in the program, and

providers that do not sign cannot participate. *Id.* at 433:6-10.

126.    The DPP Program agreement requires that a provider "shall not discriminate

against any person on the basis of race, color, religion, national origin, gender, age, except as to

the age of children qualifying for tuition questions, military status, sexual orientation, gender

variance, marital status, or physical or mental disability, except as such disability may materially

and adversely affect proper administration of the preschool program." Tr. Ex. 43 at 26 (2022-

2023 DPP Renewal Contract); Holguín TR at 432:19-25.

127.     If a provider turned away a family for one of the reasons enumerated in that paragraph, DPP would consider it a violation of the agreement, would investigate it, and would if necessary terminate the contract. *Id*. at 433:24-434:2.

128.     St. Bernadette signed this agreement in 2022. DPP Renewal Contract, Tr. Ex. 43; Holguín TR at 437:13-24.

129.     The DPP agreement has language reading: "Nothing in this agreement shall be construed to affect the Provider's right to engage in privately funded, inherently religious activity or affect the independence of Providers, including any rights protected by the Colorado and U.S. Constitutions and applicable law." DPP Renewal Contract, Tr. Ex. 43 at 16; Holguín TR at 438:17-21.  DPP does not interpret this provision to allow a faith-based provider to refuse to enroll an LGBTQ child or discriminate against LGBTQ families. *Id.* at 439:15-440:7.

130.     Ten Archdiocese of Denver Catholic schools, including St. Bernadette, participate in DPP.  *Id.* at 436:8-13; ECF No. 38-5 (Holguín Decl.) at ¶ 7. DPP paid roughly $1 million to participating Archdiocese schools in the 2022-23 school year. Holguín TR at 437:11-12.

131.     DPP has no record of complaints against these schools regarding LGBTQ children or families. ECF No. 38-5 (Holguín Decl.) at ¶ 10; Holguín TR at 447:3-6.

**Colorado Child Care Assistance Program ("CCCAP")**

132.     On January 4, 2024, Jesse Burne, the Division Director of Early Learning Access and Quality at the Colorado Department of Early Childhood where he oversees the state-wide administration of the Colorado Child Care Assistance Program, testified. *See generally,* Burne TR 1/4/2024 at 398-419.  His testimony was credible and some of his testimony rose to the level of expert opinion due to his extensive programmatic knowledge.

133.    Plaintiff St. Mary participates in the CCCAP program. Seul TR at 88:20-89:3.

134.    CCCAP serves children from birth through age 13. Burne TR at 399:18-19, 399:25-400:5, 416:16-18.

135.    CCCAP providers need to have a signed fiscal agreement in place before they enroll children. *Id*. at 402:12-17.  Plaintiff St. Mary signed the CCCAP fiscal agreement. *Id*. at 403:1-24. It is in effect through July 31, 2026. *Id*. at 404:10-12; Tr. Ex. 42 (2023 CCCAP Contract).

136.    The fiscal agreement requires CCCAP providers to not discriminate against a child or family "with regard to race, color, national origin, age, sex, religion, marital status, sexual orientation, or physical, intellectual, or mental health disability." Burne TR at 404:18-405:7. CCCAP considers the rejection of a child on the basis of one of those categories a violation of the fiscal agreement. *Id*. at 406:21-407:1.

137.    St. Mary has been compliant with the CCCAP fiscal agreement nondiscrimination provision. *Id*. at 407:8-10, 413:18-25.

**Plaintiff Preschools Have No History With LGBTQ+ Preschoolers**

138.    To their knowledge, the Plaintiff Preschools have not enrolled an LGBTQ preschooler and have not received inquiries about enrolling an LGBTQ preschooler.  Seul TR at 80:16-81:5, Coats TR at 115:5-13.Additionally, the Plaintiff Preschools have never been the subject of a complaint to the Department regarding discrimination against an LGBTQ preschooler. Chilelli TR 1/ 2/2024 at 69:7-11.

139.    The Plaintiff Preschools and the Archdiocese of Denver do not have a record of denying an application of admission due to a child's family members' or guardian's sexual

orientation or gender identity since January 1, 2018 to the present.  *See* Plaintiffs' Answer to Defendants' First Set of Interrogatories, Tr. Ex. 52 at 6 (Interrogatory #3).  Similarly, the Plaintiff Preschools and the Archdiocese of Denver do not have record of denying an enrolled student's request for an accommodation regarding pronouns, use of bathroom facilities, or school uniform since January 1, 2018 to the present.  *Id.* at Interrogatory #4.

**Plaintiff Preschools' Policies For LGBTQ+ Students**

140.    The Archdiocese of Denver issued guidance to its schools, including the Plaintiff Preschools, regarding the enrollment of LGBTQ children and their families.  The Archdiocese instructs their schools that if a child, who is already enrolled "but begins asserting an identity that's at odds with his or her biological sex" sometime during the school year, "maintaining the relationship with the family with the child's enrollment would not be possible."  Chilelli TR at 53:10-54:20.

141.    The Archdiocese would also counsel their schools, including Plaintiff Preschools, to not make accommodations for a child who is gender diverse or transgender. Chilelli TR at 52:24-54:5. The Archdiocese asserts that their schools "wouldn't be able to use pronouns inconsistent with a child's biological sex" or "allow a child to wear a uniform that may be inconsistent with their biological sex." Chilelli TR at 54:6-12.

142.    Both Plaintiff Preschools would follow the Archdiocese's guidance. Coats TR at 126:21; Seul TR at 93:20.

143.    Plaintiff Preschools do not require families to be Catholic to enroll their children. Chilleli TR at 68:4-5; Seul TR at 81:23-25; Coats TR at 116:9-11.

144.     Plaintiff, Lisa Sheley became a parishioner of St. Mary's Catholic Church in 2009 but was not confirmed Catholic until 2017. Sheley TR at 98:2-3, 10.

145.     At least six preschools run by Catholic Charities which are subject to the authority of the Archdiocese are participating in the UPK Program. Odean TR at 234:8; Deposition of Elias Moo ("Moo") at 75:20-23. The Archdiocese governs these preschools and some operate on parish property. Moo at 79:12-17. "Catholic Charities operates under the umbrella within the Archdiocese of Denver." Chilelli TR at 65:18-19.

146.     The Archdiocese is comfortable with Catholic Charities preschools participating in UPK. Chilleli TR at 66:3-5. *See also* Moo at 75:20-23.

**The Department Has Not Intervened and Will Not Intervene in Preschool Providers' Hiring Practices**

147.     Contractual Provision 18(B) was not in a part of the contract Ms. Cooke drafted. Cooke TR at 148:7-13 (CDEC drafted the main part of the contract only). The exhibits, which include Provision 18(B), were drafted by the contracts and procurement offices for Department of Human Services and for the state comptroller's office. *Id.*

148.     "The terms and conditions came from a template written by the Colorado Department of Human Services, where the office of early childhood had previously been housed before the new department.  And they were a part of the transition support of the new department."  The same is true for Contractual Provision 18 (B).  Odean testified that the Department never intended to regulate the hiring practices of faith-based providers.  Odean TR at 231:10-14, 231:20-232:2.

149.     Before trial, Odean gave assurances to faith-based providers that it was not the Department's intention to interfere with their hiring practices that were in accordance with

federal and state laws, and disavowed enforcement of Paragraph 18(B) with respect to Plaintiffs' employment practices that were consistent with federal law. ECF No. 38-1, pp. 5, 16 (Motion to Dismiss).

150.    Odean testified that Paragraph 18(B) has been removed from the 2024-2025 contract and it will not apply to providers going forward. Odean also testified that the Department will not enforce 18(B) against any providers who have already signed a contract that includes 18(B).  Odean TR at 232:9-22.

## III.    <u>PROPOSED CONCLUSIONS OF LAW</u>

The Court first addresses the merits of the Free Exercise Clause claims alleged in Counts I, IV, and V, followed by the Free Speech Clause claim alleged in Count VI and the Establishment Clause claim alleged in Count VII. Finally, the Court addresses Counts II and III and a part of Count VI—which address the Plaintiff Preschools' employment practices—and finds them to be moot.

**Count I**: "<u>Free Exercise Clause—Categorical Exclusion from Otherwise Available Government Benefits</u>"

The Court concludes that Colorado's UPK Program does not categorically exclude religious entities in violation of the Free Exercise Clause. The Free Exercise Clause does not require a state to open a universal preschool program to private preschool providers. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) ("A State need not subsidize private education."). Even so, Colorado has chosen to do so by including both faith-based and secular private preschools in its Program, along with public schools.  FOF ¶ 23; Colo. Rev. Stat. § 26.5-4-203(14). For this reason, Colorado's UPK program differs from the public funding programs at issue in *Carson v. Makin*, 596 U.S. 767 (2022), *Espinoza*, and *Trinity*

36

*Lutheran Church v. Comer*, 582 U.S. 449 (2017). Unlike Colorado's program, each of the public funding programs at issue in that trio of cases "specifically carved out private religious schools from those eligible to receive such funds." *See Carson,* 596 U.S. at 780. In *Carson,* for example, Maine's public funding program expressly excluded religious schools from participating in the state's tuition assistance program to prevent the use of state funds for religious instruction, and the U.S. Supreme Court held that this categorical exclusion of religious schools "solely because they [we]re religious" violated the Free Exercise Clause. *Id.* at 780, 785, 787-89.

In contrast, Colorado's Program includes religious preschools, as religious providers currently participate in, and receive public funding under, the Program. FOF ¶¶ 26-28, 75, 78, 110-116, 117. Colorado's UPK Program thus does not exclude otherwise-eligible providers because they are religious, nor does it violate any "right to participate in a government benefit program without having to disavow its religious character," *Trinity Lutheran*, 582 U.S. at 463.

Plaintiffs nevertheless assert that because, for religious reasons, they do not agree to comply with the Program's statutory nondiscrimination provision, they are categorically excluded from the Program, based on their religious exercise. But Plaintiffs' assertion incorrectly conflates the analysis for assessing a government's categorical exclusion of religion with the analysis for assessing a governmental burden on religion. The Program's nondiscrimination provision prohibits discriminatory conduct by requiring all publicly funded preschools, both religious and secular, to provide "an equal opportunity to enroll and receive preschool services" regardless of protected class status, and Plaintiffs seek an exemption from this requirement because they believe that it burdens their religious practice. *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990), and its progeny thus provide the relevant

37

Free Exercise Clause analysis in cases like this, where the challenger alleges that the government's action has burdened its religious exercise.

**Counts IV and V:** <u>"Free Exercise Clause—Not Generally Applicable: Discretionary Exemptions" and "Free Exercise Clause—Not Neutral or Generally Applicable: Categorical Exemptions"</u>

Government actions that are neutral and generally applicable are subject only to rational basis scrutiny for Free Exercise Clause purposes. *Smith,* 494 U.S. at 879-80. After weighing the evidence, the Court finds that the statutory nondiscrimination provision, as enacted and implemented, is neutral and generally applicable, and that it satisfies rational basis review.

<u>The Nondiscrimination Provision is Neutral</u>

A governmental action is not neutral for Free Exercise Clause purposes if it "prohibits conduct because it is undertaken for religious reasons" — in other words, where "the object or purpose of a law is the suppression of religion or religious conduct." *Church of the Lukumi Babalu v. City of Hialeah*, 508 U.S. 520, 532-33 (1993). Evidence of such an impermissible object may be found in the text of the law, the legislative history, or the background circumstances that gave rise to the law. *Id.* at 533-34, 540-41. That a law may have an adverse impact on religious conduct, however, does not mean that the law impermissibly targets that conduct. *Id.* at 535. Conversely, a "law is neutral so long as its object is something other than the infringement or restriction of religious practices." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649-50 (10th Cir. 2006).

The Program's statutory nondiscrimination requirement is facially neutral in protecting children and families from discrimination by prohibiting discrimination regardless of its motivation—secular, religious, or otherwise. § 26.5-4-205(2)(b). Forty faith-based providers

currently participate in, and receive funding from, the Program. Six Catholic Charities preschools currently participate in, and receive funding from, the Program. Defendants affirmatively sought to include religious providers at the Program's outset by convening an interfaith working group that met bi-weekly to encourage and facilitate religious providers' participation in the Program. And Defendants developed a congregation preference specifically to respond to concerns expressed by religious providers to ensure that they could hold seats for members of the communities they serve. FOF ¶¶ 112-118, 145.

The Court thus finds that the statutory nondiscrimination is neutral because its text, legislative history, and the circumstances surrounding its enactment and implementation do not support an inference that its object is to suppress religious conduct. *See Harmon v. City of Norman*, 61 F.4th 779, 794 (10th Cir. 2023) (holding that a law was neutral because nothing in the record indicated that its enactment or enforcement sought to infringe religious practice).

<u>The Nondiscrimination Provision is Generally Applicable</u>

A governmental action is not generally applicable for Free Exercise Clause purposes either when it provides a mechanism for individualized exemptions from its requirements or when it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). After weighing the evidence, the Court finds that the statutory nondiscrimination provision, as enacted and as implemented by Defendants, is generally applicable.

The Statute's Temporary Waiver Provision Does Not Create an Individualized
Exemption From the Nondiscrimination Provision

First, the Court finds that the statutory nondiscrimination provision, as enacted and

implemented, is generally applicable because it does not provide a mechanism for individualized

exemptions that invites the government to consider the particular reasons for a person's conduct.

*See Fulton*, 141 S. Ct. at 1877 (2021) ("A law is not generally applicable if it 'invite[s]' the

government to consider the particular reasons for a person's conduct by providing 'a mechanism

for individualized exemptions.'") (quoting *Smith*, 494 U.S. at 884)).

Plaintiffs assert that the statutory provision authorizing the Department to temporarily

waive a UPK-funded provider's compliance with some quality standards provides an

individualized exemption from the statutory nondiscrimination requirement. *See* Colo. Rev. Stat.

§ 26.5-4-205(1)(b)(II). That provision, however, does not permit a waiver for those quality

standards relating to health and safety. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(II).

Defendants interpret the statutory nondiscrimination provision as a quality standard

"relating to health and safety" such that the temporary waiver provision does not authorize them

to approve an exemption from the nondiscrimination provision. FOF ¶¶ 38, 110-111.

In support of the Department's understanding, the Early Childhood Act requires the

Program's use of practice- and evidence-based practices for family support and child

development. Colo. Rev. Stat. § 26.5-1-102(1)(h)(II). The statutory text goes on to emphasize the

importance of behavioral health and linguistically appropriate strategies to support child and

parent outcomes and improve overall family well-being. *Id*. § -103(1)(a). Moreover, in enacting

the Early Childhood Act, the General Assembly expressly found that stressful experiences early

in life have destructive impacts on the architecture of the brain, and observed that responsive,

nurturing relationships between young children and their caregivers can lead to secure attachment. *Id*. § -113(1)(a).

Defendants' testimony further explained how the Act's legislative history and implementation reflected a "whole child" approach that emphasized the importance of safe, healthy, and nurturing learning environments free from discrimination. The experts' evidence-based testimony further confirmed how discrimination against children and their parents, including in school settings, harms children, and how children's health benefits from environments that are supportive and free from discrimination. FOF ¶¶ 20-22, 33-38, 47, 50-55, 58-70. By ensuring that children in publicly funded preschool programs have access to a safe educational environment free from discrimination, the statutory nondiscrimination provision thus directly advances the statute's health and safety objectives. Colo. Rev. Stat. § 26.5-4-205(2)(b).

Because the Department's interpretation is "consistent with the statute's purpose, language, structure, and legislative history," this Court finds it persuasive consistent with the Colorado Supreme Court's treatment of an agency's statutory interpretation, and thus entitled to respect. *See Nieto v. Clark's Market*, 488 P.3d 1140, 1149 (Colo. 2021); *see also Kaiser v. Aurora Urban Renewal Auth*., 2024 CO 4 ¶ 30 ("An agency's interpretation of its own rules is generally entitled to great weight unless it is plainly erroneous or inconsistent with the underlying statute." (quotations omitted)).

Moreover, even if the temporary-waiver provision were instead understood to apply to the nondiscrimination requirement, the temporary-waiver provision constrains Defendants' discretion in ways that distinguish it from the fully discretionary exemption in *Fulton,* 141 S. Ct. at 1878-79. The contractual provision at issue in *Fulton* prohibited service providers from

discriminating based on sexual orientation or other protected class status while permitting, in the same sentence, the possibility of "an exception is granted by the Commissioner or the Commissioner's designee, *in his/her sole discretion*." *Id.* at 1878 (emphasis added). In contrast, the UPK statute's temporary waiver provision does not authorize Defendants' "sole discretion" to grant an exception, but instead makes a temporary waiver available only when "necessary to ensure the availability of a mixed delivery system within a community" and only so long as the provider meets "all quality standards relating to health and safety as a condition of participating in the preschool program" and is "working toward compliance" with *all* of the quality standards. Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). In other words, the provision constrains the Department's discretion to grant a temporary waiver, does not permit a permanent waiver of *any* quality standard, and is available to *all* providers, secular or religious, who meet the statutory requirements for a temporary waiver.

For these reasons, the Court concludes that the temporary waiver does not operate as an individualized exception of the nondiscrimination requirement.

<u>The Program's Matching Preferences Do Not Create Individualized Exemptions from the Nondiscrimination Provision</u>

This Court also finds that the Program's preferences that permit departures from the standard matching process are not individualized exemptions from the statutory nondiscrimination provision.

Plaintiffs misunderstand the Program's "preferences" as exceptions from its nondiscrimination requirement when those preferences are instead departures from the Program's standard process for matching families with providers. The matching preferences were developed in response to the statute's directive to the Department to work with other state

and local agencies, public and private early childhood providers, Head Start agencies, nonprofit organizations, and parents and families to prioritize the equitable delivery of resources and supports for early childhood. Colo. Rev. Stat. § 26.5-1-102(1). These preferences seek to avoid the unintended consequences of the Program's matching algorithm by permitting a participating preschool to save seats for families or community members to ensure continuity of care, to ensure programmatic coverage, or to comply with other federal or state requirements. FOF ¶¶ 79-84, 87-93, 101, 105, 107-108.

But these preferences do not exempt any provider from the statutory nondiscrimination provision and Defendants testified that they have not approved, and will not approve, any preference that would violate the statutory nondiscrimination provision. FOF ¶¶ 87-96, 100-101, 103-109, 119.

Plaintiffs also assert that the preferences, which permit providers to save seats for members of the communities they serve, are exceptions to what Plaintiffs mistakenly describe as a programmatic principle to ensure that every child has access to every participating preschool provider. But the evidence at trial established that the Program has no such principle because it would be incompatible with a mixed-delivery system that includes public schools, employer-based preschools, school-based preschools, faith-based providers, and other providers that serve specific communities that include low-income children, children with disabilities, and other communities. FOF ¶¶ 79-82, 107-108.

Because these preferences do not permit a provider to discriminate in violation of the statutory nondiscrimination requirement, they are not exemptions from that requirement. *See Church v. Polis*, No. 20-1391, 2022 WL 200661 *9 (10th Cir. Jan. 24, 2022) (unpublished), *cert.*

*denied sub nom. Cmty. Baptist Church v. Polis*, 142 S. Ct. 2753 (2022) (finding that a law was neutral and generally applicable because "the so-called" exemptions did not "actually operate" as exemptions) (citations omitted)); *see also Grace United Methodist Church,* 451 F.3d at 643, 655 (10th Cir. 2006) (finding that a zoning ordinance was generally applicable when there was "no evidence that the Board ever interpreted the exempt categories to include certain daycare operations and not others, or that the ordinance was enacted based on religious animus. . . . ").

<u>The Program's Preferences For Providers That Prioritize Low-Income Children and Children with Disabilities Do Not Prohibit Religious Conduct While Permitting Secular Conduct That Undermines the Government's Asserted Interests In a Similar Way</u>

Nor do the Program's preferences "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *See Fulton*, 141 S. Ct. at 1877. The Program prohibits discrimination in violation of the statute regardless of the motivations for such unlawful discrimination, religious or secular.

Plaintiffs allege that because Defendants' preferences permit providers to prioritize low-income children and children with disabilities, those preferences create exemptions for secular conduct that violates the statute's prohibition of discrimination based on income and disability status. The Department, for its part, asserts that prioritizing low-income children and children with disabilities does not violate the statutory nondiscrimination provision because the statute expressly directs the prioritization of low-income children and children with disabilities to address the longstanding barriers to preschool access experienced by those children. FOF ¶¶ 12, 29-31, 88-92, 97-100.

This Court concludes that the statute's text, purpose, and structure support Defendants' interpretation of the statutory nondiscrimination provision, such that providers who prioritize

low-income children and children with disabilities have not engaged in unlawful discrimination, and that permitting providers to prioritize such children thus does not exempt any provider from the statute's nondiscrimination provision. The Program's key objectives, as expressly identified in statute, include expanding low-income families' access to preschool. Colo. Rev. Stat. §§ 26.5-4-202; 26.5-4-204(1)(b). Moreover, that the UPK Act's definition of "preschool provider" expressly requires the inclusion of Head Start providers demonstrates that the Act does not understand Head Start providers to violate that statutory nondiscrimination provision when they prioritize families who qualify for the Head Start program because of their low-income status. Colo. Rev. Stat. § 26.5-4-203(14). Similarly, the statute's express objectives seek to ensure access for children with disabilities and to ensure the inclusion of providers that specifically serve those children. Colo. Rev. Stat. §§ 26.5-4-202(4), 26.5-4-206(1); 26.5-4-204(1)(c); (4)(a)(II)-(IV).

Because the Department's interpretation is "consistent with the statute's purpose, language, structure, and legislative history," this Court finds it persuasive consistent with the Colorado Supreme Court's treatment of an agency's statutory interpretation, and thus entitled to respect. *See Nieto v. Clark's Market*, 488 P.3d 1140, 1149 (Colo. 2021); *see also Kaiser v. Aurora Urban Renewal Auth*., 2024 CO 4 ¶ 30 ("An agency's interpretation of its own rules is generally entitled to great weight unless it is plainly erroneous or inconsistent with the underlying statute." (quotations omitted)). Because these preferences do not permit a provider to discriminate in violation of the statutory nondiscrimination requirement, they are not exemptions from that requirement.

Nor does the Constitution prohibit Defendants from interpreting the statutory nondiscrimination provision to prohibit discrimination *against* low-income children or children with disabilities while permitting providers to prioritize those children for services. *See Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440-442 (1985) (explaining that the government's disability-based distinctions and other distinctions on bases other than race, alienage, national origin, and gender do not trigger heightened scrutiny and are instead subject to rational-basis review). Indeed, the government routinely provides certain services or benefits only to persons with disabilities or only to low-income persons without triggering the application of nondiscrimination law, much less heightened constitutional review. The innumerable examples include the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., which makes certain educational and related services available to children with disabilities, and the Supplemental Nutrition Assistance Program, 7 USC § 2011 et seq., which provides financial support to low-income families to supplement their grocery budgets.

<u>The Program's Congregation Preference Does Not Prohibit Religious Conduct While Permitting Secular Conduct That Undermines the Government's Asserted Interests In a Similar Way</u>

Plaintiffs also contend that the "congregation preference"—that permits faith-based providers to reserve seats for families who are members of their congregations—permits those providers to discriminate on the basis of religion, and thus creates an exemption from the statutory nondiscrimination provision.

The Department testified that it does not intend or interpret the congregation preference to permit religious-based discrimination. Defendants testified that this preference was developed in response to faith-based providers' feedback and is intended to enable faith-based providers to

save seats for the members of their communities that they have served.  FOF ¶¶ 103-109, 112-115.

Through its ongoing rulemaking process, the Department is currently evaluating how to define "congregation" for these purposes. FOF ¶¶ 85-86. As of trial, the draft rules, which remain a work in progress, [Tr. Ex. 71 at 2] defined "congregation" to mean "a religious-based convocation, or multiple religious-based convocations, of individuals in a particular geographic area who share a common set of beliefs and who collectively engage in conduct with a direct nexus to that shared common set of beliefs." The draft rules also provided that "In utilizing these programmatic preferences, eligible preschool providers must still comply with rule section 4.109(B)," where section 4.109 codified the text of the statutory nondiscrimination requirement into rule. *Id.* at 8. And, if the Department learned that a provider was utilizing the congregation preference to discriminate, the Department testified that it would investigate and follow the expectations set forth in law. FOF ¶¶ 102-109.

While "congregations" could be understood in religious terms, they need not be. For example, some faith-based organizations make clear that all are welcome to attend their services and activities, or otherwise treat their congregations and communities to include those who participate in certain activities or share certain interests regardless of whether they share the same religion. Indeed, one of the Plaintiffs in this case, Ms. Sheley, testified that she joined St. Mary's Parish in 2009 but did not become confirmed as a Catholic until 2017, and the heads of Plaintiff Preschools testified that they enroll students and families who are not Catholic. FOF ¶¶ 141-142.  These circumstances indicate that a preference that permits faith-based providers to

privilege those participating in their communities need not mean that it permits them to discriminate on the basis of religion.

For these reasons, the Court accepts the Department's interpretation of its congregation preference to prohibit a provider's religious-based discrimination, as an agency's interpretation of its own rules is "generally entitled to great weight unless it is plainly erroneous or inconsistent with the underlying statute." *Kaiser v. Aurora Urban Renewal Auth*., 2024 CO 4 ¶30 (quotations omitted).

In any event, even if the congregation preference were understood to permit faith-based providers to discriminate on the basis of religion, that need not trigger strict scrutiny for Free Exercise Clause purposes because such a preference does not "prohibit religious conduct while permitting *secular* conduct that undermines the government's asserted interests in a similar way." *See Fulton*, 141 S. Ct. at 1877 (emphasis added); *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (explaining that government regulations are not generally applicable "whenever they treat any comparable secular activity more favorably than religious exercise"); *Kennedy v. Bremerton Sch. Dist*., 142 S. Ct. 2407, 2422 (2022) ("A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way'") (citing *Fulton*, 141 S. Ct. at 1877).

The congregation preference is available only to religious providers, and thus does not treat secular providers more favorably than religious providers in any way.[5] The Supreme Court's general applicability analysis screens for situations where the government is favoring secular entities' conduct over religious entities' conduct, not vice versa. For this reason, it does not make sense to understand a governmental exemption available only to religious providers as triggering Free Exercise Clause suspicion. To hold otherwise, moreover, would only discourage government programs from accommodating religious exercise in one set of circumstances if that accommodation would then subject its program to strict scrutiny for declining to provide an entirely different exemption.

---

[5] This case thus takes place in a setting very different from that confronted by this Court in *Newland v. Sebelius*, 881 F. Supp. 2d 1287 (D. Colo. 2012). That case involved an employer who sought a religious exemption from a federal law that required employers to provide health insurance coverage for contraceptives, and who brought a federal Religious Freedom Restoration Act (RFRA) challenge to the federal government's refusal to grant the exemption. Under RFRA's statutory framework, once a challenger establishes that the government has substantially burdened its religious exercise, the government bears the burden of proving that its refusal satisfies a statutory form of strict scrutiny. And when applying that scrutiny in *Newlands*, this Court concluded that the government's willingness to exempt certain other employers, both religious and secular, from the contraceptive coverage requirement undermined the government's claim that it could not grant the same exemption to the challenger. In contrast, this case instead involves a Free Exercise Clause challenge, in which courts do not apply strict scrutiny to a governmental burden on religious exercise *unless* the law is not neutral or not generally applicable as determined by the Supreme Court's precedent. And *Fulton* instructs that a governmental program is not generally applicable when it prohibits religious conduct while permitting secular conduct that compromises the government's asserted interests in similar ways. 141 S. Ct. at 1877. Defendants in this case have not permitted *any* conduct that compromises the government's interest in ensuring that publicly-funded preschools provide safe and healthy learning environments free from discrimination.

<u>The Nondiscrimination Provision Satisfies Rational Basis Scrutiny, and Even Strict Scrutiny</u>

Because the Court finds the statutory nondiscrimination provision, as enacted and implemented, to be neutral and generally applicable,[6] rational basis scrutiny applies. *Smith*. 494 U.S. at 879-80. The Court concludes that this requirement satisfies rational basis scrutiny, and even strict scrutiny, because it is rationally related and even narrowly tailored to achieving the government's legitimate, indeed compelling interest in in ensuring that children and their families have equal access to publicly-funded preschool environments, and in ensuring that, once enrolled, they receive publicly-funded preschool services that are safe, healthy, and free from discrimination. *See Fulton,* 141 S. Ct. at 1882 (describing the government's interest in the equal treatment of participants in publicly funded services as "weighty"); *Bob Jones Univ. v. United States,* 461 U.S. 574, 604 (1983) (noting the government's "fundamental, overriding interest" in preventing discrimination in education).

The expert testimony established that LGBTQ+ families experience significant barriers to access to preschool services. Many LGBTQ+ families are low-income, and their access to such services may turn on whether a provider that will accept them is located close to their home,

---

[6] Plaintiffs further assert that the nondiscrimination provision is not generally applicable because a court-ordered preliminary injunction currently precludes Defendants from enforcing the Program's nondiscrimination provision against a specific plaintiff in another case. *Darren Patterson Christian Academy v. Roy,* No. 1:23-cv-1557, 2023 WL 7270874 (D. Colo. Oct. 20, 2023). But general applicability analysis focuses on whether *the Defendant* has created an exemption from its Program in a way that triggers Free Exercise Clause suspicion, not whether Defendant is complying with a court order. Defendants' decision not to appeal a preliminary injunction in another case as they continue to litigate that case on the merits does not create an exemption from the nondiscrimination provision for Free Exercise Clause purposes.

work, or public transportation. Many LGBTQ+ families live in rural areas where preschool providers are often fewer in number. Even in metropolitan areas, LGBTQ families experience discrimination a significant amount of the time. And sometimes religious LGBTQ+ families seek out religious providers, where to be excluded by such providers "could be a terrible loss of community and faith that's important to them." Such exclusion harms children as well as parents, as the expert testimony showed that the children of LGBTQ parents are adversely affected when their parents experience discrimination. FOF ¶¶ 48-56, 64, 69-70.

The expert testimony also established that LGBTQ+ children and families who experience discrimination, especially in school contexts, suffer a range of harms to their health, safety, and well-being. Examples of such harmful discriminatory conduct include treating children differently based on their sexual orientation and gender identity, turning students and families away or disenrolling students and families because of sexual orientation or gender identity, or refusing to let LGBTQ+ students already enrolled in a school to dress or use bathrooms or pronouns in ways consistent with their gender identity. Adverse experiences during early childhood—which include discrimination in a school setting—can lead to profound negative effects for a child's development, mental and physical health, and sense of safety in the world. Transgender and gender diverse children experience higher incidence of adversity, including discrimination, than do cisgender children. FOF ¶¶ 50-55, 59-65, 67-70.

When home and school both offer accepting environments for a child, they foster positive academic and emotional outcomes for that child's development; in contrast, children experience harm when they are accepted in one environment (for example, at home) but not in another (like school). Additionally, stigmatizing a child's parents in school environments not only makes that

child feel less safe, but can negatively impact their educational experience when the child is unable to observe a positive relationship between parents and teachers, nor to feel supported across the spheres of influence in their lives. FOF ¶¶ 50-55, 64-68, 70.

The Court concludes that the State has a legitimate, indeed compelling, interest in ensuring that children and their families have equal access to publicly funded preschool environments, and in ensuring that, once enrolled, they receive publicly funded preschool services that are safe, healthy, and free from discrimination. FOF ¶¶ 11-22, 25-27, 29-38.

By prohibiting publicly funded providers from discriminating on bases that include sexual orientation and gender identity, the nondiscrimination requirement is rationally related to achieving Colorado's interests in ensuring that children and their families have equal access to publicly-funded preschool environments, and in ensuring that, once enrolled, they receive publicly-funded preschool services that are free from discrimination.

Indeed, the Court also concludes that the nondiscrimination provision is narrowly tailored, as the State cannot achieve its interest in ensuring equal access to publicly funded preschool services if it were to permit any publicly funded provider to exclude children or families from enrolling based on sexual orientation or gender identity or to disenroll a child already enrolled because of their gender identity.

Plaintiffs assert that the State could achieve its interests while exempting Plaintiff Preschools from the nondiscrimination provision because they believe that other providers are available who will serve LGBTQ+ children and families. *See* ECF No. 94 (Plaintiffs' Reply to Mot. for Summ. J.) at 16. But, as noted earlier, the evidence established that LGBTQ+ families face a variety of barriers to preschool access that limit the options available to them. The

nondiscrimination provision seeks to ensure that families have equal access to publicly-funded preschools, and the State cannot achieve this interest if some publicly-funded preschool providers are permitted to exclude LGBTQ families.

Plaintiffs also assert that the State could achieve its interest in ensuring that children and families receive publicly-funded preschool services that are free from discrimination by permitting them to "maintain enrollment policies that would prevent this situation from arising in the first place"—in other words, by permitting Plaintiff Preschools to refuse to enroll LGBTQ children and families on the front end. *See* ECF No. 94 (Plaintiffs' Reply to Mot. for Summ. J.) at 16. Not only would this deny LGBTQ+ children and families equal access to the publicly funded providers available to other families, but sometimes children do not identify as gender diverse until after enrollment, at which point they would face harm if they were then disenrolled or otherwise subject to discriminatory conduct because of their LGBTQ status. FOF ¶¶ 69-70.

Plaintiffs also propose that the State can achieve its regulatory interest through disclaimers that communicate to the public that the beliefs of private preschool providers aren't attributable to the State, or by disclosures that faith-based providers may exclude certain children or families consistent with their faith. *See* ECF No. 61 (Plaintiffs' Mot. for Summ. J.) at 40-41. But these proposals, if adopted, would simply communicate that some providers do not comply with the nondiscrimination environment when the State's interest is instead in ensuring that LGBTQ+ children and families have equal access to the publicly funded providers available to other families.

The Court thus concludes that the Program's nondiscrimination requirement satisfies rational basis as well as strict scrutiny review.

**Count VI:** "Free Speech—Compelled Speech and Expressive Association"

First, for the reasons described below with respect to Counts II and III, the Court concludes that the portion of Count VI that concerns Paragraph 18(B)'s application to the Plaintiff Preschools' employment decisions is moot.

Second, this Court concludes that the statutory nondiscrimination provision, as enacted and implemented, does not interfere with Plaintiff Preschools' associational freedoms, nor does it compel their speech, in violation of the Free Speech Clause.

Plaintiffs allege that, because the statutory nondiscrimination provision prohibits Plaintiff Preschools from discriminating against children and families on the basis of sexual orientation and gender identity, that provision requires Plaintiff Preschools to admit families "who are opposed to their religious vision" and that this would require them to "send[] a misleading and erroneous message" that "the Church approves of the[ir] conduct." *See* ECF No. 30 (First Amended Compl.) at ¶¶ 234-235.

The Court concludes that the Program's nondiscrimination requirement does not unconstitutionally interfere with Plaintiff Preschools' speech or association, but instead prohibits them from engaging in discriminatory conduct in publicly funded learning environments. FOF ¶¶ 48-56, 64-70.  Neither the Supreme Court nor the Tenth Circuit has ever recognized an expressive association right that permits schools to engage in otherwise illegal discrimination: to the contrary, the Supreme Court has rejected expressive association challenges to the application of nondiscrimination requirements in education settings.

For example, in *Runyon v. McCrary,* the Court rejected a commercially-operated school's claim that it had a First Amendment right to refuse to admit Black students, notwithstanding a

federal law prohibiting race discrimination in contracting. 427 U.S. 160, 173 (1976). There the

Court found that the law prohibited discriminatory "conduct" in the form of a "discriminatory

admissions policy," *Id.* at 178, and that in so doing the law did not interfere with the school's

ability to control the content of its teaching. *Id.* at 175-76 ("[A]s the Court of Appeals noted,

'there is no showing that discontinuance of (the) discriminatory admission practices would

inhibit in any way the teaching in these schools of any ideas or dogma.'") (quoting *McCrary v.

Runyon,* 515 F. 2d 1082, 1087 (4th Cir. 1975)). In other words, to prohibit a school's

discriminatory conduct did not require that school to engage in expression or to teach curriculum

contrary to its sincerely held, and constitutionally protected, views about race.

In the same vein, the Court held that a law regulated *conduct*—equal access to university

services—rather than expression when it required law schools to provide military recruiters with

access to their campuses equal to that provided by other recruiters. *Rumsfeld v. Forum for

Academic and Institutional Rights, Inc*., 547 U.S. 47, 68 (2006) (holding that the federal equal

access requirement did not violate universities' free speech or association rights); *see also

Hishon v. King & Spalding,* 467 U.S. 69, 78 (1984) (regulating a law firm's employment

practices by requiring it to treat its female and male attorneys equally did not "inhibi[t] the firm's

ability to advocate for certain 'ideas and beliefs,'" and thus did not interfere with its freedom of

speech or association).

As the Supreme Court has thus held, the refusal to teach, or work with, a class of people

because of their race or gender is not an expressive interest protected by the First Amendment.

Here too, the statutory nondiscrimination provision does not burden speech or association when

it requires preschools to provide equal access to their publicly funded services. The

nondiscrimination provision regulates conduct, not speech, and it does so regardless of the motivation—political, religious, or otherwise—underlying the conduct. The provision's regulation of conduct thus operates like the nondiscrimination law upheld in *Rumsfeld*: "As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." 547 U.S. at 60 (emphasis in original); *see also id.* at 70 (Though "[t]he law schools object to having to treat military recruiters like other recruiters," the Court held "that regulation of conduct does not violate the First Amendment.").

Plaintiff Preschools remain free, under the statutory nondiscrimination provision, to believe and teach what they want. Indeed, the Defendants testified that they do not review or regulate faith-based providers' curriculum. FOF ¶ 118. What they may not do under the nondiscrimination provision is treat children and families differently in a way that denies them equal access to, and equal quality of, preschool services. This Court concludes that the Program's nondiscrimination provision regulates discriminatory conduct, not expression, and satisfies rational basis review by prohibiting publicly funded preschools from discriminating on the basis of sexual orientation and gender identity.

Even if the government's regulation of publicly funded discriminatory conduct were to incidentally burden expression such that intermediate scrutiny applied, *see United States v. O'Brien,* 391 U.S. 367, 377 (1968), the nondiscrimination provision easily satisfies that standard. For the reasons explained in the Court's discussion of Counts IV and V above, the nondiscrimination provision "promotes a substantial government interest that would be achieved less effectively absent the regulation." *See United States v. Albertini,* 472 U.S. 675, 689 (1985).

Plaintiffs offer *Boy Scouts of America v. Dale* as support for their position, but that decision applied only to a nonprofit organization's right to control its membership and not to a school's or publicly-funded service provider's discriminatory conduct towards its students and service recipients in denial of equal educational opportunity. 530 U.S. 640, 644 (2000) (holding that the Boy Scouts had a right to exclude Scoutmasters and other members based on sexual orientation). Indeed, the Boy Scouts acknowledged at that time that they would have to comply with any employment discrimination law that prohibited terminating employees based on sexual orientation. *Id.* at 672 (Stevens, J., dissenting) (quoting from the Boy Scouts' statements of policies and procedures).  Neither does *303 Creative v. Elenis* provide any support for Plaintiffs' position, as that decision did not consider schools' or publicly-funded service providers' discriminatory conduct toward their students or service recipients, but instead involved the potential enforcement of public accommodations law against a website designer who wanted to make and sell wedding websites for opposite-sex, but not same-sex, couples. 600 U.S. 570, 578-79 (2023).

Plaintiffs also rely on a Second Circuit decision, *Slattery v. Hochul*, 61 F.4[th] 278, 283 (2d Cir. 2023), where the court found that an employer had stated a plausible claim that a state nondiscrimination law interfered with its hiring decisions in violation of its expressive association rights and remanded to the lower court to apply heightened scrutiny. But this decision is neither binding nor persuasive as applied to this case, as the Second Circuit failed to mention, much less make any effort to distinguish, the Supreme Court precedent discussed above that has rejected expressive association challenges to the application of nondiscrimination law in educational and employment settings.

Moreover, because the scope of expressive association protections cannot be limited to those with *religious* objections to admitting or serving certain students or families based on protected class status, Plaintiffs' position, if accepted, would have no limiting principle. For example, this position, if accepted, would provide a school with a Free Speech Clause right to refuse to admit women if it believed—for political reasons or any other reason—that women should not be educated and should instead remain at home. To note that Plaintiff Preschools' position lacks a limiting principle, or to discuss applicable precedent, is not to equate Plaintiff Preschools with racially segregated academies. Rather, this point simply recognizes that the Free Speech Clause does not permit courts to privilege beliefs that it finds more worthy or more longstanding than others. In other words, courts are not competent, and the First Amendment does not permit them to try, to carve out protections for beliefs that are more longstanding than others, or that a court believes to be more honorable than others. Such an effort would instead reflect a court's own viewpoint-based or religious discrimination. *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 391 (1992) ("The First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects."); *United States v. Ballard*, 322 U.S. 78, 86-87 (1944) (explaining that courts are not competent to distinguish among religions based on the perceived validity or value or wisdom of their beliefs); *United States v. Seeger,* 380 U.S. 163, 184-85 (1965) (same).

**Count VII:** "Denominational Favoritism"

The Court concludes that the Program's congregation preference does not discriminate among religions or religious denominations in violation of the Establishment Clause, as that preference is available to faith-based providers of all denominations and religions. Developed to

enable faith-based providers to save preschool seats for members of the communities that they serve, the congregation preference also allows preschools to self-select whether they are "faith-based," the Department does not verify the provider's selection, and the Department lets these providers define their communities for themselves. FOF ¶¶ 102-03, 116.

Plaintiff Preschools object that the congregation preference does not provide them with the exemption that they seek, because it would not permit them to discriminate on the basis of sexual orientation or gender identity. But that is immaterial to the Establishment Clause analysis, which asks instead whether the preference discriminates *among* religions or denominations. The congregation preference does not violate the Establishment Clause because it permits all faith-based providers to define their congregations, their communities, for themselves.

*Larson v. Valente,* 456 U.S. 228 (1982), provides no support for Plaintiffs' claim. The Court in *Larson* found that a state violated the Establishment Clause by expressly imposing certain registration and reporting requirements only upon certain religious organizations and not others—that is, on only religious organizations that, like the Unification Church, solicited more than fifty percent of their funds from nonmembers. *Id.* at 230, 246. Colorado's UPK Program, in contrast, draws no such lines between denominations or religions.  For the same reasons, *Colorado Christian University v. Weaver,* 534 F.3d 1245 (10th Cir. 2008), is also inapposite. There the Tenth Circuit considered a program that permitted sectarian universities to participate in a state-funded scholarship program so long as they were not "pervasively" sectarian, and the state then applied this criterion to include a Roman Catholic university and a Methodist institution, among others, but to exclude an evangelical Protestant university and a Buddhist university. *Id.* at 1258. The Tenth Circuit held that the state's program expressly discriminated

among religions without constitutional justification through criteria that required

unconstitutionally intrusive scrutiny of religious belief and practice. *Id.* at 1250.

Unlike the programs at issue in *Larson* and *Colorado Christian University* that expressly

treated different religions and denominations differently, Colorado's congregation preference,

and the Program overall, is available to all religions and denominations. FOF ¶¶ 102-03, 116.

The Court thus concludes that Defendants' congregation preference does not violate the

Establishment Clause.

**Counts II and III:** "<u>Free Exercise Clause—Ministerial Exception</u>" and "<u>Free Exercise
Clause—Church Autonomy</u>"

In Counts II and III of their Complaint, Plaintiff Preschools allege that Paragraph 18(B)

of the Program's contractual Service Agreement interferes with their employment decisions in

violation of the Free Exercise Clause. The Court concludes that these two Counts are moot

(along with, as noted above, the portion of Count VI that addresses Plaintiff Preschools'

employment practices). Defendant Odean testified at trial that the Department plans to remove

Paragraph 18(B) from the Program Service Agreement, that in the meantime it will not enforce

Paragraph 18(B) against any party, and that it does not plan ever to enforce Paragraph 18(B)

against any party. FOF ¶¶ 149-50.[7] Moreover, earlier in this litigation, without any motion by

Plaintiffs or prompting by the Court, Defendants stated in a sworn declaration that they

disavowed enforcement of Paragraph 18(B) against religious providers who hire co-religionists

in accordance with federal law, as well as its enforcement against religious providers'

---

[7] The Court had invited the parties to consider a stipulation on this issue, but none was
submitted; the matter was, however, addressed swiftly and efficiently at trial by Ms. Odean.

employment decisions involving their ministerial employees as protected by federal law. Odean

Decl., Ex. 39 ¶ 16.

   **Plaintiffs' Request for a Permanent Injunction Is Denied**

   To obtain a permanent injunction, the party seeking it must prove "(1) actual success on

the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury

outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if

issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v.*

*Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quoting *Fisher v. Okla. Health Care Auth.,* 335

F.3d 1175, 1180 (10th Cir. 2003)). These factors are "remarkably similar to the standard for a

preliminary injunction." *Id*. The Court concludes that Plaintiffs have failed to meet their burden

to show any of these factors, and thus denies their request for an injunction.

   As a threshold matter, for all the foregoing reasons, the Court concludes that Counts II,

III, and part of Count VI are moot, and thus play no role in the Court's consideration of

injunctive relief.

   On the merits, Plaintiffs have not carried their burden to prove actual success with respect

to Counts I, IV, V, the remaining parts of Count VI, and Count VII.

   While these determinations alone resolve the issue in Defendants' favor, the remaining

injunctive factors also weigh in favor of Defendants.

   The Court concludes that Plaintiffs have not established irreparable harm. Plaintiffs seek

an injunction that would allow Plaintiff Preschools to: (1) prioritize Catholic students in

admission; (2) allow the schools to consider for enrollment and retention purposes "whether a

family or child seeking placement in their schools has identified as LGBTQ, is in a same-sex

relationship, or has adopted a gender identity different from his or her biological sex;" and (3)

allow schools to bar students from bathrooms or changing rooms that do not correspond to their

gender as assigned at birth, bar them from wearing uniforms that do not correspond to their

gender assigned at birth, and allow schools to refuse to use students' requested pronouns. ECF

No. 30 (Amend. Compl.) at 36.

Plaintiffs fail to show irreparable harm from the denial of an injunction because their

testimony, as well as the Archdiocese's, establishes that they are unaware of ever having

enrolled an LGBTQ+ preschooler, of ever having received an inquiry about preschool enrollment

from an LGBTQ+ family, or of ever having been the subject of a complaint from an LGBTQ

student or family.  FOF ¶¶ 131, 137, 138-39.  In other words, under the status quo that they seek

to change, they are unaware of ever having been in a position that would require them to engage

in conduct that would violate the nondiscrimination provision.

Moreover, Plaintiff Preschools have signed contracts for CCCAP (Tr. Ex. 42) and DPP

(Tr. Ex. 43) containing similar nondiscrimination provisions and have participated in those

programs with Archdiocese approval and without "hardship." FOF ¶¶ 126, 128, 130, 133, 136;

Tr. Ex. 68 (Moo Dep.) at 160:13-16, *see also id.* at 164:21-165:1, 93:1-5; 94:4-5.

Plaintiffs have thus not shown any injury that requires injunctive relief.

Regarding the balance of harms, the Court concludes that an injunction's potential to

harm LGBTQ+ children and families outweighs any injury to Plaintiffs. As explained above,

preschool-aged children and their families seeking publicly funded preschool services face

significant harm if providers are permitted to discriminate against them because of their sexual

orientation or gender identity. FOF ¶¶ 48-52; 64-70.

Because Defendants established a compelling public interest in ensuring that children and families have equal access to publicly-funded preschool services and in ensuring that, once enrolled, they have access to publicly-funded preschool environments that are free from discrimination, the Court also concludes that an injunction would not be in the public interest. "A court should be particularly cautious when contemplating relief that implicates public interests." *Salazar v. Buono*, 559 U.S. 700, 714 (2010). Here, Colorado voters overwhelmingly voted to establish voluntary, universal preschool. Colo. Rev. Stat. § 26.5-4-202(1)(a)(V). And the Colorado legislature declared what it believes to be the public interest in addressing income barriers and increasing access to high-quality preschool for all children in Colorado through the equitable delivery of quality preschool services.  Colo. Rev. Stat. §§ 26.5-4-202; 26.5-1-102(1)(a), (f). In doing so, it mandated that the Program, as part of the Department's quality standards and its commitment to the health, safety, and well-being of children and families, require that publicly-funded preschool providers provide all eligible children with an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability. Colo. Rev. Stat. § 26.5-4-205(2)(b).

The public's interest in ensuring equal access to publicly-funded preschool environments that are safe, healthy, and free from discrimination thus weighs heavily in Defendants' favor.

Dated: January 26, 2024          PHILIP J. WEISER
Attorney General

*s/ Virginia R. Carreno*

*Virginia R. Carreno,* Second Assistant Attorney General
*Janna K. Fischer*, Senior Assistant Attorney General
*Nicole Rust*, Assistant Attorney General
*J. Gregory Whitehair*, Assistant Attorney General
*Helen Norton,* Special Assistant Attorney General
1300 Broadway, 6th Floor, Denver, CO 80203
Telephone: (720) 508-6349
Email: virginia.carreno@coag.gov; niki.rust@coag.gov; greg.whitehair@coag.gov; janna.fischer@coag.cov; helen.norton@coag.gov
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2024, I electronically filed the foregoing **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** with the Clerk of Court using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

Eric C. Rassbach
Joseph C. Davis
Nicholas R. Reaves
Mark L. Rienzi
Amanda Dixon
Jordan Varberg
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Suite 400
Washington, D.C. 20006
erassbach@becketlaw.org; jdavis@becketlaw.org; nreaves@becketlaw.org; mrienzi@becketlaw.org; adixon@becketlaw.org; jvarberg@becketlaw.org

*Attorneys for Plaintiffs*

*s/* Bonnie Smith
*Bonnie Smith*