**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02079-JLK

ST. MARY CATHOLIC PARISH IN LITTLETON;
ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY; and
LISA SHELEY,

       Plaintiffs,

v.

LISA ROY, in her official capacity as Executive Director
of the Colorado Department of Early Childhood; and
DAWN ODEAN, in her official capacity as Director
of Colorado's Universal Preschool Program,

       Defendants.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER FOR ENTRY OF JUDGMENT**

---

Kane, J.

       Plaintiffs in this case are two Catholic parishes that operate preschools—St. Mary

Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood—and the parents of

a preschool-aged child—Daniel and Lisa Sheley. They bring their claims against Dr. Lisa Roy,

the Executive Director of the Colorado Department of Early Childhood, and Dawn Odean, the

Director of the Colorado Universal Preschool Program, in their official capacities. Plaintiffs'

claims allege the equity-related requirements of Colorado's newly implemented Universal

Preschool Program ("UPK" or the "UPK Program"), as the requirements are applied to them,

violate their rights guaranteed by the Free Exercise, Free Speech, and Establishment Clauses of

the First Amendment to the U.S. Constitution.

Presently, in its inaugural year, the UPK Program provides at least 15 hours of free preschool per week for each eligible child in the state. The Program is administered by the Colorado Department of Early Childhood (the "Department") and uses a "mixed-delivery system of preschool providers," that is "a combination of school- and community-based preschool providers . . . funded by a combination of public and private money." Colo. Rev. Stat. § 26.5-4-203(12). In accordance with the implementing statute, the Department must require participating "preschool provider[s to] provide eligible children an equal opportunity to enroll and receive services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2)(b). Plaintiffs contend that, by conditioning participation in the UPK Program on compliance with this "equal-opportunity requirement,"[1] namely the religious-affiliation, sexual-orientation, and gender-identity aspects of the requirement, the Department has excluded Plaintiffs from receiving a generally available public benefit.

While it is settled at this point that states may not generally decline to fund religious schools as part of an educational benefits program, the weight of the relevant precedent supports that states administering such programs are not obligated to subsidize discrimination using taxpayer dollars, even when that discrimination is based on religious beliefs. This case involves a statute that requires preschool providers receiving funding through the UPK Program to give students with certain characteristics—those prioritized by the State of Colorado—an equal opportunity to enroll and receive services. Although the equal-opportunity requirement allows

---

[1] Previously, I referred to it as the "statutory nondiscrimination requirement." However, Plaintiffs are correct that this provision is more appropriately framed as an equal-opportunity requirement.

providers to specifically serve low-income families and children with disabilities, it does not

grant the Department the authority or discretion to exempt providers from complying with the

requirement. The key question in this case is whether the Department, in administering the UPK

Program, has nevertheless created exceptions to the equal-opportunity requirement that warrant

granting Plaintiff Preschools similar exemptions.[2]

In January of this year, I held a three-day trial and now issue the Findings of Fact and

Conclusions of Law below. I dismiss as moot Plaintiffs' claims based on a contractual provision

that is separate from the equal-opportunity requirement. I then find the Department has applied

the equal-opportunity requirement in a neutral and generally applicable manner, as dictated by

the statute, with one exception. The Department has allowed faith-based providers to deny

children and families equal opportunity based on their religious affiliation, or lack thereof, and

has cited no compelling interest for permitting that discrimination while denying Plaintiffs'

request for a related exemption. On that narrow basis, I conclude Defendants have violated

Plaintiffs' free-exercise rights and that judgment in favor of Plaintiffs is warranted. I

consequently grant Plaintiffs relief in the form of a limited permanent injunction, declaratory

judgment, and nominal damages. Because I grant that relief, I decline to address the additional

declaratory relief sought under the Establishment Clause. Finally, I conclude Plaintiffs' free-

speech claim is entirely without merit, as Plaintiffs ignore applicable doctrines and attempt to

stretch precedent beyond recognizability.

---

[2] I note at the outset that I must confine my rulings to the case as it has been presented to me. The issues in dispute do not include, for example, permissibility of the UPK Program under the Establishment Clause or the Colorado Constitution, application of the religious nondelegation doctrine, consideration of this case as one involving hybrid rights, whether the UPK Program policies impose a *substantial* burden on Plaintiffs' religious exercise, or any potential violations of the rights of other eligible children and/or their parents as a result of the UPK policies.

## I.  Findings of Fact

### A. The Universal Preschool Program

### 1.  History and Statutory Framework

In 2020, Colorado voters approved Proposition EE by nearly a two-to-one margin, creating a dedicated source of funding for voluntary, universal preschool in the State. *See* Colo. Rev. Stat. § 26.5-4-202(1)(a)(V). At the trial in this case, M. Michael Cooke, the former Early Childhood Transition Director of the Colorado State Governor's Office, and Defendant Dawn Odean testified about the development and implementation of the UPK Program. In 2021, the Colorado General Assembly passed House Bill 21-1304 (the "Early Childhood Act") to begin organizing the Program. *See* H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021) (enacted). That legislation created the Colorado Department of Early Childhood, using the last executive department permitted by the Colorado Constitution. *Id.*; Trial Tr. (Cooke) 136:12-21. As relevant here, the Early Childhood Act specifies that it is the intent of the General Assembly for the Department to "work with other state and local agencies, public and private early childhood providers, head start agencies, nonprofit organizations, and parents and families to:

> (a)  Provide high-quality, voluntary, affordable early childhood opportunities for all children in Colorado;
>
> (b)  Coordinate the availability of early childhood programs and services in Colorado to meet the needs of all families;
>
> (c)  Establish state and community partnerships that provide for a mixed delivery of child care and early childhood programs through school-based and community-based providers; . . .
>
> (f)  Prioritize the equitable delivery of resources and supports for early childhood; . . . [and]
>
> (h)  Improve outcomes for children and families through: . . .
>
> > (II)   Implementation of evidence- and practice-based best practices in

> education, family support, and child development with a focus on
> continuous improvement and innovation; . . . [and]
>
> (IV) Alignment with state and federal requirements under the state
> "Exceptional Children's Educational Act", part 1 of article 20 of title
> 22, and part B and part C of the federal "Individuals with Disabilities
> Education Act", 20 U.S.C. sec. 1400 et seq., as amended . . . .

Colo. Rev. Stat. § 26.5-1-102(1).

Following the passage of the Early Childhood Act, there "was a very robust stakeholder process that was led by the Early Childhood Leadership Commission to talk about what [the D]epartment should look like." Trial Tr. (Cooke) 136:20-24. Monthly town halls were held and "were open to all Coloradans: providers, parents, advocates,[ and] anyone with an interest in the work around the establishment of the new [D]epartment and Universal Preschool." *Id.* 137:12-16. The stakeholder process resulted in two reports from the Early Childhood Leadership Commission that became the foundation for House Bill 22-1295, which officially created the UPK Program when it was enacted. *Id.* at 142:1-7; *see* H.B. 22-1295, 73rd Gen. Assemb. (Colo. 2021) (enacted).

> Among other obligations, this legislation directs the Department to:
>
> Promote child physical, oral, and behavioral health and use multigenerational and
> culturally and linguistically appropriate strategies to support child and parent
> outcomes that improve overall family well-being; [and] . . .
>
> Promote access to quality early childhood care and education, including monitoring
> and increasing the capacity of quality early childhood care and education programs
> to support the availability of said programs for children throughout the state . . . .

Colo. Rev. Stat. § 26.5-1-109(1)(a).

Colorado Revised Statutes §§ 26.5-4-201 to 26.5-4-210[3] (the "UPK Statute") are the codified portions of House Bill 22-1295 that contain provisions specific to the UPK Program. The UPK Statute obligates the Department to "develop and the executive director [to] establish by rule the quality standards that each preschool provider must meet to receive funding through the [Program]." *Id.* § 26.5-4-205(1)(a). Those standards "must reflect national and community-informed best practices with regard to school readiness, academic and cognitive development, healthy environments, social-emotional learning, and child and family outcomes." *Id.* Ms. Odean testified that this focus acknowledges the importance of "whole child" development, which ensures "that children have access to . . . cognitive development, but also inclusive of physical development, as well as social-emotional development." Trial Tr. (Cooke) 194:1-17. The statute further emphasizes "healthy environments," so the Department must be "thoughtful about the actual environment that a child is in." *Id.* 194:21-25. According to Ms. Cooke, the quality standards were intended to go beyond licensure requirements to ensure that a "high-quality preschool program" was created. Trial Tr. (Cooke) 143:24-144:7.

### i.  Equal Opportunity

As highlighted above, one of the specific quality standards the Department must establish is:

> A requirement that each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family . . . .

---

[3] Section 26.5-4-211, creating the bonus payment program to incentivize preschool providers to participate in the UPK Program, was added with additional legislation in June 2023. *See* Act of June 2, 2023, 2023 Colo. Legis. Serv. 336.

Colo. Rev. Stat. § 26.5-4-205(2)(b).[4] I will refer to this provision of the UPK Statute as the "statutory equal-opportunity requirement." The UPK Statute defines an "eligible child" as "a child who is eligible to receive preschool services as provided in section 26.5-4-204(3)." Colo. Rev. Stat. § 26.5-4-203(7). Section 26.5-4-204(3) covers every child in the state in the year preceding the school year in which he or she is eligible to enroll in kindergarten, and in particular, that subsection includes children three or four years of age who may receive additional preschool services because they are in low-income families or meet at least one qualifying factor[5] as well as three- and four-year-olds with disabilities who "must be offered preschool services in accordance with the child's individualized education program" under the Individuals with Disabilities Education Act and Exceptional Children's Educational Act. The incorporation of § 26.5-4-204(3) into the definition of eligible child makes clear that the equal-opportunity requirement contemplates allowing additional services for children with disabilities, those in low-income families, and those who meet qualifying factors.

Both Ms. Cooke and Ms. Odean were involved in the drafting of House Bill 22-1295. *See* Trial Tr. (Cooke) 143:11-13; Trial Tr. (Odean) 197:23-24. Ms. Cooke testified that one of the Early Childhood Leadership Commission's reports that was provided to the General Assembly stated that the UPK Program "should be a program that was equitable and grounded in equity" and HB 22-1295 "carried that forward by putting the equity statement[, i.e., the equal-

_____

[4] On April 25, 2024, the Department finalized its rules for the UPK Program. In accordance with this provision, the rules state: "Eligible preschool providers must ensure that children receive an equal opportunity to enroll and receive universal preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." 8 Colo. Code Reg. 1404-1:4.109(B).

[5] Under the statute, "qualifying factors must include identification as a dual-language learner or a child with disabilities and may include such other factors as the department may identify." Colo. Rev. Stat. § 26.5-4-204(4)(a)(II).

opportunity requirement,] into th[e] legislation." Trial Tr. (Cooke) 142:13-18. Additionally, she understood that Colorado voters, in approving Proposition EE, "intended th[e] program to be available to all families, and equitably delivered to all families," which "carried through the stakeholder process into [House Bill 22-]1295." *Id.* 142:20-25. According to Ms. Cooke, the legislation was developed and enacted with the recognition that it was important "that all families had equal access, equitable access to preschool programs of their choosing, and [that they] would not be discriminated against based on any of the factors that are included in the legislation and now in statute." *Id.* 142:25-143:3.

Ms. Odean testified that, among other reasons, the statutory equal-opportunity requirement was included in the UPK Act to "be thoughtful about not putting children in an unsafe or unhealthy environment" and "to be really intentional about children having [a safe and healthy] environment so that they can grow to their maximum ability." Trial Tr. (Odean) 197:17-198:9. Her understanding is that the requirement was placed within the quality standards section of the statute because they not only "want children around the state to be able to access programming that best fits their family's needs" but also want to ensure that, once children are in a preschool setting, "they have equitable access to learning and growth." *Id.* 199:15-24. Ms. Odean explained that universal, and not targeted or limited, preschool is "important so that all [preschool-aged] children can have access to [a] high-quality environment and get to the learning outcomes that we know come from a high-quality program" and because "it also allows for families to have opportunity and options, all families." *Id.* 190:10-14.

### ii. Mixed Delivery

Mixed delivery, meaning the inclusion of school- and community-based preschool providers, is another foundational aspect of the UPK Program. *See* Colo. Rev. Stat. §§ 26.5-4-202(1)(b); 26.5-4-203(12). The UPK Statute specifically lists in the definition of "mixed delivery system" "family child care homes, child care centers, and head start agencies." *Id.* § 26.5-4-203(12). Ms. Cooke testified that the Department's "goal in the mixed delivery program was to recruit and engage providers . . . of all types, school districts, center-based, home-based, faith-based, that could provide a safe, nurturing, inclusive, nondiscriminatory environment for children." Trial Tr. (Cooke) 147:23-148:2. Through Local Coordinating Organizations ("LCOs"), the Department conducted outreach and encouraged qualified providers to participate. *Id.* 150:17-151:5. The Department also organized separate working groups with school district, Head Start, in-home family childcare, corporate, and faith-based providers. Trial Tr. (Odean) 215:10-13.

The working group for faith-based providers benefited from the participation of a diverse array of religious organizations, including the Efshar Project, an umbrella organization for Jewish preschools; Lutheran, Presbyterian, and nondenominational representatives; the Colorado Council of Churches; and the Interfaith Task Force. Trial Tr. (Cooke) 152:8-20. The faith-based working group initially met on a weekly basis and, over time, decreased their meetings to biweekly and then monthly. *Id.* 152:22-153:1. Ms. Cooke explained at the trial that faith-based providers were always "envisioned to be part of the mixed-delivery model." *Id.* 160:16-17. The Department "wanted to certainly give families every opportunity to seek a provider of their choosing, and that includes faith-based providers." *Id.* 160:19-22.

### iii.  Temporary Waiver of Quality Standards

Ms. Odean testified that the UPK Statute directs the Department to "ensure that families have choice through this mixed-delivery model, and that families have confidence that those are safe and healthy environments, and that they're in place not only for supervision, but so that their child can grow and begin a positive journey for learning." Trial Tr. (Odean) 197:11-16. In line with that testimony, the UPK Statute permits a temporary waiver of some of the quality standards if it is "necessary to ensure the availability of a mixed delivery system within a community." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). Under those circumstances, "the [D]epartment may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards." *Id.* However, "each preschool provider must meet all quality standards relating to health and safety." *Id.* The Department interprets the statutory equal-opportunity requirement to be among the exempted quality standards related to health and safety. Trial Tr. (Odean) 210:10-12; Trial Tr. (Cooke) 147:21-23. The Department believes the statutory equal-opportunity requirement implicates the health and safety of preschool children. *See id.* 147:21-148:2. Its interpretation is also based on the fact that the equal-opportunity requirement is set out in the statute and not a Department-created obligation. Trial Tr. (Odean) 210:5-9.

### 2. Current UPK Program

For the 2023-24 school year, UPK providers are reimbursed by the State for at least 15 hours of preschool per eligible child they enroll. UPK Application Website at 1, Trial Ex. 22; UPK Colorado Provider Guide at 2, 21-22, Trial Ex. 24; Odean Dep. 18:15-25, Trial Ex. 26. There are roughly 1,900 preschool providers participating in the UPK Program this year. Odean

Decl. ¶ 9, Trial Ex. 39.[6] Almost 40,000 children are enrolled in the Program, which is about 60

percent of eligible 4-year-olds in the State. Trial Tr. (Odean) 210:14-19. These numbers include

forty faith-based preschools with over 900 preschoolers in the UPK Program. *Id.* 234:8, 23-25.


   ### i. Program Service Agreement

   To participate in the UPK Program, a preschool must register in the UPK portal and sign

the Department's Program Service Agreement (the "Agreement"). Trial Tr. (Cooke) 149:4-11,

164:24-165:1; *see* Agreement, Trial Ex. 13. But there is no requirement for preschool providers

to participate in UPK Colorado. Odean Dep. 71:20-72:2, Trial. Ex. 26. Plaintiffs' claims in this

case challenge two provisions of the UPK Agreement: its incorporation of the statutory equal-

opportunity requirement and a more expansive nondiscrimination provision found in Paragraph

18(B) of Exhibit A to the Agreement. Under the heading "Quality Assurance," the Agreement

recites word for word the statutory equal-opportunity requirement. *See* Agreement at 2, Trial Ex.

13 ("Provider agrees to adhere to the quality standards identified in §26.5-4-205, C.R.S.,

[including] . . . [the r]equirement that each preschool provider provide eligible children an equal

opportunity to enroll and receive preschool services regardless of race, ethnicity, religious

affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as

such characteristics and circumstances apply to the child or the child's family."). Because this

---

[6] Plaintiffs offered for admission 13 exhibits to which Defendants did not stipulate: Exhibit Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 23, 33, 38, and 39. I reviewed these exhibits and find Nos. 2, 5, 6, 7, 10, and 39 to be admissible and have relied on those exhibits in my Findings of Fact. The other exhibits were either not necessary or not relevant for my Findings of Fact. I note that, although Defendants objected to Exhibit No. 39—Ms. Odean's October 26, 2023 Declaration filed in this case, Defendants cited to that Declaration in their Proposed Findings of Fact and Conclusions of Law. And I specifically find that Exhibit 23—the news article that reported a quote from Colorado Governor Jared Polis—is irrelevant. His off-hand comment does not represent nor dictate the interest of the State or the Department.

provision is identical to the statutory requirement, I refer to the two together as simply "the equal-opportunity requirement." Paragraph 18(B) reads: "Provider shall not . . . discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." *Id.* at 28.

Plaintiffs claim that Paragraph 18(B) would inappropriately permit the Department to dictate the hiring decisions of faith-based providers. In pretrial filings in this case, Ms. Odean disclosed that the Department interpreted Paragraph 18(B) to permit religious organizations to make hiring decisions in accordance with federal law, and on behalf of the Department, she disavowed enforcement of Paragraph 18(B) with respect to religious providers' employment practices that were consistent with federal law. Odean Decl. ¶ 16, Trial Ex. 39. At trial, Ms. Odean testified that the Department never intended to analyze providers' employment decisions under Paragraph 18(B). Trial Tr. (Odean) 231:25-232:2. While Ms. Cooke drafted the Agreement, the exhibits to the Agreement were put together by the contracts and procurement offices for the Department of Human Services. Trial Tr. (Cooke) 148:7-12. Exhibit A—the Terms and Conditions for the UPK Program, including Paragraph 18(B), came from a template written by the Colorado Department of Human Services. Trial Tr. (Odean) 231:8-24. Ms. Odean testified that Paragraph 18(B) has been removed from the 2024-25 contract, and it will not apply to providers going forward. Trial Tr. (Odean) 232:16-22. She explained that the purpose of the Department's previous disavowal was to give assurances that, beyond licensing credentials, the Department would not have or exercise authority related to providers' hiring practices. *Id.* 232:5-15. Similarly, Ms. Odean indicated that the Department does not have any intention of interfering with the curriculum of faith-based providers. *Id.* 232:25-233:3.

### ii. Family Enrollment

Once a preschool has registered as a participating UPK provider and has signed the Agreement, it appears in the Department's Family Search and Application portal, allowing families to apply and match with that preschool. UPK Colorado Provider Guide at 4, 23-60, Trial Ex. 24. Ordinarily, the family of an eligible child uses the portal to select up to five providers and ranks them in order of preference. Odean Decl. ¶ 9, Trial Ex. 39.[7] The child is then matched with one of the family's selected preschools. Odean Dep. 18:10-12, Trial Ex. 26. If none of the family's choices is available, the family may select additional providers for their child. Odean Decl. ¶ 9, Trial Ex. 39.

### iii. Algorithm Preferences

For the UPK portal and to match children with providers, the Department uses BridgeCare software, which was not designed specifically for the UPK Program but is customizable. Trial Tr. (Cooke) 149:5-6, 156:1-9. The software relies on a deferred acceptance algorithm for lottery matching. Trial Tr. (Odean) 212:9-11, 277:2-4. Through testing and development of the system, the Department heard from Local Coordinating Organizations, providers, and families that some important considerations were being overlooked. *Id.* 212:13-20; Odean Dep. 79:17-22, Trial Ex. 26. Consequently, the Department added to the system the option for providers to select applicable preferences that enable the matching process to take into account various unique provider characteristics. Trial Tr. (Cooke) 155:17-23; Trial Tr. (Odean)

---

[7] After the UPK Program's initial enrollment for the 2023-24 school year, the Department started allowing "direct placement," meaning families may select a participating provider by showing up at that school and being directly registered there by the Local Coordinating Organization. Odean Dep. 27:12-22, Trial. Ex. 26.

217:1-9, 277:2-10. Over the course of this case, the Department has continued to evaluate and refine these preferences.

The following preferences are listed in the UPK Colorado Provider Guide as "exception criteria" that providers were able to select for the 2023-24 school year:

☐ I am a faith-based provider and may require families to be a part of my congregation.

☐ I am a co-op and will require family participation as a part of my programming.

☐ I am an immersive or dual language provider and children may need to be screened to participate in my program.

☐ I am a school district provider and will require families to live in my school district or boundary AND/OR I support children with Individualized Education Plans (IEP).

☐ I am a Head Start grantee and families may need to meet additional factors to enroll with me.

☐ I am a provider that prioritizes placement for the children of my employees.

UPK Colorado Provider Guide at 37, Trial Ex. 24. As the Department went through the rulemaking process for the UPK Program, it filled in the details and recognized additional preferences. *See, e.g.*, Proposed Rules at 6, Trial Ex. 21.

Ultimately, the Department's final rules for the UPK Program permit providers to "utilize the following programmatic preferences to the deferred acceptance algorithm component of the matching process:

1. Faith-based providers granting preference to members of their congregation;

2. Cooperative preschool providers requiring participation in the cooperative;

3. School districts maintaining enrollment consistent with their established boundaries;

14

4. Participating preschool providers reserving placements for a student(s) with an Individualized Education Program (IEP) to ensure conformity with obligations incurred pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. section 1400 (2004), or the Exceptional Children's Education Act, Article 20 of Title 22, C.R.S.;

5. Head Start programs' adhering to any applicable federal law requirements including eligibility requirements;

6. Participating preschool providers granting preference to an eligible child of one (1) of their employees;

7. Participating preschool providers granting preference to an eligible child to ensure continuity-of-care for that child;

8. Participating preschool providers granting preference to an eligible child to keep siblings similarly located; [and]

9. Participating preschool providers granting preference to an eligible child who is multilingual, to ensure proper delivery of services to that child.

10. Participating preschool providers may grant preference to an eligible child based: on the child and/or family being a part of a specific community; having specific competencies or interests; having a specific relationship to the provider, provider's employees, students, or their families; receiving specific public assistance benefits; or participating in a specific activity. Participating preschool providers seeking to utilize this preference, must ensure:

    a. That the specific community, competencies or interests, relationship, public assistance benefit, or activity being required of children and/or families who attend, is a requirement of all participating children and/or families.

    b. That implementation of requiring the specific community, competencies or interests, relationship, public assistance benefit, or activity does not conflict with any other provision of the Colorado Universal Preschool Program statutes at sections 26.5-4-201 through 26.5-4-211, C.R.S., nor with any other applicable law or regulation.

    c. Examples of approved preferences include, but are not limited to: participating preschool providers who require a focus in a certain knowledge area (such as science, technology, engineering, and math ("STEM")); providers who serve families with a family member who works or attends school at a specific site(s) or location(s); providers who serve families within a specific geographical catchment area; providers who require a certain amount of volunteering or participation by the participating family; providers who require certain vaccinations for the health and safety of its staff and

students; and providers who serve families who are receiving a specific public assistance benefit(s) such as housing assistance."

8 Colo. Code Reg. 1404-1:4.110. The final rules specify that, "[i]n utilizing these programmatic preferences, eligible preschool providers must still comply with" the equal-opportunity requirement. *Id.* 1404-1:4.110(B).

While using the UPK portal, a family can either see what preferences providers have or will be asked questions to determine if the family qualifies for a particular provider, considering any applicable preference. Trial Tr. (Odean) 263:20-22; Trial Tr. (Cooke) 167:11-168:2. If a provider has selected a preference and a child who does not fit that preference is matched to that provider, the provider may decline the match. *Id.* 156:19-157:2. When a provider declines a match, the Department reviews that decision to make sure it was accurate for the provider to exercise it. *Id.* 157:3-6. Of the approximately 1,900 UPK providers, the Department has permitted 1,091 preschools to select at least one preference. Trial Tr. (Odean) 255:19-25.

The so-called "congregation preference" allowed by the Department is particularly relevant to Plaintiffs' claims. The Department created the congregation preference in response to conversations with providers, bill sponsors, and community members who questioned whether members of a church family might lose their seats based on the algorithm. Trial Tr. (Cooke) 154:21-25, 157:17-24. Ms. Cooke testified that she shared the development of the congregation preference with the faith-based working group when members of that group raised concerns about the inclusion of sexual orientation in the equal-opportunity requirement. *Id.* 154:19-155:5. The congregation preference permits faith-based providers to reserve for members of their church community all or a portion of the seats for which they are licensed. *Id.* 157:3-10; *see also* Odean Decl. ¶ 8, Trial Ex. 39. The Department considers a provider to be faith-based for the purposes of the congregation preference from the provider's self-identification alone. Trial Tr.

16

(Odean) 275:23-276:6. The Department has intended to use the word "congregation" as expansively as possible so that faith-based providers could define their own community. *Id.*; *see also* 8 Colo. Code Reg. 8 Colo. Code Reg. 1404-1:4.103(L) (defining "congregation" in the final rules for the UPK Program as "members of the community that the faith-based provider serves as the faith-based provider defines that community").

Testimony at trial established that providers who select the congregation preference may designate seats for preschoolers from families that adhere to a specific faith and may decline children from other families. For example, Ms. Odean testified that a Catholic provider could reserve seats for Catholics, and a Lutheran provider could reserve seats for Lutherans. Trial Tr. (Odean) 239:18-22. Similarly, she indicated that a Catholic provider could limit its seats to members of its congregation only and would not have to provide an opportunity to enroll Lutherans. *Id.* 239:23-240:1. Ms. Odean insisted, however, that no faith-based provider is allowed to discriminate on the basis of religion or religious affiliation, and if the Department learned that a provider was utilizing the congregation preference in a discriminatory way, it would investigate. *Id.* 276:7-9, 16-19. The Department does not consider the congregation preference to act as a workaround for the equal-opportunity requirement because the preference is intended to support inclusive community and "ensure that providers can continue to serve the communities that they have served, and families can continue to participate." *Id.* 276:10-15.

Plaintiffs also highlight as pertinent to their claims the algorithm preferences involving Head Start programs and children with Individualized Education Programs ("IEPs"). Head Start programs prioritize low-income families and are permitted to participate in the UPK program. Trial Tr. (Odean) 237:14-238:5; *see also* Trial Tr. (Cooke) 171:7-10. It was intentionally written into the UPK Statute that Head Start providers be "prioritized as participants and that the

children they serve [be] prioritized as participants." Trial Tr. (Odean) 221:16-18. The algorithm

preference involving children with IEPs applies only to school districts and their contracted

partners and allows them to place children with specific special needs in a particular classroom

consistent with the child's IEP. Trial Tr. (Cooke) 171:11-172:3; Trial Tr. (Odean) 219:24-220:1.

The preference was created because it was highlighted in the UPK Statute as a priority. *Id.*

219:18-20. The Department heard from school district providers and the Colorado Department of

Education that it was critical for them to be able to participate and satisfy their obligation under

the federal mandate associated with the Individuals with Disabilities Education Act, and not

every preschool setting can accommodate children with various special needs. *Id.* (Odean) 219:8-

23; Trial Tr. (Cooke) 171:14-17.

   The tenth preference included in the final rules promulgated by the Department permits

participating providers to prioritize a child based on "the child and/or family being a part of a

specific community" or "having specific competencies or interests." 8 Colo. Code Reg. 1404-

1:4.110. Considering that preference, Ms. Odean initially testified that a participating school

could be just for "gender-nonconforming children," could prioritize "children of color from

historically underserved areas," or could grant preference to a child based on the child or family

being part of the LGBTQ[8] community. Trial Tr. (Odean) 244:15-25, 245:25-246:8. Ms. Odean

attempted to qualify her responses by explaining that the equal-opportunity requirement takes

precedence and there would need to be a conversation about the appropriateness of such

preferences. *Id.* 245:3-10, 19-24. She later clarified that, upon receiving such a request from a

provider, she would have a conversation with the leadership team, and likely the attorneys, to

---

[8] LGBTQ is an acronym for lesbian, gay, bisexual, transgender, and queer (or questioning).
Throughout this Order, I also use the term LGBTQ+ to refer to all individuals who identify as
part of that community.

determine what the next steps would be, but they would not allow a provider to utilize a preference to violate the law. *Id.* 278:2-8, 279:18-280:5.

Ms. Cooke testified that the algorithm preferences the Department created "were meant to really identify and acknowledge certain relationships . . . that existed between the provider and the community the provider served or families the provider served" and were designed to protect "the seats in a particular provider setting from the unintended consequences of [the] computer algorithm which manage[s] matching." Trial Tr. (Cooke) 153:22-25, 154:9-12. Ms. Odean acknowledged that, because of the variety of programming and settings providers offer in the mixed-delivery program, it would be "really difficult" for providers to be able to participate if they had to accept every child who could be matched to them. Trial Tr. (Odean) 214:7-17. Despite the Department's implementation of the algorithm preferences, though, Ms. Cooke, Ms. Odean, and Dr. Roy have been unwavering in their assertions that the Department cannot permit a participating provider to violate the equal-opportunity requirement. *See, e.g.*, Trial Tr. (Cooke) 160:4-8; Trial Tr. (Odean) 206:22-207:6, 210:5-9, 268:21-24; Roy Dep. 23:10-15, Trial Ex. 27.

### iv.  Individual Provider Preferences

In addition to the defined algorithm preferences, the Department allows providers to request other individual preferences through an online form.[9] Trial Tr. (Odean) 256:1-14; UPK Individual Preference Form at 2, Trial Ex. 31. The form provides as examples[10] of individual

---

[9] In their filings, Plaintiffs addressed these individual preferences as a separate type of "exception" permitted by the Department, and I do the same in this Order. However, the tenth preference included in the final rules subsumes these individualized requests into one of the Department's defined categories of algorithm preferences. *See* Trial Tr. (Odean) 228:22-229:2.

[10] The form uses "i.e." before its "teen moms" example. UPK Individual Preference Form at 2, Trial Ex. 31. In context, I believe "e.g." is intended.

preferences that may be permitted: "My location only serves teen moms enrolled at a neighboring high school; [and] My location only serves children with specific disabilities." *Id.* The Department has granted many individual preferences, including requests to admit only "fully vaccinated children" and to prioritize subdivision residents. UPK Individual Preference Response Data at 82-83, Trial Ex. 34; Trial Tr. (Odean) 257:9-23. The process for individual preferences was created in response to input from providers with circumstances that had not been considered, and the preferences were permitted "to honor mixed delivery and family choice and be inclusive of [different types of] communities." *Id.* 229:4-20.

## B. Plaintiffs

As identified above, the plaintiffs in this case are St. Mary Catholic Parish in Littleton ("St. Mary's"), St. Bernadette Catholic Parish in Lakewood ("St. Bernadette's"), and Daniel and Lisa Sheley. St. Mary's and St. Bernadette's operate Catholic schools—St. Mary's Catholic School and Wellspring Catholic Academy—that include preschools ("Plaintiff Preschools"). At the trial, Plaintiffs presented testimony from Tracy Seul, the Director of Preschool and Development for St. Mary's; Avery Coats, Principal and Head of School for Wellspring Catholic Academy; Abriana Chilelli, the Acting Superintendent of Catholic Schools for the Archdiocese of Denver (the "Archdiocese"); and Ms. Sheley.

### 1. Plaintiff Preschools

### i. Operation and Religious Doctrine

Plaintiff Preschools are subject to the religious authority of the Archdiocese and are overseen by its Office of Catholic Schools. Trial Tr. (Seul) 73:13-15; Trial Tr. (Coats) 105:9-12;

Trial Tr. (Chilelli) 36:24-37:5. In total, the Archdiocese oversees 36 Catholic preschools, including Catholic Charities preschools that currently participate in the UPK Program. Trial Tr. (Chilelli) 37:1, 65:18-19, 67:21-22; Trial Tr. (Odean) 234:9-13, 235:1-4. The mission of the Archdiocese's schools is to be "'sanctuaries of education' supporting parents and empowering families to lead their children to encounter and be rescued by Jesus Christ and have abundant life, here on earth and in heaven, for the glory of the Father." Mission and Charter of Catholic Schools at 1, Trial Ex. 3; Trial Tr. (Chilelli) 40:24-41:20. Ms. Chilelli, from the Archdiocese's Office of Catholic Schools, clarified that this mission is viewed as "serv[ing] the family [and] . . . parents in their duties as primary educators or principal educators of their children." Trial Tr. (Chilelli) 55:15-18. She explained that, for schools to fulfill their mission, parents must therefore understand that mission and "desire to teach it within their family, to promote it, to defend it, and [to] have their children formed in . . . a Catholic worldview." *Id.* at 55:21-25; *see also* Trial Tr. (Seul) 78:18-21, 82:15-17; Trial Tr. (Coats) 116:14-18. Ms. Chilelli further testified that, with their focus on serving parents, the schools "would never want to . . . cause conflict with what the parents are teaching in their home" as it would create confusion for the child and the family. Trial Tr. (Chilelli) 51:13-20; see also Trial Tr. (Seul) 79:9-10; Trial Tr. (Coats) 126:2-5.

Consistent with that perspective, parents of children enrolling in the Archdiocese's schools  are required to sign the Statement of Community Beliefs "so that it's abundantly clear what the Catholic school will teach and what the Catholic school community believes." Trial Tr. (Chilelli) 44:18-23; *see also* Statement of Community Beliefs at 7-8, Trial Ex. 2; Trial Tr. (Seul) 79:11-24; Trial Tr. (Coats) 111:12-112:12. The Statement of Community Beliefs for parents and guardians of students informs:

> For our school to properly support you as the primary educators of your children
> and partner with you in the formation and education of your children, all Catholic

> school families must understand and display a positive and supportive attitude toward the Catholic Church, her teachings, her work, and the mission of the Catholic school. . . . [F]amilies must refrain from public promotion or approval of any conduct or lifestyle that would discredit, disgrace, or bring scandal to the School, and the Church in the Archdiocese of Denver, or be considered a counter-witness to Catholic doctrine or morals.

Statement of Community Beliefs at 8, Trial Ex. 2. Even baptized Catholics are required to sign the Statement of Community Beliefs to enroll a child at an Archdiocesan preschool, and some may not desire to sign the Statement. Trial Tr. (Chilelli) 68:13-22.

The Archdiocese's oversight of its schools "includes standard operating procedures . . . and adherence to Catholic faith [and] morals [and] the building up of Catholic culture within the school, all ordered towards the formation of the human person, the student, [and] all in service to the family." *Id.* 38:4-11. The Archbishop of the Archdiocese "promulgates policies, directives, [and] guidance" that "are expected to be implemented at the school level." *Id.* 37:22-38:1.

Particularly relevant to this case, the Archdiocese has produced guidance on sexual orientation and gender identity. In a document titled the *Splendor of the Human Person: A Catholic Vision of the Person and Sexuality*, the Archbishop provided a "basic outline for addressing issues of the human person, sexuality and gender for use within parishes and schools in the Archdiocese of Denver." Splendor of the Human Person at 5, Trial Ex. 7; Trial Tr. (Chilelli) 48:20-49:5. The document explains that "[i]t is essential that Catholics, particularly those working for the Church in parishes and schools, as well as the young people to whom the Church ministers in [its] parishes and schools, receive formation in the Church's teaching on the human person and sexuality." Splendor of the Human Person at 6, Trial Ex. 7. In pertinent part, the document states: "Sexual identity, embodiment as either a man or a woman is a gift that is given to us from the moment of creation." *Id.* at 7. It reasons that "same-sex relationships,

including those in which one partner identifies as transgender, distort the truth and meaning of sexual identity by suggesting that mothers and fathers are interchangeable." *Id.* at 8.

The Office of Catholic Schools has also provided concrete direction for schools in the document *Guidance for Issues Concerning the Human Person and Sexual Identity*. Guidance on the Human Person and Sexual Identity, Trial Ex. 5; Trial Tr. (Chilelli) 49:6-18. The document instructs Archdiocesan schools to use pronouns that correspond with biological sex, to enforce their dress code that corresponds with an individual's biological sex, and to make changing and bathroom facilities available only as they correspond with an individual's biological sex. Guidance on the Human Person and Sexual Identity at 2, 9-12, Trial Ex. 5. Additionally, the document advises that enrolling a child of a same-sex couple "is likely to lead to intractable conflicts. *Id.* at 16. And it warns that "[a] Catholic school cannot treat a same-sex couple as a family equivalent to the natural family without compromising its mission and Catholic identity and causing confusion about the nature of marriage for all students enrolled." *Id.* (emphasis removed). If a family is seeking to enroll their child in an Archdiocesan school and there is a conflict between what the school teaches and what same-sex parents are teaching their child regarding human sexuality or parents of a transgender child are teaching their child regarding "the body's biological reality" and identity, then "out of abundant respect for the family and the child," school leaders are not to enroll the student. Trial Tr. (Chilelli) 50:18-53:2. If a child who is a student at one of the Archdiocesan schools "begins asserting an identity that's at odds with his or her biological sex," school leaders are to explain that the school is unable to make accommodations relating to dress, pronoun use, and bathroom access. *Id.* 53:10-54:12. In that circumstance, if the parents decide "they would like those accommodations or they would like their child's identity that they're sharing with us to be affirmed," the school is to "explain that

maintaining the relationship with the family with the child's enrollment would not be possible." *Id.* 54:13-20. Plaintiff Preschools are expected to and do follow this guidance. Trial Tr. (Chilelli) 54: 21-23; Trial Tr. (Seul) 80:6-15; Trial Tr. (Coats) 112:20-114:13. In fact, last year, Wellspring Catholic Academy declined to enroll a fifth grader with same-sex parents. *Id.* 113:5-114:13, 125:25-126:10.

In making general admissions decisions, Plaintiff Preschools prioritize siblings of current students, parishioners of their own parish, and Catholic families affiliated with other parishes. Trial Tr. (Seul) 81:8-17; Tr. (Day 1, Coats) 115:17-116:20. A "parishioner," as defined by the Archdiocese, is any Catholic living within the geographic boundaries of a particular parish; the individual does not have to be formally enrolled at the parish. Trial Tr. (Chilelli) 67:9-15. Plaintiff Preschools are obligated to serve their parishioners first because they are a ministry of their parishes. Trial Tr. (Seul) 81:18-20; Trial Tr. (Coats) 116:1-3. Ms. Seul of St. Mary's testified that the school must then prioritize providing a Catholic education for Catholic parents who want that for their children. Trial Tr. (Seul) 81:20-22. And Ms. Coats from Wellspring Catholic Academy clarified that Catholic families are prioritized because they "share a foundational mission in life." Trial Tr. (Coats) 116:3-5. Archdiocesan preschools also enroll students of non-Catholic families as an act of evangelization. Trial Tr. (Chilelli) 68:4-11.

### ii.  Potential Conflicts with the UPK Requirements and Request for Accommodation

The equal-opportunity requirement demands that participating preschools "provide eligible children an equal opportunity to enroll and receive preschool services regardless of . . . religious affiliation, sexual orientation, [or] gender identity . . . , as such characteristics and circumstances apply to the child or the child's family." Agreement at 2, Trial Ex. 13; Colo. Rev.

24

Stat. § 26.5-4-205(2)(b). Plaintiffs Preschools contend this requirement prevents them from making enrollment decisions in accordance with their religious beliefs, as it prohibits them from preferencing Catholic families in enrollment and from considering whether a child or family is supportive of the Catholic Church's teachings, in particular its teachings on human sexuality.

Considering these potential conflicts, the Archdiocese determined its schools should not participate in the UPK Program until religious exemptions can be guaranteed and the Archdiocese could "have the confidence that [its] parishes and schools [would] not be placed into a compromising situation that jeopardizes [their] Catholic mission." Dollins Email at 2, Trial Ex. 10. The Archdiocese believed that, if its schools participated in the UPK Program, it "would be in non-compliance for upholding Church teaching in [its] employment and admission practices and programs." *Id.* And it warned that participation "would be to cooperate with an ideology and agenda contrary to [its] beliefs on the human person, which would ultimately compromise the integrity of [its] Catholic schools' mission." *Id.* The Archdiocese directed its parishes and their preschool programs not to enter into any agreements with the State related to the UPK Program. *Id.*; Trial Tr. (Chilelli) 56:8-10, 57:1-5; Trial Tr. (Seul) 90:2-15; Trial Tr. (Coats) 120:23-121:8. As a result, neither of the Plaintiff Preschools participates in UPK Colorado. Trial Tr. (Seul) 89:25-90:7; Trial Tr. (Coats) 120:12-13, 120:23-121:1.

Citing the potential conflicts between school policies and the equal-opportunity requirement, the Archdiocese, along with a coalition of religious preschool providers, sent a letter to the Governor of Colorado in February 2023. Trial Tr. (Chilelli) 59:1-4. The letter asserted that "providing exemptions for faith-based religious providers from aspects of the UPK Program that those providers believe run counter to their sincerely held beliefs will maintain the legal and constitutional integrity of the program while enhancing the number and variety of

preschools from which Colorado parents can choose." Coalition Letter at 2, Trial Ex. 11. Dr.

Roy, the Department's Executive Director, responded to the letter, stating that she lacked "the

authority to create an exemption that excludes faith-based providers from the statute." Roy Letter

at 1, Trial Ex. 12. She advised that faith-based providers participating in the Program may give

preference to members of their congregation, explaining that they could "reserve all or a portion

of their seats for their members, and [could] decline a match from a family that is not part of the

congregation." *Id.* at 2. The Archdiocese did not regard the congregation exception permitted by

the Department as a sufficient accommodation because of how the Archdiocese defines and

prioritizes parishioners and because all families—Catholic and non-Catholic—enrolling students

in Archdiocesan preschools must sign the Statement of Community Beliefs. Trial Tr. (Chilelli)

67:2-69:2.

Pursuing another route for its schools to participate in the UPK Program, the Archdiocese

advised its interested schools to sign up as providers but send back the Agreement unsigned with

a letter explaining why they were unable to sign it. Trial Tr. (Chilelli) 59:9-15; Trial Tr. (Seul)

95:25-96:5; Trial Tr. (Coats) 121:12-16. The Department did not respond to this effort to

participate. Trial Tr. (Chilelli) 59:21-60:3.

### iii. Participation in Other Preschool Programs

Plaintiff Preschools have signed agreements for other government-funded, tuition-

assistance programs, including the Denver Preschool Program and the Colorado Child Care

Assistance Program ("CCCAP"). Trial Tr. (Chilelli) 60:25-61:4; Trial Tr. (Seul) 88:3-4; Trial Tr.

(Coats) 117:1-20. Elisa Holguín, the President and CEO of the Denver Preschool Program, and

Jesse Burne, who oversees CCCAP as the Division Director for Early Learning Access and Quality at the Department, testified at the trial about those programs and their requirements.

The Denver Preschool Program provides tuition support for children in Denver to attend preschool. Trial Tr. (Holguín) 422:21-23. The Program requires providers to complete an application to participate in the program. *Id.* 424:2-3, 433:5-11. The Provider Agreement for the 2022-23 school year, which Wellspring Catholic Academy signed, prohibits providers from "discriminat[ing] against any person on the basis of race, color, religion, national origin, gender, age (except as to the age of children qualifying for Tuition Credits), military status, sexual orientation, gender variance, marital status, or physical or mental disability (except as such disability may materially and adversely affect proper administration of the preschool program)." 2022-23 DPP Renewal Agreement at 26, Trial Ex. 43. The application also has language reading: "Nothing in this agreement shall be construed to affect the Provider's right to engage in privately funded, inherently religious activity or affect the independence of Providers, including any rights protected by the Colorado and U.S. Constitutions and applicable law." *Id.* at 16. Ms. Holguín testified that this latter language does not exempt a program from complying with the nondiscrimination requirement and does not allow a faith-based provider to refuse to enroll an LGBTQ child or to discriminate against LGBTQ families. Trial Tr. (Holguín) 439:1-3; 440:1-7.

CCCAP supports low-income children and families in Colorado by offsetting the cost of child care. Trial Tr. (Burne) 399:14-16. The Program provides assistance for children from birth through age 13. *Id.* 399:18-19. To participate in CCCAP, a provider must sign a fiscal agreement with the local county. *Id.* 401:4-17. On August 24, 2023, Ms. Seul, on behalf of St. Mary's, signed a CCCAP fiscal agreement with the Jefferson County Human Services Department that is effective until July 2026. *Id.* 403:12-404:2, 404:10-12. The fiscal agreement requires providers to

"[a]ccept referrals for child care without discrimination with regard to race, color, national origin, age, sex, religion, marital status, sexual orientation or physical, intellectual or mental health disability." 2023 CCCAP Fiscal Agreement at 5, Trial Ex. 42. Mr. Burne testified that CCCAP interprets that provision to mean that a provider is not allowed to discriminate against a child or a family in accepting referrals of children to their program. Trial Tr. (Burne) 404:25-405:2. According to Mr. Burne, CCCAP is based on a family's choice, and if a family chooses a registered CCCAP provider, that provider must accept the family without discrimination. *Id.* 406:8-15.

I previously found, in evaluating whether Plaintiff Preschools' alleged injury was sufficient to meet the requirements for standing, that it was not inconsistent for Plaintiff Preschools to simultaneously believe that the UPK Program requirements conflict with their beliefs but that those of the Denver Preschool Program and the CCCAP provision do not. Order on Defs.' Mot. to Dismiss, Pls.' Mot. for Summ. J., and Pls' Mot. to Exclude ("Order in Preparation for Trial") at 16-17, ECF No. 99. This ruling did not determine how the Denver Preschool Program and CCCAP agreements should be interpreted. It merely concluded that Plaintiff Preschools were not prevented from bringing this suit because they had signed the other agreements.

### iv. Harm Experienced by Plaintiff Preschools

The evidence at trial established that Plaintiff Preschools have experienced harm from not participating in the UPK Program. Most definitively, Plaintiff Preschools have not received bonuses given to providers participating in the UPK Program. Trial Tr. (Seul) 91:12-17; Trial Tr. (Coats) 121:19-22. Ms. Seul testified that St. Mary's lack of participation also affected the

preschools' ability to recruit families and compete with preschools participating in the Program. Trial Tr. (Seul) 90:23-91:11. Ms. Seul and Ms. Coats had prospective families ask if Plaintiff Preschools are participating in the UPK Program, and Ms. Seul reported that a lot of families did not complete the enrollment process after finding out the preschool was not participating. *Id.* 91:22-92:5; Trial Tr. (Coats) 121:23-122:1, 122:10-12. If the Archdiocese confirmed that participating in the UPK Program was consistent with Catholic teaching, Plaintiff Preschools would immediately seek to participate in the Program. Trial Tr. (Seul) 92:22-25; Trial Tr. (Coats) 122:13-16.

### 2. Plaintiff Parents

Plaintiffs Daniel and Lisa Sheley are parishioners of St. Mary's. Trial Tr. (Sheley) 98:4-8. They have a four-year-old and a three-year-old enrolled at St. Mary's preschool, as well as a one-year-old they plan to send to St. Mary's once she is old enough. *Id.* 98:4-8, 98:13-20, 99:4-6, 99:10-14. The Sheleys believe that it is their "directive as Catholics" to provide a Catholic education for their children. *Id.* 98:25-99:3, 100:3-7. Because they send their four-year-old to St. Mary's, the Sheleys do not benefit from the UPK Program and are missing out on approximately $4,700 in tuition assistance for the 2023-24 school year. *Id.* at 100:10-101:3.

### 3. Plaintiffs' Claims

In their Amended Complaint, Plaintiffs assert seven claims that are as-applied constitutional challenges to Defendants' implementation of the equal-opportunity requirement. The first, fourth, and fifth claims are brought by Plaintiff Preschools and the Sheleys under the Free Exercise Clause of the First Amendment. The first claim alleges that the equal-opportunity

requirement and Paragraph 18(B) of the UPK Agreement disqualify Plaintiff Preschools from the UPK Program based on the schools' religious character and exercise. Plaintiffs' fourth claim asserts that the Department's "discretionary exemptions" to the equal-opportunity requirement—what I refer to as the individual provider preferences—confirm the Department has the discretion to grant exemptions and demonstrate that its policies are not generally applicable. Plaintiffs' fifth claim contends that the Department's "categorical exemptions"—what I call the algorithm preferences—prevent the equal-opportunity requirement from being neutral or generally applicable. Based on those arguments, Plaintiffs' fourth and fifth claims contend the equal-opportunity requirement is unconstitutional because it cannot be justified under strict scrutiny. The second and third claims are brought by Plaintiff Preschools and allege Paragraph 18(B) of the UPK Agreement violates the ministerial exception (Claim Two) and the church autonomy doctrine (Claim Three), which originate from the Free Exercise Clause. With the sixth claim, Plaintiff Preschools assert that the at-issue provisions of the UPK Agreement infringe their rights guaranteed by the Free Speech Clause of the First Amendment. Lastly, the seventh claim is brought by Plaintiff Preschools under the Establishment Clause of the First Amendment, alleging the Department's creation of the congregation preference has resulted in unlawful denominational favoritism.

Plaintiffs seek declaratory judgment, declaring that "exclusion of the preschools at Plaintiffs St. Mary Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood from Colorado's Universal Preschool Program on account of their sincere religious exercise, including: (i) prioritizing Catholic students and families in admissions decisions; (ii) requiring employees to adhere to and support the schools' religious beliefs, including on marriage and sexuality; (iii) considering for purposes of student admission or retention whether a family or

child adheres to and supports the schools' religious beliefs, including on marriage and sexuality; and (iv) operating their schools in accordance with their religious beliefs, violates the First Amendment to the United States Constitution." Pls.' Proposed Findings of Fact and Conclusions of Law ("FOFCOL") at 69.

Plaintiffs also contend they are entitled to permanent injunctive relief prohibiting "Defendants Lisa Roy and Dawn Odean from conditioning participation in the Colorado Universal Preschool Program, Colo. Rev. Stat. §§ 26.5-4-201, et seq., by Plaintiffs St. Mary Catholic Parish in Littleton, St. Bernadette Catholic Parish in Lakewood, Daniel Sheley, and Lisa Sheley on their:

    i.    agreeing to provide, or providing, eligible children an equal opportunity to enroll and receive preschool services regardless of religious affiliation, sexual orientation, or gender identity;

    ii.    agreeing not to discriminate against any person on the basis of religion, sexual orientation, or gender identity; or

    iii.    otherwise agreeing to violate, or violating, their religious beliefs, character, and exercise, including:

        a.    prioritizing Catholic students and families in admissions decisions;

        b.    requiring employees to adhere to and support the schools' religious beliefs, including on marriage and sexuality;

        c.    considering for purposes of student admission or retention whether a family or child adheres to and supports the schools' religious beliefs, including on marriage and sexuality; and

        d.    maintaining operational policies in accordance with their religious beliefs on marriage and sexuality, including with respect to dress codes, pronoun usage, and restroom usage.

*Id.* at 69-70. Plaintiffs further request an order requiring "that Defendants immediately permit Plaintiffs St. Mary Catholic Parish in Littleton, St. Bernadette Catholic Parish in Lakewood, Daniel Sheley, and Lisa Sheley to begin participating in UPK Colorado, including for the 2023-

24 school year, notwithstanding their sincere religious exercise described above." *Id.* at 70.

Additionally, Plaintiffs claim $1 in nominal damages. Am. Compl. at 36, ECF No. 30.

A brief was filed by the Jewish Coalition for Religious Liberty, the Rocky Mountain District Lutheran Church Missouri Synod, and the Colorado Association of Private Schools, as amici curiae. *See* Br. of Amici Curiae, ECF No. 71-1. Amici support the relief sought by Plaintiffs and advocate for "permitting religious preschools to freely participate in the [UPK] Program." *Id.* at 19.

## C. Expert Testimony

Defendants presented the testimony of expert witnesses at trial to establish the State's interest in enacting and enforcing the equal-opportunity requirement. Defendants offer two State interests they contend are compelling: (1) ensuring eligible children and their families do not face discriminatory barriers to publicly funded preschool and (2) protecting children from discrimination, i.e., "ensuring that, once enrolled, they receive publicly-funded [sic] preschool services that are safe, healthy, and free from discrimination." Defs.' Resp. to Mot. for Summ. J. at 22, ECF No. 77; Defs.' Proposed FOFCOL at 50. Ms. Holguín from the Denver Preschool Program provided testimony on the importance and impact of preschool. Dr. Abbie Goldberg, a clinical psychologist and psychology professor, testified as an expert about families with

LGBTQ+ parents. And Dr. Amy Tishelman, a clinical and research psychologist, provided her opinions as an expert on variations in sex traits[11] and gender diverse and transgender[12] children.

### 1. Elsa Holguín[13]

Ms. Holguín testified that "[p]reschool is very important to ensure that children have equal access and equal support to be ready to access school, to be ready for school, but also to be ready for life." Trial Tr. (Holguín) 427:12-14. In terms of school readiness, she explained that it includes "readiness for math, readiness for learning, readiness for reading," and also being "emotionally ready to perform in the classrooms." *Id.* 431:16-21. Children who attend preschool "are less likely to repeat a grade," "more likely to graduate," and "more likely to access college or higher education." *Id.* 430:4-10. Attending preschool "has a multiplying effect, and . . . the children of the children [who] attend preschool are also benefiting." *Id.* 430:11-15. Ultimately, preschool "is a key element for children to be able to succeed, and an equalizer for many children [who] don't have the opportunity to be in a place where they can acquire those skills."

---

[11] Variations in sex characteristics or sex traits are "congenital biological conditions whereby there's an atypicality in reproductive or sex anatomical or hormonal expressions." Trial Tr. (Tishelman) 336:12-14.

[12] "[T]ransgender' is an umbrella term to refer to somebody whose gender identity differs from what their gender identity was assumed to be at birth." Trial Tr. (Tichelman) 336:24-337:1. "'[G]ender diversity' is a broader term . . . [t]hat can refer to diverse gender expressions that maybe aren't expected in [a] particular community, and not necessarily gender identity differences.'" *Id.* 337:1-4.

[13] Plaintiffs challenged Defendants' designation of Ms. Holguín as a non-retained expert on the ground that her testimony should relate only to facts and not her opinions. *See* Pls.' Motion to Exclude at 6, ECF No. 73. I denied that Motion but advised that Plaintiffs may object to a particular opinion provided by a witness during the trial. *See* Order in Preparation for Trial at 31. Other than the testimony summarized here, Ms. Holguín's testimony was limited to the facts as she experienced them. Plaintiffs did not object to this background information on the importance of preschool, and I find Ms. Holguín is qualified to provide these opinions, they are reliable, and they satisfy Federal Rule of Evidence 702.

*Id.* 430:15-18. Ms. Holguín made clear that, to achieve these "quality" results, the providers must also be of quality. *Id.* 449:6-9.

In contrast, not having access to quality early childhood education, "impacts the children's readiness to succeed." *Id.* 430:22-23. Ms. Holguín testified:

> [F]or many children, it's detrimental in that . . . they are held behind, more likely to be in special education, and less likely to succeed academically and socially and emotionally as well. So, the impact is profound, particularly for some of our communities that don't have access to those resources.

*Id.* 430:25-431:5.

### 2. Dr. Goldberg

Dr. Goldberg is a clinical psychologist and psychology professor at Clark University in Massachusetts, where she is the Director of Women's and Gender Studies. Goldberg Report at 1, Trial Ex. 45. One of her areas of expertise and research is LGBTQ+ parent families, and she is the author of over 150 peer-reviewed articles, 25 book chapters, and four books. *Id.* at 2.

According to Dr. Goldberg, "LGBT[14] parents are about twice as likely to live in poverty as compared to heterosexual cisgender parents." Trial Tr. (Goldberg) 287:15-17. Poverty may affect the reliability of parents' transportation or may require them to use public transportation, and consequently, transportation will often be a factor they consider when looking for an early childhood program. *Id.* 324:4-17. There is also "a disproportionate number of LGBTQ parents parenting in rural areas, meaning when you look at same-sex couples in rural areas, a greater percentage of them will be parents than . . . in urban areas." *Id.* 287:4-9. In rural areas, there are

---

[14] Dr. Goldberg used the term LGBT, but she clarified that she did not intend to exclude queer individuals and was using the term with "an implicit asterisk or plus sign." Trial Tr. (Goldberg) 294:23-295:6.

fewer early childhood education environments, and they are more spread out. *Id.* 325:3-8. For those reasons, LGBTQ+ families often have fewer options when looking for early childhood education. *Id.* 287:19-25, 289:21-23, 324:25-325:2. For LGBTQ+ parents in rural environments, sometimes the only option available for early childhood education is a religious provider. *Id.* 325:9-14. "[I]f there is a group that is more likely to live in poverty and more likely to have fewer options in terms of preschools and accessible early childhood education, . . . those families may be at risk for . . . inadequate . . .  outcomes . . . ." *Id.* 288:10-14.

Children are impacted by the environments they spend the most time in, which usually includes school. *Id.* 296:5-7, 297:1-4. If a child "is being implicitly or explicitly told that there is something wrong with them or their family, this can create negative self-views." *Id.* 297:11-13. The struggles faced by youth who are raised by LGBTQ+ parents stem not from their parents' sexual orientation or gender identity but from other people's perceptions or reactions to their families. *Id.* 299:2-9. Likewise, "if a child is getting messages that their identity or presentation is non-normative, not accepted, [or] equated with negative qualities or attributes, they will internalize those qualities as applying to themselves." *Id.* 297:17-20.

### 3. Dr. Tishelman

Dr. Tishelman is a clinical and research psychologist and currently a Research Associate Professor at Boston College in Massachusetts. Tishelman Report at 1, Trial Ex. 47. She has received funding from the National Institutes of Health for her research, which has focused on gender diverse and transgender youth. *Id.* at 2. She has developed best practices for caring for and assessing gender diverse prepubescent children and has served as an expert witness approximately 40 times. *Id.* at 2-4.

Dr. Tishelman provided testimony on early life adversities and adverse childhood experiences, known as "ACEs." Trial Tr. (Tishelman) 339:19-21, 346:15. "Early life adversities can be child maltreatment" and "can also constitute other kinds of stressors." *Id.* 340:5-10. In basic terms, ACEs are "experiences that have the potential to cause trauma for a child, and they can be single incidents or . . . chronic extreme stress." *Id.* 340:10-13. ACEs "have been demonstrated to be extremely important in terms of development." *Id.* 339: 23-24. Discrimination is a form of an ACE, as is significant bullying, which can emanate from adults. Trial Tr. (Tishelman) 340:14-18, 348:1-4, 369:10, 369:16-370:6. Generally, there are "a lot of different kinds of ways for children to be different, and if they're treated poorly because of that difference, it can create a lot of anxiety and low self-esteem." *Id.* 348:10-13. "[T]he way that it works for other children is the way that it works for gender-diverse and transgender children in the sense that if they're rejected for something that they can't change about themselves, that can be very hard, because they didn't have a way to be different." *Id.* 348:14-18. "[B]eing isolated and excluded [at school] can be very hard for children as well." *Id.* 369:5-6.

Dr. Tishelman reflected on this case as one that is about access to religious institutions for people who do, or who may start to while they're enrolled, identify as transgender, gender diverse, or in the LGBTQ community. *Id.* 382:15-18. In her experience and research, individuals often draw on religion as a source of solace and to help sustain them, and some families may want to not be excluded from religious institutions because it "could be a terrible loss of community and faith that's important to them." *Id.* 382:18-24. Dr. Tishelman specifically indicated that a child could enroll at a school as cisgender and later be revealed as gender diverse. Trial Tr. (Tishelman) 390:16-19. Switching schools for the child could be "really stressful." *Id.* 391:1-2, 383:5-10 ("[I]f children are already at a school and start to identify as

within a LGBTQ community and need to be then excluded from a community that they . . . .

support and a community that means something to them, that can be a significant adversity and

loss."). Dr. Tishelman clarified:

> "[It] is hard to explain to a child that they need to leave a school because of who they are, including something that they can't change . . . . And even more, if a child has been schooled in a particular religion and taught faith, losing and not understanding why they're not able to be part of a community of faith that is important to their family can be really hard as well." *Id.* 391:5-12.

Extreme stress and chronic stress can affect a child's neurodevelopment and ability to

learn and interact with others. *Id.* 342:15-19. "Youth who are exposed to early adversities have a

higher likelihood of diseases as adults, for instance heart diseases and cancers." *Id.* 343:17-19.

These adversities can also cause "higher addiction, higher trauma, . . . PTSD in adulthood, [and]

higher suicidality." *Id.* 343:23-24. Transgender children are often affected by chronic stress. *Id.*

345:21-23. And "transgender youth who have been exposed to stressors have a higher likelihood

of anxiety, depression, and suicidality." *Id.* 368:3-6.


Plaintiffs are correct that none of the expert testimony presented by Defendants spoke

directly to whether Plaintiff Preschools' participation in the UPK Program would increase or

decrease the ability of LGBTQ+ families to access preschool services in Denver and the

surrounding area. *See* Pls.' Proposed FOFCOL at 29. Nevertheless, I find the expert testimony

described here to be reliable and persuasive, and it guides my analysis of Plaintiffs' claims.


## II. Conclusions of Law

Now, to apply the law to the facts above, I first address Defendants' disavowal of

Paragraph 18(B) of the Agreement and its impact on Plaintiffs' claims. Then, I consider

Plaintiffs' first, fourth, and fifth claims brought under the Free Exercise Clause. I move on to Plaintiffs' sixth claim based on the Free Speech Clause and seventh claim implicating the Establishment Clause. After assessing the merits, I evaluate the other permanent-injunction factors and the appropriateness of the additional relief requested.

## A. Paragraph 18(B): Claims Two and Three and Part of Claims One, Four, and Six

In Claims One, Two, Three, Four, and Six, Plaintiffs allege that, through the UPK Agreement, the Department is unconstitutionally interfering in the internal operations of religious institutions. These concerns are predicated on the application of Paragraph 18(B) of the Agreement. *See* Agreement at 28, Trial Ex. 13. After this litigation commenced, Defendants submitted a declaration indicating that they construe this provision such that it does not conflict with federal law and the related protections afforded religious organizations in making employment decisions. *See* Odean Decl. ¶ 16, Trial Ex. 39.[15] Additionally, Ms. Odean testified at trial that Paragraph 18(B) would not be applied as presently written in the Agreement and removed in future drafts. *See* Trial Tr. (Odean) 232:16-22. She and Ms. Cooke explained that Paragraph 18(B) came from a template written by the Colorado Department of Human Services and that the Department did not intend to analyze providers' employment decisions under that

---

[15] In my Order Denying Summary Judgment, I suggested a stipulation resolving these claims might be appropriate because, according to Defendants, Paragraph 18(B) would not place any additional burdens on Plaintiff Preschools as employers. *See* Order in Preparation for Trial at 27 n.10. At trial, the parties indicated that a written stipulation would be presented to the Court. Trial Tr. 30:10-17 (Defendants' counsel: "We believe that the parties are going to be able to enter into a stipulation as to counts two and three, with the expectation that the contractual provision 18B will be removed from the contract in year two. And to the extent that the plaintiff preschools, or any of the Archdiocese's preschools, for that matter, intend to sign on to the UPK program in year one, that that provision would not apply to them."). No such stipulation has been provided.

provision. Trial Tr. (Odean) 231:8-232:2; Trial Tr. (Cooke) 148:7-13. Defendants argue that their disavowal of Paragraph 18(B) moots any analysis of whether it would, as Plaintiffs allege, impermissibly interfere with Plaintiff Preschools' religious hiring policies for their ministerial employees and their other internal decisions based on religious doctrine.[16]

"Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010) (quoting *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005). Unless there is a live controversy, I "lack jurisdiction to consider claims no matter how meritorious." *Id.* (quoting *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008)). "A case or controversy becomes moot 'when it is impossible for the court to grant any effectual relief whatsoever to a prevailing party.'" *Church v. Polis*, No. 20-1391, 2022 WL 200661, at *3 (10th Cir. Jan. 24, 2022) (unpublished) (quoting *Colo. Off-Highway Vehicle Coal. v. U.S. Forest Serv.*, 357 F.3d 1130, 1133 (10th Cir. 2004)). A case is live and not moot only if "granting a present determination of the issues offered will have some effect in the real world." *Fleming v. Gutierrez*, 785 F.3d 442, 444–45 (10th Cir. 2015) (quoting *Rio Grande*, 601 F.3d at 1110); *see also Polis*, 2022 WL 200661, at *4 ("[A] claim for injunctive relief is moot if there is no reasonable likelihood that the injunction would result in any changes.").

With their claims, Plaintiffs request that I prevent the alleged harm Paragraph 18(B) will cause them if they participate in the UPK Program. *See, e.g.*, Am. Compl. at 27-30, 34 (alleging

---

[16] Plaintiffs assert that Paragraph 18(B), in addition to the equal-opportunity requirement, infringes their free-exercise and free-speech rights. *See* Am. Compl. at 26-27, 30-31, 34. There is no argument that Claims One, Four, or Six are wholly moot. Here, I evaluate only the aspect of those claims based on Paragraph 18(B). I consider the rest of those claims and their allegations related to the equal-opportunity requirement below.

Paragraph 18(B) interferes with Plaintiff Preschools' "selection of preschool teachers and administrators by prohibiting them from selecting employees based on the employee's religious beliefs or willingness to abide by the Catholic Church's beliefs regarding marriage, human sexuality, and gender" and "right to frame policies and doctrine, govern their own internal affairs, and maintain a school environment faithful to their religious beliefs"). In the chain of causation connecting Defendants' actions to this subset of Plaintiffs' alleged injuries, the application of Paragraph 18(B) is an essential step. If Defendants' representations that Paragraph 18(B) would not be applied and would be absent in the next year's draft are genuine, no effectual relief could be granted. Any analysis of Paragraph 18(B)'s constitutionality would, therefore, be advisory and violative of my role under Article III of the U.S. Constitution.

Plaintiffs argue that Paragraph 18(B) remains a threat to their religious autonomy because Defendants' disavowal was made voluntarily and belatedly. Plaintiffs argue that Defendants' "11th-hour decision to drop Paragraph 18(B)" should not be effective because "Defendants likely will seek the freedom" to "engage in unlawful conduct . . . once the claim is dismissed." Pls.' Proposed FOFCOL at 61 (relying on *United States v. Sanchez-Gomez*, 584 U.S. 381, 386 n.* (2018)). "One exception to a claim of mootness is a defendant's voluntary cessation of an alleged illegal practice which the defendant is free to resume at any time." *Rio Grande*, 601 F.3d at 1115 (quoting *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008)).[17] "[T]his exception exists to counteract the possibility of a defendant ceasing illegal action long

---

[17] Plaintiffs quote *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), for the principle that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Pls.' Proposed FOFCOL at 61. However, the Tenth Circuit has made clear that *Aladdin's Castle* is not applicable when there is no evidence in the record to indicate that the defendant intends to resume the challenged practice. *See, e.g.*, *Camfield v. City of Okla. City*, 248 F.3d 1214, 1223-24 (10th Cir. 2001).

enough to render a lawsuit moot and then resuming the illegal conduct." *Id.* (quoting *Chihuahuan Grasslands All.*, 545 F.3d at 892). "[V]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Id.* (quoting *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) (per curiam)). "The party asserting mootness bears the '"heavy burden of persua[ding]"' the court that the challenged conduct cannot reasonably be expected to start up again.'" *Id.* at 1116 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Defendants must provide more than "a mere informal promise or assurance on the part of the [government] defendants that the challenged practice will cease." *Id.* at 1118 (quoting *Burbank v. Twomey*, 520 F.2d 774, 748 (7th Cir. 1975)). Generally, mootness is not established "follow[ing an] announcement of an intention to change or adoption of a plan to work toward lawful behavior." 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3533.7 (3d ed. 2024). Here, Defendants have not just set out their plan to remove Paragraph 18(B) from future drafts, they have presented uncontroverted evidence that Paragraph 18(B) was not included with the intent to engage in the challenged conduct, explained that they believed the policy imposed no additional burdens on Plaintiffs,[18] and committed that

---

[18] Originally, Plaintiffs represented that the Department interpreted Paragraph 18(B) consistent with the federal-law protections for religious organizations' employment decisions. *See* Odean Decl. ¶ 16, Trial Ex. 39. In a footnote in their Motion to Dismiss, Defendants indicated that, if a specific complaint were to arise, "the Department will of course need facts to determine whether a provider's employment decisions regarding its co-religionist employees and ministerial employees are protected by federal law." *See* Mot. to Dismiss at 16 n. 5, ECF No. 38. Plaintiffs claim it makes no sense for the Department to be able to investigate providers' employment decisions if it lacks the authority to enforce Paragraph 18(B). I am not persuaded that the Department would lack any investigatory authority. Regardless, however, related testimony was not elicited at trial, and the only evidence that was presented made clear that there would be no application or enforcement of Paragraph 18(B).

the provision would not be applied to providers going forward. The possibility of Defendants implementing the same or a substantially similar policy to Paragraph 18(B) in the future is a speculative contingency, and any determination regarding that speculative policy would necessarily be advisory. *See Rio Grande*, 601 F.3d at 1117.

Plaintiffs also take issue with the timing of Defendants' complete disavowal of Paragraph 18(B), highlighting the opportunities Defendants had to recognize their error and correct it even before this lawsuit was filed. *See* Pls.' Proposed FOFCOL at 60 n.13. While the timing of Defendants' representations is inconvenient, to put it mildly, such changes in governmental policy are not uncommon and can legitimately moot controversies. *See, e.g.*, 13C Federal Practice & Procedure § 3533.7 ("[S]elf-correction . . . provides a secure foundation for mootness so long as it seems genuine."). Without further corroboration, I am unwilling to accept a naked assertion of Defendants' bad faith or that the timing indicates an intent to rely on Paragraph 18(B) in the future.

Consequently, I treat Defendants' disavowal of Paragraph 18(B) as complete and sincere. Since Plaintiffs can point to no source of their alleged harm, determining the validity of Paragraph 18(B) will have no effect in the real world. *See Fleming*, 785 F.3d at 444–45. As a result, Plaintiffs' Claims Two and Three are found to be moot, as are the parts of Claims One, Four, and Six that rely on the application of Paragraph 18(B).

**B.  Claims One, Four, and Five**

The First Amendment to the U.S. Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ." U.S. Const. Amend. I. The Amendment references "Congress," but "the

Fourteenth Amendment—which references the entire 'State,' not just a legislature—makes the rights protected by the Amendment applicable to the States." *Fulton v. City of Phila.*, 593 U.S. 552, 565 n.27 (2021). Plaintiffs first, fourth, and fifth claims are brought under the Free Exercise Clause and allege that Defendants have precluded Plaintiffs from participating in the UPK Program because of Plaintiffs' religious beliefs. "The Free Exercise Clause 'protect[s] religious observers against unequal treatment' . . . ." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148 (1987) (Stevens, J., concurring in judgment)).[19] In addition to outright prohibitions, the Free Exercise Clause "protects against 'indirect coercion or penalties on the free exercise of religion." *Carson v. Makin*, 596 U.S. 767, 778 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988)). For this reason, the Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.*[20]

In *Employment Division, Department of Human Resources of Oregon v. Smith*, the Supreme Court explained that "the right of free exercise does not relieve an individual of the

---

[19] I conclude Plaintiffs' beliefs as set forth in the Findings of Fact above are their sincerely held religious beliefs, *see Frazee v. Illinois Dep't of Employment Sec.*, 489 U.S. 829, 834 (1989), as "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds," *Employment Div., Dep't of Hum. Resources of Or. v. Smith*, 494 U.S. 872, 887 (1990) (quoting *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989)).

[20] *But see Lyng*, 485 U.S. at 450–51 ("This does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions. The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" (quoting *Sherbert v. Verner*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring))).

obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879.[21] In *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, the Court more specifically articulated the standard for reviewing claims brought under the Free Exercise Clause, stating: "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." 508 U.S. at 531. In contrast, as the Court in *Lukumi* instructed, a law that is not neutral or generally applicable must pass strict scrutiny, meaning it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531-32.

Plaintiffs contend their inability to participate in the UPK Program triggers strict scrutiny under the Free Exercise Clause for at least four reasons:

> *[F]irst*, because the exclusion is based solely on Plaintiff preschools' religious character and exercise in violation of the rule in *Carson* [*v. Makin*]; *second*, because the Department recognizes categorical exceptions permitting other preschool providers to engage in similar conduct for secular reasons, violating the rule in *Tandon* [*v. Newsom*, 593 U.S. 61 (2021),] and *Kennedy* [*v. Bremerton School District*, 597 U.S. 507 (2022),]; *third*, because the Department has reserved the authority to carve out, and has carved out, individualized exceptions from the [equal-opportunity requirement] in violation of the rule in *Fulton* [*v. City of Philadelphia*]; and *fourth*, because the Department's implementation of UPK Colorado is not neutral, violating the rule in *Lukumi* and *Masterpiece* [*Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018)].

Pls.' Proposed FOFCOL at 31.[22]

---

[21] Although there has been a steady push to overturn *Smith*, in *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021), the Court recently declined to revisit the decision. *See also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022).

[22] Reviewing recent Supreme Court jurisprudence, it is unclear the extent to which courts must rely on the Nation's history and tradition in considering claims brought under the Free Exercise Clause. *See, e.g., Kennedy*, 597 U.S. at 535-36 (explaining that, in interpreting the Establishment Clause, "'[t]he line' that courts and governments 'must draw between the permissible and the impermissible' has to 'accor[d] with history and faithfully reflec[t] the understanding of the

### 1.  Carson v. Makin:  Claim One

Plaintiffs' first claim relies primarily on *Carson*. That case involved Maine's tuition-assistance program for parents who live in school districts that do not operate a secondary school. 596 U.S. at 771-73. Like the UPK Program challenged here, parents in those school districts designated the school they would like their child to attend, and the school received payments to help defray the costs of tuition. *Id.* at 772-74. Unlike the UPK Program, however, Maine's program explicitly allowed only "nonsectarian" schools to receive the payments. *Id.* at 773-75. Citing two other recently decided cases—*Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), the Supreme Court found that strict scrutiny applied because Maine "'effectively penalize[d] the free exercise' of religion" by "'disqualify[ing] some private schools' from funding 'solely because they are religious.'" *Carson*, 596 U.S. at 780 (first quoting *Trinity Lutheran*, 582 U.S. at 462; then quoting *Espinoza*, 591 U.S. at 487). The Court went on to hold that Maine could not satisfy strict scrutiny because its "interest in separating church and state more fiercely than the Federal Constitution [requires] . . . cannot qualify as compelling in the face of the infringement of free exercise." *Id.* at 781 (quoting *Espinoza*, 591 U.S. at 484-85).

---

Founding Fathers'" (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014))). Neither party presented related arguments, but to the extent the early understanding of the Free Exercise Clause must be taken into account, it seems free exercise rights did not require the granting of an exemption when the rights of others were involved. *See, e.g.*, Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harvard L. Rev. 1409, 1464 (May 1990) ("[A] believer has no license to invade the private rights of others or to disturb public peace and order, no matter how conscientious the belief or how trivial the private right on the other side. . . . Where the rights of others are not involved, however, the free exercise right prevails."). Here, there is a strong argument that children have the right not to face discriminatory barriers in using a government benefit and seeking a quality education.

Plaintiffs assert that the holding in *Carson* dictates the outcome here and that any consideration of *Smith* is unnecessary. Plaintiffs highlight that *Carson* relies on pre-*Smith* cases and contend that *Carson* is based on the "longstanding Free Exercise rule distinct from *Smith*" that "exclusion from a public benefit on account of one's religious exercise 'violates the Free Exercise Clause.'" Pls.' Proposed FOFCOL at 32 (rewording and quoting *Carson*, 596 U.S. at 778). I am not persuaded that *Carson* articulates a distinct rule. Although *Smith* considered the constitutionality of an Oregon statute criminalizing the use of peyote, it ultimately determined that "Oregon may, consistent with the Free Exercise Clause, deny respondents unemployment compensation when their dismissal results from use of the drug." 494 U.S. at 890. Thus, *Smith* itself was a public-benefits case. As I previously noted, *Carson* fits into the *Smith* framework because it finds that Maine's tuition-assistance program was not neutral and then subjects the program to strict scrutiny. *See Carson*, 596 U.S. at 781 ("[T]here is nothing neutral about Maine's program."). While *Carson* does not cite *Smith* specifically, it cites *Trinity Lutheran* throughout, which contains a full analysis of *Smith*. *See Trinity Lutheran*, 582 U.S. at 460-61. Any breadcrumbs that may or may not have been dropped in *Carson* are insufficient to slice public-benefits cases from the *Smith* framework.

Nonetheless, for the purposes of this case, whether *Carson* expounds on a distinct rule is not consequential. The rule gleaned from *Carson* is that a law that operates to "'disqualify some private schools' from funding 'solely because they are religious' . . . must be subjected to 'the strictest scrutiny.'" 596 U.S. at 780. Plaintiffs would like this rule to embrace what has been termed "substantive neutrality." In his concurrence in *Lukumi*, Justice Souter discussed the difference between "formal neutrality and substantive neutrality." *Lukumi*, 508 U.S. at 561-62 (Souter, J., concurring). "[F]ormal neutrality . . . would only bar laws with an object to

discriminate against religion," while "substantive neutrality, . . . in addition to demanding a secular object, would generally require government to accommodate religious differences by exempting religious practices from formally neutral laws."[23] Justice Souter explained that the dissent in *Smith* embraced substantive neutrality by "requir[ing] the government to justify *any* substantial burden on religiously motivated conduct by a compelling state interest and by means narrowly tailored to achieve that interest." *Id.* at 562-63 (quoting *Smith*, 494 U.S. at 894). But the majority in *Carson* did not go so far. The Court's language in *Carson* made clear that Maine's program was not formally neutral since schools were excluded from the public benefit "solely because of" their religious character. 596 U.S. at 780-81.[24]

As discussed further below in analyzing Plaintiffs' fifth claim, the equal-opportunity requirement does not exclude Plaintiffs from the UPK Program solely because of their religious status or exercise. The requirement applies to UPK providers, regardless of their religious or non-religious character. The purpose of the requirement is not to invade religious freedom but to further the implementation of a strongly embraced public value. *Carson*, *Espinoza*, and *Trinity Lutheran* are all distinguishable because each involved a program that "specifically carved out" religious organizations from those eligible to receive funding. *See Carson*, 596 U.S. at 780.

---

[23] It is noteworthy that Plaintiffs cite to Justice Souter for his discussion of substantive neutrality since he dissented in *Zelman v. Simmons-Harris*, insisting that the use of tax money as vouchers to support religious schools and their missions violates the Establishment Clause. 536 U.S. 639, 686 (2002) (Souter, J. dissenting).

[24] One sentence in *Carson* leaves out "solely" in "solely because of," reading: "A State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." 596 U.S. at 781. The Court, however, emphasized that its holding was based on *Trinity Lutheran* and *Espinoza*, which both used the language "solely because of." *See id.* at 779 (quoting *Trinity Lutheran*, 582 U.S. at 462, and *Espinoza*, 591 U.S. at 476, 487).

Plaintiffs assert that "[t]he Department has effectively imposed a special tax on religious preschools, whereby families who send their children to Catholic preschools continue to pay full freight, while families who send their children to over 2,000 other Colorado preschools receive 15 hours of free instruction per week." Pls.' Proposed FOFCOL at 34. That may well be the effect of the equal-opportunity requirement, but that is not its purpose. And, again, the Supreme Court, in *Carson*, did not hold that strict scrutiny is triggered by any condition on a government benefit that affects religious exercise.[25] Plaintiffs have failed to show that *Carson* applies to the equal-opportunity requirement, and thus, I conclude that their first claim lacks merit.

## 2. Neutral:  Claim Five

Plaintiffs' fifth claim alleges the equal-opportunity requirement, as applied by Defendants, is not neutral under the *Smith* framework. If the requirement is not neutral, strict scrutiny would apply, and Plaintiffs contend Defendants cannot satisfy that stringent test.

A law is not neutral "if the object of [the] law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. In analyzing neutrality, I look at the relevant government action from multiple angles. First, I review the text of the equal-opportunity requirement as well as the historical background of its adoption and Defendants' decision in denying Plaintiff Preschools' an exemption from the requirement. *See id.* at 533 ("To

---

[25] Plaintiffs note that I have previously written: "The government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . [,] even though the person has no right to the valuable government benefit[.]" Pls.' Proposed FOFCOL at 34 (quoting *Pryor v. School Dist. No. 1*, No. 22-cv-02886-JLK, 2022 WL 18145414, at *1 (D. Colo. Dec. 23, 2022)). The full quote includes the additional caveat that "the government may deny him the benefit for any number of reasons." *Pryor*, 2022 WL 18145414, at *1 (quoting *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996)). The point is that Plaintiffs must show their rights have been infringed, not just burdened. Otherwise, the benefit may be denied.

determine the object of a law, we must begin with its text."); *id.* at 540 (instructing that the object may be determined from evidence of "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body"). I investigate specifically whether Defendants have "proceed[ed] in a manner intolerant of religious beliefs." *Fulton*, 593 U.S. at 533. Then, I assess the real-world operation of the equal-opportunity requirement, asking whether it targets religion. *See Lukumi*, 508 U.S. at 535 ("[T]he effect of a law in its real operation is strong evidence of its object."). After moving through each of these considerations, I conclude, in accordance with my findings of fact, that the equal-opportunity requirement is neutral and has been applied to Plaintiffs in a neutral manner.

### i. Text and Background

Nothing in the text of the statutory equal-opportunity requirement, or its inclusion in the UPK Agreement, indicates that religious discrimination is its object. Plaintiffs do not argue the contrary, nor do they present evidence that the requirement was adopted with the object of targeting religious beliefs or conduct. *Cf. id.*, 508 U.S. at 541 ("The minutes and taped excerpts of the . . . session [when enactments were initially passed], both of which are in the record, evidence significant hostility exhibited by residents, members of the city council, and other city officials toward the Santeria religion and its practice of animal sacrifice."). Instead, Plaintiffs argue that Defendants, in denying their request for an exemption and litigating this case, have exhibited offensive and hostile opinions. I see nothing of the sort and may neither assume nor

manufacture facts. As such, I do not infer the existence of hostility where there is none. *See* Pls.'
Mot. for Summ. J. at 36-37, ECF No. 61; Pls.' Proposed FOFCOL at 46-47.

"[T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot
impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a
manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and
practices." *Masterpiece Cakeshop*, 584 U.S. at 638. "[E]ven 'subtle departures from neutrality'
on matters of religion" are impermissible. *Id.* (citing *Lukumi*, 508 U.S. at 534).

First, Plaintiffs point to Dr. Roy's deposition testimony. When asked whether it would
constitute discrimination against children if a faith-based provider were to give notice that a
transgender child is not allowed to use the bathroom of the gender the child identifies with and
the school will not use the requested pronouns, Dr. Roy responded "it would prove best to have a
conversation with the family and decide what's best for the child based on the environment that
the child was exposed to." Roy Dep. 29:20-30:9, Trial Ex. 27.[26] She emphasized that the
Department does not "want any child to be harmed by being in a situation where they would be
discriminated against" and commented that "[t]he law is there to protect, and thank goodness it
does." *Id.* 30:9-13. Dr. Roy clarified that she was responding from a child development
perspective. *Id.* 30:3-5. With the plentiful evidence in the record of the harm that children may
suffer when in environments that do not accept them or affirm their experiences, *see, e.g.*, Trial
Tr. (Goldberg) 297:11-20 (explaining that, if children receive messages that something is wrong
with them or their families, that can lead to negative self-views); Trial Tr. (Tishelman) 340:14-
18, 342:15-19, 343:17-19, 343:23-24, 345:21-23, 386:3-6, 48:10-18 (informing that

---

[26] To the extent Defendants object to this testimony as speculation and for lack of foundation, *see*
Defs.' Objections to Pls.' Designated Dep. Testimony at 2, ECF No. 93, their objections are
overruled.

discrimination is an adverse childhood experience that can lead to negative physical and mental health impacts and, if children are rejected or treated poorly because of their difference, it can create anxiety and low self-esteem), Dr. Roy's statements cannot be viewed as hostile.

Second, Plaintiffs take issue with the arguments made by Defendants' counsel analogizing the differential treatment of LGBTQ+ children and families to race discrimination. Plaintiffs also believe it is improper for Defendants' attorneys to characterize their "millennia-old religious beliefs as stigmatization and bullying." Pls.' Proposed FOFCOL at 46.[27] Defendants have pursued only fair and reasonable legal arguments.

Starting with the comparison between race discrimination in education and denying LGBTQ+ children and families equal access to publicly funded preschool, the law is predicated on the application of general principles to the varying facts of individual cases. *See* Dan Hunter, *Reason is Too Large: Analogy and Precedent in the Law*, 50 Emory L.J. 1197, 1202 (2001); Lloyd L. Weinreb, *Legal Reason: The Use of Analogy in Legal Argument* 4 (2d ed. 2016). Our Nation's history has produced countless landmark cases involving race discrimination. While the

---

[27] Plaintiffs' citations to Ms. Odean's testimony for these contentions are entirely misleading. Ms. Odean testified that she was aware that her lawyers had compared the lawsuit to academies in the 1970s that were segregated based on race and that they had cited studies about the impacts of bullying and stigmatization in LGBTQ children. Trial Tr. (Odean) 260:5-9, 263:7-14. When asked specifically if she thought Plaintiff Preschools' enrollment policies were similar to segregationist academies in the 1970s, she stated:

> "[W]e need to consider what we have in the law that we're implementing, including the antidiscrimination provision, and ensure that if a child is in a preschool setting of a participating provider, that it's safe and healthy for them to be able to engage, and that it isn't—that safe and healthy isn't compromised by discrimination.

*Id.* 261:21-262:12.

facts of those cases are not equivalent to the ones here,[28] the legal principles and considerations are similar. *See* Serena Mayeri, *"A Common Fate of Discrimination": Race-Gender Analogies in Legal and Historical Perspective*, 110 Yale L.J. 1045, 1053 (2001) ("Analogical reasoning may go beyond direct parallels between various forms of inequality to engage in more nuanced comparisons that recognize differences as well as similarities and attempt to determine their moral and legal significance."). The effects of differential treatment in education—along with the invocation of the Free Exercise Clause to justify such treatment—are similarities making comparisons in this case apt. Drawing attention in legal briefing to these similarities does not evince animus to religion. To suggest that it does fundamentally misunderstands the role of analogy in legal reasoning.[29]

The arguments advanced by Defendants' attorneys are wholly distinguishable from the facts in *Masterpiece Cakeshop*, where the Supreme Court found the initial decisionmaking body exhibited hostility to religion because members of it "endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain," mentioned the religious justifications for slavery and the Holocaust, and referred to religious beliefs as "one of

---

[28] It undoubtedly does a disservice to all historically subaltern groups to literally equate their struggles. The history of race-based discrimination and the means in which it has been and is perpetrated are distinct. That recognition, however, should not imply that members of the LGBTQ+ community have not been and are not the victims of invidious prejudice nor that they do not deserve the dignity and protections the laws ensure. *See, e.g., Griffith v. El Paso Cnty., Colorado*, No. 21-cv-00387-CMA-NRN, 2023 WL 2242503, at *10 (D. Colo. Feb. 27, 2023), *report and recommendation adopted*, No. 21-cv-00387-CMA-NRN, 2023 WL 3099625 (D. Colo. Mar. 27, 2023) ("[O]ne would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people.") (quoting *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018))).

[29] Indeed, the very essence of common law analytic methodology is analogical inference to precedent which differs from the continental law's analytic basis in deduction from code principles.

the most despicable pieces of rhetoric that people can use . . . to hurt others." 584 U.S. at 634-635. Defendants' legal arguments are limited to relevant and applicable precedent and venture nowhere near attempts to divorce religion from early childhood education or denigrate religious beliefs.

Defendants' attorneys have not vilified Plaintiffs nor accused them of having actually caused harm to children. Counsel have presented persuasive evidence from qualified experts on the harm that children experience when they encounter environments that do not accept them or affirm their experiences. Although Plaintiffs may disagree with the science or may view any impact as minimal or hypothetical, they did not present any contrary evidence, and expert testimony is often framed in hypotheticals.[30]

The record contains no evidence that Defendants have passed judgment on or presupposed the illegitimacy of Plaintiffs' religious beliefs and practices. The evidence instead shows the Department committed to the idea of mixed delivery and engaged with representatives

---

[30] Plaintiffs filed a Notice of Supplemental Authority (ECF No. 114), submitting the recently issued Tenth Circuit opinion in *Does 1-11 v. Board of Regents of University of Colorado*, No. 21-1414, 2024 WL 2012317 (10th Cir. May 7, 2024). In that case, the court held that "the specific series of events leading to" the later-adopted policy "demonstrated that the [p]olicy was not neutral toward religion." *Id.* at *18. Plaintiffs contend the same is true here, where Defendants' latest definition of "congregation" for the congregation preference "appears to be an (unsuccessful) effort to respond to Plaintiffs' litigation arguments and fortify their exclusion of Plaintiffs from [the UPK Program]" and "confirms non-neutrality." Notice of Suppl. Authority at 3, ECF No. 114. Plaintiffs' argument is hyperbole, based on assumptions that are not supported by the record. If anything, by broadening the definition of congregation, Defendants have worked to include more faith-based providers. The comparison to *Does 1-11* is not fitting. There, the Administration adopted a new policy after the litigation was filed, but it did not reevaluate all employees' requests for an exemption under the new policy for almost three months. *Id.* at *18. When the Administration did reevaluate the employees, it used similar criteria as it did under its prior, problematic policy and reached the same results. *Id.* at *18-19. Defendants here have ostensibly extended the congregation preference to, as I conclude below, permit faith-based providers, including Plaintiff Preschools, to discriminate on the basis of religious affiliation even more flexibly, as Plaintiff Preschools have sought to do.

from faith-based providers. The result is that forty faith-based preschools currently participate in the UPK Program, including the Catholic Charities schools overseen by the Archdiocese. Trial Tr. (Odean) 234:8, 23-25. Neither the text of the equal-opportunity requirement nor the circumstances surrounding its enactment and implementation reveal any basis for finding that the requirement is not neutral.

### ii.  Real-World Operation

The operation of the equal-opportunity requirement similarly does not show that its object is to restrict practices because of their religious motivation. "[An] adverse impact will not always lead to a finding of impermissible targeting." *Lukumi*, 508 U.S. at 535; *see also Tingley v. Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022) (explaining "that a particular group, motivated by religion, may be more likely to engage in the proscribed conduct does not amount to a free exercise violation" (internal quotation marks and citation omitted)). "[A] social harm may [be] a legitimate concern of government for reasons quite apart from [religious] discrimination." *Lukumi*, 508 U.S. at 535 (citing *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)).

Plaintiffs argue that "Defendants cannot rewrite unambiguous state-law commands to gerrymander Plaintiffs out." Pls.' Proposed FOFCOL at 42. With the enactment of the UPK Act the State prioritized the inclusion of diverse preschool providers, *see* Colo. Rev. Stat. §§ 26.5-4-202(1)(b) & (1)(a)(VI), 26.5-4-203(12), and faith-based providers were always "envisioned to be part of the mixed-delivery model." Trial Tr. (Cooke) 160:16-17. The Department's "goal in the mixed delivery program was to recruit and engage providers . . . of all types, school districts, center-based, home-based, [and] faith-based . . . ." *Id.* 147:23-148:2. Defendants worked with religious providers to accommodate them, establishing a task force and developing the

congregation exception. *Id.* 152:8-20, 154:21-25, 157:17-24. The participation of the Catholic Charities preschools in the UPK Program substantiates that Defendants have not excluded Catholic providers. Defendants have not gerrymandered Plaintiffs out of the UPK Program, intentionally or otherwise. They apply the equal-opportunity requirement "in spite of" Plaintiffs' religious beliefs, not because of them. *Cf. Lukumi*, 508 U.S. at 540.

In sum, Plaintiffs have not established that the equal-opportunity requirement, on its face or as applied by Defendants, is not neutral.

### 3. Generally Applicable:  Claims Four and Five

Plaintiffs' fourth and fifth claims allege that the algorithm preferences and individual provider preferences permitted by Defendants demonstrate that the equal-opportunity requirement is not generally applicable as applied to Plaintiffs. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). Additionally, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534; *see also Lukumi*, 508 U.S. at 543 ("A law is not generally applicable if it, 'in a selective manner [,] impose[s] burdens only on conduct motivated by religious belief.'"). I begin by examining whether there is a mechanism for individualized exemptions to the equal-opportunity requirement such that the Department is invited to consider the particular reasons for providers' conduct. After that analysis, I consider whether the application of the equal-opportunity requirement selectively imposes burdens on religious conduct.

### i. Any Mechanism for Granting Individualized Exceptions to the Equal-Opportunity Requirement

Plaintiffs put forward three theories to establish the existence of a mechanism for individualized exemptions to the equal-opportunity requirement. First, Plaintiffs argue the temporary waiver provision in the UPK Statute authorizes the Department to grant exemptions to the requirement in its discretion. Second, Plaintiffs contend the individual provider preferences permitted by the Department substantiate that the Department has sufficient discretion to grant individual exemptions to the equal-opportunity requirement. And, third, they contend that Defendants have exhibited such discretion by permitting Darren Patterson Christian Academy, a provider with similar beliefs, to participate in the Program.

Statutory Waiver Provision

The temporary waiver provision of the UPK Statute does not authorize a waiver of any aspect of the equal-opportunity requirement. The provision states: "if necessary to ensure the availability of a mixed delivery system within a community, the [D]epartment may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). Significantly, however, the statute requires "each preschool provider [to] meet all quality standards relating to health and safety." *Id.* Defendants contend the statutory equal-opportunity requirement cannot be waived under this provision because it is a quality standard that relates to health and safety. Plaintiffs respond that "this interpretation flies in the face of common sense, contradicts the text of the Department's own contracts, and appears to have been invented during this litigation." Pls.' Proposed FOFCOL at 6. I conclude

Defendants' view of the waiver provision is consistent with the plain language and the purpose of the statute.

The terms "health" and "safety" are broad and general concepts. Health is defined as "the condition of being sound in body, mind, or spirit." *Health*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/health (last visited June 1, 2024). Similarly, safety is "the condition of being safe from undergoing or causing hurt, injury, or loss." *Safety*, https://www.merriam-webster.com/dictionary/safety (last visited June 1, 2024). From these definitions, it is clear the General Assembly did not intend to allow the Department to waive any standard that would have potentially caused physical or mental harm to preschool children.

The evidence in this case establishes that the statutory equal-opportunity requirement was included in the UPK Statute so that eligible children would not experience discrimination on the bases identified in the statute and so that they can grow to their maximum ability and not be placed in an unsafe or unhealthy environment. *See* Trial Tr. (Cooke) 142:25-143:3; Trial Tr. (Odean) 197:17-198:9, 199:15-24. The expert testimony Defendants presented at trial supports that discrimination can be harmful, both mentally and physically, for LGBTQ+ children and children from LGBTQ+ families. *See, e.g.*, Trial Tr. (Goldberg) 297:11-20; Trial Tr. (Tishelman) 340:14-18, 342:15-19, 343:17-19, 343:23-24, 345:21-23, 386:3-6, 48:10-18. Plaintiffs argue that, "in ordinary usage, 'health and safety' surely refers to regulations of the *conditions at the preschool* for students who are already there, rather than regulations that limit a school's discretion to decide who can become part of the school community." Pls.' Proposed FOFCOL at 45. Plaintiffs miss the point that the regulations limit a school's discretion to deny equal access to eligible children because doing so potentially threatens the health and safety of preschoolers. Furthermore, there is no basis for speculating that the General Assembly envisioned the

temporary waiver provision as applying to the equal-opportunity requirement given that it is unlikely any provider would need to violate the requirement for a limited time while working toward compliance.

Since the Department's interpretation of the equal-opportunity requirement and waiver provision is "consistent with the statute's purpose, language, structure, and legislative history," it weighs in favor of my conclusion. *Nieto v. Clark's Market*, 488 P.3d 1140, 1149 (Colo. 2021). Plaintiffs suspect that the Department must have originally interpreted the statute differently since, in the UPK Agreement, it listed the equal-opportunity requirement and "[q]uality standards relating to health and safety" as two different types of "quality standards." Pls.' Proposed FOFCOL at 45 (quoting Agreement at 2, Trial Ex. 13). This redundancy is easily explained by the significance of the equal-opportunity requirement. It was set out in the UPK Statute, and the Department is obligated to ensure providers comply with it. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(I) & (2). There is no reason to believe the Department's present interpretation of the equal-opportunity requirement and temporary waiver is a post-hoc justification. The Department has not yet had to apply the temporary waiver provision and so cannot be expected to have previously articulated and documented its interpretation. The equal-opportunity requirement is a quality standard related to health and safety that cannot be waived under the UPK Statute.

Consequently, I conclude that the UPK Statute does not give the Department any discretion to grant exemptions from the equal-opportunity requirement—the Department must adopt the equal-opportunity requirement as part of its quality standards and must ensure that each preschool provider that participates in the UPK Program meets that standard. Colo. Rev. Stat. § 26.5-4-205(1)(b)(I) & (2). The Department has no discretion to deviate from this directive. *See* Roy Letter at 1 (explaining that the Department lacked the authority to create an exemption and

avoiding any consideration of the particular reasons for the exemption request). Accordingly, the statutory equal-opportunity requirement itself is neutral and generally applicable.[31]

Individual Provider Preferences

The Department allows providers to request individual preferences through an online form and has let providers exercise many of the requested preferences such that the providers have not been required to admit all children who match with them. Trial Tr. (Odean) 256:1-14; 257:9-23. Examples of individual preferences the Department has approved are requests to admit only fully vaccinated children and to prioritize subdivision residents. UPK Individual Preference Response Data at 82-83, Trial Ex. 34. The online form also includes as illustrative preferences providers that only serve teen moms enrolled at a neighboring high school or that only serve children with specific disabilities. UPK Process for Preferences at 55, Trial Ex. 31.

Plaintiffs claim "it is undisputed that Defendants have discretion to make individualized exceptions from the requirement that providers accept the children [who] are matched with them." Pls.' Proposed FOFCOL at 43. There is no requirement that providers accept all children who are matched with them. The at-issue requirement demands that participating preschools provide equal opportunity regardless of certain characteristics of a child or family. Plaintiffs assert that "the mere discretion to grant these exceptions . . .—even if not exercised—triggers strict scrutiny." *Id.* at 44. That would be true if there were evidence in the record that Defendants had the discretion to grant any individual preferences that would exempt providers from the equal-opportunity requirement, but there is none. The Department's case-by-case determinations

---

[31] I note that this theory of Plaintiffs' claims resembles a facial challenge to the statute, and for that reason, I reach this conclusion.

relate to how it can include providers in the UPK Program, not whether it should grant providers an exemption from the equal-opportunity requirement. The Department may consider whether a request would violate the requirement, and if it concludes that a request would, the request would not be granted. *See, e.g.*, Trial Tr. (Odean) 278:23-280:5. Plaintiffs contend the example given by the Department of a provider serving only teen moms shows Defendants could grant an exemption permitting a provider to deny equal opportunity to families on the basis of sex. *See* Pls.' Proposed FOFCOL at 44. It is not clear that such an admissions preference would violate the equal-opportunity requirement. And, again, if the requested preference did deny equal opportunity based on one of the characteristics enumerated in the equal-opportunity requirement, the evidence shows the Department would have no authority to grant and has not granted such an individual preference to a provider.

Plaintiffs rely primarily on the Supreme Court's analysis in *Fulton* to support their argument that the equal-opportunity requirement is not generally applicable because the Department has "reserved the authority to carve out, and has carved out, individualized exceptions from the [equal-opportunity requirement]." *Id.* at 31. In *Fulton*, the City of Philadelphia stopped referring children to a Catholic foster care agency after the City discovered that the agency would not certify same-sex couples to be foster parents, and the agency sued alleging, as relevant here, violations of the Free Exercise Clause. 593 U.S. at 526-28, 530-531. The City's decision to discontinue its referrals to the foster care agency was based on its foster care contract, which included a nondiscrimination provision. *Id.* at 530-31, 534-35. The Supreme Court found that the provision was not generally applicable because it "incorporate[d] a system of individual exemptions, made available . . . at the 'sole discretion' of the Commissioner [of the Department of Human Services]." *Id.* at 534-35. Consequently, the Court applied strict scrutiny

and held that "the refusal of [the City] to contract with [the foster care agency] for the provision of foster care services unless it agree[d] to certify same-sex couples as foster parents [could ]not survive strict scrutiny, and violate[d] the First Amendment." *Id.* at 540-42.

*Fulton* is fully distinguished from this case throughout the rest of the analysis of Plaintiffs' fourth and fifth claims. For now, I resolve that Defendants' exercise of discretion differs from the City's in *Fulton* because Defendants are bound by a statutory requirement which does not authorize them to grant any exemptions. The contract at issue in *Fulton*, in contrast, specifically authorized the Commissioner of the Department of Human Services to grant individual exemptions *to the nondiscrimination provision* in his or her sole discretion. 593 U.S. at 534-35. Here, there is no mechanism of individualized exemptions to the equal-opportunity requirement.

Darren Patterson Christian Academy

Plaintiffs' last argument regarding a mechanism of individualized exemptions pertains to a case currently pending before my colleague Judge Domenico—*Darren Patterson Christian Academy v. Roy*, in which the constitutionality of the UPK Program's equal-opportunity requirement and Paragraph 18(B) of the Agreement are similarly challenged. No. 23-cv-1557-DDD-STV, 2023 WL 7270874 (D. Colo. Oct. 20, 2023). The plaintiff in that case, Darren Patterson Christian Academy ("Darren Patterson"), has signed the UPK Agreement and has participated in the Program, *id.* at *3, unlike Plaintiff Preschools in this case.[32] Darren Patterson

---

[32] Notably, Darren Patterson does not seek to exclude children and families from its school but, instead, intends to "limit[] employment to those who share its beliefs and to align[] its policies about bathroom usage, dress codes, pronouns, and student lodging with its religious beliefs about sexuality and gender." Mot. for Prelim. Inj. at 2, *Darren Patterson*, No. 23-cv-01557-DDD-STV, ECF No. 14. As such, the policies and conduct at issue in the two cases differ materially.

moved for a preliminary injunction, and the defendants in that case, the same ones as here, moved to dismiss Darren Patterson's claims for lack of jurisdiction. *Id.* at *4. The defendants filed a response to Darren Patterson's preliminary-injunction motion but did not respond to its merits. *Id.* at *1, *4, *13-14. Without the benefit of the defendants' merits arguments, Judge Domenico granted a narrow preliminary injunction prohibiting the defendants from "expelling, punishing, withholding funds from, or otherwise disciplining" Darren Patterson under the UPK Program based on the school's policies violating the "statutory or contractual antidiscrimination provisions." *Id.* at *19. The defendants chose not to appeal that decision. As a result, Darren Patterson currently is participating in the UPK Program without having to conform its policies to Paragraph 18(B) of the Agreement or the equal-opportunity requirement.

Plaintiffs here argue that, by allowing Darren Patterson to participate in the UPK Program, Defendants have permitted the same exemption from the equal-opportunity requirement that they seek such that the requirement cannot be generally applicable. First, while Defendants permitted Darren Patterson to sign the UPK Agreement, that action, in and of itself, did not grant an exception to the equal-opportunity requirement. A school's discriminatory policies do not on their own necessarily violate the equal-opportunity requirement because, unless and until they are implemented, they do not prevent eligible children from having an equal opportunity to enroll and receive preschool services. *Cf. id.* at *6 ("The terms of the statute and contract [including Paragraph 18(B)] 'arguably' cover merely having discriminatory policies even if there are no instances of those policies being applied to someone who would feel aggrieved."). Or at least, Defendants may view the equal-opportunity requirement in such a way when reviewing and approving UPK providers. Second, Defendants' strategy in another case is irrelevant here and is not evidence that Defendants have granted an exemption from the equal-

opportunity requirement, especially when they continue to litigate Darren Patterson's claims on the merits and are bound by a court order.

### ii. Any Prohibition of Religious Conduct While Permitting Secular Conduct

In determining whether the equal-opportunity requirement is generally applicable, I must also consider whether it "treats *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). If it does, strict scrutiny is triggered. *Id.* "[W]hether two activities are comparable for the purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* "Comparability is concerned with the risks various activities pose . . . ." *Id.*

The equal-opportunity requirement mandates that participating preschools provide eligible children with an equal opportunity "regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability." Colo. Rev. Stat. § 26.5-4-205(2)(b). Plaintiffs' claims target three of these protected characteristics: religious affiliation, sexual orientation, and gender identity.

As explained above, the asserted State interests are eliminating discriminatory barriers to publicly funded preschool education and protecting the well-being of children. Plaintiffs claim that Defendants permit providers to select algorithm preferences that pose a risk to Defendants' asserted interests that are identical to the one posed by granting Plaintiffs their requested exemption. Specifically, Plaintiffs allege that, despite the equal-opportunity requirement, the algorithm preferences Defendants have developed allow:

- Head Start providers to screen applicants based on "income level";

- Providers to serve only children with disabilities or to have related programs for specific needs;

- Providers to limit enrollment to children of color from historically underserved areas;

- Providers to limit enrollment to gender-nonconforming children or the LGBTQ community; and

- Faith-based providers to reserve seats for members of their congregation.

Pls.' Proposed FOFCOL at 37.

Although Plaintiffs assert—without support—that it "is *not* legally required," *id.* at 38, each of the characteristics enumerated in the equal-opportunity requirement must be analyzed independently. I understand Plaintiffs' suggestion that, if Defendants have the discretion to grant any exception allowing discrimination in contravention of a single aspect of the equal-opportunity requirement, they necessarily have discretion to grant any exception to the requirement. I have touched on that argument in discussing the individual provider preferences the Department permits and address it below in relation to the algorithm preferences. First, however, I consider the alleged exceptions to each of the characteristics covered by the equal-opportunity requirement separately. This is because, instead of enacting a generic nondiscrimination provision, the General Assembly specifically enumerated each characteristic. In *Fulton*, the formal mechanism for providing exceptions was universal, relating to the entire nondiscrimination provision. 593 U.S. at 534-37 (determining that the nondiscrimination provision in the contract, which included the language: "unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion," was not generally applicable). Here, no universal discretion has been authorized or exercised.

Moreover, the specific State interests in eliminating discriminatory barriers for children and families and protecting children from discrimination are distinct depending on the basis for the discrimination. For instance, there was significant testimony in this case on the specific

barriers LGBTQ+ children and families face in obtaining preschool services. These circumstances would differ for barriers based on religious affiliation, disability, sex, or race.[33] And, if exemptions from the equal-opportunity requirement are permitted, there would be separate considerations for allowing the exceptions with respect to each characteristic. In other words, all discrimination is not the same. Plaintiffs make this point in arguing that treating members of the LGBTQ+ community differently is not equivalent to race discrimination. *See* Pls.' Proposed FOFCOL at 46, 63.[34]

In arguing that Defendants treat secular conduct more favorably than religious exercise, Plaintiffs rely on *Fellowship of Christian Athletes v. San Jose Unified School District*, a case in which a divided Ninth Circuit held that a school district's revocation of a religious student organization's status as an official student club likely violated the organization's free exercise rights. 82 F.4th 664, 671-72, 695-96 (9th Cir. 2023) (en banc). The school district adopted an "All-Comers Policy" that prevented student clubs from enacting discriminatory membership and leadership criteria but "carved out several exceptions." *Id.* at 678. The majority found that "[d]espite the All-Comers-Policy, schools in the District were allowed to maintain—or even themselves sponsor—clubs with facially discriminatory membership requirements," including a club for "seniors who identify as female" and a club "prioritiz[ing] acceptance of [S]outh Asian students." *Id.* at 678, 688. As a result, the majority concluded that the policies were not generally applicable and thus were subject to strict scrutiny. *Id.* 689-90. This case is neither binding nor

---

[33] While I independently consider most of the characteristics covered by the equal-opportunity requirement, much of my analysis regarding sexual orientation and gender identity overlaps on account of Plaintiffs' related arguments and the evidence presented in this case.

[34] Furthermore, it would be illogical to find that, if Defendants violate Plaintiffs' constitutional rights with the implementation of a single aspect of the equal-opportunity requirement, then Plaintiffs automatically should not be bound by any aspect of the requirement, leaving children and families with the other characteristics less protected.

applicable. The policy at issue there required clubs "to permit any student to become a member

or leader, if they meet nondiscriminatory criteria." *Id.* at 678. It did not specify the characteristics

that could be or were prohibited from being considered. *See id.* ("[T]he guidelines do not define

what constitutes "non-discriminatory criteria."). And the majority assumed that, by permitting

discrimination based on any characteristic, the school district was allowing secular activity that

was comparable to the differential treatment of LGBTQ+ individuals by the religious student

organization. The facts in this case, including the discretion involved, are dissimilar, and

consequently the analysis is different.


### Preferences Involving Disability, Income, and Race

The disability and income aspects of the equal-opportunity requirement are unique and

warrant independent consideration. As I already concluded, the UPK Statute does not authorize

the Department to grant any exception to the equal-opportunity requirement. Now, I further

conclude that the equal-opportunity requirement incorporates its own exceptions for children in

low-income families or who meet at least one qualifying factor as well as those with disabilities

who "must be offered preschool services in accordance with the child's individualized education

program" under the Individuals with Disabilities Education Act and Exceptional Children's

Educational Act. Colo. Rev. Stat. §§ 26.5-4-204(3).[35] Thus, the allowance for special

programming to serve the identified children with disabilities and those in low-income families

---

[35] This understanding of the UPK Statute is bolstered by the statute's specific naming of these
providers and identification as purposes of the program to provide access to preschool services
for children with disabilities and those in low-income families. Colo. Rev. Stat. § 26.5-4-202(1)
& (4).

does not violate the equal-opportunity requirement,[36] and the Department's treatment of related programs is not discretionary and does not involve favoring secular activity over religious exercise.[37]

---

[36] I continue to question whether the equal-opportunity requirement, on its face, applies to individuals without a disability, as the language obligates participating preschools to provide an equal opportunity "regardless of . . . disability." Colo. Rev. Stat. § 26.5-4-205(2)(b). It does not guarantee individuals without a disability equal opportunity. Additionally, as Ms. Odean described the special programs for specific needs, school-district based providers have such programs aligned to their federal mandate" at one location within multiple in a school district and would still provide services to other children apart from that program. Odean Dep. 99:4-7, 19-23, Trial Ex. 26.

[37] Plaintiffs argue, in passing and for the first time in their Proposed Findings of Fact and Conclusions of Law, that "there is simply no neutral, compelling basis to distinguish between children and families whose need for a unique educational environment is driven by their (say) disability and those for whom it is driven by their faith." Pls.' Proposed FOFCOL at 41. It is unnecessary to explain all the reasons this argument fails, but suffice it to say, there are statutory imperatives that necessitate certain special treatment on the basis of disability, imperatives that go beyond what is required by the Free Exercise Clause. *See, e.g.*, 20 U.S.C. § 1400 *et seq.*; 42 U.S.C. § 12132. These, and other laws, reflect the nuanced realities of education, permitting special programming in specific cases for specific children. Yet, "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(A). In arguing that there is no basis for funding distinct education programs for children with a disability but not for religiously adherent children, Plaintiffs cite *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, in which the Third Circuit held that the Newark Police Department's no-beard policy violated the Free Exercise Clause because the Department made exemptions for medical reasons and offered no substantial justification for refusing to provide similar exemptions for officers who are required to wear beards for religious reasons. 170 F.3d 359, 360 (3d Cir. 1999). In that case, however, the permitted medical exemptions and denied religious exemptions were to the same no-beard policy, and the difference in outcomes was a result of the City's belief that it needed to comply with the Americans with Disabilities Act while it ignored the required accommodation for religion in Title VII of the Civil Rights Act of 1964. *Id.* at 365. Here, there are no analogous obligations for the State to fund separate education for religiously adherent children.

Just as importantly, even if the existence of specific programs that serve children with disabilities and those in low-income families violated the equal-opportunity requirement and even if Defendants were conferred the discretion to grant exceptions to the requirement to allow for those programs, that discretion would not lead to the conclusion that Defendants could also grant exceptions that would permit providers to deny equal access to LGBTQ+ children and families. There are distinct reasons, including statutory mandates, that Defendants might be authorized to permit special access for children with disabilities and those in low-income families. These same justifications likely would not apply to denying equal access on the basis of sexual orientation or gender identity. Accordingly, any differential treatment of children based on disability or income is not indicative that the equal-opportunity requirement, in its entirety or any other aspect of it, is not generally applicable.

Plaintiffs claim that "while Defendants are willing to interpret the [equal-opportunity requirement] flexibly to accommodate . . . providers [serving low-income children and those with disabilities], they insist on a rigid interpretation of that [requirement] to exclude Plaintiff preschools." Pls.' Proposed FOFCOL at 40. Not only is prioritizing low-income children and children with disabilities permissible under the equal-opportunity requirement, there is no evidence that it implicates the State's interest in protecting children from the harm they might suffer from discrimination.

Plaintiffs also claim that the Department could grant an exception to the equal-opportunity requirement that would permit a provider to limit enrollment to children of color from historically underserved areas. Plaintiffs cite to Ms. Odean's testimony at trial. Trial Tr. (Odean) 245:25-246:3 ("Could a school under this preference prioritize children of color from historically underserved areas? Yes."). However, later in her testimony, Ms. Odean clarified that

she had never received such a request to limit enrollment to children of color and had not thought about the possibility of such a request. *Id.* 277:23-25, 278:23-279:2, 279:13-15. She indicated that she does not have sole authority to approve such a request, and the Department would carefully review any request for a preference with the advice of legal counsel and would not grant any request if the preference violated the equal-opportunity requirement. *Id.* at 245:3-24, 278:1-8, 279:16-280:5. Ms. Odean's testimony confirms that the Department does not have the authority to grant any exemption from the equal-opportunity requirement.

<u>Preferences Involving Sexual Orientation and Gender Identity</u>

Similar to their arguments regarding the equal-opportunity requirement and race, Plaintiffs point to Ms. Odean's testimony as proof the Department could grant an exception allowing a preschool to limit enrollment to gender-nonconforming children or members of the LGBTQ community. *See id.* 244:15-25, 245:13-24, 246:4-8. Here, too, Ms. Odean qualified her testimony, responding that the Department would look into a school for gender-nonconforming children and would accept the request as long as there was no discrimination under the equal-opportunity requirement. *Id.* 245:19-24; *see also id.* 278:1-8, 279:16-280:5. Apart from this testimony, Plaintiffs identify no evidence that Defendants have been given or have exercised the authority to grant an exemption from the sexual-orientation and gender-identity aspects of the equal-opportunity requirement. I cannot conclude that Defendants have the discretion to grant such exemptions based merely on hypotheticals and speculation when nothing in the UPK Statute or official documents from the Department supports that it does.

The Department has made decisions to promote mixed-delivery that do not run afoul of the equal-opportunity requirement. These decisions do not devalue religious beliefs or make such

beliefs any less important than nonreligious justifications. The differential treatment of children and families on the basis of disability and income is permitted by the UPK Statute, and specifically the equal-opportunity requirement. Defendants do not have the discretion to grant any exemptions to the equal-opportunity requirement. At most, they would be authorized to grant exemptions to the disability and income aspects of the equal-opportunity requirement, and in that case, it would not lead to the conclusion that they have similar discretion to grant exemptions to the sexual-orientation and gender-identity aspects of the requirement. Defendants have not exercised discretion to grant exemptions to the disability, income, race, sexual-orientation, or gender-identity aspects of the requirement. *Cf. Fellowship of Christian Athletes*, 82 F.4th at 688 (finding that the school district exercised discretion to allow discrimination in violation of the at-issue policy). The algorithm preferences the Department allows providers to exercise do not pose a similar risk to the asserted interests as would permitting Plaintiff Preschools to deny LGBTQ+ children and families equal access to publicly funded preschool services. Therefore, Plaintiffs have failed to show Defendants treat any comparable secular activity violating the sexual-orientation and gender-identity aspects—as well as the disability, income, and race aspects—of the equal-opportunity requirement more favorably than Plaintiffs' religious exercise.

Preferences Involving Religious Affiliation

For the religious affiliation aspect of the equal-opportunity requirement, the conclusion is the opposite. The congregation preference permitted by Defendants is a clear exception to that aspect of the requirement, as it unequivocally permits faith-based providers to prioritize access to their services for members of their congregation, however they choose to define that term. Thus, a preschool that exercises the preference does not have to provide an equal opportunity to

children and families "regardless of . . . religious affiliation." Colo. Rev. Stat. § 26.5-4-205(2)(b).

The testimony here from Ms. Odean is explicit:  the congregation preference would allow a

Catholic provider to reserve seats for "Catholics" and allow a Lutheran provider to reserve seats

for "Lutherans", and the Catholic provider "wouldn't have to provide an opportunity to enroll

Lutherans." Trial Tr. (Odean) 239:3-240:17. Ms. Odean did not later qualify this testimony. This

exception to the religious-affiliation aspect of the equal-opportunity requirement mandates the

conclusion that the particular aspect is not generally applicable.

Defendants disagree with this conclusion and insist that the congregation preference does

not allow providers to discriminate on the basis of religious affiliation. *Id.* 276:7-22; Trial Tr.

(Cook) 154:14-18. Ms. Odean testified that the Department would investigate if it learned that a

provider was utilizing the congregation preference to discriminate. Trial Tr. (Odean) 276:7-22.

Defendants justify the congregation preference by explaining that its purpose is to sustain

ongoing relationships with specific provider communities. *Id.* 276:10-15 ("It is about an

inclusive community, and being able to ensure that providers can continue to serve the

communities they have served, and families can continue to participate."). According to

Defendants, the term congregation does not need to be understood in religious terms. But the

preference is specifically available to "faith-based providers." Defendants claim providers could

define congregation to include individuals who attend services and activities but do not share the

same religion. Defs.' Proposed FOFCOL at 47. Applied in this way, the preference would still be

based on affiliation with the faith-based provider, i.e., religious affiliation.

Defendants' most salient argument is that "even if the congregation preference were

understood to permit faith-based providers to discriminate on the basis of religion, that need not

trigger strict scrutiny for Free Exercise Clause purposes because such a preference does not

'prohibit religious conduct while permitting *secular* conduct that undermines the government's asserted interests in a similar way.'" *Id.* at 48 (quoting *Fulton*, 593 U.S. at 534 (emphasis added)). Defendants cannot have it both ways, though. They cannot contend that the congregation preference does not apply to conduct that is necessarily religious, *see id.* at 47, while also arguing that the preference "is available only to religious providers," *see id.* at 49. Under their own theory, Defendants allow discrimination on the basis of religious affiliation for secular reasons (e.g., maintaining community relationships) but not religious ones (e.g., sharing the same faith). Defendants, in effect, contend the latter would violate the equal-opportunity requirement, while the former would not. This amounts to favoring secular activity over religious exercise.

Additionally, under these unique circumstances, the congregation preference singles out faith-based providers and requires them to navigate an untenable situation. The congregation preference invites them to reserve seats for members of their "congregation" such that they are, in effect, denying equal access on the basis of religious affiliation. Faith-based providers cannot tread carefully enough to both take advantage of that preference and also be confident that they will not be investigated for discriminating on the basis of religious affiliation. *See* Trial Tr. (Odean) 276:7-22 (advising that providers may be investigated if they use the congregation preference to discriminate).

In the end, Plaintiffs have established that the religious-affiliation aspect of the equal-opportunity requirement is not generally applicable as the Department has applied it and thus that strict scrutiny is triggered for that government policy. As for the other challenged aspects of the equal-opportunity requirement—those related to sexual orientation and gender identity, I conclude that they are neutral and generally applicable and that Defendants must only show that

they are rationally related to a legitimate government end. *See United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002).

### 4.  Strict Scrutiny

Although I have concluded the sexual-orientation and gender-identity aspects of the equal-opportunity requirement should not be subjected to strict scrutiny, I find that even if strict scrutiny applied, it would be satisfied. With that considerably higher threshold met, Defendants easily overcome rational basis review. On the other hand, regardless of whether it could satisfy rational basis review, the religious-affiliation aspect of the equal-opportunity requirement triggers strict scrutiny. For this specific aspect of the equal-opportunity requirement, and based on the record before me, Defendants' conduct is not justified under such an exacting review.

To satisfy strict scrutiny, Defendants must demonstrate their "course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525 (citing *Lukumi*, 508 U.S. at 546). "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton*, 593 U.S. at 541 (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546.

Defendants have consistently claimed that the UPK Statute does not permit them to grant any exemption from the equal-opportunity requirement. *See* Trial Tr. (Cooke) 159:23-160:7, 173:18-20; Roy Letter at 1, Trial Ex. 12. I have already determined that Defendants are correct—under the UPK Statute, the Department lacks the authority to grant any exemption from the

equal-opportunity requirement. Because that is the case, it is appropriate to consider the State's underlying interests and whether Defendants' actions further those interests. Defendants assert that their conduct—in denying Plaintiff Preschools an exemption from the equal-opportunity requirement—is justified by two compelling State interests: (1) ensuring eligible children and their families do not face discriminatory barriers to publicly funded preschool and (2) protecting children from discrimination.

Plaintiffs contend the interests Defendants assert are "after-the-fact justifications" and cannot be attributed to the Legislature. Pls.' Proposed FOFCOL at 49. Uncontroverted testimony at trial, however, established that the statutory equal-opportunity requirement was included in the UPK Statute so that eligible children would have access to preschool programs of their choosing and that best fit their family's needs without experiencing discrimination on the bases identified in the statute and so that eligible children can grow to their maximum ability and are not put in an unsafe or unhealthy environment. *See* Trial Tr. (Cooke) 142:25-143:3; Trial Tr. (Odean) 197:17-198:9, 199:15-25. The asserted State interests are not factitious, hypothesized, or invented post hoc. *Cf. Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) (finding that the legislative history and state court interpretation were contrary to the asserted interest); *Kennedy*, 597 U.S. at 543 n.8 (noting that the school district did not raise concerns related to the state interest in its correspondence with the plaintiff and the interest was not addressed by the lower courts).

### i.  Sexual Orientation and Gender Identity

I consider first whether the asserted State interests are compelling and narrowly tailored as they relate to Defendants' denial of an exemption from the sexual-orientation and gender-

identity aspects of the equal-opportunity requirement. Because I find that the first State interest Defendants identify—ensuring eligible children and their families do not face discriminatory barriers—is compelling and that Defendants' conduct was narrowly tailored in pursuit of that interest, I do not assess whether the second State interest—protecting children from discrimination—likewise satisfies strict scrutiny.

Plaintiffs argue that Defendants must establish there is an "actual problem" in need of solving and have failed to do so. Pls.' Proposed FOFCOL at 51 (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011)). The case Plaintiffs cite for that requirement, *Brown v. Entertainment Merchants Association*, involved content-based restrictions on speech, which are not at issue in this case. In *Brown*, the Court found that the State of California could not show that the challenged legislation's labeling requirements and prohibition on the sale or rental of video games to minors met "a substantial need of parents who wish to restrict their children's access to violent video games but cannot do so." 546 U.S. at 789, 803. As I detail below, Defendants here have shown that there is a substantial need for LGBTQ+ children and families in Colorado to have equal access to publicly funded, quality preschool services. *Cf. Awad v. Ziriax*, 670 F.3d 1111, 1129-30 (10th Cir. 2012) (in a challenge to an amendment to the Oklahoma Constitution that would have prevented state courts from considering or using Sharia law, finding that Oklahoma officials could not show an actual problem the amendment sought to address when they admitted they were unaware of "a single instance where an Oklahoma court had applied Sharia law or used the legal precepts of other nations or cultures"). Plaintiffs point out that, although Plaintiff Preschools are licensed by the State and have participated in other government-funded preschool programs, no formal complaints have previously been filed with the State alleging that they have engaged in discrimination against LGBTQ+ children or families.

Trial Tr. (Odean) 264:1-265:3. Plaintiffs believe this shows that any potential harm to LGBTQ+ students or families is merely speculative and insufficient to establish a compelling interest. *See* Pls.' Proposed FOFCOL at 50-51. I disagree. The scope of the UPK program is much more extensive than the prior preschool programs, and it provides opportunities for students who may not have sought out religious preschool services before. It cannot be assumed that a lack of formal complaints in the past equates to discrimination not having occurred or evinces it is unlikely to occur in the future.[38]

The compelling nature of the State's interest in ensuring LGBTQ+ children and their families do not face discriminatory barriers is supported by the evidence in the record. The testimony at trial established the positive impact preschool attendance, and in particular quality preschool services, can have on students and their families. Preschool prepares children for school, educationally and emotionally. Trial Tr. (Holguín) 427:12-14, 431:16-21. Preschool attendance is associated with positive outcomes, such as access to college or higher education, whereas non-attendance corresponds with negative outcomes, such as a lack of success

---

[38] Both sides have played fast and loose in claiming that Catholic schools in Denver have not historically denied access to LGBTQ+ children and families. For example, Plaintiffs' counsel argued to the Court that "not one of the Archdiocese's 36 preschools has any history of a complaint from a LGBTQ family or other person alleging LGBTQ-based discrimination." Trial Tr. (Openings) 9:21-25. I give counsel the benefit of the doubt that, technically speaking, perhaps no formal complaint with the State or in court has been filed against any of the Archdiocese's preschools. Although not part of the evidentiary record, however, it cannot be said that there is no history of any of the Archdiocese's preschools denying equal access to a family based on sexual orientation. *See, e.g.*, Archbishop Charles J. Chaput, *Catholic schools: Partners in faith with parents*, Denver Catholic Register (Mar. 10, 2010), *accessed at* https://web.archive.org/web/20110119221141/http://www.archden.org/index.cfm/ID/3560 (describing how one of the Archdiocese's schools had decided that a lesbian couple's child who was enrolled in preschool would be able to finish out that year but not continue at the school to kindergarten). Regardless, Ms. Coats testified that, just last year, Wellspring Catholic Academy declined to enroll a fifth grader with same-sex parents. Trial Tr. (Coats) 113:5-114:13, 125:25-126:10. There is no reason to believe that same-sex parents of preschoolers would not likewise seek to enroll their children in Plaintiff Preschools.

academically, socially, and emotionally. *Id.* 430:4-10, 430:19-431:5. Preschool "is a key element for children to be able to succeed, and an equalizer for many children that don't have the opportunity to be in a place where they can acquire those skills." *Id.* 430:15-18.

The testimony likewise established that LGBTQ+ families often have fewer options when looking for early childhood education. Trial Tr. (Goldberg) 287:19-25, 289:18-23, 324:25-325:2. LGBTQ+ parents are about twice as likely to live in poverty, which may affect a family's options for transportation. Trial Tr. (Goldberg) 287:15-17, 324:4-17. The fact that LGBTQ+ families are more likely to live in poverty and have fewer options for preschools ultimately puts them at risk for inadequate outcomes. *Id.* 288:10-14. This evidence substantiates that the State's interest in ensuring LGBTQ+ children and families do not experience discriminatory barriers to publicly funded preschool is compelling.

Plaintiffs contend that denying Plaintiff Preschools an exemption does not advance the State's interest because "[a]llowing Plaintiff preschools to participate would not take away a single . . . option[] for LGBTQ families" and instead would add to the list of providers. Pls.' Proposed FOFCOL at 48 (emphasis removed). Plaintiffs misunderstand the State's interest. If Defendants claimed the State's interest were simply increasing the number of available preschool spots, Plaintiffs' argument might have merit. But Defendants identify the State's interest as ensuring that children and families do not face discriminatory barriers when enrolling and receiving publicly funded preschool services. The purpose is to avoid these children and families being denied access to the publicly funded preschool programs that best fit their family's needs and to avoid putting them at risk for inadequate outcomes. Simply adding to the list of UPK providers does not address this purpose.

The State's interest here differs significantly from the City's in *Fulton*. There, the City's relevant asserted interests were "maximizing the number of foster parents . . . and ensuring equal treatment of prospective foster parents and foster children." *Fulton*, 593 U.S. at 541. The Court observed that including the Catholic foster care agency "seem[ed] likely to increase, not reduce, the number of available foster parents." *Id.* at 542. And, it found that, while equal treatment is a weighty interest, the City's "creation of a system of exceptions under the contract undermine[d] [its] contention that its non-discrimination policies [could] brook no departures." *Id.* As I just explained, the State's interest identified by Defendants is not simply to increase the number of preschool spots available. Moreover, as I have already found, the Department has not created a formal mechanism for exceptions to the sexual-orientation and gender-identity aspects of the equal-opportunity requirement.[39]

Plaintiffs insist Defendants' evidence in actuality confirms that a compelling interest is lacking. Plaintiffs note that Defendants' experts could not point to any research "demonstrating that excluding preschools (much less Catholic preschools specifically) from UPK Colorado would advance the Department's alleged interests in removing discriminatory barriers to preschool." Pls.' Proposed FOFCOL at 51. And, specifically, Plaintiffs highlight that Dr. Goldberg provided "no evidence lesbian or gay families in Denver would be unable to access affirming preschools as a result of Plaintiff[ Preschools'] policies." *Id.* at 52.

Once again, Plaintiffs skew the identified State interest. The interest is not that LGBTQ+ children and their families are able to access some preschool services somewhere. It is clear from

---

[39] Using the same type of logic the Court employed in *Fulton*, it seems that if public money is not being disbursed to schools that discriminate in a manner contrary to the equal-opportunity requirement, then more money should be available for schools that do not discriminate in such a way, perhaps creating additional opportunities for children and families that might experience discrimination on the bases specified in the requirement.

the evidence that such a limited interest would not constitute equity or equal opportunity as envisioned. The asserted State interest is in removing discriminatory barriers so that these children and families may have access to the publicly funded, quality preschool programs of their choosing and that best fit their family's needs. As the expert testimony illustrated, removing discriminatory barriers prevents the burden of discrimination from continuing to be placed on these children and families by, for example, requiring them to find another preschool provider or to travel a greater distance to receive preschool services.

Additionally, the State's interest is focused on ensuring access to publicly funded, *quality* preschool services so that eligible children can grow to their maximum potential. The Brief of Amici Curiae informs that "religious schools often provide the best academic experience for students." Br. of Amici Curiae at 6. The Brief cites to a meta-analysis that ostensibly concludes "students who attend religious schools perform better than their counterparts who are in public schools[,] . . . both in terms of academic and behavioral outcomes." William H. Jeynes, *A Meta-Analysis on the Effects and Contributions of Public, Public Charter, and Religious Schools on Student Outcomes*, 87 Peabody J. of Educ. 305, 324 (2012).[40] On Colorado's rating system for early childhood education providers, both Plaintiff Preschools have earned four out of five stars. Trial Tr. (Seul) 71:19-72:1; Trial Tr. (Coats) 104:22-23; *see also* Trial Tr. (Holguín) 428:11-15. If religious schools in fact provide the best academic experience, the State's interest in removing discriminatory barriers for publicly funded preschool education is even more significant. The children who could be denied preschool services if Plaintiff Preschools were granted an exemption would lose out not only on receiving services from their preferred preschool but

---

[40] Amici also emphasize the value of the mixed-delivery program and its ability to offer students and families options. *See, e.g.*, Br. of Amici Curiae at 1. They miss, however, the irony in valuing choice for religious schools and their students—but not for LGBTQ+ children and families.

perhaps would also be forced to forgo "the best academic experience." When the State is footing the bill, it has a compelling interest in deciding that children may not be denied this experience based on specified discriminatory factors. "[E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Plyler v. Doe*, 457 U.S. 202, 221 (1982). If LGBTQ+ children and their families do not have access to the best academic experience, they may be denied the opportunity to achieve their maximum potential, to the detriment of all.

More generally, it would be unreasonable to require Defendants to present the evidence Plaintiffs claim is necessary. Defendants cannot be expected to determine which preschool programs best fit each family's needs and then to evaluate how each child or family might be subject to inappropriate discrimination under the equal-opportunity requirement. Nor can courts demand research that addresses the exact circumstances.[41] Inferences based on reliable, circumstantial evidence and the exercise of common sense suffice.

Defendants have established a compelling interest in denying an exemption from the sexual-orientation and gender-identity aspects of the equal-opportunity requirement for Plaintiff Preschools specifically. I note as well, however, that the Department's interest goes beyond

---

[41] Undoubtedly, if such research were presented, Plaintiffs would contend it is irrelevant because it was not considered by the General Assembly in enacting the UPK Act. *See, e.g.*, Pls.' Mot. to Exclude Expert Testimony at 3, ECF No. 73 ("[T]here is no evidence that the Colorado Legislature or the Department of Early Childhood reviewed and considered *any* of the studies or research relied on by either expert . . . in making the decisions to exclude Plaintiffs."). In effect, Plaintiffs argue that, for evidence to be relevant, it must be related only to the decision to deny Plaintiff Preschools an exemption and also that it must have been considered by the General Assembly and the Department before denying the exemption. Under these circumstances, it would be impossible to provide any such research. The Department did not seek out or review any research because it believed it did not—and in reality did not—have the authority to grant Plaintiff Preschools an exemption. And the General Assembly could not have predicted each provider that might request an exemption and commissioned research related to that provider. Plaintiffs' arguments, viewed together, are unreasonable.

denying the exemption for Plaintiff Preschools. If Defendants granted Plaintiff Preschools an exemption, they would likely have to grant exemptions to many other religious providers. In this case, the Archdiocese sought an exemption for its 34 other preschools in addition to Plaintiff Preschools, and Amici advocate on behalf of numerous other religious preschools desiring similar exemptions. Upon the granting of an exemption from any preschool, other religious providers would surely argue that the Department has permitted its interests to be undermined and, consequently, that its interests are not compelling. Indeed, Plaintiffs make this exact argument regarding Defendants' decision not to appeal the preliminary injunction granted in *Darren Patterson*. *See, e.g.*, Pls.' Mot. for Summ. J. at 39, ECF No. 61 ("[I]f the Department is fine with the *Darren Patterson* school's participation . . . then it's difficult to see why the Department here has a 'compelling' interest in stopping the Archdiocese from doing the same."). If one exemption is granted, others would necessarily follow and the number of preschools denying equal access to LGBTQ+ children and families would quickly grow.[42] The State's interest in eliminating discriminatory barriers, therefore, relates not just to the consequences that would result from granting Plaintiff Preschools an exemption.

"Ensuring equal opportunity for students to attend publicly supported schools . . . comports with public policy that has been widely adopted in the United States for the last thirty years or more." Ira C. Lupu & Robert W. Tuttle, *Zelman's Future: Vouchers, Sectarian Providers, and the Next Round of Constitutional Battles*, 78 Notre Dame L. Rev. 917, 977 (2003)

---

[42] If religious preschools across the State must be permitted to deny LGBTQ+ children and families equal access, those children and families in rural areas will be impacted to an even greater extent and could be denied access to preschool services altogether. *See* Trial Tr. (Goldberg) 287:4-9, 325:3-14 (discussing how options for early childhood education are fewer in number and more spread out in rural areas and how sometimes the only option available for LGBTQ parents is a religious provider).

(writing twenty years ago). The Supreme Court has recognized the prerogative of states to refuse to fund private discrimination.[43] And granting even one exemption undermines this public policy.

For Defendants to satisfy strict scrutiny, they must show the means of pursuing the compelling interest they have demonstrated are narrowly tailored, or in other words that the means are "closely fitted" to that compelling interest. *See Kennedy*, 597 U.S. at 525; *Awad*, 670 F.3d at 1129. Plaintiffs contend the "means" Defendants have chosen do not "fit" their asserted interest because there is no connection between excluding Plaintiff Preschools and the State interest in removing discriminatory barriers to publicly funded preschool. *See* Pls.' Proposed FOFCOL at 57. I addressed this argument above and restate that adding preschools does not remove the discriminatory barriers the General Assembly chose to prioritize and does not provide equal access to the children and families who might be subjected to the discriminatory treatment.

Plaintiffs suggest that, instead of applying the equal-opportunity requirement, Defendants could include a disclaimer for Plaintiff Preschools in the UPK portal, informing that they do not provide services to LGBTQ+ students or families. In no way would such a disclaimer achieve the State's interest in removing discriminatory barriers. On the contrary, it would appear to reenforce those barriers, even if an added disclaimer is provided to explain the "obvious point" that the schools' positions are not attributable to the Department. *See id.* at 56 n.12.

I conclude, therefore, that the State interest in removing discriminatory barriers for LGBTQ+ children and families is compelling and the means for pursuing that interest are

---

[43] *See, e.g.*, *Norwood v. Harrison*, 413 U.S. 455, 468–69 (1973) ("There is no reason to discriminate against students for reasons wholly unrelated to individual merit unless the artificial barriers are considered an essential part of the educational message to be communicated to the students who are admitted. Such private bias is not barred by the Constitution, nor does it invoke any sanction of laws, but neither can it call on the Constitution for material aid from the State.").

narrowly tailored. If strict scrutiny were triggered for Plaintiffs' first, fourth, or fifth claim in relation to the sexual-orientation or gender-identity aspects of the equal-opportunity requirement, Defendants would have overcome it.[44]

### ii. Religious Affiliation

In sharp contrast to the evidence Defendants presented to establish a compelling interest with respect to the sexual-orientation and gender-identity aspects of the equal-opportunity requirement, Defendants did not offer any evidence relating to discrimination on the basis of religious affiliation. The evidence in the record supports the determination that quality preschool services are beneficial for children and thus that children should not be denied equal access to such publicly funded preschool services based on factors unrelated to the needs of the children or their families. This evidence is insufficient to find Defendants' conduct in denying Plaintiffs an exemption from the religious-affiliation aspect of the equal-opportunity requirement is justified by a compelling interest. Moreover, any State interest in ensuring children and families do not experience discrimination because of their religious affiliation, or lack thereof, is undermined by Defendants' creation of the congregation exception, which unquestionably permits such discrimination. Defendants have failed to establish a compelling interest justifying their denial of an exemption from the religious-affiliation aspect of the equal-opportunity requirement for

---

[44] This conclusion does not contradict the application of strict scrutiny in *Darren Patterson* because, at the time the limited preliminary injunction was issued in that case, "the state ha[d] not really attempted to proffer a compelling interest of the highest order, nor ha[d] it shown that it narrowly tailored its policies to pursue any interest." 2023 WL 7270874, at *16. Here, Defendants asserted and argued the State interests in multiple filings and at the trial, where relevant expert testimony was presented.

Plaintiff Preschools. Thus, because strict scrutiny was triggered and is not satisfied, Plaintiffs' free exercise rights have been violated in this regard.

The UPK Program is an innovative endeavor, and the Department's implementation is occurring as the relationship between church and state continues to undergo a legal transformation. "[T]hose who must make practical decisions about how and where we educate our children . . . and how we care for the least fortunate among us, do not enjoy [the luxury of watching and waiting as new principles emerge and work themselves pure]. They face formidable challenges in reconciling those concerns with appropriate limits on state power in dealing with religious entities." Lupu & Tuttle, *supra*, at 994. In their attempts to include and accommodate faith-based providers, Defendants have created an unworkable scheme that breaches the appropriate limits on state power. Defendants enable faith-based providers to effectively discriminate on the basis of religious affiliation in their admission of preschoolers but, at the same time, deny Plaintiff Preschools an explicit exemption from the related aspect of the equal-opportunity requirement. Defendants have provided no compelling interest for their course of conduct. As a result, Plaintiff Preschools succeed on the merits of their fifth claim with respect to the religious-affiliation aspect of the equal-opportunity requirement. Plaintiffs otherwise fall short on their first, fourth, and fifth claims.

## C.  Claim Seven

Plaintiffs' seventh claim is brought under the Establishment Clause for "denominational favoritism." Plaintiffs allege Defendants' policies favor other religious denominations because they allow faith-based preschools to prioritize their congregation members, but Plaintiff Preschools would like to give admissions preference to the children of all members of the

Catholic Church and believe they are unable to do so. I concluded above that Defendants'

creation and implementation of the congregation exception violates Plaintiffs' free-exercise

rights. Since I grant a related preliminary injunction and award nominal damages below, the only

additional relief Plaintiffs seek under this claim is a declaration, which I need not provide.

Though I am doubtful of Plaintiffs' expansive reading of *Larson v. Valente*, 456 U.S. 228, 245

(1982), *see, e.g.*, *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008)

("[W]hen the state passes laws that facially regulate religious issues, it must treat individual

religions and religious institutions 'without discrimination or preference' . . . ." (quoting New

York Constitution of 1777, art. XXXVIII, reprinted in 5 The Founders' Constitution, at 75)), I

decline to exercise my discretion to consider whether Defendants have violated the

Establishment Clause.

### D.  Claim Six

Plaintiff Preschools' sixth claim asserts a violation of their free-speech rights based on

two theories: that the Universal Preschool Program forces them to accept members who oppose

the purposes of their group (expressive association) and thus compels them to speak messages

against their will (compelled speech). While similar and both grounded in the First

Amendment—and some consider compelled speech a corollate to the right to expressive

association—their analyses are slightly different. Because the determination regarding expressive

association generally is more complex, I begin there.

### 1. Plaintiffs' Arguments

The U.S. Supreme Court has determined that expressive association is an indispensable right, which secures other speech rights. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). Plaintiff Preschools maintain that, like the Boy Scouts of America in *Boy Scouts of America v. Dale*,[45] their association is expressive, and Defendants should not be able to require them to admit LGBTQ+ children and families as a condition of participating in the UPK Program because the presence of those children and families would undermine the expressive message Plaintiffs intend to convey. *See* 530 U.S. 640 (2000). I agree with Plaintiffs that, based on Supreme Court precedent, their association likely is expressive. *See id.* at 641 (observing that plaintiff organization engages in expressive association "when its adult leaders inculcate its youth members with its value system"). But my agreement ends there. The rest of Plaintiff Preschools' argument poses significant problems, including that the facts and laws implicated in *Dale* do not align with those in the instant litigation.

In *Dale*, the Boy Scouts of America revoked the membership of a former Eagle Scout and an assistant scoutmaster, James Dale, after he publicly disclosed his sexual orientation as

---

[45] Plaintiffs also refer to *Slattery v. Hochul*, which held that a crisis pregnancy center stated a plausible claim that a New York "statute unconstitutionally burdens its right to freedom of expressive association—as guaranteed by the First and Fourteenth Amendments—by preventing it from disassociating itself from employees who, among other things, seek abortions." 61 F.4th 278, 283 (2d Cir. 2023). Even if this precedent were binding, it is inapposite for at least one of the same reasons as *Dale*, which is that no benefit is being conditionally offered by the government. Second and relatedly, *Slattery* did not involve a non-discrimination policy that, among other things, was engineered to ensure equal opportunity regardless of membership in certain protected classes.

homosexual and promoted gay rights. *Id.* at 644. The Boy Scouts justified Dale's expulsion on the grounds that it "is a private, not-for-profit organization engaged in instilling its system of values in young people" and "homosexual conduct is inconsistent with the values it seeks to instill." *Id.* James Dale filed suit, seeking readmission to the Boy Scouts of America under the theory that his removal violated New Jersey's public accommodation laws. The Boy Scouts of America petitioned for certiorari after the New Jersey Supreme Court held that the organization had to readmit Dale. The United States Supreme Court accepted the case and reversed, holding that compelling Dale's admission violated the expressive associational rights guaranteed by the First Amendment to the Constitution. *Id.* at 656.

The circumstances here are entirely different.[46] First and most importantly, the state of New Jersey sought only to enforce its public accommodations law in *Dale*, 530 U.S. at 644. Here, the government is conferring a benefit on the schools themselves and attaching conditions for receipt of that benefit.

Second, admission to private clubs, such as the Boy Scouts of America is entirely elective with no encouragement of participation from the state. Education of Colorado's youth, by

---

[46] Initially, I question whether the equal-opportunity requirement targets expressive activity at all. Precedent prescribes a case-specific assessment of the regulated activity in determining whether the implicated regulation affects speech or affects conduct that, in turn, indirectly impacts speech. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986) (determining whether speech rights apply first requires finding whether the conduct with a "significant expressive element" drew the legal remedy or the regulation "has the inevitable effect of singling out those engaged in expressive activity"). Were it not the case that Plaintiff Preschools engage in substantially the same activity as in *Dale*—youth instruction involving organizational value, I likely would find the equal-opportunity requirement does not target expressive activity at all. Indeed, the legal analysis in *Dale* is so brief and all-encompassing, "[i]t is hard to imagine an association that is not expressive under Dale's criteria." Andrew Koppelman, *Signs of the Times: Dale v. Boy Scouts of America and the Changing Meaning of Nondiscrimination*, 23 Cardozo L. Rev. 1819, 1822 (2002). When a bar on discrimination is a restriction that predominantly targets conduct, speech rights are not relevant unless the conduct itself is inherently expressive. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62, 65-66 (2006).

contrast, is strongly promoted by the State at the preschool stage—the program is literally intended to be "universal"—and thereafter is compulsory.[47]

Third, the Boy Scouts of America sought to determine who would be providing instruction to youth members.[48] James Dale was "the copresident of a gay and lesbian organization at college and remains a gay rights activist." *See id.* at 653. Here, the members the organization seeks to exclude, people whose presence allegedly would impair Plaintiffs' associative expression, are children. Preschool children are not (yet) group leaders, holding authority within the organization itself, and the First Amendment does not apply the same for children as for adults generally, particularly "in light of the special characteristics of the school environment." *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 187 (2021) (quoting *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266, (1988)). While Plaintiff Preschools may also associate with parents in educating their children, parents' conduct or beliefs cannot be attributed to the children Plaintiff Preschools seek to exclude. To withhold a benefit for children on a parent's status (or even the parent's actions) is typically offensive to the Constitution. *Cf. Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972) (holding, in the context of equal protection jurisprudence, "[t]he status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage[, b]ut visiting this condemnation on the head of an infant is illogical and unjust").

---

[47] Colorado mandates school attendance, but only for children above the age of six. *See* Colo. Rev. Stat. § 22-33-104.

[48] As explained above, the only policy that would impact Plaintiff schools' employment decisions for teachers and other staff is contained in Paragraph 18(B), which Defendants have indicated was included by accident and would not be enforced. *See* Trial Tr. (Odean) 231:8-232:2; Trial Tr. (Cooke) 148:7-12. Thus, I have found this portion of Plaintiffs' sixth claim to be moot.

Fourth, the rights of gender diverse individuals were not considered in *Dale*. It has become clearer that transgender members of the LGBTQ+ community constitute a "discrete and insular minority," warranting basic protections. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ("We agree with the Seventh and now Eleventh Circuits that when a 'School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate,' the policy necessarily rests on a sex classification.") (quoting *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017)); *Griffith*, 2023 WL 2242503, at *9 ("This Court has little trouble stating that the Tenth Circuit needs to revisit its holding in *Brown v. Zavaras*[, 63 F.3d 967 (10th Cir. 1995)]," which, after applying rational basis review, rejected a transgender female inmate's claim that, by withholding estrogen treatment, her equal protection rights were violated.).[49] Based on these distinctions it is clear *Dale* cannot and should not be extended to the facts of this case.

---

[49] Another point that should be considered is the changing legal landscape and social acceptance for LGBTQ+ rights. The recognition and acceptance of same sex relationships alluded to in the *Dale* dissent has been more fully realized than Justice Stevens could have predicted in the year 2000. *Dale*, 530 U.S. at 699-700 (listing examples of acceptance of homosexual people and disapproval of discrimination against them) (Stevens, J., dissenting). Indeed, the present-day Boy Scouts of America "welcome all eligible youth, regardless of race, ethnic background, *gender or orientation*, who are willing to accept Scouting's values and meet any other requirements of membership" and declare "[p]rejudice, intolerance and unlawful discrimination are unacceptable within the ranks of the Boy Scouts of America." Membership Policy, About the BSA, THE BOY SCOUTS OF AMERICA, https://www.scouting.org/about/membership-policy/. This was not the case when *Bowers v. Hardwick* was good law. 478 U.S. 186, 192 (1986) (upholding criminal statute outlawing sodomy because a "fundamental right to homosexuals to engage in acts of consensual sodomy" was neither "implicit in the concept of ordered liberty" nor "deeply rooted in this Nation's history and traditions"), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003). Eventually, however, our jurisprudence acknowledged the legitimacy of same sex marriage and that "[w]ithout the recognition, stability, and predictability marriage offers, . . . children [of same-sex couples] suffer the stigma of knowing their families are somehow lesser." *Obergefell v. Hodges*, 576 U.S. 644, 668 (2015).

Plaintiffs second and related argument—that the limitation on their ability to associate with whom they please forces them to convey a particular message with which they disagree—ties in another factually dissimilar case, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). Like *Dale*, *303 Creative* evaluated the application of a public accommodations law, not the extension of material state benefits. Additionally, the regulation at issue in *303 Creative* was determined to restrict "pure speech," a position the Tenth Circuit Court of Appeals found the State of Colorado had conceded. 600 U.S. at 583. Assuming the preschool admissions process implicates speech, the equal-opportunity requirement still cannot reasonably be said to apply to "pure speech," as in *303 Creative*.

I distinguished the expressive association at issue in *Dale* on the grounds that associating with LGBTQ+ children and the children of LGBTQ+ parents is not likely to send the same message as "an avowed homosexual and gay rights activist in an assistant scoutmaster's uniform" in *Dale*. 530 U.S. at 655-56. This case is similarly distinguishable from *303 Creative* with regard to compelled speech because it is not clear here how Plaintiff Preschools' preferred message would be impaired. To the extent that any message is being forcibly expressed, it does not conflict with the preschools' preferred message.[50] Having these children at the school, even if the school has ideological or otherwise substantive criticisms of the status of the children or their parents, does not, in and of itself, convey agreement with that particular status. This is very different from the circumstances of the plaintiff in *303 Creative*, who sought to make websites to celebrate the marriages of only couples whose union she personally endorsed. *303 Creative*, 600

---

[50] I recognize that religious dogma is inscrutable within our courts, and it is beyond the role and ability of the federal judiciary to interpret religious doctrine or determine its legitimacy or centrality to religious exercise. *See supra* note 19. Accordingly, I focus my analysis on the contours of the potential message sent by agreeing to and complying with the equal-opportunity requirement.

U.S. at 581. If providing a service to someone can express endorsement of that person's views, in terms of the message and degree of implicit support of that message conveyed via association, the plaintiff in *303 Creative* is in a fundamentally different position than the Plaintiff Preschools. One cannot reasonably dispute that a website made by a sole member-owned LLC that exists only to positively describe a union between a woman and another woman is much more likely to express a message of LGBTQ+ acceptance than having a preschool child present on a school campus who may or may not be a member of the LGBTQ+ community or *be a part of a family with a member in that community*.

This point is further supported by the fact that the implicit message conveyed here is not that Plaintiff Preschools support tolerance of the LGBTQ+ community, but rather that participating provider schools receive money under a program that supports giving every child "an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability." Colo. Rev. Stat. § 26.5-4-205(2)(b). Again, the message is not that Plaintiff Preschools necessarily endorse this policy. There are a number of reasons why a school may opt to accept the benefit and any one of those offer a competing message that, per Plaintiffs' expansive theory of compelled speech, could be reasonably understood by someone else to be the transmitted message. Plaintiff Preschools' signing of the UPK Agreement and compliance with the equal-opportunity requirement would not directly conflict or otherwise contravene the Plaintiffs' preferred messages.

### 2.  The Equal-Opportunity Requirement as a Condition on Benefits

Properly viewed, the equal-opportunity requirement is a constitutionally permissible condition on a State benefit.[51] Ordinarily, the state is granted tremendous leeway to determine how to allot funding or other assistance and, to further the promotion of specific values, may choose to fund one project over another. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 192, 196-200 (1991) (explaining that "the Government 'may make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds'" (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977))). It may similarly condition receipt of benefits on a recipient's willingness to comply with certain regulations. *See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985) (recognizing the state's right "to preserve the property under its control for the use to which it is lawfully dedicated"). These regulations may restrict First Amendment freedoms. *See Healy v. James*, 408 U.S. 169, 189 (1972) (noting that a club at a state college may access facilities and other resources to engage in "[a]ssociational activities [except] where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education"); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights.").

---

[51] As discussed above, recent Supreme Court precedent applying the Free Exercise Clause has shown that denying benefits to organizations that are religious in nature while providing such benefits to their secular counterparts, does not pass muster without a state interest of the "highest order." *See Trinity Lutheran*, 582 U.S. at 458 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)); *see also Carson*, 596 U.S. at 789; *Espinoza*, 591 U.S. at 484. The Court in these cases did not assess whether a condition like the equal-opportunity requirement on a state benefit constitutes an improper restriction on the right to expressive association.

However, such regulations may at times prove unduly restrictive or otherwise run afoul of the Constitution. *See, e.g., Speiser v. Randall*, 357 U.S. 513, 518 (1958) (holding that a California regulation conditioning a property tax exemption on the recipient affirming not to advocate for forcibly overthrowing the government was an unconstitutional restriction on speech since "[t]o deny [a tax] exemption to claimants who engage in speech is in effect to penalize them for such speech"). Conditions tied to government benefits are reviewed more critically if the conditions restrict speech as opposed to general conduct not otherwise shielded by the Constitution. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[R]estrictions on protected expression are distinct from restrictions . . . on nonexpressive conduct. . . . [T]he First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech.").

 "Compelled speech" generally may be anathema to the First Amendment, but the government may "regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995). "[T]he distinction that has emerged from [the Supreme Court's] cases is between conditions that define the limits of the Government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *See Agency for Int'l Dev.*, 570 U.S. at 214-15.

Assuming that the equal-opportunity requirement is a restriction that limits speech or inherently expressive conduct, *see supra* note 46, I must assess how this restrictive condition relates to the purpose and function of the program at issue. As I explained above, the UPK program was implemented in furtherance of the Department's aim to "[p]rovide high-quality,

voluntary, affordable early childhood opportunities for all children in Colorado." Colo. Rev. Stat. § 26.5-1-102(1)(d). The UPK statute was developed and enacted with the recognition that it was important "that all families had . . . equitable access to preschool programs of their choosing, and [that they] would not be discriminated against based on any of the factors" in the equal-opportunity requirement. Trial Tr. (Cooke) 142:25-143:3. The requirement serves Defendants' interests of ensuring eligible children and their families do not face discriminatory barriers to publicly funded preschool education and protecting children from discrimination.

The equal-opportunity requirement is tied logically and closely to the interests the UPK Program serves. It is limited to preschool services only and does not seek to impact participating providers' admissions policies outside of the preschool context. Defendants even put on evidence that the Department does not have any intention of interfering with the curriculum of faith-based providers. *See* Trial Tr. (Odean) 232:25-233:3. Significantly, the equal-opportunity requirement was neither contemplated nor implemented because Plaintiff Preschools engage in speech. Far from suggesting Defendants harbored religious animus toward Plaintiff, there is no indication in the record that the equal-opportunity requirement was intended to suppress any ideas or speech generally.

This case bears some similarities to (and key differences from) a recent case involving a Maryland school voucher program, *Bethel Ministries, Inc. v. Salmon*. No. CV SAG-19-1853, 2022 WL 111164, at *7 (D. Md. Jan. 12, 2022). There, when the plaintiff school reapplied for the voucher program, its application was denied because its handbook was found to violate the program's nondiscrimination requirement against LGBTQ+ students. *Id.* The court found the defendants' actions constituted an unconstitutional viewpoint-based restriction on speech. *Id.* Here, while Plaintiff Preschools possess a handbook that expresses its views regarding marriage

and gender identity, Defendants' implementation and enforcement of the equal-opportunity requirement is not responsive to any of Plaintiff Preschools' speech. Even if speech from schools somehow did inform the incorporation of the equal-opportunity requirement, the equal-opportunity requirement has not been applied to Plaintiff Preschools for their specific speech, making the regulation viewpoint neutral. Consequently, Plaintiff Preschools' related activity is subject to regulation. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992) ("Where the [State] does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.")

I conclude Plaintiffs' arguments that the equal-opportunity requirement unconstitutionally interferes with their expressive association and compels them to send a disfavored message are without merit. When a community, via government, elects to confer a benefit on a school, the values that community holds, such as preventing the exclusion of certain historically disfavored groups, may—and in some cases must—be placed as a limited condition on receiving the related benefit. The equal-opportunity requirement, including Defendants' implementation of it, does not seek to limit speech whatsoever and is confined to the UPK program itself. Under the Free Speech Clause, the requirement constitutes a constitutional condition on a government benefit.

## E.  Relief

As described above, Plaintiffs seek three types of relief: declaratory judgment, a permanent injunction, and nominal damages. I find all three, including a limited permanent injunction, are warranted based on Plaintiffs' partial success on their fifth claim.

### 1.  Declaratory Judgment

Pursuant to 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Plaintiffs are entitled to a declaration that Defendants' application of the religious-affiliation aspect of the equal-opportunity requirement has violated their rights guaranteed by the Free Exercise Clause of the First Amendment.

### 2. Injunctive Relief

"For a party to obtain a permanent injunction, it must prove: '(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.'" *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quoting *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003)). Although the permanent injunction sought by Plaintiffs mentions the Sheleys, it relates only to demands Defendants may not place on Plaintiff Preschools. *See* Pls.' Proposed FOFCOL at 69-70 (prohibiting Defendants from conditioning participation on agreeing to provide or providing an equal opportunity for children to enroll and receive preschool services, agreeing not to discriminate, and agreeing not to violate or violating their religious exercise in student admission and retention decisions and school operations). Because the proposed injunction involves Defendants' actions targeted at Plaintiff Preschools, I review these factors as they apply to Plaintiff Preschools principally.

I have concluded that Plaintiffs have succeeded on their fifth claim in part—they have established that the religious-affiliation aspect of the equal-opportunity requirement is not generally applicable and does not satisfy strict scrutiny. I have also concluded that Plaintiffs have

not succeeded on any other aspect of their claims. "In the First Amendment context, 'success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)).[52] And that is the case here.

### i. Irreparable Harm

Generally, "[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Awad*, 670 F.3d at 1131 (quoting *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001)). Plaintiffs contend that, since the inception of the UPK Program, they have suffered and continue to suffer irreparable injury because they have been unable "to participate in an otherwise-available government program without having to forswear their religious exercise." Pls.' Proposed FOFCOL at 66-67. I have found Defendants violated Plaintiffs' constitutional rights by exercising discretion to grant exemptions from the religious-affiliation aspect of the equal-opportunity requirement but refusing to grant Plaintiff Preschools a similar exemption. The record indicates that, if an injunction is not granted, Plaintiff Preschools will not participate in the UPK Program and will not receive the associated benefits.[53] The benefits that Plaintiff Preschools will lose could be estimated, but it would be difficult to ascertain an adequate amount, as there was evidence that

---

[52] The Tenth Circuit has articulated this parallel as part of the standard for preliminary injunctions. In this case, however, I see no reason why the analysis would differ for a permanent injunction.

[53] While it is not clear whether the limited injunction I grant here will result in Plaintiff Preschools' participation in the UPK Program, the injunction remedies the specific constitutional violation found and eliminates at least one barrier to Plaintiff Preschools' participation.

their nonparticipation in the UPK Program has dissuaded additional children from enrolling and prevents the preschools from competing with other providers. Consequently, Plaintiff Preschools have shown they are likely to suffer irreparable injury from their nonparticipation in the Program if an injunction is not granted.[54]

Defendants contend Plaintiff Preschools cannot show irreparable harm because they "are unaware of ever having enrolled an LGBTQ+ preschooler, of ever having received an inquiry about preschool enrollment from an LGBTQ+ family, or of ever having been the subject of a complaint from an LGBTQ+ student or family." Defs.' Proposed FOFCOL at 62. But the harm established by Plaintiff Preschools—for their fifth claim at least—is their nonparticipation in the UPK Program, not that they may potentially face some future enforcement action by the Department. That they will miss out on the benefit of participating in the UPK Program is sufficient to establish irreparable injury in this case.

### ii.  Balance of Harms and Public Interest

The last two factors to be considered in determining whether a permanent injunction should issue are the threatened injury to the Plaintiff Preschools weighed against the harm the injunction might cause Defendants and any adverse effect the injunction might cause to the

---

[54] Because the harm at issue here involves a monetary government benefit, I am not convinced the determination that Plaintiffs' rights have been violated mandates a finding of irreparable harm. Similarly, I am not certain irreparable harm should be a given conclusion when there is no evidence that Plaintiffs experienced any coercive effect on their religious exercise. I recognize, however, that the Tenth Circuit has, in recent history, used broad language presuming irreparable harm when any constitutional violation is found. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill." (citing *Awad*, 670 F.3d at 1131)). I do not analyze how this language would or should apply here because I find Plaintiff Preschools have otherwise shown irreparable injury.

public interest. When the government is a party in the case and opposes the injunction, the government's interest and the public interest are assumed to align such that the third and fourth permanent-injunction factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

As discussed above, Defendants did not present any evidence of the harm the Department or the public would experience if Plaintiff Preschools are not obligated to comply with the religious-affiliation aspect of the equal-opportunity requirement. Considering Defendants' failure and the corresponding violation of Plaintiffs' free exercise rights, the last two permanent-injunction factors weigh in favor of issuing a limited injunction exempting Plaintiffs from the religious-affiliation aspect of the equal-opportunity requirement. *See Free the Nipple*, 916 F.3d at 807 ("[I]t's always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks and citation omitted)). Plaintiffs' lack of success on their remaining theories and claims prevents the full injunction they seek from being granted, as does the fact that the public policy backed by the State would be undermined and the State's compelling interest would suffer.

While I generally agree with Defendants that "the legislature and voters are in a better position than Plaintiffs or this Court to determine the public interest," Resp. to Mot. for Summ. J. at 37, ECF No. 77 (citing *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016)), the constitutional violation found here involves unelected government employees misconstruing a generally applicable statute. This is to say that, whatever democratic support might ordinarily bolster the perception that the government's actions reflect public sentiment, such support is diluted in this specific context. Consequently, I conclude it is appropriate to issue the permanent injunction set out in the final section of this Order.

### 3.  Nominal Damages

The Tenth Circuit also requires an award of nominal damages upon a finding of a constitutional violation. *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) ("[T]he rule seems to be that an award of nominal damages is mandatory upon a finding of a constitutional violation . . . ."). Plaintiffs are, therefore, entitled to nominal damages in the amount of $1.

## III. Order

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS ORDERED:

- Plaintiffs' Claims Two and Three and the part of Claims One, Four, and Six that rely on the application of Paragraph 18(B) are DISMISSED AS MOOT.

- Judgment SHALL ENTER in favor of Plaintiffs and against Defendants on Plaintiffs' fifth claim with respect to only the religious-affiliation aspect of the equal-opportunity requirement.

- It is DECLARED that:

    The application by Defendants Lisa Roy and Dawn Odean, acting in their official capacities on behalf of the Colorado Department of Early Childhood, of the religious affiliation aspect of the equal-opportunity requirement set out in Colorado Revised Statute § 26.5-4-205(2)(b) and in the Colorado Universal Preschool Program Service Agreement violates Plaintiffs' rights secured by the Free Exercise Clause of the First Amendment to the U.S. Constitution.

- Additionally, the following permanent injunction is ISSUED:

    The Court immediately and permanently enjoins Defendants Lisa Roy and Dawn Odean, acting in their official capacities on behalf of the Colorado Department of

Early Childhood, from requiring, as a condition for participation in the Colorado Universal Preschool Program, that the preschools operated by Plaintiffs St. Mary Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood agree to provide or provide eligible children an equal opportunity to enroll and receive preschool services regardless of religious affiliation for as long as Defendants allow exceptions from the religious affiliation aspect of the equal-opportunity requirement set out in Colorado Revised Statute § 26.5-4-205(2)(b) and in the Colorado Universal Preschool Program Service Agreement.

- Defendants SHALL PAY Plaintiffs $1 in nominal damages.

- On all other issues and claims brought in this case, Judgment SHALL ENTER in favor of Defendants and against Plaintiffs.

DATED this 4th day of June, 2024.

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE